No. 23-50869

# In the United States Court of Appeals for the Fifth Circuit

STATE OF TEXAS,

*Plaintiff-Appellant*

*v.*

UNITED STATES DEPARTMENT OF HOMELAND SECURITY; ALEJANDRO MAYORKAS, SECRETARY, U.S. DEPARTMENT OF HOMELAND SECURITY; UNITED STATES CUSTOMS AND BORDER PROTECTION; UNITED STATES BORDER PATROL; TROY MILLER, ACTING COMMISSIONER, U.S. CUSTOMS AND BORDER PROTECTION; JASON OWENS, IN HIS OFFICIAL CAPACITY AS CHIEF OF THE U.S. BORDER PATROL; JUAN BERNAL, IN HIS OFFICIAL CAPACITY AS ACTING CHIEF PATROL AGENT, DEL RIO SECTOR UNITED STATES BORDER PATROL,

*Defendants-Appellees.*

On Appeal from the United States District Court
for the Western District of Texas, Del Rio Division

## PLAINTIFF'S OPPOSED EMERGENCY MOTION FOR AN INJUNCTION PENDING APPEAL AND FOR A TEMPORARY ADMINISTRATIVE INJUNCTION

*(Counsel Listed on Inside Cover)*

KEN PAXTON
Attorney General of Texas

BRENT WEBSTER
First Assistant Attorney General

Office of the Attorney General
P.O. Box 12548 (MC 059)
Austin, Texas 78711-2548
Tel.: (512) 936-1700
Fax: (512) 474-2697

AARON L. NIELSON
Solicitor General
Aaron.Nielson@oag.texas.gov

ARI CUENIN
Deputy Solicitor General

J. ANDREW MACKENZIE
Assistant Attorney General

Counsel for Plaintiff-Appellant

# Certificate of Interested Persons

No. 23-50869

### State of Texas,
*Plaintiff-Appellant*

*v.*

### United States Department of Homeland Security; Alejandro Mayorkas, Secretary, U.S. Department of Homeland Security; United States Customs and Border Protection; United States Border Patrol; Troy Miller, Acting Commissioner, U.S. Customs and Border Protection; Jason Owens, in his official capacity as Chief of the U.S. Border Patrol; Juan Bernal, in his official capacity as Acting Chief Patrol Agent, Del Rio Sector United States Border Patrol,
*Defendants-Appellees.*

Under the fourth sentence of Fifth Circuit Rule 28.2.1, Appellant, as a governmental party, need not furnish a certificate of interested persons.

/s/ Aaron L. Nielson
Aaron L. Nielson
*Counsel of Record for*
*Plaintiff-Appellant*

i

## Nature of Emergency

As the district court documented at length, federal immigration officials persist in undermining Texas's border-security efforts. In Eagle Pass, Texas deployed rolls of concertina wire ("c-wire") as part of Governor Greg Abbott's efforts to tackle illegal-entry hotspots. Since September 2023, however, Defendants have cut and torn Texas's wire fencing to wave thousands of unlawful migrants into the interior of the country—without Texas's consent and in the absence of any medical exigency. Accordingly, Texas brought this suit seeking a preliminary injunction to prevent ongoing damage to its property.

In response, Defendants took matters into their own hands and accelerated their damage to Texas's property. After Texas sought injunctive relief, Defendants brought a forklift to destroy Texas's c-wire fence. Then, after Texas sought a temporary restraining order, Defendants returned with another forklift just 20 minutes later to smash Texas's fence into the ground. The district court granted a TRO while it considered Texas's motion for a preliminary injunction.

After holding several hearings and considering supplemental briefing, the district court specifically identified the "culpable and duplicitous conduct" that animates the Biden Administration's open-border policies, which betrays an "utter failure . . . to deter, prevent, and halt unlawful entry into the United States." App. P. 6, 28. The district court also found that Defendants' conduct inflicts "irreparable harm" upon Texas and puts human lives in danger by enticing unlawful migrants to "undertake the dangerous task of crossing the river" rather than going to a formal port of entry. *Id.* at 9, 34. And the district court confirmed that Texas will likely

prevail on the merits of its common-law trespass claim. *Id.* at 10-13. Nonetheless, the district court (*id.* at 15)—based on a technical question of sovereign immunity— determined that it was powerless to convert Texas's TRO into a preliminary injunction. Specifically, the district court determined that despite the categorical waiver of sovereign immunity for injunctive remedies, Congress nonetheless implicitly retained immunity for certain suits "seeking relief other than money damages." 5 U.S.C. § 702. In so doing, the district court created a split of authority. This Court—"always chary to create a circuit split," *Alfaro v. Comm'r*, 349 F.3d 225, 229 (5th Cir. 2003)—is unlikely to repeat that error on appeal.

An injunction pending appeal is urgently needed, moreover, because the district court denied Texas's motion for a preliminary injunction just minutes before the TRO expired at 11:59 PM on November 29, 2023. Texas immediately appealed and asked the district court to protect Texas's property rights with an injunction pending appeal by 9 AM on Monday, December 4, 2023. Fed. R. App. P. 8(a)(1)(C); App. Q.; App. R. Because the district court failed to afford the relief requested, Texas now asks this Court for an emergency injunction pending appeal. Fed. R. App. P. 8(a)(2)(A)(ii); 5th Cir. R. 27.3. Additionally, or alternatively, Texas immediately requests a temporary administrative injunction by December 4, 2023, while the Court considers this emergency motion.

# Background

## I.  The District Court's Findings Regarding the Border Crisis

Following several evidentiary hearings, the district court concluded that "[t]he immigration system" is central to the "unique challenge[s]" at the U.S.-Mexico

border. App. P. 6. As the district court explained, "dysfunctional and flawed as it is, [the immigration system] would work if properly implemented." *Id.* The way it is currently being implemented, however, "serves no one." *Id.* Furthermore, the "number of Border Patrol encounters with migrants illegally entering the country has swelled from a comparatively paltry 458,000 in 2020 to 1.7 million in 2021 and 2.4 million in 2022"—with Border Patrol "on track to meet or exceed those numbers in 2023." *Id.* at 7 (citation omitted).

Unfortunately, "organized criminal organizations take advantage of these large numbers," and "conveying all those people to the doorstep of the United States has become an incredibly lucrative enterprise for the major Mexican drug cartels." *Id.* Indeed, trafficking across the southern border has metastasized "from a scattered network of freelance 'coyotes' to a multi-billion-dollar international business controlled by organized crime, including some of Mexico's most violent drug cartels."[1] These cartels, which "have increasingly acquired a transnational dimension," are now the fifth largest employer in Mexico,[2] and operate as "potent paramilitary forces, with heavily armed mobile units able to stand their ground against the Mexican military."[3] At the same time, "the infrastructure built by the

---

[1] Miriam Jordan, *Smuggling Migrants at the Border Now a Billion-Dollar Business*, N.Y. Times (July 25, 2022), https://www.nytimes.com/2022/07/25/us/migrant-smuggling-evolution.html; *see also* App. P. 7 (taking notice of this article).

[2] Rafael Prieto-Curiel et al., *Reducing Cartel Recruitment Is the Only Way to Lower Violence in Mexico*, 381 Science 1312 (2023).

[3] William P. Barr, Opinion, *The U.S. Must Defeat Mexico's Drug Cartels*, Wall St. J. (March 2, 2023), https://www.wsj.com/articles/the-us-must-defeat-

cartels for human cargo can also be used to ship illegal substances, namely fentanyl." App. P. 7. "Lethal in small doses, fentanyl is a leading cause of death for young Americans and is frequently encountered in vast quantities at the border." *Id.*

Border towns like Eagle Pass are at the "epicenter" of this country's immigration problem. *Id.* at 8. According to Eagle Pass Mayor Rolando Salinas, Jr., the recent surge of border crossings is like "nothing that we've seen ever . . . to have so many people crossing in without consequence."[4] After roughly 14,000 people—about half of Eagle Pass's population—entered the city in less than two weeks, Mayor Salinas declared a state of disaster.[5]

## II. Operation Lone Star

Governor Abbott "launched Operation Lone Star in 2021 to aid Border Patrol in its core functions" at Texas's border with Mexico. App. P. 8. As part of this multi-front initiative, the Governor authorized the Texas Military Department ("TMD") to deploy c-wire fencing with the permission of landowners to deter and slow illegal crossings at hotspots like Eagle Pass. App. C. (Banks Decl.) ¶12. As the district court explained, "[t]he wire serves as a deterrent—an effective one at that." App. P. 8.

---

mexicos-drug-cartels-narco-terrorism-amlo-el-chapo-crenshaw-military-law-enforcement-b8fac731?mod=article_inline.

[4] Gaige Davila, *High Migration Through Texas Border Town of Eagle Pass Strains Resources*, NPR (Sept. 22, 2023), https://www.npr.org/2023/09/22/1201215460/high-migration-through-texas-border-town-of-eagle-pass-strains-resources.

[5] App. C. (Banks Decl.) ¶11; *see also* Alicia A. Caldwell & Michelle Hackman, *Migrants Overwhelm Texas City of Eagle Pass*, Wall St. J. (Sept. 21, 2023), https://www.wsj.com/politics/policy/migrants-overwhelm-texas-city-of-eagle-pass-531879cf.

Indeed, "the wire was so successful that illegal border crossings dropped to less than a third of their previous levels." *Id.* The federal government thus also uses c-wire fencing to deter illegal crossings and route migrants to lawful ports of entry. App. B. (Storrud Decl.) ¶7. Indeed, Texas regularly erects c-wire at the border in *collaboration* with Border Patrol and CBP. *Id.* ¶¶2-3. "[S]tate agents have given concertina wire to federal agents to assist them in deploying wire fencing, and federal agents have given concertina wire to state agents to assist them in doing the same." *Id.* ¶4; *see also id.* ¶¶8-15; App. P. 8 ("By all accounts, Border Patrol is grateful for the assistance of Texas law enforcement, and the evidence shows the parties work cooperatively across the state, including in El Paso and the Rio Grande Valley.").

As Eagle Pass began experiencing an unprecedented surge in illegal crossings, however, the federal government flipflopped. Eyewitness observers reported that the cuttings "facilitate the surge of migrants into Eagle Pass." App. C. ¶¶13-14. As the district court documented, video evidence shows federal agents "cutting multiple holes in the concertina wire for no apparent purpose other than to allow migrants easier entrance further inland." App. P. 9. On more than 20 occasions between September 20 and October 10, 2023, TMD recorded CBP officials cutting breaches in Texas's fence. App. D. (Garcia Decl.) ¶¶12-13. When Texas officers tried to document this ongoing destruction, CBP agents told them to "back the f*** off," App. H. 26 n.55, and claimed they are "not authorized to take any pictures," App. E. (Cooney Decl.) ¶14.

On October 26, 2023, two days after Texas filed this suit, photos show Defendants escalating matters by "trading bolt cutters for an industrial-strength

telehandler forklift to dismantle Texas's border fence." App. I. 2. TMD Officer Brian Cooney spotted several hundred migrants on Mexico's side of the Rio Grande. App. E. ¶5. After the group crossed the river, Border Patrol used a forklift to pull Texas's c-wire out of the ground, suspending it aloft for approximately 20 minutes while over 300 migrants traversed the gap. *Id.* ¶¶6-7. Border Patrol had airboats in the water at the time, none of the migrants appeared to be in distress or in need of medical attention, and no call was made for a medical team. *Id.* ¶10.[6] Officer Cooney took this picture of the scene, *id.* at 6:

---

[6] When medical issues occur, Texas does not dispute that the wire can be cut. *See* App. U. 12 n.2.



Texas promptly filed an emergency motion for a TRO to stop the Biden Administration's lawless conduct. Just 20 minutes later, however, TMD Officer Ortiz Diaz observed CBP officials use the forklift to repeatedly smash Texas's c-wire into the ground to facilitate entry of approximately 60 migrants, most of whom had not yet left Mexico's riverbank. App. F. (Diaz Ortiz Decl.) ¶¶6-8. Again, the Officer never witnessed any of the migrants in distress or in need of medical attention, and no call for a medical team was made. *Id.* ¶8.

## III. Procedural History

Texas sued on October 24, 2023, asserting claims for conversion and trespass and substantive APA violations, as well as *ultra vires* conduct. App. G. (Complaint). Texas also sought a preliminary injunction. App. H. While Defendants were using a forklift to tear Texas's fence out of the ground, Texas sought a TRO. App. I.; App. J. The district court issued a TRO on October 30, 2023, concluding that Texas will likely prevail on its trespass-to-chattel claim; ongoing interference with the State's proprietary interest caused irreparable harm; and the equitable balance favored the State. App. K. at 4-10. The TRO enjoined Defendants from tampering with Texas's fencing in the vicinity of Eagle Pass and carved out an exception—which Texas did not oppose—for "provid[ing] or obtain[ing] emergency medical aid." *Id.* at 4, 11; App. M. 1.

At a November 7, 2023, hearing, testimony confirmed that Defendants' fence cutting was not precipitated by medical exigency. Michael Banks, the Texas Border Czar, provided an eyewitness account of federal agents waving migrants through

Texas's dismantled fencing. Rather than apprehend them, "migrants were led through this hole and pointed a mile down the road and entrusted that they're going to just report there." App. L. (Nov. 7 Hrg. Tr.) 84. Nor were the migrants discouraged from making the crossing. Federal agents patrolling the Rio Grande by boat "literally usher[ed] them" across. *Id.* at 85. Banks testified that when he confronted the deputy patrol agent on the scene, the patrol agent was unable to explain his actions. But the agent promised more destruction nonetheless, telling Banks: "If you close the wire, I will f'ing cut it all; I will tie a strap to it and will rip it all out of here." *Id.*; *see also* App. P. 9 (district court findings).

The TRO was extended, initially by order and then by party agreement, until November 29, 2023. App. N. The district court also ordered supplemental briefing and the production of certain documents before a second hearing. App. M.

On November 29, the district court made extensive findings supporting Texas. As relevant here, the district court concluded that: Texas has "direct proprietary interests" in its property, App. P. 12; Defendants' conceded "destruction of . . . property" that is not theirs cannot be justified based on "statutory duties they are so obviously derelict in enforcing" given their "utter failure . . . to deter, prevent, and halt unlawful entry into the United States," *id.* at 28; injunctive relief is "the only appropriate remedy" for Defendants' "continuing or future" interference with that property interest, *id.* at 13 n.7; Texas will suffer irreparable harm absent a preliminary injunction given Defendants' "culpable and duplicitous conduct" throughout this litigation, *id.* at 6, 34; and the public interest continues to favor an injunction because Defendants' policy "provide[s] ample incentive" for drug smuggling and dangerous

crossings, *id.* at 27-28, 34. The district court also documented the Defendants' "cynical arguments," and identified the Defendants' "disingenuous[ness]" in "argu[ing] the wire hinders Border Patrol from performing its job, while also asserting the wire helps." *Id.* at 10; *see also id.* at 9 n.4 (detailing federal official's "totally uncorroborated" assertions and "evasive answers and demeanor").

Despite those findings and conclusions of law, the district court determined it was powerless to convert the court's TRO into a preliminary injunction on Texas's common law claims. According to the district court, Congress's waiver of sovereign immunity in 5 U.S.C. § 702 does not apply here. *Id.* at 13. In reaching that conclusion, the district court acknowledged that its analysis may conflict with that of multiple circuit courts but concluded that those "decisions are not binding on this Court." *Id.* at 18 n.9. Regarding the APA claims, the district court concluded that Texas had not yet shown the existence of a policy, relying partly on documents reviewed *in camera* that are presently unavailable to Texas. *Id.* at 4-6, 30-33.

## STATEMENT OF JURISDICTION

The Court has jurisdiction to review a denial of a preliminary injunction under 28 U.S.C. § 1292(a)(1).

## ARGUMENT

Texas, like the federal government, may hold "the rights of an ordinary proprietor." *Fort Leavenworth Ry. Co. v. Lowe*, 114 U.S. 525, 527 (1885). Just as a private landowner could sue if federal officials deliberately tore down his fence every day, so can Texas. Texas sued to vindicate its property interests and to require the federal government to stay within the bounds Congress has set.

Defendants, however, take the remarkable position that they may destroy the property of others "without restraint." App. L. 207; *cf. id.* at 201, 216-17. The district court rightly rejected that view—partly because Defendants are *not* carrying out their statutory duties to deter unlawful entries into this Country, secure the border, and apprehend unlawful migrants. Congress assigned Defendants the "duty to control and guard the boundaries and borders of the United States against the illegal entry of aliens." 8 U.S.C. § 1103(a)(5). As the district court documented following multiple hearings, Defendants have subverted that mandate by inviting agents to destroy Texas's fencing. Defendants' ongoing trespass to property that is not theirs is not justified by medical exigency or any other common law privilege.

Federal Rule of Appellate Procedure 8(a) permits an injunction pending appeal upon the movant showing: (1) a strong likelihood of success on the merits; (2) irreparable injury without an injunction; (3) that the balance of hardships supports an injunction; and (4) that the public interest favors such relief. *Whole Woman's Health v. Jackson*, 13 F.4th 434, 441 (5th Cir. 2021). In proceedings below, the district court consistently found that Texas made the second, third, and fourth showings in support of injunctive relief. The district court has also found Texas's trespass claim meritorious. But it nevertheless denied a preliminary injunction because it mistakenly concluded that sovereign immunity tied its hands. In so doing, the district court parted ways with multiple circuits that read federal law by its terms to waive immunity for non-monetary suits like this one. As for the APA claims, the district court concluded that Texas had not established the existence of a policy or final agency action. But Texas has pointed to more than enough at this preliminary

11

injunction stage, and such showing is irrelevant to the State's *ultra vires* claim. This Court should grant an injunction pending appeal.

## I. Texas Will Likely Succeed on the Merits.

### A. Congress has waived federal sovereign immunity for Texas's conversion and trespass claims.

In its TRO, the district court already found—applying the same four factors applicable to a preliminary injunction—that Texas was entitled to preliminary relief on its common law claim for trespass to chattels. The district court stood by all of those conclusions in its recent preliminary injunction order. And Defendants have never argued that their pattern of destroying others' property anytime they deem it convenient to do so is somehow lawful under common law tort principles. The only reason the district court did not convert its TRO into a preliminary injunction was because it mistakenly believed that a broad statutory waiver of sovereign immunity must not be read to cover this case. That was legal error.

**1.** Texas common law furnishes a cause of action for conversion for "the unlawful and wrongful exercise of dominion, ownership, or control by one person over the property of another, to the exclusion of the same rights by the owner." *Pan Am. Petroleum Corp. v. Long*, 340 F.2d 211, 219-220 (5th Cir. 1964). It also furnishes a cause of action for trespass to chattels for wrongfully exercising dominion over the private property of another in a way that causes "actual damage" or "deprives the owner of its use for a substantial period of time." *Zapata v. Ford Motor Credit Co.*, 615 S.W.2d 198, 201 (Tex. 1981). Under either tort, the subjective intent or ill will of the tortfeasor is irrelevant. *Pan Am.*, 340 F.2d at 220 & n.24. "The important thing

is that a property right was violated." *Mountain States Tel. & Tel. Co. v. Vowell Constr. Co.*, 341 S.W.2d 148, 150 (Tex. 1960).

Texas holds a proprietary interest in its c-wire fence. *See, e.g.*, *State v. Cemex Constr. Materials S., LLC*, 350 S.W.3d 396, 398, 409 (Tex. App.—El Paso 2011, judgm't vacated w.r.m.) (conversion claim for construction materials). Yet Defendants "deliberately and intentionally used [wire cutters] in making a cut to the [fence]." *Mountain States Tel.*, 341 S.W.2d at 150. "The [fence] was lawfully in place" on state, municipal, or private land, *id.*, as Defendants stipulated for preliminary-injunction purposes, App. S. 14 n.3. So, "[t]he molesting or severing of the [fence] was a violation of a property right which gave rise to a cause of action regardless of negligence." *Mountain States*, 341 S.W.2d at 150. By cutting Texas's c-wire fence, Defendants have destroyed its utility as a barrier and deprived Texas of its use for a substantial time. Never in this litigation have Defendants contested *any* of that—even after the district court found Texas was likely to prevail. *See* App. S. 20-23; App. T. 10.

**2.** The district court already explained why Texas will likely win its common-law claims in its detailed TRO opinion. App. P. 13. But due to a mistaken understanding of sovereign immunity, the district court did not convert Texas's TRO into a preliminary injunction. In particular, the district court concluded that "the 1976 amendment to the [APA]" does not waive sovereign immunity here. *Id.* at 15.

The waiver at issue here provides:

> An action in a court of the United States seeking relief other than money damages and stating a claim that an agency or an officer or employee thereof acted or failed to act in an official capacity or under color of legal authority shall not be dismissed nor relief therein be denied on the ground that it is against the United States.

5 U.S.C. § 702. This text is clear—"[a]n action in" federal court "seeking relief other than money damages" means *any* action, whether under the APA, a different statute, or the common law.

The "leading treatise" on similar justiciability questions, *E.T. v. Paxton*, 41 F.4th 709, 717 (5th Cir. 2022), agrees: "Though codified in the APA, the waiver [in § 702] applies to *any suit*, whether or not brought under the APA." RICHARD FALLON ET AL., HART & WECHSLER'S THE FEDERAL COURTS AND THE FEDERAL SYSTEM 902 (7th ed. 2015) (emphasis added).

Circuit courts across the country likewise agree that § 702's waiver is broad and must be read under its plain terms. *See, e.g.*, *Apter v. HHS*, 80 F.4th 579, 589-91 (5th Cir. 2023) (rejecting effort to narrow § 702); *Blagojevich v. Gates*, 519 F.3d 370, 371-72 (7th Cir. 2008) ("Congress has waived sovereign immunity for most forms of prospective relief" because "§ 702 is a law of general application"); *Puerto Rico v. United States*, 490 F.3d 50, 57-58 (1st Cir. 2007) ("This waiver is for *all* equitable actions for specific relief against a Federal agency or officer acting in an official capacity" (quotation omitted)); *Trudeau v. FTC*, 456 F.3d 178, 186 (D.C. Cir. 2006) ("There is nothing in the language of the second sentence of § 702 that restricts its waiver to [certain] suits."); *see also Muniz-Muniz v. U.S. Border Patrol*, 741 F.3d 668, 672 (6th Cir. 2013); *Treasurer of N.J. v. U.S. Dep't of Treasury*, 684 F.3d 382, 400

(3d Cir. 2012); *Presbyterian Church (U.S.A.) v. United States*, 870 F.2d 518, 525 (9th Cir. 1989); *Red Lake Band of Chippewa Indians v. Barlow*, 846 F.2d 474, 476 (8th Cir. 1988); *B.K. Instrument, Inc. v. United States*, 715 F.2d 713, 724-25 (2d Cir. 1983).

**3.** The district court nevertheless ruled that § 702 does not mean what it says. That decision is mistaken and creates a square split of authority.

First, the district court noted that waivers are "strictly construed." App. P. 14, 19. From that premise, it reasoned that § 702 could not cover Texas's claims without specifically listing "common law claims for conversion or trespass to chattels" by name. *Id.* at 19. But that "rule[] of thumb" applies only to ambiguity about whether a waiver exists. *Sebelius v. Cloer*, 569 U.S. 369, 380-81 (2013). The district court never identified ambiguity in § 702; it claimed only that the plain-text reading would be "over-inclusive" and "broad[]." App. P. 19. Breadth, however, does not equal ambiguity. *See Bostock v. Clayton County*, 140 S. Ct. 1731, 1749 (2020). The Supreme Court readily enforces immunity waivers that employ "broad language." *United States v. Williams*, 514 U.S. 527, 531-36 (1995). And just months ago, the Supreme Court heard a breach of trust claim against the federal government brought by an Indian tribe seeking accounting of water rights—a form of non-monetary relief. *See Arizona v. Navajo Nation*, 143 S. Ct. 1804, 1812 (2023). Neither the Supreme Court nor the Ninth Circuit suggested that § 702 barred the suit because the statute lists no "common law claims for [breach of trust obligations]." *See Navajo Nation v. U.S. Dep't of Interior*, 26 F.4th 794, 804 (9th Cir. 2022) (instead holding that § 702's waiver "applied squarely to the Nation's breach of trust claim" (cleaned up)).

Second, the district court concluded § 702 cannot apply to state-law claims. App. P. 16-17. That limitation appears nowhere in the statutory text, which is why multiple circuits have already rejected it. In *Perry Capital LLC v. Mnuchin*, the D.C. Circuit rebuffed the Treasury Department's "argument that § 702 does not waive its immunity from suit for state law claims" because "the APA's waiver of sovereign immunity applies to any suit whether under the APA or not." 864 F.3d 591, 620 (D.C. Cir. 2017). Although Texas cited *Perry*, the district court never discussed it. Nor is the D.C. Circuit alone. The Third Circuit applied § 702's waiver in an unclaimed-property suit brought by seven States "making claims under state, not federal law." *Treasurer of N.J.*, 684 F.3d at 400-01; *see also id.* at 387-92 (describing state unclaimed-property acts' common law origin); *cf. Dep't of Army v. Blue Fox, Inc.*, 525 U.S. 255, 256-58, 263 (1999) (Section 702's waiver barred claims *not* because they rested on state law but because plaintiff sought monetary relief). The district court intimated that state-law claims under § 702 were uncommon. Yet it is also uncommon for federal officers to brazenly destroy someone else's property. Regardless, whether common or not, the key point here is that nothing in § 702's broad waiver of sovereign immunity bars such suits.

Third, the court suggested the Federal Tort Claims Act impliedly precludes torts-based suits under § 702 because that act provides "a separate, appropriate remedy"—namely, a claim for "money damages for prior harm to its fence." App. P. 19-20. That inverts the district court's holding elsewhere that "compensation for past injury cannot adequately redress the prospect of continuing or future harm" caused by Defendants' interference with state property. *Id.* at 13 n.7. Instead, "the

only appropriate remedy would be injunctive relief." *Id.* That correct conclusion that "only" injunctive relief could suffice in a case such as this underscores why the FTCA does not implicitly preclude an action under state law "in a court of the United States seeking relief other than money damages." 5 U.S.C. § 702.

Accordingly, at least two circuits have already rejected that the FTCA implicitly precludes suits like this one simply because it authorizes money damages for torts. That "reads too much into congressional silence." *Michigan v. U.S. Army Corps of Eng'rs*, 667 F.3d 765, 775 (7th Cir. 2011); *see also B.K.*, 715 F.2d at 727-28. Here, Texas "is bringing a different claim, seeking different relief, from the kind the [FTCA] addresses." *Match-E-Be-Nash-She-Wish Band of Pottawatomi Indians v. Patchak*, 567 U.S. 209, 222 (2012). That this suit and the FTCA deal with a "similar subject matter" (*i.e.*, torts) "is not itself sufficient" to "trigger a remedial statute's preclusive effect." *Id.* at 223. Plus, § 702 was designed to add to and "strengthen th[e] accountability" already provided by the FTCA. H.R. Rep. 94-1656, at 4 (1976), *reprinted in* 1976 U.S.C.C.A.N. 6121, 6124. Section 702 and the FTCA sit side-by-side.

Finally, the district court's view that "Congress did not intend for Section 702's waiver to be so over-inclusive" is unavailing. App. P. 19. Section 702's text speaks for itself. And in any event, the legislative record shows that the district court was wrong: "[T]he House and Senate Reports' repeated declarations that Congress intended to waive immunity for 'any' and 'all' actions for equitable relief against an agency make clear that no [other] limitations were intended." *Trudeau*, 456 F.3d at 187 (citations omitted). Those reports posed three limits on § 702's waiver: "First,

the amendment only waives sovereign immunity for actions in a federal court; second, such actions must seek non-monetary relief; and third, it is 'applicable only to functions falling within the definition of "agency" in 5 U.S.C. section 701.'" *Treasurer of N.J.*, 684 F.3d at 400 (citation omitted). "But the House Report does not state that there is a fourth limitation limiting the waiver of sovereign immunity." *Id.* The district court's contrary view was mistaken.

## B. Texas has shown a policy and final agency action supporting its APA claims.

The Court should grant Texas's motion because of the district court's misapplication of § 702. Once that error is corrected, the district court's own analysis demonstrates that Texas is entitled to injunctive relief. Separately, however, Texas is also independently entitled to such relief on its other claims.

"All the officers of the government, from the highest to the lowest, are creatures of the law and are bound to obey it." *United States v. Lee*, 106 U.S. 196, 220 (1882). Federal law permits judicial enforcement of this principle via the *ultra vires* doctrine, under which litigants may seek specific relief against "a federal officer acting in excess of his authority or under authority not validly conferred." *Larson v. Domestic & Foreign Com. Corp.*, 337 U.S. 682, 690-91 (1949). Federal statutes also permit judicial enforcement of this principle via the APA's prohibition of agency action that is "arbitrary [and] capricious," "not in accordance with law," or "in excess of statutory . . . authority." 5 U.S.C. § 706(2)(A), (C).

The district court's findings demonstrate that Defendants' conduct is unlawful. Despite claiming they must destroy Texas's fence to "apprehend" and "detain"

aliens, the district court found "[n]o reasonable interpretation of these definitions can square with Border Patrol's conduct." App. P. 26-27. "Opening fences does not restrain freedom of movement." *Id.* at 27. The district court thus rightly rejected the United States's "cynical" and "disingenuous" contentions. *Id.* at 10.

The district court nevertheless concluded that Texas had not "conclusively" proven the existence of a policy or final agency action. *Id.* at 29-33. Of course, conclusive proof is *never* required at the preliminary-injunction stage, which is "by its very nature . . . not fixed or final or conclusive." *SEC v. First Fin. Grp. of Tex.*, 645 F.2d 429, 435 n.8 (5th Cir. 1981) (citation omitted). Yet evidence showing Defendants' unabated practice of destruction, coupled with public statements that mirror their position in this litigation and the fact that agency leadership still has not ordered this destruction to cease, App. P. 30 n.14, shows that Defendants *have* settled on a policy. That policy unquestionably affects property owners' rights in the vicinity of the border near Eagle Pass by instructing agents that they are authorized to destroy property.

Defendants' own witness at the preliminary injunction hearing, moreover, attested to a policy authorizing destruction of Texas's fence absent medical exigency. App. L. 137-40, 150. Defendants' counsel agreed "there's a policy, at least in" Eagle Pass. *Id.* at 217. Defendants suggested that whether to destroy Texas's fence depends on whether aliens were exposed to the elements, faced difficulty traversing the riverbank, or contributed to crowding and congestion. *Id.* at 35-36, 52, 122. But such "normal" and "typical" conditions would *always* be met in the "ordinary course." *Id.* at 133-34, 217. Defendant's witness acknowledged that the

"situation" "wouldn't be" different day-to-day. *Id.* at 134. All of this demonstrates that there is a policy with respect to Texas's fences in Eagle Pass. This evidence suffices for a preliminary injunction. *Cf. Dep't of Commerce v. New York*, 139 S. Ct. 2552, 2575 (2019) (courts are "not required to exhibit a naiveté from which ordinary citizens are free").

At a minimum, the existence of a policy or final agency action is irrelevant to Texas's *ultra vires* claim because "virtually every statement an agency may make" suffices. *Apter*, 80 F.4th at 590 (citation omitted). That broad definition embraces Defendants' "guidance that supervisors in the Del Rio Sector have provided line agents regarding the wire." App. O. 17. That guidance is *ultra vires*. Congress directed Defendants to control and guard US borders against illegal entry. *See* 6 U.S.C. §§ 202(5), 211(c)(2), (5), (6), (8), (e)(3). As the district court expressly found, Defendants' conduct "directly contravene[s] those same statutory obligations." App. P. 28.

## II. The Remaining Factors Favor an Injunction Pending Appeal.

The remaining injunctive factors justify relief. As the district court recognized, Defendants are openly flouting their statutory duties at the border, enticing migrants to "undertake the dangerous task of crossing the river" and causing "irreparable harm" to Texas. App. P. 9, 34. These harms include the "repeated or continuing" invasions of Texas's property rights. *Beathard Joint Venture v. W. Houston Airport Corp.*, 72 S.W.3d 426, 432 (Tex. App.—Texarkana 2002, no pet.). And for the reasons that the district court cataloged, the balance of equities and public interest

also favor relief because of the significant—and, indeed, all but conceded—value of c-wire in safeguarding the public interest. App. P. 8, 27-28.

## III.   The Court Should Enter a Temporary Administrative Injunction.

For these reasons, Texas requests an administrative injunction while the Court considers this motion. Such routine administrative relief prevents irreparable harm while the Court reviews the party's motion. *See, e.g.*, *Richardson v. Tex. Sec'y of State*, 978 F.3d 220, 227-28 (5th Cir. 2020).

## Conclusion

The Court should grant an injunction pending appeal and, or alternatively, immediately grant a temporary administrative injunction.

Respectfully submitted.

Ken Paxton
Attorney General of Texas

Brent Webster
First Assistant Attorney General


Office of the Attorney General
P.O. Box 12548 (MC 059)
Austin, Texas 78711-2548
Tel.: (512) 936-1700
Fax: (512) 474-2697

/s/ Aaron L. Nielson
Aaron L. Nielson
Solicitor General
Aaron.Nielson@oag.texas.gov

Ari Cuenin
Deputy Solicitor General

J. Andrew Mackenzie
Assistant Attorney General

Counsel for Plaintiff-Appellant

## Certificate of Compliance with Rule 27.3

I certify the following in compliance with Fifth Circuit Rule 27.3:

- Before filing this Motion, counsel for Appellant contacted the Clerk's Office and opposing counsel to advise them of the intent to file this Motion. Counsel also phoned the offices of opposing counsel before filing.

- The facts stated herein supporting emergency consideration of this motion are true and complete.

- Because Appellant requests an injunction pending appeal as soon as practicable and, or alternatively, an immediate temporary administrative injunction, the Court's review of this motion is requested by December 4, 2023.

- True and correct copies of relevant orders and other documents are attached as exhibits to this motion.

- This motion is being served at the same time it is being filed.

- The names of counsel representing the parties, including contact information of all counsel, are as follows:

  Steven Andrew Myers
  U.S. Department of Justice
  Civil Division, Appellate Section, Suite 7232
  950 Pennsylvania Avenue, N.W.
  Washington, DC 20530
  Direct: 202-305-8648
  Email: steven.a.myers@usdoj.gov
  Fax: 202-514-7974

  Melissa Nicole Patterson
  U.S. Department of Justice
  Civil Division, Appellate Section, Suite 7230
  950 Pennsylvania Avenue, N.W.
  Washington, DC 20530
  Direct: 202-514-1201

Email: melissa.patterson@usdoj.gov
Fax: 202-514-7964

Christopher A. Eiswerth
U.S. Department of Justice
Civil Division, Federal Programs Branch, Suite 12310
1100 L. Street, N.W.
Washington, DC 20005
Direct: 202-305-0568
Email: christopher.a.eiswerth@usdoj.gov

*Counsel for Defendants-Appellees*

/s/ Aaron L. Nielson
Aaron L. Nielson

## Certificate of Conference

On December 3, 2023, counsel for Appellant conferred with counsel for Appellees, who stated that Appellees oppose the relief requested in this motion and will file a response in opposition to the motion. The filing of this motion was also preceded by telephone calls to the clerk's office and to the offices of opposing counsel on December 4, 2023, advising of the intent to file the emergency motion.

/s/ Aaron L. Nielson
Aaron L. Nielson

## CERTIFICATE OF SERVICE

On December 4, 2023, this document was served via CM/ECF on all registered counsel and transmitted to the Clerk of the Court. Counsel further certifies that: (1) any required privacy redactions have been made in compliance with Fifth Circuit Rule 25.2.13; (2) the electronic submission is an exact copy of the paper document in compliance with Fifth Circuit Rule 25.2.1; and (3) the document has been scanned with the most recent version of Symantec Endpoint Protection and is free of viruses.

/s/ Aaron L. Nielson
AARON L. NIELSON

## CERTIFICATE OF COMPLIANCE

This motion complies with: (1) the type-volume limitation of Federal Rule of Appellate Procedure 27(d)(2)(A) because it contains 5,195 words, excluding the parts of the motion exempted by rule; and (2) the typeface requirements of Rule 32(a)(5) and the type style requirements of Rule 32(a)(6) because it has been prepared in a proportionally spaced typeface (14-point Equity) using Microsoft Word (the same program used to calculate the word count).

/s/ Aaron L. Nielson
AARON L. NIELSON