No. 23-50869

# In the United States Court of Appeals for the Fifth Circuit

STATE OF TEXAS,

*Plaintiff-Appellant*

*v.*

UNITED STATES DEPARTMENT OF HOMELAND SECURITY;
ALEJANDRO MAYORKAS, SECRETARY, U.S. DEPARTMENT OF
HOMELAND SECURITY; UNITED STATES CUSTOMS AND BORDER
PROTECTION; UNITED STATES BORDER PATROL; TROY MILLER,
ACTING COMMISSIONER, U.S. CUSTOMS AND BORDER
PROTECTION; JASON OWENS, IN HIS OFFICIAL CAPACITY AS
CHIEF OF THE U.S. BORDER PATROL; JUAN BERNAL, IN HIS
OFFICIAL CAPACITY AS ACTING CHIEF PATROL AGENT, DEL RIO
SECTOR UNITED STATES BORDER PATROL,

*Defendants-Appellees.*

On Appeal from the United States District Court for the
Western District of Texas, Del Rio Division, 2:23-cv-00055-AM

## EXHIBITS IN SUPPORT OF PLAINTIFF'S OPPOSED EMERGENCY MOTION FOR AN INJUNCTION PENDING APPEAL AND FOR A TEMPORARY ADMINISTRATIVE INJUNCTION

### INDEX OF EXHIBITS[1]

Exhibit

ECF 26-1, Supplemental Amended Declaration of Manuel Perez ......................... A

ECF 30, Reply in Support of Motion for Preliminary Injunction or Stay of
Agency Action and Appendix (Declaration of Sean Storrud) ................................. B

ECF 3-2, Declaration of Michael Banks ................................................................. C

---

[1] In these Exhibits, "ECF ___" refers to the district court docket number.

ECF 3-2, Declaration of Carlos R. Garcia ...................................................... D

ECF 5-1, Declaration of Brian Cooney ........................................................... E

ECF 8-1, Declaration of Ortiz Diaz ................................................................ F

ECF 1, Plaintiff's Original Complaint ........................................................... G

ECF 3-1, Plaintiff's Motion for Preliminary Injunction or Stay of Agency Action ........................................................................................................... H

ECF 5, Plaintiff's Emergency Motion for a Temporary Restraining Order or Stay of Agency Action ........................................................................... I

ECF 8, Plaintiff's Notice of Escalating Property Damage in Support of Its Emergency Motion for a Temporary Restraining Order or Stay of Agency Action ............................................................................................................. J

ECF 9, Order Granting TRO ......................................................................... K

Transcript of Preliminary Injunction Hearing, Nov. 7, 2023 ..................... L

ECF 33, Order Extending TRO ..................................................................... M

ECF 46, Supplemental Order Extending TRO ............................................. N

ECF 47, Defendants' Supplemental Brief on Texas's APA Claims Pursuant to the Court's November 9, 2023 Order .................................... O

ECF 57, Memorandum Opinion and Order .................................................. P

ECF 58, Plaintiff's Notice of Appeal ............................................................ Q

ECF 59, Plaintiff's Emergency Motion for Injunction Pending Appeal ................... R

ECF 23-1, Defendants' Opposition to Texas's Motion for Preliminary Injunction or Stay of Agency Action .......................................................... S

ECF 27-1, Plaintiff's Reply in Support of Motion for Preliminary Injunction or Stay of Agency Action ....................................................................... T

ECF 48, Plaintiff's Supplemental Brief in Support of Motion for Preliminary Injunction or Stay of Agency Action.................................................... U

**Exhibit A**

## DECLARATION OF MANUEL PEREZ

1.      My name is Manuel Perez. I am the Director of Procurement and Contract Services for the Office of State Administration within the Texas Military Department. In that role, I am responsible for reviewing all purchasing contracts made by the department. My current primary focus is working on Operation Lone Star.

2.      I served for twenty-three years in the United States Army, primarily working on logistics. I retired in 2004 with the rank of first sergeant. After retiring from the army, I spent ten years working as procurement team lead at the Comptroller's office and four years as a branch manager in the procurement division of the Department of Public Safety. I am a certified Texas Procurement Manager. In total, I have over thirty years of experience in logistics.

3.      Since the beginning of Operation Lone Star, I have created approximately 52 purchase orders for concertina wire and fencing material connected to c-wire placement. The first c-wire purchase was ordered on October 19, 2021. The latest purchase was on October 9, 2023. The total combined cost of all these orders is approximately $32,572,637.99. The two largest c-wire purchases in support of Operation Lonestar have taken place during 2023. The largest was on July 10, 2023 totaling $2,413,216.80 for 20,040 rolls. The second largest purchase was on October 9, 2023 totaling $874,800.00 for 7,200 rolls. The

Texas Military Department is currently in the process of receiving all of the c-wire ordered on October 9. I anticipate that the department will continue to order c-wire as the need arises.

4.      The majority of the c-wire procured by the Texas Military Department is stored at a bill of materials yard in Eagle Pass, Texas to support Operation Lone Star activities in the area.

5.      Concertina wire is similar to barbed wire. C-wire is purchased in rolls that can vary from 25 feet long to 50 feet long. These rolls are clamped together and attached to metal rods to keep them in place, thereby forming a fence. Per industry practice, 211 rolls of 30" x 25' c-wire can cover 1 mile, although this may vary depending on terrain and how much the wire is stretched.

6.      In my experience, a single roll of 36" x 50' c-wire costs approximately $121.50 and a single roll of 30" x 25' c-wire costs approximately $321.65.

7.      C-wire can be cut using bolt cutters or other tools that can be purchased at a hardware store. When cut, c-wire is difficult to repair and is often replaced instead.

I hereby declare under penalty of perjury, pursuant to 28 U.S.C. § 1746, that the foregoing is true and correct to the best of my knowledge and information.

Signed this 31st day of October 2023.

Manuel Perez

Director of Procurement and
Contract Services

Office of State Administration
Texas Military Department.

Exhibit B

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF TEXAS
DEL RIO DIVISION

| | | |
|---|---|---|
| THE STATE OF TEXAS, | § | |
| | § | |
| *Plaintiff*, | § | |
| | § | CIVIL ACTION NO. 2:23-CV-00055-AM |
| v. | § | |
| | § | |
| U.S. DEPARTMENT OF HOMELAND | § | |
| SECURITY, *et al.*, | § | |
| | § | |
| *Defendants*. | | |

---

PLAINTIFF'S REPLY IN SUPPORT OF
MOTION FOR PRELIMINARY INJUNCTION OR STAY OF AGENCY ACTION

---

## TABLE OF CONTENTS

Table of Contents .................................................................................................................. ii

Table of Authorities ............................................................................................................. iii

Argument .............................................................................................................................. 1

   I.   This Court has jurisdiction to award the requested relief ..................................... 1

   II.   Texas is likely to succeed on the merits of its claims. ........................................ 2

      A.   Texas is likely to succeed on its conversion and trespass to chattel claims. ..................... 2

      B.   Texas is likely to succeed on its claims that Defendants violated the APA ...................... 7

   III.   The State has pointed to an ongoing threat of irreparable harm. ....................... 16

   IV.   The balance of the equities and public interest favor preliminary relief. .......................... 19

Conclusion .......................................................................................................................... 20

Certificate of Service ......................................................................................................... 21

TABLE OF AUTHORITIES

Page(s)

**Cases**

*Abbott Labs v. Gardner*,
387 U.S. 136 (1967)...............................................................................11

*All. for Hippocratic Med. v. FDA*,
78 F.4th 210 (5th Cir. 2023) ...................................................................2

*Am. Trucking Ass'ns v. City of Los Angeles*,
569 U.S. 641 (2013)................................................................................6

*Apter v. HHS*,
80 F.4th 579 (2023)...............................................................................15

*B.K. Instrument, Inc. v. United States*,
715 F.2d 713 (2d Cir. 1983) (Friendly, J.)...........................................3, 5

*Barrick Goldstrike Mines Inc. v. Browner*,
215 F.3d 45 (D.C. Cir. 2000) ................................................................11

*Beathard Joint Venture v. W. Houston Airport Corp.*,
72 S.W.3d 426 (Tex. App. 2002)...........................................................16

*In re Beef Processors, Inc.*,
468 F.3d 248 (5th Cir. 2006) (en banc) ...................................................4

*Biden v. Texas*,
142 S. Ct. 2528 (2022)..................................................................1, 2, 9, 12

*Boiles v. City of Abilene*,
276 S.W.2d 922 (Tex. App. 1955)..........................................................16

*Central Pines Land Co. v. United States*,
274 F.3d 881 (5th Cir. 2001) ..................................................................6

*Ciba–Geigy Corp. v. EPA*,
801 F.2d 430 (D.C. Cir. 1986) ..............................................................11

*Clean Water Action v. EPA*,
936 F.3d 308 (5th Cir. 2019) ................................................................14

*Daniels Health Scis., L.L.C. v. Vascular Health Scis., L.L.C.*,
710 F.3d 579 (5th Cir. 2013) ................................................................20

*Data Mktg. P'ship, LP v. DOL*,
45 F.4th 846 (5th Cir. 2022) .............................................................11, 12

*Dep't of Commerce v. New York*,
    139 S. Ct. 2551 (2019) ........................................................................................ 8, 19

*Department of Army v. Blue Fox, Inc.*,
    525 U.S. 255 (1999) ................................................................................................ 4

*DHS v. Regents of Univ. of Cal.*,
    140 S. Ct. 1891 (2020) .......................................................................................... 8, 9

*DHS v. Thuraissigiam*,
    140 S. Ct. 1959 (2020) .......................................................................................... 10, 11

*United States ex rel. Drury v. Lewis*,
    200 U.S. 1 (1906) .................................................................................................. 5

*E.T. v. Paxton*,
    41 F.4th 709 (5th Cir. 2022) (Oldham, J.) ............................................................ 3

*Fort-Acre Spring Live Stock Co. v. W. Tex. Bank & Tr. Co.*,
    118 S.W. 790 (Tex. App. 1909) ........................................................................... 16

*Garland v. Aleman Gonzalez*,
    142 S. Ct. 2057 (2022) .......................................................................................... 2

*Graves v. New York ex rel. O'Keefe*,
    306 U.S. 466 (1939) .............................................................................................. 5

*Her Majesty the Queen in Right of Ontario v. EPA*,
    912 F.2d 1525 (D.C. Cir. 1990) ........................................................................... 11

*Holder v. Humanitarian Law Project*,
    561 U.S. 1 (2010) .................................................................................................. 20

*Hunsucker v. Phinney*,
    497 F.2d 29 (5th Cir. 1974) .................................................................................. 7

*Irma Blas v. Rosen*,
    No. DR-18-CV-66-AM, 2019 WL 5199284 (W.D. Tex. July 16, 2019) ............... 6

*Itar-Tass Russian News Agency v. Russian Kurier Inc.*,
    886 F. Supp. 1120 (S.D.N.Y. 1995) ..................................................................... 20

*Jean v. Nelson*,
    472 U.S. 846 (1985) .............................................................................................. 10

*Johnson v. Maryland*,
    254 U.S. 51 (1920) (Holmes, J.) .......................................................................... 5

*La. Pub. Serv. Comm'n v. FCC*,
  476 U.S. 355 (1986)..................................................................14

*Lumbermens Mut. Cas. Co. v. United States*,
  654 F.3d 1305 (Fed. Cir. 2011)....................................................4

*Match-E-Be-Nash-She-Wish Band of Pottawatomi Indians v. Patchak*,
  567 U.S. 209 (2012)....................................................................5

*Mexican Gulf Fishing Co. v. U.S. Dep't of Com.*,
  60 F.4th 956 (5th Cir. 2023) ......................................................13

*Michigan v. U.S. Army Corps of Eng'rs*,
  667 F.3d 765 (7th Cir. 2011) (Wood, J.) ...................................3, 4

*Penn Dairies v. Milk Control Comm'n of Pennsylvania*,
  318 U.S. 261 (1943)....................................................................7

*Pennhurst State Sch. & Hosp. v. Halderman*,
  465 U.S. 89 (1984)....................................................................16

*Perry Capital LLC v. Mnuchin*,
  864 F.3d 591 (D.C. Cir. 2017)....................................................4

*Plyler v. Doe*,
  457 U.S. 202 (1982)..................................................................18

*Puerto Rico v. United States*,
  490 F.3d 50 (1st Cir. 2007) (Lipez, J.).........................................3

*Ramirez v. Immigr. & Customs Enf't*,
  310 F. Supp. 3d 7 (D.D.C. 2018)...............................................20

*Sackett v. EPA*,
  566 U.S. 120 (2012)..................................................................12

*Sierra Club v. Peterson*,
  228 F.3d 559 (5th Cir. 2000) .....................................................13

*South Carolina v. Baker*,
  485 U.S. 505 (1988)....................................................................6

*Texas v. Biden*,
  646 F. Supp. 3d 753 (N.D. Tex. 2022) .........................................2

*Texas v. Biden (MPP)*,
  20 F.4th 928 (5th Cir. 2021) ..................................9, 12, 18, 19

*Texas v. Brooks-LaSure*,
   No. 6:21-cv-191, 2021 WL 5154219 (E.D. Tex. Aug. 20, 2021) (Barker, J.)..........................3

*Texas v. EEOC*,
   933 F.3d 433 (5th Cir. 2019) ...............................................................11

*Texas v. Kleinert*,
   855 F.3d 305 (5th Cir. 2017) .................................................................6

*Texas v. United States*,
   40 F.4th 205 (5th Cir. 2022) (per curiam) ............................................2

*Texas v. United States*,
   50 F.4th 498 (5th Cir. 2022) ...............................................................17

*Trudeau v. FTC*,
   456 F.3d 178 (D.C. Cir. 2006) (Garland, J.) ........................................3

*Trump v. Vance*,
   140 S. Ct. 2412 (2020) ...........................................................................5

*United States v. Texas*,
   143 S. Ct. 1964 (2023) ...........................................................................2

*United States v. Washington*,
   142 S. Ct. 1976 (2022) ........................................................................5, 6

*Wages & White Lion Invs., LLC v. FDA*,
   16 F.4th 1130 (5th Cir. 2021) .........................................................18, 19

*Weyerhaeuser Co. v. U.S. Fish & Wildlife Serv.*,
   139 S. Ct. 361 (2018) .............................................................................8

*Wilkie v. Robbins*,
   551 U.S. 537 (2007) ............................................................................5, 6

**Statutes**

5 U.S.C. § 551(4) ......................................................................................9

5 U.S.C. § 702 ..................................................................................3, 4, 5, 7

5 U.S.C. § 705 ..........................................................................................2

5 U.S.C. § 706(2)(C) ...............................................................................14

6 U.S.C. § 202(5) .....................................................................................14

6 U.S.C. § 211(c)(2), (5), (6), (8) ............................................................14

vi

8 U.S.C. § 701(a)(2) ..........................................................................................7, 8

8 U.S.C. § 1103(a)(3) ...............................................................................................1

8 U.S.C. § 1103(a)(5) .............................................................................................14

8 U.S.C. §§ 1221-1232 ............................................................................................1

8 U.S.C. § 1225(b)(2)(A) and § 1225(b)(1)(B)(ii) .................................................2

8 U.S.C. § 1225 and § 1226 .....................................................................................1

8 U.S.C. § 1226(c) and § 1231(a)(2) .......................................................................2

8 U.S.C. § 1252(f)(1) ...........................................................................................1, 2

8 U.S.C. § 1324(a)(1)(A)(iv) .................................................................................16

8 U.S.C. § 1357(a)(3) ..................................................................................1, 14, 15

28 U.S.C. § 1356 ......................................................................................................7

28 U.S.C. § 1367 ......................................................................................................7

90 Stat. 2721 (1976) ................................................................................................4

**Other Authorities**

42 C.F.R. § 440.225(c) ..........................................................................................18

H.R. Rep. 94-1656 ...................................................................................................4

ARGUMENT[1]

## I. This Court has jurisdiction to award the requested relief.

Defendants cannot justify their brazen destruction of another sovereign's property or their pattern of forcing line-level federal agents to violate their oaths to deter illegal entry and secure our Nation's border.[2] Perhaps that is why Defendants' lead argument asks this Court not to even look at these troubling actions. ECF 23-1 at 18–20.

Defendants claim that 8 U.S.C. § 1252(f)(1) "divests this Court of any jurisdiction." *Id.* at 18. But the Supreme Court recently made clear that, even where it applies, § 1252(f)(1) "does not deprive the lower courts of all subject matter jurisdiction." *Biden v. Texas*, 142 S. Ct. 2528, 2539 (2022). Instead, it limits their "power to issue a specific category of remedies," while "preserving th[e] [Supreme] Court's power to enter injunctive relief." *Id.*

More fundamentally, though, § 1252(f)(1) has no application to this case. That provision asks two things—whether the relief sought would "[1] enjoin or restrain the operation of [2] the provisions of part IV of this subchapter [8 U.S.C. §§ 1221-1232]." Most of the immigration-law provisions Defendants point to—including Defendants' vague authorization to take "other acts … deem[ed] necessary," 8 U.S.C. § 1103(a)(3), and their limited license to access private lands within 25 miles of the border, *id.* § 1357(a)(3)—simply do not fall within the specified provisions. ECF 23-1 at 10-14, 24-26, 31-33 (citing 6 U.S.C. §§ 202, 211; 8 U.S.C. §§ 1101, 1103, 1158, 1182, 1252, 1325, 1326, 1328, 1357); *see* ECF 23-1 at 18 (conceding "[t]he specified provisions [are codified at] 8 U.S.C. §§ 1221-1232").

The only provisions that matter, then, are 8 U.S.C. § 1225 and § 1226, which Defendants say require them to apprehend any alien that effects an illegal crossing into the United States. ECF 23-1 at 12, 19. The claim that these alien-processing provisions are mandatory is rich, coming from

---

[1] Plaintiff incorporates its briefing and exhibits in ECF Nos. 3-1, 3-2, 5, 5-1, 8, and 8-1. References to page numbers for filings are to the pagination stamped at the header by the ECF system.

[2] *See* Ali Bradley, *'Demoralizing': Border Patrol Agents Cut Razor Wire for Migrants*, NEWSNATION (Sept. 29, 2023), https://www.newsnationnow.com/us-news/immigration/video-border-patrol-agents-cut-razor-wire-for-migrants-in-texas/.

1

Defendants who previously grabbed for the power to ignore neighboring provisions mandating that various categories of aliens "shall" be detained. *See, e.g.*, *United States v. Texas*, 143 S. Ct. 1964, 1968–69 (2023) (disclaiming any need to comply with 8 U.S.C. § 1226(c) and § 1231(a)(2)); *Biden*, 142 S. Ct. at 2535–37 (disclaiming any need to comply with 8 U.S.C. § 1225(b)(2)(A) and § 1225(b)(1)(B)(ii)). But what matters here is that Texas does not seek an order from this Court barring Defendants from apprehending and processing aliens under "the specified statutory provisions." *Garland v. Aleman Gonzalez*, 142 S. Ct. 2057, 2065 (2022). Instead, the State asks only that federal agents be ordered not to wantonly destroy property that is not theirs, in violation of state tort law.

Defendants' reading of § 1252(f)(1) as prohibiting any order that somehow touches on their preferred method of going about their work cannot be squared with common sense or Supreme Court precedent. A disgruntled CBP officer might find it convenient to assault TMD soldiers based on his opinion that they make his job harder. But an order enjoining him from committing future batteries would not be an order restraining him from processing aliens. That is why the Supreme Court already rejected an argument like Defendants' when it recognized that a court *may* issue injunctive relief "even if [it] has some collateral effect on the operation of a covered provision." *Aleman Gonzalez*, 142 S. Ct. at 2067 n.4. At most, that is all Defendants point to here. But in any event, the evidence shows CBP agents freely moving along the river on the Mexico side of the fence. Texas's property thus does not inhibit Defendants from passing out water bottles, processing aliens along the river, or directing them to federal entry points. And Defendants' naked assertion that they simply "must" destroy Texas's fence to process aliens does not prove otherwise. ECF 23-2 at 5.[3]

## II.  Texas is likely to succeed on the merits of its claims.

### A.  Texas is likely to succeed on its conversion and trespass to chattel claims.

---

[3] Nor would Defendants' reading of § 1252(f)(1) bar a stay of agency action under the Administrative Procedure Act (APA), 5 U.S.C. § 705, for a stay is not an injunction. *Texas v. Biden*, 646 F. Supp. 3d 753, 769 (N.D. Tex. 2022). Recent Fifth Circuit precedent confirms this. *See All. for Hippocratic Med. v. FDA*, 78 F.4th 210, 254 (5th Cir. 2023) ("In the same way that a preliminary injunction is the temporary form of a permanent injunction, a stay [under § 705] is the temporary form of vacatur."); *Texas v. United States (DACA)*, 50 F.4th 498, 528 (5th Cir. 2022) ("As an initial matter, § 1252(f)(1) does not apply to vacatur.").

**1.** As Texas explained before, this Court may never see a simpler case for common-law conversion or trespass to chattels. ECF 3-1 at 17–18, 21–28, 31–32 n.55; ECF 5 at 5. Defendants apparently do not disagree. They explicitly accept, for purposes of this motion, that Texas's wire fence, which Defendants' agents routinely damage, destroy, or meddle with, is lawfully in place. ECF 23-1 at 14 n.3; Reply.Appx. 008–016 (maps of Texas's fence placement). Having conceded those dispositive facts, Defendants offer no argument that Texas's claims for conversion or trespass would fail on the merits. By offering no merits argument whatsoever, Defendants tacitly concede that Texas is likely to prevail on its common-law tort claims, as this Court already recognized in granting a temporary restraining order. ECF 9 at 4–7; *see also Texas v. Brooks-LaSure*, No. 6:21-cv-191, 2021 WL 5154219, at *14 (E.D. Tex. Aug. 20, 2021) (Barker, J.) (holding that federal government's preliminary-injunction papers forfeited "insufficiently briefed" arguments).

**2.** They nevertheless insist (again) that justiciability rules prevent this Court from taking cognizance of admitted, repeated, and ongoing torts. But 5 U.S.C. § 702's broad waiver of federal sovereign immunity for non-monetary relief means what it says, and intergovernmental immunity does not give federal actors a blank check to perpetrate intentional torts. As Texas explained in its Complaint, ECF 1 at 5, the APA waives Defendants' federal-law immunity from suit for a claim like this one: "An action in a court of the United States seeking relief other than money damages and stating a claim that an agency  or an officer or an employee thereof acted or failed to act in an official capacity or under color of legal authority shall not be dismissed nor relief therein be denied on the ground that it is against the United States." 5 U.S.C. § 702. This plain text is clear—"[a]n action in" federal court "seeking relief other than money damages" means *any* action, whether under the APA, a different statute, or the common law.

Circuits across the country agree. *See, e.g., Trudeau v. FTC*, 456 F.3d 178, 186 (D.C. Cir. 2006) (Garland, J.); *B.K. Instrument, Inc. v. United States*, 715 F.2d 713, 724–25 (2d Cir. 1983) (Friendly, J.); *Puerto Rico v. United States*, 490 F.3d 50, 57–58 (1st Cir. 2007) (Lipez, J.); *Michigan v. U.S. Army Corps of Eng'rs*, 667 F.3d 765, 776 (7th Cir. 2011) (Wood, J.). So does the go-to source on federal jurisdiction. The Fifth Circuit (among others) recognizes that *Hart & Wechsler* is "the leading treatise" on questions

like this one. *E.T. v. Paxton*, <u>41 F.4th 709, 717</u> (5th Cir. 2022) (Oldham, J.). And it could not be clearer: "Though codified in the APA, the waiver [in § 702] applies to *any suit*, whether or not brought under the APA." RICHARD FALLON ET AL., HART & WECHSLER'S THE FEDERAL COURTS AND THE FEDERAL SYSTEM 902 (7th ed. 2015) (emphasis added); *see also* <u>90 Stat. 2721</u> (1976) (amending § 702 to waive federal sovereign immunity).

It is unsurprising, then, that the court tasked most often with interpreting the APA rejects Defendants' suggestion that this waiver is not broad enough to cover state-law causes of action: The "argument that § 702 does not waive its immunity from suit for state law claims is foreclosed by our precedent. We have repeatedly and expressly held in the broadest terms that the APA's waiver of sovereign immunity applies to any suit whether under the APA or not." *Perry Capital LLC v. Mnuchin*, <u>864 F.3d 591, 620</u> (D.C. Cir. 2017) (cleaned up). That accords with the Supreme Court's decision in *Department of Army v. Blue Fox, Inc.*, <u>525 U.S. 255</u> (1999). There, a subcontractor sought to use § 702 to press an equitable lien against the Army, *id.* at 256-58, based on "rights created by state law," *Lumbermens Mut. Cas. Co. v. United States*, <u>654 F.3d 1305, 1315</u> (Fed. Cir. 2011). If Defendants were right that § 702 can *never* apply to state-law claims, the Court could have simply said that. Instead, it held the waiver did not apply because "the sort of equitable lien sought by respondent here constitutes a claim for 'money damages.'" *Blue Fox*, <u>525 U.S. at 263</u> (quoting § 702). Meanwhile, the Fifth Circuit case Defendants cite did not involve § 702's waiver for non-monetary relief at all. *See In re Beef Processors, Inc.*, <u>468 F.3d 248, 251</u> (5th Cir. 2006) (en banc) (describing claim "seeking damages").

With no support in § 702's text or precedent, Defendants ask this Court to imply a limit found nowhere in a *different statute*: The Federal Tort Claims Act, they say, waives the federal government's immunity for torts and authorizes monetary relief; it thus "impliedly precludes" non-monetary relief for torts. ECF 23-1 at 21–22. Other Courts have rejected this argument for good reason—it "reads too much into congressional silence." *Michigan*, <u>667 F.3d at 775</u>. Section 702 "requires evidence, in the form of either express language or fair implication, that Congress meant to forbid the relief that is sought." *Id.* But the FTCA's silence on injunctive relief is unhelpful and unsurprising because it concerned only monetary liability. Historical context, too, shows that § 702 was designed to add to

and "strengthen th[e] accountability" already provided by the FTCA. H.R. Rep. 94-1656, 1976 WL 14066, at *4 (Sept. 22, 1976); *see also B.K. Instrument*, 715 F.2d at 727. Texas "is bringing a different claim, seeking different relief, from the kind the [FTCA] addresses." *Match-E-Be-Nash-She-Wish Band of Pottawatomi Indians v. Patchak*, 567 U.S. 209, 222 (2012). The fact that this suit and the FTCA may deal with a "similar subject matter" (*i.e.*, torts) "is not itself sufficient" to "trigger a remedial statute's preclusive effect." *Id.* at 223.

**3.** In two paragraphs, Defendants—perhaps accidentally acknowledging that § 702 *could* extend to state-law claims—suggest that Texas's tort claims are barred by intergovernmental immunity, making the breathtaking claim that state law can never interfere with operations of the federal government. ECF 23-1 at 22–23. Surely Defendants do not think a federal agent would be immune from a state criminal prosecution for murder simply because he was wearing a badge when he killed the victim. *See United States ex rel. Drury v. Lewis*, 200 U.S. 1, 3, 7–8 (1906) (no intergovernmental immunity for federal officer and enlisted soldier who murdered a civilian on municipal or private land in Pennsylvania). And while pointing to recent Supreme Court decisions as somehow supportive, Defendants neglect to mention that *Trump v. Vance*, 140 S. Ct. 2412, 2424–29 (2020), unanimously *approved* the issuance of state criminal subpoenas to a sitting President of the United States in the face of an argument that it would impair the performance of his duties, and that *United States v. Washington*, 142 S. Ct. 1976, 1984 (2022), prohibited only an effort to "singl[e] out the Federal Government for unfavorable treatment" under state law. The older cases Defendants cite are no more helpful: "Of course an employee of the United States does not secure a general immunity from state law"—including tort liability—"while acting in the course of his employment." *Johnson v. Maryland*, 254 U.S. 51, 56 (1920) (Holmes, J.); *see also Wilkie v. Robbins*, 551 U.S. 537, 560 (2007) ("the tort or torts by Governmental employees would be so clearly actionable under the general [common] law").

The idea that federal agents might be subject to state tort law on occasion—on equal terms with everyone else—does not "flip[] the Supremacy Clause on its head." ECF 23-1 at 23. It merely respects our system of federalism, in which agents of a federal government vested with limited and enumerated powers must often operate within state governments of unenumerated powers. *See, e.g., Graves v. New*

*York ex rel. O'Keefe*, 306 U.S. 466, 486–87 (1939) (states may tax federal officials, employees, and property). Defendants' two-paragraph recitation of platitudes about federal power, without any explanation of the how the cases they cite support their claim, makes no serious effort to show why the immunity applies. It thus forfeits any argument on this affirmative defense. *Cf. Irma Blas v. Rosen*, No. DR-18-CV-66-AM, 2019 WL 5199284, at *4 (W.D. Tex. July 16, 2019).

In any event, the argument would fail. For one thing, under binding Fifth Circuit precedent intergovernmental immunity applies "only when a federal officer is held *in the state court* to answer" for official actions. *Texas v. Kleinert*, 855 F.3d 305, 314 (5th Cir. 2017) (emphasis added). Defendants do not—and cannot—complain that they will not receive a fair shake in federal court. And this Court may not ignore that precedent. *See Central Pines Land Co. v. United States*, 274 F.3d 881, 893 (5th Cir. 2001) (following rule of orderliness in intergovernmental-immunity case).

After ignoring Fifth Circuit precedent, Defendants run headfirst into Supreme Court precedent. The broad version of intergovernmental immunity that Defendants press here "has been thoroughly repudiated by modern intergovernmental immunity caselaw." *South Carolina v. Baker*, 485 U.S. 505, 520 (1988). Intergovernmental immunity applies only where a state (1) "regulate[s] the United States directly" or (2) "discriminates against the Federal Government or those with whom it deals." *Washington*, 142 S. Ct. at 1984. Texas's invocation of its own property rights under state tort law does not "regulate" anyone—much less the United States. Each government (whether federal or state) "deals with its neighbors as one [property] owner among the rest." *Wilkie*, 551 U.S. at 558. And Texas acts here as a property owner, not as a regulator. *Cf. Am. Trucking Ass'ns v. City of Los Angeles*, 569 U.S. 641, 649–50 (2013). Moreover, invoking generally applicable tort principles treats Defendants equally. Just like the federal government has authority "to enforce the trespass and land-use rules" in favor of its own property interests, so too do those whom it trespasses against. *Wilkie*, 551 U.S. at 558. (If anything, Texas has treated the federal government *more favorably* than other tortfeasors: By now, state officials would have arrested private individuals who engaged in the destructive campaign being carried out by the federal government.) To the extent restrictions on destroying someone else's property creates any burden at all, it is the *same* burden borne by everyone who operates in Texas; "state

regulation … inevitably imposes some burdens on the national government of the same kind as those imposed on citizens of the United States within the state's borders" without invading federal functions. *Penn Dairies v. Milk Control Comm'n of Pennsylvania*, 318 U.S. 261, 271 (1943).[4]

\*          \*          \*

Invocations of § 702 to press state-law claims may be rare. One might hope that is because most federal agents are not brazenly perpetrating ongoing torts. But it will not stay that way if this Court becomes the first ever to accept the argument that federal sovereign immunity precludes all state-law claims despite § 702, that intergovernmental immunity confers a blank check to violate local laws, and that federal agents are nowhere accountable for the intentional destruction of property.

### B. Texas is likely to succeed on its claims that Defendants violated the APA.

Defendants do engage on the merits of Texas's APA claims. But their arguments largely hinge on ignoring uncontested facts: Defendants and their agents have damaged, destroyed, or otherwise interfered with Texas's concertina-wire fence on almost a daily basis since September 20, 2023. In public statements, officials have stated that DHS's policy allows agents to do so anytime an alien crosses the Rio Grande, even absent an acute medical exigency. And Defendants never subjected that policy to public notice and comment, explained how it is consistent with statutes that task Defendants with deterring illegal entry, or acknowledged the arbitrariness of destroying Texas's barriers to entry while building federal barriers designed to do the same thing.

**1.** At the outset, Defendants argue their challenged practice of declaring open season on someone else's property is "committed to agency discretion by law," 8 U.S.C. § 701(a)(2), and is therefore unreviewable under the APA. *See Heckler v. Chaney*, 470 U.S. 821 (1985). But it is simply not true that the policy Texas identifies rests on boundless discretion. Although Defendants repeatedly insist their

---

[4] Defendants briefly suggest that Texas may not rely on 28 U.S.C. § 1356 for subject-matter jurisdiction over its tort claims. ECF 23-1 at 20 n.4. But they cite only one case that declined jurisdiction based on a specific carveout from this general grant. *See Hunsucker v. Phinney*, 497 F.2d 29, 31 (5th Cir. 1974) (citing the Tax Anti-Injunction Act). Defendants point to no similar carveout covering Texas's tort claims. Nor do they dispute that—on the plain text—this action concerns the "seizure [of property] … on land," which Defendants claim is permitted "under a[] law of the United States." ECF 23-1 at 31–33.

policy builds in "discretion" or "independent judgment" in "fast-moving situations," ECF 23-1 at 24–27, elsewhere they argue that the *only* thing their agents and employees are empowered to do once an alien manages to get a toe across the international boundary is apprehend them, ECF 23-1 at 15, 19; ECF 23-2 at 4, and they *must* move or destroy Texas's fence in order to fulfill that statutory mandate, ECF 23-2 at 5. Tellingly, line-level agents have described feeling "demoralized" at being "compelled to" participate in the destruction of property, disserving their mission of deterring illegal entries in the process. *Supra* at 1 n.1. Meanwhile, undisputable video evidence shows agents are *not* apprehending the aliens they wave through Texas's fencing. ECF 3-2 at 31, 33. Defendants cannot have it both ways. It cannot be the case that agents *must* apprehend (rather than repel back across the border) any alien they see and *must* destroy property (rather than utilize federal resources on the Mexico side of the fence) to fulfill that statutory mandate, yet all of this somehow consists of "unbounded" discretion. *Dep't of Commerce v. New York*, 139 S. Ct. 2551, 2568 (2019).

In any event, the fact that an agency's course of action includes some measure of discretion is not the litmus test for when a question is committed to the agency for purposes of § 701(a)(2). The Supreme Court has explained, time and again, that it "read[s] the exception in § 701(a)(2) quite narrowly, restricting it to 'those rare circumstances where the relevant statute is drawn so that a court would have no meaningful standard against which to judge the agency's exercise of discretion.'" *Weyerhaeuser Co. v. U.S. Fish & Wildlife Serv.*, 139 S. Ct. 361, 370–372 (2018). In other words, the Court "ha[s] generally limited the exception to 'certain categories of decisions that courts traditionally have regarded as 'committed to agency discretion,''" where discretion really is "unbounded" and subject to "no meaningful standard" of review. *New York*, 139 S. Ct. at 2567–69. The destruction of private property "is not one of those areas traditionally committed to agency discretion." *Id.* at 2568. To the extent Defendants believe some common-law or statutory privilege justifies their ongoing trespass to someone else's property, the application of tort principles "involves the sort of routine dispute" that courts regularly decide. *Weyerhaeuser*, 139 S. Ct. at 370.

Defendants' claim that their domain is especially exempt from judicial scrutiny because it implicates "national-security interests," ECF 23-1 at 26, is impossible to square with the Supreme

Court's application of these same standards to DHS. *See, e.g., DHS v. Regents of Univ. of Cal.*, 140 S. Ct. 1891, 1905–07 (2020) (DHS's discretionary enforcement decisions were amenable to judicial scrutiny because non-enforcement could affect the sorts of "interest[s] 'courts often are called upon to protect.'"). Just last year the Supreme Court stated that DHS's authority "is not unbounded" despite a statute granting the Secretary authority "in his discretion" to act "under such conditions as he may prescribe"; instead, "DHS's exercise of discretion within that statutory framework must be reasonable and reasonably explained." *Biden*, 142 S. Ct. at 2543–44. Thus, even broad grants of discretion to an agency whose work touches on national security do not preclude review under the APA.

The fact that Defendants' policy is also a "rule" under the APA underscores its amenability to judicial review. A rule is "an agency statement of general … applicability and future effect" that either "prescribe[s] law or policy" or "describe[s] [agency] organization, procedure, or practice requirements. 5 U.S.C. § 551(4). And § 701(a)(2)'s nonreviewability limit "does not apply to agency rules." *Texas v. Biden (MPP)*, 20 F.4th 928, 978 (5th Cir. 2021) (citing *Heckler*, 470 U.S. 821). That limit applies, "if at all, to one-off agency enforcement decisions rather than to agency rulemakings." *Id.* at 984. Defendants' ongoing policy does not fall within that category. The actions Texas challenges here are not mere "nonenforcement" or "a refus[al] to institute proceedings against a particular entity or even a particular class." *Regents*, 140 S. Ct. at 1906. Instead, Texas challenges an established policy, pattern, or practice of affirmatively damaging another sovereign's property. These actions "provide[] a focus for judicial review" under the APA. *Id; see also Texas v. United States (DAPA)*, 809 F.3d 134, 168 (5th Cir. 2015) ("where there is affirmative agency action … the action at least can be reviewed to determine whether the agency exceeded its statutory powers.") (citations omitted). Where "an agency *does* act to enforce, that action itself provides a focus for judicial review, inasmuch as the agency must have exercised its power in some manner," and "[t]he action at least can be reviewed to determine whether the agency exceeded its statutory powers." *DAPA*, 809 F.3d at 166.

**2.** Defendants have an established policy, pattern, or practice that they never subjected to public notice and comment. ECF 3-1 at 34–37; ECF 5 at 5–6. The sheer volume of similar incidents, coupled with repeated public statements from DHS itself, demonstrates that. Defendants claim Texas has not

pointed to any statement. ECF 27-1 at 28. The APA, of course, does not require that given the possibility of unwritten policies. *See, e.g., Jean v. Nelson*, 472 U.S. 846, 851 (1985) (discussing "unwritten INS policy put into place in the first half of 1981"). But Texas *has* repeatedly pointed to such statements indicating a policy that concertina wire fencing must be cut or moved anytime aliens are present. On June 30, 2023, a spokesperson for CBP justified federal officials' cutting Texas's fence as "consistent w/ federal law" simply because "[t]he individuals had already crossed the Rio Grande from Mexico [and] were on U.S. soil." *See* ECF 3-1 at 22 (citing CBP statement). On October 24, 2023, in response to inquiries about this lawsuit concerning Defendant's destruction of state property, a DHS spokesperson said: "Border Patrol agents have a responsibility under federal law to take those who have crossed onto U.S. soil without authorization into custody for processing." *See* ECF 5 at 6 n.1 (citing DHS statement). And just this past week, Defendants reiterated the same policy in identical terms in statements to numerous news outlets after this Court granted a TRO.[5] Now, in a declaration submitted with their response, Defendants say no policy has been "issued" while at the same time admitting that DHS has instructed its employees on "issues related to obstructions" near the border for decades based on the idea that an alien "has already made entry into the United States" as soon as he crosses the Rio Grande. ECF 23-2 at 3–5.[6] An agency cannot turn an APA vice (*i.e.*, failing to issue a policy for public notice and comment) into a tool for avoiding the APA itself (*i.e.*, no policy thus "exists"). It would be hard to find evidence more clearly attesting to a policy that federal agencies chose not to share with the world.

At this stage, the record more than amply demonstrates Texas's likelihood of success in showing

---

[5] *See, e.g.*, J. David Goodman, *Judge Orders Border Agents to Stop Cutting Texas' Barbed Wire Fence*, N.Y. TIMES (Oct. 30, 2023), https://www.nytimes.com/2023/10/30/us/texas-border-concertina-wire-judge-paxton.html (quoting DHS spokesman Luis Miranda); Ryan King, *Texas Scores Wire-Cutting Win in Border Battle with Biden Agents*, N.Y. POST (Oct. 30, 2023), https://nypost.com/2023/10/30/news/texas-scores-a-win-in-border-battle-with-biden-administration/ (same).

[6] The central premise of Defendants' policy—that any alien who manages to cross the border has already entered the United States—is not even correct: "[A]n alien who is detained shortly after unlawful entry cannot be said to have 'effected an entry.' Like an alien detained after arriving at a port of entry, an alien like respondent is 'on the threshold.'" *DHS v. Thuraissigiam*, 140 S. Ct. 1959, 1982–83 (2020) (quoting *Zadvydas v. Davis*, 533 U.S. 678, 693 (2001), and *Shaughnessy v. United States ex rel. Mezei*, 345 U.S. 206, 212 (1953)).

the policy required public notice and comment. It is "final agency action" that "mark[s] the consummation of the agency's decisionmaking process." *Data Mktg. P'ship, LP v. DOL*, 45 F.4th 846, 853 (5th Cir. 2022). And Texas's "rights or obligations"—just like the rights of others with private property in close proximity to the Texas-Mexico border—have indisputably been impaired. *Id.* Texas need only show that it is "direct[ly] and immediate[ly]" impacted by Defendants' guidance in the form of "direct effect on [its] day-to-day business." *Abbott Labs v. Gardner*, 387 U.S. 136, 152 (1967). "The Supreme Court has long taken a pragmatic approach to finality, viewing the APA's finality requirement as 'flexible.'" *Texas v. EEOC*, 933 F.3d 433, 441 (5th Cir. 2019) (cleaned up). Because Defendants unlawfully direct the destruction of Texas's concertina-wire fence, directly impacting Texas's property rights, Texas must expend, and has expanded, substantial time and resources to repair its wires, affecting its day-to-day work.

"Final agency action may result from a series of agency pronouncements rather than a single edict." *Barrick Goldstrike Mines Inc. v. Browner*, 215 F.3d 45, 48–49 (D.C. Cir. 2000) (cleaned up). "Hence, a preamble plus a guidance plus an enforcement letter from [an agency] could crystallize an agency position into final agency action." *Id.*; *see also Ciba-Geigy Corp. v. EPA*, 801 F.2d 430, 436 n.8 (D.C. Cir. 1986) (final agency action consisted of a "series of steps taken by EPA" culminating in a letter from an EPA official clarifying the agency's position). This is consistent with the "flexible and pragmatic way" in which courts apply the finality requirement. *Her Majesty the Queen in Right of Ontario v. EPA*, 912 F.2d 1525, 1531 (D.C. Cir. 1990).

The declaration submitted by Defendants never disavows that USBP has a policy of sanctioning the destruction of private property anytime an agent sees an alien. Instead, it practically admits such a policy exists, albeit claiming that it contains certain limits that agents are not even following. ECF 23-2, BeMiller Decl. ¶6.[7] Nothing about it is merely "tentative or interlocutory [in] nature." ECF 23-1 at

---

[7] Defendants have not "work[ed] with [Texas] to gain access" to the river. *Id.* They have not taken steps to "close" or make "repairs" to the fences they destroy. *Id.* And they have not "ameliorate[d] any damage." *Id.* The notion that using hydraulic-powered tractors to tear fence posts out of the ground and to smash wire into a pulverized mass of tangled metal was an effort "to minimize damage to the wire" should not be taken seriously. ECF 23-1 at 16–17.

27. It strains credulity to suggest that the policy implemented by Defendants or their agents (who have damaged, destroyed, or otherwise interfered with Texas's concertina-wire fence on a near-daily basis since September 20, 2023) is "subject to further Agency review." *Sackett v. EPA*, 566 U.S. 120, 127 (2012) (citation omitted). "An action is either final or not, and the mere fact that the agency could— or actually does—reverse course in the future does not change that fact." *Data Marketing*, 45 F.4th at 854.

Defendants admit that CBP "has provided general guidance to individual officers concerning Texas's concertina wire," but insist that this guidance is subject to "agents' independent on-the-ground decisionmaking," and that requisite subsequent implementation makes the policy not final. ECF 23-1 at 29–30. As an initial matter, all rules are implemented down the line by orders to particular parties, and this does not serve to deprive the rules of finality. *See MPP*, 20 F.4th at 948 (rejecting argument that agency action was not "final until the agency applies it 'in a particular situation' to an affected person or entity"); *Biden*, 142 S. Ct. at 2545 n.7 ("The fact that the agency could not cease implementing MPP, as directed by the October 29 Memoranda" until the occurrence of a contingent event "did not make the October 29 Memoranda any less the agency's final determination of its employees' obligation to do so once such" an event would occur). And Defendants' own evidence reveals that agents have no such discretion in locations "where concertina wire is present" if the alternative would "force [aliens] who have entered the United States to leave the immediate area of the Rio Grande River" by "[t]ravers[ing] the river's shoreline." BeMiller Decl. ¶13.

In any case, the APA is routinely used to challenge policies that bake in discretion. ECF 23-1 at 27–30. That makes good sense—because every upstream policy requires downstream implementation by federal actors. For the same reason, the fact that this policy is implemented downstream does not mean it is committed to agency discretion. ECF 23-1 at 24–27. Because Defendants' policy applies anytime an alien is "present," it hardly requires "balanc[ing] a variety of factors in fast-moving situations."

To the extent Texas's modest request for an injunction against the destruction of its concertina-wire fencing may result in a change to some of DHS's policies and practices, that does not convert

Texas's claim into an impermissible "programmatic attack" on border policy, as Defendants suggest. ECF 23-1 at 29. Federal law differentiates between the subject of suit and the incidental effects of relief, clarifying that the APA permits challenges to "a specific 'final agency action' [which] has an actual or immediately threatened effect,' even when such a challenge has 'the effect of requiring a regulation, a series of regulations, or even a whole program to be revised by the agency.'" *Sierra Club v. Peterson*, 228 F.3d 559, 567 (5th Cir. 2000) (citation omitted).

**3.** Defendants' policy of declaring open season on property that belongs to someone else—indeed, property that serves as a barrier to illegal entry—is arbitrary and capricious. ECF 3-1 at 37–39; ECF 5 at 6. Defendants make no serious effort to reconcile their policy of destroying barriers with DHS's recent acknowledgment of an acute and immediate need for barriers.[8] Indeed, they do not even *discuss* that fact, which attests to a "fail[ure] to consider an important aspect of the problem." *Mexican Gulf Fishing Co. v. U.S. Dep't of Com.*, 60 F.4th 956, 971 (5th Cir. 2023) (quoting *Motor Veh. Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983)). Federal property—*i.e.*, fencing being constructed near Brownsville, Texas—gets to stand. Meanwhile, Texas property—*i.e.*, fencing being maintained near Eagle Pass, Texas—gets cut open, ripped up, or torn down on a daily basis. It would be hard to find a clearer picture of arbitrariness.

But even if Defendants had attempted to justify this unequal treatment, they have not "consider[ed] the costs and benefits" of cutting Texas's concertina-wire barriers. *Id.* at 971, 973. Defendants' own testimony reflects reliance on claimed benefits of reducing "injury and/or the loss of life of noncitizens attempting to enter the United States" without considering the impact on deterrence. BeMiller Decl. ¶16. All of that despite federal actors recognizing that concertina-wire

---

[8] DHS "says deterrence of illegal border activities is achieved *primarily* through border barriers." *GLO v. Biden*, 71 F.4th 264, 273 (5th Cir. 2023) (emphasis in original); *id.* ("DHS has affirmed that border barriers funnel illegal immigrants to areas where Customs and Border Protection is better prepared to intercept them, thus reducing illegal immigration," and "[i]n the absence of longer walls, at least some illegal aliens who otherwise would have been prevented from entering Texas will seek driver's licenses, education, and healthcare from Texas."); *see also* ECF 5 at 7 n.2 (recent DHS federal register notice stating that "[t]here is presently an acute and immediate need to construct physical barriers and roads in the vicinity of the border of the United States in order to prevent unlawful entries into the United States.")

barriers have undisputed benefits that Defendants have previously recognized. *See* Storrud Decl. ¶¶3-4, 7–16, Reply.Appx.002, 003–006 (detailing how federal employees collaborated with and even requested help from TMD to deploy concertina-wire fencing near El Paso, Texas, to deter illegal migration, protect federal and state law enforcement officers, and route aliens to safe, legal ports of entry).

**4.** The APA prohibits agency action "in excess of statutory jurisdiction, authority, or limitations." 5 U.S.C. § 706(2)(C). As "mere creatures of statute," federal agencies are likewise subject to *ultra vires* actions when they exceed their statutory authority. *Cf. Clean Water Action v. EPA*, 936 F.3d 308, 313 (5th Cir. 2019); *see also La. Pub. Serv. Comm'n v. FCC*, 476 U.S. 355, 374 (1986) ("[A]n agency literally has no power to act … unless and until Congress confers power upon it."). Defendants' policy and the actions taken pursuant to it plainly exceed any statutory authority or otherwise amount to *ultra vires* actions. ECF 3-1 at 32–34, 39–42; ECF 5 at 6.

Defendants' own recitation of the origins behind Congress's decision to enact 8 U.S.C. § 1357(a)(3) shows why: Defendants have the "duty to control and guard the boundaries and borders of the United States against the illegal entry of aliens." 8 U.S.C. § 1103(a)(5). "Before Congress enacted § 1357(a)(3)," however, USBP's operations were "seriously impaired by the refusal of some property owners along the border to allow patrol officers access to extensive border areas in order *to prevent such illegal entries*." ECF 23-1 at 11-12, 31–32 (emphasis added). Consistent with that focus on preventing illegal entries, federal law tasks Defendants with setting "national immigration enforcement policies and priorities," 6 U.S.C. § 202(5), in order to "ensure the interdiction of persons and goods illegally entering the United States," "detect, respond to, and interdict terrorists, drug smugglers and traffickers, human smugglers and traffickers, and other persons who may undermine the security of the United States," "safeguard the borders of the United States," and "enforce and administer all immigration laws." 6 U.S.C. § 211(c)(2), (5), (6), (8).

Here, Defendants have taken the position that they have no power to repel illegal entries as soon as an alien gets one inch past the border, that they must adopt an approach to apprehension that encourages illegal entry by routinely opening barriers to entry, and that, upon invoking that basis for

destroying Texas property, they need not actually apprehend aliens at all. Despite claiming their policy hinges on aliens effecting a crossing of the border and a need to apprehend, Defendants and their agents have created breaches in Texas's wire fencing *before* aliens even cross the border, ECF 3-2 at 23, and they have given migrants who pass through the fence freedom to move about the country, *id.* at 31, 33. Congress has not authorized Defendants to destroy State property for the purpose of facilitating unlawful entry into the United States. Not one of the provisions cited above authorizes Defendants to destroy and seize border infrastructure belonging to another sovereign to facilitate unlawful entry of aliens into the United States. The only statutory provision that even comes close authorizes Defendants to "have access to private lands, but not dwellings, for the purpose of patrolling the border *to prevent the illegal entry of aliens* into the United States." 8 U.S.C. § 1357(a)(3) (emphasis added). That provision provides no support whatsoever for a policy that is admittedly not about preventing illegal entry.

Defendants also rely on their general "power and duty to control and guard the boundaries and borders of the United States against the illegal entry of [noncitizens]" and to "perform such other acts as … necessary for carrying out [t]his authority." ECF 23-1 at 31 (quoting 8 U.S.C. § 1103(a)(3), (5)). But such general provisions do not extend limitless discretion, particularly to authorize the destruction of another sovereign's property for convenience rather than necessity.[9] The FDA made a similar argument in a recent case, pointing to the purpose statement in its authorizing Act reflecting the FDA's "general mission to protect the public health." *Apter v. HHS*, 80 F.4th 579, 589 (2023). The Fifth Circuit was unpersuaded, reasoning that general "statements of purpose … cannot override a statute's operative language." *Id.* (quoting *Sturgeon v. Frost*, 139 S. Ct. 1066, 1086 (2019)). Because the FDA could not point to "plain text" that "authorize[d] FDA to issue medical advice or recommendations," its "argument from the Act's purpose statement … leads nowhere." *Id.*

---

[9] The Fifth Circuit has rejected similar attempts by Defendants: "the broad grants of authority in 6 U.S.C. § 202(5), 8 U.S.C. § 1103(a)(3), and 8 U.S.C. § 1103(g)(2) cannot reasonably be construed as assigning decisions of vast economic and political significance" to DHS. *DAPA*, 809 F.3d at 183.

Far from being authorized by statute, Defendants' conduct would subject individual actors to criminal prosecution. A person who "encourages or induces an alien to come to, enter, or reside in the United States, knowing or in reckless disregard of the fact that such coming to, entry, or residence is or will be in violation of law" commits a felony offense. 8 U.S.C. § 1324(a)(1)(A)(iv). By creating gaps in Texas's concertina-wire fence, Defendants are rolling out the red carpet to illegal entry by aliens assembled across the Rio Grande. *See, e.g.*, Banks Decl. ¶¶15–20, Appx.020–025.

Congress has not granted Defendants authority to destroy Texas's property to facilitate unlawful migration. Texas is therefore likely to succeed on its claim that they have acted "without any authority whatever," *Pennhurst State Sch. & Hosp. v. Halderman*, 465 U.S. 89, 101 n.11 (1984), or have acted *ultra vires*.

## III. The State has pointed to an ongoing threat of irreparable harm.

First, the ongoing tortious damage of private property *is* irreparable. That is precisely why Texas courts permit awarding injunctive relief rather than damages. ECF 3-1 at 32 (citing cases). Defendants have inflicted monetary harm on Texas in the past and Texas may well choose to vindicate its right to pursue those remedies under the FTCA later. But money damages for past invasions are not an adequate remedy for a party being subjected to "repeated or continuing" invasions of its property rights, which inflict "irreparable injury." *Beathard Joint Venture v. W. Houston Airport Corp.*, 72 S.W.3d 426, 432 (Tex. App. 2002). "Many authorities support the rule that injunction is a proper remedy to restrain repeated or continuing trespasses." *Boiles v. City of Abilene*, 276 S.W.2d 922, 925 (Tex. App. 1955) (collecting cites); *see also Fort-Acre Spring Live Stock Co. v. W. Tex. Bank & Tr. Co.*, 118 S.W. 790, 791 (Tex. App. 1909) (approving award of injunction for "continuing" trespass). Even if Texas could recover the costs for each time Defendants damage it in the future, that *still* would not fully compensate the State for its harms. The fence is not a mere decoration with a value equal to its material parts—it performs a function that reduces the flow of illegal aliens into the State and the resulting costs. There is no way to compensate Texas for the lost utility of the fence as a fence. That by itself suffices to show that Texas will likely suffer irreparable harm absent a preliminary injunction.

With respect to the consequences flowing from illegal entry, Defendants confusingly claim that Texas identified harm "in merely two paragraphs." ECF 23-1 at 37. Not so. Texas explained at length the litany of harms flowing directly from illegal entry into Texas. ECF 3-1 at 9–14. And it should be common sense that concertina wire deters unauthorized entries and the harms associated with them. If that were not enough, though, Texas also cited the widespread practice using concertina wire around sensitive locations and statements from Defendants themselves admitting that it helps deter illegal entry. ECF 3-1 at 15–17. In fact, after this Court granted the TRO, Texas discovered that federal agents have themselves proposed that Texas deploy concertina-wire fencing to help deter illegal entry. *See* Storrud Decl. ¶¶3–4, 7–16, Reply.Appx.002, 003–006. The notion that Texas's concertina-wire fencing has not completely prevented illegal migration is beside the point. Texas is entitled to take efforts to *reduce* the flow of illegal migration and associated harms. And in any event, outlets criticizing the fence's effectiveness describe in the same breath how *the federal government is routinely cutting the wire*.[10] A fence that everyone knows will be destroyed anytime someone stands opposite it cannot serve as an effective fence. Defendants cannot rely on their own tortious conduct of destroying fences to establish that fences do not deter illegal entry.

In addition to the costs of repairs to state property and increased crime and human suffering because of unchecked illegal migration, Texas will also incur uncompensated "expenditures in providing emergency medical services, social services and public education for illegal aliens." *Texas v. DACA*, 50 F.4th at 518. The record in this case describes how the City of Eagle Pass was overwhelmed by a one-week surge of migrants facilitated by the federal Defendants. Understandably, city leaders declared a state of emergency and requested funding from the State. ECF 3-1 at 19; ECF 3-2 at 21. That same dynamic is sure to ripple across the State: In just the past two years, the number of aliens who illegally crossed the southern border in Texas was 2.6 million—greater than the population of

---

[10] *See, e.g.*, Patrick J. McDonnell & Hamed Aleaziz, *Razor Wire and Soldiers Fail to Deter Migrants: 'They Say Its Easier to Get in with Kids,'* L.A. Times (Oct. 2, 2023), https://www.latimes.com/world-nation/story/2023-10-02/razor-wire-soldiers-fail-deter-migrants-border (explaining how "day and night in Eagle Pass" federal agents "use[] pliers to cut open a passage through the thickets of barbed wire" and destroy the fence "soon" after TMD soldiers "roll[] out fresh loops to patch [a] hole").

the City of Houston.[11] Future public welfare expenditures are sure to come and past payouts may be unrecoverable because of the federal government's sovereign immunity. *Wages & White Lion Invs., LLC v. FDA*, 16 F.4th 1130, 1142 (5th Cir. 2021). Damages would not be available to cover that. *See MPP*, 20 F.4th at 1002 (Texas satisfied irreparable injury prong because costs from aliens in the State could not be recovered from federal government). Consider just a few areas where the State's expenditures are impacted by illegal migration, which Defendants' policy facilitates.[12]

First, the State funds healthcare programs that cover illegal aliens. Federal law requires Texas to include illegal aliens in its Emergency Medicaid program. *See* 42 C.F.R. § 440.225(c). That costs the State tens of millions of dollars annually. *See* Bricker Decl. ¶8, Appx.036–037 (estimating costs between $72 million and $116 million for various years). And Texas's Children's Health Insurance Program spends tens of millions of dollars each year on perinatal coverage for illegal aliens. *Id.* ¶10 Appx.037–038 (estimating costs between $11 million and $31 million for various years).

Second, the State also provides public education to illegal aliens, as the Supreme Court required in *Plyler v. Doe*, 457 U.S. 202, 230 (1982). The cost of educating unaccompanied alien children, which is only a subset of illegal aliens eligible for public education, is tens of millions of dollars per year. Meyer Decl. ¶4, Appx.060 (estimating annual costs between $27 million and $180 million).

Third, Texas also incarcerates many illegal aliens. Criminal activity that would not occur had an alien not been present imposes significant costs on Texans, not only in the form of victims' suffering but also in the significant financial cost of the criminal justice system. In one year alone, the Texas Department of Criminal Justice housed 7,058 illegal criminal aliens for a total of 1,984,597 days. Waltz

---

[11] Bob Price, *Migrants Apprehended in Texas-Based Border Sectors in Past Two Years Exceeds Houston Population*, Breitbart (Oct. 30, 2023), https://www.breitbart.com/border/2023/10/30/migrants-apprehended-in-texas-based-border-sectors-in-2-years-exceeds-houston-population/.

[12] Defendants argue that the Supreme Court's decision in *United States v. Texas*, 143 S. Ct. 1964 (2023), makes these injuries not judicially cognizable. ECF 23-1 at 38–39. But that case held those injuries non-cognizable solely because the States there were challenging a failure to take enforcement actions against aliens, which fell into nonreviewable executive discretion. *Texas*, 143 S. Ct. at 1973–76. That does not apply here—Plaintiff challenges affirmative actions of Defendants destroying its property. The destruction of private property "is not one of those areas traditionally committed to agency discretion." *New York*, 139 S. Ct. at 2568; *cf. Texas*, 143 S. Ct. at 1973–76 (using same analysis for APA reviewability under *Heckler v. Chaney* in determining whether there was a judicially cognizable injury in fact under Article III).

Decl. ¶8, Appx.032. That cost more than $150 million, but the federal government reimbursed the State less than $15 million. *Id.* ¶¶8–9, Appx.033. As one TDCJ official explained, "to the extent the number of aliens in TDCJ custody increases, TDCJ's unreimbursed expenses will increase as well." *Id.* ¶10, Appx.033.

Finally, consider the costs that additional illegal aliens impose on Texas's driver's license program. Texas provides driver's licenses to aliens so long as their presence in the United States is authorized by the federal government. Gipson Decl. ¶¶3–5, Appx.047–048. Texas loses money on each driver's license issued. *Id.* ¶8, Appx.049. The Chief of the Texas Department of Public Safety's Driver License Division has submitted a declaration estimating the costs of issuing additional licenses to aliens. *Id.* ¶8.

The destruction of Texas's concertina-wire fence facilitates the entry of more aliens into Texas. And the federal government is no longer subjecting newly arrived aliens to the Migrant Protection Protocols (MPP). That means aliens arriving at the border—to the extent they are even apprehended at all—are immediately granted parole and being released into the State to use healthcare services, obtain subsidized driver's licenses, and claim other costly public benefits. *MPP*, 20 F.4th at 966, 968. Some migrants crossing the southern border may ultimately make their way to other destinations, but it remains the case that Texas shoulders a "disproportionate share of [aliens]" and the costs detailed above do "not rest on mere speculation." *New York*, 139 S. Ct. at 2565-66.

## IV. The balance of the equities and public interest favor preliminary relief.

The harms Defendants assert do not outweigh these harms to Texas and its residents, which are immediate, irreparable, and continuing. A heightened risk of terrorist infiltration. A scourge of human trafficking. Illicit smuggling of the world's most dangerous opioid. Spikes in crime, violence, and property damage in border communities. And perils for migrants themselves making a dangerous journey. Defendants may choose not to admit it now, but on previous occasions they have recognized that concertina-wire fences, along with a variety of other tools, help ameliorate these harms. The benefits of awarding a preliminary injunction are clear.

Conversely, the Defendants face essentially no harm from maintaining the status quo ante. *See Wages & White Lion*, 16 F.4th at 1144 ("the *status quo* [is] the state of affairs before the" challenged

agency action). On the merits of Texas's common-law claims, Defendants "have no right to [damage] the [property] and assert none." *Itar-Tass Russian News Agency v. Russian Kurier Inc.*, 886 F. Supp. 1120, 1130–31 (S.D.N.Y. 1995). And evidence of federal and state cooperation—while using concertina-wire fencing in El Paso, Texas—shows there is absolutely no need for the broad policy of disrupting Texas's wire fencing to carry out Defendants' duties. *See* Storrud Decl. ¶17, Reply.Appx.006. Defendants have agents on both sides of Texas's fencing to apprehend aliens wherever they may be found. And the facts on the ground show Defendants are not all that interested in apprehending aliens anyway.

Instead, Defendants focus on foreign-policy concerns. ECF 23-1 at 40–41. "Our precedents, old and new, make clear that concerns of national security and foreign relations do not warrant abdication of the judicial role." *Holder v. Humanitarian Law Project*, 561 U.S. 1, 34 (2010). The idea that Defendants' approach to border enforcement would somehow do a better job of hampering "terrorists, criminals, and smugglers" is risible. And the fact that federal employees have received complaints from Mexico is irrelevant. Mexico could not dictate what kinds of fences property owners should maintain in Maverick County. To the extent foreign relations matter at all, then so should Congress's interests in that area. And Congress has expressed in statutory text that it expects Defendants to prevent, not invite, illegal entries. "[W]here the agency's discretion has been clearly constrained by Congress[,] [t]he public interest surely does not cut in favor of permitting an agency to fail to comply with a statutory mandate." *Ramirez v. Immigr. & Customs Enf't*, 310 F. Supp. 3d 7, 33 (D.D.C. 2018).

Finally, "the public is served when the law is followed." *Daniels Health Scis., L.L.C. v. Vascular Health Scis., L.L.C.*, 710 F.3d 579, 585 (5th Cir. 2013). A preliminary injunction here will be a step toward promoting respect for America's system of laws.

## CONCLUSION

Plaintiff respectfully requests the Court preliminarily enjoin Defendants from damaging, destroying, or otherwise interfering with Texas's concertina-wire fence or, alternatively, enter a stay of Defendants' policy directing the same.

Dated: November 5, 2023.

**KEN PAXTON**
Attorney General of Texas

**BRENT WEBSTER**
First Assistant Attorney General

**GRANT DORFMAN**
Deputy First Assistant Attorney General

**RALPH MOLINA**
Deputy Attorney General for Legal Strategy

**ROBERT HENNEKE**
Texas Bar No. 24026058
Texas Public Policy Foundation
901 Congress Ave.
Austin, Texas 78701
(512) 472-2700
rhenneke@texaspolicy.com

Respectfully submitted.

*/s/ Ryan D. Walters*
**RYAN D. WALTERS**
Chief, Special Litigation Division
Texas Bar No. 24105085

**DAVID BRYANT**
Special Counsel
Texas Bar No. 03281500

**MUNERA AL-FUHAID**
Special Counsel
Texas Bar No. 24094501

**HEATHER L. DYER**
Special Counsel
Texas Bar No. 24123044

Office of the Attorney General
Special Litigation Division
P.O. Box 12548, Capitol Station
Austin, Texas 78711-2548
(512) 936-1706
Ryan.Walters@oag.texas.gov
David.Bryant@oag.texas.gov
Munera.Al-Fuhaid@oag.texas.gov
Heather.Dyer@oag.texas.gov

**COUNSEL FOR PLAINTIFF**

**CERTIFICATE OF SERVICE**

I certify that a true and accurate copy of the foregoing document was filed electronically (via CM/ECF) on November 5, 2023, which automatically serves all counsel of record who are registered to receive notices in this case.

*/s/Ryan D. Walters*
RYAN D. WALTERS

**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF TEXAS**
**DEL RIO DIVISION**

| | |
|---|---|
| **THE STATE OF TEXAS**, | § |
| | § |
| *Plaintiff*, | § |
| | §    Civil Action No. 2:23-CV-00055-AM |
| **v.** | § |
| | § |
| **U.S. DEPARTMENT OF HOMELAND** | § |
| **SECURITY**, *et al.*, | § |
| | § |
| *Defendants*. | § |

**APPENDIX TO PLAINTIFF'S REPLY IN SUPPORT OF MOTION FOR**
**PRELIMINARY INJUNCTION OR STAY OF AGENCY ACTION**

| R-1 | Declaration of Sean Storrud | Reply.Appx. 001 - 007 |
|---|---|---|
| R-2 | Map of Concertina Wire Locations | Reply.Appx. 008 - 016 |

Dated: November 5, 2023.

**KEN PAXTON**
Attorney General of Texas

**BRENT WEBSTER**
First Assistant Attorney General

**GRANT DORFMAN**
Deputy First Assistant Attorney General

**RALPH MOLINA**
Deputy Attorney General for Legal Strategy

**ROBERT HENNEKE**
Texas Bar No. 24026058
Texas Public Policy Foundation
901 Congress Ave.
Austin, Texas 78701
(512) 472-2700
rhenneke@texaspolicy.com

Respectfully submitted.

*/s/ Ryan D. Walters*
**RYAN D. WALTERS**
Chief, Special Litigation Division
Texas Bar No. 24105085

**DAVID BRYANT**
Special Counsel
Texas Bar No. 03281500

**MUNERA AL-FUHAID**
Special Counsel
Texas Bar No. 24094501

**HEATHER L. DYER**
Special Counsel
Texas Bar No. 24123044

Office of the Attorney General
Special Litigation Division
P.O. Box 12548, Capitol Station
Austin, Texas 78711-2548
(512) 936-1706
Ryan.Walters@oag.texas.gov
David.Bryant@oag.texas.gov
Munera.Al-Fuhaid@oag.texas.gov
Heather.Dyer@oag.texas.gov

**COUNSEL FOR PLAINTIFF**

**CERTIFICATE OF SERVICE**

I certify that a true and accurate copy of the foregoing document was filed electronically (via CM/ECF) on November 5, 2023.

*/s/Ryan D. Walters*
RYAN D. WALTERS

## DECLARATION OF SEAN STORRUD

1.      My name is Sean Storrud. I am a Major in the Texas Army National

Guard. I am the commander of Operation Lone Star's Task Force (TF) West. In

that role, I am responsible for commanding Texas Military Department (TMD)

personnel in the City of El Paso and Big Bend region. I currently have 705 Soldiers

and Airmen under my command.  Our mission is to prevent, deter, and interdict

illegal border crossings.   In support of this mission, we provide overwatch of

approximately 20 linear miles of concertina wire barrier along the Rio Grande

River in the immediate vicinity of El Paso.   We directly support the Texas

Department of Public Safety in their law enforcement efforts.    TF West Soldiers

have turned back over 30,000 attempted illegal border crossings since January 1st

of this year.  We couldn't have done this without the concertina wire barrier.  We

initially established our concertina wire barrier in December of 2022 and since

that time, I have personally witnessed adult males in Mexico flashing guns and

knives at my Soldiers and cursing us.

2.      In my role overseeing Operation Lone Star's efforts in the western

sector, I regularly work and collaborate with a variety of federal entities, including

the U.S. Border Patrol (USBP), the U.S. Customs and Border Protection (CBP),

the International Boundary and Water Commission (IBWC), and their agents and

employees.

3.      In particular, I have worked and collaborated with federal employees to procure, deploy, and maintain concertina wire barriers to deter illegal migration into Texas and the United States, including the same kind of concertina wire fencing that Texas has deployed near Eagle Pass, Texas.

4.      Over the past year, this collaboration has been extensive. CBP employees have proposed projects using concertina wire, state agents have given concertina wire to federal agents to assist them in deploying wire fencing, and federal agents have given concertina wire to state agents to assist them in doing the same. USBP employees have even considered asking TMD soldiers to help train federal agents on how to deploy concertina wire.

5.      Texas's border with Mexico passes through five different border patrol sectors designated by CBP—the Rio Grande Sector, the Laredo Sector, the Del Rio Sector, the Marfa Sector, and the El Paso Sector. Each sector is itself comprised of multiple stations.

6.      The El Paso Sector covers the City of El Paso and the surrounding areas. It also covers the entire State of New Mexico and is comprised of 10 different sections. The Santa Teresa Station, for example, includes the far western portion of the City of El Paso as well as large stretches of the Chihuahuan Desert in New Mexico just west of El Paso.

**Reply.Appx.002**

7.      In late January or early February 2023, an officer from USBP's El Paso Station contacted TF West to arrange a meeting with USBP's Santa Teresa Station. I personally met with BP agents on the ground near American Dam (at the corner where the Texas, Mexico, and New Mexico borders meet), where they proposed placing concertina wire fencing along the Texas-New Mexico border. Federal agents described how migrants were illegally crossing the border into New Mexico and then crossing the Rio Grande into Texas.  After crossing into Texas, migrants would attempt to cross two highways on foot.  On multiple occasions migrants were hit by vehicular traffic. TMD soldiers, myself included, agreed with the federal agents' recommendation that deploying concertina wire fencing would help deter these illegal crossings in and around El Paso and to route migrants to lawful ports of entry.  At the time, however, TF West lacked the engineers and manning necessary to install the concertina wire due to higher priority projects.  This project would be started in May of 2023.

8.      On or around May 6, 2023, USBP contacted TMD about an existing breach in a federal border wall around Yarborough Drive on the east side of El Paso. Migrants illegally crossing through the breach were often seen rushing to getaway cars parked on Yarborough just across the river and speeding away to evade apprehension. At the request of USBP, TMD deployed concertina wire to prevent migrants from entering through this breach.

9.     On May 11, 2023, the federal government allowed the Title 42 program to expire as President Biden had previously announced. Because federal and state law enforcement officers anticipated a large surge of illegal migration as soon as the program ended, CBP agents requested TMD provide additional concertina wire to deploy across the Paso Del Norte Bridge in El Paso, Texas, and around the base of the bridge.

10.    On May 12, 2023, hundreds of migrants rushed across the Paso Del Norte Bridge in an attempt to overrun CBP.  CBP was able to turn back the migrants with the assistance of barriers reinforced with concertina wire.  At the same time, Texas agents (TMD and DPS) stood alongside USBP officers under the bridge at a TMD installed barrier turning back hundreds more migrants. In both cases the concertina wire barrier managed to prevent the mass of migrants from entering illegally. At CBP's request, TMD provided CBP a half pallet of concertina wire to assist CBP in reinforcing the bridge for officer protection to ensure that, in the event of a riot, adequate distance was maintained between CBP officers and rioters.

11.    On May 13, 2023, I personally oversaw TMD soldiers installing concertina wire fencing along the first quarter of a mile of the Texas-New Mexico border, consistent with the proposal of USBP agents (from the meeting in early February).  We removed the concertina wire a couple of weeks later at the request

of IBWC in order to facilitate river maintenance. By that time, irrigation water had been released from upstream forming a lake in that area.

12.    In August 2023, CBP agents obtained a large supply of concertina wire at the U.S. Army base at Fort Bliss in El Paso, Texas. At the request of CBP agents, TMD soldiers helped load the coils of concertina wire onto trucks so that federal agents could transport the wire to New Mexico and deploy it there.

13.    On or around September 7, 2023, an officer from CBP once again contacted TMD about resuming the earlier proposal to deploy one and a half miles of concertina wire fencing along the Texas-Mexico border and one and a half miles of concertina wire fencing along the Texas-New Mexico border in western El Paso. A couple of weeks later, Texas DPS requested a concertina wire barrier in the same location for the same reason. Migrants crossing into Texas in that area were crossing highways on foot or getting picked up resulting in high-speed chases putting themselves and the residents of El Paso in danger.

14.    Although TMD initially agreed to resume the project, I notified federal agents that TMD lacked sufficient supply of concertina wire at that time to complete it. Just as TMD had previously given concertina wire to USBP, on this occasion USBP gave 40 pallets of concertina wire to TMD. A USBP officer even suggested using TMD soldiers to train federal agents on how to deploy concertina wire fencing so they could deploy similar barriers in New Mexico.

15.      On or around October 4, 2023, at CBP's request and using CBP-provided concertina wire, TMD began to erecting a concertina wire fence along the one and a half mile stretch of the Texas- New Mexico border. Since then, TMD has also begun erecting a concertina wire fence along the immediately adjoining one and a half mile stretch of the Texas-Mexico border.

16.      TMD has deployed over 17 miles of concertina wire along the border in the El Paso area. To my knowledge, no federal official in the El Paso area has cut, damaged, destroyed, or tampered with TMD's concertina wire without first coordinating with TMD personnel. I have never heard a federal agent express concern that concertina wire reduced agents' visibility of the Rio Grande or migrant activity there.

17.      In my experience, federal and state agents have routinely worked together to ensure they can carry out their duties while deploying and maintaining concertina wire in El Paso, Texas. For example, TMD has temporarily repositioned wire barriers to allow for grass cutting, to allow IBWC equipment to pass, and to address discrete medical emergencies. These actions by TMD are always done in a deliberate and controlled manner. TMD personnel routinely close any breach as soon as the immediate need has dissipated, rather than leaving a breach open to facilitate illegal entries.

I hereby declare under penalty of perjury, pursuant to 28 U.S.C. § 1746, that the foregoing is true and correct to the best of my knowledge and information.

Signed this 4th day of November 2023.

STORRUD.SEAN.DA
NIEL.1266949673

Digitally signed by
STORRUD.SEAN.DANIEL.126694
9673
Date: 2023.11.04 15:43:20 -06'00'

Sean D. Storrud
MAJ, FA, TXARNG
TF WEST, Commanding



## C-Wire

| County | Total installed C-Wire (in miles) | Total Reinforced C-Wire (In miles) | CONNEX |
|--------|-----------------------------------|-------------------------------------|--------|
| Val Verde | 0 | 0 | 0 |
| Maverick | 29.08 | 10.94 | 98 |
| Webb | 0.00 | 0.00 | 0 |
| Zapata | 0.00 | 0.00 | 0 |
| Starr | 3.13 | 1.79 | 0 |
| El Paso | 24.13 | 5.12 | 0 |
| Cameron | 8.41 | 1.29 | 0 |
| Hidalgo | 17.58 | 5.62 | 0 |
| Total | 82.33 | 24.76 | 98 |
| | 107.09 | | |

Notes:

Reply.Appx008

250900SEP23



# Operation Lone Star -- Val Verde



## C-Wire

| County | Total installed C-Wire (In miles) | Total Reinforced C-Wire (In miles) | CONNEX |
|---|---|---|---|
| Val Verde | 0 | 0 | 0 |
| Maverick | 29.08 | 10.94 | 98 |
| Webb | 0.00 | 0.00 | 0 |
| Zapata | 0.00 | 0.00 | 0 |
| Starr | 3.13 | 1.79 | 0 |
| El Paso | 24.13 | 5.12 | 0 |
| Cameron | 8.41 | 1.29 | 0 |
| Hidalgo | 17.58 | 5.62 | 0 |
| Total | 82.33 | 24.76 | 98 |
| 107.09 | | | |

Notes:

Reply.Appx009
250900SEP23





## C-Wire

| County | Total installed C-Wire (In miles) | Total Reinforced C-Wire (In miles) | CONNEX |
|---|---|---|---|
| Val Verde | 0 | 0 | 0 |
| Maverick | 29.08 | 10.94 | 98 |
| Webb | 0.00 | 0.00 | 0 |
| Zapata | 0.00 | 0.00 | 0 |
| Starr | 3.13 | 1.79 | 0 |
| El Paso | 24.13 | 5.12 | 0 |
| Cameron | 8.41 | 1.29 | 0 |
| Hidalgo | 17.58 | 5.62 | 0 |
| Total | 82.33 | 24.76 | 98 |
| | 107.09 | | |

Notes:





### C-Wire

| County | Total installed C-Wire (In miles) | Total Reinforced C-Wire (In miles) | CONNEX |
|---|---|---|---|
| Val Verde | 0 | 0 | 0 |
| Maverick | 29.08 | 10.94 | 98 |
| Webb | 0.00 | 0.00 | 0 |
| Zapata | 0.00 | 0.00 | 0 |
| Starr | 3.13 | 1.79 | 0 |
| El Paso | 24.13 | 5.12 | 0 |
| Cameron | 8.41 | 1.29 | 0 |
| Hidalgo | 17.58 | 5.62 | 0 |
| Total | 82.33 | 24.76 | 98 |
| | 107.09 | | |

Notes:

Cause No: 23-50869    Document:    Page: 49    Date Filed: 12/04/2023

Reply.Appx011

250900SEP23



## C-Wire

| County | Total installed C-Wire (In miles) | Total Reinforced C-Wire (In miles) | CONNEX |
|---|---|---|---|
| Val Verde | 0 | 0 | 0 |
| Maverick | 29.08 | 10.94 | 98 |
| Webb | 0.00 | 0.00 | 0 |
| Zapata | 0.00 | 0.00 | 0 |
| Starr | 3.13 | 1.79 | 0 |
| El Paso | 24.13 | 5.12 | 0 |
| Cameron | 8.41 | 1.29 | 0 |
| Hidalgo | 17.58 | 5.62 | 0 |
| Total | 82.33 | 24.76 | 98 |
| 107.09 | | | |

Notes:



## C-Wire

| County | Total installed C-Wire (In miles) | Total Reinforced C-Wire (In miles) | CONNEX |
|---|---|---|---|
| Val Verde | 0 | 0 | 0 |
| Maverick | 29.08 | 10.94 | 98 |
| Webb | 0.00 | 0.00 | 0 |
| Zapata | 0.00 | 0.00 | 0 |
| Starr | 3.13 | 1.79 | 0 |
| El Paso | 24.13 | 5.12 | 0 |
| Cameron | 8.41 | 1.29 | 0 |
| Hidalgo | 17.58 | 5.62 | 0 |
| Total | 82.33 | 24.76 | 98 |
| | 107.09 | | |

Notes:

Case No. 23-50869  Document:  Page: 51  Date Filed: 12/04/2025
Reply.Appx013
250900SEP23



## C-Wire

| County | Total installed C-Wire (In miles) | Total Reinforced C-Wire (In miles) | CONNEX |
|--------|-----------------------------------|-------------------------------------|--------|
| Val Verde | 0 | 0 | 0 |
| Maverick | 29.08 | 10.94 | 98 |
| Webb | 0.00 | 0.00 | 0 |
| Zapata | 0.00 | 0.00 | 0 |
| Starr | 3.13 | 1.79 | 0 |
| El Paso | 24.13 | 5.12 | 0 |
| Cameron | 8.41 | 1.29 | 0 |
| Hidalgo | 17.58 | 5.62 | 0 |
| Total | 82.33 | 24.76 | 98 |
| | 107.09 | | |

Notes:

Reply.Appx014

250900SEP23



## C-Wire

| County | Total installed C-Wire (In miles) | Total Reinforced C-Wire (In miles) | CONNEX |
|---|---|---|---|
| Val Verde | 0 | 0 | 0 |
| Maverick | 29.08 | 10.94 | 98 |
| Webb | 0.00 | 0.00 | 0 |
| Zapata | 0.00 | 0.00 | 0 |
| Starr | 3.13 | 1.79 | 0 |
| El Paso | 24.13 | 5.12 | 0 |
| Cameron | 8.41 | 1.29 | 0 |
| Hidalgo | 17.58 | 5.62 | 0 |
| Total | 82.33 | 24.76 | 98 |
| | 107.09 | | |

Notes:

Reply.Appx015

**250900SEP23**





## C-Wire

| County | Total installed C-Wire (In miles) | Total Reinforced C-Wire (In miles) | CONNEX |
|---|---|---|---|
| Val Verde | 0 | 0 | 0 |
| Maverick | 29.08 | 10.94 | 98 |
| Webb | 0.00 | 0.00 | 0 |
| Zapata | 0.00 | 0.00 | 0 |
| Starr | 3.13 | 1.79 | 0 |
| El Paso | 24.13 | 5.12 | 0 |
| Cameron | 8.41 | 1.29 | 0 |
| Hidalgo | 17.58 | 5.62 | 0 |
| Total | 82.33 | 24.76 | 98 |
| | 107.09 | | |

Notes:

Reply.Appx016

250900SEP23

**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF TEXAS**
**DEL RIO DIVISION**

| | | |
|---|---|---|
| **THE STATE OF TEXAS**, | § | |
| | § | |
| *Plaintiff*, | § | |
| | § | CIVIL ACTION NO. 2:23-CV-00055-AM |
| **v.** | § | |
| | § | |
| **U.S. DEPARTMENT OF HOMELAND** | § | |
| **SECURITY**, *et al.*, | § | |
| | § | |
| *Defendants*. | § | |

## [Proposed] Order Granting Motion to Exceed Page Limitations

Before the Court is Defendants' Motion to Exceed Page Limitations. After considering the motion, record, and relevant authorities, the Court hereby GRANTS the motion and allows Plaintiff 20 pages for its Reply in Support of its Motion for Preliminary Injunction or Stay of Agency Action.

SIGNED on this the _____ day of _____, 2023.

_____
Hon. Alia Moses
United States District Judge

Exhibit C

# DECLARATION OF MICHAEL BANKS

1.      My name is Michael Banks. I am the Special Advisor on Border Matters to the Governor of Texas, often referred to as the "Texas Border Czar." In that role, I am responsible for coordinating and implementing border security strategies under Operation Lone Star.

2.      For almost three decades, I have worked in security and law-enforcement operations along the U.S.-Mexico border. For 10 years, I served in the United States Navy, where I worked in border law enforcement as a member of the Navy Military Police. I then spent 23 years working as an agent in the U.S. Customs and Border Protection ("CBP"), U.S. Border Patrol ("USBP"), an agency housed within the U.S. Department of Homeland Security ("DHS"), serving under five different presidential administrations—from President Clinton to President Biden.

3.      Among other responsibilities, CBP is tasked with "ensur[ing] the interdiction of persons and goods illegally entering the United States"; "detect[ing], respond[ing] to, and interdict[ing] terrorists, drug smugglers and traffickers, human smugglers and traffickers, and other persons who may undermine the security of the United States;" "safeguard[ing] the borders of the

United States"; and "enforc[ing] and administer[ing] all immigration laws." 6 U.S.C. § 211(c)(2), (5), (6), (8); *see also id.* § 211(e)(3) (specifying duties of the U.S. Border Patrol within CBP).

4.      I have carried out those duties in leadership roles for CBP with responsibilities across California, Arizona, and Texas. From 2019 to 2021, I served as Patrol Agent in Charge for the McAllen, Texas Border Patrol Station, with responsibility for the command of a large station with over 600 agents, 80 supervisors, and 7 support staff, and for the management of budget and a payroll. During my time at the, station manpower grew to 1,100 with the addition of 210 Office of Field Operations ("OFO") officers and 198 National Guard and Activity Duty soldiers. I managed and oversaw the following: various enforcement, detention, and processing operations; seizure of property; fleet maintenance and supplies; facility construction and alteration; budgeting and procurement; technology projects; community relations; and partnerships with other agencies. I managed these operations for a dynamic operating environment that spans 53 river miles and a total of 7,254 square miles, including 10 cities, 3 ports of entry, National Parks, and several wildlife refuges. I led and managed the following: labor and employment issues; air coordination; disruption initiatives; intelligence; Processing Investigations Team; Common Intelligence Picture; administrative reports; pay cap issues; trend analysis; agent deployments; technology

deployments; specialty units; employee recognition; budget; Continuity of Operations; training requirements; health and safety; Integrated Mission Analysis; joint operations; media relations; International Liaison Unit; facilities; station enforcement targets; vehicle fleet; and critical incidents. On a regular basis, I coordinated operations with all three ports of entry, the Weslaco and Rio Grande City Border Patrol stations, the Rio Grande Valley Sector Intel, Air Support, CBP's Special Operations Group, Joint Field Command, National Park Service, Fish and Wildlife, Cameron and Hidalgo County Sherriff Departments, 10 different city police departments as well as their mayors, High Intensity Drug Trafficking Areas, and public land managers.

5. From 2022 to 2023, I served as Patrol Agent in Charge for Weslaco, Texas, with responsibility for the command of a large station with over 400 agents, 60 supervisors, and 5 support staff, and for the management of an annual budget and payroll. I managed and oversaw the following: various enforcement, detention, and processing operations; seizure of property; fleet maintenance and supplies; facility construction and alteration; budgeting and procurement; technology projects; community relations; and partnerships with other agencies. I managed these operations for a dynamic operating environment that spans 48 river miles and a total of 5,144 square miles, including 8 cities, 2 ports of entry, National Parks, and several wildlife refuges. I led and managed the following:

labor and employment issues; air coordination; disruption initiatives; intelligence; Processing Investigations Team; Common Intelligence Picture; administrative reports; pay cap issues; trend analysis; agent deployments; technology deployments; specialty units; employee recognition; budget; Continuity of Operations; training requirements; health and safety; Integrated Mission Analysis; joint operations; media relations; International Liaison Unit; facilities; station enforcement targets; vehicle fleet; and critical incidents. On a regular basis, I coordinated operations with all three ports of entry, the Weslaco and Rio Grande City Border Patrol stations, the Rio Grande Valley Sector Intel, Air Support, CBP's Special Operations Group, Joint Field Command, National Park Service, Fish and Wildlife, Cameron and Hidalgo County Sheriff Departments, 10 different city police departments as well as their mayors, High Intensity Drug Trafficking Areas, and public land managers.

6.      I have also held leadership positions in CBP with responsibility for outside of Texas. From 2021 to 2022, I served as Deputy Chief for Law Enforcement Operational Programs at the U.S. Border Patrol Headquarters in Washington, D.C. This position is the number five official in charge of the U.S. Border Patrol and had direct supervision over the immigration, prosecution, custody, and detention division which oversees and implements U.S. Border

Patrol Policy for the entire U.S. border with respect to immigration, prosecution, custody, and detention.

7.      I have been recognized for my decades of federal service in CBP and the U.S. Navy with numerous awards. In 1994, I received the Navy and Marine Corps Achievement Medal for superior performance. In 1997, I received the Navy and Marine Corps Achievement Medal gold star in lieu of second award for superior performance, among other Navy awards and accommodations. In 2022, I received the U.S. Border Patrol Meritorious Achievement Award for my leadership in handling the 2021 migrant surge. In the years 2006 through 2022, I received Outstanding Performance awards for my leadership in CBP and was rated the top performer in each of these years when rated against my peers. In each of those years I also received case awards for Outstanding Performance in leadership.

8.      On January 30, 2023, Governor Abbott named me the first ever Border Czar for the State of Texas. In that role, I work closely with the Texas Military Department ("TMD"), the Texas Department of Public Safety ("DPS"), the Texas National Guard (the "Guard"), the Texas Facilities Commission ("TFC"), local and municipal governments, and private landowners along the border. My responsibilities include facilitating the construction of Texas's border wall, strategic advising on the deployment of other border infrastructure like

concertina wire and buoy systems, and regular consultation with federal, state, and local law-enforcement partners to respond to the surge of illegal migration.

9.     Specifically, I have worked with other state agencies participating in Operation Lone Star to coordinate strategic placement of border infrastructure based on identifying historical hotspots for illicit traffic and shifting illegal migration patterns across the Rio Grande. I have worked with private landowners along the border to secure agreements to permit state construction of steel-bollard fencing. Under Operation Lone Star, Texas has already constructed 12 miles of this border wall and is on pace to complete one mile of new construction every two weeks. I have also advised on the safety, effectiveness, and costs for the deployment of buoy systems in the Rio Grande and placement of concertina wire to deter illegal and dangerous crossings.

10.     To facilitate regular supervision of these efforts along the southern border, my office is based in Hidalgo County, Texas. To that end, I also regularly travel along Texas's border with Mexico to observe the construction of the border wall and deployment of concertina wire, to meet with state and federal law-enforcement officials, and to monitor the mass illegal entry of migrants into this country. Although my work regularly takes me across all fourteen Texas counties touching the U.S.-Mexico border, in recent weeks, I have spent additional time in Maverick County because of a surge in illegal crossings near Eagle Pass, Texas in

September of this year. Over a one-week period, almost 14,000 migrants—half the entire population of Eagle Pass—entered the City illegally. The following week, more than 4,000 migrants illegally crossed into Eagle Pass in a single day. I personally observed much of this surge in Eagle Pass from September 18 to September 22.

11.    In response to this massive influx of migrants, the Mayor of Eagle Pass issued an emergency declaration under the Texas Disaster Act of 1975. On September 19, 2023, Mayor Rolando Salinas, Jr., declared a state of disaster "due to the severe undocumented immigrant surge into the City of Eagle Pass." On September 26, 2023, the City Council ratified the mayor's disaster declaration, stating that it would remain in effect until terminated by the City Council. As far as I am aware, the Eagle Pass City Council has not terminated the disaster declaration.

12.    TMD has taken steps to address and deter this sudden influx by deploying concertina wire along the border near Eagle Pass. I am in regular communication with TMD, which purchases, deploys, and maintains concertina wire on state, municipal, and private land. In every instance where TMD has deployed wire on municipal or private land, the landowner has agreed to allow Texas to place its wire fence to deter illegal crossings. I have personally observed TMD officers placing the concertina wire along the border near Eagle Pass. On

many of these occasions, CBP officials have also been physically present and observed Texas officials placing wire fencing.

13.     I have also personally observed federal officials damage this wire fence to facilitate the surge of migrants into Eagle Pass by cutting gaps into the wire and pulling the fence apart to destroy its ability to serve as a fence against illegal entries. On the days I have been present near Eagle Pass, federal officials have cut, destroyed, or otherwise damaged Texas's wire fencing there on almost a daily basis. I have documented many of these incidents by capturing video recordings on my cellular phone. Based on conversations with TMD officers and other state employees stationed in Eagle Pass, I understand that my observations are typical of ongoing federal efforts to damage and destroy Texas's border infrastructure.

14.     On repeat occasions I have observed federal agents—not migrants, cartel members, or state officials—cut Texas's concertina wire and then attach ropes or cables from the back of pickup trucks to assist migrants illegally climbing up the bank into Texas. Instead of merely cleaning up mangled wire, I have regularly observed federal officers cut new openings into the fence, sometimes immediately after Texas officers have placed new wire to plug up gaps in the fencing barrier. On some occasions, I have witnessed federal officers cut a new gap in the wire fence roughly 10 feet from an existing opening, seemingly for no

purpose other than to destroy state property. And I have regularly observed federal agents cut wire for migrants who are in no apparent distress, whether immediately upon migrants reaching the Texas bank or even as they begin to assemble on the opposite riverbank.

15. For example, on September 20, 2023, I observed federal officials destroy state property by cutting Texas's wire on municipal land owned by the City of Eagle Pass. On this occasion, I approached several members of CBP leadership standing at a large hole that had been cut into the Texas wire. I also noticed that a green and white marked Border Patrol service truck was backed up to the hole, one end of a rope was tied to the bumper of this truck, and the other end of this rope was in the river. Migrants were using the rope to ease their climb

up the riverbank. Below is a still shot taken from one of the videos that truly and accurately depicts the scene on September 20, 2023.



The video footage is attached to this declaration as **Exhibit A**.

16.     While at the scene, I asked the senior federal agent why they had cut Texas's wire fencing, to which he responded that they had acted to prevent a possible drowning sometime earlier. Surveying the scene, I observed no migrants in distress. Instead, I saw a line of more than 2,000 migrants stretching across the Rio Grande, calmly and steadily approaching the Texas riverbank to make use of

openings in the wire fence. Below is a still shot taken from one of the videos that also truly and accurately depicts the scene at the border that day.



The video footage is attached to this declaration as **Exhibit B**.

17.     During the conversation, I advised the federal agent that I was aware that a boat unit had assisted an illegal immigrant in the river about half an hour earlier, but I asked him what that had to do with cutting the wire in the first place and allowing it to stay open thereafter. As I observed the scene, it was clear that the wire fence was not impeding law enforcement boats from operating along river. I then pointed to the long line of migrants illegally streaming from Mexico across the river and through the fence gap. I advised the federal agent that the hole CBP had cut in Texas's wire was attracting and inviting migrants to cross and that,

if he was concerned about drowning, it was critical to close the hole and cut off the open invitation. The federal agent responded, "I'm not in charge."

18.     I then asked him who was in charge, to which he stated let me get him and walked away. The federal agent returned with his supervisor, Deputy Patrol Agent in Charge, whom I asked what's the plan here. He responded in a raised and angry voice, "You were in the patrol not that long ago. You know the plan." I responded that I had been in CBP leadership not that long ago, but that I had never, and would not ever, facilitate illegal entry. I also advised him I did not know "the plan," which is why I was asking for an explanation. He did not respond to my question. I then asked him how long he planned to keep the hole open. He replied, "until they are all in," looking out at the long line of migrants. I responded that Texas would have its engineers close all the holes, to which he responded, "I will just cut it again." After I responded, "and we will patch it up again," The lead agent  became angry and shouted, "If that's the case, I will tie a fucking tow strap to this shit and rip it all out." Refusing to escalate the argument, I walked away. I got back to my vehicle and was in the process of reaching out to TMD to have them respond to the area to close the hole, when I heard Mr. Trevino yell out to another agent "get me the fucking cutters."

19.     At this point, I ordered a sergeant with TMD to film the episode. We then witnessed this supervisor move approximately 10 to 15 feet down river from

the current hole and start cutting a new hole. Below is a still shot from the video attached as **Exhibit A**.



There was no need to make additional cuts in the wire fence as CBP had already had an existing breach in the wire fence just a few feet away that they were using to shuttle migrants illegally into the United States.

20.    During this entire episode, migrants continued using the rope that CBP had placed off the back of a pickup truck to climb up the riverbank, and law-enforcement boats continued moving along the Rio Grande unimpeded. Below is a still shot taken from one of the videos that truly and accurately depicts the scene on September 20, 2023.



Footage of this episode is included in the video attached to this declaration as **Exhibit C**.

21.     Likewise, on September 26, 2023, I observed CBP leadership cut Texas's wire on private property owned by a local farmer. On this occasion, Texas National Guard had just completed breach repairs to the Texas wire and moved on to another area to conduct more repairs. Within minutes, CBP leadership, specifically the Deputy Patrol Agent in Charge, came behind the soldiers and cut the wire.

22.     Based on my own observations and conversations, it was my opinion that CBP officials were aware they were damaging state property. As my interaction with Mr. Trevino shows, CBP officials routinely cut wire immediately after it has been placed by TMD officers. TMD has told me that on September 20, 2023, a Sergeant from the Texas National Guard observed two members of CBP

leadership cutting Texas wire. When the Sergeant approached the CBP agents and asked about them cutting the wire, the Supervisor from the two previous incidents told the Sergeant to "back the fuck off, and you better not record us." This incident was reported to the TMD chain of command.

23.     Based on my observations, it is my opinion that Texas's wire fence in no way prevents federal officials from providing drinking water and food, emergency medical response, or other safety measures to migrants crossing the Rio Grande. While federal officials cut Texas's wire fence, law-enforcement airboats regularly move along the Rio Grande freely to perform water rescues or other river operations. And CBP has regular access points and station houses along the riverbank, both at lawful ports of entry and elsewhere.

24.     I have personally spoken with many Border Patrol Agents who are opposed to the federal government's policy and practice of cutting Texas's concertina wire. Many officers have told me they believe that routine efforts by the federal government to destroy or damage Texas's border infrastructure undercuts CBP's mission to secure our nation's border, enforce federal immigration laws, and deter and interdict illegal entries facilitating an epidemic of drug, weapons, and human smuggling. Brandon Judd, President of the National Border Patrol Council, which is the Border Patrol's labor union, has similarly

denounced the wire-cutting policy being implemented by CBP under the Biden Administration.

25.     Because of discomfort with the federal government's deliberate efforts to make the southern border less secure, many Border Patrol Agents have told me they refuse to cut Texas's wire fencing after being instructed to do so by Border Patrol leadership. The federal government has thus been forced to enlist higher-level Border Patrol leadership to perpetrate the damage and destruction of Texas's wire fence. On multiple occasions, I have personally observed leadership and management-level officials, like the Deputy Patrol Agent in Charge I describe herein, damage state property by cutting and destroying Texas's concertina wire.

I hereby declare under penalty of perjury, pursuant to 28 U.S.C. § 1746, that the foregoing is true and correct to the best of my knowledge and information.

Signed this 23rd day of October 2023.

Michael Banks

Special Advisor on Border Matters
to the Governor of Texas

Exhibit D

# DECLARATION OF CARLOS R. GARCIA

1. My name is Captain Carlos R. Garcia. I currently serve as the Officer in Charge of engineering operations for Operation Lone Star including construction, maintenance, and repair of concertina wire, or c-wire, fencing.

2. I have worked in both federal and state military engineering operations for almost a decade. From 2013 to 2019, I worked as a logistics officer for the Texas Military Department ("TMD") in the Combat Engineer Company, training engineers to support Operation Enduring Freedom, Guantanamo Bay. From 2019 to 2021, I worked as an operations officer in the United States Military Entrance Processing Command. I began serving in my current role as Captain in the 156th Brigade Engineer Battalion in 2021.

3. My current responsibilities include working closely with the Battalion Executive Officer. I write operational directives, plans, and tactical orders, overseeing field training exercises and training schedules, and preparing recommended courses of action for the regiment commander. As the officer in charge of engineering operations, I also oversee a staff of 77 people assigned to operational control and four different Special Response Teams ("SRTs") of about forty engineers each.

4. Engineering SRTs are divided across four strategic locations along Texas's southern border: SRT 1 is based in the Rio Grande Valley; SRT 2 is assigned

to the region surrounding the City of Zapata; SRT 3 is assigned to the region surrounding the City of Eagle Pass; and SRT 4 is assigned to the western corridor near the City of El Paso.

5.      Part of my responsibilities include overseeing Operation Lone Star engineer deployment, installation, maintenance, and repair of border infrastructure, like Texas's c-wire fencing, and the strategic allocation of our engineers to carry out those tasks as the mission demands.

6.      For much of this year, members of SRT 2 deployed to assist SRT 3 with engineering operations near Eagle Pass, Texas. As part of that mission, engineers cleared land to increase visibility and constructed miles of c-wire fencing. Engineers are continuously deployed in the vicinity of Eagle Pass to construct, maintain, and repair Texas's c-wire fence.

7.      C-wire is a type of barbed wire that is formed in large coils and can expand like a concertina, a musical instrument that resembles an accordion. A single roll is usually 36 inches in diameter and can be stretched to span more than 50 feet of distance and connect with other rolls and other components to form a continuous fence. To enhance effectiveness, however, engineers usually do not stretch a single coil of wire to its maximum possible length, instead stretching each roll to around almost 40 feet.

8.     Texas's c-wire fence consists of more than just c-wire. To make a continuous fence, fencing stakes are placed in the ground and spaced out every five to six feet. C-wire is then stretched along the line of fencing stakes, attaching successive rolls of wire to each other by clamps and attaching rolls to the fence stakes with tying wires. Additionally, ground anchors are placed at intervals to keep the c-wire coils flush with the ground.

9.     To the best of my knowledge, engineers employ this fencing structure using a minimum of three rows of c-wire. Two rolls of wire are situated on the ground on either side of the stake line, while a third roll is installed above and between them in line with the fencing stakes. On some occasions, engineers construct the c-wire fence using four, five, or even six rows of coil depth. Engineers almost never deploy just one or two coils, which would highly reduce the fence's efficacy as a barrier.

10.     C-wire fencing is installed on municipal or private land only with the agreement of the landowner. The Texas Department of Public Safety ("DPS") initiates conversations with landowners about permission to place c-wire fencing. On some occasions landowners themselves request c-wire fencing. Operation Lone Star then executes a written Border Barrier License Agreement with the landowner authorizing construction, maintenance, and repair of c-wire fencing.

11.     When the c-wire fence is destroyed, damaged, or breached, it is our practice to have local officers send a report to the Lone Star Battle Desk, which also forwards those incident reports to the engineering team. Accordingly, my group is regularly made aware of incidents of damage to Texas's c-wire fence in order deploy SRTs to promptly make repairs.

12.     I am aware that officials of the U.S. Customs and Border Protection ("CBP") have seized, cut, and otherwise damaged Texas's c-wire fence near Eagle Pass, Texas, on numerous occasions since September 20, 2023. Incident reports I have reviewed show that CBP officials have cut breaches into Texas's c-wire fence more than twenty times just between September 20 and October 10 of this year. Those include the following reported incidents:

    a.  On September 21, 2023, CBP officials cut Texas's c-wire near Eagle Pass, Texas, at 4:45 AM.

    b.  On September 24, 2023, CBP officials cut Texas's c-wire near Eagle Pass, Texas, at 1:05 PM.

    c.  On September 24, 2023, CBP officials cut Texas's c-wire near Eagle Pass, Texas, at 5:53 PM.

    d.  On September 26, 2023, CBP officials cut Texas's c-wire near Eagle Pass, Texas, at 1:40 PM.

e.  On September 27, 2023, CBP officials cut Texas's c-wire near Eagle Pass, Texas, at 2:47 PM.

f.  On September 27, 2023, CBP officials cut Texas's c-wire near Eagle Pass, Texas, at 3:20 PM.

g.  On September 27, 2023, CBP officials cut Texas's c-wire near Eagle Pass, Texas, at 3:30 PM.

h.  On September 28, 2023, CBP officials cut Texas's c-wire near Eagle Pass, Texas, at 3:37 AM.

i.  On September 28, 2023, CBP officials cut Texas's c-wire near Eagle Pass, Texas, at 7:50 AM.

j.  On September 28, 2023, CBP officials cut Texas's c-wire near Eagle Pass, Texas, at 10:20 AM.

k.  On September 28, 2023, CBP officials cut Texas's c-wire near Eagle Pass, Texas, at 11:20 AM.

l.  On September 28, 2023, CBP officials cut Texas's c-wire near Eagle Pass, Texas, at 2:02 PM.

m. On September 29, 2023, CBP officials cut Texas's c-wire near Eagle Pass, Texas, at 6:00 AM.

n.  On September 29, 2023, CBP officials cut Texas's c-wire near Eagle Pass, Texas, at 4:12 PM.

o.  On September 30, 2023, CBP officials cut Texas's c-wire near Eagle Pass, Texas, at 1:30 PM.

p.  On September 30, 2023, CBP officials cut Texas's c-wire near Eagle Pass, Texas, at 2:43 PM.

q.  On September 30, 2023, CBP officials cut Texas's c-wire near Eagle Pass, Texas, at 4:37 PM.

r.  On October 1, 2023, CBP officials cut Texas's c-wire near Eagle Pass, Texas, at 11:26 AM.

s.  On October 2, 2023, CBP officials cut Texas's c-wire near Eagle Pass, Texas, at 11:23 AM.

t.  On October 2, 2023, CBP officials cut Texas's c-wire near Eagle Pass, Texas, at 2:55 PM.

u.  On October 4, 2023, CBP officials cut Texas's c-wire near Eagle Pass, Texas, at 110:04 AM.

v.  On October 4, 2023, CBP officials cut Texas's c-wire near Eagle Pass, Texas, at 3:00 PM.

w.  On October 6, 2023, CBP officials cut Texas's c-wire near Eagle Pass, Texas, at 1:14 PM.

x.  On October 6, 2023, CBP officials cut Texas's c-wire near Eagle Pass, Texas, at 5:30 PM.

y. On October 10, 2023, CBP officials cut Texas's c-wire near Eagle Pass, Texas, at 11:40 AM.

13. These reports document that CBP officials themselves routinely cut the c-wire with bolt cutters, pull the fence apart, flatten it, place clothes atop it, and engage in other destructive measures, usually cutting through all rows of wire fencing present at the breach location. On some occasions, reports show, CBP officers have engaged in this practice even where there is no apparent distress or medical emergency.

14. I am aware of the repair process engineers undertake to address breaches like these. Texas's c-wire fence cannot be easily patched together at the breach points. The tying or tangling up of c-wire as an immediate, short-term measure, is ineffective and can only be a short-term solution. Effective reinforcement of c-wire requires deploying a new roll of c-wire wherever CBP officials have breached the fence. Accordingly, at places where CBP officials have damaged Texas's c-wire fence, Texas must deploy a minimum of three new rolls of concertina wire for every breach.

I hereby declare under penalty of perjury, pursuant to 28 U.S.C. § 1746, that

the foregoing is true and correct to the best of my knowledge and information.

Signed this __20__ day of October 2023.


GARCIA.CARLOS.R
AMIREZ.1216746933

Digitally signed by
GARCIA.CARLOS.RAMIREZ.121
6746933
Date: 2023.10.20 10:51:24 -05'00'

Carlos R. Garcia

Captain, 156th Brigade Engineer Battalion of the Texas Military Department

EXHIBIT E

# DECLARATION OF BRIAN COONEY

1. My name is Brian Cooney. I am a Staff Sergeant assigned to Task Force Eagle under Golf Company and I am an employee of the Texas Military Department ("TMD"). In that role, I currently serve as a Team Leader on Operation Lone Star ("OLS"), as Sergeant of the Guard.

2. I have served in OLS since July 2023. My job duties include patrolling and maintaining my area of operations along the border as part of OLS and taking care of soldiers under my command. I currently serve in the vicinity of Eagle Pass, Texas.

3. During my service at the Texas-Mexico border I have observed that Eagle Pass remains an area where large numbers of migrant border crossings regularly occur. During my service, I have observed TMD personnel construct, maintain, and repair Texas's concertina wire fence within my area of operation in the Eagle Pass area.

4. When TMD soldiers encounter destruction of, damage to, or a breach in the concertina wire fence, it is our practice to send a "spot

report" to the OLS Battle Desk, which forwards those reports to the TMD engineering team.

5. On October 26, 2023, I was on my regular patrol at the international border near the river, in close proximity to the Heavenly Farms Pecan Orchard, when I spotted a group of several hundred migrants congregating on the Mexican side of the Rio Grande. Once this group reached a certain size, it began to cross the river.

6. At around 12:30 PM on October 26, 2023, as soon as the first group of migrants who had crossed the river set foot on the Texas side, I saw a telehandler forklift operated by an agent of U.S. Border Patrol ("BP") move in to position to assist the migrants. .

7. The forklift driven by the BP agent inserted pallet forks into the concertina wire barrier, lifted the barrier high enough to pull out of the ground the fencing stakes that kept the fence in place, and held it suspended in the air for approximately 20 minutes. This created a gap in the wire fence large enough to allow migrants to cross.

8. BP agents then began to help the migrants enter through the gap in the wire fence created by the forklift. I observed 310 migrants cross through the gap.

9. None of the federal personnel at the scene asked for permission from me or, to my knowledge, from other OLS personnel to move the concertina wire barrier. And as far as I am aware, no such permission was granted by TMD to PB.

10. During this process, I saw PB airboats in the water. The airboats were not obstructed by the concertina wire barrier. BP airboats access the river from isolated access points along the Rio Grande. I did not witness any of the migrants in distress while they were in the river, and none of the migrants appeared to need medical attention. Additionally, while I observed this episode, no call was made by anyone at the scene for a medical team to assist the migrants. Instead, as the migrants who had just crossed the river approached the gap in the fence, BP agents began assisting the migrants entry through the concertina wire.

11. I witnessed 310 migrants enter through the gap in the fence created by the forklift operated by BP agents. This occurred over a twenty-minute period. I and other TMD personnel documented this event using cellphone cameras. Attached as Exhibit A are true and correct copies of photos that were taken at the scene that depict these events.

12. After the last of the migrants passed through the concertina wire that had been raised by the telehandler forklift, the BP agent operating it lowered

the wire. The stakes that were attached to the wire, and which keep the wire in place, were not put back into the ground.  As a result, the wire will have to be repaired by TMD engineers.

13. After this incident, I spoke with the operator of the telehandler forklift who was dressed in plain clothes. When I inquired about his role on the scene, he confirmed that he worked for BP.

14. As I documented the event, BP officers approached me and claimed I was not authorized to take any pictures of them or ask their names.

15. After this incident, the BP employees positioned the forklift up the hill next to the paved road 100-150 yards  away from point 2020 ,which is along the river. I drafted a spot report to the OLS Battle Desk describing what I had witnessed and explaining that it  seemed  likely  that  BP  might use  the  machinery  again  to  lift  the  concertina wire fence.

I hereby declare under penalty of perjury, pursuant to 28 U.S.C. § 1746, that the foregoing is true and correct to the best of my knowledge and information.

Signed this 26th day of October 2023.

COONEY.BRIAN.PA
TRICK.1280176750

Digitally signed by
COONEY.BRIAN.PATRICK.12801
76750
Date: 2023.10.26 22:24:45
-05'00'

Brian Cooney

Staff Sergeant

Texas Military Department

Exhibit A









Exhibit F

Case 2:23-cv-00055-AM   Document 8-1   Filed 10/28/23   Page 3 of 7

## DECLARATION OF ORTIZ DIAZ

1. My name is Roberto Ortiz Diaz. I am over eighteen years old, I have never been convicted of a felony and I am competent to testify to the matters set forth below.

2. I am a soldier employed by the Texas Military Department ("TMD"). I have attained the rank of Sergeant and I am assigned to Task Force Eagle under Charlie Company.  In that role, I currently serve on Special Response Team 3 on Operation Lone Star ("OLS"), as an engineer.

3. I have served in OLS since September 2021. My job duties include patrolling and maintaining my area of operations along the border as part of OLS and inspecting and repairing concertina wire fencing in my area of operations. I currently serve in the vicinity of Eagle Pass, Texas, where I have served for over a year.

4. During my service at the Texas-Mexico border, I have observed that Eagle Pass is an area where large numbers of migrant border crossings through the Rio Grande regularly occur.

5. When TMD soldiers report destruction of, damage to, or a breach in the concertina wire fence, it is my team's responsibility to return the fence to its proper condition.

Case 2:23-cv-00055-AM   Document 8-1   Filed 10/28/23   Page 4 of 7

6. At 12:26 PM on October 27, 2023, I was on my regular patrol at the Texas-Mexico border near the Rio Grande river, close to the Heavenly Farms Pecan Orchard, when I spotted a telehandler forklift operated by an individual in plainclothes. U.S. Customs and Border Patrol ("CBP") agents were directing the driver of the telehandler forklift.

7. Additionally, several CBP vehicles were parked at the scene, and I saw media crews that appeared to be following CBP officials near the concertina wire fence. The media crews traveling with CBP personnel appeared to be interviewing migrants who had crossed the border.

8. When I arrived, I observed approximately 10 migrants who had already crossed the river and were standing on the United States side of the Rio Grande. I also observed approximately 50 migrants congregating on the Mexican side of the border across the river. I did not witness any of the migrants in distress and none of the migrants appeared to need medical attention. At no point did I hear any federal or state officers call for medical services.

9. At the scene, I observed CBP personnel directing the individual operating the telehandler forklift. Under the direction of CBP officials, the telehandler operator proceeded to flatten the concertina wire fence to facilitate entry by the migrants crossing the river.

Case 2:23-cv-00055-AM   Document 8-1   Filed 10/28/23   Page 5 of 7

10. For approximately 30 minutes, I observed the telehandler forklift disabling a large section of the concertina wire fence by repeatedly lifting hydraulic-powered pallet forks up and down in order to smash the fence into the dirt.

11. Below are still images taken from the video, which truly and accurately depict this scene on the border on October 27, 2023.



12. While the operator was flattening the concertina wire, I observed no medical emergencies among the migrant crossing the river and I am not aware of any reason for CPB agents to flatten the concertina wire other than to allow an easier entry path for migrants arriving in the United States. After

observing these activities, I resumed my patrol.

13. When I returned to the area twenty minutes later, I saw that 30 to 40 feet of the concertina wire fence had been completely flattened. No CBP employees remained in the area, but three media crews and migrants on both sides of the river were still present.

14. None of the federal personnel at the scene asked for permission from me or, to my knowledge, from any other OLS personnel to disturb the concertina wire barrier. And to my knowledge, no OLS personnel granted CBP permission to disable large sections of TMD's concertina wire fence. As a result of CBP's actions, approximately 40 migrants were able to traverse over the mangled concertina wire and gain entry into Texas illegally.

15. As I understand it, the location of this incident is the same location where CPB agents, the day before, used a telehandler forklift to lift the concertina wire to allow hundreds of migrants to enter the United States. Although I did not witness that incident, I learned of it from fellow soldiers.

I hereby declare under penalty of perjury, pursuant to 28 U.S.C. § 1746, that the foregoing is true and correct to the best of my knowledge and information.

Signed this 28th day of October 2023.

Case 2:23-cv-00055-AM   Document 8-1   Filed 10/28/23   Page 7 of 7

Roberto Ortiz Diaz

Sergeant

Texas Military Department

Exhibit G

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF TEXAS
DEL RIO DIVISION

| | | |
|---|---|---|
| THE STATE OF TEXAS, | § | |
| | § | |
| *Plaintiff*, | § | |
| | § | |
| v. | § | CIVIL ACTION NO. 2:23-CV-00055 |
| | § | |
| U.S. DEPARTMENT OF HOMELAND | § | |
| SECURITY; ALEJANDRO | § | |
| MAYORKAS, in his official capacity as | § | |
| Secretary of the U.S. Department of | § | |
| Homeland Security; U.S. CUSTOMS | § | |
| AND BORDER PROTECTION; TROY | § | |
| A. MILLER, in his official capacity as | § | |
| Acting Commissioner for U.S. Customs | § | |
| and Border Protection; U.S. BORDER | § | |
| PATROL; JASON OWENS, in his | § | |
| official capacity as Chief of the U.S. | § | |
| Border Patrol; and JUAN BERNAL, in | § | |
| his official capacity as Acting Chief | § | |
| Patrol Agent, Del Rio Sector, U.S. | § | |
| Border Patrol, | § | |
| | § | |
| *Defendants.* | § | |
| | § | |

---

## PLAINTIFF'S ORIGINAL COMPLAINT

---

### I.    INTRODUCTION

1.    In the midst of an unprecedented immigration crisis at the southern border, federal government officials are, once again, undermining Texas's efforts to stem the flow of illegal immigration.

2.    The crisis at the southern border is well known. The Biden Administration's abdication of its duty to secure the border has allowed millions of aliens to illegally cross into Texas and the

United States in record numbers. According to data maintained by the federal government, U.S. Customs and Border Protection ("CBP") encountered approximately 458,000 aliens at the border in FY2020. That number swelled to over 1.7 million encounters in FY2021 and nearly 2.4 million in FY2022. And the number of "gotaways"—aliens who are detected as making an illegal entry but neither found nor apprehended—increased by 303 percent between FY2019 and FY2022, reaching more than 600,000 in FY2022.

3.    But the border crisis is not just limited to harms of this unprecedented influx of unlawful immigration. It also includes deadly drug smuggling, human trafficking, infiltration by suspected terrorists, and other criminal drug cartel activities. To date, in FY2023, CBP has seized over 22,000 pounds of fentanyl—compared with 8,300 pounds over the same period in FY2022. Fentanyl is potentially lethal at a two-milligram dose and is involved in more deaths of Americans under 50 than any other cause of death, including heart disease, cancer, homicide, or suicide. Fentanyl and other drugs are often illegally smuggled into the United States by cartels that operate as transnational criminal organizations—and that have been designated by the Governor of Texas as foreign terrorist organizations. And the organized crime and drug cartels shuttling these drugs daily prey on alien communities and children through human trafficking, violence, extortion, and exploitation.

4.    In response, Texas has acted to fill the breach created by the federal government's indolence. The Governor of Texas declared a border security disaster in 2021 and launched Operation Lone Star, which utilizes multiple state agencies, including the Texas Military Department ("TMD"), to fill dangerous gaps left by the Biden Administration's failure to secure the U.S.-Mexico border.

5.   Among other Operation Lone Star initiatives, TMD has purchased and deployed concertina wire fencing, always with the permission of the landowners, to deter and slow illegal crossings at hot spots along the southern border—including in Eagle Pass, Texas, located in the U.S. Border Patrol's Del Rio Sector.

6.   Recently, Eagle Pass has become the epicenter of this unprecedented alien surge. According to Eagle Pass Mayor Rolando Salinas, Jr., this recent surge is like "nothing that we've seen ever, really, to have so many people crossing in without consequence." [1] After roughly 14,000 people—about half of Eagle Pass's population—entered the city in less than two weeks, Mayor Salinas declared a state of disaster, which the City Council endorsed the next week.

7.   On previous occasions, agents of CBP have cut Texas's concertina wire barriers placed at strategic border crossing locations. But just as Eagle Pass was being overwhelmed by this alien surge in September and October of 2023, agents of CBP, without any justification, increased this federal practice of cutting, destroying, or otherwise damaging Texas's concertina wire that had been strategically positioned for the purpose of securing the border and stemming the flow of illegal migration.

8.   Since September 20, 2023, federal agents have developed and implemented a policy, pattern, or practice of destroying Texas's concertina wire to encourage and assist thousands of aliens to illegally cross the Rio Grande and enter Texas. Federal agents not only cut Texas's concertina wire, but also attach ropes or cables from the back of pickup trucks to ease aliens' ability to illegally climb up the riverbank into Texas. And they regularly cut new openings in the wire

---

[1] Gaige Davis, *High Migration Through Texas Border Town of Eagle Pass Strains Resources*, NPR (Sept. 22, 2023), https://www.npr.org/2023/09/22/1201215460/high-migration-through-texas-border-town-of-eagle-pass-strains-resources.

fence, sometimes immediately after Texas officers have placed new wire to plug up gaps in fencing barriers.

9.  By cutting Texas's concertina wire, the federal government has not only illegally destroyed property owned by the State of Texas; it has also disrupted the State's border security efforts, leaving gaps in Texas's border barriers and damaging Texas's ability to effectively deter illegal entry into its territory.

10.  Texas brings this lawsuit to end this ongoing, unlawful practice which undermines its border security efforts. This Court can and should enjoin the federal defendants from continuing to destroy and damage private property that is not theirs—without statutory authority and in violation of both state and federal law.

## II.    PARTIES

11.  Plaintiff the State of Texas is a sovereign state actively engaged in combatting illegal migration by purchasing, installing, and maintaining concertina wire at hotspots along the southern border, including Eagle Pass, Texas. Texas deploys such wire with the consent of landowners.

12.  Defendant the U.S. Department of Homeland Security ("DHS") is an agency of the United States.

13.  Defendant Alejandro Mayorkas is Secretary of DHS. He is sued in his official capacity.

14.  Defendant the U.S. Customs and Border Protection ("CBP") is an agency of the United States and a department of DHS.

15.  Defendant Troy A. Miller is the Acting Commissioner for CBP. He is sued in his official capacity.

16.  Defendant the U.S. Border Patrol ("USBP") is an agency of the United States and a department of CBP.

17. Defendant Jason Owens is Chief of the USBP. He is sued in his official capacity.

18. Defendant Juan Bernal is Acting Chief Patrol Agent, Del Rio Sector, USBP. He is sued in his official capacity.

19. On information and belief, DHS, CBP, USBP, and their officers and agents (together, "Defendants") ordered or participated in the destruction and seizure of Plaintiff's concertina wire.

## III.    JURISDICTION AND VENUE

20. This Court has subject matter jurisdiction under 28 U.S.C. §§ 1331, 1346, and 1356 because this case involves federal questions, federal defendants, and seizures of property on land.

21. Venue is proper within this District under 28 U.S.C. §§ 1391(b)(2) because the events and actions giving rise to this suit occurred in the vicinity of Eagle Pass, Texas.

22. The federal government has waived any immunity for its officers from this suit pressing claims for non-monetary relief under 5 U.S.C. § 702.

## IV.    FACTUAL BACKGROUND

**A.    Overview of the Crisis at the Southern border.**

23. A crisis of human trafficking, drug smuggling, and terrorist infiltration exists along Texas's 1,200-mile border with Mexico. For three years, the number of aliens illegally crossing the southern border has ballooned. CBP encountered about 458,000 aliens at the border in FY2020, 1.7 million in FY2021, and 2.4 million in FY2022.[2] So far in FY2023, CBP has already encountered more than

---

[2] OFFICE OF INSPECTOR GENERAL, DEP'T OF HOMELAND SECURITY, OIG-23-24: INTENSIFYING CONDITIONS AT SOUTHWEST BORDER ARE NEGATIVELY IMPACTING CBP AND ICE EMPLOYEES' HEALTH AND MORALE 6 (May 3, 2023), https://www.oig.dhs.gov/sites/default/files/assets/2023-05/OIG-23-24-May23.pdf.

2.2 million.[3] Those numbers omit individuals detected as making an illegal entry but neither found nor apprehended (there were more than 600,000 in FY2022) and the "unknown number of aliens who evade detection" entirely.[4]

24.   This unprecedented influx of criminal activity along our southern border has had predictable and harmful effects in Texas and across the country.

25.   Both Texas citizens and aliens themselves—many of them unaccompanied minors—are often at the mercy of transnational criminal cartels that see illicit activity along the border as good business.[5] These transnational criminal organizations that ferry violent crime across the Rio Grande daily "have become potent paramilitary forces, with heavily armed mobile units able to stand their ground against the Mexican military."[6] One former U.S. Attorney General has stated that the cartels pose security threats that look "more like ISIS than like the American mafia."[7] In one recent incident, these non-state actors were able to overwhelm Mexico's military with "700 cartel paramilitary fighters with armored cars, rocket launchers and heavy machine guns."[8] The federal government has chosen to "accept a failed narco-state on our border, providing sanctuary to narco-terrorist groups preying on the American people."[9]

---

[3] *Southwest Land Border Encounters*, U.S. Customs & Border Protection, https://www.cbp.gov/newsroom/stats/southwest-land-border-encounters.

[4] OIG-23-24, *supra* n.2, at 10.

[5] TODD BENSMAN, OVERRUN: HOW JOE BIDEN UNLEASHED THE GREATEST BORDER CRISIS IN U.S. HISTORY 29-32, 193 (2023).

[6] William Barr, Opinion, *The U.S. Must Defeat Mexico's Drug Cartels*, WALL ST. J. (Mar. 2, 2023), https://www.wsj.com/articles/the-us-must-defeat-mexicos-drug-cartels-narco-terrorism-amlo-el-chapo-crenshaw-military-law-enforcement-b8fac731.

[7] *Id.*

[8] *Id.*

[9] *Id.*

26.  These criminal organizations—"the largest, most violent, and most prolific fentanyl trafficking operation in the world"—shuttle illegal narcotics like fentanyl from Mexico into every corner of this country.[10] Although federal officials continue to claim that "Mexico is not a producer of fentanyl," that country is home to thousands of "illegal laboratories" that in fact manufacture the synthetic drug.[11] This year alone, CBP has seized over 22,000 pounds of fentanyl—a synthetic opioid that is lethal at 2mg doses and is now the leading cause of death for Americans under 50.[12] The fentanyl epidemic is now a nationwide problem that reaches far beyond Texas.[13] Just last month, an infant died after accidentally coming into contact with fentanyl residue at a daycare in New York City.[14]

27.  In addition to trafficking drugs, Mexican cartels also traffic human beings. "For the first time in history, the cartel proceeds from human smuggling [may] have surpassed those from drug smuggling."[15] Trafficking across the southern border has changed "from a scattered network of

---

[10] Press Release, U.S. Department of Justice, Justice Department Announces Charges Against Sinaloa Cartel's Global Operation (Apr. 14, 2023), https://www.justice.gov/opa/pr/justice-department-announces-charges-against-sinaloa-cartel-s-global-operation.

[11] Press Release, U.S. Department of State, Remarks at Joint Press Availability in Palacio Nacional (Oct. 5, 2023), https://www.state.gov/secretary-antony-j-blinken-secretary-of-homeland-security-alejandro-mayorkas-attorney-general-merrick-garland-white-house-homeland-security-advisor-dr-liz-sherwood-randall-mexican-secretary-of-p/; *see* DRUG ENFORCEMENT AGENCY, DEA-DCT-DIR-008-20: FENTANYL FLOW TO THE UNITED STATES (Jan. 2020), https://www.dea.gov/sites/default/files/2020-03/DEA_GOV_DIR-008-20%20Fentanyl%20Flow%20in%20the%20United%20States_0.pdf.

[12] Press Release, Chuck Grassley, Feinstein-Grassley Resolution for National Fentanyl Awareness Day Passes Senate (May 18, 2023), https://www.grassley.senate.gov/news/news-releases/feinstein-grassley-resolution-for-national-fentanyl-awareness-day-passes-senate.

[13] *Id.*

[14] Susie Coen, *Baby Boy Dies After Ingesting Fentanyl at New York Nursery*, DAILY TELEGRAPH (Sept. 17, 2023), https://www.telegraph.co.uk/world-news/2023/09/16/baby-boy-dead-ingesting-fentanyl-new-york-nursery-bronx/.

[15] BENSMAN, *supra* n.5, at 41.

freelance 'coyotes' to a multi-billion-dollar international business controlled by organized crime, some of Mexico's most violent drug cartels."[16] Cartels demand thousands of dollars from aliens to facilitate their illegal entry, commodifying them as human "inventory" with "numbered, colored wrist band[s]."[17] Women and children are raped and abused while journeying to the border, only to be trafficked for further sexual violence upon arriving in the United States.[18] Many newly-arrived aliens live in constant fear of visits by cartel members shaking them down for the thousands of dollars they still owe.[19]

28.    Besides submitting themselves to violence and exploitation at the hands of criminal cartels, geographic perils exist for aliens attempting to illegally cross the border. A record high of 853 aliens died crossing it between October 2021 and October 2022.[20] Much of the border passes through the arid Chihuahuan Desert—the largest desert in North America—where aliens risk dying from excessive heat and lack of water.[21] Other portions of the border pass through the Rio Grande, where

---

[16] Miriam Jordan, *Smuggling Migrants at the Border Now a Billion-Dollar Business*, N.Y. TIMES (July 25, 2022), https://www.nytimes.com/2022/07/25/us/migrant-smuggling-evolution.html.

[17] BENSMAN, *supra* n.5, at 32.

[18] *See* Laura Gottesdiener et al., *Migrants Are Being Raped at the Mexico Border as they Await Entry to US*, REUTERS (Sept. 29, 2023), https://www.reuters.com/world/migrants-are-being-raped-mexico-border-they-await-entry-us-2023-09-29/; Virginia Allen, *'America's New Slave Trade' Is Here at Hands of Mexican Cartels, Border Expert Tells Lawmakers*, DAILY SIGNAL (July 19, 2023), https://www.dailysignal.com/2023/07/19/new-slave-trade-arrived-america-hands-mexican-cartels-border-expert-tells-congress/.

[19] Tim Hains, *Sen. Katie Britt: What I Saw at the Border Was Not the American Dream, It Was a Nightmare*, REALCLEARPOLITICS (Sept. 27, 2023), https://www.realclearpolitics.com/video/2023/09/27/sen_katie_boyd_britt_what_i_saw_at_the_border_was_not_the_american_dream_it_was_a_nightmare.html.

[20] Camilo Montoya-Galvez, *At Least 853 Migrants Died Crossing the U.S.-Mexico Border in Past 12 Month—a Record High*, CBS NEWS (Oct. 28, 2022), https://www.cbsnews.com/news/migrant-deaths-crossing-us-mexico-border-2022-record-high/.

[21] *See* Frances Vinall, *More than 100 Migrants Died from Heat Near U.S.-Mexico Border this Year*, WASH. POST (July 7, 2023), https://www.washingtonpost.com/weather/2023/07/07/migrant-deaths-heat-mexico-border/.

aliens risk drowning in some stretches with a powerful current.[22] A United Nations agency has declared the U.S.-Mexico border the deadliest land crossing in the world.[23]

29. Cartel members who cross the border bring violence and crime with them. Law enforcement along the Texas border now regularly engage in high-speed chases with traffickers[24] while " 'robberies and violence' skyrocket in [previously] quiet town[s]." [25] Cartels seizing upon an open border have also facilitated the infiltration of terrorists from across the globe. In 2022, the number of border apprehensions of individuals on the FBI's terrorist watchlist was "500 percent more than in *the prior five years combined*." [26] Put another way, CBP encountered just 6 individuals on the terrorist watchlist in 2018; it encountered 146 of them in 2023.[27] Given the hundreds of thousands of "gotaways" who have evaded apprehension, it is impossible to know how many

---

[22] *See* Santiago Perez & Alicia Caldwell, *'It's Like a Graveyard': Record Numbers of Migrants Are Dying at the U.S. Border*, WALL ST. J. (Mar. 17, 2023), https://www.wsj.com/articles/illegal-immigration-mexico-us-border-deaths-c35cf892.

[23] Peter Aitken, *UN Migration Study Deems US-Mexico Border 'Deadliest' Land Route in the World Based on 2021 Numbers*, FOX NEWS (July 4, 2022), https://www.foxnews.com/us/un-migration-study-deems-us-mexico-border-deadliest-land-route-world-based-2021-numbers.

[24] Ali Bradley, *Chases Rampant at Southern Border, Plaguing Communities*, NEWS NATION (Mar. 17, 2023), https://www.newsnationnow.com/us-news/immigration/border-coverage/cartels/southern-border-pursuits/.

[25] Harriet Alexander, *Venezuelan Migrants Are Repelled By Re-installed Razor Wire at Eagle Pass*, DAILY MAIL (Sept. 22, 2023), https://www.dailymail.co.uk/news/article-12547831/eagle-pass-migrants-razor-wire-venezuelans.html.

[26] BENSMAN, *supra* n.5, at 255-56 (emphasis added); *see also id.* at 258-64; Adam Shaw et al., *Thousands of 'Special Interest Aliens' from Middle East Countries Stopped at Southern Border Since 2021: Data*, FOX NEWS (Oct. 10, 2023), https://www.foxnews.com/politics/thousands-special-interest-aliens-middle-east-countries-stopped-southern-border-2021-data.

[27] MaryAnn Martinez, *Feds Prevented Over 160 People on Terror Watchlist From Crossing US Borders Illegally—Highest Ever Total Recorded: DHS*, N.Y. POST (Sept. 15, 2023), https://nypost.com/2023/09/15/160-people-on-terror-watch-list-stopped-at-us-border-in-2023/.

terrorists have already succeeded in passing through the porous southern border and formed terror cells in America.[28]

**B.    Operation Lone Star and Concertina Wire**

30.    In 2021, Governor Greg Abbott declared a border security disaster and launched Operation Lone Star to mitigate the effects of this unprecedented crisis. As part of that initiative, the Governor has:

a.  detailed law enforcement officers to plug border staffing gaps;

b.  heightened vehicle inspections by the Department of Public Safety ("DPS");

c.  bused aliens who wished to relocate to sanctuary cities in other States, which now recognize the southern border poses a national problem;

d.  constructed miles of border wall after the U.S. ceased construction;

e.  invoked the Texas Disaster Act to enhance penalties for criminal trespass on private land, *see* Tex. Gov't Code § 418.014; Tex. Penal Code §§ 12.50, 30.05;

f.  designated transnational criminal cartels smuggling drugs, people, and weapons into Texas as foreign terrorist organizations;

g.  deployed floating marine barriers to deter illegal crossings in hotspots along the Rio Grande; and

h.  invoked the Invasion Clauses of the U.S. Constitution, *see* U.S. Const. art. I, § 10, cl. 3; *id.* art. IV, § 4.

---

[28] Andrew Miller, *Hamas Attacks Reminder That Sleeper Cells Are Crossing Southern Border, Expert Warns: 'They're Already Here,'* Fox News (Oct. 11, 2023), https://www.foxnews.com/politics/hamas-attack-reminder-sleeper-cells-crossing-southern-border-expert-warns-theyre-already-here.

31.  These efforts have so far "led to over 477,800 illegal alien apprehensions," "more than 34,200 criminal arrests, with more than 31,200 felony charges reported," and "over 428 million lethal doses of fentanyl" seized.[29] "Every individual who is apprehended or arrested and every ounce of drugs seized would have otherwise made their way into communities across Texas and the nation."[30]

32.  In addition to those historic initiatives, Governor Abbott also instructed TMD to deploy concertina wire to deter aliens from making the illegal and dangerous journey across the border into Texas.[31]

33.  Concertina wire is a type of barbed wire that is formed in large coils that can be expanded like a concertina, a musical instrument that resembles an accordion. A single roll can span more than 50 feet of distance and connect with other rolls, posts, hinges, and other components to form a continuous fence.

34.  Accordingly, concertina wire has long been used to form a secure perimeter around airports, prisons, military bases, government buildings, and other high-security locations. The federal government, for example, deployed concertina wire to create a secure perimeter around the U.S. Capitol and the Supreme Court of the United States in early 2021.[32] Even retail stores have

---

[29] Press Release, Office of the Texas Governor, Operation Lone Star Builds More Border Wall To Protect Texans (Sept. 15, 2023), https://gov.texas.gov/news/post/operation-lone-star-builds-more-border-wall-to-protect-texans.

[30] *Id.*

[31] Press Release, Office of the Texas Governor, Operation Lone Star Deploys New Border Security Deterrence Strategies (June 9, 2023), https://gov.texas.gov/news/post/operation-lone-star-deploys-new-border-security-deterrence-strategies.

[32] Zachary Cohen, *US Capitol Police Tells Lawmakers that Razor Wire Fencing Should Remain Until September*, CNN (Feb. 19, 2021), https://www.cnn.com/2021/02/19/politics/us-capitol-police-fencing-extension-request/index.html; Marisa J. Lang, *An Increasingly Fortified Federal City*,

begun employing concertina wire "[i]n an effort to combat a wave of retail thefts and smash-and-grab robberies."[33]

35.   International borders across the globe are likewise secured with concertina wire.[34] India, the world's largest democracy, has used concertina wire to fence off almost 2,000 miles of its border with Bangladesh.[35] The Obama Administration likewise used razor wire along portions of the U.S.-Mexico border.[36]

36.   Coiled razor wire can be quickly deployed to cover a large span of geographical space. As DHS itself acknowledges, once deployed, it effectively "serves as a deterrent" to prevent unauthorized crossings and entry onto restricted property.[37] Snags on wire coils slow illegal entries and ease law enforcement apprehension. But the challenge of safely navigating the wire itself often deters trespassers from attempting to cross at all.

---

WASH. POST (Apr. 13, 2021), https://www.washingtonpost.com/dc-md-va/interactive/2021/us-capitol-fencing/.

[33] Nancy Loo & Katie Smith, *Retailers Using Metal Coils to Deter Robberies, Nab Thieves*, NEWS NATION (Dec. 15, 2021), https://www.newsnationnow.com/holidays-on-alert/retailers-using-metal-coils-to-deter-robberies-nab-thieves/; *see also* Lisa Fickenscher et al., *Saks Fifth Avenue is Wrapped in Razor Wire to Prevent Looting*, N.Y. POST (June 3, 2020), https://nypost.com/2020/06/02/saks-fifth-avenue-is-wrapped-in-razor-wire-to-prevent-looting/.

[34] Lorena Iñiguez Elebee, *What Border Walls Look Like Around the World*, L.A. Times (Jan. 31, 2017), https://web.archive.org/web/20170514093140/https://www.latimes.com/world/mexico-americas/la-fg-g-border-bariers-20170130-story.html.

[35] Shahidul Islam Chowdhury, *India Completes Fencing Three-Fourths of Border*, New Age Bangladesh (Sept. 23, 2020), https://www.newagebd.net/article/117038/india-completes-fencing-three-fourths-of-border.

[36] OFFICE OF INSPECTOR GENERAL, DEP'T OF HOMELAND SECURITY, OIG-17-39: CBP'S BORDER SECURITY EFFORTS – AN ANALYSIS OF SOUTHWEST BORDER SECURITY BETWEEN THE PORTS OF ENTRY 4 (Feb. 27, 2017), https://www.oig.dhs.gov/sites/default/files/assets/2017/OIG-17-39-Feb17.pdf.

[37] OFFICE OF INSPECTOR GENERAL, DEP'T OF HOMELAND SECURITY, OIG-17-115: MANAGEMENT ALERT – SECURITY AND SAFETY CONCERNS AT BORDER PATROL STATIONS IN THE TUCSON SECTOR 6 (Sept. 29, 2017), https://www.oig.dhs.gov/sites/default/files/assets/2017/OIG-17-115-MA-092917.pdf.

37.   TMD regularly purchases concertina wire from a variety of vendors to help secure the border, including in the vicinity of Eagle Pass, Texas. Over the past three years, TMD has spent roughly $11 million to procure more than 70,000 rolls of concertina fencing wire.

38.   TMD servicemembers regularly deploy concertina wire along Texas's border with Mexico, including in the vicinity of Eagle Pass, Texas. They obtain consent from landowners before placing any such wire. And they are capable of laying "a quarter mile of triple-strand razor wire each day."[38]

**C.    September Alien Surge in Eagle Pass**

39.   Maverick County—which includes Eagle Pass, Texas—has been particularly affected by the ongoing border crisis.[39] In June 2023, Eagle Pass represented nearly 25% of all CBP border encounters.[40] Seizures there of cocaine, methamphetamine, heroin, fentanyl, and marijuana increased by 7% in June 2023 and 9% in July 2023.[41]

40.   But those routine and ongoing challenges in Eagle Pass pale in comparison to the massive influx the city saw this fall. Over the second and third weeks of September, almost 14,000 aliens—roughly half the entire population of Eagle Pass—entered the city illegally. On September 20, 2023, more than 4,000 aliens illegally crossed into Eagle Pass in a single day.[42]

---

[38] Press Release, Texas Military Department, Texas Gets Help With Border, Florida-Tennessee National Guard  (June 7, 2023), https://tmd.texas.gov/ols-weekly-joint-press-release-injects-6-7-2023.

[39] Determination Pursuant to Section 102 of the Illegal Immigration Reform and Immigrant Responsibility Act of 1996, as Amended, 85 Fed. Reg. 14,953, 14,953-14,955 (Mar. 16, 2020).

[40] *Southwest Land Border Encounters (By Component)*, U.S. CUSTOMS & BORDER PROTECTION, https://www.cbp.gov/newsroom/stats/southwest-land-border-encounters-by-component.

[41] Press Release, U.S. Customs & Border Patrol, CBP Releases July 2023 Monthly Update (Aug. 18, 2023), https://www.cbp.gov/newsroom/national-media-release/cbp-releases-july-2023-monthly-update.

[42] MaryAnn Martinez & Jorge Fitz-Gibbon, *Overwhelmed Texas City Declares State of Emergency As*

41.   That two-week surge in Eagle Pass is roughly the same as the total number of alien apprehensions for the entire Del Rio Sector for the entire year in each of 2009, 2010, 2011, 2017, and 2018.[43]

42.   This sudden and overwhelming influx of aliens has resulted in what one observer called "complete madness," straining local resources.[44] The city's law enforcement officers have been "overwhelmed" by a spate of crime[45] and Eagle Pass is home to only a single shelter capable of housing aliens.[46]

43.   In response to this massive influx, the Mayor of Eagle Pass issued an emergency declaration under the Texas Disaster Act. On September 19, 2023, Mayor Rolando Salinas, Jr., declared a state of disaster "due to the severe undocumented immigrant surge into the City of Eagle Pass."[47]

---

over 11K Migrants—Close to Half Its Population—Surge Across Border, N.Y. POST (Sept. 20, 2023), https://nypost.com/2023/09/20/eagle-pass-texas-declares-state-of-emergency-over-migrants/.

[43]   Total Illegal Alien Apprehensions By Month, U.S. BORDER PATROL (Jan. 2020), https://www.cbp.gov/sites/default/files/assets/documents/2020-Jan/U.S.%20Border%20Patrol%20Monthly%20Apprehensions%20%28FY%202000%20-%20FY%202019%29_1.pdf.

[44]   See Anna Giaritelli, Elon Musk Goes to the Border and Leaves Stunned: 'Complete Madness,' WASH. EXAMINER (Sept. 29, 2023), https://www.washingtonexaminer.com/policy/immigration/elon-musk-goes-to-the-border-and-leaves-stunned; see also Alicia Caldwell & Michelle Hackman, Migrants Overwhelm Texas City of Eagle Pass, WALL ST. J. (Sept. 21, 2023), https://www.wsj.com/politics/policy/migrants-overwhelm-texas-city-of-eagle-pass-531879cf.

[45]   Alexander, supra n.25.

[46]   See Uriel J. Garcia, Texas Border Cities Scramble to Shelter Thousands of Newly-Arrived Migrants, TEX. TRIB. (Sept. 21, 2023), https://www.texastribune.org/2023/09/21/texas-migrants-border-eagle-pass/.

[47]   City of Eagle Pass (@CityEaglePassTx), X (Sept. 20, 2023, 9:13 AM), https://twitter.com/CityEaglePassTx/status/1704498968154009806.

44.  On September 26, 2023, the City Council ratified the mayor's disaster declaration because the alien surge continued to plague the city, stating that it would remain in effect until terminated by the City Council.[48] The Eagle Pass City Council has not terminated the disaster declaration.

45.  Texas had previously "installed razor wire in Eagle Pass to stop illegal crossings." During the September surge, the Governor of Texas "deployed more Texas National Guard to repel illegal crossings & install more razor wire." [49] TMD "reinforced the razor wire barrier, adding new spools to deter entry at the illegal crossing point." [50]

**D.      Federal Defendants' Destruction of Texas's Wire**

46.  Federal law tasks DHS and Secretary Mayorkas with, among other things, "[p]reventing the entry of terrorists and the instruments of terrorism into the United States"; "[s]ecuring the borders … of the United States, including managing and coordinating those functions transferred to [DHS] at ports of entry"; "[c]arrying out the immigration enforcement functions vested by statute," like Border Patrol operations, detention and removal, and inspections at ports of entry; and consulting with "the heads of State and local law enforcement agencies to determine how to most effectively conduct [immigration] enforcement operations." 6 U.S.C. §§ 202(1)-(3), 251, 255; *see also id.* § 111(b)(1)(A), (B), (D), (H).

47.  Federal law tasks CBP and Acting Commissioner Miller with, among other things, "ensur[ing] the interdiction of persons and goods illegally entering the United States";

---

[48] City of Eagle Pass, *The City of Eagle Pass City Council Ratifies Emergency Declaration*, Facebook (Sept. 27, 2023), https://www.facebook.com/photo.php?fbid=710818617741865&set=a.63276834 2213560&type=3 .

[49] Greg Abbott (@GregAbbott_TX), X (Sept. 20, 2023, 4:54 PM), https://twitter.com/Greg Abbott_TX/status/1704614936218149361.

[50] Keith Griffith, *Eagle Pass Border Standoff*, Daily Mail (Sept. 26, 2023), https://www.daily mail.co.uk/news/article-12563581/Eagle-Pass-border-crisis-Texas-National-Guard.html.

"detect[ing], respond[ing] to, and interdict[ing] terrorists, drug smugglers and traffickers, human smugglers and traffickers, and other persons who may undermine the security of the United States;" "safeguard[ing] the borders of the United States"; and "enforc[ing] and administer[ing] all immigration laws." *Id.* § 211(c)(2), (5), (6), (8).

48.   Federal law tasks USBP and Chief Owens with, among other things, "serv[ing] as the law enforcement office of [CBP] with primary responsibility for interdicting persons attempting to illegally enter or exit the United States or goods being illegally imported into or exported from the United States at a place other than a designated port of entry"; "deter[ring] and prevent[ing] the illegal entry of terrorists, terrorist weapons, persons, and contraband"; and "carry[ing] out other duties and powers prescribed by the Commissioner" of CBP. *Id.* § 211(e)(3)(A)-(B).

49.   When it comes to fencing along the border, federal law instructs that DHS "shall construct reinforced fencing along not less than 700 miles of the southwest border where fencing would be most practical and effective." Pub. L. 110–161, div. E, title V, §564(a), Dec. 26, 2007, <u>121 Stat. 2090</u>.[51] And when it first assigned immigration and border functions to DHS, Congress instructed that it "should be a priority for the Secretary" to complete a "14-mile border fence project" near San Diego, California. <u>6 U.S.C. § 256</u>.

50.   The federal Defendants, however, have taken deliberate steps not to police the Nation's southern border. They have taken additional steps to undercut any State that tries to secure its own border, which the federal government has itself abandoned.

---

[51] *See also* Pub. L. No. 109-367, §§ 2(a)(2), 3, <u>120 Stat. 2638</u>, <u>2638-2639</u> (2006).

51. TMD servicemembers routinely record and report noteworthy or suspicious incidents to TMD's chain of command, including incidents of anyone damaging state property or tampering with border infrastructure.

52. In the first half of this year, TMD documented at least 20 incidents when CBP officials seized and damaged Texas's wire fencing by cutting it. On various occasions from January 2023 through August 2023, CBP officials cut Texas's concertina wire to admit aliens illegally entering Texas through the fence hole created by CBP's destruction of state property.

53. In response to reporting in June that showed footage of "Border Patrol cutting through razor wire placed by the state of TX to allow aliens to enter & be processed,"[52] "a CBP spokesperson" stated that federal officials were entitled to destroy state property to admit illegal aliens anytime they had already effectuated an illegal crossing of the international border.[53]

54. CBP's damage to Texas's concertina wire accelerated in September and October, just as the sudden influx of aliens was surging into Eagle Pass.

55. On September 20, 2023, CBP officials cut Texas's concertina wire near Eagle Pass, Texas, at 8:51 AM, admitting more than 1,200 aliens through the hole.

56. That same day, the Governor of Texas publicly explained in a statement on X that Texas had "installed [the] razor wire in Eagle Pass to stop illegal crossings." Federal officers, however, "CUT that wire" to "open[] the floodgates to illegal immigrants." In response, the Governor

---

[52] Bill Melugin (@BillMelugin_), X (June 30, 2023, 1:35 PM), https://twitter.com/BillMelugin_/status/1674849236448313372.

[53] Bill Melugin (@BillMelugin_), X (June 30, 2023, 6:23 PM), https://twitter.com/BillMelugin_/status/1674921617661591553.

announced that he " immediately deployed more Texas National Guard to repel illegal crossings &
install more razor wire." [54]

57.  This post—which has since been viewed more than 10 million times—included an
embedded video from earlier that same day showing CBP officials tearing Texas's fence apart:



---

The video also shows CBP officials waving aliens up the riverbank:



58.   Defendants did not cease their destruction of state property. Instead, they doubled down on their policy, pattern, or practice of destroying Texas's wire fence. TMD has documented CBP officials seizing and damaging Texas's wire fence by cutting openings more times since September 20 than in the prior eight months combined.

a. On September 21, CBP officials cut Texas's concertina wire near Eagle Pass, Texas, at 4:52 AM, admitting an unknown number of aliens through the hole.

b. On September 23, CBP officials cut Texas's concertina wire near Eagle Pass, Texas, at 5:53 PM, admitting 30 aliens through the hole.

c. On September 24, CBP officials cut Texas's concertina wire near Eagle Pass, Texas, at 1:05 PM, admitting 186 aliens through the hole.

d. On September 26, CBP officials cut Texas's concertina wire near Eagle Pass, Texas, at 1:40 PM, admitting an unknown number of aliens through the hole.

e. On September 27—

   i. CBP officials cut Texas's concertina wire near Eagle Pass, Texas, at 2:47 PM, admitting 94 aliens through the hole.

   ii. CBP officials cut Texas's concertina wire near Eagle Pass, Texas, at 3:25 PM, admitting an unknown number of aliens through the hole.

f. On September 28—

   i. CBP officials cut Texas's concertina wire near Eagle Pass, Texas, at 7:23 AM, admitting 72 aliens through the hole.

   ii. CBP officials cut Texas's concertina wire near Eagle Pass, Texas, at 10:04 AM, admitting 32 aliens through the hole.

   iii. CBP officials cut Texas's concertina wire near Eagle Pass, Texas, at 11:20 AM, admitting more than 30 aliens through the hole.

   iv. CBP officials cut Texas's concertina wire near Eagle Pass, Texas, at 1:55 PM, admitting an unknown number of aliens through the hole.

g.  On September 29—

   i.  CBP officials cut Texas's concertina wire near Eagle Pass, Texas, at 6:00 AM, admitting an unknown number of aliens through the hole.

   ii.  CBP officials cut Texas's concertina wire near Eagle Pass, Texas, at 4:12 PM, admitting 35 aliens through the hole.

h.  On September 30—

   i.  CBP officials cut Texas's concertina wire near Eagle Pass, Texas, at 9:14 AM, admitting 232 aliens through the hole.

   ii.  CBP officials cut Texas's concertina wire near Eagle Pass, Texas, at 1:30 PM, admitting an unknown number of aliens through the hole.

   iii.  CBP officials cut Texas's concertina wire near Eagle Pass, Texas, at 2:35 PM, admitting an unknown number of aliens through the hole.

   iv.  CBP officials cut Texas's concertina wire near Eagle Pass, Texas, at 4:37 PM, admitting an unknown number of aliens through the hole.

i.  On October 1, CBP officials cut Texas's concertina wire near Eagle Pass, Texas, at 11:00 AM, admitting an unknown number of aliens through the hole.

j.  On October 2—

   i.  CBP officials cut Texas's concertina wire near Eagle Pass, Texas, at 11:11 AM, admitting an unknown number of aliens through the hole.

   ii.  CBP officials cut Texas's concertina wire near Eagle Pass, Texas, at 2:55 PM, admitting an unknown number of aliens through the hole.

k.  On October 6—

       i.   CBP officials cut Texas's concertina wire near Eagle Pass, Texas, at 12:45 PM, admitting an unknown number of aliens through the hole.

      ii.   CBP officials cut Texas's concertina wire near Eagle Pass, Texas, at 5:25 PM, admitting an unknown number of aliens through the hole.

   l.   On October 10, CBP officials cut Texas's concertina wire near Eagle Pass, Texas, at 11:40 AM, admitting an unknown number of aliens through the hole.

59. Since September 20, then, CBP has seized and damaged Texas's concertina wire to escort aliens into Texas more than 20 times. On each of these occasions, CBP has entered onto state, municipal, or private land to destroy state property. Plaintiff has not placed concertina wire on any federal land near Eagle Pass.

60. Defendants have a policy, practice, or pattern of seizing, damaging, and destroying Texas's personal property by cutting, severing, and tearing its concertina wire fence to introduce breaches, gaps, or holes in the barrier. It has authorized its officials or agents to engage in this conduct anytime an alien has managed to illegally cross the international border in the Rio Grande to process that alien in the United States.

61. Defendants' wire-cutting policies are pervasive and widespread. And they are largely implemented by higher level CBP leadership, rather than lower level officers, who regularly refuse to destroy or damage Texas's border infrastructure.

62. CBP's routine act of seizing and cutting Texas's concertina wire destroys its utility as a barrier fence, as evidenced by CBP's ability to usher large numbers of aliens through breaches made in the fence.

63.  As a result of Defendants' destruction of concertina wire, Plaintiff has suffered and continues to suffer harm and a real and immediate threat of repeated injury in the future. Plaintiff owns the concertina wire that has been placed in border locations and Defendants' repeated destruction of Plaintiff's property has diminished Texas's efforts to secure the border, increasing its costs for providing healthcare, public education, incarceration, and driver's licenses.

64.  Defendants have no statutory authority or other privilege to seize and damage Texas's wire fence by cutting breaches. Defendants routinely damage Texas's fence with no apparent need to administer emergency response to an alien in distress. The concertina wire does not prevent officials from providing water or other nourishment to aliens on the other side of the fence, and law enforcement continue to operate boats in the river.

65.  Defendants have no statutory authority or other privilege to hold open the breaches in Texas's wire fence after seizing and damaging it. Even if Defendants have cut Texas's wire fence on some occasions to aid an individual migrant in urgent distress, Defendants routinely refuse to repair the damages to Texas's wire fence promptly after any exigency has dissipated, instead broadening breaches or leaving them open for hundreds of other aliens to enter illegally.

## V.    CLAIMS FOR RELIEF

### COUNT 1
### Common Law Action for Conversion

61.  Texas law furnishes a cause of action for conversion for wrongfully exercising dominion over the private property of another. *Pan Am. Petroleum Corp. v. Long*, 340 F.2d 211, 219-220 (5th Cir. 1964).

62.  Plaintiff has a proprietary interest in the concertina wire fencing purchased with state funds.

63. Plaintiff's concertina wire fence is personal property that is lawfully in place on state, municipal, or private land.

64. Defendants have intentionally and repeatedly intermeddled with, destroyed, or otherwise exercised dominion over Plaintiff's concertina wire fencing in the past by seizing and cutting it.

65. Defendants continue to intermeddle with, destroy, or otherwise exercise dominion over Plaintiff's concertina wire fencing by seizing and cutting it on a regular basis.

66. Defendants' policy, pattern, or practice of intermeddling with Plaintiff's concertina wire has caused actual damage, destroying the wire's utility as a barrier fence and depriving Plaintiff of its use for a substantial time.

67. Defendants' repeated and ongoing conversion of state property may be remedied by preliminary and permanent injunctive relief.

## COUNT 2
## Common Law Action for Trespass to Chattels

68. Texas law furnishes a cause of action for trespass to chattels for wrongfully exercising dominion over the private property of another. *Zapata v. Ford Motor Credit Co.*, 615 S.W.2d 198, 201 (Tex. 1981).

69. Plaintiff has a proprietary interest in the concertina wire fencing purchased with state funds.

70. Plaintiff's concertina wire fence is personal property that is lawfully in place on state, municipal, or private land.

71. Defendants have intentionally and repeatedly intermeddled with, destroyed, or otherwise exercised dominion over Plaintiff's concertina wire fencing in the past by seizing and cutting it.

72. Defendants continue to intermeddle with, destroy, or otherwise exercise dominion over Plaintiff's concertina wire fencing by seizing and cutting it on a regular basis.

73. Defendants' policy, pattern, or practice of intermeddling with Plaintiff's concertina wire has caused actual damage, diminishing the wire's utility as a barrier fence and depriving Plaintiff of its use for a substantial time.

74. Defendants' repeated and ongoing trespass to state chattels may be remedied by preliminary and permanent injunctive relief.

## COUNT 3
### 5 U.S.C. § 706(2)(C): Acts in Excess of Statutory Jurisdiction

75. "[A]n agency literally has no power to act . . . unless and until Congress confers power upon it." *La. Pub. Serv. Comm'n v. FCC*, 476 U.S. 355, 374 (1986).

76. No statute authorizes Defendants to destroy and seize border infrastructure belonging to another sovereign in order to facilitate unlawful entry of aliens into the United States.

77. Defendants have "the power and duty to control and guard the boundaries and borders of the United States against the illegal entry of aliens." 8 U.S.C. § 1103(a)(5).

78. The power to "control and guard the boundaries and borders of the United States against the illegal entry of aliens" does not include the power to destroy and seize concertina wire that controls and guards the boundary and border against illegal entry of aliens.

79. Defendants have the power, without a warrant, "within a distance of twenty-five miles from any such external boundary" of the United States, "to have access to private lands, but not dwellings, for the purpose of patrolling the border to prevent the illegal entry of aliens into the United States[.]" 8 U.S.C. § 1357(a)(3).

80.   The power " to have access to private lands, but not dwellings, for the purpose of patrolling the border to prevent the illegal entry of aliens into the United States" does not include the power to cut concertina wire that prevents the illegal entry of aliens into the United States.

81.   Moreover, Defendants are violating statutory authority.

82.   Defendants have " the power and duty to control and guard the boundaries and borders of the United States against the illegal entry of aliens." 8 U.S.C. § 1103(a)(5).

83.   When Defendants destroy and seize Texas's concertina wire, they violate their duty to control and guard the boundaries and borders of the United States against the illegal entry of aliens.

84.   A person who " knowing or in reckless disregard of the fact that an alien has come to, entered, or remains in the United States in violation of law, transports, or moves or attempts to transport or move such alien within the United States by means of transportation or otherwise, in furtherance of such violation of law" commits a crime. 8 U.S.C. § 1324(a)(1)(A)(ii). Defendants' destruction and seizure of Plaintiff's concertina wire would be a crime under that provision if committed by a private actor because it permits and allows the movement and transportation of aliens who have illegally entered into the United States within the United States.

85.   A person who " encourages or induces an alien to come to, enter, or reside in the United States, knowing or in reckless disregard of the fact that such coming to, entry, or residence is or will be in violation of law" commits a crime. 8 U.S.C. § 1324 (a)(1)(A)(iv). Defendants' destruction and seizure of Plaintiff's concertina wire would be a crime under that provision if committed by a private actor because it encourages and induces aliens to illegally cross the Rio Grande to the north bank, assured that the federal government will allow them into the rest of Texas and the United States.

86.   Moreover, federal law tasks Defendants with "ensur[ing] the interdiction of persons and goods illegally entering the United States"; "detect[ing], respond[ing] to, and interdict[ing] terrorists, drug smugglers and traffickers, human smugglers and traffickers, and other persons who may undermine the security of the United States;" "safeguard[ing] the borders of the United States"; and "enforc[ing] and administer[ing] all immigration laws." 6 U.S.C. § 211(c)(2), (5), (6), (8); *see also id.* § 211(e)(3).

87.   Defendants' policy, pattern, or practice of seizing and destroying Plaintiff's concertina wire fencing, which serves as a border barrier, is without legal authority and exceeds any statutory jurisdiction or authorization.

88.   Destroying and seizing Plaintiff's concertina wire is final agency action. 5 U.S.C. § 551(13), (10)(D).

89.   Defendants' actions in excess of statutory authority have harmed and continue to harm Plaintiff's interest in personal property.

## COUNT 4
### 5 U.S.C. § 706(2)(D): Failure to Observe Required Procedures

90.   The Administrative Procedure Act directs federal courts to set aside agency action that is taken "without observance of procedure required by law."

91.   Defendants' policy, pattern, or practice of seizing and destroying Plaintiff's concertina wire fencing, which serves as a border barrier, is a substantive rule.

92.   Defendants' decision to implement that substantive rule without submitting it to notice and comment did not observe the procedure required by law.

## COUNT 5
### 5 U.S.C. § 706(2)(A): Arbitrary and Capricious

93. The Administrative Procedure Act directs federal courts to set aside agency action that is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law."

94. Plaintiff's concertina wire fencing serves as a border barrier to illegal entry.

95. Defendants have recently recognized the urgent need to erect and maintain border infrastructure.

96. Defendants' policy, pattern, or practice of seizing and destroying Plaintiff's concertina wire fencing while recognizing the need to for such infrastructure is arbitrary and capricious.

97. Defendants' policy, pattern, or practice of seizing and destroying Plaintiff's concertina wire fencing while federal law tasks it with constructing and maintaining such infrastructure is contrary to law.

## COUNT 6
### *Ultra Vires* Non-Final Agency Action

98. In the alternative, if Defendants' destruction and seizure of Plaintiff's concertina wire is not final agency action, it is *ultra vires* action.

99. The agency action irreparably harms Plaintiff, and Plaintiff's injuries are in the zone of interests sought to be protected by the APA.

100. Plaintiff seeks non-monetary injunctive and declaratory relief.

101. Therefore, the APA waives Defendants' sovereign immunity to Plaintiff's *ultra vires* claims. *Apter v. Dep't of Health & Human Services*, 80 F.4th 579 (5th Cir. 2023).

## VI.    DEMAND FOR RELIEF

Plaintiff respectfully requests that the Court:

i. Preliminarily and permanently enjoin Defendants from seizing and destroying Plaintiff's concertina wire fencing and maintaining breaches in said fencing.

ii. Stay agency action under 5 U.S.C. § 705 and set aside (*i.e.*, vacate) Defendants' policy, pattern, or practice of seizing and destroying Plaintiff's concertina wire fencing.

iii. Declare that Defendants' destruction and seizure of Plaintiff's concertina wire fencing is unlawful.

iv. Award costs and such other relief as the Court deems equitable and just.

Dated: October 24, 2023.

**KEN PAXTON**
Attorney General of Texas

**BRENT WEBSTER**
First Assistant Attorney General

**GRANT DORFMAN**
Deputy First Assistant Attorney General

**RALPH MOLINA**
Deputy Attorney General for Legal Strategy

**ROBERT HENNEKE**
Texas Bar No. 24046058
Texas Public Policy Foundation
901 Congress Ave.
Austin, Texas 78701
(512) 472-2700
rhenneke@texaspolicy.com

Respectfully submitted.

*/s/ Ryan D. Walters*
**RYAN D. WALTERS**
Chief, Special Litigation Division
Texas Bar No. 24105085

**SUSANNA DOKUPIL**
Special Counsel
Texas Bar No. 24034419

**MUNERA AL-FUHAID**
Special Counsel
Texas Bar No. 24094501

**AMY S. HILTON**
Special Counsel
Texas Bar No. 24097834

**HEATHER L. DYER**
Special Counsel
Texas Bar No. 24123044

Office of the Attorney General
Special Litigation Division
P.O. Box 12548, Capitol Station
Austin, Texas 78711-2548
(512) 936-1706
Ryan.Walters@oag.texas.gov
Munera.Al-Fuhaid@oag.texas.gov
Susanna.Dokupil@oag.texas.gov
Amy.Hilton@oag.texas.gov
Heather.Dyer@oag.texas.gov

**COUNSEL FOR PLAINTIFF**

Exhibit H

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF TEXAS
DEL RIO DIVISION

| | | |
|---|---|---|
| **THE STATE OF TEXAS**, | § | |
| | § | |
| *Plaintiff*, | § | |
| | § | CIVIL ACTION NO. 2:23-CV-00055 |
| **v.** | § | |
| | § | |
| **U.S. DEPARTMENT OF HOMELAND** | § | |
| **SECURITY**, *et al.*, | § | |
| | § | |
| *Defendants*. | § | |

---

## PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION OR STAY OF AGENCY ACTION

---

## TABLE OF CONTENTS

Table of Contents ............................................................................................................... ii

Table of Authorities ........................................................................................................... iii

Introduction ......................................................................................................................... 1

Factual Background ............................................................................................................. 3

    A.    Texas has a crisis at its Southern border. ................................................................ 3

    B.    Texas launches Operation Lone Star and installs concertina wire.................................. 8

    C.    In September, aliens surge in Eagle Pass........................................................ 12

    D.    Federal Defendants destroy Texas's concertina wire.................................... 14

Argument ........................................................................................................................... 22

    A.    Texas can show a likelihood of success on the merits. .................................. 23

        1.    Texas is likely to succeed on its conversion and trespass to chattels claims............. 24

        2.    Texas is likely to succeed on its claim that Defendants violated the APA by acting in excess of their statutory authority. ............................................. 26

        3.    Texas is likely to succeed on its claim that Defendants failed to follow prescribed procedures. ............................................................................. 28

        4.    Texas is likely to succeed on its claim that Defendants' actions were arbitrary and capricious in violation of the APA............................................. 31

        5.    In the alternative, Texas is likely to succeed on its claim that Defendants acted *ultra vires*. ................................................................................................. 33

    B.    Texas has demonstrated a substantial threat of irreparable harm. ................................ 36

    C.    Texas has demonstrated that the balancing of interests weighs in its favor and that the injunctive relief will serve the public interest. ........................................ 37

Conclusion ......................................................................................................................... 39

Certificate of Conference ................................................................................................... 41

Certificate of Service.......................................................................................................... 41

TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Affinity Healthcare Servs., Inc. v. Sebelius,*
720 F. Supp. 2d 12 (D.D.C. 2010) ....................................................................23

*All. for Hippocratic Med. v. U.S. Food & Drug Admin.,*
78 F.4th 210 (5th Cir. 2023) ........................................................................... 22

*Apter v. HHS,*
80 F.4th 579 (5th Cir. 2023) ............................................................... 34, 35, 36

*Connasauga River Lumber Co. v. Shippen,*
293 F.3d 579 (5th Cir. 1923) .........................................................................26

*Cummer-Graham Co. v. Maddox,*
285 S.W.2d 932 (Tex. 1956) ...........................................................................25

*Dallas Cowboys Cheerleaders, Inc. v. Scoreboard Posters, Inc.,*
600 F.2d 1184 (5th Cir. 1979) .........................................................................23

*E.V. v. Robinson,*
906 F.3d. 1082 (9th Cir. 2018) .........................................................................36

*Frost v. Mischer,*
463 S.W.2d 166 (Tex. 1971) ...........................................................................26

*Gen. Elec. Co. v. EPA,*
290 F.3d 377 (D.C. Cir. 2002) ...................................................................29, 30

*Geyen v. Marsh,*
775 F.2d 1303 (5th Cir. 1985) .........................................................................34

*Glasgow v. Owen,*
6 S.W. 527 (Tex. 1887) ...................................................................................26

*Hazel v. Lonesome Ranch Property Owners Ass'n,*
656 S.W.3d 468 (Tex. App.—El Paso 2022) ....................................................26

*Humana, Inc. v. Avram A. Jacobson, M.D., P.A.,*
804 F.2d 1390 (5th Cir. 1986) .........................................................................36

*La. Pub. Serv. Comm'n v. FCC,*
476 U.S. 335 (1986) ......................................................................................26

iii

*Larson v. Domestic & Foreign Commerce Corp.*,
    337 U.S. 682 (1949) ................................................................. 36

*Louisiana v. Biden*,
    55 F.4th 1017 (5th Cir. 2022) ................................................... 39

*Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*,
    463 U.S. 29 (1983) ...................................................... 31, 32, 33

*Mountain States Tel. & Tel. Co. v. Vowell Constr. Co.*,
    341 S.W.2d 148 (Tex. 1960) ............................................... 24, 25

*Nken v. Holder*,
    556 U.S. 418 (2009) ................................................................. 22

*Office of Commc'n of the United Church of Christ v. FCC*,
    707 F.2d 1413 (D.C. Cir. 1983) ................................................ 33

*Pan Am. Petroleum Corp. v. Long*,
    340 F.2d 211 (5th Cir. 1964) .................................................... 24

*Portland Cement Ass'n v. EPA*,
    665 F.3d 177 (D.C. Cir. 2011) .................................................. 33

*Prof'ls & Patients for Customized Care v. Shalala*,
    56 F.3d 592 (5th Cir. 1995) ...................................................... 29

*SEC v. Chenery Corp.*,
    318 U.S. 80 (1943) ................................................................... 32

*Sepulvado v. Jindal*,
    729 F.3d 413 (5th Cir. 2013) .................................................... 39

*State v. Cemex Constr. Materials South, LLC*,
    350 S.W.3d 396 (Tex. App.—El Paso 2011) ............................ 24

*Texas v. U.S. EPA*,
    829 F.3d 405 (5th Cir. 2016) .................................................... 23

*Texas v. United States*,
    40 F.4th 205 (5th Cir. 2022) .................................................... 39

*Texas v. United States (DACA)*,
    50 F.4th 498 (5th Cir. 2022) ......................................... 35, 36, 37

*Texas v. United States (DAPA)*,
    809 F.3d 134 (5th Cir. 2015) ........................................ 28, 29, 30, 31

iv

*U.S. Army Corps of Eng'rs v. Hawkes Co.*,
578 U.S. 590 (2016) ................................................................29

*U.S. Dep't of Labor v. Kast Metals Corp.*,
744 F.2d 1145 (5th Cir. 1984) ...........................................29, 30

*United States v. Garner*,
767 F.2d 104 (5th Cir. 1985)...................................................32

*United States v. Williams*,
441 F.2d 637 (5th Cir. 1971) ..................................................26

*In re Village Mobile Homes, Inc.*,
947 F.2d 1282 (5th Cir. 1991) ................................................25

*Wages & White Lion Invs., L.L.C. v. United States Food & Drug Admin.*,
16 F.4th 1130 (5th Cir. 2021) ................................................23

*Winter v. NRDC*,
555 U.S. 7 (2008) .............................................................22, 36

*Zapata v. Ford Motor Credit Co.*,
615 S.W.2d 198 (Tex. 1981) ...................................................24

**Statutes**

5 U.S.C. § 551(10)(D) ................................................................23

5 U.S.C. § 551(13) ......................................................................23

5 U.S.C. § 551(13), (10)(D) .........................................................26

5 U.S.C. § 553 ......................................................................28, 29

5 U.S.C. § 553(a)(2) ...................................................................31

5 U.S.C. § 553(b)(A) ............................................................28, 29, 30

5 U.S.C. § 558(b) .......................................................................26

5 U.S.C. § 702 ......................................................................34, 36

5 U.S.C. § 705 ...................................................................3, 22, 23

5 U.S.C. § 706(2)(A) ..................................................................31

5 U.S.C. § 706(2)(D) ..................................................................28

6 U.S.C. §§ 202(1)-(3), 251, 255 ............................................................................14

6 U.S.C. § 202(5) ......................................................................................................27

6 U.S.C. § 211(c)(2), (5), (6), (8) ....................................................................... 14, 27

6 U.S.C. § 256 ..........................................................................................................15

8 U.S.C. § 1103(a)(5) ...............................................................................................27

8 U.S.C. § 1324 (a)(1)(A)(ii) ....................................................................................27

8 U.S.C. § 1324(a)(1)(A)(iv) .................................................................................... 28

8 U.S.C. §1357(a)(3) ..........................................................................................25, 27

Pub. L. 110–161, div. E, title V, §564(a), Dec. 26, 2007, 121 Stat. 2090 ................................ 15, 33

Pub. L. No. 109-367, §§ 2(a)(2), 3, 120 Stat. 2638, 2638-2639 (2006) ......................................... 15

Tex. Gov't Code § 418.014 ........................................................................................8

Tex. Penal Code §§ 12.50, 30.05 ..............................................................................8

**Other Authorities**

85 Fed. Reg. 14,953 .................................................................................................12

88 Fed. Reg. 69214 ..................................................................................................32

Exec. Order No. 14059, 86 Fed. Reg. 71549, 71549 (Dec. 15, 2021) .............................................38

RESTATEMENT (SECOND) OF TORTS §263 (1965) .........................................................25

U.S. Const. art. I, § 10, cl. 3 ......................................................................................9

## INTRODUCTION

In the midst of an unprecedented immigration crisis at the southern border, federal government officials are, once again, undermining Texas's efforts to stem the flow of illegal immigration.

The crisis at the southern border is well known. The Biden Administration's abdication of its duty to secure the border has allowed millions of aliens to illegally cross into Texas and the United States in record numbers. According to data maintained by the federal government, U.S. Customs and Border Protection ("CBP") encountered approximately 458,000 aliens at the border in FY2020. That number swelled to over 1.7 million encounters in FY2021 and nearly 2.4 million in FY2022. And the number of "gotaways"—aliens who are detected as making an illegal entry but neither found nor apprehended—increased by 303 percent between FY2019 and FY2022, reaching more than 600,000 in FY2022.

But the border crisis is not just limited to harms of this unprecedented influx of unlawful immigration. It also includes deadly drug smuggling, human trafficking, infiltration by suspected terrorists, and other criminal drug cartel activities. To date, in FY2023, CBP has seized over 22,000 pounds of fentanyl—compared with 8,300 pounds over the same period in FY2022. Fentanyl is potentially lethal at a two-milligram dose and is involved in more deaths of Americans under 50 than any other cause of death, including heart disease, cancer, homicide, or suicide. Fentanyl and other drugs are often illegally smuggled into the United States by cartels that operate as transnational criminal organizations—and that have been designated by the Governor of Texas as foreign terrorist organizations. And the organized crime and drug cartels shuttling these drugs

daily prey on alien communities and children through human trafficking, violence, extortion, and exploitation.

In response, Texas has acted to fill the breach created by the federal government's indolence. The Governor of Texas declared a border security disaster in 2021 and launched Operation Lone Star, which utilizes multiple state agencies, including the Texas Military Department ("TMD"), to fill dangerous gaps left by the Biden Administration's failure to secure the U.S.-Mexico border.

Among other Operation Lone Star initiatives, TMD has purchased and deployed concertina wire fencing, always with the permission of the landowners, to deter and slow illegal crossings at hot spots along the southern border—including in Eagle Pass, Texas, located in the U.S. Border Patrol's Del Rio Sector.

Recently, Eagle Pass has become the epicenter of this unprecedented alien surge. According to Eagle Pass Mayor Rolando Salinas, Jr., this recent surge is like "nothing that we've seen ever, really, to have so many people crossing in without consequence." [1] After roughly 14,000 people—about half of Eagle Pass's population—entered the city in less than two weeks, Mayor Salinas declared a state of disaster, which the City Council endorsed the next week.

On previous occasions, agents of CBP have cut Texas's concertina wire barriers placed at strategic border crossing locations. But just as Eagle Pass was being overwhelmed by this alien surge in September and October of 2023, agents of CBP, without any justification, increased this

---

[1] Gaige Davis, *High Migration Through Texas Border Town of Eagle Pass Strains Resources*, NPR (Sept. 22, 2023), https://www.npr.org/2023/09/22/1201215460/high-migration-through-texas-border-town-of-eagle-pass-strains-resources.

federal practice of cutting, destroying, or otherwise damaging Texas's concertina wire that had been strategically positioned for the purpose of securing the border and stemming the flow of illegal migration.

Since September 20, 2023, federal agents have developed and implemented a policy, pattern, or practice of destroying Texas's concertina wire to encourage and assist thousands of aliens to illegally cross the Rio Grande and enter Texas. Federal agents not only cut Texas's concertina wire, but also attach ropes or cables from the back of pickup trucks to ease aliens' ability to illegally climb up the riverbank into Texas. And they regularly cut new openings in the wire fence, sometimes immediately after Texas officers have placed new wire to plug up gaps in fencing barriers.

By cutting Texas's concertina wire, the federal government has not only illegally destroyed property owned by the State of Texas; it has also disrupted the State's border security efforts, leaving gaps in Texas's border barriers and damaging Texas's ability to effectively deter illegal entry into its territory. Texas is entitled to a preliminary injunction against this ongoing, unlawful practice which undermines its border security efforts. This Court can and should enjoin the Defendants from continuing to destroy and damage private property that is not theirs—without statutory authority and in violation of both state and federal law. In the alternative, the Court should issue a stay of agency action under 5 U.S.C. § 705.

## FACTUAL BACKGROUND

**A.      Texas has a crisis at its Southern border.**

A crisis of human trafficking, drug smuggling, and terrorist infiltration exists along Texas's 1,200-mile border with Mexico. For three years, the number of aliens illegally crossing the southern border has ballooned. CBP encountered about 458,000 aliens at the border in FY2020, 1.7 million

3

in FY2021, and 2.4 million in FY2022.[2] So far in FY2023, CBP has already encountered more than 2.2 million.[3] Those numbers omit individuals detected as making an illegal entry but neither found nor apprehended (there were more than 600,000 in FY2022) and the "unknown number of aliens who evade detection" entirely.[4]

This unprecedented influx of criminal activity along our southern border has had predictable and harmful effects in Texas and across the country. Both Texas citizens and aliens themselves—many of them unaccompanied minors—are often at the mercy of transnational criminal cartels that see illicit activity along the border as good business.[5] These transnational criminal organizations that ferry violent crime across the Rio Grande daily "have become potent paramilitary forces, with heavily armed mobile units able to stand their ground against the Mexican military."[6] One former U.S. Attorney General has stated that the cartels pose security threats that look "more like ISIS than like the American mafia."[7] In one recent incident, these non-state actors were able to overwhelm Mexico's military with "700 cartel paramilitary fighters with armored cars, rocket launchers and heavy machine guns."[8] The federal government has chosen to "accept

---

[2] Office of Inspector General, Dep't of Homeland Security, OIG-23-24: Intensifying Conditions at Southwest Border Are Negatively Impacting CBP and ICE Employees' Health and Morale 6 (May 3, 2023), https://www.oig.dhs.gov/sites/default/files/assets/2023-05/OIG-23-24-May23.pdf.

[3] *Southwest Land Border Encounters*, U.S. Customs & Border Protection, https://www.cbp.gov/newsroom/stats/southwest-land-border-encounters.

[4] OIG-23-24, *supra* n.2, at 10.

[5] Todd Bensman, Overrun: How Joe Biden Unleashed the Greatest Border Crisis in U.S. History 29-32, 193 (2023).

[6] William Barr, Opinion, *The U.S. Must Defeat Mexico's Drug Cartels*, Wall St. J. (Mar. 2, 2023), https://www.wsj.com/articles/the-us-must-defeat-mexicos-drug-cartels-narco-terrorism-amlo-el-chapo-crenshaw-military-law-enforcement-b8fac731.

[7] Id.

[8] Id.

a failed narco-state on our border, providing sanctuary to narco-terrorist groups preying on the American people."[9]

These criminal organizations—"the largest, most violent, and most prolific fentanyl trafficking operation in the world"—shuttle illegal narcotics like fentanyl from Mexico into every corner of this country.[10] Although federal officials continue to claim that "Mexico is not a producer of fentanyl," that country is home to thousands of "illegal laboratories" that in fact manufacture the synthetic drug.[11] This year alone, CBP has seized over 22,000 pounds of fentanyl—a synthetic opioid that is lethal at two milligram doses and is now the leading cause of death for Americans under 50.[12] The fentanyl epidemic is now a nationwide problem that reaches far beyond Texas.[13] Just last month, an infant died after accidentally coming into contact with fentanyl residue at a daycare in New York City.[14]

---

[9] Id.

[10] Press Release, U.S. Department of Justice, Justice Department Announces Charges Against Sinaloa Cartel's Global Operation (Apr. 14, 2023), https://www.justice.gov/opa/pr/justice-department-announces-charges-against-sinaloa-cartel-s-global-operation.

[11] Press Release, U.S. Department of State, Remarks at Joint Press Availability in Palacio Nacional (Oct. 5, 2023), https://www.state.gov/secretary-antony-j-blinken-secretary-of-homeland-security-alejandro-mayorkas-attorney-general-merrick-garland-white-house-homeland-security-advisor-dr-liz-sherwood-randall-mexican-secretary-of-p/; see DRUG ENFORCEMENT AGENCY, DEA-DCT-DIR-008-20: FENTANYL FLOW TO THE UNITED STATES (Jan. 2020), https://www.dea.gov/sites/default/files/2020-03/DEA_GOV_DIR-008-20%20Fentanyl%20Flow%20in%20the%20United%20States_0.pdf.

[12] Press Release, Chuck Grassley, Feinstein-Grassley Resolution for National Fentanyl Awareness Day Passes Senate (May 18, 2023), https://www.grassley.senate.gov/news/news-releases/feinstein-grassley-resolution-for-national-fentanyl-awareness-day-passes-senate.

[13] Id.

[14] Susie Coen, *Baby Boy Dies After Ingesting Fentanyl at New York Nursery*, DAILY TELEGRAPH (Sept. 17, 2023), https://www.telegraph.co.uk/world-news/2023/09/16/baby-boy-dead-ingesting-fentanyl-new-york-nursery-bronx/.

In addition to trafficking drugs, Mexican cartels also traffic human beings. "For the first time in history, the cartel proceeds from human smuggling [may] have surpassed those from drug smuggling."[15] Trafficking across the southern border has changed "from a scattered network of freelance 'coyotes' to a multi-billion-dollar international business controlled by organized crime, some of Mexico's most violent drug cartels."[16] Cartels demand thousands of dollars from aliens to facilitate their illegal entry, commodifying them as human "inventory" with "numbered, colored wrist band[s]."[17] Women and children are raped and abused while journeying to the border, only to be trafficked for further sexual violence upon arriving in the United States.[18] Many newly arrived aliens live in constant fear of visits by cartel members shaking them down for the thousands of dollars they still owe.[19]

Besides submitting themselves to violence and exploitation at the hands of criminal cartels, geographic perils exist for aliens attempting to illegally cross the border. A record high of 853 aliens died crossing it between October 2021 and October 2022.[20] Much of the border passes through the

---

[15] BENSMAN, *supra* n.5, at 41.

[16] Miriam Jordan, *Smuggling Migrants at the Border Now a Billion-Dollar Business*, N.Y. TIMES (July 25, 2022), https://www.nytimes.com/2022/07/25/us/migrant-smuggling-evolution.html.

[17] BENSMAN, *supra* n.5, at 32.

[18] *See* Laura Gottesdiener et al., *Migrants Are Being Raped at the Mexico Border as they Await Entry to US*, REUTERS (Sept. 29, 2023), https://www.reuters.com/world/migrants-are-being-raped-mexico-border-they-await-entry-us-2023-09-29/; Virginia Allen, *'America's New Slave Trade' Is Here at Hands of Mexican Cartels, Border Expert Tells Lawmakers*, DAILY SIGNAL (July 19, 2023), https://www.dailysignal.com/2023/07/19/new-slave-trade-arrived-america-hands-mexican-cartels-border-expert-tells-congress/.

[19] Tim Hains, *Sen. Katie Britt: What I Saw at the Border Was Not the American Dream, It Was a Nightmare*, REALCLEARPOLITICS (Sept. 27, 2023), https://www.realclearpolitics.com/video/2023/09/27/sen_katie_boyd_britt_what_i_saw_at_the_border_was_not_the_american_dream_it_was_a_nightmare.html.

[20] Camilo Montoya-Galvez, *At Least 853 Migrants Died Crossing the U.S.-Mexico Border in Past 12*

arid Chihuahuan Desert—the largest desert in North America—where aliens risk dying from excessive heat and lack of water.[21] Other portions of the border pass through the Rio Grande, where aliens risk drowning in some stretches with a powerful current.[22] A United Nations agency has declared the U.S.-Mexico border the deadliest land crossing in the world.[23]

Cartel members who cross the border bring violence and crime with them. Law enforcement along the Texas border now regularly engage in high-speed chases with traffickers[24] while " 'robberies and violence' skyrocket in [previously] quiet town[s]." [25] Cartels seizing upon an open border have also facilitated the infiltration of terrorists from across the globe. In 2022, the number of border apprehensions of individuals on the FBI's terrorist watchlist was "500 percent more than in *the prior five years combined*." [26] Put another way, CBP encountered just 6 individuals

---

*Months—a Record High*, CBS NEWS (Oct. 28, 2022), https://www.cbsnews.com/news/migrant-deaths-crossing-us-mexico-border-2022-record-high/.

[21] *See* Frances Vinall, *More than 100 Migrants Died from Heat Near U.S.-Mexico Border this Year*, WASH. POST (July 7, 2023), https://www.washingtonpost.com/weather/2023/07/07/migrant-deaths-heat-mexico-border/.

[22] *See* Santiago Perez & Alicia Caldwell, *'It's Like a Graveyard': Record Numbers of Migrants Are Dying at the U.S. Border*, WALL ST. J. (Mar. 17, 2023), https://www.wsj.com/articles/illegal-immigration-mexico-us-border-deaths-c35cf892.

[23] Peter Aitken, *UN Migration Study Deems US-Mexico Border 'Deadliest' Land Route in the World Based on 2021 Numbers*, FOX NEWS (July 4, 2022), https://www.foxnews.com/us/un-migration-study-deems-us-mexico-border-deadliest-land-route-world-based-2021-numbers.

[24] Ali Bradley, *Chases Rampant at Southern Border, Plaguing Communities*, NEWS NATION (Mar. 17, 2023), https://www.newsnationnow.com/us-news/immigration/border-coverage/cartels/southern-border-pursuits/.

[25] Harriet Alexander, *Venezuelan Migrants Are Repelled By Re-installed Razor Wire at Eagle Pass*, DAILY MAIL (Sept. 22, 2023), https://www.dailymail.co.uk/news/article-12547831/eagle-pass-migrants-razor-wire-venezuelans.html.

[26] BENSMAN, supra n.5, at 255-56 (emphasis added); see also id. at 258-64; Adam Shaw et al., *Thousands of 'Special Interest Aliens' from Middle East Countries Stopped at Southern Border Since 2021: Data*, FOX NEWS (Oct. 10, 2023), https://www.foxnews.com/politics/thousands-special-interest-aliens-middle-east-countries-stopped-southern-border-2021-data.

on the terrorist watchlist in 2018; it encountered 146 of them in 2023.[27] Given the hundreds of thousands of "gotaways" who have evaded apprehension, it is impossible to know how many terrorists have already succeeded in passing through the porous southern border and formed terror cells in America.[28]

**B.    Texas launches Operation Lone Star and installs concertina wire.**

In 2021, Governor Greg Abbott declared a border security disaster and launched Operation Lone Star to mitigate the effects of this unprecedented crisis. As part of that initiative, the Governor has:

    a.    detailed law enforcement officers to plug border staffing gaps;

    b.    heightened vehicle inspections by the Department of Public Safety ("DPS");

    c.    bused aliens who wished to relocate to sanctuary cities in other States, which now recognize the southern border poses a national problem;

    d.    constructed miles of border wall after the U.S. ceased construction;

    e.    invoked the Texas Disaster Act to enhance penalties for criminal trespass on private land, *see* Tex. Gov't Code § 418.014; Tex. Penal Code §§ 12.50, 30.05;

    f.    designated transnational criminal cartels smuggling drugs, people, and weapons into Texas as foreign terrorist organizations;

---

[27] MaryAnn Martinez, *Feds Prevented Over 160 People on Terror Watchlist From Crossing US Borders Illegally—Highest Ever Total Recorded: DHS*, N.Y. Post (Sept. 15, 2023), https://nypost.com/2023/09/15/160-people-on-terror-watch-list-stopped-at-us-border-in-2023/.

[28] Andrew Miller, *Hamas Attacks Reminder That Sleeper Cells Are Crossing Southern Border, Expert Warns: 'They're Already Here,'* Fox News (Oct. 11, 2023), https://www.foxnews.com/politics/hamas-attack-reminder-sleeper-cells-crossing-southern-border-expert-warns-theyre-already-here.

g.  deployed floating marine barriers to deter illegal crossings in hotspots along the Rio Grande; and

h.  invoked the Invasion Clauses of the U.S. Constitution, *see* U.S. Const. art. I, § 10, cl. 3; *id.* art. IV, § 4.

These efforts have so far "led to over 477,800 illegal alien apprehensions," "more than 34,200 criminal arrests, with more than 31,200 felony charges reported," and "over 428 million lethal doses of fentanyl" seized.[29] "Every individual who is apprehended or arrested and every ounce of drugs seized would have otherwise made their way into communities across Texas and the nation."[30]

In addition to those historic initiatives, Governor Abbott also instructed TMD to deploy concertina wire to deter aliens from making the illegal and dangerous journey across the border into Texas.[31] Concertina wire is a type of barbed wire that is formed in large coils that can be expanded like a concertina, a musical instrument that resembles an accordion. A single roll can span more than 50 feet of distance and connect with other rolls, posts, hinges, and other components to form a continuous fence.

Accordingly, concertina wire has long been used to form a secure perimeter around airports, prisons, military bases, government buildings, and other high security locations. The

---

[29] Press Release, Office of the Texas Governor, Operation Lone Star Builds More Border Wall To Protect Texans (Sept. 15, 2023), https://gov.texas.gov/news/post/operation-lone-star-builds-more-border-wall-to-protect-texans.

[30] Id.

[31] Press Release, Office of the Texas Governor, Operation Lone Star Deploys New Border Security Deterrence Strategies (June 9, 2023), https://gov.texas.gov/news/post/operation-lone-star-deploys-new-border-security-deterrence-strategies.

federal government, for example, deployed concertina wire to create a secure perimeter around the U.S. Capitol and the Supreme Court of the United States in early 2021.[32] Even retail stores have begun employing concertina wire "[i]n an effort to combat a wave of retail thefts and smash-and-grab robberies."[33]

International borders across the globe are likewise secured with concertina wire.[34] India, the world's largest democracy, has used concertina wire to fence off almost 2,000 miles of its border with Bangladesh.[35] The Obama Administration likewise used razor wire along portions of the U.S.-Mexico border.[36]

Coiled razor wire can be quickly deployed to cover a large span of geographical space. As DHS itself acknowledges, once deployed, it effectively "serves as a deterrent" to prevent

---

[32] Zachary Cohen, *US Capitol Police Tells Lawmakers that Razor Wire Fencing Should Remain Until September*, CNN (Feb. 19, 2021), https://www.cnn.com/2021/02/19/politics/us-capitol-police-fencing-extension-request/index.html; Marisa J. Lang, *An Increasingly Fortified Federal City*, WASH. POST (Apr. 13, 2021), https://www.washingtonpost.com/dc-md-va/interactive/2021/us-capitol-fencing/.

[33] Nancy Loo & Katie Smith, *Retailers Using Metal Coils to Deter Robberies, Nab Thieves*, NEWS NATION (Dec. 15, 2021), https://www.newsnationnow.com/holidays-on-alert/retailers-using-metal-coils-to-deter-robberies-nab-thieves/; *see also* Lisa Fickenscher et al., *Saks Fifth Avenue is Wrapped in Razor Wire to Prevent Looting*, N.Y. POST (June 3, 2020), https://nypost.com/2020/06/02/saks-fifth-avenue-is-wrapped-in-razor-wire-to-prevent-looting/.

[34] Lorena Iñiguez Elebee, *What Border Walls Look Like Around the World*, L.A. Times (Jan. 31, 2017), https://web.archive.org/web/20170514093140/https://www.latimes.com/world/mexico-americas/la-fg-g-border-bariers-20170130-story.html.

[35] Shahidul Islam Chowdhury, *India Completes Fencing Three-Fourths of Border*, New Age Bangladesh (Sept. 23, 2020), https://www.newagebd.net/article/117038/india-completes-fencing-three-fourths-of-border.

[36] Office of Inspector General, Dep't of Homeland Security, OIG-17-39: CBP's Border Security Efforts – An Analysis of Southwest Border Security Between the Ports of Entry 4 (Feb. 27, 2017), https://www.oig.dhs.gov/sites/default/files/assets/2017/OIG-17-39-Feb17.pdf.

unauthorized crossings and entry onto restricted property.[37] Snags on wire coils slow illegal entries and ease law enforcement apprehension. But the challenge of safely navigating the wire itself often deters trespassers from attempting to cross at all.

TMD regularly purchases concertina wire from a variety of vendors to help secure the border, including in the vicinity of Eagle Pass, Texas. Over the past three years, TMD has spent $32 million to procure components for its concertina wire fence, Perez Decl. ¶3—including roughly $11 million for more than 70,000 rolls of concertina wire—equivalent to roughly 330 miles of barrier, Perez Decl. ¶5. Texas's need for concertina wire has increased in recent months. In the second half of 2023 alone, as the Defendants accelerated their practice of destroying Texas's property, TMD has purchased almost 30,000 rolls of wire. Perez Decl. ¶3. Much of this wire is stored in facilities near Eagle Pass, Texas. Perez Decl. ¶4.

TMD servicemembers regularly deploy concertina wire along Texas's border with Mexico, including in the vicinity of Eagle Pass, Texas. After initial conversations with landowners, they obtain written consent in a Border Barrier License Agreement authorizing construction, maintenance, and repair of concertina wire fencing. Garcia Decl. ¶10. To construct the concertina fence, TMD servicemembers place stakes in the ground, spaced out every five to six feet, and stretch concertina wire along the line of fencing stakes. Garcia Decl. ¶8. Successive rolls of wire are attached to each other by clamps and the rolls are attached to the fence stakes with tying wires. Garcia Decl. ¶8. Ground anchors placed at intervals keep the wire coils flush with the ground.

---

[37] Office of Inspector General, Dep't of Homeland Security, OIG-17-115: Management Alert – Security and Safety Concerns at Border Patrol Stations in the Tucson Sector 6 (Sept. 29, 2017), https://www.oig.dhs.gov/sites/default/files/assets/2017/OIG-17-115-MA-092917.pdf.

Garcia Decl. ¶8. TMD servicemembers almost always construct the fence with a minimum of three rolls of wire: Two rolls of wire are situated on the ground on either side of the stake line, while a third roll is installed above and between them in line with the fencing stakes. Garcia Decl. ¶9. TMD servicemembers are capable of laying " a quarter mile of [this] triple-strand razor wire each day." [38]

**C.     In September, aliens surge in Eagle Pass.**

Maverick County—which includes Eagle Pass, Texas—has been particularly affected by the ongoing border crisis.[39] In June 2023, Eagle Pass represented nearly 25% of all CBP border encounters.[40] Seizures there of cocaine, methamphetamine, heroin, fentanyl, and marijuana increased by 7% in June 2023 and 9% in July 2023.[41]

But those routine and ongoing challenges in Eagle Pass pale in comparison to the massive influx the city saw this fall. Over the second and third weeks of September, almost 14,000 aliens— roughly half the entire population of Eagle Pass—entered the city illegally. On September 20, 2023, more than 4,000 aliens illegally crossed into Eagle Pass in a single day.[42] That two-week surge in

---

[38] Press Release, Texas Military Department, Texas Gets Help With Border, Florida-Tennessee National Guard  (June 7, 2023), https://tmd.texas.gov/ols-weekly-joint-press-release-injects-6-7-2023.

[39] Determination Pursuant to Section 102 of the Illegal Immigration Reform and Immigrant Responsibility Act of 1996, as Amended, 85 Fed. Reg. 14,953, 14,953-14,955 (Mar. 16, 2020).

[40] *Southwest Land Border Encounters (By Component)*, U.S. CUSTOMS & BORDER PROTECTION, https://www.cbp.gov/newsroom/stats/southwest-land-border-encounters-by-component.

[41] Press Release, U.S. Customs & Border Patrol, CBP Releases July 2023 Monthly Update (Aug. 18, 2023), https://www.cbp.gov/newsroom/national-media-release/cbp-releases-july-2023-monthly-update.

[42] MaryAnn Martinez & Jorge Fitz-Gibbon, *Overwhelmed Texas City Declares State of Emergency As over 11K Migrants—Close to Half Its Population—Surge Across Border*, N.Y. POST (Sept. 20, 2023), https://nypost.com/2023/09/20/eagle-pass-texas-declares-state-of-emergency-over-migrants/.

Eagle Pass is roughly the same as the total number of alien apprehensions for the entire Del Rio

Sector for the entire year in each of 2009, 2010, 2011, 2017, and 2018.[43]

      This sudden and overwhelming influx of aliens has resulted in what one observer called

"complete madness," straining local resources.[44] The city's law enforcement officers have been

"overwhelmed" by a spate of crime[45] and Eagle Pass is home to only a single shelter capable of

housing aliens.[46]

      In response to this massive influx, the mayor of Eagle Pass issued an emergency declaration

under the Texas Disaster Act. On September 19, 2023, Mayor Rolando Salinas, Jr., declared a state

of disaster "due to the severe undocumented immigrant surge into the City of Eagle Pass."[47] On

September 26, 2023, the City Council ratified the mayor's disaster declaration because the alien

surge continued to plague the city, stating that it would remain in effect until terminated by the

City Council.[48] The Eagle Pass City Council has not terminated the disaster declaration.

---

[43] *Total Illegal Alien Apprehensions By Month*, U.S. BORDER PATROL (Jan. 2020), https://www.cbp.gov/sites/default/files/assets/documents/2020-Jan/U.S.%20Border%20Patrol%20Monthly%20Apprehensions%20%28FY%202000%20-%20FY%202019%29_1.pdf.

[44] *See* Anna Giaritelli, *Elon Musk Goes to the Border and Leaves Stunned: 'Complete Madness,'* WASH. EXAMINER (Sept. 29, 2023), https://www.washingtonexaminer.com/policy/immigration/elon-musk-goes-to-the-border-and-leaves-stunned; *see also* Alicia Caldwell & Michelle Hackman, *Migrants Overwhelm Texas City of Eagle Pass*, WALL ST. J. (Sept. 21, 2023), https://www.wsj.com/politics/policy/migrants-overwhelm-texas-city-of-eagle-pass-531879cf.

[45] Alexander, *supra* n.25.

[46] *See* Uriel J. Garcia, *Texas Border Cities Scramble to Shelter Thousands of Newly-Arrived Migrants*, TEX. TRIB. (Sept. 21, 2023), https://www.texastribune.org/2023/09/21/texas-migrants-border-eagle-pass/.

[47] City of Eagle Pass (@CityEaglePassTx), X (Sept. 20, 2023, 9:13 AM), https://twitter.com/CityEaglePassTx/status/1704498968154009806.

[48] City of Eagle Pass, *The City of Eagle Pass City Council Ratifies Emergency Declaration*, FACEBOOK (Sept. 27, 2023), https://www.facebook.com/photo.php?fbid=710818617741865&set=a.632768342213560&type=3 .

Texas had previously "installed razor wire in Eagle Pass to stop illegal crossings." During the September surge, however, the Governor of Texas "deployed more Texas National Guard to repel illegal crossings & install more razor wire."[49] TMD "reinforced the razor wire barrier, adding new spools to deter entry at the illegal crossing point."[50]

### D.    Federal Defendants destroy Texas's concertina wire.

Federal law tasks DHS and Secretary Mayorkas with, among other things, "[p]reventing the entry of terrorists and the instruments of terrorism into the United States"; "[s]ecuring the borders … of the United States, including managing and coordinating those functions transferred to [DHS] at ports of entry"; "[c]arrying out the immigration enforcement functions vested by statute," like U.S. Border Patrol (USBP) operations, detention and removal, and inspections at ports of entry; and consulting with "the heads of State and local law enforcement agencies to determine how to most effectively conduct [immigration] enforcement operations." 6 U.S.C. §§ 202(1)-(3), 251, 255; *see also id.* § 111(b)(1)(A), (B), (D), (H).

Federal law tasks CBP and Acting Commissioner Miller with, among other things, "ensur[ing] the interdiction of persons and goods illegally entering the United States"; "detect[ing], respond[ing] to, and interdict[ing] terrorists, drug smugglers and traffickers, human smugglers and traffickers, and other persons who may undermine the security of the United States;" "safeguard[ing] the borders of the United States"; and "enforc[ing] and administer[ing] all immigration laws." *Id.* § 211(c)(2), (5), (6), (8).

---

[49] Greg Abbott (@GregAbbott_TX), X (Sept. 20, 2023, 4:54 PM), https://twitter.com/Greg Abbott_TX/status/1704614936218149361.

[50] Keith Griffith, *Eagle Pass Border Standoff*, DAILY MAIL (Sept. 26, 2023), https://www.daily mail.co.uk/news/article-12563581/Eagle-Pass-border-crisis-Texas-National-Guard.html.

Federal law tasks USBP and Chief Owens with, among other things, "serv[ing] as the law enforcement office of [CBP] with primary responsibility for interdicting persons attempting to illegally enter or exit the United States or goods being illegally imported into or exported from the United States at a place other than a designated port of entry"; "deter[ring] and prevent[ing] the illegal entry of terrorists, terrorist weapons, persons, and contraband"; and "carry[ing] out other duties and powers prescribed by the Commissioner" of CBP. *Id.* § 211(e)(3)(A)-(B).

When it comes to fencing along the border, federal law instructs that DHS "shall construct reinforced fencing along not less than 700 miles of the southwest border where fencing would be most practical and effective." Pub. L. 110–161, div. E, title V, §564(a), Dec. 26, 2007, 121 Stat. 2090.[51] And when it first assigned immigration and border functions to DHS, Congress instructed that it "should be a priority for the Secretary" to complete a "14-mile border fence project" near San Diego, California. 6 U.S.C. § 256.

The federal Defendants, however, have taken deliberate steps not to police the Nation's southern border. They have taken additional steps to undercut any State that tries to secure its own border, which the federal government has itself abandoned. Here, Defendants have done just that by adopting a policy, pattern, or practice of destroying Texas's concertina wire fence.

TMD servicemembers routinely record and report noteworthy or suspicious incidents to TMD's chain of command, including incidents of anyone damaging state property or tampering with border infrastructure. *See* Garcia Decl. ¶11. In the first half of this year, TMD documented at least 20 incidents when CBP officials seized and damaged Texas's wire fencing by cutting it. On

---

[51] *See also* Pub. L. No. 109-367, §§ 2(a)(2), 3, 120 Stat. 2638, 2638-2639 (2006).

various occasions from January 2023 through August 2023, CBP officials cut Texas's concertina wire to admit aliens illegally entering Texas through the fence hole created by CBP's destruction of state property.

In response to reporting in June that showed footage of "Border Patrol cutting through razor wire placed by the state of TX to allow aliens to enter & be processed,"[52] "a CBP spokesperson" stated that federal officials were entitled to destroy state property to admit illegal aliens anytime they had already effectuated an illegal crossing of the international border.[53] CBP's damage to Texas's concertina wire accelerated in September and October, just as the sudden influx of aliens was surging into Eagle Pass.

On September 20, 2023, CBP officials cut Texas's concertina wire near Eagle Pass, Texas, at 8:51 AM, admitting more than 1,200 aliens through the hole. That same day, the Governor of Texas publicly explained in a statement on X (formerly known as Twitter) that Texas had "installed [the] razor wire in Eagle Pass to stop illegal crossings." Federal officers, however, "CUT that wire" to "open[] the floodgates to illegal immigrants." In response, the Governor announced that he "immediately deployed more Texas National Guard to repel illegal crossings & install more razor wire."[54]

This post—which has since been viewed more than 10 million times—included an embedded video from earlier that same day showing CBP officials tearing Texas's fence apart:

---

[52] Bill Melugin (@BillMelugin_), X (June 30, 2023, 1:35 PM), https://twitter.com/BillMelugin_/status/1674849236448313372.

[53] Bill Melugin (@BillMelugin_), X (June 30, 2023, 6:23 PM), https://twitter.com/BillMelugin_/status/1674921617661591553.

[54] Abbott, *supra* n.49.

16



The video also shows CBP officials waving aliens up the riverbank:



Defendants did not cease their destruction of state property. Instead, they doubled down on their policy, pattern, or practice of destroying Texas's wire fence. TMD has documented CBP officials seizing and damaging Texas's wire fence by cutting openings more times since September 20 than in the prior eight months combined. Garcia Decl. ¶12.

a. On September 21, CBP officials cut Texas's concertina wire near Eagle Pass, Texas, at 4:52 AM, admitting an unknown number of aliens through the hole.

b. On September 23, CBP officials cut Texas's concertina wire near Eagle Pass, Texas, at 5:53 PM, admitting 30 aliens through the hole.

18

c. On September 24, CBP officials cut Texas's concertina wire near Eagle Pass, Texas, at 1:05 PM, admitting 186 aliens through the hole.

d. On September 26, CBP officials cut Texas's concertina wire near Eagle Pass, Texas, at 1:40 PM, admitting an unknown number of aliens through the hole.

e. On September 27, CBP officials cut Texas's concertina wire near Eagle Pass, Texas, at 2:47 PM, admitting 94 aliens through the hole.

f. On September 27, CBP officials cut Texas's concertina wire near Eagle Pass, Texas, at 3:25 PM, admitting an unknown number of aliens through the hole.

g. On September 28, CBP officials cut Texas's concertina wire near Eagle Pass, Texas, at 7:23 AM, admitting 72 aliens through the hole.

h. On September 28, CBP officials cut Texas's concertina wire near Eagle Pass, Texas, at 10:04 AM, admitting 32 aliens through the hole.

i. On September 28, CBP officials cut Texas's concertina wire near Eagle Pass, Texas, at 11:20 AM, admitting more than 30 aliens through the hole.

j. On September 28, CBP officials cut Texas's concertina wire near Eagle Pass, Texas, at 1:55 PM, admitting an unknown number of aliens through the hole.

k. On September 29, CBP officials cut Texas's concertina wire near Eagle Pass, Texas, at 6:00 AM, admitting an unknown number of aliens through the hole.

l. On September 29, CBP officials cut Texas's concertina wire near Eagle Pass, Texas, at 4:12 PM, admitting 35 aliens through the hole.

m. On September 30, CBP officials cut Texas's concertina wire near Eagle Pass, Texas, at 9:14 AM, admitting 232 aliens through the hole.

n.  On September 30, CBP officials cut Texas's concertina wire near Eagle Pass, Texas, at 1:30 PM, admitting an unknown number of aliens through the hole.

o.  On September 30, CBP officials cut Texas's concertina wire near Eagle Pass, Texas, at 2:35 PM, admitting an unknown number of aliens through the hole.

p.  On September 30, CBP officials cut Texas's concertina wire near Eagle Pass, Texas, at 4:37 PM, admitting an unknown number of aliens through the hole.

q.  On October 1, CBP officials cut Texas's concertina wire near Eagle Pass, Texas, at 11:00 AM, admitting an unknown number of aliens through the hole.

r.  On October 2, CBP officials cut Texas's concertina wire near Eagle Pass, Texas, at 11:11 AM, admitting an unknown number of aliens through the hole.

s.  On October 2, CBP officials cut Texas's concertina wire near Eagle Pass, Texas, at 2:55 PM, admitting an unknown number of aliens through the hole.

t.  On October 6, CBP officials cut Texas's concertina wire near Eagle Pass, Texas, at 12:45 PM, admitting an unknown number of aliens through the hole.

u.  On October 6, CBP officials cut Texas's concertina wire near Eagle Pass, Texas, at 5:25 PM, admitting an unknown number of aliens through the hole.

v.  On October 10, CBP officials cut Texas's concertina wire near Eagle Pass, Texas, at 11:40 AM, admitting an unknown number of aliens through the hole.

Since September 20, then, CBP has seized and damaged Texas's concertina wire—cutting through usually a minimum of three rows of concertina wire—to escort aliens into Texas more than 20 times. Garcia Decl. ¶¶12-13. On each of these occasions, CBP has entered onto state,

municipal, or private land to destroy state property. (Plaintiff has not placed concertina wire on any federal land near Eagle Pass.)

Defendants thus have a policy, practice, or pattern of seizing, damaging, and destroying Texas's personal property by cutting, severing, and tearing its concertina wire fence to introduce breaches, gaps, or holes in the barrier. Banks Decl. ¶14. They have authorized their officials or agents to engage in this conduct anytime an alien has managed to illegally cross the international border in the Rio Grande to process that alien in the United States—even where migrants are in no apparent distress or when any legitimate exigency has dissipated. Garcia Decl. ¶13; Banks Decl. ¶¶16-17, 19. Defendants' wire-cutting policies are pervasive and widespread. And they are largely implemented by higher-level CBP leadership, rather than lower-level officers, who regularly refuse to destroy or damage Texas's border infrastructure. Banks Decl. ¶¶24-25.

CBP's routine act of seizing and cutting Texas's concertina wire destroys its utility as a barrier fence, as evidenced by CBP's ability to usher large numbers of aliens through breaches made in the fence. TMD servicemembers are constantly tasked with closing gaps CBP agents have cut in the fence, deploying new rolls each time, Garcia Decl. ¶14, often for CBP officials to come behind them immediately to cut the fence once again, Banks Decl. ¶¶14, 18, 21. As a result of Defendants' destruction of concertina wire, Plaintiff has suffered and continues to suffer harm and a real and immediate threat of repeated injury in the future. Plaintiff owns the concertina wire that has been placed in border locations and Defendants' repeated destruction of Plaintiff's property has diminished Texas's efforts to secure the border.

Defendants have no statutory authority or other privilege to seize and damage Texas's wire fence by cutting breaches. Defendants routinely damage Texas's fence with no apparent need to

administer emergency response to an alien in distress. The concertina wire does not prevent officials from providing water or other nourishment to aliens on the other side of the fence, and law enforcement continue to operate boats in the river. Banks Decl. ¶23. Defendants also have no statutory authority or other privilege to hold open the breaches in Texas's wire fence after seizing and damaging it. Even if Defendants have cut Texas's wire fence on some occasions to aid an individual migrant in urgent distress, Defendants routinely refuse to repair the damages to Texas's wire fence promptly after any exigency has dissipated, instead broadening breaches or leaving them open for hundreds of other aliens to enter illegally. Banks Decl. ¶¶15, 17-18.

## ARGUMENT

Texas is entitled to a preliminary injunction against Defendants' destruction of its concertina wire along the border because it can show "that [it] is likely to succeed on the merits, that [it] is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in [its] favor, and that an injunction is in the public interest." *Winter v. NRDC*, 555 U.S. 7, 20 (2008). The final two elements merge when the opposing party is the government. *Nken v. Holder*, 556 U.S. 418, 435 (2009).

The Court should also issue a stay under 5 U.S.C. § 705. The standard for staying an agency action is the same as the standard for a preliminary injunction. "In the same way that a preliminary injunction is the temporary form of a permanent injunction, a stay [under section 705] is the temporary form of vacatur." *All. for Hippocratic Med. v. U.S. Food & Drug Admin.*, 78 F.4th 210, 254 (5th Cir. 2023). "Under 5 U.S.C. § 705, [courts] may, under certain "conditions[,] ... and to the extent necessary to prevent irreparable injury, ... issue all necessary and appropriate process to postpone the effective date of an agency action or to preserve status or rights pending conclusion

22

of the review proceedings." *Wages & White Lion Invs., L.L.C. v. United States Food & Drug Admin.*, 16 F.4th 1130, 1143 (5th Cir. 2021) (quoting 5 U.S.C. § 705).

This provision "authorizes reviewing courts to stay agency action pending judicial review." *Affinity Healthcare Servs., Inc. v. Sebelius*, 720 F. Supp. 2d 12, 15 n.4 (D.D.C. 2010) (citing 5 U.S.C. § 705). "Motions to stay agency action pursuant to these provisions are reviewed under the same standards used to evaluate requests for interim injunctive relief." *Id.* (citing *Cuomo v. U.S. Nuclear Regulatory Comm'n*, 772 F.2d 972, 974 (D.C. Cir. 1985)); s*ee also Texas v. U.S. EPA*, 829 F.3d 405, 435 (5th Cir. 2016) (granting stay of agency action under 5 U.S.C. § 705 and applying preliminary injunction factors).

Further, under the Administrative Procedure Act (APA), " 'agency action' includes the whole or a part of an agency … sanction." 5 U.S.C. § 551(13). A " 'sanction' includes the whole or a part of an agency destruction, taking, seizure, or withholding of property." 5 U.S.C. § 551(10)(D). The destruction of the concertina wire is a sanction, which qualifies as a final agency action.

A.    **Texas can show a likelihood of success on the merits.**

" A preliminary injunction may issue … despite the existence of a plausible defense, as long as the movant demonstrates a substantial likelihood of success." *Dallas Cowboys Cheerleaders, Inc. v. Scoreboard Posters, Inc.*, 600 F.2d 1184, 1188 (5th Cir. 1979).

Texas has a substantial likelihood of success in demonstrating that Defendants committed conversion and trespass, exceeded their statutory duty, and violated the APA. In the alternative, Texas has a substantial likelihood of success in demonstrating that Defendants' agents acted *ultra vires*.

1.    **Texas is likely to succeed on its conversion and trespass to chattels claims.**

Texas common law furnishes a cause of action for conversion for "the unlawful and wrongful exercise of dominion, ownership, or control by one person over the property of another, to the exclusion of the same rights by the owner." *Pan Am. Petroleum Corp. v. Long*, 340 F.2d 211, 219-220 (5th Cir. 1964) (applying Texas law). It also furnishes a cause of action for trespass to chattels for wrongfully exercising dominion over the private property of another in a way that causes "actual damage" or "deprives the owner of its use for a substantial period of time." *Zapata v. Ford Motor Credit Co.*, 615 S.W.2d 198, 201 (Tex. 1981). The difference between the two torts is the degree of interference with the property interest: Any interference with another's property causing actual damage constitutes a trespass; but "serious[] interfere[nce]" amounts to conversion when it would justify requiring the tortfeasor to pay the full value of the property. *Id.*

Under either tort, the subjective intent or ill will of the tortfeasor is irrelevant to the question of liability. "[A] wrongful or fraudulent intent or purpose is not required, and the presence of any good faith in the [tortfeasor] is relevant only to the issue of [money] damages." *Pan Am.*, 340 F.2d at 220 & n.24. "The important thing is that a property right was violated." *Mountain States Tel. & Tel. Co. v. Vowell Constr. Co.*, 341 S.W.2d 148, 150 (Tex. 1960).

These principles have a straightforward application here. The State of Texas may—and does—hold a proprietary interest in property, like its concertina wire fence. *See, e.g.*, *State v. Cemex Constr. Materials South, LLC*, 350 S.W.3d 396, 398, 409 (Tex. App.—El Paso 2011) (permitting state conversion claim for construction materials to proceed). Here Defendants "deliberately and intentionally used [wire cutters] in making a cut to the [fence]." *Mountain States Tel.*, 341 S.W.2d at 150. "The [fence] was lawfully in place" on state, municipal, or private land. *Id.* So, "[t]he molesting or severing of the [fence] was a violation of a property right which gave rise to a cause of

action regardless of negligence." *Id.* By cutting Texas's concertina wire fence, Defendants have destroyed its utility as a barrier and deprived Texas of its use for a substantial time. Texas will likely succeed on its conversion and trespass claims. *See Cummer-Graham Co. v. Maddox*, 285 S.W.2d 932, 935 (Tex. 1956) (finding liability for trespass to chattels based on "the destruction of some fences"); *In re Village Mobile Homes, Inc.*, 947 F.2d 1282, 1283 (5th Cir. 1991) (applying Texas law finding liability for conversion based on removal of "a fence from the lot").

No authority justifies Defendants' ongoing practice of destroying Texas's concertina wire. The common law may furnish certain narrow privileges to invade the property interests of others. *See* RESTATEMENT (SECOND) OF TORTS §263 (1965) (private necessity). Federal officials may also have a privilege embodied in statute—namely, 8 U.S.C. §1357(a)(3), which authorizes them "to have access to private lands … for the purpose of patrolling the border to prevent the illegal entry of aliens" within 25 miles of the border. But Texas's concertina wire fence in no way impedes federal officers from patrolling the border or apprehending aliens—much less conducting water rescues or administering aid to migrants on the banks of the Rio Grande. Banks Decl. ¶¶15-16, 20. Defendants here have a practice of willfully destroying property that is not their own when there is no exigency at all, and of persisting in that abuse even after any exigency has dissipated. Garcia Decl. ¶13; Banks Decl. ¶¶14, 16-17, 19. And it should be obvious that destroying a wire fence serving as a barrier to illegal entry is *not* "patrolling the border to prevent the illegal entry of aliens."[55]

---

[55] Even if Defendants' subjective intent was somehow relevant (it is not), there can be no question that the conduct here is willful. Even after Governor Abbott tweeted that CBP officials were destroying *state property*, Defendants have persisted in their policy of destroying Texas's fencing.

Because Defendants' unlawful and destructive exercises of dominion and control over state property are ongoing, this court can and should preliminarily and permanently enjoin them. *See, e.g.*, *Hazel v. Lonesome Ranch Property Owners Ass'n*, 656 S.W.3d 468, 581, 500 (Tex. App.—El Paso 2022); *Glasgow*, 5 S.W. at 529. Money damages may be an adequate legal remedy for past conversion or trespass, but only an injunction can prevent ongoing invasions of property interests—as both the Supreme Court of Texas and the Fifth Circuit have recognized. *See Frost v. Mischer*, 463 S.W.2d 166, 168 (Tex. 1971); *Connasauga River Lumber Co. v. Shippen*, 293 F.3d 579, 580 (5th Cir. 1923). The federal government has sought injunctive relief for ongoing invasions of its own property interests before. *See, e.g.*, *United States v. Williams*, 441 F.2d 637, 642 (5th Cir. 1971) ("[T]he United States filed a complaint characterizing these intrusions as continuing trespasses and praying for a permanent injunction."). It should not be heard to object when Texas seeks an injunction against Defendants' ongoing destruction of state property here.

**2. Texas is likely to succeed on its claim that Defendants violated the APA by acting in excess of their statutory authority.**

An agency sanction in excess of statutory authority violates the APA. "A sanction may not be imposed or a substantive rule or order issued except within jurisdiction delegated to the agency and as authorized by law." 5 U.S.C. § 558(b). Defendants have no statutory authority to destroy Texas's concertina wire. "[A]n agency literally has no power to act … unless and until Congress confers power upon it." *La. Pub. Serv. Comm'n v. FCC*, 476 U.S. 335, 374 (1986). Defendants' destruction of concertina wire is a final agency action. 5 U.S.C. § 551(13), (10)(D).

---

And when confronted by state officials, CBP agents have ordered them to "back the fuck off" and threatened to "tie a fucking tow strap to this shit and rip it all out." Banks Decl. ¶¶18, 22. This willful conduct is itself evidence of exceeding the lawful scope of any common-law or statutory authority to trespass. *See Glasgow v. Owen*, 6 S.W. 527, 530 (Tex. 1887).

Defendants do have the authority and duty to set "national immigration enforcement policies and priorities," 6 U.S.C. § 202(5), and to "ensure the interdiction of persons and goods illegally entering the United States"; "detect[ing], respond[ing] to, and interdict[ing] terrorists, drug smugglers and traffickers, human smugglers and traffickers, and other persons who may undermine the security of the United States;" "safeguard[ing] the borders of the United States"; and "enforc[ing] and administer[ing] all immigration laws." 6 U.S.C. § 211(c)(2), (5), (6), (8); *see also id.* § 211(e)(3). But no statute authorizes Defendants to destroy and seize border infrastructure belonging to another sovereign in order to facilitate unlawful entry of aliens into the United States. On the contrary, facilitating unlawful entry runs directly counter to Defendants' "power and duty to control and guard the boundaries and borders of the United States against the illegal entry of aliens." 8 U.S.C. § 1103(a)(5). This power does not include destroying and seizing concertina wire that controls and guards the boundary and border against the illegal entry of aliens.

As discussed earlier, Defendants also have the power, "within a distance of twenty-five miles from any such external boundary" of the United States, "to have access to private lands, but not dwellings, for the purpose of patrolling the border to prevent the illegal entry of aliens into the United States[.]" 8 U.S.C. § 1357(a)(3). This power also does not include the power to cut concertina wire that prevents the illegal entry of aliens into the United States.

A person who "knowing or in reckless disregard of the fact that an alien has come to, entered, or remains in the United States in violation of the law, transports, or moves or attempts to transport or move such alien within the United States by means of transportation or otherwise, in furtherance of such violation of law" commits a crime. 8 U.S.C. § 1324 (a)(1)(A)(ii). Defendants' destruction and seizure of TMD's concertina wire would therefore be a *crime* if

27

committed by a private actor because it permits and allows the movement and transportation of illegal aliens within the United States.

Additionally, a person who "encourages or induces an alien to come to, enter, or reside in the United States, knowing or in reckless disregard of the fact that such coming to, entry, or residence is or will be in violation of law" commits a crime. 8 U.S.C. § 1324(a)(1)(A)(iv). If a private actor cut Plaintiff's concertina wire in the same way that Defendants did—perhaps even lowering ropes from the beds of pickup trucks with a view to waving aliens across the Rio Grande—that person would have committed a crime because cutting the wire "encourages or induces" aliens to enter the United States in violation of the law.

Texas has shown a likelihood of success in demonstrating that Defendants' actions in removing and destroying concertina wire are in direct conflict with their statutory duties under federal law in violation of the APA. This court should enjoin any further destruction.

3.   **Texas is likely to succeed on its claim that Defendants failed to follow prescribed procedures.**

The APA directs federal courts to set aside agency action that is taken "without observance of procedure required by law." 5 U.S.C. § 706(2)(D). Defendants' policy, pattern, or practice of seizing and destroying Plaintiff's concertina wire is a sanction equivalent to a substantive rule. As such, it should have been subject to notice and comment.

The APA requires that agencies engaging in rulemaking provide notice to affected parties in advance of the rulemaking and an opportunity to participate in the process. 5 U.S.C. § 553. When the rulemaking involves "interpretive rules, general statements of policy, or rules of agency organization, procedure, or practice," the notice and comment requirement of formal rulemaking does not apply. 5 U.S.C. § 553(b)(A). But these exceptions "must be narrowly construed." *Texas*

*v. United States (DAPA)*, 809 F.3d 134, 171 (5th Cir. 2015). "Section 553 was enacted to give the public an opportunity to participate in the rule-making process. It also enables the agency promulgating the rule to educate itself before establishing rules and procedures which have a substantial impact on those who are regulated." *U.S. Dep't of Labor v. Kast Metals Corp.*, 744 F.2d 1145, 1153 n.17 (5th Cir. 1984) (quotations omitted).

The destruction of the concertina wire was a final and reviewable agency action subject to notice and comment. First, it "mark[s] the consummation of the agency's decisionmaking process—it [is] not [] of a merely tentative or interlocutory nature. Second, the action [is] one by which rights or obligations have been determined, or from which legal consequences will flow." *U.S. Army Corps of Eng'rs v. Hawkes Co.*, 578 U.S. 590, 597 (2016) (citation omitted).

Defendants' sanction was also substantive. If an agency action is an interpretive rule, general statement of policy, or rule of agency procedure or practice, it is exempt from the notice-and-comment requirement, but if it is a substantive rule, it is subject to notice and comment. *See Prof'ls & Patients for Customized Care v. Shalala*, 56 F.3d 592, 595 (5th Cir. 1995); 5 U.S.C. § 553(b)(A). To evaluate whether a rule is substantive, courts will examine "whether the rule (1) imposes any rights and obligations and (2) genuinely leaves the agency and its decision-makers free to exercise discretion. … If a statement denies the decisionmaker discretion in the area of its coverage … then the statement is binding and creates rights or obligations." *DAPA*, 809 F.3d. at 171 (internal citations and quotation marks omitted).

"While mindful but suspicious of the agency's own characterization, [courts] … focus[] primarily on whether the rule has binding effect on agency discretion or severely restricts it." *Gen. Elec. Co. v. EPA*, 290 F.3d 377, 382 (D.C. Cir. 2002) (quoting *McLouth Steel Prods. Corp. v. Thomas*,

838 F.2d 1317, 1320 (D.C. Cir. 1988)). "[A]n agency pronouncement will be considered binding as a practical matter if it either appears on its face to be binding, or is applied by the agency in a way that indicates it is binding." *Id.* at 383 (citation omitted). The practical effect of a sanction destroying concertina wire is that of a binding rule. A policy of cutting wire—routinely and when exigent circumstances that might otherwise justify a trespass have dissipated or are entirely non-existent—"is applied by the agency in a way that indicates it is binding." *Id.* A binding rule issued or exercised without notice and comment violates the APA.

Alternatively, the sanction is subject to notice and comment because it has a substantive impact. A binding rule may be exempt from notice and comment rulemaking if it is one of "agency organization, procedure, or practice." 5 U.S.C. § 553(b)(A). But, if an arguably procedural rule has a substantial impact, the exemption will not apply. "[T]he substantial impact test is the primary means by which [we] look beyond the label 'procedural' to determine whether a rule of the type Congress thought appropriate for public participation." *Kast Metals Corp.*, 744 F.2d at 1153. Similarly, "rules are generally considered procedural so long as they do not 'change the substantive standards by which the [agency] evaluates' applications that seek a benefit that the agency has the power to provide." *DAPA*, 809 F.3d at 176-77 (quoting *Nat'l Sec. Counselors v. CIA*, 931 F. Supp. 2d 77, 107 (D.D.C. 2013)). Here, the destruction of concertina wire changes the substantive standards by which aliens are permitted to enter the United States, so the sanction is substantive.

The Fifth Circuit also examines the "effect on those interests ultimately at stake in the agency proceeding," and "agency rules that impose 'derivative,' 'incidental,' or 'mechanical' burdens on regulated individuals are considered procedural, rather than substantive." *DAPA*, 809 F.3d at 176 (quotation omitted). The interests at stake here are substantive. Texas's interest in the

security of the border, the security of Texas residents, and the interests of Texas taxpayers in not being commandeered to provide education and social services to immigrants who have not properly been admitted into the United States are sufficiently significant that they should not have been affected without proper notice-and-comment rulemaking. [56]

Defendants' failure to follow proper rulemaking procedures before declaring open season on Texas's property violates the APA. This court should enjoin any further destruction of Texas's concertina wire fence.

### 4. Texas is likely to succeed on its claim that Defendants' actions were arbitrary and capricious in violation of the APA.

Defendants' actions in ordering the cutting and destroying of concertina wire were also arbitrary and capricious. A "reviewing court shall … hold unlawful and set aside agency action … found to be—(A) arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law … [or] (C) in excess of statutory jurisdiction, authority, or limitations, or short of statutory right." 5 U.S.C. § 706(2)(A).

An agency decision is considered arbitrary and capricious "if the agency has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S.

---

[56] Plaintiff recognizes that there is an additional exception to the notice and comment requirement for the provision of a public benefit. 5 U.S.C. § 553(a)(2). But that exception is narrowly construed to refer to monetary payments from federal agencies to beneficiaries and does not apply here. *See, e.g.*, *DAPA*, 809 F.3d at 177 (quoting *Baylor Univ. Med. Ctr. v. Heckler*, 758 F.2d 1052, 1061 (5th Cir. 1985)).

29, 43 (1983). Although agencies are entitled to some deference, "the arbitrary and capricious standard of review … is by no means a rubber stamp." *United States v. Garner*, 767 F.2d 104, 116 (5th Cir. 1985).

An agency must articulate a sufficient rationale to justify its action. "Because the central focus of the arbitrary and capricious standard is on the rationality of the agency's 'decisionmaking,' rather than its actual decision, '[i]t is well-established that an agency's action must be upheld, if at all, on the basis articulated by the agency itself.'" *Garner*, 767 F.2d at 116 (quoting *State Farm*, 463 U.S. at 50). As such, "the grounds upon which an administrative order must be judged are those upon which the record discloses that its action was based." *SEC v. Chenery Corp.*, 318 U.S. 80, 87 (1943).

Arguably, all the Defendants have ever pointed to as a basis for their conduct here is a vague humanitarian concern—not enough to justify acting in direct contravention of their statutory responsibilities as well as their own stated priorities. *But see* Compl. ¶¶52–53. Defendants have, at a minimum, behaved in a manner that "entirely failed to consider an important aspect of the problem." *State Farm*, 463 U.S. at 43. For one thing, Defendants have (finally) recognized the urgent need to construct border infrastructure: Just a few weeks ago, Secretary Mayorkas announced there "is presently an acute and immediate need to construct physical barriers … in the vicinity of the border of the United States in order to prevent unlawful entries." [57] Yet Defendants have, at the same time, destroyed Texas's border infrastructure designed to prevent

---

[57] Determination Pursuant to Section 102 of the Illegal Immigration Reform and Immigrant Responsibility Act of 1996, as Amended, 88 Fed. Reg. 69214, 69215 (filed Oct. 4, 2023), available at https://public-inspection.federalregister.gov/2023-22176.pdf.

unlawful entries—all in violation of the federal laws that task Defendants with securing the southern border. *Cf. Portland Cement Ass'n v. EPA*, 665 F.3d 177, 187 (D.C. Cir. 2011) ("an agency must have a similar obligation to acknowledge and account for a changed regulatory posture the agency creates—especially when the change impacts a contemporaneous and closely related rulemaking"); *Office of Commc'n of the United Church of Christ v. FCC*, 707 F.2d 1413, 1441–42 (D.C. Cir. 1983) (finding it "seriously disturbing" and "almost beyond belief" that an agency would take rulemaking action undercutting another "concurrent" rulemaking process).

Defendants have, at a maximum, behaved in a manner "so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *State Farm*, 463 U.S. at 43. When it comes to fencing along the border, federal law instructs that DHS "shall construct reinforced fencing along not less than 700 miles of the southwest border where fencing would be most practical and effective." Pub. L. 110–161, div. E, title V, §564(a), Dec. 26, 2007, 121 Stat. 2090. Defendants have instead actively destroyed reinforced fencing along the border where fencing was practical and effective—in direct conflict with their statutory duties. This is the very definition of "implausible."

Texas has a likelihood of success on the merits in demonstrating that Defendants have acted arbitrarily and capriciously in violation of the APA, and this court should enjoin any further destruction of the border wire.

   5.  **In the alternative, Texas is likely to succeed on its claim that Defendants acted**
       ***ultra vires.***

In the alternative, if Defendants' destruction and seizure of Plaintiff's concertina wire is not final agency action, it is *ultra vires* action. Defendants are destroying and seizing Texas's concertina wire without legal authority and contrary to legal authority. *See infra*, Part A.2.

"Section 702 of '[t]he APA generally waives the Federal Government's immunity from a suit "seeking relief other than money damages and stating a claim that an agency or an officer or employee thereof acted or failed to act in an official capacity or under color of legal authority.'" *Apter v. HHS*, 80 F.4th 579, 589 (5th Cir. 2023) (quoting *Match-E-Be-Nash-She-Wish Band of Pottawatomi Indians v. Patchak*, 567 U.S. 209, 215 (2012), in turn quoting 5 U.S.C. § 702). "[A] non-statutory cause of action under the APA (that is, an *ultra vires* claim that uses the APA as a vehicle to sue an agency)" is a "distinct type[] of claim[]" from "a cause of action under the APA's general provisions." *Id.* at 592 (*citing Alabama-Coushatta Tribe of Tex. v. United States*, 757 F.3d 484, 489 (5th Cir. 2014)). Defendants have waived sovereign immunity for *ultra vires* claims under the APA via the 1976 amendment to 5 U.S.C. § 702, which "waived sovereign immunity for suits seeking nonmonetary relief through nonstatutory judicial review of agency action." *Geyen v. Marsh*, 775 F.2d 1303, 1307 (5th Cir. 1985).

"When a plaintiff uses the APA to assert a 'non-statutory cause of action'—such as an *ultra vires* claim—section 702 contains two separate requirements for establishing a waiver of sovereign immunity. First, the plaintiff must identify some 'agency action' affecting him in a specific way. The action need not be final. Second, the plaintiff must show that he has been adversely affected or aggrieved by that action. To satisfy this second requirement, the plaintiff must establish that the injury he complains of falls within the 'zone of interests' sought to be protected by the statutory provision whose violation forms the legal basis for his complaint. *Apter*, 80 F.4th at 589-90 (cleaned up, citations omitted).

First, Plaintiff here asserts that the agency action—the destruction of concertina wire—aggrieves Texas specifically. The *ultra vires* agency action harms Plaintiff because Plaintiff incurs

costs in repairing the wire fencing the federal government persists in destroying, Garcia Decl. ¶14—all in addition to obvious "expenditures in providing emergency medical services, social services and public education for illegal aliens." *Texas v. United States (DACA)*, 50 F.4th 498, 518 (5th Cir. 2022).

Second, Plaintiff's injuries are in the zone of interests sought to be protected by the APA. The zone-of-interests test is not especially demanding and is applied in keeping with Congress's evident intent when enacting the APA to make agency action presumptively reviewable. *Apter*, 80 F.4th at 592. The test is satisfied if the claims are "*arguably* within the zone of interests to be protected or regulated by the statute." *DACA*, 50 F.4th at 521 (citing *Patchak*, 567 U.S. at 224). The only time that review is foreclosed under this test is "when a plaintiff's interests are so marginally related to or inconsistent with the purposes implicit in the statute that it cannot reasonably be assumed that Congress intended to permit the suit." *Id.* (internal quotations omitted) (quoting *Patchak*, 567 U.S. at 225). "The Supreme Court has always conspicuously included the word *arguably* in the test to indicate that the benefit of *any doubt goes to the plaintiff.*" *Apter*, 80 F.4th at 592 (quoting *DACA*, 50 F.4th at 520).

In this case, the interests or purposes of the INA and related immigration statutes are to set forth "a comprehensive federal statutory scheme for regulation of immigration and naturalization" and to "set the terms and conditions of admission to the country and the subsequent treatment of aliens lawfully in the country." *DACA*, 50 F.4th at 521 (internal quotations omitted) (quoting *Chamber of Commerce v. Whiting*, 563 U.S. 582, 587 (2011)). Thus, Plaintiffs have an interest in seeing the INA and other statutes enforced and upheld. *See id.* at 521 (citing *Arizona*, 567 U.S. at

397, and *DAPA*, 809 F.3d at 163). Plaintiffs also have an interest in reducing the financial burdens of illegal immigration, as shown by the injuries that demonstrate their standing. *Id.*

Moreover, destruction and seizure of property is explicitly covered by the APA, so the destruction and seizure of TMD's concertina wire is explicitly within the APA's zone of interests, as are injuries resulting from that destruction and seizure of property—namely, the fiscal harms to Texas resulting from additional aliens present in Texas.[58] Gipson Decl. (driver's licenses); Meyer Decl. (public education), Bricker Decl. (healthcare); Waltz Decl. (incarceration).

**B.    Texas has demonstrated a substantial threat of irreparable harm.**

The State of Texas has established a substantial likelihood of irreparable harm. " To show irreparable injury if threatened action is not enjoined, it is not necessary to demonstrate that the harm is inevitable and irreparable." *Humana, Inc. v. Avram A. Jacobson, M.D., P.A.*, 804 F.2d 1390, 1394 (5th Cir. 1986). Instead, " [t]he plaintiff need show only a significant threat of injury from the impending action, that the injury is imminent, and that money damages would not fully repair the harm." *Id.* (footnote omitted). Texas meets this showing because it is " likely to suffer irreparable harm in the absence of preliminary relief." *Winter*, 555 U.S. at 20.

---

[58] Before 1976, courts viewed such claims under judge-made, common-law legal fictions and principles set out in *Larson v. Domestic & Foreign Commerce Corp.*, 337 U.S. 682 (1949). The *Apter* court noted that " under our precedent, Congress apparently 'd[id] away with the *ultra vires* doctrine and other fictions surrounding sovereign immunity" when it amended the APA in 1976," *Apter*, 80 F.4th at 593 (citing *Geyen*, 775 F.3d at 1307), but " decline[d] to consider whether [litigants] might also be able to assert their *ultra vires* claims using only the common law version of that doctrine." *Id.* The court also noted that the Second, Fourth, Ninth, Eleventh, and District of Columbia circuits still recognize common-law *ultra vires* claims in some cases. *Id. See, e.g., E.V. v. Robinson*, 906 F.3d. 1082, 1093 (9th Cir. 2018) (" [N]either the text nor the structure of the 1976 amendment to the APA indicates that Congress intended to abrogate the *Larson* exceptions in cases not covered by the section 702 waiver." ). Plaintiff's claims in the present case are covered by the section 702 waiver, so there is no need to consider whether the claims could also be brought under the *Larson* principles.

36

Defendants' repeated destruction of Texas's concertina wire irreparably harms Texas because it facilitates increased illegal entry into the State. As a result, Texas will incur uncompensated "expenditures in providing emergency medical services, social services and public education for illegal aliens." *DACA*, 50 F.4th at 518; Gipson Decl. (driver's licenses); Meyer Decl. (public education), Bricker Decl. (healthcare); Waltz Decl. (incarceration). In addition, Defendants' ongoing pattern of cutting Texas's concertina wire will frustrate the State's ability to protect its residents from deadly fentanyl and other serious dangers posed by cartel activity at the border, as described in the Factual Background section of this motion. To prevent Texas's irreparable harm, this Court should enjoin further destruction of the concertina wire.

**C.      Texas has demonstrated that the balancing of interests weighs in its favor and that the injunctive relief will serve the public interest.**

As set forth above, Plaintiff has established a likelihood of success on the merits and irreparable harm. The balance of hardships and public interest also favor a preliminary injunction.

Millions of migrants and hundreds of millions of fatal doses of illegal drugs have crossed into Texas from Mexico in the last three years due to the failure of the federal government to secure the border. Texas's placement of concertina wire along the border limits those illegal crossings. It is squarely within the public interest to prohibit the federal government from unlawfully destroying wire barriers owned and positioned by Texas as part of its efforts to obstruct the unchecked flow of migrants and deadly fentanyl. In December 2021, the Biden Administration itself declared "a national emergency to deal with the threat" of fentanyl and found that "the trafficking into the United States of illicit drugs, including fentanyl and other synthetic opioids, is causing the deaths

of tens of thousands of Americans annually."[59] Texas's border security efforts are directly aimed at combatting the illicit importation of deadly fentanyl and the disastrous effects of unchecked migration. The State has a strong interest in protecting its citizens from such irreparable harms through the placement of concertina wire at busy international border crossings.

Further, the placement of concertina wire along the border deters migrants intending to undertake dangerous border crossings in an active drug smuggling and human trafficking hotspots. Deaths and disappearances along the U.S.-Mexico border have become commonplace in recent years, and such tragedies are increasing.[60] Indeed, in 2021 there were 78 water-related deaths along the Southwest Border, up from 41 in 2020.[61] Since President Biden took office, a United Nations agency has declared that the U.S.-Mexico border is the deadliest land crossing in the world.[62] Aliens who enter the United States and Texas at ports of entry—rather than attempting an illegal and dangerous water crossing—may enter lawfully if allowed to do so and in any event the placement of concertina wire acts as a deterrent to water crossings. Texas's placement of concertina wire protects Texas residents and minimizes the risks to migrants of drowning while journeying to and through illegal entry points of entry.

---

[59] Exec. Order No. 14059, 86 Fed. Reg. 71549, 71549 (Dec. 15, 2021).

[60] *See* Annual Regional Overview—Executive Summary, International Organization for Migration's ("IOM") Missing Migrants Project ("MMP") (2021), available at https://missingmigrants.iom.int/sites/g/files/tmzbdl601/files/publication/file/MMP%20annual%20regional%20overview%202021%20LAC_Executive%20Summary-ENG_0.pdf; *see also* Border Rescues and Mortality Data, U.S. Customs and Border Protection, available at https://www.cbp.gov/newsroom/stats/border-rescues-and-mortality-data.

[61] *See* Border Rescues and Mortality Data, U.S. Customs and Border Protection, available at https://www.cbp.gov/newsroom/stats/border-rescues-and-mortality-data.

[62] UN Migration Study Deems US-Mexico Border 'Deadliest' Land Route in the World Based on 2021 Numbers, (July 4, 2022), https://www.foxnews.com/us/un-migration-study-deems-us-mexico-border-deadliest-land-route-world-based-2021-numbers.

On the other side of the scale, there can be no public interest in unlawful agency action. *Louisiana v. Biden*, 55 F.4th 1017, 1035 (5th Cir. 2022). "To the contrary, there is a substantial public interest in having governmental agencies abide by the federal laws that govern their existence and operations." *Texas v. United States*, 40 F.4th 205, 229 (5th Cir. 2022) (quoting *League of Women Voters of United States v. Newby*, 838 F.3d 1, 12 (D.C. Cir. 2016)) (internal quotations omitted). It will not "disserve the public interest" for this Court to grant an injunction. *Sepulvado v. Jindal*, 729 F.3d 413, 417 (5th Cir. 2013).

## CONCLUSION

Plaintiff respectfully requests the Court to preliminarily enjoin Defendants from cutting or otherwise destroying Texas's concertina wire. Alternatively, Plaintiff requests a stay of agency action pending judicial review.

Dated: October 24, 2023.

**KEN PAXTON**
Attorney General of Texas

**BRENT WEBSTER**
First Assistant Attorney General

**GRANT DORFMAN**
Deputy First Assistant Attorney General

**RALPH MOLINA**
Deputy Attorney General for Legal Strategy

**ROBERT HENNEKE**
Texas Bar No. 24046058
Texas Public Policy Foundation
901 Congress Ave.
Austin, Texas 78701
(512) 472-2700
rhenneke@texaspolicy.com

Respectfully submitted.

*/s/ Ryan D. Walters*
**RYAN D. WALTERS**
Chief, Special Litigation Division
Texas Bar No. 24105085

**SUSANNA DOKUPIL**
Special Counsel
Texas Bar No. 24034419

**MUNERA AL-FUHAID**
Special Counsel
Texas Bar No. 24094501

**AMY S. HILTON**
Special Counsel
Texas Bar No. 24097834

**HEATHER L. DYER**
Special Counsel
Texas Bar No. 24123044

Office of the Attorney General
Special Litigation Division
P.O. Box 12548, Capitol Station
Austin, Texas 78711-2548
(512) 936-1706
Ryan.Walters@oag.texas.gov
Munera.Al-Fuhaid@oag.texas.gov
Susanna.Dokupil@oag.texas.gov
Amy.Hilton@oag.texas.gov
Heather.Dyer@oag.texas.gov

**COUNSEL FOR PLAINTIFF**

40

## CERTIFICATE OF CONFERENCE

I certify that I conferred via email with counsel for Defendants, Jean Lin of the U.S. Department of Justice, Civil Division, Federal Programs Branch, regarding the relief requested in this motion.  Counsel for Defendants stated that they oppose the motion.

*/s/Ryan D. Walters*
RYAN D. WALTERS

## CERTIFICATE OF SERVICE

I certify that a true and accurate copy of the foregoing document was filed electronically (via CM/ECF) on October 24, 2023, which automatically serves all counsel of record who are registered to receive notices in this case. I also served a copy of this via email to counsel for Defendants, Jean Lin, at Jean.Lin@usdoj.gov.

*/s/Ryan D. Walters*
RYAN D. WALTERS

Exhibit I

## UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF TEXAS
## DEL RIO DIVISION

| | | |
|---|---|---|
| **THE STATE OF TEXAS**, | § | |
| | § | |
| *Plaintiff*, | § | |
| | § | CIVIL ACTION NO. 2:23-CV-00055-AM |
| v. | § | |
| | § | |
| **U.S. DEPARTMENT OF HOMELAND** | § | |
| **SECURITY**, *et al.*, | § | |
| | § | |
| *Defendants*. | § | |

---

## PLAINTIFF'S EMERGENCY MOTION FOR A
## TEMPORARY RESTRAINING ORDER OR
## STAY OF AGENCY ACTION

---

INTRODUCTION

The State of Texas filed this lawsuit because federal officials have claimed the authority to destroy state property simply "to allow [illegal] aliens to enter & be processed." ECF 3-1 at 22. Beginning on September 20, 2023, the federal Defendants accelerated that practice, seizing and destroying Texas's concertina wire fence on almost a daily basis, *id.* at 24–27—just as the City of Eagle Pass was experiencing an unprecedented influx of illegal migration, *id.* at 18–20. Rather than resorting to self-help measures, Texas brought this suit in federal district court to enjoin ongoing invasions of the State's property rights and violations of the Administrative Procedure Act (APA).

But Defendants, it seems, are not content to have this Court decide these issues. Instead, just two days after Texas notified them of this lawsuit, federal agents escalated matters, trading bolt cutters for an industrial-strength telehandler forklift to dismantle Texas's border fence:

 

Federal agents used hydraulic-powered pallet forks to rip Texas's fence—concertina wire, fencing posts, clamps, and all—out of the ground, holding it suspended in the air in order to wave more than 300 migrants illegally into Texas. *See* Cooney Decl. ¶¶5-15, Supp.Appx.002–004.

This brazen escalation by Defendants is an affront not only to Texas, but also to this Court, which already had pending before it a motion for a preliminary injunction. ECF 3-1. This Court should immediately grant a temporary restraining order to enjoin Defendants from continuing to damage, destroy, or otherwise meddle with Texas's concertina wire fence until the Court can rule on the State's preliminary-injunction motion. Alternatively, this Court could simply grant a preliminary injunction in light of Defendants' willful misconduct. *Cf. 360 Mortgage Grp., LLC v. Homebridge Fin. Servs., Inc.*, No. A-14-CA-847, 2014 WL 12570176, at *4 (W.D. Tex. Oct. 10, 2014) (Sparks, J.). Further, the Court could issue a stay of agency action pending judicial review under the APA. 5 U.S.C. § 705. Defendants oppose the relief sought in this motion.

## ARGUMENT

Texas seeks a temporary restraining order for the purpose "of preserving the status quo and preventing [the] irreparable harm" that will occur if Defendants are allowed to continue cutting, destroying, or otherwise damaging Plaintiff's concertina wire fence. *Granny Goose Foods, Inc. v. Bhd. of Teamsters & Auto Truck Drivers Local No. 70 of Alameda Cnty.*, 415 U.S. 423, 439 (1974).

To merit such relief, Texas, as the moving party, must make a showing similar to the one required to obtain a preliminary injunction: "(1) a substantial likelihood of success on the merits; (2) a substantial threat that failure to grant the injunction will result in irreparable injury; (3) that the threatened injury outweighs any damage that the injunction may cause the opposing party; and

(4) that the injunction will not disserve the public interest." *Leija v. Kickapoo Traditional Tribe of Texas*, No. DR-18-cv-043, 2018 WL 7255430, at *6 (W.D. Tex. Sept. 14, 2018) (Moses, J.).

"None of [these] four prerequisites has a fixed quantitative value." *Texas v. Seatrain Int'l, S.A.*, 518 F.2d 175, 180 (5th Cir. 1975). Instead, "a sliding scale is utilized, which takes into account the intensity of each in a given calculus." *Id.* (citation omitted). Ultimately, whether to grant a request for a temporary restraining order "is left to the sound discretion" of the Court. *Nianga v. Wolfe*, 435 F. Supp. 3d 739, 743 (N.D. Tex. 2020).

This Court has routinely found that imminent interference with property interests presents an appropriate occasion for entering a temporary restraining order. *See, e.g., Pomeroy, Inc. v. Border Opportunity Saver Sys., Inc.*, No. DR-10-010, 2010 WL 11652127, at *4 (W.D. Tex. Feb. 23, 2010) (Moses, J.); *Jones v. Wells Fargo Bank, N.A.*, No. A-18-cv-379, 2018 WL 2996898 (W.D. Tex. June 4, 2018) (Yeakel, J.); *Baker v. HUD*, No. SA:19-cv-1049, 2019 WL 7763992 (W.D. Tex. Sept. 30, 2019) (Ezra, J.). A TRO is especially appropriate where, as here, "notice of the action … hasten[s] the Defendants' threatened [interference with] property." *Pomeroy*, 2010 WL 11652127, at *2.

In addition, the APA empowers a "reviewing court" to "issue all necessary and appropriate process to postpone the effective date of an agency action or to preserve status or rights pending conclusion of the review proceedings." 5 U.S.C. § 705. A stay of the agency action should issue "to the extent necessary to prevent irreparable injury" and "[o]n such conditions as may be required." *Id.; Wages & White Lion Invs., L.L.C. v. United States Food & Drug Admin.*, 16 F.4th 1130, 1143 (5th Cir. 2021); *Texas v. U.S. EPA*, 829 F.3d 405, 435 (5th Cir. 2016) (staying an EPA action pending review).

When considering "whether to stay an agency action pending judicial review," district courts apply the same test used for temporary restraining orders and preliminary injunctions. *Texas v. United States*, 95 F. Supp. 3d 965, 973 (N.D. Tex. 2015); *see also IHG Healthcare, Inc. v. Sebelius*, 4:09-cv-3233, 2010 WL 11680368, at *1 (S.D. Tex. Apr. 1, 2010); *Safety Nat'l Cas. Corp. v. U.S. Dep't of Homeland Sec.*, 4:05-cv-2159, 2005 WL 8168878, at *2 (S.D. Tex. Dec. 9, 2005). Thus, for the reasons explained in its preliminary-injunction motion, Texas has made the showing necessary for a stay.

Staying the policy or practice of Defendants differs from a temporary restraining order in one important respect. While a standard temporary restraining order expires after 14 days, *see* Fed. R. Civ. P. 65(b)(2), the APA empowers the Court to postpone the effective date as long as necessary "to preserve status or rights pending conclusion of the review proceedings." 5 U.S.C. § 705. As a result, a stay would allow the Court to maintain the status quo pending a preliminary injunction hearing—or a final merits determination—regardless of the schedule the Court chooses.

**A.** There can no longer be any dispute that: the concertina wire fence is state property; Defendants have exercised dominion over that property absent any kind of exigency; and they have continued to do so even after being put on notice of the State's interest in the property. ECF 3-1 at 17–18, 21–28, 31–32 n.55; Perez Decl ¶¶3–6, Appx.001–002; Banks Decl. ¶¶15–25, Appx.020–027. This Court may never see a simpler case for common-law conversion or trespass to chattels. ECF 3-1 at 30–32. And it has granted a temporary restraining order for conversion before. *See Pomeroy*, 2010 WL 11652127, at *2-3. Defendants' conduct yesterday likewise attests to violations of the APA. Just like clockwork, agents of Defendants undertook the same destructive behavior they have

perpetrated almost every day since September 20—evidence of an obvious policy, pattern, or practice never subjected to public notice and comment. ECF 3-1 at 34–37. The fact that federal officers and agencies tasked with securing the border and deterring illegal entries persist instead in destroying state property designed to secure the border and deter illegal entries is clear evidence of acts in excess of statutory authority or *ultra vires* conduct. *Id.* at 32–34, 39–42. And the incoherence of destroying border barriers just weeks after DHS itself acknowledged "an acute and immediate need to construct physical barriers" demonstrates that Defendants' policy is arbitrary and capricious. *Id.* at 37–39.

**B.** Texas has demonstrated a substantial threat of irreparable harm. It has already shown the extensive costs incurred because of Defendants' ongoing interference with state property. Garcia Decl. ¶¶5–10, 13–14, Appx.005–006, 010. Even more harm is "threatened if Plaintiff does not regain the use of" its concertina wire fence. *Pomeroy*, 2010 WL 11652127, at *3. Defendants' actions this week demonstrate—beyond any shadow of a doubt—that they *will* prevent the State of Texas from maintaining operational control of its own property. Instead, they will persist in damaging, destroying, and exercising dominion over state property on a continual basis, anytime aliens "have crossed onto U.S. soil without authorization into custody for processing."[1] This intransigence demonstrates that nothing short of ordering immediate relief will protect Plaintiff's property interest and the Texas communities being harmed by the uninhibited flow of illegal migration while this Court adjudicates Plaintiff's motion for a preliminary injunction.

---

[1] Uriel J. Garcia, *Texas Sues to Stop Border Patrol Agents from Cutting State's Razor Wire at the Border*, Tex. Trib. (Oct. 24, 2023), https://www.texastribune.org/2023/10/24/texas-attorney-general-paxton-lawsuit-border-concertina-wire/ (quoting "a spokesperson for the department").

Defendants' repeated destruction of Texas's concertina wire irreparably harms Texas because it facilitates increased illegal entry into the State.[2] ECF 3-1 at 43. As a result, Texas will incur uncompensated "expenditures in providing emergency medical services, social services and public education for illegal aliens." *Texas v. United States*, 50 F.4th 498, 518 (5th Cir. 2022); *see* Watlz Decl., Appx.031–033 (incarceration); Bricker Decl., Appx.034–046 (healthcare); Gipson Decl., Appx.047–058 (driver's licenses); Meyer Decl., Appx.059–062 (education). These costs are irreparable because of the sovereign immunity enjoyed by federal agencies. *Wages & White Lion Invs., L.L.C.*, 16 F.4th at 1142.

**C.** The balance of interests plainly favors Texas and temporary relief will serve the public interest. As Texas explained in its preliminary-injunction motion, ECF 3-1 at 31–32 & n.55, "[t]here is no … legal basis for the Defendants to exercise control and dominion over the property," *Pomeroy*, 2010 WL 11652127, at *3. If Defendants believe they *do* have some lawful basis to continuously interfere with another sovereign's chattels, "[t]he proper course of action to [remove that property] is through legal proceedings, not self-help action." *Id.* A temporary restraining order here will plainly serve the public interest. There is presently a crisis of human trafficking, drug smuggling, and terrorist infiltration along the southern border. ECF 3-1 at 9–14,

---

[2] Defendants have recently conceded that physical border barriers are effective in reducing unlawful entry by aliens: "There is presently an acute and immediate need to construct physical barriers and roads in the vicinity of the border of the United States in order to prevent unlawful entries into the United States." U.S. Dep't of Homeland Security, *Determination Pursuant to Section 102 of the Illegal Immigration Reform and Immigrant Responsibility Act of 1996, As Amended*, 88 Fed. Reg. 69,214, 69,215 (Oct. 5, 2023), *available at* https://www.federalregister.gov/documents/2023/10/05/2023-22176/determination-pursuant-to-section-102-of-the-illegal-immigration-reform-and-immigrant-responsibility.

38–39. Just days ago, CBP officials warned in an "intelligence note" that operatives from Hamas may be seeking to enter through the U.S.-Mexico border. [3]

Concertina wire fencing undoubtedly serves as an effective "deterrent" against the illegal entries fomenting this litany of harms. ECF 3-1 at 15–17. And Defendants' acts yesterday prove they are committed to permitting a free flow of these harms into Texas and the United States.

CONCLUSION

Plaintiff the State of Texas respectfully requests the Court to enter an order temporarily restraining Defendants from damaging, destroying, or otherwise interfering with Texas's concertina wire fence while it adjudicates the pending preliminary-injunction motion—or grant that motion due to Defendants' escalation of its misconduct. Alternatively, the Court should issue a stay of Defendants' policy doing the same, pending judicial review.

---

[3] Quinn Owen & Luke Barr, *Hamas Militants 'May Potentially' Try Crossing the Southern Border, US Officials Warn*, ABC News (Oct. 23, 2023), https://abcnews.go.com/Politics/hamas-militants-potentially-crossing-southern-border-us-officials/story?id=104236095.

Dated: October 27, 2023.

**KEN PAXTON**
Attorney General of Texas

**BRENT WEBSTER**
First Assistant Attorney General

**GRANT DORFMAN**
Deputy First Assistant Attorney General

**RALPH MOLINA**
Deputy Attorney General for Legal Strategy

**ROBERT HENNEKE**
Texas Bar No. 24046058
Texas Public Policy Foundation
901 Congress Ave.
Austin, Texas 78701
(512) 472-2700
rhenneke@texaspolicy.com

Respectfully submitted.

*/s/ Ryan D. Walters*
**RYAN D. WALTERS**
Chief, Special Litigation Division
Texas Bar No. 24105085

**SUSANNA DOKUPIL**
Special Counsel
Texas Bar No. 24034419

**MUNERA AL-FUHAID**
Special Counsel
Texas Bar No. 24094501

**AMY S. HILTON**
Special Counsel
Texas Bar No. 24097834

**HEATHER L. DYER**
Special Counsel
Texas Bar No. 24123044

Office of the Attorney General
Special Litigation Division
P.O. Box 12548, Capitol Station
Austin, Texas 78711-2548
(512) 936-2714
Ryan.Walters@oag.texas.gov
Munera.Al-Fuhaid@oag.texas.gov
Susanna.Dokupil@oag.texas.gov
Amy.Hilton@oag.texas.gov
Heather.Dyer@oag.texas.gov

**COUNSEL FOR PLAINTIFF**

## CERTIFICATE OF CONFERENCE

I certify that on October 27, 2023, I conferred via email with counsel for Defendants, Christopher Eiswerth of the U.S. Department of Justice, Civil Division, Federal Programs Branch, regarding the relief requested in this motion.  Counsel for Defendants stated that they oppose the motion.

*/s/Ryan D. Walters*
RYAN D. WALTERS

## CERTIFICATE OF SERVICE

I certify that a true and accurate copy of the foregoing document was filed electronically (via CM/ECF) on October 27, 2023, which automatically serves all counsel of record who are registered to receive notices in this case. I also served a copy of this document via email to counsel for Defendants, Jean Lin and Christopher Eiswerth, at Jean.Lin@usdoj.gov and Christopher.A.Eiswerth@usdoj.gov.

*/s/Ryan D. Walters*
RYAN D. WALTERS

Exhibit J

## UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF TEXAS
## DEL RIO DIVISION

**THE STATE OF TEXAS,**                §
                                       §
    *Plaintiff,*                   §
                                       §
                                       §   CIVIL ACTION NO. 2:23-CV-00055-AM
**v.**                                 §
                                       §
**U.S. DEPARTMENT OF HOMELAND**        §
**SECURITY**, *et al.*,                §
                                       §
    *Defendants.*                  §

---

### PLAINTIFF'S NOTICE OF ESCALATING PROPERTY DAMAGE
### IN SUPPORT OF ITS EMERGENCY MOTION FOR A
### TEMPORARY RESTRAINING ORDER OR STAY OF AGENCY ACTION

---

It happened again. Yesterday, federal Defendants and their agents unlawfully exercised dominion over another sovereign's personal property by seizing Texas's concertina wire fence with a forklift and smashing it into the ground. They did so *after* Plaintiff sought a temporary restraining order from this Court to protect against just this sort of escalation. This Court can and should immediately grant Plaintiff's Emergency Motion for a Temporary Restraining Order or Stay of Agency Action by entering an order immediately and temporarily restraining Defendants from seizing, damaging, destroying, or otherwise interfering with Texas's concertina wire fencing until the Court can hold a hearing on the pending motions for a temporary restraining order or preliminary injunction.

Texas brought this suit on October 24, 2023, after federal Defendants and their agents accelerated their policy, pattern, or practice of destroying state property by cutting gaps into Texas's concertina wire fence to allow an unprecedented surge of illegal migration in Eagle Pass, Texas. ECF 1. That same day, Texas sought a preliminary injunction pending this Court's adjudication of its conversion, trespass, and APA claims. ECF 3-1. In response to this suit, an official spokesperson for DHS expressed the department's view that Defendants have the authority to damage, destroy, and exercise dominion over Texas's property any time aliens "have crossed onto U.S. soil without authorization into custody for processing." [1] Just two days later, Defendants escalated matters by again destroying the State's wire fence, but this time in a novel way: Federal agents used hydraulic-powered pallet forks to rip Texas's fence—concertina wire,

---

[1] Uriel J. Garcia, *Texas Sues to Stop Border Patrol Agents from Cutting State's Razor Wire at the Border*, Tex. Trib. (Oct. 24, 2023), https://www.texastribune.org/2023/10/24/texas-attorney-general-paxton-lawsuit-border-concertina-wire/.

fencing posts, clamps, and all—out of the ground, holding it suspended in the air for twenty minutes in order to wave more than 300 migrants illegally into Texas. ECF 5-1 at 4–6, 8–11.

Brazen destruction of another sovereign's property is unacceptable all by itself. But it is positively head-spinning when a barrier fence designed to secure the southern border is destroyed by a federal agency named "U.S. Customs and *Border Protection.*" On the morning of October 27, 2023, Plaintiff's counsel notified Defendants' counsel that Texas intended to move for a temporary restraining order in response to Defendants' forklift provocation. ECF 5 at 10. In response, the federal Defendants urged Texas to forbear from filing that motion. Recognizing that Texas could not be protected from further invasion of its property interests absent immediate relief from this Court, Plaintiff's counsel declined that request and docketed its motion for a temporary restraining order at 12:09 PM. In that motion, Texas explained how this Court has granted such orders to ensure that "[t]he proper course of action to [remove property] is through legal proceedings, not self-help action." ECF 5 at 7.

Just *twenty minutes* later, Defendants and their agents nonetheless chose "self-help action" once again. Never at a loss for creative ways to destroy property that does not belong to them, Defendants used their telehandler forklift to smash Texas's concertina wire fence into the ground. For roughly 30 minutes, the forklift operator—at CBP's direction—repeatedly lifted hydraulic-powered pallet forks up and down in order to pulverize Texas's wire fence until it was "completely flattened." Diaz Decl. ¶¶6, 9–11, 13.



One TMD soldier who witnessed this episode attests that he saw no migrants in distress and that no federal or state agent expressed a need for medical services. *Id.* ¶¶8, 12. Instead, CBP agents simply waved more than 40 migrants over the leveled fence and into Texas, *id.* ¶¶9, 14, in violation of federal law, *see, e.g.*, 8 U.S.C. § 1325.

As Texas predicted in its TRO motion, "notice of th[is] action" has only "hasten[ed]" Defendants' threatened interference with state property. ECF 5 at 4. This Court pointed to just that risk as a basis for awarding an *ex parte* temporary restraining order against conversion of private property in *Pomeroy, Inc. v. Border Opportunity Saver Systems, Inc.*, No. DR-10-010, 2010 WL 11652127, at *2, 4 (W.D. Tex. Feb. 23, 2010) (Moses, J.). It should do the same thing here—especially considering Plaintiff repeatedly notified Defendants of this suit from its commencement.

*See* Fed. R. Civ. P. 65(b)(1)(B). On October 24, 2023, Plaintiff's counsel notified defense counsel of this suit and asked whether they would oppose a preliminary injunction. ECF 3-1 at 47. On October 27, 2023, Plaintiff's counsel notified defense counsel of Texas's intent to seek a temporary restraining order. ECF 5 at 10. Rather than meeting Texas's motions with legal arguments fit for peaceable resolution by this Court, Defendants have repeatedly opted to respond with a forklift that has further damaged Texas's property. It is entirely appropriate, therefore, to enter a temporary restraining order without awaiting a response from Defendants.

This Court should immediately restrain Defendants and their agents from damaging, destroying, or otherwise interfering with Texas's concertina wire fence until this Court can hold a hearing on the motion for a temporary restraining order that Texas filed yesterday, ECF 5, or a hearing on the motion for a preliminary injunction that it filed on Tuesday, ECF 3-1. Under our frame of government, guided by the rule of law, "courts provide the mechanism for the peaceful resolution of disputes that might otherwise give rise to attempts at self-help." *Talamini v. Allstate Ins. Co.*, 470 U.S. 1067, 1070–71 (1985) (Stevens, J., concurring); *see also United States v. Blake*, 89 F. Supp. 2d 328, 351 (E.D.N.Y. 2000) (Weinstein, J.). A lack of relief here can only invite further escalation by federal Defendants.

Dated: October 28, 2023.

**KEN PAXTON**
Attorney General of Texas

**BRENT WEBSTER**
First Assistant Attorney General

**GRANT DORFMAN**
Deputy First Assistant Attorney General

**RALPH MOLINA**
Deputy Attorney General for Legal Strategy

**ROBERT HENNEKE**
Texas Bar No. 24026058
Texas Public Policy Foundation
901 Congress Ave.
Austin, Texas 78701
(512) 472-2700
rhenneke@texaspolicy.com

Respectfully submitted.

*/s/ Ryan D. Walters*
**RYAN D. WALTERS**
Chief, Special Litigation Division
Texas Bar No. 24105085

**SUSANNA DOKUPIL**
Special Counsel
Texas Bar No. 24034419

**MUNERA AL-FUHAID**
Special Counsel
Texas Bar No. 24094501

**AMY S. HILTON**
Special Counsel
Texas Bar No. 24097834

**HEATHER L. DYER**
Special Counsel
Texas Bar No. 24123044

Office of the Attorney General
Special Litigation Division
P.O. Box 12548, Capitol Station
Austin, Texas 78711-2548
(512) 936-1706
Ryan.Walters@oag.texas.gov
Munera.Al-Fuhaid@oag.texas.gov
Susanna.Dokupil@oag.texas.gov
Amy.Hilton@oag.texas.gov
Heather.Dyer@oag.texas.gov

**COUNSEL FOR PLAINTIFF**

**CERTIFICATE OF SERVICE**

I certify that a true and accurate copy of the foregoing document was filed electronically (via CM/ECF) on October 28, 2023, which automatically serves all counsel of record who are registered to receive notices in this case. I also served a copy of this document via email to counsel for Defendants, Jean Lin and Christopher Eiswerth, at Jean.Lin@usdoj.gov and Christopher.A.Eiswerth@usdoj.gov.

*/s/Ryan D. Walters*
RYAN D. WALTERS

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF TEXAS
DEL RIO DIVISION

| THE STATE OF TEXAS, | § | |
|---|---|---|
| *Plaintiff*, | § § § | |
| v. | § § | CIVIL ACTION NO. 2:23-CV-00055-AM |
| U.S. DEPARTMENT OF HOMELAND SECURITY, *et al.*, | § § § § | |
| *Defendants*. | § | |

SECOND SUPPLEMENTAL APPENDIX TO
PLAINTIFF'S NOTICE OF ESCALATING PROPERTY DAMAGE
IN SUPPORT OF ITS EMERGENCY MOTION FOR A
TEMPORARY RESTRAINING ORDER OR STAY OF AGENCY ACTION

| 2S-1 | Declaration of Roberto Ortiz Diaz | 2Supp. Appx. 001 - 005 |
|---|---|---|

Dated: October 28, 2023.

KEN PAXTON
Attorney General of Texas

BRENT WEBSTER
First Assistant Attorney General

GRANT DORFMAN
Deputy First Assistant Attorney General

RALPH MOLINA
Deputy Attorney General for Legal Strategy

ROBERT HENNEKE
Texas Bar No. 24026058
Texas Public Policy Foundation
901 Congress Ave.
Austin, Texas 78701
(512) 472-2700
rhenneke@texaspolicy.com

Respectfully submitted.

*/s/ Ryan D. Walters*
RYAN D. WALTERS
Chief, Special Litigation Division
Texas Bar No. 24105085

SUSANNA DOKUPIL
Special Counsel
Texas Bar No. 24034419

MUNERA AL-FUHAID
Special Counsel
Texas Bar No. 24094501

AMY S. HILTON
Special Counsel
Texas Bar No. 24097834

HEATHER L. DYER
Special Counsel
Texas Bar No. 24123044

Office of the Attorney General
Special Litigation Division
P.O. Box 12548, Capitol Station
Austin, Texas 78711-2548
(512) 936-1706
Ryan.Walters@oag.texas.gov
Munera.Al-Fuhaid@oag.texas.gov
Susanna.Dokupil@oag.texas.gov
Amy.Hilton@oag.texas.gov
Heather.Dyer@oag.texas.gov

COUNSEL FOR PLAINTIFF

CERTIFICATE OF SERVICE

I certify that a true and accurate copy of the foregoing document was filed electronically (via CM/ECF) on October 28, 2023, and served on all Defendants via Certified Mail Return Receipt.

*/s/Ryan D. Walters*
RYAN D. WALTERS

## DECLARATION OF ORTIZ DIAZ

1. My name is Roberto Ortiz Diaz. I am over eighteen years old, I have never been convicted of a felony and I am competent to testify to the matters set forth below.

2. I am a soldier employed by the Texas Military Department ("TMD"). I have attained the rank of Sergeant and I am assigned to Task Force Eagle under Charlie Company.  In that role, I currently serve on Special Response Team 3 on Operation Lone Star ("OLS"), as an engineer.

3. I have served in OLS since September 2021. My job duties include patrolling and maintaining my area of operations along the border as part of OLS and inspecting and repairing concertina wire fencing in my area of operations. I currently serve in the vicinity of Eagle Pass, Texas, where I have served for over a year.

4. During my service at the Texas-Mexico border, I have observed that Eagle Pass is an area where large numbers of migrant border crossings through the Rio Grande regularly occur.

5. When TMD soldiers report destruction of, damage to, or a breach in the concertina wire fence, it is my team's responsibility to return the fence to its proper condition.

Case 2:23-cv-00055-AM  Document 8-1  Filed 10/28/23  Page 4 of 7

6. At 12:26 PM on October 27, 2023, I was on my regular patrol at the Texas-Mexico border near the Rio Grande river, close to the Heavenly Farms Pecan Orchard, when I spotted a telehandler forklift operated by an individual in plainclothes. U.S. Customs and Border Patrol ("CBP") agents were directing the driver of the telehandler forklift.

7. Additionally, several CBP vehicles were parked at the scene, and I saw media crews that appeared to be following CBP officials near the concertina wire fence. The media crews traveling with CBP personnel appeared to be interviewing migrants who had crossed the border.

8. When I arrived, I observed approximately 10 migrants who had already crossed the river and were standing on the United States side of the Rio Grande. I also observed approximately 50 migrants congregating on the Mexican side of the border across the river. I did not witness any of the migrants in distress and none of the migrants appeared to need medical attention. At no point did I hear any federal or state officers call for medical services.

9. At the scene, I observed CBP personnel directing the individual operating the telehandler forklift.  Under the direction of CBP officials, the telehandler operator proceeded to flatten the concertina wire fence to facilitate entry by the migrants crossing the river.

10. For approximately 30 minutes, I observed the telehandler forklift disabling a large section of the concertina wire fence by repeatedly lifting hydraulic-powered pallet forks up and down in order to smash the fence into the dirt.

11. Below are still images taken from the video, which truly and accurately depict this scene on the border on October 27, 2023.



12. While the operator was flattening the concertina wire, I observed no medical emergencies among the migrant crossing the river and I am not aware of any reason for CPB agents to flatten the concertina wire other than to allow an easier entry path for migrants arriving in the United States. After

observing these activities, I resumed my patrol.

13. When I returned to the area twenty minutes later, I saw that 30 to 40 feet of the concertina wire fence had been completely flattened. No CBP employees remained in the area, but three media crews and migrants on both sides of the river were still present.

14. None of the federal personnel at the scene asked for permission from me or, to my knowledge, from any other OLS personnel to disturb the concertina wire barrier. And to my knowledge, no OLS personnel granted CBP permission to disable large sections of TMD's concertina wire fence. As a result of CBP's actions, approximately 40 migrants were able to traverse over the mangled concertina wire and gain entry into Texas illegally.

15. As I understand it, the location of this incident is the same location where CPB agents, the day before, used a telehandler forklift to lift the concertina wire to allow hundreds of migrants to enter the United States. Although I did not witness that incident, I learned of it from fellow soldiers.

I hereby declare under penalty of perjury, pursuant to 28 U.S.C. § 1746, that the foregoing is true and correct to the best of my knowledge and information.

Signed this 28th day of October 2023.

Roberto Ortiz Diaz

Sergeant

Texas Military Department

Exhibit K

# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF TEXAS
### DEL RIO DIVISION

| | | |
|---|---|---|
| **THE STATE OF TEXAS,** | § | |
| **Plaintiff,** | § | |
| | § | |
| **v.** | § | |
| | § | **Civil Action No. DR-23-CV-00055-AM** |
| **U.S. DEPARTMENT OF HOMELAND** | § | |
| **SECURITY, ALEJANDRO** | § | |
| **MAYORKAS, in his official capacity as** | § | |
| **Secretary of the U.S. Department of** | § | |
| **Homeland Security, U.S. CUSTOMS &** | § | |
| **BORDER PROTECTION, U.S.** | § | |
| **BORDER PATROL, TROY A.** | § | |
| **MILLER, in his official capacity as** | § | |
| **Acting Commissioner for U.S.** | § | |
| **Customers & Border Protection, JASON** | § | |
| **OWENS, in his official capacity as Chief** | § | |
| **of the U.S. Border Patrol, and JUAN** | § | |
| **BERNAL, in his official capacity as** | § | |
| **Acting Chief Patrol Agent, Del Rio** | § | |
| **Sector U.S. Border Patrol** | § | |
| **Defendants.** | § | |

## <u>ORDER</u>

Pending before the Court is the State of Texas's ("the Plaintiff") Emergency Motion for a Temporary Restraining Order or Stay of Agency Action ("the Motion") against the United States Department of Homeland Security ("DHS"); Alejandro Mayorkas, in his official capacity as Secretary of DHS ("Mayorkas"); United States Customs and Border Protection ("CBP"); United States Border Patrol ("BP"); Troy A. Miller, in his official capacity as Acting Commissioner for CBP ("Miller"); Jason Owens, in his official capacity as Chief of BP ("Owens"); and Juan Bernal, in his official capacity as Acting Chief Patrol Agent of the Del Rio Sector of BP ("Bernal") (collectively, "the Defendants"). (ECF No. 5.) As explained below, the Court **GRANTS** the

Motion for a temporary restraining order until the parties have an opportunity to present evidence at a preliminary injunction hearing before the Court.

## II. BACKGROUND

On October 24, 2023, the Plaintiff commenced this civil action against the Defendants when it filed a Complaint.  (ECF No. 1.)  According to the Plaintiff, this lawsuit was filed because federal officials are allegedly destroying the Plaintiff's property by cutting the Plaintiff's concertina wire located near the United States-Mexico border.  (ECF No. 5 at 2; ECF No 5-1.) The Plaintiff believes that this property destruction is intended to allow migrants to enter the country.  (ECF No. 5 at 2.)

The Plaintiff contends that since September 20, 2023, this property destruction has accelerated.  (ECF No. 5 at 2.)  Pictures, video, and declarations from various officials associated with the Plaintiff detail specific instances when the federal government allegedly damaged the Plaintiff's property and consequently allowed migrants to enter.  (*See, e.g.*, ECF No. 5-1.)  The Plaintiff raises numerous claims against the Defendants, including common law conversion, common law trespass to chattels, and Administrative Procedure Act violations.  (ECF No. 1 at 23-28.)  The Plaintiff also seeks a preliminary and permanent injunction enjoining the Defendants from interfering with the Plaintiff's property; a stay of agency action; a declaration that Defendant's actions are unlawful; and costs.  (*Id.* at 28-29.)

In the Complaint and some documents filed with the Court, the Plaintiff establishes that the wire barrier is on private property with the permission of the owners and/or municipal authority.  (ECF No. 1 at ¶¶ 5, 11, 59; ECF No. 3-2 at 9.)  Documents executed between the Plaintiff and the landowners provide the Plaintiff with a basis for its presence on the border properties.  (ECF No. 3-2 at 9.)

On October 24, 2023, the Plaintiff filed an unopposed motion for leave to exceed the page limits for its motion for a preliminary injunction, along with the preliminary injunction motion. (ECF No. 3.)  On October 27, 2023, the Plaintiff filed the instant Motion.  (ECF No. 5.)  On October 28, 2023, the Plaintiff filed the declaration of another individual associated with the Plaintiff concerning the Defendants allegedly damaging more concertina wires.  (ECF No. 8-1.)

### III. STANDARD OF REVIEW

Federal Rule of Civil Procedure 65(b) states that a court may issue a temporary restraining order without notice to the adverse party only if the "specific facts in an affidavit or a verified complaint clearly show that immediate or irreparable injury, loss, or damage will result to the movant before the adverse party can be heard in opposition" and "the movant's attorney certifies in writing any efforts made to give notice and the reasons why it should not be required." Fed. R. Civ. P. 65(b).

Federal Rule of Civil Procedure 65 continues:

> Every temporary restraining order issued without notice must state the date and hour it was issued; describe the injury and state why it is irreparable; state why the order was issued without notice; and be promptly filed in the clerk's office and entered in the record.  The order expires at the time after entry – not to exceed 14 days – that the court sets, unless before that time the court, for good cause, extends it for a like period or the adverse party consents to a longer extension.  The reasons for an extension must be entered in the record.  Fed. R. Civ. P. 65(b)(2) (cleaned up); *see also Pomeroy, Inc. v. Norder Opportunity Saver Sys., Inc.*, 2010 WL 11652127, at *4 (W.D. Tex. Feb. 23, 2010).

If the Court issues a temporary restraining order, the nonmovants must receive seven days' notice before the preliminary injunction hearing is held.  Fed. R. Civ. P. 6(c).

To succeed on a motion for a temporary restraining order, the movant must establish four elements: (1) "a substantial likelihood that the movant will prevail on the merits"; (2) "a substantial

threat that irreparable harm will result if the injunction is not granted"; (3) "the threatened injury outweighs the threatened harm to the defendant"; and (4) the injunction "will not disserve the public interest." *Clark v. Pichard*, 812 F.2d 991, 993 (5th Cir. 1987) (citation omitted). Elements three and four merge "when the Government is the opposing party." *Nken v. Holder*, 556 U.S. 418, 435-36 (2009). The decision whether to grant a temporary restraining order "is within the sound discretion of the district court." *Rockwell*, 2019 WL 2745754, at *2 (citing *Miss. Power & Light Co. v. United Gas Pipe Line Co.*, 760 F.2d 618, 621 (5th Cir. 1985)). Emergency injunctive relief is an extraordinary remedy that should not be granted when the evidence supporting it fails to support such a finding. *See Clark*, 812 F.2d at 993 (citations omitted).

## IV. ANALYSIS

The Plaintiff requests "an order temporarily restraining Defendants from damaging, destroying, or otherwise interfering with Texas's concertina wire fence while" the preliminary injunction motion remains pending. (ECF No. 5 at 8.) The Court shall grant the temporary relief requested, with one important exception for any medical emergency that mostly likely results in serious bodily injury or death to a person, absent any boats or other life-saving apparatus available to avoid such medical emergencies prior to reaching the concertina wire barrier.

### A. Likelihood of Success on the Merits

The Plaintiff argues that it is likely to succeed on its common law trespass to chattels claim because "[1] the concertina wire is state property; [2] Defendants have exercised dominion over that property absent any kind of exigency; and [3] they have continued to do so even after being put on notice of [the Plaintiff's] interest in the property." (ECF No. 5 at 5.)

Failure to prove a claim "with certainty . . . does not foreclose" a temporary restraining order. *Texas v. Seatrain Int'l, S. A.*, 518 F.2d 175, 180 (5th Cir. 1975). "To assess the likelihood

of success on the merits, we look to standards provided by the substantive law." *Janvey v. Alguire*, 647 F.3d 585, 596 (5th Cir. 2011) (quotation marks and citation omitted). Under Texas common law, a trespass to chattels is "an injury to, or interference with, possession, unlawfully, with or without the exercise of physical force." *Mountain States Tel. & Tel. Co. v. Vowell Constr. Co.*, 341 S.W.2d 148, 149-50 (Tex. 1960) (citation and quotation marks omitted) (affirming a judgment finding a trespass to chattels where a construction company severed another company's communications cable); *see also Omnibus Int'l, Inc. v. AT & T, Inc.*, 111 S.W.3d 818, 826 (Tex. App. - Dallas 2003) (stating that trespass to chattels applies to use or possession). "For liability to attach, causing *actual damage* to the property or *depriving the owner of its use for a substantial period* must accompany the wrongful interference." *Omnibus Int'l, Inc.*, 111 S.W.3d at 826 (citing *Zapata v. Ford Motor Credit Co.*, 615 S.W.2d 198, 201 (Tex. 1981)). A "great public calamity" can justify property destruction. *Steele v. City of Houston*, 603 S.W.2d 786, 791 (Tex. 1980).

Here, the Plaintiff is likely to succeed on its trespass to chattels claim. First, the Plaintiff established that it owns the concertina wires. *Mountain States Tel. & Tel. Co.*, 341 S.W.2d at 149-50. Brian Cooney, a Texas Military Department employee, averred that he has observed Texas Military Department officials "construct, maintain, and repair Texas's concertina wire fence" in the Eagle Pass, Texas area. (ECF No. 5-1, ¶¶ 1, 3; *see also* ECF No. 3-2 at 15, 23) (Michael Banks, a special adviser on border matters to the Texas governor, averred that he saw federal officials on September 20, 2023 cut "Texas's wire.")).[1]

---

[1] Although Cooney's declaration was one of two sworn declarations attached to the Motion (ECF No. 5-1; ECF No. 8-1), the Plaintiff incorporates the declarations of others by referring to the Plaintiff's motion for a preliminary injunction. (*See, e.g.*, ECF No. 5 at 5-6.) Moreover, although Manuel Perez, a Texas Military Department official, submitted a declaration that supports that the Plaintiff owns the wires (ECF No. 3-2 at 4-5), that declaration was unsworn and otherwise failed to include a penalty of perjury statement. 28 U.S.C. § 1746. Thus, the Court will not rely on that document.

Second, the Plaintiff established that the Defendants "*actual[ly] damage[d]*" the concertina wires. *Omnibus Int'l, Inc.*, 111 S.W.3d at 826. According to Cooney, a Border Patrol agent operating a forklift on October 26, 2023, near Eagle Pass, Texas "inserted pallet forks into the concertina wire barrier, lifted the barrier high enough to pull the fencing stakes that kept the fence in place out of the ground, and held it suspended in the air for approximately 20 minutes," which created a large enough gap for migrants to pass through. (ECF No. 5-1, ¶ 7.) According to Cooney, "[a]fter the last of the migrants passed through the concertina wire that had been raised by . . . the forklift, the BP agent operating it lowered the wire." (*Id.* ¶ 12.) But, Cooney avers, the stakes attached to the concertina wire and that helped keep the wire situated "were not put back into the ground" and consequently, Texas Military Department engineers must repair the concertina wire. (*Id.*; *see also* ECF No. 3-1 at 16-18 (video posted on the website X, formerly known as Twitter, purports to show uniformed individuals in Eagle Pass, Texas cutting concertina wire near a river, and then pulling that wire to form an accessible opening for migrants in that river).)[2] Photos attached to Cooney's declaration appear to confirm his observations. (ECF No. 5-1, ¶ 11; *id.* at 8-9, 11.) Separately, Roberto Ortiz Diaz, who is a Texas Military Department employee, establishes that the Defendants damaged wires on October 27, 2023. (ECF No. 8-1, ¶¶ 1, 6, 10-13.) The Defendants may continue to damage wires, which is especially likely because they damaged more property a mere day after this Motion was filed. (ECF No. 5-1, ¶ 15; ECF No. 8-1; ECF No. 5; *see also* ECF No. 3-2 at 26.)

Third and finally, the Plaintiff established that the Defendants lacked permission to interfere with the wires. According to Cooney, "[n]one of the federal personnel at the scene asked

---

[2] Like the sworn declarations in the Plaintiff's motion for a preliminary injunction, the Plaintiff incorporated by reference this video in its Motion (ECF No. 5 at 5 (citing ECF No. 3-1 at 21-28)), which the Court viewed on the Internet.

for permission from me or, to my knowledge, from other [Operation Lone Star] personnel to move the concertina wire barrier."  (ECF No. 5-1, ¶ 9.)  Cooney also added that as far as he knew, the Texas Military Department did not give permission to BP to move the wire.  (*Id.*; *see also* ECF No. 8-1, ¶ 14.)  Further, no "great public calamity" is apparent on this record to justify property destruction.  *Steele*, 603 S.W.2d at 791.  Cooney further avers that, even though BP had airboats in the water, no migrant was "in distress while they were in the river"; no migrant "appeared to need medical attention"; and no one at the scene called a medical team to help the migrants.  (*Id.* ¶¶ 10-11.)  Diaz also reported a similar incident.  (ECF No. 8-1, ¶¶ 8, 14.)  Therefore, the Plaintiff established that it is likely to succeed on its trespass to chattels claim.  The Court need not analyze the other claims.

### B. **Irreparable Harm**

Harm is irreparable only "if it cannot be undone through monetary remedies."  *Interox Am. v. PPG Indus., Inc.*, 736 F.2d 194, 202 (5th Cir. 1984).  However, the Plaintiff may still establish irreparable harm when its costs are unrecoverable due to the government's sovereign immunity.  *See Wages & White Lion Invs., L.L.C. v. U.S. Food & Drug Admin.*, 16 F.4th 1130, 1142 (5th Cir. 2021); *see also Portée v. Morath*, No. 1:23-CV-551-RP, 2023 WL 4688528, at *5 (W.D. Tex. July 21, 2023) (publication pending) ("[C]laims for money damages against state entities and officials are generally barred by sovereign immunity, which makes Portée's harm irreparable for purposes of seeking preliminary injunctive relief.").

The Plaintiff preliminarily establishes that it would face irreparable harm without a temporary restraining order.  The Plaintiff alleges that by "damaging, destroying, and exercising dominion over state property," the Defendants are causing the Plaintiff to incur "extensive costs."  (ECF No. 5 at 6.)  The Plaintiff also claims that the Defendants' actions show that they intend to

prevent the Plaintiff from "maintaining operational control of its own property." (*Id.*) Furthermore, the Plaintiff avers that destroying the concertina wire "irreparably harms Texas because it facilitates increased illegal entry into the State." (*Id.* at 7.) Consequently, the Plaintiff argues that it will continue to incur considerable additional expenses to expand social services, medical care, education, and other government programs, to accommodate the influx of illegal aliens. (*Id.* at 6-7.) To support this assertion, the Plaintiff provides sworn declarations from various Texas state officials, who describe the significant annual cost of providing emergency medical services, social services, and public education to illegal aliens. (*See generally* ECF No. 3-2.)

The Court is mindful, however, that the Defendants enacted an extensive scheme, which includes immigration enforcement and the interdiction of migrants. *Arizona v. United States*, 567 U.S. 387, 394, 401-02 (2012). The question then becomes how much "harm" should a state bear if the Defendants are unable to meet their obligations of securing the border and controlling the flow of migrants into the country. The only "harm" before this Court at the moment is the cost of the destruction of the Plaintiff's property, which is the wire barrier.

The injuries alleged by the Plaintiff are irreparable because they undermine the Plaintiff's control over its property and impose costs, which sovereign immunity precludes the Plaintiff from ever recovering. *Wages & White Lion*, 16 F.4th at 1140-41. A temporary restraining order can prevent such injuries by maintaining the status quo while the parties prepare thorough arguments on the merits of this case. Moreover, "the risk of irreparable harm to the Plaintiff is sufficient to proceed with the temporary restraining order without first giving notice to the Defendants." *Pomeroy, Inc.*, 2010 WL 11652127, at *4. Therefore, the Plaintiff established irreparable harm.

C. **Public Interest**

The Plaintiff argues that the balance of interests favors the Plaintiff for two reasons. First, the Plaintiff asserts that its use of concertina wire deters illegal entries and activities, including human trafficking, drug smuggling, and terrorist infiltration.  (ECF No. 5 at 7-8.) Second, the Plaintiff argues that the Defendants' actions are unlawful, and that even if a lawful basis exists, the Defendants must seek redress "through legal proceedings, not self-help actions."  (*Id.*)

Deterring unlawful activity, including illegal entry, is in the public interest.  *United States v. Brignoni-Ponce*, 422 U.S. 873, 878 (1975) ("[T]he public interest demands effective measures to prevent the illegal entry of aliens at the Mexican border.").  Further, "[t]here is generally no public interest in the perpetuation of unlawful agency action.'"  *Louisiana v. Biden*, 55 F.4th 1017, 1035 (5th Cir. 2022) (quoting *Texas v. Biden*, 10 F.4th 538, 560 (5th Cir. 2021)).  To the extent an agency's acts facilitate rather than prevent unlawful conduct, as the Plaintiff argues, such acts implicate the "substantial public interest in having governmental agencies abide by the federal laws that govern their existence and operations."  *Texas v. United States*, 40 F.4th 205, 229 (5th Cir. 2022) (quoting *League of Women Voters of U.S. v. Newby*, 838 F.3d 1, 12 (D.C. Cir. 2016)) (quotations omitted).  The Plaintiff established that the balance of interests favors granting an injunction, but just barely.

The Court recognizes a countervailing public interest, however, in allowing BP agents to address medical emergencies.  *See Croy v. United States,* No. DR-22-CV-00005-AM-VRG, 2023 WL 6393888, at *14 (W.D. Tex. Oct. 2, 2023) (discussing U.S. Customs and Border Protection policy requiring "Border Patrol Agents who encounter individuals who are injured . . . to take immediate action to obtain medical attention for the injured party"); *Carcamo-Lopez v. Does 1*

*through 20*, 865 F. Supp. 2d 736, 754 (W.D. Tex. 2011).  This Order therefore includes a narrow exception to permit the Defendants to move or cut the concertina wire to aid individuals in medical distress, as noted above.

The Court is also very aware that the Plaintiff claims to have permission to place the wire barrier on the property or properties where the concertina wire was located before the actions of the Defendants and its agents.  The Court is also very aware that the Defendants are charged with protecting the border and may take measures necessary to do so.  The matter needed to be further litigated at a hearing is at the intersection of: the private property rights of the persons consenting to the placement of the concertina wire on their land, the Plaintiff's right to assist private property owners and avoid costs to the Plaintiff; and the Defendants' responsibilities over national security and border security, and its powers to effectuate its duties, up to and including the destruction of private or state property.

## V. CONCLUSION

Accordingly, it is **ORDERED** that the Plaintiff's Emergency Motion for a Temporary Restraining Order or Stay of Agency Action (ECF No. 5) is **GRANTED** on October 30, 2023 at 9:30 a.m.

The temporary restraining order shall last until it expires on November 13, 2023 at 9:30 a.m., unless a further order of this Court extends the time. For purposes of this Order, the word "property" refers to concertina wire that the Plaintiff installed at the United States- Mexico border in Eagle Pass, Texas prior to this order.

Until November 13, 2023 at 9:30 a.m., the Defendants shall be enjoined from: (1) removing the property from its present location for any reason other than to provide or obtain emergency medical aid, as noted above; (2) concealing the property in any way; (3) offering the property for sale, rent, or use to any person, business, or entity; (4) selling or otherwise transferring the property in whole or in part; (5) encumbering the property in any way; (6) scrapping the property; (7) disposing of the property in any way; (8) disassembling, degrading, tampering with, or transforming the property in any way for any reason other than to provide or obtain emergency medical as noted in this order; and (9) failing to take all steps necessary to protect the property against damage or loss of any kind.

A preliminary injunction hearing shall be scheduled for November 7, 2023, at 2 p.m.

SIGNED and ENTERED on this 30th day of October 2023.

_____

ALIA MOSES
Chief United States District Judge

Exhibit L

1    IN THE UNITED STATES DISTRICT COURT

2    FOR THE WESTERN DISTRICT OF TEXAS

3    DEL RIO DIVISION

4

5

6    STATE OF TEXAS,                          *    No. DR-23-CV-55
                                              *
7          Plaintiff,                         *
                                              *
8    v.                                       *    NOVEMBER 7, 2023
                                              *
9    U.S. DEPARTMENT OF HOMELAND SECURITY,    *
                                              *
10   ALEJANDRO MAYORKAS, U.S. CUSTOMS AND     *
                                              *
11   BORDER PROTECTION, U.S. BORDER PATROL,   *
                                              *
12   TROY A. MILLER, JASON OWENS, AND         *
                                              *
13   JUAN BERNAL,                             *
                                              *
14         Defendants.                        *    DEL RIO, TEXAS

15

16   ------------------------------------------------------------

17   TRANSCRIPT OF PRELIMINARY INJUNCTION HEARING

18   BEFORE THE HONORABLE ALIA MOSES

19   CHIEF UNITED STATES DISTRICT JUDGE

20   ------------------------------------------------------------

21

22

23

24   Proceedings recorded by mechanical stenography.  Transcript

25   produced by Computer-Aided transcription.

A P P E A R A N C E S

For the Plaintiffs:          OFFICE OF THE ATTORNEY GENERAL OF TEXAS
                             BY:   MR.  RYAN WALTERS
                                   MR.  DAVID BRYANT
                                   MS.  HEATHER DYER
                                   MS.  MUNERA AL-FUHAID
                             P.O. Box 12548
                             Austin, Texas  78711

For the Defendants:          U.S. DEPARTMENT OF JUSTICE
                             BY: MR. CHRISTOPHER EISWERTH
                                 MS.  FAITH E. LOWRY
                                 MS.  JEAN LIN
                             Federal Programs Branch, Civil Division
                             1100 L Street, N.W.
                             Washington, D.C.  20005

                             *  *  *  *  *  *

1                                I N D E X

2

3                                                                PAGE

4  OPENING STATEMENTS BY THE PLAINTIFFS...................... 4

5  OPENING STATEMENTS BY THE DEFENDANTS...................... 38

6  ARGUMENTS................................................ 195

7

8

9

10  FOR THE PLAINTIFFS:

11   MR. MICHAEL BANKS
          Examination by Mr. Bryant...................... 59 / 114
12          Examination by Ms. Lowry.......................... 104

13

14  FOR THE DEFENDANTS:

15   MR. MARIO TREVINO
          Examination by Ms. Lowry...................... 118 / 173
16          Examination by Mr. Bryant........................ 149

17

18   MR. DAVID B. MILLER
          Examination by Mr. Eiswerth...................... 184
19          Examination by Ms. Dyer.......................... 189

20

21

22                             E X H I B I T S

23

24  PLAINTIFF'S EXHIBITS ONE THROUGH 73 OFFERED/ADMITTED...... 58

25                            * * * * * *

1    (2:05:45 P.M., START TIME)

2    THE COURT:   DR-23-CV-55, the State of Texas versus the

3    U.S. Department of Homeland Security, et al.

4    Announcements.

5    MR. WALTERS:   Your Honor, Ryan Walters for the State

6    of Texas, and with me are Heather Dyer, David Bryant, and Munera

7    Al-Fuhaid.

8    THE COURT:   Okay.

9    MR. EISWERTH:   Good afternoon, Your Honor.

10   Christopher Eiswerth for the United States' defendants.   I'm

11   joined by my colleagues Jean Lin and Faith Lowry from the

12   Department of Justice.

13   THE COURT:   All right.   Opening statements by the

14   State of Texas.

15   MR. WALTERS:   Would you like me to approach the

16   podium, Your Honor?

17   THE COURT:   Please.

18   OPENING STATEMENTS BY THE PLAINTIFFS

19   MR. WALTERS:   Your Honor, may it please the Court,

20   today we are here to show why the State of Texas is entitled to

21   a preliminary injunction after this Court entered a temporary

22   restraining order by the federal defendants' policy and practice

23   of cutting Texas' concertina wire fence for reasons other than

24   in a -- in a medical emergency.

25   The -- we're also asking for an alternative relief

1    of a stay of agency action under the Administrative Procedure

2    Act.   The test is the same; the factors are considered.   And

3    I -- I will get into a little later as to why there might be a

4    distinction as to which sort of relief the Court would enter on

5    the various claims in this way.

6           The first test is the substantial likelihood of

7    success on the merits.   We have a substantial threat of

8    irreparable injury.   And, of course, the final two prongs emerge

9    because of the federal government as the defendant, the --

10    whether this is in the -- whether relief is in the public

11    interest or -- and the balance of harms are in Texas' favor.

12           On the substantial likelihood of success on the

13    merits, the defendants' first -- they have a lot of claims

14    against this Court's jurisdiction, were able to review the

15    actions we're complaining of.   The first is whether 8 U.S.C.

16    1252(f)(1), which is a provision of the INA that precludes

17    injunctive relief against actions to implement certain parts of

18    the INA that is between 8 U.S.C., Sections 1221 through 1232.

19    That does not apply for several reasons to this.

20           First, as to a state of agency action, the -- the

21    combination of a couple of recent Fifth Circuit opinions makes

22    clear why that provision does not apply to a stay of agency

23    action.   And in the -- in the DACA case, that's of the Fifth

24    Circuit last year, 50 F.4th 498, the Court held that -- the

25    Fifth Circuit held that vacatur under the APA, which nullifies

1   the agency action, it's not injunctive relief, it is not barred

2   by this provision, 1252(f)(1).

3             And then earlier this year, the Fifth Circuit, in

4   *Alliance for Hippocratic Medicine versus FDA*, **that's**

5   78 F.4th 210, said that a stay is a temporary form of vacatur.

6             So, just as a preliminary injunction is to a

7   permanent injunction, a stay under the APA is to vacatur under

8   the APA.

9             So, this provision would not prevent the Court from

10  issuing a stay of agency action were it to find that there was

11  a -- a rule that DHS had created regarding the acts complained

12  of here.

13            THE COURT:  And the acts complained of by the state is

14  the destruction of the wire?

15            MR. WALTERS:  Yes, ma'am.  Yes, Your Honor.

16            And even injunctive relief is not barred here.

17  Preliminary injunction would not be barred for any of the claims

18  here because the -- just because a -- an injunction would have a

19  collateral effect on the implementation of some provision.  So,

20  for example, the federal defendants raise that their -- their

21  power to inspect aliens under Section 1225, which would fall

22  within that range of 1221 through 1232 covered by the 1252(f)(1)

23  provision, that -- they argue that an injunction from preventing

24  them from cutting the wire, except for exigent circumstances,

25  would be an injunction enjoining the implementation of that

1  provision.   But the Supreme Court in the key case on this

2  provision in *Aleman Gonzalez*, 142 S.Ct. 2057 from last year said

3  that if it -- just because an injunction would have some

4  collateral effect on the -- on implementation of some provision

5  does not bring it within that; it would have to be a direct --

6  and obviously the State of Texas is not seeking any sort of

7  relief forbidding the defendants from inspecting or apprehending

8  or taking into custody any -- any aliens.

9           THE COURT:  So what is the State of Texas doing?

10          MR. WALTERS:  I'm sorry, Your Honor?

11          THE COURT:  So what is the State of Texas doing with

12 the wire?

13          MR. WALTERS:  The State of Texas is -- is placing the

14 wire in order to deter migrants from -- from crossing, and to

15 channel them into the ports of entry so that there would be

16 orderly migration.  So for example in the -- the part of --

17          THE COURT:  So where did the State of Texas get

18 jurisdiction to deal with migration?

19          MR. WALTERS:  Well, Your Honor, this is -- we're not

20 enforcing any immigration laws, but this is on -- this is not on

21 federal property.  We -- we place concertina wire on private or

22 municipal or state property.  And we -- we have jurisdiction

23 just as a sovereign or proprietary interest in preventing people

24 from trespassing on private lands or State of Texas lands or

25 municipal lands.

1      THE COURT:  So you're saying this is more of a

2   trespass than an immigration matter?

3      MR. WALTERS:  Yes, Your Honor.  This is not a

4   federal -- we're not -- we're not using federal immigration laws

5   to ask the -- the Court to order the defendants to take any

6   immigration action against any particular aliens.

7      THE COURT:  Proceed.

8      MR. WALTERS:  Thank you, Your Honor.

9      The -- on the state law tort claims, the trespass to

10  chattels and conversion claims, the -- the defendants have

11  conceded that -- well, the -- the evidence shows that this is

12  state property, the concertina wire.  The defendants have

13  conceded that they are -- that is lawfully placed for purposes

14  of this preliminary injunction motion.  That's ECF 23-1 at 14,

15  Note 3, and that's their opposition to our PI motion.

16      They also -- defendants also admit that they

17  exercise control over Texas state property, the concertina wire.

18  And it's without permission.  The evidence will show that it's

19  without permission of Texas.  So they admit that they cut it,

20  and they -- they try to justify it.

21      However, there are no exigent circumstances in the

22  record of this case or any sort of other necessity that would

23  require them to cut the concertina wire.  The State of Texas

24  concedes that there -- there would be some circumstances where

25  the federal government would have, by necessity, due to -- to --

1    if someone is in serious medical distress in order to cut -- and

2    that's the only -- the quickest way to get to someone to assist

3    them, that they cut the concertina wire.  And -- and this

4    happens in other sectors outside of the Del Rio Sector that

5    Eagle Pass is in.  The State of Texas has a very cooperative

6    relationship with U.S. Border Patrol, and we have concertina

7    wire in El Paso and Brownsville.

8          THE COURT:  So, answer this question, counsel.  I

9    noticed that.  I noticed that usually the -- the government --

10   the Border Patrol, and DPS and/or the state or the federal

11   government have a very cooperative relationship in other places.

12   Why is just Eagle Pass the point where everybody is fighting?

13         MR. WALTERS:  Well --

14         THE COURT:  Why is that such a hotbed of controversy?

15         MR. WALTERS:  Your Honor, I think there has been a

16   large influx of people crossing the border in Eagle Pass, and

17   it's led to a lot of strife within the city in trying to deal

18   with that.  And I think that, you know, in -- in general the --

19   the State of Texas and -- and Border Patrol have -- including in

20   placing concertina wire -- have cooperated and understand that

21   even -- even if it's necessary to -- to do this --

22           So, for example, in Brownsville and -- and the

23   testimony will show today that in Brownsville and El Paso when

24   something does occur, where someone does need a medical --

25   someone needs to get access to someone because of a -- a medical

1  reason, Border Patrol contacts Texas, they say, We're going to

2  cut the wire.  We say that's -- that's fine.  They cut it.  But

3  they don't wave in unrelated, you know, aliens who are not in

4  medical distress.

5          But -- but what the record shows in this case is,

6  they are -- when they -- when they cut the wire, they are

7  allowing huge -- hundreds, sometimes thousands of people in.

8          So, even if there were one or a number of -- of

9  people who it would be justified to cut the wire, it is not

10  justified to leave the wire open and wave people in who are not

11  subject to that exigent circumstance.

12          THE COURT:  So what do you say to the federal

13  government's position that that impairs their ability to do

14  their job?

15          MR. WALTERS:  Your Honor, we -- the record will show

16  that they are not required to -- so they're claiming that

17  once -- once an alien crosses -- once a migrant crosses the

18  middle -- middle point of the Rio Grande, that they're on U.S.

19  territory --

20          THE COURT:  Uh-huh.

21          MR. WALTERS:  -- and therefore they have a duty to

22  immediately take them into custody, process them, inspect them.

23          But what the record shows here, and the testimony

24  will -- will show today, is that when they are bringing these

25  people in, they are not immediately -- so even after they cut

1  the wire in order to -- after they've crossed and they bring

2  them up onto the bank and they're -- they're coming up, they are

3  not immediately inspecting, processing these people.

4          So, that justification falls apart based on the

5  record in this case.  And nothing prevents them from accessing

6  the river.  The -- DPS -- in addition to Texas agencies, the

7  Border Patrol has airboats in the river where they can access

8  people.  It is also -- there are points where they can enter.

9  Nothing prevents them from -- from accessing them.  So the only

10 argument would be a -- a sense of urgency, which would be some

11 sort of medical reason or if someone, you know --

12          What the record shows here -- and we can show the

13 Court some videos, which I think the Court has already seen.

14 These people are just sort of leisurely coming across the

15 border.  These are not runners, these are not, you know, going

16 across the river who we need to immediately get to them at the

17 shortest point possible in order to apprehend them.  That's not

18 what's going in the -- on the -- based on the record in this

19 case.

20          So we think, you know, there would be exigent

21 circumstances that -- that could justify cutting the concertina

22 wire, but it would not justify completely destroying it as a

23 border barrier for a period of time that is not related to that

24 exigent circumstance.

25          THE COURT:  But does the federal government need to

1  have exigent circumstances to have access to the aliens --

2          MR. WALTERS:   No, Your Honor.

3          THE COURT:   -- once they're on U.S. land?

4          MR. WALTERS:   No, Your Honor.   We -- we think on this

5  they -- they do not need this -- and this is different -- in --

6  so, in Brownsville and El Paso they do not do this, and they are

7  performing their duties.   And there's been no argument that

8  Border Patrol is not performing its duties to apprehend or

9  inspect aliens in Brownsville or El Paso.

10          So, the argument that they just have to cut the

11  concertina wire in order to perform those mandatory duties under

12  federal law.   Which we admit, if -- if there were such a

13  mandatory duty under federal law, that would clearly preempt any

14  state activity.   But -- but that is not on the record in this

15  case what -- what is happening, Your Honor.

16          THE COURT:   So this always goes back to my original

17  question.   Why is this area such an area of contention with

18  concertina wire, where it isn't anywhere else in the state of

19  Texas?

20          MR. WALTERS:   I -- I can't speak to that, Your Honor.

21  I -- I think it has been a flashpoint.   You know, there has been

22  a lot of media coverage that is unfavorable.   You know, from the

23  administration's point, I would say they don't like to see a lot

24  of people lining up at the -- at the border in Eagle Pass, which

25  has been happening.   They -- you know, there's lots of videos,

1    there's -- cable news networks show this and it's not a good

2    image for the administration.   So it's easier to -- to get rid

3    of that image at that particular point by letting people in so

4    they're not built up at that particular -- massed up in a -- in

5    a site like that, Your Honor.

6          That's -- that's my -- that's my view of it, but

7    it's not -- it's not based on any inside knowledge of Border

8    Patrol.

9          THE COURT:   Anything else in your opening statement?

10          MR. WALTERS:   Your Honor, I'd like to just make a few

11    quick points.   And I'm happy to talk about anything that you

12    would prefer to talk about, or stop when you'd like me to stop.

13    But on the state law tort claims, you know, we think we -- we

14    clearly have a waiver of sovereign immunity under the

15    Administrative Procedure Act, Section 702.   There's no contrary

16    Fifth Circuit precedent.   And the D.C. Circuit precedent, which

17    would be, I'd say, the second-best precedent in this area given

18    how they -- how often they deal with this statute.   The D.C.

19    Circuit says that state law claims -- the federal government has

20    waived sovereign immunity for non-monetary relief, which is all

21    that we're seeking here.   We're not seeking money damages.   And

22    intergovernmental immunity, we're not directly attempting to

23    regulate the federal government.   We're -- we have a property

24    interest in our property.   And just a general tort law that

25    applies to everyone is not a discriminatory measure aimed at the

 1 │ federal government.

 2 │         Under the Administrative Procedure Act, we have to

 3 │ show -- well, there -- for an ultra vires claim, the -- we have

 4 │ to show that there's an agency action, which clearly there is

 5 │ here.  But for -- for other claims under the Administrative

 6 │ Procedure Act, we have to show there's final agency action.

 7 │         And there are two categories of agency actions here.

 8 │ One way to look at it is the individual instances of cutting of

 9 │ the concertina wire.  And under the APA nomenclature, that would

10 │ be considered an order or a sanction.  And that would be subject

11 │ to an injunction because of an ongoing, continuous, tortious-

12 │ like activity.  So injunctive relief would be permitted under

13 │ the APA there.

14 │         The other category of agency action would be the

15 │ policy, which is, under the APA's parlance, a rule.  And a rule

16 │ would -- would be subject to injunctive relief, but it would

17 │ also be subject to a stay under the APA, a stay of agency

18 │ action.

19 │         For final agency action, you have to show two

20 │ things.  One is the consummation of the agency's decision-making

21 │ process, and the other is that it affects rights or obligations.

22 │         Clearly, the individual instances of cutting

23 │ satisfies both of those.  It is the consummation of the

24 │ agency in that it has -- it has done the act.  It is complete

25 │ when they cut the wire.  And it affects rights or obligations.

1    It determines rights or obligations to Texas' property rights.

2    It is determined that Texas property rights are not paramount in

3    that circumstance.

4          So, the individual actions, the individual orders or

5    sanctions, are final agency action.  And the -- the rule also

6    satisfies this test.  It is a -- it is the -- the declaration

7    of -- of Commissioner B. Miller that -- that the defendants have

8    put in the record in their opposition to the preliminary

9    injunction motion.  Even though it says there is no policy about

10   this, it repeatedly refers to the requirements of agents if --

11   if someone crosses the border, they are -- there is a need to

12   cut the wire, they must cut the wire in order to perform their

13   duties.  And they said these are mandatory duties under the INA.

14         So, that is a rule.  And just because it has to be

15   implemented downstream does not take away its status as final

16   agency action.  The Supreme Court in the MPP case, the Migrant

17   Protection Protocols case from last year, said that just because

18   a -- a rule had to wait on some contingent further action to be

19   implemented on the ground against particular parties does not

20   mean it is -- it is not final agency action.  And the Fifth

21   Circuit, which was not reversed on standing grounds or final

22   agency action grounds, had also ruled in a more elaborate

23   fashion in that direction.

24         The -- the defendants say that there is no policy

25   because, you know, it hasn't been published in the Federal

1   Register.  Well, that's not a requirement.  In the MPP case, the

2   *Biden versus Texas* case from the Supreme Court last year, the --

3   the October 29th memorandum terminating the Migrant Protection

4   Protocols by Secretary Mayorkas, was also not published in the

5   Federal Register, but the Supreme Court held it was final agency

6   action.

7              And the -- the various statements -- you know,

8   the -- the D.C. Circuit -- we cite various D.C. Circuit cases in

9   our -- in our brief that you don't have to -- the -- the inquiry

10  for final agency action is a very flexible pragmatic inquiry.

11  It's not, you know, you have to dot your i's and cross your t's

12  in order to have a final agency action.  That -- you know, a

13  series of --

14             THE COURT:  So, wait.  Wait, counsel.  Let me -- let

15  me ask you a question.  You're saying that the federal

16  government has a policy or does not have a proper policy for

17  cutting the concertina wire?

18             MR. WALTERS:  We're saying that they have a policy.

19  They've articulated a policy through their statements of their

20  spokespeople both on June -- on June 30th and October 24th, and

21  after this Court entered the TRO.  We cite these at 27-1 at 17.

22  We cite these -- and in the B. Miller declaration itself, it

23  refers to the obligation that agents must do this when -- when

24  aliens cross over to help prevent them from drowning, so they

25  traverse the river banks; that they have to just let them all in

1    by cutting the wire in those instances.

2         So those -- the D.C. Circuit has said in a series of

3    cases that we site, the *Barrick Goldstrike Mines and the*

4    *Ciba-Geigy* opinion, that a series of statements by the agency

5    can constitute final agency action.

6         So this is -- this is where there is a policy --

7         THE COURT:  Okay.  So -- but the State of Texas

8    doesn't object to that policy at any other point other than

9    Eagle Pass?

10        MR. WALTERS:  No, Your Honor.  The -- well, the way

11   that we've --

12        THE COURT:  Because y'all are in agreement with any

13   time there's a cutting of the wire in other parts.

14        MR. WALTERS:  Right.

15        THE COURT:  Just in Eagle Pass.

16        MR. WALTERS:  Well, we think this -- this policy is

17   relatively recent.  We have seen this activity has really

18   accelerated over the last couple months in Eagle Pass.  And --

19   and the way that the -- the department has adopted through its

20   public statements to the press and to -- in its filings with

21   this court that that is the policy of the department, even

22   though, from our experience and our testimony will show today,

23   that that is not what happens in Brownsville or El Paso.  But --

24   but DHS has said that what is going on in Eagle Pass is the

25   policy, that it is proper what they are doing in -- in -- I'm

1  sorry, in Eagle Pass.   They have adopted that as -- and we're

2  saying that is a rule under the Administrative Procedure Act.

3  It's a policy that they have adopted.

4           They also say that there is no reviewability under 5

5  U.S.C., Section 701.   This is the provision of the APA that says

6  that agency actions committed to agency discretion by law are

7  not reviewable.   The key case here is *Heckler versus Chaney*, a

8  Supreme Court case from 1985.   And this is usually in the -- in

9  the context of enforcement discretion.   When is -- if an agency

10  decides not to enforce a law against particular people, there

11  are always a lot of factors that go into that.   And given

12  traditional prosecutorial discretion, the Court has said -- the

13  Supreme Court has said that that is the type of activity by

14  agencies that are not reviewable for their reasoning and the

15  like under the Administrative Procedure Act.

16           But that does not apply here for several reasons.

17  One, the Fifth Circuit has held in the MPP case from December of

18  2021 -- which is still good law on -- on this area; it was not

19  overturned by the Supreme Court -- that the *Heckler versus*

20  *Chaney* enforcement discretion does not apply to rules, but only

21  applies to one-off enforcement decisions.

22           So, if the Court were to find there is a rule, a

23  policy relating to the cutting here, they could not make the

24  claim that it is not reviewable under the APA pursuant to

25  that -- provision.

1          Also, these are affirmative acts.  The cutting of
2    the wires is not like refusing to -- or declining to enforce the
3    law against a particular person.  And -- and the Court has held
4    that that is -- that provides a focus for judicial review when
5    there is an affirmative action by the agency.  And clearly,
6    cutting Texas' wire is an affirmative action.  It's not just
7    saying, We're not going to enforce the law against a particular
8    migrant, because of a particular circumstance.  Which we're not
9    seeking any sort of relief that would require them to do that.

10          The -- in the Supreme Court's MPP case, as well from
11   last year, the *Biden versus Texas* case, the -- the Court
12   analyzed an argument about the -- the scope of DHS's discretion
13   under the parole authority of Section 1182 of the INA.  And that
14   language says that the -- the Secretary may, in his discretion
15   and under such conditions as he may prescribe, parole people.
16   But the Supreme Court still held, despite that very broad
17   language as to the discretion of the secretary, that it was
18   reviewable under the Administrative Procedure Act for whether it
19   was arbitrary and capricious or not.

20          And, Your Honor, on the notice and comment claim
21   under the APA, it's very similar to the -- the inquiry for final
22   agency action.  The -- the Fifth Circuit, a lot of times, refers
23   back to its determination on final agency action as to whether a
24   rule is a substantive or legislative rule that was required to
25   undergo notice and comment, as opposed to falling into some

1    exception like a procedural rule or an interpretive rule.

2           And -- so the inquiry is whether it imposes or

3    denies rights or obligations, it -- or whether it has a

4    substantial impact on, in this case, Texas or migrants.

5           I think, clearly, if this Court were to find that

6    it -- the policy is a final agency action, it would also say it

7    was a substantive or legislative rule that was required to

8    undergo notice of comment rule making for the same reasons.  It

9    affects Texas' rights and obligations regarding its property, it

10   affects the ability of migrants to come across the border in a

11   different way, and it -- it affects the day-to-day business of

12   the State of Texas constantly having to repair its -- its

13   concertina wire fences.

14          And moving on to the arbitrary and capricious claim.

15   For a couple reasons interrelated, the -- both the individual

16   decisions to cut the Texas concertina wire, as -- as in the

17   record in this case and the overarching rule of policy,

18   arbitrary and capricious, they lack reasoned decision-making.

19   Because the -- the evidence in the record shows, and the

20   testimony will show again today, that -- that Border Patrol

21   supports -- they install their own concertina wire fences in

22   other areas, they have supported Texas placing concertina wire

23   fences in other circumstances, and they have made -- just

24   recently they issued a Federal Register notice waiving a lot of

25   environmental and other regulations to accelerate the building

1    of a border wall in Starr County, saying that border barriers

2    are necessary to help manage the flow of migrants into the

3    United States.

4                So at the same time that they are making these

5    arguments that we just have to allow them in through border

6    barriers, they are also doing -- performing agency actions that

7    do the opposite, and that is unreasoned decision-making.

8                And we cite a couple of D.C. Circuit cases in our PI

9    motion that says that an agency is acting in an arbitrary or

10   capricious manner if it is failing to take note of how it is

11   acting in other ways that are contradictory.  They -- they've

12   also failed to consider the relevant factors that they should

13   have considered.

14               So in Mr. B. Miller's declaration and -- they --

15   they never acknowledge or analyze or weigh the benefits of

16   deterrence of a concertina wire fence, which as said -- as I

17   said, is in a lot of their other publications and their

18   statements, including very recent statements, and in their

19   actions in other areas with regard to border barriers.  They

20   also have no consideration of the costs imposed on Texas from

21   the flow of migrants.  Which the Fifth Circuit in repeated cases

22   have said that when a federal agency acts in this area, it is

23   required to undergo in the first instance an analysis of the

24   cost to a border state like Texas.  That doesn't mean that they

25   have to issue -- reach a particular result, but they have to go

1    through the process of reasoned decision-making, and they failed

2    to do that in this case.   There's no evidence in the record that

3    they've considered any of these factors.

4            As to contrary to law or ultra vires claims, they --

5    they justify that 8 U.S.C., Section 1357(a)(3), which states

6    that the -- the Border Patrol shall have access to private

7    lands, but not dwellings, for the purpose of patrolling the

8    border to prevent the illegal entry of aliens, that that

9    justifies -- that provides the statutory authorization for them

10   to cut the concertina wire.

11           But the evidence in the record will show again

12   today --

13           THE COURT:   What if they say that the wire prevents

14   them from having access to enforce the law?

15           MR. WALTERS:   Yes, Your Honor.   So we think the record

16   will show and the testimony that we're going to put forward

17   today will show that they are not require -- this in no way

18   prevents them.   There are -- the video we will show will show

19   that there are airboats in the river.   One of the videos shows a

20   new hole being cut in Texas concertina wire a just few feet

21   away, I think maybe 10 or 15 feet away, from an existing hole.

22   So they are cutting new holes.   There can be no just -- and

23   migrants were already going up -- up that entry point.

24           So, and -- and the evidence -- you know, in the

25   other areas in -- in Brownsville and El Paso, this has not been

1  an obstacle to them enforcing.  Border Patrol is doing its job

2  in those sectors, and -- and they're not performing these sorts

3  of actions.

4        They've also -- the -- the -- you know, they're --

5  this provision says that it is for the purpose of patrolling and

6  to prevent the illegal entry of aliens.  But the record shows

7  that they are allowing people in through this fence without --

8  without any sort of immediate processing, that they're waving

9  them through, saying, Go over to the port of entry that's down

10  the road over there.

11        They're not being escorted.  So they're not using --

12  they're not -- they're not able to justify these particular

13  actions.

14        THE COURT:  So you're -- you're basically saying the

15  evidence is going to show that once the aliens come in and

16  the -- and the agents let them in at that point, they let them

17  walk on their own to whenever they're going --

18        MR. WALTERS:  We have --

19        THE COURT:  -- to the port of entry.

20        MR. WALTERS:  -- we have evidence of that, Your Honor.

21  And we have not seen any contrary evidence where the -- when

22  they waved in 300 or over a thousand people that -- there's --

23  you'll hear testimony today that they -- when they open up and

24  they're letting them in, they are not personally escorting these

25  people to the checkpoint down the road; that they are just

1  letting them in en masse, Your Honor.

2          And we're not -- and that provision also says, you

3  know, they have -- they still have access to private lands, but

4  nothing is preventing -- Border Patrol's on both sides of this

5  fence.   There's -- there's nothing preventing Border Patrol to

6  access any particular area.   It's not a landlocked concertina

7  fence.   Border Patrol has boats in there.

8          THE COURT:   How long is the fence?   What -- what will

9  the evidence show to be the length of the fence there?

10          MR. WALTERS:   Your Honor, I -- I cannot recall off the

11  top of my head, but the -- there will be testimony today on that

12  specific number.

13          On irreparable injury, the defendants raise the --

14  the possibility that we could get money damages for the costs of

15  the materials of our fence.   They say that, you know, concertina

16  wire is a mass produce -- mass-produced good and, therefore,

17  money damages could possibly fully remedy our injury.   But a

18  fence performs a function.   The -- the -- it is not just the sum

19  of its material costs.   The fence prevents enormous costs to the

20  State of Texas, as we have evidence in the record of drivers'

21  license costs, public education costs, incarceration costs, and

22  healthcare costs that we have to provide to unlawful aliens

23  every year.   And that the Fifth Circuit has repeatedly said, our

24  legitimate costs that -- for the state's injury purpose --

25          THE COURT:   Hasn't the Supreme Court just addressed

 1   that issue, though?

 2         MR. WALTERS:   That is a good point, Your Honor.   In --

 3   in the recent *Texas versus United States* case, the Supreme Court

 4   dealt with what it said was a very unique circumstance where the

 5   states -- including the State of Texas here.   I was involved in

 6   that case, Your Honor.   The State of Texas had -- had asked the

 7   Court to require DHS to arrest and take into custody aliens.

 8   And that goes -- and the Court then used the *Heckler versus*

 9   *Chaney* enforcement discretion under the APA context, and said

10   that the Article III standing inquiry was the same for -- for

11   these purposes.

12         So that involved the agency not enforcing the law.

13   Whereas here you have affirmative acts.   And the -- the Supreme

14   Court's majority opinion explicitly cited the Fifth Circuit's

15   DAPA decision from 2015 as falling outside of -- of the

16   limitation of that case.   That, and also, the MPP case, where

17   the Supreme Court reached the merits on determination of the

18   Migrant Protection Protocols.   So it specifically cited that as

19   not falling within its limitation on judicially cognizable

20   injury.

21         That's also a key thing.   The -- the Supreme Court

22   ruled on the basis that it was not a judicially cognizable

23   injury for costs to the state from a particular type of agency

24   action, and that is a refusal to enforce the law against people.

25   And that is not what we're seeking here.

1         And the Supreme Court cited the *Regents versus*

2    *DHS* -- or *DHS versus Regents* case involving the DACA program,

3    where the -- the Supreme Court, under the *Heckler versus Chaney*

4    APA reviewability issue, had said that because this involved an

5    affirmative act -- the DACA status, there was an application

6    process, and they -- they granted an affirmative status to the

7    recipients.  It wasn't just, We're not going to enforce the law

8    against you.  We're not going to try --

9         THE COURT:  Actually, it is defer -- it's a deferment

10   of deportation.  It is not applying the law to them.  It's not

11   granting them status.

12        MR. WALTERS:  It is, Your Honor, but -- but --

13        THE COURT:  It doesn't grant them status.  It's a

14   defer -- deferment of the deportation process.

15        MR. WALTERS:  It does defer, but the Supreme Court

16   said that there were several parts to the program.  And the

17   parts of the program that granted benefits and a -- a formal

18   status so -- it -- it held that because there was a -- a formal

19   application process where they granted a -- they made an

20   adjudication, is the term they used.  Where the agency used an

21   adjudication to say, This person qualifies for DACA status, and

22   it made them eligible for certain benefits.

23        THE COURT:  But DACA status, you're still an illegal

24   alien.  I just had --

25        MR. WALTERS:  Yes.

1    THE COURT:  -- a jury trial, I just saw the

2    documentation, and it said DACA statute -- record that they get

3    that still says, You are in the United States illegally.  It

4    just defers the deportation process.

5         So, let's not use defer -- granting status, because

6    they don't get status, they just don't get deported.

7         MR. WALTERS:  Okay.  I mean, that's true, Your Honor,

8    in the sense -- it's true that they do not have a lawful status.

9    They are still unlawful -- unlawfully in the country.  But the

10   Court did say that they are eligible for certain benefits --

11        THE COURT:  Uh-huh.

12        MR. WALTERS:  -- when they are granted DACA status,

13   and that was an affirmative act of the federal agency, and that

14   took it out of the lack of an enforcement.  And this -- this

15   circumstance is more like that in the sense that this is --

16   involves affirmative actions by the agency.

17        And in the DAPA case from 2015, the Fifth Circuit

18   case, it said that that provides a focus for judicial review.

19   When the agency takes an action, as opposed to declining to take

20   an action, which was like the *Texas versus U.S.* case from this

21   year, then that provides a focus for judicial review and it --

22   so I think the analysis is the same.  If the Court were to find

23   that this is reviewable under *Heckler versus Chaney* under the

24   APA, the -- the Supreme Court in the recent *Texas versus U.S.*

25   decision used the exact same analysis for the injury, whether it

1  was a judicially cognizable injury.  So I think the inquiry

2  would be the same.

3          So those -- it's not -- so the Supreme Court said

4  that that was a very unique sort of one-off circumstance it had

5  never faced before, where a state was trying to get a court to

6  order an agency to enforce the law against someone, to prosecute

7  people.  And that is --

8          THE COURT:  You've made it clear that's not what

9  you're trying to do.

10         MR. WALTERS:  Yes.  Yes, Your Honor.  We -- we -- yes.

11 All we are trying to do is -- is have them stop taking their

12 affirmative actions to destroy Texas' concertina wire, subject

13 to the prudent exceptions that Your Honor put in the temporary

14 restraining order, which Texas fully supports.  You know, human

15 life is paramount.  And we -- we have no objection to someone

16 destroying Texas' property if it is necessary to save someone's

17 life or serious bodily injury.

18         And the last thing, Your Honor, is just the balance

19 of -- of equities and public interest.  We've -- we briefed this

20 up and -- you know, the -- the public interest is -- if it's an

21 unlawful agency action, there's no public interest in that.  And

22 given that DHS -- the Border Patrol is able to perform its

23 duties in Brownsville and in El Paso without doing this, that

24 undermines the defendants' argument that they're being -- they

25 would be hobbled by an order from this Court that would affect

1  the public interest and the balance of injuries.

2          And if Your Honor has no questions for me, I -- I

3  will sit down.

4          THE COURT:  Okay.  Let me have the -- the government

5  make their opening statements.

6          MR. WALTERS:  Thank you, Your Honor.

7          THE COURT:  And I -- I will ask you questions as well,

8  counsel.

9          MR. EISWERTH:  Of course, Your Honor.

10          THE COURT:  Okay, counsel, the first question.  Why is

11  this such a point of contention if y'all are able to work with

12  the state in other areas?

13          MR. EISWERTH:  Your Honor, I -- I can't speak to why

14  Texas has placed the wire in a particular area.  And luckily

15  this motion doesn't raise whether the wire is good or bad.

16          THE COURT:  That wasn't the Court's question.  The

17  question is:  Why is this such a point of contention?

18          MR. EISWERTH:  So, I think one of the points of

19  contention here is -- so the wire starts at about from the boat

20  ramp at Shelby Park, and then goes four -- four -- a little over

21  four miles down the river in a continuous stream, dips in the

22  river, out of the river, and along those steep banks.  So there

23  is no other access point for agents to get to the migrants who

24  have crossed onto that shoreline, except to go through the wire.

25          Now, Mr. Walters mentioned that there are these

1  airboats on the -- the river and there -- there are four of

2  them.  But those boats typically seat about five people, and

3  having, you know, massive rescue operations, it's not what they

4  were designed to do.

5          THE COURT:  But at that point, isn't that where you're

6  supposed to be enforcing the immigration law; in the middle of

7  the river?

8          MR. EISWERTH:  Your Honor, once they have crossed the

9  international boundary.

10          THE COURT:  But they're not -- I saw one of the videos

11  that the parties have -- have brought in.  There are still

12  people on the Mexican side in the middle of the river.  At that

13  point, why isn't the federal government enforcing the

14  immigration law there?

15          MR. EISWERTH:  Your Honor, the infrastructure that's

16  in place there is not --

17          THE COURT:  But you're not even trying to stop them

18  there, counsel.

19          MR. EISWERTH:  The --

20          THE COURT:  You've got -- you've got the boat in the

21  water, and you've got the agents watching them stream in.

22          MR. EISWERTH:  Your Honor --

23          THE COURT:  So if you're trying to enforce immigration

24  law, why aren't you doing it at that point where there is no

25  wire?

1          MR. EISWERTH:  Your Honor, that is a call for the

2     agents to make on the ground as far as what specifically --

3          THE COURT:  I get it, but the issue before this Court

4     is the wire prohibits the federal government from doing its job,

5     right?

6          MR. EISWERTH:  Correct.

7          THE COURT:  That's -- that's basically --

8          MR. EISWERTH:  Yes, Your Honor.

9          THE COURT:  -- the government's position.

10          So my question is, at the point where the boat is,

11     there is no wire, they can do their job at that point, why are

12     they not doing it there?

13          MR. EISWERTH:  Your Honor, I -- I think part of the

14     issue is that the equipment that they have to do it, it's a

15     question of balance between the safety of the people crossing,

16     the safety of the agents.

17          THE COURT:  So you're basically saying you can't stop

18     people at that point and you can't have one of the agents ask

19     them, What are you -- do you have documents to come in?

20          Your agents at that point are watching people that

21     are not in the United States illegally enter the United States.

22          Now, your -- your declaration is basically that

23     y'all are needing to remove the wire so that you can process

24     people who have illegally entered the United States, but you're

25     right by the people that are illegally entering the United

1    States in the river, and you're not doing anything there.   Why?

2            MR. EISWERTH:   Your Honor, I -- how the agents go

3    about making a decision when --

4            THE COURT:   I -- and I'm -- I'm not questioning the

5    agents.   I -- I've been down here for many years.   I know the

6    agents are doing what they're instructed to do.   I don't have a

7    problem with the individual agents.

8                But my question is, the position of the government

9    is you need to cut the wire to enforce federal law in that part

10   of the river.   Okay.   I understand that.

11           MR. EISWERTH:   Yes.

12           THE COURT:   But you have agents in the middle of the

13   river, where technically at that point you could prevent people

14   from even entering the United States that would -- that would

15   need to be processed, and you're not doing that.   And there

16   isn't any wire that prevents you that -- there, there isn't any

17   state action that prevents you from doing it there.   But

18   you're -- you're waiting until they get to the bank, to the

19   wire, to then have to enforce the law.   Why is that?

20           MR. EISWERTH:   Well, Your Honor, I think once they've

21   crossed the boundary line --

22           THE COURT:   Okay, but I'm talking about the people

23   that have -- that are right at that point, they haven't crossed

24   into the United States where the boat is, right?

25           MR. EISWERTH:   Uh-huh.

1    THE COURT:  I'm assuming the boat is in U.S. waters.

2 Right?

3    MR. EISWERTH:  Fair enough.

4    THE COURT:  So, the boat is in U.S. waters, the

5 people -- some people are still in Mexico, why are they not

6 doing their duty at that point?  Why are they waiting until they

7 get to the wire to then enforce the law?

8    MR. EISWERTH:  A couple responses, Your Honor.

9    THE COURT:  Okay.

10    MR. EISWERTH:  So first, you know, if you're on the

11 Mexican side of the -- the line, there's no jurisdiction there

12 to do that.

13    THE COURT:  I understand that.

14    MR. EISWERTH:  Yeah.  And then as I understand it, it

15 is a function of capability at that point.  Now, could they, you

16 know, ask, Please turn around.  And maybe some will, maybe some

17 won't.  I -- that seems to depend very much on who the

18 individuals are and what -- the judgments being made at that

19 point.

20    Once they have crossed the boundary line, federal

21 law --

22    THE COURT:  That's a different story.  They're in the

23 United States.

24    MR. EISWERTH:  Yes.  And so -- you know, I recognize

25 the --

1          THE COURT:   So if you come to the port of entry and

2    you're crossing the bridge --

3          MR. EISWERTH:   Uh-huh.

4          THE COURT:   -- there is a stoppage point in the middle

5    of the bridge.   And at that point CBP agents either stop them

6    from entering the United States and turn them back, or they let

7    them in.   Why can you do it in the middle of the bridge, but you

8    can't do it anywhere else?

9          MR. EISWERTH:   So, in the middle of the bridge, my

10   understanding is that is where there's a -- I don't know --

11   buffer zone, for lack of a better term.   But --

12         THE COURT:   It's right on the -- it's right on the --

13         MR. EISWERTH:   Right.

14         THE COURT:   -- it's right on the U.S. side of that

15   middle line.

16         MR. EISWERTH:   But in order to cross that, they can

17   require a showing of papers at that point.

18         THE COURT:   Right.   And so --

19         MR. EISWERTH:   And that --

20         THE COURT:   -- so CBP is enforcing the law in what

21   would effectively be the American side of the middle of the

22   river on the --

23         MR. EISWERTH:   Uh-huh.

24         THE COURT:   -- on the bridge, but they're in the

25   middle of the river and they're not doing it.

1          MR. EISWERTH:  I understand, Your Honor.  I think -- I

2     think practicalities are a big part of that as far as they can

3     control the environment on the bridge that makes that process

4     orderly.  When you have the stream of migrants all the way

5     across and it's --

6          THE COURT:  So do you think it's a good look, counsel,

7     to have your Border Patrol agents watching people illegally

8     enter the United States in the middle of the river?  Do you

9     think that's a good optic?

10          MR. EISWERTH:  Your Honor, I don't think that is

11     anybody's desired outcome for that to continue.  I think the --

12     the agents on the ground, once they got --

13          THE COURT:  They're having a tough time.

14          MR. EISWERTH:  Yes.

15          THE COURT:  Yeah.  They are.

16          MR. EISWERTH:  And, you know, I -- I think what the

17     record will show is that they are doing this either because a

18     situation has arisen where they have to go in and provide

19     emergency assistance, or they can see it's going to happen in a

20     short period of time.

21              My understanding is last month it was, you know,

22     well over a hundred degrees down here on the bank.

23          THE COURT:  Uh-huh.

24          MR. EISWERTH:  And so to leave the people pinned on

25     the bank there -- because there's not -- the way the wire is

1  situated, it's not easy to -- to go along the bank.  You're

2  getting back in the river, which with this population, at least

3  for some of them, is -- is dangerous.

4          THE COURT:  Why?

5          MR. EISWERTH:  Well, with the rocks --

6          THE COURT:  They just crossed the river.

7          MR. EISWERTH:  They did.

8          THE COURT:  Okay.  So why is it dangerous?

9          MR. EISWERTH:  It -- it's just increased time in the

10 river and walking along --

11         THE COURT:  I understand.

12         MR. EISWERTH:  -- and walking along.

13         THE COURT:  And I understand what you're saying.  And

14 I'm not trying to -- at all say, counsel, that it's anybody

15 else's business to enforce immigration law other than the

16 federal government.

17         MR. EISWERTH:  Uh-huh.

18         THE COURT:  It is your -- it is your job, it is your

19 jurisdiction.  The question is, though -- it appears to be that

20 there is a certain amount of -- of fight here over this wire

21 that is not anywhere else.  And if you can cut the wire in one

22 location to let them in, why do you have to cut it ten feet over

23 or 15 feet, or why do you have to drag it with a -- with a chain

24 on a truck?

25         MR. EISWERTH:  So, Your Honor, I -- you will hear from

1  witnesses later that can describe specifically why this was

2  done.  My understanding is as the migrants -- and that day it

3  was almost -- there was over 2500 came through on that pass.

4  And so as they are wet and soaking and walking up that silt, it

5  becomes slippery and they start sliding down, and so it's

6  necessary to move over to allow them so that they're not just

7  falling back in.  And then doing --

8          And then the third time that it was to -- that's why

9  the rope was lowered, was to allow them to pull themselves up.

10          THE COURT:  I didn't see a rope.  I'm not talking

11  about a rope.  I don't know what you're talking about.  What

12  rope?

13          MR. EISWERTH:  I -- I believe that some of the -- the

14  videos --

15          THE COURT:  The video will show that?

16          MR. EISWERTH:  -- or the complaints --

17          THE COURT:  I didn't see a rope.

18          MR. EISWERTH:  Yes.

19          THE COURT:  Okay.

20          MR. EISWERTH:  Or off the back of the truck.  And --

21  but -- but the reason was that the agents on the ground at the

22  time decided that the way they were coming up there was no

23  longer safe or it wasn't effective, and so it was necessary to

24  try a different part of the -- of the bank.  It wasn't done

25  purely as a way to, Let's cut three, four, five holes.  It

1  wasn't anything like that.

2          THE COURT:  Okay.  Keep going.

3              OPENING STATEMENTS BY THE DEFENDANTS

4          MR. EISWERTH:  Okay.  So, Your Honor, I'd like to

5  start first where Mr. Walters did, which was with 8 U.S.C.

6  1252(f)(1), which bars the Court from entering an injunction to

7  the extent it has the effect of restraining the inspection of

8  these individuals.

9              And when an agent identifies somebody who has, you

10 know, crossed the river, has illegally entered the United

11 States --

12         THE COURT:  And so let me stop you there, counsel.

13         MR. EISWERTH:  Sure.

14         THE COURT:  I'm not saying what this Court's going to

15 do, but if this Court were to say you're enjoined from cutting

16 the concertina wire, how does that impair your ability to do

17 your job in terms of inspecting or arresting anybody?

18         MR. EISWERTH:  Sure.  So an individual is standing on

19 the bank, wire, agent on the other side.

20         THE COURT:  Uh-huh.

21         MR. EISWERTH:  That inspection starts as soon as the

22 eyes are laid on the individual, assessing whether they're

23 dangerous --

24         THE COURT:  And you're saying that's in the middle of

25 the river; that's when the agents first lay eyes on most of

1  these people, right?

2          MR. EISWERTH:  Sure.  But -- but at the point --

3          THE COURT:  Okay, but that's not where the inspection

4  is taking place.  They're waiting until they get up on the

5  river.  So my question is:  How does -- if the Court were to

6  enjoin you from cutting the wire, how does that stop you from

7  asking a person, Do you have documents?  Do you have status

8  here?  What are you doing?

9          MR. EISWERTH:  Because that inspection is an ongoing

10  process from when they immediately lay eyes on them; to assess

11  whether they're dangerous, they're carrying contraband; to when

12  they apprehend them or initiate the encounter; to then escort

13  them, in this instance, down to under the port of entry, which

14  is where they're sorting and determining, you know,

15  unaccompanied children, families, single adult -- adult males,

16  and which pathway they go down.  So that process --

17          THE COURT:  And isn't there a border wall there from

18  the federal government in that area?  Close to the --

19          MR. EISWERTH:  I don't --

20          THE COURT:  -- close to the golf course, which is

21  close to the port of entry?  And the reason I'm asking is, I

22  signed the first condemnation orders for land for the secure

23  border wall in -- in the country, and it was for that wall by

24  the port of entry.

25          MR. EISWERTH:  So when I was there yesterday, I

1  observed storage containers with concertina wire, which I

2  understand were placed by Texas.  On that part, I didn't see any

3  border -- federal border wall near the golf course.

4         THE COURT:  There's one by the golf course, which is

5  close to the port of entry.

6         MR. EISWERTH:  Right.  I -- I don't believe it was

7  there when I saw it yesterday.  But there was a state wall, I

8  understand, further up, about a mile or two up and a little bit

9  back.

10        THE COURT:  I don't know about that.

11        MR. EISWERTH:  But -- but when I was --

12        THE COURT:  But that's not an issue in this case,

13  right?

14        MR. EISWERTH:  Yes.  No, that is not an issue in this

15  case.  But my point is, Your Honor, that injunction would have

16  the effect of preventing that inspection from continuing,

17  preventing the apprehension because --

18        THE COURT:  I've got to disagree with you on that,

19  counsel.  If you're telling me a piece of wire is preventing

20  Border Patrol from doing its job, I really would have to digress

21  with you on that one.

22        MR. EISWERTH:  I'm not saying it's preventing them

23  entirely from doing the job.  I'm saying it has -- it's an

24  impediment.  They either have to go miles upriver and then back

25  downriver to get them, or they have to get through at some

1  point.   And my understanding is, at least over the last week,

2  the migrants have begun just putting their clothing over the

3  wire and coming over themselves.   And at which point, then the

4  agents are apprehending them, oftentimes because Texas has

5  called the Border Patrol to alert them that they're there.

6            So my point is that the injunction would have an

7  effect or restraint on that inspection process under 1225.

8  Because as soon as somebody crosses the international boundary

9  and they are an applicant for admission, then the Border Patrol

10  has a duty to inspect them from the beginning.

11       THE COURT:   And the beginning's in the middle of the

12  river where you boat with your agents are sitting.   That's the

13  beginning.   And it doesn't start there.

14       MR. EISWERTH:   I -- I do believe the agents are

15  assessing the group as they're -- as they're coming there.

16       THE COURT:   They're asking them at that point, and

17  they're following them to the -- to the banks of the river?

18       MR. EISWERTH:   Your Honor, I would disagree that the

19  inspection starts simply with questioning.   I believe it's part

20  of the --

21       THE COURT:   Counsel, you're the one that's arguing

22  that it's an ongoing process that starts when the person enters

23  the United States.

24       MR. EISWERTH:   Yes, Your Honor.

25       THE COURT:   They enter the United States in the middle

1    of the river where your boat is sitting, and it's not starting

2    there.

3          MR. EISWERTH:  Your Honor, I -- I do believe those

4    agents are making an assessment of the group that's crossing.

5          THE COURT:  So what assessment are they making?  Are

6    they asking them whether they have documents?  Are they asking

7    them anything?

8          MR. EISWERTH:  I -- I mean, in any given instance they

9    could be asking them something, but I believe all the agents are

10   assessing are these people -- you know, what is the makeup of

11   this group, what is -- you know, do they present any danger, can

12   I observe contraband from the beginning.  And that process has

13   to continue until they are processed.  It is --

14         THE COURT:  Okay, but the bottom line is, y'all aren't

15   starting, really, that process until they get to the wire.

16   That's the reality of it, right?  Until they get to the bank.

17         MR. EISWERTH:  I mean, I think that's where a good

18   portion of it is -- is starting.

19         THE COURT:  Okay.

20         MR. EISWERTH:  I'm not --

21         THE COURT:  So that's really where everything starts.

22         MR. EISWERTH:  Right.  But the wire is preventing

23   the -- it is impeding agents from apprehending them at that

24   point.

25         THE COURT:  It's making it more difficult.

1  MR. EISWERTH:  Yes, Your Honor.  And that is -- I

2  think what 1252(f) is designed to prevent.  In the *Aleman*

3  *Gonzalez* case from two years ago, which is <u>142 S.Ct. 2057</u>.  And

4  it refers to orders that inhibit particular actions, or the

5  enforcement of those provisions.  Which respectfully, I do think

6  includes --

7  THE COURT:  So you're basically saying the Court's

8  injunction is preventing you from doing your job because I'm

9  saying you can't cut the wire?

10  MR. EISWERTH:  I'm saying it's having an effect and

11  it's hindering the agents from doing --

12  THE COURT:  Okay, that's my question.  You're saying

13  that my injunction is preventing the Border Patrol from doing

14  its job?

15  MR. EISWERTH:  And -- and my answer is, I'm not saying

16  it's prohibiting or preventing, I'm saying it's hindering that

17  effort.

18  THE COURT:  Okay.  I just want to get that clear.

19  Okay.  Go ahead.

20  MR. EISWERTH:  Texas mentioned that one way to get

21  around this would be to construe any order as a stay of agency

22  action under 5 U.S.C. 705.  I -- I don't think that works here

23  because the authority to cut the wire comes from federal

24  statutes and not from any policy.

25  THE COURT:  I'm listening.

1        MR. EISWERTH:   And that restraining any policy
2   whether -- which we disagree exists, but restraining that would
3   not have the effect of stop -- of taking away the agents'
4   authority to cut the wire; it would be, in fact, an injunction
5   which prohibits them from doing so.   Which would fall clearly
6   within the bounds of 1252(f).
7        If I may touch on the state law claims.   Texas has
8   to show that there's been a waiver of sovereign immunity here.
9   And I think 702, for a variety of reasons, does not include
10  injunctions -- or seeking injunctive relief under state tort law
11  against the federal government.   And there's a couple reasons
12  for that.
13       First, Texas has pointed to one case ever, and that
14  is the only one I am aware of that has even suggested or could
15  be read to allow a state tort law claim to serve as the basis of
16  an injunction with the APA.   Congress, when it dealt with state
17  tort actions, clearly set out the FTCA.   It is a, you know,
18  meticulous scheme.   It is complicated.   It is the way these
19  tort -- type things are meant to be done.   It is a limited
20  waiver for monetary relief and not for injunctive relief, which
21  suggests that the later passed 702 part of it did not need to
22  include that and that Congress did not mean to upset that scheme
23  that it had created that way.
24       If the Court were to read 702 to allow a state tort
25  action in this area, it would create, actually, a quite odd

1  situation where there would be only subject matter jurisdiction

2  under a statute if somebody brought a federal claim along with

3  it and the Court chose to exercise supplemental discretion.

4      This isn't a federal question under 1331; it's not

5  an FTCA claim under 1346.  And while Texas suggests that 13 --

6  18 U.S.C. -- or -- sorry.  28 U.S.C. 1356 might be a basis for

7  it.  The cases that have interpreted that provision, dating back

8  to Chief Justice Marshall, have said trespass to chattels is not

9  what that's talking about.

10      And so you'd have this odd situation where Congress

11  would be essentially saying that Texas could bring this claim,

12  but only if it piggybacked with another claim.  And all of those

13  cases, with the exception of the one, the -- *Green Energy*, I

14  believe it's called -- deals with the situation where courts are

15  citing other federal statutes and whether they are included

16  within 702 and issuing dictums saying, We read 702 broadly to

17  include this.

18      As I said, Your Honor, we just simply don't think,

19  given the way things operate, given the Fifth Circuit's

20  statements in *Supreme Beef Processors* regarding state law's

21  ability to impair federal operation, then Judge Kavanaugh's

22  concurrence in the *El Shifa* case, we don't think 702 covers a

23  waiver that applies to this motion here.  But even if you read

24  it, too, we'd run headlong into the Supremacy Clause, and,

25  specifically, intergovernmental immunity.

1          And while there are two strands of this doctrine,

2    the one clearly that the Supreme Court recognized last year in

3    *United States v. Washington* still applies, which is that state

4    law cannot be used to regulate the federal government or to

5    impede how it conducts its operations.

6          THE COURT:  Okay, so that's the bottom line here.  The

7    question for the Court is:  How are the federal government's

8    operations impeded by items on private land; whether it's the

9    State of Texas or private landowners?

10          Let's assume for a moment you have a landowner that

11   puts up a chain-link fence.  Right?  What action could they take

12   if the federal government goes in and destroys the fence?

13          MR. EISWERTH:  So, as a practical matter, there's

14   certainly negotiations that happen.  And -- and -- you know, as

15   with other things on the border, they try and work this out

16   because it's a relationship that's not going to change.

17          THE COURT:  And that's my question in this case.

18   Y'all work it out everywhere else, why not in Eagle Pass?

19   What -- why is this such a point of contention for the parties?

20   Because the federal government is putting up border walls, the

21   federal government has put up border walls, the federal

22   government cooperates with the state, the state cooperates with

23   the federal government.  I see it every day in my court except

24   in this one area in this one place.  Why is this such a point of

25   contention?

1        MR. EISWERTH:  Your Honor, all I can speak to is why

2    the wire has to be cut in this circumstance, and it's --

3        THE COURT:  I get that, counsel.  And I saw the

4    videos.  And not everybody coming in has a medical emergency.

5        MR. EISWERTH:  Uh-huh.

6        THE COURT:  Okay.  So the question becomes:  Why is

7    this such a point of contention for the parties?

8        MR. EISWERTH:  Your Honor, I --

9        THE COURT:  You forget, I've been in this division for

10    at least 34 years in various capacities.  I have seen this

11    almost all of my life.  I have see the parties work and not work

12    together.  But the bottom line is, this one is just the most

13    incredible lack of cooperation between the parties, and I'm not

14    understanding why.  If you're going along building border walls

15    just down the river from where this is, why is this such a

16    problematic part?

17        MR. EISWERTH:  Your Honor, what I can say is in line

18    with the -- the fence or the gate example.  If there's a way to

19    access the migrants, if there's a way to access the river in the

20    border area without destroying property, that's what Border

21    Patrol does.

22        THE COURT:  Right.

23        MR. EISWERTH:  The problem here is it's four miles,

24    and there's no access point except to go through the wire.

25        THE COURT:  And there's 445 miles of border, and

1  you're fighting over four.  Okay.

2        MR. EISWERTH:  Okay.  So the -- that last point I

3  would like to touch on is --

4        THE COURT:  Sure.  Go ahead.

5        MR. EISWERTH:  -- is just the -- well, sorry.  Two

6  final points.  One is the -- the claim that this is not

7  authorized by federal law.

8        THE COURT:  Uh-huh.

9        MR. EISWERTH:  And I just want to briefly walk through

10 the statutes as we did in the brief, which is -- Congress has

11 assigned to DHS, and specifically to the Border Patrol, duties

12 to protect the border.  And that includes necessary actions to

13 apprehend individuals.

14       THE COURT:  Uh-huh.

15       MR. EISWERTH:  Specifically in 1357, they can go on

16 private lands.  As you mentioned, there are gates that end up

17 getting broken.  If it can't be worked out, there is a mechanism

18 to seek compensation from the -- the government.  You could also

19 file an FTCA claim of some kind in these common tort areas of

20 getting compensation for it.  But the point is, in those

21 situations the government is -- the federal government

22 (COUGHING) excuse me.

23       THE COURT:  Yes, sir.

24       MR. EISWERTH:  The federal government is not going to

25 allow private or any action to impede those actions if the

1  agents determine it's necessary to get to that point at that

2  time.

3        THE COURT:  Okay.  And so what is the process for them

4  making that determination?

5        MR. EISWERTH:  It's going to be an on-the-ground

6  assessment of factors.  So, for instance, if you have --

7        THE COURT:  So it's -- every individual agent makes

8  that determination?

9        MR. EISWERTH:  Yes, Your Honor.

10        THE COURT:  So you're saying that every agent has the

11  discretion and the power to or not to destroy private property

12  or anybody else's property?

13        MR. EISWERTH:  If -- if the individual agent decides

14  that in this instance it's necessary to cut the wire, either to

15  apprehend those individuals at that point --

16        THE COURT:  Right.

17        MR. EISWERTH:  -- to provide medical care, they're

18  authorized to make that determination.  Now --

19        THE COURT:  Okay.  So that's what I'm asking you.

20  What you're basically saying is the federal government has

21  delegated the authority down to the individual agents to make

22  those assessments and determine if or when or how to do -- and I

23  don't want to use the word "destroy" -- to remove and/or cut

24  wire and/or destroy property to execute their duties.  Something

25  they're not willing to do when they're in the middle of the

1  river unimpeded, but that they have to do on land.

2       MR. EISWERTH:  There is no -- I'm going to be very

3  clear.  There's no requirement from headquarters or anywhere

4  that the wire must be cut.

5       THE COURT:  No, I realize that.  But --

6       MR. EISWERTH:  It's --

7       THE COURT:  But what I'm -- but what you're telling me

8  is, though, there is an order from headquarters that every agent

9  has that discretion to take whatever action is necessary to do

10  what -- to -- to engage in the -- in their duties?

11       MR. EISWERTH:  I -- I would say that comes from the

12  statute rather than an order from -- from the agency.  But --

13  but, yes, each individual agent.  Like a police officer pursuing

14  a suspect; if they go through a door or something, that is --

15  that is made at that -- at that point in time by the individual

16  officer.

17       THE COURT:  Yes, but you're talking about exigent

18  circumstances.  We're not talking about, necessarily, exigent

19  circumstances in these cases.  We're talking about cutting the

20  wire to let people stream in.  Some may be in a -- in a bad way

21  medically, some may not be.

22       MR. EISWERTH:  And I understand, Your Honor.  And I

23  want to be very clear here as far as -- you have a stream of

24  people and there may be some individuals that need --

25       THE COURT:  Uh-huh.

1    MR. EISWERTH:  -- medical attention right then --

2    THE COURT:  Right.

3    MR. EISWERTH:  -- so the wire's cut and they go in to

4    do that.

5    THE COURT:  Right.

6    MR. EISWERTH:  You are then left with the others there

7    and it's a determination of how to apprehend them most

8    efficiently, as far as the deployment of resources.

9    THE COURT:  So this is a matter of convenience for the

10   federal government.  What is convenient for them in deploying

11   and engaging in their duties and responsibilities.

12   MR. EISWERTH:  I would -- I would say it's more an act

13   of discretion in how they prioritize responding to this issue

14   that they're charged by law with, yes.

15   THE COURT:  Okay.  And -- and you're basically saying

16   every agent has the discretion to make the decision to or not to

17   cut wire?

18   MR. EISWERTH:  If -- if they --

19   THE COURT:  Pretty much.

20   MR. EISWERTH:  -- if the agent deems it necessary to

21   do -- to perform his or her duties, then, yes, he has the

22   authority to do that.

23   THE COURT:  Okay.

24   MR. EISWERTH:  And lastly, I'd just like to touch on

25   the -- on the APA arguments.

1    THE COURT:  Uh-huh.  Sure.

2    MR. EISWERTH:  And specifically the committed to

3  agency discretion, because I think there's a point that's been

4  lost so far.  Which is we're not -- this isn't a claim that any

5  law enforcement -- or any enforcement of a statute is

6  unreviewable.  That's certainly not the claim we're making.

7    What we're saying here is given the number of

8  factors that go into each individual circumstance where the

9  agent is making the decision to cut or not to cut, there's no

10  way of judging that ex ante whether a medical emergency exists

11  or is likely to exist -- because what happens here a lot of

12  times is that agents, in their experience, can perceive that one

13  is going to happen and that -- for instance, if all these

14  migrants are crowding on the bank, there needs to be a release,

15  otherwise, people are going to start going down the river.  And

16  so they'll cut the wire -- or could cut the wire at least at

17  that point to make the determination, We need to process them.

18    They're outnumbered a lot of times when these groups

19  are here, and so it's an issue of controlling what they can

20  control, to do it in a way that is safest for the agents.

21    THE COURT:  So then it's not for the safety of the

22  aliens anymore, it's for the safety of the agents.

23    MR. EISWERTH:  It's both.

24    THE COURT:  Okay.

25    MR. EISWERTH:  These are all the considerations that

1  go into it.  I'm not trying to -- what I'm saying is, there
2  isn't one factor.
3        THE COURT:  Okay, so -- so, counsel, address the
4  matter raised in terms of saying, But then they let these folks
5  walk on their own to the port of entry.
6        MR. EISWERTH:  I -- I don't think that's what the
7  record --
8        THE COURT:  You don't -- you're not --
9        MR. EISWERTH:  I -- I would not agree with that.
10        THE COURT:  You're not aware of that.
11        MR. EISWERTH:  In -- in the instances at least -- in
12  this four-mile stretch we're talking about --
13        THE COURT:  Uh-huh.
14        MR. EISWERTH:  -- at least a -- so you have the
15  concertina wire on one side --
16        THE COURT:  Sure.
17        MR. EISWERTH:  -- and on the other side there's fence.
18  So it's like a channel or a road that they're going on.
19        THE COURT:  Right.  Right.
20        MR. EISWERTH:  They are being moved up to the port of
21  entry at that point under the POE II, and that is where they are
22  being -- that is where the -- the sorting is happening, and
23  that's where they are then leaving to go to the processing
24  centers.  And my understanding is that has been the protocol,
25  and that is what is happening in these instances.

1          THE COURT:   Okay.

2          MR. EISWERTH:   Now, how many agents are stationed how

3    far along what road, I -- that is something --

4          THE COURT:   You don't know.   Okay.

5          MR. EISWERTH:   I don't.

6          THE COURT:   Okay.   All right.

7          MR. EISWERTH:   But that's my understanding of that's

8    what's happening.

9          THE COURT:   Okay.   Go ahead.

10          MR. EISWERTH:   And than -- and then, finally, as to

11    irreparable harm, to the extent we're talking about the price of

12    wire here, this isn't a family heirloom that's irreplaceable.

13    It is -- there's money that we can -- a dollar amount we can put

14    on it, and that's where you go seek money damages for.

15               As far as the -- the other claims costs, you know,

16    no state can bring parens patriae suit against the federal

17    government.   And in the *United States v. Texas* case, the Supreme

18    Court went through and said attenuated costs like this are --

19    you know, are very difficult to --

20          THE COURT:   Is this attenuated, or is this a direct

21    cost to the state if they're paying for the wire?

22          MR. EISWERTH:   Well, I -- I think the issue with the

23    declarations that have been submitted so far are that it never

24    actually ties those costs to any of the individuals that would

25    or would not make it across the wire here, and so there's a

1  disconnect between costs in general from migrants being --

2  THE COURT:  No, I'm just talking about the cost of the

3  wire directly to the state.  Not the cost of supporting people

4  as they come in.

5  MR. EISWERTH:  No, no.  I -- I would -- sorry.  I

6  would try -- I would keep those separate.  I'm talking about the

7  indirect costs of educating and providing medical care --

8  THE COURT:  Right.

9  MR. EISWERTH:  -- and those sorts.

10  And then last, to the equities.  The only thing I

11  would add there is any time the Supremacy Clause is not being

12  followed, that is an inherent injury to the federal government

13  that falls into that balance of equities.

14  THE COURT:  Okay, so let -- back up for just a quick

15  second, because that also ties into whether or not -- what type

16  of preemption the federal government has on the immigration

17  matter.  Because when you read Arizona -- *U.S. versus Arizona*,

18  basically the Supreme Court goes through all sorts of analysis,

19  but in the final analysis, it's conflict preemption; is it not?

20  MR. EISWERTH:  I believe that's how Arizona comes out

21  and --

22  THE COURT:  So if it's conflict preemption, there's

23  got to be a conflict between the actions to the United States

24  authority for it to be -- for it to be preempted and the

25  Supremacy Clause to have some degree of -- of play.

1    MR. EISWERTH:  So, I -- I believe generally that's --

2    that's how we would do the analysis under conflict preemption.

3    I think here, actually, the better doctrine to follow is

4    intergovernmental immunity, which is the state attempting to

5    regulate how the government -- how the federal government is

6    performing its operations.

7        THE COURT:  Well, I've got to tell you, counsel, I

8    don't necessarily buy into that.  I don't.  And the reason is no

9    one is preventing the federal government from doing its job.

10   It's maybe preventing it from doing it at their convenience, or

11   what's easier for the federal government, but nobody is

12   prohibiting the federal government from enforcing immigration

13   law --

14       MR. EISWERTH:  But, Your --

15       THE COURT:  -- or processing aliens.  It's just a

16   question of when, where, and how they can come in and they can

17   go to the processing center.  So I'm not really sure -- you may

18   need to address that.  And maybe that's a matter for a later

19   briefing, which is fine.

20       MR. EISWERTH:  Okay.  And we -- we would be happy to

21   submit whatever briefing Your Honor would like.

22           But the point I -- the last point I would just like

23   to make on that point is one -- and forgive me if I wasn't

24   articulate enough before.  When I say "prevent," I'm talking

25   about hindering and in some way regulating.

1      So, for instance, the -- the *GEO Group versus Newsom*

2  case out of the en banc Ninth Circuit --

3      THE COURT:  Well, that's the wrong circuit to cite in

4  this court, counsel.

5      MR. EISWERTH:  It was en banc though, so it was a good

6  mix.

7      THE COURT:  It's still the wrong circuit to cite here.

8      MR. WALTERS:  But -- but in that situation, California

9  had tried to determine how the government was transporting the

10  migrants and who could be certified and who couldn't, and how

11  that was done.  And, yes, it's not stopping them.  You could

12  have Border Patrol agents do it as opposed to the contractors,

13  but that -- that limitation creates the -- sufficient conflict

14  for intergovernmental immunity.  And that -- that in and of

15  itself is barred by the Supremacy Clause.

16      THE COURT:  Okay.

17      MR. EISWERTH:  So that -- Your Honor --

18      THE COURT:  And I'm going to give everybody the

19  opportunity to brief whatever needs to be briefed beyond this

20  point as well.

21      MR. EISWERTH:  We -- we appreciate it, Your Honor.

22      Thank you.

23      THE COURT:  All right.  First witness, counsel.

24      MR. BRYANT:  Your Honor, the State calls Michael

25  Banks.  And we'd like to invoke the rule.

1          THE COURT:   Okay.   And who -- how many witnesses do we

2    have in the courtroom on -- on this matter?  I'm not -- I'm not

3    seeing any other witnesses.

4          MS. LOWRY:   We have a witness of our own, Your Honor,

5    but he's in the U.S. Attorney's Office space, so we don't --

6          THE COURT:   Okay, so we don't have to worry about the

7    rule.

8          MS. LOWRY:   -- have any present in the courtroom.

9          THE COURT:   Okay.   Got that.   So it looks like we

10   don't have any other witnesses here.

11

12                        MICHAEL BANKS,

13   having first been duly sworn, testified to the following:

14

15          THE COURT:   Proceed.

16          MR. BRYANT:   Your Honor, first the State of Texas

17   would like to offer into evidence the exhibits, Plaintiff's One

18   through 73 that are in the notebooks that have been provided to

19   the Court, as well as to the defendants.

20          THE COURT:   Okay.   Counsel, objections to one through

21   73, for purposes of this hearing only?

22          MR. EISWERTH:   No objection, Your Honor.

23          THE COURT:   All right.   So admitted.

24      (PLAINTIFF'S EXHIBITS ONE THROUGH 73 ADMITTED)

25

DIRECT EXAMINATION

BY MR. BRYANT

Q    Please state your name for the record.

A    Michael Banks.

Q    Where do you currently reside?

A    I currently reside in Mission, Texas.

Q    And how are you currently employed?

A    I'm employed by the Office of the Governor for the State of Texas.

Q    And in that position, are you informally referred to as the Texas Border Czar?

A    Yes, sir.

Q    Where do you maintain your principal office?

A    McAllen, Texas.

Q    Have you served in the U.S. military?

A    Yes, I served for ten years in the Navy.

Q    And did you serve in the Navy military police?

A    Yes.

Q    After you completed your military service, what was your first job in law enforcement?

A    U.S. Border Patrol as a Border Patrol agent.

Q    And how long in total were you with the U.S. Border Patrol?

A    Right at 23 years.

Q    In what states did you serve with the U.S. Border Patrol?

A    I served in California, Arizona, Texas, Washington State,

1   and Washington, D.C.

2   Q    How many years in total did you serve as a Border Patrol

3   agent on the southern border of Texas?

4   A    I'd say about a year and a half outside -- in Texas?

5   Q    Yes.

6   A    I believe about eight or nine.

7   Q    And did you serve as the U.S. Border Patrol McAllen station

8   agent in -- in charge?

9   A    I did.

10   Q    What years?

11   A    From 2019 to 2021.

12   Q    And did you serve as acting deputy chief of law enforcement

13   operation -- operational programs at the U.S. Border Patrol

14   headquarters in Washington, D.C.?

15   A    Yes, I did.

16   Q    When did you hold that position?

17   A    About mid-2021 to mid-2022.

18   Q    Did you serve as the U.S. Border Patrol Weslaco Station

19   agent in charge?

20   A    Yes.

21   Q    And when did you serve in that role?

22   A    Mid-2022 to my retirement date of January 2023.

23   Q    When did you accept your current position working for

24   Governor Abbott?

25   A    Within a week of retirement.  I believe it was -- it was

1  late January, somewhere between the 25th and the 30th.  I don't

2  remember the exact date.

3  Q    Of 2023?

4  A    Of 2023.

5  Q    Okay.  What generally are your responsibilities in your

6  current position as the border czar?

7  A    So, I do a lot of collaboration.  I work with --

8  collaborating with local state law enforcement municipalities,

9  mayors, judges in the areas.  I collaborate with Texas Military

10  Department, Operation Lone Star, Texas DPS.  If -- if they're

11  assigned to Operation Lone Star, I have the overall oversight of

12  that.

13  Q    Okay.  Now, Plaintiff's Exhibits 70 through 73, which are

14  in evidence, which are N, O, P, and Q in the notebooks, describe

15  some announcements and -- regarding your announcement of your

16  appointment and actions that you have taken in 2023 to date.

17          MR. BRYANT:  I just make that reference for the

18  Court's reference in case the Court might wish to refer to it at

19  some point.

20  Q    (By MR. BRYANT) In your current role, do you work regularly

21  in all areas of the southern Texas border?

22  A    I spend about 95 percent of my time on the southern border.

23  Q    And does that include the Del Rio and Eagle Pass areas?

24  A    It includes Del Rio and Eagle Pass.  I've spent quite a bit

25  of time in Del Rio and Eagle Pass over the last several months

1  due to the current migrant surge.

2  Q    As a Border Patrol agent and in your current position, did

3  you observe deterioration of conditions in the -- on the -- on

4  the Texas border in terms of criminal or unlawful activity from

5  2020 to 2023?

6  A    Yes.  Absolutely.

7  Q    Are you familiar with the 2021 Disaster Declaration by the

8  governor of Texas, which is Exhibit 12, Plaintiff's Exhibit 12?

9  A    Yes, I am familiar.

10  Q    Did it include Maverick County, Texas, and -- and most or

11  all of the counties in south Texas that are near the southern

12  border of Texas?

13  A    Yes, it did.

14  Q    You were with the U.S. Border Patrol at that time.  Did you

15  support the governor's Border Disaster Declaration in 2021?

16  A    I did.

17  Q    Why did you do that?

18  A    Because a growing number of Border Patrol agents were

19  pulled off the line to process, leaving masses -- massive spots

20  of the border open.  We needed help.  We were being overrun.

21  Q    What is Operation Lone Star that we already referred to in

22  your testimony?  Could you explain for the Court --

23          MS. LOWRY:  Objection, Your Honor.

24          MR. BRYANT:  -- what that is.

25          MS. LOWRY:  The witness is appearing to speak on

1  behalf of CBP in its -- in his former official role as a CBP

2  employee.  And so I'd like to clarify that he is -- in his

3  personal capacity, he is not a CBP employee, and that is the

4  scope of his testimony.  If he is testifying as to while he was

5  an official CBP employee and wearing that official hat, I would

6  object.

7          THE COURT:  Okay.  I'm -- I understood the question to

8  be about Operation Lone Star, as now the commander of that

9  program.  Correct?

10          MR. BRYANT:  Yes, Your Honor.

11          THE COURT:  Okay.  That's the way I'm understanding --

12          MS. LOWRY:  He was specifically, Your Honor, though,

13  asking about 2021, when he was a CBP employee.

14          THE COURT:  He was asking him what he did as a CBP

15  employee and what he accepted as a CBP employee.  I'm not -- I'm

16  not sure that -- I didn't take it to mean that he now has an

17  opinion based on that time as a CBP rep.

18          MS. LOWRY:  To clarify, yes, not as a CBP --

19          THE COURT:  Okay.  I'm not taking it as such.

20          MS. LOWRY:  Thank you, Your Honor.

21          THE COURT:  Okay.  Go ahead.

22  Q.  (By MR. BRYANT) What is Operation Lone Star?

23  A.  Operation Lone Star is an operation that originally started

24  out with DPS.  And the specific purpose of Operation Lone Star

25  was to provide law enforcement officers into areas where there

1  were no Border Patrol agents patrolling due to the mass

2  processing.  And so as that -- the -- the surge continued, those

3  gaps grew wider.  And currently, Operation Lone Star -- we've

4  enlisted the help of -- we have TMD, which is Texas Military

5  Department; Texas Facilities Commission, which is building a

6  state border wall; we have Texas Alcohol Beverage Control.

7          If you are a state law enforcement officer in Texas,

8  you're in some way involved in Operation Lone Star, to include

9  the military.  And it has also grown to include 14 other states

10 who have provided support, both TMD and state law enforcement

11 support at the cost of those states, in order to continue to try

12 to put some law enforcement in these large gaps that have been

13 left open.

14 Q    Since 2021, how's the Texas legislature demonstrated its

15 support for Operation Lone Star?

16 A    The Texas legislature demonstrates its support in numerous

17 way.  One way is they've passed several bills to provide the --

18 the extensive funding that is needed to run Operation Lone Star,

19 and they continue to legislate towards creating border fencing

20 and other things that will help protect Texas.

21 Q    Since 2021, have the citizens of Texas demonstrated their

22 support for Operation Lone Star?

23 A    Absolutely.  I -- I've received over -- I've received

24 overwhelming support from Texas.

25 Q    And have the citizens of Texas demonstrated their

1    operate -- support for Operation Lone Star in the polling places

2    of the state?

3    A    They have.

4    Q    Now, specifically, what are the purposes or goals of

5    Operation Lone Star?

6    A    So first and foremost, you know, we -- one of the main --

7    main things we want to do is we want to deter people from even

8    wanting to make the decision to cross that river.  Over the last

9    three years, we have seen record numbers of deaths along the

10    border from migrants attempting to cross the border.  And so

11    our -- first and foremost is to encourage them that this is not

12    a safe place to cross.  We do that in the form of putting up a

13    wall for deterrence.  We also have constant messaging that is

14    being played out over loudspeakers to the migrants, informing

15    them it is not safe to cross in that area.  And if they do

16    cross, we would hopefully be able to funnel them into a place

17    where Border Patrol is actually at and where Border Patrol could

18    make the apprehension to ensure that we don't have large numbers

19    of got-aways continuing to climb.

20    Q    Does Texas or the personnel of Operation Lone Star actually

21    enforce any of the U.S. immigration laws?

22    A    No.  Very clearly we don't do that.

23    Q    Could you describe briefly for the Court the

24    accomplishments of Operation Lone Star to date.

25    A    So, I'm going to use approximate numbers because I don't

1  have numbers with me.  But at last count, over 481,000

2  referrals.  That's 481,000 people that crossed where there was

3  no Border Patrol available, and we referred those migrants to

4  the Border Patrol.  A little over 80,000 migrants that have been

5  deterred, meaning they've made the decision -- they've

6  approached and decided that they didn't want to continue moving

7  north and returned back to Mexico.  It's commonly referred to in

8  Border Patrol terminology as "turn back south."

9          Almost 2,000 pounds of fentanyl has been seized,

10  which is 434 million-plus lethal doses.  Large amounts of

11  heroin, methamphetamines.

12          So we've -- we've seized a lot of drugs and we've

13  turned back quite a few migrants, and we've been able to detect

14  and turn over to U.S. Border Patrol almost 500,000.

15  Q    To what extent are you aware of Operation Lone Star

16  preventing or stopping human trafficking in -- into Texas or in

17  Texas?

18  A    And so we often -- you know, so -- so -- what Operation

19  Lone Star does do is that we do arrest for violation of Texas

20  law.  Right.  And so just recently, you know -- I want to say

21  less than three weeks ago -- we hit a stash house where they

22  were harboring illegal immigrants.  But we hit the stash house

23  because the stash house was being operated as a prostitution

24  ring where juveniles were being -- juveniles that have been

25  trafficked into the United States were being, you know,

1  prostituted out to the migrants that were staying in the stash

2  house.

3  And so that's just one example of what Operation

4  Lone Star's doing on a daily basis to try to combat child sex

5  trafficking, to try to combat smuggling of narcotics and

6  weapons.

7  Q    To what extent do you interact with U.S. Border Patrol in

8  your current role?

9  A    I interact with U.S. Border Patrol, I don't want to say a

10  daily basis, but almost -- almost daily.  I communicate with

11  sector chiefs, I communicate with agents.  I -- as I said, I

12  spend 95 percent of my time on the border, and I actually am out

13  there on the border talking to the agents.  So at least 95

14  percent of my time on the border, and at least daily I have

15  interaction with at least one Border Patrol agent.

16  Q    In your experience, is that relationship between you

17  personally and Operation Lone Star with the U.S. Border Patrol a

18  cooperative relationship?

19  A    I think we have an outstanding relationship and very

20  cooperative.

21  Q    Does Texas act consistently in terms of its policies with

22  respect to the U.S. Border Patrol in all sectors of the Texas

23  border?

24  A    Not -- not in all sectors.

25  Q    Okay.  I wanted -- the Court asked the question, and I want

1  to give you an opportunity to answer the Court's question.

2          Does Operation Lone Star cooperate successfully with

3  the Border Patrol in the El Paso Sector?

4  A    Yes.   Very -- we have a very great relationship with

5  El Paso Sector.

6  Q    Does Texas and Operation Lone Star cooperate successfully

7  with the U.S. Border Patrol in the Rio Grande Valley Sector?

8  A    We have a great working relationship there.

9  Q    Has that relationship not been as smooth with the Border

10 Patrol in the Del Rio Sector, and specifically the Eagle Pass

11 area?

12 A    The relationship at the -- at the tactical level with the

13 agents and the troops and the officers out there have been

14 great.   There -- there has been some consternation between a

15 relationship with management.

16 Q    And can you explain to the Court why that is.   Is Texas

17 acting differently or is the Border Patrol acting differently?

18 A    I can't tell you why it's acting differently.   We -- we

19 behave and treat Border Patrol with the same respect we do in

20 Eagle Pass that we do anywhere else.

21 Q    Are you supportive of the mission of the U.S. Border Patrol

22 today, just as you were for the 23 years you served there?

23 A    Just as much today as the day as I swore an oath.

24 Q    Now, let's take a brief look at the declaration Sean

25 Storrud filed in this case on November 5th, 2023, and marked as

1  Plaintiff's Exhibit Nine.  It's Tab 89 in the notebooks.  Can

2  you see that on your screen, Mr. Banks?

3  A    No.  I do not have it.

4          THE COURT:  Yeah, his screen is not up.

5          MR. BRYANT:  Do you want me to hit the button?

6          THE COURT:  I -- I've got it on my screen.

7              Do you have it on your screen?  No?  Okay.

8              Ms. Green, it's not on any of the screens.

9       (BRIEF PAUSE FOR TECHNICAL DIFFICULTIES)

10  Q    (By MR. BRYANT) Mr. Banks, have you reviewed the

11  declaration of Major Storrud?

12  A    I have.

13  Q    Are you personally familiar with the collaboration between

14  the U.S. Border Patrol and the personnel of Operation Lone Star

15  in the El Paso area in 2023?

16  A    I am.

17  Q    Could you describe what that collaboration consisted of to

18  your knowledge.

19  A    So as part of the state's collaboration and part of Lone

20  Star, we have a -- a program called Border Star, which works

21  outside of -- which works out of each sector, which also helps

22  with a coordination piece between DPS and Border Patrol.  At a

23  requested meeting with Border Patrol, there was a meeting held

24  in the armory in El Paso, Texas, in which --

25  Q    Approximately when did that occur?

1  A    June -- May or June.

2  Q    Of this year?

3  A    April.  April or May.

4  Q    Okay.  Thank you.

5  A    Of '23.

6  Q    Please continue.

7  A    And so in that meeting, which is not uncommon for us to

8  have with Border Patrol, we discussed what we were doing in the

9  past, we are moving forward up, with to ensure that there's no

10  surprises.  They share with us any concerns they may have with

11  what we're doing and how it may interfere with something, and

12  then we try to find a common ground where -- where we both can

13  achieve our mission without, you know, being in the situation

14  we're in here in Eagle Pass.

15          And -- and in that, Border Patrol requested that TMD

16  provide training for Border Patrol agents in how to deploy

17  concertina wire because they had seen the effectiveness of our

18  concertina wire and were in the process of trying to get

19  clearance from their headquarters in order to lay concertina

20  wire again.

21  Q    Where was the concertina wire that Texas had laid that you

22  just referred to?

23  A    So that would have been laid in El Paso, Texas, along the

24  U.S./Mexican border.  And then they -- we were just beginning to

25  lay wire along the Texas/New Mexico border, moving north on the

1   Texas side.

2   Q    And had Texas accomplished that wire placement in the

3   El Paso area prior to approximately May of 2023?

4   A    Yes, sir.

5   Q    We'll get into the precise numbers, but approximately how

6   many miles of concertina wire had Texas placed there in the

7   El Paso area?

8   A    I'll have to go -- I have to look at the numbers exactly.

9   Q    We will.

10  A    But I believe it's somewhere around 24.

11  Q    Now, please continue with your description of what occurred

12  in terms of the interaction between Operation Lone Star and the

13  Border Patrol in El Paso in that second quarter of 2023.

14  A    So the Border Patrol reported that our -- our deterrence

15  posture with the -- with the concertina wire had become so

16  successful that it was pushing a lot of the migrants that wanted

17  to enter into El Paso into New Mexico.  And the issue was they

18  were crossing right at the New Mexico/Texas line and then coming

19  right back into Texas.  At that point we informed the Border

20  Patrol that we were going to put wire a little further north

21  that would move the traffic in -- around a certain mountain

22  that's there to make the entry point that they were -- where

23  they were going to make their entry more accessible to the

24  Border Patrol, for them not to have to deal with the mountainous

25  terrain.

1  Q.    Okay.  And in general, could you describe the conditions

2  that existed in El Paso at the time of this collaboration

3  between Operation Lone Star and the U.S. Border Patrol in

4  El Paso.

5  A    So before we began laying down the c-wire in -- in the

6  large miles in El Paso, El Paso was overrun.  El Paso was over

7  capacity, and their process and capability -- and I'm

8  referencing the Border Patrol.  This came directly from Border

9  Patrol in our meetings.  They were receiving anywhere from 2700

10  to 3700 migrants a day, they were having a very hard time

11  keeping up with the -- being able to process what they had in

12  custody, and they were all on board for anything we could do to

13  help slow that flow.

14            Additionally, the City of El Paso had declared an

15  emergency because so many migrants were -- were crossing the

16  border with no one to apprehend them, no one to take them into

17  custody and process them, that El Paso was overrun with homeless

18  migrants all over the -- the city.

19            I can tell you that we even had the diocese asking

20  us if we could come pick up migrants, and we were explaining to

21  the diocese we cannot do that; that's -- you know, their --

22  their -- if their only crime is illegal entry, that needs to be

23  something that Border Patrol can do.

24            We were able, within a short few weeks of putting up

25  this wire in El Paso, to reduce the traffic into the 6- to 700

1    average range.   Border Patrol was very appreciative.   It allowed

2    them to get caught up on their -- their processing.   It also

3    allowed them to -- to put themselves in a position where they

4    could start going through the streets of El Paso and picking up

5    all the homeless migrants that had crossed illegally but had

6    never been detained.

7              And so -- I mean, that's -- I mean, that -- it was

8    successful in what we needed to do; which was, one, deter the

9    traffic from making the -- the dangerous crossing in the river,

10   but then also -- you know, deferring them to -- or not

11   deferring, but trying to direct them or funnel them to a port of

12   entry where they could go and apply through CBP One, or whatever

13   the federal government chose to apply to them.

14   Q    And as part of that collaboration between Operation Lone

15   Star and the Border Patrol in the El Paso area, did Texas supply

16   any concertina wire at U.S. Border Patrol's request --

17   A    We did.

18   Q     -- to the Border Patrol?

19   A    We did.   And I say "we did."  It was stored on the -- the

20   military base.   And so we didn't give them state wire, but what

21   we did is we helped facilitate them getting wire from the

22   federal government on the Army base there in El Paso.

23   Q    And did any members of Operation Lone Star provide

24   assistance in showing how the -- the wire could be deployed?

25   A     I don't know if the training actually ever took place.   I

1   know it was requested and I know we agreed to support it.

2   Q     Okay.   Now, sometime after that situation in El Paso, did a

3   somewhat similar situation arise in the Rio Grande Valley?

4   A     It did.   And so --

5   Q     Approximately when was that?

6   A     As soon as we started seeing the numbers decrease in

7   El Paso, we started seeing them increase in Brownsville.   When I

8   say "as soon as," within days.

9   Q     And what collaboration did Operation Lone Star have with

10  U.S. Border Patrol in the Rio Grande Valley area to deal with

11  that surge of -- of migration?

12  A     Much similar to what we did in El Paso.   We went -- we sat

13  down with U.S. Border Patrol there in RGV, we shared with them

14  what we felt were our successes in El Paso, and informed them

15  that we wanted to bring that same, you know -- I'm trying to use

16  the word -- "tactic," I guess, but the same process that worked

17  in El Paso to Brownsville.   Border Patrol understood.   They

18  understand that there are things that -- I'm going to say this,

19  I understand, and I have a -- a -- I've heard it from Border

20  Patrol, they had told me directly.   There are things that we

21  don't agree on and that we can't work together on, but we always

22  find the common ground where we can, and we find ways to make it

23  work for both of us.

24          And so ultimately we went to Brownsville with

25  Operation Lone Star; we repeated the -- the operations that we

1  had in El Paso; we saw an overwhelming success.  When we arrived

2  in Brownsville, they were averaging 2700 migrants a day.  2700

3  and some change.  Approximately 2700.  Within about 14 days, the

4  crossings in that area were reduced to single digits.

5  Q    When you say "single digits," are you talking about --

6  A    Nine or less.

7  Q    -- single digits -- single digits of hundreds of people a

8  day, or single digits of people per day?

9  A    Single digits.  It reduced below nine; nine or below.

10  Q    Okay.  Now, as part of that effort, did Texas place

11  concertina wire or c-wire near the southern Texas border in the

12  Brownsville area?

13  A    In the Brownsville area and seven other areas -- several

14  other areas in RGV.

15  Q    Could you describe where Texas placed c-wire in the

16  Rio Grande Valley to deal with this surge that occurred roughly

17  during the Summer of 2023.

18  A    Directly on the north -- the north bank of the river.

19  Q    Okay.  Let's look at Plaintiff's Exhibit 69.

20        Mr. Banks, can you see Plaintiff's Exhibit 69?

21  A    Yes, I see it.

22        MR. BRYANT:  Can the Court see it?

23        THE COURT:  Uh-huh.  Everybody else can see it?

24        Okay.

25        MR. BRYANT:  Okay.

1   Q    (By MR. BRYANT) How much c-wire has Texas installed to date
2   at or near the southern border of Texas in total?
3   A    107.9 miles.
4   Q    And does Plaintiff's Exhibit 69 generally show the
5   locations where Texas has located c-wire along the southern
6   border to date?
7   A    Yes.
8   Q    How much c-wire has Texas installed in Val Verde County?
9   A    None.
10  Q    How many wire -- miles has Texas installed in Maverick
11  County to date?
12  A    29.08.
13  Q    How much c-wire installed in Webb County?
14  A    None.
15  Q    How much c-wire has Texas installed in Zapata County?
16  A    None.
17  Q    How much c-wire has Texas installed in Starr County?
18  A    3.13 miles.
19  Q    How much c-wire has Texas installed in El Paso County?
20  A    24.13 miles.
21  Q    How much c-wire has Texas installed in Cameron County?
22  A    8.41.
23  Q    And how much has Texas installed c-wire in Hidalgo County?
24  A    17.58.
25  Q    Is it correct that Maverick County has the most c-wire that

1  Texas has placed of any single county?

2  A    That is correct.

3  Q    Okay.  Is it correct that El Paso's not far behind that in

4  terms of the number of miles?

5  A    Correct.

6  Q    And if you aggregate the three Rio Grande Valley counties

7  of Cameron, Hidalgo, and Starr, that's -- that would be about

8  the same, roughly, as Maverick County?

9  A    Correct.

10 Q    So, does the placement of the c-wire by Texas to date

11 generally correspond with what you described as the three major

12 hotspot areas in Texas that have been experienced in 2023?

13 A    That is correct.

14 Q    Is the c-wire that Texas has deployed in the southern

15 border area of Texas placed on private or local government land

16 with the permission of the landowners?

17 A    That is correct.

18 Q    Do you view the -- the c-wire barriers as helpful in the

19 protection of Texas landowners?

20 A    Absolutely.

21 Q    Do you view the c-wire barriers as necessary in the

22 protection of Texas communities like El Paso and Eagle Pass?

23 A    Yes, sir, I do.

24 Q    And do you view the c-wire as necessary in -- as an

25 effective deterrent for the protection of Texas citizens from

1   violations of Texas laws by cross-border criminals?

2   A    Yes, sir, I do.

3   Q    I think you mentioned that the U.S. Border Patrol also uses

4   c-wire barriers at some points along the southern U.S. border.

5   Is that correct?

6   A    That is correct.

7   Q    To your personal knowledge, where does the Border Patrol

8   use c-wire barriers along the southern border?

9   A    So CBP in general uses them at most ports of entries so

10  they can erect them when there are port runnings, when they get

11  massive surges across the port.  I know that there is c-wire

12  placed along the border in Progres -- the Progres -- near the

13  Progreso POE in -- in -- I think that would still be Hidalgo

14  County.  There is wire in Brownsville between the ports of

15  entries and the actual, physical structure which is the --

16  commonly referred to as the "wall," but permanent border wall --

17  or border infrastructure.

18  Q    Now, have there been occasions when Operation Lone Star

19  personnel have encountered somebody on the other side of the

20  c-wire barrier that had a life-threatening medical emergency,

21  whether that's in the El Paso area, Rio Grande Valley, anywhere?

22  A    Yes.

23  Q    And what is -- what does Operation Lone Star personnel

24  typically do when there's somebody on the other side of a c-wire

25  barrier who has an emergency that is a life-threatening

1   situation?

2   A     We cut the wire and immediately provide them medical

3   attention.

4   Q     Okay.  Do you use -- typically use techniques that isolate

5   the person with the medical emergency from other crowds of

6   people who may be on the other side of the wire?

7   A     We have very specific tactics in how we go about opening

8   the wire.  And typically if the person is lucid or able to walk

9   or move, we will walk with that person -- one of our soldiers

10  or -- or troopers on the north side of the wall walk them away

11  from a larger crowd, and then cut the wire, bring them in, and

12  immediately reseal that wire.

13          If -- if it is a medical emergency where we need to

14  get to them immediately and they aren't able to -- to move

15  themselves, we cut the wire, go in, retrieve that person that

16  needs medical attention, bring them through the wire, and then

17  immediately reseal the wire.

18  Q     Okay.  Does Texas have any problem with U.S. Border Patrol

19  cutting its c-wire barriers and using similar procedures as

20  those that you just described to address a medical emergency

21  situation?

22  A     Absolutely not.  Protection of life is first.  And that

23  happens in most other sectors.

24  Q     Well, I was going to ask you, have -- when emergency -- a

25  medical emergency situation has arisen with persons on the river

1  side of the concertina wire, how have -- have they typically

2  been handled by the Border Patrol and Operation Lone Star in the

3  El Paso Sector?

4  A    It's hard to describe "typical" in law enforcement, but if

5  it's somewhere where Texas is not at, meaning that we -- we

6  don't -- if we don't have a constant surveillance over that

7  particular spot -- spot of the river, Border Patrol calls us and

8  advises they have a medical emergency, they're going to cut the

9  wire.  We respond.  Border Patrol brings that person through.

10  Right?  They don't leave it open.  And then the military

11  responds and closes that wire back.

12          Oftentimes they get calls from Mexico 9-1-1, saying

13  that someone's called reporting that they were on the other side

14  of the wire and having difficulties, and Border Patrol advises

15  that they are responding.  And then we -- if we're already

16  there, we will ask for identification of, you know, who is it

17  that's -- that has the issue, we'll bring them through, and then

18  Border Patrol will take them from our custody as soon as they

19  arrive.

20  Q    Have such situations also been encountered in the Rio

21  Grande Valley Sector with the U.S. Border Patrol?

22  A    Yes.

23  Q    And how are those -- how have those been handled?

24  A    Same way.

25  Q    Okay.  Now, did Operation Lone Star in approximately

1  September 2023 become aware of an upswing in incidents where the

2  U.S. Border Patrol in the Eagle Pass area cut Texas c-wire

3  without notifying Texas and without an apparent need to do so in

4  response to a medical emergency?

5  A     Yes, we did.

6  Q     How and when did you first personally become aware of that

7  problem?

8  A     Personally, September the 20th, I was here in Eagle Pass

9  and I received a call from the Border Patrol that advised, We

10  had to cut the wire, we've let in quite a few.  I'm sure you're

11  not going to be happy about it, but you might want to get

12  somebody down here.

13         So I responded from my hotel to POE II, Bridge II,

14  where I estimated that there was probably about 2,000 migrants

15  under the bridge.  I approached the patrol agent in charge and

16  said, What happened?  You know, the deterrent had been working

17  so well.

18         His response was, We almost had a drowning in the

19  river, so we had to open the wire.

20         And I said, Well, how long ago was that?

21         I was informed it was about a half hour ago.  And I

22  said, Well, why is the wire still open?  I still see a stream of

23  migrants coming in.

24         He said, Well, that's the decision we made.

25         So I said okay.  So I started following the stream

1    of migrants that were coming -- walking down the river to

2    approximately -- just a little over a mile down the river, down

3    the -- down the road.  I did not pass a single agent until I

4    arrived at the source of where all the migrants were coming down

5    the road from, and that there was two agents standing over a

6    hole in the river -- or in the c-wire at the river.  They had a

7    Border Patrol vehicle backed up to the hole, had a rope tied to

8    the bumper of the Border Patrol vehicle, and had the rope down

9    into the water.

10           I recognized the watch commander that was there.

11   And as I approached, he said, Hey, Mike, I know this wasn't -- I

12   know this doesn't look good, but we almost had a drowning.

13           I said, I see a lot of boats in the water.  You've

14   got Texas boats, you've got Border Patrol boats, you've numerous

15   boats.  My understanding was that the boats picked this guy up

16   out of the water and he -- he was fine.  You know, how long are

17   you keeping this hole open?

18           His response was, Well, I'm not in charge.

19           I asked who was, and at that time he brought over

20   another individual who -- they were identified as the deputy

21   patrol agent for one of the stations.

22           I asked him -- I say, Hey, what's the plan here?

23           His response was, Well, you know the plan.  You used

24   to be in the BP.

25           And I said, Look, man, I'm not here to argue with

1  you.   I don't know what the plan is because I've never been part

2  of a plan that opens infrastructure and invites people to come

3  in.   There's no longer an emergency; how long do you plan on

4  leaving this open?

5              He turns back, didn't respond.   So I said, Well, I'd

6  like to know what your plan is because I need to know what we're

7  going to do.   Right?  We have to take some type of action as

8  well.   And so how long do you plan on leaving the hole open?

9              And he looks out over the group of migrants and

10  says, Until they're all in.

11             And I said okay.

12  Q    And at that point, where was the group of migrants that you

13  and --

14  A    So at that point --

15  Q    -- the agent observed?

16  A    -- the group of migrants stretched from the bridge, a mile

17  down to the hole, through the hole, another quarter of a mile at

18  least down the north river bank, across the river to the south

19  river bank where there was a landing that had approximately 300

20  migrants.   And that's an approximate.   And then another steady

21  stream of migrants coming down the south bank in Mexico to the

22  landing, whereas every time you would see a migrant go into the

23  river, you would see another one go to the landing.

24             And so I said, Well, look, our stance is we're going

25  to go plug up these other holes that -- that have been created.

1  We're going to need to close this hole, too.

2          He says, What part of "we" -- well, something to the

3  effect -- I don't remember the exact words, but something to the

4  effect of, You understand there was almost a drowning earlier?

5          And I said, I understand that, but I understand it's

6  been resolved.  You've cut wire across from the deepest part of

7  this river.

8          I'd spent weeks in that area.  They had actually put

9  the wire in the deepest part of the river and -- so the migrants

10  were actually put at much more of a risk.

11          My other concern that I expressed was that there was

12  only two agents at that hole.  That hole was over a mile away

13  from the bridge.  There were no agents between that hole and the

14  bridge, and every migrant that came through was told, Go that

15  way and report to the bridge.

16          So, you know, with -- with almost two million

17  reported got-aways -- you know, there's no inspection taking

18  place, there's no processing taking place.  These migrants were

19  led through this hole and pointed a mile down the road and

20  entrusted that they're going to just report there.

21  Q.   Was it even possible to look from the place where the hole

22  was and where migrants were being sent towards a station for

23  processing and a station for processing [sic]?  In other words,

24  could they even see where all the -- the migrants were going

25  unaccompanied?

1  A     There's no line of sight.  It dips down, it comes back up,

2  it dips down.  And at that point I turn to the -- the deputy

3  patrol agent in charge and said, Look, again -- like, I'm not

4  here to argue about it.  I'm going to go -- I'm going to get the

5  engineers to go plug the holes.  You know, how much longer are

6  you going to be here?

7           And he said, If you plug the hole, I'll cut it

8  again.

9           And I said, Well, then I'll plug it again.

10          He goes, I'll cut it again.

11          I said, Okay, we can go back and forth.  I'm not

12  going to have this conversation with you.  You do what you feel

13  you got to do.  I'm going to go back, I need to make a report

14  because I need to report, you know, that --

15          Thousands of migrants at this point are dropping

16  into the river in Mexico, they're passing by boats that are

17  just -- the boats are literally ushering them.  They're not --

18  there's no -- no statements made, Turn back, it's not safe,

19  don't cross here, it's illegal to cross.

20          And as I'm walking back to my truck, he makes the

21  comment -- and with all respect to the Court, and I'll try to

22  use the abbreviation -- If you close the wire, I will f'ing cut

23  it all; I will tie a strap to it and will rip it all out of

24  here.

25          And my response was, If that's what you feel you

1  need to do, I'm not going to interfere with you, but this is

2  unnecessary.  And I got back into my -- back into my vehicle.

3          These were recorded.  The initial recording of the

4  migrants coming down the road and the thousands that were

5  crossing the river was filmed by me.  The -- the -- I ordered a

6  sergeant with TMD to film the -- the second cutting of the

7  fence.  This fence was cut approximately ten feet away from a

8  hole that was already established --

9  Q    Let me --

10  A    -- that already had the -- the rope --

11  Q    -- let me slow you down just a little bit.

12          I think earlier in your testimony you referred not

13  only to the -- the hole where all the migrants were streaming

14  through, but also other holes that you had observed.  Could you

15  describe what other holes that you had observed on that

16  September 20th occasion.

17  A    So, as I made my way down the river bank to try to figure

18  out where the hole was, based on, you know, following the

19  migrants that were walking down the river, we came across three

20  other holes; the hole where the truck was backed up to was the

21  fourth hole, and then the hole they chose to cut 15 -- 10, 15

22  feet away would have been a fifth hole cut.  And those were all

23  cut that morning.

24  Q    Now, you described two holes that were within 15 feet or so

25  apart.  When did you see the -- did you see the second hole

1  being cut --

2  A    Yes.

3  Q    -- within 15 feet of the -- an existing hole --

4  A    Yes.

5  Q    -- in the c-wire?

6  A    Yes.  An existing hole 10 to 15 feet.

7  Q    And was the -- either the first or the second hole through

8  the c-wire, the hole through which the migrants were streaming?

9  A    Yes.  That's where the migrants were coming through.

10  Q    Through both of them, or through the first or the second?

11  A    They were coming through the hole where the -- that the

12  truck was backed up to.  So it would have been the hole where I

13  was standing at, having a conversation with the two Border

14  Patrol agents.  And so there was a rope that was lowered down to

15  the river to assist the migrants in coming up the river bank.

16  And the second -- the next hole that was cut, that I witnessed

17  being cut was, again, 10 to 15 feet east of the initial hole.

18  Q    Okay.  The -- is the video that you had been referring to

19  that -- that you recorded at that occasion near Eagle Pass on --

20  on September 20th, 2023, what has been put in evidence as

21  Plaintiff's Exhibit Ten?

22  A    Yes.

23      (BRIEF PLAYING OF PLAINTIFF'S EXHIBIT NUMBER 10)

24          MR. BRYANT:  Stop it for a second.

25          Your Honor, I know from your remarks that you've

1   already seen this video.

2        THE COURT:  The videos that were -- were filed by the

3   parties with the filings were -- we -- I have watched them, but

4   you play what you need to play.

5        MR. BRYANT:  Okay.

6   (PLAYING OF PLAINTIFF'S EXHIBIT NUMBER 10)

7   Q.   (By MR. BRYANT) Let's look at Plaintiff's Exhibit Four,

8   which is a declaration of Captain Carlos Garcia.

9        Do you have that in front of you, Mr. Banks?

10  A    I do.  Yes, sir.

11       MR. BRYANT:  And does the Court and opposing counsel

12  have it in front of you?

13       MS. LOWRY:  We do.

14       MR. BRYANT:  Thanks.

15  Q.   (By MR. BRYANT) Now, as set forth in his declaration, is

16  Captain Garcia the officer in charge of the engineering for

17  Operation Lone Star, which includes the placement of c-wire

18  barriers and the maintenance, repair and replacement of cut or

19  damaged c-wire -- c-wire barriers?

20  A    Yes, he is the officer in charge.

21  Q.   And do all the reports from the field of cut or damaged

22  Texas-owned c-wire barriers ultimately come to Captain Garcia's

23  attention?

24  A    Correct.

25  Q.   Now, looking at the fourth page of Captain Garcia's

1    declaration --

2            MR. BRYANT:  Move it farther down, please.  Okay.

3    Q    (By MR. BRYANT) It describes an incident where CBP or -- or

4    Border Patrol cut Texas's c-wire barrier in the Eagle Pass area

5    on September 21st, 2023, which was just one day after the

6    September 20th incident you described for the Court.

7            Then there were two more incidents reported of

8    Border Patrol cutting Texas c-wire barriers near Eagle Pass on

9    September 24th, 2023.

10           Were you made aware of any or all of those incidents

11   when they were reported to Operation Lone Star?

12   A    Yes, sir, I'm on the distribution for those reports.

13   Q    And did you personally witness another incident where

14   Border Patrol cut Texas' c-wire in the Eagle Pass area on

15   September 26th, 2023?

16   A    I did.

17   Q    What did you observe on that occasion?

18   A    So much closer to the port of entry this time,

19   approximately -- maybe a hundred yards from the POE II bridge, I

20   was observing engineers with the Texas Military Department

21   repairing a hole that -- I don't know how long the hole was

22   there; it was there when I got there.  Texas engineers were

23   filling that hole.  Approximately 10 to 15 minutes max after the

24   engineers made that repair and walked away, the same gentleman,

25   the DPAIC from one of the stations, Mr. Trevino, he approached

1  the wire and cut the wire and allowed the migrants -- any

2  migrant that was there, into the -- into the north side to walk

3  over for processing.

4  Q    And approximately how many migrants did you see go through

5  the hole that Mr. Trevino cut in the c-wire barrier in your

6  presence?

7  A    I -- I would be taking a guess if I had to give an answer.

8  I'm not comfortable guessing.

9  Q    Please don't guess.

10        Okay.  Did -- on either of the occasions where you

11  present, did anyone from Border Patrol request any permission

12  from Texas to cut the Texas c-wire barrier?

13  A    No.  No requests were made.

14  Q    Are you aware --

15  A    Or notification.

16  Q    -- are you aware of any other incidents in the Eagle Pass

17  area where any of the Border Patrol supervisors or managers

18  sought out anybody from Operation Lone Star to work out a

19  protocol for handling any incident where the Border Patrol

20  needed or perceived that it needed to cut Texas c-wire?

21  A    I know that we've had communication with the Del Rio Sector

22  the same as we've had with Eagle Pass and with El Paso, and

23  we've shared with them what has worked for us in other

24  locations.

25        Initially, they had no objections to the c-wire, or

1    didn't voice any objections in our initial meetings.  And so

2    when the wires -- the wire cutting started, they didn't --

3    didn't communicate with us.  It was like communication stopped.

4    Q    Based on your personal observations, did the defendants on

5    multiple occasions in September 2023, without Texas' permission,

6    intentionally damage, destroy, and interfere with personal

7    property of Texas, namely the concertina wire that was located,

8    with permission of the landowners, on Texas land in Maverick

9    County, Texas?

10   A    Yes.  That's correct.

11   Q    Based on your personal observation, did the -- did the

12   Border Patrol act arbitrarily in -- on those occasions?

13   A    Yes.

14   Q    And why do you say that?

15   A    Because there's multiple ways that this could have been

16   done that has worked and proven to work in numerous other

17   locations.  They've just chosen that they're going to cut wire

18   because they can.  That's my belief, based on what I've seen and

19   based on the fact that you're cutting a hole right next to a

20   hole that you already have with an established entry point.

21   Q    Looking further at Captain Garcia's declaration at

22   Paragraph 12, it looks like the incidents are similar and

23   they're numbered from -- or lettered from A to Y.  So I'm -- it

24   looks like 25 reported incidents of the Border Patrol cutting

25   Texas-owned c-wire barriers in or near Eagle Pass just from

1    September 21st to October 10th, 2023.   Is that consistent with

2    what has been reported to you by the personnel in the field in

3    or near Eagle Pass, Texas?

4    A    Yes, sir, it is.

5    Q    Now, the listing in Captain Garcia's declaration ends at

6    October 10th, 2023.   Did similar incidents continue to occur

7    after October 10th, 2023?

8    A    Have there been additional reported incidents?  Yes.

9    Q    And was the approximate frequency of those incidents after

10   October 10th, 2023, similar to that that is indicated in

11   Paragraph 12 of Captain Garcia's declaration?

12   A    That is correct.   It has been consistent and constant.

13   Q    Now, did such incidents continue in the Eagle Pass area

14   of -- of cutting of Texas wire by the -- by the Border Patrol

15   even after Texas filed this lawsuit on October 24th, 2023?

16   A    After the law -- yes, after the lawsuit was filed, cutting

17   continued.

18   Q    Okay.  Let's look at the declaration of Staff Sergeant

19   Brian Cooney, which is Plaintiff's Exhibit One.

20           Do you have that in front of you, Mr. Banks?

21   A    Yes, sir.

22           MR. BRYANT:  Does the Court and counsel have it?

23           It looks like we're getting this system working

24   better.

25   Q    (By MR. BRYANT) Now, Exhibit One describes an incident on

1    October 26th, 2023, in which Sergeant Cooney observed the Border

2    Patrol using a forklift to displace a Texas-owned c-wire barrier

3    in the Eagle Pass area lifted high in the air, and allowed 310

4    migrants to cross through a gap created by lifting the c-wire

5    barrier over a 20-minute approximate period.

6              Did you receive a report of that incident shortly

7    after October 26, 2023?

8    A    Yes, sir, on the day it happened.

9    Q    Sergeant Cooney reported there was no apparent medical

10   emergency among any of the 310 migrants, no EMTs were called,

11   and there were -- U.S. Border Patrol nearby had an emergency

12   occurred.   Is that consistent with all the reports of this

13   incident that you received?

14   A    It is.

15   Q    Let's look at Plaintiff's Exhibit Three, which is a

16   declaration by Roberto Ortiz-Diaz.

17             MR. BRYANT:   Does everybody have that one?

18   Q    (By MR. BRYANT) Okay.   Does -- is Exhibit Three a -- a

19   declaration that you reviewed?

20   A    Yes, sir, I've reviewed this declaration.

21   Q    Sergeant Diaz is a soldier on one of the special response

22   teams that Captain Garcia sends to do work, like repair cut or

23   damaged Texas c-wire barriers.   He describes an incident in the

24   Eagle Pass area on October 27th, 2023.   He observed Border

25   Patrol personnel instructing a forklift operator to lift and

1  flatten Texas c-wire barriers by slamming them into the dirt

2  again and again.

3      Sergeant Diaz reported that at least 40 migrants

4  were allowed to enter over the flattened c-wire barrier.  Again,

5  he reports that Border Patrol asked no permission from Texas and

6  there was no apparent medical issue.

7      Were you advised of that October 27th incident

8  shortly after it occurred?

9  A   Yes, sir, I was.

10 Q   Did you receive any information about the October 27th

11 incident that is in any way inconsistent with Sergeant Diaz's

12 sworn declaration?

13 A   No, sir.

14 Q   Do you know if the Border Patrol was using the forklift so

15 that they could say they hadn't cut any more wire after the

16 lawsuit was filed?

17 A   It was reported back to DPS when the regional director

18 spoke with the Chief.  The response was:  We're not cutting it.

19      And the question was:  Why are you ripping it out

20 with a forklift?

21      And the response was:  We're not cutting it.

22 Q   But the forklift still damaged the c-wire barrier in each

23 instance when the forklift was used?

24 A   It does.

25 Q   How?

1  A    It actually is more damaging.  It's ripping the posts that

2  hold the wire in place out.  It also mangles the wire to where

3  the wire can't even be bonded back and -- and closed back up.

4  Sometimes when they cut, if it's cut properly, we can -- we can

5  close it back pretty cheap in comparison to if it's cut, you

6  know, haphazardly.

7           And so there's an actual process in which you can

8  cut that wire and still be able to save it and -- and reuse it.

9  You cannot when -- when you're crushing it down with a forklift.

10 Q    And in all of those forklift incidents, did Captain Garcia

11 still have to send personnel out to repair or replace the

12 c-wire barrier -- c-wire barriers?

13 A    Yes, they did.

14 Q    And that repair and replacement is all at the expense of

15 the taxpayers of Texas?

16 A    Correct.

17 Q    So, the filing of this lawsuit on October 24th didn't stop

18 the Border Patrol from damaging or destroying Texas c-wire

19 barriers.  Was the only thing that has stopped the Border Patrol

20 from this practice of cutting, damaging or destroying Texas

21 c-wire barriers this Court's injunctive order on October 30th?

22 A    The Court's injunctive order stopped the cutting; it did

23 not stop the tampering with the wire.

24           THE COURT:   And who made the decision to not stop

25 tampering?  Do you know who had made the decision?

1     THE WITNESS:  I was not on scene for that, so I don't
2  know who directly made the decision to utilize the forklift to
3  do what they did.
4     THE COURT:  Okay.
5  Q    (By MR. BRYANT) Does Texas still need injunctive relief
6  from this Court to continue until this case can be tried on the
7  merits?
8  A    I believe so.
9  Q    In your judgment, does Texas need that injunctive relief
10  only in this small area near Eagle Pass, or does it need it in a
11  broad -- broader area along the border to make sure that the
12  Border Patrol does not continue to cut c-wire barriers along the
13  southern border with Texas and thereby inflict injury on Texas?
14  A    You know, that's a tough one because I don't believe we
15  need it in Rio Grande, and I don't believe we need it in
16  El Paso.  But I do know that typically migrants always follow
17  the path of least resistance.  It has always been that way.  And
18  if they can't cross in Del Rio, does this traffic move to
19  Big Bend and do we now need to repeat in Big Bend, and will we
20  find ourselves in the same situation?
21     I would -- I would think that it would be most
22  operationally effective to us if they made it to apply to Texas
23  in general.
24  Q    In any event, I believe the -- there may have been
25  reference in the TRO to the City of Eagle Pass on the -- some of

1   the incidents that you described inside the City of Eagle Pass

2   and some nearby, outside the City of Eagle Pass?

3   A    I'm sorry, can you repeat that question?

4   Q    Okay.  Sorry.  It was probably confusing.

5           Were all of the incidents that are described in

6   Captain Garcia's declaration, and those that you personally

7   witnessed, ones that were within the city limits --

8   A    Okay.

9   Q    -- of Eagle Pass, or were some of them outside the city

10  limits, but in Maverick County?

11  A    Some were outside of the city limits.

12  Q    Okay.  Let's talk about the injuries that Texas has

13  suffered and will continue to suffer absent a preliminary

14  injunction in this case from the Border Patrol's practice of

15  intentionally cutting, destroying, or damaging Texas c-wire

16  barriers.

17          First, just in terms of dollars, about -- what's the

18  approximate cost of repairing damaged or -- or destroyed c-wire

19  and materials, labor and equipment, recognizing that some --

20  some types of damage cost more to repair than others?

21  A    Correct.  Rough estimate, obviously the forklift would --

22  would require more -- more extent -- would cause extensive

23  damage.  I think the average I've been given by TMD would be

24  about $3500 per -- per incident of cutting.  I didn't get an

25  estimate on the damage from a forklift.

1   Q      I think you indicated in your testimony that the damage

2   from the forklift can be as --

3   A      Potentially greater.

4   Q      -- even greater than -- than damage from cutting at times.

5   A      Correct.

6   Q      Based on the incidents -- just the incidents described in

7   declarations of Sergeant Cooney, Sergeant Diaz, Captain Garcia,

8   and those you personally witnessed, is that well over a $100,000

9   of damage to Texas and its taxpayers?

10  A      Easily.

11  Q      Okay.  Now, what, if any, injury has Texas suffered in

12  damage to the mission of Operation Lone Star to deter unlawful

13  crossings into Texas and deal with the border disaster declared

14  by Governor Abbott for Maverick County and other south Texas

15  counties?

16  A      First and foremost, the unknown number of got-aways that --

17  that we have no idea where they're going or what they're coming

18  to do.

19          We talked about the morale of the soldiers out

20  there, we talked about how hot it gets down here and you stand

21  out there in 110-degree temperature, putting up infrastructure

22  that -- that hasn't been tampered with in other places, just to

23  watch it within a matter of minutes be torn apart right behind

24  you.  That doesn't help with the recruiting issue, and it

25  certainly doesn't help with retention of keeping soldiers and

1    troopers on mission.  And then the untold amount of narcotics

2    that are getting to the streets, the sex trafficking that's

3    going on, you know, in these areas where people are coming

4    across unabated, it's -- it's got significant effects.

5    Q    What, if any, damage to Texas has there been and will there

6    be absent injunctive relief to Texas' efforts to protect Texas

7    landowners and Texas communities like Eagle Pass?

8    A    So, it's significant.  I spent a lot of time with the mayor

9    of El Paso [sic] during the -- the unabated surge there when it

10   first started, and I can tell you that there were more migrants

11   that came across the border in Eagle Pass than there are people

12   that live in Eagle Pass.  And it -- it's -- it devastates the

13   system; it devastates the communities; it takes away from

14   services that are meant to provide services for the community,

15   whether it be someone responding to your home for a break-in,

16   whether it be waiting for an ambulance because of the -- the

17   system being overwhelmed.  And so I think it's had a huge

18   impact.

19             As far as property --

20   Q    Let me slow you down just for a second.  At the start of

21   your answer you mentioned the mayor of El Paso.

22   A    Yes.  I'm sorry, I meant Eagle Pass.

23   Q    Okay.  And approximately when did you have the conversation

24   with the mayor of Eagle Pass that you described?

25   A    We spoke daily from early September when the traffic

1  started picking up, to now we probably speak weekly.  So, daily,

2  though, for the first couple of weeks of the -- the major surge.

3  Q    And, although it's not the largest form of damage, is there

4  also damage to Texas from additional unlawful immigration into

5  Texas in the form of additional emergency medical costs,

6  additional drivers' license costs, or ID costs, additional

7  public education costs, and additional law enforcement,

8  incarceration and social service costs?

9  A    There are -- one thing I'd like to say is --

10  Q    What is that?

11  A    -- because I don't want the property owners to feel like I

12  left them out.  I -- because I -- the correction on the -- the

13  mayor's name.

14        We have substantial damage to ranches and properties

15  and livelihood in the state of Texas from mass numbers of people

16  going through their ranches, destroying their gates, which lets

17  the livestock out.  We have had ranches that have been in

18  family -- families for years, for centuries, that are ultimately

19  selling their -- their land and moving out because of the --

20  the -- just the unabated illegal immigration that's flowing

21  through their property.

22        Many of those property owners have -- have entered

23  into an agreement for criminal trespass.  So that is

24  something -- where you ask about immigration law, we don't

25  enforce immigration, we do enforce state law.  So criminal

1  trespass on private property is one of the ways that we're

2  addressing that as well.

3  Q    Is there any possible way that any of the damages that

4  you've described could be fully compensated for with a damage

5  award against the defendants?

6  A    No.

7  Q    In your judgment, will continued preliminary injunctive

8  relief, with an appropriate exception for medical emergencies,

9  serve the -- the public interest?

10  A    I believe it will.

11  Q    And in your judgment as a former Border Patrol agent for

12  over 20 years, is there a necessity for the U.S. Border Patrol

13  to cut, damage, or flatten Texas c-wire barriers to accomplish

14  the mission and the legitimate duties of the Border Patrol?

15          MS. LOWRY:   Same objection, Your Honor.   This is not a

16  CBP employee.   He can't --

17          THE COURT:   Counsel, he's not speaking on behalf of

18  CBP, but he's relying on his previous experience.   Why is that

19  prohibited?

20          MS. LOWRY:   So long as he is in his individual

21  capacity, but he's --

22          THE COURT:   He has -- and I'm not taking it as he's

23  speaking for CBP, so don't worry about that.

24            Proceed.

25          THE WITNESS:   Yes, in my professional and personal

1  opinion, the mission of CBP can still be completed without

2  damaging the wire.

3  Q    Now, how can the Border Patrol successfully compete it --

4  complete its mission, for example, in the Eagle Pass area,

5  without unpermitted cutting of Texas c-wire barriers whenever a

6  particular agent decides that's appropriate to do?

7  A    There's a significant number of miles of river that have no

8  wire.   There are also locations along the river.   One, directing

9  the migrants to the port of entry.   Another one would be the

10 Shelby Park boat ramp, for example.   There's c-wire there.   It's

11 a roller gate where you launch your boats, and the Border Patrol

12 for years has directed migrants to that location to cross

13 without having to damage any property.

14 Q    Now, in opening argument there was some discussion about

15 whether there is or is not federal border wall in the Eagle Pass

16 area.   Can you describe the -- the facts on that subject.

17 A    There's substantial federal border wall in Eagle Pass.   As

18 a matter of fact, when you drop into Shelby Park from the

19 entrance of Shelby Park west is a border wall that was put up

20 prior to the Trump administration.   And if you drop down to

21 POE II, the line of sight from the bridge, approximately 2.5

22 miles north of the river, is the border wall that went up during

23 the Trump administration.   And that wall also stretches.

24          So with the exception of that -- that compound

25 there, which is a park, it's baseball fields, it's golf

1  courses -- with the exception of that area, there's wall on both

2  sides, substantial wall.

3  Q    It's been suggested that cutting Texas c-wire barriers is

4  necessary because the c-wire barriers reduce or block visibility

5  for Border Patrol agents.  In your judgment, is that visibility

6  issue any justification for cutting Texas c-wire barriers?

7  A    No, and I would actually argue --

8  Q    Why not?

9  A    -- I would actually argue that Border Patrol has much more

10 visibility in the area.  The area where the wire is being cut

11 over, and over, and over again is an area that was an island

12 before Operation Lone Star went into that area.  That island was

13 completely covered with cedar -- salt cedar and Carrizo cane,

14 which are two very invasive species.  Border Patrol could not

15 patrol that area, nor see in that area, nor would we.  We

16 cleared that of all the invasive species and created a peninsula

17 versus an island so that anyone can now access that area to

18 actually perform patrols.

19 Q    It's been suggested that the Border Patrol is justified in

20 cutting or destroying Texas c-wire barriers because technically

21 when migrants cross the middle of the river or touch shore on

22 the Texas side, they are in the -- technically in the United

23 States unlawfully, and it's the duty of the Border Patrol to

24 immediately take them into custody.

25          In your judgment, is that a reasonable justification

1  for the Border Patrol damaging or destroying Texas' c-wire

2  barriers?

3  A    No, it is not.  The large --

4  Q    Why not?

5  A    The large majority of the federal wall that's built on the

6  border is built well north of the border.  A lot of it's built

7  to follow the floodplain.  The Border Patrol has a process

8  called TBS, Turn Back South.  They are graded on efficiency.

9  The efficiency is the total number of entries, minus the total

10  number of apprehensions, minus the total number of Turn Back

11  South, plus the number of got-aways.

12          That -- that figure is what the U.S. Border Patrol

13  has used for my entire career when I was in the Border Patrol to

14  determine efficiency.

15          Oftentimes migrants make an entry; while they are

16  still continuing to further that entry, they are pushed back,

17  and they return to Mexico.

18          MR. BRYANT:  Your Honor, unless the Court has

19  questions, I'll pass the witness.

20          THE COURT:  Okay.  Counsel?

21                  CROSS-EXAMINATION

22  BY MS. LOWRY

23  Q    Good afternoon, Mr. Banks.

24          At the risk of beating a dead horse, you are not a

25  CBP employee, correct?

1  A    Correct.

2  Q    You've not been authorized to speak on behalf of CBP?

3  A    Correct.

4  Q    I'd like to touch on one thing and make sure whether I

5  understood your testimony.  Is it your testimony that a forklift

6  was used to damage the concertina wire after the TRO was issued

7  in this -- this case?

8  A    Yes.

9  Q    And Texas didn't file a declaration to that effect after

10  that happened?

11  A    I'm not sure what Texas filed after it happened.

12  Q    You didn't see it yourself, correct?

13  A    Correct.  I did not.

14  Q    To your knowledge, did anyone contact CBP and say, You're

15  violating the Court's order?

16  A    Yes.

17  Q    Who did you contact at CBP and say, You're in violation of

18  the TRO?

19  A    The regional director of DPS contacted the chief patrol

20  agent -- the acting chief patrol agent of the Del Rio Sector and

21  said, Hey, we've got a TOR -- TRO, why are you crushing the

22  fence?

23        And his response was, Well, we're not cutting it.

24  Q    After the TRO issued; that's your testimony?

25  A    I'd have to go back and look at the dates.  I'm not sure

1  exactly the date.

2  Q    So you're not sure that it was after this Court's TRO?

3  A    Correct.

4  Q    Thank you.

5        You mentioned that Texas collaborated fairly

6  extensively in the El Paso Sector on the placement of the

7  concertina wire, correct?

8  A    Correct.

9  Q    Did Operation Lone Star collaborate that effectively in

10 this sector on the placement of the concertina wire?

11 A    I believe so.

12 Q    You believe that CBP was consulted on the placement of the

13 concertina wire, where it would be placed, and how it would be

14 placed?

15 A    Consulted or informed.  No, not consulted, but they were

16 informed of where it would be placed.

17 Q    It was not a collaborative process, correct?

18 A    There was no objection given when we informed them of where

19 we intended to place it.

20 Q    Were you asking, Can we place it here?

21 A    Any time I work with Border Patrol, everything's a

22 question.  Because as I've said, if Border Patrol has an

23 objection to something we're doing, we will figure out how do

24 we -- we try to figure out where we come to an agreement and

25 come to an agreement.

1        Are there times where we don't agree with the Border

2   Patrol and the Border Patrol's going to do what it needs to do?

3   Absolutely.   And there are times where the state will take that

4   same position.   But not before communicating with each other and

5   trying to come to an agreement.

6   Q    You've not come to an agreement here with Border Patrol on

7   how to deal with instances when Border Patrol feels it necessary

8   to cut the wire?

9   A    Clearly.

10  Q    There are no gates in the concertina wire, correct?

11  A    That is not correct.   There is a --

12  Q    I'm talking about this four-point mile -- four-mile stretch

13  in Eagle Pass.

14  A    Correct.

15  Q    Yes.   Where is the gate?

16  A    Shelby Park.   There's a huge roll gate with no concertina

17  wire on it, where you can roll the gate back and forth.

18  Q    From Shelby Park moving south, is there a break in the

19  wire?

20  A    Other than at Shelby Park?

21  Q    Other than at Shelby Park, moving south?

22  A    No, not that I'm aware.

23  Q    And that goes on for miles, correct?

24  A    It does.

25  Q    With no access point to get from this side on land down

1  into the river through the concertina wire?  No access points,
2  no gates, correct?

3  A    Correct.

4  Q    And that hinders CBP's ability to get to migrants that they
5  feel they need to get to in the water, correct?

6  A    I -- I disagree.

7  Q    You don't -- you think the concertina wire is an impediment
8  to migrants coming up, but is not an impediment to CBP going
9  down?

10  A    CBP can access that area via the boats.

11  Q    I'm asking about in the area where the -- the wire is
12  continuous.  If I'm standing on this side of the wire, I am
13  hindered from getting down, correct?  I would have to go miles
14  back up, get in a boat, and come miles back down.

15  A    Well, boats -- boats operate on the border the entire time.
16  The agents don't go from boat to land, to land to boat.  Boats
17  are a separate operation.  Boats stay on the water to deter, to
18  prevent the migrants from coming.  Then you have the land-based
19  agents that will be on the north side.

20          So, it wouldn't be a matter of going down, it would
21  be a matter of picking up the radio and calling boats to inform
22  them that they needed some type of enforcement in that area.

23  Q    So now you're talking about a second or additional agents,
24  correct?

25  A    Correct.

1  Q     This agent is hindered in his ability to get down to the

2  water?

3  A     Correct.

4  Q     Texas employees have cut the wire themselves to address

5  medical emergencies, correct?

6  A     Correct.

7  Q     Texas employees have cut the wire to make arrests when they

8  feel it necessary to do so, correct?

9  A     Correct.

10 Q     That is apart from medical emergencies, to arrests,

11 correct?

12 A     Correct.

13 Q     That is an exception that was not sought for the federal

14 government when Texas asked for a T -- its TRO, though, correct?

15 A     I don't believe so.

16 Q     So Texas treats its wire differently than it is seeking to

17 allow CBP to treat the wire to make arrests?

18 A     No, I disagree.

19 Q     Do you think that CBP could cut the wire to make an arrest

20 and not violate the Court's order?

21 A     The arrests are made to protect someone.  If someone's

22 being violent toward another person, we consider that protection

23 of life, so we go in and arrest that person to keep him from

24 assaulting anyone in the group.

25 Q     To make an arrest, correct?

1  A    To protect life.

2  Q    Okay.  Part of Border Patrol's job is to, in your words,

3  interdict illegal immigrants, correct?

4  A    Correct.

5  Q    Migrants who are not in the country legally?

6  A    Correct.

7  Q    Part of that job is to inspect migrants, correct?

8  A    Yes.

9  Q    And Border Patrol agents exercise their judgment when

10  inspecting migrants, correct?

11  A    I'm not sure how you make a judgment when you're in --

12  doing an inspection.  You're -- you're asking specific questions

13  and -- if they're legal or illegal.  And -- so I don't know

14  necessarily -- I don't believe you can make a judgment as to

15  whether someone's legal or not.  Either the law applies or it

16  doesn't apply.

17  Q    But how they -- the order they ask the questions --

18  A    Sure.

19  Q    -- when they do it, how they do it, those are judgment

20  calls?

21  A    Sure.

22  Q    The same for how they apprehend a migrant that requires

23  Border Patrol to exercise their judgment, correct?

24  A    Correct.

25  Q    In your experience and understanding, is Border Patrol

 1  allowed to cut locks on gates if they need to do so to apprehend
 2  a migrant?  Within --
 3  A    If there's an emergent need, yes.
 4  Q    Within 25 miles of the border, I should have specified
 5  there.  They have that -- they have that authorization?
 6  A    Yes.
 7  Q    They are not required to wait on this side of the gate for
 8  the migrant to come across, correct?
 9  A    Well, they have to use judgment.
10  Q    Correct.  And if in their judgment they feel it necessary
11  to cut the lock to go get them, they are authorized to do so?
12  A    Yes.
13  Q    A large group of migrants pose a security risk to Border
14  Patrol, correct?
15  A    They pose a security risk to everyone.
16  Q    Including Border Patrol agents --
17  A    Correct.
18  Q    -- who are charged with interdicting them?
19  A    Correct.
20  Q    The concertina wire in the Eagle Pass area was deployed in
21  May, correct?
22  A    Some of it was, yes.
23  Q    And the September instances we're talking about,
24  September 20th and 23rd, that's clearly some months after the
25  wire was deployed, correct?

1  A    Correct.

2  Q    It did not deter those migrants from attempting to cross in

3  September, correct?

4  A    Okay, can you ask that question again.

5  Q    The migrants started crossing the river where the

6  concertina wire was placed, correct?

7  A    Correct.

8  Q    Though it had been there for some months, correct?

9  A    Correct.

10 Q    You mentioned that on the September 20th incident, you

11 observed about 2,000 migrants under POE II, correct?

12 A    Correct.  Estimated.

13 Q    And then a continuous line about a mile down to where the

14 cut in the wire was, correct?

15 A    Correct.

16 Q    Is this state border fencing running along the highway in

17 this area, correct?

18 A    Correct.

19 Q    So up from the river -- you have the river here, there's a

20 piece of land that has the concertina wire, and then up at the

21 highway there's the state border wall, correct?

22 A    No, we don't have any state border wall near the highway.

23 Q    I thought I just asked and you said yes.

24 A    Federal border wall.

25 Q    Federal border wall.  Okay.

1    The -- did you actually see any get-aways running

2 towards the community, running -- making a break from the group

3 that was traveling in this line?

4 A    No, ma'am.

5 Q    So as far as you know, as far as you saw, this was a

6 continuous line from coming into the country to staging for

7 processing, correct?

8 A    There was a continuous line of migrants, yes.

9 Q    And you have no reason to believe that they were then just

10 let go from where they were being staged, correct?

11 A    That's incorrect.

12 Q    Did -- tell me about that.

13 A    The TMD officer that was assigned to count the number of

14 migrants that came through the hole counted 4,555 migrants

15 before he stopped counting.  The Del Rio Sector that day

16 reported a total of 2400 apprehensions.

17 Q    And you -- but you did not see some 1500 people as

18 getaways?

19 A    No, I did not personally see them running away.

20 Q    There is no drowning risk in the area right around the

21 border wall itself, correct, in this area?

22 A    By "border wall" you mean?

23 Q    The federal border wall is on land?

24 A    Yes, it's well north of the river.

25 Q    Well north of the river, they're not -- Border Patrol

1  aren't -- agents aren't negotiating a drowning risk when they're

2  apprehending migrants around the border wall itself?

3  A    I -- I can't agree with that, because in my experience I've

4  chased people that are north of the wall and they've ran back to

5  the river and it's turned into a rescue.  They're very close to

6  the river, so anytime you're chasing someone who's willing to

7  flee from you that close to the river -- I mean, they'll dive

8  into the river, so there's always a risk of drowning.

9  Q    Okay.  Sure.  Back at the river.

10  A    Correct.

11  Q    Correct.  There are gates in the border wall, correct?

12  A    Correct.

13  Q    There are access points built into the border wall?

14  A    Correct.  And every one of them are left open.

15          MS. LOWRY:  I'll pass the witness.

16          THE COURT:  Okay.  Any redirect?

17          MR. BRYANT:  Just a bit, Your Honor.

18                  REDIRECT EXAMINATION

19  BY MR. BRYANT

20  Q    Mr. Banks, let's see if we can get this chronology

21  straight.  We looked at the two declarations by Sergeant Cooney

22  and Sergeant Diaz that describe forklift incidents, I'll call

23  them, on October 26th and October 27th.  Do you recall that?

24  A    Correct.

25  Q    And this action was filed on October 24th, and the state

1   made a request for a temporary injunctive relief at or shortly

2   after the time when it filed the lawsuit on October 24th.  The

3   Court act -- didn't actually enter its TRO until October 30th,

4   which was a week ago Monday.

5   A    Correct.

6   Q    Are the incidents that you are referring to that -- the

7   ones that Sergeant Cooney and Sergeant Diaz described?

8   A    Yes.  So I apologize, and I have to correct myself.

9   There's been a lot of dates thrown around --

10  Q    Yeah.

11  A    -- up here today and -- so you're correct.  The -- the two

12  incidents that were discussed with the forklift were after the

13  initial filing, but before any type of TRO.  It's my

14  understanding that the TRO was actually requested because of

15  continued damaging of the fence.

16  Q    Okay.  Now, in questioning by opposing counsel a minute

17  ago, there was a discussion about the long line of migrants who

18  had been sent by the Border Patrol to check in.  Was that

19  approximately a mile away?

20  A    I measured it.  It was 1.08 miles.

21  Q    Okay.  1.08 miles.  And did you observe that those migrants

22  were sent by the Border Patrol with no Border Patrol

23  accompaniment or supervision?

24  A    Yes, I did.

25  Q    And you didn't see anybody make a break for the woods on

1  that -- on the single time that you went from the -- one side of

2  the line to the end of it?

3  A    It would be impossible to see because, again, there's dips

4  and lows and rises.  You cannot keep eyes on that group from the

5  entry point at the hole to the bridge.

6  Q    Was there anything that you could see that prevented any

7  one of those, or a group of those folks, from becoming got-aways

8  during that unaccompanied trip for about 1.08 miles?

9  A    There was nothing in place to prevent.

10            MR. BRYANT:  Pass the witness, Your Honor.

11            THE COURT:  Any recross?

12            MS. LOWRY:  Nothing further, Your Honor.

13            THE COURT:  All right.  You may be -- you may step

14  down.  You may be excused.

15              Call your next witness.

16            MR. BRYANT:  Thank you, Your Honor.

17            MR. EISWERTH:  Your Honor -- I'm sorry.

18            THE COURT:  Yes, sir.

19            MR. EISWERTH:  While we're bringing the witness in,

20  would it be possible to take a five-minute break?

21            THE COURT:  Sure.  Absolutely.

22            MR. EISWERTH:  Thank you, Your Honor.

23            COURT SECURITY OFFICER:  All rise.

24      (4:35:26 to 4:47:49 P.M., OFF THE RECORD)

25            THE COURT:  Okay.  Next witness is?

1          MR. BRYANT:   Your Honor, we wanted to handle one minor

2    housekeeping matter.   With our motion for preliminary

3    injunction, we included a declaration of Mr. Banks, who's

4    already testified live.   We didn't include it in the exhibit

5    list, but we'd like to ask the Court to consider that as part of

6    the record for -- for purposes of the preliminary injunction

7    only.

8          MS. LOWRY:   No objection, Your Honor.

9          THE COURT:   All right.   So granted.

10          MR. BRYANT:   And we very much appreciate the Court's

11    time this afternoon.   And given that it's already 4:45 -- we

12    were going to call this gentleman our -- as our witness.   The

13    state will rest at this time.

14          THE COURT:   So you're not going to call this witness?

15          MR. BRYANT:   And the defendants are.

16          THE COURT:   Oh, okay.   So you're calling him anyway.

17    Okay.   All right.

18          MS. LOWRY:   Yes, Your Honor.

19          MR. EISWERTH:   Yes.

20          THE COURT:   So they're resting.

21             Go ahead and call your witness.

22          MS. LOWRY:   Thank you, Your Honor.

23             The federal defendants call Chief Mario Trevino.

24

25

1                          MARIO TREVINO,

2    having first been duly sworn, testified to the following:

3

4                        DIRECT EXAMINATION

5    BY MS. LOWRY

6    Q.    Chief Trevino, will you please state your name and title

7    for the record.

8    A.    My name is Mario Trevino, Junior.  I'm a deputy patrol

9    agent in charge for the United States Border Patrol, assigned to

10   the Eagle Pass South Station.

11   Q.    What sector is the Eagle Pass South Station in?

12   A.    Del Rio Sector.

13   Q.    How long have you been at CBP?

14   A.    Approximately 22 years.

15   Q.    Have you always been stationed in Eagle Pass?

16   A.    No, ma'am.

17   Q.    Where else have you worked?

18   A.    I started my career in Carrizo Springs, moved on to Eagle

19   Pass, stationed in Del Rio Sector headquarters for about two

20   years, and now I'm back in Eagle Pass.

21   Q.    How long altogether have you spent in Eagle Pass and

22   Del Rio?

23   A.    Approximately 19 years.

24   Q.    What are your job responsibilities?

25   A.    As a deputy patrol agent in charge of the station, I

1  oversee all operational aspects, to include the administrative

2  functions of the station, things of that sort.

3  Q    Do your responsibilities including apprehending,

4  inspecting, and processing migrants crossing the border?

5  A    They do.

6  Q    We've heard from Mr. Banks on the events of September 20th.

7  Are you familiar with September 20th and the events of a migrant

8  crossing that day?

9  A    I am.

10  Q    You said your title is deputy chief patrol agent?

11  A    The deputy patrol agent in charge.

12  Q    Was that your title on September 20th?

13  A    It was not.

14  Q    What was your title on that day?

15  A    On September 20th I was designated -- well, on September

16  the 19th the incident command structure was enacted to deal with

17  the -- the migrant flow in -- in Shelby Park, and I was

18  designated as the deputy incident commander.

19  Q    What were your responsibilities as the deputy incident

20  commander?

21  A    Responsibilities ranged from the safe apprehension and --

22  and transport of the migrants to the staging area,

23  transportation of the migrants into our soft-sided processing

24  facility, separation of the migrants into -- into populations

25  with demographics that would allow -- or enable the safety and

1  well-being of not only the migrants, but the agents themselves.

2  Q    Why was the incident command structure initiated?

3  A    For the -- for the amounts of -- of migrants that we had

4  encountered during that time, it was necessary to set up the

5  incident command to deal with the large influx of people.  When

6  you have a large group of people, as we did on that day, the

7  logistical aspects become very complex.  So we -- we have to

8  account for not only the safe transport of the migrants from the

9  apprehension location to the staging area, but also once they

10 are at the staging area, we have to provide them with food, we

11 have to provide them with water, we have to coordinate

12 transportation, we have to record any medical services if

13 they're needed.  There's -- there's a -- a myriad of -- of -- of

14 things that need to be coordinated.  And that can only be done

15 with an incident command structure in place.

16 Q    How did Border Patrol first become aware of this large

17 group of migrants?

18 A    We received a call from one our agents roughly around

19 8 o'clock in the morning, and they advised that there was a

20 large group amassing on the Mexican side of the river.  I was

21 already down there as the deputy incident commander.  I made my

22 way down to where the agents advised that the big group was

23 amassing and assessed the situation.  By the time I got there,

24 the group had already started making their way toward -- or

25 across the river and -- and into the United States.

1  Q     What are some of the other ways that Border Patrol becomes

2  aware of migrants illegally entering the United States?

3  A     The more traditional ways are we have some of the -- the

4  state guard will call us at times and let us know that they have

5  migrants on the U.S. side, and they will ask us to go either

6  grab them -- apprehend them or -- or take custody of them if

7  they're already on our side.

8  Q     Are there technologies that you use?

9  A     We have camera systems in place, we have ground sensors in

10  place as well.  But traditionally it's just -- it's agent

11  observation and -- and lookout posts.

12  Q     Do large groups of migrants pose security risks to Border

13  Patrol?

14  A     Absolutely.

15  Q     What are some of those risks?

16  A     When you have a large population of individuals that are

17  already on the U.S. side, number one, you don't know who you're

18  dealing with.  So in order to -- to figure out who you have in

19  front of you, you have to bring those migrants up.  And you

20  don't want a large group amassing and getting bigger because

21  there are vulnerable populations; there's women, there's

22  children, there's elderly folks that are still in the water.

23  And at some portions of the river, the -- the current is very --

24  very swift, and individuals do get swept away.

25  Q     Are groups, large groups, always calm and orderly?

1  A    No, ma'am.

2  Q    What are some of your concerns with that kind of -- the

3  kind of chaos that can ensue with large groups?

4  A    Typically -- so -- so these individuals have been on a long

5  journey.  Once they make it onto the U.S. side, the ultimate

6  goal is to -- is to reach land.  And when they are impeded,

7  they -- they become -- well, they have the potential to become

8  unruly.  So we don't want an already complex situation or

9  incident to turn even worse if people do decide to -- to get

10  unruly.  That would -- that would not only pose a -- a danger

11  for the migrants themselves, but it also poses a danger for all

12  of the law enforcement officers there at -- at the scene.

13  Q    Is Border Patrol always in a reactive posture, or are there

14  times when Border Patrol's able to act proactively to address

15  groups of migrants?

16  A    We try to be as proactive as possible.  In some situations,

17  when the situation -- with the situation -- situational

18  awareness is not there, we are reactive.  But by and far, we --

19  we take a proactive approach to -- to border security.

20  Q    Are there situations where Border Patrol can anticipate an

21  emergency may arise, so they act proactively to minimize or

22  otherwise prevent that emergency?

23  A    Yes.

24  Q    We -- talking specifically about September 20th and the

25  area of the cuts that were placed in the concertina wire, how

1  wide is the river in this area?

2  A    Approximately 60 to 80 yards.

3  Q    How deep can it get in this area?

4  A    Anywhere from four to six feet, depending on -- on -- on

5  what part of the -- what section of the river you're on.

6  Q    There's a dam north of this part of the river, correct?

7  A    Correct.

8  Q    What dam is that?

9  A    The Amistad Dam.

10 Q    How does the dam impact water levels in this part of the

11 river?

12 A    So, the dam releases water upon request either from the

13 United States or Mexico through the International Water and

14 Boundary Commission [sic].  And during this incident, the dam --

15 or the -- the IBWC was releasing water.  So the water levels

16 were elevated, and coupled with the strong currents made -- made

17 that portion of the river very treacherous and very dangerous

18 to -- to cross.

19 Q    And is it -- is the dam constantly releasing water, or was

20 this something that happened around this time?

21 A    It's -- it's something that -- the water release just

22 happened to be around this time.

23 Q    Can you describe the banks and the shoreline on the United

24 States' side where the wire was being cut.

25 A    The embankment on the U.S. side is very steep in that area.

1 It's a -- a four- to five-foot drop.  So when you have a large

2 group of individuals amassing, that are soaking wet, the water

3 coming off their clothing turns that river silt into mud, and

4 migrants were sliding back down into the river and being swept

5 away by the swift currents.

6 Q    You mentioned the river silt.  Is this solid footing to

7 climb up the riverbank?

8 A    It's not solid, it's very -- it's -- it's -- it's not like

9 clay.  It's -- it's -- it's very arid.  It's -- it's not a -- a

10 hard-packed soil.

11 Q    Have migrants drowned in this section of the river?

12 A    Yes, ma'am.

13 Q    Have you had to rescue migrants to prevent drowning in this

14 section of the river?

15 A    Yes.

16 Q    What was the weather like on this day?

17 A    It was sunny.  I believe the temperature peaked at 108 or

18 109 degrees that day.  Very hot.  You couple the humidity with

19 that, it -- it made for a very unfavorable situation to have

20 people exposed to -- to that type of weather behind the c-wire.

21 Q    How can the -- how do heat and humidity impact migrants?

22 A    So you're talking about individuals that have already made

23 a long trek.  They're tired, they're weary, they're not --

24 they're not physically up to -- up to par as -- as a normal

25 person would be.  Exposing them to long-term -- or a long term

1  exposure to the elements, especially in 108/109-degree weather,

2  just exacerbates that.  And it's only a matter of time before

3  you're going to have a medical emergency on your hands.

4  Q    Something like dehydration?

5  A    Yes.

6  Q    Heat exhaustion?

7  A    Yes.

8  Q    Heat stroke?

9  A    Yes.

10  Q    Have you seen migrants fall back into the water after

11  making it to the shoreline; they can't stay on the shore, they

12  fall back into the water?

13  A    Yes.

14  Q    Is it easy for a migrant to walk along the -- so on the

15  water side of the c-wire, but along the embankment, can they

16  walk straight down to the POE?

17  A    Lateral movement along the riverbank is very difficult in

18  and of itself due to the -- the terrain.  The c-wire that was

19  deployed makes it even more difficult because migrants can only

20  reach a certain point before the c-wire actually goes into the

21  river, which prevents further lateral movement.  So it's not

22  typically something that we suggest or -- or advise the migrants

23  to do.  We certainly don't want to put them in any more harm

24  than they already are.

25  Q    So the c-wire is running laterally at the top of the

1   embankment, correct?

2   A     Correct.

3   Q     And then there are instances when the wire runs vertically

4   down all the way to the water, correct?

5   A     Correct.

6   Q     And how many -- if you just estimated in the four miles,

7   kind of how regular are those vertical sections going down?

8   A     I would have to say, based on my recollection, it's maybe

9   every -- every half a mile.

10  Q     Are there sections where it's closer together, further

11  apart?

12  A     There are some.

13  Q     There are sections where it's going vertically --

14  A     There are some.

15  Q     -- into the water?

16        THE COURT:  Okay, what's the answer?  Some closer,

17  some further apart?  What was the answer?

18        THE WITNESS:  In -- in -- Judge, in -- in some -- in

19  some areas they're -- they're closer than they are in -- in

20  other areas.   But generally speaking, they're about a -- a half

21  a mile apart.

22        THE COURT:  I got it.

23  Q     (By MS. LOWRY) When you encounter a migrant who's entered

24  without proper documentation, do you have the option to push

25  them back across the river?

1   A     Absolutely not.

2   Q     What kind of questions are you asking as part of your

3   inspection of a migrant?

4   A     Well, first and foremost, you want to determine

5   citizenship.  By and large, the majority of people who make an

6   illegal entry are not U.S. citizens.  And so at that point,

7   under the Immigration and Nationality Act, we are bound and we

8   have a duty to take those individuals into custody because they

9   are afforded due process in the form of either an immigration

10  hearing or some type of immigration review.

11  Q     Do you have the opportunity to search them for drugs and

12  weapons during an inspection?

13  A     We do.

14  Q     Are there places where the concertina wire is running in

15  the water itself?

16  A     It is.

17  Q     Is it easy to see in those locations?

18  A     It is not.

19  Q     By the time a migrant crosses the middle of the river, what

20  country are they in?

21  A     The United States.

22  Q     Why was the wire cut on September 20th in the first

23  instance?

24  A     In the first instance, it was cut due to several people

25  that were already on the -- on the riverbank on the U.S. side

1    having slid back down into the water and were swept away.  I had

2    some marine units positioned downriver that were able to rescue

3    them.  And looking at what was -- the group that was still in

4    Mexico making their way across, it was only a matter of time

5    before more people were going to be swept away.  So I made the

6    decision to cut the c-wire in order to -- to rescue the migrants

7    that were already on -- on the riverbank.

8    Q    It's been --

9         THE COURT:  Wait, wait, wait, wait.  You cut the wire

10   to rescue the ones that were on the riverbank or the ones that

11   were in Mexico that you could see?

12        THE WITNESS:  I -- I cut the wire to rescue the ones

13   that were on the riverbank on the U.S. side.

14        THE COURT:  Weren't those the ones that got swept away

15   and the marine boat picked up?

16        THE WITNESS:  Yes, ma'am.  But it was only a matter of

17   time before the rest that were on the river -- or on the

18   embankment were going to have --

19        THE COURT:  Okay, so tell me how many were on the

20   embankment at that point.

21        THE WITNESS:  Approximately 60.

22        THE COURT:  Okay.  Okay.

23   Q    (By MS. LOWRY) It's been suggested that the marine units

24   could be apprehending migrants in the water.  How many marine

25   units do you have in that area?

1 | A     That day we -- we had --

2 |          THE COURT:  It wasn't suggested.  The Court asked that

3 | question.  The Court is asking that question.

4 |          THE WITNESS:  Yes.  Yes, Your Honor.

5 |          THE COURT:  How many did you have?

6 |          THE WITNESS:  That particular day we had four, four

7 | marine units that were deployed.

8 | Q     (By MS. LOWRY) My apologies, Your Honor.  I couldn't --

9 |          THE COURT:  Okay.

10 |          MS. LOWRY:  -- remember if it was counsel --

11 |          THE COURT:  No, it was the Court.

12 |          MS. LOWRY:  -- who'd asked the question.

13 |          THE COURT:  I'm happy to take responsibility.

14 | Q     (By MS. LOWRY) The -- how many people fit safely on one of

15 | the marine units?

16 | A     So, ma'am, the -- the vessels vary.  We had three airboats

17 | and one RSDV, which is a -- a -- a more traditional type of --

18 | of vessel with -- with an actual v-hull.  So on the airboats,

19 | you have three crew members, and you're able to safely take on

20 | or accommodate three or four more people, depending on size and

21 | weight.  On the RSDVs, you've got three crew members; you're

22 | able to take maybe five or six, depending on the size and

23 | weight.

24 | Q     How many migrants -- when you got to the scene around

25 | 8:00 a.m., and saw them starting -- coming across, making it to

1   the United States side, how many migrants could you see?

2   A    A lot.  I -- I didn't -- I didn't count.  It was -- it was

3   a continuous line of migrants from the U.S. side that were

4   already on the embankment into the river, and then on up the

5   Mexican side of the embankment into Mexico.

6   Q    Hundreds?

7   A    I -- yes.  Hundreds.

8   Q    How far is it from where the wire was cut to the boat ramp?

9   A    To the city boat ramp, from there to where the wire was cut

10   is approximately a mile and a half to two miles upriver.

11   Q    How long does it take for the boat to go from the boat ramp

12   down to where the wire was cut?

13   A    They can make that trip in about -- in about ten minutes.

14   Q    So round trip is about 20 minutes?

15   A    It's about 20 minutes.

16        THE COURT:  Ask that question again.  Ask the first

17   question.  How long does it take the boats to do what now?

18        MS. LOWRY:  To go from the boat ramp --

19        THE COURT:  Uh-huh.

20        MS. LOWRY:  -- to where the wire was cut.

21        THE COURT:  A mile away takes about ten minutes for

22   the boat?

23        THE WITNESS:  It's about a mile and a half to two

24   miles, Your Honor.

25        THE COURT:  And it takes ten minutes for the boat to

1  get that mile; is that --

2          THE WITNESS:   About.

3          THE COURT:   -- what you're saying?  Okay.

4          THE WITNESS:   About ten minutes, yes.

5          THE COURT:   Okay.  All right.

6  Q    (By MS. LOWRY) It's an airboat?

7  A    It's an airboat.

8          MS. LOWRY:   Yeah, three of them are airboats, not

9  engine -- traditional engines.

10         THE WITNESS:   Right.

11         THE COURT:   I -- I know what they are.

12         MS. LOWRY:   Okay.

13         THE COURT:   I've been on them.

14  Q    (By MS. LOWRY) And you said that airboats can accommodate

15  about three to four additional people safely besides the crew?

16  A    Yes, ma'am.

17  Q    And that would be about a 20-minute round trip endeavor to

18  get back and forth from the boat to the cutting and back?

19  A    Twenty minutes unimpeded.  So the -- the city boat ramp

20  is -- has -- has changed dramatically because you have DPS, you

21  have the Texas State Guard that are also deploying and launching

22  their vessels.  It's not -- it -- so at times we have to wait --

23  or -- or our marine unit has to wait -- if there's a vessel

24  being launched, they have to wait for the boat ramp to be clear

25  in order to go and -- and -- and dock the boat and safely

1  offload the migrants.

2  Q    How long did it take to cut through the wire in this

3  location?

4  A    It took me about ten -- ten minutes, ten to 12 minutes to

5  cut through the wire that was deployed there at that time.

6  Q    Do you remember about how many strands of wire were in this

7  location?

8  A    It was about three or four; three or four strands of

9  deep -- of c-wire that was deployed.  Two on the bottom, and

10 maybe one or two more strands on -- on top.

11 Q    Are there places where there are more than two to four

12 rolls of c-wire deployed in one place?

13 A    Yes.

14 Q    How long might it take to cut through a really dense,

15 large, many rolls of c-wire in one location?

16 A    Twenty, 30 minutes, perhaps, depending on -- on -- on the

17 density of -- of the -- of the c-wire.

18 Q    The -- at some point was a rope dropped off the back of a

19 truck --

20 A    Yes.

21 Q    -- down the embankment?

22 A    Yes.

23 Q    Why was that done?

24 A    As I stated before, so where the migrants were amassing

25 already on the U.S. side, it -- it -- the -- the ground became

1  oversaturated and very muddy and very slippery, and migrants

2  could not make -- make their way up the embankment on their own.

3  So in order to -- to assist them safely, I tied a rope to one of

4  the vehicles and let the migrants pull themselves up, up the

5  embankment.  That was the only way we were going to be able

6  to -- absent a Border Patrol agent going down there with them

7  and helping them up, that was the only other way we were going

8  to safely extract the migrants from that riverbank.

9  Q    Is this a typical or common way that you engage with the

10  migrants like this; with the rope and the truck?

11  A    Only in emergency situations.  It's not typical for us to

12  do that.

13  Q    Was it appropriate in this circumstance?

14  A    At that point in time, yes.

15          THE COURT:  Why?  Why?

16          THE WITNESS:  Your Honor, there was no other way to

17  bring those individuals up, up there.

18          THE COURT:  But that would be normal than -- that

19  would be typical than to any other time that you're down there

20  patrolling, right?  You would need a rope?

21          THE WITNESS:  No, ma'am.  There's --

22          THE COURT:  So why was this so different from any time

23  when migrants are amassing there?

24          THE WITNESS:  Because of the embankment, and -- and --

25  the steep dropoff.

1          THE COURT:  Okay.  That's what I'm asking.  That's

2     what I'm asking you, Chief Trevino.  You're saying that

3     agents [sic] amass there, it's safe to bring them up with a

4     rope, right?  That's the safest way to bring them up.

5          THE WITNESS:  In that situation, yes.

6          THE COURT:  Okay.  Why is that situation different

7     from any other time that you have migrants coming through there

8     that you don't use a rope?

9          THE WITNESS:  Through that same -- that same point?

10          THE COURT:  Uh-huh.  That's -- yeah, that's what we're

11     talking about.

12          THE WITNESS:  It -- it wouldn't be.  We -- we haven't

13     had -- we haven't had a group amass at that particular point

14     since that incident.

15          THE COURT:  No, I'm saying even before that incident.

16          THE WITNESS:  I don't remember a group crossing at

17     that same location --

18          THE COURT:  Really?

19          THE WITNESS:  -- where this group crossed.

20          THE COURT:  Really?  Are you sure?

21          THE WITNESS:  Yes.

22          THE COURT:  Okay.

23            Proceed.

24     Q.   (By MS. LOWRY) Was the group size part of that calculation?

25     A.   To cut the -- to cut the c-wire there?

1  Q    Just how did the group's size change the dynamics on that

2  day?

3  A    Taking into account the individuals that were already on

4  the U.S. side on the riverbank, and then assessing the

5  individuals that were in the water, and then the individuals

6  that were still in Mexico, we -- we needed another access point

7  to safely bring the individuals up.  One access point was not

8  going to -- to suffice.

9           Also, that portion where the migrants were sliding

10 off because the -- the dirt was already wet and muddy, so -- we

11 needed to find some dry ground, so we moved further downriver

12 and found another suitable location where we could cut where

13 there wasn't a lot of c-wire, and we made another opening.

14 Q    How did that group size compare in terms of -- you know, in

15 your career, in terms of numbers?

16 A    This is the single biggest crossing event that I have -- in

17 my 22 years that I have ever witnessed in one -- in one event.

18 This was one group of 2,680 migrants at one time that spanned

19 about three and a half to four hours from when the first migrant

20 crossed to when the last migrant came ashore.

21           THE COURT:  You're saying this is the largest group

22 ever to cross in Eagle Pass within the last three years?

23           THE WITNESS:  This is the largest single crossing --

24           THE COURT:  What's what you're telling me?

25           THE WITNESS:  Yes, ma'am.  In a --

1          THE COURT:  Are you sure, Chief Trevino?

2          THE WITNESS:  -- in a single event.  So we're talking

3    about a single event.

4          THE COURT:  I'm talking about a single event.  You're

5    saying this is the largest you've seen in the Eagle Pass area in

6    the last three years?

7          THE WITNESS:  I don't know about the last three years,

8    Your Honor, but in my --

9          THE COURT:  Well, you've been -- you've been over

10   Eagle Pass for the last three years.

11         THE WITNESS:  In -- in my career?

12         THE COURT:  Yes.

13         THE WITNESS:  This is the largest group in a single

14   crossing that I have seen.

15         THE COURT:  But you've been in Eagle Pass the last how

16   many years?

17         THE WITNESS:  So I just got back to Eagle Pass in

18   July.  I was stationed in the Del Rio Sector for two years.

19         THE COURT:  So this is the largest single group you've

20   seen come in in any of the Del Rio Sectors?

21         THE WITNESS:  In my experience.

22         THE COURT:  Not the 16,000 Haitians under this bridge?

23         THE WITNESS:  That was not a single crossing.  That --

24   that spanned the course of seven days.  So the Haitian migration

25   under the -- the POE here was a crossing or a migration that

1  spanned about seven days.  What I'm referring to is one single

2  event and one single group, is -- is what -- what I'm trying

3  to -- to convey.

4          THE COURT:  Ask your next question.

5  Q    (By MS. LOWRY) Did you, as Border Patrol, take lessons from

6  the Haitian migrant crossing?

7  A    We did.

8  Q    You mentioned making additional cuts in the c-wire on this

9  day so it wasn't the one point of access.  Why were additional

10 cuts made?

11 A    So as I stated before, the ground was -- was -- was

12 oversaturated as we were -- as the migrants were amassing, and

13 so we -- we needed to find areas of the riverbank that were dry

14 that would allow the migrants to safely make it up the

15 embankment without sliding back down and either falling back

16 into the river or taking some more people with them as they slid

17 back down the embankment.  It was the most -- it was the safest

18 and the most orderly way to conduct that rescue operation.

19 Q    You are a supervisor, correct?

20 A    I am.

21 Q    And it was your call to cut the wire here?

22 A    It -- it was.

23 Q    Why were you doing that as a supervisor versus someone

24 else?

25 A    Given -- given the scrutiny that's -- that's -- that this

1    situation has, we have relegated the cutting of the c-wire, or

2    any breach of the c-wire, to a manager from the first-line level

3    and above.  We don't -- we don't relegate this to our journeymen

4    agents.

5    Q.    Do you exercise your judgment when deciding whether to cut

6    the c-wire?

7    A    Yes.

8    Q.    Are you aware of any Border Patrol policy directing you to

9    cut the c-wire?

10    A    No.

11    Q.    Is there any CBP policy directing you to cut wire?

12    A    No.

13    Q.    Is there any --

14         THE COURT:  Okay, wait.

15    Q.    (By MS. LOWRY) -- DHS policy --

16         THE COURT:  Wait just a -- I have a question on

17    this -- in this area.

18              So if you've relegated the decision to a -- a

19    mid-manager or above, what is that that you're delegating to

20    them?  What authority are you delegating to them?

21         THE WITNESS:  Your Honor, it's not -- it's not any

22    authority.  It's --

23         THE COURT:  Well, you just said journeymen don't make

24    this decision, it's relegated to supervisors, to managers

25    first-line level and above.  What is the decision or the policy

1  that relegated it to that level?

2          THE WITNESS:  So at the managerial level we just -- we

3  assume more risk and more responsibility.  And so by -- by --

4          THE COURT:  Okay.  So why was it decided that you had

5  to take it upon yourself at that time?  What was that discussion

6  that was made to relegate what type of decision to the -- to the

7  first-line manager and above?

8            What was that authority --

9          THE WITNESS:  I'm not sure I'm understanding your

10  question.

11          THE COURT:  Well, you're saying that given the

12  situation and the scrutiny --

13          THE WITNESS:  Uh-huh.

14          THE COURT:  -- the decision was relegated to mid --

15  first-level managers and above to do what?

16          THE WITNESS:  To cut the c-wire if -- if it --

17          THE COURT:  Okay.  So there was a decision made that

18  the permission had to come that from level of manager and above?

19          THE WITNESS:  Typically, yes.

20          THE COURT:  Okay.  Who -- who made that call?  Or how

21  was that put in enforcement?  Or how was that told to everyone

22  in the area in terms of Border Patrol?

23          THE WITNESS:  So I'm speaking for the -- for the

24  Eagle Pass South Station.  It was a -- it was -- it was a --

25          THE COURT:  Okay.

1     THE WITNESS:  -- it was a -- a conversation that I had

2 with my -- with my second-line supervisors, and -- and they knew

3 they --

4     THE COURT:  So this was your decision and policy for

5 that station, or was this for other stations as well?

6     THE WITNESS:  I cannot speak for the other stations,

7 Your Honor.  This was --

8     THE COURT:  So this was a decision you made for your

9 station?

10     THE WITNESS:  Yes, ma'am.

11     THE COURT:  Okay.  All right.  I'm just trying to --

12 I'm trying to pin that down.

13     THE WITNESS:  Yes, ma'am.

14     THE COURT:  All right.  Go ahead.

15 Q   (By MS. LOWRY) And that is whether or not to cut the wire,

16 correct?

17 A   Correct.

18 Q   Not to cut it in any given circumstances?

19 A   Correct.

20 Q   Can line Border Patrol agents make that decision on their

21 own if it -- if there's an exigent circumstance?

22 A   Absolutely.

23 Q   To your knowledge, has any Border Patrol agent cut the wire

24 solely for the purpose of destroying Texas property?

25 A   No.

1  Q    To your knowledge, has any Border Patrol agent cut the wire

2  for the purpose of encouraging illegal immigration into the

3  United States?

4  A    No.

5  Q    Stepping back from the wire, does Border Patrol encounter

6  fences and locks while it's executing its mission?

7  A    Yes.

8  Q    What does -- what would you do if you were trying to

9  apprehend a migrant and you encountered a locked fence?

10  A    If there was no other way around to get to where the

11  migrant was, we typically -- we would either cut the lock, cut

12  the chain, or cut the fence to apprehend the migrant or

13  migrants, and then we would advise the landowner.  And we

14  have -- there are mechanisms to -- to compensate the landowner

15  for that -- that damage.

16  Q    Does Border Patrol need a warrant to do that?

17  A    No.

18  Q    Does Border Patrol try to minimize damage to property

19  owners when executing its mission?

20  A    Yes.

21  Q    Are there non-medical emergencies when Border Patrol has

22  cut a lock on a fence?

23  A    Yes.

24  Q    To execute its mission?

25  A    Yes.

1  Q    Is that a similar analysis to what's at play with the

2  concern -- concertina wire?

3  A    Yes.

4  Q    Are there any gates or access points in this continuous

5  stretch of concertina wire from Shelby Park moving down south?

6  A    No.

7  Q    Are you familiar with any landowners who are unhappy with

8  the concertina wire on their property?

9  A    I know of one, Mr. Urbina, who owns the -- the Heavenly

10  Farms, formally known as the -- the Leonard Orchard.

11  Q    Have you spoken to Mr. Urbina?

12  A    On one occasion, yes.

13  Q    How many miles of riverfront land does Mr. Urbina own?

14  A    Approximately two miles.

15  Q    Do you understand why he is unhappy with the wire?

16  A    In speaking -- speaking to him, he -- he said that the --

17          MR. BRYANT:  Objection.  Hearsay, Your Honor.

18          THE COURT:  Hearsay's gotten in.

19            Do you know what he -- why or not?  Do you know why

20  he's unhappy or not?

21          THE WITNESS:  He's told me that he's unhappy --

22          THE COURT:  Did he -- the question is:  Do you know

23  why?

24          THE WITNESS:  Only from what he's told me.

25          THE COURT:  Okay, but she's asking why.

1          MS. LOWRY:   Yes.   And -- and why is that?

2          THE COURT:   That's what she's asking you.

3          THE WITNESS:   So the deployment of the c-wire was not

4   what he had anticipated.   He said initially he -- he gave the

5   state permission to -- to be on -- on his land, but didn't --

6   didn't -- does not agree with -- with the deployment of the

7   c-wire.

8   Q     Is there also state fencing on his property?

9   A     There is.

10  Q     Did Border Patrol and the Urbinas reach any agreements that

11  allow Border Patrol to use the Urbina's property?

12  A     Yes.   So when we -- when we -- when we noticed that the --

13  the migrant crossings in that -- in those particular zones,

14  Zones 18 and 19, were -- were -- were rising, we -- we leased a

15  piece of -- a portion of his land --

16          THE COURT:   Which was when?   Give me a date.

17          THE WITNESS:   Ma'am, I don't recall, Your Honor.

18          THE COURT:   Okay, what -- we're trying to talk about

19  in terms of all this time period.   So you leased it before

20  January 1st?   After January 1st?

21          THE WITNESS:   Oh, no.   It was after January 1st.

22          THE COURT:   Okay.   So before the wire was put up?

23  After the wire was put up?

24          THE WITNESS:   It was around the same time.   It was

25  around when Title 42 was -- was going to expire.   So around

1  May 11th --

2         THE COURT:  Okay.

3         THE WITNESS:  -- in -- in anticipation.

4         THE COURT:  So you anticipated big groups in that area

5  already?

6         THE WITNESS:  Yes.

7         THE COURT:  So you believed that was going to come to

8  that area already?

9         THE WITNESS:  We did.

10         THE COURT:  Okay.

11  Q    (By MS. LOWRY) Is -- what kind of operations was Border

12  Patrol going to do on this leased portion of the Urbina's

13  property?

14  A    So we did -- we did flex in infrastructure, we flexed in

15  some processing trailers, we flexed in some -- some porta

16  potties, we flexed in some -- some aggregate to -- to improve

17  the roadway so our buses could -- could maneuver in and out

18  without getting stuck in the event of a -- of a big rain, things

19  of that nature, we flexed in some water, all -- all kinds of

20  detainee supplies and things of that sort.

21  Q    Is Border Patrol still using that infrastructure?

22  A    No, ma'am.

23  Q    Why not?

24  A    The reason that location was -- was chosen was, number one,

25  it was -- it was central to where the uptick in traffic was, and

1  there was a direct access point from that location down to the

2  river.   Which is why that was strategically chosen.

3  Q     Has Border Patrol stopped using that facility?

4  A     We have.

5  Q     Why is that?

6  A     The gate that -- that was -- that we were utilizing to

7  access the river road has now been closed by -- by the State of

8  Texas, and there has been dirt that has been piled on either

9  side of the gate preventing us from even opening it or -- or --

10  or driving a vehicle through it without bringing in some type of

11  heavy machinery to -- to move all that out.

12  Q     Dirt placed on either side of the gate that was used to

13  access that infrastructure that you built on the Urbina's

14  property?

15  A     Yes.

16  Q     By the State of Texas?

17  A     Yes.

18  Q     Does the wire -- concertina wire place an impediment to you

19  accessing migrants on the other side of the wire?

20  A     It certainly impedes our ability, yes.

21  Q     Does it increase response time in the case of emergencies?

22  A     Yes.

23  Q     Have agents been injured interacting with the wire?

24  A     They have.

25  Q     Are you familiar with any instances in which Border Patrol

1  cut the wire to apprehend, inspect, and take migrants into

2  custody apart from a medical emergency?

3  A    Yes.

4        THE COURT:  Wait.  Say -- say that question again,

5  counsel.

6  Q    (By MS. LOWRY) Are you familiar with any instances when

7  Border Patrol has cut the wire to apprehend and inspect migrants

8  apart from a medical emergency?

9        THE COURT:  Okay.  And he answered "yes."  I heard

10  that.  Okay.

11  Q    (By MS. LOWRY) Do you stand by your decision-making related

12  to cutting the wire on September 20th?

13  A    I do.

14  Q    Why is the wire different than the federal border wall in

15  this area?  How are they different in terms of impact on -- on

16  Border Patrol?

17  A    So the federal border -- or the -- the border wall -- are

18  you talking about the border wall that the state put up or

19  which -- which point?

20  Q    I was talking about the federal border wall in the Eagle

21  Pass area, but we can talk about the state border wall

22  separately.

23  A    So the federal border wall, the legacy border wall that

24  was -- that was constructed years ago is -- is not continuous,

25  and there are access points every -- I -- I don't know how --

1  how far apart the access points are.  But there are access

2  points to get down to -- to the river and -- to respond to an

3  incursion, migrants crossing, any type of medical emergency.

4  Q    Do those access points exist in the concertina wire from

5  Shelby Park going south?

6  A    They do not.

7  Q    Does that -- does the concertina wire impact where the

8  marine units can dock their boats?

9  A    Yes.

10 Q    How so?

11 A    So I can give you an example.  So if Shelby -- if -- if the

12 municipal boat ramp, which is where we -- the Texas DPS and --

13 and -- and other agencies are -- are staging right now,

14 sometimes that boat ramp is closed.  Texas has put a chain

15 around the gate to access the boat ramp, and sometimes there is

16 no one to grant our marine units access.  So we have to utilize

17 boat ramps on private property to deploy our vessels, which

18 dramatically increases not only response time, but deployment

19 time as well.

20 Q    And you can't do that where the c-wire has been deployed --

21 A    No.

22 Q    -- correct?

23 A    No.

24 Q    About how many migrants crossed on September 20th through

25 the crossing and going into processing?

1   A     2680.

2                THE COURT:   And eight?

3                THE WITNESS:   Eighty.

4                THE COURT:   Eighty.   Okay.

5                THE WITNESS:   Yes, ma'am.

6   Q     (By MS. LOWRY) Are you aware of any large groups of get-

7   aways in conjunction with this group?

8   A     On that particular day, we were -- we were so focused and

9   so busy with migrants that were already on the U.S. side trying

10  to bring them out, I -- I don't know if we had any got-aways in

11  that -- in that particular zone and -- and -- during that

12  particular time.

13  Q     You're not aware of a large group of get-aways, correct?

14  A     I'm not aware.

15  Q     How many officers, Border Patrol agents, did you have at

16  the places where the wire was being cut?

17  A     So where we were cutting the wire, there was approximately

18  seven -- seven agents there, and there was another large

19  contingent of agents underneath Port of Entry Number II, which

20  is where our staging area is located.   We dedicated more

21  personnel there because the -- the number of migrants was just

22  growing, and growing, and growing incrementally as -- as

23  migrants made their way underneath the port of entry.   And so in

24  order to -- to ensure security and keep it safe and orderly, we

25  needed a bigger contingent of agents at that location.

1  Q    Were you outnumbered at the point where the wire was being
2  cut?
3  A    Absolutely.
4  Q    Ratios, how many migrants to each officer?
5  A    Fifty to one.
6  Q    At any --
7  A    At any --
8  Q    -- at any particular time?
9  A    -- given time.   At any given time.
10         MS. LOWRY:   I'll pass the witness, Your Honor.
11         THE COURT:   Okay.   Cross?
12                    CROSS-EXAMINATION
13 BY MR. BRYANT
14 Q    Mr. Trevino, my name's David Bryant.   I'm with the Attorney
15 General's Office in Austin, and I represent the State of Texas,
16 along with our other attorneys here.
17         First, on behalf of the State of Texas, I want to
18 thank you and the people you work with on the Border Patrol for
19 all you do in the service of all of us.
20         Now, you -- is my understanding correct that you
21 believe you have the authority to cut Texas' c-wire whenever you
22 believe that that's necessary to accomplish a Border Patrol
23 objective?
24 A    I believe I have the authority to enforce immigration laws
25 within 25 miles of the border unimpeded.

1  Q     And that includes cutting Texas' c-wire?

2  A     Yes.

3  Q     And who within the Border Patrol advised you that you have

4  that authority?

5  A     It is part of the Immigration and Naturalization Act, and

6  it's statutory authority that's been given to the United States

7  Border Patrol.

8  Q     Is that a uniform policy within the Border Patrol?

9  A     It's a statutory authority that -- that we are -- that we

10 are given when --

11 Q     Okay.

12 A     -- when we are hired as Border Patrol agents.

13 Q     And in your testimony, I understand that on this occasion,

14 around September 20th, 2023, there was a limit placed on who

15 could exercise that authority; that it was not to be exercised

16 by journeymen Border Patrol agents.  Is that right?

17 A     Typically, yes, sir.  Typically, it -- this is done at the

18 supervisory level and above.

19 Q     Okay.  And on that occasion, you described that you felt --

20 or this was the largest group that -- of migrants coming across

21 at one time that you had seen in the Eagle Pass area?

22 A     In my 22 years, this has been the single biggest migration

23 or migrant crossing that I have experienced or -- or witnessed.

24 In my 22 years.  I'm not saying that this is the biggest in the

25 Del Rio Sector; this is the biggest that I have experienced.

1  Q    Okay.  Now, there's been some testimony earlier about the

2  number of cuts in Texas' c-wire in the Eagle Pass area that were

3  present on September 20th.  If I understand correctly, you

4  testified that the Border Patrol made two different cuts on that

5  date?

6  A    We made three different cuts on that day.

7  Q    Okay.  Where was the third cut, as compared to the first

8  two that you described earlier in your testimony?

9  A    It was slightly downriver, and I'm talking maybe 10 or

10  20 feet from -- from the second cut.  They -- they were not far

11  apart from each other.

12  Q    Did migrants come through all three of the cuts?

13  A    They did.

14  Q    Did -- did you or others in the Border Patrol to your

15  knowledge seek any permission from the State of Texas or any of

16  the agencies involved in it prior to making those cuts?

17  A    No, we did not, sir.

18  Q    Did you attempt to notify the State of Texas or any of its

19  agencies that you -- that you were cutting the wire at the time

20  that you were cutting it?

21  A    So that -- there were a lot of personnel there at the time.

22  We did -- I -- I can't remember who we told that we were going

23  to cut the wire.  It was -- it was a -- a state guard soldier

24  that we advised we were cutting the wire.  So, the -- the

25  communication was made verbally to -- to that individual.  I

1    don't remember who --

2    Q    Okay.  And you didn't personally provide that information

3    or direct that it be provided?

4    A    No, I didn't -- I didn't provide that information.

5    Q    Just somebody who was there with the Border Patrol saw a

6    soldier and said, We're cutting the wire?

7    A    Yes.

8    Q    We focused a lot on that one incident on September 20th.

9    Did the Border Patrol cut Texas' wire without its permission on

10   other occasions in September 2023; to your knowledge?

11   A    I believe so.

12   Q    How many times that you're aware of that, aside from

13   September 20th, did the Border Patrol cut Texas's wire without

14   its permission in the Eagle Pass area in September 2023?

15   A    I know of five or six other occasions where -- where we --

16   where we cut the c-wire.

17   Q    Were those occasions where you were present or just that

18   you were -- heard of or were told?

19   A    I was -- I was -- I was present for one or two, and then

20   I -- I was advised that -- that the c-wire was cut on -- for the

21   other occasions.

22   Q    When the Border Patrol cut Texas' c-wire without its

23   permission in the Eagle Pass area in September of 2023, did

24   it -- did it make any kind of written reports regarding those

25   cuts or the -- the reasons why they were made?

1    A    So we have our own internal reporting mechanisms.   And so

2    when we -- those reports are generated, all the pertinent

3    information and -- and facts go in to -- to that reporting

4    system.

5    Q    And where are those reports maintained?

6    A    They're maintained at the -- it's a database, so it's not

7    even here at the sector level.   It's -- it's -- I don't -- I

8    don't know who the owner of that database is or who maintains

9    that database.

10    Q    Okay.

11    A    But it's -- it's -- it's a CBP database.

12    Q    And you or other supervisors in the Del Rio Sector access

13    that database that -- that contains all the reports of all of

14    the cuttings of -- or damage to the Texas c-wire that were made

15    without its permission in September 2023?

16    A    With the proper access and -- and permissions, yes.

17    Q    Who would you need permission from?

18    A    It's the system administrator that grants access to --

19    to -- to run any reports that -- that are not originated in your

20    particular area of operation.

21         THE COURT:   Wait.   But this was happening in your area

22    of operation, so you would have access.

23         THE WITNESS:   So the area -- that area, Your Honor --

24         THE COURT:   It's within your area of operation.

25    That's what you testified on direct.   So you would have access

1  to them.

2          THE WITNESS:  So that area, Your Honor, is -- belongs

3  to Eagle Pass North station.  I was there because I was the

4  deputy incident commander.

5          THE COURT:  That's right.  So you had control over

6  that area, so you would have access to those reports.

7          THE WITNESS:  I -- I don't have access to those

8  reports because they're generated under the Eagle Pass North

9  Station's classification.

10          THE COURT:  No.  No.  No, Chief Trevino.  I'm sure you

11  have access to those reports.

12          THE WITNESS:  I don't have --

13          THE COURT:  You were the incident commander making

14  some of these decisions, so you would have access to the reports

15  that were made when you were incident commander.

16          THE WITNESS:  I don't have access to the reports.  I

17  cannot gener -- I cannot go into the system and run a query or a

18  search for events that did not happen under the Eagle Pass South

19  organizational structure or code.  I don't have that permission.

20          THE COURT:  So how is it this -- the South station was

21  making the operational decision to cut the wire?

22          THE WITNESS:  Because I was the deputy incident

23  commander.

24          THE COURT:  Exactly.  So you would have access to

25  those reports as such.  Because it was the South Station agents

1  that were cutting; were they not?

2          THE WITNESS:  No, ma'am.  No.  This -- this -- these

3  were -- these were North Station agents.  There were some South

4  agents there, but by and large, this was happening in the

5  Eagle Pass North Station area of responsibility.  They were --

6  they were predominantly --

7          THE COURT:  So who in the North Station was making the

8  decision, mid-level management, to cut the wire when you weren't

9  there?

10          THE WITNESS:  That would have been the incident

11  commander at the time.  Mr. --

12          THE COURT:  Who would that have been if it wasn't you?

13          THE WITNESS:  Mr. Mickey Donaldson was the incident

14  commander.

15          THE COURT:  Okay.  At all of these times?  Or was it

16  you at all of these times?

17          THE WITNESS:  So, Mr. Donaldson, Your Honor, was the

18  incident commander.  I -- I was the second commander -- or the

19  second in command in -- in that --

20          THE COURT:  I get that.

21          THE WITNESS:  -- in that hierarchy.  So when I was not

22  present, Mr. Donaldson was the one making the decisions.

23          THE COURT:  So you and Mr. Donaldson were in charge of

24  this area and making the decision -- or who made the decisions

25  to cut the wire, so you would have access to those reports.

1    Because I'm assuming you would have reviewed them.   You and/or
2    Mr. Donaldson.
3    A    So, Mr. Donaldson has access because he's the patrol agent
4    in charge of the Eagle Pass North Station, which is the area --
5         THE COURT:   So you're telling me as the deputy
6    incident commander you would not have access to those reports or
7    have knowledge of what's in those reports is what your testimony
8    is?
9         THE WITNESS:   No, I have knowledge as to what is in
10   the reports.   I -- I don't --
11        THE COURT:   So you have --
12        THE WITNESS:   -- have access to the reports.
13        THE COURT:   So you read the reports?
14        THE WITNESS:   I read the reports.
15        THE COURT:   And you read them on the database?
16        THE WITNESS:   No, ma'am.
17        THE COURT:   So how did you read them?
18        THE WITNESS:   On email.
19        THE COURT:   So you have them on your email then?
20        THE WITNESS:   I do have them on my email.
21        THE COURT:   Okay.   So you could have access via your
22   email for those reports.
23        THE WITNESS:   Yes.   Maybe I misunderstood the
24   question.   I -- I -- understood the question to say --
25        THE COURT:   So those reports are available to you if

1   you need them.

2   Q    (By MR. BRYANT) And would that be true of all of the

3   incident reports regarding Texas' c-wire being cut in the -- in

4   both of the North and Eagle Pass South areas in September of

5   2023?

6   A    I'm sorry, one more time.

7   Q    Okay.  I'll try to ask that one more clearly.

8        Did you receive the emails that described the

9   cutting incidents for Texas' c-wire in September 2023 as to both

10  those that were in the Eagle Pass North Sector and those that

11  were in the Eagle Pass South Sector?

12       THE WITNESS:  I did receive them, yes.  Because I'm on

13  the -- I'm on the distribution list for the entire sector.

14  Q    Okay.  And -- and -- so those are all on your email

15  somewhere?

16  A    They are, if --

17  Q    Okay.

18  A    -- if -- they -- they could be -- they could be extracted.

19  Q    And as far as you know, was -- was a report made for each

20  incident in which Border Patrol personnel cut the c-wire without

21  Texas' permission in September of 2023?

22  A    To my knowledge, yes.

23  Q    Thank you.

24       MR. BRYANT:  Could we bring up Plaintiff's Exhibit

25  Four, which is Captain Garcia's declaration, and look at

1  Paragraph 12 again.

2  Q    (By MR. BRYANT) Okay, can you see that, Mr. Trevino?

3  A    Yes, sir.

4  Q    Can you see that document?

5  A    Yes, sir.

6        MR. BRYANT:   And I assume everyone else can.

7  Q    (By MR. BRYANT) Okay.  This is a -- a declaration that was

8  provided by Captain Garcia, who's involved in Operation Lone

9  Star with the State of Texas.  And beginning on 12-A, he states

10 that Texas had a record of a report of the Border Patrol cutting

11 Texas' c-wire near Eagle Pass, Texas.  September 21st, 2023.

12 Did that occur, to your knowledge?

13 A    It -- it -- I'm not saying it didn't occur.  It -- it

14 probably did occur, given the time.  I probably saw that report.

15 I -- I don't remember all the reports.

16 Q    Do you have any knowledge of the circumstances or reasons

17 why the Border Patrol cut Texas' c-wire near Eagle Pass on that

18 occasion?

19 A    No.

20 Q    You don't have any reason to believe it was for any of the

21 reasons that you made the call to cut Texas' c-wire on

22 September 20th, did you?

23 A    I -- I don't know why the wire was cut on that particular

24 day, at that particular time is -- is --

25 Q    Okay.  There are two additional instances of -- noted under

1   B and C that were reported to have occurred on September 24th,

2   2023.   Do you have any reason to believe that the Border Patrol

3   did not cut Texas' c-wire in the Eagle Pass area without

4   permission, as indicated in Plaintiff's Exhibit Four?

5   A    Do I have any reason to believe that the Border Patrol did

6   not cut the c-wire without the -- the permission?

7   Q    Right.  I'll be happy to clarify it.

8           We have Captain Garcia saying that he got reports

9   that -- two reports on September 24th --

10  A    Okay.

11  Q    -- that the Border Patrol cut Texas' c-wire.  Do you have

12  any reason to believe those are not accurate?

13  A    No, I don't have any reason to believe they're not

14  accurate.  No, sir.

15  Q    Do you know any -- any good reason why that was done by the

16  Border Patrol on that day?

17  A    Without reading the reports, I -- I couldn't tell you why

18  they cut it.

19  Q    And there was an incident reported on September 26th, 2023,

20  in which it was reported that the Border Patrol cut Texas'

21  c-wire near Eagle Pass.  Do you have any knowledge of that

22  incident?

23  A    No.

24  Q    Do you have any reason to believe that it did not occur?

25  A    I don't have any reason to believe it did not occur, no.

1   Q    Okay, let's look at -- at the next page.  And there are

2   many incidents there.  Do you -- do you know -- do you have

3   personal knowledge of any of those individual incidents?

4   A    Just looking at the time and the date, no, sir.  I -- I

5   don't have anything to reference other than the time and the

6   date, and I don't recall.

7   Q    Okay.  Do you have any reason to believe that any of the

8   incidents reported to Captain Garcia of the Border Patrol

9   cutting Texas' c-wire between September 21st and October 10th of

10  2023 did not occur?

11  A    No, I don't have no reason to -- to believe it didn't

12  occur.

13  Q    Okay.  Now, I think earlier in your testimony you indicated

14  that there were one or two other instances in which you were

15  personally present and the decision was made to cut Texas'

16  c-wire without its permission; is that right?

17  A    Yes, sir.

18  Q    Do you recall the dates of those?

19  A    I don't recall the dates.

20  Q    Do you recall the approximate dates of those?

21  A    I don't.

22  Q    Do you recall any specific reasons why Texas -- why Border

23  Patrol made the decision to cut Texas' c-wire without its

24  permission on those occasions?

25  A    Specifically, no, but I can tell you that it -- it -- it

1  would have been for an emergency situation or to bring up

2  migrants that were exposed or had been exposed to the elements

3  for a prolonged period of time and to prevent a potential

4  medical emergency requiring more personnel that we didn't have.

5  And also it would have put a strain on the -- the EMS and the

6  hospital in Eagle Pass, Texas.

7  Q    Isn't it correct that about any migrant that has made it to

8  the border across from Eagle Pass and then has come across the

9  river has been exposed to the elements?

10  A    They have.

11  Q    And I think you indicated it's typical that anybody who is

12  in that situation has been in a pretty extreme physical

13  situation, they're not in their best health or condition.

14  A    They are not.

15  Q    Now, are there any -- any of the incidents of the Border

16  Patrol cutting Texas' wire without its permission in September

17  or October of 2023, ones in which there was an -- it was done

18  for an actual medical emergency as opposed to a potential or

19  possible medical emergency?

20  A    I can recall one incident earlier.  I believe it was this

21  month.

22  Q    In October or November?

23  A    No, November.

24  Q    Okay.

25  A    Early November, late October.  Don't -- don't -- I'm -- I'm

1    unsure, but it was within the last week, week and a half, where

2    we cut the c-wire to extract an elderly gentleman who was

3    already exhibiting signs of hypothermia.    That gentleman went to

4    the hospital and spent about a day and a half in the hospital

5    for -- for hypothermia.

6    Q     Okay.    The Court entered its temporary restraining order on

7    October 30th, which was a week ago Monday.    Are you aware of

8    the -- the Border Patrol cutting Texas' c-wire for any reason

9    since that date?

10   A     Yes.    The -- the incident that I just referenced happened

11   after the -- the restraining order went into effect.

12   Q     Okay.    And did Border Patrol report that incident to the

13   Court, to your knowledge?

14   A     To who, sir?

15   Q     To the Court.

16   A     To -- I -- I don't know.

17   Q     Did Border Patrol report that incident to its attorneys in

18   this case?

19   A     I believe so.

20   Q     And did Border Patrol report that incident to anybody

21   representing the State of Texas?

22   A     So the State of Texas had firsthand knowledge because

23   soldiers from the Texas State Guard were the ones that made the

24   phone call to the Eagle Pass North Station advising them that

25   there was an elderly gentleman in need of medical attention.

1   Eagle Pass North Station called us because it was -- it was

2   determined that it was in our area of operation.   We sent agents

3   to the location and we safely extracted the -- or -- or rescued

4   the -- the individual.

5   Q    And at that point was when you -- the Border Patrol cut the

6   wire?

7   A    Yes, we cut the wire.

8   Q    And did Border Patrol ask Texas's permission to cut the

9   wire?

10  A    No.

11  Q    And was there an incident report that details the

12  circumstances of that cutting of Texas' wire without its

13  permission?

14  A    There is.

15  Q    Okay.

16       THE COURT:   I have a question.   Going back to the one

17  that was after the Court order was issued, you're saying that

18  was in the South Station area.

19       THE WITNESS:   Yes, Your Honor.

20       THE COURT:   Is that -- where Heavenly Farms is?

21       THE WITNESS:   So --

22       THE COURT:   Is that where Heavenly Farms is?

23       THE WITNESS:   It's part of the Heavenly Farms.

24       THE COURT:   Okay.   So at which point does it become

25  North Station versus South Station if we use Heavenly Farms as

1  kind of a reference point?

2      THE WITNESS:  So there's a fence line.  It's called

3  the 1430 fence line.  That is -- that is the seam between --

4      THE COURT:  Okay.  So in relationship to Heavenly

5  Farms, is it north of there or is it south of there?

6      THE WITNESS:  It's --

7      THE COURT:  Is it upriver or downriver?

8      THE WITNESS:  -- it's south.  It's downriver.

9      THE COURT:  It's downriver?

10      THE WITNESS:  It's downriver, Yes, Your Honor.

11      THE COURT:  So Heavenly Farms is not in your normal

12  area of operation.

13      THE WITNESS:  Part of it is.

14      THE COURT:  Okay.  So, that's what I'm trying to say.

15  Heavenly Farms, where it is, okay, where -- let's say where you

16  had the processing area.

17      THE WITNESS:  Uh-huh.

18      THE COURT:  Okay.  At that processing area, you're

19  saying that's in the north -- North Station area?

20      THE WITNESS:  Yes, ma'am.

21      THE COURT:  Okay.  And your point starts south of

22  there?

23      THE WITNESS:  Yes, Your Honor.

24      THE COURT:  And where the elderly man needed help was

25  at which point in relationship to where your processing center

1  used to be on Heavenly Farms?

2          THE WITNESS:  Slightly downriver.

3          THE COURT:  So that was in your area?

4          THE WITNESS:  Yes, Your Honor.

5          THE COURT:  Okay.  I'm just trying to get an idea.

6  All right.

7          THE WITNESS:  Yes, Your Honor.

8  Q.    (By MR. BRYANT) Okay.  Are you aware of incidents in

9  September or October of 2023 when U.S. Border Patrol personnel

10 or people acting under their -- their direction used forklifts

11 to lift or damage Texas' c-wire without its permission?

12 A.    Yes.

13 Q.    When did that first occur, to your knowledge?

14 A.    I don't recall the exact date.  It -- I -- I do know it was

15 before the -- the temporary restraining order went into effect.

16 But I don't recall the specific date when -- when the -- when

17 the front end loader was used.

18 Q.    Can you give a reasonable estimate of the first incident of

19 that, to your knowledge.

20 A.    September 25th, 26th.  Around that -- around that

21 timeframe, perhaps.

22 Q.    Okay.  How many such incidents are you aware of that

23 occurred in which the Border Patrol directed that a forklift be

24 used to lift or flatten or otherwise damage Texas' c-wire

25 without its permission?

1  A     Three.

2  Q     And where did those occur?

3  A     Those occurred in the Eagle Pass South Station area of

4  responsibility.

5  Q     Were those actions that you personally authorized?

6  A     Yes.

7  Q     And why did you choose on those occasions to use a forklift

8  rather than just cutters?

9  A     It was easier to use the forklift than to cut through four

10  or five strands of c-wire to -- to get to the migrants.   And on

11  some of those occasions we had drownings.   We had a six-year-old

12  child who drowned, and -- and our marine units performed CPR and

13  brought her back to life.   So we needed to bring her up from --

14  from the riverbank.

15  Q     And was that the only reason that you used the forklift

16  to -- to damage or destroy the Texas' c-wire on those three

17  occasions?

18  A     No, there was another incident where a paraplegic

19  individual was brought across the river by his brother.   His

20  brother swam with him on his back, he -- they could not -- he

21  could not make it up the river bank.   And again, cutting through

22  all of that c-wire was going to be too labor- and time-

23  intensive.   It was easier to bring in a front end loader, which

24  doesn't involve cutting the c-wire.   There was no damage to

25  the -- to the wire itself.   We simply lifted it and we brought

1  it back down.

2  Q    And as part of lifting it, does it tear out the stakes or

3  the -- hardware that holds the c-wire in the ground?

4  A    It lifted the stakes, yes.

5  Q    Okay.  Did Border Patrol make any attempt to replace them

6  when it was done?

7  A    No.

8  Q    On all the incidents that you described in September and

9  October of 2023 when the Border Patrol cut Texas' c-wire without

10  its permission, did it attempt to make any repairs to try to

11  close up the -- the wire once the Border Patrol was through

12  there?

13  A    So we -- we were advised by the Texas State Guard that they

14  would be making all the patches all the repairs to the breaches.

15  Q    So, you left them open, even when nobody from the Texas

16  National Guard was even aware that you made the openings?

17  A    No, they were there.  As soon as --

18  Q    On every single occasion that we've looked at in September

19  or October of 2023?

20  A    I'm speaking of the occasions where we've had to cut the

21  c-wire.  When we cut the c-wire, when I was present, the Texas

22  State Guard was there.  They -- they're -- they're all up and

23  down that -- that stretch of the river.  So once they -- once

24  they observe us cutting the c-wire, they mobilize their folks

25  and they bring in a pickup truck full of c-wire and

1    immediately -- they immediately start repairing and patching up

2    that breach as soon as we're done with -- with extracting the

3    migrants.

4    Q    That's for the three incidents that you were personally

5    present, right?

6    A    So the three incidents that we just spoke about was when we

7    lifted the c-wire --

8    Q    Right.

9    A    -- not when we cut it.

10   Q    You had -- you had previously testified, I believe -- and

11   correct me if I'm wrong -- and there were all three incidents

12   where you were present and directed the cutting of the wire.  Is

13   that right?

14   A    On September 20th, yes.  Where we cut in three different

15   locations, yes.

16   Q    Okay.  And were those -- but weren't there some other

17   incidents, other than on September 20th when you were present,

18   when the Border Patrol intentionally cut Texas' c-wire without

19   its permission?

20   A    Well, it wasn't intentional.  We cut the c-wire to extract

21   migrants.  It was not intentional.

22   Q    It wasn't an accident, was it?

23   A    It was a necessary -- it was necessary to cut the c-wire to

24   extract the migrants.

25   Q    Okay.  Nobody made the Border Patrol cut the wire.  The

1  Border Patrol intentionally cut the wire; is that right?

2  A    We cut the wire to extract the migrants.

3  Q    Okay.  And on occasion, 310 migrants at a time?

4  A    How many?

5  Q    310.

6  A    I don't remember --

7  Q    Are you aware of an incident in which that occurred?

8  A    I don't remember every group size.

9  Q    All right.  Now, on that September 20th incident that we've

10 talked about, was -- was there an occasion during that period

11 when the Border Patrol directed migrants that it had let through

12 the concertina wire to walk about a mile down to the staging

13 area and turn themselves in there for processing?

14 A    Could you repeat that first portion?

15 Q    Sure.  Were there -- were there times on September 20th

16 when the Border Patrol, after letting migrants through the

17 already cut concertina wire, directed them to walk about a mile

18 down to the staging area near the bridge for -- to be turned in

19 for processing?

20 A    Yes, we directed them toward the -- toward the port of

21 entry.

22 Q    Okay.  And I understand it was a busy, busy day.  Did you

23 send Border Patrol agents to accompany them and to maintain them

24 in Border Patrol custody on that one-mile walk that day?

25 A    There was Border Patrol agents staged from the crossing

1  location, from the -- where -- where -- where they were coming

2  up from the riverbank to the port of entry.  There was Border

3  Patrol agents staged at various points to keep directing them

4  and to maintain a semblance of order.

5  Q    How many were there?

6  A    I don't recall.

7  Q    Do you know if there was more than one?

8  A    There was certainly more than one.  I -- I cannot give you

9  a definitive number.

10 Q    Do you know of any reason why, when the Border Patrol has a

11 circumstance where it believes it needs to make a cut in Texas'

12 c-wire, it could not timely notify Texas of what it's doing and

13 make sure that only the people that's necessary for some exigent

14 circumstance to come through the wire and then immediately have

15 the wire closed up?

16 A    So those notifications, to my knowledge, are made as soon

17 as practical.  Most times there isn't -- there -- there isn't

18 any time to make a notification before you cut the c-wire.

19 It -- it -- it's usually done after the fact.  And that is based

20 on the situation at hand, which is usually a -- either a medical

21 emergency or migrants that have already been exposed to the

22 elements for an extended period of time and things of that sort.

23 Q    Okay.  Do you know Michael Banks?

24 A    I do.

25 Q    How long have you known him, by the way?

1  A    I've met Mr. Banks on two separate -- three now, separate

2  occasions.    September 20th being the third one.

3  Q    Okay.    And on September 20th, did you have a conversation

4  with Mr. Banks in which he brought up closing up the cut that

5  the Border Patrol had made in Texas' c-wire?

6  A    I did.

7  Q    And did you tell him to go F himself?

8  A    No, I did not.

9         MR. BRYANT:   Pass the witness.

10         THE COURT:   Okay.   I have a question.

11           All right.   So, Chief Trevino -- Chief, right?

12  That's the correct title?

13         THE WITNESS:   It -- it's deputy patrol agent in

14  charge.

15         THE COURT:   Okay.   Deputy patrol agent in charge.

16  Okay.   Deputy PAIC.   So that morning of September the 20th, you

17  got notification there was a large group coming and they were

18  amassing on the Mexican side, correct?

19         THE WITNESS:   Yes, ma'am.

20         THE COURT:   About how long before the wire was cut?

21  How many hours approximately?

22         THE WITNESS:   It wasn't hours.   It was -- from the

23  time the notification was received --

24         THE COURT:   Uh-huh.

25         THE WITNESS:   -- to the time that we cut the c-wire

1   was approximately 25 to 30 minutes.

2           THE COURT:  So you're telling me that it took the

3   aliens that were slipping down the embankment that you said

4   that's why you needed to cut, because they were slipping down

5   the embankment -- you're telling me it took them 20 to 25

6   minutes to cross the river?  Is that what you're saying?

7           THE WITNESS:  Yes, ma'am.

8           THE COURT:  And you were able to get somebody there

9   with wire cutters in 20 to 25 minutes?

10          THE WITNESS:  We already had the wire cutters in our

11  vehicles.

12          THE COURT:  So they're ready for you to cut the wire

13  regardless?

14          THE WITNESS:  Yes, ma'am.

15          THE COURT:  Okay.  So you're telling me that in 25

16  minutes before they reached the embankment and they were

17  slipping, you couldn't pick up the phone -- or anybody couldn't

18  pick up the phone and notify other people about it?  Is that

19  your testimony?

20          THE WITNESS:  So there was Texas State Guard there.

21  They --

22          THE COURT:  No, that's not my question.  You couldn't

23  pick up the phone and call somebody since you were on site and

24  you were making the decision?

25          THE WITNESS:  No, we let the State Guard know we were

1  going to cut.

2      THE COURT:  But you're telling a line guard agent.

3  You couldn't pick up the phone and call somebody in charge?  You

4  couldn't or you wouldn't?

5      THE WITNESS:  I didn't.  We didn't pick up the phone

6  and call.

7      THE COURT:  Okay.  So you chose not to do that?

8      THE WITNESS:  Yes.

9      THE COURT:  Okay.

10     MR. BRYANT:  Pass the witness.

11     THE COURT:  Any -- yes, ma'am.  Go ahead.  Redirect.

12     MS. LOWRY:  Very briefly.

13     THE COURT:  Yes.  Go ahead.

14                  REDIRECT EXAMINATION

15 BY MS. LOWRY

16 Q    Just a quick point on the reports.  I think you were

17 talking about access kind of technically -- is that right --

18 what you have access to with your badge?

19 A    I understood the question to -- to be can I access those

20 reports.  If they are not in my email anymore, I cannot access

21 them.  I -- so I don't know what reports I have.  I delete

22 reports that are old that are --

23 Q    But you can get them?

24 A    I --

25 Q    You have permission to see them; you're not being difficult

1  in providing them.  Is that fair?

2  A    No, no, no.  If we need to get them, there are mechanisms

3  and there are ways to extract them.  I just -- I cannot do it if

4  they don't belong to my organizational code.

5  Q    Do you cut the wire any time a migrant crosses the

6  concertina wire?

7  A    No.

8        THE COURT:  Now say that again.  What was the question

9  again?

10  Q    (By MS. LOWRY) Do you cut the wire any time a migrant

11  crosses at the concertina wire to let them in?

12  A    No.

13  Q    Have you decided to make cuts in the wire while Texas

14  officers were present?

15  A    Yes.

16  Q    Has anyone from Texas offered to relocate the wire or to do

17  the cuts in a way that minimize damage?

18  A    Yes.  On one specific occasion, we were about to breach the

19  c-wire, had two Texas State sold -- two Texas State Guards

20  approach us -- and by "us" I mean PIC Donaldson and myself --

21  and they asked us if they could cut the wire because they know

22  how to cut it and it made patching it easier.  So we allowed

23  them to cut the wire.

24        THE COURT:  So why don't you do that every time?

25        THE WITNESS:  Not all the Texas State Guard is --

1            THE COURT:   So why don't you do that every time?  So
2   why don't you ask every time?

3            THE WITNESS:   Sometimes we do, Your Honor.  And some
4   Texas State Guards won't -- won't cut it.

5            THE COURT:   When has that happened?

6            THE WITNESS:   Where they won't --

7            THE COURT:   When have you asked and they've refused?

8            THE WITNESS:   I don't recall all the dates, but --

9            THE COURT:   Well, you're the one testifying to this,
10  so when has that happened, or how many times has that happened?

11           THE WITNESS:   It's happened on occasions.

12           THE COURT:   Okay.  How many times?

13           THE WITNESS:   Four or five.

14           THE COURT:   So you've asked them to cut it four or
15  five times and they've refused?

16           THE WITNESS:   Yes.

17           THE COURT:   Is it the same occasions where you cut
18  it --

19           THE WITNESS:   No.

20           THE COURT:   -- or where your officers cut it?

21           THE WITNESS:   No, different --

22           THE COURT:   So it's -- so it's separate from these
23  occasions?

24           THE WITNESS:   Yes, ma'am.

25           THE COURT:   Okay.  So on these occasions that are

1  noted in here, at any time did you ask them to cut it for you so

2  they could patch it up again?

3       THE WITNESS:  I don't recall on all those occasions if

4  we -- if we asked them or not.  I'm -- I'm -- I'm speaking to

5  the times that I was there.

6       THE COURT:  So according to you, that was about three

7  times out of how many that it was cut?  Because that was your

8  testimony.  So you were there at maybe three times when it was

9  cut in your presence --

10       THE WITNESS:  That particular --

11       THE COURT:  -- aside from the -- aside from the three

12  cuts on the one occasion.

13       THE WITNESS:  About.

14       THE COURT:  So the question is -- you're saying this

15  has happened at times you weren't there?

16       THE WITNESS:  Some -- Sometimes there are not soldiers

17  around.  So -- and the times that there are, we will tell them

18  we're going to cut the wire.

19       THE COURT:  No, that wasn't my question.  How many

20  times -- other times have you asked them if they will help by

21  cutting it so that they can cut it and patch it up easier for

22  you, since you know they're willing to do that?

23       THE WITNESS:  Like I said, maybe five times that

24  we've -- we've asked.  And -- and --

25       THE COURT:  Okay.

1          THE WITNESS:   -- and --

2          THE COURT:   And is it separate from the times that I'm

3  seeing in this declaration?

4          THE WITNESS:   Yes.

5          THE COURT:   And so when -- in the times of this

6  declaration, you didn't ask why?

7          THE WITNESS:   Sometimes there were not soldiers

8  present.

9          THE COURT:   How do you know if you weren't there?  You

10  were only there three times according to your testimony.  How do

11  you know that?

12          THE WITNESS:  I -- I -- I don't.  I don't know if --

13          THE COURT:   You're assuming that?

14          THE WITNESS:   For the times that I was there --

15  Your Honor, I can tell you the times that we did ask or that I

16  was --

17          THE COURT:   No, I'm asking about these times in the

18  declaration, okay?  The times you were there, were there

19  guard -- guard -- state officers or soldiers there?

20          THE WITNESS:   On occas -- not every single time.

21          THE COURT:   No, I'm asking about the times you were

22  there, you personally were there, were there --

23          THE WITNESS:   On some days, yes, and on some days, no.

24          THE COURT:   Okay.  But according to your testimony,

25  you were only there three times when they cut the wire.  So on

1  those three times, were there guardsmen there?

2          THE WITNESS:  On some days, yes, and on some days, no.

3          THE COURT:  No, couns -- I'm not asking you about

4  times when you weren't there, sir.  I'm asking about what -- the

5  times you were there.  So were you there more than three times

6  when they cut the wire?

7          THE WITNESS:  So on three times --

8          THE COURT:  No.  So were you there other times when

9  they cut the wire?  Just answer my questions.  It's real simple.

10          Were you there any other time when they cut the

11  wire, other than the three you testified to?

12          THE WITNESS:  No.

13          THE COURT:  Okay.  So do you know on those occasions

14  whether there was soldiers there or not; you personally?

15          THE WITNESS:  No.

16          THE COURT:  So how are you testifying that sometimes

17  they were there and sometimes they were not?  You don't know, do

18  you?

19          THE WITNESS:  I -- I don't think I'm understanding,

20  really, your question right.

21          THE COURT:  How is it that you don't understand that

22  you don't know whether there were guardsmen there when you

23  weren't personally present?  What part of that question do you

24  not understand?

25          THE WITNESS:  When I was not personally present --

1            THE COURT:   Yes.

2            THE WITNESS:   -- I don't know.  I don't know if there

3    were guardsmen there.

4            THE COURT:   Okay.  So you're just assuming there

5    weren't any there sometimes?

6            THE WITNESS:   Yes.

7            THE COURT:   Okay.  So the times you were there,

8    personally there, were there guards -- guardsmen there?  The --

9    the times you personally were there when they cut the wire.

10           THE WITNESS:   On some occasions there were, and on

11   some occasions there were not guards there.

12           THE COURT:   No.  I'm not asking some occasions.  I'm

13   asking on occasions you were there.  You testified you were

14   there --

15           THE WITNESS:   Three times.

16           THE COURT:   -- three times.  Okay.  Of those three

17   times, how many were there soldiers there?

18           THE WITNESS:   Two of the three times I can recall --

19           THE COURT:   Okay, so on --

20           THE WITNESS:   -- that there were soldiers there.

21           THE COURT:   -- the two times that there were soldiers

22   there that you recall, did you ask them to help you cut the wire

23   so they could patch it up?

24           THE WITNESS:   Yes.

25           THE COURT:   You asked them?

1    THE WITNESS:   Yes.

2    THE COURT:   And did they do it?

3    THE WITNESS:   No.

4    THE COURT:   So what -- who -- who denied you that

5 access?  Do you recall a name?

6    THE WITNESS:   I don't recall the name of the soldier.

7    THE COURT:   Do you recall how to describe them?

8    THE WITNESS:   Your Honor, there's so many soldiers

9 down there I --

10    THE COURT:   I understand that.

11    THE WITNESS:   -- I couldn't tell you.

12    THE COURT:   But you're trying to convince me that

13 something happened and I'm having a really hard time with that,

14 because you're assuming a lot of things that you don't really

15 know.   And you're testifying to a lot of things that you don't

16 personally know, and you're just assuming.   It's not even based

17 on what somebody told you.

18    Now, you know they're willing to cut and patch up

19 the wire, but you're not willing to ask them.   And now all --

20 all of a sudden after the fact you're testifying that you asked

21 them and they said no, when earlier on in your testimony you

22 said you didn't ask them.   What is it?

23    THE WITNESS:   So I have asked them on occasion to cut.

24    THE COURT:   Uh-huh.   But you were only there three

25 times when it got cut, so it has to be one of the three times,

1   right?

2          THE WITNESS:  Right.  Two of --

3          THE COURT:  It can't be other times --

4          THE WITNESS:  -- two of --

5          THE COURT:  -- right?

6          THE WITNESS:  -- two of the three times that we cut,

7   there were soldiers present.

8          THE COURT:  And earlier in your testimony you

9   testified that you didn't ask them on those occasions because

10  there was a medical emergency and you didn't have time to ask

11  them.

12             So what is your testimony?  You asked or you didn't

13  have time?

14         THE WITNESS:  When it was a medical emergency, we

15  didn't ask.

16         THE COURT:  Okay.

17         THE WITNESS:  We didn't ask.

18         THE COURT:  So of the three times you were there, your

19  testimony was at least one, maybe two, were medical emergencies.

20         THE WITNESS:  To my recollection, yes.

21         THE COURT:  Okay.  So you didn't ask two times if two

22  times were medical emergencies.

23         THE WITNESS:  I see your point.

24         THE COURT:  Think very clearly about your testimony,

25  what you testified to earlier.

1          So when did you personally ask?

2          THE WITNESS:  I remember asking about two times to --

3    to -- cut.

4          THE COURT:  Okay.  Is that the two times that they

5    were medical emergencies?

6          THE WITNESS:  That I cannot recall, if it was a --

7    there's --

8          THE COURT:  Well, at least one of them had to be a

9    medical emergency if you're telling me two out of three times

10   were medical emergencies, right?

11         THE WITNESS:  I can't recall if both of them were

12   medical emergencies, Your Honor.

13         THE COURT:  Okay.  Assume with me for a moment they

14   were both medical emergencies.  On your earlier testimony, you

15   said on those occasions you didn't ask for permission; y'all

16   just cut it because it was a medical emergency.  Right?

17         THE WITNESS:  Yes.

18         THE COURT:  Is that -- is that your earlier testimony?

19         THE WITNESS:  Yes.

20         THE COURT:  So, at least -- what you're now testifying

21   to is at least one of these medical emergencies, at a very

22   minimum, you're saying you asked for permission or asked for

23   help to cut the wire?

24         THE WITNESS:  Yes.

25         THE COURT:  Okay.  Counsel?

1  BY MS. LOWRY

2  Q    To clean that up, do you have specific memories --

3        THE COURT:   Yeah, to clean that up, please.

4  Q    (By MS. LOWRY) -- of asking Texas officers -- telling them

5  that you're planning to cut the wire, asking them to cut it for

6  you?

7  A    Do I have examples?

8  Q    Do you remember doing that?  Have you done that?

9  A    I have -- I have asked the Texas soldiers if they would cut

10  the wire on this -- on this occasion that you referenced; when

11  the two soldiers cut the wire, we were notified the day after by

12  their general or their colonel that they had been fired or sent

13  home because they cut the wire.

14        So a lot of soldiers are reluctant to cut the wire

15  for fear of disciplinary action.

16  Q    If Texas was willing to cut the wire to minimize damage,

17  would you work with them in that way?

18  A    Yes.  Absolutely.

19  Q    And you've said in your -- and you have had an instance

20  where you collaborated and the Texas officers cut the wire to

21  allow you to perform the mission, correct?

22  A    Yes.

23  Q    And from your point of view, was that an effective

24  collaboration?

25  A    Absolutely.

1    MS. LOWRY:  Nothing further, Your Honor.

2    THE COURT:  Recross?

3    MR. BRYANT:  None, Your Honor.

4    THE COURT:  You may step down.

5       Call your next witness.

6    MR. EISWERTH:  Your Honor, we'll call Chief David B.

7    Miller just very briefly.

8    THE COURT:  Sure.

9

10    DAVID B. MILLER,

11    having first been duly sworn, testified to the following:

12

13    THE COURT:  Proceed.

14    DIRECT EXAMINATION

15    BY MR. EISWERTH

16    Q    Good afternoon, Chief.  Please state your name and position

17    for the record.

18    A    David B. Miller, Chief of Law Enforcement Operations,

19    Border Patrol Headquarters.

20    Q    How long have you served in the Border Patrol?

21    A    Twenty-five years.

22    Q    Okay.  And in those 25 years, have you served in different

23    sectors across the country?

24    A    Yes, sir.

25    Q    And what are your responsibilities as chief of law

1  enforcement operations?

2  A     I have direct oversight of the strategic and tactical

3  operations of every sector throughout the United States.

4  Q     And are you familiar with Border Patrol policies and

5  procedures?

6  A     Yes, I am.

7  Q     Have you ever been stationed in Texas?

8  A     No, I have not.

9  Q     How are you aware of what's going on in the Del Rio Sector?

10  A     I monitor the activity throughout the United States, as

11  well as Texas and Del Rio.   And I was at the border yesterday.

12  Q     When you're at headquarters, do you receive daily reports?

13  A     Yes, I do.

14  Q     And do you have access to real-time data?

15  A     Yes, I do.

16  Q     And what data would be included there?

17  A     Everything from daily encounters of migrants, narcotics,

18  activity of all sorts that we -- that we encounter.

19  Q     About how many miles long is the border in the Del Rio

20  Sector?

21  A     247 miles, I believe.

22  Q     Okay.   And where is the international boundary line in that

23  sector?

24  A     In this sector, it lies right between -- right in the

25  middle of the Rio Grande River.

1  Q     About how many agents are assigned to the sector?

2  A     I believe there's about 1600 total for Del Rio Sector,

3  currently.

4  Q     So, does the sector need to prioritize the deployment of

5  its resources?

6  A     Yes.

7  Q     You mentioned that you visited the border yesterday.   So

8  you're aware that Texas has placed concertina wire near

9  Eagle Pass?

10  A     Yes.

11  Q     And over approximately how -- sorry.   Let me rephrase.

12         There's an area -- and part of that was you saw

13  there was an area of border wire from -- or concertina wire from

14  about the Shelby Park area downriver?

15  A     Yes, sir.

16  Q     So if I refer to this area as the Shelby Park area, do you

17  understand what I mean?

18  A     Yes, sir.

19  Q     Okay.   About how many miles of concertina wire is placed in

20  the Shelby Park area there?

21  A     About four miles.

22  Q     Okay.   And when migrants come into contact with that wire,

23  which country are they in?

24  A     The United States.

25  Q     Okay.   And is there DHS policy requiring agents to cut the

1  wire in that area?

2  A    There is not.

3  Q    Is there a CBP policy requiring agents to cut the wire?

4  A    There is not.

5  Q    Is there a Border Patrol policy requiring agents to cut the

6  wire?

7  A    No, sir.

8  Q    Are you aware of any supervisor in the Border Patrol

9  directing agents to cut the wire for the purposes of destroying

10  Texas's property?

11  A    I have no knowledge to that.

12  Q    Are you aware of any supervisor in the Border Patrol

13  directing agents to cut the wire for the purpose of encouraging

14  illegal entry into the United States?

15  A    No.

16  Q    Okay.  If you learned agents were doing either of those

17  actions, cutting it for the purpose of destroying the wire, or

18  to encourage illegal entry, would that violate the Border

19  Patrol's standards of conduct?

20  A    Yes, it would.

21  Q    And would you expect local station management to address

22  actions if they became aware -- or when they became aware of it?

23  A    Yes.

24  Q    And would that include a disciplinary process?

25  A    A corrective action process, yes.

1    THE COURT:  Okay, so back up just a second.  The

2 question was:  As far as you know, there isn't a requirement to

3 cut the wire by any Border Patrol agent; is that correct?

4    THE WITNESS:  I'm sorry, ma'am?

5    THE COURT:  There is no requirement for them to cut

6 the Border Patrol wire --

7    THE WITNESS:  That's correct.

8    THE COURT:  -- I mean, the Texas wire.

9    THE WITNESS:  That's absolutely correct.

10    THE COURT:  So they basically can do their job without

11 having to cut the wire, because there's no --

12    THE WITNESS:  Depending on --

13    THE COURT:  -- requirement to do it, right?

14    THE WITNESS:  Yeah.  Depending on the circumstances,

15 yes.

16    THE COURT:  But generally, not required because it's

17 not necessary?

18    THE WITNESS:  The law enforcement action might deem it

19 necessary to -- in order to take individuals into custody.

20    THE COURT:  Okay.  Proceed.

21 Q    (By MR. EISWERTH) To that point, Chief, if -- if an agent

22 is standing on the northern side of the concertina wire, is that

23 wire hindering their ability to apprehend somebody down along

24 the river?

25 A    As long as those individuals are immediately south of razor

1  wire, yes.

2  Q    Okay.

3            MR. EISWERTH:  Pass the witness.

4            THE COURT:  Okay.  Cross?

5            MS. DYER:  Thank you, Your Honor.

6                      CROSS EXAMINATION

7  BY MS. DYER

8  Q    Good evening, Chief Miller.  It is evening now.

9  A    Yes.

10  Q    I have just a few questions that I want to get some clarity

11  on today.  First of all, do you remember writing the signed

12  declaration?

13            MS. DYER:  For the Court's reference, that was

14  attached to Defendant's response to our motion for preliminary

15  injunction.

16            THE WITNESS:  Yes, ma'am.

17  Q    (By MS. DYER) Okay.  And you said yesterday was -- is that

18  the first time you've visited the border or have you been --

19  historically, more recently?

20  A    I've been down here before, and I -- I visit the entire

21  southwest border often.

22  Q    Okay.  Before yesterday, when was the last time you'd seen

23  the Texas/Mexico border?

24  A    In Del Rio, about six months ago.

25  Q    Okay.  And when you were here, did you see the c-wire

1  that's been referenced quite often?

2  A    No, ma'am.

3  Q    Okay.  And so in your declaration that you signed -- which

4  if I told you that you signed it October 30th, does that sound

5  about right?

6  A    Yes.

7  Q    Okay.  So in that declaration you -- you asserted that the

8  c-wire made it difficult for visibility purposes.  If you had

9  not seen the c-wire, how did you know that it made it difficult

10  for visibility?

11  A    Because I do get reports, and I see video and images almost

12  every single day.

13  Q    Okay.

14        MS. DYER:  I would like to pull up Plaintiff's Exhibit

15  One.  It's Exhibit A to Plaintiff's Exhibit One.

16  Q    (By MS. DYER) Can you see it, Chief?

17  A    It's --

18        THE COURT:  There's no document on there.

19          There it is now.

20          Can you see it now?

21        THE WITNESS:  Yes.  Okay.

22        MS. DYER:  Just Exhibit A.  It's the photograph.

23  Q    (By MS. DYER) Okay, Chief, if I represented to you that

24  this is a photo of the c-wire in question that you likely saw

25  yesterday, would you agree with that?

1    A    Yes.

2    Q    Okay.  And can you see through the c-wire in this photo,

3    across the river onto the other side of the bank?

4    A    Yes.

5    Q    So do you think that it reduces visibility?

6    A    Not in this location.

7    Q    Okay.

8         MS. DYER:  You can take that off.

9    Q    (By MS. DYER) And I also wanted to ask another question

10   about your affidavit.  And you discussed the -- I'm sorry, I

11   got -- I jumped around just a little bit.

12         Oh, so you are the principal adviser to the chief of

13   Border Patrol on enforcement operation, personnel,

14   infrastructure, and technology requirements, correct?

15   A    Yes, ma'am.

16   Q    Okay.  Does -- and so does infrastructure in that

17   description include walls and concertina wire?

18   A    It could, yes.

19   Q    Okay.  So, in that -- in the affidavit you said that there

20   was no -- I'm going to get it specifically.  There was no wall

21   infrastructure.  Is that a correct representation?

22   A    Yes.

23   Q    Okay.  And so were you unaware of the border wall that --

24   the federal border wall that sits on both sides of Shelby Park

25   in Del Rio [sic]?

1  A     It's further in, away from where the concertina wire is.

2  Q     But it is in the Del Rio sector?

3  A     Yes, ma'am.

4  Q     So the statement in your affidavit is not correct?

5  A     With respect to the immediate river basin where the c-wire

6  is at, there's not infrastructure at that location.  There is

7  infrastructure in other places.  And infrastructure also

8  includes roads and -- and other things as well.

9  Q     Okay, so you were just referring to right on the bank of

10 the river?

11 A     Yes, ma'am.

12 Q     Okay.  Would you say -- would you consider deterrence as a

13 goal of the Border Patrol?

14 A     Yes, it is.

15 Q     And would you say it's a primary goal, a top -- well, where

16 would you rank it?

17 A     Well, it's -- it's -- it's part of the strategy that we use

18 to prevent, detect, and apprehend individuals.  So it's -- it's

19 a piece of our operational setting.

20 Q     And would you say it has some high importance?

21 A     It definitely does.

22 Q     Okay.  And do you think that infrastructure like the -- the

23 border walls we've discussed and the c-wire, do you think that

24 those deter migrants?

25 A     No, I wouldn't say they necessarily do.

1  Q   Why do you think they don't deter migrants?

2  A   By the fact that we'll still catch as many people as we're

3  catching and it's -- there -- we have no indication to believe

4  that once they walk up to the -- to the fence that they turn

5  around and go back to where they came from because of the fence.

6  Q   And does the federal government have any concertina wire?

7  A   Yes.

8  Q   Why do they have it if it doesn't work?

9  A   Because it works where we placed it.

10 Q   So concertina wire can work to be a deterrent, but it just

11 doesn't in this case?

12 A   Yeah, as I mentioned, it -- it's part of a complete system

13 where we have technology, where we have border walls, where we

14 have a complete enforcement package in order to -- I mean, one

15 thing by itself isn't sufficient enough to have a -- have an

16 impact on -- on the traffic like we'd expect it to.

17 Q   And so you don't think that the ships and the other items

18 that we have deployed collectively, both Texas and Border

19 Patrol, are not a complete package in addition to the concertina

20 wire to be effective like the situations you're mentioning?

21 A   I -- I didn't hear the first part.  The what deployed?

22 Q   You were saying -- I'm -- and correct me if I misquote you,

23 but from my understanding you were saying there needs to be a

24 complete package in order for the c-wire to be effective; is

25 that correct?

1  A     Yes.  It has terrain matters, other infrastructure matters.

2  Yeah, so there's a lot of factors that go into the deployment of

3  it.

4  Q     And so what is it about this area, or the border in

5  particular, that makes concertina wire ineffective here?

6  A     Well, clearly it's not having an effect now, but that's not

7  because we deployed it.  We assess the environment for both

8  operational advantage as well as our operational ability to

9  interdict traffic when it -- when it makes it into the United

10  States.  This wasn't one of the locations that we deemed it

11  necessary or would potentially restrict our ability to perform

12  our duties or potentially cause harm to human life.

13  Q     Okay.  Let me see.

14         MS. DYER:  Okay, I think that's it, Your Honor.  I'll

15  pass the witness.

16         THE COURT:  Okay.

17         MS. DYER:  Unless you have any questions.

18         THE COURT:  Okay.  Redirect?

19           No?  All right.

20         MR. EISWERTH:  No, Your Honor.

21         THE COURT:  You may step down.

22           Next witness.  Any more witnesses?

23         MR. EISWERTH:  No, Your Honor.

24         THE COURT:  Okay.  The federal -- the United States

25  rests.  I'm going to call you just the United States

1  collectively.  How about that?

2        MR. EISWERTH:  Fair enough.

3        THE COURT:  State of government [sic], any -- any

4  rebuttal witnesses?

5        MR. BRYANT:  No, Your Honor.

6        THE COURT:  Okay.  Evidence is closed, then.

7  Arguments.

8                          ARGUMENTS

9        THE COURT:  I'm going to -- I'm going to give y'all

10  some guidance in terms of arguments on both sides.

11        What this sounds like to me, it's a power struggle

12  who's in control.  This is not whether the wire is effective or

13  not or anything else.  This is about who's going to be in

14  control and who's going to make the decision to be in control.

15  That's what this is all about.

16        The federal government and the state work together

17  with the wire in El Paso and RGV and other areas.  It's just

18  this four miles where we have a problem.  And quite frankly, it

19  sounds like a personality issue more than anything else.  That's

20  the reason -- and it gets back to that first question that the

21  Court had:  Why is this the hot spot?

22        Now, I've got to tell the parties, I found a lot of

23  Deputy Chief Trevino's testimony right on the line.  Every time

24  that he was asked a question and he decided that maybe the

25  answer wasn't quite right, it always changed.  No, he doesn't

1  have access to the reports; no, he doesn't have access to the
2  report; no, he -- oh, yeah, well he maybe has them in the email,
3  and then later as well, that is if he kept the email.  Boy,
4  we're right on the line, folks.

5         I think this is more of a personality issue where
6  he's going to make the decision and he's going to decide what
7  happens and when it happens.  And it's not anything more than
8  that.  Because here we have testimony that as a complete package
9  the border walls work with concertina wire, but they don't
10 happen to work in this particular area, even though this is
11 where you have a big flow of people coming in.

12         I don't get it.  I don't understand why we're having
13 these problems.

14         Now, I saw a video, and it's part of the exhibits,
15 it was an attachment to the declarations.  I don't know if the
16 parties all want to play it just so that we all know which video
17 that may be referenced to so that it's clear.

18         But your -- Deputy Chief Trevino wants me to believe
19 that he didn't know before 25 minutes that all these people were
20 going to cross the river, and that's all it took for them to
21 cross the river.  Y'all need to watch this video.  Everybody
22 needs to watch this video.  This took more than 25 minutes.

23         Now, I think this is more of who's going to be the
24 top dog, and who's going to tell me when and how I can cut, and
25 I can enforce the law.

1          Play the video.

2      (6:29:51 TO 6:34:42 P.M., PLAYING OF THE VIDEO)

3          THE COURT:  So, now tell me, what medical emergencies

4  did we see on there?  Not a one.  We saw people coming up just

5  fine without a rope.

6          And number two, how many contacts were there between

7  Border Patrol agents and any of those aliens, even asking them

8  their -- their citizenship?  Not a one.  They were busy moving

9  the wire.  How many -- how many times did you see a Border

10 Patrol agent talking to any one of these -- one of these

11 migrants, other than they're moving the wire?

12         Where is the processing part that I'm being told was

13 being hampered?

14         MS. LOWRY:  May I be heard, Your Honor?

15         THE COURT:  Sure.

16         MS. LOWRY:  The -- so the context in this video, as

17 Mr. Trevino testified, this was a three- or four-hour total

18 process.  I believe he testified that 25 minutes is how long it

19 took the first migrants to make it across.  So not that all of

20 this was happening --

21         THE COURT:  I get it.  But his testimony was they had

22 to cut the wire because they were muddy and the people were

23 slipping down the banks.  I'm watching people coming up the

24 banks that are wet, in a muddy area, without the help of a rope,

25 without any problems.

1    MS. LOWRY:  Yeah.  Exactly.  So his -- his
2  testimony --
3    THE COURT:  So where is this medical emergency?
4    MS. LOWRY:  It was that they had already had people
5  swept away that the marine unit had to rescue.  After the wet
6  people crawled up the silty area, it starts to become muddy and
7  they slip.
8    THE COURT:  Okay.
9    MS. LOWRY:  So then they cut a new area where they are
10  able to come up, to prevent people from slipping back into the
11  water.
12    THE COURT:  Okay.  And so where is -- where is it
13  hindering Border Patrol's work to process them if they're not
14  even saying a word to them?
15    MS. LOWRY:  They're in the process of taking them into
16  Border Patrol --
17    THE COURT:  No, they're not.  They're turning their
18  backs to those migrants and the migrants are just walking down
19  the road.
20    MS. LOWRY:  Where they go to be staged under the --
21  Bridge II --
22    THE COURT:  I get it, but they're not in custody,
23  counsel.  That's not custody.  That's helping them into the
24  United States so they can go to the staging process on their
25  own.  It's not hindering Border Patrol's work at all.

1        MS. LOWRY:   Respectfully, Your Honor, this is Border

2  Patrol's work.

3        THE COURT:   I know Border Patrol's work.   I have been

4  in this area of the country for 51 of my 61 years.

5        MS. LOWRY:   Yes, Your Honor.

6        THE COURT:   I know Border Patrol work.   That is not

7  Border Patrol work.   That is not.

8             So, where are they asking them at that point, What

9  is your citizenship?

10             Now, where is the big group that he's trying to

11  prevent from congregating at a rope?  You don't see any big

12  group congregating, you don't see anybody being unruly, you

13  don't see anybody causing any issues.

14             Isn't that what he said he was trying to do?  He cut

15  it in several places so that groups could not congregate and get

16  unruly.

17        MS. LOWRY:   We can't see over the bank, but I believe

18  both Mr. Banks and Chief Trevino testified people -- it went

19  almost a quarter mile of people just lined up on the embankment.

20  And that that was --

21        THE COURT:   I don't think that is the testimony.   I

22  didn't hear anything about a quarter mile on the embankment,

23  other than once they got on the road it was a mile to the

24  processing area.

25        MS. LOWRY:   I -- I believe that was the testimony,

1  Your Honor.

2       THE COURT:  I don't think so, counsel.  I took copious

3  notes.  I didn't hear anything about a quarter of a mile in

4  terms of along the embankment.  What I heard Chief Trevino -- or

5  Deputy Chief Trevino testifying that the concertina wire -- wire

6  went vertically down about every half mile or so.

7       MS. LOWRY:  Yes.  That -- and that was -- that was

8  separate testimony.  Yes.

9        But there are -- there is a long line of people on

10  the embankment, and then it cuts into the river --

11       THE COURT:  I don't think so, counsel.  And if it's a

12  long line of people on the embankment a quarter mile long, then

13  it takes a whole lot longer to cross that river than 25 minutes.

14       MS. LOWRY:  Again, I think --

15       THE COURT:  Which is what Chief Trevino testified --

16       MS. LOWRY:  -- he means the first people to make it

17  across the river and to get to the embankment.

18       THE COURT:  I get it, but they're cutting wire --

19       MS. LOWRY:  The aliens.

20       THE COURT:  -- long after that.  They're cutting it in

21  a different area, they're not yet putting any ropes, there isn't

22  any problems with people coming up, no one's being unruly.

23  They're all just walking off to the processing center on their

24  own without a single question or even a hello from a Border

25  Patrol agent, because one of them had his back to them.

1      MS. LOWRY:   And as Chief Trevino testified, that was

2   because they had already had sweep-aways and marine rescues --

3          THE COURT:   That -- I got to tell you, Chief Trevino's

4   is not the testimony that I'd be relying on if I were you.

5              So, yes, they had been swept away, but the emergency

6   was over.

7          MS. LOWRY:   And they were aiming to prevent further

8   emergencies for this large group.

9          THE COURT:   That's not enforcement.   You're -- you're

10  here saying that this prevented enforcement.   You're not

11  enforcing.   They're walking down the road without any contact

12  with a Border Patrol agent, other than being helped up the

13  embankment.

14         MS. LOWRY:   If they could -- if the wire could not be

15  cut, if the officer were required to stand on this side and wait

16  until multiple people are slipping into the water, that's the

17  impediment that is happening.

18         THE COURT:   So that's not the --

19         MS. LOWRY:   So we're seeing --

20         THE COURT:   But the point is, you're saying that this

21  injunction is not possible because it hinders them from doing

22  their work.   You're not saying that because it might be a danger

23  to the migrants.   You're saying because it hinders Border Patrol

24  from doing its work.   I'm looking at that video; Border Patrol

25  is not even talking to them.

1          So -- so that's a different point of view.

2          MS. LOWRY:  I -- I take your point, Your Honor, but it

3   is our position that this is the work of Border Patrol in how to

4   deal with a large group of people and get them from this point

5   safely --

6          THE COURT:  Okay, so explain to me, then, how Border

7   Patrol was able to get the processing trailers and everything

8   there prior to this group -- big group of aliens coming?

9          Or migrants.  Y'all call them "migrants."  I'm used

10  to the criminal statute that says "aliens."  So I'll go back and

11  forth.

12         How is it they were able to prepare and get all of

13  those processes in place and they didn't know that there were

14  big groups coming until 25 minutes before?

15         MS. LOWRY:  Well, there -- there was staging that was

16  happening under --

17         THE COURT:  I get that.

18         MS. LOWRY:  -- POE II, and then they were bussed for

19  further processing.

20         THE COURT:  I get that, but didn't Chief Trevino also

21  testify that they had some staging trailers and they had had

22  aggregates so the buses would move on the Heavenly Farms land?

23         MS. LOWRY:  That was -- they were --

24         THE COURT:  And that occurred around May when the

25  concertina wire went up?

1          MS. LOWRY:   Correct.

2          THE COURT:   So they were already anticipating big

3    groups there; that's why they were having a staging area there,

4    right?

5          MS. LOWRY:   Correct.

6          THE COURT:   Okay.   So how did they know and have

7    enough time to know that big groups were coming in that area to

8    stage that, but they didn't know that day to prepare for that

9    large group?

10         MS. LOWRY:   Like he testified, the incident command

11   structure was put in place the day before, so they --

12         THE COURT:   Yes.

13         MS. LOWRY:   -- did know that people were going --

14         THE COURT:   Okay, but he --

15         MS. LOWRY:   They -- they don't know exactly where

16   they're going to choose to cross until they walk down into the

17   water or they're --

18         THE COURT:   Obviously they did, or they wouldn't have

19   that other temporary command center on Heavenly Farms, which is

20   right in the area where these people crossed, right?

21         MS. LOWRY:   At this point, we -- as we discussed,

22   they're not -- they don't have infrastructure there because --

23         THE COURT:   Yes, they do.   He said they put it up

24   starting around May.   This is -- this is at -- this in the

25   September timeframe.

1    MS. LOWRY:  Exactly.  And he testified Texas put dirt
2  on either side of the gate, so they had to abandon the
3  infrastructure they put in place.
4    THE COURT:  So the bottom line is, though, they had
5  the infrastructure there because they knew people were crossing
6  there.  And a lot of people were crossing there, right?
7    MS. LOWRY:  Yes.
8    THE COURT:  Prior -- prior to this time?
9    MS. LOWRY:  All through this area.
10    THE COURT:  Okay.  So they knew that before -- even
11  the day before the incident command day.
12    MS. LOWRY:  In general that this is a place that
13  aliens cross, yes.
14    THE COURT:  Okay.  So, the question then becomes:  Why
15  didn't they just put the POE staging area right there where they
16  were standing, and then go and process them there?
17    MS. LOWRY:  So this is Mr. Urbina's property.
18    THE COURT:  Okay.  But he testified that Mr. Urbina
19  wasn't happy with the wire, so why not get his permission to put
20  a staging area on the -- on that roadway close to the riverbank?
21    MS. LOWRY:  Operationally, I don't know, but this is
22  among those discretionary decisions that are left to CBP.
23    THE COURT:  I get that, but, counsel, CBP is
24  encouraging these people to come, and then you're discouraging
25  any type of action by anybody.  And even when you have action

1   that could help Border Patrol in its work, only in Eagle Pass do

2   you have this fight going on, because everywhere else it's

3   collaborative.   Right?

4             MS. LOWRY:   I don't think it's just that, Your Honor.

5   I think --

6             THE COURT:   I think this is a personality fight.

7             MS. LOWRY:   There is also dynamics at play, such as

8   river levels, and the embankment --

9             THE COURT:   Counsel, Amistad --

10            MS. LOWRY:   -- is kind of inclining.

11            THE COURT:   -- Amistad Lake is north of Del Rio,

12  upriver of Del Rio.   How is it that Chief Trevino knew that just

13  at this time the water level and the currents were just that

14  horrible?  He couldn't even remember how many times he was there

15  at that area.

16            MS. LOWRY:   It's something he is aware of, the

17  releases from the dam.   But I mean particularly in, like,

18  El Paso, the river doesn't look the same as it does in this

19  section.

20            THE COURT:   I get it.   But you're still relying on the

21  state to put a concertina wire and working with them there.   The

22  river flows into the -- into the Gulf of Mexico in Brownsville,

23  all the way down to RGV, and they work collaboratively there.

24  So why is it this one area where you can't?

25            MS. LOWRY:   I -- I think as we've heard, there have

1  been asks for collaboration to cut wire when CBP deems it

2  necessary that have been rebuffed.

3       THE COURT:  I think they were told they were going to

4  cut the wire.  I don't know about the collaboration past one

5  point.  But if you had that collaboration at one point, why not

6  ask every time?

7       MS. LOWRY:  We have Mr. Banks.  Mr. Banks wasn't here

8  saying he -- he offered to cut, he tried to collaborate on

9  cutting.

10      THE COURT:  I get it, but we had Chief Trevino, who

11  was the incident commander, who said he -- one time.  And the

12  other time they didn't ask.  Why not?

13      MS. LOWRY:  I don't --

14      THE COURT:  And he even testified that a collaborative

15  work could be effective.

16      MS. LOWRY:  That's exactly right.  So --

17      THE COURT:  So why did he do everything in his power

18  to make it not collaborative?  Because that's really what we

19  have here, counsel.

20      MS. LOWRY:  I think that the bottom-line question is

21  whether CBP is allowed to cut the wire.  If Texas says, We don't

22  want you to, we've not given permission, does CBP have the power

23  to do so?

24      THE COURT:  I think the question becomes is, That's a

25  hypothetical.  We don't know because they didn't ask.

1     MS. LOWRY:  Well --

2     THE COURT:  They asked one time and they got

3 permission.  The other times they were told they were going to

4 get cut at their -- and the -- the way they wanted to cut it.

5          Now, I get that you have the authority to have

6 access to these people, I get that you have authority to do your

7 job by having access to these people, but there's nothing in the

8 law that says access is at the discretion, the behest, and the

9 choice, and the desires of any particular agent.  And that's

10 really what we have here.

11     MS. LOWRY:  I think it's -- it's without restraint of

12 their abilities.  That is the law.

13     THE COURT:  I -- I get it, but there is lot a

14 restraint along the border with all the different fences, with

15 all the different gates, with all the different things.  And

16 you're telling me, and Chief Trevino wanted me to believe, that

17 an alien's going to stay behind a locked gate that they can't

18 open until they get cutters to cut the chain or the lock, and

19 the agent's just going to stay there, waiting for them to

20 enforce the law.

21          It doesn't happen that way.

22     MS. LOWRY:  No, I don't believe --

23     THE COURT:  But that's what he -- he testified that

24 that's when they cut private gates or locks or things of that

25 nature, when they have to apprehend an alien.  The alien's not

1 going to stay there waiting for them to be apprehended.

2          MS. LOWRY:   Yeah.   Exactly, Your Honor.   So in pursuit

3 of the alien, they will cut locks if necessary.

4          THE COURT:   But there are locks and there are gates

5 and there are fences.   So it's not a total physical lack of

6 barriers with Border Patrol enforcing the law.   There's --

7 that's not required by the statute, either.

8          MS. LOWRY:   And that's not our argument in this case,

9 Your Honor.

10          THE COURT:   Well, your argument is this wire impedes

11 your enforcement actions that are discretionary.

12          MS. LOWRY:   And that -- that part of CBP's discretion

13 is to make cuts when it deems necessary.

14          THE COURT:   Where is that in the statute?

15          MS. LOWRY:   That -- I can pass this to my counsel for

16 more full legal arguments.

17          THE COURT:   Uh-huh.   Sure.

18          MR. EISWERTH:   Your Honor, I think you need to --

19          THE COURT:   I think we're talking legal authority

20 versus physical reality.

21          MR. EISWERTH:   Is it okay if I stand up here?

22          THE COURT:   Sure.   Absolutely.

23          MR. EISWERTH:   Your Honor, so I agree that at the

24 bottom line if there's not going to be cooperation that this

25 does come down to power, and I think it's the federal government

1  that has the power here to decide how to enforce the immigration

2  laws.

3         THE COURT:  But you're not enforcing up there,

4  counsel.  That's just the bottom line.  You didn't even talk --

5  your agents didn't even talk to the aliens.  So if you're going

6  to argue enforcement and you have the right to enforce and you

7  have sole discretion when it comes to immigration law, I do not

8  at all doubt that or question that.  But all your agents were

9  doing, they were busy cutting the wire, they weren't busy

10  enforcing immigration law.

11         MR. EISWERTH:  Your Honor, with all due respect,

12  that's -- our position is that that is part of enforcement.

13  That collecting them there and moving them down so that they can

14  be processed at that -- under the port of entry is how they've

15  judged to do that.

16            So whether we're talking about -- so -- so even if

17  you disagree with me that that part of it is part of the

18  inspection process, not allowing the inspection process to start

19  in the way that CBP wants it to start is a restraint on the

20  operation of that law.

21         THE COURT:  I get it, counsel.  So what this is all

22  about is convenience to CBP.  It's not about anything else other

23  than convenience.  It's how Chief Deputy Trevino -- or Deputy

24  Incident Commander Trevino decides he wants to do it.

25         MR. EISWERTH:  And, Your Honor, there are remedies if

1  Texas or another landowner doesn't like --

2        THE COURT:  Okay.

3        MR. EISWERTH:  -- how it's done.

4        THE COURT:  So here's my question.

5        MR. EISWERTH:  It's just not this lawsuit.

6        THE COURT:  Okay.  So here's my question.  Why can't

7  y'all work with the state, to work effectively together like you

8  do in other places?

9        MR. EISWERTH:  Your Honor, I mean, I can urge my

10  clients to see if there is a way to work this out, but at the

11  end of the day, that cooperation takes two parties.

12        THE COURT:  I agree with you.

13        MR. EISWERTH:  And the Border Patrol has, you know --

14        THE COURT:  Chief Trevino did not try to cooperate,

15  counsel.  Do not try to convince me of that.  That's not the

16  person I saw on the stand.

17        MR. EISWERTH:  Okay.  I'm not --

18        THE COURT:  That's not the person I saw on the stand.

19  The person I saw on the stand was, I decided there was an

20  emergency, I decided where I'm going to do my job.

21        And all of a sudden when he gets pushed, It's not in

22  my area of command; that's in the North area.

23        As soon as he gets pushed.

24        So the bottom line is, it's either in his area of

25  command or not, but he can't jump around and make that decision

1    whenever it suits him.  I think what we have here is more of a

2    personality conflict than a fight for power.

3         MR. EISWERTH:  And as far as particular interactions,

4    it could be a personality conflict.  I'm not familiar enough

5    with all the individuals involved and the history and all of

6    that.  But I am sure that when it comes down to power, it is the

7    federal government that has the authority here, and the state

8    and state law cannot be used to regulate federal government law

9    enforcement.

10        THE COURT:  Okay.  So the question is -- nobody is

11   trying to regulate federal law enforcement.  What it is, is

12   federal law enforcement is trying to impose their will on

13   however they intend to reg -- to enforce the law according to

14   their views and their specter.

15             Now, Chief Miller was very persuasive in that there

16   are a lot of things that you can do to enforce the -- the

17   immigration law along the border.  On one hand he's saying

18   it's -- sometimes it's wall and concertina wire and sometimes

19   it's not.  Okay.  So in this particular case, why can't that be

20   part of your package, for you to enforce your law?

21        MR. EISWERTH:  So obviously that's a decision that

22   Border Patrol and CBP has to make.

23        THE COURT:  Okay.

24        MR. EISWERTH:  That's not --

25        THE COURT:  So you're -- okay.  But it's got to be

1   done at a level above Chief Trevino.  Because at the moment,

2   this is what I'm seeing.  It's Chief Trevino decides, I'm going

3   to do it this way, and this is what's going to happen because

4   the INA says I can.  That's really all this is.

5           It works well in other parts of the river; why not

6   in four miles of the Eagle Pass station?

7           MR. EISWERTH:  I mean, Your Honor, I think we've

8   stated our position of why this area is different.  And I'm not

9   trying to be antagonistic --

10          THE COURT:  Why -- why is this area different?

11          MR. EISWERTH:  This area is different because of the

12  way the bank is.  There's not any sort of slope up.

13          THE COURT:  Do -- do you know if this is different

14  from the RGV one?

15          MR. EISWERTH:  Based on the description that I've

16  heard, that the conditions are different.  That it's not --

17          THE COURT:  Well, they have concertina wire in RGV and

18  y'all are fine with it.

19          MR. EISWERTH:  I believe --

20          THE COURT:  That's the testimony I heard today.

21          MR. EISWERTH:  I -- I believe there's cooperation

22  there.  I believe DHS had input on where it was placed.

23          THE COURT:  Okay.  I get that.

24          MR. EISWERTH:  And I do know it's also been cut on

25  instances where they've needed to get through.

1    THE COURT:  And I get that, and it's been cut and

2  the -- and the Texas National Guard apparently helped.

3  According to Mr. Banks, they helped, they cut it, they patched

4  it up.  They're willing to do that.  So why does that whole

5  sphere of cooperation not work in this one area?

6    MR. EISWERTH:  Your Honor, I'm -- I don't think our

7  position is that we're opposed to cooperation where it can be

8  had.

9    THE COURT:  So let's work on that.

10    MR. EISWERTH:  And -- and I am happy to advise my

11  client.  I -- I just want to stress here that I think that is

12  very different than what this motion asked to be done.

13    THE COURT:  This motion asked that their -- that their

14  property not be destroyed.  Their motion is not trying to stop

15  you from doing your job, it's just asking not to destroy their

16  property.  That's first and foremost.

17    Now, there are other issues, and I'm going to rule

18  on them later on.  But what I'm seeing from testimony today,

19  counsel, I think y'all could very easily work, the wire could

20  very easily be cut, people could do their job in that area, if

21  you have people that are willing to talk to each other and

22  communicate and work together.  Because I think that's what it

23  boils down to in this one particular area.  Quite frankly.

24    I want you to do your job.  I want you to do it

25  effectively.  I want you to do it without unnecessary hard --

1    hardships to the agents.  I know these guys work very hard, and

2    they work long and hard in a bad area, in the -- in the heat, in

3    the cold.  I get that.  I see this every single day.

4              MR. EISWERTH:  I know, Your Honor.

5              THE COURT:  So it's -- that's not the point.  It's not

6    to try to make their life more miserable or harder.  So the

7    question is:  If you can work with the state so that everybody's

8    life is better, why not do that?

9              MR. EISWERTH:  And -- and I can certainly advise them,

10   strongly suggest it, but at the end of the day -- (COUGHING)

11   excuse me, Your Honor.

12             THE COURT:  Uh-huh.  Sure.

13             MR. EISWERTH:  I'm sorry.

14             THE COURT:  No, that's fine.  At the end of the day,

15   you want me to -- you want me to find that Chief -- Deputy Chief

16   Trevino has all the authority because DHS and CBP don't have a

17   policy to cut the wire, but he can decide that on his own and

18   not cooperate because that's -- because you have the power to do

19   that.  That's really what you want me to find.

20             MR. EISWERTH:  Your Honor, I think our position is we

21   are -- I -- I can say I was --

22             THE COURT:  True or not true?

23                True or not true?

24             MR. EISWERTH:  Your Honor, what -- I think Chief

25   Trevino is one of -- is one of the front-line agents here.  And

1  what our position is is that the circumstances in these

2  situations are different and it requires judgment in that

3  moment.   Now, we -- you know --

4         THE COURT:   Uh-huh.

5         MR. EISWERTH:   -- certain individuals' judgment may be

6  questioned; it may be questioned in certain instances.   Those

7  are different than what we have here, where Texas has sued us

8  for any cuts to the wire.   They've accepted the medical

9  emergencies in this hearing, but that's not how I read their

10  complaint or their motion; is a per se bar on cutting the wire.

11         THE COURT:   Well, but -- because it sounds from the

12  testimony that I heard, counsel, is that the wire's being cut at

13  all times at the discretion of Deputy Chief Trevino.

14         MR. EISWERTH:   I think it's being cut when the agents

15  on the line determine it's necessary to apprehend the

16  individuals --

17         THE COURT:   It's not the agents on the line.   Agent

18  Trevino testified that it's mid-level managers or above, and

19  that's how the decision was made in the South station.   But then

20  he testifies that the majority of these four miles are not in

21  his South station.   So what is it?

22         MR. EISWERTH:   I think the guide -- the advice that's

23  been given to agents is, if there's not an exigency, involve the

24  supervisor.

25         THE COURT:   Exactly.

1      MR. EISWERTH:  When there is an exigency --

2      THE COURT:  That's right.

3      MR. EISWERTH:  -- save the life.  And that --

4      THE COURT:  Exactly.  No -- no doubt about that.

5      MS. LOWRY:  And that that is then exercised by the

6  agent there.  Sometimes that's Chief Trevino --

7      THE COURT:  Okay --

8      MR. EISWERTH:  -- sometimes that's others.

9      THE COURT:  So the testimony, though, other than a

10  couple of times from that list, there is no testimony that there

11  were exigent circumstances on any other occasion.

12      MR. EISWERTH:  I think what Chief Trevino testified to

13  is he wasn't sure based on just dates and times, what any of

14  those situations were.

15      THE COURT:  I get it, but I have no evidence before me

16  that other than maybe one or two times, there were exigent

17  circumstances.  That's the testimony I have before me right now.

18  Because he didn't know, and he couldn't remember, and he

19  couldn't recall, and he couldn't have access to the reports, but

20  maybe they're in his email box or whatever.  But the bottom line

21  is, other than a couple of times, where are the -- where is the

22  evidence of exigent circumstances?

23      MR. EISWERTH:  And -- and our position is, Your Honor,

24  while exigent circ --

25      THE COURT:  I know.  Your position is you don't have

1  to have it necessarily to cut the wire.

2          MR. EISWERTH:  And -- and -- sure.  One last thing is,

3  with every one of those instances in the complaint --

4          THE COURT:  Uh-huh.

5          MR. EISWERTH:  Texas alleges that migrants were

6  apprehended at each time.  It's not that there was a cut and

7  then people were left to go.  It's that --

8          THE COURT:  Okay, but that's not an exigent

9  circumstance.  That's an ordinary course of business.

10          MR. EISWERTH:  I -- I understand, Your Honor.  And as

11  you said, our position is exigent circumstances don't have to

12  exist.

13          THE COURT:  Okay.  And I get that.  But I'm just

14  saying, absent exigent circumstances, it sounds like from the

15  Chief Deputy that it's -- there's a policy, at least in his

16  South station, that it has to be a mid-level or front-level

17  manager and above that makes the decision to cut the wire.

18          MR. EISWERTH:  If there's no exigent circumstances --

19          THE COURT:  Right.

20          MR. EISWERTH:  -- that's my understanding and the

21  advice.

22          THE COURT:  Okay.  But his testimony was nobody --

23  other than two or three times, no mid-level manager made the

24  decision, or he didn't know.

25          MR. EISWERTH:  I think he -- what -- what he testified

1  to was he didn't know -- like he couldn't describe to you what
2  happened on that time based on the --
3      THE COURT:  Okay, so who's the other front-line
4  manager that could have made the decision?
5      MR. EISWERTH:  I'm sorry, could you repeat that, Your
6  Honor.
7      THE COURT:  Who were they -- who were the other
8  front-line managers that could have made the decision?
9      MR. EISWERTH:  I mean, I can't give you a roster of
10 managers, but I meant --
11     THE COURT:  Well, that's the -- the problem is, the "I
12 don't know."  I -- I don't know if there's a policy, if there's
13 not a policy.  I don't know if this is a decision that's made by
14 the line agents or not.  According to Chief Trevino, that's not
15 the case.  But I don't know who else may have made the decision
16 because he didn't make it every time.
17          And -- and what I'm -- I heard him testify to is
18 that on-the-line agents can't make that decision unless there's
19 exigent circumstances, but I didn't hear any evidence of exigent
20 circumstances other than maybe one or two times.
21     MR. EISWERTH:  Yes, Your Honor.  I mean, I think
22 there's -- right, there's the two stations --
23     THE COURT:  Uh-huh.
24     MR. EISWERTH:  -- and he's assigned to one except when
25 this incident command is activated --

1    THE COURT:   Uh-huh.

2    MR. EISWERTH:   -- and that creates all sorts of

3   things.

4    THE COURT:   Uh-huh.

5    MR. EISWERTH:   And there's obviously different shifts

6   and all of that.

7    I would just point again that Texas has not

8   presented any evidence that a policy does exist, other than

9   stringing together these incidents to say that, Well, there must

10   be one.   When you've heard from the chief of one --

11    THE COURT:   Well, what do you call -- what do you call

12   it when -- when they decide that certain people can make the

13   decision and others can't?  Isn't that a policy?

14    MR. EISWERTH:   That's not their challenge, though.

15    THE COURT:   Isn't that a policy?

16    MR. EISWERTH:   I would say that's guidance and doesn't

17   qualify, but --

18    THE COURT:   But that was his own and his station.   He

19   said it was only in his South station.

20    MR. EISWERTH:   Yes, Your Honor.   I -- I'm not

21   disputing what --

22    THE COURT:   Okay.   So is it his policy?

23    MR. EISWERTH:   I -- sorry.   I -- I think we're

24   speaking past each other.

25    THE COURT:   Okay.

1     MR. EISWERTH:  "Policy" is a broad term that can mean

2  many things.  It's not linked up to the EPA.  The EPA terms are

3  rules, statements of policy, things of that nature, which are

4  not -- some of those are not final agency action, so I'm not

5  trying to confuse the two.

6          We would characterize what was here as guidance,

7  which is not final agency action.  You could call it a policy,

8  as far as advice or whatever is there, but it's different in the

9  sense --

10     THE COURT:  We're talking semantics now, counsel.

11     MR. EISWERTH:  Well, we're talking semantics in what

12  we describe it as, but there -- there -- in the APA context

13  there is significance to that, which is all I was trying to not

14  mess those up or not be clear about that.

15     THE COURT:  Okay.  So the question is -- you're

16  telling me that CBP nationally and DHS nationally leaves it up

17  to the line agent to decide what they do and how they carry out

18  their -- their -- their duties?

19     MR. EISWERTH:  Yes, Your Honor.

20     THE COURT:  Okay.  So they don't have any trainings,

21  they don't have any guidance, they don't have any other type of

22  policies in terms of how to do their job; they get to decide it

23  on the ground on their own?

24     MR. EISWERTH:  No, Your Honor, there's --

25     THE COURT:  Stop.  Stop.  I'm -- I'm going somewhere.

1   Okay?  So they do have certain things of how they train their

2   agents, right?  How they can do their job and what the limits of

3   their job is, correct?

4           MR. EISWERTH:  Yes, Your Honor, they go through --

5           THE COURT:  Okay.

6           MR. EISWERTH:  -- six months-plus training.

7           THE COURT:  Right.  Okay.  They -- and then they have

8   on the -- on-the-job training or field training, so to speak.

9   So, they have to follow certain steps in doing their job.

10          So -- so, CBP also has a structure on how the jobs

11   are carried out, as is in the discretion of CBP and is up to

12   them.  Right?  We got that.

13          My question is, though:  Is there any limit to that

14   discretion at all in terms of what is convenient versus what is

15   necessary?

16           MR. EISWERTH:  So, Your Honor, I think you heard Chief

17   B. Miller testify when I asked him would --

18           THE COURT:  Uh-huh.

19           MR. EISWERTH:  -- destroying it for the purpose of

20   destroying it violate standards of conduct, and he said yes.

21           THE COURT:  Uh-huh.  I -- I heard that.

22           MR. EISWERTH:  I think there are gradations of that.

23   Whereas if individual line attorneys [sic] are abusing their

24   authority in that way, there's a process to do that, 'it just

25   happens not to be this lawsuit.

1        THE COURT:   So what process is there?

2        MR. EISWERTH:   There's a --

3        THE COURT:   Especially if you don't have names because

4  nobody will give you a name or everybody's saying somebody else

5  is making the decision.   What is that process, if it's not some

6  kind of, Hey, guys, work together for the betterment of

7  everybody.

8        MR. EISWERTH:   And -- and again, as I said, I'm happy

9  to -- to make that strong suggestion.   I would say as far as

10  the -- the individual employment and however they deal with

11  individuals -- complaints against individuals, that's a separate

12  process.   It would start with station management.

13        THE COURT:   But station management's the one making

14  the decis -- the decision.

15        MR. EISWERTH:   Well, I'm sure there are -- well, I --

16  I don't want to speak to what I don't know.   But I can provide

17  further information if that would be helpful to the Court of

18  what to do in this --

19        THE COURT:   What do you think would be necessary for a

20  brief?   What area do you think would be most necessary to brief?

21        MR. EISWERTH:   From our perspective, this -- should --

22  should we decide it on the legal threshold issues that I argued

23  earlier?   So to the extent there are issues there that you would

24  ask us to brief more on, or specific questions, happy to do

25  that.

1    THE COURT:  Okay.

2    MR. EISWERTH:  I'm also happy to address any of these

3  fact questions that you think further information would be

4  helpful.

5    THE COURT:  Counsel, the fact question is:  If you

6  build it, they will come.  They built a processing center, they

7  came.  That's really what we're talking about here.  If you

8  build it, they will come.

9    MR. EISWERTH:  And -- and I -- I understand that,

10  Your Honor, and I just think there -- I wish there were an easy

11  answer I could offer.  There's obviously not.

12    THE COURT:  I wish you could have one.

13    MR. EISWERTH:  I would just come back again to this is

14  a very narrow, specific question.  And I understand there are

15  all -- other issues that are debated and decided and changed,

16  and that's just not this narrow question.

17    THE COURT:  But this narrow question legally is

18  determined based on facts as well.  And the facts that I heard

19  and that I saw today leave a lot to be desired.

20    State?

21    MR. EISWERTH:  Thank you, Your Honor.

22    MR. WALTERS:  Your Honor, may I approach?

23    THE COURT:  Uh-huh.

24    MR. WALTERS:  Your Honor, I -- I don't have much to

25  say, unless there's anything specific you would like me to talk

1  about.

2       THE COURT:  Counsel, the question is --

3       MR. WALTERS:  Yes.

4       THE COURT:  -- are you impeding Border Patrol from

5  doing their job?  And if you are, why do you have the wire up?

6       MR. WALTERS:  We are not --

7       THE COURT:  Are you not asking for them to destroy it?

8       MR. WALTERS:  Your Honor, I think the -- the evidence

9  from other sectors shows that having concertina wire does not

10  impede the ability of Border Patrol to perform its duties.

11       THE COURT:  Well, apparently it impeded them in this

12  area.  So why impede them?

13       MR. WALTERS:  Yes, Your Honor.  Well, I think with,

14  you know, the -- the specifics about Chief Trevino and how he is

15  operating here, I think that the key thing to understand is that

16  the -- the defendants have adopted the maximalist sort of

17  position that Chief Trevino thinks is his prerogative.

18       THE COURT:  Okay.  But the bottom line is, immigration

19  belongs to the federal government.  They have access to do their

20  job wherever and whenever.  If they are being impeded for

21  whatever reason, why can't they remove that impediment?

22       MR. WALTERS:  I think that there would be an ability

23  to remove an impediment if there was any evidence in the record

24  that that is what was actually happening here.  But as we've

25  seen, they are not processing or inspecting these people.

1          THE COURT:  But --

2          MR. WALTERS:  You know, they've said -- they -- they

3     tried to pivot from the health exigent circumstances that was

4     originally in their public statements when this -- when these

5     controversies arose to this duty-based impediment.

6          THE COURT:  Okay.  So, but if it's -- if it's impeding

7     them in a convenient manner and an operational manner to do

8     their job, why can't they do something about it?

9          MR. WALTERS:  Well, I think that just -- there's lots

10    of things that could be more convenient for them that are --

11         THE COURT:  I get it.

12         MR. WALTERS:  -- that are not within their

13    authorization.

14         THE COURT:  But it is within their authorization when

15    it comes to immigration.  So the question becomes, if the

16    federal government says it's more difficult for us to do our

17    duty under federal law because of concertina wire, then why

18    don't they have the right to remove it or to cut it?

19         MR. WALTERS:  I'd say there's a couple things.  One,

20    there is no statute that specifically says you can destroy

21    private property.  Now, they do have access -- the ability to

22    access lands within 25 miles of the border in order -- for a

23    specific purpose, and that is to prevent illegal entries.

24    But -- but what we see here, that is not -- you know, that's the

25    justification they're trying to make, but that is not what we

1   see that is actually happening on the ground.  They are not --

2   they are opening -- they are -- they are breaking through the

3   border barriers, allowing people.  They are not immediately

4   processing them, which is what they say they have to do.

5          THE COURT:  But once a person gets into -- onto

6   American soil in the middle of the river, then they are entitled

7   to all the -- the rights of the Constitution and the statutes,

8   and they have the right to be processed, they have the right to

9   make all of their claims.  The Border Patrol has a right to

10   arrest them and to bring them and charge them with crimes, but

11   that's all within the Border Patrol discretion that cannot be

12   impeded, correct?

13          MR. WALTERS:  No, Your Honor.  I don't think that's

14   right.

15          THE COURT:  Why not?

16          MR. WALTERS:  Well, first, once -- once they --

17   there's a case called United States versus -- I'm not going to

18   be able to pronounce this -- *Thuraissigiam*, I believe, a 2020

19   Supreme Court case, that said that just because people make it

20   across the border does not mean they have made an entry here;

21   that they are on the threshold -- that's the term that the

22   Supreme Court used.  They're on the threshold.  And that's

23   what --

24          THE COURT:  But the Supreme Court has held that any

25   person on American land is entitled to all the rights of any

1  other person.  Aliens --

2         MR. WALTERS:  If they've just made an intermittent

3  entry --

4         THE COURT:  But they -- but they made an entry once

5  they crossed the middle of the river.

6         MR. WALTERS:  Well, I think we've seen from the

7  testimony of -- of Border Czar Banks, that they're -- they're --

8  have been able to repel people.  They've been -- they -- they

9  are able to encourage people --

10         THE COURT:  But isn't -- but at that point --

11         MR. WALTERS:  -- to push them back.

12         THE COURT:  -- isn't it the discretion of

13  Border Patrol, whether they repel them or they let them in?

14         MR. WALTERS:  Well, I -- I think -- you know,

15  destroying another sovereign's property is a different thing.  I

16  think that you would have to have a more specific authorization.

17         THE COURT:  Why?

18         MR. WALTERS:  Because of -- well, you have the sort of

19  major questions doctrine, even before the recent articulation of

20  that in the DAPA case, in the Fifth Circuit case in 2015.  A lot

21  of these sort of general authorities of DHS over immigration,

22  the same ones that are cited here were used as a justification

23  in that program.  And the Fifth Circuit said that you -- you --

24  you're -- you're trying to create a vast -- a power -- a vast

25  power that would have -- Congress would have to articulate more

1   specifically in order to find this.

2          This -- these -- these statutes just speak in

3   generalities and -- and not in the sense of -- you know, there's

4   all sorts of things that could, you know --

5          THE COURT:  But in generalities, Border Patrol, under

6   the INA, has the power, the duty, and the responsibility to

7   enforce immigration law, which is apprehend, process, prosecute,

8   whatever the case may be.  They have -- that is totally within

9   their discretion.  How does any other authority have the right

10  to interfere with that?

11         MR. WALTERS:  Well, Your Honor, I'd say -- for

12  example, you know, we have speed limit laws, traffic laws here.

13         THE COURT:  Uh-huh.

14         MR. WALTERS:  DHS has to obey those laws.  Now, there

15  could be an exigent --

16         THE COURT:  No, they don't.

17         MR. WALTERS:  -- circumstance --

18         THE COURT:  No, they don't, under the Supremacy

19  Clause.

20         MR. WALTERS:  Well, on our --

21         THE COURT:  Not -- not in their official --

22         MR. WALTERS:  You know, if they're just driving --

23         THE COURT:  -- in their official vehicles.

24         MR. WALTERS:  I see what you're saying, and I do agree

25  with you that if they're trying to, you know, chase after

1  someone to -- to -- in pursuit, you know, they --

2      THE COURT:  No, in just normal --

3      MR. WALTERS:  -- they could do that.

4      THE COURT:  -- everyday things.  They can still -- as

5  long as they're in their -- in the -- in the performance of

6  their duty, they're technic -- they do follow the speed limits,

7  mainly because they're worried about crashes and liability and

8  things of that nature under --

9      MR. WALTERS:  Uh-huh.

10     THE COURT:  -- the Federal Torts Claims Act.  But

11 they're not necessarily bound to the state traffic laws.

12     MR. WALTERS:  Well, Your Honor, I -- I would say that,

13 you know, taking an active role in destroying another -- someone

14 else's property, especially that state, you know, where they

15 haven't made a showing that is actually stopping them from

16 performing their duties.

17     THE COURT:  Okay, but the question --

18     MR. WALTERS:  Just because it makes --

19     THE COURT:  But the question here is not whether they

20 have to show that it's stopping them from doing their duties,

21 you have to show that it's not.  Because you're the one that's

22 acting -- asking for injunctive relief.  Okay?

23     MR. WALTERS:  True, Your Honor.

24     THE COURT:  So the -- so, again, I think that what

25 we've got here, when you compare all the situations along the

1  border, you have four miles that is under control of people that

2  want to show who the big dog is, and that I'm going to decide

3  this is how I'm going to do it, and why I'm going to do it, and

4  I'm going to cut this wire as many times as I want whether you

5  like it or not.

6           I just don't understand why the -- the two

7  sovereigns are probably working towards the same end, an

8  orderly, a safe, effective way of having people either enter the

9  United States without any danger to any of the agents, to any of

10  the migrants, to anybody -- anybody's property.

11           Why people can't work together to come to that end

12  is beyond me.   Because it's only happening in Eagle Pass, in my

13  hometown.   And I don't know why that is happening.   I don't

14  understand why -- the parties can't get around that and work

15  together.   You both have basically the same mission; protect

16  your citizens, protect the citizens of the United States, make

17  sure the migrants are safe, that they're not in any medical

18  emergency, that they're properly processed and either released

19  or brought into court.

20           You both have basically the same motivation, so to

21  speak.   Maybe not the same legal mission, but the same

22  motivation.   So why can't y'all work together to bring it about?

23           MR. WALTERS:   Your Honor, we would be happy to have --

24  arrange further discussions between our respective clients in

25  order to make this happen.   But, you know, from our perspective

1  we think -- you know, you've heard the testimony of the -- the

2  Texas Border Czar.  I mean, everything goes through him.  We do

3  not have -- so, he -- the same people working together in

4  El Paso and in the RGV/Brownsville area, for -- for the state --

5  for the State of Texas' perspective, are basically the same

6  people.  It's all going through that centralized repository.

7          So we think from -- from our perspective, we --

8  we're taking the same position in -- in every sector.  And there

9  is something happening in the Del Rio Sector, but we would be --

10  you know, we -- we would encourage our -- our relevant

11  stakeholders to -- to reach out to DHS.

12          Now, one thing I did want to broach is, you know,

13  the -- the Court does have the authority to extend the TRO an

14  additional 14 days beyond its -- its current -- if it wanted to

15  facilitate further discussions or time to resolve the pending PI

16  motion.  I just wanted to raise that issue.

17          But we -- we would be happy to go back to all the

18  relevant people on our side to encourage further discussions

19  with the federal defendants.

20          THE COURT:  Okay, I have another matter that is -- was

21  not part of the hearing, but I need for y'all to come to the

22  bench for that for just a quick second.

23      (7:10:25 TO 7:12:05 P.M., BENCH CONFERENCE)

24          THE COURT:  All right.  The Court will issue a ruling.

25              Anything further by either side?

1          MR. WALTERS:  No, Your Honor.  Did you want anything

2     further from us, with any -- any briefing or anything --

3          THE COURT:  Not unless the parties believe that

4     there's any more briefing that's necessary.

5          MR. WALTERS:  We don't think so from our perspective,

6     Your Honor.

7          THE COURT:  Okay.  And I think the federal government

8     also --

9          MS. LOWRY:  Unless your Honor has a particular point,

10    no.

11         THE COURT:  Okay.  All right.  I will issue a ruling.

12    You're --

13         MR. EISWERTH:  So sorry, Your Honor.

14         THE COURT:  Yes, sir?

15         MR. EISWERTH:  One last thing.  To the extent that you

16    were intending to go beyond your TRO, we would just ask that you

17    stay that piece of it for seven days, so we may consider whether

18    to seek further relief from the Fifth Circuit.

19         THE COURT:  You're -- you're saying beyond the --

20    the -- right now the deadline of the 13th?  You're saying or

21    beyond a day?

22         MR. EISWERTH:  Sorry, Your Honor.  Yes, beyond the --

23    I -- I understood Your Honor to say you were going to rule

24    before the expiration of the TRO.

25         THE COURT:  I'm hoping to.

1          MR. EISWERTH:  Hoping to.

2          THE COURT:  Yeah.

3          MR. EISWERTH:  My specific request is to the extent

4    you are extending or --

5          THE COURT:  Oh, I see what you're saying.

6          MR. EISWERTH:  -- or as far -- in substance.

7          THE COURT:  Then stay it while you decide what you're

8    going to do?

9          MR. EISWERTH:  Yes, Your Honor.

10         THE COURT:  All right.

11         MR. EISWERTH:  Thank you, Your Honor.

12         THE COURT:  Uh-huh.

13         MR. WALTERS:  Your Honor, I just wanted to thank you

14   and the Court's staff for a -- late evening.  We appreciate it

15   and apologize.

16         THE COURT:  That's all right.  They're going to be

17   here tomorrow night about this time or later since we're in a

18   jury trial.  They're going to be here anyway.  We're used to

19   this on Saturdays as well.  We do this Saturdays and whatever

20   days.

21             Okay, you may be excused.

22         MS. LOWRY:  Thank you, Your Honor.

23         MR. BRYANT:  Thank you, Your Honor.

24      (7:13:34 P.M., END TIME)

25                         -o0o-

1          C E R T I F I C A T E

2

3

4    U.S. DISTRICT COURT        )

5    WESTERN DISTRICT OF TEXAS )

6    DEL RIO DIVISION           )

7

8

9          I, Vickie-Lee Garza, Certified Shorthand Reporter, do

10   hereby certify that the above-styled proceedings were reported

11   by me, later reduced to typewritten form, and that the foregoing

12   pages are a true and correct transcript of the original notes to

13   the best of my ability.

14

15

16         Certified to by me this 14th day of November, 2023.

17

18

19

20              /s/  VICKIE-LEE GARZA
                TX CSR #9062, Expires 10/31/25
21              P.O. Box 2276
                Del Rio, Texas  78841
22

23

24

25

**Exhibit M**

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
DEL RIO DIVISION

NOV -9  PM 2: 16

CLERK U.S. DISTRICT COURT
WESTERN DISTRICT OF TEXAS

THE STATE OF TEXAS,                    §
                    Plaintiff,         §
                                       §
v.                                     §
                                       §        Civil Action No. DR-23-CV-00055-AM
U.S. DEPARTMENT OF HOMELAND            §
SECURITY, ALEJANDRO                    §
MAYORKAS, in his official capacity as  §
Secretary of the U.S. Department of    §
Homeland Security, U.S. CUSTOMS &      §
BORDER PROTECTION, U.S.                §
BORDER PATROL, TROY A.                 §
MILLER, in his official capacity as    §
Acting Commissioner for U.S. Customs   §
& Border Protection, JASON OWENS,      §
in his official capacity as Chief of U.S. §
Border Patrol, and JUAN BERNAL, in     §
his official capacity as Acting Chief   §
Patrol Agent, Del Rio Sector U.S. Border §
Patrol                                 §
                    Defendants.         §

## ORDER

It is **ORDERED** that, pursuant to Federal Rule of Civil Procedure 65(b)(2), the temporary

restraining order issued on October 30, 2023 (TRO) (ECF No. 9) shall be extended beyond

November 13, 2023, for 14 days to allow the Court more time to fully consider the parties'

arguments and evidence;

It is **FURTHER ORDERED**, as a clarification, that the TRO is not limited to the city of

Eagle Pass, Texas, but includes the vicinity of Eagle Pass, Texas as indicated in the Complaint;

It is **FURTHER ORDERED** that a second in-person preliminary injunction hearing be

held before this Court to discuss all pending issues, including the matters discussed below;

It is **FURTHER ORDERED** that the parties at the second hearing be joined by individuals with authority to answer and give final consent on any matter;

It is **FURTHER ORDERED** that the parties consult each other to identify mutually convenient dates and times for the second hearing, and to inform the Court of same by November 13, 2023;

It is **FURTHER ORDERED** that the parties provide supplemental briefs concerning the Plaintiff's Administrative Procedure Act (APA) claims, as well as legal definitions of the words "inspect," "interrogate," "admit," "apprehend," "examine," "remove," "transfer," "detain," "detect," "interdict," "arrest," "process," "policy," "procedure," and "notice";

It is **FURTHER ORDERED** that the parties provide to the Court any and all documents, including but not limited to reports and emails, among United States Border Patrol, especially the Del Rio Sector agents, regarding or referencing the Plaintiff's concertina wire barriers or other barriers located in Maverick County, Texas, as well as any and all documents which regard or reference impediments to said agents' performance as a result of the barriers;

It is **FURTHER ORDERED** that the parties provide to the Court communications, including but not limited to emails, from and including March 6, 2021, through today regarding or referencing the Plaintiff's and the Defendants' cooperation on implementing, facilitating, managing, maintaining, damaging, destroying, or interfering with the Plaintiff's barriers, specifically the concertina wire barriers, along the Texas-Mexico border; and

2

It is **FURTHER ORDERED** that the parties file their supplemental briefs and foregoing evidence by the day of the second hearing.

SIGNED and ENTERED on this 9th day of November 2023.

ALIA MOSES
Chief United States District Judge

3

Exhibit N

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF TEXAS**
**DEL RIO DIVISION**

F I L E D

NOV 21 2023

CLERK, U.S. DISTRICT COURT
WESTERN DISTRICT OF TEXAS
BY_____
DEPUTY

| | |
|---|---|
| THE STATE OF TEXAS, | § |
| **Plaintiff,** | § |
| | § |
| v. | § |
| | § |
| U.S. DEPARTMENT OF HOMELAND | § |
| SECURITY, ALEJANDRO | § |
| MAYORKAS, in his official capacity as | § |
| Secretary of the U.S. Department of | § |
| Homeland Security, U.S. CUSTOMS & | § |
| BORDER PROTECTION, U.S. | § |
| BORDER PATROL, TROY A. | § |
| MILLER, in his official capacity as | § |
| Acting Commissioner for U.S. Customs | § |
| & Border Protection, JASON OWENS, | § |
| in his official capacity as Chief of U.S. | § |
| Border Patrol, and JUAN BERNAL, in | § |
| his official capacity as Acting Chief | § |
| Patrol Agent, Del Rio Sector U.S. Border | § |
| Patrol | § |
| **Defendants.** | § |

Civil Action No. DR-23-CV-00055-AM

## SUPPLEMENTAL ORDER

It is **ORDERED** that based on today's virtual conference and the parties' previous filing

(ECF No. 36), the temporary restraining order initially issued on October 30, 2023 at 9:30 a.m.

and then extended to November 27, 2023 at 9:30 a.m. be extended to November 29, 2023 at 11:59

p.m. on the consent of the parties, which will provide the Court enough time to render a timely

decision on the pending preliminary injunction motion; and

It is **FURTHER ORDERED** that the Defendants have until November 27, 2023 at 10 a.m. to produce outstanding documents that the Court ordered on November 9, 2023 to be produced, as modified by the Court's November 15, 2023 order, through a virtual link that the Court has already sent to the parties.

SIGNED and ENTERED on this 21st day of November 2023.

ALIA MOSES
Chief United States District Judge

Exhibit O

**THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF TEXAS**
**DEL RIO DIVISION**

**STATE OF TEXAS**,

*Plaintiff,*

**v.**

**U.S. DEPARTMENT OF HOMELAND SECURITY**, *et al.*,

*Defendants.*

Case No. 2:23-cv-00055-AM

Hon. Alia Moses

**DEFENDANTS' SUPPLEMENTAL BRIEF ON TEXAS'S APA CLAIMS**
**PURSUANT TO THE COURT'S NOVEMBER 9, 2023 ORDER**

## TABLE OF CONTENTS

INTRODUCTION ........................................................................................................ 1

ARGUMENT .............................................................................................................. 3

I.    Texas Is Unlikely To Succeed On Its APA Claims for Threshold Reasons .............. 3

    A.    Texas cannot rely on the APA to circumvent the statutory bar to its requested injunctive relief. .................................................................... 4

    B.    Judicial review of Texas's APA claims is not available. ............................... 9

        1.    Decisions about whether and how to apprehend and inspect migrants are committed to agency discretion by law ...................... 9

        2.    Texas's claims are not based on discrete, final agency action. ........ 11

II. Texas Is Unlikely to Succeed on the Merits of Its APA Claims ..................................... 14

    A.    Defendants' actions are consistent with their broad statutory authority .. 14

    B.    Defendants' actions are not a legislative rule. ............................................ 17

    C.    Defendants' actions are not arbitrary and capricious ................................. 18

CONCLUSION ........................................................................................................ 20

# TABLE OF AUTHORITIES

Cases

*Al Otro Lado, Inc. v. Nielsen,*
   327 F. Supp. 3d 1284 (S.D. Cal. 2018) ............................................................ 12

*Arizona v. Biden,*
   40 F.4th 375 (6th Cir. 2022) ............................................................................... 7

*Barrick Goldstrike Mines, Inc. v. Browner,*
   215 F.3d 45 (D.C. Cir. 2000) ............................................................................ 14

*Bennett v. Spear,*
   520 U.S. 154 (1997) .......................................................................................... 13

*Ciba-Geigy Corp. v. EPA,*
   801 F.2d 430 (D.C. Cir. 1986) .......................................................................... 14

*Data Mktg. P'ship v. Dep't of Labor,*
   45 F.4th 846 (5th Cir. 2022) ............................................................................. 14

*Dep't of Comm. v. New York,*
   139 S. Ct. 2551 (2019) ........................................................................................ 9

*Dep't of Labor v. Kast Metals Corp.,*
   744 F.2d 1145 (5th Cir. 1984) .......................................................................... 19

*DHS v. Thuraissigiam,*
   140 S. Ct. 1959 (2020) ...................................................................................... 17

*DRG Funding Corp. v. Sec'y of Hous. & Urb. Dev.,*
   76 F.3d 1212 (D.C. Cir. 1996) .......................................................................... 14

*Garland v. Aleman Gonzalez,*
   596 U.S. 543 (2022) ................................................................................. 1, 5, 6, 7

*Holistic Candlers & Consumers Ass'n v. FDA,*
   664 F.3d 940 (D.C. Cir. 2012) .......................................................................... 14

*Indep. Equip. Dealers Ass'n v. EPA,*
   372 F.3d 420 (D.C. Cir. 2004) .......................................................................... 14

*Moher v. United States,*
   875 F. Supp. 2d 739 (W.D. Mich. 2012) .......................................................... 11

*Narenji v. Civiletti*,
   617 F.2d 745 (D.C. Cir. 1979) ............................................................... 16

*Nat'l Mining Ass'n v. McCarthy*,
   758 F.3d 243 (D.C. Cir. 2014) ............................................................... 18

*Northpoint Tech., Ltd. v. FCC*,
   414 F.3d 61 (D.C. Cir. 2005) ................................................................. 20

*Norton v. South. Utah Wilderness Alliance*,
   542 U.S. 55 (2004) ........................................................................... 2, 13

*Sierra Club v. Peterson*,
   228 F.3d 559 (5th Cir. 2000) .................................................................. 2

*Sierra Club v. U.S. Dep't of Interior*,
   990 F.3d 909 (5th Cir. 2021) ................................................................. 20

*Texas v. Biden*,
   646 F. Supp. 3d 753 (N.D. Tex. 2022) ..................................................... 9

*Texas v. United States*,
   50 F.4th 498 (5th Cir. 2022) ................................................................... 9

*U.S. Army Corps of Eng'rs v. Hawkes Co.*,
   578 U.S. 590 (2016) .............................................................................. 14

*United States v. Texas*,
   599 U.S. 670 (2023) ....................................................................... *passim*

*West Virginia v. EPA*,
   142 S. Ct. 2587 (2022) .......................................................................... 16

Statutes

5 U.S.C. § 553 ......................................................................................... 18

5 U.S.C. § 701 ........................................................................................... 9

5 U.S.C. § 704 ........................................................................................... 9

5 U.S.C. § 705 ..................................................................................... 4, 8

8 U.S.C. § 1103 .................................................................................. 15, 16

8 U.S.C. § 1158 ....................................................................................... 10

8 U.S.C. § 1225 ............................................................................................ *passim*

8 U.S.C. § 1226 ........................................................................................... 13

8 U.S.C. § 1228 ........................................................................................... 10

8 U.S.C. § 1229 ........................................................................................... 10

8 U.S.C. § 1229a .......................................................................................... 10

8 U.S.C. § 1252 ......................................................................................... 1, 4

8 U.S.C. § 1357 ....................................................................................... 15, 16

19 U.S.C. § 1630 ......................................................................................... 11

28 U.S.C. § 1346 ......................................................................................... 11

Regulations

8 C.F.R. § 287.5 .......................................................................................... 15

Other Authorities

Elizabeth Findell, *Texas Spent Billions on Border Security. It's Not Working.*,
  Wall Street Journal (July 22, 2023) ........................................................ 16

H.R. Rep. No. 82-1377, 1952 U.S.C.C.A.N. 1358 (Feb. 19, 1952) ........................................... 16

*Inspection*, American Heritage Dictionary, https://perma.cc/QWK8-EVN4 ................................. 5

## INTRODUCTION

Texas admits that the concertina wire it has placed along the banks of the Rio Grande near Eagle Pass impedes Border Patrol's—and indeed Texas's own—ability to access migrants on U.S. soil on the other side of the wire. The State nevertheless asserts various APA claims seeking to curtail Border Patrol's discretion to decide whether and when to remove that impediment so that Border Patrol may apprehend, inspect, and process the migrants under the Immigration and Nationality Act (INA). *See, e.g.*, 8 U.S.C. § 1225. These claims fail as a matter of law on multiple grounds.

Congress has withdrawn lower courts' authority to grant the relief Texas seeks, even if Texas's APA claims were meritorious, which they are not. Specifically, except in circumstances inapplicable here, Congress has specified that "[r]egardless of the nature of the action or claim or of the identity of the party or parties bringing the action," no lower federal courts "shall have jurisdiction or authority to enjoin or restrain the operation of [8 U.S.C. § 1225]," among other INA provisions. 8 U.S.C. § 1252(f)(1). The Supreme Court has held that this bar applies even when the challenged "operation" of the INA is alleged to be "illegal" or "improper," as long as "in the Government's view [the actions] are allowed by § [1225]." *Garland v. Aleman Gonzalez*, 596 U.S. 543, 551 (2022) (parentheses omitted). Texas cannot rely on the APA to circumvent this express bar on the relief it seeks; were it otherwise, the bar would be rendered a nullity.

Beyond the § 1252(f)(1) bar, APA review is unavailable. For one thing, decisions about whether and how to apprehend, inspect, and process noncitizens are committed to agency discretion by law, just like decisions to arrest, prosecute, or remove a noncitizen

under the INA. *See United States v. Texas*, 599 U.S. 670, 678-79 (2023). For another, Texas's APA claims do not challenge a discrete, final agency action—which is "a prerequisite to suit" under the APA. *Sierra Club v. Peterson*, 228 F.3d 559, 564 (5th Cir. 2000). Not every act by individual agency employees or every agency policy constitutes a final agency action for purposes of the APA; indeed, most do not. Programmatic attacks on how an agency conducts its day-to-day operations are unreviewable under the APA. *See Norton v. S. Utah Wilderness All.*, 542 U.S. 55, 66-67 (2004). But that is precisely what Texas attempts to do here.

Even if Texas could overcome these threshold hurdles, its APA claims have no merit. First, its claims that Border Patrol exceeded its statutory authorities or acted *ultra vires* are unlikely to succeed because Border Patrol undoubtedly has the authority to remove impediments to its execution of federal immigration laws. Congress has charged the Department of Homeland Security, including its subagency U.S. Customs and Border Protection, with protecting the border and apprehending and inspecting unlawful entrants. Border Patrol has authority to interrogate and arrest noncitizens entering between ports of entry and to enter land near the border to carry out that mission. As Texas's own witness acknowledged, that authority includes the ability to break through barriers, such as gates or locks, when agents judge it necessary. Concertina wire belonging to Texas (or anyone else) is no different.

Second, the guidance that Border Patrol's Del Rio Sector provided to the line agents is not a legislative rule and, thus, it need not comply with APA's notice-and-comment rulemaking requirements. That guidance—the only "policy" shown to exist—

simply concerns which agents should decide whether to cut Texas's wire when exigent circumstances do *not* exist. It does not require the wire to be cut under any particular circumstances. Nor does it require Texas to do or refrain from doing anything. It is, at most, an interpretive rule, a general statement of policy, or a procedural rule, none of which requires notice and comment.

Third, Defendants' actions are reasonable—not arbitrary and capricious. Texas admits that Border Patrol agents have cut the wire to provide medical assistance or to facilitate apprehension of migrants, which wholly aligns with Border Patrol's mission. Doing so is necessary (as Texas's own conduct demonstrates) because there are no access points in the four-mile stretch of concertina wire at issue, unlike federal infrastructure at this location or elsewhere. In addition to the fact that Texas has admitted that migrants continue to unlawfully enter near Eagle Pass despite the wire's presence. Border Patrol reasonably could judge that the wire should be cut to carry out its statutory functions, even if it believed that concertina wire has beneficial uses.

For these reasons, and those stated in Defendants' preliminary-injunction opposition, the Court should deny Texas's motion for a preliminary injunction.[1]

## ARGUMENT

### I.    Texas Is Unlikely To Succeed On Its APA Claims for Threshold Reasons.

Texas is unlikely to overcome several threshold bars to the Court's review of its APA claims. *See* Opp. to Mot. for Prelim. Inj. at 10-12, 15-29, ECF No. 23-1.

---

[1] In compliance with the Court's November 9 order, Defendants provide the "legal definitions" of the 15 identified terms—to the extent possible—in the attached appendix.

### A. Texas cannot rely on the APA to circumvent the statutory bar to its requested injunctive relief.

Texas seeks an injunction and a stay of agency action under the APA, 5 U.S.C. § 705, to block CBP's purported policy of cutting or moving Texas's concertina wire. But Congress has expressly withdrawn the Court's authority to restrain Defendants' enforcement discretion in the way that Texas's motion requests and the temporary restraining order does. 8 U.S.C. § 1252(f)(1).[2] Section 1252(f)(1) states that lower federal courts—"[r]egardless of the nature of the action or claim or of the identity of the party or parties bringing the action"—do not have "jurisdiction or authority to enjoin or restrain the operation" of certain provisions in Title 8 governing inspection, apprehension, and removal of noncitizens. *Id.* (referencing 8 U.S.C. §§ 1221-1231). Texas does not dispute that § 1225, which governs inspection and processing of applicants for admission, is among those identified provisions. *See* Pl.'s Reply in Supp. of Mot. for Prelim. Inj. at 1, ECF No. 27-1. But it contends that § 1252(f)(1) does not apply to its APA claims here. These arguments are meritless.

Contrary to Texas's suggestion, the requested injunction would have a direct impact on Border Patrol's enforcement of § 1225—not a mere "collateral effect," Reply at 2. Section 1225(a)(1) deems any noncitizen "present in the United States who has not been

---

[2] The TRO allows Defendants to cut the wire when necessary to render aid in a "medical emergency that mostly likely results in serious bodily injury or death to a person." TRO at 4, ECF No. 9. Texas has acknowledged that Defendants may cut through the wire when necessary to provide emergency medical treatment, Transcript of Prelim. Inj. Hr'g at 28 (argument of counsel for Texas), and that Texas officials have cut through the wire for the same reason, *see id.* at 109 (testimony of Special Advisor Michael Banks).

admitted" to be an "applicant for admission," and § 1225(a)(3) directs immigration officers—including Border Patrol agents—to "inspec[t]" all such "applicants for admission." The statute does not define "inspection," but it generally means an "[o]fficial examination or review," American Heritage Dictionary, https://perma.cc/QWK8-EVN4; *see also* Appendix at 1-2. In the context of § 1225, inspection includes a determination whether a noncitizen is inadmissible and whether the noncitizen presents a security risk. *See* 8 U.S.C. § 1225(b)(1)(A)(i), (b)(2)(A). After initial assessments, Border Patrol may conduct further inspection and processing to determine whether the noncitizen is seeking asylum or other humanitarian protection, and which immigration-law pathway (*e.g.*, removal, expedited removal, voluntary departure) is appropriate for the migrant, *see id.* § 1225(b). And in practical terms, for migrants who have entered the United States by crossing the river, Border Patrol's authority to inspect begins as soon as a Border Patrol agent observes the migrant, and once the migrant is apprehended, inspection covers initial intake and beyond, as the migrant is processed.

Texas's requested injunctive relief would directly interfere with Border Patrol's efforts to inspect migrants crossing the Rio Grande to enter the U.S. When approaching such migrants, Border Patrol agents are carrying out their responsibilities under § 1225, which "no one disputes … is among the provisions the 'operation' of which cannot be 'enjoined or restrained' under § 1252(f)(1)." *Aleman Gonzalez*, 596 U.S. at 551. The wire's presence, at a minimum, impedes law enforcement on one side of the wire from reaching migrants on the other; it could take anywhere from approximately 10 to 30 minutes to cut through the wire, depending on how many rolls of wire were deployed by Texas. *See* Tr.

at 132 (testimony of Deputy Patrol Agent in Charge Mario Trevino, Jr.). Indeed, Texas's "Border Czar," Mr. Banks, testified that Texas personnel themselves have had to cut through the wire to reach the migrants and provide medical assistance or make arrests. Tr. at 109 (Banks testimony). The same is necessarily true for Border Patrol. And preventing Border Patrol from cutting or otherwise moving the wire to gain access to migrants on the shoreline necessarily "inhibit[s]" or "stop[s]" the agents' efforts "to enforce, implement, or otherwise carry out" their responsibilities under § 1225. *Aleman Gonzalez*, 596 U.S. at 549-50. Just as district court orders requiring the government to provide certain hearings to noncitizens detained under 8 U.S.C. § 1231 "'enjoin[ed] or restrain[ed] the operation' of § 1231(a)(6) because they require officials to take actions that (in the Government's view) are not required by § 1231(a)(6) and to refrain from actions that (again in the Government's view) are allowed by § 1231(a)(6)," *id.*, the requested preliminary injunction would preclude Border Patrol officials from carrying out activities Border Patrol believe are authorized under § 1225. A preliminary injunction, and indeed the current TRO, "interfere with the Government's efforts to operate" § 1225 and are thus not permitted under § 1252(f)(1). *See id.* at 551.

To the extent that Texas contends that Defendants' cutting or moving of the wire is not implementing *the proper* interpretation of § 1225, the argument is foreclosed by the Supreme Court's decision in *Aleman Gonzalez.* There, the Court rejected the argument that "the operation" of immigration provisions covered in § 1252(f)(1) means the operation of those provisions "as *properly* interpreted." *See id.* at 552. The Court reasoned that a natural reading of the term "operation" is not so limited; rather, "it is very common to refer to

the 'unlawful' or 'improper' operation of whatever it is that is being operated." *Id.; see also Arizona v. Biden,* 40 F.4th 375, 397 (6th Cir. 2022) (Sutton, C.J., concurring) ("§ 1252(f)(1) has the same force even when the National Government allegedly enforces the relevant statutes unlawfully. Else, it would not be much of a prohibition.").

Equally irrelevant is Texas's focus on whether § 1225 imposes "mandatory" duties on Border Patrol, *see* Reply at 1-2, or allows for the exercise of enforcement discretion. There is no dispute that Congress has tasked Border Patrol agents with apprehending, inspecting, and processing illegal entrants. It follows that § 1252(f)(1) insulates Border Patrol's performance of those law-enforcement functions from an injunction restraining how Border Patrol carries out these responsibilities.

Even if Texas were correct that "inspection" in certain instances did not actually begin until migrants reached the staging area under Port of Entry #2 in Eagle Pass, the § 1252(f)(1) bar still applies. A directive that agents cannot cut or move the wire to apprehend migrants or otherwise direct them to a place where agents can conduct a sufficient inspection prevents the inspection process from starting in the first place. Such an order, in other words, "restrains" "the Government's efforts to enforce or implement [§ 1225]" and "the way" officials "carry out" those statutory duties—exactly what § 1252(f)(1) prohibits. *Aleman Gonzalez,* 596 U.S. at 550.

Furthermore, it makes no difference whether a judicial order restricts particular actions Border Patrol agents take in performing their § 1225 duties or forbids the performance of those § 1225 duties under any circumstances. *See* Reply at 1. Barring Border Patrol agents from taking specific actions in enforcing § 1225 is still "restraining"

their discharge of their § 1225 duties. Texas's suggestions as to how Border Patrol could otherwise perform its duties under § 1225—such as by "passing out water bottles, processing aliens along the river, or directing them to federal entry points" from the Mexico side of the barrier, Reply at 2—underscore that Texas is trying to dictate how Border Patrol performs its duties under § 1225. And such a restraint on the operation or enforcement of § 1225 is not permitted.

Finally, reframing the injunction as a stay of agency action under 5 U.S.C. § 705 does not avoid § 1252(f)(1)'s reach. *See* Reply at 2 n.3. Staying the effective date of an agency action restrains the agency from carrying out that action and thus is precluded by § 1252(f)(1). But even if § 1252(f)(1) did not preclude a court from staying agency action implementing the provisions specified in 1252(f)(1) (here, a purported policy directing Border Patrol agents to cut Texas's wire to apprehend migrants), that alternative relief would not redress Texas's purported injuries in this case. *See Texas*, 599 U.S. at 691 (Gorsuch, J., concurring). The agents' authority to cut the wire when necessary to perform their § 1225 responsibilities comes from the INA—not an agency policy—and thus staying the effective date of the alleged policy would not "compel [Border Patrol agents] to change how they exercise their [enforcement] discretion." *Id.* That distinguishes this case from other cases concerning agency programs—such as the Migrant Protection Protocols, *see Texas v. Biden*, 646 F. Supp. 3d 753 (N.D. Tex. 2022), and Deferred Action for Childhood Arrivals, *see Texas v. United States*, 50 F.4th 498 (5th Cir. 2022)—where vacating (or staying) the agency program at issue nullified the challenged conduct. Here, in contrast, Border Patrol has the authority to cut the wire whether there is any purported

policy or not. Texas's attempt to frame its suit as a request for a stay is nothing more than "a clever workaround" that "doesn't succeed" here. *Texas*, 599 U.S. at 691 (Gorsuch, J., concurring) (rejecting argument that vacatur avoids the reach of § 1252(f)(1)).

**B.    Judicial review of Texas's APA claims is not available.**

Texas's claims under the APA are unreviewable for two threshold reasons: (1) decisions about whether and how to apprehend, inspect, and process migrants are committed to agency discretion by law, *see* Opp. at 16-19; 5 U.S.C. § 701(a)(2); and (2) Texas does not premise its claims for injunctive relief on a discrete, final agency action, *see* Opp. at 19-22; 5 U.S.C. § 704.

**1.    Decisions about whether and how to apprehend and inspect migrants are committed to agency discretion by law.**

Texas acknowledges that there are "certain categories of administrative decisions that courts traditionally have regarded as 'committed to agency discretion,'" in part, because that discretion is "subject to 'no meaningful standard' of review." Reply at 8 (quoting *Dep't of Comm. v. New York*, 139 S. Ct. 2551, 2568 (2019)). However, Texas ignores the Supreme Court's recent admonition that one of those categories is decisions about whether and how to arrest noncitizens. As the Court said, "[u]nder Article II, the Executive Branch possesses authority to decide 'how to prioritize and how aggressively to pursue legal actions against defendants who violate the law.'" *Texas*, 599 U.S. at 678-79. And not only does immigration enforcement implicate "foreign-policy objectives," but also "courts generally lack meaningful standards for assessing the propriety of enforcement choices in this area." *Id.; see also id.* (noting that "the Executive Branch also

retains discretion over whether to remove a noncitizen from the United States" under the same principles). These principles apply to Defendants' decisions about whether and how to apprehend and inspect noncitizens crossing the International Boundary Line near Eagle Pass. Accordingly, they are similarly not reviewable under the APA, *see* Opp. at 16-19, and Texas's arguments to the contrary fail.

Texas's challenge confuses the duties Congress has imposed on Border Patrol and the decisions Congress left to agency discretion. *See* Reply at 7-8. Section 1225 directs agents to inspect applicants for admission, § 1226 authorizes DHS to arrest or detain certain noncitizens, and §§ 1228, 1229, and 1229a set out different procedures for removing noncitizens. None of those provisions allows an agent to force a noncitizen who has crossed the International Boundary Line to return to Mexico without going through the statutory procedures, unless the noncitizen chooses to return. *See id.* § 1225(a)(4) (allowing DHS to permit voluntary withdrawal of application for admission and immediate departure); *cf. id.* § 1158(a) (permitting any noncitizen "who arrives in the United States (whether or not at a designated port of arrival …)" to "apply for asylum"). Border Patrol agents nevertheless have enforcement discretion in deciding whether or how to apprehend, detain, and process a noncitizen consistent with those provisions. *See Texas*, <u>599 U.S. at 679</u>; *see also* Tr. at 110–11 (Banks testimony). With respect to that enforcement discretion, Border Patrol agents are no different from other law-enforcement officers who have a responsibility to arrest someone suspected of committing a crime but must also use their judgment in determining whether and how to effectuate that arrest.

Texas cannot justify its request for injunctive relief merely by pointing to past instances of Border Patrol cutting Texas's wire. Whatever the circumstances in which those past instances occurred,[3] the decision whether and when to do so is within Border Patrol's discretionary authority, and the APA does not empower this Court to lay down a rule regulating how Border Patrol may exercise that authority in the future. Neither Texas nor a court could identify all the factors that go into deciding whether to cut the wire in a particular instance, let alone how to balance those hypothetical factors in advance. Decisions about apprehension, inspection, and processing, like those to arrest, require agents to "react and adjust to the ever-shifting public-safety and public-welfare needs," to respond to "inevitable resource constraints," and to engage in a "complicated balancing process" that "leaves courts without meaningful standards for assessing those policies," to the extent they exist. *Texas*, 599 U.S. at 679–80.

### 2.    Texas's claims are not based on discrete, final agency action.

Texas has asserted that Defendants have a "policy" "that concertina wire fencing must be cut or moved anytime [noncitizens] are present." Reply at 10; *see* Compl. ¶¶ 8, 60-61 (page 22), ECF No. 1; Pl.'s Mot. for Prelim. Inj. at 28-30, ECF No. 3-1; Reply at 9-13; Tr. at 15, 17-18. But Texas has not produced any evidence supporting that unfounded assertion, and even assuming the alleged policy's existence, it is not final agency action.

---

[3] Such actions could potentially be reviewed after the fact in a suit for damages, *see* 28 U.S.C. § 1346; *see, e.g.*, *Moher v. United States*, 875 F. Supp. 2d 739, 755-56 (W.D. Mich. 2012) (considering and rejecting trespass claim against Border Patrol agents under the Federal Tort Claims Act), when assessing claims for compensation under 19 U.S.C. § 1630, or when a Border Patrol agent is subject to personnel actions for violating agency conduct standards, *see* Tr. at 187 (testimony of Chief David BeMiller).

DHS's sworn declaration, and the evidence introduced at the first preliminary-injunction hearing, show that no such policy exists and that none was issued by DHS, CBP, or Border Patrol. *See* Declaration of Chief of Law Enforcement Operations David BeMiller ¶ 17, ECF No. 23-2; Tr. 186-87 (BeMiller testimony); *accord* Tr. at 138 (Trevino testimony stating same). Texas has not proven otherwise. In fact, Mr. Banks acknowledged that, by and large, Border Patrol has *not* cut the wire except when faced with exigent circumstances in the El Paso and Rio Grande Valley Sectors, disproving the notion that there is an agency-wide directive *requiring* agents to cut the wire. Tr. at 80, 96 (Banks testimony). The only other evidence that the State points to is Border Patrol's repeated confirmation that it has authority to cut the wire "to take those who have crossed onto U.S. soil without authorization into custody for processing." Reply at 9-10 (citing DHS statement). But that does not add up to a "policy of sanctioning the destruction of private property anytime an agent sees [a noncitizen]." *Id.* at 11; *see Al Otro Lado, Inc. v. Nielsen*, 327 F. Supp. 3d 1284, 1321 (S.D. Cal. 2018) (complaint failed to state discrete agency action where "there are no allegations connecting any of [CBP agents'] conduct" to the "unwritten policy" alleged by plaintiffs to have been issued by CBP). And so, what Texas is actually trying to do is to "inject[] [the Court] into day-to-day agency management," which "is not contemplated by the APA." *Utah Wilderness*, 542 U.S. at 67.

The guidance that supervisors in the Del Rio Sector have provided line agents regarding the wire likewise does not compel cutting the wire under any specific circumstances. Both Chief BeMiller and Deputy Patrol Agent in Charge Trevino explained that the advice supervisors in the Eagle Pass Stations provided to their line

agents was: (a) if there are no exigent circumstances, the agents should call a supervisor before any wire-cutting; and (b) if a supervisor is unavailable or exigent circumstances exist, the agents should use their judgment in determining how best to apprehend noncitizens or provide medical assistance. Tr. at 137-41 (Trevino testimony); BeMiller Decl. ¶ 19. In both cases, the line agents have discretion to assess the situation and exercise their judgment whether to cut the wire, *see, e.g.*, BeMiller Decl. ¶ 19, just as Mr. Banks testified Border Patrol agents do in other situations, Tr. at 110-11 (Banks testimony).

This guidance does not qualify as a final agency action, which requires that the action both "mark the consummation of the agency's decisionmaking process" and "determine[] rights or obligations … or from which legal consequences will flow." *Bennett v. Spear*, 520 U.S. 154, 177–178 (1997). As previously explained, this informal guidance does not represent the "consummation" of the agency's decisionmaking process about whether to cut any wire; rather, it expressly contemplates further agency action, specifically Border Patrol agents exercising their judgment in determining whether to cut the wire given the circumstances at the time. *See* Opp. at 21-22 (citing *DRG Funding Corp. v. Sec'y of Hous. & Urb. Dev.*, 76 F.3d 1212, 1215 (D.C. Cir. 1996)).

The cases that Texas cites illustrate the lack of a final agency action here. In those cases, the agency announced a definitive position that, by itself, would have real-world consequences. *See* Reply at 11 (citing *Barrick Goldstrike Mines, Inc. v. Browner*, 215 F.3d 45, 48-49 (D.C. Cir. 2000); *Ciba-Geigy Corp. v. EPA*, 801 F.2d 430, 436 n.8 (D.C. Cir. 1986)). In *Barrick Goldstrike*, for example, the EPA made a firm determination (through a series of actions) that waste rock, like that moved by the petitioner, did not qualify for a de

13

minimis exception to statutory requirements. 215 F.3d at 47-48. And in *Ciba-Geigy*, the EPA "unequivocally stated [its] position on the question whether registrants were entitled to a cancellation hearing before labeling changes were required." 801 F.2d at 436.

Here, in contrast, Border Patrol's purely internal guidance in Eagle Pass makes no finding that any wire *should* or *would* be cut, only who should make that determination. *Cf. Holistic Candlers & Consumers Ass'n v. FDA*, 664 F.3d 940, 944 (D.C. Cir. 2012) (agency warning letters, advising that company may be in violation of law, "do not mark the consummation of [agency's] decisionmaking"). To the extent any wire is cut, that consequence flows not from the guidance but from the Border Patrol's statutory authority. That is, the guidance itself does not have "direct and appreciable legal consequences." *U.S. Army Corps of Eng'rs v. Hawkes Co.*, 578 U.S. 590, 598 (2016); *contra* Reply at 12. It "[c]ompel[s] no one to do anything" and "ha[s] no binding effect whatsoever—not on the agency and not on the regulated community." *Indep. Equip. Dealers Ass'n v. EPA*, 372 F.3d 420, 427 (D.C. Cir. 2004) (Roberts, J.); *cf. Data Mktg. P'ship v. Dep't of Labor*, 45 F.4th 846, 854 (5th Cir. 2022) (advisory opinion bound the agency and thus "alter[ed] the legal regime"). It therefore is not a reviewable final agency action.

## II. Texas Is Unlikely to Succeed on the Merits of Its APA Claims

Even apart from any of the dispositive threshold grounds discussed above, Texas's APA claims fail on the merits.

### A. Defendants' actions are consistent with their broad statutory authority.

Defendants previously demonstrated that Border Patrol agents have authority to cut through Texas's concertina wire when it obstructs the performance of their duties. *See*

Opp. at 23-25. Congress has given Border Patrol agents "the power and duty to control and guard the boundaries and borders of the United States," 8 U.S.C. § 1103(a)(5), to apprehend, inspect, and process noncitizens who have illegally entered the country, *id.* §§ 1225, 1226, and to make arrests and enter lands near the border without a warrant in pursuit of that mission, *id.* § 1357(a)(2), (3). And if those grants of authority on their own were not enough to permit Border Patrol agents to cut through Texas's concertina wire when it obstructs the performance of their duties (and they are enough), Congress also authorized Defendants to "perform such other acts as [they] deem[] necessary for carrying out" those provisions. *Id.* § 1103(a)(3); *see* 8 C.F.R. § 287.5 (addressing power and authority to patrol border, interrogate, and arrest noncitizens).

Texas's efforts to show otherwise are unavailing. To start, Texas mischaracterizes § 1103 as a mere "statement of purpose," Reply at 15; that provision is far more. Section 1103 "confer[s]" "broad authority" on the Secretary of Homeland Security, *Narenji v. Civiletti*, 617 F.2d 745, 747 (D.C. Cir. 1979), and permits him to delegate that authority to subordinates, *see* 8 U.S.C. § 1103(a)(4).[4] As a result, Defendants can take actions specifically authorized and those "reasonably related to the duties imposed on [them]." *Narenji*, 617 F.2d at 747. And as explained above and before, *see* Opp. at 23-25, cutting

---

[4] Texas appears to invoke the major-questions doctrine. *See* Reply at 15 n.9. However, it offers no argument as to how wire damage that is not a significant amount in the Operation Lone Star budget, much less the national economy, qualifies as being of "vast economic and political significance." *Id.*; *compare* Elizabeth Findell, *Texas Spent Billions on Border Security. It's Not Working.*, Wall Street Journal (July 22, 2023) (Texas spent "$4.5 billion on Operation Lone Star in its first two years" and has "allocated another $5.1 billion for the next two years") *with* Tr. at 97-98 (Banks testimony) (estimated cost of repairing wire is $3,500 per incident).

wire in the course of apprehending, inspecting, or providing medical care to a migrant is "reasonably related" to Defendants' duties enumerated by Congress and was intended by Congress, *see* H.R. Rep. No. 82-1377, 1952 U.S.C.C.A.N. 1358, 1360 (Feb. 19, 1952). Even Mr. Banks admitted that Border Patrol agents are authorized to cut locks to access private land to apprehend migrants in certain circumstances. Tr. at 111 (Banks testimony).

Texas is also incorrect to suggest that because Defendants have not "repel[led] illegal entries," their power to apprehend migrants who have unlawfully crossed the border is somehow diluted. *See* Reply at 14-15. It makes little sense to impede Border Patrol agents from apprehending someone before they reach further into the country just because agents had not apprehended the person sooner. And even if Congress had authorized Border Patrol to immediately expel migrants who have crossed the International Boundary Line in the Rio Grande but have not made landfall—which Congress has not done—that would have no impact on the powers Congress granted the Border Patrol in the provisions discussed above.[5]

Finally, Texas speculates that Border Patrol cut the wire "for the purpose of encouraging illegal entry," and thus, the conduct is outside of Defendants' statutory

---

[5] Texas's citation to *DHS v. Thuraissigiam*, 140 S. Ct. 1959 (2020), for the proposition that a noncitizen who manages to cross the border has not really effected entry into the United States, is inapposite. *See* Reply at 10 n.6. The Ninth Circuit there had held that a noncitizen had a constitutional Due Process right to more process than what Congress set out in § 1225(b)(1)(B)(ii), (v). The Court rejected that conclusion, holding that "the procedure authorized by Congress" is sufficient for "due process as far as [a noncitizen] denied entry is concerned." 140 S. Ct. at 1982. But the Court also emphasized that such a noncitizen "has … those rights regarding admission that Congress provided by statute." *Id.* at 1983 (cleaned up). Border Patrol cannot disregard the statutory regime any more than the Ninth Circuit could add to it.

authority. But the uncontradicted testimony of the Chief of Border Patrol's Law Enforcement Operations is that the wire is cut to facilitate apprehension, inspection, and processing of migrants or to provide medical assistance. *See* Tr. at 187 (BeMiller testimony); *see also* BeMiller Decl. ¶¶ 16, 18. Moreover, in every instance that Texas claims that Border Patrol improperly cut the wire, the agents apprehended noncitizens—rather than let them go free—and "escorted [migrants]" through. Compl. ¶ 59; *see also* BeMiller Decl. ¶¶ 16, 18. Indeed, with respect to the incident on which Texas places its primary focus, Mr. Banks acknowledges that Border Patrol took action and did not just wave migrants through into the interior of the country. *See* Tr. at 81, 113 (Banks testimony).

In sum, Congress has granted Border Patrol broad authority to patrol the border and apprehend and inspect illegal entrants, which includes—where necessary—the power to cut through Texas's wire when it is an impediment to carrying out their statutory functions. There is no evidence that Border Patrol authorizes its agents to cut the wire in other circumstances or that agents have done so. Accordingly, Texas has not shown that Defendants acted in excess of their statutory authorization or *ultra vires*.

### B.  Defendants' actions are not a legislative rule.

In its reply, Texas asserts that Defendants' policy or guidance qualifies as a legislative rule (requiring notice and comment), but it has not supported that assertion. That is understandable. To the extent a policy exists, it does not meet the definition of a legislative rule—and thus did not require notice and comment. *See* 5 U.S.C. § 553(b)-(d).

As Defendants previously explained, *see* Opp. at 26, a legislative or substantive rule is "[a]n agency action that purports to impose legally binding obligations or

prohibitions on regulated parties—and that would be the basis for an enforcement action for violations of those obligations or requirements," *Nat'l Mining Ass'n v. McCarthy*, 758 F.3d 243, 251 (D.C. Cir. 2014) (Kavanaugh, J.). An interpretive rule, on the other hand, "merely interprets a prior statute or regulation, and does not itself purport to impose new obligations or prohibitions or requirements on regulated parties." *Id.* at 252. And "a general statement of policy" "merely explains how the agency will enforce a statute or regulation—in other words, how it will exercise its broad enforcement discretion … under some extant statute or rule." *Id.*

Neither the "policy" that Texas alleges exists nor the Border Patrol's informal guidance in the Del Rio Sector qualifies as a legislative rule. They do not require Texas to do anything or to stop doing anything, and they could not be the basis of an enforcement action. Rather, they are—at the very most—interpretive rules because they interpret the various statutory provisions governing agents' authority, or general statements of policy because they explain how agents may exercise their discretion. And to the extent they advise communication within Border Patrol, it is a procedural rule, even if it rose to the level of a rule. *See Dep't of Labor v. Kast Metals Corp.*, 744 F.2d 1145, 1153 (5th Cir. 1984). Notice and comment was thus not required, and Texas has failed to show otherwise.

C.    **Defendants' actions are not arbitrary and capricious.**

Texas appears to claim that Defendants' cutting of Texas's wire is arbitrary and capricious, except in cases of emergency to save life or prevent serious bodily injury. *See* Compl. ¶ 96, Mot. at 31-32; Reply at 13; Tr. at 28 (Counsel for Texas: "we have no objection to someone destroying Texas' property if it is necessary to save someone's life or

[prevent] serious bodily injury."). Texas is unlikely to succeed on its arbitrary-and-capricious claim under the APA, the review of which is "narrow and highly deferential." *Sierra Club v. U.S. Dep't of Interior*, 990 F.3d 909, 913 (5th Cir. 2021); *see also* Opp. at 28.

First, Texas contends that it is "arbitrar[y]" that federal fencing "gets to stand," while Texas's fencing near Eagle Pass "gets cut open, ripped up, or torn down on a daily basis." Reply at 13. But Texas's own witness explained why this may happen. There are no access points in Texas's wire in the four-mile stretch starting at Shelby Park and moving south. Tr. at 107-08 (Banks testimony). Federal border structure in the area, on the other hand, contains gates allowing law enforcement to pass through. *Id.* at 114. By Mr. Banks' own admission, Texas's wire near Eagle Pass, specifically, "hinder[s]" Border Patrol agents' and Texas employees' "ability to get down to the water" such that Texas personnel *themselves* cut the wire to provide medical assistance and make arrests. *Id.* at 109. There is no evidence in the record that federal infrastructure similarly impedes such efforts. That is, federal fencing and Texas's wire near Eagle Pass are differently placed and situated. Accordingly, the Border Patrol's different treatment of them is not arbitrary or capricious. *See Northpoint Tech., Ltd. v. FCC*, 414 F.3d 61, 75 (D.C. Cir. 2005) ("not arbitrary or capricious" to treat "differently situated" entities differently).

Second, Texas suggests that Defendants have failed to "consider[] the costs and benefits of cutting Texas's concertina-wire barriers" and specifically faults Defendants for prioritizing "reducing injury and/or the loss of life of noncitizens" over "the impact of deterrence." Reply at 13. Texas's witness, however, undermines this argument. Mr. Banks testified that "[p]rotection of life is first" and that, despite the cost, Texas employees will

cut the wire when there is a medical emergency. Tr. at 79 (Banks testimony); *see id.* at 28 (Counsel for Texas: "human life is paramount."). But if Border Patrol cannot act proactively to prevent a medical emergency from occurring, it may be too late by the time the wire needs to cut (which takes approximately 10 to 30 minutes depending on wire density) or an airboat needs to be deployed (which takes approximately 20 minutes roundtrip to travel one mile to one mile and a half, and that is without accounting for the accessibility of the city boat ramp at Shelby Park). Tr. at 130-132 (Trevino testimony). Mr. Banks acknowledged, moreover, that despite the wire's presence for several months, large numbers of migrants continued crossing the river where the wire was placed, raising significant questions about its deterrent value. Tr. at 112. Because the wire's deterrent effect is acknowledged to be dubious, Border Patrol's purported failure to prioritize that over its other law enforcement functions is not arbitrary or capricious.

Finally, Texas seems to claim that because Defendants have acknowledged the usefulness or benefits of concertina wire in some instances, it is per se unreasonable to cut through it in others. Reply at 13. This argument makes little sense. Locks on gates have beneficial uses. But Texas's witness Mr. Banks acknowledged that Border Patrol agents may cut them when, in their "judgment," "it is necessary" to apprehend a migrant. Tr. at 111 (Banks testimony). The same is true for concertina wire, as Texas's own actions to cut the wire to provide medical assistance and make arrests show.

## <u>CONCLUSION</u>

This Court should deny Texas's motion for a preliminary injunction.

Dated: November 21, 2023           Respectfully submitted,

                                   BRIAN M. BOYNTON
                                   Principal Deputy Assistant Attorney General

                                   JAIME ESPARZA
                                   United States Attorney

                                   JEAN LIN
                                   Special Litigation Counsel

                                   /s/ *Christopher A. Eiswerth*
                                   Christopher A. Eiswerth (D.C. Bar 1029490)
                                   Stephen Ehrlich (NY Bar No. 5264171)
                                   Faith E. Lowry (TX Bar No. 24099560)
                                   Trial Attorneys
                                   U.S. Department of Justice
                                   Civil Division, Federal Programs Branch
                                   1100 L St., N.W.
                                   Washington, D.C. 20530
                                   Tel: (202) 305-0568 / Fax: (202) 616-8460
                                   christopher.a.eiswerth@usdoj.gov

                                   Robert D. Green (TX Bar No. 24087626)
                                   Assistant United States Attorney
                                   601 N.W. Loop 410, Suite 600
                                   San Antonio, Texas 78216
                                   Tel: (210) 384-7362 / Fax: (210) 384-7312
                                   robert.green3@usdoj.gov

                                   *Counsel for Defendants*

## CERTIFICATE OF SERVICE

I hereby certify that I caused a true and accurate copy of the foregoing document to be filed electronically (via CM/ECF) on November 21, 2023, which automatically serves all counsel of record who are registered to receive notices in this case.

*/s/ Christopher A. Eiswerth*
Christopher A. Eiswerth

## APPENDIX

The Court's November 9 order directs the parties to provide the legal definitions of 15 words. Defendants have made their best effort to define those words in the context that appears most relevant to the issues and arguments raised in Texas's motion for preliminary injunction in this case. When appropriate, Defendants have also explained how those terms would apply in the circumstances of this case. However, they respectfully note that many words "take[] on different meanings in different contexts." *Torres v. Lynch*, 578 U.S. 452, 459 (2016). "The same words may have different meanings in different parts of the same act, and of course words may be used in a statute in a different sense from that in which they are used in the Constitution." *Lamar v. United States*, 240 U.S. 60, 65 (1916). For that reason, the Supreme Court has cautioned against construing "[s]tatutory language … in a vacuum" and has stated that "words of a statute must be read in their context and with a view to their place in the overall statutory scheme." *Roberts v. Sea-Land Servs., Inc.*, 566 U.S. 93, 101 (2012); *see Envtl. Def. v. Duke Energy Corp.*, 549 U.S. 561, 576 (2007) ("context counts").

*      *      *

**Inspect**: Section 1225(a)(3) of Title 8 states: "Inspection. All aliens (including alien crewmen) who are applicants for admission or otherwise seeking admission or readmission to or transit through the United States shall be inspected by immigration officers." The term is not further defined by statute. However, as noted above, an "inspection" ordinarily means an "[o]fficial examination or review," *American Heritage Dictionary*, https://perma.cc/QWK8-EVN4, "checking or testing an individual against

established standards," *Merriam-Webster Dictionary*, https://perma.cc/85XJ-7FK7, or "[a] careful examination of something," *Black's Law Dictionary* (9th ed. 2009). As a practical matter, the authority to inspect begins when a Border Patrol agent first observes the migrant; inspection includes questioning about citizenship and assessing security threats and medical needs; and it continues through to processing. Department regulations provide further guidance on inspections, including certain documentary requirements. *See* 8 C.F.R. §§ 235.1, 235.2.

**Interrogate:** Under 8 U.S.C. § 1357(a)(1), immigration officers—including Border Patrol agents, 8 C.F.R. § 1.2—have the authority to "interrogate any alien or person believed to an alien as to his right to be or remain in the United States." "Interrogate" is not further defined in Title 8. Agency regulation, 8 C.F.R. § 287.8(b)(1), explains that "[i]nterrogation is questioning designed to elicit specific information." In the context of this case, interrogation could include questioning of migrants in the river, on the banks, or at a staging area under Port of Entry #2, and "[i]nformation obtained from this questioning may provide the basis for a subsequent arrest," *id.* § 287.8(b)(3).

**Admit:** As relevant to this case, the INA defines "[t]he term[s] 'admission' and 'admitted' [to] mean, with respect to an alien, the lawful entry of the alien into the United States after inspection and authorization by an immigration officer." 8 U.S.C. § 1101(a)(13)(A).

**Apprehend:** The INA does not define "apprehend" or "apprehension." However, CBP has defined the term as "the physical control or temporary detainment of a person who is not lawfully in the United States which may or may not result in an arrest." U.S.

Customs & Border Protection, *Nationwide Enforcement Encounters: Title 8 Enforcement Actions and Title 42 Expulsions Fiscal Year 2024*, https://perma.cc/YWE2-B6UZ. And in the context of this case, "apprehend" would include the control Border Patrol agents exert over migrants exiting the river and being directed to a staging area from which the migrants are then transported for further evaluation.

**Examine:** Section 1222 of Title 8 provides for the detention of noncitizens for purposes of a physical and mental examination. As noted above, inspection under § 1225 includes an examination. And 8 U.S.C. § 1357(a)(2) directs that officers arresting a noncitizen on suspicion of illegal entry shall take the noncitizen "without unnecessary delay for examination … as to their right to enter or remain in the United States." The INA does not specify what this examination includes, but agency regulations provide guidance on the scope of examination for certain types of individuals. *See* 8 C.F.R. § 235.1. The examining officers must otherwise exercise their judgment and discretion to determine whether the noncitizen is lawfully present or is removable, needs medical attention, or requires other assistance.

**Remove:** In the context of the INA, to "remove" a noncitizen is usually to cause him or her to depart the United States under an administrative or judicial order. *See* 8 U.S.C. § 1101(g) ("any alien ordered deported or removed … who has left the United States, shall be considered to have been deported or removed in pursuance to law"). Put another way, "removal" is understood as an execution of a final administrative or judicial order of removal, which results in a noncitizen being physically outside the United States, and can sometimes include noncitizens leaving the United States on their own accord

3

when they are under a final order of removal. *See* 8 C.F.R. § 241.7. Removal is a civil process, *Arizona v. United States*, 567 U.S. 387, 396 (2012), and Congress has set out the bases for removal, *see, e.g.*, 8 U.S.C. § 1227, and the exclusive procedures for effectuating removal, *see, e.g.*, *id.* §§ 1228, 1229, 1229a. Whether to initiate removal proceedings is wholly within the Executive Branch's discretion and is unreviewable. *See United States v. Texas*, 599 U.S. 670, 679 (2023) (citing *Arizona*, 567 U.S. at 396).

**Transfer:** Section 211(c)(8)(B) of Title 6 charges CBP, alongside U.S. Immigration and Customs Enforcement and U.S. Citizenship and Immigration Services, with "enforc[ing] and administer[ing] all immigration laws," including "the detection, interdiction, removal, … and *transfer* of persons unlawfully entering … the United States." (emphasis added). The statute does not define "transfer," but as most relevant here, it refers to the process of Border Patrol releasing legal or physical custody of migrants to another agency after it has completed its inspection. That can include turning unaccompanied children over to the Department of Health and Human Services' Office of Refugee Resettlement; turning noncitizens over to ICE for further processing (including pending immigration proceedings) or removal; and turning noncitizens over to the U.S. Marshals or state and local law enforcement.

**Detain:** Sections 1225, 1226, and 1231 direct that certain noncitizens should be detained in certain circumstances. The Supreme Court has held that immigration officers have discretion in enforcing these provisions and that States may not challenge those discretionary decisions in federal court. *See United States v. Texas*, 599 U.S. 670, 679-80 (2023). While "detain" is not a defined term under the INA, CBP has defined "detention"

4

as "[r]estraint from freedom of movement." CBP, *National Standards on Transport, Escort, Detention, and Search* at 28 (October 2015), https://perma.cc/6KRP-2XTH. That restraint, however, does not necessarily have to be physical. *See id.* ("Physical restraint is not an essential element of detention.").

**Detect:** Section 211(c)(5) of Title 6 directs CBP to "detect, respond to, and interdict terrorists, drug smugglers and traffickers, human smugglers and traffickers, and other persons who may undermine the security of the United States, in cases in which such persons are entering, or have recently entered, the United States." Further, 6 U.S.C. § 211(c)(8)(B) provides that CBP "shall ... enforce and administer all immigration laws, ... including ... the detection, interdiction, removal, departure from the United States, short-term detention, and transfer of persons unlawfully entering, or who have recently unlawfully entered, the United States." Neither Title 6 nor Title 8 defines "detect," but it ordinarily means "to discover or determine the existence, presence, or fact of," *Merriam-Webster's Dictionary*, https://perma.cc/YK7R-CAY2, or "to discern (something hidden or subtle)," *American Heritage Dictionary*, https://perma.cc/4VDP-392Y; *see also Black's Law Dictionary* (9th ed. 2009) (defining "detection" as "[t]he act of discovering or revealing something that is hidden"). In this case, it could include Border Patrol agents' efforts to discover the presence of migrants illegally entering the United States or weapons or contraband on their persons.

**Interdict:** Title 6 charges CBP with "ensur[ing] the interdiction of persons and goods illegally entering ... the United States," *id.* § 211(c)(2), including "terrorists, drug smugglers," and human "traffickers," among others, *id.* § 211(c)(5). Title 6 further gives

Border Patrol "primary responsibility for interdicting persons attempting to illegally enter … the United States." *Id.* § 211(e)(3)(A). Neither Title 6 nor Title 8 defines "interdict." In this context, it primarily means "[t]o confront and halt the activities, advance, or entry of" something, *American Heritage Dictionary*, https://perma.cc/JRV6-TS8R, or "[t]o intercept and seize," *Black's Law Dictionary* (9th ed. 2009).

**Arrest**: Border Patrol agents are immigration and customs officers with certain authorities under both Title 8 and Title 19. As most relevant here, Title 8 gives an agent authority to "arrest any [noncitizen]" without a warrant "who in [the agent's] presence or view is entering or attempting to enter the United States in violation of any law," 8 U.S.C. § 1357(a)(2), and to "make arrests" in certain circumstances for offenses "committed in the officer's … presence" or for felonies "under the laws of the United States," *id.* § 1357(a)(5); *see* 8 C.F.R. § 287.5 (defining who may exercise these powers). Agency regulations govern the conduct of arrests. *See* 8 C.F.R. § 287.8(c).

Title 8 does not define "arrest." Depending on the circumstances, it can refer to different levels or durations of restraint on an individual's movement, and different standards can apply. For instance, arrests for felonies unrelated to immigration law are analogous to ordinary criminal arrests and require probable cause. 8 U.S.C. § 1357(a)(5)(B); *see United States v. Quintana*, 623 F.3d 1237, 1239 (8th Cir. 2010) (equating "reason to believe" with "probable cause"). However, given that immigration violations are ordinarily civil in nature, other arrests are more administrative in nature and different standards apply. *See, e.g., Quintana*, 623 F.3d at 1241; *see also Abel v. United States*, 362 U.S. 217, 233-34 (1960) (administrative arrests do not require judicial warrant); *United States v.*

*Wong Kim Bo*, 466 F.2d 1298, 1300 n.4 (5th Cir. 1972) (describing an arrest under § 1357(a)(2) as "simply a cautionary measure intended to prevent the escape of persons suspected of entering or being in this country illegally pending a determination of whether or not a show cause order should issue"). In each case, an arrest includes some restraint on the person's freedom of movement.

**Process:** Section 211(c)(8)(A) provides that CBP "shall … enforce and administer all immigration laws, … including … the inspection, processing, and admission of persons who seek to enter or depart the United States." Neither Title 6 nor Title 8 defines "processing." However, colloquially, Border Patrol uses this term to encompass both the inspection and examination of an individual, as outlined in 8 U.S.C. § 1225(a)(3) and 8 U.S.C. § 1357(a)(2), as well as other steps, some of which are legally required, like ensuring that the noncitizen does not have urgent medical needs, logging personal property, determining whether the noncitizen is traveling with children, and determining whether the noncitizen is an unaccompanied child under the Trafficking Victims Protection Reauthorization Act of 2005, 8 U.S.C. § 1232.

**Policy**: As a general matter, a "policy" is "[a] plan or course of action, as of a government, political party, or business, intended to influence and determine decisions, actions, and other matters." *American Heritage Dictionary*, https://perma.cc/V4CK-PUXL; *accord Merriam-Webster Dictionary*, https://perma.cc/955E-42M9 (defining "policy" as "a high-level overall plan embracing the general goals and acceptable procedures especially of a governmental body"); *Black's Law Dictionary* (9th ed. 2009) (defining "policy" as "[t]he general principles by which a government is guided in its

management of public affairs"). And depending on its content and how it was promulgated, a policy (as so defined) could qualify as a legislative rule, interpretative rule, general statement of policy, or a procedural rule. *See Nat'l Mining Ass'n v. McCarthy*, 758 F.3d 243, 251-52 (D.C. Cir. 2014) (Kavanaugh, J.) (reviewing differences between many of these terms).

Under the APA, a "general statement of policy" is "[a]n agency action that merely explains how the agency will enforce a statute or regulation—in other words, how it will exercise its broad enforcement discretion or permitting discretion under some extant statute or rule." *Id.* at 252. Such statements are usually not considered "final agency actions" reviewable under the APA, and do not require notice and comment. *See id.* at 251-52 (explaining that "a general statement of policy … is not subject to pre-enforcement review;" "[l]egislative rules generally require notice and comment, but interpretive rules and general statements of policy do not"); 5 U.S.C. § 704.

**Procedure**: Under the APA, "rules of agency, organization, procedure, or practice" are not subject to notice and comment. 5 U.S.C. § 553(b)(4)(A). The APA does not define "procedure." But case law defines "procedural rules" as rules that "cover[] agency actions that do not themselves alter the rights or interests of parties, although it may alter the manner in which the parties present themselves or their viewpoints to the agency." *McCarthy*, 758 F.3d at 250; *see also Dep't of Labor v. Kast Metals Corp.*, 744 F.2d 1145, 1153 (5th Cir. 1984) (discussing procedural rules).

**Notice**: In the context of the APA, notice (in notice and comment) is provided when the government publishes a notice of proposed rulemaking in the Federal Register

that includes "(1) a statement of the time, place, and nature of public rule making proceedings; (2) reference to the legal authority under which the rule is proposed; and (3) either the terms or substance of the proposed rule or a description of the subjects and issues involved." 5 U.S.C. § 553(b). Notice and comment is not required for interpretative rules, general statements of policy, or rules of agency organization, procedure, or practice. *Id.* § 553(b)(4)(A).

Exhibit P

# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF TEXAS
### DEL RIO DIVISION

| | | |
|---|---|---|
| **THE STATE OF TEXAS,** | § | |
| | § | |
| *Plaintiff* | § | |
| | § | **Civil Action No.** |
| **v.** | § | **DR-23-CV-00055-AM** |
| | § | |
| **U.S. DEPARTMENT OF HOMELAND** | § | |
| **SECURITY; ALEJANDRO** | § | |
| **MAYORKAS, in his official capacity as** | § | |
| **Secretary of the U.S. Department of** | § | |
| **Homeland Security; U.S. CUSTOMS &** | § | |
| **BORDER PROTECTION; U.S.** | § | |
| **BORDER PATROL; TROY A.** | § | |
| **MILLER, in his official capacity as** | § | |
| **Acting Commissioner for U.S. Customs** | § | |
| **& Border Protection; JASON OWENS,** | § | |
| **in his official capacity as Chief of the** | § | |
| **U.S. Border Patrol; and JUAN** | § | |
| **BERNAL, in his official capacity as** | § | |
| **Acting Chief Patrol Agent, Del Rio** | § | |
| **Sector U.S. Border Patrol,** | § | |
| | § | |
| *Defendants.* | § | |

## MEMORANDUM OPINION AND ORDER

Pending before the Court is the State of Texas's (the "Plaintiff") Motion for a Preliminary Injunction or Stay of Agency Action (the "Motion") against the United States Department of Homeland Security ("DHS"); Alejandro Mayorkas, in his official capacity as Secretary of DHS ("Mayorkas"); United States Customs and Border Protection ("CBP"); United States Border Patrol ("BP"); Troy A. Miller, in his official capacity as Acting Commissioner for CBP ("Miller"); Jason Owens, in his official capacity as Chief of BP ("Owens"); and Juan Bernal, in his official capacity as Acting Chief Patrol Agent of the Del Rio Sector of BP ("Bernal") (collectively, the

"Defendants").  (ECF No. 3-1.)  Upon careful consideration of the record and relevant law, the Court **DENIES** the motion for preliminary injunctive relief.

## I. BACKGROUND

### A.  Procedural Background

On October 24, 2023, the Plaintiff commenced this civil action against the Defendants. (ECF No. 1.)  According to the Plaintiff, the Defendants are destroying its property by cutting the concertina wire ("c-wire" or "wire") fence the Plaintiff constructed near the U.S.-Mexico border. (*Id.* at 3-4.)  The Plaintiff claims that this property destruction is intended to allow migrants to enter the country illegally.  (*Id.* at 1-4.)  The Plaintiff raises numerous claims against the Defendants, including common law conversion, common law trespass to chattels, and several violations under the Administrative Procedure Act ("APA").  (*Id.* at 23-28.)  The Plaintiff seeks the following: preliminary and permanent injunctive relief to enjoin the Defendants from seizing or destroying the Plaintiff's property; a stay of agency action under 5 U.S.C. § 705; a declaration that the Defendants' actions are unlawful; and costs.  (*Id.* at 28-29.)  Together with the Complaint, the Plaintiff filed a motion for preliminary injunctive relief, which is presently before the Court. (ECF No. 3-1.)

Three days later, on October 27, 2023, the Plaintiff filed a Motion for a Temporary Restraining Order ("TRO").  (ECF No. 5.)  One day later, the Plaintiff filed a Notice of Escalating Property Damage in Support of its Emergency Motion for a TRO.  (ECF No. 8.)  The Plaintiff alleged that the Defendants, knowing a motion for a TRO had already been filed, used a forklift to seize concertina wire and smash it to the ground.  (*Id.*)  The Court, considering the motion for a TRO *ex parte* and on an expedited basis, granted the request on October 30, 2023, which forbade the Defendants from interfering with the Plaintiff's concertina wire except for medical

emergencies.  (ECF No. 9 at 4, 11.)  Following the TRO, the Defendants filed an opposition to the motion.  (ECF No. 23-1.)  Thereafter, the Plaintiff filed a reply in support of its request for a preliminary injunction.  (ECF No. 27-1.)

The parties appeared before the Court on November 7, 2023 for an initial hearing on the motion for preliminary injunction.  The Court heard testimony from the Plaintiff's witness, Michael Banks, Border Czar for the State of Texas, and from the Defendants' witnesses, Mario Trevino, Deputy Patrol Agent in Charge for the U.S. Border Patrol at the Eagle Pass South Station, and David S. BeMiller, Chief of Law Enforcement Operations at U.S. Border Patrol Headquarters.  The Court also considered extensive arguments from the parties.  On November 9, 2023, the Court extended the TRO for an additional 14 days to fully consider the parties' arguments and evidence.  (ECF No. 33.)  The Court then ordered that a second preliminary injunction hearing should be held, that the parties provide supplemental briefs on the APA claims, that the parties define various legal terms, and that the parties provide all documents and communications related to the cutting of the Plaintiff's c-wire and any other border barriers.  (*Id.*)

On November 14, 2023, the Defendants filed a Motion to Modify the Court's November 9, 2023 Order.  (ECF No. 38.)  The Defendants explained they would not be able to fully comply with the Court's order for production given the breadth of the order and the limited amount of time remaining before the next hearing, which the parties consented to have on mutually agreeable days between November 20 and November 29, 2023.  (ECF Nos. 36, 38.)  The Defendants proposed limiting the Court's discovery to seven custodians likely to have responsive documents to the Court's order.  (ECF Nos. 38 at 4; 38-1 at 4.)  These custodians included the Chief Patrol Agent and Deputy Patrol Agent of the Del Rio Sector, the Patrol Agents in Charge and Deputy Patrol Agents in Charge of the Eagle Pass North and Eagle Pass South Stations, and the Chief of Law

Enforcement Operations. (ECF No. 38-1 at 4.) According to the Defendants, a targeted search of these seven individuals yielded over 310,000 emails and documents. (ECF No. 38 at 4.) Thus, the Defendants also requested that they be permitted to produce only responsive documents from the search described in paragraphs 11, 12, and 15 of the Courey Declaration. (*Id.* at 4-5.)

On November 15, 2023, the Court denied in part and granted in part the Defendants' motion to modify. (ECF No. 39.) Specifically, the Court ordered that its November 9, 2023 Order not be modified except to limit document production to the period between March 6, 2021, and November 9, 2023. (*Id.*) The parties had until November 21, 2023 to produce the documents as modified. (*Id.*) The Court also set the second preliminary injunction hearing for November 27, 2023. In a separate order, the Court set a virtual conference for November 21, 2023 regarding document production, the TRO, and the second preliminary injunction hearing. (ECF No. 41.)

Before the virtual conference, the Defendants reported that they reviewed more than 6,000 documents pulled from a search of the seven identified custodians' electronic records to include the modified period. (ECF No. 43 at 6.) From the pool, the Defendants produced approximately 1,182 documents and five videos, asserting they attempted to maintain appropriate controls to safeguard privileges and other necessary redactions and withholdings. (*Id.*) They stated these documents reflect that the c-wire "inhibits Border Patrol's ability to patrol the border and inspect, apprehend, and process migrants in this four-mile stretch of the border, and the ways in which Border Patrol has coordinated with Texas about the wire in this area." (*Id.* at 7.) They further stated that while Border Patrol and the Texas Department of Public Safety ("DPS") have coordinated concerning the c-wire, the documents reflect that the "relationship has deteriorated over time, driven at least in part by at least one instance in which Texas DPS personnel threatened

4

to criminally charge Border Patrol for cutting the wire and DPS efforts to impede Border Patrol access to certain areas." (*Id.* at 8.)

Following the virtual conference, the Court ordered that the TRO be extended to November 29, 2023, at 11:59 p.m. on consent of the parties. (ECF No. 46 at 1.) The Court further ordered that the Defendants had until the morning of the second preliminary injunction hearing to produce the outstanding documents as previously ordered. (*Id.* at 2.) On November 26, 2023, the Defendants submitted additional documents to the Court for its review. The Plaintiff also submitted documents to the Court on November 21 and November 27, 2023. The Court held the second preliminary injunction hearing on November 27, 2023.

The Court now considers the Plaintiff's Motion for Preliminary Injunction. (ECF No. 3-1.) For purposes of clarifying the record, the Court makes its factual and legal determinations below based on the following: the Plaintiff's Complaint (ECF No. 1); the Plaintiff's Motion for Preliminary Injunction (and the appended declarations and exhibits) (ECF No. 5-1); the Plaintiff's Notice of Escalating Property Damage (and the appended declaration) (ECF No. 8); the Court's TRO entered on October 30, 2023 (ECF No. 9); the Plaintiff's video exhibits submitted on October 30, 2023 (ECF No. 10); the Defendants' Opposition to the Preliminary Injunction (and the appended declarations and exhibits) (ECF No. 23-1); the Plaintiff's Notice of Filing of Amended Declaration of Manuel Perez (ECF No. 26); the Plaintiff's Reply in Support of the Preliminary Injunction (and the appended declarations and exhibits) (ECF No. 27-1); the arguments, testimony, and evidence presented at hearings before the Court on November 7 and November 27, 2023; the Defendants' document production submitted to the Court *ex parte* and for *in camera* review on November 21, November 26, and November 29, 2023; and the Plaintiff's document production submitted to the Court *ex parte* and for *in camera* review on November 21 and

November 27, 2023.[1]  The Court also considers the Defendants' Supplemental Brief filed on November 21, 2023, and the Plaintiff's Supplemental Brief filed on November 27, 2023.  (ECF Nos. 47, 48.)

## B. Factual Background

The U.S.-Mexico border presents a unique challenge that is equal parts puzzling to outsiders and frustrating to locals.  The immigration system at the heart of it all, dysfunctional and flawed as it is, would work if properly implemented.  Instead, the status quo is a harmful mixture of political rancor, ego, and economic and geopolitical realities that serves no one.  So destructive is its nature that the nation cannot help but be transfixed by, but simultaneously unable to correct, the present condition.  What follows here is but another chapter in this unfolding tragedy.  The law may be on the side of the Defendants and compel a resolution in their favor today, but it does not excuse their culpable and duplicitous conduct.

### i.  The Border – A Brief Synopsis

Much of the 1,200-mile run of the Rio Grande River separating Texas and Mexico presents a bucolic setting, rolling from ranches to pecan orchards and back again.  Twenty-nine official ports of entry dot the landscape, but much of the focus in this matter, and the border debate more broadly, is the vast stretches of land between.  To guard this area, Congress created Border Patrol.  Its principal statutory objective, in the words of the Defendants, "is to deter illegal entry into the United States and to intercept individuals who are attempting to unlawfully enter the United States." (ECF No. 23-1 at 13.)  Border Patrol agents are empowered to apprehend noncitizens

---

[1] The Court is cognizant of the general nature of contents of the documents and is not relying on any particular document in this order.

unlawfully entering the country, process them, inspect them for asylum or related claims, and in appropriate circumstances, place them in removal proceedings.  (*Id.* at 13–14.)

In recent years, the character of the situation facing Border Patrol agents has changed significantly.  The number of Border Patrol encounters with migrants illegally entering the country has swelled from a comparatively paltry 458,000 in 2020 to 1.7 million in 2021 and 2.4 million in 2022.  (ECF No. 3-1 at 9–10 (citing internal DHS figures).)  Border Patrol is on track to meet or exceed those numbers in 2023.  (*Id.* at 10.)  As expected, organized criminal organizations take advantage of these large numbers.  *The New York Times* reported that conveying all those people to the doorstep of the United States has become an incredibly lucrative enterprise for the major Mexican drug cartels.  (*Id.* at 10–12.)  However, the infrastructure built by the cartels for human cargo can also be used to ship illegal substances, namely fentanyl.  (*Id.* at 11.)  Lethal in small doses, fentanyl is a leading cause of death for young Americans and is frequently encountered in vast quantities at the border.  (*Id.*)

Migrant numbers increased apparently in response to softened political rhetoric.  To prepare those additional migrants for parole, Border Patrol devoted increasing portions of its manpower to processing.  (ECF No. 37 at 63, 64.)  For this purpose, the Defendants set up a temporary processing center on private land in Maverick County, Texas close to the Rio Grande River.  (*Id.* at 143–45, 163–65, 200, 223 (discussing the processing center and its location).)  As it became known that additional migrants were being allowed entry into the country, more appeared at the border, requiring still more agents to be pulled from deterrence and apprehension to processing.  (ECF No. 37 at 63, 64.)  This became a cycle in which the gaps in law enforcement at the border grew wider even as more illegal entries occurred.  (*Id.*)

### ii.  *Operation Lone Star and the Concertina Wire*

The Plaintiff launched Operation Lone Star in 2021 to aid Border Patrol in its core functions.  (ECF No. 3-1 at 14.)  Through that initiative, the Plaintiff allocated resources in an attempt to stem the deteriorating conditions at the border.  (*Id.*; ECF No. 37 at 62–64.)  The activity subject to dispute here is the Plaintiff's laying of concertina wire along several sections of riverfront.  The wire serves as a deterrent—an effective one at that.  The Court heard testimony that in other border sectors, the wire was so successful that illegal border crossings dropped to less than a third of their previous levels.  (ECF No. 37 at 71–74.)  By all accounts, Border Patrol is grateful for the assistance of Texas law enforcement, and the evidence shows the parties work cooperatively across the state, including in El Paso and the Rio Grande Valley.  (*Id.* at 71–75.)  The Eagle Pass area, though, is another matter.

Eagle Pass, and Maverick County generally, is the epicenter of the present migrant influx: nearly a quarter of migrant entries into the United States happen there.  (ECF No. 3-1 at 18–19.)  Naturally, the Plaintiff's efforts under Operation Lone Star flowed there as well.  Just over 29 miles of concertina wire was installed in Maverick County by September 2023.  (ECF No. 37 at 76.)

Of course, the installed wire creates a barrier between crossing migrants and law enforcement personnel, meaning that it must be cut in the event of an emergency, such as a drowning or heat exhaustion.  The Plaintiff does not contest this.  In fact, the Plaintiff itself cuts the wire from time to time to provide first aid or render treatment.  (*Id.* at 79–80.)  The problem arises when Border Patrol agents cut the wire without prior notification to the Plaintiff for reasons other than emergencies.

Plaintiff's Exhibit 10 neatly displays this issue.[2]  In the video, Border Patrol agents are cutting a hole in the wire to allow a group of migrants to climb up from the riverbank.  However, another hole already exists in the wire, less than 15 feet away, through which migrants can be seen passing.  After completing the second hole and installing a climbing rope for migrants, agents then proceed to further damage the wire in that area and cut a third hole further down.  Meanwhile, in the background, a Border Patrol boat can be seen situated in the middle of the river, passively observing a stream of migrants as they make the hazardous journey from Mexico, across the river, and then up the bank on the American side.  At no point are the migrants interviewed, questioned as to citizenship, or in any way hindered in their progress into the United States.[3]

Border Patrol agents can be seen cutting multiple holes in the concertina wire for no apparent purpose other than to allow migrants easier entrance further inland.[4]  Any rational observer could not help but wonder why the Defendants do not just allow migrants to access the country at a port of entry.  If agents are going to allow migrants to enter the country, and indeed facilitate their doing so, why make them undertake the dangerous task of crossing the river?  Would it not be easier, and safer, to receive them at a port of entry?  In short, the very emergencies the Defendants assert make it necessary to cut the wire are of their own creation.

---

[2] Because the video is not yet publicly available, the Court includes herewith still images taken from the video as Appendix A. Those images provide a visual representation of key moments that factor heavily in the Court's analysis.

[3] It is important to note that the Court is aware of at least fourteen incidents of wire cutting.  (ECF No. 3-2 at 10–13, 23–28; ECF No. 8-1.)  However, the Court will focus on the September 20 incident, as shown in Plaintiff's Exhibit 10, because it is most illustrative for analysis purposes.  The Court is aware of one additional wire cutting incident that took place after the TRO was issued, but the Court is satisfied that a sufficient emergency existed to justify the action.

[4] The evidence suggests that on the day Plaintiff's Exhibit 10 was filmed, several migrants attempting to cross the river had been swept away.  (ECF No. 37 at 127–28.)  Accordingly, the wire was cut to rescue the individuals situated on the riverbank who had already entered the country, given the muddy and slippery conditions.  (*Id.* at 132–33.)  However, this assertion, made by Agent Mario Trevino, is totally uncorroborated by the condition of the migrants seen on the video.  Regardless, Agent Trevino's testimony is not lent great weight by the Court given his evasive answers and demeanor.

Making matters worse are the cynical arguments of the Defendants in this case. During the second preliminary injunction hearing, counsel for the Defendants argued that although no Border Patrol agent can be seen making any sort of effort to physically restrain them, the migrants are in fact in custody because their path is bounded on both sides by wire and fence. It is disingenuous to argue the wire hinders Border Patrol from performing its job, while also asserting the wire helps. But regardless, the Court heard testimony that some 4,555 migrants entered during this incident, but only 2,680 presented themselves for processing that day at the Eagle Pass South Border Patrol Station. (ECF No. 37 at 113, 147–48.)[5] This information was provided to Banks by an unidentified Texas National Guardsman. (*Id.* at 113.) The Defendants do not contest the final processing number, only the number of entries on that day, though they do so without their own contrary evidence. (*Id.* at 148.)

## II. STANDARD OF REVIEW

A preliminary injunction is an "extraordinary and drastic remedy," which is never awarded as a right. *Munaf v. Geren*, 553 U.S. 674, 689–90 (2008); *accord Pham v. Blaylock*, 712 F. App'x 360, 363 (5th Cir. 2017); *Miss. Power & Light Co. v. United Gas Pipe Line Co.*, 760 F.2d 618, 621 (5th Cir. 1985). Its purpose is to preserve the relative positions of the parties until a trial on the merits can be held. *Univ. of Tex. v. Camenisch*, 451 U.S. 390, 395 (1981); *Texas v. United States*, 809 F.3d 134, 187 n.205 (5th Cir. 2015). A preliminary injunction is warranted only when a movant can show (1) a substantial likelihood of success on the merits; (2) substantial injury to the moving party if the injunction is not granted; (3) that the injury outweighs any harm that will result if the injunction is granted; and (4) that granting the injunction will not disserve the public interest. *All. for Hippocratic Med. v. FDA*, 78 F.4th 210, 242 (5th Cir. 2023); Fed. R. Civ. P. 65.

---

[5] Importantly, the Defendants raised concerns about the actions of the Plaintiff and its agents, suggesting the cooperative portrait the Plaintiff paints may not be entirely accurate.

When the United States is the opposing party to a preliminary injunction, the third and fourth requirements merge. *Nken v. Holder*, 556 U.S. 418, 435 (2009). The party seeking the injunction must clearly carry the burden of persuasion on all four requirements. *Munaf*, 553 U.S. at 689-90; *Karaha Bodas Co. v. Negara*, 335 F.3d 357, 363 (5th Cir. 2003). Thus, "the decision to grant a preliminary injunction is to be treated as the exception rather than the rule." *Karaha Bodas Co.*, 335 F.3d at 363–64 (quoting *Miss. Power & Light Co.*, 760 F.2d at 621).

### III. JURISDICTIONAL ISSUES

#### A. Standing

To establish standing, a plaintiff must show an injury in fact caused by a defendant and redressable by a court order. *See Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560-61 (1992). The Plaintiff complains of three types of injuries caused by the Defendants' cutting or moving the fence: (1) harm to the fence; (2) harm from increased crime; and (3) increased state expenditures on healthcare, social services, public education, incarceration, and its driver's license program. (ECF No. 3-1 at 12-13, 40-41, 43; ECF No. 27 at 16-19.)

The Defendants do not challenge the Plaintiff's proprietary interest in the integrity of the fence. (*See* ECF No. 23-1 at 14 n.3.) They also admit that they did, in fact, cause the asserted harm to the fence. (*Id.* at 15.) Instead, the Defendants argue that states have "no cognizable interest in how the federal government exercises its enforcement discretion." (*Id.* at 38-39 (citing *United States v. Texas*, 143 S. Ct. 1964, 1970-71 (2023).) In that case, the Supreme Court held that states generally lack standing to assert "attenuated" injuries in the form of "indirect effects" of federal policies on "state revenues or state spending" derived from an alleged federal failure to make arrests or bring prosecutions. *Texas*, 143 S. Ct. at 1972 n.3, 1973-76.

11

In addition, citing *Haaland v. Brackeen*, 143 S. Ct. 1609, 1640 (2023), the Defendants argue that the Plaintiff cannot assert claims on behalf of its citizens. (ECF No. 23-1 at 39.) *Haaland* found that states lacked standing to challenge a statute's rule governing child custody disputes based on a state's abstract "promise to its citizens" and indirect recordkeeping costs that were not "fairly traceable" to the federal policy. *Haaland*, 143 S. Ct. at 1640-41. The Defendants argue that the Plaintiff cannot claim standing based on an alleged rise in crime affecting the Plaintiff's citizens—such as drug smuggling, human trafficking, terrorist infiltration, and cartel activities (*see* ECF No. 3-1 at 7-8)—that the Defendants claim is similarly difficult to trace to their cutting or moving the fence. (ECF No. 23-1 at 39.)

While *Texas* and *Haaland* cast significant doubt on whether the Plaintiff can claim indirect increased expenditures or a rise in crime as bases for standing, they do not address direct physical damage to a state's property by agents of the federal government.[6] Here, the Plaintiff has direct proprietary interests in seeking to prevent or minimize damage to its fence caused by the Defendants' affirmative acts and to protect the Plaintiff's control and intended use thereof. The asserted harm is particularized, concrete, and directly traceable to the Defendants' conduct. *See Lujan*, 504 U.S. at 560. It also satisfies the APA's additional "zone of interests" standing requirement. *See Texas v. United State*s, 50 F.4th 498, 521 (5th Cir. 2022) (holding the requirement is satisfied if a claim is "arguably within the zone of interests to be protected or regulated by the statute" and the test is "not especially demanding."). The APA expressly covers

---

[6] The Plaintiff suggests that this case could fall within one of the potential exceptions contemplated in *Texas*, *see* 143 S. Ct. at 1973-74, thereby establishing standing based on indirect state expenditures. (ECF No. 37 at 25.) The Plaintiff cited *Texas v. United States* as an example of adequate standing derived in this manner. Because the Court finds the injury-in-fact prong of standing analysis satisfied by direct harm to the Plaintiff's property, the Court need not further examine this argument at this time. 809 F.3d 134 (5th Cir. 2015).

"sanctions" affecting a plaintiff, defined as an agency's "destruction, taking, seizure, or withholding of property." 5 U.S.C. § 551.

The only question is whether the relief the Plaintiff seeks can redress such injuries. That, of course, depends on whether such relief is available in the first place. While an award of monetary damages under the Federal Tort Claims Act ("FTCA") could perhaps redress past property damage, as the Defendants suggest (*see* ECF No. 23 at 21-22, 38), the Plaintiff does not seek that remedy. (*See* ECF No. 1.)[7] Absent other jurisdictional issues, the Court must therefore review the availability of injunctive relief or a stay of agency action and potential barriers thereto.[8]

## B. Sovereign Immunity for Plaintiff's Common Law Claims

In Counts One and Two of this suit, the Plaintiff asserts common law claims for conversion and trespass to chattels. (ECF No. 1 at 23-25.) When the Court granted the Plaintiff's *ex parte* motion for a TRO, it did so under the trespass to chattels claim. However, at the time, sovereign immunity was not considered. (*See* ECF No. 9 at 4.) For the reasons stated below, sovereign immunity presents a jurisdictional barrier to the Plaintiff's request for injunctive relief under its state law claims. That said, the Plaintiff may have alternative state law relief for the damage the Defendants have previously caused to its concertina wire.

The Supreme Court has long recognized that "[i]t is axiomatic that the United States may not be sued without its consent and that the existence of consent is a prerequisite for jurisdiction." *United States v. Mitchell*, 463 U.S. 206, 212 (1983) (citing *United States v. Sherwood*, 312 U.S.

---

[7] The Court recognizes that compensation for past injury cannot adequately redress the prospect of continuing or future harm for which the only appropriate remedy would be injunctive relief.

[8] The Court pauses here to address the matter of jurisdiction. There is no dispute the Court holds jurisdiction over the Plaintiff's APA claims, but also asserted are various state law claims. The Court may maintain supplemental jurisdiction over the state law claim if it is so related to the other claim(s) that it forms part of the same case or controversy. 28 U.S.C. § 1367. Here, it is clear the state law claims are so bound up with the APA claims as to be part of the same case or controversy. Accordingly, the Court has the ability to, and does, exercise supplemental jurisdiction. Likewise, any issue not discussed in this order would not be outcome determinative at this stage of litigation.

584, 586 (1941)); *accord FDIC v. Meyer*, <u>510 U.S. 471, 475</u> (1994) ("Absent a waiver, sovereign immunity shields the Federal Government and its agencies from suit."); *Loeffler v. Frank*, <u>486 U.S. 549, 554</u> (1988); *Price v. United States*, <u>174 U.S. 373, 375-76</u> (1899) ("It is an axiom of our jurisprudence. The Government is not liable to suit unless it consents thereto, and its liability in suit cannot be extended beyond the plain language of the statute authorizing it."); *see also La. Dep't of Envtl. Quality v. United States EPA*, <u>730 F.3d 446, 448-49</u> (5th Cir. 2013). The exemption of the United States from being sued without its consent, known as "sovereign immunity," extends to a suit by a State. *California v. Arizona*, <u>440 U.S. 59, 61-62</u> (1979) (quoting *Kansas v. United States*, <u>204 U.S. 331, 342</u> (1907)) ("It does not follow that because a State may be sued by the United States without its consent, therefore the United States may be sued by a State without its consent. Public policy forbids that conclusion."); *Blatchford v. Native Vill. of Noatak*, <u>501 U.S. 775, 781-82</u> (1991); *Minnesota v. United States*, <u>305 U.S. 382, 387</u> (1939).

Only Congress can establish how the United States and its governing agencies can consent to be sued. *Gonzalez v. Blue Cross Blue Shield Ass'n*, <u>62 F.4th 891, 899</u> (5th Cir. 2023); *La. Dep't of Envtl. Quality*, <u>730 F.3d at 449</u> (citing *Mitchell*, <u>463 U.S. at 215-16</u>) ("An agency cannot waive the federal government's immunity when Congress hasn't."). Moreover, the terms of consent to be sued may not be inferred or implied and must be unequivocally expressed in statutory text to define a court's jurisdiction. *United States v. White Mt. Apache Tribe*, <u>537 U.S. 465, 472</u> (2003); *United States v. Bormes*, <u>568 U.S. 6, 9</u> (2012); *Gonzalez*, <u>62 F.4th at 899</u>. Further, a waiver of sovereign immunity and the conditions therein "must be construed strictly in favor of the sovereign." *La. Dep't of Envtl. Quality*, <u>730 F.3d at 449</u>.

Congress has enacted legislation to create several exceptions to sovereign immunity. At issue in this preliminary injunction is the 1976 amendment to the Administrative and Procedures Act, passed under 5 U.S.C. § 702 ("Section 702"), which provides:

> A person suffering legal wrong because of agency action, or adversely affected or aggrieved by agency action within the meaning of a relevant statute, is entitled to judicial review thereof. An action in a court of the United States seeking relief other than money damages and stating a claim that an agency or an officer or employee thereof acted or failed to act in an official capacity or under color of legal authority shall not be dismissed nor relief therein be denied on the ground that it is against the United States or that the United States is an indispensable party. The United States may be named as a defendant in any such action, and a judgment or decree may be entered against the United States: Provided, That any mandatory or injunctive decree shall specify the Federal officer or officers (by name or by title), and their successors in office, personally responsible for compliance. Nothing herein (1) affects other limitations on judicial review or the power or duty of the court to dismiss any action or deny relief on any other appropriate legal or equitable ground; or (2) confers authority to grant relief if any other statute that grants consent to suit expressly or impliedly forbids the relief which is sought. 5 U.S.C. § 702.

Section 702 has thus "waived sovereign immunity for suits seeking nonmonetary relief through nonstatutory judicial review of agency action." *Geyen v. Marsh*, 775 F.2d 1303, 1307 (5th Cir. 1985). "The intended effect of the amendment was to broaden the avenues for judicial review of agency action by eliminating the defense of sovereign immunity in cases covered by the amendment." *Doe v. United States*, 853 F.3d 792, 798-99 (5th Cir. 2017) (internal citations omitted).

Under Fifth Circuit precedent, Section 702 waives immunity for two distinct types of claims. *See Ala.-Coushatta Tribe of Tex. v. United States*, 757 F.3d 484, 489 (5th Cir. 2014). First, it waives immunity for claims where a "person suffer[s] legal wrong because of agency action." *Id.* (citing § 702). "This type of waiver applies when judicial review is sought pursuant only to the general provisions of the APA." *Id.* Second, Section 702 waives immunity for claims where a person is "adversely affected or aggrieved by agency action within the meaning of a relevant

statute." *Id.* (citing § 702). "This type of waiver applies when judicial review is sought pursuant to a statutory or non-statutory cause of action that arises completely apart from the general provisions of the APA." *Id.* (citing *Sheehan v. Army & Air Force Exch. Serv.*, 619 F.2d 1132, 1139 (5th Cir. 1980); *Trudeau v. FTC*, 456 F.3d 178, 187 (D.C. Cir. 2006)). Under this second type, there does not need to be final agency action; only "agency action" as defined by 5 U.S.C. § 551(13) is required. *Id.* (citing *Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 882 (1990)). Because the Plaintiff's common law claims are separate and apart from those brought under the APA, they would not fall under the first type of waiver and could only be considered under the second type of waiver.

In the Motion for Preliminary Injunction, the Plaintiff asserts that Section 702 generally waives the United States's immunity from a suit "seeking relief other than money damages and stating a claim that an agency or an officer or employee thereof acted or failed to act in an official capacity or under color of legal authority." (ECF No. 3-1 at 40.) They further assert, "[the] Defendants have waived sovereign immunity for *ultra vires* claims under the APA via the 1976 amendment to Section 702, which 'waived sovereign immunity for suits seeking nonmonetary relief through nonstatutory judicial review of agency action.'" (*Id.* (quoting *Geyen*, 775 F.2d at 1307).) The Motion for Preliminary Injunction did not, however, explicitly contend that Section 702's waiver of sovereign immunity applies to the state law claims of conversion and trespass to chattels. (*See generally* ECF Nos. 1, 3-1.)

In response to the Motion, the Defendants contend that the Plaintiff cannot assert its state law claims of conversion and trespass to chattels because Congress has not waived the United States's sovereign immunity for such claims. (ECF No. 23-1 at 20.) The Defendants note that the Plaintiff invokes Section 702's waiver of sovereign immunity for actions in federal court "seeking

relief other than money damages," but states no binding precedent that Section 702 covers its state law claims. (*Id.* at 21.)

In reply, the Plaintiff again relies on the statutory text of Section 702 and asserts that the waiver of sovereign immunity applies to "any action seeking relief other than money damages." (ECF No. 27-1 at 10.) In support of this theory, the Plaintiff asserts that the "plain text is clear— "[a]n action in" federal court "seeking relief other than money damages" means *any* action, whether under the APA, a different statute, or the common law." (*Id.* (citing § 702) (emphasis in original).) The Plaintiff relies on the D.C. Circuit's review of Section 702 and supposes that the D.C. Circuit held the waiver extends to "any action" seeking non-monetary relief. (*Id.* at 10-11 (citing *Trudeau*, 456 F.3d at 187).) The Plaintiff also cites a Supreme Court decision where instead of establishing that Section 702 can never apply to state law claims the Supreme Court held the waiver did not apply because the equitable lien sought constituted a claim for money damages. (*Id.* at 11 (citing *Department of Army v. Blue Fox, Inc.* 525 U.S. 255, 263 (1999).)

In supplemental briefing, the Plaintiff asserts that the Defendants have not cited any case that finds the Plaintiff is barred from the state law injunctive relief they seek. (ECF No. 48 at 11.) The Plaintiff also claims that a finding for the Defendants would create a circuit split with at least three other circuits. (*Id.* (citing *Perry Capital LLC v. Mnuchin*, 864 F.3d 591, 620 (D.C. Cir. 2017); *Michigan v. U.S. Army Corps of Eng'rs*, 667 F.3d 765, 775 (7th Cir. 2011); and *B.K. Instrument, Inc. v. United States*, 715 F.2d 713, 727 (2d Cir. 1983).)

After an extensive review of the relevant law, the Court has not identified any case or legal authority that finds Congress unequivocally consented to suit for injunctive relief under common law conversion or trespass to chattels causes of action. The Fifth Circuit has also never recognized the availability of such a claim. Nor has any other circuit court. Absent binding precedent, the

Plaintiff instead relies on a D.C. Circuit case that held Section 702's waiver of sovereign immunity permits "nonstatutory" actions.[9] *Trudeau*, 456 F.3d at 187.

This argument is unavailing for several reasons. The D.C. Circuit did not hold that Section 702 waives sovereign immunity for common law claims of conversion or trespass to chattels. *See id.* Instead, the plaintiff in *Trudeau* initially raised claims against the Federal Trade Commission ("FTC") for exceeding its statutory authority under 15 U.S.C. § 46(f) and violations of the First Amendment, but the non-statutory actions derived from the plaintiff's statutory and First Amendment claims. *Id.* at 190 ("[Plaintiff] contends that his § 46(f) claim falls within the core of the doctrine of non-statutory review because the issuance of a false and misleading press release exceeds the FTC's authority to disseminate information in the public interest.") (internal quotations omitted); *see also* Brief for Appellants at 33, *Trudeau*, 456 F.3d 178 (No. 05-5365) (asserting "it is well-established the First Amendment itself provides a means for plaintiffs to seek 'equitable relief to remedy agency violations' thereof.") Although not explicitly stated, the non-statutory claims the D.C. Circuit recognized seem to present as *ultra vires* claims, as opposed to separate or independent common law causes of action for conversion and trespass to chattels. *See Trudeau*, 456 F.3d at 190 (holding "[t]here certainly is no question that nonstatutory review 'is intended to be of extremely limited scope,' [*Griffith v. Fed. Lab. Rel. Auth.*, 842 F.2d 487, 493 (D.C. Cir. 1988)], and hence represents a more difficult course for [plaintiff] than would review under the APA (assuming final agency action) for acts 'in excess of statutory . . . authority,' 5 U.S.C. § 706(2)(C)."). And notably, the *Trudeau* case was considered under a motion to dismiss posture, not a preliminary injunction posture as in this case. *See generally id.*

---

[9] To the extent that *Trudeau* supports the Plaintiff's position, the D.C. Circuit, as well as the Second and Seventh Circuits, are not binding on this Court.

The Plaintiff also contends that the absence of cited precedent barring their state law claims supports the waiver of sovereign immunity. Notwithstanding that the burden is squarely on the Plaintiff, the fact that a court has not barred such claims does not then mean that Congress has authorized them. It could imply the very opposite—that the sovereign immunity doctrine is so imposing that a plaintiff would not seek such equitable relief against the United States. More likely, however, it indicates that a separate, appropriate remedy already exists. *See, e.g.*, *Blue Fox, Inc.*, <u>525 U.S. at 263-64</u>. Indeed, in *Blue Fox*, cited by the Plaintiff, the Supreme Court denied the equitable lien sought because it constituted a claim for money damages. *Id.*

In order to find that sovereign immunity is waived for the Plaintiff's common law claims, the Court would have to conclude that the language in Section 702 unequivocally expresses Congress's consent to *all* non-monetary actions arising outside the APA. Statutory construction presumes Congress did not intend for Section 702's waiver to be so over-inclusive. Had Congress intended to include common law claims for conversion or trespass to chattels or other state law claims under Section 702, it could have so stated. To accept the Plaintiff's proposition would so broaden the scope of the APA that sovereign immunity would be effectively negated for state law causes of action seeking equitable relief. To the extent there is any ambiguity in the application or statutory interpretation of Section 702, the Court is reminded that "a waiver of the Government's sovereign immunity will be strictly construed, in terms of its scope, in favor of the sovereign." *Lane v. Peña*, <u>518 U.S. 187, 192</u> (1996). Thus, the Court finds that the Plaintiff's common law claims do not overcome sovereign immunity.

Although the Plaintiff did not raise the issue, the Defendants recognized that the FTCA "'waives the United States' sovereign immunity from tort suits' in certain circumstances, and is 'the exclusive remedy for compensation for a federal employee's tortious acts committed in the

scope of employment.'" (ECF No. 23-1 at 21-22 (quoting *McGuire v. Turnbo*, 137 F.3d 321, 324 (5th Cir. 1998); *Dickson v. United States*, 11 F.4th 308, 312 (5th Cir. 2021).) The record here shows that Border Patrol has been known to cut the fences and locked gates of private ranch owners to perform immigration duties. As most of the land near our southern border is privately owned, this relationship with Border Patrol has existed out of necessity for decades. In instances where Border Patrol causes harm to private property, such as damaging fencing and allowing livestock to escape, they will often *ex post* restore a rancher by repairing the property or through financial compensation. Such a cooperative relationship suggests that Border Patrol, and the federal government at large, acknowledge its duty to respect private property. So, too, could such a relationship between the Plaintiff and the Defendants exist. Thus, although the Plaintiff's common law claims seeking injunctive under conversion and trespass to chattels are unlikely to succeed, it is conceivable that the Plaintiff could pursue money damages for prior harm to its fence. The Court is not ruling on what would be appropriate for future potential harm; it only references prior harm.

## IV. ANALYSIS

A. **Likelihood of Success on the Merits**

### *i. The Defendants' Conduct*

#### a. The Defendants' Justifications

While the Plaintiff bears the burden on a motion for preliminary injunctive relief, the Court will first consider the Defendants' own explanations for their conduct before turning to the Plaintiff's allegations. The Defendants offer two justifications for their series of decisions to cut or move the Plaintiff's fence: (1) to discharge their statutory obligation to inspect, apprehend, and

detain individuals unlawfully entering the United States; and (2) to prevent or address medical emergencies.  (*See* ECF No. 23-1 at 15.)

### 1. Inspection, Apprehension, and Processing

The federal government "has broad, undoubted power over the subject of immigration and the status of [noncitizens]," which "rests, in part, on the National Government's constitutional power to 'establish an [sic] uniform Rule of Naturalization' and its inherent power as sovereign to control and conduct relations with foreign nations." *Arizona v. United States*, 567 U.S. 387, 394-95 (2012).  To that end, Congress has specified who may be admitted to the United States, *see, e.g.*, 8 U.S.C. § 1182, criminalized unlawful entry and reentry, *see id.* §§ 1325, 1326, and determined who may be removed and under what conditions, *see id.* §§ 1182, 1225-1227; *Arizona*, 567 U.S. at 395-96.

Congress entrusted DHS with the "power and duty to control and guard the boundaries and borders of the United States against the illegal entry of [noncitizens]."  8 U.S.C. § 1103(a)(5).  Congress has charged the Secretary of Homeland Security to "establish such regulations" and "perform such other acts as he deems necessary for carrying out his authority under [8 U.S.C. §§ 1101-1537]."  *Id.* § 1103(a)(3).  That includes "authoriz[ing] any employee . . . to perform or exercise any of the powers, privileges, or duties conferred [by the Immigration and Nationality Act (INA)]."  *Id.* § 1103(a)(4).  Those employees authorized by the Secretary to enforce the INA are known as immigration officers. 8 U.S.C. § 1101(a)(18).

U.S. Customs and Border Protection ("CBP"), in coordination with other federal agencies, bears responsibility to "enforce and administer all immigration laws," including "the inspection . . . and admission of persons who seek to enter" the United States and "the detection, interdiction, removal . . . and transfer of persons unlawfully entering . . . the United States."  6 U.S.C. §

211(c)(8).  U.S. Border Patrol is "the law enforcement office of [CBP] with primary responsibility for interdicting persons attempting to illegally enter . . . the United States" and for "deter[ring] and prevent[ing] the illegal entry of terrorists, . . . persons, and contraband."  *Id.* § 211(e)(3)(A)-(B). Individual immigration officers, including Border Patrol agents, "interrogate any [noncitizen] or person believed to be [a noncitizen] as to his right to be or remain in the United States" and may "arrest any [noncitizen] who in his presence or view is entering or attempting to enter the United States in violation of any law."  8 U.S.C. § 1357(a)(1)-(2).

Before Congress enacted § 1357(a)(3), Border Patrol's "activities . . . in certain areas [were] seriously impaired by the refusal of some property owners along the border to allow patrol officers access to extensive border areas in order to prevent such illegal entries."  H.R. Rep. No. 82-1377, 1952 U.S.C.C.A.N. 1358, 1360.  In response, Congress authorized agents to "access . . . private lands" without a warrant within 25 miles of an external border "for the purposes of patrolling the border to prevent the illegal entry of [noncitizens] into the United States."  8 U.S.C. § 1357(a)(3). Congress intended that Border Patrol agents should "conduct[ ] such activities as are customary, or reasonable and necessary, to prevent the illegal entry of aliens into the United States."  8 C.F.R. § 287.1(c); *see* H.R. Rep. No. 82-1377, 1952 U.S.C.C.A.N. at 1360 (Section 1357(a)(3) "adequately authorize[s] immigration officers to continue their normal patrol activities, concerning which Congress has been well informed during the past 48 years, and which authority it unquestionably meant these officers to exercise.").

DHS has long made use of this provision to move or cut privately owned fencing within 25 miles of the international border when exigencies arise.  Border Patrol guidance dating back to the 1980s has advised Border Patrol Agents to work with private landowners where the agents encounter locked gates prohibiting access to the border.  (ECF No. 23-2 at 3.)  While Border Patrol

guidance requires that agents take steps to work with the owner to gain access, it acknowledges that the agent may cut locks or fencing that prohibits access to the border.  (*Id.*)  When they must do so, Border Patrol guidance instructs agents to take steps to close gates, make available repairs to fencing, and take other steps to ameliorate any damage.  (*See id.*)

Here, the Defendants claim that the appearance of any migrants at the Rio Grande qualifies as a situation requiring agents to cut the Plaintiff's fence.  The Defendants argue that "[n]oncitizens who have already crossed the international boundary into the United States stand on a different legal footing from those who have not."  (ECF No. 23-1 at 12.)  Disregarding that entering the United States by crossing the river other than at an official port of entry is a federal crime, *see* 8 U.S.C. § 1325, the Defendants note that a person "present in the United States who has not been admitted or who arrives in the United States (whether or not at a designated port of arrival . . .)" is "deemed . . . an applicant for admission." *Id.* § 1225(a)(1).[10] Claiming that "[n]o immigration statute that Congress has enacted authorizes Border Patrol agents to simply push noncitizens already present in the United States back to Mexico," (ECF No. 23-1 at 13), the Defendants maintain that they must assist anyone who has unlawfully crossed the border to advance further into the United States for immigration processing after this initial "inspection."

In short, the Defendants claim their hands are tied.  They have a statutory duty to "inspect," so they claim they must cut or move the Plaintiff's fence to get to the river.  Once at the river, they claim they have no authority to direct illegal entrants to return to Mexico, so they must cut or move

---

[10] The nation's immigration system is separate from its criminal justice system. An individual who enters the United States by unlawful means may freely apply for a change in his or her immigration status while serving time in federal prison. At the Rio Grande, Border Patrol agents can and should both process those they encounter as "applicants for admission" and arrest them for criminal conduct. As discussed below, Border Patrol agents may also simply direct such individuals to return to the far side of the river.

the Plaintiff's fence to help such individuals proceed further into the United States. These claims fail to recognize the dual civil and criminal nature of the immigration statutes.

The Defendants first argue that the mere act of laying eyes on migrants as they wade through the Rio Grande, as seen in Plaintiff's Exhibit 10, qualifies as the beginning of a drawn-out inspection process. As noted above, this inspection process involves: no warning against criminal violation of immigration law; no attempt to prevent the same; no direction to enter at a lawful port of entry; no questioning; no document requests; and no search for drugs or weapons. (*See* Plaintiff's Ex. 10; ECF No. 37 at 84–85.) According to the Defendants, pure visual observation justifies cutting or moving the Plaintiff's fence to access the river.

This rests on two false and misguided propositions. First, Border Patrol agents already possess access to both sides of the fence by which to accomplish this extraordinarily superficial, hands-off "inspection": to the river and bank by boat and to the further-inland side of the fence by road. (*See, e.g.*, Plaintiff's Ex. 10; ECF No. 37 at 82.) The fence may conceivably slow Border Patrol agents' ability to respond to medical emergencies, as discussed below, but the evidence and testimony presented so far has not conclusively established that any delay would materially impede inspection practices of the kind described above.

Second, "an alien who is detained shortly after unlawful entry cannot be said to have 'effected an entry.' Like an alien detained after arriving at a port of entry, an alien like respondent is 'on the threshold.'" *DHS v. Thuraissigiam*, 140 S. Ct. 1959, 1982–83 (2020) (citations omitted); *see also Leng May Ma v. Barber*, 357 U.S. 185, 186–87 (1958). Federal officials can and historically do take steps to turn migrants on the threshold back across the border into Mexico. *See, e.g.*, *Sale v. Haitian Ctrs. Council, Inc.*, 509 U.S. 155, 163 (1993) (finding that aliens could be repatriated "without giving them any opportunity to establish their qualifications as refugees").

The Defendants' view of immigration enforcement would "create a perverse incentive to enter at an unlawful rather than a lawful location," which is why the Supreme Court rejected it for a migrant who managed to "mak[e] it 25 yards into U.S. territory before he was caught." *Thuraissigiam*, 140 S. Ct. at 1982.[11]

Border Patrol itself assesses agents' performance based on the number of migrants repelled, and thousands of migrants have, in fact, been "turned back" after crossing the Rio Grande. (ECF No. 37 at 66, 104.) The Defendants recently boasted their agents' authority to "turn back" migrants on the threshold of the international boundary. *See* Press Release, U.S. Customs & Border Protection (June 1, 2023), https://www.cbp.gov/newsroom/local-media-release/us-border-patrol-urges-migrants-not-endanger-their-lives-swimming (describing an incident on May 25, 2023, where Border Patrol agents were able to "turn [aliens] back south into Mexico" even after they "cross[ed] the maritime boundary line"). Publicly available records show that the Defendants regularly track incidents of successful "turn-backs" at the Border, including more than 5,000 "TBS"—*i.e.*, "Turn Back South"—between October 2018 and March 2020. *See* USBP FOIA Documents at 22, 25, 30, 128-29, 136-54, available at https://int.nyt.com/data/documenttools/border-patrol-fence-breach/b9addab9d72a6a2a/full.pdf (embedded in Zolan Kanno-Youngs, *Armed Mexicans Were Smuggled in to Guard Border Wall*,

---

[11] The Defendants argue that *Thuraissigiam* is inapposite for the proposition that a noncitizen who manages to cross the border has not really effected entry into the United States. (*See* ECF No. 47 at 21 n.5.) The Ninth Circuit there had held that a noncitizen had a constitutional Due Process right to more process than what Congress set out in § 1225(b)(1)(B)(ii), (v). The Supreme Court rejected that conclusion, holding that "the procedure authorized by Congress" is sufficient for "due process as far as [a noncitizen] denied entry is concerned." 140 S. Ct. at 1982. The Supreme Court also noted that such a noncitizen "has . . . those rights regarding admission that Congress provided by statute," *Id.* at 1983 (cleaned up). Like the Ninth Circuit in *Thuraissigiam*, the Defendants here seek to add to the requirements of the immigration statutes. This Court refuses to ignore Supreme Court precedent and follow the Ninth Circuit's example of inventing a novel barrier to immigration enforcement where none exists. Doing so "would undermine the 'sovereign prerogative' of governing admission to this country and create a perverse incentive to enter at an unlawful rather than a lawful location." *Id.* Those who enter the United States unlawfully do possess certain due process rights; the right to continue into the United States rather than be stopped at the border is not among them.

*Whistle-Blowers      Say*,      N.Y.      TIMES      (Dec.      7,      2020), https://www.nytimes.com/2020/12/07/us/politics/border-wall-mexico.html).

The Defendants cannot justify cutting or moving the Plaintiff's fence whenever and wherever they find convenient based on a supposed need to access the river by both boat and foot so they may passively observe migrants crossing. Nor can they do so when the Defendants fail to direct migrants attempting to unlawfully enter the United States to return back across the border per longstanding, Supreme Court-sanctioned practice.

The Defendants next claim that they must cut or move the Plaintiff's fence to allow migrants to proceed toward a further-inland processing center. (ECF No. 37 at 198.) Once they pass through the fence, Border Patrol agents orally direct persons whom they have just witnessed illegally entering the United States to walk as much as a mile or more—with vanishingly little if any further supervision or direction—and present themselves at the nearest immigration processing center. (ECF No. 37 at 83–85, 112–13, 115–16, 147–48, 169–170.) Notably, the Defendants concede that their hope that the aliens will flow in an orderly manner from the breach they created in the Plaintiff's fence to the nearest processing center relies on the Plaintiff's fence along the route.[12] The Defendants claim that easing migrants' path toward the processing center in this manner is necessary to "apprehend" and "detain" the migrants.

Border Patrol itself has defined "apprehension" as "the physical control or temporary detainment of a person who is not lawfully in the United States which may or may not result in an arrest." Customs & Border Protection, *Nationwide Enforcement Encounters: Title 8 Enforcement Actions and Title 42 Expulsions Fiscal Year 2024*, https://perma.cc/YWE2-B6UZ. It has defined "detention" as "[r]estraint from freedom of movement." CBP, *National Standards on Transport,*

---

[12] *See* forthcoming transcript of November 27, 2023 hearing. The Court has access to an audio recording of this hearing.

*Escort, Detention, and Search* at 28 (Oct. 2015), https://perma.cc/6KRP-2XTH.  No reasonable interpretation of these definitions can square with Border Patrol's conduct.  Visual observation is not physical control.  Opening fences does not restrain freedom of movement.  Blind trust that migrants who have just been seen criminally violating one boundary will respect barriers along the road toward a processing center constitutes neither "apprehension" nor "detention."  No unfair cynicism is required to suspect that some such migrants likely commit other crimes (*e.g.*, drug smuggling, human trafficking, etc.) during this process, providing ample incentive for the individuals posing the greatest public danger to flee rather than deliver themselves to the Defendants.[13]  To the extent migrants who fear no additional criminal or immigration consequence because of the Defendants' broader immigration policies, practices, and public statements elect to declare themselves at a processing center, their decision to do so can hardly be attributed to any acts to restrict their freedom of movement by the Defendants.

The Defendants cannot justify their wire-cutting based on purported "apprehension" and "detention" of migrants after they cross through the fence in the face of testimony of both parties strongly suggesting neither occurs without migrants' willing cooperation.  (ECF No. 37 at 112, 115–116, 169–170).  By ignoring the blatant criminal context of where, when, and how these "applicants for admission" enter the United States, the Defendants apparently seek to establish an unofficial and unlawful port of entry stretching from wherever they open a hole through the Plaintiff's fence to the makeshift processing center they established on private land a mile or more away.  The Defendants even appear to seek gates in the Plaintiff's fence that the Defendants can control to facilitate this initiative.  (*See id.* at 107-108, 114.)  Establishing such a system at a

---

[13] As noted above, the Plaintiff's fact witness claimed that during one incident, its personnel observed 4,555 migrants enter through holes the Defendants created while only 2,680 presented themselves for processing.  (ECF No. 37 at 113, 147-48.)

particularly dangerous stretch of the river creates a perverse incentive for aliens to attempt to cross at that location, begetting life-threatening crises for aliens and agents both.

The evidence presented amply demonstrates the utter failure of the Defendants to deter, prevent, and halt unlawful entry into the United States. The Defendants cannot claim the statutory duties they are so obviously derelict in enforcing as excuses to puncture the Plaintiff's attempts to shore up the Defendants' failing system. Nor may they seek judicial blessing of practices that both directly contravene those same statutory obligations and require the destruction of the Plaintiff's property. Any justifications resting on the Defendants' illusory and life-threatening "inspection" and "apprehension" practices, or lack thereof, fail.

## 2. Medical Emergencies

At times, agents rescue individuals who have crossed into the United States illegally and who are in distress in or near the banks of the Rio Grande River. (ECF No. 23-2 at 4–5). These routine rescues, life-saving measures, and other such urgent care, often provided at grave risk to agents' safety, are a noble and legitimate part of Border Patrol operations. Injury, drowning, dehydration, and fatigue are real and common perils in this area of the border, particularly in the context of changing water levels and regular triple-digit heat. (*Id.*) The parties agree that medical emergencies justify cutting or moving the Plaintiff's fence. (ECF No. 37 at 28, 79; ECF No. 23-1 at 15). The Court endorses this agreement.

However, evidence suggests that these exceptional circumstances can be used to swallow a rule against wire-cutting such as the one the Court entered in the TRO. (*See, e.g.*, ECF No. 37 at 81.) While an ongoing medical emergency can justify opening the fence, the end of that exigency ends the justification. As a hypothetical example, cutting the wire to address a single individual's display of distress does not justify leaving the fence open for a crowd of dozens or hundreds to

pass through. In addition, an emergency that can be just as adequately addressed by less destructive means, such as by reaching one or more individuals by boat rather than on foot, does not justify opening the fence at all. Moreover, given the greater potential for abuse, prevention of possible future exigencies rests on far more dubious grounds as a justification for destroying the use of private property than the need to address actual, ongoing crises. Further, the question of whether a situation rises to the level of an emergency is an objective inquiry of a reasonable person's judgment, not the subjective determination of a particular agent. With those qualifications, the Court accepts medical emergencies as a narrow, partial justification for the Defendants' conduct.

### b. Plaintiff's Allegation of a Policy, Practice, or Pattern

The Plaintiff alleges that the Defendants' series of acts interfering with its wire fence represent a "a policy, practice, or pattern of seizing, damaging, and destroying Texas's personal property by cutting, severing, and tearing its concertina wire fence to introduce breaches, gaps, or holes in the barrier." (ECF No. 3-1 at 27.) The Plaintiff alleges that the Defendants "have authorized their officials or agents to engage in this conduct anytime an alien has managed to illegally cross the international border in the Rio Grande to process that alien in the United States—even where migrants are in no apparent distress or when any legitimate exigency has dissipated." (*Id.*) The Plaintiff suggests that orders to cut the Plaintiff's wire are largely implemented by Border Patrol supervisors, rather than lower-level agents, who allegedly often refuse to destroy or damage the Plaintiff's border infrastructure. (*Id.*; *see also* ECF No. 37 at 139–140, 150.)

The Plaintiff argues that the sheer volume and regularity of similar incidents, together with repeated public statements from DHS itself, demonstrates an institutional policy, practice, or pattern of sanctioning Border Patrol agents' cutting or moving the fence even absent exigent

circumstances. (ECF No. 27-1 at 16–17.)[14] The Defendants deny that any such alleged pattern reflects an intentional policy handed down by DHS or Border Patrol leadership. (ECF No. 47-1 at 16–18; *see* ECF No. 23-2 at 5; ECF No. 37 at 138, 186–87.)

The problem appears unique to the Del Rio sector. The testimony and evidence of both parties suggest that, by and large, Border Patrol agents have not cut the Plaintiff's wire except when faced with exigent circumstances in the El Paso and Rio Grande Valley Sectors. (ECF No. 47-1 at 16–18 (citing ECF No. 37 at 80, 96).) The Defendants argue that this disproves the notion that there is an agency-wide directive requiring or authorizing agents to cut the wire when they observe any unlawful border crossing. (*Id.* (citing ECF No. 37 at 80, 96).) The Defendants admit that supervisors in the Del Rio Sector have provided "guidance" to agents along the following lines: "(a) if there are no exigent circumstances, the agents should call a supervisor before any wire-cutting; and (b) if a supervisor is unavailable or exigent circumstances exist, the agents should use their judgment in determining how best to apprehend noncitizens or provide medical assistance." (*Id.* (citing ECF No. 37 at 137–41).) The Defendants emphasize that in both cases, agents have discretion to assess the situation and exercise their judgment whether to cut the wire. (*Id.* (citing ECF No. 23-2 at 6; ECF No. 37 at 110-11).)

Regular and frequent occurrence of the incidents in question between September 20, 2023, and the entering of the TRO, regardless of exigency, and the fact of communications between lower- and higher-ranking DHS officers regarding wire-cutting in the Del Rio Sector raise the

---

[14] The Plaintiff provides the following examples of the Defendants' public statements, each of which is consistent with the Defendants' position in this litigation: On June 30, 2023, a spokesperson for CBP justified federal officials' cutting Texas's fence as "consistent w/ federal law" simply because "[t]he individuals had already crossed the Rio Grande from Mexico [and] were on U.S. soil." (*See* ECF No. 3-1 at 22 (citing CBP statement).) On October 24, 2023, in response to inquiries about this lawsuit concerning Defendants' destruction of state property, a DHS spokesperson said: "Border Patrol agents have a responsibility under federal law to take those who have crossed onto U.S. soil without authorization into custody for processing." (*See* ECF No. 5 at 6 n.1 (citing DHS statement).) The Defendants reiterated the same policy in identical terms in statements to numerous news outlets after this Court granted a TRO. (*See* ECF No. 27-1 at 16-17.)

possibility that an unwritten "policy, practice, or pattern" exists. However, the Court cannot find, on this procedural posture, that the evidence the Court has reviewed thus far conclusively establishes or disproves the existence of such an institutional "policy, practice, or pattern." Such a determination would require further review of evidence and likely additional investigation.

### ii. APA (Final Agency Action)

The Plaintiff asserts that the Defendants' interference with its c-wire is a final agency action and thus reviewable under the APA. (ECF No. 3-1 at 29.) The APA empowers courts to review only "final agency action." 5 U.S.C. § 704; *see also Lujan*, 497 U.S. at 885 ("When, as here, review is sought not pursuant to specific authorization in the substantive statute, but only under the general review provisions of the APA, the 'agency action' in question must be 'final agency action.'"). Absent a final agency action, a court lacks subject matter jurisdiction to consider a claim brought under the APA. *See Peoples Nat'l Bank v. Off. of the Comptroller of the Currency of the U.S.*, 362 F.3d 333, 336 (5th Cir. 2004); *accord Sierra Club v. Peterson*, 228 F.3d 559, 562 (5th Cir. 2000) ("Absent a specific and final agency action, we lack jurisdiction to consider a challenge to agency conduct.").

An agency action is final when two conditions are satisfied. *See Bennett v. Spear*, 520 U.S. 154, 177-78 (1997). First, the action "must mark the 'consummation' of the agency's decisionmaking process." *Id.* Second, "the action must be one by which 'rights or obligations have been determined,' or from which 'legal consequences will flow.'" *Id.* at 178 (quoting *Port of Boston Marine Terminal Assn. v. Rederiaktiebolaget Transatlantic*, 400 U.S. 62, 71 (1970)). Although this analysis is "flexible" and "pragmatic," courts take great care not to confuse final agency action with tentative or interlocutory agency actions, or broader programmatic decisions. *Lujan*, 497 U.S. at 891; *see also Peterson*, 228 F.3d at 562. The APA does not authorize courts to

31

supervise "day-to-day agency management," *Norton v. S. Utah Wilderness All.*, 542 U.S. 55, 67 (2004), and thus, courts must reject invitations to find final agency action in an agency's "continuing (and thus constantly changing) operations." *Lujan*, 497 U.S. at 890.

As the party seeking preliminary injunctive relief, the Plaintiff bears the burden of showing a substantial likelihood that it will succeed on the merits of its APA claim, which requires final agency action. *Clark v. Pichard*, 812 F.2d 991, 993 (5th Cir. 1987) (discussing the standard for obtaining injunctive relief). Here, the Plaintiff alleges that the Defendants' interference with its concertina wire constitutes such a final action. (ECF No. 1 at 27.) Specifically, it asserts that "[s]ince September 20, 2023, federal agents have developed and implemented a policy, pattern, or practice of destroying Texas's concertina wire to encourage and assist thousands of aliens to illegally cross the Rio Grande and enter Texas." (*Id.* at 3.) The question, then, is whether the evidence presented thus far creates a substantial likelihood that the Plaintiff will ultimately establish the existence of final agency action.

At the November 7, 2023, hearing, the Court heard evidence from CBP officials involved in the decisions to cut or manipulate Texas's concertina wire. After the hearing, the Court took a step it rarely takes at this stage of injunction litigation and ordered the parties to produce additional documents regarding Texas's placement of the concertina wire and the Defendants' subsequent interference with it. (ECF No. 9.) The parties provided as much discovery as narrow time constraints allowed, and thereafter, the Court reviewed thousands of pages of emails, reports, and other documents. These documents shed further light on the events referenced at the November 7, 2023 hearing. But even viewed alongside the evidence presented at the hearing,[15] they fall short of demonstrating the existence of a final agency action.

---

[15] The Court continues to review the numerous documents provided by the parties and may supplement the factual findings in this Order in light of new information discovered through this review process.

Having considered the evidence presented at the November 7, 2023 hearing, the post-hearing document production, and the arguments of counsel, the Court finds that the Plaintiff has not, at this preliminary stage, shown a substantial likelihood that it will establish the existence of a final agency action. Of course, the Court does not suggest that the Plaintiff *cannot* establish final agency action when this case proceeds to be heard on the merits. As the Defendants note, the documents within the federal government's possession that mention the Plaintiff's concertina wire potentially number in the millions. (ECF No. 43 at 2.) Discovery may produce information that sheds new light on the nature of the directives to cut or otherwise interfere with the Plaintiff's concertina wire. But at this early stage of the case, the Court finds insufficient evidence of final agency action. Absent such final agency action, the Court need not address the Plaintiff's claims that the Defendants are engaging in arbitrary and capricious action or exceeding their statutory authority.

### *iii. APA (Ultra Vires)*

The Plaintiff correctly asserts that final agency action need not exist for the Court to address its non-statutory *ultra vires* claim. (ECF No. 48 at 13 n.7.) The Fifth Circuit recognizes that courts "may have jurisdiction to review an *ultra vires* agency decision under one of the exceptions to the final agency action rule." *Exxon Chemicals Am. v. Chao*, 298 F.3d 464, 467 n.2 (5th Cir. 2002); *see also Apter v. Dep't of Health & Hum. Servs.*, 80 F.4th 579, 589 (5th Cir. 2023) (noting that for *ultra vires* claims, agency action complained of "need not be final").

To prevail on its *ultra vires* claim, the Plaintiff must show that an agency had "no colorable basis" for the challenged actions. *Fla. Dep't of State v. Treasure Salvors, Inc.*, 458 U.S. 670, 682 (1982). This standard sets a high bar for plaintiffs bringing *ultra vires* claims. *See Trudeau*, 456 F.3d at 190. "[A] state officer may be said to act *ultra vires* only when he acts 'without any

authority whatever.'" *Pennhurst State Sch. & Hosp. v. Halderman*, 465 U.S. 89, 102 (1984). "There certainly is no question that nonstatutory review 'is intended to be of extremely limited scope.'" *Trudeau*, 456 F.3d at 190 (quoting *Griffith*, 842 F.2d at 493). Thus, plaintiffs bringing *ultra vires* claims face a higher burden than they do for traditional APA claims. *See id.* ("[*Ultra vires*] hence represents a more difficult course for Trudeau than would review under the APA (assuming final agency action) for acts 'in excess of statutory . . . authority.'") (quoting 5 U.S.C. § 706(2)(C)). Here, based on the evidence presented at the November 7, 2023 hearing and the documents submitted thereafter, the Court finds that there is insufficient evidence at this juncture to support a substantial likelihood of success on the Plaintiff's *ultra vires* claim.

## B.  Irreparable Harm and Public Interest

The possible harm suffered by the Plaintiff in the form of loss of control and use of its private property continues to satisfy the irreparable harm prong of preliminary-injunction analysis. (*See* ECF No. 9 at 7-8; *see also* above discussion of potential redressability for past violation of the Plaintiff's property under the FTCA.)  The public interest calculation reflected in the Court's TRO decision stands.  (*See id.* at 9-10.)

## V. CONCLUSION

Accordingly, it is **ORDERED** that the Plaintiff's Motion for a Preliminary Injunction Order or Stay of Agency Action (ECF No. 3-1) is **DENIED**.

SIGNED and ENTERED on this 29th day of November 2023.

_____

ALIA MOSES
Chief United States District Judge

# APPENIDX A



















EXHIBIT Q

**United States District Court**
**Western District of Texas**
**Del Rio Division**

| | | |
|---|---|---|
| The State of Texas, | | |
| *Plaintiff*, | | |
| v. | | |
| U.S. Department of Homel and Security; Alejandro Mayorkas, in his official capacity as Secretary of the U.S. Department of Homel and Security; U.S. Customs & Border Protection; U.S. Border Patrol; Troy A. Miller, in his official capacity as Acting Commissioner for U.S. Customs & Border Protection; Jason Owens, in his official capacity as Chief of the U.S. Border Patrol; and Juan Bernal, in his official capacity as Acting Chief Patrol Agent, Del Rio Sector U.S. Border Patrol, | | No. 2:23-CV-00055-AM |
| *Defendants*. | | |

## Plaintiff's Notice of Appeal

Plaintiff the State of Texas appeals this Court's Order entered on November 29, 2023, to the United States Court of Appeals for the Fifth Circuit. *See* Memorandum Opinion and Order, ECF No. 57. That Order denied the State of Texas's motion for a preliminary injunction. *See id.; see also* Pl.'s Mot. for Prelim. Inj. or Stay of Agency Action, ECF No. 3. The order denying a preliminary injunction is immediately appealable. *See* 28 U.S.C. § 1292(a)(1).

Date: November 30, 2023

Ken Paxton
Attorney General of Texas

Brent Webster
First Assistant Attorney General

Grant Dorfman
Deputy First Assistant Attorney General

Ralph Molina
Deputy Attorney General for Legal Strategy

Office of the Attorney General
P. O. Box 12548, MC-009
Austin, TX 78711-2548
(512) 936-2172

Robert Henneke
Texas Bar No. 24046058
Texas Public Policy Foundation
901 Congress Ave.
Austin, Texas 78701
(512) 472-2700
rhenneke@texaspolicy.com

Respectfully submitted,

*/s/ Ryan D. Walters*
Ryan D. Walters
Chief, Special Litigation Division
Tex. State Bar No. 24105085
ryan.walters@oag.texas.gov

DAVID BRYANT
Special Counsel
Texas Bar No. 03281500
David.bryant@oag.texas.gov

Munera Al-Fuhaid
Special Counsel
Tex. State Bar No. 24094501
Munera.Al-Fuhaid@oag.texas.gov

Amy S. Hilton
Special Counsel
Tex. State Bar No. 24097834
Amy.Hilton@oag.texas.gov

Heather L. Dyer
Special Counsel
Tex. State Bar No. 24123044
Heather.Dyer@oag.texas.gov

**Counsel for Defendants**

## Certificate of Service

On November 30, 2023, this document was filed electronically through the Court's CM/ECF system, which automatically serves all counsel of record.

*/s/ Ryan D. Walters*
Ryan D. Walters

Exhibit R

**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF TEXAS**
**DEL RIO DIVISION**

| | | |
|---|---|---|
| **THE STATE OF TEXAS**, | § | |
| | § | |
| *Plaintiff,* | § | |
| | § | CIVIL ACTION NO. 2:23-CV-00055-AM |
| v. | § | |
| | § | |
| **U.S. DEPARTMENT OF HOMELAND** | § | |
| **SECURITY**, *et al.*, | § | |
| | § | |
| *Defendants.* | § | |

---

**PLAINTIFF'S EMERGENCY MOTION**
**FOR INJUNCTION PENDING APPEAL**

---

Shortly before midnight on November 29, 2023, when the temporary restraining order protecting Texas's concertina-wire fence was set to expire, this Court entered an order denying a preliminary injunction. ECF 57. The very next morning, Texas noticed an interlocutory appeal from that order to the U.S. Court of Appeals for the Fifth Circuit. *See* 28 U.S.C. § 1292(a)(1). Pursuant to Federal Rule of Appellate Procedure 8(a)(1)(C), Texas now files this emergency motion for an injunction pending appeal.

Texas is entitled to a Rule 8 injunction pending appeal because it can "show (1) a strong likelihood of success on the merits; (2) irreparable injury in the absence of an injunction; (3) that the balance of hardships weighs in their favor if injunctive relief is granted; and (4) that the public interest favors such relief." *Whole Woman's Health v. Jackson*, 13 F.4th 434, 441 (5th Cir. 2021) (per curiam). This Court already found that every preliminary-injunction factor favors Texas. Defendants' pattern of perpetrating unnecessary damage shows that Texas faces real harm during the pendency of its appeal. And Defendants cannot be heard to complain about interim relief pending appeal, having previously asked this Court for it themselves.

**1.** This Court correctly found in its temporary restraining order that Texas is likely to prevail on the merits of its common-law claim for trespass to chattels: Texas owns its concertina-wire fence just like any other proprietor; Defendants have deliberately and repeatedly damaged that fence; and they have claimed authority to do so absent any common-law privilege, like consent or private necessity. ECF 9 at 5–7. At no point in this litigation have Defendants contested *any* of that. *See* ECF 23-1 at 20–23 (making no merits argument at all); *see also* ECF 27-1 at 10. Instead, they openly claim the ongoing power to destroy and tamper with property that belongs to someone else whenever they want and "without restraint." Nov. 7 Tr.207. In its preliminary injunction

order, this Court likewise correctly found that: Texas has "direct proprietary interests" in its own property, ECF 57 at 12; Defendants' "continuing or future" interference with that interest can be remedied only by injunctive relief, *id.* at 13 n.7; Texas will suffer irreparable harm absent a preliminary injunction, *id.* at 34; and the public interest continues to favor injunctive relief, *id.*

Despite all that, this Court thought itself obligated to deny a preliminary injunction because Congress's circa-1976 waiver of federal sovereign immunity, codified at 5 U.S.C. § 702, does not specifically reference "common law claims for conversion or trespass to chattels." ECF 57 at 19. Respectfully, that was an error of law. Construing ambiguity in an immunity waiver narrowly does not authorize courts to ignore a waiver's plain and broad text. *See, e.g.*, *United States v. Williams*, 514 U.S. 527, 531–35 (1995) (rejecting government effort to narrow immunity waiver's "broad language"); *Kosak v. United States*, 465 U.S. 848, 853 n.9 (1984) (similar); *Sebelius v. Cloer*, 569 U.S. 369, 380–81 (2013) (similar); *Ali v. Federal Bureau of Prisons*, 552 U.S. 214, 222 (2008) (construing "any" in immunity waiver to mean "any"). Consider this Court's own citation to *Alabama-Coushatta Tribe v. United States*, 757 F.3d 484 (5th Cir. 2014). *See* ECF 57 at 15–16. The plaintiff in that case pressed a "common law" claim "for breach of fiduciary duty." *Alabama-Coushatta*, 757 F.3d at 489. Tellingly, the Fifth Circuit did not deem § 702's waiver inapplicable just because it did not reference "common law claims for [breach of fiduciary duty]." Instead, the waiver was held not to apply because the plaintiff had identified no agency action at all. *Id.*

To affirm this Court's order would be to put the Fifth Circuit squarely at odds with the D.C. Circuit over the meaning of the Administrative Procedure Act. In *Perry Capital LLC v. Mnuchin*, 864 F.3d 591 (D.C. Cir. 2017), the D.C. Circuit rejected the very argument Defendants press here, namely, "that § 702 does not waive [their] immunity from suit for state law claims."

3

*Id.* at 620; *see also Trudeau v. FTC*, 456 F.3d 186 (D.C. Cir. 2006) ("There is nothing in the language of the second sentence of § 702 that restricts its waiver to suits brought under the APA."). Moreover, by suggesting that the Federal Tort Claims Act's provision of "a separate … remedy" (*i.e.*, money damages) impliedly precludes injunctive relief for state-law tort claims, ECF 57 at 19, this Court invites the Fifth Circuit to part ways with both the Seventh Circuit and the Second Circuit, which have held just the opposite. *See Michigan v. U.S. Army Corps of Eng'rs*, 667 F.3d 765, 775 (7th Cir. 2011); *B.K. Instrument, Inc. v. United States*, 715 F.2d 713, 727 (2d Cir. 1983); *see also* ECF 30 at 12 (noting Defendants' position, which this Court adopted, is in tension with *Match-E-Be-Nash-She-Wish Band of Pottawatomi Indians v. Patchak*, 567 U.S. 209, 222 (2012)).

This outcome-determinative error of law as to § 702's broad waiver of federal sovereign immunity gives Texas a strong likelihood of success in the Fifth Circuit, which is "always chary to create a circuit split." *Alfaro v. Comm'r*, 349 F.3d 225, 229 (5th Cir. 2003); *see also, e.g.*, *Curr-Spec Partners, L.P. v. C.I.R.*, 579 F.3d 391, 398 n.37 (5th Cir. 2009) (same); *Gahagan v. CIS*, 911 F.3d 298, 304 (5th Cir. 2018) (same); *TEA v. DOE*, 992 F.3d 350, 358 (5th Cir. 2021) (same); *Martinelli v. Hearst Newspapers, L.L.C.*, 65 F.4th 231, 245 (5th Cir. 2023) (same); *but see* ECF 57 at 18 n.9 (reasoning that "the D.C. Circuit, as well as the Second and Seventh Circuits, are not binding on this Court"). At the very least, this Court should grant an injunction pending appeal so that the Fifth Circuit has time to decide whether it welcomes such open disagreement with sister circuits.

**2.** The Court's determination that there was insufficient evidence of a policy that constituted the final agency action necessary to be reviewable under the APA, ECF 57 at 29–33, was also incorrect, for the reasons it articulated in previous briefing. *See* ECF 3-1 at 35; ECF 30 at 16–20; ECF 48 at 21–25. This determination made it unnecessary for the Court to address the

merits of Plaintiff's APA claims—arbitrary-and-capricious decisionmaking, failure to follow the required procedures under notice-and-comment rulemaking, and agency action contrary to law or exceeding statutory authority—which are likely to succeed on the merits. *See* ECF 3-1 at 32–39; ECF 30 at 16–23; ECF 48 at 26–28.

**3.** The Court also rejected that Plaintiff had demonstrated a likelihood of success on its *ultra vires* claim. ECF 57 at 33–34. But this was in tension with the Court's extensive findings elsewhere that Defendants had no justification for cutting Texas's wire fence. ECF 57 at 21–29. Plaintiff's previous briefing showing a likelihood of success on the merits of its *ultra vires* claim— which is similar to its contrary-to-law APA claim but does not require final agency action—was not addressed. ECF 3-1 at 39–42; ECF 30 at 21–23; ECF 48 at 11–21, 26.

**4.** There can be no doubt that Texas will suffer irreparable harm absent an injunction pending appeal. This Court already found that Texas would face irreparable harm absent a temporary restraining order, which has protected its concertina-wire fence from Defendants' lawless and destructive behavior since October 30, 2023. ECF 9 at 7–8. This Court reiterated just yesterday that Texas continues to face such harm absent a preliminary injunction. ECF 57 at 34. And it recognized that an injunction is "the only appropriate remedy" for "the prospect of continuing or future harm." *Id.* at 13 n.7. That prospect of future harm is real here—as evidenced by Defendants' "culpable and duplicitous conduct" during this litigation. *Id.* at 6.

After Texas moved for a preliminary injunction, Defendants escalated matters by "trading bolt cutters for an industrial-strength telehandler forklift to dismantle Texas's border fence." ECF 5 at 2. Then they did the same thing just 20 minutes after Texas moved for a temporary restraining order. ECF 8 at 3–4. They even had the audacity to suggest that ripping another sovereign's fence

out of the ground and smashing it into a pulverized mass were merely courteous efforts "to minimize damage." ECF 23-1 at 16–17. Once this Court entered its temporary restraining order, Defendants steadfastly refused to agree to extend it, *see* Nov. 21 Tr., even as they complained that they lacked sufficient time to comply with the Court's document-production order, ECF 38 at 4; ECF 43 at 4. Given that the temporary restraining order carved out an exception for medical exigency, the inescapable conclusion is that Defendants are hell-bent on breaking things whenever they deem it convenient to do so. Nov. 7 Tr. 51, 56–57, 209. When Texas soldiers have made efforts to simply document this destruction, CBP agents have told them to "back the f--k off," ECF 3-1 at 26 n.55, and claimed they are "not authorized to take any pictures," ECF 5-1 at 6—all in an effort to shield their misconduct from public view.

Defendants have made their intentions clear. Allowing such an ongoing abuse of power certainly harms Texas. But more than that, it effectively invites Defendants to continue their destructive behavior more broadly by declaring open season on the property rights of any person or entity with land or chattels near the southern border.

**5.** Defendants oppose this motion. But they have no basis to do so. After all, they preemptively asked this Court to stay any preliminary injunction pending resolution of their anticipated appeal to the Fifth Circuit. *See* Nov. 7 Tr. 232–33; *see also* ECF 57 at 26 n.12 (noting unavailability of Nov. 27 Tr.). That was back when Defendants worried—with good reason—that they were going to lose. Now, armed with an order from this Court denying the preliminary injunction, Defendants should not be heard to object to Texas's plea for the sort of interim relief they previously asked of this Court. *See* 18B Wright & Miller, Fed. Prac. & Proc. § 4477 (describing equitable estoppel and justiciable estoppel as aiming "to prevent a party from 'playing fast and

loose' with the courts" by changing its position). It certainly would be "unseeml[y]" for Defendants to claim that interim relief is inappropriate only now that the shoe is on a different foot than they anticipated. *Reed v. City of Arlington*, 650 F.3d 571, 574 (5th Cir. 2011).

**6.** Finally, the public interest favors an injunction pending appeal for the reasons given by this Court twice before. ECF 9 at 7–8; ECF 57 at 34. As this Court correctly found, Defendants are "begetting life-threatening crises for aliens and agents," as well as for the many Texans victimized by human trafficking and deadly fentanyl, with their "utter failure … to deter, prevent, and halt unlawful entry into the United States." ECF 57 at 7, 27–28. And Defendants' destruction of Texas's property was rightly condemned from the bench just a few days ago: "From the Court's point of view, you're cutting the wire to not do your job." *See* ECF 57 at 26 n.12 (noting unavailability of Nov. 27 Tr.). The public interest is hardly served by allowing Defendants to continue their lawless, dangerous, and destructive practices while the Fifth Circuit hears Texas's appeal. *See, e.g.*, *R.J. Reynolds Vapor Co. v. FDA*, 65 F.4th 182, 195 (5th Cir. 2023) ("It is of highest public importance that federal agencies follow the law.").

\*     \*     \*

The State of Texas appreciates this Court's careful and ongoing attention to the parties' arguments and evidence adduced at the preliminary-injunction stage. *See* ECF 57 at 32 n.15. And it recognizes that, rather than engage on the merits of Texas's common law claims, Defendants repeatedly injected various justiciability questions that this Court was forced to answer on a compressed timetable. *See* ECF 23-1 at 18–23; Nov. 7 Tr.38–46, 55–57; ECF 47 at 8–14. That time crunch was not merely a function of the natural expiration of the temporary restraining order, but also a consequence of Defendants' obstinate refusal to agree to extend that order to allow for more

considered adjudication—even as they complained that this Court had not given them enough time to comply with its production demand. Now, Texas must seek relief on appeal without access to the documents that Defendants produced and on which this Court has relied *in camera*, ECF 57 at 4–6—even after this Court granted Defendants a gracious extension, ECF 46 at 1, and warned them of contempt sanctions for their pre-announced refusal to comply, Nov. 21 Tr. In addition to allowing the Fifth Circuit to decide whether to make this Circuit the only one to read § 702 contrary to its plain text, entering an injunction pending appeal would also allow this Court the time for considered decisionmaking that Defendants refused to help provide.

Accordingly, Texas respectfully requests that this Court grant its emergency motion and enter the proposed order pending appeal. Given the State's ability to prepare this motion less than 24 hours after this Court entered its order denying a preliminary injunction, it would be reasonable to require any response from Defendants by 6 PM on Friday, December 1, 2023. In light of Defendants' demonstrated plans to continue inflicting immediate and irreparable harm on the State by destroying its property anytime an alien manages to cross the international boundary near Eagle Pass, the State intends to seek similar emergency relief from the Fifth Circuit at **9 AM on Monday, December 4, 2023**, absent a decision from this Court. *See* Fed. R. App. Proc. 8(a)(2).

Dated: November 30, 2023.

KEN PAXTON
Attorney General of Texas

BRENT WEBSTER
First Assistant Attorney General

GRANT DORFMAN
Deputy First Assistant Attorney General

RALPH MOLINA
Deputy Attorney General for Legal Strategy

ROBERT HENNEKE
Texas Bar No. 24026058
Texas Public Policy Foundation
901 Congress Ave.
Austin, Texas 78701
(512) 472-2700
rhenneke@texaspolicy.com

Respectfully submitted.

*/s/ Ryan D. Walters*
RYAN D. WALTERS
Chief, Special Litigation Division
Texas Bar No. 24105085

DAVID BRYANT
Special Counsel
Texas Bar No. 03281500

MUNERA AL-FUHAID
Special Counsel
Texas Bar No. 24094501

HEATHER L. DYER
Special Counsel
Texas Bar No. 24123044

Office of the Attorney General
Special Litigation Division
P.O. Box 12548, Capitol Station
Austin, Texas 78711-2548
(512) 936-1706
Ryan.Walters@oag.texas.gov
David.Bryant@oag.texas.gov
Munera.Al-Fuhaid@oag.texas.gov
Heather.Dyer@oag.texas.gov

COUNSEL FOR PLAINTIFF

## CERTIFICATE OF CONFERENCE

I certify that on November 30, 2023, I contacted counsel for Defendants via email regarding this motion. Counsel for Defendants Jean Lin stated that they oppose this motion.

*/s/Ryan D. Walters*
RYAN D. WALTERS


## CERTIFICATE OF SERVICE

I certify that a true and accurate copy of the foregoing document was filed electronically (via CM/ECF) on November 30, 2023, which automatically serves all counsel of record who are registered to receive notices in this case.

*/s/Ryan D. Walters*
RYAN D. WALTERS

Exhibit S

Case: 23-50869   Document: 26-1   Page: 549   Date Filed: 12/04/2023

**THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF TEXAS**
**DEL RIO DIVISION**

|  |  |
|---|---|
| **STATE OF TEXAS**, <br><br> *Plaintiff*, <br> **v.** <br><br> **U.S. DEPARTMENT OF HOMELAND SECURITY**, *et al*., <br> *Defendants*. | Case No. 2:23-cv-00055-AM <br><br> Hon. Alia Moses |

**DEFENDANTS' OPPOSITION TO TEXAS'S MOTION**
**FOR PRELIMINARY INJUNCTION OR STAY OF AGENCY ACTION**

## TABLE OF CONTENTS

INTRODUCTION ................................................................................................. 1

BACKGROUND ................................................................................................... 2

I.    Statutory Background ................................................................................ 2

II.   Factual Background .................................................................................. 5

III.  Litigation History ...................................................................................... 8

LEGAL STANDARD ........................................................................................... 9

ARGUMENT ..................................................................................................... 10

I.    Texas Is Unlikely To Succeed On Its Claims. ....................................... 10

      A.    The Court lacks jurisdiction to grant Texas's requested relief. ................. 10

      B.    Texas may not assert its state-law claims against Defendants. ................. 12

      C.    Judicial review is not available under the APA. .......................................... 15

            i.     Defendants' actions are committed to agency discretion by law. ................. 16

            ii.    The alleged "policy, practice, and pattern" is not final agency action.. ................. 19

      D.    Defendants' actions are consistent with their broad statutory authority. ................. 23

      E.    Defendants' actions do not constitute a legislative rule. ................. 25

      F.    Defendants' actions are not arbitrary or capricious. ................. 28

II.   Texas Has Not Demonstrated That It Will Suffer Irreparable Harm. ................. 29

III.  An Injunction Would Be Contrary To The Equities And The Public Interest ........ 31

CONCLUSION .................................................................................................. 33

## TABLE OF AUTHORITIES

**Cases**

*Al Otro Lado, Inc. v. Nielsen*,
    327 F. Supp. 3d 1284 (S.D. Cal. 2018) ................................................. 21

*All. for Hippocratic Med. v. FDA*,
    78 F.4th 210 (5th Cir. 2023) ................................................................. 9

*Anibowei v. Morgan*,
    70 F.4th 898 (5th Cir. 2023) ............................................................... 29

*Arizona v. Biden*,
    40 F.4th 375 (6th Cir. 2022) ............................................................... 22

*Arizona v. California*,
    283 U.S. 423 (1931) ........................................................................... 15

*Arizona v. United States*,
    567 U.S. 387 (2012) ............................................................................. 2

*Bark v. U.S. Forest Serv.*,
    37 F. Supp. 3d 41 (D.D.C. 2014) ....................................................... 20

*Biden v. Texas*,
    142 S. Ct. 2528 (2022) ....................................................................... 11

*CAE Integrated, LLC v. Moov Techs., Inc.*,
    44 F.4th 257 (5th Cir. 2022) ................................................................. 9

*City of New York v. Dep't of Def.*,
    913 F.3d 423 (4th Cir. 2019) ............................................................... 20

*Dennis Melancon, Inc. v. City of New Orleans*,
    703 F.3d 262 (5th Cir. 2012) ............................................................... 29

*Dep't of Labor v. Kast Metals Corp.*,
    744 F.2d 1145 (5th Cir. 1984) ............................................................ 26

*Dickson v. United States*,
    11 F.4th 308 (5th Cir. 2021) ............................................................... 14

*DRG Funding Corp. v. Sec. of Hous. & Urban Dev.*,
   76 F.3d 1212 (D.C. Cir. 1996) ............................................................ 22

*El-Shifa Pharm. Indus. Co. v. United States*,
   607 F.3d 836 (D.C. Cir. 2010) ....................................................... 13, 15

*Fla. Wildlife Fed. v. Goldschmidt*,
   611 F.2d 547 (5th Cir. 1980) ............................................................. 16

*Garland v. Aleman Gonzalez*,
   142 S. Ct. 2057 (2022) ................................................................ 10, 11

*Geo Grp., Inc. v. Newsom*,
   50 F.4th 745 (9th Cir. 2022) .............................................................. 15

*Haaland v. Brackeen*,
   143 S. Ct. 1609 (2023) ..................................................................... 31

*Hancock v. Train*,
   426 U.S. 167 (1976) ........................................................................ 15

*Heckler v. Chaney*,
   470 U.S. 821 (1985) ................................................................... 16, 17

*Hernandez v. Mesa*,
   140 S. Ct. 735 (2020) ...................................................................... 18

*Hunsucker v. Phinney*,
   497 F.2d 29 (5th Cir. 1974) ............................................................... 12

*In re Supreme Beef Processors, Inc.*,
   468 F.3d 248 (5th Cir. 2006) (en banc) ............................................. 13, 14

*Johnson v. Maryland*,
   254 U.S. 51 (1920) ......................................................................... 15

*Kokkonen v. Guardian Life Ins. Co. of Am.*,
   511 U.S. 375 (1994) ........................................................................ 12

*Lane v. Pena*,
   518 U.S. 187 (1996) ........................................................................ 13

*Leslie Miller, Inc. v. Arkansas*,
   352 U.S. 187 (1956) ........................................................................ 15

*Lincoln v. Vigil*,
   508 U.S. 182 (1993) .................................................................. 17

*Lujan v. Nat'l Wildlife Fed.*,
   497 U.S. 871 (1990) .................................................................. 20

*Mayo v. United States*,
   319 U.S. 441 (1943) ............................................................. 14, 15

*McGuire v. Turnbo*,
   137 F.3d 321 (5th Cir. 1998) ...................................................... 14

*Michigan v. U.S. Army Corps. of Eng'rs*,
   667 F.3d 765 (7th Cir. 2011) ...................................................... 13

*Mock v. Garland*,
   75 F.4th 563 (5th Cir. 2023) ...................................................... 26

*Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*,
   463 U.S. 29 (1983) ................................................................... 28

*Munaf v. Geren*,
   553 U.S. 674 (2008) .................................................................. 11

*Nken v. Holder*,
   556 U.S. 418 (2009) .................................................................. 32

*Norton v. S. Utah Wilderness All.*,
   542 U.S. 55 (2004) .................................................................... 19

*Perez v. Mortg. Bankers Ass'n*,
   575 U.S. 92 (2015) .................................................................... 26

*Pros.& Patients for Customized Care v. Shalala*,
   56 F.3d 592 (5th Cir. 1995) ........................................................ 26

*Sambrana v. United Airlines, Inc.*,
   2022 WL 486610 (5th Cir. Feb. 17, 2022) ................................... 30

*Sierra Club v. Peterson*,
   228 F.3d 559 (5th Cir. 2000) .................................................. 19, 20

*Sierra Club v. U.S. Dep't of Interior*,
    990 F.3d 909 (5th Cir. 2021) ................................................ 28

*Soundboard Ass'n v. FTC*,
    888 F.3d 1261 (D.C. Cir. 2018) ............................................ 22

*Steele v. City of Hous.*,
    603 S.W.2d 786 (Tex. 1980) ................................................. 25

*Talbert v. United States*,
    932 F.2d 1064 (4th Cir. 1991) ............................................. 14

*Texas v. EPA*,
    983 F.3d 826 (5th Cir. 2020) ............................................... 18

*Texas v. United States*,
    809 F.3d 134 (5th Cir. 2015) ........................................... 26, 27

*Towers Charter & Marine Corp. v. Cadillac Ins. Co.*,
    894 F.2d 516 (2d Cir. 1990) ................................................ 30

*Trump v. Vance*,
    140 S. Ct. 2412 (2020) ...................................................... 14

*U.S. Army Corps of Eng'rs v. Hawkes Co.*,
    578 U.S. 590 (2016) ..................................................... 19, 22

*United States v. Delgado-Garcia*,
    374 F.3d 1337 (D.C. Cir. 2004) ........................................... 18

*United States v. Mitchell*,
    463 U.S. 206 (1983) ..................................................... 12, 13

*United States v. Texas*,
    143 S. Ct. 1964 (2023) ............................................. 12, 18, 30

*United States v. Washington*,
    142 S. Ct. 1976 (2022) ...................................................... 14

*United States v. Williams*,
    514 U.S. 527 (1995) ......................................................... 13

*Webster v. Doe*,
    486 U.S. 592 (1988) ......................................................... 17

*Westbay Steel, Inc. v. United States,*
970 F.2d 648 (9th Cir. 1992) ........................................................ 14

*Winter v. Nat. Res. Defense Council, Inc.,*
555 U.S. 7 (2008) ................................................................. 29, 32

**Statutes**

5 U.S.C. § 551 ................................................................... 19, 25

5 U.S.C. § 553 ................................................................... 25, 26

5 U.S.C. § 554 ....................................................................... 25

5 U.S.C. § 701 ............................................................... 16, 17, 19

5 U.S.C. § 702 ............................................................... 13, 14, 15

5 U.S.C. § 704 ................................................................... 16, 19

5 U.S.C. § 705 .................................................................... 9, 11

5 U.S.C. § 706 ........................................................................ 8

6 U.S.C. § 202 ....................................................................... 17

6 U.S.C. § 211 ............................................................... 3, 17, 23

8 U.S.C. § 1103 ................................................................ *passim*

8 U.S.C. § 1158 ....................................................................... 5

8 U.S.C. § 1182 ....................................................................... 2

8 U.S.C. § 1225 ................................................................ *passim*

8 U.S.C. § 1226 ............................................................ 2, 4, 11, 23

8 U.S.C. § 1227 ....................................................................... 2

8 U.S.C. § 1252 ........................................................... 10, 11, 12, 16

8 U.S.C. § 1325 ....................................................................... 2

8 U.S.C. § 1326 ......................................................................................... 2

8 U.S.C. § 1328 ......................................................................................... 5

8 U.S.C. § 1357 .................................................................................. *passim*

19 U.S.C. § 1630 ................................................................................. *passim*

28 U.S.C. § 1331 ..................................................................................... 12

28 U.S.C. § 1346 ....................................................................... 12, 14, 30

28 U.S.C. § 1356 ..................................................................................... 12

28 U.S.C. § 1367 ..................................................................................... 12

**Regulations**

8 C.F.R. § 287.1 ................................................................... 4, 16, 18, 23

**Other Authorities**

CBP, *Southwest Land Border Encounters (By Component)* (last modified Oct. 21, 2023),
https://perma.cc/7WKS-2GRF .................................................................. 5

Charles Alan Wright & Arthur R. Miller, 11A *Federal Practice & Procedure* § 2944
(3d ed. Apr. 2023 update) ...................................................................... 30

Government of Mexico, Information Note No. 04 (July 14, 2023),
https://perma.cc/V72L-GTXE ................................................................. 32

Government of Mexico, Information Note No. 05 (July 26, 2023),
https://perma.cc/F932-U9T9 ................................................................. 33

H.R. Rep. No. 82-1377, 1952 U.S.C.C.A.N. 1358 ................................... 3

Treaty of Peace, Friendship, Limits, and Settlement between the United States of America
and the Mexican Republic, Feb. 2, 1848, 9 Stat. 922,
1848 WL 6374 (July 4, 1848) ................................................................. 5

Case: 23-50869    Document: 26    Page: 557    Date Filed: 12/04/2023

## INTRODUCTION

The Department of Homeland Security (DHS) and its officers and agents are charged with, among other things, protecting the Nation's borders and enforcing the immigration laws, including apprehending, inspecting, and processing noncitizens who have entered the United States unlawfully. No State or private party may obstruct the performance of those statutory duties. By deploying approximately 4 miles of concertina wire along the bank of the Rio Grande River without consultation with DHS, however, Texas has created such an obstruction—the wire impedes U.S. Border Patrol agents' access to noncitizens who have already crossed the international boundary in the middle of the Rio Grande into the United States. Border Patrol agents, therefore, properly have cut or moved that wire when necessary to carry out their statutory duties, including to apprehend, inspect, and process these noncitizens.

Raising state common law claims and a variety of Administrative Procedure Act (APA) claims, Texas seeks an injunction against further "disrupt[ion] [of] the State's border security efforts" by "cutting Texas's concertina wire." Mot. for Prelim. Inj. at 3, ECF No. 3-1 (PI Mot.). But Texas has things backwards. The Constitution assigns the responsibility over immigration and border security to the federal government, not to the States. That fundamental misunderstanding is fatal to Texas's claims and requests for injunctive relief. The Court should not accept Texas's invitation to impose the State's immigration policy preference on the federal government. Rather, it should deny Texas's motion for preliminary injunction because Texas cannot establish that it will likely

succeed on the merits, that it will suffer irreparable harm, or that the equities favor issuing the extraordinary relief sought.

For these reasons and those below—including significant jurisdictional bars to Texas's requested injunctive relief and the lack of any material factual disputes—the Government also respectively requests that the Court dissolve the October 30, 2023 Temporary Restraining Order (TRO) as soon as possible, before the TRO's current expiration date of November 13, 2023.

**BACKGROUND**

## I.     Statutory Background

The federal government "has broad, undoubted power over the subject of immigration and the status of [noncitizens]," which "rests, in part, on the National Government's constitutional power to 'establish an uniform Rule of Naturalization' and its inherent power as sovereign to control and conduct relations with foreign nations." *Arizona v. United States*, 567 U.S. 387, 394-95 (2012). To that end, Congress has specified who may be admitted to the United States, *see, e.g.*, 8 U.S.C. § 1182, criminalized unlawful entry and reentry, *see id.* §§ 1325, 1326, and determined who may be removed and under what conditions, *see id.* §§ 1182, 1225-1227. *See Arizona*, 567 U.S. at 395-96.

DHS has significant discretion to exercise its "power and duty to control and guard the boundaries and borders of the United States against the illegal entry of [noncitizens]." 8 U.S.C. § 1103(a)(5). The Secretary of Homeland Security may "establish such regulations" and "perform such other acts as he deems necessary for carrying out his authority under [8 U.S.C. §§ 1101-1537]." *Id.* § 1103(a)(3). That includes "authoriz[ing]

2

any employee . . . to perform or exercise any of the powers, privileges, or duties conferred [by the Immigration and Nationality Act (INA)]." *Id.* § 1103(a)(4). Those employees authorized by the Secretary to enforce the INA are known as immigration officers. 8 U.S.C. § 1101(a)(18).

U.S. Customs and Border Protection (CBP), in coordination with other federal agencies, is charged with "enforc[ing] and administer[ing] all immigration laws," including "the inspection . . . and admission of persons who seek to enter" the United States and "the detection, interdiction, removal . . . and transfer of persons unlawfully entering . . . the United States." 6 U.S.C. § 211(c)(8). U.S. Border Patrol is "the law enforcement office of [CBP] with primary responsibility for interdicting persons attempting to illegally enter . . . the United States" and for "deter[ring] and prevent[ing] the illegal entry of terrorists, . . . persons, and contraband." *Id.* § 211(e)(3)(A)-(B).

Individual immigration officers, including Border Patrol agents, also have express statutory authority "to interrogate any [noncitizen] or person believed to be [a noncitizen] as to his right to be or remain in the United States" and "to arrest any [noncitizen] who in his presence or view is entering or attempting to enter the United States in violation of any law." 8 U.S.C. § 1357(a)(1)-(2). Before Congress enacted § 1357(a)(3), Border Patrol's "activities . . . in certain areas [were] seriously impaired by the refusal of some property owners along the border to allow patrol officers access to extensive border areas in order to prevent such illegal entries." H.R. Rep. No. 82-1377, 1952 U.S.C.C.A.N. 1358, 1360. Congress responded by codifying that agents may "access . . . private lands" without a warrant within 25 miles of an external border "for the purposes of patrolling the border

to prevent the illegal entry of [noncitizens] into the United States," 8 U.S.C. § 1357(a)(3). This means that Border Patrol agents may "conduct[ ] such activities as are customary, or reasonable and necessary, to prevent the illegal entry of aliens into the United States." 8 C.F.R. § 287.1(c); see H.R. Rep. No. 82-1377, 1952 U.S.C.C.A.N. at 1360 (Section 1357(a)(3) "adequately authorize[s] immigration officers to continue their normal patrol activities, concerning which Congress has been well informed during the past 48 years, and which authority it unquestionably meant these officers to exercise.").

Noncitizens who have already crossed the international boundary into the United States stand on a different legal footing from those who have not. Under the INA, a noncitizen "present in the United States who has not been admitted or who arrives in the United States (whether or not at a designated port of arrival . . .)" is "deemed . . . an applicant for admission." 8 U.S.C. § 1225(a)(1). And the INA authorizes "immigration officers" to "inspect[]" all such applicants, as well as those "who are applicants for admission or otherwise seeking admission or readmission to or transit through the United States." Id. § 1225(a)(3).

If an immigration officer determines that a noncitizen is inadmissible, the noncitizen may be removed or be permitted to depart from the United States only under the statutes' specified procedures, see id. §§ 1225(a)(4) (withdrawal); 1229a (removal proceedings); 1225(b)(1)(A) (expedited removal procedures). Inadmissible noncitizens may be detained pending removal. Id. §§ 1225(b)(1), 1226. With limited exceptions, Congress has specified that a noncitizen "who is physically present in the United States or who arrives in the United States (whether or not at a designated port of arrival . . . ),

4

irrespective of such [noncitizen's] status, may apply for asylum." *Id.* § 1158(a). And certain noncitizens encountered by Border Patrol agents may be subject to criminal prosecution. *See id.* § 1328 ("Reentry of removed aliens").

No immigration statute that Congress has enacted authorizes Border Patrol agents to simply push noncitizens already present in the United States back to Mexico.

## II. Factual Background

The United States and Mexico share a border nearly 2,000 miles long. From the Gulf of Mexico to the southern border of New Mexico, the middle of the Rio Grande serves as "[t]he boundary line between the two republics." Treaty of Peace, Friendship, Limits, and Settlement between the United States of America and the Mexican Republic, Feb. 2, 1848, 9 Stat. 922, 1848 WL 6374, at *3. In Fiscal Year 2023, Border Patrol agents had over 2 million encounters with noncitizens at the Southwest land border, including approximately 400,000 in the Del Rio Sector. *See* CBP, *Southwest Land Border Encounters (By Component)* (last modified Oct. 21, 2023), https://perma.cc/7WKS-2GRF. Border Patrol agents in the Del Rio Sector are responsible for patrolling 245 miles of the U.S.-Mexico border. Declaration of David S. BeMiller ¶ 3.

One of Border Patrol's main statutory objectives is to deter illegal entry into the United States and to intercept individuals who are attempting to unlawfully enter, including terrorists, criminals, and smugglers, before they can move to the interior of the country. *Id.* ¶ 4. As one exercise of this authority, agents patrol areas between ports of entry along the Rio Grande in the Del Rio Sector. *Id.* ¶¶ 3-4. Agents apprehend noncitizens unlawfully entering the country, inspect them, process them, and in

appropriate circumstances place them in removal proceedings. *Id.* ¶ 4. The land along the border in the Del Rio Sector consists primarily of farms and ranches. *Id.* ¶ 3. Agency guidance has long advised Border Patrol agents to coordinate with private landowners when encountering locks, fences, and other barriers preventing access to the border and to take steps to ameliorate any damage caused to such private property. *Id.* ¶ 6. However, Border Patrol agents are authorized to cut locks or remove barriers if necessary to access private lands and perform their duties. *See id.* ¶¶ 6, 19; *see also* 8 U.S.C. § 1357(a)(3).

In March 2021, Governor Abbott launched Operation Lone Star. Compl. ¶ 30, ECF No. 1. As part of that initiative, Texas has deployed concertina wire along the riverbank of the U.S. side of the Rio Grande "to deter" noncitizens from crossing into the United States. *Id.* ¶ 32.[1] Defendants have observed this wire on the U.S. side of the Rio Grande itself and across gates that provide access to the river. BeMiller Decl. ¶ 11. Texas alleges that the wire "is lawfully in place on state, municipal, or private land," Compl. ¶ 63,[2] and that it "has not placed concertina wire on any federal land near Eagle Pass," *id.* ¶ 59.[3] Because the concertina wire is on the U.S. side of the Rio Grande, any noncitizen

---

[1] In addition, Texas has installed a floating buoy barrier in the Rio Grande near Eagle Pass to stop migrants from crossing the river. That barrier structure is the subject of a suit by the United States. *See United States v. Abbott*, 1:23-cv-00853-DII (W.D. Tex.), *appeal of PI pending,* No. 23-50632 (5th Cir.).

[2] On page 23 of Texas's complaint, it restarts numbering paragraphs so that there are two paragraphs numbered 61, 62, 63, 64, and 65. Except where noted, Defendants' citations to these paragraphs in the complaint refer to second paragraphs numbered 61, 62, 63, 64, and 65.

[3] For purposes of these motions, Defendants accept this allegation as true. Any placement of concertina wire on federal land by Texas is presently beyond the scope of this case.

approaching this wire from the Rio Grande has already entered the United States. BeMiller Decl. ¶¶ 8-9.

Texas's installation of the concertina wire has reduced Border Patrol agents' view of the river and prevented them from apprehending or otherwise accessing noncitizens who have already unlawfully entered the United States. *Id.* ¶ 12. This has consequences for agents, migrants, and others. Most importantly, it makes it more difficult for Border Patrol to carry out its statutory responsibilities. *Id.* ¶¶ 12, 15. Migrants who are not apprehended and who cannot get through the wire travel down the shoreline, sometimes long distances in significant heat, until there is no wire blocking their egress. *Id.* ¶ 13. That increases the chances these migrants will evade apprehension as well as the migrants' risk of injury, dehydration, fatigue, and drowning. *Id.* When such circumstances arise, the wire can reduce Border Patrol's response time and pose a danger to Border Patrol agents' and migrants' safety. *See id.* ¶¶ 12, 15, 20-21. And when migrants have tried to traverse the wire, some have sustained injuries. *See id.* ¶¶ 21, 24.

Border Patrol agents have cut or moved the wire where the wire prevents them from performing their statutory duties to inspect, apprehend, and process noncitizens who have unlawfully entered the United States or from rendering aid to distressed individuals. *Id.* ¶ 16. Contrary to Texas's allegation, Compl. ¶ 8, Border Patrol does not have a policy or procedure requiring agents to cut this wire, let alone for the purpose of destroying Texas's property or of encouraging unlawful entry into the United States. BeMiller Decl. ¶¶ 17-18. Rather, agents have been advised to use their independent

7

judgment, subject to supervisory review in appropriate circumstances, in determining whether cutting the wire is required to fulfill their responsibilities. *Id.* ¶¶ 19-20.

## III.   Litigation History

On October 24, 2023, Texas filed this lawsuit against DHS and its officials. *See* Compl. The State alleges that Defendants "have a policy, practice, or pattern of seizing, damaging, and destroying Texas's personal property by cutting, severing, and tearing its concertina wire fence to introduce breaches, gaps, or holes in the barrier." *Id.* ¶ 60. And it asserts that "[s]ince September 20, [2023], CBP has seized and damaged Texas's concertina wire to escort aliens into Texas more than 20 times." *Id.* ¶ 59.

Texas contends that these actions violate Texas common law and the APA. Counts 1 and 2 assert state common law claims for conversion and trespass to property. *Id.* ¶¶ 61-74. Counts 3 and 6 assert that Defendants have acted without or in excess of their statutory authority. *Id.* ¶¶ 75-89, 98-101. Count 4 asserts that "Defendants' policy, pattern, or practice" constitutes a "substantive rule" and that Defendants violated 5 U.S.C. § 706(2)(D) by not providing notice and an opportunity to comment beforehand. Compl. ¶¶ 90-92. And Count 5 asserts that Defendants' alleged destruction of Texas's concertina wire was arbitrary and capricious. *Id.* ¶ 93-97.

On the same day that it filed the complaint, Texas moved for a preliminary injunction or, in the alternative, a stay of agency actions based on each of these claims. *See* PI Mot. at 39. On October 26, following the filing of Texas's suit, Defendants used a front-end loader to temporarily lift the wire, as opposed to cutting it, to minimize damage to the wire. BeMiller Decl. ¶ 23. In response, the State filed an emergency motion for a

TRO or stay of agency action. *See* Mot. for TRO, ECF No. 8. On October 28, when Defendants used a front-end loader to move the wire again, in another effort to minimize damage to the wire, Texas supplemented its filings with another declaration. Notice of Escalating Property Damage, ECF No. 8. On October 30, 2023, the Court entered a TRO, enjoining Defendants from, among other things, "removing the [wire] from its present location [in Eagle Pass, Texas] for any reason other than to provide or obtain emergency medical aid." ECF No. 9, Order at 6.

## LEGAL STANDARD

A preliminary injunction is an "extraordinary remedy" and "warranted only when the movant shows '(1) a substantial likelihood of success on the merits, (2) irreparable injury if the injunction is not granted, (3) that the injury outweighs any harm to the other party, and (4) that granting the injunction will not disserve the public interest.'" *CAE Integrated, LLC v. Moov Techs., Inc.*, 44 F.4th 257, 261 (5th Cir. 2022). These factors also govern a stay application under 5 U.S.C. § 705 "because a stay has the practical effect of an injunction." *All. for Hippocratic Med. v. FDA*, 78 F.4th 210, 242 (5th Cir. 2023). "The 'burden of persuasion on all of the four requirements . . . is at all times upon the plaintiff.'" *CAE Integrated*, 44 F.4th at 261.

## ARGUMENT

**I.      Texas Is Unlikely To Succeed On Its Claims.**

      **A.      The Court lacks jurisdiction to grant Texas's requested relief.**

      The INA divests this Court of any jurisdiction or authority to restrain Border Patrol agents from cutting Texas's concertina wire in the course of inspecting, processing, and apprehending noncitizens who have crossed the border into the United States. *See* 8 U.S.C. § 1252(f)(1). Section 1252(f)(1) provides:

> Regardless of the nature of the action or claim or of the identity of the party or parties bringing the action, no court (other than the Supreme Court) shall have jurisdiction or authority to enjoin or restrain the operation of [8 U.S.C. §§ 1221–1231], other than with respect to the application of such provisions to an individual alien against whom proceedings under [those provisions] have been initiated.

The specified provisions, 8 U.S.C. §§ 1221–1231, "charge the Federal Government with the implementation and enforcement of the immigration laws governing the inspection, apprehension, examination, and removal of [noncitizens]." *Garland v. Aleman Gonzalez*, 142 S. Ct. 2057, 2064 (2022). As the Supreme Court has explained, § 1252(f)(1)'s reference to "the 'operation' of the relevant statutes is best understood to refer to the Government's efforts to enforce or implement them." *Id.* That is, "the 'operation of the provisions' is a reference . . . to the way that [it is] being carried out." *Id.* Accordingly, with limited exceptions inapplicable here, § 1252(f)(1) "prohibits lower courts from entering injunctions that order federal officials to take or to refrain from taking actions to enforce, implement, or otherwise carry out the specified statutory provisions." *Id.* at 2065.

Here, Texas seeks to restrain Border Patrol agents from exercising their statutory functions under 8 U.S.C. § 1225 to inspect "applicants for admission," *id.* § 1225(a)(1), (3)—namely, as relevant here, those noncitizens who have already crossed the international boundary in the middle of the Rio Grande into the United States—and to inspect, process, apprehend or detain them pending removal proceedings or expedited removal, *id.* § 1225; *see also id.* § 1226 ("Apprehension and detention of aliens"). Indeed, there is no dispute that Border Patrol agents cut or lift the concertina wire in the course of performing such duties. *See* BeMiller Decl. ¶¶ 16, 22; Compl. ¶¶ 58, 61 (pages 19-22); Declaration of Michael Banks ¶¶ 15-20, Appx.020-025, ECF No. 3-2. In other words, Texas asks this Court to order Defendants to "refrain from actions that (. . . in the Government's view) are allowed" by § 1225. *Aleman Gonzalez*, 142 S. Ct. at 2065. As such, the order would "interfere with the Government's efforts to operate" that provision, which is a provision specified in 1252(f)(1). *Id.* Accordingly, the requested relief is barred by § 1252(f)(1). *See Biden v. Texas*, 142 S. Ct. 2528, 2538 (2022) (district court's order enjoining DHS's Migrant Protection Protocols, which was implemented under 8 U.S.C. § 1225(b)(2)(C), "violated" § 1252(f)(1)). The Court thus lacks jurisdiction to issue the requested relief, and Texas is unlikely to succeed on the merits. *Cf. Munaf v. Geren*, 553 U.S. 674, 690 (2008) ("difficult question as to jurisdiction" makes success on the merits "more unlikely due to potential impediments to even reaching the merits").

Texas cannot frame its request as one for a stay of agency action under 5 U.S.C. § 705, rather than an injunction, to avoid § 1252(f)(1)'s reach. Its requested relief would not just maintain the status quo, but also "restrain the operation" of §§ 1225 and 1226 by

11

restraining Defendants from performing their duties under those provisions, exactly what § 1252(f)(1) precludes. And if Texas's requested relief does not "require federal officials to change how they exercise th[eir] discretion," then it does not redress Texas's alleged injuries. *United States v. Texas*, 143 S. Ct. 1964, 1979 (2023) (Gorsuch, J., concurring). That lack of redressability would deprive them of standing to pursue the requested relief. *Id.* Either way, this Court lacks authority to grant the requested relief.

**B.      Texas may not assert its state-law claims against Defendants.**

In Counts 1 and 2 of the complaint (at ¶¶ 61-74), Texas asserts state common law claims against Defendants: conversion and trespass to chattels. The Court concluded that Texas was likely to succeed on its trespass to chattels claim, Order at 6-7, but in addition to this Court's inability to afford Texas the relief it seeks, the Court lacks jurisdiction to review Texas's state-law claims. Congress has not waived the United States' sovereign immunity for such claims.[4]

It is well established that "the United States may not be sued without its consent and that the existence of consent is a prerequisite for jurisdiction." *United States v.*

---

[4] The complaint (at ¶ 20) cites three statutory bases—28 U.S.C. §§ 1331, 1346, and 1356—for the Court's subject matter jurisdiction, but none of them is applicable. The state common law claims do not "aris[e] under the Constitution, laws, or treaties of the United States," 28 U.S.C. § 1331; this is not a suit for "money damages" against the "United States," *id.* § 1346; and section 1356 does not cover state-law claims for tortious conversion of personal property, *see Hunsucker v. Phinney*, 497 F.2d 29, 35 (5th Cir. 1974); *see also* PI Mot. at 24 (noting functional similarity of conversion of and trespass to chattels). While the Court could potentially exercise supplemental jurisdiction over these state law claims, *see* 28 U.S.C. § 1367(a), Texas has made no attempt to show why the Court should do so, *see Kokkonen v. Guardian Life Ins. Co. of Am.*, 511 U.S. 375, 377 (1994) (burden is on the party invoking federal jurisdiction to establish jurisdiction).

*Mitchell*, 463 U.S. 206, 212 (1983). Moreover, "a waiver of the Government's sovereign immunity will be strictly construed, in terms of its scope, in favor of the sovereign." *Lane v. Pena*, 518 U.S. 187, 192 (1996); *see also United States v. Williams*, 514 U.S. 527, 531 (1995) (when confronted with a purported waiver of the Federal Government's sovereign immunity, the Court will "constru[e] ambiguities in favor of immunity"). Texas invokes 5 U.S.C. § 702's waiver of sovereign immunity for actions in federal court "seeking relief other than money damages." Compl. ¶ 22. But the State cites no binding precedent establishing that § 702 covers *state-law* claims. *Cf. Michigan v. U.S. Army Corps. of Eng'rs*, 667 F.3d 765, 775 (7th Cir. 2011) ("The waiver [in § 702] applies when any *federal statute* authorizes review of agency action, as well as in cases involving constitutional challenges and other claims arising *under federal law*." (emphases added)); *El-Shifa Pharm. Indus. Co. v. United States*, 607 F.3d 836, 854 (D.C. Cir. 2010) (en banc) (Kavanaugh, J., concurring) ("State tort law doesn't run against the United States, so it's not a federal law that can be pointed to as a substantive law which is being transgressed for an APA cause of action."). As the Fifth Circuit has explained, "[t]hat state law defines certain conduct as tortious . . . simply does not mean that a private person may sue the U.S. Government solely under the state's law," because "[t]he federal government enjoys complete sovereign immunity except as it has consented to be sued and consented to submit to liability." *In re Supreme Beef Processors, Inc.*, 468 F.3d 248, 255 (5th Cir. 2006) (en banc).

The Federal Tort Claims Act "waives the United States' sovereign immunity from tort suits" in certain circumstances, and is "the exclusive remedy for compensation for a federal employee's tortious acts committed in the scope of employment." *McGuire v.*

13

*Turnbo*, 137 F.3d 321, 324 (5th Cir. 1998); *Dickson v. United States*, 11 F.4th 308, 312 (5th Cir. 2021). But the FTCA's consent to suit for tort claims against the United States allows a plaintiff to seek only money damages. 28 U.S.C. § 1346(b). And by expressly permitting suit for money damages in certain circumstances, the FTCA impliedly precludes claims for the declaratory and equitable relief that Texas seeks. *See Talbert v. United States*, 932 F.2d 1064, 1065–66 (4th Cir. 1991) ("[t]he only relief provided for in the [FTCA] is "money damages," and thus, court "lack[s] jurisdiction under the FTCA" to grant "other relief"); *Westbay Steel, Inc. v. United States*, 970 F.2d 648, 651 (9th Cir. 1992) (same). The "FTCA's incorporation of state tort law" cannot be "divorced from that statute's express limits on liability." *In re Supreme Beef Processors, Inc.*, 468 F.3d at 255.

Even if § 702 could be read broadly to waive the United States' sovereign immunity for state common law claims "seeking relief other than money damages," intergovernmental immunity would preclude Texas from obtaining an injunction against the federal government based on state law. The doctrine of intergovernmental immunity recognizes that the Constitution "prohibit[s] States from interfering with or controlling the operations of the Federal Government." *United States v. Washington*, 142 S. Ct. 1976, 1984 (2022); *Mayo v. United States*, 319 U.S. 441, 445 (1943) ("[A]ctivities of the Federal Government are free from regulation by any state."). Across two centuries, the Supreme Court has repeatedly affirmed that "the Constitution guarantees 'the entire independence of the General Government from any control by the respective States,'" so States can neither "control the operations of the constitutional laws enacted by Congress," nor impede the Executive Branch's "execution of those laws." *Trump v. Vance*, 140 S. Ct. 2412,

2425 (2020) (quoting *Farmers & Mechs. Sav. Bank of Minneapolis v. Minnesota*, 232 U.S. 516, 521 (1914); *McCulloch v. Maryland*, 17 U.S. (4 Wheat.) 316, 436 (1819)); *Arizona v. California*, 283 U.S. 423, 451 (1931) ("The United States may perform its functions without conforming to the police regulations of a state.").

Counts 1 and 2 in Texas's complaint seek to do indirectly—through an injunction from this Court—what it cannot do directly: use state tort law to regulate how federal officials conduct their law-enforcement function. But States cannot "control" federal agents' "performance of their duties." *Johnson v. Maryland*, 254 U.S. 51, 57 (1920); *see Leslie Miller, Inc. v. Arkansas*, 352 U.S. 187, 190 (1956); *Geo Grp., Inc. v. Newsom*, 50 F.4th 745, 755 (9th Cir. 2022). And no "specific congressional action" authorizes this "regulation by a subordinate sovereign." *Hancock v. Train*, 426 U.S. 167, 179 (1976); *see El-Shifa Pharm. Indus. Co.*, 607 F.3d at 854 (Kavanaugh, J., concurring) (noting that "the APA does not borrow state law or permit state law to be used as a basis for seeking injunctive or declaratory relief against the United States"). To hold otherwise would allow States to flip the Supremacy Clause on its head; States could regulate federal officials and then run to federal court for an injunction based on state law. It would undermine paramount interests enshrined in the Supremacy Clause that "uniformity [of] the laws of United States be dominant over those of any state." *Mayo*, 319 U.S. at 445. In sum, Texas would be unlikely to succeed on its state-law claims even if § 702 waived sovereign immunity.

C.    **Judicial review is not available under the APA.**

In Counts 3, 4, and 5, Texas appears to challenge two separate purported agency actions: (a) Defendants' purported "policy, pattern, or practice of seizing and destroying

15

[Texas's] concertina wire fencing," Compl. ¶ 87; *see id.* ¶¶ 91, 96-97, and (b) Defendants' alleged destruction and seizure of the wire fencing itself, *see id.* ¶ 88. Texas is unlikely to succeed in stating a claim for prospective injunctive relief under the APA with respect to the alleged "policy, pattern, or practice" for threshold reasons. Actions taken pursuant to the purported "policy, pattern or practice" are "committed to agency discretion by law." 5 U.S.C. § 701(a)(2). And any "policy, pattern or practice" challenged here is neither discrete nor "final." *Id.* § 704. Moreover, any claim for injunctive relief based on past acts of wire-cutting is not only precluded by 8 U.S.C. § 1252(f)(1) but also moot, *see Fla. Wildlife Fed. v. Goldschmidt*, 611 F.2d 547, 549 (5th Cir. 1980) ("Where the activities sought to be enjoined have already substantially occurred and the appellate court can not undo what has already been done, the action is moot.").

### i.    Defendants' actions are committed to agency discretion by law.

Agency actions are not reviewable under the APA "to the extent" that they are "committed to agency discretion by law." 8 U.S.C. § 701(a)(2). Here, Congress has granted Defendants and their agents significant discretion to patrol the border and to use their judgment in inspecting and apprehending noncitizens they encounter at the border, which includes the authority to access private lands within 25 miles of the border. *See* 8 U.S.C. §§ 1103(a), 1225, 1357(a); *see also* 8 C.F.R. § 287.1(c). There are no "manageable standards . . . available for judging" *ex ante* "how and when" Border Patrol agents "should exercise [that] discretion"—as Texas's request for relief would have this Court do. *Heckler v. Chaney*, 470 U.S. 821, 830 (1985).

Section 701(a)(2) precludes review "where the relevant statute is drawn so that a court would have no meaningful standard against which to judge the agency's exercise of discretion." *Lincoln v. Vigil*, <u>508 U.S. 182, 191</u> (1993). There are "certain categories of administrative decisions that courts traditionally have regarded as 'committed to agency discretion,'" *id.*, such as enforcement decisions, *see Chaney*, <u>470 U.S. at 831-32</u>, and ones involving "interests in national security, an area of executive action 'in which courts have long been hesitant to intrude,'" *Lincoln*, <u>508 U.S. at 192</u> (citing *Webster v. Doe*, <u>486 U.S. 592, 599-600</u> (1988)). Each of them "requires 'a complicated balancing of a number of factors which are peculiarly within [the agency's] expertise.'" *Id.* at 193 (quoting *Chaney*, <u>470 U.S. at 831</u>). Those factors include "whether a violation has occurred," how agency resources are spent, and "whether the agency is likely to succeed if it acts." *Chaney*, <u>470 U.S. at 831</u>.

Here, Texas seeks judicial review that goes to the heart of Defendants' exercise of quintessential enforcement discretion. As an initial matter, the relevant statutes grant Defendants broad discretion to carry out their law-enforcement duties and do not provide "meaningful standards for defining the limits of that discretion" in the abstract. *Id.* at 834. Texas acknowledges that Defendants have the '"power and duty to control and guard the boundaries and borders of the United States,'" PI Mot. at 27 (quoting <u>8 U.S.C. § 1103(a)(5))</u>, and that Congress has specifically granted Defendants '"access to private lands . . . for the purpose of patrolling the border to prevent the illegal entry of [noncitizens] into the United States,"' *id.* (quoting <u>8 U.S.C. § 1357(a)(3))</u>; *see also id.* (citing broad grants of authority under <u>6 U.S.C. §§ 202(5)</u>, <u>211(c)</u>, <u>(e))</u>. But Congress went further and authorized the Secretary to "perform such other acts as *he deems necessary* for carrying

17

out his authority," 8 U.S.C. § 1103(a)(3) (emphasis added), including authorizing employees to "exercise any of the powers, privileges, or duties" conferred on him by the INA, *id.* § 1103(a)(4); *see* H.R. Rep. No. 82-1377, 1952 U.S.C.C.A.N. at 1360 (Section 1357(a)(3) "adequately authorize[s] immigration officers to continue their normal patrol activities" on private lands.). And the Secretary has, in fact, authorized Border Patrol agents to "conduct[] such activities as are customary, or reasonable and necessary, to prevent the illegal entry of [noncitizens] into the United States." 8 C.F.R. § 287.1(c). These provisions grant Defendants broad discretion, *cf. Texas v. EPA*, 983 F.3d 826, 834-35 (5th Cir. 2020) (finding permissive language as evidence "decision [wa]s 'committed to agency discretion by law'"), and provide no meaningful standard for this Court to judge *ex ante* which methods and actions are permissible in carrying out Defendants' law-enforcement responsibilities. *See Texas*, 143 S. Ct. at 1972 (The "complicated balancing process" involved in "devising arrest and prosecution policies" "leaves courts without meaningful standards for assessing those policies.").

These law-enforcement decisions, moreover, are of the type that courts have traditionally considered committed to agency discretion. Indeed, these decisions require individual officers to balance a variety of factors in fast-moving situations based on their training and expertise and the facts at hand. The exercise of enforcement discretion here also necessarily involves national-security interests in securing the border. *See id.* at 1970-72; *Hernandez v. Mesa*, 140 S. Ct. 735, 746 (2020) (noting that control of an international "border has a clear and strong connection to national security"); *United States v. Delgado-Garcia*, 374 F.3d 1337, 1345 (D.C. Cir. 2004) ("[T]his country's border-control policies are

18

of crucial importance to the national security and foreign policy of the United States."). And, of course, federal officials use their broad discretion in executing their statutory mission to enforce this Nation's immigration laws, which includes, as noted above, the inspection and processing of applicants for admission and the removal of inadmissible noncitizens. Because there is no standard to apply to judge law-enforcement tactics in the abstract, review under the APA is unavailable. *See* 5 U.S.C. § 701(a)(2).

  **ii.  The alleged "policy, practice, and pattern" is not final agency action.**

  The APA permits review of only discrete and "final agency action." *Id.* § 704. A plaintiff must challenge "a specific" "agency action." *Sierra Club v. Peterson*, 228 F.3d 559, 565 (5th Cir. 2000); *see* 5 U.S.C. § 551(13) (defining "agency action"). General "programmatic" attacks on how an agency conducts its day-to-day operations are not cognizable. *Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 891 (1990); *see Norton v. S. Utah Wilderness All.*, 542 U.S. 55, 66-67 (2004). Moreover, two conditions must be satisfied for an agency action to be deemed final. "First, the action must mark the consummation of the agency's decisionmaking process—it must not be of a merely tentative or interlocutory nature." *U.S. Army Corps of Eng'rs v. Hawkes Co.*, 578 U.S. 590, 597 (2016) (quoting *Bennett v. Spear*, 520 U.S. 154, 177-78 (1997)). "And second, the action must be one by which rights or obligations have been determined, or from which legal consequences will flow." *Id.* Even apart from this Court's inability to grant Texas the injunctive relief it seeks, Texas's challenges to Defendants' actions do not satisfy these requirements.

*First*, Defendants' purported "patterns and practices" that Texas challenges in Counts 3, 4, and 5 do not constitute discrete agency action. The "pattern" and "practice" that Texas identifies are agents performing their day-to-day duties of apprehending, inspecting, and processing noncitizens who have already crossed the border unlawfully, which could require the cutting of Texas's concertina wire to access the noncitizens or to private lands along the border. *See* Compl ¶ 8. Texas is not challenging specific actions but the overall allowance of certain law enforcement methods; thus, the suit is a "programmatic" attack that is not cognizable under the APA. *See Nat'l Wildlife*, 497 U.S. at 891; *Bark v. U.S. Forest Serv.*, 37 F. Supp. 3d 41, 50-51 (D.D.C. 2014). The fact that Texas pointed to "specific allegedly-improper" agency conduct "within that [alleged] program" makes no difference, *Peterson*, 228 F.3d at 567, because the State is effectively asking this Court to "supervise an agency's compliance with [its] broad statutory mandate" to patrol the border, *City of New York v. Dep't of Def.*, 913 F.3d 423, 433 (4th Cir. 2019), and to inspect noncitizens who have crossed the border. Yet "the obvious inability for a court to function in such a day-to-day managerial role over agency operations is precisely the reason why the APA limits judicial review to discrete agency actions." *Id.* at 434.

The Fifth Circuit's decision in *Sierra Club v. Peterson* is instructive. The plaintiffs in that case challenged "the [U.S.] Forest Service's program of timber management in the Texas forests," 228 F.3d at 566, on basis that the Forest Service's allowance of certain "timber harvesting techniques" contravened a federal statute, *id.* at 563. The Fifth Circuit held that the program—as opposed to particular individual sales—was not an "identifiable action or event" reviewable under the APA. *Id.* at 566. Allowing such a

challenge to proceed, the Court reasoned, would exceed the "institutional limits on courts" and "encroach[] on the other branches of government." *Id.* This problem with justiciability, the Court further held, was not resolved by the plaintiffs' ability to identify specific timber sales "as evidence" of the Forest Services' management program. *Id.* at 567. The same is true here: Texas is challenging DHS's day-to-day immigration enforcement at the border, and pointing to specific instances of wire cutting or lifting does not transform Texas' programmatic attack into a discrete agency action. Accordingly, Texas's "pattern and practice" claim is unlikely to succeed.

*Second*, there is no agency "policy" that either exists or is sufficiently final to be reviewable. Texas alleges that "[s]ince September 20, 2023, federal agents have developed and implemented a policy . . . of destroying Texas's concertina wire to encourage and assist thousands of aliens to illegally cross the Rio Grande and enter Texas." Compl. ¶ 8; *see id.* ¶¶ 60-61 (page 22). Texas cites a number of discrete actions and infers that "an overarching policy" must exist. But there is nothing to support the legal conclusion that such a purported policy exists. *See Al Otro Lado, Inc. v. Nielsen*, 327 F. Supp. 3d 1284, 1321 (S.D. Cal. 2018) (complaint failed to state discrete agency action where "there are no allegations connecting any of [CBP agents'] conduct" to the "unwritten policy" alleged by plaintiffs to have been issued by CBP). This is confirmed by the Chief of Law Enforcement Operations for the U.S. Border Patrol. BeMiller Decl. ¶¶ 17–18.

Although CBP has provided general guidance to individual officers concerning Texas's concertina wire, any such guidance does not satisfy either condition for final agency action. To start, the guidance does not represent the consummation of the

agency's decisionmaking process. By its nature, the informal guidance contemplates further decisions, *i.e.*, the agents' independent on-the-ground decisionmaking based on the facts presented in a particular circumstance. *Id.* ¶¶ 19-20; *cf. DRG Funding Corp. v. Sec'y of Hous. & Urb. Dev.*, 76 F.3d 1212, 1215 (D.C. Cir. 1996) (contemplation of further agency action indicates that agency decisionmaking is not final). The guidance reinforces the agents' discretion to exercise their independent judgment, rather than direct a specific course of action. BeMiller Decl. ¶¶ 19-20; *cf. Hawkes*, 578 U.S. at 598 (a "definitive decision" after fact-finding is consummation of agency decisionmaking). And it lacks indicia of formality or finality, such as publication in the Federal Register. C*f. Soundboard Ass'n v. FTC*, 888 F.3d 1261, 1268 (D.C. Cir. 2018) ("informal" letter issued by "subordinate official" not consummation of agency decisionmaking). These data points indicate that the guidance does not satisfy the first condition for final agency action, and little suggests otherwise.

Moreover, no legal consequences flow from the Board Patrol guidance, and the guidance does not determine any rights or obligations. *Hawkes*, 578 U.S. at 597. It does not "impose liability on a regulated party, create legal rights, or mandate, bind, or limit other government actors in the future." *Arizona v. Biden*, 40 F.4th 375, 387 (6th Cir. 2022) (Sutton, C.J.). Nor does it have any "direct effect on [Texas's] day-to-day business." *Id.* Instead, the guidance "maintains officials' independent decisionmaking" expressed in the statutes discussed above, allowing broad discretion for federal officials to conduct their immigration-enforcement operations. *Id.* Accordingly, the guidance "lacks legal effect," and is not reviewable under the APA. *Id.*

22

D.    **Defendants' actions are consistent with their broad statutory authority.**

In Counts 3 and 6, Texas claims that Defendants exceeded their statutory authority in cutting the concertina wire, at least in some circumstances, and that those actions are reviewable under the APA, Compl. ¶¶ 75-89, or under principles of nonstatutory review, *id.* ¶¶ 98-101. The State is incorrect and thus unlikely to succeed on either claim.

Congress has authorized Defendants to take necessary actions, which will include in some circumstances cutting Texas's (or any other party's) concertina wire, to carry out their statutory duties. As discussed above, Congress has charged Defendants with "detect[ing], interdict[ing], [and] remov[ing] . . . persons unlawfully entering . . . the United States," 6 U.S.C. § 211(c)(8)(B), and with "inspect[ing] . . . persons who seek to enter . . . the United States," *id.* § 211(c)(8)(A); *see also* 8 U.S.C. §§ 1225 (requiring immigration officials to inspect "applicants" for admission whether or not at a port of entry), 1226 (concerning the "[a]pprehension and detention" of noncitizens). It has granted Defendants "the power and duty to control and guard the boundaries and borders of the United States against the illegal entry of [noncitizens]" and to "perform such other acts as . . . necessary for carrying out [t]his authority." *Id.* § 1103(a)(3), (5).

Further, it has granted individual officers authority to "access . . . private lands . . . for the purpose of patrolling the border," *id.* § 1357(a)(3), which includes "activities . . . reasonable and necessary[] to prevent the illegal entry of [noncitizens] into the United States," 8 C.F.R. § 287.1(c). Congress specifically did so because "the refusal of some property owners along the border to allow patrol officers access" to their land "in order to prevent such illegal entries" was "endanger[ing] the national security" and "affect[ing]

the sovereign right of the United States to protect its own boundaries against the entry of [noncitizens], including those of the most dangerous classes." H.R. Rep. No. 82-1377, 1952 U.S.C.C.A.N. at 1360. Contrary to the State's assertions, *see* PI Mot. at 25, Texas's concertina wire, as Mr. BeMiller's declaration shows, similarly obstructs Border Patrol agents from fulfilling their responsibilities, and in certain circumstances, it has been necessary for agents to cut or move the wire to interdict and inspect noncitizens crossing the Rio Grande into the United States, *see* BeMiller Decl. ¶ 16.

Congress "unquestionably meant these officers to exercise" their responsibilities to protect the national security and "adequately authorize[d] immigration officers to continue their normal patrol activities." H.R. Rep. No. 82-1377, 1952 U.S.C.C.A.N. at 1360. Cutting, lifting, or otherwise moving the wire is therefore fully authorized by a straightforward application of the foregoing authorities.

Texas's contention otherwise ignores key statutory provisions and is inconsistent with background understandings of law-enforcement authority. PI Mot. 26-28. While the State recites a number of key provisions outlining Defendants' responsibilities, *see id.* at 26-27 (citing, among others, 8 U.S.C. § 1357(a)(3)), it ignores subsections (a)(3) and (a)(4) of 8 U.S.C. § 1103. Those subsections allow agents, acting on the Secretary's delegated authority, to "perform such other acts as [are] deem[ed] necessary for carrying out" their duties. 8 U.S.C. § 1103(a)(3). That can include cutting or lifting the wire. No additional authorization is required, as Texas suggests (PI Mot. at 27), because these subsections provide that authorization. And even if those subsections did not provide sufficient authorization on their own, the authority to take necessary supporting actions, such as

cutting or lifting the wire in certain circumstances, is included within the general grant of power to access private lands without a warrant and to interdict, inspect, and even arrest noncitizens. *Cf. Steele v. City of Hous.*, 603 S.W.2d 786, 792-93 (Tex. 1980) (recognizing government may defend its "destruction of … property as a means to apprehend escapees [a]s a classic instance of police power" by showing "public necessity"). Indeed, consistent with these authorities Border Patrol has long recognized that its agents may exercise their judgment to take steps to cut locks or fencing that prohibits access to areas immediately adjacent to the border where such access is needed if they cannot obtain cooperation from the private landowners. BeMiller Decl. ¶ 6; *see* H.R. Rep. No. 82-1377, 1952 U.S.C.C.A.N. at 1360 (Section 1357(a)(3) is "positive legislative enactment authoriz[ing] specifically that which must always have been of necessity implied from the time the border patrol was first created.").

E. **Defendants' actions do not constitute a legislative rule.**

Texas wrongly contends that "Defendants' [purported] policy" of "destroying [its] concertina wire" is a legislative rule that "should have been subject to notice and comment." PI Mot. 28.[5] The "policy" as alleged by Texas does not constitute a legislative

---

[5] At points, Texas suggests that destroying the wire "is a sanction equivalent to a substantive rule" and "subject to notice and comment." PI Mot. 28, 30; *see id.* at 29 ("Defendants' sanction was also substantive."). These statements conflate two mutually exclusive concepts. *Compare* 5 U.S.C. § 551(4) (defining a "rule" as "an agency statement of general or particular applicability and future effect"), *with id.* § 551(10)(D) (defining a "sanction," in relevant part, as the past "destruction, taking, seizure, or withholding of property"). The notice-and-comment requirement applies only to certain rulemakings, *see id.* § 553(b)(A), and has no more relevance to sanctions than it does to adjudications, *see id.* § 554 (setting different procedures).

rule, and Border Patrol's actual guidance to its agents also is exempt from notice and comment because the guidance is at most a "general statement[] of policy," interpretative rule, or procedural rule. 5 U.S.C. § 553(b)(A).

The APA "does not define 'substantive rules,'" "statements of policy," or procedural rules. *Pros. & Patients for Customized Care v. Shalala*, 56 F.3d 592, 595 (5th Cir. 1995); *see also Perez v. Mortg. Bankers Ass'n*, 575 U.S. 92, 97 (2015). But at their essence, substantive rules or "[l]egislative rules are ones with the 'force and effect of law.'" *Mock v. Garland*, 75 F.4th 563, 578 (5th Cir. 2023). In contrast, statements of policy "leave[] the agency and its decisionmakers free to exercise discretion" and do "not impose any rights or obligations." *Texas v. United States*, 809 F.3d 134, 171 (5th Cir. 2015) (*DAPA*). Interpretive rules are "issued by an agency to advise the public of the agency's construction of the statutes and rules which it administers," and "do not have the force and effect of law." *Perez*, 575 U.S. at 97. And procedural rules are directed at the agency's internal workings, do not create new law, and do not have "a substantial impact on the regulated industry." *Dep't of Labor v. Kast Metals Corp.*, 744 F.2d 1145, 1153 (5th Cir. 1984).

Texas has failed to allege facts establishing that Defendants' purported "policy" is a legislative rule. The State does not show that the "policy" has the force and effect of law, imposes any rights or obligations, or affects individual rights. *Mock*, 75 F.4th at 579 (cleaned up).[6] Further, Texas has not alleged that the "policy" bears any of the hallmarks

---

[6] Texas claim that "the destruction of concertina wire changes the substantive standards by which [noncitizens] are permitted to enter the United States." PI Mot. at 30. That relies on an incorrect premise because migrants who have crossed the middle of the Rio Grande are already in the United States. *See* pp. 6-7, *supra*.

of a legislative rule—*e.g.*, that "the agency intend[s] to speak with the force of law"; that the "policy is published in the Code of Federal Regulations, with the agency "explicitly invok[ing] its general legislative authority"; or that the agency has "claimed *Chevron* deference." *Id.* at 580. Indeed, Texas has not pointed to any "language actually used by the agency" or shown that the "policy," as opposed to the exercise of statutory authority, "w[ould] produce significant effects on private interests." *Id.* (cleaned up).

In fact, to the extent that a policy exists, it is embodied in the informal guidance provided to Border Patrol agents that reinforced those agents' independent, day-to-day decisionmaking authority; the guidance qualifies, at most, as a general statement of policy, interpretative rule, or procedural rule. The informal guidance does not deny or limit the agents' discretion in how they apprehend or inspect noncitizens. *See* BeMiller Decl. ¶¶ 19-20. It arguably interprets the authority that the various statutes provide to Border Patrol agents, potentially making it an interpretative rule. *See id.* And because it informs agents in the field of the internal procedure for ensuring that supervisors are notified when wire is cut and that noncitizens receive emergency medical treatment, it could be considered a procedural rule. *Id.* The impact of this guidance is merely "derivative," "incidental," or "mechanical," and thus, the notice and comment procedures are inapplicable. *DAPA*, 809 F.3d at 176.

Texas has not shown that cutting wire in certain circumstances has a causal relation to "the security of Texas residents" or "the interests of Texas taxpayers." PI Mot. 30-31. If anything, it is Border Patrol's enforcement of immigration laws and the

noncitizens' decision to enter the United States that affects those interests. *See* Appx.030-062. Texas's notice-and-comment claim in Count 4 is therefore unlikely to succeed.

### F.  Defendants' actions are not arbitrary or capricious.

Even if Texas's claims were reviewable under the APA, the State is unlikely to succeed in showing that Defendants' actions were arbitrary and capricious. The arbitrary-and-capricious standard under the APA is "narrow and highly deferential." *Sierra Club v. U.S. Dep't of Interior*, 990 F.3d 909, 913 (5th Cir. 2021). Under that standard, a court considers "whether the decision was based on a consideration of the relevant factors and whether there has been a clear error of judgment." *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983); *accord Sierra Club*, 990 F.3d at 913. "[A] court is not to substitute its judgment for that of the agency[.]" *State Farm, 463 U.S. at 43; accord Sierra Club*, 990 F.3d at 913.

In this case, the agents' decisions to cut the wire were reasonable in that they furthered the agents' execution of their statutory duties. Indeed, Border Patrol guidance since at least the 1980s has advised agents to exercise their judgment to cut any lock or fencing that impedes their access to the area immediately adjacent to the border if such access is necessary to carry out their statutory duties to patrol the area or to inspect or apprehend noncitizens. BeMiller ¶ 6. Texas's allegations show as much. For each instance of wire-cutting that Texas identifies, it acknowledges that Border Patrol agents did so to apprehend, inspect, and process noncitizens who have already entered the United States. *See* Compl. ¶ 58 (identifying over 20 instances). Moreover, some agents' decision to use a front-end loader to lift the wire near Shelby Park—rather than cutting it—was to

minimize damage to the wire while still allowing the agents to carry out their duties. BeMiller Decl. ¶ 22. These actions in direct furtherance of statutory duties are reasonable and reasoned decisionmaking, and easily pass arbitrary-and-capricious review.

## II.   Texas Has Not Demonstrated That It Will Suffer Irreparable Harm.

Texas must "demonstrate[] that irreparable injury is *likely* in the absence of an injunction" to obtain its requested relief. *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 22 (2008). It identifies three alleged harms in merely two paragraphs: (1) the destruction of the concertina wire, (2) "expenditures in providing emergency medical services, social services and public education" due to "increased illegal entry into the State," and (3) frustration of "the State's ability to protect its residents from deadly fentanyl." PI Mot. at 37. None of these is sufficient to establish irreparable harm.

First, if the Court finds that Texas can assert state tort-law claims against the federal government, *see* Order at 7, any harm to the concertina wire itself is not irreparable. "Irreparable injury is 'harm for which there is no adequate remedy at law.'" *Anibowei v. Morgan*, 70 F.4th 898, 902 (5th Cir. 2023). "The *possibility* that adequate compensatory or other corrective relief will be available at a later date"—including in a subsequent, separate suit—weighs "heavily against a claim of irreparable harm." *Dennis Melancon, Inc. v. City of New Orleans*, 703 F.3d 262, 279 (5th Cir. 2012) (emphasis added); *id.* (noting a lack of irreparable harm where the plaintiffs "have recourse" in "the form of subsequent civil suits" to recover the amounts at issue). Monetary compensation would be an adequate remedy here, where the concertina wire is a mass-produced good, *see* Compl. ¶ 37, and damages "are the norm in actions involving personal property because

29

personal property is relatively fungible." *Towers Charter & Marine Corp. v. Cadillac Ins. Co.*, 894 F.2d 516, 523 (2d Cir. 1990); *accord Sambrana v. United Airlines, Inc.*, 2022 WL 486610, at *16-17 (5th Cir. Feb. 17, 2022) (Smith, J., dissenting) ("[H]arms to real property, every plot of which is unique, often call for equitable remedies, while harms to personal property do not."); Wright & Miller, 11A *Federal Practice & Procedure* § 2944 (3d ed.).

In issuing the TRO, this Court found that Texas would be irreparably harmed because money damages are unavailable for Texas's property damage. *See* Order at 8 ("the only 'harm' before this Court at the moment is the cost of the destruction of the Plaintiff's property, which is the wire barrier"). But Texas could pursue whatever remedies are available under the Federal Tort Claims Act (FTCA), which as discussed above, waives the federal government's sovereign immunity for money damages in certain circumstances. *See* 28 U.S.C. § 1346; *see also* 28 C.F.R. §§ 14.1-14.11 (governing process for seeking compensation for property damage from DHS). And even if damages were unavailable under the FTCA, authority exists for the settlement of claims "for damage to, or loss of, privately owned property caused by an investigative or law enforcement officer (as defined in section 2680(h) of Title 28) who is employed by the Customs Service and acting within the scope of his or her employment." 19 U.S.C. § 1630(a).

Second, Texas's purported harm of increased expenditures in providing emergency medical services, social services, and public education is not cognizable, let alone a basis for establishing irreparable harm. As the Supreme Court just held, Texas has no cognizable interest in how the federal government exercises its enforcement

discretion, *Texas*, 143 S. Ct. at 1970–71, and reframing that interest as "indirect effects on state revenues or state spending" does not overcome this "fundamental" problem, *id.* at 1972 n.3. Moreover, there is no way to know whether individuals Defendants apprehended after cutting wire would have otherwise entered Texas anyway.

Third, any alleged impairment of Texas's interest to protect its citizens from fentanyl is not cognizable in a suit against the Federal Government, and still less does it constitute irreparable harm. *Cf. Haaland v. Brackeen*, 143 S. Ct. 1609, 1640 (2023) (Texas had no standing to assert claim on behalf of its citizens because "[a] State does not have standing as *parens patriae* to bring an action against the Federal Government"). Moreover, even if such an asserted harm is cognizable here, there is no showing that Defendants' actions will have any impact on Texas's ability to protect its citizens from fentanyl. For example, it is unclear how the concertina wire would lead to Texas seizing or excluding fentanyl that it would not otherwise. And it is also unclear how obstructing Defendants' efforts to apprehend, inspect, and process noncitizens unlawfully entering the United States would lead to less fentanyl in circulation. Indeed, Texas notes that Defendants have made significant seizures of fentanyl, and it is difficult to see how frustrating those efforts would make Texans safer from illegal drugs. Compl. ¶ 3; *see* PI Mot. at 12 (noting CBP drug seizures increased in June and July 2023). As a result, Texas has failed to carry this essential part of its burden.

## III.   An Injunction Would Be Contrary To The Equities And The Public Interest.

In assessing whether to grant the "extraordinary remedy" of a temporary restraining order or preliminary injunction, courts "must consider the effect on each party

[and on the public] of the granting or withholding of the requested relief." *Winter*, <u>555 U.S. at 24</u>. "These factors merge when the Government is the opposing party." *Nken v. Holder*, <u>556 U.S. 418, 435</u> (2009). And here, the balance of equities decidedly tips against the issuance of any emergency relief.

Texas's requested relief will indisputably interfere with Defendants' efforts to interdict and inspect noncitizens unlawfully entering the country, including efforts to secure the Nation's borders. *See* BeMiller Decl. ¶ 15. Not only would it impede Defendants' enforcement of immigration laws, but it also would have national-security implications. As Texas acknowledges, it is important to apprehend and inspect noncitizens who have illegally crossed the border into the United States because they could be—and have been—terrorists, criminals, and smugglers. *See* Compl. ¶ 3; TRO Mot. at 7. Yet the requested relief would prevent federal agents from doing just that.

Similarly, Texas's requested relief would harm the foreign relations of the United States. Mexico has repeatedly lodged official complaints about Texas's placement of concertina wire. The foreign ministry of Mexico reported on July 14, 2023 that Mexico had "sent a diplomatic note to the United States [on June 26] to express its concern over the installation of a spiral fence of razor wire" and other installations and actions. Government of Mexico, Information Note No. 04 (July 14, 2023), https://perma.cc/V72L-GTXE. Mexico specifically "expressed its concern" that the concertina wire would "obstruct[] and diver[t] runoff into Mexican territory" and requested its removal. *Id.* The Mexican foreign ministry further reported that Mexico sent a follow-up note several weeks later "express[ing] its concern" over "alleged human rights violations" caused by

Texas's actions, including the deployment of concertina wire. Government of Mexico, Information Note No. 05 (July 26, 2023), https://perma.cc/F932-U9T9. Mexico requested that the federal government investigate possible impact on "the integrity of migrants" and risks of "serious damage [to] people's well-being." *Id.* A court order preventing Defendants from freely traversing the wire to offer emergency assistance to individuals already in the United States would exacerbate Mexico's concerns, affecting U.S. foreign relations.

On the other side of the ledger, Texas cites generalized concerns without showing that keeping concertina wire in place will address them in any appreciable manner. *See* PI Mot. at 37-38. That is insufficient to tip the scale in favor of Texas's requested relief, particularly given the weighty federal sovereignty interests at stake on the other side. The motion for preliminary injunction should be denied.

## CONCLUSION

For these reasons, Texas's motion for a preliminary injunction should be denied.

Dated: October 30, 2023

Respectfully submitted,

BRIAN M. BOYNTON
Principal Deputy Assistant Attorney General

JAIME ESPARZA
United States Attorney

JEAN LIN
Special Litigation Counsel

/s/ *Christopher A. Eiswerth*
Christopher A. Eiswerth (D.C. Bar 1029490)
Stephen Ehrlich (NY Bar No. 5264171)
Faith E. Lowry (TX Bar No. 24099560)
Trial Attorneys
U.S. Department of Justice
Federal Programs Branch, Civil Division
1100 L St., N.W.
Washington, D.C. 20005
Tel: (202) 305-0568 / Fax: (202) 616-8460
christopher.a.eiswerth@usdoj.gov

*Counsel for Defendants*

Exhibit T

Case 2:23-cv-00055 Document 26 Filed 12/04/2023 Page 1 of 21

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF TEXAS
DEL RIO DIVISION

| | | |
|---|---|---|
| THE STATE OF TEXAS, | § | |
| | § | |
| *Plaintiff*, | § | |
| | § | CIVIL ACTION NO. 2:23-CV-00055-AM |
| v. | § | |
| | § | |
| U.S. DEPARTMENT OF HOMELAND | § | |
| SECURITY, *et al.*, | § | |
| | § | |
| *Defendants*. | § | |

---

**PLAINTIFF'S REPLY IN SUPPORT OF
MOTION FOR PRELIMINARY INJUNCTION OR STAY OF AGENCY ACTION**

---

## TABLE OF CONTENTS

Table of Contents ........................................................................................................... ii

Table of Authorities ...................................................................................................... iii

Argument ......................................................................................................................... 1

   I.    This Court has jurisdiction to award the requested relief................................... 1

   II.   Texas is likely to succeed on the merits of its claims. ...................................... 2

      A.    Texas is likely to succeed on its conversion and trespass to chattel claims..................... 2

      B.    Texas is likely to succeed on its claims that Defendants violated the APA..................... 7

   III.  The State has pointed to an ongoing threat of irreparable harm........................................ 16

   IV.  The balance of the equities and public interest favor preliminary relief. ........................... 19

Conclusion...................................................................................................................... 20

Certificate of Service ................................................................................................... 21

TABLE OF AUTHORITIES

Page(s)

**Cases**

*Abbott Labs v. Gardner*,
    387 U.S. 136 (1967) ....................................................................................11

*All. for Hippocratic Med. v. FDA*,
    78 F.4th 210 (5th Cir. 2023) ........................................................................2

*Am. Trucking Ass'ns v. City of Los Angeles*,
    569 U.S. 641 (2013) ......................................................................................6

*Apter v. HHS*,
    80 F.4th 579 (2023) .....................................................................................15

*B.K. Instrument, Inc. v. United States*,
    715 F.2d 713 (2d Cir. 1983) (Friendly, J.) ............................................3, 5

*Barrick Goldstrike Mines Inc. v. Browner*,
    215 F.3d 45 (D.C. Cir. 2000) ......................................................................11

*Beathard Joint Venture v. W. Houston Airport Corp.*,
    72 S.W.3d 426 (Tex. App. 2002) ................................................................16

*In re Beef Processors, Inc.*,
    468 F.3d 248 (5th Cir. 2006) (en banc) ......................................................4

*Biden v. Texas*,
    142 S. Ct. 2528 (2022) .....................................................................1, 2, 9, 12

*Boiles v. City of Abilene*,
    276 S.W.2d 922 (Tex. App. 1955) ..............................................................16

*Central Pines Land Co. v. United States*,
    274 F.3d 881 (5th Cir. 2001) ........................................................................6

*Ciba–Geigy Corp. v. EPA*,
    801 F.2d 430 (D.C. Cir. 1986) ....................................................................11

*Clean Water Action v. EPA*,
    936 F.3d 308 (5th Cir. 2019) ......................................................................14

*Daniels Health Scis., L.L.C. v. Vascular Health Scis., L.L.C.*,
    710 F.3d 579 (5th Cir. 2013) ......................................................................20

*Data Mktg. P'ship, LP v. DOL*,
    45 F.4th 846 (5th Cir. 2022) ................................................................11, 12

*Dep't of Commerce v. New York*,
    139 S. Ct. 2551 (2019)..................................................................8, 19

*Department of Army v. Blue Fox, Inc.*,
    525 U.S. 255 (1999)..........................................................................4

*DHS v. Regents of Univ. of Cal.*,
    140 S. Ct. 1891 (2020)...................................................................8, 9

*DHS v. Thuraissigiam*,
    140 S. Ct. 1959 (2020)...............................................................10, 11

*United States ex rel. Drury v. Lewis*,
    200 U.S. 1 (1906)..............................................................................5

*E.T. v. Paxton*,
    41 F.4th 709 (5th Cir. 2022) (Oldham, J.) .......................................3

*Fort-Acre Spring Live Stock Co. v. W. Tex. Bank & Tr. Co.*,
    118 S.W. 790 (Tex. App. 1909)......................................................16

*Garland v. Aleman Gonzalez*,
    142 S. Ct. 2057 (2022).....................................................................2

*Graves v. New York ex rel. O'Keefe*,
    306 U.S. 466 (1939)..........................................................................5

*Her Majesty the Queen in Right of Ontario v. EPA*,
    912 F.2d 1525 (D.C. Cir. 1990) .....................................................11

*Holder v. Humanitarian Law Project*,
    561 U.S. 1 (2010)............................................................................20

*Hunsucker v. Phinney*,
    497 F.2d 29 (5th Cir. 1974) .............................................................7

*Irma Blas v. Rosen*,
    No. DR-18-CV-66-AM, 2019 WL 5199284 (W.D. Tex. July 16, 2019) ................................6

*Itar-Tass Russian News Agency v. Russian Kurier Inc.*,
    886 F. Supp. 1120 (S.D.N.Y. 1995)...............................................20

*Jean v. Nelson*,
    472 U.S. 846 (1985)........................................................................10

*Johnson v. Maryland*,
    254 U.S. 51 (1920) (Holmes, J.) .....................................................5

*La. Pub. Serv. Comm'n v. FCC,*
476 U.S. 355 (1986)............................................................................14

*Lumbermens Mut. Cas. Co. v. United States,*
654 F.3d 1305 (Fed. Cir. 2011)............................................................4

*Match-E-Be-Nash-She-Wish Band of Pottawatomi Indians v. Patchak,*
567 U.S. 209 (2012)..............................................................................5

*Mexican Gulf Fishing Co. v. U.S. Dep't of Com.,*
60 F.4th 956 (5th Cir. 2023) ..............................................................13

*Michigan v. U.S. Army Corps of Eng'rs,*
667 F.3d 765 (7th Cir. 2011) (Wood, J.) ..........................................3, 4

*Penn Dairies v. Milk Control Comm'n of Pennsylvania,*
318 U.S. 261 (1943)..............................................................................7

*Pennhurst State Sch. & Hosp. v. Halderman,*
465 U.S. 89 (1984)..............................................................................16

*Perry Capital LLC v. Mnuchin,*
864 F.3d 591 (D.C. Cir. 2017) .............................................................4

*Plyler v. Doe,*
457 U.S. 202 (1982)............................................................................18

*Puerto Rico v. United States,*
490 F.3d 50 (1st Cir. 2007) (Lipez, J.).................................................3

*Ramirez v. Immigr. & Customs Enf't,*
310 F. Supp. 3d 7 (D.D.C. 2018) ......................................................20

*Sackett v. EPA,*
566 U.S. 120 (2012)............................................................................12

*Sierra Club v. Peterson,*
228 F.3d 559 (5th Cir. 2000) .............................................................13

*South Carolina v. Baker,*
485 U.S. 505 (1988)..............................................................................6

*Texas v. Biden,*
646 F. Supp. 3d 753 (N.D. Tex. 2022) ................................................2

*Texas v. Biden (MPP),*
20 F.4th 928 (5th Cir. 2021) ...............................................9, 12, 18, 19

*Texas v. Brooks-LaSure*,
    No. 6:21-cv-191, 2021 WL 5154219 (E.D. Tex. Aug. 20, 2021) (Barker, J.) .......................... 3

*Texas v. EEOC*,
    933 F.3d 433 (5th Cir. 2019) ...................................................................... 11

*Texas v. Kleinert*,
    855 F.3d 305 (5th Cir. 2017) ...................................................................... 6

*Texas v. United States*,
    40 F.4th 205 (5th Cir. 2022) (per curiam) ................................................ 2

*Texas v. United States*,
    50 F.4th 498 (5th Cir. 2022) ...................................................................... 17

*Trudeau v. FTC*,
    456 F.3d 178 (D.C. Cir. 2006) (Garland, J.) ............................................ 3

*Trump v. Vance*,
    140 S. Ct. 2412 (2020) ............................................................................... 5

*United States v. Texas*,
    143 S. Ct. 1964 (2023) ............................................................................... 2

*United States v. Washington*,
    142 S. Ct. 1976 (2022) ............................................................................... 5, 6

*Wages & White Lion Invs., LLC v. FDA*,
    16 F.4th 1130 (5th Cir. 2021) ................................................................... 18, 19

*Weyerhaeuser Co. v. U.S. Fish & Wildlife Serv.*,
    139 S. Ct. 361 (2018) ................................................................................. 8

*Wilkie v. Robbins*,
    551 U.S. 537 (2007) ................................................................................... 5, 6

**Statutes**

5 U.S.C. § 551(4) ............................................................................................. 9

5 U.S.C. § 702 ............................................................................................. 3, 4, 5, 7

5 U.S.C. § 705 ................................................................................................. 2

5 U.S.C. § 706(2)(C) ...................................................................................... 14

6 U.S.C. § 202(5) ............................................................................................ 14

6 U.S.C. § 211(c)(2), (5), (6), (8) .................................................................. 14

8 U.S.C. § 701(a)(2) .................................................................................7, 8

8 U.S.C. § 1103(a)(3) ....................................................................................1

8 U.S.C. § 1103(a)(5) ..................................................................................14

8 U.S.C. §§ 1221-1232 .................................................................................1

8 U.S.C. § 1225(b)(2)(A) and § 1225(b)(1)(B)(ii) .......................................2

8 U.S.C. § 1225 and § 1226 ..........................................................................1

8 U.S.C. § 1226(c) and § 1231(a)(2) ............................................................2

8 U.S.C. § 1252(f)(1) ................................................................................1, 2

8 U.S.C. § 1324(a)(1)(A)(iv) ......................................................................16

8 U.S.C. § 1357(a)(3) .......................................................................1, 14, 15

28 U.S.C. § 1356 ...........................................................................................7

28 U.S.C. § 1367 ...........................................................................................7

90 Stat. 2721 (1976) ......................................................................................4

**Other Authorities**

42 C.F.R. § 440.225(c) ...............................................................................18

H.R. Rep. 94-1656 .........................................................................................4

ARGUMENT[1]

## I. This Court has jurisdiction to award the requested relief.

Defendants cannot justify their brazen destruction of another sovereign's property or their pattern of forcing line-level federal agents to violate their oaths to deter illegal entry and secure our Nation's border.[2] Perhaps that is why Defendants' lead argument asks this Court not to even look at these troubling actions. ECF 23-1 at 18–20.

Defendants claim that 8 U.S.C. § 1252(f)(1) "divests this Court of any jurisdiction." *Id.* at 18. But the Supreme Court recently made clear that, even where it applies, § 1252(f)(1) "does not deprive the lower courts of all subject matter jurisdiction." *Biden v. Texas*, 142 S. Ct. 2528, 2539 (2022). Instead, it limits their "power to issue a specific category of remedies," while "preserving th[e] [Supreme] Court's power to enter injunctive relief." *Id.*

More fundamentally, though, § 1252(f)(1) has no application to this case. That provision asks two things—whether the relief sought would "[1] enjoin or restrain the operation of [2] the provisions of part IV of this subchapter [8 U.S.C. §§ 1221-1232]." Most of the immigration-law provisions Defendants point to—including Defendants' vague authorization to take "other acts … deem[ed] necessary," 8 U.S.C. § 1103(a)(3), and their limited license to access private lands within 25 miles of the border, *id.* § 1357(a)(3)—simply do not fall within the specified provisions. ECF 23-1 at 10-14, 24-26, 31-33 (citing 6 U.S.C. §§ 202, 211; 8 U.S.C. §§ 1101, 1103, 1158, 1182, 1252, 1325, 1326, 1328, 1357); *see* ECF 23-1 at 18 (conceding "[t]he specified provisions [are codified at] 8 U.S.C. §§ 1221-1232").

The only provisions that matter, then, are 8 U.S.C. § 1225 and § 1226, which Defendants say require them to apprehend any alien that effects an illegal crossing into the United States. ECF 23-1 at 12, 19. The claim that these alien-processing provisions are mandatory is rich, coming from

---

[1] Plaintiff incorporates its briefing and exhibits in ECF Nos. 3-1, 3-2, 5, 5-1, 8, and 8-1. References to page numbers for filings are to the pagination stamped at the header by the ECF system.

[2] *See* Ali Bradley, *'Demoralizing': Border Patrol Agents Cut Razor Wire for Migrants*, NEWSNATION (Sept. 29, 2023), https://www.newsnationnow.com/us-news/immigration/video-border-patrol-agents-cut-razor-wire-for-migrants-in-texas/.

1

Defendants who previously grabbed for the power to ignore neighboring provisions mandating that various categories of aliens "shall" be detained. *See, e.g., United States v. Texas*, 143 S. Ct. 1964, 1968–69 (2023) (disclaiming any need to comply with 8 U.S.C. § 1226(c) and § 1231(a)(2)); *Biden*, 142 S. Ct. at 2535–37 (disclaiming any need to comply with 8 U.S.C. § 1225(b)(2)(A) and § 1225(b)(1)(B)(ii)). But what matters here is that Texas does not seek an order from this Court barring Defendants from apprehending and processing aliens under "the specified statutory provisions." *Garland v. Aleman Gonzalez*, 142 S. Ct. 2057, 2065 (2022). Instead, the State asks only that federal agents be ordered not to wantonly destroy property that is not theirs, in violation of state tort law.

Defendants' reading of § 1252(f)(1) as prohibiting any order that somehow touches on their preferred method of going about their work cannot be squared with common sense or Supreme Court precedent. A disgruntled CBP officer might find it convenient to assault TMD soldiers based on his opinion that they make his job harder. But an order enjoining him from committing future batteries would not be an order restraining him from processing aliens. That is why the Supreme Court already rejected an argument like Defendants' when it recognized that a court *may* issue injunctive relief "even if [it] has some collateral effect on the operation of a covered provision." *Aleman Gonzalez*, 142 S. Ct. at 2067 n.4. At most, that is all Defendants point to here. But in any event, the evidence shows CBP agents freely moving along the river on the Mexico side of the fence. Texas's property thus does not inhibit Defendants from passing out water bottles, processing aliens along the river, or directing them to federal entry points. And Defendants' naked assertion that they simply "must" destroy Texas's fence to process aliens does not prove otherwise. ECF 23-2 at 5.[3]

## II. Texas is likely to succeed on the merits of its claims.

### A. Texas is likely to succeed on its conversion and trespass to chattel claims.

---

[3] Nor would Defendants' reading of § 1252(f)(1) bar a stay of agency action under the Administrative Procedure Act (APA), 5 U.S.C. § 705, for a stay is not an injunction. *Texas v. Biden*, 646 F. Supp. 3d 753, 769 (N.D. Tex. 2022). Recent Fifth Circuit precedent confirms this. *See All. for Hippocratic Med. v. FDA*, 78 F.4th 210, 254 (5th Cir. 2023) ("In the same way that a preliminary injunction is the temporary form of a permanent injunction, a stay [under § 705] is the temporary form of vacatur."); *Texas v. United States (DACA)*, 50 F.4th 498, 528 (5th Cir. 2022) ("As an initial matter, § 1252(f)(1) does not apply to vacatur.").

**1.** As Texas explained before, this Court may never see a simpler case for common-law conversion or trespass to chattels. ECF 3-1 at 17–18, 21–28, 31–32 n.55; ECF 5 at 5. Defendants apparently do not disagree. They explicitly accept, for purposes of this motion, that Texas's wire fence, which Defendants' agents routinely damage, destroy, or meddle with, is lawfully in place. ECF 23-1 at 14 n.3; Reply.Appx. 008–016 (maps of Texas's fence placement). Having conceded those dispositive facts, Defendants offer no argument that Texas's claims for conversion or trespass would fail on the merits. By offering no merits argument whatsoever, Defendants tacitly concede that Texas is likely to prevail on its common-law tort claims, as this Court already recognized in granting a temporary restraining order. ECF 9 at 4–7; *see also Texas v. Brooks-LaSure*, No. 6:21-cv-191, 2021 WL 5154219, at *14 (E.D. Tex. Aug. 20, 2021) (Barker, J.) (holding that federal government's preliminary-injunction papers forfeited "insufficiently briefed" arguments).

**2.** They nevertheless insist (again) that justiciability rules prevent this Court from taking cognizance of admitted, repeated, and ongoing torts. But 5 U.S.C. § 702's broad waiver of federal sovereign immunity for non-monetary relief means what it says, and intergovernmental immunity does not give federal actors a blank check to perpetrate intentional torts. As Texas explained in its Complaint, ECF 1 at 5, the APA waives Defendants' federal-law immunity from suit for a claim like this one: "An action in a court of the United States seeking relief other than money damages and stating a claim that an agency  or an officer or an employee thereof acted or failed to act in an official capacity or under color of legal authority shall not be dismissed nor relief therein be denied on the ground that it is against the United States." 5 U.S.C. § 702. This plain text is clear—"[a]n action in" federal court "seeking relief other than money damages" means *any* action, whether under the APA, a different statute, or the common law.

Circuits across the country agree. *See, e.g., Trudeau v. FTC*, 456 F.3d 178, 186 (D.C. Cir. 2006) (Garland, J.); *B.K. Instrument, Inc. v. United States*, 715 F.2d 713, 724–25 (2d Cir. 1983) (Friendly, J.); *Puerto Rico v. United States*, 490 F.3d 50, 57–58 (1st Cir. 2007) (Lipez, J.); *Michigan v. U.S. Army Corps of Eng'rs*, 667 F.3d 765, 776 (7th Cir. 2011) (Wood, J.). So does the go-to source on federal jurisdiction. The Fifth Circuit (among others) recognizes that *Hart & Wechsler* is "the leading treatise" on questions

like this one. *E.T. v. Paxton*, 41 F.4th 709, 717 (5th Cir. 2022) (Oldham, J.). And it could not be clearer: "Though codified in the APA, the waiver [in § 702] applies to *any suit*, whether or not brought under the APA." RICHARD FALLON ET AL., HART & WECHSLER'S THE FEDERAL COURTS AND THE FEDERAL SYSTEM 902 (7th ed. 2015) (emphasis added); *see also* 90 Stat. 2721 (1976) (amending § 702 to waive federal sovereign immunity).

It is unsurprising, then, that the court tasked most often with interpreting the APA rejects Defendants' suggestion that this waiver is not broad enough to cover state-law causes of action: The "argument that § 702 does not waive its immunity from suit for state law claims is foreclosed by our precedent. We have repeatedly and expressly held in the broadest terms that the APA's waiver of sovereign immunity applies to any suit whether under the APA or not." *Perry Capital LLC v. Mnuchin*, 864 F.3d 591, 620 (D.C. Cir. 2017) (cleaned up). That accords with the Supreme Court's decision in *Department of Army v. Blue Fox, Inc.*, 525 U.S. 255 (1999). There, a subcontractor sought to use § 702 to press an equitable lien against the Army, *id.* at 256-58, based on "rights created by state law," *Lumbermens Mut. Cas. Co. v. United States*, 654 F.3d 1305, 1315 (Fed. Cir. 2011). If Defendants were right that § 702 can *never* apply to state-law claims, the Court could have simply said that. Instead, it held the waiver did not apply because "the sort of equitable lien sought by respondent here constitutes a claim for 'money damages.'" *Blue Fox*, 525 U.S. at 263 (quoting § 702). Meanwhile, the Fifth Circuit case Defendants cite did not involve § 702's waiver for non-monetary relief at all. *See In re Beef Processors, Inc.*, 468 F.3d 248, 251 (5th Cir. 2006) (en banc) (describing claim "seeking damages").

With no support in § 702's text or precedent, Defendants ask this Court to imply a limit found nowhere in a *different statute*: The Federal Tort Claims Act, they say, waives the federal government's immunity for torts and authorizes monetary relief; it thus "impliedly precludes" non-monetary relief for torts. ECF 23-1 at 21–22. Other Courts have rejected this argument for good reason—it "reads too much into congressional silence." *Michigan*, 667 F.3d at 775. Section 702 "requires evidence, in the form of either express language or fair implication, that Congress meant to forbid the relief that is sought." *Id.* But the FTCA's silence on injunctive relief is unhelpful and unsurprising because it concerned only monetary liability. Historical context, too, shows that § 702 was designed to add to

4

and "strengthen th[e] accountability" already provided by the FTCA. H.R. Rep. 94-1656, 1976 WL 14066, at *4 (Sept. 22, 1976); *see also B.K. Instrument*, 715 F.2d at 727. Texas "is bringing a different claim, seeking different relief, from the kind the [FTCA] addresses." *Match-E-Be-Nash-She-Wish Band of Pottawatomi Indians v. Patchak*, 567 U.S. 209, 222 (2012). The fact that this suit and the FTCA may deal with a "similar subject matter" (*i.e.*, torts) "is not itself sufficient" to "trigger a remedial statute's preclusive effect." *Id.* at 223.

**3.** In two paragraphs, Defendants—perhaps accidentally acknowledging that § 702 *could* extend to state-law claims—suggest that Texas's tort claims are barred by intergovernmental immunity, making the breathtaking claim that state law can never interfere with operations of the federal government. ECF 23-1 at 22–23. Surely Defendants do not think a federal agent would be immune from a state criminal prosecution for murder simply because he was wearing a badge when he killed the victim. *See United States ex rel. Drury v. Lewis*, 200 U.S. 1, 3, 7–8 (1906) (no intergovernmental immunity for federal officer and enlisted soldier who murdered a civilian on municipal or private land in Pennsylvania). And while pointing to recent Supreme Court decisions as somehow supportive, Defendants neglect to mention that *Trump v. Vance*, 140 S. Ct. 2412, 2424–29 (2020), unanimously *approved* the issuance of state criminal subpoenas to a sitting President of the United States in the face of an argument that it would impair the performance of his duties, and that *United States v. Washington*, 142 S. Ct. 1976, 1984 (2022), prohibited only an effort to "singl[e] out the Federal Government for unfavorable treatment" under state law. The older cases Defendants cite are no more helpful: "Of course an employee of the United States does not secure a general immunity from state law"—including tort liability—"while acting in the course of his employment." *Johnson v. Maryland*, 254 U.S. 51, 56 (1920) (Holmes, J.); *see also Wilkie v. Robbins*, 551 U.S. 537, 560 (2007) ("the tort or torts by Governmental employees would be so clearly actionable under the general [common] law").

The idea that federal agents might be subject to state tort law on occasion—on equal terms with everyone else—does not "flip[] the Supremacy Clause on its head." ECF 23-1 at 23. It merely respects our system of federalism, in which agents of a federal government vested with limited and enumerated powers must often operate within state governments of unenumerated powers. *See, e.g., Graves v. New*

*York ex rel. O'Keefe*, 306 U.S. 466, 486–87 (1939) (states may tax federal officials, employees, and property). Defendants' two-paragraph recitation of platitudes about federal power, without any explanation of the how the cases they cite support their claim, makes no serious effort to show why the immunity applies. It thus forfeits any argument on this affirmative defense. *Cf. Irma Blas v. Rosen*, No. DR-18-CV-66-AM, 2019 WL 5199284, at *4 (W.D. Tex. July 16, 2019).

In any event, the argument would fail. For one thing, under binding Fifth Circuit precedent intergovernmental immunity applies "only when a federal officer is held *in the state court* to answer" for official actions. *Texas v. Kleinert*, 855 F.3d 305, 314 (5th Cir. 2017) (emphasis added). Defendants do not—and cannot—complain that they will not receive a fair shake in federal court. And this Court may not ignore that precedent. *See Central Pines Land Co. v. United States*, 274 F.3d 881, 893 (5th Cir. 2001) (following rule of orderliness in intergovernmental-immunity case).

After ignoring Fifth Circuit precedent, Defendants run headfirst into Supreme Court precedent. The broad version of intergovernmental immunity that Defendants press here "has been thoroughly repudiated by modern intergovernmental immunity caselaw." *South Carolina v. Baker*, 485 U.S. 505, 520 (1988). Intergovernmental immunity applies only where a state (1) "regulate[s] the United States directly" or (2) "discriminates against the Federal Government or those with whom it deals." *Washington*, 142 S. Ct. at 1984. Texas's invocation of its own property rights under state tort law does not "regulate" anyone—much less the United States. Each government (whether federal or state) "deals with its neighbors as one [property] owner among the rest." *Wilkie*, 551 U.S. at 558. And Texas acts here as a property owner, not as a regulator. *Cf. Am. Trucking Ass'ns v. City of Los Angeles*, 569 U.S. 641, 649–50 (2013). Moreover, invoking generally applicable tort principles treats Defendants equally. Just like the federal government has authority "to enforce the trespass and land-use rules" in favor of its own property interests, so too do those whom it trespasses against. *Wilkie*, 551 U.S. at 558. (If anything, Texas has treated the federal government *more favorably* than other tortfeasors: By now, state officials would have arrested private individuals who engaged in the destructive campaign being carried out by the federal government.) To the extent restrictions on destroying someone else's property creates any burden at all, it is the *same* burden borne by everyone who operates in Texas; "state

regulation … inevitably imposes some burdens on the national government of the same kind as those imposed on citizens of the United States within the state's borders" without invading federal functions. *Penn Dairies v. Milk Control Comm'n of Pennsylvania*, 318 U.S. 261, 271 (1943).[4]

\*       \*       \*

Invocations of § 702 to press state-law claims may be rare. One might hope that is because most federal agents are not brazenly perpetrating ongoing torts. But it will not stay that way if this Court becomes the first ever to accept the argument that federal sovereign immunity precludes all state-law claims despite § 702, that intergovernmental immunity confers a blank check to violate local laws, and that federal agents are nowhere accountable for the intentional destruction of property.

### B.  Texas is likely to succeed on its claims that Defendants violated the APA.

Defendants do engage on the merits of Texas's APA claims. But their arguments largely hinge on ignoring uncontested facts: Defendants and their agents have damaged, destroyed, or otherwise interfered with Texas's concertina-wire fence on almost a daily basis since September 20, 2023. In public statements, officials have stated that DHS's policy allows agents to do so anytime an alien crosses the Rio Grande, even absent an acute medical exigency. And Defendants never subjected that policy to public notice and comment, explained how it is consistent with statutes that task Defendants with deterring illegal entry, or acknowledged the arbitrariness of destroying Texas's barriers to entry while building federal barriers designed to do the same thing.

**1.** At the outset, Defendants argue their challenged practice of declaring open season on someone else's property is "committed to agency discretion by law," 8 U.S.C. § 701(a)(2), and is therefore unreviewable under the APA. *See Heckler v. Chaney*, 470 U.S. 821 (1985). But it is simply not true that the policy Texas identifies rests on boundless discretion. Although Defendants repeatedly insist their

---

[4] Defendants briefly suggest that Texas may not rely on 28 U.S.C. § 1356 for subject-matter jurisdiction over its tort claims. ECF 23-1 at 20 n.4. But they cite only one case that declined jurisdiction based on a specific carveout from this general grant. *See Hunsucker v. Phinney*, 497 F.2d 29, 31 (5th Cir. 1974) (citing the Tax Anti-Injunction Act). Defendants point to no similar carveout covering Texas's tort claims. Nor do they dispute that—on the plain text—this action concerns the "seizure [of property] … on land," which Defendants claim is permitted "under a[] law of the United States." ECF 23-1 at 31–33.

policy builds in "discretion" or "independent judgment" in "fast-moving situations," ECF 23-1 at 24–27, elsewhere they argue that the *only* thing their agents and employees are empowered to do once an alien manages to get a toe across the international boundary is apprehend them, ECF 23-1 at 15, 19; ECF 23-2 at 4, and they *must* move or destroy Texas's fence in order to fulfill that statutory mandate, ECF 23-2 at 5. Tellingly, line-level agents have described feeling "demoralized" at being "compelled to" participate in the destruction of property, disserving their mission of deterring illegal entries in the process. *Supra* at 1 n.1. Meanwhile, undisputable video evidence shows agents are *not* apprehending the aliens they wave through Texas's fencing. ECF 3-2 at 31, 33. Defendants cannot have it both ways. It cannot be the case that agents *must* apprehend (rather than repel back across the border) any alien they see and *must* destroy property (rather than utilize federal resources on the Mexico side of the fence) to fulfill that statutory mandate, yet all of this somehow consists of "unbounded" discretion. *Dep't of Commerce v. New York*, 139 S. Ct. 2551, 2568 (2019).

In any event, the fact that an agency's course of action includes some measure of discretion is not the litmus test for when a question is committed to the agency for purposes of § 701(a)(2). The Supreme Court has explained, time and again, that it "read[s] the exception in § 701(a)(2) quite narrowly, restricting it to 'those rare circumstances where the relevant statute is drawn so that a court would have no meaningful standard against which to judge the agency's exercise of discretion.'" *Weyerhaeuser Co. v. U.S. Fish & Wildlife Serv.*, 139 S. Ct. 361, 370–372 (2018). In other words, the Court "ha[s] generally limited the exception to 'certain categories of decisions that courts traditionally have regarded as 'committed to agency discretion,'" where discretion really is "unbounded" and subject to "no meaningful standard" of review. *New York*, 139 S. Ct. at 2567–69. The destruction of private property "is not one of those areas traditionally committed to agency discretion." *Id.* at 2568. To the extent Defendants believe some common-law or statutory privilege justifies their ongoing trespass to someone else's property, the application of tort principles "involves the sort of routine dispute" that courts regularly decide. *Weyerhaeuser*, 139 S. Ct. at 370.

Defendants' claim that their domain is especially exempt from judicial scrutiny because it implicates "national-security interests," ECF 23-1 at 26, is impossible to square with the Supreme

Court's application of these same standards to DHS. *See, e.g., DHS v. Regents of Univ. of Cal.*, 140 S. Ct. 1891, 1905–07 (2020) (DHS's discretionary enforcement decisions were amenable to judicial scrutiny because non-enforcement could affect the sorts of "interest[s] 'courts often are called upon to protect.'"). Just last year the Supreme Court stated that DHS's authority "is not unbounded" despite a statute granting the Secretary authority "in his discretion" to act "under such conditions as he may prescribe"; instead, "DHS's exercise of discretion within that statutory framework must be reasonable and reasonably explained." *Biden*, 142 S. Ct. at 2543–44. Thus, even broad grants of discretion to an agency whose work touches on national security do not preclude review under the APA.

The fact that Defendants' policy is also a "rule" under the APA underscores its amenability to judicial review. A rule is "an agency statement of general ... applicability and future effect" that either "prescribe[s] law or policy" or "describe[s] [agency] organization, procedure, or practice requirements. 5 U.S.C. § 551(4). And § 701(a)(2)'s nonreviewability limit "does not apply to agency rules." *Texas v. Biden (MPP)*, 20 F.4th 928, 978 (5th Cir. 2021) (citing *Heckler*, 470 U.S. 821). That limit applies, "if at all, to one-off agency enforcement decisions rather than to agency rulemakings." *Id.* at 984. Defendants' ongoing policy does not fall within that category. The actions Texas challenges here are not mere "nonenforcement" or "a refus[al] to institute proceedings against a particular entity or even a particular class." *Regents*, 140 S. Ct. at 1906. Instead, Texas challenges an established policy, pattern, or practice of affirmatively damaging another sovereign's property. These actions "provide[] a focus for judicial review" under the APA. *Id; see also Texas v. United States (DAPA)*, 809 F.3d 134, 168 (5th Cir. 2015) ("where there is affirmative agency action … the action at least can be reviewed to determine whether the agency exceeded its statutory powers.") (citations omitted). Where "an agency *does* act to enforce, that action itself provides a focus for judicial review, inasmuch as the agency must have exercised its power in some manner," and "[t]he action at least can be reviewed to determine whether the agency exceeded its statutory powers." *DAPA*, 809 F.3d at 166.

**2.** Defendants have an established policy, pattern, or practice that they never subjected to public notice and comment. ECF 3-1 at 34–37; ECF 5 at 5–6. The sheer volume of similar incidents, coupled with repeated public statements from DHS itself, demonstrates that. Defendants claim Texas has not

pointed to any statement. ECF 27-1 at 28. The APA, of course, does not require that given the possibility of unwritten policies. *See, e.g., Jean v. Nelson,* 472 U.S. 846, 851 (1985) (discussing "unwritten INS policy put into place in the first half of 1981"). But Texas *has* repeatedly pointed to such statements indicating a policy that concertina wire fencing must be cut or moved anytime aliens are present. On June 30, 2023, a spokesperson for CBP justified federal officials' cutting Texas's fence as "consistent w/ federal law" simply because "[t]he individuals had already crossed the Rio Grande from Mexico [and] were on U.S. soil." *See* ECF 3-1 at 22 (citing CBP statement). On October 24, 2023, in response to inquiries about this lawsuit concerning Defendant's destruction of state property, a DHS spokesperson said: "Border Patrol agents have a responsibility under federal law to take those who have crossed onto U.S. soil without authorization into custody for processing." *See* ECF 5 at 6 n.1 (citing DHS statement). And just this past week, Defendants reiterated the same policy in identical terms in statements to numerous news outlets after this Court granted a TRO.[5] Now, in a declaration submitted with their response, Defendants say no policy has been "issued" while at the same time admitting that DHS has instructed its employees on "issues related to obstructions" near the border for decades based on the idea that an alien "has already made entry into the United States" as soon as he crosses the Rio Grande. ECF 23-2 at 3–5.[6] An agency cannot turn an APA vice (*i.e.,* failing to issue a policy for public notice and comment) into a tool for avoiding the APA itself (*i.e.,* no policy thus "exists"). It would be hard to find evidence more clearly attesting to a policy that federal agencies chose not to share with the world.

At this stage, the record more than amply demonstrates Texas's likelihood of success in showing

---

[5] *See, e.g.,* J. David Goodman, *Judge Orders Border Agents to Stop Cutting Texas' Barbed Wire Fence,* N.Y. TIMES (Oct. 30, 2023), https://www.nytimes.com/2023/10/30/us/texas-border-concertina-wire-judge-paxton.html (quoting DHS spokesman Luis Miranda); Ryan King, *Texas Scores Wire-Cutting Win in Border Battle with Biden Agents,* N.Y. POST (Oct. 30, 2023), https://nypost.com/2023/10/30/news/texas-scores-a-win-in-border-battle-with-biden-administration/ (same).

[6] The central premise of Defendants' policy—that any alien who manages to cross the border has already entered the United States—is not even correct: "[A]n alien who is detained shortly after unlawful entry cannot be said to have 'effected an entry.' Like an alien detained after arriving at a port of entry, an alien like respondent is 'on the threshold.'" *DHS v. Thuraissigiam,* 140 S. Ct. 1959, 1982–83 (2020) (quoting *Zadvydas v. Davis,* 533 U.S. 678, 693 (2001), and *Shaughnessy v. United States ex rel. Mezei,* 345 U.S. 206, 212 (1953)).

the policy required public notice and comment. It is "final agency action" that "mark[s] the consummation of the agency's decisionmaking process." *Data Mktg. P'ship, LP v. DOL*, 45 F.4th 846, 853 (5th Cir. 2022). And Texas's "rights or obligations"—just like the rights of others with private property in close proximity to the Texas-Mexico border—have indisputably been impaired. *Id.* Texas need only show that it is "direct[ly] and immediate[ly]" impacted by Defendants' guidance in the form of "direct effect on [its] day-to-day business." *Abbott Labs v. Gardner*, 387 U.S. 136, 152 (1967). "The Supreme Court has long taken a pragmatic approach to finality, viewing the APA's finality requirement as 'flexible.'" *Texas v. EEOC*, 933 F.3d 433, 441 (5th Cir. 2019) (cleaned up). Because Defendants unlawfully direct the destruction of Texas's concertina-wire fence, directly impacting Texas's property rights, Texas must expend, and has expanded, substantial time and resources to repair its wires, affecting its day-to-day work.

"Final agency action may result from a series of agency pronouncements rather than a single edict." *Barrick Goldstrike Mines Inc. v. Browner*, 215 F.3d 45, 48–49 (D.C. Cir. 2000) (cleaned up). "Hence, a preamble plus a guidance plus an enforcement letter from [an agency] could crystallize an agency position into final agency action." *Id.; see also Ciba-Geigy Corp. v. EPA*, 801 F.2d 430, 436 n.8 (D.C. Cir. 1986) (final agency action consisted of a "series of steps taken by EPA" culminating in a letter from an EPA official clarifying the agency's position). This is consistent with the "flexible and pragmatic way" in which courts apply the finality requirement. *Her Majesty the Queen in Right of Ontario v. EPA*, 912 F.2d 1525, 1531 (D.C. Cir. 1990).

The declaration submitted by Defendants never disavows that USBP has a policy of sanctioning the destruction of private property anytime an agent sees an alien. Instead, it practically admits such a policy exists, albeit claiming that it contains certain limits that agents are not even following. ECF 23-2, BeMiller Decl. ¶6.[7] Nothing about it is merely "tentative or interlocutory [in] nature." ECF 23-1 at

---

[7] Defendants have not "work[ed] with [Texas] to gain access" to the river. *Id.* They have not taken steps to "close" or make "repairs" to the fences they destroy. *Id.* And they have not "ameliorate[d] any damage." *Id.* The notion that using hydraulic-powered tractors to tear fence posts out of the ground and to smash wire into a pulverized mass of tangled metal was an effort "to minimize damage to the wire" should not be taken seriously. ECF 23-1 at 16–17.

27. It strains credulity to suggest that the policy implemented by Defendants or their agents (who have damaged, destroyed, or otherwise interfered with Texas's concertina-wire fence on a near-daily basis since September 20, 2023) is "subject to further Agency review." *Sackett v. EPA*, 566 U.S. 120, 127 (2012) (citation omitted). "An action is either final or not, and the mere fact that the agency could— or actually does—reverse course in the future does not change that fact." *Data Marketing*, 45 F.4th at 854.

Defendants admit that CBP "has provided general guidance to individual officers concerning Texas's concertina wire," but insist that this guidance is subject to "agents' independent on-the-ground decisionmaking," and that requisite subsequent implementation makes the policy not final. ECF 23-1 at 29–30. As an initial matter, all rules are implemented down the line by orders to particular parties, and this does not serve to deprive the rules of finality. *See MPP*, 20 F.4th at 948 (rejecting argument that agency action was not "final until the agency applies it 'in a particular situation' to an affected person or entity"); *Biden*, 142 S. Ct. at 2545 n.7 ("The fact that the agency could not cease implementing MPP, as directed by the October 29 Memoranda" until the occurrence of a contingent event "did not make the October 29 Memoranda any less the agency's final determination of its employees' obligation to do so once such" an event would occur). And Defendants' own evidence reveals that agents have no such discretion in locations "where concertina wire is present" if the alternative would "force [aliens] who have entered the United States to leave the immediate area of the Rio Grande River" by "[t]ravers[ing] the river's shoreline." BeMiller Decl. ¶13.

In any case, the APA is routinely used to challenge policies that bake in discretion. ECF 23-1 at 27–30. That makes good sense—because every upstream policy requires downstream implementation by federal actors. For the same reason, the fact that this policy is implemented downstream does not mean it is committed to agency discretion. ECF 23-1 at 24–27. Because Defendants' policy applies anytime an alien is "present," it hardly requires "balanc[ing] a variety of factors in fast-moving situations."

To the extent Texas's modest request for an injunction against the destruction of its concertina-wire fencing may result in a change to some of DHS's policies and practices, that does not convert

Texas's claim into an impermissible "programmatic attack" on border policy, as Defendants suggest. ECF 23-1 at 29. Federal law differentiates between the subject of suit and the incidental effects of relief, clarifying that the APA permits challenges to "a specific 'final agency action' [which] has an actual or immediately threatened effect,' even when such a challenge has 'the effect of requiring a regulation, a series of regulations, or even a whole program to be revised by the agency.'" *Sierra Club v. Peterson*, 228 F.3d 559, 567 (5th Cir. 2000) (citation omitted).

**3.** Defendants' policy of declaring open season on property that belongs to someone else—indeed, property that serves as a barrier to illegal entry—is arbitrary and capricious. ECF 3-1 at 37–39; ECF 5 at 6. Defendants make no serious effort to reconcile their policy of destroying barriers with DHS's recent acknowledgment of an acute and immediate need for barriers.[8] Indeed, they do not even *discuss* that fact, which attests to a "fail[ure] to consider an important aspect of the problem." *Mexican Gulf Fishing Co. v. U.S. Dep't of Com.*, 60 F.4th 956, 971 (5th Cir. 2023) (quoting *Motor Veh. Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983)). Federal property—*i.e.*, fencing being constructed near Brownsville, Texas—gets to stand. Meanwhile, Texas property—*i.e.*, fencing being maintained near Eagle Pass, Texas—gets cut open, ripped up, or torn down on a daily basis. It would be hard to find a clearer picture of arbitrariness.

But even if Defendants had attempted to justify this unequal treatment, they have not "consider[ed] the costs and benefits" of cutting Texas's concertina-wire barriers. *Id.* at 971, 973. Defendants' own testimony reflects reliance on claimed benefits of reducing "injury and/or the loss of life of noncitizens attempting to enter the United States" without considering the impact on deterrence. BeMiller Decl. ¶16. All of that despite federal actors recognizing that concertina-wire

---

[8] DHS "says deterrence of illegal border activities is achieved *primarily* through border barriers." *GLO v. Biden*, 71 F.4th 264, 273 (5th Cir. 2023) (emphasis in original); *id.* ("DHS has affirmed that border barriers funnel illegal immigrants to areas where Customs and Border Protection is better prepared to intercept them, thus reducing illegal immigration," and "[i]n the absence of longer walls, at least some illegal aliens who otherwise would have been prevented from entering Texas will seek driver's licenses, education, and healthcare from Texas."); *see also* ECF 5 at 7 n.2 (recent DHS federal register notice stating that "[t]here is presently an acute and immediate need to construct physical barriers and roads in the vicinity of the border of the United States in order to prevent unlawful entries into the United States.")

barriers have undisputed benefits that Defendants have previously recognized. *See* Storrud Decl. ¶¶3-4, 7–16, Reply.Appx.002, 003–006 (detailing how federal employees collaborated with and even requested help from TMD to deploy concertina-wire fencing near El Paso, Texas, to deter illegal migration, protect federal and state law enforcement officers, and route aliens to safe, legal ports of entry).

**4.** The APA prohibits agency action "in excess of statutory jurisdiction, authority, or limitations." 5 U.S.C. § 706(2)(C). As "mere creatures of statute," federal agencies are likewise subject to *ultra vires* actions when they exceed their statutory authority. *Cf. Clean Water Action v. EPA*, 936 F.3d 308, 313 (5th Cir. 2019); *see also La. Pub. Serv. Comm'n v. FCC*, 476 U.S. 355, 374 (1986) ("[A]n agency literally has no power to act … unless and until Congress confers power upon it."). Defendants' policy and the actions taken pursuant to it plainly exceed any statutory authority or otherwise amount to *ultra vires* actions. ECF 3-1 at 32–34, 39–42; ECF 5 at 6.

Defendants' own recitation of the origins behind Congress's decision to enact 8 U.S.C. § 1357(a)(3) shows why: Defendants have the "duty to control and guard the boundaries and borders of the United States against the illegal entry of aliens." 8 U.S.C. § 1103(a)(5). "Before Congress enacted § 1357(a)(3)," however, USBP's operations were "seriously impaired by the refusal of some property owners along the border to allow patrol officers access to extensive border areas in order *to prevent such illegal entries.*" ECF 23-1 at 11-12, 31–32 (emphasis added). Consistent with that focus on preventing illegal entries, federal law tasks Defendants with setting "national immigration enforcement policies and priorities," 6 U.S.C. § 202(5), in order to "ensure the interdiction of persons and goods illegally entering the United States," "detect, respond to, and interdict terrorists, drug smugglers and traffickers, human smugglers and traffickers, and other persons who may undermine the security of the United States," "safeguard the borders of the United States," and "enforce and administer all immigration laws." 6 U.S.C. § 211(c)(2), (5), (6), (8).

Here, Defendants have taken the position that they have no power to repel illegal entries as soon as an alien gets one inch past the border, that they must adopt an approach to apprehension that encourages illegal entry by routinely opening barriers to entry, and that, upon invoking that basis for

destroying Texas property, they need not actually apprehend aliens at all. Despite claiming their policy hinges on aliens effecting a crossing of the border and a need to apprehend, Defendants and their agents have created breaches in Texas's wire fencing *before* aliens even cross the border, ECF 3-2 at 23, and they have given migrants who pass through the fence freedom to move about the country, *id.* at 31, 33. Congress has not authorized Defendants to destroy State property for the purpose of facilitating unlawful entry into the United States. Not one of the provisions cited above authorizes Defendants to destroy and seize border infrastructure belonging to another sovereign to facilitate unlawful entry of aliens into the United States. The only statutory provision that even comes close authorizes Defendants to "have access to private lands, but not dwellings, for the purpose of patrolling the border *to prevent the illegal entry of aliens* into the United States." 8 U.S.C. § 1357(a)(3) (emphasis added). That provision provides no support whatsoever for a policy that is admittedly not about preventing illegal entry.

Defendants also rely on their general "power and duty to control and guard the boundaries and borders of the United States against the illegal entry of [noncitizens]" and to "perform such other acts as … necessary for carrying out [t]his authority." ECF 23-1 at 31 (quoting 8 U.S.C. § 1103(a)(3), (5)). But such general provisions do not extend limitless discretion, particularly to authorize the destruction of another sovereign's property for convenience rather than necessity.[9] The FDA made a similar argument in a recent case, pointing to the purpose statement in its authorizing Act reflecting the FDA's "general mission to protect the public health." *Apter v. HHS*, 80 F.4th 579, 589 (2023). The Fifth Circuit was unpersuaded, reasoning that general "statements of purpose … cannot override a statute's operative language." *Id.* (quoting *Sturgeon v. Frost*, 139 S. Ct. 1066, 1086 (2019)). Because the FDA could not point to "plain text" that "authorize[d] FDA to issue medical advice or recommendations," its "argument from the Act's purpose statement … leads nowhere." *Id.*

---

[9] The Fifth Circuit has rejected similar attempts by Defendants: "the broad grants of authority in 6 U.S.C. § 202(5), 8 U.S.C. § 1103(a)(3), and 8 U.S.C. § 1103(g)(2) cannot reasonably be construed as assigning decisions of vast economic and political significance" to DHS. *DAPA*, 809 F.3d at 183.

Far from being authorized by statute, Defendants' conduct would subject individual actors to criminal prosecution. A person who "encourages or induces an alien to come to, enter, or reside in the United States, knowing or in reckless disregard of the fact that such coming to, entry, or residence is or will be in violation of law" commits a felony offense. 8 U.S.C. § 1324(a)(1)(A)(iv). By creating gaps in Texas's concertina-wire fence, Defendants are rolling out the red carpet to illegal entry by aliens assembled across the Rio Grande. *See, e.g.*, Banks Decl. ¶¶15–20, Appx.020–025.

Congress has not granted Defendants authority to destroy Texas's property to facilitate unlawful migration. Texas is therefore likely to succeed on its claim that they have acted "without any authority whatever," *Pennhurst State Sch. & Hosp. v. Halderman*, 465 U.S. 89, 101 n.11 (1984), or have acted *ultra vires*.

### III. The State has pointed to an ongoing threat of irreparable harm.

First, the ongoing tortious damage of private property *is* irreparable. That is precisely why Texas courts permit awarding injunctive relief rather than damages. ECF 3-1 at 32 (citing cases). Defendants have inflicted monetary harm on Texas in the past and Texas may well choose to vindicate its right to pursue those remedies under the FTCA later. But money damages for past invasions are not an adequate remedy for a party being subjected to "repeated or continuing" invasions of its property rights, which inflict "irreparable injury." *Beathard Joint Venture v. W. Houston Airport Corp.*, 72 S.W.3d 426, 432 (Tex. App. 2002). "Many authorities support the rule that injunction is a proper remedy to restrain repeated or continuing trespasses." *Boiles v. City of Abilene*, 276 S.W.2d 922, 925 (Tex. App. 1955) (collecting cites); *see also Fort-Acre Spring Live Stock Co. v. W. Tex. Bank & Tr. Co.*, 118 S.W. 790, 791 (Tex. App. 1909) (approving award of injunction for "continuing" trespass). Even if Texas could recover the costs for each time Defendants damage it in the future, that *still* would not fully compensate the State for its harms. The fence is not a mere decoration with a value equal to its material parts—it performs a function that reduces the flow of illegal aliens into the State and the resulting costs. There is no way to compensate Texas for the lost utility of the fence as a fence. That by itself suffices to show that Texas will likely suffer irreparable harm absent a preliminary injunction.

With respect to the consequences flowing from illegal entry, Defendants confusingly claim that Texas identified harm "in merely two paragraphs." ECF 23-1 at 37. Not so. Texas explained at length the litany of harms flowing directly from illegal entry into Texas. ECF 3-1 at 9–14. And it should be common sense that concertina wire deters unauthorized entries and the harms associated with them. If that were not enough, though, Texas also cited the widespread practice using concertina wire around sensitive locations and statements from Defendants themselves admitting that it helps deter illegal entry. ECF 3-1 at 15–17. In fact, after this Court granted the TRO, Texas discovered that federal agents have themselves proposed that Texas deploy concertina-wire fencing to help deter illegal entry. *See* Storrud Decl. ¶¶3–4, 7–16, Reply.Appx.002, 003–006. The notion that Texas's concertina-wire fencing has not completely prevented illegal migration is beside the point. Texas is entitled to take efforts to *reduce* the flow of illegal migration and associated harms. And in any event, outlets criticizing the fence's effectiveness describe in the same breath how *the federal government is routinely cutting the wire.*[10] A fence that everyone knows will be destroyed anytime someone stands opposite it cannot serve as an effective fence. Defendants cannot rely on their own tortious conduct of destroying fences to establish that fences do not deter illegal entry.

In addition to the costs of repairs to state property and increased crime and human suffering because of unchecked illegal migration, Texas will also incur uncompensated "expenditures in providing emergency medical services, social services and public education for illegal aliens." *Texas v. DACA*, 50 F.4th at 518. The record in this case describes how the City of Eagle Pass was overwhelmed by a one-week surge of migrants facilitated by the federal Defendants. Understandably, city leaders declared a state of emergency and requested funding from the State. ECF 3-1 at 19; ECF 3-2 at 21. That same dynamic is sure to ripple across the State: In just the past two years, the number of aliens who illegally crossed the southern border in Texas was 2.6 million—greater than the population of

---

[10] *See, e.g.*, Patrick J. McDonnell & Hamed Aleaziz, *Razor Wire and Soldiers Fail to Deter Migrants: 'They Say Its Easier to Get in with Kids,'* L.A. Times (Oct. 2, 2023), https://www.latimes.com/world-nation/story/2023-10-02/razor-wire-soldiers-fail-deter-migrants-border (explaining how "day and night in Eagle Pass" federal agents "use[] pliers to cut open a passage through the thickets of barbed wire" and destroy the fence "soon" after TMD soldiers "roll[] out fresh loops to patch [a] hole").

the City of Houston.[11] Future public welfare expenditures are sure to come and past payouts may be unrecoverable because of the federal government's sovereign immunity. *Wages & White Lion Invs., LLC v. FDA*, 16 F.4th 1130, 1142 (5th Cir. 2021). Damages would not be available to cover that. *See MPP*, 20 F.4th at 1002 (Texas satisfied irreparable injury prong because costs from aliens in the State could not be recovered from federal government). Consider just a few areas where the State's expenditures are impacted by illegal migration, which Defendants' policy facilitates.[12]

First, the State funds healthcare programs that cover illegal aliens. Federal law requires Texas to include illegal aliens in its Emergency Medicaid program. *See* 42 C.F.R. § 440.225(c). That costs the State tens of millions of dollars annually. *See* Bricker Decl. ¶8, Appx.036–037 (estimating costs between $72 million and $116 million for various years). And Texas's Children's Health Insurance Program spends tens of millions of dollars each year on perinatal coverage for illegal aliens. *Id.* ¶10 Appx.037–038 (estimating costs between $11 million and $31 million for various years).

Second, the State also provides public education to illegal aliens, as the Supreme Court required in *Plyler v. Doe*, 457 U.S. 202, 230 (1982). The cost of educating unaccompanied alien children, which is only a subset of illegal aliens eligible for public education, is tens of millions of dollars per year. Meyer Decl. ¶4, Appx.060 (estimating annual costs between $27 million and $180 million).

Third, Texas also incarcerates many illegal aliens. Criminal activity that would not occur had an alien not been present imposes significant costs on Texans, not only in the form of victims' suffering but also in the significant financial cost of the criminal justice system. In one year alone, the Texas Department of Criminal Justice housed 7,058 illegal criminal aliens for a total of 1,984,597 days. Waltz

---

[11] Bob Price, *Migrants Apprehended in Texas-Based Border Sectors in Past Two Years Exceeds Houston Population*, Breitbart (Oct. 30, 2023), https://www.breitbart.com/border/2023/10/30/migrants-apprehended-in-texas-based-border-sectors-in-2-years-exceeds-houston-population/.

[12] Defendants argue that the Supreme Court's decision in *United States v. Texas*, 143 S. Ct. 1964 (2023), makes these injuries not judicially cognizable. ECF 23-1 at 38–39. But that case held those injuries non-cognizable solely because the States there were challenging a failure to take enforcement actions against aliens, which fell into nonreviewable executive discretion. *Texas*, 143 S. Ct. at 1973–76. That does not apply here—Plaintiff challenges affirmative actions of Defendants destroying its property. The destruction of private property "is not one of those areas traditionally committed to agency discretion." *New York*, 139 S. Ct. at 2568; *cf. Texas*, 143 S. Ct. at 1973–76 (using same analysis for APA reviewability under *Heckler v. Chaney* in determining whether there was a judicially cognizable injury in fact under Article III).

Decl. ¶8, Appx.032. That cost more than $150 million, but the federal government reimbursed the State less than $15 million. *Id.* ¶¶8–9, Appx.033. As one TDCJ official explained, "to the extent the number of aliens in TDCJ custody increases, TDCJ's unreimbursed expenses will increase as well." *Id.* ¶10, Appx.033.

Finally, consider the costs that additional illegal aliens impose on Texas's driver's license program. Texas provides driver's licenses to aliens so long as their presence in the United States is authorized by the federal government. Gipson Decl. ¶¶3–5, Appx.047–048. Texas loses money on each driver's license issued. *Id.* ¶8, Appx.049. The Chief of the Texas Department of Public Safety's Driver License Division has submitted a declaration estimating the costs of issuing additional licenses to aliens. *Id.* ¶8.

The destruction of Texas's concertina-wire fence facilitates the entry of more aliens into Texas. And the federal government is no longer subjecting newly arrived aliens to the Migrant Protection Protocols (MPP). That means aliens arriving at the border—to the extent they are even apprehended at all—are immediately granted parole and being released into the State to use healthcare services, obtain subsidized driver's licenses, and claim other costly public benefits. *MPP*, 20 F.4th at 966, 968. Some migrants crossing the southern border may ultimately make their way to other destinations, but it remains the case that Texas shoulders a "disproportionate share of [aliens]" and the costs detailed above do "not rest on mere speculation." *New York*, 139 S. Ct. at 2565-66.

## IV. The balance of the equities and public interest favor preliminary relief.

The harms Defendants assert do not outweigh these harms to Texas and its residents, which are immediate, irreparable, and continuing. A heightened risk of terrorist infiltration. A scourge of human trafficking. Illicit smuggling of the world's most dangerous opioid. Spikes in crime, violence, and property damage in border communities. And perils for migrants themselves making a dangerous journey. Defendants may choose not to admit it now, but on previous occasions they have recognized that concertina-wire fences, along with a variety of other tools, help ameliorate these harms. The benefits of awarding a preliminary injunction are clear.

Conversely, the Defendants face essentially no harm from maintaining the status quo ante. *See Wages & White Lion*, 16 F.4th at 1144 ("the *status quo* [is] the state of affairs before the" challenged

19

agency action). On the merits of Texas's common-law claims, Defendants "have no right to [damage] the [property] and assert none." *Itar-Tass Russian News Agency v. Russian Kurier Inc.*, 886 F. Supp. 1120, 1130–31 (S.D.N.Y. 1995). And evidence of federal and state cooperation—while using concertina-wire fencing in El Paso, Texas—shows there is absolutely no need for the broad policy of disrupting Texas's wire fencing to carry out Defendants' duties. *See* Storrud Decl. ¶17, Reply.Appx.006. Defendants have agents on both sides of Texas's fencing to apprehend aliens wherever they may be found. And the facts on the ground show Defendants are not all that interested in apprehending aliens anyway.

Instead, Defendants focus on foreign-policy concerns. ECF 23-1 at 40–41. "Our precedents, old and new, make clear that concerns of national security and foreign relations do not warrant abdication of the judicial role." *Holder v. Humanitarian Law Project*, 561 U.S. 1, 34 (2010). The idea that Defendants' approach to border enforcement would somehow do a better job of hampering "terrorists, criminals, and smugglers" is risible. And the fact that federal employees have received complaints from Mexico is irrelevant. Mexico could not dictate what kinds of fences property owners should maintain in Maverick County. To the extent foreign relations matter at all, then so should Congress's interests in that area. And Congress has expressed in statutory text that it expects Defendants to prevent, not invite, illegal entries. "[W]here the agency's discretion has been clearly constrained by Congress[,] [t]he public interest surely does not cut in favor of permitting an agency to fail to comply with a statutory mandate." *Ramirez v. Immigr. & Customs Enf't*, 310 F. Supp. 3d 7, 33 (D.D.C. 2018).

Finally, "the public is served when the law is followed." *Daniels Health Scis., L.L.C. v. Vascular Health Scis., L.L.C.*, 710 F.3d 579, 585 (5th Cir. 2013). A preliminary injunction here will be a step toward promoting respect for America's system of laws.

## CONCLUSION

Plaintiff respectfully requests the Court preliminarily enjoin Defendants from damaging, destroying, or otherwise interfering with Texas's concertina-wire fence or, alternatively, enter a stay of Defendants' policy directing the same.

Dated: November 5, 2023.

Respectfully submitted.

**KEN PAXTON**
Attorney General of Texas

*/s/ Ryan D. Walters*
**RYAN D. WALTERS**
Chief, Special Litigation Division
Texas Bar No. 24105085

**BRENT WEBSTER**
First Assistant Attorney General

**GRANT DORFMAN**
Deputy First Assistant Attorney General

**DAVID BRYANT**
Special Counsel
Texas Bar No. 03281500

**RALPH MOLINA**
Deputy Attorney General for Legal Strategy

**MUNERA AL-FUHAID**
Special Counsel
Texas Bar No. 24094501

**ROBERT HENNEKE**
Texas Bar No. 24026058
Texas Public Policy Foundation
901 Congress Ave.
Austin, Texas 78701
(512) 472-2700
rhenneke@texaspolicy.com

**HEATHER L. DYER**
Special Counsel
Texas Bar No. 24123044

Office of the Attorney General
Special Litigation Division
P.O. Box 12548, Capitol Station
Austin, Texas 78711-2548
(512) 936-1706
Ryan.Walters@oag.texas.gov
David.Bryant@oag.texas.gov
Munera.Al-Fuhaid@oag.texas.gov
Heather.Dyer@oag.texas.gov

**COUNSEL FOR PLAINTIFF**

## CERTIFICATE OF SERVICE

I certify that a true and accurate copy of the foregoing document was filed electronically (via CM/ECF) on November 5, 2023, which automatically serves all counsel of record who are registered to receive notices in this case.

*/s/Ryan D. Walters*
RYAN D. WALTERS

**Exhibit U**

**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF TEXAS**
**DEL RIO DIVISION**

| | | |
|---|---|---|
| **THE STATE OF TEXAS**, | § | |
| | § | |
| *Plaintiff*, | § | |
| | § | CIVIL ACTION NO. 2:23-CV-00055-AM |
| **v.** | § | |
| | § | |
| **U.S. DEPARTMENT OF HOMELAND** | § | |
| **SECURITY**, *et al.*, | § | |
| | § | |
| *Defendants*. | § | |

---

### PLAINTIFF'S SUPPLEMENTAL BRIEF IN SUPPORT OF
### MOTION FOR PRELIMINARY INJUNCTION OR STAY OF AGENCY ACTION

# TABLE OF CONTENTS

Table of Contents ........................................................................................................... ii

Table of Authorities…………………………………………………………………………………iii

Argument ........................................................................................................................ 1

I. This Court has jurisdiction to award the non-monetary relief that Texas seeks. ............... 1

II. The statutory terms this Court flagged show why immigration laws provide Defendants no basis to evade Texas's common-law claims. ............................................................. 3

III. Record evidence supports Texas's APA claims challenging a federal policy that authorizes wanton destruction of state property. ........................................................... 13

Conclusion ..................................................................................................................... 20

Certificate of Service....................................................................................................... 21

**TABLE OF AUTHORITIES**

Page(s)

**Cases**

*Al Otro Lado, Inc. v. McAleenan,*
  394 F.Supp.3d 1168 (S.D. Cal. 2019) ...................................................................... 16

*Am. Trucking Ass'ns v. City of Los Angeles,*
  569 U.S. 641 (2013) ..............................................................................................6

*Amadei v. Nielsen,*
  348 F. Supp.3d 145 (E.D.N.Y. 2018) ....................................................................... 14

*Apter v. HHS,*
  80 F.4th 579 (5th Cir. 2023) .................................................................................. 13

*B.K. Instrument, Inc. v. United States,*
  715 F.2d 713 (2d Cir. 1983) ....................................................................................3

*Barton v. Barr,*
  140 S. Ct. 1442 (2020) ......................................................................................... 11

*Bhd. of Locomotive Eng'rs & Trainmen v. FRRA,*
  972 F.3d 83 (D.C. Cir. 2020) .................................................................................. 14

*Biden v. Texas,*
  142 S. Ct. 2528 (2022) .................................................................................. 2, 3, 12

*Cargill v. Garland,*
  57 F.4th 447 (5th Cir. 2023) (en banc) ......................................................................3

*De La Mota v. U.S. Dep't of Educ.,*
  No. 02-cv-4276, 2003 WL 21919774 (S.D.N.Y. Aug. 12, 2003) ............................................ 14

*Dep't of Revenue v. Kentucky,*
  553 U.S. 328 (2008) ..............................................................................................6

*DHS v. Regents of Univ. of Cal.,*
  140 S. Ct. 1891 (2020) ......................................................................................... 12

*DHS v. Thuraissigiam,*
  140 S. Ct. 1959 (2020) ........................................................................................7, 8

*United States ex rel. Drury v. Lewis,*
  200 U.S. 1 (1906) .................................................................................................4

*Exxon Mobil Corp. v. Allapattah Servs., Inc.,*
  545 U.S. 546 (2005) ........................................................................9

*Fort Leavenworth Ry. Co. v. Lowe,*
  114 U.S. 525 (1885) ........................................................................6

*FTC v. Standard Oil Co. of Cal.,*
  449 U.S. 232 (1980) ......................................................................15

*Garland v. Aleman Gonzalez,*
  142 S. Ct. 2057 (2022) ................................................................1, 2

*Gomez v. Trump,*
  485 F.Supp.3d 145 (D.D.C. 2021) ..............................................14

*Grand Canyon Tr. v. Pub. Serv. Co. of N.M.,*
  283 F.Supp.2d 1249 (D.N.M. 2003) ...........................................15

*Hall v. Virginia,*
  105 S.E. 551 (Va. 1921) ..................................................................4

*Heinsohn v. Carabin & Shaw, P.C.,*
  832 F.3d 224 (5th Cir. 2016) ..........................................................9

*Her Majesty the Queen in Right of Ontario v. EPA,*
  912 F.2d 1525 (D.C. Cir. 1990) ...................................................15

*Hernandez v. Mesa,*
  140 S. Ct. 735 (2020) ....................................................................11

*Holder v. Martinez Gutierrez,*
  566 U.S. 583 (2012) ......................................................................10

*Johnson v. Arteaga-Martinez,*
  142 S. Ct. 1827 (2022) ..................................................................11

*Johnson v. Maryland,*
  254 U.S. 51 (1920) ..........................................................................4

*Leng May Ma v. Barber,*
  357 U.S. 185 (1958) ........................................................................7

*Louisiana v. Biden,*
  45 F.4th 841 (5th Cir. 2022) .........................................................12

*Merrill Lynch, Pierce, Fenner & Smith Inc. v. Manning,*
  578 U.S. 374 (2016) ........................................................................9

*Mexican Gulf Fishing Co. v. United States Dep't of Com.*,
  60 F.4th 956 (5th Cir. 2023) ............................................... 20

*Michigan v. EPA*,
  135 S. Ct. 2699 (2015) ...................................................... 20

*Michigan v. U.S. Army Corps of Eng'rs*,
  667 F.3d 765 (7th Cir. 2011) ..................................................3

*North Carolina v. Ivory*,
  906 F.2d 999 (4th Cir. 1990) ..................................................4

*OnPath Fed. Credit Union v. United States Dep't of Treasury, Cmty. Dev. Fin. Institutions Fund*,
  73 F.4th 291 (5th Cir. 2023) ............................................... 19

*Perez v. Mortg. Bankers Ass'n*,
  575 U.S. 92 (2015) .......................................................... 12

*Perry Capital LLC v. Mnuchin*,
  864 F.3d 591 (D.C. Cir. 2017) ................................................3

*POET Biorefining, LLC v. EPA*,
  970 F.3d 392 (D.C. Cir. 2020) ............................................... 17

*R.I.L-R v. Johnson*,
  80 F.Supp.3d 164 (D.D.C. 2015) ............................................ 15

*Reid v. INS*,
  420 U.S. 619 (1975) ........................................................ 10

*Rosa v. McAleenan*,
  583 F. Supp. 3d 850 (S.D. Tex. 2019) ...................................... 11

*Rosa v. McAleenan*,
  No. 1:19-cv-00138, 2019 WL 5191095 (S.D. Tex. Oct. 15, 2019) ............ 14

*Sale v. Haitian Centers Council, Inc.*,
  509 U.S. 155 (1993) ..........................................................8

*Sanchez v. Mayorkas*,
  141 S. Ct. 1809 (2021) ..................................................... 10

*Sanchez v. United States*,
  803 F. Supp. 2d 1066 (C.D. Cal. 2011) .......................................4

*Shaughnessy v. United States ex rel. Mezei,*
    345 U.S. 206 (1953) .................................................................................... 7, 8

*Slocum v. Mayberry,*
    15 U.S. 1 (1817) ............................................................................................... 9

*South Carolina v. Baker,*
    485 U.S. 505 (1988) ........................................................................................ 6

*Sprint Nextel Corp. v. FCC,*
    508 F.3d 1129 (D.C. Cir. 2007) .................................................................. 20

*Tamayo-Tamayo v. Holder,*
    725 F.3d 950 (9th Cir. 2013) ...................................................................... 10

*Texas v. Biden (MPP),*
    20 F.4th 928 (5th Cir. 2021) ................................................................... 2, 17

*Texas v. Kleinert,*
    855 F.3d 305 (5th Cir. 2017) ........................................................................ 5

*Texas v. Nuclear Regul. Comm'n,*
    78 F.4th 827 (5th Cir. 2023) ....................................................................... 18

*Texas v. United States,*
    40 F.4th 205 (5th Cir. 2022) ....................................................................... 18

*Texas v. United States,*
    555 F. Supp. 3d 351 (S.D. Tex. 2021), *appeal dismissed,* No. 21-40618, 2022
    WL 517281 (5th Cir. Feb. 11, 2022) ........................................................ 19

*Texas v. United States (DACA),*
    50 F.4th 498 (5th Cir. 2022) ....................................................................... 19

*U.S. Gypsum Co. v. Muszynski,*
    161 F. Supp. 2d 289 (S.D.N.Y. 2001) ....................................................... 16

*United States v. Benitez-Villafuerte,*
    186 F.3d 651 (5th Cir. 1999) ...................................................................... 10

*United States v. Brignoni-Ponce,*
    422 U.S. 899 (1975) ............................................................................... 11, 13

*United States v. Martinez-Fuerte,*
    428 U.S. 543 (1976) ..................................................................................... 10

*United States v. Olano*,
  507 U.S. 725 (1993) ............................................................... 3

*United States v. Ortiz*,
  422 U.S. 891 (1975) ............................................................. 13

*United States v. Texas*,
  599 U.S. 670 (2023) ......................................................... 2, 17

*United States v. Valenzuela-Bernal*,
  458 U.S. 858 (1982) ............................................................. 11

*United States v. Washington*,
  142 S. Ct. 1976 (2022) .......................................................... 6

*Velesaca v. Decker*,
  458 F.Supp.3d 224 (S.D.N.Y. 2020) ................................... 14

*Venetian Casino Resort, LLC v. EEOC*,
  530 F.3d 925 (D.C. Cir. 2008) ............................................ 15

*Wages & White Lion Invs., L.L.C. v. United States Food & Drug Admin.*,
  16 F.4th 1130 (5th Cir. 2021) .............................................. 19

*Walji v. Gonzales*,
  500 F.3d 432 (5th Cir. 2007) ............................................... 11

*West Virginia v. EPA*,
  142 S. Ct. 2587 (2022) ......................................................... 18

*Whitman v. Am. Trucking Ass'ns*,
  531 U.S. 457 (2001) ............................................................. 14

*Wilkie v. Robbins*,
  551 U.S. 537 (2007) ............................................................... 4

**Statutes**

5 U.S.C. § 551(4) ................................................................... 12, 17

5 U.S.C. § 553(b), (c) .................................................................. 12

5 U.S.C. § 701(a)(2) ...................................................................... 17

5 U.S.C. § 702 ............................................................................ 1, 3

6 U.S.C. § 202(1)–(3) ................................................................... 10

6 U.S.C. § 211 ............................................................................. 10, 11, 12

6 U.S.C. § 251(2) ................................................................................ 11

8 U.S.C. § 1103(a)(3) ............................................................................ 1

8 U.S.C. § 1225 .................................................................................... 1

8 U.S.C. § 1226 .................................................................................. 10

8 U.S.C. § 1252(f)(1) ...................................................................... 1, 2, 3

8 U.S.C. § 1357(a)(1) .......................................................................... 10

8 U.S.C. § 1357(a)(2) ...................................................................... 11, 12

8 U.S.C. § 1357(a)(3) ............................................................................ 5

28 U.S.C. § 1331 ................................................................................... 9

28 U.S.C. § 1356 ................................................................................... 9

28 U.S.C. § 1367(a) .............................................................................. 9

**Other Authorities**

WEBSTER'S NEW COLLEGIATE DICTIONARY (1949) ........................................ 10, 11, 12

BLACK'S LAW DICTIONARY (11th ed. 2019) ................................................ 11

ARGUMENT

**I. This Court has jurisdiction to award the non-monetary relief that Texas seeks.**

In their supplemental brief, Defendants continue to insist that this Court lacks jurisdiction to award the non-monetary relief Texas seeks here. That is incorrect. The 8 U.S.C. § 1252(f)(1) proscription on restraining federal statutes is not implicated by a suit to enforce state tort law, and 5 U.S.C. § 702 waives Defendants' sovereign immunity from this suit for an injunction.

**1.** Section 1252(f)(1) does not bar the injunction Texas seeks. All Texas prays for here is an order "that [its] property not be destroyed"; it is "not trying to stop [Defendants] from doing [their] job." Tr.213. During the November 7th hearing, Defendants' counsel conceded that Texas's fence is "not … prohibiting or preventing" them from doing their job, Tr.43, even on their (mistaken) view that 8 U.S.C. § 1225 and § 1226 somehow require them to wave every illegal alien spotted on the threshold deeper into the United States, *infra* at 5-7. Instead, the most counsel could muster was that an injunction "would have an effect." Tr.41. That, of course, is the very thing the Supreme Court has said does *not* trigger § 1252(f)(1): A court may enjoin federal immigration officials "*even if that injunction has some collateral effect* on the operation of a covered provision." *Garland v. Aleman Gonzalez*, 142 S. Ct. 2057, 2067 n.4 (2022) (emphasis added). And ordering federal agents not to violate state criminal law ("thou shalt not murder") or state tort law ("thou shalt not steal") would, at most, have a collateral effect on the implementation of federal immigration statutes.

Now Defendants attempt to write their way out of that concession in their supplemental brief. They tacitly admit that most of the statutory provisions they previously cited—including 8 U.S.C. § 1103(a)(3) and § 1357(a)(3)—are outside § 1252(f)(1)'s cross-reference and thus irrelevant. *See* ECF 47 at 9.[1] Nevertheless, Defendants continue to claim that provision gives them the unreviewable power to do anything they want in the name of inspecting aliens, no matter how

---

[1] References to pagination for documents filed on this Court's electronic docket are to the stamped page numbers in the header of those filings.

needlessly destructive their misconduct. *Id.* at 9–13. Indeed, Defendants seem to *agree* that their reading of § 1252(f)(1) would "insulate" the "disgruntled CBP officer [who] might find it convenient to assault TMD soldiers based on his opinion that they make his job harder." *Compare* ECF 27-1 at 9, *with* ECF 47 at 12. To embrace Defendants' reading would be to permit unchecked federal power anytime a federal actor claims that his conduct somehow relates to his duties. Thankfully, the Supreme Court has preemptively warned against just that view. *See Aleman Gonzalez*, 142 S. Ct. at 2067 n.4. Section 1252(f)(1) does not elevate Defendants' mere "convenience" above the power of the federal courts. *E.g.*, Tr.51, 56, 209.

On whether a stay under § 705 of the APA—which is the temporary form of vacatur—is barred by § 1252(f)(1), Defendants avoid addressing the binding Fifth Circuit precedent on this issue, *see* ECF 27-1 at 9 n.3, instead relying on a three-Justice concurrence in *United States v. Texas*, 599 U.S. 670 (2023). ECF 47 at 13–14. A concurring Supreme Court opinion not in any way essential to the majority cannot override Fifth Circuit precedent. They attempt to distinguish this precedent by reasoning that staying their policy would have no effect because their agents could cut Texas's fence even without it. ECF 47 at 13–14. But that same argument was rejected in the case Defendants cite as different from this one—in the challenge to the termination of the Migrant Protection Protocols program (MPP), the Fifth Circuit noted that DHS said relief "would provide no redress because immigration officers under MPP would have discretion not to return any given immigrant to Mexico," but the court looked to past practice of how DHS personnel had exercised that discretion to reject this argument. *Texas v. Biden (MPP)*, 20 F.4th 928, 973–74 (5th Cir. 2021). Similarly, that Border Patrol agents do not cut Texas's fence in El Paso or the RGV to allow all awaiting migrants to enter, Tr.80, shows that absent the policy applied in Eagle Pass, agents will exercise their discretion in a way that reduces the harm to Texas.

More fundamentally, Defendants waived the applicability of § 1252(f)(1) when they agreed to extend the TRO. ECF 36 at 1; ECF 46. Because that provision does not go to un-waivable subject matter jurisdiction, *see Biden v. Texas*, 142 S. Ct. 2528, 2539–40 (2022), a party may waive its

applicability. And Defendants' affirmative conduct here constitutes a waiver, rather than mere forfeiture, of any argument under this statutory defense. *See United States v. Olano*, 507 U.S. 725, 733 (1993) ("Whereas forfeiture is the failure to make the timely assertion of a right waiver is the intentional relinquishment or abandonment of a known right.") (quotation omitted)); *Cargill v. Garland*, 57 F.4th 447, 465 (5th Cir. 2023) (en banc) (noting that, unlike a forfeited argument, courts generally cannot pursue a waived argument). At the very least, § 1252(f)(1) must be understood to authorize this Court to make findings that would support issuance of a preliminary injunction by the Supreme Court, which has unquestioned authority to enter injunctions even in scenarios covered by this provision. *See Biden*, 142 S. Ct. at 2539.

**2.** Section 702 waives the federal government's sovereign immunity here. This action is plainly "[a]n action in a court of the United States seeking relief other than money damages." 5 U.S.C. § 702. Congress has therefore waived the immunity that Defendants now contend shields them from this suit. At the hearing, Defendants suggested this Court should read into a different statute words that are not there and complained that Texas has pointed to just "one case" holding that § 702's waiver applies to state-law claims. Tr.44. But Defendants have pointed to *zero cases* saying the opposite. Instead, they ask this Court to become the first ever to ignore the statute's plain text—and, in the process, to create a split with the D.C. Circuit and at least two others. *See Perry Capital LLC v. Mnuchin*, 864 F.3d 591, 620 (D.C. Cir. 2017) (rejecting Defendants' " argument that § 702 does not waive [their] immunity from suit for state law claims"); *Michigan v. U.S. Army Corps of Eng'rs*, 667 F.3d 765, 775 (7th Cir. 2011) (rejecting Defendants' argument that the FTCA impliedly precludes injunctive relief for torts); *B.K. Instrument, Inc. v. United States*, 715 F.2d 713, 727 (2d Cir. 1983) (same). The Court should decline that invitation.

## II. The statutory terms this Court flagged show why immigration laws provide Defendants no basis to evade Texas's common-law claims.

This case impacts states, municipalities, private individuals, corporations, organizations—*any* person or entity with property near the border. Defendants admit they have given their agents carte blanche to tamper with property that does not belong to them, whenever they deem it convenient

3

to do so, even if based on a bare desire to "release" the congestion of illegal aliens crowding Texas's riverbanks. Tr.49, 51–52. Defendants do not dispute that this amounts to an ongoing trespass to chattels or conversion of property under Texas common law. ECF 23-1 at 20–23 (making no merits argument at all); *see also* ECF 27-1 at 10. This Court was right, then, that "the bottom line" here is whether federal law authorizes federal agents to perpetrate ongoing, intentional torts. Tr.46. It does not, as is clear from the statutory terms this Court flagged.[2]

**1.** As a general matter, federal agents operating within the territorial confines of a state *are* subject to state law. That includes: state criminal law, *United States ex rel. Drury v. Lewis*, 200 U.S. 1, 3, 7–8 (1906) (U.S. Army officer and enlisted soldier prosecuted for murder); state tort law, *Johnson v. Maryland*, 254 U.S. 51, 56 (1920) (approving federal officer liability for negligence); state laws protecting private property interests, *Wilkie v. Robbins*, 551 U.S. 537, 560 (2007) (Bureau of Land Management employees could be sued for trespass); and yes, even state traffic laws, *Hall v. Virginia*, 105 S.E. 551, 552 (Va. 1921) (Postal Service worker could be fined for exceeding speed limit in mail truck); *North Carolina v. Ivory*, 906 F.2d 999, 1001–02 (4th Cir. 1990) (Marine driving truck in a military convoy "was subject to local traffic laws concerning rights of way, speed limits and the like"); *Sanchez v. United States*, 803 F. Supp. 2d 1066, 1070–71 (C.D. Cal. 2011) (FBI agent liable for not yielding to a pedestrian).

There may be exceptions to this general rule. To the extent Defendants believe an exception applies, though, it is their burden to show why. As this Court noted during the November 7th hearing, federal laws passed within the scope of Congress's enumerated powers may preempt state

---

[2] Defendants suggest Texas's common-law claims seek relief beyond what this Court ordered in its TRO. Tr.215. Not true. Because Defendants made no effort to engage on the common law, it is unsurprising that they misunderstand it. Texas has sued to prevent ongoing conversion and trespass to chattels. As the State has observed before, an acute medical emergency may afford a limited privilege to trespass at common law, consistent with this Court's TRO. *See* ECF 3-1 at 31. Far from Texas seeking "a per se bar" to any tampering with its fence, Tr.215, it is Defendants who seek an order authorizing them to damage the property of others "without restraint," Tr.207; *cf.* Tr.201, 216–17.

laws that conflict with federal mandates. Tr.55 (citing *Arizona v. United States*, 567 U.S. 387 (2012)). Understandably, however, Defendants have chosen *not* to argue conflict preemption. Tr.56. That's because no federal law actually says that the rights of each and every person with property in proximity to the southern border conflict with federal immigration laws. No statute declares that property rights vanish there or that they exist solely "at the discretion, the behest, and the choice, and the desires of" federal immigration officials. Tr.207. The only provision that is even arguably relevant on that score—8 U.S.C. § 1357(a)(3)—authorizes federal agents "within a distance of twenty-five miles from [the border] to have access to private lands, but not dwellings, for the purpose of patrolling the border *to prevent the illegal entry of aliens* into the United States." *See* Tr.149. The evidence adduced at the hearing showed the challenged policy is *not* designed to prevent illegal entry but rather is "encouraging [aliens] to come." Tr.204. Defendants and their agents have breached Texas's wire fence where there was no medical need. Tr.128. Instead, they have done so simply to "release" the congestion of aliens crowding Texas's riverbanks, Tr.52, and to prevent anything from "imped[ing]" the aliens from entering, Tr.122. While watching more than three thousand aliens cross the Rio Grande illegally, they have vowed to keep breaches open "[u]ntil they're all in." Tr.83. And they have permitted aliens, once past the fence, to "just walk[] off to the processing center on their own without a single question or even a hello from a Border Patrol agent." Tr.200.

Defendants had no answer when this Court asked: "Where is [the authority for] that in the statute?" Tr.208. So, instead of pressing conflict preemption, they rely solely on intergovernmental immunity. Tr.56. But Texas has already explained why that doctrine does not bar its tort claims. ECF 27-1 at 12–14. First, intergovernmental immunity applies in the Fifth Circuit "only when a federal officer is held *in the state court* to answer" for official actions. *Texas v. Kleinert*, 855 F.3d 305, 314 (5th Cir. 2017) (emphasis added). Second, Defendants' sweeping theory of intergovernmental immunity—*i.e.*, that it precludes the application of state law "without restraint," Tr.207, anytime federal actors deem compliance with state law inconvenient, Tr.51,

5

56–57, 209—"has been thoroughly repudiated by modern intergovernmental immunity caselaw." *South Carolina v. Baker*, 485 U.S. 505, 520 (1988). The Supreme Court made clear just last year that such immunity applies only where a state (1) "regulate[s] the United States directly" or (2) "discriminate[s] against the Federal Government or those with whom it deals." *United States v. Washington*, 142 S. Ct. 1976, 1984 (2022).

The State of Texas, just like the federal government itself, may hold "the rights of an ordinary proprietor." *Fort Leavenworth Ry. Co. v. Lowe*, 114 U.S. 525, 527 (1885). And by invoking that proprietary interest in the fence it owns, Texas is not "regulating" anyone. *Washington*, 142 S. Ct. at 1984. The hypothetical this Court posed at the November 7 hearing is a helpful one: Imagine a private "landowner that puts up a chain-link fence," Tr.46, perhaps to keep a pet in the yard or to keep coyotes out of the henhouse. Now imagine federal officials deliberately cut open, rip up, or tear down his fence on a daily basis. No one could seriously argue that, if this landowner sued to assert the right not to have his property continuously tampered with, he would be "directly regulating" the federal government. *See* Tr.211, 213. The same is true when the State, as a proprietor, presses the very same claim. In this case, Texas is not "acting in a regulatory rather than a proprietary mode"; instead, the State exercises its own property rights "just as a private party would." *Am. Trucking Ass'ns v. City of Los Angeles*, 569 U.S. 641, 649–50 (2013); *see also Dep't of Revenue v. Kentucky*, 553 U.S. 328, 339 (2008). And those rights apply against all tortfeasors equally. Generally applicable tort principles in no way "singl[e] out the Federal Government for unfavorable treatment." *Washington*, 142 S. Ct. at 1984. To the extent Texas tort law "indirectly increases costs for the Federal Government," it lawfully "imposes those costs in a neutral and nondiscriminatory way." *Id.*

**2.** Even assuming a freewheeling approach to intergovernmental immunity applied, the premise of the argument that Texas's property rights conflict with Defendants' statutory duties is mistaken. Defendants' policy of declaring open season on someone else's property rests on the idea that any alien who manages to get across the Rio Grande has "already crossed the international

boundary into the United States," ECF 23-1 at 12, and therefore *must* be brought further into this Country for processing "as soon as somebody crosses the international boundary," Tr.41. That is false. As Texas has already explained, ECF 27-1 at 17 n.6, "an alien who is detained shortly after unlawful entry cannot be said to have 'effected an entry.' Like an alien detained after arriving at a port of entry, an alien like respondent is 'on the threshold.'" *DHS v. Thuraissigiam*, 140 S. Ct. 1959, 1982–83 (2020) (citations omitted); *see also Shaughnessy v. United States ex rel. Mezei*, 345 U.S. 206, 21 (1953); *Leng May Ma v. Barber*, 357 U.S. 185, 186–87 (1958). An alien on the threshold has *not* entered the country and federal officials *can* take steps to repel him.

Unsurprisingly, Defendants have a historical practice of turning migrants back across the border into Mexico. Mr. Banks testified that USBP itself assesses agents' performance based on the number of aliens repelled, and that thousands of migrants have, in fact, been turned back after crossing the Rio Grande. Tr.66, 104. This Court need not take Mr. Banks's word for it. Just this past summer, Defendants trumpeted their agents' authority to turn back aliens on the threshold of the international boundary.[3] Publicly available records show that Defendants regularly track incidents of successful "turn-backs" at the Border, including more than 5,000 "TBS"—*i.e.*, "Turn Back South"—between October 2018 and March 2020.[4] Unless Defendants are prepared

---

[3] *See* Press Release, U.S. Customs & Border Protection (June 1, 2023), https://www.cbp.gov/newsroom/local-media-release/us-border-patrol-urges-migrants-not-endanger-their-lives-swimming (describing incident on May 25, 2023, where USBP agents were able to "turn [aliens] back south into Mexico" even *after* they "cross[ed] the maritime boundary line").

[4] *See* USBP FOIA Documents at 22, 25, 30, 128-29, 136-54, available at https://int.nyt.com/data/documenttools/border-patrol-fence-breach/b9addab9d72a6a2a/full.pdf (embedded in Zolan Kanno-Youngs, *Armed Mexicans Were Smuggled in to Guard Border Wall, Whistle-Blowers Say*, N.Y. TIMES (Dec. 7, 2020), https://www.nytimes.com/2020/12/07/us/politics/border-wall-mexico.html). In addition to documenting turnback authority, this collection of documents obtained by the *New York Times* shows that Defendants themselves use concertina-wire barriers along the southern border, record damage to their c-wire fencing, and repair such fencing when it is damaged because such breaches "enabl[e] illegal crossings." *See id.* at 6 ("C-Wire Damaged"); *id.* at 55 ("Agent saw two aliens either cutting the concertina wire or attempting to remove wire from the stakes that

to admit that all this documented activity of their own agents repelling aliens denies due process, violates federal statutes, or endangers migrants, they must concede that federal law does *not* leave them "duty"-bound to wave aliens into the United States and destroy Texas's property in the process, Tr.41. Now Defendants seem to recognize the error, based on efforts to walk back this duty-based argument in their supplemental brief. *See* ECF 47 at 12. But Defendants—not Texas— injected this "focus on whether § 1225 imposes 'mandatory' duties on Border Patrol." *Id.; see, e.g.,* Tr. 41 ("Border Patrol has a *duty*"); *see also* ECF 23-1 at 12–13, 36; ECF 23-2 at 4–6; Tr.33, 38–39, 127, 172, 186, 188.

And Defendants' view of immigration enforcement would "create a perverse incentive to enter at an unlawful rather than a lawful location," which is why the Supreme Court rejected it for a migrant who managed to "mak[e] it 25 yards into U.S. territory before he was caught." *Thuraissigiam*, 140 S. Ct. at 1982. Federal immigration officials have authority to repel aliens on the threshold of the border and to prevent them from making further entry into the United States. *See, e.g., Sale v. Haitian Centers Council, Inc.*, 509 U.S. 155, 163 (1993) (aliens could be repatriated "without giving them any opportunity to establish their qualifications as refugees"); *Shaughnessy*, 345 U.S. at 207, 212 (alien could be "permanently excluded from the United States" and his "harborage at Ellis Island [for two years] is not an entry into the United States").

The Court was therefore correct that Defendants can do in the river the very same thing they do at international bridges or other ports of entry, Tr.34, and that merely waving migrants deeper into the United States without attempting to repel or apprehend them is not enforcing the

---

hold up the wire [and] the aliens then walked through the fence"); *id.* at 66 ("C-Wire removed"); *id.* at 88 ("Reinstalled Concertina Wire. Breach Repaired."); *id.* at 109 ("C-Wire cut and pushed down"); *id.* ("C-Wire cut at top and bottom and pushed aside"); *id.* ("C-Wire stake/pole bent backwards into Mexico"); *id.* ("Agent reported that the concertina wire ... was cut up"); *id.* ("Agent reported another concertina wire breach"); *id.* ("C-wire has been compromised"); *id.* at 110 ("Top of C-Wire removed"); *id.* at 116 (after alien "appeared to be tampering/cutting the C-wire on top of International Boundary Fence" CBP "contacted Mexican officials about the incident" and "fence crew in the immediate areas was informed of the C-wire tampering").

immigration laws, Tr.199, 201, 209. Accordingly, Texas's state-law claims in no way impede federal agents from carrying out their statutory duties. ECF 27-1 at 8–9, 12–14.[5]

**3.** The terms this Court pointed to in its November 9th order further demonstrate why Texas's common-law claims do not impede Defendants' enforcement authority. Defendants are free to take the position (at Tr.199) that "Border Patrol's work" consists in: taking no steps to deter aliens attempting to cross into this country illegally, Tr.32; tearing down border infrastructure that Defendants simultaneously concede "can work as a deterrent," Tr.193; manufacturing emergencies by inviting aliens to cross (illegally) at "the deepest part of the river," Tr.84; classifying as "apprehensions" scenarios where aliens are "not in custody," Tr.198; and conducting "inspections" that entail asking them no questions at all, Tr.201.

But federal laws task Defendants with actually securing our nation's borders, actually deterring illegal entries, actually apprehending aliens, and actually inspecting them. *See* ECF 3-1 at 20–21 (citing 6 U.S.C. § 202(1)–(3); *id.* § 211(c)(2), (5), (6), (8); *id.* § 211(e)(3)(A)–(B); *id.* § 251; *id.* § 255). Together, DHS, CBP, and USBP are duty-bound to: "deter and prevent the illegal entry

---

[5] Defendants' efforts to direct focus away from Texas tort law to federal immigration statutes shows why their halfhearted objection to subject-matter jurisdiction is a dead end. *See* ECF 23-1 at 20 n.4; Tr.45. Defendants cannot simultaneously argue that this case is all about federal statutory authority, *and* that it also does not implicate "a federal issue" that is "actually disputed" and "substantial" for purposes of 28 U.S.C. § 1331. *Merrill Lynch, Pierce, Fenner & Smith Inc. v. Manning*, 578 U.S. 374, 383-84 (2016). Likewise, they make no attempt to show how Texas's state-law claims—which concern Defendants' "seizure [of property] on land" ostensibly under "law[s] of the United States"—fall outside the plain text of 28 U.S.C. § 1356. The very case Defendants cite approves federal court jurisdiction over a suit (like this one) to take property "out of the possession of the [federal] officer." *Slocum v. Mayberry*, 15 U.S. 1, 10 (1817).

And this Court unquestionably may exercise supplemental jurisdiction under the "broad jurisdictional grant" in 28 U.S.C. § 1367(a), *Exxon Mobil Corp. v. Allapattah Servs., Inc.*, 545 U.S. 546, 558–59 (2005). This Court may do so even absent a citation to the supplemental jurisdiction statute in the complaint, for "the failure to expressly plead supplemental jurisdiction will not defeat it if the facts alleged in the complaint satisfy the jurisdictional requirements." *Heinsohn v. Carabin & Shaw, P.C.*, 832 F.3d 224, 232 (5th Cir. 2016). Plaintiff's state-law claims are "part of the same case or controversy" as the federal claims, 28 U.S.C. § 1367(a), and none of the factors in favor of declining supplemental jurisdiction exist here, *see id.* at § 1367(c).

of terrorists, terrorist weapons, persons, and contraband," 6 U.S.C. § 211(e)(3)(B); "detect" and "ensure the interdiction of persons … illegally entering the United States," id. § 211(c)(2), (c)(5); administer "the inspection, processing, and admission of" aliens, id. § 211(c)(8)(A); and implement the "detention and removal program." See ECF 3-1 at 20–21; 6 U.S.C. § 202(1)–(3); id. § 211(c)(2), (5), (6), (8); id. § 211(e)(3)(A)–(B); id. § 251; id. § 255.

A brief review of some of these terms (and others this Court asked the parties to define) demonstrates how Defendants' position is out of step with federal law:

- Inspect: WEBSTER'S NEW COLLEGIATE DICTIONARY 435 (1949) ("To look upon; to view closely and critically; scrutinize" or "To view and examine officially, as troops, arms, etc."); 6 U.S.C. § 211(c)(8)(A) (CBP shall enforce immigration laws concerning inspection of aliens attempting to enter); Reid v. INS, 420 U.S. 619, 624-25 (1975) ("inspection" requires subjecting aliens to a "closer examination"—rather than a "perfunctory" process—including the completion of registration forms, submitting to fingerprinting, and collection of "information and a variety of records that enable [officials] to keep track of the alien after his entry"); Sanchez v. Mayorkas, 141 S. Ct. 1809, 1813 (2021) (inspection must occur prior to admission into the United States, citing 8 U.S.C. § 1101(a)(13)(A)). According to the Department of Homeland Security, United States Citizenship and Immigration Service ("USCIS"), "[i]nspection is the formal process of determining whether a noncitizen may lawfully enter the United States." USCIS Policy Manual, Vol. 7, Part B, Chapter 2, available at https://www.uscis.gov/policy-manual/volume-7-part-b-chapter-2#footnotelink-11 (accessed November 20, 2023).

- Interrogate: WEBSTER'S NEW COLLEGIATE DICTIONARY 440 (1949) ("To question; esp., to examine by asking questions; as, to interrogate a witness"); 8 U.S.C. § 1357(a)(1) (DHS and CBP authority "to interrogate any alien or person believed to be an alien"); United States v. Martinez-Fuerte, 428 U.S. 543, 552 & n.8 (1976) (describing Border Patrol agents' authority to stop and interrogate persons believed to be aliens as part of "an effort to minimize illegal immigration").

- Admit: WEBSTER'S NEW COLLEGIATE DICTIONARY 12 (1949) ("To suffer to enter; to grant entrance to, whether into a place, the mind, or consideration" and "To allow to enter on an office or to enjoy a privilege"); 6 U.S.C. § 211(c)(8)(A) (CBP shall enforce immigration laws concerning admission of aliens); Holder v. Martinez Gutierrez, 566 U.S. 583, 591 (2012) ("The terms 'admission' and 'admitted' mean, with respect to an alien, the lawful entry of the alien into the United States after inspection and authorization by an immigration officer." (quoting 8 U.S.C. § 1101(a)(13)(A))).

- Apprehend: WEBSTER'S NEW COLLEGIATE DICTIONARY 44 (1949) ("To seize" or "To arrest"); 8 U.S.C. § 1226 (statutory mandate that DHS and CBP "take into custody" criminal aliens in a provision titled "Apprehension and detention of aliens"); United States v. Benitez-Villafuerte, 186 F.3d 651, 654 (5th Cir. 1999) ("Benitez was apprehended by the local authorities and placed in the Dallas County jail."); Tamayo-Tamayo v. Holder, 725 F.3d 950, 952 (9th Cir. 2013) (alien was "apprehended" where federal government "sent Petitioner a letter advising him of an appointment" and when he "arrived for his appointment … the government arrested him").

- Examine: WEBSTER'S NEW COLLEGIATE DICTIONARY 286 (1949) ("To test by an appropriate method; to subject to inquiry or inspection; to investigate; scrutinize"); 8 U.S.C. § 1357(a)(2) (requiring that aliens be examined "without unnecessary delay" by an immigration officer); *United States v. Valenzuela-Bernal*, 458 U.S. 858, 864 (1982) ("Border Patrol agents … are directed to examine [aliens] without 'unnecessary delay' to determine whether 'there is prima facie evidence establishing' their attempted illegal entry."); *cf. Walji v. Gonzales*, 500 F.3d 432, 436–37 (5th Cir. 2007) (citing 8 U.S.C. § 1446).

- Remove: WEBSTER'S NEW COLLEGIATE DICTIONARY 716 (1949) ("To change the location of; to transfer"); 6 U.S.C. §§ 211(c)(8)(B), 251(2) (DHS and CBP shall enforce immigration laws concerning removal of illegal aliens); *Barton v. Barr*, 140 S. Ct. 1442, 1446 (2020) ("The umbrella statutory term for being inadmissible or deportable is 'removable.'); *Valenzuela-Bernal*, 458 U.S. at 864 ("Congress has determined that prompt deportation … constitutes the most effective method for curbing the enormous flow of illegal aliens across our southern border.").

- Transfer: WEBSTER'S NEW COLLEGIATE DICTIONARY 902 (1949) ("To convey from one place, person, or thing, to another; transport, remove, or cause to pass, to another"); 6 U.S.C. § 211(c)(8)(B) (DHS and CBP shall enforce immigration laws concerning the transfer of aliens unlawfully entering); *Rosa v. McAleenan*, 583 F. Supp. 3d 850, 860 (S.D. Tex. 2019) ("Once CBP transfers an alien to ICE custody, CBP's responsibility as to the care and custody of that alien ends.").

- Detain: WEBSTER'S NEW COLLEGIATE DICTIONARY 225 (1949) ("To hold or keep as in custody"); 6 U.S.C. § 251(2) (DHS shall implement detention program); *Johnson v. Arteaga-Martinez*, 142 S. Ct. 1827, 1830 (2022) (describing how federal agents "detained [alien] at the border, determined he was inadmissible, and removed him" on three different occasions); DHS Office of Homeland Security Statistics, Office of Immigration Statistics, Reporting Terminology and Definitions, https://www.dhs.gov/ohss/about-data/glossary (accessed November 21, 2023) (DHS defining "custody – CBP" as "[n]oncitizens apprehended by CBP and detained in CBP short-term custody facilities or processing centers").

- Detect: WEBSTER'S NEW COLLEGIATE DICTIONARY 225 (1949) ("To discover the existence, presence, or fact of (something hidden or obscure)"); 6 U.S.C. § 211(c)(5) (CBP shall detect human smugglers and traffickers); *United States v. Brignoni-Ponce*, 422 U.S. 899, 907 (1975) (describing Border Patrol's "first line of defense … called the 'line watch'" which "consists of agents being placed *immediately upon the physical boundary* where experience has shown that large numbers of illegal aliens can be detected attempting entry").

- Interdict: WEBSTER'S NEW COLLEGIATE DICTIONARY 439 (1949) ("To prohibit; debar; esp., to lay under or prohibit by, an interdict"); BLACK'S LAW DICTIONARY (11th ed. 2019) ("To forbid or restrain" and "To intercept and seize (contraband, etc.)"); 6 U.S.C. § 211(c)(2), (c)(5) (CBP shall interdict aliens illegally entering and human smugglers and traffickers); *Hernandez v. Mesa*, 140 S. Ct. 735, 746 (2020) (interdiction "right at the border … *to prevent illegal entry*" is "one of [CBP's] main responsibilities").

- Arrest: WEBSTER'S NEW COLLEGIATE DICTIONARY 49 (1949) ("*Law.* To take or keep (a person or chattels) in custody by authority of law; to apprehend; attach"); BLACK'S LAW DICTIONARY (11th ed. 2019) ("A seizure or forcible restraint, esp. by legal authority" or "The taking or keeping of a person in custody by legal authority, esp. in response to a

criminal charge; specif., the apprehension of someone for the purpose of securing the administration of the law"); 8 U.S.C. § 1357(a)(2), (a)(5) (DHS and CBP authority "to arrest *any alien who in his presence or view is entering* or attempting to enter the United States in violation of any law" and to "make arrests" for offenses observed while "performing duties relating to the enforcement of the immigration laws"); DHS Office of Homeland Security Statistics, Office of Immigration Statistics, Reporting Terminology and Definitions, https://www.dhs.gov/ohss/about-data/glossary (accessed November 21, 2023) (DHS defining "arrest" as the [a]ct of detaining an individual by legal authority based on an alleged violation of the law").

- Process: WEBSTER'S NEW COLLEGIATE DICTIONARY 672–73 (1949) ("*Law.* To issue or take out process against, or to serve process upon."). 6 U.S.C. § 211(c)(8)(A) (CBP "shall ... enforce and administer all immigration laws, … including ... the inspection, processing, and admission of persons who seek to enter or depart the United States").

- Policy: WEBSTER'S NEW COLLEGIATE DICTIONARY 653 (1949) ("A settled course adopted and followed by a government, institution, body, or individual"); 5 U.S.C. § 551(4) (APA defining "rule" to mean "the whole or a part of an agency statement of general or particular applicability and future effect designed to implement, interpret, or prescribe law or *policy* or describing the organization, procedure, or practice requirements of an agency"); *Biden*, 142 S. Ct. at 2545 (discrete agency memoranda "were themselves the operative agency actions … designed to implement, interpret, or prescribe law or policy"); *Louisiana v. Biden*, 45 F.4th 841, 846 (5th Cir. 2022) (APA can be used to police even "an unwritten agency policy").

- Procedure: WEBSTER'S NEW COLLEGIATE DICTIONARY 672 (1949) ("Manner or method of proceeding in a process or course of action; also, a particular way of proceeding."); 5 U.S.C. § 551(4) (APA defining "rule" to mean "the whole or a part of an agency statement of general or particular applicability and future effect designed to implement, interpret, or prescribe law or policy or describing the organization, *procedure*, or practice requirements of an agency").[6]

- Notice: WEBSTER'S NEW COLLEGIATE DICTIONARY 574 (1949) ("Information, esp. of a formal nature; announcement" or "An announcement or written mention"); 5 U.S.C. § 553(b), (c) (notice must provide substantive details on proposed agency rule and legal authority supporting it, along with meaningful opportunity to comment).

Congress, then, has directed Defendants to detect illegal entries and the human smugglers facilitating such entries as the first line of defense on our border, to interdict and deter entries right at the international boundary, to closely examine aliens before they are admitted into the United States, to apprehend, arrest, and detain aliens who manage to cross illegally, and to deport them from this Country promptly thereafter. The idea that "encouraging [aliens] to come" here illegally

---

[6] A "rule"—whether it prescribes a "policy" or describes a "procedure"—constitutes 'agency action'" that may be subject to arbitrary and capricious review, *DHS v. Regents of Univ. of Cal.*, 140 S. Ct. 1891, 1933 (2020), even if it would not *also* be subject to the APA's notice-and-comment requirements, *Perez v. Mortg. Bankers Ass'n*, 575 U.S. 92, 95-97 (2015). *See infra* at 17 n.10.

while "discouraging any type of action by anybody" else, Tr.204, "is part of enforcement," Tr.209, cannot be taken seriously. Once upon a time, the federal government "convinc[ed]" the Supreme Court "that the public interest demands effective measures to prevent the illegal entry of aliens at the Mexican border." *Brignoni-Ponce*, 422 U.S. at 878. Congress has provided such measures. It has not left our "society seemingly impotent to deal with massive lawlessness," and it certainly has not authorized Defendants to commit torts that can only encourage "the tide of illegal aliens—and dangerous drugs—that daily and freely crosses" the southern border. *United States v. Ortiz*, 422 U.S. 891, 899–914 (1975) (Burger, C.J., concurring in judgment).

## III. Record evidence supports Texas's APA claims challenging a federal policy that authorizes wanton destruction of state property.

In their supplemental brief, Defendants maintain that this Court cannot review their actions cutting Texas's fence because they are committed to agency discretion by law and there is no final agency action. On the merits, they claim that their actions are not contrary to law because they are consistent with their statutory authority; their policy is not a substantive (or "legislative") rule that required notice-and-comment procedures; and it is not arbitrary and capricious.

**1. Defendants' policy is final agency action.**[7] In their supplemental brief, they deny that it has "real-world consequences" because "[t]o the extent any wire is cut, that consequence flows not from the guidance but from Border Patrol's statutory authority." ECF 47 at 18–19.[8] But the ongoing destruction of Texas's fence is a "real-world consequence[]," and the evidence that the

---

[7] Even if the Court were to find that the policy did not satisfy the standards of final agency action, the Court could still reach Plaintiff's *ultra vires* claim. *See* ECF 3-1 at 24 (discussing *Apter v. HHS*, 80 F.4th 579, 589–90 (5th Cir. 2023), which held that when using the APA to bring an *ultra vires* claim, "[t]he [challenged] action need not be final").

[8] Defendants continue to press their argument that because their policy has to be implemented downstream, it is not final. ECF 47 at 18. To accept this would mean no "rules"—which by their nature must be implemented downstream in particular circumstances via "orders" or "sanctions," per the APA—could ever be subject to judicial review. As Plaintiff has explained, the Fifth Circuit and the Supreme Court have directly repudiated this argument. ECF 27-1 at 19 (quoting *MPP*, 20 F.4th at 948, and *Biden*, 142 S. Ct. at 2545 n.7).

El Paso and RGV Sectors do not follow this policy, Tr.80, shows that it does not flow from the same statutory authority that governs Border Patrol in all sectors—it is the specific policy applied in Eagle Pass that does the deed.

That an agency has not committed the Eagle Pass policy to writing does not insulate it from judicial review. *Whitman v. Am. Trucking Ass'ns,* 531 U.S. 457, 479 (2001) ("Though the agency has not dressed its decision with the conventional procedural accoutrements of finality, its own behavior thus belies the claim that its interpretation is not final."); *see Gomez v. Trump,* 485 F.Supp.3d 145, 193 (D.D.C. 2021) ("cluster of guidance documents, cables, and directives, have ordered consular offices and embassies to cease processing and issuing visas for otherwise qualified applicants" constitutes final agency action). Rather, the final-agency-action inquiry is pragmatic and elevates substance over form. *See* ECF 27-1 at 17–19.

Courts consistently find that unwritten policies constitute final agency action regardless of whether they are committed to a formal writing or published in the Federal Register. *Bhd. of Locomotive Eng'rs & Trainmen v. FRRA,* 972 F.3d 83, 100 (D.C. Cir. 2020) (collecting cases holding that "[a]gency action generally need not be committed to writing to be final and judicially reviewable"); *accord Rosa v. McAleenan,* No. 1:19-cv-00138, 2019 WL 5191095, at *19 (S.D. Tex. Oct. 15, 2019) (Rodriguez, J.) (same); *Velesaca v. Decker,* 458 F.Supp.3d 224, 237 n.7 (S.D.N.Y. 2020) ("[A] number of cases have involved courts inferring from a course of agency conduct that the agency has adopted a general policy, even in the face of agency denials of such policies existing."); *Amadei v. Nielsen,* 348 F. Supp.3d 145, 165 (E.D.N.Y. 2018) ("[N]umerous courts have found that a plaintiff can satisfy the [APA's] finality requirement without offering evidence of a formal or official statement regarding the agency's position."). *De La Mota v. U.S. Dep't of Educ.,* No. 02-cv-4276, 2003 WL 21919774, at *8 (S.D.N.Y. Aug. 12, 2003) ("[I]t is of no moment that the agency action here came in the form of an 'informal' email correspondence between a DOE employee and the law schools and plaintiffs. The practical effect of the DOE's action, not the informal packaging in which it was presented, is the determining factor in evaluating whether the

DOE's action was 'final.'"); *Her Majesty the Queen in Right of Ontario v. EPA*, 912 F.2d 1525, 1531 (D.C. Cir. 1990) (finding that "the absence of a formal statement of the agency's position, as here, is not dispositive"); *Venetian Casino Resort, LLC v. EEOC*, 530 F.3d 925, 929 (D.C. Cir. 2008) (concluding that "the record" as a whole "leaves no doubt" that a policy exists, even though "the details ... are still unclear"); *R.I.L-R v. Johnson*, 80 F.Supp.3d 164, 184 (D.D.C. 2015) ("Agency action, however, need not be in writing to be final and judicially reviewable."); *Grand Canyon Tr. v. Pub. Serv. Co. of N.M.*, 283 F.Supp.2d 1249, 1252 (D.N.M. 2003) (holding that "[b]oth law and logic" dictate that an unwritten agency policy is reviewable).

Here, Defendants have repeatedly articulated the contents of a policy specific to Eagle Pass. Defendants cannot, now, have their cake and eat it too: They responded to various media inquiries by saying that they were following a policy in Eagle Pass, *see* ECF 27-1 at 17, and testified to the same. Tr. 137–140, ECF 23-2 (BeMiller Decl. ¶¶ 5–6, 19), and the Court should take them at their word.[9] *See FTC v. Standard Oil Co. of Cal.*, 449 U.S. 232, 239 (1980) (finding that denying review of an agency action that is essentially conceded but ostensibly unwritten would fly in the face of the instruction that finality be interpreted "pragmatic[ally]"); *Grand Canyon Tr.*, 283 F.Supp.2d at 1252 (noting that an agency cannot be allowed "to shield its decisions from judicial review simply by refusing to put those decisions in writing").

Despite their belated efforts to suggest that this Eagle Pass policy of authorizing the destruction of property is limited to "non-exigent" circumstances, *compare* Tr.138-40, 215-17, *with* Tr.161, evidence adduced at the hearing demonstrated that the policy is keyed to prerequisites that will always be met in the "ordinary course," Tr.217; *see also* Tr.36 (after Defendants suggested that traversing the riverbank "is dangerous" this Court noted that migrants have "just crossed the river."). For example, Defendants' witness testified that the policy authorizes leadership to breach

---

[9] In their supplemental brief, Defendants appear to concede a separate policy limited to Eagle Pass. *See* ECF 47 at 17 (noting—without contesting—that "Mr. Banks acknowledged that, by and large, Border Patrol has not cut the wire except when faced with exigent circumstances in the El Paso and Rio Grande Valley Sectors," contrasted with Eagle Pass).

the fence anytime to remove an impediment. Why? Because any impediment creates a risk of "crowding" and "unruly" behavior. Tr.52, 122. But *any* c-wire fence creates an impediment. *See* Tr.133–34 (Q: "Why is that situation different from any other time…?" A: "It wouldn't be."). The policy, then, boils down to permission to destroy any fence operating as a fence. No wonder that, until this Court issued its TRO, Defendants were destroying Texas's property on almost a daily basis.

Given Defendants' numerous acknowledgements of the existence of a policy in Eagle Pass, and the facts that show Border Patrol in that area is acting differently than in El Paso and the RGV, Tr.80, Defendants' continued denials of a different policy in Eagle Pass are implausible.

Other courts have found a defendant agency's behavior relevant to inferring the existence of a policy. In *U.S. Gypsum Co. v. Muszynski*, 161 F. Supp. 2d 289 (S.D.N.Y. 2001) (Rakoff, J.), the plaintiff, a sediment disposal company, requested judicial review of an EPA policy that prevented the plaintiff from receiving a permit. The EPA moved to dismiss the action for lack of subject matter jurisdiction on the ground that, *inter alia*, no final agency action was taken. *See id.* at 290. In denying EPA's motion, the court held that despite the agency's disclaimer of its former policy, an agency's "'own behavior may belie the claim that its interpretation is not final.' … Ultimately, where an agency's decision is given practical effect, it will be sufficient to trigger judicial review." *Id.* at 291 (alterations adopted) (quoting *Whitman v. Am. Trucking Ass'ns*, 531 U.S. 457, 479 (2001)). Here, the Eagle Pass policy is evidenced by the actions on the ground there.

Finality is a pragmatic test precisely so federal agencies cannot circumvent APA review this way. *BNSF Ry. Co.*, 385 F.Supp.3d at 523 ("An agency cannot skirt its obligations by acting illegally and then claiming it has not acted at all."); *Al Otro Lado, Inc. v. McAleenan*, 394 F.Supp.3d 1168, 1206-07 (S.D. Cal. 2019) ("[A] contrary rule 'would allow an agency to shield its decisions from judicial review simply by refusing to put those decisions in writing.'"). Holding that the Eagle Pass policy is not reviewable final agency action would provide the Executive Branch with a template to

16

evade judicial review.[10]

**2.** Defendants' policy is not an unreviewable lack of enforcement under 5 U.S.C. § 701(a)(2). In their supplemental brief, Defendants rely almost entirely on what they call "the Supreme Court's recent admonition that one of those [unreviewable] categories is decisions about whether and how to arrest noncitizens." ECF 47 at 9 (citing *Texas*, 599 U.S. 670). First, that case did not address APA unreviewability at all—it was solely about the injury-in-fact prong of Article III standing, unchallenged here. *Texas*, 599 U.S. at 676, 686. Second, that case involved seeking judicial relief to require DHS to arrest more aliens, after the agency had made nonenforcement decisions. *Id.* at 676–77, 680. That is not the case here, where the challenged agency action is not a refusal to enforce the law or arrest anyone, but the affirmative agency action authorizing the ongoing destruction of Texas's property. *See* ECF 27-1 at 16 (discussing distinction). Finally, Defendants never address the binding Fifth Circuit precedent that agency rules[11]—as opposed to "orders" or "one-off nonenforcement decisions"—do not ever fall within the APA's unreviewability provision. *MPP*, 20 F.4th at 983–84. That "does not apply to rules" at all. *Id.* at 978. And because the challenged rule here does not involve mere "nonenforcement decisions," but affirmative agency action destroying Texas's property, it does not involve "the executive's longstanding, common-law-based discretion *to do nothing* in a particular case." *Id.* at 982 (emphasis added).

---

[10] Even if the Court were to find that the policy is not a substantive rule—and thus did not need to undergo notice-and-comment rulemaking—as final agency action, it would still be subject to Plaintiff's arbitrary-and-capricious and contrary-to-law claims. *See MPP*, 20 F.4th at 948–49 (policy statement exempt from notice and comment could still be found to be final agency action); *POET Biorefining, LLC v. EPA*, 970 F.3d 392, 406 (D.C. Cir. 2020) (same regarding interpretive rules).

[11] The challenged policy is a "rule" because it is "an agency statement of general ... applicability and future effect" that either "prescribes law or policy" or at the very least "describes the organization, procedure, or practice requirements" of the agency." 5 U.S.C. § 551(4).

**3.** On whether Defendants' actions are contrary to law or *ultra vires*, as explained in Section II, *supra*, they point to general authority to detain or inspect aliens, ECF 47 at 20–22, but the record here shows that is not what they are doing. The Court need not address whether those powers or duties could justify cutting Texas's fence in particular circumstances because the record here does not plausibly involve such considerations—Defendants are allowing migrants to cross the river without performing those functions. *See* Tr.81–82, 84–85, 113, 115–16. And Defendants can perform those duties without cutting Texas's fence. Tr.102–04, 108. Indeed, Defendants are cutting Texas's fence to allow migrants who are still in Mexico come through, Tr.83, 128, and justify it in a way that applies to all migrants, regardless of circumstance. Tr.122, 124–25, 133–34, 161, 168–69, 170. This Court has seen through this already. Tr.196–98, 200–01, 207, 209, 211. Defendants' policy simply cannot be justified under the APA as an implementation of their statutory mandates. ECF 27-1 at 21-23.[12]

**4.** Defendants' policy is a substantive rule that was required to undergo notice and comment. In its PI Motion, Plaintiff explained in detail why the challenged rule satisfies the test for a substantive rule, and thus could not fall within the exceptions for policy statements, interpretive rules, or procedural rules. ECF 3-1 at 34–37. This test is similar to that for final agency action. *See Texas v. United States*, 40 F.4th 205, 228–29 (5th Cir. 2022) ("For the same reasons articulated

---

[12] Defendants maintain that their general authorizing statutes grant them the authority to cut Texas's fence, and that the major questions doctrine does not preclude it because of the supposedly small cost of repairing the fence. ECF 47 at 20 n.4. But "[w]here the statute at issue is one that confers authority upon an administrative agency, that inquiry must be shaped, at least in some measure, by the nature of the question presented—whether Congress in fact meant to confer the power the agency has asserted" and whether there are "reason[s] to hesitate before concluding that Congress meant to confer such authority." *West Virginia v. EPA*, 142 S. Ct. 2587, 2607–08 (2022) (quotations omitted). A federal agency being empowered to destroy the property of a sovereign State "is an issue of great "economic and political significance." *Id.* at 2608. "A decision of such magnitude and consequence rests with Congress itself, or an agency acting pursuant to *clear* delegation from that representative body." *Id.* at 2616 (emphasis added). And major questions are not limited to fiscal effects. *See Texas v. Nuclear Regul. Comm'n*, 78 F.4th 827, 844 (5th Cir. 2023).

[earlier in the opinion finding final agency action], the Final Memo is much more substantive than a general statement of policy and, as such, it had to undergo notice and comment procedures."); *Texas v. United States*, 555 F. Supp. 3d 351, 429 (S.D. Tex. 2021) (noting similarity between two tests), *appeal dismissed,* No. 21-40618, 2022 WL 517281 (5th Cir. Feb. 11, 2022).

"Substantive rules" produce "significant effects on private interests," *Texas v. United States (DACA)*, 50 F.4th 498, 522 (5th Cir. 2022)—aside from the effects on the aliens themselves, cutting Texas's wire fence obviously has significant effects on the State, including the costs to repair, the social service costs due to increased flow of aliens, and the conflict of a federal agency destroying another sovereign's property. The Eagle Pass policy was required to be published in the Federal Register as a substantive rule and subject to public inspection and comment. Because it was not, it is unlawful.

Defendants also assert that the policy cannot be substantive because it "does not "require Texas to do anything or to stop doing anything" and "could not be the basis for an enforcement action" against the State. ECF 47 at 23. But rules do many different things. Courts find rules to be substantive even where they do not require the plaintiff to do anything or would be enforceable against it. The Fifth Circuit found the DACA policy to be a substantive rule even though it did not require Texas to do anything and did not threaten it with any sort of enforcement. *See DACA*, 50 F.4th at 522–24.

**5.** Finally, Defendants' policy is arbitrary and capricious. Their supplemental brief provides reasons why differential treatment of Texas's fences in Eagle Pass compared to those in other sectors could be justified, and how its policy properly balances the factors of reducing injury to migrants and providing deterrence. ECF 47 at 24–25. But such "*post hoc* rationalizations" cannot be used to defend against a claim of arbitrary-and-capricious agency action. *Wages & White Lion Invs., L.L.C. v. United States Food & Drug Admin.*, 16 F.4th 1130, 1136 (5th Cir. 2021). Instead, "[a]n agency must defend its actions based on the reasons it gave when it acted." *OnPath Fed. Credit Union v. United States Dep't of Treasury, Cmty. Dev. Fin. Institutions Fund*, 73 F.4th 291, 298

19

(5th Cir. 2023) (quoting *DHS v. Regents of the Univ. of Cal.*, 140 S. Ct. 1891, 1909 (2020)). Courts "may uphold agency action only on the grounds that the agency invoked when it took the action." *Michigan v. EPA*, 135 S. Ct. 2699, 2712 (2015) (citing *SEC v. Chenery Corp.*, 318 U.S. 80, 87 (1943)). Defendants point to no reasoned explanation on these points made when the agency acted. *See Sprint Nextel Corp. v. FCC*, 508 F.3d 1129, 1132 (D.C. Cir. 2007) ("We ... require more than a result; we need the agency's *reasoning* for that result." (emphasis added)). Defendants' counsel cannot clean up after the agencies' failure to adequately justify their policy when they made it.

Further, "a regulation is arbitrary and capricious if the agency failed to consider an important aspect of the problem," which "includes, of course, considering the costs and benefits associated with the regulation." *Mexican Gulf Fishing Co. v. United States Dep't of Com.*, 60 F.4th 956, 973 (5th Cir. 2023). Defendants' failure to consider the benefits of deterrence when they acted does not pass the test of reasoned decisionmaking, especially because they elsewhere emphasize these benefits of border barriers. *See* ECF 3-1 at 38–39; ECF 27-1 at 20–21.

## CONCLUSION

Plaintiff respectfully requests the Court preliminarily enjoin Defendants from damaging, destroying, or otherwise interfering with Texas's concertina wire fence or, alternatively, enter a stay of Defendants' policy directing the same.

Dated: November 27, 2023.

Respectfully submitted.

**KEN PAXTON**
Attorney General of Texas

**BRENT WEBSTER**
First Assistant Attorney General

**GRANT DORFMAN**
Deputy First Assistant Attorney General

**RALPH MOLINA**
Deputy Attorney General for Legal Strategy

**ROBERT HENNEKE**
Texas Bar No. 24026058
Texas Public Policy Foundation
901 Congress Ave.
Austin, Texas 78701
(512) 472-2700
rhenneke@texaspolicy.com

*/s/ Ryan D. Walters*
**RYAN D. WALTERS**
Chief, Special Litigation Division
Texas Bar No. 24105085

**DAVID BRYANT**
Special Counsel
Texas Bar No. 03281500

**MUNERA AL-FUHAID**
Special Counsel
Texas Bar No. 24094501

**HEATHER L. DYER**
Special Counsel
Texas Bar No. 24123044

Office of the Attorney General
Special Litigation Division
P.O. Box 12548, Capitol Station
Austin, Texas 78711-2548
(512) 936-1706
Ryan.Walters@oag.texas.gov
David.Bryant@oag.texas.gov
Munera.Al-Fuhaid@oag.texas.gov
Heather.Dyer@oag.texas.gov

**COUNSEL FOR PLAINTIFF**

**CERTIFICATE OF SERVICE**

I certify that a true and accurate copy of the foregoing document was filed electronically (via CM/ECF) on November 27, 2023, which automatically serves all counsel of record who are registered to receive notices in this case.

*/s/Ryan D. Walters*
RYAN D. WALTERS