No. 23-50869

——————————

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

——————————

STATE OF TEXAS,

*Plaintiff-Appellant,*

v.

U.S. DEPARTMENT OF HOMELAND SECURITY, *et al.,*

*Defendants-Appellees.*

——————————

## FEDERAL GOVERNMENT'S OPPOSITION TO TEXAS'S
## EMERGENCY MOTION FOR AN INJUNCTION PENDING APPEAL
## AND A TEMPORARY ADMINISTRATIVE INJUNCTION

——————————

BRIAN M. BOYNTON
  *Principal Deputy Assistant Attorney General*

JAIME ESPARZA
  *United States Attorney*

SARAH E. HARRINGTON
  *Deputy Assistant Attorney General*

MELISSA N. PATTERSON
STEVEN A. MYERS
  *Attorneys, Appellate Staff*
  *Civil Division*
  *U.S. Department of Justice*
  *950 Pennsylvania Ave., NW*
  *Washington, DC 20530*
  *202-305-8648*

# CERTIFICATE OF INTERESTED PERSONS

*State of Texas v. U.S. Department of Homeland Security*

A certificate of interested persons is not required under Fifth Circuit Rule

28.2.1, as appellees are all governmental parties.


*/s/ Steven A. Myers*
Steven A. Myers

## INTRODUCTION AND SUMMARY OF ARGUMENT

"The authority to control immigration—to admit or exclude aliens—is vested solely in the Federal Government." *Arizona v. United States*, 567 U.S. 409-10 (2012) (quotation omitted).[1]  Exercising its unquestioned authority, Congress has provided that an "alien present in the United States who has not been admitted" "shall be inspected by immigration officers." 8 U.S.C. § 1225(a)(1), (3).  Without a warrant, Border Patrol agents may "interrogate any alien or person believed to be an alien," "arrest any alien who in his presence or view is entering or attempting to enter the United States in violation of any law," and "have access to private lands" within 25 miles of the border "for the purpose of patrolling the border to prevent the illegal entry of aliens into the United States." *Id.* § 1357(a)(1)-(3).

In recent months, Texas began installing concertina wire—a type of coiled razor wire—near the banks of the Rio Grande in the vicinity of Eagle Pass, Texas. Because the international border lies in the river, a noncitizen who crosses the river and approaches the wire is within the United States.  The wire can impede Border Patrol agents from inspecting these individuals and block them from responding to persons in danger in the river or on the riverbank.  Consistent with their statutory authority and longstanding practice—with respect to any border-adjacent barriers, no

---

[1] Federal law refers to foreign nationals as "aliens."  U.S. Customs and Border Protection typically refers to such persons as noncitizens.  *See Barton v. Barr*, 140 S. Ct. 1442, 1446 n.2 (2020).

matter the owner—agents therefore sometimes cut or move the wire to access the migrants.

Texas contends that state tort law bars federal agents from exercising this authority. While the district court plainly took issue with aspects of federal officials' enforcement of federal law, it nonetheless correctly recognized that the United States is immune from suits seeking injunctive relief under state tort law. *See* Mot.Ex-P 13-20. It also rejected Texas's contention that cutting the wire is ultra vires. *Id.* 22, 34. And it held that Texas failed to identify final agency action under the Administrative Procedure Act (APA), as "courts must reject invitations to find final agency action in an agency's 'continuing (and thus constantly changing) operations.'" *Id.* 32 (quoting *Lujan v. National Wildlife Fed'n*, 497 U.S. 871, 890 (1990)).

Those conclusions are correct, and they are far from the only impediments to an injunction. Beyond sovereign immunity, Texas's state-law claims fail under the Supremacy Clause, which denies states the power "to retard, impede, burden, or in any manner control, the operations of the constitutional laws enacted by Congress to carry into execution the powers vested in the general government." *McCulloch v. Maryland*, 17 U.S. (4 Wheat.) 316, 436 (1819); *see Texas v. Kleinert*, 855 F.3d 305, 313 (5th Cir. 2017). And even if Texas's APA claims identified final agency action, Border Patrol agents act within their statutory authority, and not arbitrarily or capriciously, in moving or cutting wire to execute their duties under federal law. Like other law-enforcement officers' on-the-ground judgment calls, decisions about how and when

2

to exercise Border Patrol's authority at the border are committed to agency discretion. *See* 5 U.S.C. § 701(a)(2).

Moreover, an injunction would contravene 8 U.S.C. § 1252(f)(1), which provides (apart from inapplicable exceptions) that lower courts lack "jurisdiction or authority to enjoin or restrain the operation" of certain provisions of the Immigration and Nationality Act (INA)—including 8 U.S.C. § 1225, which directs inspection of noncitizens, and 8 U.S.C. § 1226, which authorizes apprehension and detention.

Finally, the equities weigh against an injunction, which would flout the Supremacy Clause and interfere with agents' on-the-spot decisions regarding how to enforce federal laws. Officer discretion in such situations is key, not least because while Texas believes that an exception for medical emergencies would leave federal agents able to address life-threatening situations, the many minutes it can take to cut through Texas's dense layers of wire may mean that by the time an emergency is apparent, it is too late. Against such harms, Texas invokes the price of its wire, a purely monetary harm for which it has never sought compensation. And to the extent that Texas relies on broader dissatisfaction with federal immigration policy, Supreme Court decisions "cast significant doubt on whether the Plaintiff can claim indirect increased expenditures or a rise in crime as bases for standing," Mot.Ex-P 12—let alone irreparable harm.

As this Court held five days ago concerning a different border barrier, while Texas may have "frustrations with the problems caused by illegal immigration," "the

State may not pursue policies that undermine federal law." *United States v. Abbott*, --- F.4th ---, 2023 WL 8291577, at *13 (5th Cir. Dec. 1, 2023) (quotation omitted). This Court should deny the motion for an injunction pending appeal and immediately dissolve the temporary administrative stay.

## STATEMENT

### A.     Statutory Background

U.S. Customs and Border Protection (CBP), an agency within the Department of Homeland Security (DHS), is charged with "enforc[ing] and administer[ing] all immigration laws." 6 U.S.C. § 211(c)(8). U.S. Border Patrol is "the law enforcement office of [CBP] with primary responsibility for interdicting persons attempting to illegally enter … the United States." *Id.* § 211(e)(3)(A). Employees authorized by the DHS Secretary to enforce the INA are known as immigration officers. 8 U.S.C. § 1101(a)(18); 8 C.F.R. § 1.2.

A noncitizen "present in the United States who has not been admitted" is "deemed … an applicant for admission." 8 U.S.C. § 1225(a)(1). The INA instructs immigration officers to "inspect[]" all such applicants. *Id.* § 1225(a)(3); *see also id.* § 1226 (authorizing apprehension and detention). Border Patrol agents have authority, without a warrant, "to interrogate any alien or person believed to be an alien as to his right to be or to remain in the United States" and "to arrest any alien who in his presence or view is entering or attempting to enter the United States in violation of any law" where the individual is likely to abscond. *Id.* § 1357(a)(1)-(2).

4

And 8 U.S.C. § 1357(a)(3) provides that "within a distance of twenty-five miles from any" external boundary to the United States, Border Patrol agents shall (again without a warrant) "have access to private lands, but not dwellings, for the purpose of patrolling the border to prevent the illegal entry of aliens into the United States." *Id.* § 1357(a)(3).

## B.   Factual Background

The border between the United States and Mexico near Eagle Pass lies in the Rio Grande. *Abbott*, 2023 WL 8291577, at *5. Agents patrolling the border apprehend noncitizens unlawfully crossing the river, process and inspect them, and place them in removal proceedings. Opp.Ex-A ¶ 4; *see* Mot.Ex-O App'x 7 ("process" refers to a series of steps, including determining whether the noncitizen has "urgent medical needs" or is "an unaccompanied child under the Trafficking Victims Protection Reauthorization Act").

CBP has long advised its agents encountering barriers to the border to coordinate with the relevant private landowner. Opp.Ex-A ¶ 6. As the district court recognized, Border Patrol agents are nonetheless authorized to cut locks or remove barriers to access private lands. Mot.Ex-P 22-23. Texas's witness conceded that Border Patrol agents are "allowed to cut locks on gates" if "in their judgment they feel it necessary" to apprehend a migrant. Mot.Ex-L 111. Congress has granted the Secretary authority to settle "claim[s] for damage to, or loss of, privately owned property caused by an investigative or law enforcement officer … who is employed by

[CBP] and acting within the scope of his or her employment" for up to $50,000, provided the claim "cannot be settled" under the Federal Tort Claims Act (FTCA). 19 U.S.C. § 1630(a).

In 2021, Texas launched Operation Lone Star. Mot.Ex-G ¶ 30. As part of that initiative, Texas has placed concertina wire on private land near the riverbank in Eagle Pass. *Id.* ¶ 32. The wire prevents agents from inspecting or providing emergency assistance to noncitizens who have already entered the United States. Opp.Ex-A ¶¶ 12, 15; Mot.Ex-L 145, 188-89; Opp.Ex-B 7, 22; *see also* Mot.Ex-L 166; Opp.Ex-B 54 (agent unable to reach "unconscious subject floating on top of the water").

Border Patrol agents therefore sometimes cut or move the wire to perform their duties. No policy requires it; instead, guidance within Eagle Pass indicates that (a) agents may cut locks or fences impeding border access where necessary to carry out their duties; (b) absent exigent circumstances, the agents should call a supervisor before cutting the concertina wire; and (c) if exigent circumstances exist or a supervisor is unavailable, the agents should use their judgment in determining how best to apprehend noncitizens or provide medical assistance. *See* Opp.Ex-A ¶¶ 6, 17-19. Texas itself cuts the wire "to address medical emergencies" and "to make arrests." Mot.Ex-L 109.

## ARGUMENT

To obtain an injunction pending appeal, a movant "must show (1) a strong likelihood of success on the merits; (2) irreparable injury in the absence of an

injunction; (3) that the balance of hardships weighs in [its] favor if injunctive relief is granted; and (4) that the public interest favors such relief." *Whole Woman's Health v. Jackson*, 13 F.4th 434, 441 (5th Cir. 2021) (per curiam).  In cases involving the government, the harm to the government and the public interest merge.  *Abbott*, 2023 WL 8291577, at *12.

## I.     The District Court Correctly Rejected Texas's Ultra Vires, State Law, and APA Claims.

### A. Federal Law Authorizes Border Patrol To Cut Concertina Wire.

1.     In addition to giving defendants "the power and duty to control and guard" the border against illegal entry and to "perform such other acts as … necessary for carrying out [such] authority," 8 U.S.C. § 1103(a)(3), (5), as well as to inspect noncitizens under 8 U.S.C. § 1225, Congress gave Border Patrol agents special authority near the border:  8 U.S.C. § 1357(a)(3) allows warrantless access to private lands within 25 miles of an international boundary.  Congress enacted this provision because "the refusal of some property owners along the border to allow patrol officers access" to their land "in order to prevent such illegal entries" was "endanger[ing] the national security" and "affect[ing] the sovereign right of the United States to protect its own boundaries against the entry of aliens."  H.R. Rep. No. 82-1377, at 3 (1952); *see also* 98 Cong. Rec. 1420 (1952) (Rep. Fisher) (opposing legislation because it would authorize agents "to break down a gate or a fence").  The district

court agreed that "DHS has long" used § 1357(a)(3) "to move or cut privately owned fencing." Mot.Ex-P 22.[2]

Texas's wire can obstruct Border Patrol agents from fulfilling their responsibilities, prompting agents to cut or move it in some circumstances. *See* Opp.Ex-A ¶ 16. If agents lacked such authority, a jurisdiction—or even a property owner—opposed to immigration enforcement could enclose an area to impede federal agents. In actuality, as Texas's witness recognized, Border Patrol has statutory authority "to cut locks on gates" if "in their judgment they feel it necessary" to apprehend a migrant. Mot.Ex-L 111. Texas's ultra vires claims are thus meritless. *See* Mot.Ex-P 33-34.

2.      Texas contends that Border Patrol is not adequately apprehending migrants. But Texas's disagreement with the federal government's implementation of immigration statutes does not affect the scope of federal authority. Texas is not suing to alter federal immigration policy generally—nor can it, *see United States v. Texas*, 599 U.S. 670 (2023).

Texas's suggestion that agents cut wire for unauthorized purposes is also wrong. Agents cut the wire to facilitate apprehension, inspection, and processing of migrants or to provide medical assistance. *See* Mot.Ex-L 187; Opp.Ex-A ¶¶ 16, 18;

---

[2] The authority to disturb border impediments is also inherent in the Border Patrol's more general authorities, for Congress enacted § 1357(a)(3) to "positive[ly] … authorize specifically that which must always have been of necessity implied from the time the border patrol was first created." H.R. Rep. No. 82-1377, at 3.

Opp.Ex-B 24 (wire was cut and migrants were "processed without incident");

Opp.Ex-B 28, 29, 33. Indeed, contrary to Texas's discussion of an incident on

September 20, 2023, *see* Mot. 8-9, testimony demonstrated that Border Patrol agents

were stationed to "direct[]" migrants who had entered through the cut wire to a

"staging area" for "processing," Mot.Ex-L 169-70. Agents are sometimes

outnumbered fifty-to-one, *id.* 149; Border Patrol agents' exercise of discretion in such

circumstances in no way suggests that they cut wire for illegal purposes.

The district court believed that Border Patrol should "take steps to turn

migrants … back across the border into Mexico." Mot.Ex-P 24. Migrants sometimes

voluntarily "respond[] to United States enforcement efforts by returning promptly to

the country from which such crosser entered." 6 U.S.C § 223(a)(9) (defining "turn

back"). But the district court erred insofar as it concluded, Mot.Ex-P 24-26, that

Border Patrol can order or force a migrant back across the border; a noncitizen

"present in the United States who has not been admitted or who arrives in the United

States (whether or not at a designated port of arrival … )" is "deemed … an applicant

for admission," with certain rights, including applying for asylum. 8 U.S.C.

§ 1225(a)(1); *see also id.* § 1225(b)(1)(A)(ii); *id.* § 1158(a). Once migrants are "located

'in the United States,'" DHS "cannot unilaterally return" applicants for admission "to

Mexico." *Biden v. Texas*, 597 U.S. 785, 806 (2022). While entering the country outside

a port of entry is a crime, Mot.Ex-P 23 (citing 8 U.S.C. § 1325), even "an alien who

tries to enter the country illegally is treated as an 'applicant for admission,'" *DHS v. Thuraissigiam*, 140 S. Ct. 1959, 1982 (2020).[3]

### B. The United States Cannot Be Enjoined Under State Tort Law.

Texas's attempt to force the federal government to conform its activities to state tort law should be rejected for reasons the district court found and reasons it did not reach.

1.      "The federal government enjoys complete sovereign immunity except as it has consented to be sued and consented to submit to liability." *In re Supreme Beef Processors, Inc.*, 468 F.3d 248, 255 (5th Cir. 2006) (en banc). A waiver of sovereign immunity must be "strictly construed, in terms of its scope," in favor of the sovereign, *Lane v. Pena*, 518 U.S. 187, 192 (1996), and Congress must "provide[] 'clear and unambiguous' authorization" to permit state law to regulate federal activities, *Goodyear Atomic Corp. v. Miller*, 486 U.S. 174, 180 (1988). The district court correctly held that no such waiver applies to Texas's state-law claims. *See* Mot.Ex-P 13-20.

Texas invokes 5 U.S.C. § 702, but that statute's waiver applies to claims "arising under 28 U.S.C. § 1331," *Alabama-Coushatta Tribe of Tex. v. United States*, 757 F.3d 484, 488 (5th Cir. 2014)—the federal question statute. And "[h]ad Congress intended to

---

[3] *Sale v. Haitian Centers Council, Inc.*, 509 U.S. 155 (1993), addresses "the President's authority to repatriate aliens interdicted beyond the territorial seas of the United States," *id.* 187, not "statutory protections" that are afforded migrants who "have arrived at the border of the United States," *id.* 160. *Cf.* Mot.Ex-P 24.

include common law claims for conversion or trespass to chattels or other state law claims under Section 702, it could have so stated." Mot.Ex-P 19; *see also El-Shifa Pharm. Indus. v. United States*, 607 F.3d 836, 854 (D.C. Cir. 2010) (en banc) (Kavanaugh, J., concurring) ("[T]he APA does not borrow state law or permit state law to be used as a basis for seeking injunctive or declaratory relief against the United States.").[4]

In addition, whatever the scope of § 702's waiver generally, it does not extend to state *tort* claims. Section 702 does not apply when "any other statute that grants consent to suit expressly or impliedly forbids the relief which is sought," 5 U.S.C. § 702. Where a separate statute "specifically authorizes" a type of action against the federal government, "a plaintiff cannot use the APA to end-run [its] limitations." *Match-E-Be-Nash-She-Wish Band of Pottawatomi Indians v. Patchak*, 567 U.S. 209, 216 (2012).

The FTCA provides "the exclusive remedy for compensation for a federal employee's tortious acts committed in the scope of employment," *McGuire v. Turnbo*, 137 F.3d 321, 324 (5th Cir. 1998). It permits money damages, not prospective relief,

---

[4]  The D.C. Circuit later concluded that § 702 does waive immunity for certain claims asserting a breach of fiduciary duty under state law, *see Perry Capital LLC v. Mnuchin*, 864 F.3d 591, 620 (D.C. Cir. 2017), but it did not explain that conclusion or engage with then-Judge Kavanaugh's reasoning in *El-Shifa*. The Third Circuit reached a similar holding, *see Treasurer of N.J. v. U.S. Dep't of Treasury*, 684 F.3d 382, 400 n.19 (3d Cir. 2012), but then concluded that application of state law to the federal government would violate the Supremacy Clause, *id.* 409-412. None of Texas's other cases, Mot. 14-15, involved claims asserted under state law.

and places discretionary functions and actions authorized by statute beyond the reach of state tort laws. *See* 28 U.S.C. § 2680. Those exceptions "prevent judicial 'second-guessing' of legislative and administrative decisions." *United States v. Varig Airlines*, 467 U.S. 797, 814 (1984).

Texas's state tort claims are the same "kind of grievance" regulated by the FTCA. *Match-E-Be-Nash-She-Wish*, 567 U.S. at 217. If "Congress has dealt in particularity with a claim and has intended a specified remedy—including its exceptions—to be exclusive, that is the end of the matter; the APA does not undo the judgment." *Id.* 216 (alteration and quotation omitted); *accord Supreme Beef Processors*, 468 F.3d at 255 ("FTCA's incorporation of state tort law" cannot be "divorced from that statute's express limits on liability"). Texas thus cannot use the APA to end-run the FTCA and its limitations.

2.      Even beyond sovereign immunity, under the Supremacy Clause, states have no power "to retard, impede, burden, or in any manner control, the operations of the constitutional laws enacted by Congress to carry into execution the powers vested in the general government." *McCulloch*, 17 U.S. at 436.[5] The Supremacy Clause thus "prohibit[s] States from interfering with or controlling the operations of the

---

[5] "An absence of [sovereign] immunity does not result in liability" where the substantive law invoked does not "reach the federal entity." *U.S. Postal Serv. v. Flamingo Indus. (USA) Ltd.*, 540 U.S. 736, 744 (2004).

Federal Government." *United States v. Washington*, 596 U.S. 832, 838 (2022) ("[T]his constitutional doctrine" is "often called the intergovernmental immunity doctrine.").

This Court has held that "Supremacy Clause immunity protects federal officers, acting within their federal authority, from liability under state law," whether by prosecution or civil suit. *Kleinert*, 855 F.3d at 313. That prohibition extends to "even the most unquestionable and most universally applicable of state laws," which "will not be allowed to control the conduct of" federal officials "acting under and in pursuance of" federal law. *Johnson v. Maryland*, 254 U.S. 51, 56-57 (1920); *see also, e.g.*, *Arizona v. California*, 283 U.S. 423, 451 (1931). Because the conduct about which Texas complains is authorized by federal law, it may not be enjoined under state law.[6]

3.    Texas suggested below that the Supremacy Clause does not apply because its tort laws neither discriminate against nor directly regulate the United States. Mot.Ex-T 6. But in *Kleinert*, this Court addressed both the application of a broadly applicable state criminal law and the availability of "private suit" under state law. 855 F.3d at 314; *see also, e.g.*, *Johnson*, 254 U.S. at 56 (doctrine applies to the "most universally applicable of state laws"); *Geo Grp. Inc. v. Newsom*, 50 F.4th 745, 760 (9th Cir. 2022) (en banc) (Supremacy Clause applies to "a generally applicable state regulation … when the regulation would control federal operations").

---

[6] Preemption principles underscore that a state may not use its tort laws to regulate federal actors; state laws are (at a minimum) preempted where "the challenged state law stands as an obstacle to" achieving "the full purposes and objectives of Congress." *Arizona*, 567 U.S. at 399 (quotation omitted).

Texas also suggested below that this theory of federal supremacy has been "repudiated," Mot.Ex-T 6 (quoting *South Carolina v. Baker*, 485 U.S. 505, 520 (1988)), but the case upon which it relied deals only with "immunity for government contract income," *Baker*, 485 U.S. at 520. Finally, it suggested—startlingly—that such immunity disappears if an action is litigated in federal court, Mot.Ex-T 6, but *Kleinert* itself affirmed a *federal* court's dismissal of an indictment on Supremacy Clause grounds. *See also Geo Grp.*, 50 F.4th at 752 (action in federal court).

### C. Texas Cannot Obtain Relief Under The APA.

Texas also challenges the district court's determination that it failed to identify final agency action under the APA, *see* Mot.Ex-P 31-33. But that ruling was correct, and there are numerous other reasons why Texas's APA claims fail.

### 1. Texas Does Not Challenge Final Agency Action.

The APA's cause of action does not authorize programmatic attacks on day-to-day agency operations. It instead authorizes review of "final agency action," 5 U.S.C. § 704—agency action under 5 U.S.C. § 551(13) that is "final" under § 704. As the district court recognized, courts must "take great care not to confuse final agency action with … broader programmatic decisions" and "reject invitations to find final agency action in an agency's 'continuing (and thus constantly changing) operations.'" Mot.Ex-P 31-32 (quoting *Lujan*, 497 U.S. at 890). Even after "review[ing] thousands of pages of emails, reports, and other documents," the district court determined that

14

Texas had not satisfied its burden of demonstrating "a substantial likelihood that it will establish the existence of a final agency action." *Id.* 32-33.[7] That conclusion was correct.

There is no agency policy requiring Border Patrol agents to cut or move concertina wire. Instead, the guidance within Eagle Pass indicates that (a) they may cut locks or fences that impede border access where necessary to carry out their statutory duties; (b) absent exigent circumstances, they should call a supervisor before cutting concertina wire; and (c) if exigent circumstances exist or a supervisor is unavailable, they should use their judgment. *See* Opp.Ex-A ¶¶ 6, 17-19. That does not constitute final agency action.

To be final, an action "must mark the consummation of the agency's decisionmaking process," not be "merely tentative or interlocutory," and—importantly—"must be one by which rights or obligations have been determined, or from which legal consequences will flow." *U.S. Army Corps of Eng'rs v. Hawkes Co.*, 578 U.S. 590, 597 (2016) (quotation omitted). Here, the guidance necessarily contemplates future agency decisionmaking based on the facts presented in a particular circumstance, rendering it nonfinal. *See DRG Funding Corp. v. Secretary of*

---

[7] Texas complains (Mot. 10) that the district court did not make the documents it ordered defendants to produce *in camera* available to it, but the district court made clear that it was "not relying on any particular document." Mot.Ex-P 6 n.1. Nor did Texas articulate any theory for why these documents—the production of which the district court required *sua sponte*—was necessary to resolve its preliminary injunction motion.

15

*Hous. & Urban Dev.*, 76 F.3d 1212, 1215 (D.C. Cir. 1996).  Moreover, no legal consequences flow from the guidance:  it does not "bind[ the agency] and its staff to a legal position," "retract an agency's discretion to adopt a different view of the law," "create[] safe harbors protecting private parties from adverse action," "prescribe a multi-factor framework," or otherwise "limit[] discretion."  *Texas v. EEOC*, 933 F.3d 433, 441-43 (5th Cir. 2019).  Nor does the guidance "force[] the plaintiff either to alter its conduct, or expose itself to potential liability."  *Id.* 446 (quotation omitted).[8]

### 2. Border Patrol Decisions Regarding The Concertina Wire Are Committed To Agency Discretion By Law.

Even if Texas challenged final agency action, the decision whether to cut concertina wire to apprehend and inspect migrants in any particular instance goes to the core of law-enforcement discretion under 5 U.S.C. § 702.

There are "certain categories of administrative decisions that courts traditionally have regarded as 'committed to agency discretion.'"  *Lincoln v. Vigil*, 508 U.S. 182, 191 (1993).  One such category is decisions over whether and how to arrest noncitizens because, "[u]nder Article II, the Executive Branch possesses authority to decide 'how to prioritize and how aggressively to pursue legal actions against defendants who violate the law.'"  *Texas*, 599 U.S. at 678-79.  "[C]ourts generally lack

---

[8] Relatedly, Texas does not challenge a legislative rule requiring notice-and-comment rulemaking.  "Legislative rules are ones with the 'force and effect of law … .'"  *Mock v. Garland*, 75 F.4th 563, 578 (5th Cir. 2023).

meaningful standards for assessing the propriety of enforcement choices in this area." *Id.* 679.

The pertinent statutes grant agents broad discretion and do not provide "meaningful standards for defining the limits of that discretion." *Heckler v. Chaney*, 470 U.S. 821, 834 (1985). Nor do they provide a meaningful standard for this Court to judge *ex ante* which methods and actions are permissible in carrying out defendants' law-enforcement responsibilities. *See Texas*, 599 U.S. at 680 (The "complicated balancing process" involved in "devising arrest and prosecution policies" "leaves courts without meaningful standards for assessing those policies."). Just as law-enforcement officers' on-the-spot judgments regarding when to run a red light in pursuit of a fleeing subject are committed to discretion, so are decisions regarding breaches of barriers to border-adjacent lands.

### 3.  It Is Not Arbitrary Or Capricious To Cut Concertina Wire To Reach Migrants.

Even if review were available, it is not arbitrary or capricious to cut concertina wire to reach migrants, especially given the "narrow and highly deferential" nature of such review. *Sierra Club v. U.S. Dep't of Interior*, 990 F.3d 909, 913 (5th Cir. 2021) (quotation omitted). Border Patrol agents do so where necessary to execute their statutory duties to apprehend and inspect migrants. As the district court recognized, guidance since at least the 1980s has permitted agents to cut locks or fences impeding

border access.  Mot.Ex-P 22-23; *see* Opp.Ex-A ¶ 6; Mot.Ex-L 111.  These reasoned actions easily satisfy arbitrary-and-capricious review.

Texas admitted that state employees themselves cut the wire to address "medical emergencies" and "make arrests."  Mot.Ex-L 109.  And Texas acknowledges Border Patrol agents may cut the wire to prevent serious injury.  *Id.* 28.  Yet undisputed testimony demonstrated that if agents must wait to cut the wire until an emergency is in progress, it may be too late.  *Id.* 132 (noting that it can take 10 to 30 minutes to cut through Texas's layers of wire).  To prevent death or injury, agents instead may need to be "proactive" when they "anticipate an emergency may arise." *Id.* 122; *see id.* 128, 161.

## II.   This Court May Not Enjoin Or Restrain Enforcement Of The INA.

The injunction Texas seeks would violate 8 U.S.C. § 1252(f)(1), which provides that with certain inapplicable exceptions, lower courts lack "jurisdiction or authority to enjoin or restrain the operation" of 8 U.S.C. §§ 1221-1231—the provisions of the INA "governing the inspection, apprehension, examination, and removal of aliens." *Garland v. Aleman Gonzalez*, 596 U.S. 543, 549-50 (2022).  Those provisions include § 1225, which directs the inspection of noncitizens, and § 1226, which authorizes apprehension and detention.

Section 1252(f)(1) "prohibits lower courts from entering injunctions that order federal officials to take or to refrain from taking actions to enforce, implement, or

otherwise carry out the specified statutory provisions." *Aleman Gonzalez*, 596 U.S. at 550. Because an injunction would require defendants to "refrain from actions that (… in the Government's view) are allowed" by § 1225, it would "interfere with the Government's efforts to operate" that provision, *id.* 551, and is therefore impermissible.

Texas incorrectly suggested below that an injunction would cause only a "collateral effect on the operation" of § 1225. *Aleman Gonzalez*, 596 U.S. at 553 n.4. To the contrary, an injunction would directly impede Border Patrol's ability to reach and inspect migrants on U.S. soil—to determine whether the migrants are inadmissible, present a security risk, are seeking asylum or other humanitarian protection, or belong in a particular immigration-law pathway. *See* 8 U.S.C. § 1225(b)(1)(A)(i), (b)(2)(A); *see also* Mot.Ex-O App'x 2. When performing these functions, agents are discharging their responsibilities under § 1225, which "is among the provisions the 'operation' of which cannot be 'enjoined or restrained' under § 1252(f)(1)." *Aleman Gonzalez*, 596 U.S. at 551.

### III.    The Equitable Factors Do Not Support An Injunction.

1.    Although the district court concluded that Texas faced irreparable harm, its analysis demonstrated otherwise. Texas complains that it must spend money repairing its wire. If there were no authority for Border Patrol agents to cut the wire, Texas could try to seek compensation under the FTCA. *See* Mot.Ex-T 16 (Texas acknowledging it may try). Texas could alternatively seek compensation under 19

U.S.C. § 1630(a). The district court acknowledged that money can remedy property damage, Mot.Ex-P 13, 19, 20, yet asserted without explanation that "compensation for past injury cannot adequately redress the prospect of continuing or future harm," *id.* 13 n.7.

Texas's remaining theories boil down to a desire to "achieve its own immigration policy," but "[t]his is not the system Congress created." *Arizona*, 567 U.S. at 408. Texas has no judicially cognizable interest in how the federal government exercises its enforcement discretion, *Texas*, 599 U.S. at 677-78, and reframing that interest as "indirect effects on state revenues or state spending" does not overcome this "fundamental" problem, *id.* 680 n.3. The district court thus correctly declined to base Texas's standing on such alleged injuries, Mot.Ex-P 12, and using such asserted harms as the basis for *enjoining* the federal government would be extraordinary. *See Gill v. Whitford*, 138 S. Ct. 1916, 1934 (2018) ("[S]tanding is not dispensed in gross: A plaintiff's remedy must be tailored to redress the plaintiff's particular injury." (quotation omitted)). In any event, the number of migrants crossing near Eagle Pass despite the wire undermines any claim that Texas's barriers have a "meaningful impact." *Abbott*, 2023 WL 8291577, at *10; Mot.Ex-L 193.

2.      Granting Texas's motion would cause the United States irreparable harm, not least because the injunction would flout the Supremacy Clause and thus represent irreparable injury per se. *See Maryland v. King*, 567 U.S. 1301, 1303 (2012) (Roberts, C.J., in chambers); *cf. Texas Midstream Gas Servs., LLC v. City of Grand Prairie*,

608 F.3d 200, 206 (5th Cir. 2010) (determination that statute is expressly preempted satisfies all criteria for injunction).  More concretely, the injunction would directly interfere with defendants' efforts to enforce federal law.  Opp.Ex-A ¶ 15.  And while Texas nods to a potential exception for medical emergencies, an injunction that permits wire-cutting only for emergencies in progress would often apply too late to render life-saving aid.  *See supra* p.18.  Such extraordinary interference with federal law-enforcement officers' on-the-ground decisions in dangerous circumstances weighs heavily against an injunction.  *See Abbott*, 2023 WL 8291577, at *13 (equities favored United States given "threat to … federal government operations" and "human life"); *Winter v. Natural Res. Def. Council*, 555 U.S. 7, 23 (2008).[9]

---

[9] By limiting defendants' ability to provide emergency assistance, the injunction would also negatively affect foreign relations.  *See Abbott*, 2023 WL 8291577, at *11-12; *see also* Gov't of Mex., Information Note No. 05 (July 26, 2023), https://perma.cc/F932-U9T9 (concern over "alleged human rights violations"); Opp.Ex-B 8 (photographs of injuries).

21

## CONCLUSION

The Court should deny the motion for an injunction pending appeal and immediately dissolve the administrative stay.

Respectfully submitted,

BRIAN M. BOYNTON
  *Principal Deputy Assistant Attorney General*

JAIME ESPARZA
  *United States Attorney*

SARAH E. HARRINGTON
  *Deputy Assistant Attorney General*

MELISSA N. PATTERSON
  */s/ Steven A. Myers*
STEVEN A. MYERS
  *Attorneys, Appellate Staff*
  *Civil Division*
  *U.S. Department of Justice*
  *950 Pennsylvania Ave., NW*
  *Washington, DC 20530*
  *202-305-8648*

DECEMBER 2023

## CERTIFICATE OF COMPLIANCE

I hereby certify that this response complies with the requirements of Federal
Rule of Appellate Procedure 27(d) because it has been prepared in 14-point
Garamond, a proportionally spaced font.  I further certify that this response complies
with the type-volume limitation of Federal Rule of Appellate Procedure 27(d)(2)
because it contains 5197 words according to the count of Microsoft Word.

/s/ *Steven A. Myers*
STEVEN A. MYERS
Counsel for Appellees

## CERTIFICATE OF SERVICE

I hereby certify that, on December 6, 2023, I electronically filed the foregoing response with the Clerk of the Court by using the appellate CM/ECF system. I further certify that the participants in the case are CM/ECF users and that service will be accomplished by using the appellate CM/ECF system.

/s/ Steven A. Myers
STEVEN A. MYERS
Counsel for Appellees