# United States Court of Appeals
# for the Fifth Circuit

United States Court of Appeals
Fifth Circuit

**FILED**

December 19, 2023

Lyle W. Cayce
Clerk

No. 23-50869

STATE OF TEXAS,

*Plaintiff—Appellant,*

*versus*

UNITED STATES DEPARTMENT OF HOMELAND SECURITY; ALEJANDRO MAYORKAS, *Secretary, U.S. Department of Homeland Security*; UNITED STATES CUSTOMS AND BORDER PROTECTION; UNITED STATES BORDER PATROL; TROY MILLER, *Acting Commissioner, U.S. Customs and Border Protection*; JASON OWENS, *in his official capacity as Chief of the U.S. Border Patrol*; JUAN BERNAL, *in his official capacity as Acting Chief Patrol Agent, Del Rio Sector United States Border Patrol*,

*Defendants—Appellees.*

Appeal from the United States District Court
for the Western District of Texas
USDC No. 2:23-CV-55

Before HAYNES, WILLETT, and DUNCAN, *Circuit Judges*.

STUART KYLE DUNCAN, *Circuit Judge*:[1]

---

[1] JUDGE HAYNES does not join the order as she would send this case to a merits panel as an expedited appeal and would grant an administrative stay for a brief period of

No. 23-50869

<u>PUBLISHED ORDER</u>

Texas seeks an injunction pending appeal to prevent the United States Border Patrol from cutting, destroying, or otherwise interfering with concertina wire ("c-wire") Texas has constructed along more than 29 miles of municipal and private land in the Eagle Pass sector of our southern border. The district court granted Texas a temporary restraining order, after which it held hearings, heard testimony from multiple witnesses, and received copious documentary evidence. Despite making numerous fact findings supporting Texas's claims, the district court ruled that the United States' sovereign immunity had not been waived under 5 U.S.C. § 702 and that the court was therefore barred from converting the TRO into a preliminary injunction. Texas immediately appealed and sought an emergency injunction pending appeal. The panel granted a temporary administrative stay while considering the parties' submissions.

Concluding that the district court legally erred with respect to sovereign immunity and that Texas has otherwise satisfied the factors under *Nken v. Holder*, 556 U.S. 418, 434 (2009), we GRANT Texas's request for an injunction pending appeal. Accordingly, Defendants are ENJOINED during the pendency of this appeal from damaging, destroying, or otherwise interfering with Texas's c-wire fence in the vicinity of Eagle Pass, Texas, as indicated in Texas's complaint. As the parties have agreed, Defendants are permitted to cut or move the c-wire if necessary to address any medical emergency as specified in the TRO. *See* App. K at 4, 9–11 (Oct. 30, 2023).

---

time, deferring the question of the stay pending appeal to the oral argument merits panel which receives this case.

No. 23-50869

## I. Facts and Proceedings

We briefly summarize the procedural history and the district court's relevant fact findings. *See generally* App. P at 6–10.

### A.

Along the 1,200 miles of the Rio Grande forming the border between Texas and Mexico, there are 29 official points of entry into the United States. To guard the "vast stretches of land between" those points, Congress created the Border Patrol, whose objective is to "deter illegal entry into the United States." In recent years, illegal crossings have increased dramatically. "The number of Border Patrol encounters with migrants illegally entering the country has swelled from a comparatively paltry 458,000 in 2020 to 1.7 million in 2021 and 2.4 million in 2022." Unsurprisingly, the situation has been exploited by drug cartels, who have made "an incredibly lucrative enterprise" out of trafficking human beings and illegal drugs like fentanyl, which "is frequently encountered in vast quantities at the border."

In 2021, Texas launched Operation Lone Star to aid the Border Patrol through allocation of state resources. The activity in question here is Texas's "laying of concertina wire along several sections of [the] riverfront." The c-wire serves as a "deterrent—an effective one at that," causing illegal crossings to drop precipitously. "By all accounts, Border Patrol is grateful for the assistance of Texas law enforcement, and the evidence shows the parties work cooperatively across the state, including in El Paso and the Rio Grande Valley."

There has been conflict in the Eagle Pass area, however. Maverick County and Eagle Pass are "the epicenter of the present migrant influx: nearly a quarter of migrant entries into the United States happen there." Border Patrol has set up a temporary processing center in Maverick County on private land close to the Rio Grande. By September 2023, Texas had

No. 23-50869

installed over 29 miles of c-wire in this area. Both the Border Patrol and Texas agree that the c-wire must be cut in the event of an emergency, such as the threat of a migrant's drowning or suffering heat exhaustion. "The problem arises when Border Patrol agents cut the wire without prior notification to [Texas] for reasons other than emergencies."

## B.

On October 24, 2023, Texas sued Defendants[2] in federal court alleging common law conversion, common law trespass to chattels, and violations under the Administrative Procedure Act ("APA"). Among other relief, Texas sought a preliminary injunction based on its trespass to chattels claim. Three days later, Texas sought a TRO. The following day, Texas filed a notice with the district court alleging that "the Defendants, knowing a motion for a TRO had already been filed, used a forklift to seize concertina wire and smash it to the ground." The court granted an emergency TRO on October 30, 2023, barring Defendants "from interfering with [Texas's] concertina wire except for medical emergencies." Over the ensuing month, the court held two hearings on Texas's motion for a preliminary injunction; heard testimony from multiple witnesses; and received thousands of pages of evidence (including five videos) as a result of expedited discovery. The court also twice extended the TRO.

Although the court would ultimately deny a preliminary injunction on sovereign immunity grounds, the court made numerous fact findings supporting Texas's trespass to chattels claim. As a general matter, the court

---

[2] Defendants are the U.S. Department of Homeland Security and its Secretary, Alejandro Mayorkas; U.S. Customs and Border Protection; U.S. Border Patrol; Troy Miller, Acting Commissioner of U.S. Customs and Border Protection; Jason Owens, Chief of the U.S. Border Patrol; and Juan Bernal, Acting Chief Patrol Agent, Del Rio Sector U.S. Border Patrol.

No. 23-50869

rejected Defendants' claims that the Border Patrol was justified in cutting the c-wire: (1) to inspect, apprehend, and detain illegal aliens; and (2) to prevent or address medical emergencies. To the contrary, the court found that the Border Patrol cut the c-wire "for no apparent purpose other than to allow migrants easier entrance further inland."

While noting it was "aware of at least fourteen incidents of wire cutting," the court focused on a September 20 incident that was captured on video and was, in the court's view, "most illustrative."[3] In that incident, Border Patrol agents cut two additional holes in the c-wire 15 feet away from an existing hole and installed "a climbing rope for migrants." Meanwhile, a Border Patrol boat "passively observ[ed] a stream of migrants" crossing the river who were never "interviewed, questioned as to citizenship, or in any way hindered in their progress into the United States." Instead, after letting the migrants through, the Border Patrol sent them to "walk as much as a mile or more" with no supervision in hopes they would proceed to the nearest immigration processing center.

The court first rejected as a factual matter Defendants' claim that the Border Patrol's actions were intended to "inspect, apprehend, and process" incoming aliens.[4] The court found no alien was "inspected" at all. Moreover, if agents intended to inspect, they could have done so without doing anything

---

[3] Because the video was not yet publicly available, the court included still photos from the video as an appendix to its opinion. We have included the same photos as an appendix to this order.

[4] *See* 6 U.S.C. § 211(c)(8)(B) (setting out Commissioner's responsibility for "the detection, interdiction, removal, departure from the United States, short-term detention, and transfer of persons unlawfully entering, or who have recently unlawfully entered, the United States"); 8 U.S.C. § 1357(a) (authorizing agents, "within a distance of twenty-five miles from any . . . external boundary [of the United States] to have access to private lands, but not dwellings, for the purpose of patrolling the border to prevent the illegal entry of aliens into the United States").

No. 23-50869

to the wire. As the court noted, "Border Patrol agents already possess access to both sides of the fence . . . to the river and bank by boat and to the further-inland side of the fence by road." Nor was wire-cutting necessary to "apprehend" or "process" aliens. Indeed, no one was "apprehended" or placed in "custody"—as the court found, aliens coming through the holes were merely waived along in the "hope that [they] will flow in an orderly manner . . . to the nearest processing center." Moreover, agents let "some 4,555 migrants [in] during [the September 20] incident, but only 2,680 presented themselves for processing." Accordingly, the court found that "[n]o reasonable interpretation of the[] definitions [of 'apprehension' or 'detention'] can square with Border Patrol's conduct."

The court also rejected Defendants' argument that wire-cutting was generally necessary to prevent "medical emergencies." To be sure, the court (and the parties) recognized that "injury, drowning, dehydration, and fatigue are real and common perils in this area of the border," and so "medical emergencies justify cutting or moving [Texas's] fence." But the court rejected the notion that medical emergencies could justify any and all destruction of the c-wire. "While an ongoing medical emergency can justify opening the fence, the end of that exigency ends the justification." So, for example, "cutting the wire to address a single individual's display of distress does not justify leaving the fence open for a crowd of dozens or hundreds to pass through." The court also rejected Defendants' argument that cutting the c-wire could be justified because it would assist in the "prevention of possible future exigencies."

Despite these findings, the district court nonetheless denied Texas's request for a preliminary injunction. The court recognized that 5 U.S.C. § 702 generally waives the United States' sovereign immunity for claims for non-monetary relief based on an agency official's act or failure to act. Nonetheless, the court reasoned that § 702 does not "unequivocally"

No. 23-50869

encompass injunctive relief under common law conversion or trespass to chattels claims. Additionally, the court found that, "at this early stage of the case," Texas had not shown the c-wire cutting resulted from final agency action. Finally, the court found that there was "insufficient evidence at this juncture" to support Texas's *ultra vires* claim under 5 U.S.C.§ 706(2)(C).

Texas immediately appealed, seeking an emergency injunction pending appeal or a temporary administrative stay while the panel considered its motion. The panel granted an administrative stay. Defendants have since filed an opposition to Texas's request and Texas has filed a reply in support.

## II. Standard of Review

"[W]e consider four factors in deciding whether the grant a stay pending appeal: (1) whether [Texas] has made a strong showing that [it] is likely to succeed on the merits; (2) whether [Texas] will be irreparably injured absent a stay; (3) whether issuance of the stay will substantially injure the other parties interested in the proceeding; and (4) where the public interest lies." *SEC v. Barton*, 79 F.4th 573, 581 (5th Cir. 2023) (quoting *Nken*, 556 U.S. at 434). When the United States is the opposing party, the third and fourth requirements merge. *Nken*, 556 U.S. at 435.

## III. Discussion

### A.

We begin with Texas's likelihood of success on the merits of its common law trespass to chattels claim. For purposes of the TRO, the district court concluded Texas was likely to prevail on this claim. But the court nonetheless denied Texas's requested preliminary injunction because it concluded that 5 U.S.C. § 702 did not clearly waive sovereign immunity for claims of this sort. We disagree.

No. 23-50869

The federal government and its agencies are immune from suits, even by states, unless Congress clearly consents by waiving sovereign immunity. *See FDIC v. Meyer*, 510 U.S. 471, 475 (1994); *California v. Arizona*, 440 U.S. 59, 61–62 (1979). Any waiver must be clear and ambiguities are construed strictly in favor of immunity. *La. Dep't of Env't Quality v. EPA*, 730 F.3d 446, 448–49 (5th Cir. 2013).

Section 702 of the APA provides in relevant part:

> An action in a court of the United States seeking relief other than money damages and stating a claim that an agency or an officer or employee thereof acted or failed to act in an official capacity or under color of legal authority shall not be dismissed nor relief therein be denied on the ground that it is against the United States or that the United States is an indispensable party.

5 U.S.C. § 702. We have explained that § 702 "generally waives" sovereign immunity, *Apter v. HHS*, 80 F.4th 579, 589 (5th Cir. 2023), including for "suits seeking nonmonetary relief through nonstatutory judicial review of agency action." *Geyen v. Marsh*, 775 F.2d 1303, 1307 (5th Cir. 1985); *see also Doe v. United States*, 853 F.3d 792, 798–99 (5th Cir. 2017) (explaining that § 702 "broaden[s] the avenues for judicial review of agency action by eliminating the defense of sovereign immunity" in suits seeking nonmonetary relief).

Section 702 plainly waives immunity for Texas's trespass to chattels claim. That claim was brought as "[a]n action" in federal court; it "seek[s] relief other than monetary damages"; and it "stat[es] a claim" that a federal agency's officials and employees "acted or failed to act in an official capacity or under color of legal authority." Accordingly, Texas's claim "shall not be dismissed nor relief therein be denied on the ground that it is against the

No. 23-50869

United States." 5 U.S.C. § 702. The district court legally erred by ruling otherwise.

Instead of relying on Section 702's plain terms, the district court read the provision strictly to preclude an immunity waiver. The court would have required a Fifth Circuit or Supreme Court decision explicitly reading "an action" in § 702 to include state or common law trespass to chattels claims. This misapplies the principle that courts should construe ambiguities strictly in favor of sovereign immunity, however. *See Sebelius v. Cloer*, 569 U.S. 369, 380–81 (2013). That principle does not apply here because there is no ambiguity. Section 702's plain terms waive sovereign immunity for "any suit" seeking nonmonetary relief in federal court. Richard Fallon et al., Hart & Wechsler's The Federal Courts and the Federal System 902 (7th ed. 2015).

Numerous federal circuits follow this plain-language reading of § 702.[5] For example, the D.C. Circuit has "repeatedly . . . rejected" the argument that § 702's waiver applies only to actions arising under the APA. *Trudeau v. FTC*, 456 F.3d 178, 186 (D.C. Cir. 2006) ("There is nothing in the language of the second sentence of § 702 that restricts its waiver to suits brought under the APA."). That court explained that § 702's "clear purpose" was to "elimina[te] the sovereign immunity defense in *all* equitable actions for specific relief against a Federal agency or officer acting in an

---

[5] *See, e.g.*, *Delano Farms Co. v. Ca. Table Grape Comm'n*, 655 F.3d 1337, 1344 (Fed. Cir. 2011); *Veterans for Common Sense v. Shinseki*, 644 F.3d 845, 866 (9th Cir. 2011); *Michigan v. U.S. Army Corps of Eng'rs*, 667 F.3d 765, 775 (7th Cir. 2011); *Blagojevich v. Gates*, 519 F.3d 370, 371–72 (7th Cir. 2008); *Puerto Rico v. United States*, 490 F.3d 50, 57–58 (1st Cir. 2007); *Muniz-Muniz v. U.S. Border Patrol*, 741 F.3d 668, 672 (6th Cir. 2013); *Presbyterian Church (U.S.A.) v. United States*, 870 F.2d 518, 525 (9th Cir. 1989); *Red Lake Band of Chippewa Indians v. Barlow*, 846 F.2d 474, 476 (8th Cir. 1988); *B.K. Instrument, Inc. v. United States*, 715 F.2d 713, 724–25 (2d Cir. 1983).

No. 23-50869

official capacity." *Ibid.* (quoting *Sea-Land Serv., Inc. v. Alaska R.R.*, 659 F.2d 243, 244 (D.C. Cir. 1981)). Similarly, the Third Circuit has explained that "the waiver of sovereign immunity in section 702 extends to *all nonmonetary claims against federal agencies and their officers*, regardless of whether or not the cases seek review of 'agency action' or 'final agency action.'" *Treasurer of N.J. v. U.S. Dep't of Treasury*, 684 F.3d 382, 397 (3d Cir. 2012) (emphasis added). Applying that principle, the court ruled the § 702 waiver applied to New Jersey's claims against the U.S. Treasury under the state's unclaimed property acts. *Id.* at 389–90, 400 n.19. In sum, the district court erred in interpreting § 702, which by its plain terms waives the United States' sovereign immunity for Texas's trespass to chattels claim.[6]

Defendants do not meaningfully engage with the plain language of § 702 or with the precedents applying it. Instead, they raise alternative arguments in support of the district court's denial of a preliminary injunction. All are unavailing.

First, Defendants argue that the Federal Tort Claims Act is the exclusive remedy for all state tort actions, regardless of the remedy they seek. We disagree. Defendants offer little support for this argument, which finds no purchase in the language of the FTCA and has been rejected by our sister

---

[6] Our circuit does not appear to have addressed this § 702 issue directly. However, in *Alabama-Coushatta Tribe of Texas v. United States*, 757 F.3d 484 (5th Cir. 2014), we favorably cited both the D.C. Circuit's *Trudeau* decision, as well as the 7th Circuit's *Michigan v. U.S. Army Corps of Engineers* decision, both of which adopt a plain-language reading of § 702. *See Alabama-Coushatta*, 757 F.3d at 489. Additionally, we noted in *Alabama-Coushatta* that part of the *first* sentence of § 702 (waiving immunity where a person is "adversely affected or aggrieved by agency action within the meaning of a relevant statute") applies "when judicial review is sought pursuant to a statutory or non-statutory cause of action that arises completely apart from the general provisions of the APA." *Ibid.* That view is entirely consistent with reading the second sentence of § 702 to waive immunity for any nonmonetary claim, state or federal, as our sister circuits do.

circuits. *See Michigan v. U.S. Army Corps of Eng'rs*, 667 F.3d at 775 (rejecting argument that "the FTCA implicitly prohibits injunctive relief in tort suits against the United States" as "read[ing] too much into congressional silence"); *see also U.S. Info. Agency v. Krc*, 989 F.2d 1211, 1216 (D.C. Cir. 1993) (FTCA does not "impliedly forbid[] specific relief for tortious interference with prospective employment opportunities").

Next, Defendants argue that they enjoy intergovernmental immunity against Texas's claims. We again disagree. Defendants have no intergovernmental immunity because Texas is exercising its rights only as a proprietor, and, as the district court found, Texas is neither directly regulating the Border Patrol nor discriminating against the federal government. *See United States v. Washington*, 596 U.S. 832, 838–39 (2022) (clarifying that the intergovernmental immunity doctrine only prohibits state laws "that *either* regulat[e] the United States directly *or* discriminat[e] against the Federal Government or those with whom it deals") (citations and internal quotation marks omitted).

Finally, Defendants argue they enjoy jurisdictional immunity under the Immigration and Nationality Act ("INA"). They are again mistaken. The INA bars lower courts from issuing injunctions against certain immigration statutes, specifically 8 U.S.C. §§ 1221–1232. *See* 8 U.S.C. § 1252(f)(1). That bar does not apply here, however. To cut Texas's c-wire, Defendants did not rely on any of the statutes covered by the INA bar. Instead, they relied on 8 U.S.C. §§ 1103(a)(3) and 1357(a)(3), neither of which are covered. Accordingly, an injunction against the Defendants would, at most, have only a "collateral effect on the operation" of the covered statutes, which is permissible. *See Garland v. Aleman Gonzalez*, 596 U.S. 543, 553 n.4 (2022).

No. 23-50869

Having concluded Defendants do not enjoy sovereign immunity against Texas's trespass to chattels claim, we briefly consider Texas's likelihood of success on that claim. In its TRO, the district court concluded that Texas had a strong likelihood of success because "[1] the concertina wire is state property; [2] Defendants have exercised dominion over that property absent any kind of exigency; and [3] they have continued to do so even after being put on notice of [Texas's] interest in the property." On appeal, Texas reasserts its likelihood of success on that claim. Defendants do not brief this issue and have thus waived any argument. *Bailey v. Shell W. E&P, Inc.*, 609 F.3d 710, 722 (5th Cir. 2010). We therefore agree with the district court that Texas has demonstrated a strong likelihood of success on the merits of its trespass to chattels claims.[7]

### B.

We next consider whether Texas has shown it would be irreparably injured absent a stay. The district court found Texas would suffer irreparable harm "in the form of loss of control and use of its private property." We see no error, clear or otherwise, in this finding. *See Jiao v. Xu*, 28 F.4th 591, 598 (5th Cir. 2022).

The district court found that Defendants' employees have repeatedly "damage[d], destroy[ed], and exercis[ed] dominion over state property" and "show[ed] that they intend to prevent [Texas] from 'maintaining operational control over its own property.'" Accordingly, the court concluded that "compensation for past injury cannot adequately redress the prospect of continuing or future harm for which the only appropriate remedy would be

---

[7] Because we decide Texas is likely to succeed on this claim, we need not decide whether Texas is also likely to succeed on its APA claims that Defendants have acted arbitrarily and capriciously and, alternatively, that Defendants have acted *ultra vires*. We express no opinion on those claims.

injunctive relief." The district court was correct. When a trespass is continuous such that stopping it would require a "multiplicity of suits," an injunction is justified. *See, e.g.*, *Donovan v. Pa. Co.*, 199 U.S. 279, 304–05 (1905) (where a case involves "a continuing trespass," equitable relief is necessary to "avoid[] a multiplicity of suits" and "the inadequacy of a legal remedy . . . is quite apparent"); *see also Rojas-Adam Corp. of Del. v. Young*, 13 F.2d 988, 989–90 (5th Cir. 1926); *Beathard Joint Venture v. W. Hous. Airport Corp.*, 72 S.W.3d 426, 432 (Tex. App.—Texarkana 2002, no pet.) (applying Texas law). In other words, where a tort claim seeks to stop a "continuing trespass to land," as Texas's does, irreparable injury has been shown and injunctive relief is appropriate. *See* Restatement (Second) of Torts § 938 cmt. c (1979).[8]

## C.

Finally, we turn to the public interest prong. *See Nken*, 556 U.S. at 435 (third and fourth prongs merge when United States is opposing party). The district court, incorporating its TRO opinion by reference, focused its public interest analysis on two distinct bases: preventing unlawful agency action and deterring illegal immigration. Agreeing that the first ground plainly serves the public interest and weighs in Texas's favor, we need not consider the second. *See Daniels Health Scis., L.L.C. v. Vascular Health Scis., L.L.C.*, 710 F.3d 579, 585 (5th Cir. 2013).

"There is generally no public interest in the perpetuation of unlawful agency action." *Louisiana v. Biden*, 55 F.4th 1017, 1035 (5th Cir. 2022)

---

[8] *See also* 42 Am. Jur. 2d *Injunctions* § 109 (2023) (explaining that "prevention of a multiplicity of suits is universally recognized as a ground for equitable intervention by injunction, and especially is this so in the case of trespasses. . . . even when each act of trespass is trivial or the damage is trifling and despite the fact that no single trespass causes irreparable injury").

No. 23-50869

(citation omitted). And there is "substantial public interest in having governmental agencies abide by the federal laws that govern their existence and operations." *Texas v. United States*, 40 F.4th 205, 229 (5th Cir. 2022) (citation and quotations omitted). The district court found that the Border Patrol exceeded its authority by cutting Texas's c-wire fence for purposes other than a medical emergency, inspection, or detention. Moreover, the public interest supports clear protections for property rights from government intrusion and control.[9] Accordingly, we find no abuse of discretion in the district court's weighing of the public interest prong.

## IV. Conclusion

Because Texas has carried its burden under the *Nken* factors, we GRANT its request for an injunction pending appeal. Accordingly, Defendants are ENJOINED during the pendency of this appeal from damaging, destroying, or otherwise interfering with Texas's c-wire fence in the vicinity of Eagle Pass, Texas, as indicated in Texas's complaint. As the parties have agreed, Defendants are permitted to cut or move the c-wire if necessary to address any medical emergency as specified in the TRO. *See* App. K at 4, 9–11 (Oct. 30, 2023).

---

[9] *See Chi., B. & Q.R. Co. v. City of Chicago*, 166 U.S. 226, 235–36 (1897) ("Due protection of the rights of property has been regarded as a vital principle of republican institutions."); *Pa. Coal Co. v. Mahon*, 260 U.S. 393, 413 (1922); *Minard Run Oil Co. v. U.S. Forest Serv.*, 670 F.3d 236, 257 (3d Cir. 2011); *Apple Inc. v. Samsung Elec. Co., Ltd.*, 809 F.3d 633, 647 (Fed. Cir. 2015).

No. 23-50869

# APPENDIX





No. 23-50869





No. 23-50869





No. 23-50869





No. 23-50869

