**No. 23-50869**

# In the United States Court of Appeals for the Fifth Circuit

STATE OF TEXAS,

*Plaintiff-Appellant,*

*v.*

UNITED STATES DEPARTMENT OF HOMELAND SECURITY;
ALEJANDRO MAYORKAS, SECRETARY, U.S. DEPARTMENT OF
HOMELAND SECURITY; UNITED STATES CUSTOMS AND BORDER
PROTECTION; UNITED STATES BORDER PATROL; TROY MILLER,
ACTING COMMISSIONER, U.S. CUSTOMS AND BORDER
PROTECTION; JASON OWENS, IN HIS OFFICIAL CAPACITY AS
CHIEF OF THE U.S. BORDER PATROL; JUAN BERNAL, IN HIS
OFFICIAL CAPACITY AS ACTING CHIEF PATROL AGENT, DEL RIO
SECTOR UNITED STATES BORDER PATROL,

*Defendants-Appellees.*

On Appeal from the United States District Court
for the Western District of Texas, Del Rio Division

**BRIEF FOR APPELLANT**

*(Counsel Listed on Inside Cover)*

KEN PAXTON
Attorney General of Texas

BRENT WEBSTER
First Assistant Attorney General

Office of the Attorney General
P.O. Box 12548 (MC 059)
Austin, Texas 78711-2548
Tel.: (512) 936-1700
Fax: (512) 474-2697

AARON L. NIELSON
Solicitor General
Aaron.Nielson@oag.texas.gov

LANORA C. PETTIT
Principal Deputy Solicitor General

J. ANDREW MACKENZIE
Assistant Attorney General

Counsel for Plaintiff-Appellant

# Certificate of Interested Persons

No. 23-50869

### State of Texas,

*Plaintiff-Appellant,*

*v.*

### United States Department of Homeland Security; Alejandro Mayorkas, Secretary, U.S. Department of Homeland Security; United States Customs and Border Protection; United States Border Patrol; Troy Miller, Acting Commissioner, U.S. Customs and Border Protection; Jason Owens, in his official capacity as Chief of the U.S. Border Patrol; Juan Bernal, in his official capacity as Acting Chief Patrol Agent, Del Rio Sector United States Border Patrol,

*Defendants-Appellees.*

Under the fourth sentence of Fifth Circuit Rule 28.2.1, appellant, as a governmental party, need not furnish a certificate of interested persons.

/s/ Aaron L. Nielson
Aaron L. Nielson
*Counsel of Record for*
*Plaintiff-Appellant*

i

## Statement Regarding Oral Argument

After a motions panel of this Court issued an injunction pending appeal, the merits panel ordered expedited merits briefing and set oral argument for February 7, 2024. ECF Nos. 66-1, 70, 75. Plaintiff-Appellant the State of Texas agrees that oral argument is warranted. Oral argument will assist the Court's review of whether Congress waived sovereign immunity for claims that federal officers are violating Texas's property rights by cutting, destroying, or otherwise interfering with wire fences that Texas constructed along more than 29 miles of land in the Eagle Pass region of its southern border.

# Table of Contents

Page

Certificate of Interested Persons ................................................................. i

Statement Regarding Oral Argument ......................................................... ii

Table of Authorities ................................................................................... iv

Introduction ................................................................................................ 1

Statement of Jurisdiction ........................................................................... 2

Issues Presented ......................................................................................... 3

Statement of the Case ................................................................................. 3

    I.   The District Court's Findings Regarding the Border Crisis ...................... 3

    II.  Operation Lone Star ........................................................................... 5

    III. Proceedings in the District Court ....................................................... 8

    IV. Appellate Proceedings .................................................................... 11

Summary of the Argument ....................................................................... 12

Standard of Review ................................................................................. 15

Argument ................................................................................................. 16

    I.   Texas Is Likely to Succeed on the Merits of Both its State and
        Federal Claims ................................................................................ 16

        A.  Congress has waived federal sovereign immunity for Texas's
            common-law trespass claim for non-monetary relief. ................. 16

        B.  Texas has identified an unlawful agency policy in support of
            its APA and *ultra vires* claims ................................................. 28

    II.  The Remaining Factors Likewise Favor Entry of a Preliminary
        Injunction. .................................................................................... 35

        A.  Allowing the wanton destruction of Texas's property would
            irreparably harm both Texas and its citizens ............................. 36

        B.  The equities do not favor Defendants, who resorted to self-
            help measures and withdrew from the area in question. ............. 37

        C.  Maintaining "effective" fences to deter drug smuggling,
            human trafficking, and terrorism is in the public interest. ......... 39

Conclusion ............................................................................................... 43

Certificate of Service ...................................................................... 44

Certificate of Compliance ............................................................... 44

# Table of Authorities

Page(s)

**Cases:**

*Alfaro v. Comm'r of Internal Revenue,*
    349 F.3d 225 (5th Cir. 2003) ................................................. 1

*Ali v. Stephens,*
    822 F.3d 776 (5th Cir. 2016) ............................................... 30

*Am. Trucking Ass'ns v. City of Los Angeles,*
    569 U.S. 641 (2013) ........................................................ 25-26

*Apter v. HHS,*
    80 F.4th 579 (5th Cir. 2023) .................... 18, 19, 31, 32, 33

*Arizona v. Navajo Nation,*
    599 U.S. 555 (2023) ............................................................ 21

*B.K. Instrument, Inc. v. United States,*
    715 F.2d 713 (2d Cir. 1983) ........................................ 19, 23

*Beathard Joint Venture v. W. Hous. Airport Corp.,*
    72 S.W.3d 426 (Tex. App.—Texarkana 2002, no pet.) .................... 35

*Benisek v. Lamone,*
    138 S. Ct. 1942 (2018) ........................................................ 38

*Biden v. Texas,*
    597 U.S. 785 (2022) ...................................................... 27, 34

*Blagojevich v. Gates,*
    519 F.3d 370 (7th Cir. 2008) ............................................. 19

*Bostock v. Clayton County,*
    140 S. Ct. 1731 (2020) ...................................................... 20

*Califano v. Sanders,*
    430 U.S. 99 (1977) ............................................................. 31

*Canal Auth. of Fla. v. Callaway,*
    489 F.2d 567 (5th Cir. 1974) ............................................ 31

*Cedar Point Nursery v. Hassid*,
    141 S. Ct. 2063 (2021) ....................................................... 23

*Chevron USA, Inc. v. Aker Mar. Inc.*,
    689 F.3d 497 (5th Cir. 2012) ............................................. 30

*Citizens to Pres. Overton Park, Inc. v. Volpe*,
    401 U.S. 402 (1971) ........................................................... 30

*Data Mktg. P'ship v. DOL*,
    45 F.4th 846 (5th Cir. 2022) .........................................33, 34

*Dep't of Army v. Blue Fox, Inc.*,
    525 U.S. 255 (1999) ........................................................... 21

*Dep't of Com. v. New York*,
    139 S. Ct. 2551 (2019) ....................................................... 35

*DHS v. Regents of Univ. of Cal.*,
    140 S. Ct. 1891 (2020) .................................................. 34-35

*Dep't of Revenue v. Kentucky*,
    553 U.S. 328 (2008) ........................................................... 26

*Direct Biologics, L.L.C. v. McQueen*,
    63 F.4th 1015 (5th Cir. 2023) ...................................... 41-42

*DRG Funding Corp. v. Sec'y of Hous. & Urban Dev.*,
    76 F.3d 1212 (D.C. Cir. 1996) .......................................... 34

*El-Shifa Pharm. Indus. Co. v. United States*,
    607 F.3d 836 (D.C. Cir. 2010) .......................................... 20

*Fort Leavenworth Ry. v. Lowe*,
    114 U.S. 525 (1885) ........................................................1, 25

*Garland v. Aleman Gonzalez*,
    596 U.S. 543 (2022) ........................................................... 27

*Hadley v. Dep't of Corrs.*,
    840 N.E.2d 748 (Ill. App. Ct. 2005) ................................. 37

*Hall v. Virginia*,
    105 S.E. 551 (Va. 1921) ..................................................... 25

*Harm v. Lake-Harm*,
    16 F.4th 450 (5th Cir. 2021) .............................................. 30

*Harrison v. Young*,
    48 F.4th 331 (5th Cir. 2022) ..............................................15

*Johnson v. Maryland*,
    254 U.S. 51 (1920) ............................................................. 25

*Jones v. TDCJ*,
　880 F.3d 756 (5th Cir. 2018) ..............................................................15

*Lamie v. U.S. Trustee*,
　540 U.S. 526 (2004) ........................................................................... 24

*Larson v. Domestic & Foreign Com. Corp.*,
　337 U.S. 682 (1949) ........................................................................... 29

*Lincoln v. Vigil*,
　508 U.S. 182 (1993) ........................................................................... 34

*Match-E-Be-Nash-She-Wish Band of Pottawatomi Indians v. Patchak*,
　567 U.S. 209 (2012) ..................................................................... 23, 24

*McGuire v. Turnbo*,
　137 F.3d 321 (5th Cir. 1998) ............................................................ 24

*Michigan v. U.S. Army Corps of Engineers*,
　667 F.3d 765 (7th Cir. 2011) ...................................................... 22, 23

*Mountain States Tel. & Tel. Co. v. Vowell Constr. Co.*,
　341 S.W.2d 148 (Tex. 1960) ....................................................... 16, 17

*Muniz-Muniz v. U.S. Border Patrol*,
　741 F.3d 668 (6th Cir. 2013) ............................................................19

*Navajo Nation v. U.S. Dep't of Interior*,
　26 F.4th 794 (9th Cir. 2022) ............................................................ 21

*Netflix, Inc. v. Babin*,
　88 F.4th 1080 (5th Cir. 2023) .......................................................... 38

*Newman v. Nazcr Trac Prop. Owners Ass'n of Am., Inc.*,
　601 F. Supp. 3d 357 (E.D. Wis. 2022) ............................................. 35

*Nken v. Holder*,
　556 U.S. 418 (2009) ................................................................ 11, 15, 35

*North Carolina v. Ivory*,
　906 F.2d 999 (4th Cir. 1990) ............................................................ 25

*Pan Am. Petrol. Corp. v. Long*,
　340 F.2d 211 (5th Cir. 1964) ............................................................16

*Perry Cap. LLC v. Mnuchin*,
　864 F.3d 591 (D.C. Cir. 2017) ............................................... 19, 21, 22

*Presbyterian Church (U.S.A.) v. United States*,
　870 F.2d 518 (9th Cir. 1989) ............................................................19

*Puerto Rico v. United States*,
　490 F.3d 50 (1st Cir. 2007) ..............................................................19

*Ramirez v. McCraw*,
715 F. App'x 347 (5th Cir. 2017) ...................................................... 38

*Red Lake Band of Chippewa Indians v. Barlow*,
846 F.2d 474 (8th Cir. 1988) ...............................................................19

*Register.com, Inc. v. Verio Inc.*,
356 F.3d 393 (2d Cir. 2004) ............................................................. 37

*Sanchez v. United States*,
803 F. Supp. 2d 1066 (C.D. Cal. 2011) .............................................. 25

*Sebelius v. Cloer*,
569 U.S. 369 (2013) ........................................................................ 20

*SEC v. First Fin. Grp. of Tex.*,
645 F.2d 429 (5th Cir. Unit A May 1981) ........................................ 31

*South Carolina v. Baker*,
485 U.S. 505 (1988) ........................................................................ 26

*State v. Cemex Constr. Materials S., LLC*,
350 S.W.3d 396 (Tex. App.—El Paso 2011, pet. granted, judgm't
vacated w.r.m.) .............................................................................17

*Sw. Elec. Power Co. v. EPA*,
920 F.3d 999 (5th Cir. 2019) ...........................................................31

*Taylor-Travis v. Jackson State Univ.*,
984 F.3d 1107 (5th Cir. 2021) ..................................................... 15, 30

*Texas v. United States*,
809 F.3d 134 (5th Cir. 2015) .......................................................34, 35

*Treasurer of N.J. v. U.S. Dep't of Treasury*,
684 F.3d 382 (3d Cir. 2012) ........................................ 19-20, 21, 22, 24

*Trudeau v. FTC*,
456 F.3d 178 (D.C. Cir. 2006) ...................................... 18, 19, 22, 24

*United States v. Brignoni-Ponce*,
422 U.S. 873 (1975) ........................................................................ 40

*United States v. Chem. Found.*,
272 U.S. 1 (1926) ............................................................................ 30

*United States v. Lee*,
106 U.S. 196 (1882) ........................................................................ 29

*United States v. Washington*,
596 U.S. 832 (2022) ................................................................ 2, 25, 26

*United States v. Williams*,
  514 U.S. 527 (1995) ................................................................ 21

*United States ex rel. Drury v. Lewis*,
  200 U.S. 1 (1906) .................................................................. 25

*Univ. of Tex. v. Camenisch*,
  451 U.S. 390 (1981) ................................................................31

*Weyerhaeuser Co. v. U.S. Fish & Wildlife Serv.*,
  139 S. Ct. 361 (2018) ............................................................. 35

*Wilkie v. Robbins*,
  551 U.S. 537 (2007) ............................................................... 25

*Zapata v. Ford Motor Credit Co.*,
  615 S.W.2d 198 (Tex. 1981) ...................................................16

**Statutes and Rules:**

5 U.S.C.:
  §701 ..................................................................................... 24
  §701(a)(2) ............................................................................ 34
  §702 ...............................1, 2, 10, 12, 13, 17, 18, 19, 20, 21, 22, 23, 24
  §706(2)(A) ........................................................................... 29
  §706(2)(C) ........................................................................... 29

6 U.S.C.:
  §202(5) ............................................................................ 29, 32
  §211(c)(2) ........................................................................ 29, 32
  §211(c)(5) ........................................................................ 29, 32
  §211(c)(6) ........................................................................ 29, 32
  §211(c)(8) ........................................................................ 29, 32
  §211(e)(3) ........................................................................ 29, 32

8 U.S.C.:
  §1103(a)(3) ........................................................................ 28
  §§1221-1232 ....................................................................... 28
  §1252(f)(1) ...............................................................2, 26, 27, 28
  §1325 .................................................................................... 7
  §1357(a)(3) ......................................................................... 28

28 U.S.C.:
  §1292(a)(1) ............................................................................ 2
  §1331 .................................................................................... 3
  §1367 .................................................................................... 3
  §2106 .................................................................................... 2

90 Stat. 2721 (1976) ........................................................................ 18

Tex. Penal Code §9.22 ................................................................... 35

Fed. R. App. P. 8 ........................................................................... 11

**Other Authorities:**

William P. Barr, Opinion, *The U.S. Must Defeat Mexico's Drug Cartels*, Wall St. J. (March 2, 2023) ............................................. 4

Gaige Davila, *High Migration Through Texas Border Town of Eagle Pass Strains Resources*, NPR (Sept. 22, 2023) ................................. 5

Richard Fallon et al., Hart & Wechsler's The Federal Courts and the Federal System 902 (7th ed. 2015) ...................... 18

H.R. Rep. No. 94-1656 (Sept. 22, 1976) ....................................... 23

Miriam Jordan, *Smuggling Migrants at the Border Now a Billion-Dollar Business*, N.Y. Times (July 25, 2022) ..................................... 4

Rafael Prieto-Curiel et al., *Reducing Cartel Recruitment Is the Only Way to Lower Violence in Mexico*, Science 1312 (2023) ................. 4

# Introduction

Like the federal government, Texas may hold "the rights of an ordinary proprietor." *Fort Leavenworth Ry. v. Lowe*, 114 U.S. 525, 527 (1885). Just as a private landowner could sue if federal officials deliberately tore down his fence every day, so can Texas. Defendants, however, take the remarkable position that they may destroy the property of others "without restraint." ROA.1233; *cf.* ROA.1242-43. The district court rightly rejected that view—partly because Defendants are *not* carrying out their statutory duties to deter unlawful entries into this country, secure the border, and apprehend unlawful migrants. Defendants' ongoing trespass to property is not justified by medical exigency or any other common-law privilege.

In the proceedings below, the district court consistently found that Texas made the second, third, and fourth showings in support of injunctive relief. The district court also found Texas's trespass claim meritorious in the face of Defendants' "culpable and duplicitous conduct." ROA.932. But it nevertheless denied a preliminary injunction because it mistakenly concluded that federal sovereign immunity tied its hands. In so doing, the district court parted ways with multiple circuits that read federal law by its terms to waive immunity for non-monetary suits like this one. A motions panel of this Court corrected that error, following 5 U.S.C. §702's plain text and the circuit consensus. ROA.1016-19. This Court—"always chary to create a circuit split," *Alfaro v. Comm'r of Internal Revenue*, 349 F.3d 225, 229 (5th Cir. 2003)—should follow both the motions panel and "[n]umerous federal circuits" that adopt the "plain-language reading of § 702." ROA.1016. Because the

district court's failure to do so was the sole impediment to Texas obtaining relief, the Court could end its analysis there.

Perhaps sensing the weakness of their arguments with respect to §702, Defendants continue to backfill alternative jurisdictional arguments. This Court should reject them for the reasons already given by the motions panel. Defendants' assertion of intergovernmental immunity contravenes recent Supreme Court precedent, ROA.1018, which repudiates the notion that state law may never "retard" federal operations in view of the Supremacy Clause, *United States v. Washington*, 596 U.S. 832, 838-39 (2022). And the bar on injunctions found in the Immigration and Nationality Act ("INA"), 8 U.S.C. §1252(f)(1), does not apply because Texas's claim under Texas tort law is completely collateral to Defendants' distorted view of the INA. Defendants' contrary arguments rely on ignoring Supreme Court precedent and ongoing disagreement with the district court's factual findings. But those findings are subject to clear-error review and are supported by extensive testimonial, documentary, and video evidence.

Even if all that fails, Texas is independently entitled to injunctive relief because Defendants' conduct violates the Administrative Procedure Act ("APA") and is *ultra vires*. This Court should reverse the order denying a preliminary injunction and remand for the district court to enter an injunction like the one this Court already awarded pending appeal. *See* 28 U.S.C. §2106.

## Statement of Jurisdiction

The Court has jurisdiction to review a denial of a preliminary injunction under 28 U.S.C. §1292(a)(1). The district court exercised federal-question jurisdiction and

supplemental jurisdiction over the federal- and state-law claims in this suit. *See* 28 U.S.C. §§1331, 1367; ROA.18. This appeal is timely because the district court denied the motion for a preliminary injunction on November 29, 2023, and the notice of appeal was filed on November 30, 2023. ROA.960, 966.

## Issues Presented

1. Is Texas likely to succeed on the merits of its claims, for which federal sovereign immunity has been waived?

2. Did Texas also satisfy the remaining factors necessary for a preliminary injunction?

## Statement of the Case

### I. The District Court's Findings Regarding the Border Crisis

Texas borders Mexico for more than 1,200 miles. Every day, thousands of people—both U.S. citizens and otherwise—cross the border. Many of those crossings are lawful; indeed, the United States has created numerous official ports of entry. But untold numbers of people ignore those lawful entry points and enter Texas where they are not authorized to do so. Entry at unauthorized places often involves trespassing on private property and can be life-threatening, as when it requires traversing rivers or deserts.

Following multiple evidentiary hearings, the district court found that border crossings at unauthorized points in Texas have exploded. The "number of Border Patrol encounters with migrants illegally entering the country has swelled from a

comparatively paltry 458,000 in 2020 to 1.7 million in 2021 and 2.4 million in 2022."
ROA.933 (citation omitted).

Unfortunately, "organized criminal organizations take advantage of these large numbers," and "conveying all those people to the doorstep of the United States has become an incredibly lucrative enterprise for the major Mexican drug cartels." ROA.933. Indeed, trafficking across the southern border has metastasized "from a scattered network of freelance 'coyotes' to a multi-billion-dollar international business controlled by organized crime." Miriam Jordan, *Smuggling Migrants at the Border Now a Billion-Dollar Business*, N.Y. Times (July 25, 2022), https://www.nytimes.com/2022/07/25/us/migrant-smuggling-evolution.html; *see also* ROA.933 (taking notice of this article). These cartels "have increasingly acquired a transnational dimension," are now the fifth largest employer in Mexico, Rafael Prieto-Curiel et al., *Reducing Cartel Recruitment Is the Only Way to Lower Violence in Mexico*, 381 Science 1312 (2023), and operate as "potent paramilitary forces, with heavily armed mobile units able to stand their ground against the Mexican military," William P. Barr, Opinion, *The U.S. Must Defeat Mexico's Drug Cartels*, Wall St. J. (March 2, 2023), https://www.wsj.com/articles/the-us-must-defeat-mexicos-drug-cartels-narco-terrorism-amlo-el-chapo-crenshaw-military-law-enforcement-b8fac731?mod=article_inline. At the same time, "the infrastructure built by the cartels for human cargo can also be used to ship illegal substances, namely fentanyl." ROA.933. "Lethal in small doses, fentanyl is a leading cause of death for young Americans and is frequently encountered in vast quantities at the border." ROA.933.

Border towns like Eagle Pass are at the "epicenter" of this country's immigration problem. ROA.934. According to Eagle Pass Mayor Rolando Salinas, Jr., the recent surge of border crossings is like "nothing that we've seen ever . . . to have so many people crossing in without consequence." Gaige Davila, *High Migration Through Texas Border Town of Eagle Pass Strains Resources*, NPR (Sept. 22, 2023), https://www.npr.org/2023/09/22/1201215460/high-migration-through-texas-border-town-of-eagle-pass-strains-resources (transcript). After roughly 14,000 people—a number amounting to about half of Eagle Pass's population—entered the city in less than two weeks, Mayor Salinas declared a state of disaster. ROA.151.

## II. Operation Lone Star

Texas Governor Greg Abbott "launched Operation Lone Star in 2021 to aid Border Patrol in its core functions" at Texas's border with Mexico. ROA.934. As part of this multi-front initiative, the Governor authorized the Texas Military Department ("TMD") to deploy concertina-wire fencing—both on Texas's own property and with the permission of other landowners—at illegal-crossing hotspots like Eagle Pass. ROA.151. As the district court found, "[t]he wire serves as a deterrent—an effective one at that." ROA.934. Indeed, "the wire was so successful that illegal border crossings dropped to less than a third of their previous levels." ROA.934. The federal government also uses c-wire fencing to deter illegal crossings and route migrants to lawful ports of entry. ROA.670. In fact, it is undisputed that Texas regularly erects fencing at the border in *collaboration* with federal border-patrol agencies. ROA.668-69. "[S]tate agents have given concertina wire to federal agents

to assist them in deploying wire fencing, and federal agents have given concertina wire to state agents to assist them in doing the same." ROA.669. "By all accounts, Border Patrol is grateful for the assistance of Texas law enforcement, and the evidence shows the parties work cooperatively across the state, including in El Paso and the Rio Grande Valley." ROA.934.

As Eagle Pass began experiencing an unprecedented surge in illegal crossings, however, the federal government abruptly began cutting gaps into Texas's fencing and tearing it open repeatedly. Eyewitness observers reported that this destruction "facilitate[d] the surge of migrants into Eagle Pass." ROA.152. As the district court documented in detail, video evidence showed federal agents "cutting multiple holes in the concertina wire for no apparent purpose other than to allow migrants easier entrance further inland." ROA.935. On more than 20 occasions between September 20 and October 10, 2023, TMD recorded U.S. Customs and Border Protection ("CBP") officials cutting Texas's fencing. ROA.140-43. When Texas officers tried to document the ongoing destruction, CBP agents told them to "back the f*** off," ROA.115 n.55, and claimed that Texas officers are "not authorized to take any pictures," ROA.249.

On October 26, 2023, two days after Texas filed this suit, photos show Defendants "trading bolt cutters for an industrial-strength telehandler forklift to dismantle Texas's border fence." ROA.235. TMD Officer Brian Cooney spotted several hundred people on Mexico's side of the Rio Grande. ROA.247. After the group crossed the river, Border Patrol used a forklift to pull Texas's fencing out of the ground, suspending it aloft for approximately 20 minutes while over 300 people

entered. ROA.247. Border Patrol had airboats in the water at the time, no one appeared to be in distress or in need of medical attention, and no call was made for a medical team. ROA.248. Officer Cooney took this picture of the scene, ROA.247:



Texas promptly sought an emergency TRO to stop this ongoing destruction. ROA.234-43. Just 20 minutes later, however, CBP officials used a forklift to repeatedly smash Texas's fence into the ground to allow dozens of people, most of whom had not yet left Mexico's riverbank, to illegally enter the United States. ROA.278; *see also* 8 U.S.C. §1325. Once again, no one was in distress or needed medical attention. ROA.278.

### III. Proceedings in the District Court

Texas asserted claims for conversion and trespass to chattels, APA violations, and *ultra vires* conduct. ROA.14, 36-41. It also sought a preliminary injunction. ROA.84. As just noted, while Defendants were using a forklift to tear Texas's fence out of the ground, Texas moved for a TRO. ROA.238, 268.

The district court issued a TRO on October 30, 2023, concluding that Texas would likely prevail on its trespass-to-chattels claim, that ongoing interference with the State's proprietary interest caused irreparable harm, and that the equitable balance favored the State. ROA.285-91. The TRO enjoined Defendants from destroying Texas's fencing in the vicinity of Eagle Pass and carved out an exception, which Texas did not oppose, for "provid[ing] or obtain[ing] emergency medical aid." ROA.285, 292, 736.

At a November 7, 2023, hearing, testimony confirmed that Defendants' fence cutting was not precipitated by medical exigency or a legitimate attempt to enforce immigration law. Michael Banks, a Texas official, provided an eyewitness account of federal agents waving people through Texas's dismantled fencing without any inspection. They "were led through this hole and pointed a mile down the road and entrusted that they're going to just report there." ROA.1110. Nor was anyone discouraged from making the crossing. Indeed, federal agents patrolling the Rio Grande by boat "literally usher[ed] them" across. ROA.1111. Banks testified that, when he confronted the deputy patrol agent on the scene, the agent was unable to explain his action but nonetheless promised: "If you close the wire, I will f'ing cut it

8

all; I will tie a strap to it and will rip it all out of here." ROA.1111; *see also* ROA.935 (district-court findings).

The TRO was extended, initially by order and then by party agreement, until November 29, 2023. ROA.797. The district court also ordered supplemental briefing and document production before another hearing. ROA.736-738.

On November 29, the district court made extensive findings supporting Texas. As relevant here, it concluded that: Texas has "direct proprietary interests" in its property, ROA.938; Defendants' conceded "destruction of . . . property" that is not theirs cannot be justified based on "statutory duties they are so obviously derelict in enforcing" and that Defendants "utter[ly]" ignore, ROA.954; injunctive relief is "the only appropriate remedy" for Defendants' "continuing or future" interference with Texas's property interest, ROA.939; Texas will suffer irreparable harm absent a preliminary injunction, given Defendants' "culpable and duplicitous conduct," ROA.932, 960; and the public interest favors an injunction because Defendants' destruction of Texas's property "provide[s] ample incentive" for drug smuggling and dangerous crossings, ROA.953-54, 960, 290. The court also found that "Border Patrol agents already possess access to both sides of the fence," thus negating any need to destroy Texas' property to perform their statutory duties, should they ever decide to do so. ROA.950.

The district court also noted Defendants' "cynical arguments" and identified their "disingenuous[ness]" in "argu[ing] the wire hinders Border Patrol from performing its job, while also asserting the wire helps" when federal officials use the *same* wire elsewhere. ROA.936. The district court also made credibility findings

about the testifying federal officials, documenting their "totally uncorroborated" assertions and their "evasive answers and demeanor." ROA.935 n.4.

Despite those findings and conclusions, the district court determined that it was powerless to convert its TRO into a preliminary injunction on Texas's common-law claims. According to the district court, the waiver of sovereign immunity in 5 U.S.C. §702 does not apply to such state-law causes of action. ROA.939. In reaching that conclusion, the district court acknowledged that its analysis was inconsistent with that of multiple circuit courts, but it dismissed those decisions as "not binding." ROA.944 n.9.

As for Texas's APA claims, the district court determined that the current record did not yet support a finding of an agency policy or final agency action, relying partly on documents reviewed *in camera* that are presently unavailable to Texas. ROA.931, 959. The district court acknowledged, however, that fence cuttings had become "regular and frequent" since September 2023, "regardless of exigency." ROA.956. It noted that "repeated public statements from DHS itself," ROA.955, had "reiterated the same policy in identical terms" approving cutting anytime aliens crossed the border, ROA.956 n.14. And it highlighted "the fact of communications between lower- and higher-ranking DHS officers regarding wire-cutting in the Del Rio Sector." ROA.956, 931. But while the district court found that these circumstances "raise[d] the possibility" of an unwritten policy, it declined to hold that Texas was likely to succeed on the merits because Texas could not "conclusively establish[] or disprove[] the existence of such an institutional 'policy, practice, or pattern.'" ROA.957. It similarly held that Texas had "fall[en] short" of

demonstrating final agency action, ROA.958, and rejected Texas's *ultra vires* claim "at this juncture" with little analysis, ROA.960.

## IV. Appellate Proceedings

Texas immediately appealed and sought an emergency injunction pending appeal or, alternatively, an immediate administrative injunction. ECF No. 25; *see also* Fed. R. App. P. 8. A panel of this Court granted administrative relief on December 4, 2023, while it considered Texas's motion. ROA.1005-06. On December 19, 2023, a motions panel issued an injunction pending appeal after receiving expedited pleadings from the parties. ROA.1008-26.

The motions panel concluded that "the district court legally erred with respect to sovereign immunity" but agreed that "Texas has otherwise satisfied the factors under *Nken v. Holder*, 556 U.S. 418, 434 (2009)." ROA.1009. The panel thus ordered that "Defendants are ENJOINED during the pendency of this appeal from damaging, destroying, or otherwise interfering with Texas's c-wire fence in the vicinity of Eagle Pass, Texas, as indicated in Texas's complaint." ROA.1009. Like the district court's original TRO, the injunction provides an exception for medical emergencies: "As the parties have agreed, Defendants are permitted to cut or move the c-wire if necessary to address any medical emergency as specified in the TRO." ROA.1009. The merits panel subsequently ordered expedited briefing and scheduled oral argument for February 7, 2024. ROA.1005; ECF Nos. 70, 75.

Despite receiving the expedited relief they requested, Defendants nevertheless filed an emergency application to vacate the motions panel's injunction pending appeal with the Supreme Court on January 2, 2024. *See* Application to Vacate the

Injunction Pending Appeal, *DHS v. Texas*, No. 23A607 (U.S. Jan. 2, 2024) ("Application"). Justice Alito called for a response, which Texas filed on January 9, 2024. *See* The State of Texas's Response in Opposition to the United States's Application to Vacate Injunction Pending Appeal, *DHS v. Texas*, No. 23A607 (U.S. Jan. 9, 2024). Defendants filed a reply the next day. *See* Reply in Support of Application to Vacate the Injunction Pending Appeal, *DHS v. Texas*, No. 23A607 (U.S. Jan. 10, 2024) ("Reply"). Defendants then filed a supplemental brief, claiming that the Texas National Guard had prevented them from accessing a boat ramp in a municipal park in the Eagle Pass area. *See* Supplemental Memorandum, *DHS v. Texas*, No. 23A607 (U.S. Jan. 12, 2024) ("Supplemental Memo"). In response, Texas explained that it had commandeered the park from the municipality "to ensure the safety of recreational users as well as aliens." *See* The State of Texas's Response to the United States's Supplemental Memorandum at 3, *DHS v. Texas*, No. 23A607 (U.S. Jan. 13, 2024) ("Supplemental Response"). But Texas committed to "working to ensure that Border Patrol has access to the boat ramp." *Id*. at 5. Defendants have since filed yet another supplemental brief in the Supreme Court. *See* Second Supplemental Memorandum, No. 23A607 (U.S. Jan. 15, 2024).

## Summary of the Argument

**I.**   Texas is likely to succeed on the merits of its claims.

**A.**   The district court correctly concluded in its TRO that Texas has demonstrated a strong likelihood of success on the merits of its trespass-to-chattels claim. It declined to issue a preliminary injunction only because of its erroneous view that §702 does not waive the United States's sovereign immunity. The motions

panel appropriately embraced the first of those conclusions and rejected the second. The Court should decline Defendants' invitation to create a circuit split and should instead adopt the motion panel's plain-text reading of §702.

The two alternative jurisdictional hurdles to relief that Defendants previously raised—intergovernmental immunity and the INA's remedial bar—are inapplicable. Intergovernmental immunity prevents States from using state law to regulate the operations of the federal government. It does not prevent Texas from invoking its rights as a property owner to the protections of generally applicable tort law. And although the INA strips lower federal courts of jurisdiction to enjoin the operation of certain provisions of Title 8, Texas has never sought to stop Defendants from carrying out their covered responsibilities. It seeks only to protect its property interests.

**B.**   Alternatively, Texas is likely to succeed on the merits of its APA claims and its *ultra vires* claim. Defendants' wire-cutting practices are unlawful because they violate the APA's requirements governing agency action and are *ultra vires*. The district court declined to issue a preliminary injunction on Texas's APA claims because it erroneously ruled that Texas had not conclusively shown the existence of a wire-cutting policy or final agency action at this stage of litigation, and it rejected Texas's *ultra vires* claim because it did not think the present evidence sufficed to establish *ultra vires* conduct. But Texas *has* shown a policy and final agency action. And even if it had not, the district court correctly found that Defendants' destruction of Texas's property could not be justified by any authority that federal law grants

13

Defendants. That is enough to show *ultra vires* conduct under this Court's precedent.

**II.**  The prospect of irreparable harm, the equitable balance, and the public interest likewise favor a preliminary injunction.

**A.**  With respect to irreparable harm, the district court found that Texas would suffer loss of control and use of its property absent an injunction. The motions panel correctly held that there was no error, clear or otherwise, in that finding. Compensation for past injury cannot adequately redress the prospect of continuing or future harm that only injunctive relief can remedy.

**B.**  In balancing the equities, this Court should consider Defendants' "culpable and duplicitous conduct." ROA.932. Defendants have a proven history of resorting to self-help measures in this dispute, and their attempts to justify those measures are clouded by "evasive answers" and "totally uncorroborated" assertions. ROA.935. Defendants have repeatedly breached Texas's fence for no purpose other than to "establish an unofficial and unlawful port of entry." ROA.953. Defendants' bad-faith behavior and dilatory tactics are another equitable factor supporting Texas's requested relief.

**C.**  Finally, the public interest overwhelmingly favors Texas. As both the district court and the motions panel explained, it is in the public interest to deter unlawful agency action and to respect Texas's property rights. But it is also in the public interest to reduce the flow of deadly fentanyl, to combat human trafficking, and to protect Texans from unlawful trespass and violent attacks by criminal cartels.

And it is in the public interest to minimize the risks of migrants drowning while making a perilous journey to and through illegal points of entry. As documented by the district court, Defendants frustrate all of those commonsense objectives by facilitating the use of unauthorized points of entry.

## Standard of Review

"For a preliminary injunction to issue, a plaintiff must show: (1) a substantial likelihood of success on the merits, (2) a substantial threat of irreparable harm absent the injunction, (3) that the harm she will suffer without the injunction outweighs the cost to comply with the injunction, and (4) that the injunction is in the public interest." *Harrison v. Young*, 48 F.4th 331, 339 (5th Cir. 2022). These standards mirror those for an injunction pending appeal. *Nken*, 556 U.S. at 434-35.

In assessing the district court's denial of a preliminary injunction here, that court's "[f]actual findings are reviewed for clear error, while [its] legal conclusions are reviewed de novo." *Jones v. TDCJ*, 880 F.3d 756, 759 (5th Cir. 2018) (per curiam) (citation omitted). "Under clear error review, if the trial court's factual findings are plausible in light of the record viewed in its entirety, [the appellate tribunal] must accept them, even though [it] might have weighed the evidence differently if [it] had been sitting as a trier of fact." *Taylor-Travis v. Jackson State Univ.*, 984 F.3d 1107, 1116 (5th Cir. 2021) (quotation marks omitted).

**ARGUMENT**

## I.  Texas Is Likely to Succeed on the Merits of Both its State and Federal Claims.

In its TRO, the district court found that Texas was entitled to preliminary relief on its state-law claim for trespass to chattels. The court did not convert its TRO into a preliminary injunction only because it mistakenly believed that a broad waiver of sovereign immunity does not cover this case. As the motions panel explained, that was wrong. Once that error is corrected, Defendants have no plausible argument against the relief Texas sought.

### A.  Congress has waived federal sovereign immunity for Texas's common-law trespass claim for non-monetary relief.

**1.**  Texas's trespass-to-chattels claim is both straightforward and uncontested. Texas common law furnishes a cause of action for conversion for "the unlawful and wrongful exercise of dominion, ownership, or control by one person over the property of another, to the exclusion of the same rights by the owner." *Pan Am. Petrol. Corp. v. Long*, 340 F.2d 211, 219-220 (5th Cir. 1964). It also furnishes a cause of action for trespass to chattels for wrongfully exercising dominion over the private property of another in a way that causes "actual damage" or "deprives the owner of its use for a substantial period of time." *Zapata v. Ford Motor Credit Co.*, 615 S.W.2d 198, 201 (Tex. 1981). Under either tort, the subjective intent or ill will of the tortfeasor is irrelevant. *Pan Am.*, 340 F.2d at 220 & n.24. "The important thing is that a property right was violated." *Mountain States Tel. & Tel. Co. v. Vowell Constr. Co.*, 341 S.W.2d 148, 150 (Tex. 1960).

16

Texas holds a proprietary interest in its c-wire fence. *See, e.g.*, *State v. Cemex Constr. Materials S., LLC*, 350 S.W.3d 396, 398, 409 (Tex. App.—El Paso 2011, pet. granted, judgm't vacated w.r.m.) (conversion claim for construction materials). Yet Defendants "deliberately and intentionally used [wire cutters] in making a cut to the [fence]." *Mountain States Tel.*, 341 S.W.2d at 150. "The [fence] was lawfully in place" on state, municipal, or private land, as Defendants stipulated for preliminary-injunction purposes. ROA.591 n.3. So, "[t]he molesting or severing of the [fence] was a violation of a property right which gave rise to a cause of action regardless of negligence." *Mountain States*, 341 S.W.2d at 150. By cutting Texas's c-wire fence, Defendants have destroyed its utility as a barrier and deprived Texas of its use for a substantial time.

The district court explained in its TRO why Texas will likely prevail on its common-law claims. ROA.939. The motions panel did the same thing. ROA.1019. Never in this litigation have Defendants contested *any* of that—not after the district court found Texas was likely to prevail and not after the motions panel granted an injunction pending appeal. Even in their emergency filings in the Supreme Court, Defendants make no effort to show that Texas is unlikely to succeed on the merits of its trespass or conversion claims. At all three levels of federal judicial review, the argument that Defendants' ongoing destruction of Texas's property is an unlawful trespass stands unrefuted.

**2.**   Federal law waives Defendants' sovereign immunity from a claim like that one because Texas seeks non-monetary relief. The relevant waiver, which Congress added to the APA in 1976, provides:

> An action in a court of the United States seeking relief other than money damages and stating a claim that an agency or an officer or employee thereof acted or failed to act in an official capacity or under color of legal authority shall not be dismissed nor relief therein be denied on the ground that it is against the United States or that the United States in an indispensable party.

5 U.S.C. §702; *see also* 90 Stat. 2721 (1976). "Though codified in the APA, the waiver [in §702] applies to *any suit*, whether or not brought under the APA." Richard Fallon et al., HART & WECHSLER'S THE FEDERAL COURTS AND THE FEDERAL SYSTEM 902 (7th ed. 2015) (emphasis added). Section 702's text is clear—"[a]n action in" federal court "seeking relief other than money damages" means *any* action, whether under the APA, a different statute, or the common law. As the current U.S. Attorney General once put it: "There is nothing in the language of the second sentence of § 702 that restricts its waiver to suits brought under the APA." *Trudeau v. FTC*, 456 F.3d 178, 186 (D.C. Cir. 2006) (Garland, J.). This Court has also read the provision to "generally waive[]" sovereign immunity. *Apter v. HHS*, 80 F.4th 579, 589 (5th Cir. 2023). In the words of the motions panel: "Section 702's plain terms waive sovereign immunity for 'any suit' seeking nonmonetary relief in federal court." ROA.1016.

That broad waiver applies to Texas's common-law claims. As the motions panel put it, "Section 702 plainly waives immunity for Texas's trespass to chattels claim." ROA.1015. "That claim was brought as '[a]n action' in federal court; it 'seek[s] relief other than monetary damages'; and it 'stat[es] a claim' that a federal agency's

officials and employees 'acted or failed to act in an official capacity or under color of legal authority.'" ROA.1015. "Accordingly, Texas's claim 'shall not be dismissed nor relief therein be denied on the ground that it is against the United States.'" ROA.1015-16 (quoting 5 U.S.C. §702). "The district court legally erred by ruling otherwise." ROA.1016.

"Numerous federal circuits follow this plain-language reading of § 702." ROA.1016. Circuits across the country agree that §702's waiver is broad and must be understood based on its plain terms. *See, e.g.*, *Apter*, 80 F.4th at 589-91 (rejecting an effort to narrow §702); *Blagojevich v. Gates*, 519 F.3d 370, 371-72 (7th Cir. 2008) ("Congress has waived sovereign immunity for most forms of prospective relief" because "§ 702 is a law of general application"); *Puerto Rico v. United States*, 490 F.3d 50, 57-58 (1st Cir. 2007) ("This waiver is for *all* equitable actions for specific relief against a Federal agency or officer acting in an official capacity" (quotation marks omitted)); *Trudeau*, 456 F.3d at 186; *see also Muniz-Muniz v. U.S. Border Patrol*, 741 F.3d 668, 672 (6th Cir. 2013); *Treasurer of N.J. v. U.S. Dep't of Treasury*, 684 F.3d 382, 400 (3d Cir. 2012); *Presbyterian Church (U.S.A.) v. United States*, 870 F.2d 518, 525 (9th Cir. 1989); *Red Lake Band of Chippewa Indians v. Barlow*, 846 F.2d 474, 476 (8th Cir. 1988); *B.K. Instrument, Inc. v. United States*, 715 F.2d 713, 724-25 (2d Cir. 1983).

Furthermore, as Defendants conceded in their Supreme Court application to vacate this Court's injunction pending appeal, Application at 32 & n.7, at least two circuits have held that §702's broad waiver applies to state-law claims. *See Perry Cap. LLC v. Mnuchin*, 864 F.3d 591, 617-18, 620 (D.C. Cir. 2017); *Treasurer of N.J.*, 684

F.3d at 400 n.19. That is two more decisions than Defendants have ever identified for their atextual position. All they can muster is a non-binding concurring opinion that did not purport to interpret §702's waiver of sovereign immunity. *See El-Shifa Pharm. Indus. Co. v. United States*, 607 F.3d 836, 854 (D.C. Cir. 2010) (en banc) (Kavanaugh, J. concurring in the judgment). Then-Judge Kavanaugh's opinion never even cites that provision—which makes sense, given that his concurrence was focused on holding that the plaintiffs in that case did not have a federal cause of action, either in federal common law or implied via the APA. This Court should not strike out on its own to ignore the plain text that Congress enacted.

**3.**   The district court nevertheless ruled that §702 does not mean what it says. ROA.941. That decision is mistaken and creates a split of authority.

*First*, the district court noted that waivers are "strictly construed." ROA.945. From that premise, it reasoned that §702 could not cover Texas's claims without specifically listing "common law claims for conversion or trespass to chattels" by name. ROA.945. But "[t]his misapplies the principle that courts should construe ambiguities strictly in favor of sovereign immunity." ROA.1016 (citing *Sebelius v. Cloer*, 569 U.S. 369, 380-81 (2013)). Any strict-construction rule in favor of retaining sovereign immunity has no bearing here because there is "no ambiguity" to resolve. ROA.1016.

Rather than identifying any ambiguity in §702, the district court claimed only that a plain-text reading would be "over-inclusive" and "broad[]." ROA.945. Breadth, however, does not equal ambiguity. *See Bostock v. Clayton County*, 140 S. Ct. 1731, 1749 (2020). The Supreme Court enforces immunity waivers that employ

"broad language." *United States v. Williams*, 514 U.S. 527, 531-36 (1995). And just months ago, it heard a breach-of-trust claim against the federal government brought by an Indian tribe seeking an accounting of water rights—a form of non-monetary relief. *See Arizona v. Navajo Nation*, 599 U.S. 555, 562-63 (2023). Neither the Supreme Court nor the Ninth Circuit suggested that the suit was barred because §702 fails to expressly provide for common-law claims for breach-of-trust obligations. *Navajo Nation v. U.S. Dep't of Interior*, 26 F.4th 794, 804 (9th Cir. 2022) (holding instead that §702's waiver "applied squarely to the Nation's breach of trust claim" (cleaned up)).

*Second*, the district court concluded that §702 cannot apply to state-law claims. ROA.942-43. That limitation appears nowhere in the statutory text, which is why multiple circuits have rejected it. In *Perry Capital*, the D.C. Circuit rebuffed the Treasury Department's argument that "§ 702 does not waive [the Department's] immunity from suit for state law claims" because "the APA's waiver of sovereign immunity applies to any suit whether under the APA or not." 864 F.3d at 620. Although Texas cited *Perry Capital*, the district court did not discuss it. Nor is the D.C. Circuit alone. The Third Circuit applied §702's waiver in an unclaimed-property suit brought by seven States "making claims under state, not federal[,] law." *Treasurer of N.J.*, 684 F.3d at 400-01; *see also id.* at 387-92 (describing state unclaimed-property acts' common-law origin); *cf. Dep't of Army v. Blue Fox, Inc.*, 525 U.S. 255, 256-58, 263 (1999) (concluding that §702's waiver barred claims not because they rested on state law, but because the plaintiff sought monetary relief). The district court intimated that state-law claims under §702 were uncommon.

ROA.945. Yet it is also uncommon for federal officers to brazenly destroy someone else's property. Regardless, whether common or not, the key point is that nothing in §702's broad waiver of sovereign immunity excludes such suits from its scope.

The motions panel correctly noted that Defendants' contrary interpretation would bring this Court's precedent into conflict with that of multiple sister circuits, which have held that "the waiver of sovereign immunity in section 702 extends to all nonmonetary claims against federal agencies and their officers, regardless of whether or not the cases seek review of 'agency action' or 'final agency action.'" *Treasurer of N.J.*, 684 F.3d at 397; *see also* ROA.1016-17 (citing, *inter alia*, *Trudeau*, 456 F.3d at 186); ROA.1017-18 (noting that Defendants' arguments have "been rejected by our sister circuits," including the Second and Seventh); *Perry Capital*, 864 F.3d at 620. Although this Court "does not appear to have addressed this § 702 issue directly," it has "favorably cited both the D.C. Circuit's *Trudeau* decision, as well as the 7th Circuit's *Michigan v. U.S. Army Corps of Engineers* decision, both of which adopt a plain-language reading of §702." ROA.1017 n.6; *see Michigan*, 667 F.3d 765, 775 (7th Cir. 2011).

*Third*, the district court suggested that the Federal Tort Claims Act ("FTCA") impliedly precludes Texas from seeking injunctive relief because it provides "a separate, appropriate remedy" for certain state-tort violations—namely, a claim for "damages for prior harm to [the] fence." ROA.945-46. The motions panel rightly rejected that argument, too, because it has "no purchase in the language of the FTCA and has been rejected by [this Court's] sister circuits." ROA.1017-18. Section 702 "requires evidence, in the form of either express language or fair implication,

that Congress meant to forbid the relief that is sought." *Michigan*, 667 F.3d at 775. No such inference can fairly be drawn from the FTCA just because it authorizes damages for past torts. That would "read[] too much into congressional silence." *Id.*; *see also B.K.*, 715 F.2d at 727-28. Historical context, moreover, shows that §702 was designed to add to and "strengthen th[e] accountability" *already provided* by the FTCA. H.R. Rep. No. 94-1656, 1976 WL 14066, at *4 (Sept. 22, 1976). Section 702 and the FTCA thus exist side-by-side.

Moreover, the district court reasoned elsewhere that "compensation for past injury cannot adequately redress the prospect of continuing or future harm" caused by Defendants' interference with state property. ROA.939. As the district court correctly observed, "the only appropriate remedy would be injunctive relief." ROA.939. It would be no comfort for an arsonist to tell the homeowner he repeatedly victimizes not to worry because he'll always buy the victim a new home. The same is true when Defendants tell Texas to bring separate damages actions under the FTCA every time federal agents choose to wantonly destroy state property. The "indispensable" property right to exclude that America's founders held so dear is not up for forced sale *ad infinitum. Cedar Point Nursery v. Hassid*, 141 S. Ct. 2063, 2071 (2021); *see infra* Part II.A (describing irreparable harm).

That underscores why the FTCA does not implicitly preclude the claim under state law here: Texas "is bringing a different claim, seeking different relief, from the kind the [FTCA] addresses." *Match-E-Be-Nash-She-Wish Band of Pottawatomi Indians v. Patchak*, 567 U.S. 209, 222 (2012). That this suit and the FTCA deal with a "similar subject matter" (*i.e.*, torts) "is not itself sufficient" to "trigger a remedial

statute's preclusive effect." *Id.* at 223. True, the FTCA may provide "the exclusive remedy *for compensation* for a federal employee's tortious acts.'" *McGuire v. Turnbo*, 137 F.3d 321, 324 (5th Cir. 1998) (emphasis added). But damages cannot adequately redress ongoing, willful destruction of property; instead, as the district court explained, "the only appropriate remedy would be injunctive relief." ROA.939.

*Finally*, the district court's speculation that "Congress did not intend for Section 702's waiver to be so over-inclusive" is unavailing. *Id.* at 945. Section 702's text speaks for itself, and legislative history cannot trump unambiguous text. *See, e.g.*, *Lamie v. U.S. Trustee*, 540 U.S. 526, 531 (2004). In any event, the legislative record shows that the district court was wrong: "[T]he House and Senate Reports' repeated declarations that Congress intended to waive immunity for 'any' and 'all' actions for equitable relief against an agency make clear that no [other] limitations were intended." *Trudeau*, 456 F.3d at 187 (citations omitted). Those reports posed three limits on §702's waiver: "First, the amendment only waives sovereign immunity for actions in a federal court; second, such actions must seek non-monetary relief; and third, it is 'applicable only to functions falling within the definition of "agency" in 5 U.S.C. section 701.'" *Treasurer of N.J.*, 684 F.3d at 400 (citation omitted). "But the House Report does not state that there is a fourth limitation limiting the waiver of sovereign immunity." *Id.*

**4.**    Determined as they are to avoid the merits of the trespass claim, Defendants will likely argue—as they did before the motions panel—that two other hurdles preclude injunctive relief. The motions panel correctly rejected both arguments.

*First*, Defendants contend that intergovernmental immunity grants an unconstrained license to destroy Texas's property, as well as anyone else's, within 25 miles of the border with Mexico—an area covering more than 30,000 square miles. That is wrong. Federal agents within a State are generally subject to state law—including criminal law, *United States ex rel. Drury v. Lewis*, 200 U.S. 1, 3, 7-8 (1906); tort law, *Johnson v. Maryland*, 254 U.S. 51, 56 (1920); property law, *Wilkie v. Robbins*, 551 U.S. 537, 560 (2007); and even traffic laws, *Hall v. Virginia*, 105 S.E. 551, 552 (Va. 1921); *North Carolina v. Ivory*, 906 F.2d 999, 1001-02 (4th Cir. 1990); *Sanchez v. United States*, 803 F. Supp. 2d 1066, 1070-71 (C.D. Cal. 2011). Intergovernmental immunity's exception to that general rule applies only where a state (1) "regulate[s] the United States directly" or (2) "discriminate[s] against the Federal Government or those with whom it deals." *Washington*, 596 U.S. at 838-39.

As the motions panel held, Defendants cannot claim intergovernmental immunity because recent Supreme Court precedent "clarif[ies] that the intergovernmental immunity doctrine only prohibits state laws 'that *either* regulat[e] the United States directly *or* discriminat[e] against the Federal Government or those with whom it deals.'" ROA.1018 (quoting *Washington*, 596 U.S. at 838-39). Here, "Texas is neither directly regulating the Border Patrol nor discriminating against the federal government." ROA.1018. Texas asserts its own "rights [as] an ordinary proprietor" under state tort law. *Fort Leavenworth Ry. v. Lowe*, 114 U.S. 525, 527 (1885). By invoking that proprietary interest, Texas is not "regulat[ing]" anyone. *Washington*, 596 U.S. at 838. Instead, it is exercising its property rights "just as a private party would." *Am. Trucking Ass'ns v. City of Los Angeles*, 569 U.S. 641, 649-

50 (2013); *see also Dep't of Revenue v. Kentucky*, 553 U.S. 328, 339 (2008). And as Defendants have now conceded, Application at 26, the attendant generally applicable tort principles in no way "singl[e] out the Federal Government for unfavorable treatment." *Washington*, 596 U.S. at 839.

In their briefing before the Supreme Court, Defendants confusingly faulted the motions panel for following *Washington*'s two-part test. Application at 25-26. But that is only because *Washington* repudiates Defendants' argument that state law can never "retard" federal operations in view of the Supremacy Clause. 596 U.S. at 838-39 (describing how the doctrine has retreated from *McCulloch*'s sweeping statements). Defendants' ambitious theory of intergovernmental immunity—*i.e.*, that it precludes the application of state law "without restraint," ROA.1233, anytime federal actors deem compliance with state law inconvenient, ROA.1077, 1082-83, 1235—"has been thoroughly repudiated by modern intergovernmental immunity caselaw." *South Carolina v. Baker*, 485 U.S. 505, 520 (1988). To the extent Texas tort law "indirectly increases costs for the Federal Government," it lawfully "imposes those costs in a neutral and nondiscriminatory way." *Washington*, 596 U.S. at 839. And that is all Defendants have ever pointed to by insisting that federal law maximizes their own convenience.

*Second*, Defendants have also invoked 8 U.S.C. §1252(f)(1), a remedial bar in the INA. *E.g.*, Application at 33. Section 1252(f)(1) strips lower federal courts of "jurisdiction or authority to enjoin or restrain the operation" of certain provisions in Title 8 governing inspection, apprehension, and removal of noncitizens. But Defendants have already waived reliance on §1252(f)(1). On October 30, 2023, the

district court entered a TRO. On November 21, Defendants agreed to extend it. ROA.931 ("Following the virtual conference, the Court ordered that the TRO be extended to November 29, 2023, at 11:59 p.m. on consent of the parties."). Defendants' voluntary submission to an injunction in this very case is a telltale sign that they previously harbored no doubts about §1252(f)(1)'s inapplicability. And because §1252(f)(1) does not go to subject-matter jurisdiction, *see, e.g., Biden v. Texas*, 597 U.S. 785, 798 (2022), a party may waive its applicability in a particular case, including by agreeing to a court order contrary to its terms.

In any event, Texas has never sought to enjoin Defendants from carrying out their responsibilities under a covered provision of the INA (or any provision of the INA for that matter) based on differing understandings of what those responsibilities entail. Instead, it sought an order to protect its own property interests under Texas tort law. That kind of order—one permitting Defendants to apprehend, process, and transfer aliens to their hearts' content but barring them from wantonly destroying property in the process—would have, at most, a "collateral effect" on Defendants' enforcement of immigrations laws. *Garland v. Aleman Gonzalez*, 596 U.S. 543, 553 n.4 (2022). In fact, at the preliminary-injunction hearing, all Defendants' counsel could muster was that the requested injunction "would have an effect" on Border Patrol. ROA.1067.

Section 1252(f)(1), understandably, has nothing to say about an order like that. Otherwise, any order that somehow affected a federal agent's preferred method of going about his work would be swept up by the statute. That view, which elevates Defendants' mere "convenience" above the equitable power of the federal courts,

ROA.1077, 1082, 1235, cannot be squared with Supreme Court precedent—or common sense. A disgruntled CBP officer might find it convenient to assault TMD soldiers based on his opinion that they make his job harder. ROA.646. But an order enjoining him from committing future batteries would *not* be an order restraining him from processing aliens. Similarly, Texas is not "trying to stop [Defendants] from doing [their] job." ROA.1239. Texas just wants an injunction preventing the destruction of its property.

Even if an order merely creating some collateral inconvenience could count as one "enjoin[ing] or restrain[ing] the operation of" a statutory provision of the INA, 8 U.S.C. §1252(f)(1), the motions panel was correct to reject Defendants' argument for an additional reason: Defendants did not rely on a covered "provision[] of part IV of this subchapter," which includes 8 U.S.C. §§1221-1232. "To cut Texas's c-wire, Defendants did not rely on any of the statutes covered. Instead, they relied on 8 U.S.C. §§1103(a)(3) and 1357(a)(3), neither of which [is] covered." ROA.1018. Section 1103(a)(3) empowers the Secretary of Homeland Security to implement various immigration provisions. And §1357(a)(3) entitles Border Patrol agents to "access" certain property within 25 miles of the border to *prevent* illegal entries. Neither of those provisions references any authority to destroy property without any actual necessity. But even if they did, they are not covered by §1252(f)(1).

## B.  Texas has identified an unlawful agency policy in support of its APA and *ultra vires* claims.

Because the motions panel concluded that Texas was likely to succeed on its trespass-to-chattels claim, it did not reach Texas's alternative claims that

Defendants violated the APA and acted *ultra vires*. ROA.1019. Texas, however, is also entitled to relief on each of those independent grounds.

1.    "All the officers of the government, from the highest to the lowest, are creatures of the law and are bound to obey it." *United States v. Lee*, 106 U.S. 196, 220 (1882). Federal statutes permit judicial enforcement of that principle via the APA's bar on agency action that is "arbitrary [and] capricious," "not in accordance with law," or "in excess of statutory . . . authority." 5 U.S.C. §706(2)(A), (C). Injured parties may also seek specific relief via the *ultra vires* doctrine against "a Federal officer acting in excess of his authority or under authority not validly conferred." *Larson v. Domestic & Foreign Com. Corp.*, 337 U.S. 682, 690-91 (1949).

Texas will likely succeed on its APA and *ultra vires* claims because Congress has not authorized Defendants to destroy others' property for reasons having nothing to do with enforcing federal law. Congress empowered Defendants to set "national immigration enforcement policies and priorities"; "ensure the interdiction of persons and goods illegally entering . . . the United States"; "detect, respond to, and interdict terrorists, drug smugglers and traffickers, human smugglers and traffickers, and other persons who may undermine the security of the United States"; "safeguard the borders of the United States"; and "enforce and administer all immigration laws." 6 U.S.C. §§202(5), 211(c)(2), (5), (6), (8); *see also id.* §211(e)(3) (listing duties of the U.S. Border Patrol, which "primar[il]y" include "interdicting persons attempting to illegally enter or exit the United States or goods being illegally imported into or exported from the United States at a place other than a designated port of entry").

The district court's factual findings demonstrate that Defendants are not doing any of those things. The findings confirm that Defendants' actions could not be justified by medical exigencies or law-enforcement responsibilities. ROA.953-55. Despite Defendants' claim that they must destroy Texas's fence to "apprehend" and "detain" aliens, the district court found that "[n]o reasonable interpretation of these definitions can square with Border Patrol's conduct." ROA.952-53. The district court thus rightly rejected Defendants' "cynical" and "disingenuous" contentions to the contrary. ROA.936.

This Court should credit the district court's assessment of the facts, which is subject to "highly deferential" review under the clear-error standard. *Harm v. Lake-Harm*, 16 F.4th 450, 456 (5th Cir. 2021). Under that standard, this Court "must accept" factual findings even if they are only plausibly supported by the record and "even though [it] might have weighed the evidence differently if [it] had been sitting as trier of fact." *Taylor-Travis*, 984 F.3d at 1116 (quoting *Ali v. Stephens*, 822 F.3d 776, 783 (5th Cir. 2016)).

Against the district court's careful findings, Defendants have offered little more than the "presumption of regularity" that "supports the official acts of public officers." Application at 21-22 (quoting *United States v. Chem. Found.*, 272 U.S. 1, 14 (1926)). They did not raise this presumption below, and it is therefore forfeited. *Chevron USA, Inc. v. Aker Mar. Inc.*, 689 F.3d 497, 503 (5th Cir. 2012). Regardless, a presumption is just that—a presumption. It does not "shield [Defendants'] action[s] from a thorough, probing, in-depth review" such as that conducted by the district court. *Citizens to Pres. Overton Park, Inc. v. Volpe*, 401 U.S. 402, 415 (1971), *abrogated*

by *Califano v. Sanders*, 430 U.S. 99 (1977); *see also Sw. Elec. Power Co. v. EPA*, 920 F.3d 999, 1013 (5th Cir. 2019) (clarifying that the presumption of regularity does not render judicial review "toothless"). And should Defendants seek to present new facts or new explanations for their conduct, the proper forum for such efforts is the district court. As the case proceeds to discovery in the ordinary course, that court will be free to modify its preliminary relief should the legal or factual circumstances change. *Canal Auth. of Fla. v. Callaway*, 489 F.2d 567, 578 (5th Cir. 1974).

**2.**    The district court nevertheless rejected Texas's APA and *ultra vires* claims because Texas had not "conclusively" proven the existence of a policy or final agency action or *ultra vires* conduct. ROA.955-60. Of course, conclusive proof is never required at the preliminary-injunction stage, which is "by its very nature . . . not fixed or final or conclusive." *SEC v. First Fin. Grp. of Tex.*, 645 F.2d 429, 435 n.8 (5th Cir. Unit A May 1981) (citation omitted). Indeed, because "[t]he purpose of a preliminary injunction is merely to preserve the relative positions of the parties until a trial on the merits can be held," it follows that "a preliminary injunction is customarily granted on the basis of procedures that are less formal and evidence that is less complete than in a trial on the merits. A party thus is not required to prove his case in full at a preliminary-injunction hearing." *Univ. of Tex. v. Camenisch*, 451 U.S. 390, 395 (1981). The district court, moreover, erred for two additional reasons.

*First*, at a minimum, the existence of a policy or final agency action is irrelevant to Texas's *ultra vires* claim. Only "agency action" is necessary, and "virtually every statement an agency may make" suffices. *Apter*, 80 F.4th at 590 (citation omitted). In *Apter*, for example, this Court held that FDA social-media posts directing medical

31

advice to the public met the statutory definition of "agency action" because they announced "principle[s] of general applicability and future effect." *Id.* (citation omitted). Specifically, the posts "directed consumers to take specific actions in keeping with the generally applicable principle that FDA had settled on and announced." *Id*. at 591.

Like the FDA's social-media posts, Defendants' conceded "guidance that supervisors in the Del Rio Sector have provided line agents regarding the wire," ROA.815, announces "principle[s] of general applicability and future effect," *Apter*, 80 F.4th at 590 (citation omitted). The district court documented extensive "communications between lower- and higher-ranking DHS officers regarding wire-cutting in the Del Rio Sector." ROA.956. Those communications constitute challengeable agency action authorizing line-level officers to tamper with Texas's property. Whether that direction is characterized as "imperative language . . . recommending a general course of action" or "imperative language in prescribing a policy" is irrelevant. *Apter*, 80 F.4th at 591. Nor does it matter whether the communications were "nonbinding" and "did not mark the end of the agency's decisional process." *Id*. Any argument to the contrary "conflate[s] the test for determining *action* with the test for determining *finality*." *Id*.

Recognizing the breadth of what qualifies as "agency action," the district court rejected Texas's *ultra vires* claim not because it failed to identify qualifying conduct, but because it was uncertain whether the conduct was *ultra vires*. ROA.959-60. But the district court's own factual findings establish that element. Defendants' fence-cutting policy is *ultra vires* because Congress directed Defendants to control and

32

guard U.S. borders against illegal entry—not to facilitate illegal entry by destroying the property of another sovereign. *See* 6 U.S.C. §§ 202(5), 211(c)(2), (5), (6), (8), (e)(3). As the district court found, Defendants' conduct "directly contravene[s] [their] statutory obligations." ROA.954. "The Defendants cannot claim the statutory duties they are so obviously derelict in enforcing as excuses to puncture the Plaintiff's attempts to shore up the Defendants' failing system." ROA.954.

To succeed on an *ultra vires* claim, a plaintiff must show that its interests are not "so marginally related to or inconsistent with the purposes implicit in the statute that it cannot reasonably be assumed that Congress intended to permit the suit." *Apter*, 80 F.4th at 592 (cleaned up). Defendants' enabling statutes entrust them with the duty to protect national borders. As a border State, Texas's interest in seeing that duty fulfilled is more than just "marginal" or "arguably" within the relevant zone of interests. Border security is so central to Texas's interests that the State has expended billions of dollars and thousands of man hours to "aid Border Patrol in its core functions." ROA.934.

*Second*, Texas has shown both the existence of final agency action and a policy. Final agency action (1) marks the consummation of the agency decisionmaking process and (2) determines legal rights or obligations. *Data Mktg. P'ship v. DOL*, 45 F.4th 846, 853 (5th Cir. 2022). In a recent Supreme Court filing, Defendants acknowledged the existence of their policy permitting destruction of Texas's fence. *See* Reply at 21. And they have all but conceded that the policy marks the consummation of the agency's decision-making process. As Texas's mangled

fencing attests, "it is 'not subject to further Agency review.'" *Data Mktg. P'ship*, 45 F.4th at 853 (citation omitted).

Defendants have instead focused their attack on the second defining feature of final agency action: that it determines rights, obligations, or legal consequences. Defendants assert that their policy "does not constitute final agency action because it "only affects [a party's] rights adversely on the contingency of future administrative action." Reply at 20 (quoting *DRG Funding Corp. v. Sec'y of Hous. & Urban Dev.*, 76 F.3d 1212, 1214 (D.C. Cir. 1996)). That is, in Defendants' view, the policy is not final until a particular border agent executes it by cutting Texas's fence. But every policy must be implemented. Guidance ending the Migrant Protection Protocols in *Biden v. Texas*, for example, had to be carried out by DHS staff, yet the guidance "resulted in 'rights and obligations [being] determined.'" 597 U.S. 785, 808 (2022) (citation omitted).

Defendants have also argued that, even if final, its wire-cutting policy is "committed to agency discretion by law." Reply at 21 (quoting *Lincoln v. Vigil*, 508 U.S. 182, 191 (1993)). Yet "[t]he general exception to reviewability provided by § 701(a)(2) for action committed to agency discretion remains a narrow one," *Texas v. United States*, 809 F.3d 134, 166 (5th Cir. 2015) (citation omitted), and Defendants have not explained why it applies here. The cutting of Texas's fence looks nothing like administrative decisions typically deemed committed to agency discretion. Here, an agency has not "refus[ed] to institute investigative or enforcement proceedings." *Id.* (citation omitted). Short of that, the Supreme Court routinely rejects such self-serving claims of agency discretion. *See, e.g.*, *DHS v. Regents of Univ.*

*of Cal.*, 140 S. Ct. 1891, 1905–07 (2020); *Dep't of Com. v. New York*, 139 S. Ct. 2551, 2568 (2019); *Weyerhaeuser Co. v. U.S. Fish & Wildlife Serv.*, 139 S. Ct. 361, 370–372 (2018).

Rejecting that argument is even easier here because there clearly *is* "law to apply." *Texas*, 809 F.3d at 165. Texas tort law defines Texas's property rights. Defendants' argument that federal agents must make on-the-spot judgments actually proves the point: Although they refuse to engage on that claim, the common-law prohibition against trespass afforded a limited privilege to trespass for purposes of rendering life-saving aid. *See* ROA.846 n.2; Tex. Penal Code §9.22 (codifying the necessity defense). But that privilege, even when exercised by law-enforcement agents, could not justify destroying property when there is no exigency at all, on the theory that there *might* be an exigency sometime in the future. Hundreds of years of tort law thus already addresses the very questions that Defendants suggest are unanswerable. And in any event, any time an agency takes an affirmative step, "[t]he action at least can be reviewed to determine whether the agency exceeded its statutory powers." *Texas*, 809 F.3d at 166 (citation omitted).

## II. The Remaining Factors Likewise Favor Entry of a Preliminary Injunction.

Having determined that Texas was likely to succeed on the merits of its trespass-to-chattels claim, the motions panel also correctly determined that the remaining *Nken* factors support injunctive relief.

### A. Allowing the wanton destruction of Texas's property would irreparably harm both Texas and its citizens.

As the district court recognized, Defendants are openly flouting their statutory duties at the border, enticing people to "undertake the dangerous task of crossing the river" and causing "irreparable harm" to Texas. ROA.935, 960. The direct irreparable harm to Texas includes the "repeated or continuing" invasions of Texas's property rights. *Beathard Joint Venture v. W. Hous. Airport Corp.*, 72 S.W.3d 426, 432 (Tex. App.—Texarkana 2002, no pet.). Like any other property owner, Texas has a fundamental interest in avoiding repeated infringement of its rights by a willful tortfeasor.

But on top of that, the very purpose of a fence is to prevent dangerous circumstances from occurring. Ranchers often erect fences to prevent their livestock from escaping or being attacked by predators. And families put up fences to keep children from wandering into irrigation ditches, rivers, and streets. *See, e.g., Newman v. Nazcr Trac Prop. Owners Ass'n of Am., Inc.*, 601 F. Supp. 3d 357, 367 (E.D. Wis. 2022) (accepting plaintiffs' argument that "each day without a fence for the children deprives them of exercise and fresh air," which is an injury that cannot be adequately compensated by an award of damages). Here, Texas's fencing prevents drug runners, human traffickers, weapons smugglers, and others from unlawfully trespassing on Texas's property. It also deters dangerous attempts to traverse the Rio Grande. Defendants' argument is that they are free to destroy *anyone*'s fencing within 25 miles of the border—even fencing that serves these important public-safety functions. Damages can never compensate for increased danger to the public.

There was "no error, clear or otherwise, in [the] finding" that Texas would suffer irreparable harm from the "loss of control and use of its private property." ROA.1019 (citation omitted). "The district court found that Defendants' employees have repeatedly damaged, destroyed, and exercised dominion over state property and showed that they intend to prevent Texas from maintaining operational control over its own property." ROA.1019 (cleaned up). And the district court, after making extensive findings of fact, correctly concluded that "compensation for past injury cannot adequately redress the prospect of continuing or future harm for which the only appropriate remedy would be injunctive relief." ROA.1019-20; *see Register.com, Inc. v. Verio Inc.*, 356 F.3d 393, 404 (2d Cir. 2004) (affirming the grant of a preliminary injunction to halt an ongoing trespass to chattels); *Hadley v. Dep't of Corrs.*, 840 N.E.2d 748, 756 (Ill. App. Ct. 2005) (holding that a plaintiff would "suffer irreparable injury without the injunction" against an administrative rule that wrongly deprived inmates of a $2 fee because, "without an injunction, plaintiff and other indigent inmates will suffer the same small two-dollar injury over and over again"). No one is forced to allow the federal government to continuously destroy their property—let alone a *fence*, the point of which is to prevent future harm. This is not just about the monetary cost of wire; it is about preventing continuing threats to public safety.

## B. The equities do not favor Defendants, who resorted to self-help measures and withdrew from the area in question.

In balancing the equities, federal courts may consider traditional equitable factors like a party's bad-faith behavior, dilatory tactics, or other conduct

contributing to its own detriment. *See, e.g.*, *Benisek v. Lamone*, 138 S. Ct. 1942, 1944 (2018); *Netflix, Inc. v. Babin*, 88 F.4th 1080, 1100 (5th Cir. 2023); *Ramirez v. McCraw*, 715 F. App'x 347, 350-51 (5th Cir. 2017) (per curiam). Such traditional considerations tip the equities away from Defendants, who have a proven history of taking self-help measures in this dispute and who have already abandoned the area they now claim requires freedom from a preliminary injunction.

On September 20, 2023—after a month of destroying property belonging to another sovereign—CBP officials used bolt cutters to tear open multiple gaps in Texas's wire fence near Eagle Pass to wave more than 4,000 illegal aliens into this country. ROA.1013. Roughly 2,000 of those aliens were never processed by the United States. ROA.1013. Neither Texas nor the United States has any idea who these "gotaways" are—whether they are from Ecuador or Iran, whether their criminal history is short or long, whether they brought with them only personal effects or deadly narcotics and human slaves. The only certainty is this: Their first act on American soil was committing a federal crime, and federal officials assisted them. That novel approach to preventing the illegal entry of aliens had become a daily occurrence in Eagle Pass. ROA.935 n.3.

Texas moved for a preliminary injunction on October 24, 2023, to prevent ongoing damage to its property and notified Defendants' counsel. ROA.84. Rather than rein in its practice of destroying Texas's property, Defendants dialed things up. Two days later, Defendants traded bolt cutters for a hydraulic tractor, ripped Texas's entire fence out of the ground, and suspended it in the air for 300 illegal aliens to enter. ROA.247. Texas promptly moved for a temporary restraining order

and again notified Defendants' counsel. ROA.234. Rather than respond with written pleadings in a court of law, Defendants returned with the forklift less than an hour later, this time using the metal forks to smash Texas's fence repeatedly into the dirt. ROA.278. The pulverized mass of fencing was "completely flattened." ROA.270. Nevertheless, Defendants persisted in claiming—in sworn pleadings—that this escalation was designed to "minimize damage" to Texas's property. ROA.593-94.

After the district court granted a TRO, and without providing any notice to Texas, Defendants substantially reduced their operations in the area. Although Border Patrol previously maintained a large presence in Shelby Park, a former hotbed of illegal crossings, in November 2023—after the district court issued its TRO preventing Defendants from destroying Texas's property—Defendants withdrew almost all personnel and equipment. Supplemental Response at 2. Border Patrol even informed the Texas Department of Public Safety's Regional Director, Victor Escalon, that federal officials would not be present to monitor or administer aid unless Texas called. *Id.* at 2-3. Despite claiming that the equities favor them because the medical carveout in the Fifth Circuit's injunction is not broad enough, Application at 5, 20, 36-37, Defendants' actual behavior in withdrawing shows that they had little interest in "be[ing] in a position to respond to emergencies" there, *contra* Supplemental Memo at 4-5.

### C. Maintaining "effective" fences to deter drug smuggling, human trafficking, and terrorism is in the public interest.

It should be obvious that unlawful activity—like drug smuggling, human trafficking, terrorism, and the countless other ills associated with illegal

immigration—harms the American public and aliens themselves. ROA.290 (district-court findings). "[T]he public interest demands effective measures to prevent the illegal entry of aliens at the Mexican border." *United States v. Brignoni-Ponce*, 422 U.S. 873, 878 (1975). The district court found that Texas's fencing is an "effective" measure to help reduce the public harms associated with illegal immigration. ROA.934; *see also* ROA.953-54. That is likely why the federal government itself uses c-wire fencing as a barrier to channel aliens to ports of entry. ROA.849 n.4. Maintaining such barriers secures sovereign territory. It reduces the risk to officers and aliens alike posed by unlawful crossings. It prevents the risk of violent conflict between trespassers and landowners. It facilitates law enforcement's ability to detect contraband and criminal behavior. It enables authorities to methodically process, assess, and apprehend would-be entrants to this country. And it slows the pace of a wave of migration for which federal resources have proven inadequate.

The district court not only found that Texas's fence is effective at ameliorating public harm. It also found that Defendants' conduct of destroying the fence *exacerbates* the harm. By repeatedly breaching Texas's fence, "Defendants apparently seek to establish an unofficial and unlawful port of entry." ROA.953. That, the district court found, "provid[es] ample incentive for the individuals posing the greatest public danger to flee rather than deliver themselves to the Defendants," ROA.960, and entices people to "undertake the dangerous task of crossing the river," ROA.935. In other words, "the very emergencies the Defendants assert make it necessary to cut the wire are of their own creation." ROA.935. As the district court explained,

> [a]ny rational observer could not help but wonder why the Defendants do not just allow migrants to access the country at a port of entry. If agents are going to allow migrants to enter the country, and indeed facilitate their doing so, why make them undertake the dangerous task of crossing the river?

ROA.935.

Finally, as the motions panel found, "[t]here is generally no public interest in the perpetuation of unlawful agency action," and there is "substantial public interest in having governmental agencies abide by the federal laws that govern their existence and operations." ROA.1020-21. "The district court found that the Border Patrol exceeded its authority by cutting Texas's c-wire fence for purposes other than a medical emergency, inspection, or detention," and the public interest favors "clear protections for property rights from government intrusion and control." ROA.1021. Accordingly, the motions panel "f[ound] no abuse of discretion in the district court's weighing of the public interest prong." ROA.1021.

Defendants have also suggested that an injunction "prevents Border Patrol agents from exercising their longstanding statutory authority to disturb barriers to the border in order to perform their functions under federal immigration law." ECF No. 53 at 4. But the district court's order rejects that factual assertion, too, finding that "Border Patrol agents already possess access to both sides of the fence . . . to the river and bank by boat and to the further-inland side of the fence by road." ROA.950. The district court also found that "[n]o reasonable interpretation" of Defendants' statutory duties "can square with Border Patrol's conduct." ROA.953. Defendants cannot show that those findings are clearly erroneous. *See Direct Biologics, L.L.C. v.*

*McQueen*, 63 F.4th 1015, 1020 (5th Cir. 2023). Indeed, Defendants' theory that their putative right to "access" property within 25 miles of the border implicitly includes the power to destroy any fencing within literally tens of thousands of square miles of Texas is not plausible.

## Conclusion

The Court should reverse the district court's order denying a preliminary injunction and remand the case for entry of the requested relief.

Respectfully submitted.

Ken Paxton
Attorney General of Texas

Brent Webster
First Assistant Attorney General



Office of the Attorney General
P.O. Box 12548 (MC 059)
Austin, Texas 78711-2548
Tel.: (512) 936-1700
Fax: (512) 474-2697

/s/ Aaron L. Nielson

Aaron L. Nielson
Solicitor General
Aaron.Nielson@oag.texas.gov

Lanora C. Pettit
Principal Deputy Solicitor General

J. Andrew Mackenzie
Assistant Attorney General


Counsel for Plaintiff-Appellant

## Certificate of Service

On January 16, 2024, this brief was served via CM/ECF on all registered counsel and transmitted to the Clerk of the Court. Counsel further certifies that: (1) any required privacy redactions have been made in compliance with Fifth Circuit Rule 25.2.13; (2) the electronic submission is an exact copy of the paper document in compliance with Fifth Circuit Rule 25.2.1; and (3) the document has been scanned with the most recent version of Symantec Endpoint Protection and is free of viruses.

/s/ Aaron L. Nielson
Aaron L. Nielson

## Certificate of Compliance

This brief complies with: (1) the type-volume limitation of Federal Rule of Appellate Procedure 32(a)(7)(B) because it contains 10,845 words, excluding the parts of the brief exempted by Rule 32(f); and (2) the typeface requirements of Rule 32(a)(5) and the type style requirements of Rule 32(a)(6) because it has been prepared in a proportionally spaced typeface (14-point Equity) using Microsoft Word (the same program used to calculate the word count).

/s/ Aaron L. Nielson
Aaron L. Nielson