No. 23-50869

# In the United States Court of Appeals for the Fifth Circuit

STATE OF TEXAS,

*Plaintiff-Appellant,*

*v.*

UNITED STATES DEPARTMENT OF HOMELAND SECURITY;
ALEJANDRO MAYORKAS, SECRETARY, U.S. DEPARTMENT OF
HOMELAND SECURITY; UNITED STATES CUSTOMS AND BORDER
PROTECTION; UNITED STATES BORDER PATROL; TROY MILLER,
ACTING COMMISSIONER, U.S. CUSTOMS AND BORDER
PROTECTION; JASON OWENS, IN HIS OFFICIAL CAPACITY AS
CHIEF OF THE U.S. BORDER PATROL; JUAN BERNAL, IN HIS
OFFICIAL CAPACITY AS ACTING CHIEF PATROL AGENT, DEL RIO
SECTOR UNITED STATES BORDER PATROL,

*Defendants-Appellees.*

On Appeal from the United States District Court
for the Western District of Texas, Del Rio Division

**RECORD EXCERPTS FOR APPELLANT**

*(Counsel Listed on Inside Cover)*

KEN PAXTON
Attorney General of Texas

BRENT WEBSTER
First Assistant Attorney General

Office of the Attorney General
P.O. Box 12548 (MC 059)
Austin, Texas 78711-2548
Tel.: (512) 936-1700
Fax: (512) 474-2697

AARON L. NIELSON
Solicitor General
Aaron.Nielson@oag.texas.gov

LANORA C. PETTIT
Principal Deputy Solicitor General

J. ANDREW MACKENZIE
Assistant Attorney General

Counsel for Plaintiff-Appellant

# TABLE OF CONTENTS

1.  Docket Sheet (ROA.1-13) .................................................. Tab 1
2.  Notice of Appeal (ROA.966-967) .................................. Tab 2
3.  Opinion and Order (ROA.927-965) ............................... Tab 3
4.  Temporary Restraining Order (ROA.282-292) .............................. Tab 4

**TAB 1: DOCKET SHEET (ROA.1-13)**

INTAPP

# U.S. District Court [LIVE]
# Western District of Texas (Del Rio)
# CIVIL DOCKET FOR CASE #: 2:23-cv-00055-AM

STATE OF TEXAS v. US Department of Homeland Security et al
Assigned to: Chief Judge Alia Moses
 Case in other court:  USCA - 5th Circuit, 23-50869
                       USCA - 5th Circuit, 23-50869
Cause: 05:702 Administrative Procedure Act

Date Filed: 10/24/2023
Jury Demand: None
Nature of Suit: 899 Other Statutes:
Administrative Procedures Act/Review or
Appeal of Agency Decision
Jurisdiction: U.S. Government Defendant

**Plaintiff**

**STATE OF TEXAS**                    represented by  **Amy Snow Hilton**
                                                     PO Box 12548, Capitol Station
                                                     Special Litigation Division
                                                     78711, Ste Mc-019
                                                     Austin, TX 78711
                                                     512-463-4139
                                                     Email: amy.hilton@oag.texas.gov
                                                     *LEAD ATTORNEY*
                                                     *ATTORNEY TO BE NOTICED*

                                                     **Heather Lee Dyer**
                                                     Office of the Attorney General
                                                     General Litigation Division
                                                     P O Box 12548
                                                     Austin, TX 78711-2548
                                                     512-936-1162
                                                     Email: heather.dyer@oag.texas.gov
                                                     *LEAD ATTORNEY*
                                                     *ATTORNEY TO BE NOTICED*

                                                     **Munera Al-Fuhaid**
                                                     Office of the Attorney General
                                                     PO Box 12548
                                                     Austin, TX 78711-2548
                                                     512-936-2176
                                                     Email: munera.al-fuhaid@oag.texas.gov
                                                     *LEAD ATTORNEY*
                                                     *ATTORNEY TO BE NOTICED*

                                                     **Ralph Michael Molina**
                                                     The Office of the Attorney General of Texas
                                                     P.O. Box 12548 - MC-019
                                                     Austin, TX 78711
                                                     (512) 936-2714
                                                     Fax: (512) 320-0667
                                                     Email: ralph.molina@oag.texas.gov
                                                     *LEAD ATTORNEY*

*ATTORNEY TO BE NOTICED*

**Robert E Henneke**
Texas Public Policy Foundation
901 Congress Avenue
Austin, TX 78701
512-472-2700
Fax: 512-472-2728
Email: rhenneke@texaspolicy.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Susanna Dokupil**
Office of the Attorney General
PO Box 12548, Capitol Station
Austin, TX 78711-2548
512-936-1817
Email: susanna.dokupil@oag.texas.gov
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Monroe David Bryant , Jr**
Office of the Texas Attorney General
Special Litigation Unit
P.O Box 12548
(MC-009)
Austin, TX 78711-2548
512-936-2266
Fax: 512-457-4110
Email: david.bryant@oag.texas.gov
*ATTORNEY TO BE NOTICED*

**Ryan Daniel Walters**
Office of the Texas Attorney General
Special Litigation Division
209 W. 14th Street
7th Floor
Austin, TX 78701
512-936-2714
Email: ryan.walters@oag.texas.gov
*ATTORNEY TO BE NOTICED*

V.

**<u>Defendant</u>**

**US Department of Homeland Security**          represented by   **Christopher A. Eiswerth**
DOJ-Civ
Federal Programs Branch
1100 L Street, NW
Ste 12310
Washington, DC 20005
202-305-0568

Email: christopher.a.eiswerth@usdoj.gov
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Faith Johnson Lowry**
DOJ-Civ
Federal Programs Branch
1100 L Street
Washington, DC 20005
202-305-2532
Email: faith.e.lowry@usdoj.gov
*ATTORNEY TO BE NOTICED*

**Jean Lin**
DOJ-Civ
1100L St., N.W.
Washington, DC 20005
202-514-3716
Email: jean.lin@usdoj.gov
*ATTORNEY TO BE NOTICED*

**Robert D. Green**
United States Attorney's Office
Civil Division
601 NW Loop 410
Suite 600
San Antonio, TX 78216
210-384-7362
Email: robert.green3@usdoj.gov
*ATTORNEY TO BE NOTICED*

**Stephen Ehrlich**
U.S. Department of Justice
1100 L Street NW
Washington, DC 20005
202-305-9803
Email: stephen.ehrlich@usdoj.gov
*ATTORNEY TO BE NOTICED*

**Defendant**

**in his official capa Alejandro Mayorkas**
*in his official capacity as Secretary of the*
*U.S. Department of Homeland Security*

represented by **Christopher A. Eiswerth**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Faith Johnson Lowry**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Jean Lin**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Robert D. Green**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Stephen Ehrlich**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Defendant**

**US Customs and Border Protection**   represented by   **Christopher A. Eiswerth**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Faith Johnson Lowry**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Jean Lin**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Robert D. Green**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Stephen Ehrlich**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Defendant**

**US Border Patrol**   represented by   **Christopher A. Eiswerth**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Faith Johnson Lowry**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Jean Lin**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Robert D. Green**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Stephen Ehrlich**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Defendant**

| | | |
|---|---|---|
| **Troy A. Miller**<br>*in his official capacity as Acting Commissioner for U.S. Customs and Border Protection* | represented by | **Christopher A. Eiswerth**<br>(See above for address)<br>*LEAD ATTORNEY*<br>*ATTORNEY TO BE NOTICED* |
| | | **Faith Johnson Lowry**<br>(See above for address)<br>*ATTORNEY TO BE NOTICED* |
| | | **Jean Lin**<br>(See above for address)<br>*ATTORNEY TO BE NOTICED* |
| | | **Robert D. Green**<br>(See above for address)<br>*ATTORNEY TO BE NOTICED* |
| | | **Stephen Ehrlich**<br>(See above for address)<br>*ATTORNEY TO BE NOTICED* |

**Defendant**

| | | |
|---|---|---|
| **Jason Owens**<br>*in his official capacity as Chief of the U.S. Border Patrol* | represented by | **Christopher A. Eiswerth**<br>(See above for address)<br>*LEAD ATTORNEY*<br>*ATTORNEY TO BE NOTICED* |
| | | **Faith Johnson Lowry**<br>(See above for address)<br>*ATTORNEY TO BE NOTICED* |
| | | **Jean Lin**<br>(See above for address)<br>*ATTORNEY TO BE NOTICED* |
| | | **Robert D. Green**<br>(See above for address)<br>*ATTORNEY TO BE NOTICED* |
| | | **Stephen Ehrlich**<br>(See above for address)<br>*ATTORNEY TO BE NOTICED* |

**Defendant**

| | | |
|---|---|---|
| **Juan Bernal**<br>*in his official capacity as Acting Chief Patrol Agent, Del Rio Sector U.S. Border Patrol* | represented by | **Christopher A. Eiswerth**<br>(See above for address)<br>*LEAD ATTORNEY*<br>*ATTORNEY TO BE NOTICED* |
| | | **Faith Johnson Lowry**<br>(See above for address) |

*ATTORNEY TO BE NOTICED*

**Jean Lin**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Robert D. Green**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Stephen Ehrlich**
(See above for address)
*ATTORNEY TO BE NOTICED*

| Date Filed | # | Docket Text |
|---|---|---|
| 10/24/2023 | 1 (p.14) | COMPLAINT ( Filing fee $ 402 receipt number ATXWDC-18020532). No Summons requested at this time, filed by STATE OF TEXAS. (Attachments: # 1 (p.14) Civil Cover Sheet)(Walters, Ryan) (Entered: 10/24/2023) |
| 10/24/2023 | 2 (p.45) | REQUEST FOR ISSUANCE OF SUMMONS by STATE OF TEXAS. *All Defendants* (Walters, Ryan) (Entered: 10/24/2023) |
| 10/24/2023 | 3 (p.81) | Unopposed MOTION for Leave to Exceed Page Limitation by STATE OF TEXAS. (Attachments: # 1 (p.14) Motion for Preliminary Injunction, # 2 (p.45) Appendix to Motion for Preliminary Injunction, # 3 (p.81) Proposed Order Granting Preliminary Injunction, # 4 (p.198) Proposed Order Granting Motion to Exceed Page Limits)(Walters, Ryan) (Entered: 10/24/2023) |
| 10/24/2023 | | Case assigned to Chief Judge Alia Moses. CM WILL NOW REFLECT THE JUDGE INITIALS AS PART OF THE CASE NUMBER. PLEASE APPEND THESE JUDGE INITIALS TO THE CASE NUMBER ON EACH DOCUMENT THAT YOU FILE IN THIS CASE. (ccr) (Entered: 10/26/2023) |
| 10/26/2023 | 4 (p.198) | Summons Issued as to Alejandro Mayorkas, Troy A. Miller, Jason Owens, US Border Patrol, US Customs and Border Protection, US Department of Homeland Security. (ccr) (Entered: 10/26/2023) |
| 10/27/2023 | 5 (p.234) | MOTION for Temporary Restraining Order *or Stay of Agency Action* by STATE OF TEXAS. (Attachments: # 1 (p.14) Appendix Supplemental Appendix, # 2 (p.45) Proposed Order Granting Temporary Restraining Order)(Walters, Ryan) (Entered: 10/27/2023) |
| 10/27/2023 | 6 (p.256) | REQUEST FOR ISSUANCE OF SUMMONS by STATE OF TEXAS. (Walters, Ryan) (Entered: 10/27/2023) |
| 10/27/2023 | 7 (p.262) | Summons Issued as to Juan Bernal. (ccr) (Entered: 10/27/2023) |
| 10/28/2023 | 8 (p.268) | NOTICE *OF ESCALATING PROPERTY DAMAGE* by STATE OF TEXAS re 5 (p.234) MOTION for Temporary Restraining Order *or Stay of Agency Action* (Attachments: # 1 (p.14) Appendix Declaration of Roberto Ortiz Diaz)(Walters, Ryan) (Entered: 10/28/2023) |
| 10/30/2023 | 9 (p.282) | ORDER GRANTING 5 (p.234) Motion for TRO Signed by Chief Judge Alia Moses. (ccr) (Entered: 10/30/2023) |

| 10/30/2023 | | Preliminary Injunction Hearing set for 11/7/2023 02:00 PM before Chief Judge Alia Moses, (ccr) (Entered: 10/30/2023) |
|---|---|---|
| 10/30/2023 | 10 | EXHIBIT - Flash-drive corresponding to docket entry 3.2 Appendix to Plaintiff's Motion for Preliminary Injunction filed by STATE OF TEXAS. (ccr) (Entered: 10/30/2023) |
| 10/30/2023 | 11 (p.293) | SUMMONS Returned Executed by STATE OF TEXAS. US Department of Homeland Security served on 10/30/2023, answer due 12/29/2023. (Attachments: # 1 (p.14) Supplement Summons Return Executed through USAG, # 2 (p.45) Supplement Summons Return Executed through US District Clerk for Western District of Texas)(Walters, Ryan) (Entered: 10/30/2023) |
| 10/30/2023 | 12 (p.392) | SUMMONS Returned Executed by STATE OF TEXAS. Alejandro Mayorkas served on 10/30/2023, answer due 12/29/2023. (Attachments: # 1 (p.14) Supplement Summons Return Executed through USAG, # 2 (p.45) Supplement Summons Return Executed through US District Clerk for Western District of Texas)(Walters, Ryan) (Entered: 10/30/2023) |
| 10/30/2023 | 13 (p.491) | SUMMONS Returned Executed by STATE OF TEXAS. Troy A. Miller served on 10/30/2023, answer due 12/29/2023. (Attachments: # 1 (p.14) Supplement Summons Return Executed through USAG, # 2 (p.45) Supplement Summons Return Executed through US District Clerk for Western District of Texas)(Walters, Ryan) (Entered: 10/30/2023) |
| 10/30/2023 | 14 (p.506) | SUMMONS Returned Executed by STATE OF TEXAS. US Border Patrol served on 10/30/2023, answer due 12/29/2023. (Attachments: # 1 (p.14) Supplement Summons Return Executed through USAG, # 2 (p.45) Supplement Summons Return Executed through US District Clerk for Western District of Texas)(Walters, Ryan) (Entered: 10/30/2023) |
| 10/30/2023 | 15 (p.521) | SUMMONS Returned Executed by STATE OF TEXAS. US Customs and Border Protection served on 10/30/2023, answer due 12/29/2023. (Attachments: # 1 (p.14) Supplement Summons Return Executed through US District Clerk for Western District of Texas)(Walters, Ryan) (Entered: 10/30/2023) |
| 10/30/2023 | 16 (p.531) | SUMMONS Returned Executed by STATE OF TEXAS. Jason Owens served on 10/30/2023, answer due 12/29/2023. (Attachments: # 1 (p.14) Supplement Summons Return Executed through US District Clerk for Western District of Texas)(Walters, Ryan) (Entered: 10/30/2023) |
| 10/30/2023 | 17 (p.541) | SUMMONS Returned Executed by STATE OF TEXAS. Juan Bernal served on 10/30/2023, answer due 12/29/2023. (Walters, Ryan) (Entered: 10/30/2023) |
| 10/30/2023 | 18 (p.546) | DEFICIENCY NOTICE: re 11 (p.293) Summons Returned Executed as to USA, (jaw) (Entered: 10/30/2023) |
| 10/30/2023 | 19 (p.547) | DEFICIENCY NOTICE: re 12 (p.392) Summons Returned Executed as to USA, (jaw) (Entered: 10/30/2023) |
| 10/30/2023 | 20 (p.548) | SUMMONS Returned Executed by STATE OF TEXAS. *Corrected Dkt. 11 - 11.2* (Attachments: # 1 (p.14) Supplement Summons Return Executed through USAG, # 2 (p.45) Supplement Summons Return Executed through US District Clerk for Western District of Texas)(Walters, Ryan) (Entered: 10/30/2023) |
| 10/30/2023 | 21 | SUMMONS Returned Executed by STATE OF TEXAS. *Corrected Dkt. 12 - 12.2* |

| | | |
|---|---|---|
| | (p.563) | (Attachments: # 1 (p.14) Supplement Summons Return Executed through USAG)(Walters, Ryan) (Entered: 10/30/2023) |
| 10/30/2023 | 22 (p.573) | NOTICE of Attorney Appearance by Monroe David Bryant, Jr on behalf of STATE OF TEXAS. Attorney Monroe David Bryant, Jr added to party STATE OF TEXAS(pty:pla) (Bryant, Monroe) (Entered: 10/30/2023) |
| 10/30/2023 | 23 (p.575) | Unopposed MOTION for Leave to Exceed Page Limitation by Juan Bernal, Alejandro Mayorkas, Troy A. Miller, Jason Owens, US Border Patrol, US Customs and Border Protection, US Department of Homeland Security. (Attachments: # 1 (p.14) Exhibit Opposition to Motion for Preliminary Injunction, # 2 (p.45) Exhibit BeMiller Declaration, # 3 (p.81) Proposed Order Granting Motion to Exceed Page Limitations)(Eiswerth, Christopher) (Entered: 10/30/2023) |
| 10/31/2023 | 24 (p.628) | NOTICE of Attorney Appearance by Christopher A. Eiswerth on behalf of Juan Bernal, Alejandro Mayorkas, Troy A. Miller, Jason Owens, US Border Patrol, US Department of Homeland Security. Attorney Christopher A. Eiswerth added to party Juan Bernal(pty:dft), Attorney Christopher A. Eiswerth added to party Alejandro Mayorkas(pty:dft), Attorney Christopher A. Eiswerth added to party Troy A. Miller(pty:dft), Attorney Christopher A. Eiswerth added to party Jason Owens(pty:dft), Attorney Christopher A. Eiswerth added to party US Border Patrol(pty:dft), Attorney Christopher A. Eiswerth added to party US Customs and Border Protection(pty:dft), Attorney Christopher A. Eiswerth added to party US Department of Homeland Security(pty:dft) (Eiswerth, Christopher) (Entered: 10/31/2023) |
| 11/01/2023 | | Text Order GRANTING 3 (p.81) Motion for Leave to File Excess Pages entered by Chief Judge Alia Moses. The Clerk of Court shall docket the Motion for Preliminary Injunction or Stay of Action. (This is a text-only entry generated by the court. There is no document associated with this entry.) (HMlc) (Entered: 11/01/2023) |
| 11/01/2023 | | Text Order GRANTING 23 (p.575) Motion for Leave to File Excess Pages entered by Chief Judge Alia Moses. The Clerk of Court shall docket the Opposition to Motion for Preliminary Injunction or Stay of Action. (This is a text-only entry generated by the court. There is no document associated with this entry.) (HMlc) (Entered: 11/01/2023) |
| 11/01/2023 | 25 (p.629) | NOTICE of Attorney Appearance by Jean Lin on behalf of Juan Bernal, Alejandro Mayorkas, Troy A. Miller, Jason Owens, US Border Patrol, US Customs and Border Protection, US Department of Homeland Security. Attorney Jean Lin added to party Juan Bernal(pty:dft), Attorney Jean Lin added to party Alejandro Mayorkas(pty:dft), Attorney Jean Lin added to party Troy A. Miller(pty:dft), Attorney Jean Lin added to party Jason Owens(pty:dft), Attorney Jean Lin added to party US Border Patrol(pty:dft), Attorney Jean Lin added to party US Customs and Border Protection(pty:dft), Attorney Jean Lin added to party US Department of Homeland Security(pty:dft) (Lin, Jean) (Entered: 11/01/2023) |
| 11/02/2023 | 26 (p.630) | NOTICE of Filing of Amended Declaration of Manuel Perez (Dkt. 3-2) by STATE OF TEXAS (Attachments: # 1 (p.14) Supplement Amended Declaration of Manuel Perez)(Walters, Ryan) (Entered: 11/02/2023) |
| 11/05/2023 | 27 (p.635) | Motion for leave, filed by STATE OF TEXAS, re 23 (p.575) Unopposed MOTION for Leave to Exceed Page Limitation filed by Defendant Troy A. Miller, Defendant Alejandro Mayorkas, Defendant US Border Patrol, Defendant US Department of Homeland Security, Defendant US Customs and Border Protection, Defendant Juan |

| | | |
|---|---|---|
| | | Bernal, Defendant Jason Owens (Attachments: # 1 (p.14) Reply in Support of Motion for Preliminary Injunction, # 2 (p.45) Appendix, # 3 (p.81) Proposed Order)(Walters, Ryan) Modified on 11/7/2023 (ccr). (Entered: 11/05/2023) |
| 11/07/2023 | 28 (p.685) | NOTICE of Attorney Appearance by Faith Johnson Lowry on behalf of Juan Bernal, Alejandro Mayorkas, Troy A. Miller, Jason Owens, US Border Patrol, US Customs and Border Protection, US Department of Homeland Security. Attorney Faith Johnson Lowry added to party Juan Bernal(pty:dft), Attorney Faith Johnson Lowry added to party Alejandro Mayorkas(pty:dft), Attorney Faith Johnson Lowry added to party Troy A. Miller(pty:dft), Attorney Faith Johnson Lowry added to party Jason Owens(pty:dft), Attorney Faith Johnson Lowry added to party US Border Patrol(pty:dft), Attorney Faith Johnson Lowry added to party US Customs and Border Protection(pty:dft), Attorney Faith Johnson Lowry added to party US Department of Homeland Security(pty:dft) (Lowry, Faith) (Entered: 11/07/2023) |
| 11/07/2023 | 29 (p.686) | NOTICE of Attorney Appearance by Stephen Ehrlich on behalf of Juan Bernal, Alejandro Mayorkas, Troy A. Miller, Jason Owens, US Border Patrol, US Customs and Border Protection, US Department of Homeland Security. Attorney Stephen Ehrlich added to party Juan Bernal(pty:dft), Attorney Stephen Ehrlich added to party Alejandro Mayorkas(pty:dft), Attorney Stephen Ehrlich added to party Troy A. Miller(pty:dft), Attorney Stephen Ehrlich added to party Jason Owens(pty:dft), Attorney Stephen Ehrlich added to party US Border Patrol(pty:dft), Attorney Stephen Ehrlich added to party US Customs and Border Protection(pty:dft), Attorney Stephen Ehrlich added to party US Department of Homeland Security(pty:dft) (Ehrlich, Stephen) (Entered: 11/07/2023) |
| 11/07/2023 | | Text Order GRANTING 27 (p.635) Motion entered by Chief Judge Alia Moses. The Clerk of Court shall docket the Reply in Support of Motion for Preliminary Injunction or Stay of Action. (This is a text-only entry generated by the court. There is no document associated with this entry.) (HMlc) (Entered: 11/07/2023) |
| 11/07/2023 | 30 (p.687) | Reply in Support of Motion for Preliminary Injunction or Stay of Action by STATE OF TEXAS (jaw) (Entered: 11/07/2023) |
| 11/07/2023 | 32 | Proceedings held before Chief Judge Alia Moses: Preliminary Injunction Hearing held on 11/7/2023 (Court Reporter Vickie Garza.)(ccr) (Entered: 11/09/2023) |
| 11/07/2023 | 34 (p.739) | Clerk's Exhibit List (ccr) (Entered: 11/09/2023) |
| 11/07/2023 | 71 (p.1542) | EXHIBITS (jaw) (Entered: 12/20/2023) |
| 11/08/2023 | 35 (p.740) | TRANSCRIPT REQUEST by Juan Bernal, Alejandro Mayorkas, Troy A. Miller, Jason Owens, US Border Patrol, US Customs and Border Protection, US Department of Homeland Security for proceedings held on 11/07/2023. Proceedings Transcribed: Hearing. Court Reporter: Vickie Lee Garza. (jaw) (Entered: 11/13/2023) |
| 11/09/2023 | 31 (p.734) | TRANSCRIPT REQUEST by STATE OF TEXAS for proceedings held on 11/7/23. Proceedings Transcribed: PI Hearing. Court Reporter: Ms. Vickie-Lee Garza. (Walters, Ryan) (Entered: 11/09/2023) |
| 11/09/2023 | 33 (p.736) | ORDER. Signed by Chief Judge Alia Moses. (ccr) (Entered: 11/09/2023) |
| 11/13/2023 | | |

| | 36 (p.741) | NOTICE *OF ALL PARTIES RE: SECOND PI HEARING* by STATE OF TEXAS re 33 (p.736) Order (Walters, Ryan) (Entered: 11/13/2023) |
|---|---|---|
| 11/14/2023 | 37 (p.1027) | Transcript filed of Proceedings held on 11/07/2023, Proceedings Transcribed: Preliminary Injunction Hearing. Court Reporter/Transcriber: VICKIE GARZA, Telephone number: 8303086416. Parties are notified of their duty to review the transcript to ensure compliance with the FRCP 5.2(a)/FRCrP 49.1(a). A copy may be purchased from the court reporter or viewed at the clerk's office public terminal. If redaction is necessary, a Notice of Redaction Request must be filed within 21 days. If no such Notice is filed, the transcript will be made available via PACER without redaction after 90 calendar days. The clerk will mail a copy of this notice to parties not electronically noticed Redaction Request due 12/5/2023, Redacted Transcript Deadline set for 12/15/2023, Release of Transcript Restriction set for 2/12/2024, (vg) (Main Document 37 replaced on 11/15/2023) (jaw). (Entered: 11/14/2023) |
| 11/14/2023 | 38 (p.744) | MOTION to Amend/Correct 33 (p.736) Order by Juan Bernal, Alejandro Mayorkas, Troy A. Miller, Jason Owens, US Border Patrol, US Customs and Border Protection, US Department of Homeland Security. (Attachments: # 1 (p.14) Exhibit A - Courey Declaration, # 2 (p.45) Proposed Order)(Eiswerth, Christopher) (Entered: 11/14/2023) |
| 11/15/2023 | 39 (p.760) | ORDER, Preliminary Injunction Hearing set for 11/27/2023 09:30 AM before Chief Judge Alia Moses,), Motions terminated: Granting in part and denying in part the Defendants' motion 38 (p.744) MOTION to Amend/Correct 33 (p.736) Order filed by Troy A. Miller, Alejandro Mayorkas, US Border Patrol, US Department of Homeland Security, US Customs and Border Protection, Juan Bernal, Jason Owens.. Signed by Chief Judge Alia Moses. (ccr) (Entered: 11/15/2023) |
| 11/16/2023 | 40 (p.762) | NOTICE *Regarding Virtual Conference* by STATE OF TEXAS re 39 (p.760) Order,, Set Hearings,, Terminate Motions, (Walters, Ryan) (Entered: 11/16/2023) |
| 11/16/2023 | 41 (p.765) | ORDER SETTING VIRTUAL CONFERENCE RE: DOCUMENT PRODUCTION. TRO, AND SECOND P1 HEARING set for 11/21/2023 01:00 PM before Chief Judge Alia Moses. Signed by Chief Judge Alia Moses. (ccr) (Entered: 11/17/2023) |
| 11/17/2023 | 42 (p.766) | NOTICE of Attorney Appearance by Robert D. Green on behalf of Juan Bernal, Alejandro Mayorkas, Troy A. Miller, Jason Owens, US Border Patrol, US Customs and Border Protection, US Department of Homeland Security. Attorney Robert D. Green added to party Juan Bernal(pty:dft), Attorney Robert D. Green added to party Alejandro Mayorkas(pty:dft), Attorney Robert D. Green added to party Troy A. Miller(pty:dft), Attorney Robert D. Green added to party Jason Owens(pty:dft), Attorney Robert D. Green added to party US Border Patrol(pty:dft), Attorney Robert D. Green added to party US Customs and Border Protection(pty:dft), Attorney Robert D. Green added to party US Department of Homeland Security(pty:dft) (Green, Robert) (Entered: 11/17/2023) |
| 11/21/2023 | 43 (p.767) | NOTICE *of Good-Faith Efforts* by Juan Bernal, Alejandro Mayorkas, Troy A. Miller, Jason Owens, US Border Patrol, US Customs and Border Protection, US Department of Homeland Security (Attachments: # 1 (p.14) Exhibit Ex. A, Dismuke Declaration, # 2 (p.45) Exhibit Ex. B, Blanchard Declaration)(Lowry, Faith) (Entered: 11/21/2023) |
| 11/21/2023 | 44 | Proceedings held before Chief Judge Alia Moses: Virtual Conference for Scheduling Purposes Hearing held on 11/21/2023 (Court Reporter Vickie Lee Garza.)(ccr) |

| | | (Entered: 11/21/2023) |
|---|---|---|
| 11/21/2023 | 45 (p.796) | ORDER, Preliminary Injunction Hearing set for 11/27/2023 10:00 AM before Chief Judge Alia Moses. Signed by Chief Judge Alia Moses. (ccr) (Entered: 11/21/2023) |
| 11/21/2023 | 46 (p.797) | SUPPLEMENTAL ORDER - It is ORDERED that based on today's virtual conference and the parties' previous filing (ECF No. 36), the temporary restraining order initially issued on October 30, 2023 at 9:30 a.m. and then extended to November 27, 2023 at 9:30 a.m. be extended to November 29, 2023 at 11:59p.m. on the consent of the parties, which will provide the Court enough time to render a timely decision on the pending preliminary injunction motion; and It is FURTHER ORDERED that the Defendants have until November 27, 2023 at 10 a.m. to produce outstanding documents that the Court ordered on November 9, 2023 to be produced, as modified by the Court's November 15, 2023 order, through a virtual link that the Court has already sent to the parties.. Signed by Chief Judge Alia Moses. (ccr) (Entered: 11/21/2023) |
| 11/21/2023 | 47 (p.799) | SUPPLEMENTAL MEMORANDUM by Juan Bernal, Alejandro Mayorkas, Troy A. Miller, Jason Owens, US Border Patrol, US Customs and Border Protection, US Department of Homeland Security. (Attachments: # 1 (p.14) Appendix Definitions)(Eiswerth, Christopher) (Entered: 11/21/2023) |
| 11/27/2023 | 48 (p.835) | SUPPLEMENTAL MEMORANDUM to 33 (p.736) Order by STATE OF TEXAS. (Walters, Ryan) (Entered: 11/27/2023) |
| 11/27/2023 | 49 (p.864) | TRANSCRIPT REQUEST by STATE OF TEXAS for proceedings held on 11/21/2023. Proceedings Transcribed: Video Conference. Court Reporter: Ms. Vickie-Lee Garza. (Walters, Ryan) (Entered: 11/27/2023) |
| 11/27/2023 | 50 (p.865) | TRANSCRIPT REQUEST by STATE OF TEXAS for proceedings held on 11/27/23. Proceedings Transcribed: PI Hearing. Court Reporter: Ms. Vickie-Lee Garza. (Walters, Ryan) (Entered: 11/27/2023) |
| 11/27/2023 | 52 | Proceedings held before Chief Judge Alia Moses: Preliminary Injunction Hearing held on 11/27/2023. (Court Reporter Vickie Garza.)(am3) (Entered: 11/28/2023) |
| 11/28/2023 | 51 | Sealed Order. Signed by Chief Judge Alia Moses. (ccr) (Entered: 11/28/2023) |
| 11/29/2023 | 53 (p.866) | NOTICE of Exhibits Admitted at November 27 Hearing by Juan Bernal, Alejandro Mayorkas, Troy A. Miller, Jason Owens, US Border Patrol, US Customs and Border Protection, US Department of Homeland Security (Attachments: # 1 (p.14) Appendix Hearing Exhibits)(Lowry, Faith) (Entered: 11/29/2023) |
| 11/29/2023 | 54 (p.925) | TRANSCRIPT REQUEST by Juan Bernal, Alejandro Mayorkas, Troy A. Miller, Jason Owens, US Border Patrol, US Customs and Border Protection, US Department of Homeland Security for proceedings held on 11/27/2023. Proceedings Transcribed: Second Prelim Inj Hr'g. Court Reporter: Ms. Vickie-Lee Garza. (Eiswerth, Christopher) (Entered: 11/29/2023) |
| 11/29/2023 | 55 (p.926) | TRANSCRIPT REQUEST by Juan Bernal, Alejandro Mayorkas, Troy A. Miller, Jason Owens, US Border Patrol, US Customs and Border Protection, US Department of Homeland Security for proceedings held on 11/21/2023. Proceedings Transcribed: Virtual Conference. Court Reporter: Ms. Vickie-Lee Garza. (Eiswerth, Christopher) (Entered: 11/29/2023) |
| 11/29/2023 | 57 | MEMORANDUM OPINION AND ORDER; Order that Plaintiff's Motion for |

| | | |
|---|---|---|
| | (p.927) | Preliminary Injunction Order or Stay of Agency Action (ECF No. 3-1) is DENIED. Signed by Chief Judge Alia Moses. (Attachments: # 1 (p.14) Appendix A)(jaw) (Attachment 1 replaced on 11/30/2023 to correct typo in the title) (jaw) (Entered: 11/29/2023) |
| 11/30/2023 | 58 (p.966) | Appeal of Order entered by District Judge 57 (p.927) by STATE OF TEXAS. ( Filing fee $ 505 receipt number ATXWDC-18151317) (Walters, Ryan) (Entered: 11/30/2023) |
| 11/30/2023 | | ** 57 (p.927) **NOTICE OF INTERLOCUTORY APPEAL as to 57 (p.927) Memorandum Opinion and Order, by STATE OF TEXAS. Filing fee $ 505, receipt number ATXWDC-18151317. Per 5th Circuit rules, the appellant has 14 days, from the filing of the Notice of Appeal, to order the transcript. To order a transcript, the appellant should fill out (Transcript Order) and follow the instructions set out on the form. This form is available in the Clerk's Office or by clicking the hyperlink above. (jaw) (Entered: 11/30/2023) |
| 11/30/2023 | 59 (p.968) | Opposed MOTION *FOR INJUNCTION PENDING APPEAL* re Notice of Appeal - Interlocutory,, 57 (p.927) Memorandum Opinion and Order, 58 (p.966) Notice of Appeal (E-Filed) by STATE OF TEXAS. (Attachments: # 1 (p.14) Proposed Order)(Walters, Ryan) (Entered: 11/30/2023) |
| 12/01/2023 | 60 (p.980) | Response in Opposition to Motion, filed by Juan Bernal, Alejandro Mayorkas, Troy A. Miller, Jason Owens, US Border Patrol, US Customs and Border Protection, US Department of Homeland Security, re 59 (p.968) Opposed MOTION *FOR INJUNCTION PENDING APPEAL* re Notice of Appeal - Interlocutory,, 57 (p.927) Memorandum Opinion and Order, 58 (p.966) Notice of Appeal (E-Filed) filed by Plaintiff STATE OF TEXAS (Attachments: # 1 (p.14) Proposed Order)(Eiswerth, Christopher) (Entered: 12/01/2023) |
| 12/01/2023 | 61 (p.991) | DESIGNATION of Record on Appeal by STATE OF TEXAS re Notice of Appeal - Interlocutory,, 58 (p.966) Notice of Appeal (E-Filed) (Walters, Ryan) (Entered: 12/01/2023) |
| 12/02/2023 | 62 (p.992) | REPLY to Response to Motion, filed by STATE OF TEXAS, re 59 (p.968) Opposed MOTION *FOR INJUNCTION PENDING APPEAL* re Notice of Appeal - Interlocutory,, 57 (p.927) Memorandum Opinion and Order, 58 (p.966) Notice of Appeal (E-Filed) filed by Plaintiff STATE OF TEXAS (Walters, Ryan) (Entered: 12/02/2023) |
| 12/04/2023 | 63 (p.999) | CORRECTED 61 (p.991) - TRANSCRIPT REQUEST by STATE OF TEXAS for dates of 11/7/23 and 11/27/23. Proceedings Transcribed: Preliminary Injunction Hearing. Court Reporter: Vickie-Lee Garza.. (Walters, Ryan) Resubmitted to use correct event - Modified on 12/4/2023 (jaw). (Entered: 12/04/2023) |
| 12/04/2023 | 64 (p.1283) | Transcript filed of Proceedings held on 11/27/2023, Proceedings Transcribed: Preliminary Injunction Hearing #2g. Court Reporter/Transcriber: VICKIE GARZA, Telephone number: 830-308-6416. Parties are notified of their duty to review the transcript to ensure compliance with the FRCP 5.2(a)/FRCrP 49.1(a). A copy may be purchased from the court reporter or viewed at the clerk's office public terminal. If redaction is necessary, a Notice of Redaction Request must be filed within 21 days. If no such Notice is filed, the transcript will be made available via PACER without redaction after 90 calendar days. The clerk will mail a copy of this notice to parties not electronically noticed Redaction Request due 12/26/2023, Redacted Transcript Deadline set for 1/4/2024, Release of Transcript Restriction set for |

| | | |
|---|---|---|
| | | 3/3/2024, Appeal Record due by 12/19/2023, (vg) (Entered: 12/04/2023) |
| 12/04/2023 | 65 | Sealed Transcript filed (This transcript is not available electronically) Appeal Record due by 12/19/2023, (vg) (Entered: 12/04/2023) |
| 12/04/2023 | 66 | Sealed Transcript filed (This transcript is not available electronically) Appeal Record due by 12/19/2023, (vg) (Entered: 12/04/2023) |
| 12/04/2023 | 67 (p.1000) | USCA Appeal Info Sheet received. USCA Case Number 23-50869 for Notice of Appeal - Interlocutory, filed by STATE OF TEXAS. (jaw) (Entered: 12/10/2023) |
| 12/04/2023 | 68 (p.1004) | ORDER of USCA (certified copy) ; re ORDER that Appellant's opposed motion for a temporary administrative stay is GRANTED Notice of Appeal - Interlocutory,, (jaw) (Entered: 12/10/2023) |
| 12/19/2023 | 69 (p.1007) | ORDER of USCA (certified copy) ; re Notice of Appeal - Interlocutory. (jaw) (Entered: 12/20/2023) |
| 12/20/2023 | 70 (p.1261) | Transcript filed of Proceedings held on 11/21/2023, Proceedings Transcribed: Preliminary Injunction Hearing #1. Court Reporter/Transcriber: VICKIE GARZA, Telephone number: (830) 308-6416. Parties are notified of their duty to review the transcript to ensure compliance with the FRCP 5.2(a)/FRCrP 49.1(a). A copy may be purchased from the court reporter or viewed at the clerk's office public terminal. If redaction is necessary, a Notice of Redaction Request must be filed within 21 days. If no such Notice is filed, the transcript will be made available via PACER without redaction after 90 calendar days. The clerk will mail a copy of this notice to parties not electronically noticed. Redaction Request due 1/10/2024, Redacted Transcript Deadline set for 1/20/2024, Release of Transcript Restriction set for 3/19/2024, Appeal Record due by 1/4/2024, (jaw) (Entered: 12/20/2023) |

Tab 2: Notice of Appeal (ROA.966-967)

**United States District Court**
**Western District of Texas**
**Del Rio Division**

| | |
|---|---|
| The State of Texas, | |
| *Plaintiff*, | |
| v. | |
| U.S. Department of Homeland Security; Alejandro Mayorkas, in his official capacity as Secretary of the U.S. Department of Homeland Security; U.S. Customs & Border Protection; U.S. Border Patrol; Troy A. Miller, in his official capacity as Acting Commissioner for U.S. Customs & Border Protection; Jason Owens, in his official capacity as Chief of the U.S. Border Patrol; and Juan Bernal, in his official capacity as Acting Chief Patrol Agent, Del Rio Sector U.S. Border Patrol, | No. 2:23-CV-00055-AM |
| *Defendants*. | |

## Plaintiff's Notice of Appeal

Plaintiff the State of Texas appeals this Court's Order entered on November 29, 2023, to the United States Court of Appeals for the Fifth Circuit. *See* Memorandum Opinion and Order, ECF No. 57. That Order denied the State of Texas's motion for a preliminary injunction. *See id.*; *see also* Pl.'s Mot. for Prelim. Inj. or Stay of Agency Action, ECF No. 3. The order denying a preliminary injunction is immediately appealable. *See* 28 U.S.C. § 1292(a)(1).

1

Date: November 30, 2023

Ken Paxton
Attorney General of Texas

Brent Webster
First Assistant Attorney General

Grant Dorfman
Deputy First Assistant Attorney General

Ralph Molina
Deputy Attorney General for Legal Strategy

Office of the Attorney General
P. O. Box 12548, MC-009
Austin, TX 78711-2548
(512) 936-2172

Robert Henneke
Texas Bar No. 24046058
Texas Public Policy Foundation
901 Congress Ave.
Austin, Texas 78701
(512) 472-2700
rhenneke@texaspolicy.com

Respectfully submitted,

*/s/ Ryan D. Walters*
Ryan D. Walters
Chief, Special Litigation Division
Tex. State Bar No. 24105085
ryan.walters@oag.texas.gov

David Bryant
Special Counsel
Texas Bar No. 03281500
David.bryant@oag.texas.gov

Munera Al-Fuhaid
Special Counsel
Tex. State Bar No. 24094501
Munera.Al-Fuhaid@oag.texas.gov

Amy S. Hilton
Special Counsel
Tex. State Bar No. 24097834
Amy.Hilton@oag.texas.gov

Heather L. Dyer
Special Counsel
Tex. State Bar No. 24123044
Heather.Dyer@oag.texas.gov

**Counsel for Defendants**

### Certificate of Service

On November 30, 2023, this document was filed electronically through the Court's CM/ECF system, which automatically serves all counsel of record.

*/s/ Ryan D. Walters*
Ryan D. Walters

23-50869.967

**TAB 3: OPINION AND ORDER (ROA.927-965)**

FILED

November 29, 2023

CLERK, U.S. DISTRICT COURT
WESTERN DISTRICT OF TEXAS

BY: _____ JAW

DEPUTY

**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
DEL RIO DIVISION**

| | | |
|---|---|---|
| THE STATE OF TEXAS, | § | |
| | § | |
| *Plaintiff* | § | |
| | § | **Civil Action No.** |
| v. | § | **DR-23-CV-00055-AM** |
| | § | |
| **U.S. DEPARTMENT OF HOMELAND** | § | |
| **SECURITY; ALEJANDRO** | § | |
| **MAYORKAS, in his official capacity as** | § | |
| **Secretary of the U.S. Department of** | § | |
| **Homeland Security; U.S. CUSTOMS &** | § | |
| **BORDER PROTECTION; U.S.** | § | |
| **BORDER PATROL; TROY A.** | § | |
| **MILLER, in his official capacity as** | § | |
| **Acting Commissioner for U.S. Customs** | § | |
| **& Border Protection; JASON OWENS,** | § | |
| **in his official capacity as Chief of the** | § | |
| **U.S. Border Patrol; and JUAN** | § | |
| **BERNAL, in his official capacity as** | § | |
| **Acting Chief Patrol Agent, Del Rio** | § | |
| **Sector U.S. Border Patrol,** | § | |
| | § | |
| *Defendants.* | § | |

## MEMORANDUM OPINION AND ORDER

Pending before the Court is the State of Texas's (the "Plaintiff") Motion for a Preliminary

Injunction or Stay of Agency Action (the "Motion") against the United States Department of

Homeland Security ("DHS"); Alejandro Mayorkas, in his official capacity as Secretary of DHS

("Mayorkas"); United States Customs and Border Protection ("CBP"); United States Border Patrol

("BP"); Troy A. Miller, in his official capacity as Acting Commissioner for CBP ("Miller"); Jason

Owens, in his official capacity as Chief of BP ("Owens"); and Juan Bernal, in his official capacity

as Acting Chief Patrol Agent of the Del Rio Sector of BP ("Bernal") (collectively, the

"Defendants"). (ECF No. 3-1.) Upon careful consideration of the record and relevant law, the Court **DENIES** the motion for preliminary injunctive relief.

### I. BACKGROUND

### A. Procedural Background

On October 24, 2023, the Plaintiff commenced this civil action against the Defendants. (ECF No. 1.) According to the Plaintiff, the Defendants are destroying its property by cutting the concertina wire ("c-wire" or "wire") fence the Plaintiff constructed near the U.S.-Mexico border. (*Id.* at 3-4.) The Plaintiff claims that this property destruction is intended to allow migrants to enter the country illegally. (*Id.* at 1-4.) The Plaintiff raises numerous claims against the Defendants, including common law conversion, common law trespass to chattels, and several violations under the Administrative Procedure Act ("APA"). (*Id.* at 23-28.) The Plaintiff seeks the following: preliminary and permanent injunctive relief to enjoin the Defendants from seizing or destroying the Plaintiff's property; a stay of agency action under 5 U.S.C. § 705; a declaration that the Defendants' actions are unlawful; and costs. (*Id.* at 28-29.) Together with the Complaint, the Plaintiff filed a motion for preliminary injunctive relief, which is presently before the Court. (ECF No. 3-1.)

Three days later, on October 27, 2023, the Plaintiff filed a Motion for a Temporary Restraining Order ("TRO"). (ECF No. 5.) One day later, the Plaintiff filed a Notice of Escalating Property Damage in Support of its Emergency Motion for a TRO. (ECF No. 8.) The Plaintiff alleged that the Defendants, knowing a motion for a TRO had already been filed, used a forklift to seize concertina wire and smash it to the ground. (*Id.*) The Court, considering the motion for a TRO *ex parte* and on an expedited basis, granted the request on October 30, 2023, which forbade the Defendants from interfering with the Plaintiff's concertina wire except for medical

2

23-50869.928

emergencies.  (ECF No. 9 at 4, 11.)  Following the TRO, the Defendants filed an opposition to the motion.  (ECF No. 23-1.)  Thereafter, the Plaintiff filed a reply in support of its request for a preliminary injunction.  (ECF No. 27-1.)

The parties appeared before the Court on November 7, 2023 for an initial hearing on the motion for preliminary injunction.  The Court heard testimony from the Plaintiff's witness, Michael Banks, Border Czar for the State of Texas, and from the Defendants' witnesses, Mario Trevino, Deputy Patrol Agent in Charge for the U.S. Border Patrol at the Eagle Pass South Station, and David S. BeMiller, Chief of Law Enforcement Operations at U.S. Border Patrol Headquarters. The Court also considered extensive arguments from the parties.  On November 9, 2023, the Court extended the TRO for an additional 14 days to fully consider the parties' arguments and evidence. (ECF No. 33.)  The Court then ordered that a second preliminary injunction hearing should be held, that the parties provide supplemental briefs on the APA claims, that the parties define various legal terms, and that the parties provide all documents and communications related to the cutting of the Plaintiff's c-wire and any other border barriers.  (*Id.*)

On November 14, 2023, the Defendants filed a Motion to Modify the Court's November 9, 2023 Order.  (ECF No. 38.)  The Defendants explained they would not be able to fully comply with the Court's order for production given the breadth of the order and the limited amount of time remaining before the next hearing, which the parties consented to have on mutually agreeable days between November 20 and November 29, 2023.  (ECF Nos. 36, 38.)  The Defendants proposed limiting the Court's discovery to seven custodians likely to have responsive documents to the Court's order.  (ECF Nos. 38 at 4; 38-1 at 4.)  These custodians included the Chief Patrol Agent and Deputy Patrol Agent of the Del Rio Sector, the Patrol Agents in Charge and Deputy Patrol Agents in Charge of the Eagle Pass North and Eagle Pass South Stations, and the Chief of Law

23-50869.929

Enforcement Operations. (ECF No. 38-1 at 4.) According to the Defendants, a targeted search of these seven individuals yielded over 310,000 emails and documents. (ECF No. 38 at 4.) Thus, the Defendants also requested that they be permitted to produce only responsive documents from the search described in paragraphs 11, 12, and 15 of the Courey Declaration. (*Id.* at 4-5.)

On November 15, 2023, the Court denied in part and granted in part the Defendants' motion to modify. (ECF No. 39.) Specifically, the Court ordered that its November 9, 2023 Order not be modified except to limit document production to the period between March 6, 2021, and November 9, 2023. (*Id.*) The parties had until November 21, 2023 to produce the documents as modified. (*Id.*) The Court also set the second preliminary injunction hearing for November 27, 2023. In a separate order, the Court set a virtual conference for November 21, 2023 regarding document production, the TRO, and the second preliminary injunction hearing. (ECF No. 41.)

Before the virtual conference, the Defendants reported that they reviewed more than 6,000 documents pulled from a search of the seven identified custodians' electronic records to include the modified period. (ECF No. 43 at 6.) From the pool, the Defendants produced approximately 1,182 documents and five videos, asserting they attempted to maintain appropriate controls to safeguard privileges and other necessary redactions and withholdings. (*Id.*) They stated these documents reflect that the c-wire "inhibits Border Patrol's ability to patrol the border and inspect, apprehend, and process migrants in this four-mile stretch of the border, and the ways in which Border Patrol has coordinated with Texas about the wire in this area." (*Id.* at 7.) They further stated that while Border Patrol and the Texas Department of Public Safety ("DPS") have coordinated concerning the c-wire, the documents reflect that the "relationship has deteriorated over time, driven at least in part by at least one instance in which Texas DPS personnel threatened

4

to criminally charge Border Patrol for cutting the wire and DPS efforts to impede Border Patrol access to certain areas." (*Id.* at 8.)

Following the virtual conference, the Court ordered that the TRO be extended to November 29, 2023, at 11:59 p.m. on consent of the parties. (ECF No. 46 at 1.) The Court further ordered that the Defendants had until the morning of the second preliminary injunction hearing to produce the outstanding documents as previously ordered. (*Id.* at 2.) On November 26, 2023, the Defendants submitted additional documents to the Court for its review. The Plaintiff also submitted documents to the Court on November 21 and November 27, 2023. The Court held the second preliminary injunction hearing on November 27, 2023.

The Court now considers the Plaintiff's Motion for Preliminary Injunction. (ECF No. 3-1.) For purposes of clarifying the record, the Court makes its factual and legal determinations below based on the following: the Plaintiff's Complaint (ECF No. 1); the Plaintiff's Motion for Preliminary Injunction (and the appended declarations and exhibits) (ECF No. 5-1); the Plaintiff's Notice of Escalating Property Damage (and the appended declaration) (ECF No. 8); the Court's TRO entered on October 30, 2023 (ECF No. 9); the Plaintiff's video exhibits submitted on October 30, 2023 (ECF No. 10); the Defendants' Opposition to the Preliminary Injunction (and the appended declarations and exhibits) (ECF No. 23-1); the Plaintiff's Notice of Filing of Amended Declaration of Manuel Perez (ECF No. 26); the Plaintiff's Reply in Support of the Preliminary Injunction (and the appended declarations and exhibits) (ECF No. 27-1); the arguments, testimony, and evidence presented at hearings before the Court on November 7 and November 27, 2023; the Defendants' document production submitted to the Court *ex parte* and for *in camera* review on November 21, November 26, and November 29, 2023; and the Plaintiff's document production submitted to the Court *ex parte* and for *in camera* review on November 21 and

5

23-50869.931

November 27, 2023.[1]  The Court also considers the Defendants' Supplemental Brief filed on November 21, 2023, and the Plaintiff's Supplemental Brief filed on November 27, 2023.  (ECF Nos. 47, 48.)

## B. <u>Factual Background</u>

The U.S.-Mexico border presents a unique challenge that is equal parts puzzling to outsiders and frustrating to locals.  The immigration system at the heart of it all, dysfunctional and flawed as it is, would work if properly implemented.  Instead, the status quo is a harmful mixture of political rancor, ego, and economic and geopolitical realities that serves no one.  So destructive is its nature that the nation cannot help but be transfixed by, but simultaneously unable to correct, the present condition.  What follows here is but another chapter in this unfolding tragedy.  The law may be on the side of the Defendants and compel a resolution in their favor today, but it does not excuse their culpable and duplicitous conduct.

### i. <u>*The Border – A Brief Synopsis*</u>

Much of the 1,200-mile run of the Rio Grande River separating Texas and Mexico presents a bucolic setting, rolling from ranches to pecan orchards and back again.  Twenty-nine official ports of entry dot the landscape, but much of the focus in this matter, and the border debate more broadly, is the vast stretches of land between.  To guard this area, Congress created Border Patrol.  Its principal statutory objective, in the words of the Defendants, "is to deter illegal entry into the United States and to intercept individuals who are attempting to unlawfully enter the United States." (ECF No. 23-1 at 13.)  Border Patrol agents are empowered to apprehend noncitizens

---

[1] The Court is cognizant of the general nature of contents of the documents and is not relying on any particular document in this order.

23-50869.932

unlawfully entering the country, process them, inspect them for asylum or related claims, and in appropriate circumstances, place them in removal proceedings.  (*Id.* at 13–14.)

In recent years, the character of the situation facing Border Patrol agents has changed significantly.  The number of Border Patrol encounters with migrants illegally entering the country has swelled from a comparatively paltry 458,000 in 2020 to 1.7 million in 2021 and 2.4 million in 2022.  (ECF No. 3-1 at 9–10 (citing internal DHS figures).)  Border Patrol is on track to meet or exceed those numbers in 2023.  (*Id.* at 10.)  As expected, organized criminal organizations take advantage of these large numbers.  *The New York Times* reported that conveying all those people to the doorstep of the United States has become an incredibly lucrative enterprise for the major Mexican drug cartels.  (*Id.* at 10–12.)  However, the infrastructure built by the cartels for human cargo can also be used to ship illegal substances, namely fentanyl.  (*Id.* at 11.)  Lethal in small doses, fentanyl is a leading cause of death for young Americans and is frequently encountered in vast quantities at the border.  (*Id.*)

Migrant numbers increased apparently in response to softened political rhetoric.  To prepare those additional migrants for parole, Border Patrol devoted increasing portions of its manpower to processing.  (ECF No. 37 at 63, 64.)  For this purpose, the Defendants set up a temporary processing center on private land in Maverick County, Texas close to the Rio Grande River.  (*Id.* at 143–45, 163–65, 200, 223 (discussing the processing center and its location).)  As it became known that additional migrants were being allowed entry into the country, more appeared at the border, requiring still more agents to be pulled from deterrence and apprehension to processing.  (ECF No. 37 at 63, 64.)  This became a cycle in which the gaps in law enforcement at the border grew wider even as more illegal entries occurred.  (*Id.*)

23-50869.933

### ii. *Operation Lone Star and the Concertina Wire*

The Plaintiff launched Operation Lone Star in 2021 to aid Border Patrol in its core functions. (ECF No. 3-1 at 14.)  Through that initiative, the Plaintiff allocated resources in an attempt to stem the deteriorating conditions at the border. (*Id.*; ECF No. 37 at 62–64.)  The activity subject to dispute here is the Plaintiff's laying of concertina wire along several sections of riverfront.  The wire serves as a deterrent—an effective one at that.  The Court heard testimony that in other border sectors, the wire was so successful that illegal border crossings dropped to less than a third of their previous levels. (ECF No. 37 at 71–74.)  By all accounts, Border Patrol is grateful for the assistance of Texas law enforcement, and the evidence shows the parties work cooperatively across the state, including in El Paso and the Rio Grande Valley. (*Id.* at 71–75.)  The Eagle Pass area, though, is another matter.

Eagle Pass, and Maverick County generally, is the epicenter of the present migrant influx: nearly a quarter of migrant entries into the United States happen there. (ECF No. 3-1 at 18–19.)  Naturally, the Plaintiff's efforts under Operation Lone Star flowed there as well.  Just over 29 miles of concertina wire was installed in Maverick County by September 2023. (ECF No. 37 at 76.)

Of course, the installed wire creates a barrier between crossing migrants and law enforcement personnel, meaning that it must be cut in the event of an emergency, such as a drowning or heat exhaustion.  The Plaintiff does not contest this.  In fact, the Plaintiff itself cuts the wire from time to time to provide first aid or render treatment. (*Id.* at 79–80.)  The problem arises when Border Patrol agents cut the wire without prior notification to the Plaintiff for reasons other than emergencies.

8

Plaintiff's Exhibit 10 neatly displays this issue.[2]  In the video, Border Patrol agents are cutting a hole in the wire to allow a group of migrants to climb up from the riverbank.  However, another hole already exists in the wire, less than 15 feet away, through which migrants can be seen passing.  After completing the second hole and installing a climbing rope for migrants, agents then proceed to further damage the wire in that area and cut a third hole further down.  Meanwhile, in the background, a Border Patrol boat can be seen situated in the middle of the river, passively observing a stream of migrants as they make the hazardous journey from Mexico, across the river, and then up the bank on the American side.  At no point are the migrants interviewed, questioned as to citizenship, or in any way hindered in their progress into the United States.[3]

Border Patrol agents can be seen cutting multiple holes in the concertina wire for no apparent purpose other than to allow migrants easier entrance further inland.[4]  Any rational observer could not help but wonder why the Defendants do not just allow migrants to access the country at a port of entry.  If agents are going to allow migrants to enter the country, and indeed facilitate their doing so, why make them undertake the dangerous task of crossing the river?  Would it not be easier, and safer, to receive them at a port of entry?  In short, the very emergencies the Defendants assert make it necessary to cut the wire are of their own creation.

---

[2] Because the video is not yet publicly available, the Court includes herewith still images taken from the video as Appendix A. Those images provide a visual representation of key moments that factor heavily in the Court's analysis.
[3] It is important to note that the Court is aware of at least fourteen incidents of wire cutting.  (ECF No. 3-2 at 10–13, 23–28; ECF No. 8-1.)  However, the Court will focus on the September 20 incident, as shown in Plaintiff's Exhibit 10, because it is most illustrative for analysis purposes.  The Court is aware of one additional wire cutting incident that took place after the TRO was issued, but the Court is satisfied that a sufficient emergency existed to justify the action.
[4] The evidence suggests that on the day Plaintiff's Exhibit 10 was filmed, several migrants attempting to cross the river had been swept away.  (ECF No. 37 at 127–28.)  Accordingly, the wire was cut to rescue the individuals situated on the riverbank who had already entered the country, given the muddy and slippery conditions.  (*Id.* at 132–33.)  However, this assertion, made by Agent Mario Trevino, is totally uncorroborated by the condition of the migrants seen on the video.  Regardless, Agent Trevino's testimony is not lent great weight by the Court given his evasive answers and demeanor.

23-50869.935

Making matters worse are the cynical arguments of the Defendants in this case. During the second preliminary injunction hearing, counsel for the Defendants argued that although no Border Patrol agent can be seen making any sort of effort to physically restrain them, the migrants are in fact in custody because their path is bounded on both sides by wire and fence. It is disingenuous to argue the wire hinders Border Patrol from performing its job, while also asserting the wire helps. But regardless, the Court heard testimony that some 4,555 migrants entered during this incident, but only 2,680 presented themselves for processing that day at the Eagle Pass South Border Patrol Station. (ECF No. 37 at 113, 147–48.)[5] This information was provided to Banks by an unidentified Texas National Guardsman. (*Id.* at 113.) The Defendants do not contest the final processing number, only the number of entries on that day, though they do so without their own contrary evidence. (*Id.* at 148.)

## II. STANDARD OF REVIEW

A preliminary injunction is an "extraordinary and drastic remedy," which is never awarded as a right. *Munaf v. Geren*, 553 U.S. 674, 689–90 (2008); *accord Pham v. Blaylock*, 712 F. App'x 360, 363 (5th Cir. 2017); *Miss. Power & Light Co. v. United Gas Pipe Line Co.*, 760 F.2d 618, 621 (5th Cir. 1985). Its purpose is to preserve the relative positions of the parties until a trial on the merits can be held. *Univ. of Tex. v. Camenisch*, 451 U.S. 390, 395 (1981); *Texas v. United States*, 809 F.3d 134, 187 n.205 (5th Cir. 2015). A preliminary injunction is warranted only when a movant can show (1) a substantial likelihood of success on the merits; (2) substantial injury to the moving party if the injunction is not granted; (3) that the injury outweighs any harm that will result if the injunction is granted; and (4) that granting the injunction will not disserve the public interest. *All. for Hippocratic Med. v. FDA*, 78 F.4th 210, 242 (5th Cir. 2023); Fed. R. Civ. P. 65.

---

[5] Importantly, the Defendants raised concerns about the actions of the Plaintiff and its agents, suggesting the cooperative portrait the Plaintiff paints may not be entirely accurate.

23-50869.936

When the United States is the opposing party to a preliminary injunction, the third and fourth requirements merge. *Nken v. Holder*, 556 U.S. 418, 435 (2009). The party seeking the injunction must clearly carry the burden of persuasion on all four requirements. *Munaf*, 553 U.S. at 689-90; *Karaha Bodas Co. v. Negara*, 335 F.3d 357, 363 (5th Cir. 2003). Thus, "the decision to grant a preliminary injunction is to be treated as the exception rather than the rule." *Karaha Bodas Co.*, 335 F.3d at 363–64 (quoting *Miss. Power & Light Co.*, 760 F.2d at 621).

## III. JURISDICTIONAL ISSUES

### A. Standing

To establish standing, a plaintiff must show an injury in fact caused by a defendant and redressable by a court order. *See Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560-61 (1992). The Plaintiff complains of three types of injuries caused by the Defendants' cutting or moving the fence: (1) harm to the fence; (2) harm from increased crime; and (3) increased state expenditures on healthcare, social services, public education, incarceration, and its driver's license program. (ECF No. 3-1 at 12-13, 40-41, 43; ECF No. 27 at 16-19.)

The Defendants do not challenge the Plaintiff's proprietary interest in the integrity of the fence. (*See* ECF No. 23-1 at 14 n.3.) They also admit that they did, in fact, cause the asserted harm to the fence. (*Id.* at 15.) Instead, the Defendants argue that states have "no cognizable interest in how the federal government exercises its enforcement discretion." (*Id.* at 38-39 (citing *United States v. Texas*, 143 S. Ct. 1964, 1970-71 (2023).) In that case, the Supreme Court held that states generally lack standing to assert "attenuated" injuries in the form of "indirect effects" of federal policies on "state revenues or state spending" derived from an alleged federal failure to make arrests or bring prosecutions. *Texas*, 143 S. Ct. at 1972 n.3, 1973-76.

23-50869.937

In addition, citing *Haaland v. Brackeen*, 143 S. Ct. 1609, 1640 (2023), the Defendants argue that the Plaintiff cannot assert claims on behalf of its citizens.  (ECF No. 23-1 at 39.) *Haaland* found that states lacked standing to challenge a statute's rule governing child custody disputes based on a state's abstract "promise to its citizens" and indirect recordkeeping costs that were not "fairly traceable" to the federal policy.  *Haaland*, 143 S. Ct. at 1640-41.  The Defendants argue that the Plaintiff cannot claim standing based on an alleged rise in crime affecting the Plaintiff's citizens—such as drug smuggling, human trafficking, terrorist infiltration, and cartel activities (*see* ECF No. 3-1 at 7-8)—that the Defendants claim is similarly difficult to trace to their cutting or moving the fence.  (ECF No. 23-1 at 39.)

While *Texas* and *Haaland* cast significant doubt on whether the Plaintiff can claim indirect increased expenditures or a rise in crime as bases for standing, they do not address direct physical damage to a state's property by agents of the federal government.[6]  Here, the Plaintiff has direct proprietary interests in seeking to prevent or minimize damage to its fence caused by the Defendants' affirmative acts and to protect the Plaintiff's control and intended use thereof.  The asserted harm is particularized, concrete, and directly traceable to the Defendants' conduct.  *See Lujan*, 504 U.S. at 560.  It also satisfies the APA's additional "zone of interests" standing requirement.  *See Texas v. United State*s, 50 F.4th 498, 521 (5th Cir. 2022) (holding the requirement is satisfied if a claim is "arguably within the zone of interests to be protected or regulated by the statute" and the test is "not especially demanding.").  The APA expressly covers

---

[6] The Plaintiff suggests that this case could fall within one of the potential exceptions contemplated in *Texas*, *see* 143 S. Ct. at 1973-74, thereby establishing standing based on indirect state expenditures. (ECF No. 37 at 25.) The Plaintiff cited *Texas v. United States* as an example of adequate standing derived in this manner. Because the Court finds the injury-in-fact prong of standing analysis satisfied by direct harm to the Plaintiff's property, the Court need not further examine this argument at this time. 809 F.3d 134 (5th Cir. 2015).

23-50869.938

"sanctions" affecting a plaintiff, defined as an agency's "destruction, taking, seizure, or withholding of property."  5 U.S.C. § 551.

The only question is whether the relief the Plaintiff seeks can redress such injuries.  That, of course, depends on whether such relief is available in the first place.  While an award of monetary damages under the Federal Tort Claims Act ("FTCA") could perhaps redress past property damage, as the Defendants suggest (*see* ECF No. 23 at 21-22, 38), the Plaintiff does not seek that remedy.  (*See* ECF No. 1.)[7]  Absent other jurisdictional issues, the Court must therefore review the availability of injunctive relief or a stay of agency action and potential barriers thereto.[8]

## B. Sovereign Immunity for Plaintiff's Common Law Claims

In Counts One and Two of this suit, the Plaintiff asserts common law claims for conversion and trespass to chattels.  (ECF No. 1 at 23-25.)  When the Court granted the Plaintiff's *ex parte* motion for a TRO, it did so under the trespass to chattels claim.  However, at the time, sovereign immunity was not considered.  (*See* ECF No. 9 at 4.)  For the reasons stated below, sovereign immunity presents a jurisdictional barrier to the Plaintiff's request for injunctive relief under its state law claims.  That said, the Plaintiff may have alternative state law relief for the damage the Defendants have previously caused to its concertina wire.

The Supreme Court has long recognized that "[i]t is axiomatic that the United States may not be sued without its consent and that the existence of consent is a prerequisite for jurisdiction." *United States v. Mitchell*, 463 U.S. 206, 212 (1983) (citing *United States v. Sherwood*, 312 U.S.

---

[7] The Court recognizes that compensation for past injury cannot adequately redress the prospect of continuing or future harm for which the only appropriate remedy would be injunctive relief.

[8] The Court pauses here to address the matter of jurisdiction. There is no dispute the Court holds jurisdiction over the Plaintiff's APA claims, but also asserted are various state law claims. The Court may maintain supplemental jurisdiction over the state law claim if it is so related to the other claim(s) that it forms part of the same case or controversy. 28 U.S.C. § 1367. Here, it is clear the state law claims are so bound up with the APA claims as to be part of the same case or controversy. Accordingly, the Court has the ability to, and does, exercise supplemental jurisdiction. Likewise, any issue not discussed in this order would not be outcome determinative at this stage of litigation.

23-50869.939

584, 586 (1941)); *accord FDIC v. Meyer*, 510 U.S. 471, 475 (1994) ("Absent a waiver, sovereign immunity shields the Federal Government and its agencies from suit."); *Loeffler v. Frank*, 486 U.S. 549, 554 (1988); *Price v. United States*, 174 U.S. 373, 375-76 (1899) ("It is an axiom of our jurisprudence. The Government is not liable to suit unless it consents thereto, and its liability in suit cannot be extended beyond the plain language of the statute authorizing it."); *see also La. Dep't of Envtl. Quality v. United States EPA*, 730 F.3d 446, 448-49 (5th Cir. 2013). The exemption of the United States from being sued without its consent, known as "sovereign immunity," extends to a suit by a State. *California v. Arizona*, 440 U.S. 59, 61-62 (1979) (quoting *Kansas v. United States*, 204 U.S. 331, 342 (1907)) ("It does not follow that because a State may be sued by the United States without its consent, therefore the United States may be sued by a State without its consent. Public policy forbids that conclusion."); *Blatchford v. Native Vill. of Noatak*, 501 U.S. 775, 781-82 (1991); *Minnesota v. United States*, 305 U.S. 382, 387 (1939).

Only Congress can establish how the United States and its governing agencies can consent to be sued. *Gonzalez v. Blue Cross Blue Shield Ass'n*, 62 F.4th 891, 899 (5th Cir. 2023); *La. Dep't of Envtl. Quality*, 730 F.3d at 449 (citing *Mitchell*, 463 U.S. at 215-16) ("An agency cannot waive the federal government's immunity when Congress hasn't."). Moreover, the terms of consent to be sued may not be inferred or implied and must be unequivocally expressed in statutory text to define a court's jurisdiction. *United States v. White Mt. Apache Tribe*, 537 U.S. 465, 472 (2003); *United States v. Bormes*, 568 U.S. 6, 9 (2012); *Gonzalez*, 62 F.4th at 899. Further, a waiver of sovereign immunity and the conditions therein "must be construed strictly in favor of the sovereign." *La. Dep't of Envtl. Quality*, 730 F.3d at 449.

23-50869.940

Congress has enacted legislation to create several exceptions to sovereign immunity. At issue in this preliminary injunction is the 1976 amendment to the Administrative and Procedures Act, passed under 5 U.S.C. § 702 ("Section 702"), which provides:

> A person suffering legal wrong because of agency action, or adversely affected or aggrieved by agency action within the meaning of a relevant statute, is entitled to judicial review thereof. An action in a court of the United States seeking relief other than money damages and stating a claim that an agency or an officer or employee thereof acted or failed to act in an official capacity or under color of legal authority shall not be dismissed nor relief therein be denied on the ground that it is against the United States or that the United States is an indispensable party. The United States may be named as a defendant in any such action, and a judgment or decree may be entered against the United States: Provided, That any mandatory or injunctive decree shall specify the Federal officer or officers (by name or by title), and their successors in office, personally responsible for compliance. Nothing herein (1) affects other limitations on judicial review or the power or duty of the court to dismiss any action or deny relief on any other appropriate legal or equitable ground; or (2) confers authority to grant relief if any other statute that grants consent to suit expressly or impliedly forbids the relief which is sought. 5 U.S.C. § 702.

Section 702 has thus "waived sovereign immunity for suits seeking nonmonetary relief through nonstatutory judicial review of agency action." *Geyen v. Marsh*, 775 F.2d 1303, 1307 (5th Cir. 1985). "The intended effect of the amendment was to broaden the avenues for judicial review of agency action by eliminating the defense of sovereign immunity in cases covered by the amendment." *Doe v. United States*, 853 F.3d 792, 798-99 (5th Cir. 2017) (internal citations omitted).

Under Fifth Circuit precedent, Section 702 waives immunity for two distinct types of claims. *See Ala.-Coushatta Tribe of Tex. v. United States*, 757 F.3d 484, 489 (5th Cir. 2014). First, it waives immunity for claims where a "person suffer[s] legal wrong because of agency action." *Id.* (citing § 702). "This type of waiver applies when judicial review is sought pursuant only to the general provisions of the APA." *Id.* Second, Section 702 waives immunity for claims where a person is "adversely affected or aggrieved by agency action within the meaning of a relevant

15

statute." *Id.* (citing § 702). "This type of waiver applies when judicial review is sought pursuant to a statutory or non-statutory cause of action that arises completely apart from the general provisions of the APA." *Id.* (citing *Sheehan v. Army & Air Force Exch. Serv.*, 619 F.2d 1132, 1139 (5th Cir. 1980); *Trudeau v. FTC*, 456 F.3d 178, 187 (D.C. Cir. 2006)). Under this second type, there does not need to be final agency action; only "agency action" as defined by 5 U.S.C. § 551(13) is required. *Id.* (citing *Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 882 (1990)). Because the Plaintiff's common law claims are separate and apart from those brought under the APA, they would not fall under the first type of waiver and could only be considered under the second type of waiver.

In the Motion for Preliminary Injunction, the Plaintiff asserts that Section 702 generally waives the United States's immunity from a suit "seeking relief other than money damages and stating a claim that an agency or an officer or employee thereof acted or failed to act in an official capacity or under color of legal authority." (ECF No. 3-1 at 40.) They further assert, "[the] Defendants have waived sovereign immunity for *ultra vires* claims under the APA via the 1976 amendment to Section 702, which 'waived sovereign immunity for suits seeking nonmonetary relief through nonstatutory judicial review of agency action.'" (*Id.* (quoting *Geyen*, 775 F.2d at 1307).) The Motion for Preliminary Injunction did not, however, explicitly contend that Section 702's waiver of sovereign immunity applies to the state law claims of conversion and trespass to chattels. (*See generally* ECF Nos. 1, 3-1.)

In response to the Motion, the Defendants contend that the Plaintiff cannot assert its state law claims of conversion and trespass to chattels because Congress has not waived the United States's sovereign immunity for such claims. (ECF No. 23-1 at 20.) The Defendants note that the Plaintiff invokes Section 702's waiver of sovereign immunity for actions in federal court "seeking

16

relief other than money damages," but states no binding precedent that Section 702 covers its state law claims.  (*Id.* at 21.)

In reply, the Plaintiff again relies on the statutory text of Section 702 and asserts that the waiver of sovereign immunity applies to "any action seeking relief other than money damages." (ECF No. 27-1 at 10.)  In support of this theory, the Plaintiff asserts that the "plain text is clear— "[a]n action in" federal court "seeking relief other than money damages" means *any* action, whether under the APA, a different statute, or the common law."  (*Id.* (citing § 702) (emphasis in original).)  The Plaintiff relies on the D.C. Circuit's review of Section 702 and supposes that the D.C. Circuit held the waiver extends to "any action" seeking non-monetary relief.  (*Id.* at 10-11 (citing *Trudeau*, 456 F.3d at 187).)  The Plaintiff also cites a Supreme Court decision where instead of establishing that Section 702 can never apply to state law claims the Supreme Court held the waiver did not apply because the equitable lien sought constituted a claim for money damages. (*Id.* at 11 (citing *Department of Army v. Blue Fox, Inc.* 525 U.S. 255, 263 (1999).)

In supplemental briefing, the Plaintiff asserts that the Defendants have not cited any case that finds the Plaintiff is barred from the state law injunctive relief they seek.  (ECF No. 48 at 11.) The Plaintiff also claims that a finding for the Defendants would create a circuit split with at least three other circuits.  (*Id.* (citing *Perry Capital LLC v. Mnuchin*, 864 F.3d 591, 620 (D.C. Cir. 2017); *Michigan v. U.S. Army Corps of Eng'rs*, 667 F.3d 765, 775 (7th Cir. 2011); and *B.K. Instrument, Inc. v. United States*, 715 F.2d 713, 727 (2d Cir. 1983).)

After an extensive review of the relevant law, the Court has not identified any case or legal authority that finds Congress unequivocally consented to suit for injunctive relief under common law conversion or trespass to chattels causes of action.  The Fifth Circuit has also never recognized the availability of such a claim.  Nor has any other circuit court.  Absent binding precedent, the

Plaintiff instead relies on a D.C. Circuit case that held Section 702's waiver of sovereign immunity permits "nonstatutory" actions.[9]  *Trudeau*, 456 F.3d at 187.

This argument is unavailing for several reasons.  The D.C. Circuit did not hold that Section 702 waives sovereign immunity for common law claims of conversion or trespass to chattels.  *See id.*  Instead, the plaintiff in *Trudeau* initially raised claims against the Federal Trade Commission ("FTC") for exceeding its statutory authority under 15 U.S.C. § 46(f) and violations of the First Amendment, but the non-statutory actions derived from the plaintiff's statutory and First Amendment claims.  *Id.* at 190 ("[Plaintiff] contends that his § 46(f) claim falls within the core of the doctrine of non-statutory review because the issuance of a false and misleading press release exceeds the FTC's authority to disseminate information in the public interest.") (internal quotations omitted); *see also* Brief for Appellants at 33, *Trudeau*, 456 F.3d 178 (No. 05-5365) (asserting "it is well-established the First Amendment itself provides a means for plaintiffs to seek 'equitable relief to remedy agency violations' thereof.")  Although not explicitly stated, the non-statutory claims the D.C. Circuit recognized seem to present as *ultra vires* claims, as opposed to separate or independent common law causes of action for conversion and trespass to chattels.  *See Trudeau*, 456 F.3d at 190 (holding "[t]here certainly is no question that nonstatutory review 'is intended to be of extremely limited scope,' [*Griffith v. Fed. Lab. Rel. Auth.*, 842 F.2d 487, 493 (D.C. Cir. 1988)], and hence represents a more difficult course for [plaintiff] than would review under the APA (assuming final agency action) for acts 'in excess of statutory . . . authority,' 5 U.S.C. § 706(2)(C).").  And notably, the *Trudeau* case was considered under a motion to dismiss posture, not a preliminary injunction posture as in this case.  *See generally id.*

---

[9] To the extent that *Trudeau* supports the Plaintiff's position, the D.C. Circuit, as well as the Second and Seventh Circuits, are not binding on this Court.

23-50869.944

The Plaintiff also contends that the absence of cited precedent barring their state law claims supports the waiver of sovereign immunity. Notwithstanding that the burden is squarely on the Plaintiff, the fact that a court has not barred such claims does not then mean that Congress has authorized them. It could imply the very opposite—that the sovereign immunity doctrine is so imposing that a plaintiff would not seek such equitable relief against the United States. More likely, however, it indicates that a separate, appropriate remedy already exists. *See, e.g.*, *Blue Fox, Inc.*, 525 U.S. at 263-64. Indeed, in *Blue Fox*, cited by the Plaintiff, the Supreme Court denied the equitable lien sought because it constituted a claim for money damages. *Id.*

In order to find that sovereign immunity is waived for the Plaintiff's common law claims, the Court would have to conclude that the language in Section 702 unequivocally expresses Congress's consent to *all* non-monetary actions arising outside the APA. Statutory construction presumes Congress did not intend for Section 702's waiver to be so over-inclusive. Had Congress intended to include common law claims for conversion or trespass to chattels or other state law claims under Section 702, it could have so stated. To accept the Plaintiff's proposition would so broaden the scope of the APA that sovereign immunity would be effectively negated for state law causes of action seeking equitable relief. To the extent there is any ambiguity in the application or statutory interpretation of Section 702, the Court is reminded that "a waiver of the Government's sovereign immunity will be strictly construed, in terms of its scope, in favor of the sovereign." *Lane v. Peña*, 518 U.S. 187, 192 (1996). Thus, the Court finds that the Plaintiff's common law claims do not overcome sovereign immunity.

Although the Plaintiff did not raise the issue, the Defendants recognized that the FTCA "'waives the United States' sovereign immunity from tort suits' in certain circumstances, and is 'the exclusive remedy for compensation for a federal employee's tortious acts committed in the

19

scope of employment.'" (ECF No. 23-1 at 21-22 (quoting *McGuire v. Turnbo*, 137 F.3d 321, 324 (5th Cir. 1998); *Dickson v. United States*, 11 F.4th 308, 312 (5th Cir. 2021).) The record here shows that Border Patrol has been known to cut the fences and locked gates of private ranch owners to perform immigration duties. As most of the land near our southern border is privately owned, this relationship with Border Patrol has existed out of necessity for decades. In instances where Border Patrol causes harm to private property, such as damaging fencing and allowing livestock to escape, they will often *ex post* restore a rancher by repairing the property or through financial compensation. Such a cooperative relationship suggests that Border Patrol, and the federal government at large, acknowledge its duty to respect private property. So, too, could such a relationship between the Plaintiff and the Defendants exist. Thus, although the Plaintiff's common law claims seeking injunctive under conversion and trespass to chattels are unlikely to succeed, it is conceivable that the Plaintiff could pursue money damages for prior harm to its fence. The Court is not ruling on what would be appropriate for future potential harm; it only references prior harm.

## IV. ANALYSIS

### A. Likelihood of Success on the Merits

#### *i. The Defendants' Conduct*

##### a. The Defendants' Justifications

While the Plaintiff bears the burden on a motion for preliminary injunctive relief, the Court will first consider the Defendants' own explanations for their conduct before turning to the Plaintiff's allegations. The Defendants offer two justifications for their series of decisions to cut or move the Plaintiff's fence: (1) to discharge their statutory obligation to inspect, apprehend, and

23-50869.946

detain individuals unlawfully entering the United States; and (2) to prevent or address medical emergencies.  (*See* ECF No. 23-1 at 15.)

### 1. Inspection, Apprehension, and Processing

The federal government "has broad, undoubted power over the subject of immigration and the status of [noncitizens]," which "rests, in part, on the National Government's constitutional power to 'establish an [sic] uniform Rule of Naturalization' and its inherent power as sovereign to control and conduct relations with foreign nations." *Arizona v. United States*, 567 U.S. 387, 394-95 (2012).  To that end, Congress has specified who may be admitted to the United States, *see, e.g.*, 8 U.S.C. § 1182, criminalized unlawful entry and reentry, *see id.* §§ 1325, 1326, and determined who may be removed and under what conditions, *see id.* §§ 1182, 1225-1227; *Arizona*, 567 U.S. at 395-96.

Congress entrusted DHS with the "power and duty to control and guard the boundaries and borders of the United States against the illegal entry of [noncitizens]."  8 U.S.C. § 1103(a)(5). Congress has charged the Secretary of Homeland Security to "establish such regulations" and "perform such other acts as he deems necessary for carrying out his authority under [8 U.S.C. §§ 1101-1537]."  *Id.* § 1103(a)(3).  That includes "authoriz[ing] any employee . . . to perform or exercise any of the powers, privileges, or duties conferred [by the Immigration and Nationality Act (INA)]."  *Id.* § 1103(a)(4).  Those employees authorized by the Secretary to enforce the INA are known as immigration officers. 8 U.S.C. § 1101(a)(18).

U.S. Customs and Border Protection ("CBP"), in coordination with other federal agencies, bears responsibility to "enforce and administer all immigration laws," including "the inspection . . . and admission of persons who seek to enter" the United States and "the detection, interdiction, removal . . . and transfer of persons unlawfully entering . . . the United States."  6 U.S.C. §

21

211(c)(8). U.S. Border Patrol is "the law enforcement office of [CBP] with primary responsibility for interdicting persons attempting to illegally enter . . . the United States" and for "deter[ring] and prevent[ing] the illegal entry of terrorists, . . . persons, and contraband." *Id.* § 211(e)(3)(A)-(B). Individual immigration officers, including Border Patrol agents, "interrogate any [noncitizen] or person believed to be [a noncitizen] as to his right to be or remain in the United States" and may "arrest any [noncitizen] who in his presence or view is entering or attempting to enter the United States in violation of any law." 8 U.S.C. § 1357(a)(1)-(2).

Before Congress enacted § 1357(a)(3), Border Patrol's "activities . . . in certain areas [were] seriously impaired by the refusal of some property owners along the border to allow patrol officers access to extensive border areas in order to prevent such illegal entries." H.R. Rep. No. 82-1377, 1952 U.S.C.C.A.N. 1358, 1360. In response, Congress authorized agents to "access . . . private lands" without a warrant within 25 miles of an external border "for the purposes of patrolling the border to prevent the illegal entry of [noncitizens] into the United States." 8 U.S.C. § 1357(a)(3). Congress intended that Border Patrol agents should "conduct[ ] such activities as are customary, or reasonable and necessary, to prevent the illegal entry of aliens into the United States." 8 C.F.R. § 287.1(c); *see* H.R. Rep. No. 82-1377, 1952 U.S.C.C.A.N. at 1360 (Section 1357(a)(3) "adequately authorize[s] immigration officers to continue their normal patrol activities, concerning which Congress has been well informed during the past 48 years, and which authority it unquestionably meant these officers to exercise.").

DHS has long made use of this provision to move or cut privately owned fencing within 25 miles of the international border when exigencies arise. Border Patrol guidance dating back to the 1980s has advised Border Patrol Agents to work with private landowners where the agents encounter locked gates prohibiting access to the border. (ECF No. 23-2 at 3.) While Border Patrol

23-50869.948

guidance requires that agents take steps to work with the owner to gain access, it acknowledges that the agent may cut locks or fencing that prohibits access to the border.  (*Id.*)  When they must do so, Border Patrol guidance instructs agents to take steps to close gates, make available repairs to fencing, and take other steps to ameliorate any damage.  (*See id.*)

Here, the Defendants claim that the appearance of any migrants at the Rio Grande qualifies as a situation requiring agents to cut the Plaintiff's fence.  The Defendants argue that "[n]oncitizens who have already crossed the international boundary into the United States stand on a different legal footing from those who have not."  (ECF No. 23-1 at 12.)  Disregarding that entering the United States by crossing the river other than at an official port of entry is a federal crime, *see* 8 U.S.C. § 1325, the Defendants note that a person "present in the United States who has not been admitted or who arrives in the United States (whether or not at a designated port of arrival . . .)" is "deemed . . . an applicant for admission." *Id.* § 1225(a)(1).[10] Claiming that "[n]o immigration statute that Congress has enacted authorizes Border Patrol agents to simply push noncitizens already present in the United States back to Mexico," (ECF No. 23-1 at 13), the Defendants maintain that they must assist anyone who has unlawfully crossed the border to advance further into the United States for immigration processing after this initial "inspection."

In short, the Defendants claim their hands are tied.  They have a statutory duty to "inspect," so they claim they must cut or move the Plaintiff's fence to get to the river.  Once at the river, they claim they have no authority to direct illegal entrants to return to Mexico, so they must cut or move

---

[10] The nation's immigration system is separate from its criminal justice system. An individual who enters the United States by unlawful means may freely apply for a change in his or her immigration status while serving time in federal prison. At the Rio Grande, Border Patrol agents can and should both process those they encounter as "applicants for admission" and arrest them for criminal conduct. As discussed below, Border Patrol agents may also simply direct such individuals to return to the far side of the river.

the Plaintiff's fence to help such individuals proceed further into the United States. These claims fail to recognize the dual civil and criminal nature of the immigration statutes.

The Defendants first argue that the mere act of laying eyes on migrants as they wade through the Rio Grande, as seen in Plaintiff's Exhibit 10, qualifies as the beginning of a drawn-out inspection process. As noted above, this inspection process involves: no warning against criminal violation of immigration law; no attempt to prevent the same; no direction to enter at a lawful port of entry; no questioning; no document requests; and no search for drugs or weapons. (*See* Plaintiff's Ex. 10; ECF No. 37 at 84–85.) According to the Defendants, pure visual observation justifies cutting or moving the Plaintiff's fence to access the river.

This rests on two false and misguided propositions. First, Border Patrol agents already possess access to both sides of the fence by which to accomplish this extraordinarily superficial, hands-off "inspection": to the river and bank by boat and to the further-inland side of the fence by road. (*See, e.g.*, Plaintiff's Ex. 10; ECF No. 37 at 82.) The fence may conceivably slow Border Patrol agents' ability to respond to medical emergencies, as discussed below, but the evidence and testimony presented so far has not conclusively established that any delay would materially impede inspection practices of the kind described above.

Second, "an alien who is detained shortly after unlawful entry cannot be said to have 'effected an entry.' Like an alien detained after arriving at a port of entry, an alien like respondent is 'on the threshold.'" *DHS v. Thuraissigiam*, 140 S. Ct. 1959, 1982–83 (2020) (citations omitted); *see also Leng May Ma v. Barber*, 357 U.S. 185, 186–87 (1958). Federal officials can and historically do take steps to turn migrants on the threshold back across the border into Mexico. *See, e.g.*, *Sale v. Haitian Ctrs. Council, Inc.*, 509 U.S. 155, 163 (1993) (finding that aliens could be repatriated "without giving them any opportunity to establish their qualifications as refugees").

24

The Defendants' view of immigration enforcement would "create a perverse incentive to enter at an unlawful rather than a lawful location," which is why the Supreme Court rejected it for a migrant who managed to "mak[e] it 25 yards into U.S. territory before he was caught." *Thuraissigiam*, 140 S. Ct. at 1982.[11]

Border Patrol itself assesses agents' performance based on the number of migrants repelled, and thousands of migrants have, in fact, been "turned back" after crossing the Rio Grande. (ECF No. 37 at 66, 104.) The Defendants recently boasted their agents' authority to "turn back" migrants on the threshold of the international boundary. *See* Press Release, U.S. Customs & Border Protection (June 1, 2023), https://www.cbp.gov/newsroom/local-media-release/us-border-patrol-urges-migrants-not-endanger-their-lives-swimming (describing an incident on May 25, 2023, where Border Patrol agents were able to "turn [aliens] back south into Mexico" even after they "cross[ed] the maritime boundary line"). Publicly available records show that the Defendants regularly track incidents of successful "turn-backs" at the Border, including more than 5,000 "TBS"—*i.e.*, "Turn Back South"—between October 2018 and March 2020. *See* USBP FOIA Documents at 22, 25, 30, 128-29, 136-54, available at https://int.nyt.com/data/documenttools/border-patrol-fence-breach/b9addab9d72a6a2a/full.pdf (embedded in Zolan Kanno-Youngs, *Armed Mexicans Were Smuggled in to Guard Border Wall,*

---

[11] The Defendants argue that *Thuraissigiam* is inapposite for the proposition that a noncitizen who manages to cross the border has not really effected entry into the United States. (*See* ECF No. 47 at 21 n.5.) The Ninth Circuit there had held that a noncitizen had a constitutional Due Process right to more process than what Congress set out in § 1225(b)(1)(B)(ii), (v). The Supreme Court rejected that conclusion, holding that "the procedure authorized by Congress" is sufficient for "due process as far as [a noncitizen] denied entry is concerned." 140 S. Ct. at 1982. The Supreme Court also noted that such a noncitizen "has . . . those rights regarding admission that Congress provided by statute," *Id.* at 1983 (cleaned up). Like the Ninth Circuit in *Thuraissigiam*, the Defendants here seek to add to the requirements of the immigration statutes. This Court refuses to ignore Supreme Court precedent and follow the Ninth Circuit's example of inventing a novel barrier to immigration enforcement where none exists. Doing so "would undermine the 'sovereign prerogative' of governing admission to this country and create a perverse incentive to enter at an unlawful rather than a lawful location." *Id.* Those who enter the United States unlawfully do possess certain due process rights; the right to continue into the United States rather than be stopped at the border is not among them.

23-50869.951

*Whistle-Blowers Say*, N.Y. Times (Dec. 7, 2020), https://www.nytimes.com/2020/12/07/us/politics/border-wall-mexico.html).

The Defendants cannot justify cutting or moving the Plaintiff's fence whenever and wherever they find convenient based on a supposed need to access the river by both boat and foot so they may passively observe migrants crossing. Nor can they do so when the Defendants fail to direct migrants attempting to unlawfully enter the United States to return back across the border per longstanding, Supreme Court-sanctioned practice.

The Defendants next claim that they must cut or move the Plaintiff's fence to allow migrants to proceed toward a further-inland processing center. (ECF No. 37 at 198.) Once they pass through the fence, Border Patrol agents orally direct persons whom they have just witnessed illegally entering the United States to walk as much as a mile or more—with vanishingly little if any further supervision or direction—and present themselves at the nearest immigration processing center. (ECF No. 37 at 83–85, 112–13, 115–16, 147–48, 169–170.) Notably, the Defendants concede that their hope that the aliens will flow in an orderly manner from the breach they created in the Plaintiff's fence to the nearest processing center relies on the Plaintiff's fence along the route.[12] The Defendants claim that easing migrants' path toward the processing center in this manner is necessary to "apprehend" and "detain" the migrants.

Border Patrol itself has defined "apprehension" as "the physical control or temporary detainment of a person who is not lawfully in the United States which may or may not result in an arrest." Customs & Border Protection, *Nationwide Enforcement Encounters: Title 8 Enforcement Actions and Title 42 Expulsions Fiscal Year 2024*, https://perma.cc/YWE2-B6UZ. It has defined "detention" as "[r]estraint from freedom of movement." CBP, *National Standards on Transport,*

---

[12] *See* forthcoming transcript of November 27, 2023 hearing. The Court has access to an audio recording of this hearing.

26

*Escort, Detention, and Search* at 28 (Oct. 2015), https://perma.cc/6KRP-2XTH.  No reasonable interpretation of these definitions can square with Border Patrol's conduct.  Visual observation is not physical control.  Opening fences does not restrain freedom of movement.  Blind trust that migrants who have just been seen criminally violating one boundary will respect barriers along the road toward a processing center constitutes neither "apprehension" nor "detention."  No unfair cynicism is required to suspect that some such migrants likely commit other crimes (*e.g.*, drug smuggling, human trafficking, etc.) during this process, providing ample incentive for the individuals posing the greatest public danger to flee rather than deliver themselves to the Defendants.[13]  To the extent migrants who fear no additional criminal or immigration consequence because of the Defendants' broader immigration policies, practices, and public statements elect to declare themselves at a processing center, their decision to do so can hardly be attributed to any acts to restrict their freedom of movement by the Defendants.

The Defendants cannot justify their wire-cutting based on purported "apprehension" and "detention" of migrants after they cross through the fence in the face of testimony of both parties strongly suggesting neither occurs without migrants' willing cooperation.  (ECF No. 37 at 112, 115–116, 169–170).  By ignoring the blatant criminal context of where, when, and how these "applicants for admission" enter the United States, the Defendants apparently seek to establish an unofficial and unlawful port of entry stretching from wherever they open a hole through the Plaintiff's fence to the makeshift processing center they established on private land a mile or more away.  The Defendants even appear to seek gates in the Plaintiff's fence that the Defendants can control to facilitate this initiative.  (*See id.* at 107-108, 114.)  Establishing such a system at a

---

[13] As noted above, the Plaintiff's fact witness claimed that during one incident, its personnel observed 4,555 migrants enter through holes the Defendants created while only 2,680 presented themselves for processing.  (ECF No. 37 at 113, 147-48.)

23-50869.953

particularly dangerous stretch of the river creates a perverse incentive for aliens to attempt to cross at that location, begetting life-threatening crises for aliens and agents both.

The evidence presented amply demonstrates the utter failure of the Defendants to deter, prevent, and halt unlawful entry into the United States. The Defendants cannot claim the statutory duties they are so obviously derelict in enforcing as excuses to puncture the Plaintiff's attempts to shore up the Defendants' failing system. Nor may they seek judicial blessing of practices that both directly contravene those same statutory obligations and require the destruction of the Plaintiff's property. Any justifications resting on the Defendants' illusory and life-threatening "inspection" and "apprehension" practices, or lack thereof, fail.

## 2. Medical Emergencies

At times, agents rescue individuals who have crossed into the United States illegally and who are in distress in or near the banks of the Rio Grande River. (ECF No. 23-2 at 4–5). These routine rescues, life-saving measures, and other such urgent care, often provided at grave risk to agents' safety, are a noble and legitimate part of Border Patrol operations. Injury, drowning, dehydration, and fatigue are real and common perils in this area of the border, particularly in the context of changing water levels and regular triple-digit heat. (*Id.*) The parties agree that medical emergencies justify cutting or moving the Plaintiff's fence. (ECF No. 37 at 28, 79; ECF No. 23-1 at 15). The Court endorses this agreement.

However, evidence suggests that these exceptional circumstances can be used to swallow a rule against wire-cutting such as the one the Court entered in the TRO. (*See, e.g.*, ECF No. 37 at 81.) While an ongoing medical emergency can justify opening the fence, the end of that exigency ends the justification. As a hypothetical example, cutting the wire to address a single individual's display of distress does not justify leaving the fence open for a crowd of dozens or hundreds to

pass through.  In addition, an emergency that can be just as adequately addressed by less destructive means, such as by reaching one or more individuals by boat rather than on foot, does not justify opening the fence at all.  Moreover, given the greater potential for abuse, prevention of possible future exigencies rests on far more dubious grounds as a justification for destroying the use of private property than the need to address actual, ongoing crises.  Further, the question of whether a situation rises to the level of an emergency is an objective inquiry of a reasonable person's judgment, not the subjective determination of a particular agent.  With those qualifications, the Court accepts medical emergencies as a narrow, partial justification for the Defendants' conduct.

### b. Plaintiff's Allegation of a Policy, Practice, or Pattern

The Plaintiff alleges that the Defendants' series of acts interfering with its wire fence represent a "a policy, practice, or pattern of seizing, damaging, and destroying Texas's personal property by cutting, severing, and tearing its concertina wire fence to introduce breaches, gaps, or holes in the barrier."  (ECF No. 3-1 at 27.)  The Plaintiff alleges that the Defendants "have authorized their officials or agents to engage in this conduct anytime an alien has managed to illegally cross the international border in the Rio Grande to process that alien in the United States— even where migrants are in no apparent distress or when any legitimate exigency has dissipated." (*Id.*)  The Plaintiff suggests that orders to cut the Plaintiff's wire are largely implemented by Border Patrol supervisors, rather than lower-level agents, who allegedly often refuse to destroy or damage the Plaintiff's border infrastructure.  (*Id.*; *see also* ECF No. 37 at 139–140, 150.)

The Plaintiff argues that the sheer volume and regularity of similar incidents, together with repeated public statements from DHS itself, demonstrates an institutional policy, practice, or pattern of sanctioning Border Patrol agents' cutting or moving the fence even absent exigent

circumstances.  (ECF No. 27-1 at 16–17.)[14]  The Defendants deny that any such alleged pattern reflects an intentional policy handed down by DHS or Border Patrol leadership.  (ECF No. 47-1 at 16–18; *see* ECF No. 23-2 at 5; ECF No. 37 at 138, 186–87.)

The problem appears unique to the Del Rio sector.  The testimony and evidence of both parties suggest that, by and large, Border Patrol agents have not cut the Plaintiff's wire except when faced with exigent circumstances in the El Paso and Rio Grande Valley Sectors.  (ECF No. 47-1 at 16–18 (citing ECF No. 37 at 80, 96).)  The Defendants argue that this disproves the notion that there is an agency-wide directive requiring or authorizing agents to cut the wire when they observe any unlawful border crossing.  (*Id.* (citing ECF No. 37 at 80, 96).)  The Defendants admit that supervisors in the Del Rio Sector have provided "guidance" to agents along the following lines: "(a) if there are no exigent circumstances, the agents should call a supervisor before any wire-cutting; and (b) if a supervisor is unavailable or exigent circumstances exist, the agents should use their judgment in determining how best to apprehend noncitizens or provide medical assistance."  (*Id.* (citing ECF No. 37 at 137–41).)  The Defendants emphasize that in both cases, agents have discretion to assess the situation and exercise their judgment whether to cut the wire.  (*Id.* (citing ECF No. 23-2 at 6; ECF No. 37 at 110-11).)

Regular and frequent occurrence of the incidents in question between September 20, 2023, and the entering of the TRO, regardless of exigency, and the fact of communications between lower- and higher-ranking DHS officers regarding wire-cutting in the Del Rio Sector raise the

---

[14] The Plaintiff provides the following examples of the Defendants' public statements, each of which is consistent with the Defendants' position in this litigation: On June 30, 2023, a spokesperson for CBP justified federal officials' cutting Texas's fence as "consistent w/ federal law" simply because "[t]he individuals had already crossed the Rio Grande from Mexico [and] were on U.S. soil." (*See* ECF No. 3-1 at 22 (citing CBP statement).) On October 24, 2023, in response to inquiries about this lawsuit concerning Defendants' destruction of state property, a DHS spokesperson said: "Border Patrol agents have a responsibility under federal law to take those who have crossed onto U.S. soil without authorization into custody for processing." (*See* ECF No. 5 at 6 n.1 (citing DHS statement).) The Defendants reiterated the same policy in identical terms in statements to numerous news outlets after this Court granted a TRO. (*See* ECF No. 27-1 at 16-17.)

23-50869.956

possibility that an unwritten "policy, practice, or pattern" exists.  However, the Court cannot find, on this procedural posture, that the evidence the Court has reviewed thus far conclusively establishes or disproves the existence of such an institutional "policy, practice, or pattern."  Such a determination would require further review of evidence and likely additional investigation.

### ii. APA (Final Agency Action)

The Plaintiff asserts that the Defendants' interference with its c-wire is a final agency action and thus reviewable under the APA.  (ECF No. 3-1 at 29.)  The APA empowers courts to review only "final agency action."  5 U.S.C. § 704; *see also Lujan*, 497 U.S. at 885 ("When, as here, review is sought not pursuant to specific authorization in the substantive statute, but only under the general review provisions of the APA, the 'agency action' in question must be 'final agency action.'").  Absent a final agency action, a court lacks subject matter jurisdiction to consider a claim brought under the APA.  *See Peoples Nat'l Bank v. Off. of the Comptroller of the Currency of the U.S.*, 362 F.3d 333, 336 (5th Cir. 2004); *accord Sierra Club v. Peterson*, 228 F.3d 559, 562 (5th Cir. 2000) ("Absent a specific and final agency action, we lack jurisdiction to consider a challenge to agency conduct.").

An agency action is final when two conditions are satisfied.  *See Bennett v. Spear*, 520 U.S. 154, 177-78 (1997).  First, the action "must mark the 'consummation' of the agency's decisionmaking process."  *Id.*  Second, "the action must be one by which 'rights or obligations have been determined,' or from which 'legal consequences will flow.'"  *Id.* at 178 (quoting *Port of Boston Marine Terminal Assn. v. Rederiaktiebolaget Transatlantic*, 400 U.S. 62, 71 (1970)).  Although this analysis is "flexible" and "pragmatic," courts take great care not to confuse final agency action with tentative or interlocutory agency actions, or broader programmatic decisions.  *Lujan*, 497 U.S. at 891; *see also Peterson*, 228 F.3d at 562.  The APA does not authorize courts to

23-50869.957

supervise "day-to-day agency management," *Norton v. S. Utah Wilderness All.*, 542 U.S. 55, 67 (2004), and thus, courts must reject invitations to find final agency action in an agency's "continuing (and thus constantly changing) operations." *Lujan*, 497 U.S. at 890.

As the party seeking preliminary injunctive relief, the Plaintiff bears the burden of showing a substantial likelihood that it will succeed on the merits of its APA claim, which requires final agency action. *Clark v. Pichard*, 812 F.2d 991, 993 (5th Cir. 1987) (discussing the standard for obtaining injunctive relief). Here, the Plaintiff alleges that the Defendants' interference with its concertina wire constitutes such a final action. (ECF No. 1 at 27.) Specifically, it asserts that "[s]ince September 20, 2023, federal agents have developed and implemented a policy, pattern, or practice of destroying Texas's concertina wire to encourage and assist thousands of aliens to illegally cross the Rio Grande and enter Texas." (*Id.* at 3.) The question, then, is whether the evidence presented thus far creates a substantial likelihood that the Plaintiff will ultimately establish the existence of final agency action.

At the November 7, 2023, hearing, the Court heard evidence from CBP officials involved in the decisions to cut or manipulate Texas's concertina wire. After the hearing, the Court took a step it rarely takes at this stage of injunction litigation and ordered the parties to produce additional documents regarding Texas's placement of the concertina wire and the Defendants' subsequent interference with it. (ECF No. 9.) The parties provided as much discovery as narrow time constraints allowed, and thereafter, the Court reviewed thousands of pages of emails, reports, and other documents. These documents shed further light on the events referenced at the November 7, 2023 hearing. But even viewed alongside the evidence presented at the hearing,[15] they fall short of demonstrating the existence of a final agency action.

---

[15] The Court continues to review the numerous documents provided by the parties and may supplement the factual findings in this Order in light of new information discovered through this review process.

23-50869.958

Having considered the evidence presented at the November 7, 2023 hearing, the post-hearing document production, and the arguments of counsel, the Court finds that the Plaintiff has not, at this preliminary stage, shown a substantial likelihood that it will establish the existence of a final agency action. Of course, the Court does not suggest that the Plaintiff *cannot* establish final agency action when this case proceeds to be heard on the merits. As the Defendants note, the documents within the federal government's possession that mention the Plaintiff's concertina wire potentially number in the millions. (ECF No. 43 at 2.) Discovery may produce information that sheds new light on the nature of the directives to cut or otherwise interfere with the Plaintiff's concertina wire. But at this early stage of the case, the Court finds insufficient evidence of final agency action. Absent such final agency action, the Court need not address the Plaintiff's claims that the Defendants are engaging in arbitrary and capricious action or exceeding their statutory authority.

### *iii. APA (Ultra Vires)*

The Plaintiff correctly asserts that final agency action need not exist for the Court to address its non-statutory *ultra vires* claim. (ECF No. 48 at 13 n.7.) The Fifth Circuit recognizes that courts "may have jurisdiction to review an *ultra vires* agency decision under one of the exceptions to the final agency action rule." *Exxon Chemicals Am. v. Chao*, 298 F.3d 464, 467 n.2 (5th Cir. 2002); *see also Apter v. Dep't of Health & Hum. Servs.*, 80 F.4th 579, 589 (5th Cir. 2023) (noting that for *ultra vires* claims, agency action complained of "need not be final").

To prevail on its *ultra vires* claim, the Plaintiff must show that an agency had "no colorable basis" for the challenged actions. *Fla. Dep't of State v. Treasure Salvors, Inc.*, 458 U.S. 670, 682 (1982). This standard sets a high bar for plaintiffs bringing *ultra vires* claims. *See Trudeau*, 456 F.3d at 190. "[A] state officer may be said to act *ultra vires* only when he acts 'without any

23-50869.959

authority whatever.'" *Pennhurst State Sch. & Hosp. v. Halderman*, 465 U.S. 89, 102 (1984).

"There certainly is no question that nonstatutory review 'is intended to be of extremely limited

scope.'" *Trudeau*, 456 F.3d at 190 (quoting *Griffith*, 842 F.2d at 493). Thus, plaintiffs bringing

*ultra vires* claims face a higher burden than they do for traditional APA claims. *See id.* ("[*Ultra*

*vires*] hence represents a more difficult course for Trudeau than would review under the APA

(assuming final agency action) for acts 'in excess of statutory . . . authority.'") (quoting 5 U.S.C.

§ 706(2)(C)). Here, based on the evidence presented at the November 7, 2023 hearing and the

documents submitted thereafter, the Court finds that there is insufficient evidence at this juncture

to support a substantial likelihood of success on the Plaintiff's *ultra vires* claim.

## B.  Irreparable Harm and Public Interest

The possible harm suffered by the Plaintiff in the form of loss of control and use of its

private property continues to satisfy the irreparable harm prong of preliminary-injunction analysis.

(*See* ECF No. 9 at 7-8; *see also* above discussion of potential redressability for past violation of

the Plaintiff's property under the FTCA.) The public interest calculation reflected in the Court's

TRO decision stands. (*See id.* at 9-10.)

## V. CONCLUSION

Accordingly, it is **ORDERED** that the Plaintiff's Motion for a Preliminary Injunction

Order or Stay of Agency Action (ECF No. 3-1) is **DENIED**.

SIGNED and ENTERED on this 29th day of November 2023.

_____
ALIA MOSES
Chief United States District Judge

23-50869.960

# APPENDIX A



23-50869.961





23-50869.962





23-50869.963





23-50869.964





**TAB 4: TEMPORARY RESTRAINING ORDER (ROA.282-292)**

**FILED**

October 30, 2023

CLERK, U.S. DISTRICT COURT
WESTERN DISTRICT OF TEXAS

BY: _____
J.A. Ward

DEPUTY

**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
DEL RIO DIVISION**

| | | |
|---|---|---|
| THE STATE OF TEXAS, | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | |
| | § | **Civil Action No. DR-23-CV-00055-AM** |
| U.S. DEPARTMENT OF HOMELAND | § | |
| SECURITY, ALEJANDRO | § | |
| MAYORKAS, in his official capacity as | § | |
| Secretary of the U.S. Department of | § | |
| Homeland Security, U.S. CUSTOMS & | § | |
| BORDER PROTECTION, U.S. | § | |
| BORDER PATROL, TROY A. | § | |
| MILLER, in his official capacity as | § | |
| Acting Commissioner for U.S. | § | |
| Customers & Border Protection, JASON | § | |
| OWENS, in his official capacity as Chief | § | |
| of the U.S. Border Patrol, and JUAN | § | |
| BERNAL, in his official capacity as | § | |
| Acting Chief Patrol Agent, Del Rio | § | |
| Sector U.S. Border Patrol | § | |
| Defendants. | § | |

**ORDER**

Pending before the Court is the State of Texas's ("the Plaintiff") Emergency Motion for a
Temporary Restraining Order or Stay of Agency Action ("the Motion") against the United States
Department of Homeland Security ("DHS"); Alejandro Mayorkas, in his official capacity as
Secretary of DHS ("Mayorkas"); United States Customs and Border Protection ("CBP"); United
States Border Patrol ("BP"); Troy A. Miller, in his official capacity as Acting Commissioner for
CBP ("Miller"); Jason Owens, in his official capacity as Chief of BP ("Owens"); and Juan Bernal,
in his official capacity as Acting Chief Patrol Agent of the Del Rio Sector of BP ("Bernal")
(collectively, "the Defendants"). (ECF No. 5.)  As explained below, the Court **GRANTS** the

Motion for a temporary restraining order until the parties have an opportunity to present evidence at a preliminary injunction hearing before the Court.

## II. BACKGROUND

On October 24, 2023, the Plaintiff commenced this civil action against the Defendants when it filed a Complaint. (ECF No. 1.) According to the Plaintiff, this lawsuit was filed because federal officials are allegedly destroying the Plaintiff's property by cutting the Plaintiff's concertina wire located near the United States-Mexico border. (ECF No. 5 at 2; ECF No 5-1.) The Plaintiff believes that this property destruction is intended to allow migrants to enter the country. (ECF No. 5 at 2.)

The Plaintiff contends that since September 20, 2023, this property destruction has accelerated. (ECF No. 5 at 2.) Pictures, video, and declarations from various officials associated with the Plaintiff detail specific instances when the federal government allegedly damaged the Plaintiff's property and consequently allowed migrants to enter. (*See, e.g.*, ECF No. 5-1.) The Plaintiff raises numerous claims against the Defendants, including common law conversion, common law trespass to chattels, and Administrative Procedure Act violations. (ECF No. 1 at 23-28.) The Plaintiff also seeks a preliminary and permanent injunction enjoining the Defendants from interfering with the Plaintiff's property; a stay of agency action; a declaration that Defendant's actions are unlawful; and costs. (*Id.* at 28-29.)

In the Complaint and some documents filed with the Court, the Plaintiff establishes that the wire barrier is on private property with the permission of the owners and/or municipal authority. (ECF No. 1 at ¶¶ 5, 11, 59; ECF No. 3-2 at 9.) Documents executed between the Plaintiff and the landowners provide the Plaintiff with a basis for its presence on the border properties. (ECF No. 3-2 at 9.)

23-50869.283

On October 24, 2023, the Plaintiff filed an unopposed motion for leave to exceed the page limits for its motion for a preliminary injunction, along with the preliminary injunction motion. (ECF No. 3.) On October 27, 2023, the Plaintiff filed the instant Motion. (ECF No. 5.) On October 28, 2023, the Plaintiff filed the declaration of another individual associated with the Plaintiff concerning the Defendants allegedly damaging more concertina wires. (ECF No. 8-1.)

### III. STANDARD OF REVIEW

Federal Rule of Civil Procedure 65(b) states that a court may issue a temporary restraining order without notice to the adverse party only if the "specific facts in an affidavit or a verified complaint clearly show that immediate or irreparable injury, loss, or damage will result to the movant before the adverse party can be heard in opposition" and "the movant's attorney certifies in writing any efforts made to give notice and the reasons why it should not be required." Fed. R. Civ. P. 65(b).

Federal Rule of Civil Procedure 65 continues:

> Every temporary restraining order issued without notice must state the date and hour it was issued; describe the injury and state why it is irreparable; state why the order was issued without notice; and be promptly filed in the clerk's office and entered in the record. The order expires at the time after entry – not to exceed 14 days – that the court sets, unless before that time the court, for good cause, extends it for a like period or the adverse party consents to a longer extension. The reasons for an extension must be entered in the record. Fed. R. Civ. P. 65(b)(2) (cleaned up); *see also Pomeroy, Inc. v. Norder Opportunity Saver Sys., Inc.*, 2010 WL 11652127, at *4 (W.D. Tex. Feb. 23, 2010).

If the Court issues a temporary restraining order, the nonmovants must receive seven days' notice before the preliminary injunction hearing is held. Fed. R. Civ. P. 6(c).

To succeed on a motion for a temporary restraining order, the movant must establish four elements: (1) "a substantial likelihood that the movant will prevail on the merits"; (2) "a substantial

23-50869.284

threat that irreparable harm will result if the injunction is not granted"; (3) "the threatened injury outweighs the threatened harm to the defendant"; and (4) the injunction "will not disserve the public interest." *Clark v. Pichard*, 812 F.2d 991, 993 (5th Cir. 1987) (citation omitted). Elements three and four merge "when the Government is the opposing party." *Nken v. Holder*, 556 U.S. 418, 435-36 (2009). The decision whether to grant a temporary restraining order "is within the sound discretion of the district court." *Rockwell*, 2019 WL 2745754, at *2 (citing *Miss. Power & Light Co. v. United Gas Pipe Line Co.*, 760 F.2d 618, 621 (5th Cir. 1985)). Emergency injunctive relief is an extraordinary remedy that should not be granted when the evidence supporting it fails to support such a finding. *See Clark*, 812 F.2d at 993 (citations omitted).

## IV. ANALYSIS

The Plaintiff requests "an order temporarily restraining Defendants from damaging, destroying, or otherwise interfering with Texas's concertina wire fence while" the preliminary injunction motion remains pending. (ECF No. 5 at 8.) The Court shall grant the temporary relief requested, with one important exception for any medical emergency that mostly likely results in serious bodily injury or death to a person, absent any boats or other life-saving apparatus available to avoid such medical emergencies prior to reaching the concertina wire barrier.

### A. Likelihood of Success on the Merits

The Plaintiff argues that it is likely to succeed on its common law trespass to chattels claim because "[1] the concertina wire is state property; [2] Defendants have exercised dominion over that property absent any kind of exigency; and [3] they have continued to do so even after being put on notice of [the Plaintiff's] interest in the property." (ECF No. 5 at 5.)

Failure to prove a claim "with certainty . . . does not foreclose" a temporary restraining order. *Texas v. Seatrain Int'l, S. A.*, 518 F.2d 175, 180 (5th Cir. 1975). "To assess the likelihood

23-50869.285

of success on the merits, we look to standards provided by the substantive law." *Janvey v. Alguire*, 647 F.3d 585, 596 (5th Cir. 2011) (quotation marks and citation omitted).  Under Texas common law, a trespass to chattels is "an injury to, or interference with, possession, unlawfully, with or without the exercise of physical force."  *Mountain States Tel. & Tel. Co. v. Vowell Constr. Co.*, 341 S.W.2d 148, 149-50 (Tex. 1960) (citation and quotation marks omitted) (affirming a judgment finding a trespass to chattels where a construction company severed another company's communications cable); *see also Omnibus Int'l, Inc. v. AT & T, Inc.*, 111 S.W.3d 818, 826 (Tex. App. - Dallas 2003) (stating that trespass to chattels applies to use or possession).  "For liability to attach, causing *actual damage* to the property or *depriving the owner of its use for a substantial period* must accompany the wrongful interference."  *Omnibus Int'l, Inc.*, 111 S.W.3d at 826 (citing *Zapata v. Ford Motor Credit Co.*, 615 S.W.2d 198, 201 (Tex. 1981)).  A "great public calamity" can justify property destruction.  *Steele v. City of Houston*, 603 S.W.2d 786, 791 (Tex. 1980).

Here, the Plaintiff is likely to succeed on its trespass to chattels claim.  First, the Plaintiff established that it owns the concertina wires.  *Mountain States Tel. & Tel. Co.*, 341 S.W.2d at 149-50.  Brian Cooney, a Texas Military Department employee, averred that he has observed Texas Military Department officials "construct, maintain, and repair Texas's concertina wire fence" in the Eagle Pass, Texas area.  (ECF No. 5-1, ¶¶ 1, 3; *see also* ECF No. 3-2 at 15, 23) (Michael Banks, a special adviser on border matters to the Texas governor, averred that he saw federal officials on September 20, 2023 cut "Texas's wire.")).[1]

---

[1] Although Cooney's declaration was one of two sworn declarations attached to the Motion (ECF No. 5-1; ECF No. 8-1), the Plaintiff incorporates the declarations of others by referring to the Plaintiff's motion for a preliminary injunction.  (*See, e.g.*, ECF No. 5 at 5-6.)  Moreover, although Manuel Perez, a Texas Military Department official, submitted a declaration that supports that the Plaintiff owns the wires (ECF No. 3-2 at 4-5), that declaration was unsworn and otherwise failed to include a penalty of perjury statement.  28 U.S.C. § 1746.  Thus, the Court will not rely on that document.

23-50869.286

Second, the Plaintiff established that the Defendants "*actual[ly] damage[d]*" the concertina wires. *Omnibus Int'l, Inc.*, 111 S.W.3d at 826. According to Cooney, a Border Patrol agent operating a forklift on October 26, 2023, near Eagle Pass, Texas "inserted pallet forks into the concertina wire barrier, lifted the barrier high enough to pull the fencing stakes that kept the fence in place out of the ground, and held it suspended in the air for approximately 20 minutes," which created a large enough gap for migrants to pass through. (ECF No. 5-1, ¶ 7.) According to Cooney, "[a]fter the last of the migrants passed through the concertina wire that had been raised by . . . the forklift, the BP agent operating it lowered the wire." (*Id.* ¶ 12.) But, Cooney avers, the stakes attached to the concertina wire and that helped keep the wire situated "were not put back into the ground" and consequently, Texas Military Department engineers must repair the concertina wire. (*Id.*; *see also* ECF No. 3-1 at 16-18 (video posted on the website X, formerly known as Twitter, purports to show uniformed individuals in Eagle Pass, Texas cutting concertina wire near a river, and then pulling that wire to form an accessible opening for migrants in that river).)[2] Photos attached to Cooney's declaration appear to confirm his observations. (ECF No. 5-1, ¶ 11; *id.* at 8-9, 11.) Separately, Roberto Ortiz Diaz, who is a Texas Military Department employee, establishes that the Defendants damaged wires on October 27, 2023. (ECF No. 8-1, ¶¶ 1, 6, 10-13.) The Defendants may continue to damage wires, which is especially likely because they damaged more property a mere day after this Motion was filed. (ECF No. 5-1, ¶ 15; ECF No. 8-1; ECF No. 5; *see also* ECF No. 3-2 at 26.)

Third and finally, the Plaintiff established that the Defendants lacked permission to interfere with the wires. According to Cooney, "[n]one of the federal personnel at the scene asked

---

[2] Like the sworn declarations in the Plaintiff's motion for a preliminary injunction, the Plaintiff incorporated by reference this video in its Motion (ECF No. 5 at 5 (citing ECF No. 3-1 at 21-28)), which the Court viewed on the Internet.

23-50869.287

for permission from me or, to my knowledge, from other [Operation Lone Star] personnel to move the concertina wire barrier."  (ECF No. 5-1, ¶ 9.)  Cooney also added that as far as he knew, the Texas Military Department did not give permission to BP to move the wire.  (*Id.*; *see also* ECF No. 8-1, ¶ 14.)  Further, no "great public calamity" is apparent on this record to justify property destruction.  *Steele*, 603 S.W.2d at 791.  Cooney further avers that, even though BP had airboats in the water, no migrant was "in distress while they were in the river"; no migrant "appeared to need medical attention"; and no one at the scene called a medical team to help the migrants.  (*Id.* ¶¶ 10-11.)  Diaz also reported a similar incident.  (ECF No. 8-1, ¶¶ 8, 14.)  Therefore, the Plaintiff established that it is likely to succeed on its trespass to chattels claim.  The Court need not analyze the other claims.

### B. <u>Irreparable Harm</u>

Harm is irreparable only "if it cannot be undone through monetary remedies."  *Interox Am. v. PPG Indus., Inc.*, 736 F.2d 194, 202 (5th Cir. 1984).  However, the Plaintiff may still establish irreparable harm when its costs are unrecoverable due to the government's sovereign immunity. *See Wages & White Lion Invs., L.L.C. v. U.S. Food & Drug Admin.*, 16 F.4th 1130, 1142 (5th Cir. 2021); *see also Portée v. Morath*, No. 1:23-CV-551-RP, 2023 WL 4688528, at *5 (W.D. Tex. July 21, 2023) (publication pending) ("[C]laims for money damages against state entities and officials are generally barred by sovereign immunity, which makes Portée's harm irreparable for purposes of seeking preliminary injunctive relief.").

The Plaintiff preliminarily establishes that it would face irreparable harm without a temporary restraining order.  The Plaintiff alleges that by "damaging, destroying, and exercising dominion over state property," the Defendants are causing the Plaintiff to incur "extensive costs." (ECF No. 5 at 6.)  The Plaintiff also claims that the Defendants' actions show that they intend to

23-50869.288

prevent the Plaintiff from "maintaining operational control of its own property." (*Id.*) Furthermore, the Plaintiff avers that destroying the concertina wire "irreparably harms Texas because it facilitates increased illegal entry into the State." (*Id.* at 7.) Consequently, the Plaintiff argues that it will continue to incur considerable additional expenses to expand social services, medical care, education, and other government programs, to accommodate the influx of illegal aliens. (*Id.* at 6-7.) To support this assertion, the Plaintiff provides sworn declarations from various Texas state officials, who describe the significant annual cost of providing emergency medical services, social services, and public education to illegal aliens. (*See generally* ECF No. 3-2.)

The Court is mindful, however, that the Defendants enacted an extensive scheme, which includes immigration enforcement and the interdiction of migrants. *Arizona v. United States*, 567 U.S. 387, 394, 401-02 (2012). The question then becomes how much "harm" should a state bear if the Defendants are unable to meet their obligations of securing the border and controlling the flow of migrants into the country. The only "harm" before this Court at the moment is the cost of the destruction of the Plaintiff's property, which is the wire barrier.

The injuries alleged by the Plaintiff are irreparable because they undermine the Plaintiff's control over its property and impose costs, which sovereign immunity precludes the Plaintiff from ever recovering. *Wages & White Lion*, 16 F.4th at 1140-41. A temporary restraining order can prevent such injuries by maintaining the status quo while the parties prepare thorough arguments on the merits of this case. Moreover, "the risk of irreparable harm to the Plaintiff is sufficient to proceed with the temporary restraining order without first giving notice to the Defendants." *Pomeroy, Inc.*, 2010 WL 11652127, at *4. Therefore, the Plaintiff established irreparable harm.

8

C. **Public Interest**

The Plaintiff argues that the balance of interests favors the Plaintiff for two reasons. First, the Plaintiff asserts that its use of concertina wire deters illegal entries and activities, including human trafficking, drug smuggling, and terrorist infiltration.  (ECF No. 5 at 7-8.) Second, the Plaintiff argues that the Defendants' actions are unlawful, and that even if a lawful basis exists, the Defendants must seek redress "through legal proceedings, not self-help actions."  (*Id.*)

Deterring unlawful activity, including illegal entry, is in the public interest.  *United States v. Brignoni-Ponce*, 422 U.S. 873, 878 (1975) ("[T]he public interest demands effective measures to prevent the illegal entry of aliens at the Mexican border.").  Further, "[t]here is generally no public interest in the perpetuation of unlawful agency action.'"  *Louisiana v. Biden*, 55 F.4th 1017, 1035 (5th Cir. 2022) (quoting *Texas v. Biden*, 10 F.4th 538, 560 (5th Cir. 2021)).  To the extent an agency's acts facilitate rather than prevent unlawful conduct, as the Plaintiff argues, such acts implicate the "substantial public interest in having governmental agencies abide by the federal laws that govern their existence and operations."  *Texas v. United States*, 40 F.4th 205, 229 (5th Cir. 2022) (quoting *League of Women Voters of U.S. v. Newby*, 838 F.3d 1, 12 (D.C. Cir. 2016)) (quotations omitted).  The Plaintiff established that the balance of interests favors granting an injunction, but just barely.

The Court recognizes a countervailing public interest, however, in allowing BP agents to address medical emergencies.  *See Croy v. United States,* No. DR-22-CV-00005-AM-VRG, 2023 WL 6393888, at *14 (W.D. Tex. Oct. 2, 2023) (discussing U.S. Customs and Border Protection policy requiring "Border Patrol Agents who encounter individuals who are injured . . . to take immediate action to obtain medical attention for the injured party"); *Carcamo-Lopez v. Does 1*

9

*through 20*, 865 F. Supp. 2d 736, 754 (W.D. Tex. 2011). This Order therefore includes a narrow exception to permit the Defendants to move or cut the concertina wire to aid individuals in medical distress, as noted above.

The Court is also very aware that the Plaintiff claims to have permission to place the wire barrier on the property or properties where the concertina wire was located before the actions of the Defendants and its agents. The Court is also very aware that the Defendants are charged with protecting the border and may take measures necessary to do so. The matter needed to be further litigated at a hearing is at the intersection of: the private property rights of the persons consenting to the placement of the concertina wire on their land, the Plaintiff's right to assist private property owners and avoid costs to the Plaintiff; and the Defendants' responsibilities over national security and border security, and its powers to effectuate its duties, up to and including the destruction of private or state property.

10

# V. CONCLUSION

Accordingly, it is **ORDERED** that the Plaintiff's Emergency Motion for a Temporary Restraining Order or Stay of Agency Action (ECF No. 5) is **GRANTED** on October 30, 2023 at 9:30 a.m.

The temporary restraining order shall last until it expires on November 13, 2023 at 9:30 a.m., unless a further order of this Court extends the time.  For purposes of this Order, the word "property" refers to concertina wire that the Plaintiff installed at the United States- Mexico border in Eagle Pass, Texas prior to this order.

Until November 13, 2023 at 9:30 a.m., the Defendants shall be enjoined from: (1) removing the property from its present location for any reason other than to provide or obtain emergency medical aid, as noted above; (2) concealing the property in any way; (3) offering the property for sale, rent, or use to any person, business, or entity; (4) selling or otherwise transferring the property in whole or in part; (5) encumbering the property in any way; (6) scrapping the property; (7) disposing of the property in any way; (8) disassembling, degrading, tampering with, or transforming the property in any way for any reason other than to provide or obtain emergency medical as noted in this order; and (9) failing to take all steps necessary to protect the property against damage or loss of any kind.

A preliminary injunction hearing shall be scheduled for November 7, 2023, at 2 p.m.

SIGNED and ENTERED on this 30th day of October 2023.

_____

ALIA MOSES
Chief United States District Judge

23-50869.292

## Certificate of Service

On January 16, 2024, Appellant's Record Excerpts were served via CM/ECF on all registered counsel and transmitted to the Clerk of the Court. Counsel further certifies that: (1) any required privacy redactions have been made in compliance with Fifth Circuit Rule 25.2.13; (2) the electronic submission is an exact copy of the paper document in compliance with Fifth Circuit Rule 25.2.1; and (3) the document has been scanned with the most recent version of Symantec Endpoint Protection and is free of viruses.

/s/ Aaron L. Nielson
Aaron L. Nielson