No. 23-50869

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

**State of Texas,**

*Plaintiff-Appellant*

**v.**

**United States Department of Homeland Security; Alejandro Mayorkas, Secretary, U.S. Department of Homeland Security; United States Customs and Border Protection; United States Border Patrol; Troy Miller, Acting Commissioner, U.S. Customs and Border Protection; Jason Owens, in his official capacity as Chief of the U.S. Border Patrol; Juan Bernal, in his official capacity as Acting Chief Patrol Agent, Del Rio Sector United States Border Patrol,**

*Defendants-Appellees.*

## ON APPEAL FROM THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF TEXAS
## DEL RIO DIVISION

## BRIEF FOR *AMICUS CURIAE* IMMIGRATION REFORM LAW
## INSTITUTE IN SUPPORT OF APPELLANT

MATT A. CRAPO
CHRISTOPHER J. HAJEC
GINA M. D'ANDREA
Immigration Reform Law Institute
25 Massachusetts Ave NW, Suite 335
Washington, DC 20001
202.232.5590

*Attorneys for amicus curiae*

## SUPPLEMENTAL STATEMENT OF INTERESTED PERSONS

Pursuant to Fifth Circuit Rule 28.1 and Fed. R. App. P. 26.1, *amicus curiae*

Immigration Reform Law Institute makes the following disclosures:

1) For non-governmental corporate parties please list all parent corporations:
   None.

2) For non-governmental corporate parties please list all publicly held companies
   that hold 10% or more of the party's stock: None.

3) The following entity has an interest in the outcome of this case: Immigration
   Reform Law Institute.

DATED: January 23, 2023                      Respectfully submitted,

                                             /s/ Matt Crapo
                                             MATT A. CRAPO
                                             Immigration Reform Law Institute
                                             25 Massachusetts Ave NW, Suite 335
                                             Washington, DC 20001
                                             202.232.5590

                                             *Attorney for amicus curiae*

# **TABLE OF CONTENTS**

TABLE OF AUTHORITIES ...................................................................... iv

IDENTITY AND INTEREST OF *AMICUS CURIAE* ...............................................1

INTRODUCTION ................................................................................1

SUMMARY OF ARGUMENT ....................................................................3

ARGUMENT ..................................................................................3

   I.   TEXAS'S C-WIRE FENCE PRESENTS NO OBSTACLE TO
       CONGRESS'S PURPOSES AND OBJECTIVES..........................................6

   II.  THERE IS NO CONFLICT IN THE METHOD OF ENFORCEMENT .....13

CONCLUSION ...............................................................................17

## <u>TABLE OF AUTHORITIES</u>

### <u>Cases</u>

*Arizona v. United States*, 567 U.S. 387 (2012)................................................ passim

*Crosby v. Nat'l Foreign Trade Council*, 530 U.S. 363 (2000).................................6

*CSX Transp. v. Easterwood*, 507 U.S. 658 (1993) ................................................4, 7

*Fid. Fed. Sav. & Loan Ass'n v. de la Cuesta*, 458 U.S. 141 (1982).........................4

*Florida Lime & Avocado Growers, Inc. v. Paul*, 373 U.S. 132 (1963)................4, 5

*Gade v. Nat'l Solid Wastes Mgmt. Ass'n*, 505 U.S. 88 (1992) .................................4

*Hines v. Davidowitz*, 312 U.S. 52 (1941) ...........................................................6, 10

*Kansas v. Garcia*, 140 S. Ct. 791 (2020) ..................................................... 6, 7, 16

*Medtronic, Inc. v. Lohr*, 518 U.S. 470 (1996) .........................................................6

*Motor Coach Employees v. Lockridge*, 403 U.S. 274 (1971).................................13

*Murphy v. NCAA*, 138 S. Ct. 1461 (2018) ...............................................................7

*Rice v. Santa Fe Elevator Corp.*, 331 U.S. 218 (1947) ............................... 4, 10, 16

### <u>Statutes</u>

8 U.S.C. § 1101, *note* .........................................................................................5, 15

8 U.S.C. § 1103(a)(5)...............................................................................................8

8 U.S.C. § 1225 .......................................................................................................8

8 U.S.C. § 1357(a)(3)...............................................................................................8

8 U.S.C. § 1701, *note* .........................................................................................5, 15

Secure Fence Act of 2006, 109 Pub. L. 367, 120 Stat. 2638 .....................................5

## Other Authorities

Executive Order No. GA-41, relating to returning illegal immigrants to the border,

   available at: https://gov.texas.gov/uploads/files/press/EO-GA-41.pdf (last visited

   Sept. 26, 2023) .....................................................................................................13

Executive Order No. GA-42, available at:

   https://gov.texas.gov/uploads/files/press/EO-

   GA42_Mexican_cartels_foreign_terrorist_orgs_IMAGE_09-21-2022.pdf (last

   visited Sept. 26, 2023). ........................................................................................13

Executive Order: Border Security and Immigration Enforcement Improvements,

   Jan. 5, 2017, available at: https://trumpwhitehouse.archives.gov/presidential-

   actions/executive-order-border-security-immigration-enforcement-

   improvements/ .....................................................................................................15

Immigration Reform Law Institute, Investigative Report, December 14, 2023,

   available at: https://irli.org/wp-content/uploads/2023/12/Border-Wall-

   Study.Completed.Final_Final.pdf ........................................................................15

Letter from James Madison to Edmund Randolph (Aug. 27, 1782), in 1 Writings of

   James Madison 226 (G. Hunt ed. 1900) ...............................................................11

The Federalist No. 42, pp. 269-71 (C. Rossiter ed. 1961) (J. Madison) ..................11

U.S. Customs and Border Protection: Border Security, Border Wall System,

available at https://www.cbp.gov/border-security/along-us-borders/border-wall-

system (last visited January 9, 2024)....................................................................14

## Constitutional Provisions

U.S. Const. Art. I, § 8, cl. 4........................................................................................11

U.S. Const. Art. I, § 10, cl. 3.............................................................................. 12, 13

U.S. Const. Art. IV, § 2, cl. 1......................................................................................11

U.S. Const. Art. VI, cl. 2.........................................................................................4, 7

## IDENTITY AND INTEREST OF *AMICUS CURIAE*[1]

The Immigration Reform Law Institute ("IRLI") is a non-profit 501(c)(3) public interest law firm dedicated to litigating immigration-related cases on behalf of, and in the interests of, United States citizens, and also to assisting courts in understanding and accurately applying federal immigration law. For more than twenty years the Board of Immigration Appeals has solicited supplementary briefing, drafted by IRLI staff, from the Federation for American Immigration Reform, of which IRLI is a supporting organization. IRLI has litigated or filed *amicus curiae* briefs in a wide variety of cases, including *Trump v. Hawaii*, 138 S. Ct. 2392 (2018); *United States v. Texas*, 579 U.S. 547 (2016); *Ariz. Dream Act Coalition v. Brewer*, 855 F.3d 9857 (9th Cir. 2017); *Wash. All. Tech Workers v. U.S. Dep't of Homeland Security*, 50 F.4th 164 (D.C. Cir. 2022); and *Matter of Silva-Trevino*, 26 I. & N. Dec. 826 (B.I.A. 2016).

## INTRODUCTION

The State of Texas "launched Operation Lone Star in 2021 to aid Border Patrol in its core functions." ROA.934. As part of this operation, Texas installed concertina wire fencing on private property that abuts the U.S.-Mexico border. *Id.*

---

[1] All parties have consented in writing to the filing of IRLI's *amicus curiae* brief. No counsel for a party in this case authored this brief in whole or in part, and no such counsel or party made a monetary contribution intended to fund the preparation of this brief. No person other than *amicus curiae*, its members, or its counsel made a monetary contribution to the preparation or submission of this brief.

1

The present suit was initiated by Texas after Defendants began destroying and removing the concertina wire fencing. Texas alleged common law claims of conversion and trespass to chattels, as well as violations of the Administrative Procedure Act ("APA"), and sought injunctive relief to protect its property, a stay of agency action under the APA, and declaratory relief stating that Defendants' actions are unlawful. ROA.928.

Texas timely filed a Motion for a Temporary Restraining Order, followed by a Notice of Escalating Property Damage in Support of its Emergency Motion for a TRO. *Id.* The district court granted the TRO and held an initial hearing on the preliminary injunction motion, followed by supplemental briefing, document production, virtual conferences, and eventually a second hearing. *Id.* Despite making several findings of fact indicating the unlawfulness of Defendants' actions, the district court found that the APA's waiver of sovereign immunity precluded the lawsuit and denied Texas's motion for preliminary injunction.

Texas filed a timely interlocutory appeal and a motion for an injunction pending appeal with this Court. ROA.931. This Court granted the injunction, finding that the district court had erred in its interpretation of the APA's sovereign immunity waiver. ROA.1016-19. Defendants then filed an application to vacate the injunction with Justice Alito, which the Supreme Court granted on January 22, 2024.

## SUMMARY OF ARGUMENT

Texas's use of concertina wire ("c-wire") fencing on private property to protect its southern border does not violate the Supremacy Clause of the U.S. Constitution. No preemptive force attaches to mere enforcement priorities of the executive branch, especially where, as here, the enforcement priorities themselves violate federal law. Nor is the use of the c-wire fencing preempted because it makes compliance with both state and federal law impossible or creates an obstacle to the full purposes of Congress. On the contrary, Texas's installation of wire fencing does not prevent anyone from complying with both state law and the Immigration and Nationality Act ("INA"), and it achieves the same federal statutory purpose as other federally authorized border walls and barriers—preventing the entry of illegal aliens into the United States. As a sovereign, Texas has inherent authority to protect its borders by pursuing the very congressional objective Defendants have abandoned. Indeed, as recognized in Article I, § 10, Clause 3, of the U.S. Constitution, Texas has retained its sovereign authority to defend itself against invasion, and in exercising that authority directly under the Constitution, as it is doing here, it is certainly not subject to preemption by executive policies.

## ARGUMENT

The Supremacy Clause of the U.S. Constitution provides that "the Laws of the United States . . . shall be the supreme Law of the Land . . . Laws of any State to

the contrary notwithstanding." U.S. Const. art. VI, cl. 2. Thus, the Supremacy Clause ensures that where state law conflicts with federal law, the state law must yield. *See Arizona v. United States*, 567 U.S. 387, 399 (2012) ("The Supremacy Clause provides a clear rule . . . Congress has the power to preempt state law."). Accordingly, where "the clear and manifest purpose of Congress," *Rice v. Santa Fe Elevator Corp.*, 331 U.S. 218, 230 (1947), is that federal law be supreme, state laws that conflict with such federal enactments are preempted.

Preemption under the Supremacy Clause "is compelled whether Congress's command is explicitly stated in the statute's language or implicitly contained in its structure and purpose." *Gade v. Nat'l Solid Wastes Mgmt. Ass'n*, 505 U.S. 88, 98 (1992) (quotation marks and citations omitted). Regardless of whether "[p]re-emption . . . is explicitly stated in the statute's language or implicitly contained in its structure and purpose," *Fid. Fed. Sav. & Loan Ass'n v. de la Cuesta*, 458 U.S. 141, 152-53 (1982), Congress's preemptive purpose is found in the federal statute itself. *CSX Transp. v. Easterwood*, 507 U.S. 658, 664 (1993).

There are two types of implied conflict preemption relevant here. The first is "conflict-impossibility preemption," *Florida Lime & Avocado Growers, Inc. v. Paul*, 373 U.S. 132, 142-43 (1963), which arises where "compliance with both federal and state regulations is a physical impossibility" *Arizona*, 567 U.S. at 399. The second is "conflict-obstacle preemption" (or simply "obstacle preemption"),

4

*Florida Lime*, 373 U.S. at 142-43, "where the challenged state law stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress." *Arizona*, 567 U.S. at 399.

As both this Court and the court below recognized, there is no conflict between the INA and Texas's use of c-wire fencing to protect private property from invading illegal aliens. There is no conflict-impossibility preemption because, as the district court found, border patrol personnel have access to the land on both sides of Texas's fence, thus enabling them to "inspect, apprehend, and process" aliens illegally entering the United States without violating Texas's property rights. ROA.950. As for Defendants' claim that the c-wire "interferes" with their exercise of executive discretion under the INA, *id.*, that implicit obstacle-preemption claim must fail, since mere executive policies—especially ones that run counter to statutory purposes—lack preemptive force. The purpose of federal immigration law is operational control of the border, defined as the achievement of zero unlawful entries.[2] It is Texas's c-wire that furthers this congressional objective, whereas Defendants' policies subvert it.

---

[2] "Operational Control" has been defined by Congress as "the prevention of all unlawful entries into the United States, including by terrorists, other unlawful aliens, instruments of terrorism, narcotics, and other contraband." Secure Fence Act of 2006, 109 Pub. L. 367, 120 Stat. 2638, 2639; 8 U.S.C. § 1101, *note*; 8 U.S.C. § 1701, *note*.

5

## I.   TEXAS'S C-WIRE FENCE PRESENTS NO OBSTACLE TO CONGRESS'S PURPOSES AND OBJECTIVES.

In reviewing whether Texas's actions are implicitly preempted by the INA, a court's "primary function is to determine whether, under the circumstances of this particular case, [state] law stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress." *Hines v. Davidowitz*, 312 U.S. 52, 67 (1941). Here, the c-wire installed by Texas is no such obstacle.

First, preemption is predicated on properly enacted federal laws, not executive enforcement policies that are subject to change with every new presidential administration. Accordingly, because preemption is based on the properly enacted laws of the legislature, executive agencies cannot claim preemption when their conduct is not authorized by federal law. As the Supreme Court has explained, "the *purpose of Congress* is the ultimate touchstone in every preemption case." *Medtronic, Inc. v. Lohr*, 518 U.S. 470, 485 (1996) (emphasis added) (quotation marks and citations omitted). It is thus not surprising that the Supreme Court has consistently stated that preemption analysis is "informed by *examining the federal statute* as a whole and identifying its purpose and intended effects." *Crosby v. Nat'l Foreign Trade Council*, 530 U.S. 363, 374 n.8 (2000) (emphasis added). *See also Kansas v. Garcia*, 140 S. Ct. 791, 801 (2020) ("[T]he federal restrictions or rights that are said to conflict with state law *must stem from either the Constitution itself or a valid statute enacted by Congress*. There is no federal preemption *in vacuo*,

without a constitutional text, federal statute, or treaty made under the authority of the United States.") (emphasis added) (citation and quotation marks omitted); *Murphy v. NCAA*, 138 S. Ct. 1461, 1481 (2018) (explaining that "every form of preemption is *based on a federal law* that regulates the conduct of private actors, not the States.") (emphasis added); *CSX Transp.*, 507 U.S. at 664 ("Evidence of preemptive purpose is sought *in the text and structure of the statute itself*.") (emphasis added).

Because "all preemption arguments[] must be grounded 'in the text and structure of the statute at issue[,]'" *Kansas*, 140 S. Ct. at 804 (quoting *CSX Transp.*, 507 U. S. at 664), "the possibility that federal enforcement priorities might be upset is not enough to provide a basis for preemption. The Supremacy Clause gives priority to 'the Laws of the United States,' not the . . . enforcement priorities or preferences of federal officers." *Id*. at 807 (quoting U.S. Const. Art. VI, cl. 2.). Thus, it is not enough for Defendants to argue that Texas's attempts to secure the border conflict with this administration's non-enforcement immigration policy. They must show that Texas is acting in contravention of the purposes and objectives of Congress, as is not possible here, since it is Texas that has taken up the congressional objective of border protection that Defendants have cast aside.

In the INA, Congress provided the Secretary of Homeland Security with "the power and duty to *control and guard the boundaries and borders of the United States*

*against the illegal entry of aliens*[.]" 8 U.S.C. § 1103(a)(5) (emphasis added). As relevant here, one such power provided to carry out this duty is the ability to "access to private lands . . . for the purpose of patrolling the border to *prevent the illegal entry of aliens* into the United States." 8 U.S.C. § 1357(a)(3) (emphasis added). Defendants simultaneously ignore these clear statutory commands and argue that Texas is interfering with their ability to follow them. They cannot have it both ways. Their actions in allowing illegal aliens into the U.S. interior are at clear odds with Congress's objective of preventing such entry. The INA, moreover, gives them their authority to access private lands for the purpose of preventing, not facilitating, illegal entry. *Id.* Removing Texas's border barriers to allow migrants to flow freely into the interior of the United States is in direct conflict with this statutory command.

Nor are Defendants' actions necessary to carry out their statutory duty to inspect, apprehend, and detain illegal aliens. *See generally* 8 U.S.C. § 1225. The district court correctly rejected Defendants' justifications that cutting Texas's fence was necessary "(1) to inspect, apprehend, and detain illegal aliens; and (2) to prevent or address medical emergencies." ROA.946-47. In fact, the district court found no evidence that the fence was cut for any such valid purpose and instead found that it was cut "for no apparent purpose other than to allow migrants easier entrance further inland." ROA.935. As the district court explained:

> No reasonable interpretation of [inspect, apprehend, or process] can square with Border Patrol's conduct. Visual

8

> observation is not physical control. Opening fences does not restrain freedom of movement. Blind trust that migrants who have just been seen criminally violating one boundary will respect barriers along the road toward a processing center constitutes neither "apprehension" nor "detention."

ROA.953. The district court found further evidence of Defendants' unlawful behavior, stating that

> [d]efendants apparently seek to establish an unofficial and unlawful port of entry stretching from wherever they open a hold through the Plaintiff's fence to the makeshift processing center they established on private land a mile or more away. The Defendants even appear to seek gates in the Plaintiff's fence that the Defendants can control to facilitate this initiative. Establishing such a system at a particularly dangerous stretch of the river creates a perverse incentive for aliens to attempt to cross at that location, begetting life-threatening crises for aliens and agents both.

ROA.953-54. ROA.935 (finding that, in addition to cutting holes in the fencing to allow illegal aliens entry, the evidence showed Border Patrol "passively observing a stream of migrants as they make the hazardous journey from Mexico, across the river, and then up the bank on the American side. *At no point* are the migrants interviewed, questioned as to citizenship, or in any way hindered in their progress into the United States."). Indeed, all evidence points to Defendants' "utter failure" to fulfill their statutory duties. ROA.954. Accordingly, they "cannot claim the statutory duties they are so obviously derelict in enforcing as excuses to puncture the Plaintiff's attempts to shore up the Defendants' failing system. Nor may they

seek judicial blessing of practices that both directly contravene those same statutory obligations and require the destruction of [Texas's fencing.]" *Id.*

Second, Defendants' preemption arguments fail because Texas's c-wire fencing, far from "stand[ing] as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress," *Hines*, 312 U.S. at 67, assists in accomplishing statutory objectives. In fact, as both this Court and the court below found, not only do immigration officers have access to both sides of Texas's fence, but the c-wire fencing *furthers* the objectives of Congress by deterring and preventing illegal aliens from entering the United States. ROA.934 (explaining that "[t]he wire serves as a deterrent—an effective one at that. The Court heard testimony that in other border sectors, the wire was so successful that illegal border crossings dropped to less than a third of their previous levels. By all accounts, Border Patrol is grateful for the assistance of Texas law enforcement, and the evidence shows the parties work cooperatively across the state[.]").

Certainly, if Texas's c-wire fencing achieved a purpose contrary to Congress's objective—for example, if Texas were facilitating illegal immigration—then its state policy would likely be preempted by the INA. That is because, as the Supreme Court has repeatedly explained, preemption is triggered when a "state policy may produce a result *inconsistent with the objective of the federal statute*." *Rice*, 331 U.S. at 230 (emphasis added) (citation omitted). As explained, Texas's c-wire fencing does not

10

produce a result inconsistent with the objectives of the INA. Indeed, it comports with the objectives of the INA by preventing illegal aliens from entering the country without being inspected, apprehended, and processed. The INA can hardly obstacle-preempt Texas from producing the same result that the INA is designed to achieve.

Indeed, states' power to act congruently with Congress in protecting their borders flows from their sovereignty. "As a sovereign, [a state] has the inherent power to exclude persons from its territory, subject only to those limitations expressed in the Constitution or constitutionally imposed by Congress." *Arizona*, 567 U.S. at 417 (Scalia, J., dissenting). As Justice Scalia noted, "two of the Constitution's provisions were designed to enable the States to prevent 'the intrusion of obnoxious aliens through other States.'" *Id*. at 418 (quoting Letter from James Madison to Edmund Randolph (Aug. 27, 1782), in 1 Writings of James Madison 226 (G. Hunt ed. 1900); accord The Federalist No. 42, pp. 269-71 (C. Rossiter ed. 1961) (J. Madison)). First, "the Constitution's Privileges and Immunities Clause" was made applicable to "[t]he *Citizens* of each State." *Id*. (quoting U.S. Const. Art. IV, § 2, cl. 1) (emphasis original). Second, the constitution "authoriz[ed] the general government to establish a uniform rule of naturalization throughout the United States[,]" to ensure that the low citizenship standards of one state did not "serve as a gateway for the entry of 'obnoxious aliens' into other States." *Id*. (quoting The Federalist No. 42, *supra,* at 271; Art. I, § 8, cl. 4). Thus, as Justice Scalia explained,

"the naturalization power was given to Congress not to abrogate the States' power to exclude those they did not want, but to vindicate it." *Id.*

In fact, history shows that "the States enacted numerous laws restricting the immigration of certain classes of aliens[.] . . . State laws not only provided for the removal of unwanted immigrants but also imposed penalties on unlawfully present aliens who aided their immigration." *Id.* at 419. Because states are sovereigns, they are "*entitled* to have '[their] own immigration policy'—including a more rigorous enforcement policy—so long as that does not conflict with federal law." *Id.* at 427 (emphasis original). Texas's use of wire fencing to protect its border does not conflict with federal law, but rather executes Texas's own inherent power to defend its territory.

Furthermore, Article 1, § 10, cl. 3, of the Constitution ("the State Self-Defense Clause") explicitly recognizes that Texas retains its inherent authority to exercise war powers in the event of an invasion, and in doing so is not subject to the control of Congress. *Id.* ("No State shall, without the consent of Congress, . . . engage in War, unless actually invaded . . ."). On July 7, 2022, Governor Abbott issued Executive Order GA-41, in which he invoked the State Self-Defense Clause in order to "secure the State of Texas and repel the illegal immigration that funds the

cartels."[3] Defensive barriers such as the c-wire fencing at issue here are paradigmatically war measures, and as such are a direct exercise of Texas's constitutional power of self-defense. In taking such measures, Texas may act "without the consent of Congress," U.S. CONST. art. 1, § 10, cl. 3, and thus is not subject to its control, let alone that of executive agencies. It is therefore quite impossible for mere executive enforcement policies—or, as in this case, non-enforcement policies—to preempt Texas's c-wire fencing.

## II. THERE IS NO CONFLICT IN THE METHOD OF ENFORCEMENT.

To avoid preemption, it is not enough that state objectives be consistent with congressional objectives. A state law may be preempted despite consistent objectives where there is a conflict between state and federal methods of enforcement. "Conflict in technique can be fully as disruptive to the system Congress erected as conflict in overt policy." *Motor Coach Employees v. Lockridge*, 403 U.S. 274, 287 (1971). Here, however, there is no such conflict in technique.

---

[3] Executive Order No. GA-41, relating to returning illegal immigrants to the border, is available at: https://gov.texas.gov/uploads/files/press/EO-GA-41.pdf (last visited Sept. 26, 2023). Two months later, on September 21, 2022, Governor Abbott issued Executive Order No. GA-42, in which he designated certain Mexican drug cartels as foreign terrorist organizations. Available at: https://gov.texas.gov/uploads/files/press/EO-GA42_Mexican_cartels_foreign_terrorist_orgs_IMAGE_09-21-2022.pdf (last visited Sept. 26, 2023).

Rather, the conflict is between the state's carrying out of congressional objectives that the executive has scorned.

The presence of an actual conflict between methods of enforcement is required to establish that a state action is obstacle preempted. For example, in *Arizona*, the Supreme Court held that Congress's abstention from criminal penalties for illegal alien employment implicitly preempted Arizona from imposing such penalties. *Arizona*, 567 U.S. at 406 ("Although § 5(C) attempts to achieve one of the same goals as federal law—the deterrence of unlawful employment—it involves a conflict in the method of enforcement. . . . Congress decided it would be inappropriate to impose criminal penalties on aliens who seek or engage in unauthorized employment. It follows that a state law to the contrary is an obstacle to the regulatory system Congress chose.").

There is no such conflict here. Congress has authorized the exact enforcement method Texas uses to maintain operational control—border barriers. Indeed, review of the U.S. Customs and Border Protection website shows the extensive use of border barriers along almost all of the southern border, save for large portions of the Texas border. U.S. Customs and Border Protection: Border Security, Border Wall System, available at https://www.cbp.gov/border-security/along-us-borders/border-wall-system (last visited January 9, 2024).

14

Furthermore, the use of border barriers has been authorized by Congress. A 2017 Executive Order issued "[i]n accordance with existing law, including the Secure Fence Act and IIRIRA," called for the "plan[ing], design, and construct[ion of] a physical wall along the southern border using appropriate materials and technology to *most effectively achieve complete operational control of the southern border.*" (emphasis added) Executive Order: Border Security and Immigration Enforcement Improvements, Jan. 5, 2017, available at: https://trumpwhitehouse.archives.gov/presidential-actions/executive-order-border-security-immigration-enforcement-improvements/. As the order itself notes, Congress's objective is operational control of the border, that is, the prevention of all illegal immigration, which can be achieved through the use of border barriers. *E.g.,* 8 U.S.C. §§ 1101 *note*, 1701 *note*. In fact, as a 2017 report from the office of the inspector general at the Department of Homeland Security reflected, border barriers are an effective method of preventing illegal immigration. Immigration Reform Law Institute, Investigative Report, December 14, 2023, available at: chrome-extension://efaidnbmnnnibpcajpcglclefindmkaj/https://irli.org/wp-content/uploads/2023/12/Border-Wall-Study.Completed.Final_Final.pdf.

As explained, a conflict between a state law and federal discretionary enforcement priorities is not a conflict between laws. The nonenforcement policies of the current executive branch are not the same as statutory enforcement methods

or techniques—let alone the equivalent of Congress's "clear and manifest purpose." *Rice*, 331 U.S. at 230. Indeed, the Supreme Court considered and unanimously rejected this theory of implied preemption in *Arizona*. In that case, the United States had challenged a "show your papers" law enacted in Arizona which required state officials to inquire about the immigration status of certain arrestees. The Supreme Court was unanimous in holding that there was no implied preemption under the Supremacy Clause without a showing that the "show your papers" law actually "creates a conflict with federal law." *Arizona*, 567 U.S. at 415. Justice Alito's concurrence explained:

> The United States suggests that a state law may be pre-empted, not because it conflicts with a federal statute or regulation, but because it is inconsistent with a federal agency's current enforcement priorities. Those priorities, however, are not law. They are nothing more than an agency policy. I am aware of no decision of this Court recognizing that mere policy can have pre-emptive force . . . . If § 2(B) were pre-empted at the present time because it is out of sync with the Federal Government's current priorities, would it be unpreempted at some time in the future if the agency's priorities changed?

*Arizona*, 567 U.S. at 445 (internal citation omitted). Accord *Kansas*, 140 S. Ct. at 807. The same is true in this case. Even if Defendants wish to reduce compliance with federal law through non-enforcement policies, that alone does not preempt the states, under their inherent authority, from pursuing the scorned congressional objective by taking action to reduce illegal immigration themselves.

16

## **CONCLUSION**

For the foregoing reasons, the decision of the district court denying Texas's

motion for preliminary injunction should be REVERSED.

Dated: January 23, 2024   Respectfully submitted,

       /s/ Matt Crapo
       MATT A. CRAPO
       CHRISTOPHER J. HAJEC
       GINA M. D'ANDREA
       Immigration Reform Law Institute
       25 Massachusetts Ave NW, Suite 335
       Washington, DC 20001
       202.232.5590
       mcrapo@irli.org
       chajec@irli.org
       gdandrea@irli.org

       *Attorneys for amicus curiae*

## CERTIFICATE OF SERVICE

I certify that on January 23, 2024, I electronically filed the foregoing *amicus* brief with the Clerk of the Court for the United States Court of Appeals for the Fifth Circuit by using the appellate CM/ECF system. Participants in this case are registered CM/ECF users, and service will be accomplished by the appellate CM/ECF system.

/s/ Matt Crapo
MATT A. CRAPO

# CERTIFICATE OF COMPLIANCE

The foregoing brief complies with Fed. R. App. P. 27(d)(2)(A) because it contains 3,863 words, as measured by Microsoft Word software. The brief also complies with the typeface and style requirements of Fed. R. App. P. 32(a)(5) & 32(a)(6) because it has been prepared in a proportionally spaced, Roman-style typeface of 14 points or more.

DATED: January 23, 2024                  Respectfully submitted,

                                         /s/ Matt Crapo
                                         MATT A. CRAPO