No. 23-50869

---

**IN THE UNITED STATES COURT OF APPEALS
FOR THE FIFTH CIRCUIT**

---

**STATE OF TEXAS,**

*Plaintiff-Appellant,*

v.

**UNITED STATES DEPARTMENT OF HOMELAND
SECURITY; ALEJANDRO MAYORKAS, SECRETARY, U.S.
DEPARTMENT OF HOMELAND SECURITY; UNITED
STATES CUSTOMS AND BORDER PROTECTION; UNITED
STATES BORDER PATROL; TROY MILLER, ACTING
COMMISSIONER, U.S. CUSTOMS AND BORDER
PROTECTION; JASON OWENS, IN HIS OFFICIAL
CAPACITY AS CHIEF OF THE U.S. BORDER PATROL; JUAN
BERNAL, IN HIS OFFICIAL CAPACITY AS ACTING CHIEF
PATROL AGENT, DEL RIO SECTOR, UNITED STATES
BORDER PATROL,**

*Defendants-Appellees.*

---

**On Appeal from the United States District Court for the Western
District of Texas, Del Rio Division**

---

**BRIEF FOR *AMICUS CURIAE*
CENTER FOR RENEWING AMERICA, INC.
IN SUPPORT OF APPELLANT**

---

Kenneth T. Cuccinelli, II
  *Counsel of Record*
CENTER FOR RENEWING
AMERICA, INC.
300 Independence Ave. SE
Washington, D.C. 20003
(202) 656-8825

*Attorney for* Amicus Curiae
*Center for Renewing America*

Conor Harvey
MURPHY BALL STRATTON LLP
1001 Fannin St., Ste. 720
Houston, TX 77002
(832) 659-3790

*Local Counsel for* Amicus Curiae
*Center for Renewing America*

## SUPPLEMENTAL STATEMENT OF INTERESTED PERSONS AND CERTIFICATE OF INTERESTED PERSONS

Pursuant to Fifth Circuit Rule 28.2.1 and Fed. R. App. P. 26.1, *amicus curiae*

Center for Renewing America makes the following disclosures:

1) For non-governmental corporate parties please list all parent corporations: None.

2) For non-governmental corporate parties please list all publicly held companies that hold 10% or more of the party's stock: None.

3) The following entity has an interest in the outcome of this case: Center for Renewing America.

4) Interested persons include the government parties in this case as Plaintiff-Appellant, Defendants-Appellees, and their counsel.

5) Interested persons include Kenneth Cuccinelli, II, Earl "Trey" Mayfield, and Conor Harvey, all of whom assisted *amicus curiae* in the preparation or filing of this brief.

These representations are made in order that the judges of this Court may evaluate possible disqualification or recusal.

DATED: January 23, 2024                Respectfully submitted,

                                        */s/ Kenneth T. Cuccinelli, II*
                                        Kenneth T. Cuccinelli, II

                                        *Lead Counsel for* Amicus Curiae
                                        *Center for Renewing America*

**TABLE OF CONTENTS**

INTEREST OF *AMICUS CURIAE*.............................................................................. 1

INTRODUCTION ................................................................................................... 2

ARGUMENT .......................................................................................................... 3

I.     The Constitution Recognizes that the States Retained Their Sovereign Right to Self-Defense against Invasion When They Joined the Union. ......................... 3

II.    It Is the States' Prerogative to Determine When an Invasion Occurs. In Any Event, Constitutional Text and History Shows that Invasions Include Non-State Actors Acting for Private Gain. ........................................................................ 5

III.   The State Self-Defense Power Is Distinct From—and Supports—the Commerce, Naturalization, and Immigration Powers Exercised by the Federal Government. ...................................................................................................... 13

IV.   Texas's Governor Has the Authority as Commander-in-Chief to Defend Texas against the Invasion from Mexico. ................................................................. 16

CONCLUSION ...................................................................................................... 18

# TABLE OF AUTHORITIES

## Cases

*Arizona v. United States*, 567 U.S. 387 (2012) ............................................................ 5

*California v. United States*, 104 F.3d 1086 (9th Cir. 1997) ........................................ 5

*Dep't of Revenue v. James B. Beam Distilling Co.*, 377 U.S. 341 (1964) ................ 15

*Gordon v. Texas*, 355 U.S. 369 (1958) ...................................................................... 15

*Houston v. Moore*, 18 U.S. 1 (1820) .......................................................................... 7

*Lichter v. United States,* 334 U.S. 742 (1948) ........................................................... 9

*Luther v. Borden*, 48 U.S. 1 (1849) ........................................................................... 17

*Martin v. Mott*, 25 U.S. 19 (1827) ............................................................................. 17

*Melendez v. City of New York*, 16 F.4th 992 (2d Cir. 2021) ................................. 5, 14

*Moyer v. Peabody*, 212 U.S. 78 (1909) ...................................................................... 17

*Murphy v. Nat'l Collegiate Athletic Ass'n*, 584 U.S. 453 (2018) ............................... 3

*New York v. United States*, 505 U.S. 144 (1992) ........................................................ 4

*Padavan v. United States*, 82 F.3d 23 (2d Cir. 1996) ................................................. 5

*Sterling v. Constantin*, 287 U.S. 378 (1932). ........................................................... 17

*Sveen v. Melin*, 584 U.S. 811 (2018) ..................................................................... 5, 14

*United States v. S.-E. Underwriters Ass'n*, 322 U.S. 533 (1944) ............................... 6

*Young v. Hawaii*, 992 F.3d 765 (9th Cir. 2021) .......................................................... 5

## Constitutional Provisions

TEX. CONST. art. IV, § 7 .............................................................................................. 17

U.S. CONST. amd. X ...................................................................................................... 4

U.S. CONST. art. I, § 10 ......................................................................................... passim

U.S. CONST. art. I, § 8 ............................................................................................. 7, 17

U.S. CONST. art. I, § 9 ......................................................................... 7

U.S. CONST. art. IV, § 4 .................................................................... 4, 8

U.S. CONST. art. IV, § 7 ...................................................................... 16

U.S. CONST. pmbl. .............................................................................. 3

## Statutes

TEX. GOV'T CODE §§ 437.001 *et seq* ................................................. 17

TEX. HEALTH & SAFETY CODE § 481.1022 ............................................ 15

TEX. HEALTH & SAFETY CODE § 481.1123 ............................................ 15

TEX. PENAL CODE §§ 20A.01–.04 ....................................................... 15

## Other Authorities

Ariz. Att'y Gen'l Op. 22-001, *The Federal Government's Duty to Protect the States and the States' Sovereign Power of Self Defense When Invaded* (Feb. 7, 2022) .... 14

BENJAMIN HEBER JOHNSON, REVOLUTION IN TEXAS: HOW A FORGOTTEN REBELLION AND ITS BLOODY SUPPRESSION TURNED MEXICANS INTO AMERICANS (2003) ........ 13

Bethany Blankley, *Three More Texas Counties Declare Invasion, Bringing Total to 50*, CENTER SQUARE (Jan. 6, 2024) ........................................................ 16

FRANCISCO E. BALDERRAMA AND RAYMOND RODRIGUEZ, DECADE OF BETRAYAL: MEXICAN REPATRIATION IN THE 1930S (2006) ........................................ 15

Governor Greg Abbott, Notification to President Biden that Texas Is Being Invaded (November 16, 2022) ............................................................... 18

James Madison, Debate From Virginia Ratifying Convention (June 16, 1788) ..... 4, 10

NICOLAY AND HAY, WORKS OF ABRAHAM LINCOLN (1894) ........................................ 9

NOAH WEBSTER, A COMPENDIOUS DICTIONARY OF THE ENGLISH LANGUAGE (1806) . . 6

Syndie Henry, *Human Smuggler Causes $150K in Damage Driving through Private Property*, TEXAS SCORECARD (Jan. 10, 2024) ........................................ 10

T.R. FEHRENBACH, LONE STAR: A HISTORY OF TEXAS AND THE TEXANS (1968) .... 11, ..................................................................................... 12, 13

THE DECLARATION OF INDEPENDENCE (U.S. 1776) ........................................................ 3

THE FEDERALIST NO. 39 .................................................................................................... 3

THE FEDERALIST NO. 43 .................................................................................................... 8

U.S. Customs & Border Protection, www.cbp.gov/about/contact/ports/TX (last visited January 21, 2024) ........................................................................................................ 14

## INTEREST OF *AMICUS CURIAE*[1]

The Center for Renewing America, Inc. ("CRA") works to rebuild a consensus of America as a nation under God with a unique purpose worthy of defending. This purpose flows from its people, institutions, and history, where individuals' enjoyment of freedom is predicated on just laws and healthy communities. Among other areas of policy, CRA supports policies that protect all Americans from the array of harms that naturally arise from a failure to secure our national borders.

---

[1] All parties have consented in writing to the filing of CRA's *amicus curiae* brief. No counsel for a party in this case authored this brief in whole or in part, and no such counsel or party made a monetary contribution intended to fund the preparation of this brief. No person other than *amicus curiae*, its members, or its counsel made a monetary contribution to the preparation or submission of this brief.

## INTRODUCTION

Texas faces a massive invasion in the form of millions of illegal aliens crossing her borders. Foreign nationals are smuggling themselves and others into Texas, committing crimes and disrupting even the most basic governmental services and community order.

Carrying out his authority as the State's Commander-in-Chief and the State's duty to ensure lawful entry, Texas Governor Greg Abbott has taken measures to defend against that invasion. The federal Constitution expressly recognizes Texas's right to do so; it does not need the federal government's permission to fulfill the obligations that the federal Executive Branch has purposefully abdicated. Even before ratifying the Constitution, the sovereign States had the inherent authority to defend themselves against invasions. That authority was explicitly confirmed in the Constitution's text, and it remains to this day. An "invasion" is not limited to just state actors, or to war-making, or even to violence. As James Madison explained, invasions are any foreign encroachment on a State's sovereignty and lawful exercise of authority within its borders, including smuggling.

Governor Abbott's determinations are not susceptible to judicial review. The appropriate response to invasion is a matter for the political branches of the States and federal government. The federal government's suit here is thus beyond judicial purview, and it should be dismissed.

2

**ARGUMENT**

I.     **The Constitution Recognizes that the States Retained Their Sovereign Right to Self-Defense against Invasion When They Joined the Union.**

"When the original States declared their independence, they claimed the powers inherent in sovereignty—in the words of the Declaration of Independence, the authority 'to do all . . . Acts and Things which Independent States may of right do.'" *Murphy v. Nat'l Collegiate Athletic Ass'n*, 584 U.S. 453, 470 (2018) (quoting THE DECLARATION OF INDEPENDENCE ¶ 32 (U.S. 1776)). "The Constitution limited but did not abolish the sovereign powers of the States, which retained 'a residuary and inviolable sovereignty.'" *Id.* (quoting THE FEDERALIST NO. 39, at 245 (James Madison) (C. Rossiter ed. 1961)).

The Thirteen Colonies signed the Articles of Confederation, and then as States entered into the Union created by the Constitution, with the understanding that the new federal government would provide for the common defense. U.S. CONST. pmbl. To that end, they ceded much of their sovereign authority for self-defense to the new federal government. But they did not cede all of it. The Founders recognized that occasions might arise where the federal government could not—or would not—meet its obligations under the grand bargain that produced the Constitution. As a precaution against that eventuality, the States retained in the new Constitution their residual authority to repel actual invasions without seeking congressional approval.

To wit, the State Self-Defense Clause authorizes the States to defend themselves against invasions:

3

> *No State shall, without the Consent of Congress*, lay any Duty of Tonnage, keep Troops, or Ships of War in time of Peace, enter into any Agreement or Compact with another State, or with a foreign Power, or *engage in War, unless actually invaded, or in such imminent Danger as will not admit of delay.*

U.S. CONST. art. I, § 10, cl. 3 (emphasis added). In tandem with the State Self-Defense Clause, the Invasion Clause requires the federal government to protect each State from invasion:

> The United States shall guarantee to every State in this Union a Republican Form of Government, and shall protect each of them against Invasion; . . . .

U.S. CONST. art. IV, § 4. And the Tenth Amendment emphasizes that "[t]he powers not delegated to the United States by the Constitution, nor prohibited by it to the States, are reserved to the States respectively, or to the people." U.S. CONST. amd. X. It thus "confirms that the power of the Federal Government is subject to limits that may, in a given instance, reserve power to the States." *New York v. United States*, 505 U.S. 144, 157 (1992).

These constitutional provisions show that, while the people conferred upon the federal government the primary responsibility to protect each State against invasion, the States *retained* their respective sovereign prerogatives to repel invasion. At the Virginia Ratifying Convention, James Madison explained that the State Self-Defense Clause means that States "are restrained from making war, unless invaded, or in imminent danger. *When in such danger, they are not restrained*." James Madison, Debate From Virginia Ratifying Convention (June 16, 1788) (emphasis added).

Courts have thus correctly affirmed that the State Self-Defense Clause "leaves intact [States'] inherent power to protect their territory." *Arizona v. United States*, 567 U.S. 387, 419 (2012) (Scalia, J., concurring). The limitations in the State Self-Defense Clause are not absolute, but rather permit action when a State is "'actually invaded' or facing 'imminent Danger' not admitting delay." *Melendez v. City of New York*, 16 F.4th 992, 1018 (2d Cir. 2021); *see also id.* at 1018 n.42 (citing *Sveen v. Melin*, 584 U.S. 811, 828 (2018) (Gorsuch, J., dissenting)). And this State authority is at its apex when—as here—the federal government fails to protect a State from invasion. *See Young v. Hawaii*, 992 F.3d 765, 815 (9th Cir. 2021) (citing the prohibition in the State Self-Defense Clause as "corresponding[]" to the federal government's duty to defend against invasion), *vacated and remanded on other grounds*, 142 S. Ct. 2895 (2022).

## II.    It Is the States' Prerogative to Determine When an Invasion Occurs. In Any Event, Constitutional Text and History Shows that Invasions Include Non-State Actors Acting for Private Gain.

The federal courts have correctly held that what constitutes an "invasion" is a non-justiciable question. *See, e.g.*, *Padavan v. United States*, 82 F.3d 23, 28 (2d Cir. 1996) ("[T]he plaintiffs' Invasion Clause claim is nonjusticiable. The protection of the states from 'invasion' involves matters of foreign policy and defense, which are issues that the courts have been reluctant to consider."); *California v. United States*, 104 F.3d 1086, 1090–91 (9th Cir. 1997) (addressing whether a State had been "invaded" for constitutional purposes would require making "non-judicial policy decision[s]").

In any event, the State Self-Defense Clause has in view invasions from state or non-state actors. While the clause is commonly understood as a mechanism to thwart attacks by hostile state actors (like Great Britain attacking various American States in the War of 1812), the Clause's text makes no distinction between state and non-state actors. The critical phrase is "actually invaded, or in such imminent Danger as will not admit of delay." U.S. CONST. art. I, § 10. The clause does not require a State to be actually invaded by or in imminent danger from a state actor.

Further, the ordinary meaning of "invade" is not limited to actions by a state. "Ordinarily courts do not construe words used in the Constitution so as to give them a meaning more narrow than one which they had in the common parlance of the times in which the Constitution was written." *United States v. S.-E. Underwriters Ass'n*, 322 U.S. 533, 539 (1944), *superseded by statute on other grounds*. Webster's 1806 dictionary— the first American English dictionary—defines "invasion" broadly, as meaning "hostile entrance, attack, assault," and defines "invader" as "an assailant, encroacher, intruder."[2] Webster's 1828 dictionary also defines "invade" broadly, to include not just the entrance of a foreign army into a country, but also "To attack; to infringe; to encroach on; to violate."[3] The millions of illegal aliens entering the United States fall within these broad

---

[2] NOAH WEBSTER, A COMPENDIOUS DICTIONARY OF THE ENGLISH LANGUAGE 164 (1806).

[3] 1 NOAH WEBSTER, AMERICAN DICTIONARY OF THE ENGLISH LANGUAGE 113 (1828).

definitions of "invade," as they are entering the country in an unlawful manner that encroaches on and violates the sovereignty of the States whom they burden.

As further detailed below, the history of the Constitution's adoption also powerfully shows that the Founders understood the States were giving up certain sovereign powers to the national government, but retaining core self-defense powers against both domestic and foreign threats to their actual security within their territories. The ratification history shows the Framers understood the State self-defense power to be broad, and essentially congruent with the federal power to protect States from invasion, when it came to actions within a State's own territory. It would be nonsensical to conclude that either power is artificially limited to invasion by foreign states as opposed to non-state actors, as it would render the State defenseless in the absence of federal support. *See Houston v. Moore*, 18 U.S. 1, 16–17 (1820) (State governments' power over militias and their uses "existed prior to the formation of the constitution, and having not been prohibited by that instrument, it remains with the States").

Moreover, within the Constitution, "invasion" is contrasted with "insurrections," "rebellion," and "domestic violence," showing that the difference is not state versus non-state actors, but rather foreign versus domestic actors. Article I, § 8, cl. 5 gives Congress the power "[t]o provide for calling forth the Militia to execute the Laws of the Union, suppress Insurrections and repel Invasions." Article I, § 9 provides that "[t]he Privilege

7

of the Writ of Habeas Corpus shall not be suspended, unless when in Cases of Rebellion or Invasion the public Safety may require it." In Article IV, § 4, the clause immediately following the Invasion Clause provides "[t]he United States . . . shall protect each [State in this Union] . . . on Application of the Legislature, or of the Executive (when the Legislature cannot be convened) against domestic violence." In other words, the Framers were concerned about the federal government using the pretext of domestic violence to send other State militias into a State over its objection, and thus created an additional protection to prevent a federal commandeering of State sovereignty. The Framers were not concerned about artificially limiting the type of foreign hostile actors for which protection against "invasion" would apply (or artificially limiting the States' ability to respond and protect their own territories from such threats).

Indeed, in the Federalist No. 43, James Madison explained with respect to the Invasion Clause that "[a] protection against invasion is due from every society to the parts composing it. The latitude of the expression used here seems to secure each state, not only against foreign hostility, but against *ambitious or vindictive enterprises* of its more powerful neighbors." (emphasis added). This two-part definition does not indicate intent by the Framers to limit the protection to only state, as opposed to non-state, actors. As discussed *supra,* the Invasion Clause's plain language applies to "Invasion" and "domestic Violence." Those two categories must be understood to cover the full subject

8

of areas where a State might need external protection, and since actions by foreign non-state actors are not "domestic Violence," they must qualify as "Invasion."

The ratification history makes clear that the purposes of the Invasion and State Self-Defense Clauses were both to protect against invasion and to provide *additional* security to the States in the form of assistance of the militias of other States—not to limit a State's power to defend itself against invasion by non-state (as opposed to state) actors. In fact, whereas a major concern in creating a national government was to speak with one voice in foreign affairs, state action against the agents of a foreign government would implicate that concern far more than state action against non-state actors, such as waves of illegal immigrants straining States and their citizens to the breaking point. But it is undisputed that the Constitution expressly reserved the potentially more intrusive power (action against hostile state actors) to the States, and there is no basis to conclude it silently removed a less intrusive power (action against non-state actors). *Cf. Lichter v. United States,* 334 U.S. 742, 756 n.4 (1948) (quoting 9 NICOLAY AND HAY, WORKS OF ABRAHAM LINCOLN 75–77 (1894)) (holding that because the Constitution gives Congress the greater power to raise and support armies, that includes the lesser powers of determining the means by which to do so). Indeed, Madison addressed the lack of conflict between a State's power to defend itself and the national government's war power: States "are restrained from making war, unless invaded, or in imminent danger. When in such danger, they are not restrained. I can perceive no competition in these

9

clauses. They cannot be said to be repugnant to a concurrence of the power." James Madison, Debate from Virginia Ratifying Convention (June 16, 1788).

Madison also made clear at the Virginia Ratifying Convention that the protection against "invasion" applies to non-state actors. He specifically identified "suppress[ing] smugglers" as an example of a justified use of a State's militia, and he cited with approval an actual prior case of Virginia calling out its militia to do just that: "There were a number of smugglers, who were too formidable for the civil power to overcome. The military quelled the sailors, who otherwise would have perpetrated their intentions." *Id.*

The importance of Madison's invocation of smugglers as a species of invaders cannot be overstated. Smugglers are (1) non-state actors; (2) engaged in trespass against a sovereign State and its laws; (3) acting for private gain; and (4) are not acting violently against the State and its citizens. That is precisely what the majority of illegal aliens are: persons who are smuggling themselves or others into the sovereign States, such as Texas. The fact that different categories of illegal aliens—*e.g.*, terrorists, agents of foreign governments, members of varying levels of Mexican smuggling cartels (smuggling both humans and drugs), criminals (individuals or gang members), or individuals acting for their own reasons who enter Texas other than at a legal port of entry[4]—may have

---

[4] The day-to-day reality of the invasion in Texas is the various motives and harm blend together. *See* Syndie Henry, *Human Smuggler Causes $150K in Damage Driving through Private Property*, TEXAS SCORECARD (Jan. 10, 2024) ("The smuggler was attempting to evade law enforcement with several illegal aliens in tow and has yet to be caught.").

different levels of moral and legal culpability (and differing degrees of "hostility") for invading the United States and Texas, does not change the fact that all members of each category are in fact invaders. The practical difficulty the State of Texas would have in differentiating between these different categories of invaders is an additional reason that this question is and should be adjudicated to be non-justiciable, with the authority to decide left to the invaded State's governor and Commander-in-Chief. *See* Part V, *infra.*

And Texas's own history highlights that the State Self-Defense Clause authorizes the State to repel invasions from state and non-state actors alike. After achieving independence from Mexico in 1836, hostilities continued between Texas and Mexico. In the spring and summer of 1842, a series of small-scale raids by Mexican forces culminated in September with 1,600 Mexican troops invading and occupying San Antonio. They were soon repulsed by a much smaller group of Texas militiamen and rangers at the Battle of Salado Creek. T.R. FEHRENBACH, LONE STAR: A HISTORY OF TEXAS AND THE TEXANS 261–62, 478–79 (1968) ("Fehrenbach").

And it was not just in the immediate aftermath of the Texas Revolution that required Texas to be able to defend herself. After the Mexican-American War of 1848, a weak Mexican government was unable to enforce law and order in its northern States bordering Texas, where petty *caudillos* ruled different border regions as competing warlords. That lawlessness also permitted Indian bands to launch raids into Texas towns and ranches in the borderlands as far east as Corpus Christi. This state of affairs

11

continued for decades at least and, arguably, to the present day. Fehrenbach at 275–76, 375, 473.

In September 1859, Mexican outlaw Juan Cortina seized Brownsville, Texas, with approximately 100 men, killing three Americans and one Mexican. Cortina's forces had a series of inconclusive engagements with Brownsville militia and the Texas Rangers over the next three months. Finally, a larger force of Rangers joined with the U.S. Army, forcing Cortina's forces out of Brownsville in December 1859, and driving them west along the Rio Grande Valley, eventually forcing them back into Mexico. *Id.* at 514–15. That Ranger contingent crossed the Rio Grande in February 1860 to protect a steamboat heading towards Brownsville. The Army did not. Thirty-five Rangers, with covering fire from the steamboat, crossed the river and engaged Cortina's men, forcing them to retreat, and then escorted the steamer toward Brownsville. When confronted en route by a larger Mexican force, the Ranger commander announced that if the steamer was attacked by anyone on the Mexican side, the Rangers would return. They crossed back into Texas without incident. *Id.*

Texas continued to experience trouble at her borders into the twentieth century. From the 1870s until 1911, Texas continued to experience Mexican banditry, Indian raids, and cattle theft, and the Texas Rangers routinely rode into Mexico to recover stolen cattle and to pursue the bandits (often with the U.S. Army providing support from the Texas side of the border). *Id.* at 585. And the Mexican Revolution in 1910 sent large

12

numbers of refugees fleeing into Texas, as well as Mexican dissidents, rebels, and large parties of Mexican raiders who killed and looted on both sides of the border. *Id.* at 572–92, 690–92. Starting in July 1915, the instability fomented by the Mexican Revolution led to large Mexican raiding parties of twenty-five to one hundred men attacking from Mexico, destroying property and infrastructure. Twenty-one Americans were killed, and hundreds of Texans were driven from their homes. BENJAMIN HEBER JOHNSON, REVOLUTION IN TEXAS: HOW A FORGOTTEN REBELLION AND ITS BLOODY SUPPRESSION TURNED MEXICANS INTO AMERICANS 76 (2003).

Like Madison's specific example of Virginia taking action against smugglers, Texas's own history confirms that the State Self-Defense Clause does not confine a State to defending itself only against hostile state actors. And the ongoing deluge of millions of illegal entrants across America's southern border, and their intertwining with drug cartels and gangs, are a far greater threat to State sovereignty and tranquility than either eighteenth century Virginia smugglers or the episodic banditry that pervaded the Texas-Mexican border in the nineteenth and twentieth centuries. The State Self-Defense Clause reserves to States the sovereign right to repel the currently ongoing invasion.

## III. The State Self-Defense Power Is Distinct From—and Supports—the Commerce, Naturalization, and Immigration Powers Exercised by the Federal Government.

Texas's power of defense against cross-border invasion under Article I, § 10 can be exercised in a manner separate from federal immigration law by regaining

13

operational control of the border and ensuring that persons and goods entering Texas to go through authorized ports of entry, rather than being illegally smuggled.

States have the power to require persons and goods entering the country to arrive through authorized ports of entry, or by surrendering themselves to federal officials, and the States can do so without infringing on the separate federal powers over immigration, naturalization, and international commerce. *See generally* Ariz. Att'y Gen'l Op. 22-001, *The Federal Government's Duty to Protect the States and the States' Sovereign Power of Self Defense When Invaded* (Feb. 7, 2022). In fact, channeling such persons to authorized ports of entry and interdicting criminal gangs and cartels strengthens federal power by preventing illegal entrants that seek to circumvent federal law and avoid immigration-enforcement officials.[5] After all, the Constitution expressly provides that States retain the sovereign power to execute inspection laws under the Import-Export Clause in Article I, § 10. The Constitution's adoption qualified this sovereign power held by the States, but it did not eliminate it. *See Melendez*, 16 F.4th at 1018 ("[A]lthough a state generally may not impose import or export duties, it may do so when "absolutely necessary for executing its inspection Laws.") & n.42 (citing *Sveen*, 584 U.S. at 828 (Gorsuch, J., dissenting)).

---

[5] The federal government has established twelve authorized land ports of entry on the Texas-Mexico border. *See* U.S. Customs & Border Protection, www.cbp.gov/about/contact/ports/TX (last visited January 21, 2024).

That power is implicated here. To enforce *any* inspection laws, States must be able to take action to ensure operational control of the border and to ensure that persons and goods enter at authorized ports of entry. *See, e.g.*, *Dep't of Revenue v. James B. Beam Distilling Co.*, 377 U.S. 341, 345–46 (1964) ("It is clear that the gravamen of the offense in *Gordon* [*v. Texas*, 355 U.S. 369 (1958) (per curiam),] was the failure to obtain, or even apply for, a permit as required by state law. Such permits, in addition to other functions, *serve to channelize the traffic in liquor* and thus to prevent diversion of that traffic into unauthorized channels." (emphasis added)); *see also generally McCulloch v. Maryland*, 17 U.S. 316, 417 (1819) (discussing that from the express power of establishing a post office, there is the implied power "to punish those who steal letters from the post-office, or rob the mail"). So too, for example, Texas prohibits possession of narcotic drugs such as fentanyl, *see, e.g.*, TEX. HEALTH & SAFETY CODE §§ 481.1022, 481.1123, and human trafficking, *see, e.g.*, TEX. PENAL CODE §§ 20A.01–.04 ("Trafficking of Persons"). States have themselves actively enforced federal immigration laws. For instance, during the Great Depression, local and state law-enforcement agencies in Los Angeles conducted large-scale raids and forcibly deported those arrested. *See, e.g.*, FRANCISCO E. BALDERRAMA AND RAYMOND RODRIGUEZ, DECADE OF BETRAYAL: MEXICAN REPATRIATION IN THE 1930S 89–90 (2006). Texas plainly has the authority to channel the entry of foreign nationals through authorized ports of entry to ensure her own laws are enforced.

15

IV.    **Texas's Governor Has the Authority as Commander-in-Chief to Defend Texas against the Invasion from Mexico.**

As explained above, at the time of the Founding, the State Self-Defense Clause was understood to include a State's right to defend itself against "foreign hostility [and] ambitious or vindictive enterprises of [a State's] more powerful neighbors." *See* Part II, *supra*. This interpretation is supported by James Madison's specific example of a state militia acting to suppress smugglers. The principal activity of transnational cartels and gangs at the border is to smuggle people and drugs for profit. Indeed, using the state militia to suppress smugglers was Madison's paradigmatic example of a justified and constitutional use of the state militia. Furthermore, the commonly understood meaning at the time of the word "invasion" covers the activities of the transnational cartels and gangs at the border. *See* Part II, *supra*. That understanding continues today, as exemplified by the fifty Texas counties that have declared a state of invasion.[6]

Article 4, § 7 of the Texas Constitution fits hand-in-glove with the federal Constitution's State Self-Defense Clause, providing that the Governor "shall be Commander-in-Chief of the military forces of the State, except when they are called into actual service of the United States. *He shall have power to call forth the militia to execute the laws of the State*, to suppress insurrections, *and to repel invasions*." (emphasis added). Texas's military forces are created by statute, TEX. GOV'T CODE §§ 437.001 *et*

---

[6] Bethany Blankley, *Three More Texas Counties Declare Invasion, Bringing Total to 50*, CENTER SQUARE (Jan. 6, 2024).

*seq.*, and include the Texas National Guard, Texas State Guard, and any other military force created under state law. TEX. GOV'T CODE § 437.001(14).

The discretion afforded the Governor of Texas under the State Self-Defense Clause and his Commander-in-Chief authority is akin to that of the President. Just as the President has "exclusive authority to decide whether the [foreign or domestic] exigency has arisen" for purposes of Article I, § 8, cl. 15, *Martin v. Mott*, 25 U.S. 19, 29–30 (1827) (Story, J.); *see also Luther v. Borden*, 48 U.S. 1, 39 (1849) (stating "that it rested with the political power to decide whether the charter government had been displaced or not" as it relates to U.S. Constitution Article IV, § 4), so too the Texas Governor has exclusive authority to decide whether the foreign or domestic exigency has arisen under Article I, § 10, cl. 3, *Moyer v. Peabody*, 212 U.S. 78, 83–86 (1909) (Holmes, J.). Here, that authority is to be exercised by Governor Abbott. And because "the nature of the power itself" "necessarily" confers discretion, federal and State exercises of this power are subject only to the *same* good-faith constraint—not judicial second-guessing. *Sterling v. Constantin*, 287 U.S. 378, 399 (1932).

If one considers the question at the time of the Founding, it is clear that unreviewable authority resides with the Governor of Texas to decide if and when Texas has been invaded, and what, if anything, he will do to repel such invasion under Article 4, § 7 of the Texas Constitution. Upon the adoption of the federal Constitution, the State of Georgia was America's southwest border. It is obvious why the Governor of Georgia

17

would have *necessarily* had the sole authority under the Self-Defense Clause of the Constitution to decide whether Georgia was suffering an invasion, as well as having the sole authority to use all state resources to repel such an invasion. In 1789, it would have taken months for the Governor of Georgia to communicate the fact of an invasion to the nation's then-capitol in New York City and to receive either permission to act, or the deployment of federal officers to contend with the invasion. Considering such circumstances, it is easier to appreciate that border-state governors had to have the authority to contend with invasions immediately, without judicial review, and on their own authority. That authority was retained in the Self-Defense Clause.

The fact that today's communication between a border-state governor and the federal government can now be accomplished in moments instead of weeks, and transportation can be accomplished in hours instead of months, does not change either the locus or scope of border-state governors' retained authority as their States' Commanders-in-Chiefs to contend with invasions directly, and regardless of federal government steps or even objections.

## CONCLUSION

Article I, § 10, cl. 3 of the Constitution reserves to the Governor of Texas sole and unreviewable authority to make the determination that Texas is being invaded,[7] and to decide how best to repel such invasion. As such, this Court should dismiss this case as

---

[7] Governor Greg Abbott, Notification to President Biden that Texas Is Being Invaded (November 16, 2022), *available at* https://gov.texas.gov/uploads/files/press/BidenJoseph_11.16.22.pdf.

non-justiciable, thereby allowing Governor Abbott to exercise his full constitutional authority to secure the entire Texas-Mexico border in between the legal ports of entry established by the government of the United States.

Dated: January 23, 2024                    Respectfully submitted,

                                           */s/ Kenneth T. Cuccinelli, II*
                                           Kenneth T. Cuccinelli, II
                                              *Counsel of Record*
                                           CENTER FOR RENEWING AMERICA, INC.
                                           300 Independence Ave. SE
                                           Washington, D.C. 20003
                                           Telephone: (202) 656-8825

                                           *Attorney for* Amicus Curiae
                                           *Center for Renewing America*

                                           Conor Harvey
                                           MURPHY BALL STRATTON LLP
                                           1001 Fannin St., Ste. 702
                                           Houston, TX 77002
                                           (832) 659-3790

                                           *Local Counsel for* Amicus Curiae
                                           *Center for Renewing America*

## CERTIFICATE OF COMPLIANCE

This brief complies with the type-volume limitations of Federal Rule of Appellate Procedure 29(a)(5) because it contains 4,551 words, excluding the parts of the brief exempted by Rule 32(f). This brief complies with the typeface requirements of Federal Rules of Appellate Procedure 32(a)(5) and 32(a)(6) because it has been prepared in a proportionally spaced typeface using Microsoft Word in Times New Roman 14-point for the main text and 12-point font for the footnotes.

Dated: January 23, 2024

Respectfully submitted,

*/s/ Conor Harvey*
Conor Harvey

## CERTIFICATE OF SERVICE

I electronically filed the foregoing with the Clerk of Court for the U.S. Court of Appeals for the Fifth Circuit by using the appellate CM/ECF system. All counsel of record are registered CM/ECF users, and will be served by the appellate CM/ECF system.

Dated: January 23, 2024                    Respectfully submitted,

                                           */s/ Conor Harvey*
                                           Conor Harvey