No. 23-50869

IN THE UNITED STATES COURT OF APPEALS
FOR THE FIFTH CIRCUIT

———————————

STATE OF TEXAS,

Plaintiff-Appellant,

v.

UNITED STATES DEPARTMENT OF HOMELAND SECURITY;
ALEJANDRO MAYORKAS, Secretary, U.S. Department of Homeland Security;
UNITED STATES CUSTOMS AND BORDER PROTECTION; UNITED
STATES BORDER PATROL; TROY MILLER, Senior Official Performing the
Duties of the Commissioner, U.S. Customs and Border Protection; JASON OWENS,
in his official capacity as Chief of the U.S. Border Patrol; ROBERT DANLEY, in his
official capacity as Chief Patrol Agent, Del Rio Sector, United States Border Patrol,

Defendants-Appellees.

———————————

On Appeal from the United States District Court
for the Western District of Texas

———————————

BRIEF FOR APPELLEES

———————————

JAIME ESPARZA
  *United States Attorney*

MARY F. KRUGER
ROBERT GREEN
  *Assistant United States Attorneys*

BRIAN M. BOYNTON
  *Principal Deputy Assistant Attorney
  General*

SARAH E. HARRINGTON
  *Deputy Assistant Attorney General*

MARK R. FREEMAN
MELISSA N. PATTERSON
STEVEN A. MYERS
  *Attorneys, Appellate Staff
  Civil Division, Room 7232
  U.S. Department of Justice
  950 Pennsylvania Avenue NW
  Washington, DC 20530
  (202) 305-8648*

## CERTIFICATE OF INTERESTED PERSONS

A certificate of interested persons is not required, as defendants-appellees are all governmental parties.  5th Cir. R. 28.2.1.

*/s/ Steven A. Myers*
Steven A. Myers

## STATEMENT REGARDING ORAL ARGUMENT

The Court has scheduled oral argument for February 8, 2024.

## TABLE OF CONTENTS

Page

INTRODUCTION ..................................................................................1

STATEMENT OF JURISDICTION ........................................................2

STATEMENT OF THE ISSUE ...............................................................3

STATEMENT OF THE CASE ................................................................3

      A.    Statutory Background ...............................................................3

      B.    Factual Background ..................................................................5

      C.    Prior Proceedings....................................................................9

SUMMARY OF ARGUMENT............................................................ 11

STANDARD OF REVIEW ................................................................. 14

ARGUMENT ..................................................................................... 15

I.    Texas Cannot Establish A Likelihood Of Success On The Merits Of Its
*Ultra Vires*, State-Law, Or APA Claims.................................................. 15

      A.    Federal Law Authorizes Border Patrol Agents To Cut Concertina
Wire To Carry Out Their Duties. ..............................................16

      B.    The Federal Government Cannot Be Enjoined Under State Tort
Law.........................................................................................24

            1.    Sovereign Immunity Bars Suits Against The United States
Seeking Injunctive Relief Under State Tort Law...........................25

            2.    Under The Supremacy Clause, States Cannot Control Or
Impede Federal Law Enforcement's Execution Of Federal
Law. .......................................................................................33

      C.    Texas Cannot Succeed On Its APA Claims. ...............................38

            1.    Texas Does Not Challenge Final Agency Action. ........................38

2.      Border Patrol Decisions Regarding The Concertina Wire Are Committed To Agency Discretion By Law.............................42

3.      It Is Not Arbitrary Or Capricious To Cut Concertina Wire To Reach Migrants..............................................................................43

II.      Lower Courts May Not Enjoin Or Restrain Enforcement Of The INA..........43

III.      The Equities Weigh Heavily Against A Preliminary Injunction..........................46

CONCLUSION ..............................................................................................................52

CERTIFICATE OF SERVICE

CERTIFICATE OF COMPLIANCE

ADDENDUM

# TABLE OF AUTHORITIES

**Cases:**                                                                 **Page(s)**

*Alabama-Coushatta Tribe of Tex. v. United States*,
   757 F.3d 484 (5th Cir. 2014) ...................................................... 26

*Apter v. HHS*,
   80 F.4th 579 (5th Cir. 2023) ...................................................... 30

*Arizona v. Biden*,
   40 F.4th 375 (6th Cir. 2022) ...................................................... 44

*Arizona v. California*,
   283 U.S. 423 (1931) ............................................................ 12, 35

*Arizona v. Navajo Nation*,
   599 U.S. 555 (2023) ................................................................ 30

*Arizona v. United States*,
   567 U.S. 387 (2012) ....................................................... 35, 47, 48

*B.K. Instrument, Inc. v. United States*,
   715 F.2d 713 (2d Cir. 1983) .................................................. 30, 33

*Barton v. Barr*,
   140 S. Ct. 1442 (2020) ............................................................... 3

*Biden v. Texas*,
   597 U.S. 785 (2022) ........................................................... 21, 44

*Blagojevich v. Gates*,
   519 F.3d 370 (7th Cir. 2008) .................................................... 30

*Boelens v. Redman Homes, Inc.*,
   748 F.2d 1058 (5th Cir. 1984) .................................................. 28

*CAE Integrated, LLC v. Moov Techs., Inc.*,
   44 F.4th 257 (5th Cir. 2022) ...................................................... 14

*City of New York v. U.S. Dep't of Def.*,
   913 F.3d 423 (4th Cir. 2019) .................................................... 41

*Danos v. Jones*,
   652 F.3d 577 (5th Cir. 2011) ............................................... 18, 19

*Deerfield Med. Ctr. v. City of Deerfield Beach,*
  661 F.2d 328 (5th Cir. Unit B 1981) ............................................... 46

*Department of Commerce v. New York,*
  139 S. Ct. 2551 (2019) ................................................................... 39

*DHS v. Thuraissigiam,*
  140 S. Ct. 1959 (2020) ............................................................. 20, 21

*DRG Funding Corp. v. Secretary of Hous. & Urban Dev.,*
  76 F.3d 1212 (D.C. Cir. 1996) ....................................................... 40

*El-Shifa Pharm. Indus. Co. v. United States,*
  607 F.3d 836 (D.C. Cir. 2010) ........................................................26

*Garland v. Aleman Gonzalez,*
  596 U.S. 543 (2022) ....................................................... 13, 43, 44, 45, 46

*Geo Grp., Inc. v. Newsom,*
  50 F.4th 745 (9th Cir. 2022) .......................................................... 38

*Geyen v. Marsh,*
  775 F.2d 1303 (5th Cir. 1985) ....................................................... 27

*Gill v. Whitford,*
  138 S. Ct. 1916 (2018) .................................................................. 48

*Goodyear Atomic Corp. v. Miller,*
  486 U.S. 174 (1988) ...................................................................... 25

*Hadley v. Department of Corr.,*
  840 N.E. 2d 748 (Ill. App. Ct. 2005) ............................................. 47

*Hall v. Commonwealth,*
  105 S.E. 551 (Va. 1921) ................................................................ 37

*Hancock v. Train,*
  426 U.S. 167 (1976) ................................................................. 26, 36

*Henderson ex rel. Henderson v. Shinseki,*
  562 U.S. 428 (2011) ...................................................................... 45

*Hollingsworth v. Perry,*
  558 U.S. 183 (2010)........................................................................15

*Johnson v. Maryland*,
    254 U.S. 51 (1920) ............................................................... 12, 34, 36, 38

*Jordan v. Fisher*,
    823 F.3d 805 (5th Cir. 2016) ........................................................ 46

*Lane v. Pena*,
    518 U.S. 187 (1996) ................................................................. 25

*Larson Domestic & Foreign Commerce Corp.*,
    337 U.S. 682 (1949) ................................................................. 27

*Lincoln v. Vigil*,
    508 U.S. 182 (1993) ................................................................. 42

*Lujan v. National Wildlife Fed'n*,
    497 U.S. 871 (1990) ............................................................. 39, 41

*Maryland v. King*,
    567 U.S. 1301 (2012) ............................................................... 48

*Match-E-Be-Nash-She-Wish Band of Pottawatomi Indians v. Patchak*,
    567 U.S. 209 (2012) ......................................................... 12, 31, 32

*Mayo v. United States*,
    319 U.S. 441 (1943) ................................................................. 34

*McCulloch v. Maryland*,
    17 U.S. (4 Wheat.) 316 (1819) .............................................. 12, 34, 36

*Michigan v. U.S. Army Corp of Eng'rs*,
    667 F.3d 765 (7th Cir. 2011) ............................................. 26, 30, 33

*Mock v. Garland*,
    75 F.4th 563 (5th Cir. 2023) ....................................................... 41

*Molzof v. United States*,
    502 U.S. 301 (1992) ................................................................. 31

*Muniz-Muniz v. U.S. Border Patrol*,
    741 F.3d 668 (6th Cir. 2013) ....................................................... 30

*Neagle, In re*,
    135 U.S. 1 (1890) ............................................................... 12, 35

*Nken v. Holder,*
    556 U.S. 418 (2009) ........................................................................... 14

*North Carolina v. Ivory,*
    906 F.2d 999 (4th Cir. 1990) ........................................................... 37

*North Dakota v. United States,*
    495 U.S. 423 (1990) ......................................................................... 37

*Northwest, Inc. v. Ginsberg,*
    572 U.S. 273 (2014) ......................................................................... 36

*Norton v. Southern Utah Wilderness All.,*
    542 U.S. 55 (2004) .......................................................... 38-39, 39, 41

*Ohio v. Thomas,*
    173 U.S. 276 (1899) ......................................................................... 34

*Pennhurst State Sch. & Hosp. v. Halderman,*
    465 U.S. 89 (1984) ........................................................................... 18

*Perry Capital LLC v. Mnuchin,*
    864 F.3d 591 (D.C. Cir. 2017) ........................................................ 29

*Presbyterian Church (U.S.A.) v. United States,*
    870 F.2d 518 (9th Cir. 1989) ........................................................... 30

*Puerto Rico v. United States,*
    490 F.3d 50 (1st Cir. 2007) ............................................................. 30

*Red Lake Band of Chippewa Indians v. Barlow,*
    846 F.2d 474 (8th Cir. 1988) ........................................................... 30

*Register.com, Inc. v. Verio, Inc.,*
    356 F.3d 393 (2d Cir. 2004) ............................................................ 47

*Sale v. Haitian Centers Council, Inc.,*
    509 U.S. 155 (1993) ......................................................................... 21

*Sierra Club v. Peterson,*
    228 F.3d 559 (5th Cir. 2000) ........................................................... 41

*Sierra Club v. U.S. Dep't of Interior,*
    990 F.3d 909 (5th Cir. 2021) ........................................................... 43

*South Carolina v. Baker,*
   485 U.S. 505 (1988) ................................................................ 37

*Steele v. City of Houston,*
   603 S.W.2d 786 (Tex. 1980) .................................................. 17

*Supreme Beef Processors, Inc., In re,*
   468 F.3d 248 (5th Cir. 2006) ................................................ 25

*Texas v. Becerra,*
   89 F.4th 529 (5th Cir. 2024) ................................................. 40

*Texas v. EEOC,*
   933 F.3d 433 (5th Cir. 2019) .................................................40

*Texas v. Kleinert,*
   855 F.3d 305 (5th Cir. 2017) ........................................ 34, 36, 38

*Treasurer of N.J. v. U.S. Dep't of Treasury,*
   684 F.3d 382 (3d Cir. 2012) ................................................ 29

*Trudeau v. FTC,*
   456 F.3d 178 (D.C. Cir. 2006) ............................................. 26

*U.S. Army Corps of Eng'rs v. Hawkes Co.,*
   578 U.S. 590 (2016) .............................................................. 39

*U.S. Postal Serv. v. Flamingo Indus. (USA) Ltd.,*
   540 U.S. 736 (2004) .............................................................. 33

*United States v. Chemical Found.,*
   272 U.S. 1 (1926) ................................................................... 24

*United States v. Cotton,*
   535 U.S. 625 (2002) .............................................................. 45

*United States v. New Mexico,*
   455 U.S. 720 (1982) .............................................................. 38

*United States v. S.A. Empresa de Viacao Aerea Rio Grandense (Varig Airlines),*
   467 U.S. 797 (1984) .............................................................. 31

*United States v. Texas,*
   599 U.S. 670 (2023) ............................... 21, 27-28, 42, 47-48, 48

*United States v. Washington*,
   596 U.S. 832 (2022) ................................................................................ 34

*United States ex rel. Drury v. Lewis*,
   200 U.S. 1 (1906) .................................................................................... 36

*United States Information Agency v. Krc*,
   989 F.2d 1211 (D.C. Cir. 1993) .............................................................. 29

*Vote.Org v. Callanen*,
   89 F.4th 459 (5th Cir. 2023) ................................................................... 10

*Watson v. Philip Morris Cos.*,
   551 U.S. 142 (2007) ................................................................................ 29

*Whirlpool Corp. v. Shenzhen Sanlida Elec. Tech. Co.*,
   80 F.4th 536 (5th Cir. 2023) ................................................................... 15

*Winter v. Natural Res. Def. Council, Inc.*,
   555 U.S. 7 (2008) .................................................................................... 51

## U.S. Constitution:

Art. VI, cl. 2 ................................................................................................. 33

## Treaty:

Treaty of Peace, Friendship, Limits, and Settlement with the Republic
   of Mexico, Mex.-U.S., art. V, Feb. 2, 1848, 9 Stat. 922, 926 ...........................5

## Statutes:

Act of Oct. 21, 1976,
   Pub. L. No. 94-574, 90 Stat. 2721 ..................................................................27

Administrative Procedure Act (APA):
   5 U.S.C. § 551(13) .................................................................... 39, 41
   5 U.S.C. § 701(a)(2) ................................................................. 13, 42
   5 U.S.C. § 702 ................................................... 12, 25, 26, 28, 30, 31
   5 U.S.C. § 704 ............................................................................. 39

6 U.S.C. § 211(c)(8) .................................................................... 4, 16

6 U.S.C. § 211(e)(3)(A)-(B) ................................................................ 4, 16

8 U.S.C. § 1101(a)(18) ........................................................................ 3

8 U.S.C. § 1103(a)(3) ................................................................ 3, 16, 45-46

8 U.S.C. § 1103(a)(5) ..................................................................... 3, 16

8 U.S.C. § 1158(a) ......................................................................... 5, 20

8 U.S.C. § 1225 ........................................................................... 11, 16

8 U.S.C. § 1225(a)(1) ...................................................................... 4, 20

8 U.S.C. § 1225(a)(3) ........................................................................ 4

8 U.S.C. § 1225(a)(4) ........................................................................ 5

8 U.S.C. § 1225(b)(1) ........................................................................ 5

8 U.S.C. § 1225(b)(1)(A) .................................................................... 5

8 U.S.C. § 1225(b)(1)(A)(ii) ............................................................... 20

8 U.S.C. § 1225(b)(2)(A) .................................................................... 5

8 U.S.C. § 1226 ........................................................................... 4, 5

8 U.S.C. § 1229a ............................................................................ 5

8 U.S.C. § 1229c ............................................................................ 5

8 U.S.C. § 1252(f)(1) ............................................................... 13, 43, 45

8 U.S.C. § 1325 ............................................................................. 5

8 U.S.C. § 1326 ............................................................................. 5

8 U.S.C. § 1357(a)(1)-(2) .................................................................... 4

8 U.S.C. § 1357(a)(1)-(3) ................................................................... 17

8 U.S.C. § 1357(a)(3) ........................................................... 5, 6, 10, 18, 40

8 U.S.C. § 1357(g) .......................................................................... 38

19 U.S.C. § 1630(a) ........................................................... 46

28 U.S.C. § 1292(a)(1) ........................................................ 3

28 U.S.C. § 1331 ........................................................... 2, 28

28 U.S.C. § 1346 ............................................................. 2

28 U.S.C. § 1346(b) ......................................................... 31

28 U.S.C. § 1356 ............................................................. 2

28 U.S.C. § 1357(a)(3) .................................................. 11, 45-46

28 U.S.C. § 1367 ............................................................. 3

28 U.S.C. § 1442 ........................................................... 29

28 U.S.C. § 2680(a) ......................................................... 31

## Regulations:

8 C.F.R. § 1.2 ............................................................. 3, 4

8 C.F.R. § 287.1(c) .......................................................... 5

## Legislative Materials:

98 Cong. Rec. 1420 (1952) .................................................. 17

H.R. Rep. No. 82-1377 (1952) .............................................. 17

H.R. Rep. No. 94-1656 (1976) ................................. 27, 28, 29, 32, 33

S. Rep. No. 94-996 (1976) .................................... 27, 28, 29, 32, 33

*Sovereign Immunity: Hearing on S. 3568 Before the Subcomm. on Admin. Practice & Procedure of the S. Comm. on the Judiciary*, 91st Cong. 138 (1970) ................................. 32

## Other Authorities:

CBP:
   *National Standards on Transport, Escort, Detention, and Search* (Oct. 2015),
      https://perma.cc/6KRP-2XTH ............................................... 22

*Nationwide Enforcement Encounters: Title 8 Enforcement Actions and*
    *Title 42 Expulsions Fiscal Year 2024*,
    https://www.cbp.gov/newsroom/stats/cbp-enforcement-
    statistics/title-8-and-title-42-statistics ...................................................................21-22
Press Release (June 1, 2023), https://perma.cc/B8HP-9N32 ......................................21

*Consideration of Claim of City of Cleveland Under Act of December 28, 1922, C. 17,*
    *42 Stat. 1066*,
    38 Op. Att'y Gen. 514 (1936) .......................................................................... 46
Gov't of Mex.:
    *Information Note No. 04* (July 14, 2023), https://perma.cc/V72L-GTXE ................. 50
    *Information Note No. 05* (July 26, 2023), https://perma.cc/F932-U9T9 ...................50

Office of the Immigration Detention Ombudsman,
    *OIDO Inspection: Eagle Pass Soft-Sided Facility* (Nov. 14, 2023),
    https://perma.cc/T5MA-PHJD .......................................................................................23

## INTRODUCTION

In recent months, Texas began installing concertina wire (a type of coiled razor wire) along the Rio Grande's banks in the vicinity of Eagle Pass, Texas. Because the international border lies in the river, noncitizens who approach the wire from the river have already entered the United States. The wire can impede United States Border Patrol agents from apprehending and inspecting these individuals in U.S. territory, as well as from rendering emergency assistance to individuals drowning in the river or experiencing medical distress on the riverbank. Consistent with their express authority and longstanding practice—with respect to any barriers to the border, no matter the owner—Border Patrol agents sometimes cut or move Texas's wire to access the migrants.

Texas appeals the district court's denial of a preliminary injunction prohibiting Border Patrol agents from disturbing Texas's wire, primarily pressing state-law claims for trespass to chattels and conversion. The fundamental question presented is thus whether a single state, upon becoming dissatisfied with federal policies, may bring a state-law suit to control the manner in which federal officials carry out federal law. Texas claims that it (or apparently any other property owner) may use state tort law to prohibit Border Patrol agents from cutting or moving concertina-wire fencing that stands between agents and the border, despite a federal law guaranteeing access to border-adjacent land. Texas's sweeping theory is a roadmap for any state to impose its policy choices on the federal government, turning the Supremacy Clause on its

head and standing contrary to centuries of Supreme Court precedent. This Court should decline Texas's invitation to impose an injunction so utterly foreign to our nation's history and destructive of our constitutional order.

The equities also weigh heavily against the extraordinary relief Texas seeks. An injunction tying federal law-enforcement officers' hands would flout the Supremacy Clause, undermine the federal government's statutory authority and foreign and domestic accountability, and interfere with Border Patrol agents' specific, context-dependent decisions about how to enforce federal immigration laws under difficult circumstances at the border. Officer discretion in such situations is key, not least because while Texas believes that a medical-emergency exception permits federal agents to address life-threatening situations, the many minutes it can take to cut through Texas's dense layers of razor wire can mean that by the time an emergency is apparent, it is too late. Against such harms, Texas invokes the price of its wire, a form of monetary harm for which it has never attempted to seek compensation through the statutory means Congress established.

The Supreme Court has already vacated this Court's injunction pending appeal, applying a standard substantially similar to the standard governing a preliminary injunction. This Court should affirm the denial of preliminary injunctive relief.

## STATEMENT OF JURISDICTION

Texas invoked the district court's jurisdiction under 28 U.S.C. §§ 1331, 1346, and 1356. ROA.18. The district court exercised supplemental jurisdiction over

2

Texas's state-law claims under 28 U.S.C. § 1367.  ROA.939 n.8.  The district court

denied a preliminary injunction on November 29, 2023.  ROA.927-60.  Texas timely

appealed on November 30, 2023.  ROA.966.  This Court has jurisdiction under 28

U.S.C. § 1292(a)(1).

## STATEMENT OF THE ISSUE

Whether the district court abused its discretion in denying a preliminary

injunction that would prohibit U.S. Border Patrol agents from disturbing concertina

wire that Texas has installed near the international border in Eagle Pass, Texas, even

where those agents do so to carry out activities authorized under federal law.

## STATEMENT OF THE CASE

### A.    Statutory Background

The Secretary of Homeland Security has "the power and duty to control and

guard the boundaries and borders of the United States against the illegal entry of

aliens."[1]  8 U.S.C. § 1103(a)(5).  The Secretary may "establish such regulations" and

"perform such other acts as he deems necessary for carrying out his authority under [8

U.S.C. §§ 1101-1537]."  *Id.* § 1103(a)(3).  Employees authorized by the Secretary to

enforce the Immigration and Nationality Act (INA) are known as immigration

officers.  *Id.* § 1101(a)(18); 8 C.F.R. § 1.2.

---

[1] Federal law refers to foreign nationals as "aliens."  The Department of
Homeland Security typically refers to such persons as "noncitizens."  *See Barton v. Barr*,
140 S. Ct. 1442, 1446 n.2 (2020).

3

U.S. Customs and Border Protection (CBP), an agency within the Department of Homeland Security (DHS), is charged with "enforc[ing] and administer[ing] all immigration laws," including "the inspection, processing, and admission of persons who seek to enter" the United States and "the detection, interdiction, removal … and transfer of persons unlawfully entering … the United States." 6 U.S.C. § 211(c)(8). U.S. Border Patrol is "the law enforcement office of [CBP] with primary responsibility for interdicting persons attempting to illegally enter … the United States" and for "deter[ring] and prevent[ing] the illegal entry of terrorists, terrorist weapons, persons, and contraband." *Id.* § 211(e)(3)(A)-(B).

Congress has provided that a noncitizen "present in the United States who has not been admitted or who arrives in the United States (whether or not at a designated port of arrival …)" is "deemed … an applicant for admission." 8 U.S.C. § 1225(a)(1). The INA instructs immigration officers, including Border Patrol agents, to "inspect[]" all such applicants. *Id.* § 1225(a)(3); *see also id.* § 1226 (authorizing apprehension and detention); 8 C.F.R. § 1.2. Border Patrol agents also have authority, without a warrant, "to interrogate any alien or person believed to be an alien as to his right to be or to remain in the United States" and "to arrest any alien who in his presence or view is entering or attempting to enter the United States in violation of any law" where the individual is likely to abscond. 8 U.S.C. § 1357(a)(1)-(2). And "within a distance of twenty-five miles from any" external boundary of the United States, Border Patrol agents shall (again, without a warrant) "have access to private lands, but not dwellings,

4

for the purpose of patrolling the border to prevent the illegal entry of aliens into the United States." *Id.* § 1357(a)(3).[2]

Congress has specified the procedures under which noncitizens may be removed or permitted to depart. *See, e.g.*, 8 U.S.C. §§ 1225(a)(4) (withdrawal), 1225(b)(1)(A) (expedited removal), 1229a (removal proceedings), 1229c (voluntary departure). Inadmissible noncitizens may be detained or released pending removal proceedings and removal. *Id.* §§ 1225(b)(1), 1225(b)(2)(A), 1226, 1229a. With limited exceptions, Congress has also specified that noncitizens may apply for asylum, whether or not they arrive at a designated port of arrival. *Id.* § 1158(a). Noncitizens who enter or attempt to enter the United States unlawfully may be subject to criminal prosecution. *E.g.*, *id.* §§ 1325, 1326. No immigration authority exists, however, under which Border Patrol agents may physically force noncitizens who have entered the United States immediately back across the border.

## B.    Factual Background

The international border near Eagle Pass lies in the Rio Grande. *See* Treaty of Peace, Friendship, Limits, and Settlement with the Republic of Mexico, Mex.-U.S., art. V, Feb. 2, 1848, 9 Stat. 922, 926. In order to deter illegal entry and intercept individuals who "enter illegally before they can move to the interior of the United

---

[2] "[P]atrolling the border to prevent the illegal entry of aliens into the United States … means conducting such activities as are customary, or reasonable and necessary, to prevent the illegal entry of aliens into the United States." 8 C.F.R. § 287.1(c) (emphasis omitted).

States," Border Patrol agents patrol areas between ports of entry, including along the 245-mile stretch of border in the Del Rio Sector.  ROA.621-22; ROA.1212 (1,600 agents in this sector).  Agents apprehend noncitizens unlawfully crossing the river, process and inspect them, and in appropriate circumstances place them in removal proceedings.  ROA.621-22.

CBP has long advised agents to coordinate with landowners when encountering locks, fences, and other barriers to the border.  ROA.622.  As the district court recognized, however, agents are authorized under 8 U.S.C. § 1357(a)(3) to cut locks or remove barriers if necessary to access private lands adjoining the border.  ROA.948-49.  An official Texas calls its "Border Czar," ROA.1085, agreed that Border Patrol agents are "allowed to cut locks on gates" if "in their judgment they feel it necessary" to apprehend a migrant.  ROA.1137.

In 2021, Texas "launched Operation Lone Star to mitigate the effects" of increased border crossings.  ROA.23.  As part of that initiative, Texas has placed concertina wire along the border, including near the riverbank in Eagle Pass. ROA.24, 26; *see* ROA.871 (deployment in Del Rio Sector began in June 2023).  Texas placed this wire on the riverbank and across gates that provide river access. ROA.623.  Because the wire is on the U.S. side of the Rio Grande, noncitizens approaching the wire from the river are already in the United States.  ROA.622-23, 1153.  Texas has also installed wire running "vertically down all the way to the water," spaced about "every half a mile."  ROA.1152.

The wire can prevent agents from apprehending and inspecting noncitizens within the United States.  ROA.623-24, 1214-15; *see* ROA.874 ("[i]nhibits agents from effectively and efficiently apprehending" migrants, who "are exposed to the elements for hours while waiting on the riverbank"); ROA.889 ("resulted in a decrease in border patrol mobility in the area" and "increased safety risk to agents and migrants"); ROA.1171 (impedes access to migrants, increases response time in emergencies, and causes injury to agents).  The wire can also obstruct agents from providing emergency assistance to migrants in the river or on the riverbank.  *See* ROA.1192 (recounting "incident where a paraplegic individual was brought across the river by his brother," and they "could not make it up the river bank"); ROA.921 (agent saw "an unconscious subject floating on top of the water" but was "unable to retrieve or render aid to the subject due to the concertina wire barrier placed along the riverbank").  Border Patrol has only a few boats in the area, each of which can carry only three to six additional passengers, can operate only during daylight hours, and can take approximately ten minutes to travel one and a half to two miles from the city boat ramp, in addition to any launch-related delays.  ROA.1155-57; Supplemental Memorandum App. 5a., *Dep't of Homeland Sec. v. Texas*, No. 23A607 (U.S. Jan. 12, 2024); ROA.1173 (testimony that Texas had "put a chain around the gate to access the boat ramp," which can "dramatically increase[]" deployment and response time); *see also infra* pp. 10-11 (describing additional recent interference with Border Patrol's access to boat ramp).

7

Consistent with longstanding practice, Border Patrol agents have sometimes cut or moved the wire to perform their duties, such as "properly intak[ing]" migrants suspected of unlawful entry and rendering "immediate first aid." ROA.881-82; *see* ROA.622-24. No policy requires it; instead, guidance within Eagle Pass (a) reminds agents of their existing authority to cut locks or fences impeding border access in order to carry out their duties; (b) provides that agents should call a supervisor before cutting the wire, absent exigent circumstances; and (c) provides that if exigent circumstances exist or a supervisor is unavailable, agents should use their judgment regarding how to proceed. *See* ROA.624-25, 881-82, 1163-67, 1212-13.

Federal agents have endeavored to cooperate with state personnel. *See, e.g.,* ROA.881 (email advising agents to "[c]ontinue to remain professional with our partners"); ROA.882, 885 (noting that supervisors should be alerted after wire-cutting so they can "make proper notifications" to Texas, including GPS coordinates, description, and time); ROA.1196 (describing notifications to Texas after wire is cut); ROA.891 (Border Patrol email describing Texas notifying Border Patrol of migrants in dangerous situation on riverside, where agents cut the wire "after clearing it with DPS" and "processed" the migrants "without incident"). But even though Texas personnel themselves cut the wire to address "medical emergencies" and "make arrests" when migrants engage in violent conduct, ROA.1135, they have threatened to arrest Border Patrol agents who do so, ROA.871, 901.

### C.    Prior Proceedings

On October 24, 2023, Texas filed a complaint asserting state-law conversion and trespass claims, as well as nonstatutory and Administrative Procedure Act (APA) claims. ROA.14-43. On October 30, 2023, the district court entered an *ex parte* temporary restraining order (TRO) enjoining defendants from "removing the [wire] [in Eagle Pass, Texas] from its present location," ROA.292, except in the event of "any medical emergency that mostly likely results in serious bodily injury or death to a person, absent any boats or other life-saving apparatus available to avoid such medical emergencies prior to reaching the concertina wire barrier," ROA.285. The court based that order on its conclusion that Texas was "likely to succeed on its trespass to chattels claim" under state law. ROA.286.

The district court held a hearing on November 7, 2023. ROA.1027-1260. Two days later, it extended the TRO through November 27 and ordered the government to produce voluminous materials, including "any and all documents … among United States Border Patrol" that referenced "Plaintiff's concertina wire barriers." ROA.736-37. The district court held a second hearing on November 27, 2023. ROA.1339-1434.

On November 29, 2023, the district court denied Texas's motion for a preliminary injunction. ROA.927-65. With respect to Texas's state-law claims, it explained that the United States had not waived its sovereign immunity. ROA.939-46. It further rejected Texas's *ultra vires* claim that the federal government had "no

colorable basis for the challenged actions," ROA.959-60, noting that Border Patrol

"has long made use of [8 U.S.C. § 1357(a)(3)] to move or cut privately owned fencing

within 25 miles of the international border when exigencies arise," ROA.948. And it

rejected Texas's APA claims, finding "insufficient evidence of final agency action."

ROA.959.

On December 4, 2023, Texas sought an injunction pending appeal and a

temporary administrative injunction from this Court. A motions panel granted Texas

administrative relief that day, Dkt. 38-2, and on December 19, 2023, it entered an

injunction pending appeal, Dkt. 49-2. The injunction barred the government from

"damaging, destroying, or otherwise interfering with Texas's c[oncertina]-wire fence in

the vicinity of Eagle Pass, Texas," other than "if necessary to address any medical

emergency as specified in the TRO." Dkt. 49-2 at 14. Like the district court's TRO,

the injunction pending appeal rested solely on state law. *Id.* at 12.[3]

On January 2, 2024, the government moved to vacate the injunction in the

Supreme Court. *See* Application, *Dep't of Homeland Sec. v. Texas*, No. 23A607 (U.S. Jan.

2, 2024). In a supplemental filing, the government explained that after it filed its

application, Texas had erected new barriers, including concertina wire, that severely

restricted Border Patrol's access to the land surrounding the original concertina-wire

---

[3] The motions panel order, while published, would not bind the merits panel even had it not been vacated. *See, e.g., Vote.Org v. Callanen*, 89 F.4th 459, 469 (5th Cir. 2023).

barriers by the river—as well as the boat ramp from which Border Patrol launches its airboats—along a 2.5-mile stretch of the border near Shelby Park. *See* Supplemental Memorandum, No. 23A607 (U.S. Jan. 12, 2024). Several days later, Texas restored some Border Patrol access to the boat ramp, but it has continued to significantly restrict Border Patrol's access to the land near the border along this 2.5-mile stretch. *See* Second Supplemental Memorandum, No. 23A607 (U.S. Jan. 15, 2024).

On January 22, 2024, the Supreme Court vacated this Court's injunction. *See* Order, No. 23A607 (U.S. Jan. 22, 2024).

## SUMMARY OF ARGUMENT

The district correctly denied Texas's motion for a preliminary injunction. The denial was proper for reasons the district court gave, as well as for independent grounds it did not reach.

The district court correctly recognized that Border Patrol agents have statutory authority to disturb barriers to the border to perform their functions under federal law. Congress provided that immigration officers shall inspect all applicants for admission, including those who entered the country unlawfully, *see* 8 U.S.C. § 1225, and it granted officers warrantless authority to "access … private lands" within 25 miles of the border "for the purpose of patrolling the border," *id.* § 1357(a)(3). The district court agreed that "DHS has long made use" of Section 1357(a)(3) "to move or cut privately owned fencing within 25 miles of the international border when exigencies arise." ROA.948.

11

The district court also correctly determined that Texas could not invoke state tort law to prohibit Border Patrol from performing these functions under federal law. As it explained, 5 U.S.C. § 702 does not waive the United States's sovereign immunity from state-law claims seeking injunctive relief.  ROA.939-46.  This provision does not waive immunity to state-law claims as a general matter, and it expressly does not apply when "any other statute that grants consent to suit expressly or impliedly forbids the relief which is sought."  5 U.S.C. § 702.  Texas therefore may not use the APA to "end-run" the limits on state tort claims imposed by the Federal Tort Claims Act. *Match-E-Be-Nash-She-Wish Band of Pottawatomi Indians v. Patchak*, 567 U.S. 209, 216 (2012).

Even if there were a waiver of sovereign immunity, under the Supremacy Clause, Texas still could not use its own law to regulate federal law-enforcement officers exercising federal authority.  That conclusion follows from centuries of Supreme Court precedent: Maryland could not tax the Bank of the United States (*McCulloch v. Maryland*, 17 U.S. (4 Wheat.) 316 (1819)), or enforce its driver's license laws against federal postal workers delivering mail (*Johnson v. Maryland*, 254 U.S. 51 (1920)); California could not prosecute a Deputy U.S. Marshal for his actions protecting a Supreme Court Justice (*In re Neagle*, 135 U.S. 1, 75 (1890)); and Arizona could not superimpose its own approval process on a congressionally authorized dam-construction project (*Arizona v. California*, 283 U.S. 423 (1931)).  So too here: Texas

12

cannot use state tort law to restrain federal Border Patrol agents from carrying out their federal duties.

The district court also correctly rejected Texas's APA claims. There is no reviewable policy requiring Border Patrol agents to cut Texas's wire; guidance primarily restricts the circumstances under which agents are permitted to cut the concertina wire without supervisor approval, while otherwise reminding them to use their judgment. Beyond that, the decision whether to cut concertina wire in any particular instance goes to the core of law-enforcement discretion and is thus unreviewable under 5 U.S.C. § 701(a)(2). Nor is it arbitrary or capricious for Border Patrol agents to cut Texas's wire where necessary to reach the border and migrants who have crossed it.

An independent impediment to injunctive relief exists in 8 U.S.C. § 1252(f)(1). Under that provision, lower courts generally lack "jurisdiction or authority to enjoin or restrain the operation" of 8 U.S.C. §§ 1221-1231—the INA provisions "governing the inspection, apprehension, examination, and removal of aliens." *Garland v. Aleman Gonzalez*, 596 U.S. 543, 549-50 (2022). This provision "prohibits lower courts from entering injunctions that order federal officials to take or to refrain from taking actions to enforce, implement, or otherwise carry out the specified statutory provisions," *id.* at 550, as an injunction interfering with Border Patrol's ability to inspect and apprehend migrants in the United States would do.

13

Finally, the equities weigh overwhelmingly against an injunction, which would upend our constitutional structure and interfere with agents' specific, context-dependent decisions about how to enforce federal immigration laws while maintaining public safety under difficult circumstances at the border.  Balanced against these harms, Texas invokes damage to its wire, a monetary injury for which it has never even attempted to seek compensation.  And to the extent that Texas seeks a remedy for its larger dissatisfaction with federal immigration policy, the district court correctly recognized that under Supreme Court precedent, Texas cannot claim a judicially reviewable injury based on such grievances; standing is not dispensed in gross, and any remedy here must redress the actual wire-based injury on which Texas has established standing.

## STANDARD OF REVIEW

A preliminary injunction is an "extraordinary remedy" "warranted only when the movant shows '(1) a substantial likelihood of success on the merits, (2) irreparable injury if the injunction is not granted, (3) that the injury outweighs any harm to the other party, and (4) that granting the injunction will not disserve the public interest.'" *CAE Integrated, LLC v. Moov Techs., Inc.*, 44 F.4th 257, 261 (5th Cir. 2022) (per curiam). In governmental cases, harm to the government and the public interest merge.  *Nken v. Holder*, 556 U.S. 418, 435 (2009).

This Court reviews the "denial of a preliminary injunction for abuse of discretion, with any underlying legal determinations reviewed *de novo* and factual

findings for clear error." *Whirlpool Corp. v. Shenzhen Sanlida Elec. Tech. Co.*, 80 F.4th 536, 543 (5th Cir. 2023) (quotation omitted).

## ARGUMENT

This Court should affirm the district court's denial of preliminary injunctive relief: Texas cannot succeed on the merits, and the equities overwhelmingly favor the federal government. Indeed, the Supreme Court—under a substantially similar standard, *see, e.g.*, *Hollingsworth v. Perry*, 558 U.S. 183, 190 (2010) (per curiam)—recently vacated this Court's injunction pending appeal. This Court should reject Texas's request to direct entry of a preliminary injunction that would simply echo the injunction the Supreme Court has already vacated.

## I.    Texas Cannot Establish A Likelihood Of Success On The Merits Of Its *Ultra Vires*, State-Law, Or APA Claims.

The district court correctly concluded that Texas is unlikely to succeed on any of the claims on which the state rested its request for a preliminary injunction. First, Texas's *ultra vires* claim that Border Patrol agents lack any colorable basis for disturbing the wire barrier Texas has placed next to the international border is baseless; as the district court observed, federal officials have long exercised their statutory authority to eliminate obstacles to the border in order to perform their functions under federal law. ROA.948, 959-60. Second, Texas may not invoke state tort law to impede federal officials' implementation of federal law, both as a matter of sovereign immunity and under the straightforward operation of the Supremacy

Clause.  Finally, federal agents' day-to-day execution of their functions under federal immigration law is unreviewable under the APA.  ROA.957-59.

### A.   Federal Law Authorizes Border Patrol Agents To Cut Concertina Wire To Carry Out Their Duties.

1.   Congress has granted DHS "the power and duty to control and guard the boundaries and borders of the United States against the illegal entry of [noncitizens]" and to "perform such other acts as … necessary for carrying out [t]his authority."  8 U.S.C. § 1103(a)(3), (5).  Within DHS, Congress gave CBP authority to "enforce and administer all immigration laws," including those regarding "the inspection, processing, and admission of persons who seek to enter" the United States and "the detection, interdiction, removal … and transfer of persons unlawfully entering, or who have recently unlawfully entered, the United States."  6 U.S.C. § 211(c)(8).  And within CBP, Congress made Border Patrol "the law enforcement office … with primary responsibility for interdicting persons attempting to illegally enter … the United States" and for "deter[ring] and prevent[ing] the illegal entry of terrorists, terrorist weapons, persons, and contraband."  *Id.* § 211(e)(3)(A)-(B). Congress specifically provided for immigration officers, such as Border Patrol agents, to inspect all applicants for admission.  *See* 8 U.S.C. § 1225; 8 C.F.R. § 1.2.

In addition to these capacious authorities, Congress gave Border Patrol specific powers to carry out its mission.  By statute, agents may—without a warrant— "interrogate" suspected noncitizens regarding their right to remain in the United

16

States, arrest certain noncitizens "who in [their] presence or view [are] entering or attempting to enter the United States in violation of any law or regulation," and "access … private lands" within 25 miles of the international border "for the purpose of patrolling the border to prevent the illegal entry of aliens." 8 U.S.C. § 1357(a)(1)-(3).[4] Congress granted immigration officers authority to access private lands because "the refusal of some property owners along the border to allow patrol officers access" to their land was "endanger[ing] the national security" and "affect[ing] the sovereign right of the United States to protect its own boundaries against the entry of [noncitizens], including those of the most dangerous classes." H.R. Rep. No. 82-1377, at 3 (1952); *see also* 98 Cong. Rec. 1420 (1952) (statement of Rep. Fisher) (opposing legislation because it would authorize agents "to break down a gate or a fence or anything else in order to carry out their functions of patrolling the border"). As the district court recognized, "DHS has long made use" of Section 1357(a)(3) "to move or cut privately owned fencing within 25 miles of the international border when exigencies arise." ROA.948.

---

[4] Even apart from specific statutes, authority to cut or move wire blocking access to the border and to migrants within the United States inheres in Border Patrol's general authorities. *See* H.R. Rep. No. 82-1377, at 3 (1952) (recognizing that Section 1357(a)(3) was a "positive legislative enactment authoriz[ing] specifically that which must always have been of necessity implied from the time the border patrol was first created"); *Steele v. City of Houston*, 603 S.W.2d 786, 792-93 (Tex. 1980) (recognizing government may defend its "destruction of … property as a means to apprehend escapees [a]s a classic instance of police power" by showing "public necessity").

Because Texas's concertina wire stands between Border Patrol agents and the border they are charged with patrolling and the noncitizens they are charged with apprehending and inspecting, agents cut or move the wire in some circumstances. ROA.624. Such actions are plainly authorized by 8 U.S.C. § 1357(a)(3), to say nothing of DHS and Border Patrol's more general statutory authority. Indeed, if federal officials could not cut concertina wire to access noncitizens within twenty-five miles of the border, any jurisdiction opposed to immigration enforcement—or even any individual property owner—could enclose a large area in order to impede federal agents from enforcing federal law. That result has no plausible basis in law, and unsurprisingly, both Texas and the district court disclaimed it. *See* ROA.934, 1136-37.

The district court thus properly rejected Texas's *ultra vires* claims. ROA.959-60. To bring an *ultra vires* claim, "a plaintiff must do more than simply allege that the actions of the officer are illegal or unauthorized." *Danos v. Jones*, 652 F.3d 577, 583 (5th Cir. 2011) (quotation omitted). Rather, "[t]he complaint must allege facts sufficient to establish that the officer was acting 'without any authority whatever,' or without any 'colorable basis for the exercise of authority.'" *Id.* (quoting *Pennhurst State Sch. & Hosp. v. Halderman*, 465 U.S. 89, 101 n.11 (1984)). Texas did not meet this "high bar." ROA.959.

2.      To the extent Texas suggests that the district court required it to establish final agency action in connection with its *ultra vires* claim, it errs. *See* Br. 31-

18

32; ROA.959.  Nor did the court rely on any zone-of-interests principles.  *Compare* Br. 33 *with* ROA.938, 959-60.

More fundamentally, Texas argues that Border Patrol agents "destroy [Texas's] property for reasons having nothing to do with enforcing federal law."  Br. 29.  That is an astonishing accusation to levy at law-enforcement professionals who have served their country in difficult and often dangerous conditions across multiple administrations.  ROA.620, 1144.  And it fundamentally mistakes the nature of *ultra vires* review, in which courts look only to whether there exists a "colorable basis"—not what the challenger considers proper motive or good policy—"for the exercise of [the challenged] authority."  *Danos*, 652 F.3d at 583 (quotation omitted).  In any event, even were there any basis for such a charge—and there is not, *see infra* pp. 22-24—a belief that agents sometimes cut through Texas's wire for unauthorized purposes could not justify Texas's request for an injunction barring nearly all wire cutting, even in cases where such cutting is for authorized purposes.

3.    Texas also errs in suggesting (Br. 29-33) that the district court's belief that Border Patrol's motives for wire-cutting lacked a statutory basis rested on factual findings.  While the court plainly took issue with various aspects of federal officials' choices, the district court relied on incorrect *legal* conclusions in deciding that Border Patrol agents could not "justif[y] … their series of decisions to cut or move [Texas's] fence[] … to discharge their statutory obligation to inspect, apprehend, and detain individuals unlawfully entering the United States."  ROA.946-47; *see* ROA.954

19

(opining that "Defendants cannot claim the statutory duties they are so obviously derelict in enforcing" and that their "practices … directly contravene those same statutory obligations").

Specifically, the district court concluded that Border Patrol has the authority to "direct illegal entrants to return to Mexico" even after they have entered the United States, so long as they are "detained shortly after unlawful entry."  ROA.949-50 (quotation omitted); *see* ROA.946-52, 949 n.10.  The court further relied on unlawful entry's status as a federal crime, suggesting that Border Patrol agents are obligated to immediately arrest or impose other "criminal or immigration consequences" on those unlawfully entering in order to justify wire-cutting.  *See* ROA.949-53, 949 n.10.

Texas does not attempt to defend these startling legal conclusions—and for good reason.  The district court's view that Border Patrol can "turn migrants … back across the border into Mexico" without any type of immigration processing, ROA.950, contravenes Congress's explicit direction in the INA that a noncitizen "present in the United States who has not been admitted or who arrives in the United States (whether or not at a designated port of arrival …)" is "deemed … an applicant for admission" with certain statutory rights, including to apply for asylum.  8 U.S.C. § 1225(a)(1); *see also id.* §§ 1225(b)(1)(A)(ii), 1158(a).  While entering the country outside a port of entry is a crime, even "an alien who tries to enter the country illegally is treated as an 'applicant for admission,'" *DHS v. Thuraissigiam*, 140 S. Ct. 1959, 1982 (2020).  Individuals who are promptly apprehended may be sufficiently "on the

threshold" that they lack constitutional due process rights, but they retain "those rights regarding admission that Congress has provided by statute." *Id.* at 1983 (quotation omitted). Thus, once migrants are "located 'in the United States,'" the government "cannot unilaterally return" them "to Mexico," *Biden v. Texas*, 597 U.S. 785, 806 (2022), regardless of what arrest and prosecution decisions might later follow—a matter plainly not at issue here or subject to judicial review at Texas's behest, *see United States v. Texas*, 599 U.S. 670 (2023).[5]

The district court further erred as a legal matter in construing Border Patrol's statutory responsibilities to apprehend and inspect noncitizens. In concluding that Border Patrol did not cut the wire in furtherance of those responsibilities, the district court appeared to demand that Border Patrol take immediate physical custody of migrants once they crossed the wire. That is plainly inconsistent with what the statutory responsibilities entail. Apprehension includes "temporary detainment," CBP, *Nationwide Enforcement Encounters: Title 8 Enforcement Actions and Title 42 Expulsions Fiscal Year 2024*, https://www.cbp.gov/newsroom/stats/cbp-enforcement-

---

[5] In *Sale v. Haitian Centers Council, Inc.,* 509 U.S. 155 (1993), which the district court invoked, ROA.950, vessels transporting passengers from Haiti were intercepted "'beyond the territorial sea of the United States'"; migrants had not yet reached U.S. territory. *Sale,* 509 U.S. at 158. The reports of "turn backs" the district court cited, ROA.951-52, involved noncitizens who voluntarily turned back after crossing the border, consistent with the statutory definition of that phrase. *See* CBP, Press Release (June 1, 2023), https://perma.cc/B8HP-9N32; 6 U.S.C. § 223(a)(9) (defining "turn back" to mean "an unlawful border crosser who, after making an unlawful entry into the United States, responds to United States enforcement efforts by returning promptly to the country from which such crosser entered").

statistics/title-8-and-title-42-statistics, and detention includes "[r]estraint from freedom of movement," CBP, *National Standards on Transport, Escort, Detention, and Search* 28 (Oct. 2015), https://perma.cc/6KRP-2XTH.  Under a correct application of those definitions, Border Patrol apprehended noncitizens when they exited the river, as they were not free to proceed further into the United States.  *See, e.g.*, ROA.1145-46, 1195-96 (describing agents directing noncitizens to a staging area for processing, along a narrow direct road bounded by the concertina wire on one side and fencing on the other, in an area with law-enforcement officers present).

4.     In any event, any factual finding that federal officials cut through Texas's wire for unauthorized purposes would have been clearly erroneous.  As reflected in the overwhelming evidence before the district court—including internal Border Patrol documents predating this suit—agents cut the wire to patrol the border; facilitate apprehension, inspection, and processing of migrants; and provide emergency assistance.  *See, e.g.*, ROA.624, 1213; *see also* ROA.881-82 (June 2023 Border Patrol email noting that "[i]f migrants have made landfall … we are required to respond and establish citizenship," and that Texas is aware of Border Patrol's "obligation to respond and take subjects into our custody"); ROA.891 (July 2023 email describing migrants "processed without incident" after Texas notified agents "river was rising [and] endangering the subjects"); ROA.895 (wire cut "for a group which included small children"); ROA.896 (wire cut "to free a mother and 2 kids"); ROA.900 (July 2023 email regarding Border Patrol agent advising Texas officials "that I needed to

bring those subjects up to the tents as they have already made illegal entry and we are obligated by law to apprehend them").

The evidence regarding a wire-cutting incident on September 20, 2023, does not demonstrate any improper purpose, nor do the district court's criticisms of the Border Patrol's actions in a video from that day constitute the type of factual findings that Texas suggests. *See* ROA.935 (discussing only a lack of "*apparent* purpose" in the video (emphasis added)). The court observed that the video did not show migrants being "interviewed, questioned as to citizenship, or in any way hindered in their progress into the United States," ROA.935, but the court made no findings regarding whether Border Patrol performed or intended to perform these functions in a place, or at a time, not depicted in the video. Similarly, while Texas claims that on the day of the video, nearly "2,000 … aliens were never processed" and became "gotaways," Br. 38 (quotation omitted), the court made no such finding. Rather, it only noted the disparity between Texas's asserted count of migrants entering the country and Border Patrol's processing figure from one local station that day. *See* ROA.936, 953 n.13.

Numerous other factors could explain any discrepancy, including that processing a large group of migrants may take more than a single day. *E.g.,* Office of the Immigration Detention Ombudsman, *OIDO Inspection: Eagle Pass Soft-Sided Facility* 3 (Nov. 14, 2023), https://perma.cc/T5MA-PHJD (noting that an Eagle Pass processing center includes "hold rooms" "intended for short-term detention, generally under 72 hours, while individuals are processed and/or transferred for

23

removal, detention, or prosecution"). The record does not show the time it took to process those who entered on September 20, but Texas's witness acknowledged that he never actually saw any migrants fleeing to the interior of the country. ROA.1138-39. And given the difficult and dangerous circumstances along the riverbank that day, *see* ROA.1149-51, 1155-56, 1175, Texas's attempt to question Border Patrol agents' exercise of their discretion is entirely unwarranted, especially in light of the "presumption of regularity" that "supports the official acts of public officers," *United States v. Chemical Found.*, 272 U.S. 1, 14 (1926), as well as the general reluctance to endorse "unrealistic second-guessing" of law-enforcement officers operating "in a swiftly developing situation," *United States v. Sharpe*, 470 U.S. 675, 686 (1985).

### B.     The Federal Government Cannot Be Enjoined Under State Tort Law.

It is a foundational constitutional principle that the federal government is not bound by the laws of any state in its implementation of federal law. That principle is reflected in the multiple legal barriers to this suit. Most basically, it is embodied in the deeply rooted principle that under the Supremacy Clause, state laws cannot control the activities of federal agents exercising federal authority. Consistent with that fundamental aspect of the Supremacy Clause, Congress has never waived the United States' sovereign immunity from suits seeking injunctions under state tort law. Under either principle, the injunction Texas seeks is impermissible.

### 1.     Sovereign Immunity Bars Suits Against The United States Seeking Injunctive Relief Under State Tort Law.

"The federal government enjoys complete sovereign immunity except as it has consented to be sued and consented to submit to liability." *In re Supreme Beef Processors, Inc.*, 468 F.3d 248, 255 (5th Cir. 2006) (en banc).  A waiver of sovereign immunity must be "strictly construed, in terms of its scope, in favor of the sovereign," *Lane v. Pena*, 518 U.S. 187, 192 (1996), and Congress must "provide[] 'clear and unambiguous' authorization" to permit state law to regulate federal activities, *Goodyear Atomic Corp. v. Miller*, 486 U.S. 174, 180 (1988).  The district court correctly held that no such waiver applies to Texas's state-law claims.  ROA.939-46.

### a.     5 U.S.C. § 702 Does Not Waive The United States's Sovereign Immunity From State-Law Claims.

Texas contends (Br. 16-28) that 5 U.S.C. § 702 waives the United States's sovereign immunity from state-law claims such that it may seek an injunction requiring Border Patrol to conform its activities to what would be permitted by Texas common law.  Section 702, however, says nothing about state law, providing as relevant here:

> An action in a court of the United States seeking relief other than money damages and stating a claim that an agency or an officer or employee thereof acted or failed to act in an official capacity or under color of legal authority shall not be dismissed nor relief therein be denied on the ground that it is against the United States or that the United States is an indispensable party. … Nothing herein … confers authority to grant relief if any other statute that grants consent to suit expressly or impliedly forbids the relief which is sought.

5 U.S.C. § 702. This and other courts have concluded that this waiver extends to suits under federal law even when the plaintiff is not using the "APA['s] generic cause of action." *Trudeau v. FTC*, 456 F.3d 178, 186-88 (D.C. Cir. 2006) (quotation omitted); *see, e.g.*, *Alabama-Coushatta Tribe of Tex. v. United States*, 757 F.3d 484, 489 (5th Cir. 2014).

Reading Section 702 to permit suits under any federal law, however, is very different from reading it to permit suits under state law, from which "federal … activities" are presumptively "shield[ed]" absent "a clear congressional mandate" authorizing "regulation by a subordinate sovereign." *Hancock v. Train*, 426 U.S. 167, 179 (1976) (quotation omitted); *see infra* pp. 33-38. Accordingly, this Court has described Section 702 as "waiv[ing] immunity for non-statutory causes of action against federal agencies arising under 28 U.S.C. § 1331"—the federal-question statute. *Alabama-Coushatta*, 757 F.3d at 488; *accord Michigan v. U.S. Army Corp of Eng'rs*, 667 F.3d 765, 775 (7th Cir. 2011) ("The waiver applies when any federal statute authorizes review of agency action, as well as in cases involving constitutional challenges and other claims arising under federal law."); *El-Shifa Pharm. Indus. Co. v. United States*, 607 F.3d 836, 854 (D.C. Cir. 2010) (en banc) (Kavanaugh, J., concurring) ("[T]he APA does not borrow state law or permit state law to be used as a basis for seeking injunctive or declaratory relief against the United States."). As the district court explained, there is no "case or legal authority that finds Congress unequivocally

26

consented to suit for injunctive relief under common law conversion or trespass to chattels." ROA.943.

The statutory history confirms the impropriety of reading a waiver of sovereign immunity to state-law suits into Section 702's silence. Congress added the relevant sentence in this section—the second—in 1976, *see* Act of Oct. 21, 1976, Pub. L. No. 94-574, 90 Stat. 2721, 2721, to largely replace the need for the "legal fiction" permitting a "suit for injunctive, declaratory or mandamus relief against a named Federal officer on the theory he is exceeding his legal authority" to be treated as "against the officer and not against the Government for whom he is acting." H.R. Rep. No. 94-1656, at 5 (1976); S. Rep. No. 94-996, at 4; *see also Geyen v. Marsh*, 775 F.2d 1303, 1307 (5th Cir. 1985). But that legal fiction permitted only suits based on federal—not state—law. *See Geyen*, 775 F.2d at 1307 (describing the fiction that "a federal official acting in violation of the Constitution or beyond his statutory powers was acting for himself only and not as an agent of government") (citing *Larson v. Domestic & Foreign Commerce Corp.*, 337 U.S. 682, 689-90 (1949)); *Larson*, 337 U.S. at 695 (explaining that where "actions of an officer do not conflict with the terms of his valid statutory authority, then they are the actions of the sovereign, *whether or not they are tortious under general law*" (emphasis added)). Thus, in addition to violating the principle that immunity waivers must be read narrowly, reading Section 702's second sentence as subjecting the United States to state-law suits also violates (1) the principle requiring a clear statement "to abrogate a common-law principle," *United States v.*

*Texas*, 507 U.S. 529, 534 (1993), and (2) the presumption "against a statutory construction that would significantly affect the federal-state balance," *Boelens v. Redman Homes, Inc.*, 748 F.2d 1058, 1067 (5th Cir. 1984). Given background Supremacy Clause principles, *see infra* pp. 33-38, it would have been extraordinary for Congress to subject the federal government to lawsuits under state law in this oblique manner, and this Court should reject Texas's efforts to find such an elephant in the mousehole of 5 U.S.C. § 702.

Congress's simultaneous change to federal-question jurisdiction underscores the error of Texas's reading. Congress recognized that the addition to Section 702 would waive sovereign immunity to civil actions in which "the right asserted cannot be valued in dollars and cents." H.R. Rep. No. 94-1656, at 3; S. Rep. No. 94-996, at 2. Congress thus eliminated 28 U.S.C. § 1331's then-extant amount-in-controversy requirement for actions against the United States, ensuring that suits for which sovereign immunity was newly waived could be heard in federal court. *See* Act of Oct. 21, 1976, § 2, 90 Stat. at 2721. But Congress enacted no similar jurisdictional provision for suits brought under state law, which do not "aris[e] under the Constitution, laws, or treaties of the United States." 28 U.S.C. § 1331. On the contrary, Congress recognized that the United States would "remain[] immune from suit in state courts," H.R. Rep. No. 94-1656, at 11; S. Rep. No. 94-996 at 10, intending

only to ensure "a Federal forum for Federal claims," H.R. Rep. No. 94-1656, at 14; S. Rep. No. 94-996, at 13.[6]

Texas's contrary authority is not persuasive.  *See* Br. 19-20.  The D.C. Circuit has stated that Section 702 waives immunity for certain claims asserting breach of fiduciary duty under state law, but it did not enjoin the federal government on this theory.  *See Perry Capital LLC v. Mnuchin*, 864 F.3d 591, 620 (D.C. Cir. 2017). Moreover, the D.C. Circuit's conclusion came in a perfunctory paragraph not engaging with any of the above authorities, including then-Judge Kavanaugh's opinion in *El-Shifa*.  It instead cited its decision in *Trudeau*, which involved federal claims, as well as its decision in *United States Information Agency v. Krc*, 989 F.2d 1211 (D.C. Cir. 1993), which did not make clear the source of the law at issue.  The Third Circuit's similar conclusion in a two-sentence footnote was equally cursory, *see Treasurer of N.J. v. U.S. Dep't of Treasury*, 684 F.3d 382, 400 n.19 (3d Cir. 2012), and its more pertinent holding is that—as urged below—applying state law to the federal government would violate the Supremacy Clause, *id.* 406-12.

---

[6] The United States may remove state-court actions to federal court even when the claims arise under state law.  *See* 28 U.S.C. § 1442.  Congress gave the United States this option to ensure that it has a federal forum in which to assert Supremacy Clause immunities like those at issue here.  *See, e.g.*, *Watson v. Philip Morris Cos.*, 551 U.S. 142, 150-51 (2007).

None of the other cases Texas cites, Br. 19-21, involved claims asserted under state law.[7]  Texas thus cites no decision (beyond this Court's vacated order in this case) relying on Section 702 to find jurisdiction to enjoin the federal government to adhere to state law.

> **b.    At A Minimum, 5 U.S.C. § 702 Does Not Waive The United States' Sovereign Immunity For State Tort Claims.**

Even if Section 702 waives the federal government's sovereign immunity to some state-law claims, it does not permit state *tort* claims because it does not apply when "any other statute that grants consent to suit expressly or impliedly forbids the relief which is sought."  5 U.S.C. § 702.  Thus, even where a suit would otherwise "fit[] within the APA's general waiver" of immunity, where a separate federal statute "specifically authorizes" a type of action, "a plaintiff cannot use the APA to end-run

---

[7] *See Apter v. HHS*, 80 F.4th 579, 585 (5th Cir. 2023) (claim that federal agency's actions were "*ultra vires* under [its] enabling Act and unlawful under the APA"); *Blagojevich v. Gates*, 519 F.3d 370, 371 (7th Cir. 2008) (claim "aris[ing] under federal law"); *Puerto Rico v. United States*, 490 F.3d 50, 57 (1st Cir. 2007) (purported "nonstatutory cause of action" based on Puerto Rico's "sovereign right to enforce its criminal laws"); *Muniz-Muniz v. U.S. Border Patrol*, 741 F.3d 668, 670 (6th Cir. 2013) (alleged violations of the INA and Fourth and Fifth Amendments); *Presbyterian Church (U.S.A.) v. United States*, 870 F.2d 518, 520 (9th Cir. 1989) (alleged violations of churches' "First and Fourth Amendment rights"); *Red Lake Band of Chippewa Indians v. Barlow*, 846 F.2d 474, 475 (8th Cir. 1988) (interpretation of a "1916 Act of Congress"); *B.K. Instrument, Inc. v. United States*, 715 F.2d 713, 716 (2d Cir. 1983) (alleged violation of the federal Defense Appropriations Act); *Michigan*, 667 F.3d at 769, 776 (tort claim "based entirely on federal common law" and "related claim" under APA); *Arizona v. Navajo Nation*, 599 U.S. 555, 562 (2023) (claim for breach of trust under a federal treaty).

the [federal statute's] limitations." *Match-E-Be-Nash-She-Wish Band of Pottawatomi Indians v. Patchak*, 567 U.S. 209, 216 (2012).

The Federal Tort Claims Act (FTCA) "grants consent to suit," 5 U.S.C. § 702, with respect to state-law tort claims, but with important limitations. Among other things, it permits money damages, not prospective relief, *see* 28 U.S.C. § 1346(b), and it does not permit claims based on the federal government's actions authorized by statute or subject to its discretion, *id.* § 2680(a). Those exceptions "are designed to protect certain important governmental functions and prerogatives from disruption," *Molzof v. United States*, 502 U.S. 301, 311 (1992), and "to prevent judicial 'second-guessing' of legislative and administrative decisions grounded in social, economic, and political policy through the medium of an action in tort," *United States v. S.A. Empresa de Viacao Aerea Rio Grandense (Varig Airlines)*, 467 U.S. 797, 814 (1984). Texas cannot use the APA to obtain relief on its state tort claims beyond that to which Congress consented, or without regard to the exceptions Congress crafted.

Texas argues (Br. 20-21) that *Match-E-Be-Nash-She-Wish* supports a waiver of sovereign immunity because the Court held that "general similarity of subject matter" cannot "alone trigger a remedial statute's preclusive effect." 567 U.S. at 223. But this is not a suit involving only "similar subject matter" to that the FTCA covers; it is *precisely* the same claim—the violation of state tort law—for which the FTCA "grants consent to suit." 5 U.S.C. § 702. "When Congress has dealt in particularity with a claim and has intended a specified remedy—including its exceptions—to be exclusive,

31

that is the end of the matter; the APA does not undo the judgment." *Match-E-Be-Nash-She-Wish*, 567 U.S. at 216 (alterations and quotation marks omitted).

Section 702's history again confirms the point. In adding the sovereign-immunity waiver in 1976, Congress adopted a proposal advanced by the Administrative Conference of the United States. H.R. Rep. No. 94-1656, at 23-25 (1976); S. Rep. No. 94-996, at 22-24 (1976). The Administrative Conference explained that its "recommendation [was] phrased as not to effect an implied repeal or amendment of any prohibition, limitation, or restriction of review contained in existing statutes, such as … the Federal Tort Claims Act in which Congress has conditionally consented to suit." *Sovereign Immunity: Hearing on S. 3568 Before the Subcomm. on Admin. Practice & Procedure of the S. Comm. on the Judiciary*, 91st Cong. 138-39 (1970) (citations omitted). On behalf of the Department of Justice, Assistant Attorney General Scalia urged Congress to enact a statute withholding authority where another statute "expressly or impliedly" forbade the relief sought. H.R. Rep. No. 94-1656, at 27-28; S. Rep. No. 94-996, at 26-27. As he explained, "existing statutes have been enacted against the backdrop of sovereign immunity," and so "in most if not all cases where statutory remedies already exist, these remedies will be exclusive," and it would be "unwise to upset" Congress's preexisting, "specific determinations" regarding relief. H.R. Rep. No. 94-1656, at 27-28; S. Rep. No. 94-996, at 27. Congress heeded this request, explaining that "the partial abolition of sovereign immunity brought about by this bill does not change existing limitations on

32

specific relief, if any, derived from statutes dealing with such matters as … tort claims." H.R. Rep. No. 94-1656, at 13; S. Rep. No. 94-996, at 12.

Texas cites no decision supporting its contention (Br. 23) that the FTCA does not foreclose its reliance on Section 702. *Michigan* involved a federal common-law claim that "would not be cognizable under the FTCA"; the Seventh Circuit reasoned that "if the FTCA could never apply to the type of claim advanced, then there is no reason to think that it implicitly forbids a particular type of relief for a claim outside its scope." 667 F.3d at 776. State-law tort claims, on the other hand, may be cognizable under the FTCA. *B.K. Instrument, Inc. v. United States*, 715 F.2d 713 (2d Cir. 1983), also involved federal-law claims—sounding in contract, not tort—and has little relevance to the FTCA's limits on state tort-law claims. And in any event, both decisions predated *Match-E-Be-Nash-She-Wish*, which controls the analysis here.

## 2. Under The Supremacy Clause, States Cannot Control Or Impede Federal Law Enforcement's Execution Of Federal Law.

The Supremacy Clause stands as a fundamental and independent barrier to Texas's state-law claims. Even where Congress has waived sovereign immunity, "[a]n absence of immunity does not result in liability" where the substantive law invoked does not "reach the federal entity." *U.S. Postal Serv. v. Flamingo Indus. (USA) Ltd.*, 540 U.S. 736, 744 (2004).

Federal law is "the supreme Law of the Land," U.S. Const. art. VI, cl. 2, and it has been firmly established for two centuries that states have no power "to retard,

impede, burden, or in any manner control, the operations of the constitutional laws enacted by Congress to carry into execution the powers vested in the general government." *McCulloch v. Maryland*, 17 U.S. (4 Wheat.) 316, 436 (1819); *see also, e.g.*, *Mayo v. United States*, 319 U.S. 441, 445 (1943) (holding that "activities of the Federal Government are free from regulation by any state"). As the Supreme Court recently reiterated, the Supremacy Clause "prohibit[s] States from interfering with or controlling the operations of the Federal Government," whether by "regulat[ing] the United States directly" or discriminating against the federal government and its contractors. *United States v. Washington*, 596 U.S. 832, 838 (2022) (citation omitted). This case concerns the first type of prohibited activity: an attempt to directly regulate the federal government's operations.

This Court has explained that "Supremacy Clause immunity protects federal officers, acting within their federal authority, from liability under state law," whether by "prosecution or private suit." *Texas v. Kleinert*, 855 F.3d 305, 313-14 (5th Cir. 2017). That prohibition extends to "even the most unquestionable and most universally applicable of state laws, such as those concerning murder," which "will not be allowed to control the conduct of a marshal of the United States acting under and in pursuance of the laws of the United States." *Johnson v. Maryland*, 254 U.S. 51, 56-57 (1920); *see, e.g., Ohio v. Thomas*, 173 U.S. 276, 283 (1899) ("[W]hen discharging [their] duties under federal authority pursuant to and by virtue of valid federal laws, [federal officers] are not subject to arrest or other liability under the laws of the state in which

34

their duties are performed."); *Arizona v. California*, 283 U.S. 423, 451 (1931) ("The United States may perform its functions without conforming to the police regulations of a state.").  Indeed, "[t]o cite all the cases in which this principle of the supremacy of the government of the United States in the exercise of all the powers conferred upon it by the Constitution is maintained, would be an endless task." *In re Neagle*, 135 U.S. 1, 62 (1890).  Because the conduct about which Texas complains is authorized by federal law, it may not be enjoined under state law.

This understanding of the federal government's Supremacy Clause immunity also follows from principles of federal preemption, including the rule that "state laws are preempted when they conflict with federal law." *Arizona v. United States*, 567 U.S. 387, 399 (2012).  The Supremacy Clause mandates such preemption where compliance with both state and federal law "is a physical impossibility," and where "the challenged state law stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress." *Id.* (quotation omitted).  Preemption principles underscore that a state may not interpose its tort laws "as an obstacle to the accomplishment and execution" of federal agents' enforcement of federal law.  *Id.* at 406 (quotation omitted).

Texas acknowledges that it may not "use[] state law to regulate the operations of the federal government," Br. 13, but suggests that it is not attempting to do so because it invokes a "proprietary interest" in its fence as "an ordinary proprietor," *id.* at 25.  That assertion is wrong.  Texas's invocation of state tort law would directly

35

regulate the federal government by requiring Border Patrol agents—on pain of contempt—to conform their activities to the strictures of state law. It is true that Texas is asserting a state-law claim that could also be asserted by a private party, but that only exacerbates the Supremacy Clause problem. *See, e.g., Northwest, Inc. v. Ginsberg*, 572 U.S. 273, 283-84 (2014) (noting in a private-party suit that "state tort law that imposes certain requirements" can "'disrup[t] the federal scheme no less than state regulatory law'" (alteration in original) (quotation omitted)); *Kleinert*, 855 F.3d at 314 (Supremacy Clause immunity extends to "private suit under state law"). There is no principle of constitutional law supporting Texas's suggestion that the Supremacy Clause tolerates state-created "obstacles to [federal] action within its own sphere," and ceases "to modify every power vested in subordinate governments, as to exempt [federal] operations," so long as there might be both governmental *and* private plaintiffs. *Hancock*, 426 U.S. at 178 (quoting *McCulloch*, 17 U.S. (4 Wheat.) at 427). Indeed, if Texas were correct that claims by private property owners were not subject to the Supremacy Clause, it would presumably follow that the Constitution would tolerate an action for trespass against an FBI agent executing a warrant if that action were not specifically privileged under state law.

As Texas observes (Br. 25), the Supremacy Clause is not implicated when state law does not impede federal agents from performing federally authorized functions. *See, e.g., Johnson*, 254 U.S. at 56 ("subjection to local law" possible "when the United States has not spoken"); *United States ex rel. Drury v. Lewis*, 200 U.S. 1, 2, 8 (1906)

(upholding denial of habeas relief given conflicting testimony about whether soldier shot boy who had already surrendered, conduct "conceded" to fall outside "the performance of a duty imposed by the Federal law"); *Hall v. Commonwealth*, 105 S.E. 551, 552-53 (Va. 1921) (postal employee could be cited for speeding because speed limit does not "even incidentally interfere in any way with the performance of duty of the federal employee"); *North Carolina v. Ivory*, 906 F.2d 999, 1002 (4th Cir. 1990) (no Supremacy Clause defense where employee "has not alleged anything in the conduct of his federal responsibilities which justified his violation" of traffic laws). But that contention is irrelevant here because the injunction Texas seeks would prohibit Border Patrol agents from performing actions central to their federal functions.

Nor has the doctrine of federal supremacy been "thoroughly repudiated." Br. 26 (quoting *South Carolina v. Baker*, 485 U.S. 505, 520 (1988)). As explained in *Baker*, the Supreme Court once held that a "tax on interest earned on a … federal bond was unconstitutional." 485 U.S. at 520. It was this holding—"the general immunity for government contract income"—that the Court described as "thoroughly repudiated by modern" case law. *Id.* at 518, 520; *see also North Dakota v. United States*, 495 U.S. 423, 434 (1990) (plurality) (citing *Baker* for proposition that the Court has "repudiated" "the argument that any state regulation which *indirectly* regulates the Federal Government's activity is unconstitutional" (emphasis added)). But no case endorses the notion that state law may *directly* regulate federal actors performing federal functions. Just as states may not "lay[] demands" under their tax laws "directly

37

on the Federal Government," *United States v. New Mexico*, 455 U.S. 720, 735 (1982), they may not apply their tort laws directly to the federal government absent clear congressional permission.[8]

Finally, Texas observes (Br. 26) that its tort law does not discriminate against the federal government. That is true, but the Supremacy Clause shields the federal government from "even the most unquestionable and universally applicable of state laws." *Johnson*, 254 U.S. at 56; *see Kleinert*, 855 F.3d at 314 (addressing broadly applicable criminal law); *Geo Grp., Inc. v. Newsom*, 50 F.4th 745, 758 (9th Cir. 2022) (en banc) (Supremacy Clause applies to "a generally applicable state regulation … when the regulation would control federal operations").

### C.  Texas Cannot Succeed On Its APA Claims.

Texas also challenges (Br. 28, 33-35) the district court's determination that it failed to identify final agency action under the APA. ROA.957-59. The district court's ruling was correct, and the absence of final agency action is not the only obstacle to Texas's APA claims.

### 1.  Texas Does Not Challenge Final Agency Action.

The APA's cause of action does not authorize programmatic attacks on "day-to-day agency management." *Norton v. Southern Utah Wilderness All.*, 542 U.S. 55, 67

---

[8] Congress has instead made clear that state efforts to perform functions usually reserved to federal officials "in relation to the investigation, apprehension, or detention of aliens in the United States" must be done with the agreement, and under the direction, of the federal government. 8 U.S.C. § 1357(g).

(2004). It instead authorizes review of discrete "final agency action," 5 U.S.C. § 704—

agency action under 5 U.S.C. § 551(13) that is "final" under Section 704. *See Norton*,

542 U.S. at 61-62. To be final, an action "must mark the consummation of the

agency's decisionmaking process," must not be "tentative or interlocutory," and

"must be one by which rights or obligations have been determined, or from which

legal consequences will flow." *U.S. Army Corps of Eng'rs v. Hawkes Co.*, 578 U.S. 590,

597 (2016) (quotation omitted). As the district court recognized, courts must "take

great care not to confuse final agency action with … broader programmatic decisions"

and "reject invitations to find final agency action in an agency's 'continuing (and thus

constantly changing) operations.'" ROA.957-58 (quoting *Lujan v. National Wildlife

Fed'n*, 497 U.S. 871, 890 (1990)).

Applying that standard, the district court found that Texas had not satisfied its

burden of demonstrating "a substantial likelihood that it will establish the existence of

a final agency action." ROA.958-59.[9] Texas identifies no error in that conclusion.

---

[9] Texas complains (Br. 10) that the district court did not make certain
documents it ordered produced *in camera* available to it, but the district court made
clear that it was "not relying on any particular document." ROA.932 n.1. Nor did
Texas articulate any theory for why these documents—the production of which the
district court required *sua sponte*—would be necessary to address an APA claim not
subject to general discovery. *See Department of Commerce v. New York*, 139 S. Ct. 2551,
2573 (2019) (explaining that "in reviewing agency action, a court is ordinarily limited
to evaluating the agency's contemporaneous explanation in light of the existing
administrative record").

There is no Border Patrol policy requiring agents to disturb Texas's concertina wire. Instead, guidance within Eagle Pass (a) reminds agents of their existing authority to cut locks or fences impeding border access where necessary; (b) provides that the agents should call a supervisor before cutting the wire, absent exigent circumstances; and (c) provides that if exigent circumstances exist or a supervisor is unavailable, the agents should use their judgment regarding how best to proceed. ROA.624-25, 881-82, 1163-67, 1212-13. That advice, if anything, limits the circumstances under which agents may independently exercise their authority under 8 U.S.C. § 1357(a)(3). Texas has never explained how it is injured by (and has standing to challenge) guidance cautioning agents regarding use of their authority to cut the concertina wire.

In any event, Border Patrol's guidance necessarily contemplates future agency decisionmaking based on particular facts, rendering it nonfinal. *See DRG Funding Corp. v. Secretary of Hous. & Urban Dev.*, 76 F.3d 1212, 1215 (D.C. Cir. 1996). Moreover, no legal consequences flow from the guidance: it does not "bind[ the agency] and its staff to a legal position," "retract an agency's discretion to adopt a different view of the law," "create[] safe harbors protecting private parties from adverse action," "prescribe[] a multi-factor framework," or otherwise "limit[] [Border Patrol's] discretion." *Texas v. EEOC*, 933 F.3d 433, 441-43 (5th Cir. 2019). Nor does the guidance "force[] the plaintiff either to alter its conduct, or expose itself to potential liability." *Id.* at 446 (quotation omitted); *see Texas v. Becerra*, 89 F.4th 529, 538 (5th Cir. 2024). The guidance merely reminds Border Patrol agents of authority they already

possess and identifies circumstances in which they should seek approval before using it.

To the extent Texas believes there exists a reviewable wire-cutting "policy," Br. 33, the district court rightly rejected that contention as a factual matter. *See* ROA.957 ("[T]he Court cannot find … that the evidence the Court has reviewed thus far conclusively establishes or disproves the existence of such an institutional 'policy, practice, or pattern.'"). But even if such a policy existed, it would not constitute discrete agency action under 5 U.S.C. § 551(13). A challenge to federal agents' performance of their day-to-day duties is a "programmatic" attack not cognizable under the APA. *Lujan*, 497 U.S. at 891; *see Norton*, 542 U.S. at 64-67. That Texas pointed to "specific allegedly-improper" agency conduct "within that [alleged] program" makes no difference, *Sierra Club v. Peterson*, 228 F.3d 559, 567 (5th Cir. 2000) (en banc), because Texas is effectively asking this Court to "supervise an agency's compliance with [its] broad statutory mandate," *City of New York v. U.S. Dep't of Def.*, 913 F.3d 423, 433 (4th Cir. 2019) (citation omitted), by examining Border Patrol's reasons for cutting through barriers to the border.[10]

---

[10] Texas did not raise in its opening brief its notice-and-comment rulemaking claim as a basis for reversing the denial of the preliminary injunction and has therefore forfeited any such argument in this appeal. But for related reasons, any such claim would fail because Texas does not challenge a legislative rule "with the 'force and effect of law.'" *Mock v. Garland*, 75 F.4th 563, 578 (5th Cir. 2023).

### 2. Border Patrol Decisions Regarding The Concertina Wire Are Committed To Agency Discretion By Law.

Even if Texas challenged final agency action, whether to cut concertina wire in any particular instance goes to the core of law-enforcement discretion that the APA places beyond judicial review. *See* 5 U.S.C. § 701(a)(2) (excluding "agency action … committed to agency discretion by law"). There are "certain categories of administrative decisions that courts traditionally have regarded as 'committed to agency discretion'" because "a court would have no meaningful standard against which to judge the agency's exercise of discretion." *Lincoln v. Vigil*, 508 U.S. 182, 191 (1993) (quotation omitted). As the Supreme Court has explained, "courts generally lack meaningful standards for assessing the propriety of enforcement choices" regarding whether and how to arrest noncitizens for immigration-law violations. *Texas*, 599 U.S. at 678-79 (observing that "[u]nder Article II, the Executive Branch possesses authority to decide 'how to prioritize and how aggressively to pursue legal actions against defendants who violate the law'"). Nothing about the statutory authorities under which Border Patrol agents operate provides a meaningful standard for this Court to judge *ex ante* which methods will be proper in any particular instance as officers make real-time decisions about their law-enforcement responsibilities. *Cf. id.* at 680 (the "complicated balancing process" involved in "devising arrest and prosecution policies" "leaves courts without meaningful standards for assessing those policies."). Just as law-enforcement officers' on-the-spot judgments regarding when

42

to run a red light in pursuit of a subject are committed to their discretion, so are decisions regarding breaches of barriers to border-adjacent lands.

### 3.    It Is Not Arbitrary Or Capricious To Cut Concertina Wire To Reach Migrants.

Even if Texas could establish the prerequisites to its APA claim, that claim could not succeed.  It is not arbitrary or capricious for Border Patrol to cut through concertina wire blocking access to the international border to reach migrants, especially given the "narrow and highly deferential" nature of arbitrary-and-capricious review.  *Sierra Club v. U.S. Dep't of Interior*, 990 F.3d 909, 913 (5th Cir. 2021) (quotation omitted).  Texas suggests that it is likely to succeed because "Defendants … destroy others' property for reasons having nothing to do with enforcing federal law," Br. 29, but that is wrong; as discussed above, agents cut the concertina wire to execute their statutory duties, including the apprehension and inspection of migrants.  *See supra* pp. 15-24.

## II.    Lower Courts May Not Enjoin Or Restrain Enforcement Of The INA.

Although the district court did not reach the issue, an injunction would be improper for an additional reason: under 8 U.S.C. § 1252(f)(1), with certain inapplicable exceptions, lower courts lack "jurisdiction or authority to enjoin or restrain the operation" of 8 U.S.C. §§ 1221-1231—the INA provisions "governing the inspection, apprehension, examination, and removal of aliens."  *Garland v. Aleman Gonzalez*, 596 U.S. 543, 549-50 (2022).  Those provisions include Section 1225, which

provides for the inspection of noncitizens, and Section 1226, which authorizes apprehension and detention.

The Supreme Court has explained that Section 1252(f)(1) "prohibits lower courts from entering injunctions that order federal officials to take or to refrain from taking actions to enforce, implement, or otherwise carry out the specified statutory provisions." *Aleman Gonzalez*, 596 U.S. at 550. So long as an order enjoins or restrains action that "in the Government's view" serves to "enforce, implement, or otherwise carry out" the referenced INA sections, it is impermissible—regardless of whether the court considers the government to be carrying out those sections as "*properly* interpreted." *Id.* at 550-52 (quotation omitted); *accord*, *e.g.*, *Arizona v. Biden*, 40 F.4th 375, 394 (6th Cir. 2022) (Sutton, J., concurring) (explaining that Section "1252(f)(1) has the same force even when the National Government allegedly enforces the relevant statutes unlawfully," as it otherwise "would not be much of a prohibition"). Because the injunction requires the government to "refrain from actions that (… in the Government's view) are allowed" by Sections 1225 and 1226, it "interfere[s] with the Government's efforts to operate" those provisions, *Aleman Gonzalez*, 596 U.S. at 551, and is therefore barred by Section 1252(f)(1). *See, e.g.*, *Biden v. Texas*, 597 U.S. at 797 (order enjoining DHS's Migrant Protection Protocols "violated" Section 1252(f)(1)).

Texas contends (Br. 26-27) that the government somehow waived this argument by agreeing to extend the temporary restraining order for 48 hours in

44

district court.  The government agreed to that extension to allow the court to conduct a second preliminary injunction hearing on November 27, the Monday after Thanksgiving, "recognizing that the [district court] is closed on November 22 and 24."  ROA.741.  The government has maintained that Section 1252(f)(1) prohibits injunctive relief throughout these proceedings, including in opposition to Texas's request for a preliminary injunction.  ROA.595-97, 1064.  In any event, Section 1252(f)(1) limits the "jurisdiction or authority" of the lower courts.  8 U.S.C. § 1252(f)(1).  Because such limitations speak to "a court's power"—with respect to a particular remedy even if not to particular subject matter—they "can never be forfeited or waived."  *United States v. Cotton*, 535 U.S. 625, 630 (2002).  Although limits on relief ordinarily are not jurisdictional, Congress "is free to attach the conditions that go with the jurisdictional label"—including exemption from forfeiture—to whatever requirements it chooses.  *Henderson ex rel. Henderson v. Shinseki*, 562 U.S. 428, 435 (2011); *see Biden v. Texas*, 597 U.S. at 801 n.4 (reserving this question).

Texas suggests that the injunction would cause only a "collateral effect" on Sections 1225 and 1226, given that other provisions support Border Patrol's authority to cut the wire.  Br. 27 (quoting *Aleman Gonzalez*, 596 U.S. at 553 n.4).  But the inability to reach migrants on U.S. soil directly impedes agents' ability to inspect migrants under Section 1225, as well as to apprehend and detain them under Section 1226.  The other statutes on which the government relies simply provide additional support for the particular way that federal officials may perform those functions.  *See*

45

8 U.S.C. §§ 1103(a)(3), 1357(a)(3).  When taking those actions, the agents are discharging their responsibilities under Sections 1225 and 1226, which "no one disputes … [are] among the provisions the 'operation' of which cannot be 'enjoined or restrained' under § 1252(f)(1)."  *Aleman Gonzalez*, 596 U.S. at 551.

## III.   The Equities Weigh Heavily Against A Preliminary Injunction.

Because Texas is unlikely to succeed on the merits, it cannot succeed in its bid for a preliminary injunction.  This Court therefore need not address the remaining factors.  *See Jordan v. Fisher*, 823 F.3d 805, 809 (5th Cir. 2016).  But if the Court does consider them, the equities weigh overwhelmingly against an injunction.

Although the district court concluded that Texas faced irreparable harm, it based that assessment on a misunderstanding of that term.  Texas complains of—and the court based its analysis on—damage to property.  Br. 36; ROA.960.  But such harm is canonically *not* irreparable.  *See Deerfield Med. Ctr. v. City of Deerfield Beach*, 661 F.2d 328, 338 (5th Cir. Unit B 1981) ("An injury is 'irreparable' only if it cannot be undone through monetary remedies.").  To address such harm, Texas could seek compensation under 19 U.S.C. § 1630(a), which authorizes the Secretary to settle "claim[s] for damage to, or loss of, privately owned property caused by an investigative or law enforcement officer … who is employed by [CBP] and acting within the scope of his or her employment" for up to $50,000, provided the claim "cannot be settled" under the FTCA.  *See Consideration of Claim of City of Cleveland Under Act of December 28, 1922, C. 17, 42 Stat. 1066*, 38 Op. Att'y Gen. 514, 517 (1936)

(explaining that "it has been the uniform practice … to consider and determine claims submitted by municipalities and other state agencies" under a similar statute). Alternatively, Texas has acknowledged that it could seek compensation under the FTCA, insofar as that statute's exceptions do not apply.  *See* ROA.660.  But Texas has never even attempted to use those statutory means to seek redress for its asserted financial injuries.

The district court acknowledged that money can remedy property damage, *see* ROA.939, 946, but asserted without explanation that "compensation for past injury cannot adequately redress the prospect of continuing or future harm," ROA.939 n.7. Attempting to rehabilitate that conclusion, Texas invokes (Br. 37) plainly distinguishable authority.  *See Register.com, Inc. v. Verio, Inc.*, 356 F.3d 393, 404 (2d Cir. 2004) (finding irreparable harm where damages for "loss of reputation, good will, and business opportunities" could not be calculated); *Hadley v. Department of Corr.*, 840 N.E. 2d 748, 756-57 (Ill. App. Ct. 2005) (plaintiff lacked an adequate remedy at law because the state Court of Claims lacked jurisdiction to award a monetary remedy).  Neither case supports an injunctive remedy for damage to a bulk commercial product in circumstances where Congress has created avenues through which Texas may seek compensation.

Texas's remaining theories of harm, *see* Br. 36-37, 39-41, boil down to a desire to "achieve its own immigration policy," but "[t]his is not the system Congress created," *Arizona*, 567 U.S. at 408.  Texas has no judicially cognizable interest in how

the federal government exercises its enforcement discretion, *see Texas*, 599 U.S. at 677-78, and reframing that interest as "indirect effects on state revenues or state spending" does not overcome this "fundamental" problem, *id.* at 680 n.3. The district court thus correctly declined to base Texas's standing on such alleged injuries, ROA.938, and using such harms as the basis for *enjoining* the federal government to redress Texas's actual injury—wire damage—would be extraordinary. *See Gill v. Whitford*, 138 S. Ct. 1916, 1934 (2018) ("[S]tanding is not dispensed in gross: A plaintiff's remedy must be tailored to redress the plaintiff's particular injury." (quotation omitted)).

Balanced against Texas's asserted financial injuries are the many irremediable harms that a preliminary injunction would cause the United States and the public interest. Most obviously, an injunction under state law would flout the Supremacy Clause, upending our constitutional structure and causing irreparable harm per se to the United States. *See Maryland v. King*, 567 U.S. 1301, 1303 (2012) (Roberts, C.J., in chambers) ("[A]ny time a State is enjoined by a court from effectuating statutes enacted by representatives of its people, it suffers a form of irreparable injury.") (alteration in original) (quotation omitted). The federal government is responsible for patrolling and enforcing immigration law at the border, but if Texas can impose its own laws on federal officials' discharge of these duties, so can every other state, "diminish[ing] the [Federal Government]'s control over enforcement" and destroying the political accountability that the Supremacy Clause promotes. *Arizona*, 567 U.S. at 401-02 (alterations in original).

48

Texas's requested injunction also presents a serious risk to human life. Although the injunction pending appeal (like the TRO) contained a limited exception allowing agents to cut the wire to respond to a medical emergency, the record demonstrated that by the time an emergency (such as drowning) is in progress, it may be too late for Border Patrol to prevent death or serious injury. *See* ROA.1158 (undisputed testimony that it can take 10 to 30 minutes to cut through Texas's layers of razor wire). The Rio Grande is an unpredictable river with varying depths and powerful currents, ROA.1147-49, which is why Border Patrol agents seek to "be as proactive as possible" when they "anticipate an emergency may arise," ROA.1148; *see* ROA.1154 (describing situation where "it was only a matter of time before more people were going to be swept away"). The risk of death along this stretch of the river is real, especially for vulnerable populations such as children. *See* ROA.918-23 (discussing a child who drowned on November 11, 2023, and noting that an agent saw an "unconscious subject floating on top of the water" but was "unable to retrieve or render aid to the subject due to the concertina wire barrier placed along the riverbank").

Citing its Supreme Court filings, Texas contends (Br. 39) that federal agents "substantially reduced their operations" near the border following the TRO, which Texas asserts demonstrates that defendants do not actually want to respond to emergencies—although Texas does not attempt to reconcile this assertion with its apparent concession that Border Patrol used "scope trucks" with cameras to monitor

49

this area until the state blocked their access.  *See* Response to Supplemental

Memorandum at 2 & Fletcher Decl. ¶ 5, *Dep't of Homeland Sec. v. Texas*, No. 23A607

(U.S. Jan. 13, 2024).  But even assuming that Border Patrol has decreased its

operations near the wire, it would not be difficult to grasp why: the restrictions

imposed by the district court and this Court made it so difficult for agents to perform

their functions in this area that Border Patrol could reasonably elect to allocate its

resources elsewhere.  That consideration supports the Supreme Court's vacatur of this

Court's injunction pending appeal, not a remand for entry of a preliminary injunction.

Nor are the harms to the United States and the public interest solely domestic.

Mexico has repeatedly lodged official complaints about Texas's placement of the

concertina wire.  *See* Gov't of Mex., Information Note No. 04 (July 14, 2023),

https://perma.cc/V72L-GTXE; Gov't of Mex., Information Note No. 05 (July 26,

2023), https://perma.cc/F932-U9T9 (expressing concern over "alleged human rights

violations").  By limiting Border Patrol agents' ability to offer emergency assistance to

individuals in the United States, the injunction negatively affects U.S. foreign relations.

*Cf. Arizona*, 567 U.S. at 395 (noting that "[i]mmigration policy" can affect "diplomatic

relations for the entire Nation," as "[p]erceived mistreatment of aliens in the United

States may lead to harmful reciprocal treatment of American citizens abroad").

Texas further suggests that the federal government has a "history of resorting

to self-help measures in this dispute."  Br. 14; *see id.* at 20.  Yet Border Patrol was not

required to ask permission before exercising its authorities under federal law, and

50

Section 1357 explicitly affords agents access to the border "without warrant." And in any event, given Texas's recent deployment of armed guards to bar Border Patrol from land near the border, *see supra* pp. 10-11, Texas's complaints about self-help are difficult to take seriously.

At bottom, even if Texas had shown any degree of irreparable injury, it pales in comparison to the harms shown by the federal law-enforcement agencies Texas seeks to restrain. *See Winter v. Natural Res. Def. Council, Inc.*, 555 U.S. 7, 23 (2008) (explaining that "even if plaintiffs have shown irreparable injury" to marine wildlife, it would be "outweighed by the public interest and the Navy's interest in effective, realistic training of its sailors," and that "[a] proper consideration of these factors alone requires denial of the requested injunctive relief").

## CONCLUSION

For the foregoing reasons, the judgment of the district court should be affirmed.

Respectfully submitted,

JAIME ESPARZA
*United States Attorney*

MARY F. KRUGER
ROBERT GREEN
*Assistant United States Attorneys*

BRIAN M. BOYNTON
*Principal Deputy Assistant Attorney General*

SARAH E. HARRINGTON
*Deputy Assistant Attorney General*

MARK R. FREEMAN
MELISSA N. PATTERSON
*/s/ Steven A. Myers*
STEVEN A. MYERS
*Attorneys, Appellate Staff*
*Civil Division, Room 7232*
*U.S. Department of Justice*
*950 Pennsylvania Avenue NW*
*Washington, DC 20530*
*(202) 305-8648*
*Steven.A.Myers@usdoj.gov*

January 2024

**CERTIFICATE OF COMPLIANCE**

This brief complies with the type-volume limit of Federal Rule of Appellate Procedure 32(a)(7)(B) because it contains 12964 words. This brief also complies with the typeface and type-style requirements of Federal Rule of Appellate Procedure 32(a)(5)-(6) because it was prepared using Word for Microsoft 365 in Garamond 14-point font, a proportionally spaced typeface.

*/s/ Steven A. Myers*
Steven A. Myers

**ADDENDUM**

**TABLE OF CONTENTS**

5 U.S.C. § 701.................................................................................................A1

5 U.S.C. § 702.................................................................................................A2

8 U.S.C. § 1225...............................................................................................A3

8 U.S.C. § 1226...............................................................................................A4

8 U.S.C. § 1252...............................................................................................A7

8 U.S.C. § 1357...............................................................................................A8

**5 U.S.C. § 701**

**§ 701. Application; definitions**

(a) This chapter applies, according to the provisions thereof, except to the extent that—

> (1) statutes preclude judicial review; or

> (2) agency action is committed to agency discretion by law.

\* \* \*

**5 U.S.C. § 702.**

**§ 702. Right of review.**

A person suffering legal wrong because of agency action, or adversely affected or aggrieved by agency action within the meaning of a relevant statute, is entitled to judicial review thereof. An action in a court of the United States seeking relief other than money damages and stating a claim that an agency or an officer or employee thereof acted or failed to act in an official capacity or under color of legal authority shall not be dismissed nor relief therein be denied on the ground that it is against the United States or that the United States is an indispensable party. The United States may be named as a defendant in any such action, and a judgment or decree may be entered against the United States: *Provided*, That any mandatory or injunctive decree shall specify the Federal officer or officers (by name or by title), and their successors in office, personally responsible for compliance. Nothing herein (1) affects other limitations on judicial review or the power or duty of the court to dismiss any action or deny relief on any other appropriate legal or equitable ground; or (2) confers authority to grant relief if any other statute that grants consent to suit expressly or impliedly forbids the relief which is sought.

**8 U.S.C. § 1225**

**§ 1225. Inspection by immigration officers; expedited removal of inadmissible arriving aliens; referral for hearing.**

(a) Inspection

   (1) Aliens treated as applicants for admission

   An alien present in the United States who has not been admitted or who arrives in the United States (whether or not at a designated port of arrival and including an alien who is brought to the United States after having been interdicted in international or United States waters) shall be deemed for purposes of this chapter an applicant for admission.

\* \* \*

   (3) Inspection

   All aliens (including alien crewmen) who are applicants for admission or otherwise seeking admission or readmission to or transit through the United States shall be inspected by immigration officers.

\* \* \*

**8 U.S.C. § 1226**

**§ 1226. Apprehension and detention of aliens.**

(a) Arrest, detention, and release

On a warrant issued by the Attorney General, an alien may be arrested and detained pending a decision on whether the alien is to be removed from the United States. Except as provided in subsection (c) and pending such decision, the Attorney General--

(1) may continue to detain the arrested alien; and

(2) may release the alien on--

(A) bond of at least $1,500 with security approved by, and containing conditions prescribed by, the Attorney General; or

(B) conditional parole; but

(3) may not provide the alien with work authorization (including an "employment authorized" endorsement or other appropriate work permit), unless the alien is lawfully admitted for permanent residence or otherwise would (without regard to removal proceedings) be provided such authorization.

(b) Revocation of bond or parole

The Attorney General at any time may revoke a bond or parole authorized under subsection (a), rearrest the alien under the original warrant, and detain the alien.

(c) Detention of criminal aliens

(1) Custody

The Attorney General shall take into custody any alien who--

(A) is inadmissible by reason of having committed any offense covered in section 1182(a)(2) of this title,

(B) is deportable by reason of having committed any offense covered in section 1227(a)(2)(A)(ii), (A)(iii), (B), (C), or (D) of this title,

(C) is deportable under section 1227(a)(2)(A)(i) of this title on the basis of an offense for which the alien has been sentence[1] to a term of imprisonment of at least 1 year, or

(D) is inadmissible under section 1182(a)(3)(B) of this title or deportable under section 1227(a)(4)(B) of this title,

when the alien is released, without regard to whether the alien is released on parole, supervised release, or probation, and without regard to whether the alien may be arrested or imprisoned again for the same offense.

(2) Release

The Attorney General may release an alien described in paragraph (1) only if the Attorney General decides pursuant to section 3521 of Title 18 that release of the alien from custody is necessary to provide protection to a witness, a potential witness, a person cooperating with an investigation into major criminal activity, or an immediate family member or close associate of a witness, potential witness, or person cooperating with such an investigation, and the alien satisfies the Attorney General that the alien will not pose a danger to the safety of other persons or of property and is likely to appear for any scheduled proceeding. A decision relating to such release shall take place in accordance with a procedure that considers the severity of the offense committed by the alien.

(d) Identification of criminal aliens

(1) The Attorney General shall devise and implement a system--

(A) to make available, daily (on a 24-hour basis), to Federal, State, and local authorities the investigative resources of the Service to determine whether individuals arrested by such authorities for aggravated felonies are aliens;

(B) to designate and train officers and employees of the Service to serve as a liaison to Federal, State, and local law enforcement and correctional agencies and courts with respect to the arrest, conviction, and release of any alien charged with an aggravated felony; and

(C) which uses computer resources to maintain a current record of aliens who have been convicted of an aggravated felony, and indicates those who have been removed.

(2) The record under paragraph (1)(C) shall be made available--

(A) to inspectors at ports of entry and to border patrol agents at sector headquarters for purposes of immediate identification of any alien who was previously ordered removed and is seeking to reenter the United States, and

(B) to officials of the Department of State for use in its automated visa lookout system.

(3) Upon the request of the governor or chief executive officer of any State, the Service shall provide assistance to State courts in the identification of aliens unlawfully present in the United States pending criminal prosecution.

(e) Judicial review

The Attorney General's discretionary judgment regarding the application of this section shall not be subject to review. No court may set aside any action or decision by the Attorney General under this section regarding the detention or release of any alien or the grant, revocation, or denial of bond or parole.

**8 U.S.C. § 1252**

**§ 1252. Judicial review of orders of removal.**

* * *

(f) Limit on injunctive relief

    (1) In general

Regardless of the nature of the action or claim or of the identity of the party or parties bringing the action, no court (other than the Supreme Court) shall have jurisdiction or authority to enjoin or restrain the operation of the provisions of part IV of this subchapter, as amended by the Illegal Immigration Reform and Immigrant Responsibility Act of 1996, other than with respect to the application of such provisions to an individual alien against whom proceedings under such part have been initiated.

* * *

**8 U.S.C. § 1357**

**§ 1357. Powers of immigration officers and employees**

(a) Powers without warrant

Any officer or employee of the Service authorized under regulations prescribed by the Attorney General shall have power without warrant--

(1) to interrogate any alien or person believed to be an alien as to his right to be or to remain in the United States;

(2) to arrest any alien who in his presence or view is entering or attempting to enter the United States in violation of any law or regulation made in pursuance of law regulating the admission, exclusion, expulsion, or removal of aliens, or to arrest any alien in the United States, if he has reason to believe that the alien so arrested is in the United States in violation of any such law or regulation and is likely to escape before a warrant can be obtained for his arrest, but the alien arrested shall be taken without unnecessary delay for examination before an officer of the Service having authority to examine aliens as to their right to enter or remain in the United States;

(3) within a reasonable distance from any external boundary of the United States, to board and search for aliens any vessel within the territorial waters of the United States and any railway car, aircraft, conveyance, or vehicle, and within a distance of twenty-five miles from any such external boundary to have access to private lands, but not dwellings, for the purpose of patrolling the border to prevent the illegal entry of aliens into the United States;

\* \* \*

(g) Performance of immigration officer functions by State officers and employees

(1) Notwithstanding section 1342 of title 31, the Attorney General may enter into a written agreement with a State, or any political subdivision of a State, pursuant to which an officer or employee of the State or subdivision, who is determined by the Attorney General to be qualified to perform a function of an immigration officer in relation to the investigation, apprehension, or detention of aliens in the United States (including the transportation of such aliens across State lines to detention centers), may carry out such function at the expense of the State or political subdivision and to the extent consistent with State and local law.

(2) An agreement under this subsection shall require that an officer or employee of a State or political subdivision of a State performing a function under the agreement shall have knowledge of, and adhere to, Federal law relating to the function, and shall contain a written certification that the officers or employees performing the function under the agreement have received adequate training regarding the enforcement of relevant Federal immigration laws.

(3) In performing a function under this subsection, an officer or employee of a State or political subdivision of a State shall be subject to the direction and supervision of the Attorney General.

(4) In performing a function under this subsection, an officer or employee of a State or political subdivision of a State may use Federal property or facilities, as provided in a written agreement between the Attorney General and the State or subdivision.

(5) With respect to each officer or employee of a State or political subdivision who is authorized to perform a function under this subsection, the specific powers and duties that may be, or are required to be, exercised or performed by the individual, the duration of the authority of the individual, and the position of the agency of the Attorney General who is required to supervise and direct the individual, shall be set forth in a written agreement between the Attorney General and the State or political subdivision.

(6) The Attorney General may not accept a service under this subsection if the service will be used to displace any Federal employee.

(7) Except as provided in paragraph (8), an officer or employee of a State or political subdivision of a State performing functions under this subsection shall not be treated as a Federal employee for any purpose other than for purposes of chapter 81 of title 5 (relating to compensation for injury) and sections 2671 through 2680 of title 28 (relating to tort claims).

(8) An officer or employee of a State or political subdivision of a State acting under color of authority under this subsection, or any agreement entered into under this subsection, shall be considered to be acting under color of Federal authority for purposes of determining the liability, and immunity from suit, of the officer or employee in a civil action brought under Federal or State law.

(9) Nothing in this subsection shall be construed to require any State or political subdivision of a State to enter into an agreement with the Attorney General under this subsection.

(10) Nothing in this subsection shall be construed to require an agreement under this subsection in order for any officer or employee of a State or political subdivision of a State—

(A) to communicate with the Attorney General regarding the immigration status of any individual, including reporting knowledge that a particular alien is not lawfully present in the United States; or

(B) otherwise to cooperate with the Attorney General in the identification, apprehension, detention, or removal of aliens not lawfully present in the United States.

* * *