No. 23-50869

# In the United States Court of Appeals for the Fifth Circuit

STATE OF TEXAS,

*Plaintiff-Appellant,*

*v.*

UNITED STATES DEPARTMENT OF HOMELAND SECURITY;
ALEJANDRO MAYORKAS, SECRETARY, U.S. DEPARTMENT OF
HOMELAND SECURITY; UNITED STATES CUSTOMS AND BORDER
PROTECTION; UNITED STATES BORDER PATROL; TROY MILLER,
SENIOR OFFICIAL PERFORMING THE DUTIES OF THE
COMMISSIONER, U.S. CUSTOMS AND BORDER PROTECTION;
JASON OWENS, IN HIS OFFICIAL CAPACITY AS CHIEF OF THE U.S.
BORDER PATROL; ROBERT DANLEY, IN HIS OFFICIAL CAPACITY AS
CHIEF PATROL AGENT, DEL RIO SECTOR, UNITED STATES
BORDER PATROL,

*Defendants-Appellees.*

On Appeal from the United States District Court
for the Western District of Texas, Del Rio Division

**REPLY BRIEF FOR APPELLANT**

*(Counsel Listed on Inside Cover)*

KEN PAXTON
Attorney General of Texas

BRENT WEBSTER
First Assistant Attorney General

Office of the Attorney General
P.O. Box 12548 (MC 059)
Austin, Texas 78711-2548
Tel.: (512) 936-1700
Fax: (512) 474-2697

AARON L. NIELSON
Solicitor General
Aaron.Nielson@oag.texas.gov

LANORA C. PETTIT
Principal Deputy Solicitor General

J. ANDREW MACKENZIE
Assistant Attorney General

Counsel for Plaintiff-Appellant

# Table of Contents

Page

Table of Authorities .................................................................................... ii

Introduction ............................................................................................... 1

Argument .................................................................................................... 2

   I.   Texas Established a Likelihood of Success on the Merits .......................... 2

      A.   Texas is likely to succeed on its common-law trespass claim .............. 2

          1.   Congress has waived federal sovereign immunity for Texas's common-law trespass claim .............................................. 3

          2.   Federal law does not authorize the destruction of Texas's border fence ................................................................................... 7

          3.   Federal law does not deprive the district court of jurisdiction to enjoin Defendants' unlawful conduct ................. 13

      B.   Texas is also likely to succeed on its *ultra vires* and APA claims ................................................................................................. 15

          1.   The destruction of Texas's property is *ultra vires* ...................... 15

          2.   Defendants' fence-cutting policy is unlawful final agency action ........................................................................................ 18

   II.   The Remaining Preliminary Injunction Factors Favor Relief ................. 21

      A.   The destruction of Texas's border fence irreparably harms both Texas and its citizens ............................................................. 21

      B.   The equities favor Texas, especially in light of the district court's finding of culpable and duplicitous conduct by Defendants ....................................................................................... 22

      C.   Maintaining "effective" fences to deter drug smuggling, human trafficking, and terrorism is in the public interest .................. 23

Conclusion ................................................................................................ 25

Certificate of Service ................................................................................ 26

Certificate of Compliance ......................................................................... 26

# TABLE OF AUTHORITIES

Page(s)

**Cases:**

*Apter v. HHS*,
   80 F.4th 579 (5th Cir. 2023) ............................................................. 16

*Arizona v. United States*,
   567 U.S. 387 (2012) ............................................................................9

*B.K. Instruments, Inc. v. United States*,
   715 F.2d 713 (2d Cir. 1983) ...............................................................5

*Bd. of Locomotive Eng'rs & Trainmen v. FRRA*,
   972 F.3d 83 (D.C. Cir. 2020) ........................................................... 18

*Biden v. Texas*,
   597 U.S. 785 (2022) .......................................................................... 14

*Danos v. Jones*,
   652 F.3d 577 (5th Cir. 2011) ....................................................... 15, 16

*Dep't of Com. v. New York*,
   139 S. Ct.2552 (2019) ................................................................... 18, 19

*DHS v. Texas*,
   No. 23A607 (U.S. Jan. 13, 2024) ..................................................... 23

*Frozen Foods Express v. United States*,
   351 U.S. 40 (1956) ............................................................................ 19

*Garland v. Aleman Gonzalez*,
   596 U.S. 543 (2022) .......................................................................... 14

*Gonzalez v. DHS*,
   508 F.3d 1227 (9th Cir. 2007) ..................................................... 14, 15

*Guerrero-Lasprilla v. Barr*,
   140 S. Ct. 1062 (2020) ......................................................................20

*Hadley v. Dep't of Corrs.*,
   840 N.E.2d 748 (Ill. App. Ct. 2005) ............................................... 21

*Hancock v. Train*,
   426 U.S. 167 (1976) ............................................................................4

*Harrison v. Young*,
   48 F.4th 331 (5th Cir. 2022) ...............................................................1

*Holder v. Humanitarian L. Project*,
   561 U.S. 1 (2010) ..............................................................................23

*Johnson v. Maryland*,
    254 U.S. 51 (1920) ........................................................................ 8

*Knick v. Twp. of Scott*,
    139 S. Ct. 2162 (2019) ................................................................. 9

*Lincoln v. Vigil*,
    508 U.S. 182 (1993) .....................................................................20

*Match-E-Be-Nash-She-Wish Band of Pottawatomi Indians v. Patchak*,
    567 U.S. 209 (2012) .................................................................. 5, 6

*Medellin v. Texas*,
    552 U.S. 491 (2008) ................................................................... 23

*Michigan v. U.S. Army Corps of Engineers*,
    667 F.3d 765 (7th Cir. 2011) ....................................................... 5

*Monroe v. Pape*,
    365 U.S. 167 (1961) ................................................................... 16

*Nat'l Fed. of Indep. Bus. v. Dep't of Labor*,
    595 U.S. 109 (2022) ................................................................... 11

*Perry Cap. LLC v. Mnuchin*,
    864 F.3d 591 (D.C. Cir. 2017) .................................................... 4

*Register.com, Inc. v. Verio Inc.*,
    356 F.3d 393 (2d Cir. 2004) ....................................................... 21

*Schenck v. Pro-Choice Network of W. N.Y.*,
    519 U.S. 357 (1997) ................................................................... 17

*Taylor-Travis v. Jackson State Univ.*,
    984 F.3d 1107 (5th Cir. 2021) ..................................................... 13

*Texas v. EEOC*,
    933 F.3d 433 (5th Cir. 2019) ................................................. 19, 20

*Thomas v. Reeves*,
    961 F.3d 800 (5th Cir. 2020) ....................................................... 6

*Treasurer of N.J. v. U.S. Dep't of Treasury*,
    684 F.3d 382 (3d Cir. 2012) ..................................................... 4, 7

*Trudeau v. FTC*,
    456 F.3d 178 (D.C. Cir. 2006) ............................................. 3, 4, 6

*U.S. Info. Agency v. Krc*,
    989 F.2d 1211 (D.C. Cir. 1993) ................................................... 5

*United States v. Brignoni-Ponce*,
    422 U.S. 873 (1975) ................................................................... 23

*United States v. Lee,*
   106 U.S. 196 (1882) ........................................................... 7, 24

*United States v. Washington,*
   596 U.S. 832 (2022) ................................................................ 8

*Vitol, Inc. v. United States,*
   30 F.4th 248 (5th Cir. 2022) ................................................. 6

*West Virginia v. EPA,*
   142 S. Ct. 2587 (2022) ......................................................... 10

*Winter v. Nat. Res. Def. Council, Inc.,*
   555 U.S. 7 (2008) .................................................................. 1

**Statutes:**

5 U.S.C.
   § 701 ...................................................................................... 7
   §702 .................................................................. 1, 3, 4, 5, 6, 7
   §706(2)(A) ............................................................................ 20
   §706(2)(C) ............................................................................ 20

8 U.S.C.
   §1252(f)(1) .............................................................. 13, 14, 15
   §1357(a)(3) ................................................................ 9, 11, 18

42 U.S.C. §1983 ........................................................................ 16

**Other Authorities:**

A. Scalia & B. Garner, Reading Law: The Interpretation
   of Legal Texts (2012) ...................................................... 3, 6

H.R. Rep. No. 94-1656 .............................................................. 7

Restatement (Second) of Torts ........................................... 21

Richard H. Fallon, Jr., et al., Hart & Wechsler's The
   Federal Courts and the Federal System (7th ed.
   2015) ...................................................................................... 4

# Introduction

Defendants attempt to frame this dispute as one about their immigration authority. Texas, however, merely seeks to protect its property. The only possible relevance of immigration law is at the back end, as a potential justification for otherwise unlawful activity. But the district court found that Defendants' actions "directly contravene" their statutory obligations. ROA.954. The repeated cutting, smashing, and tearing of Texas's border fence is property destruction plain and simple, and Texas is as entitled to legal protection as any other property owner.

The district court declined to issue a preliminary injunction for one reason only: its mistaken view that federal sovereign immunity barred Texas's common law claims. A motions panel of this Court corrected that error, following other circuits to read 5 U.S.C. §702 by its plain terms to waive immunity for *all* actions seeking nonmonetary relief against a federal agency or officer. With that hurdle cleared, Texas's entitlement to relief flows from the familiar *Winter* factors. *See Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008); Opening Br. 15 (citing *Harrison v. Young*, 48 F.4th 331, 339 (5th Cir. 2022)).

The Court should give considerable weight to the district court's factual findings regarding Defendants' "culpable" and "duplicitous" conduct, ROA.932; Defendants' "cynical" and "disingenuous" arguments, ROA.936; Defendants' resort to an "illusory and life-threatening" conception of their authority, ROA.954; Defendants' "dubious" arguments about what exigencies require, ROA.955; the "evasive answers and demeanor" of Defendants' testifying witnesses, ROA.935 n.4; and Defendants' persistent practice of unwarranted property destruction, ROA.153

(September 20, 2023 incident); ROA.158 (September 26, 2023 incident); ROA.247 (October 24, 2023 incident); ROA.278 (October 27, 2023 incident); ROA.282 (issuance of TRO).

Defendants' actions, moreover, are more than just unlawful—though that alone is enough to warrant an injunction. They are also dangerous. Destroying fences encourages perilous river crossings, which places migrants—not to mention state and federal rescue teams—at risk. ROA.934-35. Texas's border fence is also an "effective" deterrent to drug smugglers, human traffickers, and terrorists. ROA.934. The 29 miles of fencing at issue here serves most immediately to protect Eagle Pass, which declared a state of emergency "due to the severe undocumented immigrant surge" around the same time that Defendants began their fence-cutting policy. ROA.27. But it also safeguards the public more generally. By any measure, Texas is entitled to injunctive relief.

## Argument

## I.  Texas Established a Likelihood of Success on the Merits.

### A.  Texas is likely to succeed on its common-law trespass claim.

As the district court noted, "Defendants do not challenge [Texas's] proprietary interest in the integrity of [its] fence." ROA.937. "They also admit that they did, in fact, cause the asserted harm to the fence." ROA.937. Indeed, even now, Defendants do not deny that their conduct meets the elements of Texas's trespass-to-chattels claim. The district court nevertheless declined to grant Texas's requested relief based on sovereign immunity. ROA.945. For the reasons identified by the motions

panel, that was error. ROA.1014. Congress has broadly waived the United States' immunity from suits for specific relief against federal agencies and officers. That includes suits raising common-law claims.

To the extent they have not been waived or forfeited, Defendants' counterarguments fail. The district court correctly concluded that Defendants "cannot claim the statutory duties they are so derelict in enforcing as excuses to puncture" Texas's fence. ROA.954. And, for largely the same reason, the Immigration and Nationality Act's remedial bar is inapplicable.

### 1. Congress has waived federal sovereign immunity for Texas's common-law trespass claim.

In 1976, Congress waived the United States' sovereign immunity from suits "seeking relief other than money damages" against federal agencies or officers. 5 U.S.C. §702. The motions panel correctly held that §702 "plainly waives immunity for Texas's trespass to chattels claim." ROA.1015.

Defendants (at 25-33) ask the Court to infer a state-law carveout to §702's plain language. But "the presumed point of using general words is to produce general coverage—not to leave room for courts to recognize ad hoc exceptions." A. Scalia & B. Garner, READING LAW: THE INTERPRETATION OF LEGAL TEXTS 101 (2012) (Scalia & Garner). Courts across the country thus read §702's broad language broadly, recognizing that it "'elimina[tes] the sovereign immunity defense in *all* equitable actions for specific relief against a Federal agency or officer acting in an official capacity.'" *Trudeau v. FTC*, 456 F.3d 178, 186 (D.C. Cir. 2006); *see* ROA.1016 n.5 (collecting cases). Indeed, it is hornbook law that §702's plain terms

waive sovereign immunity as to "any suit" seeking nonmonetary relief in federal court. Richard H. Fallon, Jr., et al., HART & WECHSLER'S THE FEDERAL COURTS AND THE FEDERAL SYSTEM 902 (7th ed. 2015).

As the motions panel explained, §702's categorical waiver applies to state-law claims. *See* ROA.1015-16. In *Perry Capital LLC v. Mnuchin*, for example, the D.C. Circuit rejected a federal agency's contrary argument as inconsistent with that court's "repeated[]" and "express[]" holdings that §702's waiver "applies to any suit." 864 F.3d 591, 620 (D.C. Cir. 2017) (quoting *Trudeau*, 456 F.3d at 186). As here, the state-law claims at issue in *Mnuchin* included "various common-law torts." *Id*. at 598. Similarly, in *Treasurer of New Jersey v. U.S. Department of Treasury*, the Third Circuit ruled that §702's waiver applied to an unclaimed property suit brought by seven States "making claims under state, not federal[,] law." 684 F.3d 382, 401 (3d Cir. 2012). It rejected the federal government's contention that "the waiver of sovereign immunity should be limited to actions brought under federal law rather than state law" because it could find "no support" for such a distinction "in either the text or the history of section 702." *Id*. at 400 n.19. Defendants fault these authorities (at 29) for not being more verbose. But tight prose follows tight logic, and §702's plain language speaks for itself.

Defendants respond (at 26) that Congress must be even clearer if it wants to subject the federal government to state regulation. But Texas is not seeking to subject the federal government to anything like a state permit requirement. *See Hancock v. Train*, 426 U.S. 167, 174 (1976). Texas seeks only to vindicate its own property rights under generally applicable law. And in any event, Congress spoke clearly. There is

no textual basis for limiting §702's scope to claims arising under federal law. Defendants cannot dispute that adopting their reading would make this Court the first ever to split from its sister circuits to read §702 contrary to its plain text.

Defendants also contend (at 31-33) that the Federal Tort Claims Act (FTCA) is the exclusive remedy for all state tort actions, irrespective of whether monetary or nonmonetary relief is sought. Precedent is again to the contrary. In *Michigan v. U.S. Army Corps of Engineers*, the United States argued that the FTCA implicitly excludes common-law tort claims from the scope of §702's waiver. 667 F.3d 765, 775 (7th Cir. 2011). The Seventh Circuit disagreed, holding that the FTCA does not contain a "ban against specific relief in tort cases against the government, and thus that plaintiffs in such cases may take advantage of the waiver in §702." *Id.* (citing *U.S. Info. Agency v. Krc*, 989 F.2d 1211, 1216 (D.C. Cir. 1993)). Defendants' attempt (at 33) to distinguish *Michigan* is ineffective because it is based on a portion of the opinion that just provided additional support for an already completed analysis. *See id.* at 776. And Defendants' suggestion (at 33) that *Match-E-Be-Nash-She-Wish Band of Pottawatomi Indians v. Patchak*, 567 U.S. 209 (2012), somehow abrogated *Michigan* (and *B.K. Instruments, Inc. v. United States*, 715 F.2d 713 (2d Cir. 1983))—even though it found that the Quiet Title Act did *not* impliedly bar application of §702's waiver—is unexplained.

Defendants' reading, moreover, creates a gaping hole in federal law. In *Patchak*, the Supreme Court adopted the sound principle, originally proffered by then-Assistant Attorney General Scalia shortly after §702's enactment, that remedial statutes "not addressed to the type of grievance which the plaintiff seeks to assert"

do not limit the scope of §702. *Patchak*, 567 U.S. at 216 (citation omitted). That principle controls here. Texas does not seek damages for past injuries—the relief the FTCA authorizes. Rather, it seeks protection from future and ongoing harm. The law of remedies has long recognized the fundamental distinction between these categories of interests and thus has authorized injunctive relief "[w]hen a trespass is continuous such that stopping it would require a multiplicity of suits." ROA.1020 (motions panel) (quotation marks omitted); *see also* ROA.939 (district court). Because damages cannot adequately redress ongoing, willful destruction of property, "the only appropriate remedy would be injunctive relief." ROA.939. Defendants' only response is to mischaracterize Texas's grievance (at 2, 14, 46-47) as a dollars-and-cents complaint. But this dispute over one sovereign's attempt to exercise dominion over another sovereign's property cannot be recast as a spat over "the price of [Texas's] wire." Response Br. 2.

Defendants' reliance (at 27-29, 31-33) on legislative history is misplaced. For one, the Court "need not consider legislative history or abstract congressional purpose" because "'[t]he truest indication of what Congress intended is what Congress enacted.'" *Vitol, Inc. v. United States*, 30 F.4th 248, 253 (5th Cir. 2022) (quoting *Thomas v. Reeves*, 961 F.3d 800, 826 (5th Cir. 2020) (Willett, J., concurring)); *see also* Scalia & Garner at 103-04. For another, the legislative record supports Texas. "[T]he House and Senate Reports' repeated declarations that Congress intended to waive immunity for 'any' and 'all' actions for equitable relief against an agency make clear that no [other] limitations were intended." *Trudeau*, 456 F.3d at 187 (citations omitted). Those reports posed three limits on §702's

waiver: "First, the amendment only waives sovereign immunity for actions in a federal court; second, such actions must seek non-monetary relief; and third, it is 'applicable only to functions falling within the definition of "agency" in 5 U.S.C. section 701.'" *Treasurer of N.J.*, 684 F.3d at 400 (citation omitted). "But the House Report does not state that there is a fourth limitation limiting the waiver of sovereign immunity." *Id.*

Finally, Defendants' argument (at 28-29) regarding Congress's elimination of the amount-in-controversy requirement reflects the mental gymnastics required to avoid the text of §702. Because the statute's language is plain, there is no need (or basis) to speculate about Congress's purposes. Regardless, on its face, "the right [here] asserted cannot be valued in dollars and cents," H.R. Rep. No. 94-1656, at 3—thus bringing this litigation within the very language Defendants present. Individuals have long been able to bring non-monetary actions against federal officers who violate state law without federal authorization. *See, e.g.*, *United States v. Lee*, 106 U.S. 196 (1882). Nothing in §702's history suggests an intention to bar such longstanding suits; rather, it allows such claims to be brought against the United States in federal court.

### 2. Federal law does not authorize the destruction of Texas's border fence.

Defendants told the district court and the motions panel that intergovernmental immunity essentially grants them an unconstrained license to destroy Texas's property. ROA.599; ECF No. 45-1 at 12-13. Intergovernmental immunity, however, applies only where a state (1) "regulat[es] the United States directly" or

(2) "discriminat[es] against the Federal Government or those with whom it deals." *United States v. Washington*, 596 U.S. 832, 838 (2022). As the motions panel correctly explained, "Texas is neither directly regulating the Border Patrol nor discriminating against the federal government." ROA.1018. It is instead "exercising its rights only as a proprietor." ROA.1018.

Defendants complain (at 37) that because respecting Texas's property rights could make their job more difficult, enforcement of those rights amounts to "regulation" of the federal government. But a state law does not violate intergovernmental immunity "just because it indirectly increases costs for the Federal Government, so long as the law imposes those costs in a neutral, nondiscriminatory way." *Washington*, 596 U.S. at 839. Unlike the state law at issue in *Washington*, which "singled out the Federal Government for unfavorable treatment," *id.*, Texas invokes a longstanding common-law duty that applies to everyone.

Defendants counter (at 36) that this understanding of intergovernmental immunity is too narrow because "the Constitution would [not] tolerate an action for trespass against an FBI agent executing a warrant." But if the FBI agent lacked a valid defense of government authorization, "[o]f course" the agent would be subject to liability for trespass. *Johnson v. Maryland*, 254 U.S. 51, 56 (1920) (explaining that "an employee of the United States does not secure a general immunity from state law while acting in the course of his employment" and holding out tort liability for negligence "under the common law of a state" as an example). Indeed, before enactment of the Tucker Act and the FTCA, the contours of federal authority were

commonly adjudicated as an affirmative defense to common-law causes of action. *See, e.g.*, *Knick v. Twp. of Scott*, 139 S. Ct. 2162, 2176 (2019).

Perhaps recognizing the limits of intergovernmental immunity, Defendants now argue (at 35-36) that Texas's tort law is preempted and (at 34, 36, 38) that Supremacy Clause immunity shields their conduct. Those arguments are waived. Before the district court, Defendants expressly disavowed reliance on preemption principles generally and on federal immigration authority under *Arizona v. United States*, 567 U.S. 387 (2012), in particular. ROA.1081-82. Defendants insisted that this case is "better" classed under the intergovernmental-immunity heading. ROA.1082. In fact, Defendants did not use either the word "preemption" (or any variant of that word) or the term "Supremacy Clause immunity" in their district-court opposition to Texas's preliminary-injunction motion, ROA.578; their district-court supplemental brief on Texas's APA claims, ROA.799; or their district-court opposition to Texas's emergency motion for an injunction pending appeal, ROA.980.

These doctrines do not help Defendants in any event. No federal statute declares—either expressly or impliedly—that property rights vanish at the border. The only law that is even arguably relevant, 8 U.S.C. §1357(a)(3), authorizes federal agents acting without a warrant "within a distance of twenty-five miles from [the border] to have access to private lands, not dwellings, for the purpose of patrolling the border to prevent the illegal entry of aliens into the United States." No amount of parsing can transform an exception to the warrant requirement into a license to destroy private property.

On its face, nothing in the statute allows federal officials to destroy private property when they have no need to do so. As the district court held, "Defendants cannot justify cutting or moving the Plaintiff's fence whenever and wherever they find convenient based on a supposed need to access the river by boat and foot so they may passively observe migrants crossing." ROA.952. Otherwise, Defendants would have *carte blanche* to destroy every fence in a 30,000-square-mile area. *See* ROA.18 (reflecting that Texas borders Mexico for more than 1,200 miles). Congress has never authorized federal agents to preemptively destroy every fence in an area roughly the size of South Carolina even when they already have access to the property. *Cf. West Virginia v. EPA*, 142 S. Ct. 2587, 2608-09 (2022).

Nor have Defendants ever, until now, pressed such an aggressive reading of the statute. Instead, "Border Patrol guidance dating back to the 1980s has advised Border Patrol Agents to work with private landowners where the agents encounter locked gates prohibiting access to the border." ROA.948. That guidance "requires that agents take steps to work with the owner to gain access." ROA.949. And although the guidance contemplates that locks and fences may sometimes be cut, it "instructs agents to take steps to close gates, make available repairs to fencing, and take other steps to ameliorate any damage." ROA.949. The federal agents who cut Texas's fence do none of those things. They do not warn Texas officials before cutting the fence. ROA.248. And they certainly do not make any attempts to repair the damage they have done. To the contrary, agents have been seen cutting additional holes within feet of existing breaches—seemingly just to prove that they can. ROA.156-57. And when one Texas official told a senior federal agent that

Texas's engineers would need to be called to repair the fence, the federal agent responded: "If that's the case, I will tie a f\*\*\*ing tow strap to this sh\*t and rip it all out." ROA.156.

Defendants further argue (at 17 n.4, 49) that they have "inhere[nt]" power to cut Texas's border fence, especially when necessary to respond to emergencies. That turns administrative law on its head. Because federal agencies are "creatures of statute," they "possess only the authority that Congress has provided." *Nat'l Fed. of Indep. Bus. v. Dep't of Labor*, 595 U.S. 109, 117 (2022). Here, Texas allows—and its requested preliminary injunction would incorporate—a limited privilege to permit fence cuttings when necessary to render life-saving aid. The problem is that Defendants seek authority to destroy fencing even absent exigency, on the apparent theory that an exigency might someday arise. That theory is limitless. It is always possible that an emergency *could* leave insufficient time to negotiate a fence and render assistance, especially when Defendants are attracting people to dangerous river crossings. The theory is also irrelevant because, again, Defendants already have access to the river where the emergencies most often materialize. ROA.950.

Even if §1357(a)(3) did implicitly authorize such wanton destruction, the district court also found that, whatever it is Defendants are doing, they are in no way acting "to prevent the illegal entry of aliens," §1357(a)(3). To the contrary, the court found that their policy is not designed to prevent illegal entry at all but rather is "encouraging . . . people to come." ROA.1318. That is not just an "accusation" by Texas; it is the finding of a federal judge. *See* ROA.935. Indeed, while watching more than two thousand people cross the Rio Grande illegally, the same senior federal

agent who made the colorful tow-strap remark vowed to keep the fence open "until they are all in." ROA.156. Defendants have permitted people—who may well be U.S. citizens engaged in drug trafficking (or worse)—to walk past the fence "without a single question or even a hello from a Border Patrol agent." ROA.1226. The district court was correct that waving those crossing the border deeper into the United States without attempting to repel or apprehend them is not enforcing the immigration laws. *See, e.g.*, ROA.936, 954.

Defendants' attempt (at 19-20) to recharacterize the district court's factual findings as legal conclusions also fails. Contrary to Defendants' claim (at 21), the district court did not "demand that Border Patrol take immediate physical custody of migrants once they crossed the wire." Instead, the relevant finding is that whatever their statutory authority might permit, Defendants are not remotely trying to enforce immigration law when they cut Texas's fence. ROA.935, 953-54. Having heard the live testimony of witnesses and reviewed the extensive video and documentary evidence, the district court correctly concluded that Defendants' attempts to defend their conduct using federal immigration law are "cynical" and "disingenuous." ROA.936. Defendants, moreover, violated even their own reading of the law. Defendants did not prevent migrants from "proceed[ing] further into the United States," Response Br. 22; instead, to the extent that some people "elect to declare themselves at a processing center, their decision to do so can hardly be attributed to any acts to restrict their freedom of movement by Defendants." ROA.953

Nor are Defendants' efforts (at 22-24) to establish clear error convincing. Even if this Court would have "weighed the evidence differently," it must accept the district court's findings so long as they are "plausible in light of the record viewed in its entirety." *Taylor-Travis v. Jackson State Univ.*, 984 F.3d 1107, 1116 (5th Cir. 2021) (quotation marks omitted). Yet Defendants relitigate assertions that the district court rejected after careful review. In fact, the district court made credibility findings about the federal officials who testified, documenting their "totally uncorroborated" assertions and "evasive answers and demeanor." ROA.935 n.4. Defendants' theory (which, tellingly, they never actually claim to be true) that federal officials might have performed their statutory duties some other time off-camera is not credible. They also fail to furnish any evidence that they really did succeed in processing 2,000 unaccounted-for aliens who crossed on September 20.

After the motions panel's decision, Defendants raised new and strenuously disputed fact issues at the Supreme Court. *See* ECF No. 117-1 at 2 & n.1 Uncertainty about the current facts in Eagle Pass likely played heavily into the Supreme Court's decision to vacate the motions panel's injunction pending appeal. This Court prudently held this appeal in abeyance so that the district court can conduct further fact finding and bring clarity to the situation. *Id.* at 3. Texas is confident that its conduct will again be vindicated in those proceedings.

### 3. Federal law does not deprive the district court of jurisdiction to enjoin Defendants' unlawful conduct.

Defendants invoke (at 43) 8 U.S.C. §1252(f)(1), a remedial bar in the Immigration and Nationality Act. Section 1252(f)(1) strips lower federal courts of

"jurisdiction or authority to enjoin or restrain the operation" of specified provisions in Title 8 governing inspection, apprehension, and removal of noncitizens. Texas has already explained how Defendants waived reliance on this provision. Opening Br. 26-27. Defendants' only response (at 45) is that §1252(f)(1) is jurisdictional and thus cannot be waived. But the Supreme Court sees it differently: Rather than limiting a court's power to adjudicate a given claim, §1252(f)(1) just restricts access to "a specific category of remedies," *Biden v. Texas*, 597 U.S. 785, 798 (2022), and Defendants have already consented to be subject to those remedies, ROA.931 (noting that both parties consented to the extension of the TRO).

Even if preserved, the argument is unavailing because Texas does not seek to interfere with Defendants' Title 8 responsibilities. Texas would like nothing more than for Defendants to inspect, apprehend, and remove noncitizens. Defendants respond (at 44-45) that Texas's requested relief is a veiled attempt to compel the federal government to enforce the immigration laws in contravention of *Garland v. Aleman Gonzalez*, 596 U.S. 543, 552-54 (2022). But Texas's desire to see Defendants fulfill their statutory mandates does not bear on the State's entitlement as an ordinary property owner to protection from unlawful trespass. Here, Texas seeks only to protect its property rights. And a preliminary injunction would accomplish that goal with, at most, only a "collateral effect" on the operation of any covered provisions in Title 8. *Id*. at 553 n.4.

*Aleman Gonzalez* is clear that ancillary repercussions are not sufficient to trigger §1252(f)(1). Indeed, it cited as an example a case involving an injunction only "one step removed" from the operation of covered provisions. *Gonzalez v. DHS*, 508 F.3d

1227, 1233 (9th Cir. 2007); *see Aleman Gonzalez*, 596 U.S. at 553 n.4. The order at issue enjoined the unlawful application of an INA provision governing alien status adjustments. *Gonzalez v. DHS*, 508 F.3d at 1233. Although the adjustment-of-status provision was not itself covered by the INA's remedial bar, the order's practical effects would likely include the commencement of removal proceedings under another provision that *was* covered. *Id*. The Ninth Circuit nevertheless correctly held §1252(f)(1) inapplicable because removal proceedings were just a "collateral consequence" of the district court's order. *Id*. Here, the possibility that Texas's requested relief might impact Defendants' Title 8 authorities to apprehend, inspect, and remove noncitizens is even more attenuated. In fact, it should have no effect at all because Defendants would retain access to the river. ROA.950.

## B. Texas is also likely to succeed on its *ultra vires* and APA claims.

### 1. The destruction of Texas's property is *ultra vires*.

Texas is likely to succeed on its *ultra vires* claim because Congress has not authorized Defendants to destroy others' property for reasons having nothing to do with the enforcement of federal law. The district court found that the "evidence presented amply demonstrates" that, if anything, Defendants' actions "contravene" their "statutory obligations." ROA.954. After reviewing extensive video, documentary, and testimonial evidence, the district court concluded that "[a]ny justification resting on Defendants' illusory and life-threatening 'inspection' and 'apprehension' practices, or lack thereof, fail[s]." ROA.954.

Defendants correctly quote (at 18) this Court's decision in *Danos v. Jones* for the proposition that a successful *ultra vires* claim must "do more than simply allege that

15

the actions of the officer are illegal or unauthorized": it must "allege facts sufficient to establish that the officer was acting 'without any authority whatever,' or without any 'colorable basis for the exercise of authority.'" 652 F.3d 577, 583 (5th Cir. 2011) (citations omitted). That is the case here.

This Court's recent decision in *Apter v. Department of Health & Human Services* is illustrative. 80 F.4th 579 (5th Cir. 2023). *Apter* involved a challenge to social-media posts published by the Food and Drug Administration advising patients not to treat COVID-19 with ivermectin. *Id.* at 583. Citing *Danos*, the district court rejected the plaintiffs' *ultra vires* claims on the theory that the FDA's enabling act provided a colorable basis for the posts when it charged the FDA with "protecting public health and ensuring that regulated medical products are safe and effective." *Id.* at 586 (citation omitted). This Court reversed, following a straightforward syllogism: "(1) FDA cannot act without express statutory authority, (2) FDA does not have express authority to recommend against off-label uses of drugs approved for human use, (3) the Posts recommend against ivermectin, therefore (4) the Posts are beyond FDA's authority." *Id.* at 588.

*Apter* thus shows that the *ultra vires* analysis is nothing like 42 U.S.C. §1983's "under color of law" framework. The question is not whether Defendants were "clothed with [government] authority," *Monroe v. Pape*, 365 U.S. 167, 184 (1961), when they cut Texas's fences, but whether they acted in accordance with federal law. *Apter* explained that "while FDA cites plenty of statutory authority allowing it to issue *information*, it never identifies even colorable authority allowing it to make medical *recommendations*." 80 F.4th at 589. Here, Defendants cite plenty of statutory

authority to inspect, apprehend, and detain noncitizens; but they identify no colorable authority to cut fences just to "passively observe migrants crossing." ROA.952.

Defendants complain (at 19) that even if their previous fence-cuttings lacked justification, Texas's requested relief is too broad because it would bar fence cutting "even in cases where such cutting is for authorized purposes." That argument is a red herring because—once more, as the district court found—Border Patrol already has access to the river. ROA.950. That finding is supported by declarations and photographic evidence. *See, e.g.*, ROA.154-55, 158. Defendants, in other words, do not need to cut Texas's fence at all.

Attempting to evade that finding, Defendants complain (at 7) that they do not have enough boats to cover the area—as if the United States of America can't send more boats. Nothing in federal law allows Defendants to destroy private property just because they would rather not reposition their equipment. Regardless, as the district court found, people attempt dangerous river crossings in Eagle Pass because of the "perverse incentive" created by Defendants. ROA.954. They gather on the Mexico side of the river when they see federal agents preparing to breach the fence. ROA.247, 278. Video also shows that federal airboats sit passively in the water while lines of people cross the river to take advantage of these breaches. ROA.154-55, 159, 248. In all events, Defendants ignore that a judge's discretion to fashion effective equitable relief includes, when appropriate, prophylactic relief. *See e.g.*, *Schenck v. Pro-Choice Network of W. N.Y.*, 519 U.S. 357, 381-82 (1997). Because Defendants

have a documented history of escalating tensions through wanton and lawless behavior, such relief is necessary here.

### 2.     Defendants' fence-cutting policy is unlawful final agency action.

Texas is also likely to succeed on its APA claims. Defendants continue (at 38-41) to resist the conclusion that their admitted policy "within Eagle Pass" of permitting the destruction of Texas's fence constitutes final agency action. According to Defendants (at 40), their policy cannot be deemed final until it is carried out by border agents. Binding precedent is to the contrary.

Defendants describe their policy (at 40-41) as "remind[ing] Border Patrol agents of authority they already possess" under 8 U.S.C. §1357(a)(3). But that is not the policy, nor does §1357(a)(3) authorize cutting fences. As Texas has explained, Defendants have a policy of "destroying Texas's [border fence] to encourage and assist thousands of aliens to illegally cross the Rio Grande and enter Texas." ROA.92. Indeed, Defendants' policy appears to authorize federal officials to destroy Texas's property "without restraint." ROA.1233. That is a classic species of final agency action: an agency's binding interpretation of its own statutory authority.

Texas could better establish the details of the policy if it had access to the relevant documents. Defendants protest (at 39 n.9) that APA claims are not generally subject to discovery. Yet that is because policies are usually made public; here, by contrast, Defendants (unsurprisingly) have avoided publishing the policy. But that does not prevent review. *See, e.g.*, *Bd. of Locomotive Eng'rs & Trainmen v. FRRA*, 972 F.3d 83, 100 (D.C. Cir. 2020); *see generally Dep't of Com. v. New York*, 139 S. Ct.

2552, 2575 (2019) (explaining that courts are "not required to exhibit a naiveté from which ordinary citizens are free") (citation omitted).

"Courts consistently hold that an agency's guidance documents binding it and its staff to a legal position produce legal consequences or determine rights and obligations, thus"—so long as the decision is final—satisfying the final-agency-action requirement. *Texas v. EEOC*, 933 F.3d 433, 441 (5th Cir. 2019). In *Frozen Foods Express v. United States*, 351 U.S. 40 (1956), for example, an order specifying which commodities were exempt from regulation was deemed reviewable even though the order would have effect only if a particular action was brought against a particular carrier. *See id.* at 44. In fact, Defendants' argument echoes that of the dissent in *Frozen Foods*. *See e.g.*, *id.* at 45 (Harlan, J., dissenting) (arguing against review because the order had not yet been applied against a carrier). And in *EEOC*, this Court held that agency guidance regarding the appropriate analytical method for conducting Title VII investigations was final because it required "agency staff to use a multi-factor analysis in deciding whether a regulated entity's activity complied with governing law." *EEOC*, 933 F.3d at 443.

So too here. Defendants' fence-cutting policy is a final decision that purports to authorize federal officers to destroy Texas's property. Defendants do not suggest that they are still deciding what their policy should be. Nor do they dispute that their interpretation of statutory language is binding on their staff. Instead, they argue (at 40) that the policy is not final agency action because individual agents must decide how to implement the policy with respect to particular facts. Every policy, however, must be applied in individual cases. That is why this Court considers agency action

final when it "has the effect of committing the agency itself to a view of the law that, in turn, forces the plaintiff either to alter its conduct, or expose itself" to financial loss. *EEOC*, 933 F.3d at 446 (citation omitted). That is the case here. Trial testimony, in any event, showed that any so-called discretion under agency policy could *always* be exercised the same way under routine circumstances. *See* ROA.1159-60.

Defendants argue (at 41 n.10) that Texas forfeited its notice-and-comment claim by failing to raise it in its opening brief. But the district court denied Texas's APA claims because it concluded that Texas failed to identify reviewable final agency action *at all*; it never addressed the separate issue of whether Defendants satisfied the requirements for *lawful* final agency action. ROA.959. Regardless, Texas raised the notice-and-comment issue when it reiterated that the APA permits judicial review of agency action that is "arbitrary," "capricious," "*not in accordance with law*," or "in excess of statutory . . . authority." Opening Br. 29 (emphasis added) (quoting 5 U.S.C. §706(2)(A), (C)). Here, Defendants' policy is unlawful under the APA because, among other reasons, Defendants have not satisfied any required statutory procedures.

Defendants also argue (at 42-43) that their wire-cutting policy is "committed to agency discretion by law." (quoting *Lincoln v. Vigil*, 508 U.S. 182, 190-91 (1993)). But Congress has never authorized them to destroy Texas's property, much less has it granted them *unreviewable* authority to do so. Defendants cannot override the "presumption of reviewability*,*" *Guerrero-Lasprilla v. Barr*, 140 S. Ct. 1062, 1069

(2020), especially given the district court's factual finding that Defendants' fence cuttings have nothing to do with enforcing immigration law. ROA.954.

## II. The Remaining Preliminary Injunction Factors Favor Relief.

### A. The destruction of Texas's border fence irreparably harms both Texas and its citizens.

Like any property owner, Texas has a fundamental interest in avoiding repeated infringement of its rights by a willful tortfeasor. The motions panel was therefore correct that there was "no error, clear or otherwise," in the district court's finding that Texas would suffer irreparable harm in the absence of a preliminary injunction. ROA.1019.

Defendants downplay such equitable principles to contend (at 46-47) that damages are always adequate to remedy a trespass to chattels. Precedent says otherwise. *See, e.g.*, *Register.com, Inc. v. Verio Inc.*, 356 F.3d 393, 404 (2d Cir. 2004); *Hadley v. Dep't of Corrs.*, 840 N.E.2d 748, 756 (Ill. App. Ct. 2005). Whether an injunction is necessary to prevent irreparable harm hinges on the "adequacy to the plaintiff of an injunction as compared with other remedies." Restatement (Second) of Torts §938. Damages for past harm would be inadequate to redress Texas's ongoing injuries because they would not address Texas's ongoing loss of control over its property. A damages award would also require Texas to return to the courthouse every time another incident occurs—thus potentially requiring a new lawsuit every day. As the motions panel recognized, "[w]hen a trespass is continuous such that stopping it would require a 'multiplicity of suits,' an injunction is justified." ROA.1020 (citing authorities).

Loss of control and multiplicity of suits, however, are not the only reasons a monetary remedy would be inadequate. A fence, by design, exists to prevent dangerous circumstances from occurring, and damages do not compensate for the increased risks to public safety that Texas's citizens must bear so long as Defendants are allowed to keep enforcing their unlawful fence-cutting policy. Texas communities are already reeling from the surge of people crossing the border. *See* ROA.27. The district court found Texas's fence to be "effective" in preventing drug runners, human traffickers, weapons smugglers, and others from unlawfully entering the United States. ROA.934. Texas is irreparably harmed by actions that thwart its lawful efforts to protect its citizens.

## B.  The equities favor Texas, especially in light of the district court's finding of culpable and duplicitous conduct by Defendants.

Even in an ordinary case, the balance of equites would favor Texas. Yet here, the district court characterized Defendants' attempts to justify their conduct as "dubious," ROA.955, "cynical," ROA.936, "disingenuous," ROA.936, and "evasive," ROA.935 n.4. In addition to being "illusory," Defendants' rationalizations are "life-threatening" to the individuals they affect. ROA.954. Those finding overwhelmingly support an injunction.

For similar reasons, any concerns about relations with Mexico fail as a matter of law. For one, this argument confirms that Defendants have a fence-cutting policy; it defies credulity that the United States would let individual border officers conduct international diplomacy via on-the-spot judgments. Regardless, this Court's "precedents, old and new, make clear that concerns of national security and foreign

22

relations do not warrant abdication of the judicial role." *Holder v. Humanitarian L. Project*, 561 U.S. 1, 34 (2010). That is particularly so where, as here, Defendants are acting beyond their authority. *See Medellin v. Texas*, 552 U.S. 491 (2008).

Defendants have no response except to accuse Texas (at 50-51) of wrongfully asserting jurisdiction over a municipal park in Eagle Pass. Border Patrol, however, has access to the Shelby Park boat ramp. *See* Texas Response to U.S. Supp. Memo. at 5, *DHS v. Texas*, No. 23A607 (U.S. Jan. 13, 2024). Furthermore, Defendants have elsewhere conceded that the events at Shelby Park are irrelevant to the questions presented here. *See* Second Supp. Memo at 5, *DHS v. Texas*, No. 23A607 (U.S. Jan. 17, 2024). Such issues, moreover, will be clarified on remand. And in all events, there is no equivalence between asserting the right to destroy another's property and asserting the right to protect one's own property.

### C. Maintaining "effective" fences to deter drug smuggling, human trafficking, and terrorism is in the public interest.

"[T]he public interest demands effective measures to prevent the illegal entry of aliens at the Mexican border." *United States v. Brignoni-Ponce*, 422 U.S. 873, 878 (1975). The district court found that Texas's fencing is an "effective" measure to help reduce the public harms associated with illegal immigration. ROA.934, 953-54.

Defendants' expression of concern (at 49) about risks to those attempting river crossings rings hollow given the district court's express and well-considered factual finding that "the very emergencies the Defendants assert make it necessary to cut the wire are of their own creation." ROA.935. As the district court found, it is not Texas's fence, but Defendants' conduct in breaching the fence, that endangers lives

by enticing people to cross at "unofficial and unlawful port[s] of entry." ROA.953. The fact that Border Patrol already has access to the river, ROA.950, further confirms that it is not necessary to destroy Texas's property even if an emergency were to occur.

And in all events, this argument proves too much; it would allow Defendants to prospectively cut down any fence within 25 miles of the border based on the speculative prospect that one day an emergency *might* occur.

Finally, Defendants appeal (at 48) to the "constitutional structure" and the supremacy of federal law. But "[a]ll the officers of the government, from the highest to the lowest, are creatures of the law and are bound to obey it." *Lee*, 106 U.S. at 220. As the motions panel put it, "[t]here is generally no public interest in the perpetuation of unlawful agency action," and there is "substantial public interest in having governmental agencies abide by the federal laws that govern their existence and operations." ROA.1020-21. Texas is entitled to injunctive relief because Defendants—for reasons of their own—have repeatedly shown themselves unwilling to follow the law, whether state or federal.

## Conclusion

The Court should reverse the district court's order denying a preliminary injunction and remand the case for entry of the requested relief.

Respectfully submitted.

Ken Paxton
Attorney General of Texas

Brent Webster
First Assistant Attorney General

/s/ Aaron L. Nielson

Aaron L. Nielson
Solicitor General
Aaron.Nielson@oag.texas.gov

Lanora C. Pettit
Principal Deputy Solicitor General

Office of the Attorney General
P.O. Box 12548 (MC 059)
Austin, Texas 78711-2548
Tel.: (512) 936-1700
Fax: (512) 474-2697

J. Andrew Mackenzie
Assistant Attorney General

Counsel for Plaintiff-Appellant

## CERTIFICATE OF SERVICE

On January 30, 2024, this brief was served via CM/ECF on all registered counsel and transmitted to the Clerk of the Court. Counsel further certifies that: (1) any required privacy redactions have been made in compliance with Fifth Circuit Rule 25.2.13; (2) the electronic submission is an exact copy of the paper document in compliance with Fifth Circuit Rule 25.2.1; and (3) the document has been scanned with the most recent version of Symantec Endpoint Protection and is free of viruses.

/s/ Aaron L. Nielson
AARON L. NIELSON

## CERTIFICATE OF COMPLIANCE

This brief complies with: (1) the type-volume limitation of Federal Rule of Appellate Procedure 32(a)(7)(B) because it contains 6,383 words, excluding the parts of the brief exempted by Rule 32(f); and (2) the typeface requirements of Rule 32(a)(5) and the type style requirements of Rule 32(a)(6) because it has been prepared in a proportionally spaced typeface (14-point Equity) using Microsoft Word (the same program used to calculate the word count).

/s/ Aaron L. Nielson
AARON L. NIELSON