No. 23-50869

# In the United States Court of Appeals for the Fifth Circuit

STATE OF TEXAS,

*Plaintiff-Appellant,*

*v.*

UNITED STATES DEPARTMENT OF HOMELAND SECURITY;
ALEJANDRO MAYORKAS, SECRETARY, U.S. DEPARTMENT OF
HOMELAND SECURITY; UNITED STATES CUSTOMS AND BORDER
PROTECTION; UNITED STATES BORDER PATROL; TROY MILLER,
SENIOR OFFICIAL PERFORMING THE DUTIES OF THE
COMMISSIONER, U.S. CUSTOMS AND BORDER PROTECTION;
JASON OWENS, IN HIS OFFICIAL CAPACITY AS CHIEF OF THE U.S.
BORDER PATROL; ROBERT DANLEY, IN HIS OFFICIAL CAPACITY AS
CHIEF PATROL AGENT, DEL RIO SECTOR, UNITED STATES
BORDER PATROL,

*Defendants-Appellees.*

On Appeal from the United States District Court
for the Western District of Texas, Del Rio Division

## SUPPLEMENTAL BRIEF FOR APPELLANT

*(Counsel Listed on Inside Cover)*

KEN PAXTON
Attorney General of Texas

BRENT WEBSTER
First Assistant Attorney General

Office of the Attorney General
P.O. Box 12548 (MC 059)
Austin, Texas 78711-2548
Tel.: (512) 936-1700
Fax: (512) 474-2697

AARON L. NIELSON
Solicitor General
Aaron.Nielson@oag.texas.gov

LANORA C. PETTIT
Principal Deputy Solicitor General

Counsel for Plaintiff-Appellant

# Table of Contents

Page

Table of Authorities ........................................................................... ii

Introduction ...................................................................................... 1

Background ........................................................................................ 3

    I.   In Granting an Injunction Pending Appeal, This Court Largely
         Affirms the District Court's Conclusions and Expedites Its
         Review ..................................................................................... 3

    II.  Defendants Levy Untrue Allegations in Public Statements and
         Pleadings Before the Supreme Court ........................................ 5

    III. On Remand Texas Thoroughly Discredits Defendants'
         Allegations, While Defendants Suddenly Claim They Are
         Irrelevant ............................................................................... 10

Argument .......................................................................................... 17

    I.   This Court Should Reaffirm the Stay Panel's Conclusions as
         Defendants Now Concede their Extra-Record Allegations Are
         Irrelevant ............................................................................... 17

    II.  The Evidence on Remand, In Any Event, Confirms that the
         Equities Favor Texas ............................................................... 21

Conclusion ........................................................................................ 25

Certificate of Service ......................................................................... 26

Certificate of Compliance .................................................................. 26

# Table of Authorities

Page(s)

**Cases:**

*Amorim v. Holder*,
575 F. App'x 529 (5th Cir. 2014) ..................................................... 25

*Ex parte Crane*,
30 U.S. (5 Pet.) 190 (1831) .............................................................19

*Dep't of Agric. v. Kirtz*,
601 U.S. 42 (2024) ....................................................................... 20

*Edokpayi v. Barr*,
762 F. App'x 211 (5th Cir. 2019) ................................................... 22

*In re Krueger*,
812 F.3d 365 (5th Cir. 2016) ........................................................ 22

*Labrador v. Poe*,
144 S. Ct. 921 (2024) ................................................................... 20

*Netflix, Inc. v. Babin*,
88 F.4th 1080 (5th Cir. 2023) ....................................................... 22

*New Hampshire v. Maine*,
532 U.S. 742 (2001) ..................................................................... 21

*P.I. & I. Motor Express, Inc. v. RLI Ins. Co.*,
40 F.4th 398 (6th Cir. 2022) ........................................................ 21

*Ex parte Republic of Peru*,
318 U.S. 578 (1943) .......................................................................19

*United States v. Barfield*,
941 F.3d 757 (5th Cir. 2019) ..........................................................19

*United States v. Shipp*,
203 U.S. 563 (1906).................................................................... 18

*United States v. Tillotson*,
25 U.S. (12 Wheat.) 180 (1827) ................................................... 18

*United States v. Zuniga*,
720 F.3d 587 (5th Cir. 2013)...........................................................19

**Statutes and Rules:**

5 U.S.C. §702 ............................................................................ 4, 20
8 U.S.C.:
   §1325(a) ................................................................................. 6
   §1357(a)(3) ........................................................................... 23
28 U.S.C.:
   §1292(a)(1) ...........................................................................19
   §1651 ....................................................................................19
Fed. R. App. P. 10(a) .................................................................19

**Other Authorities:**

Application to Vacate the Injunction Pending Appeal, *DHS v. Texas*,
   No. 23A607 (U.S. Jan. 2, 2024) ........................................ 4, 15

Order, *DHS v. Texas*, No. 23A607 (U.S. Jan. 22, 2024) ..................... 10

Response to Application to Vacate the Injunction Pending Appeal,
   *DHS v. Texas*, No. 23A607 (U.S. Jan. 9, 2024)................................. 24

Response to Second Supplemental Memorandum Regarding Emergency
   Application, *DHS v. Texas*, No. 23A607 (U.S. Jan. 17, 2024)........................9, 18

Response to Supplemental Memorandum Regarding Emergency
   Application, *DHS v. Texas*, No. 23A607 (U.S. Jan. 13, 2024)........................8, 18

Second Supplemental Memorandum Regarding Emergency Application,
   *DHS v. Texas*, No. 23A607 (U.S. Jan. 15, 2024) ........................................*passim*

Supplemental Memorandum Regarding Emergency Application, *DHS
   v. Texas*, No. 23A607 (U.S. Jan. 12, 2024) ..................................................*passim*

16A WRIGHT & MILLER, FED. PRAC. & PROC. §§3956.1, 3956.4 (5th ed.) ..............19

18B WRIGHT & MILLER, FED. PRAC. & PROC. § 4477.1 (3d ed.) ............................ 21

# Introduction

After the district court denied a preliminary injunction in this case, Defendants were happy with one of the district court's legal conclusions—that the United States' categorical waiver of sovereign immunity for injunctive relief contains an implicit carveout for state-law claims. But Defendants could not abide the district court's factual findings, including that federal officers were deliberately destroying Texas's property without any authority to do so under federal law. On appeal, Defendants argued that the district court's detailed factual findings were clearly erroneous, or perhaps even mislabeled legal conclusions. A motions panel of this Court, however, rightly rejected those arguments, reversed the district court's legal error, and issued the injunction that should have flowed from the district court's factual findings. That injunction, as Texas agreed was consistent with the common law, allowed for fencing to be cut in an emergency.

So, Defendants sought Supreme Court intervention before the merits panel of this Court could set the expedited briefing schedule that Defendants themselves had requested. Defendants bombarded the Supreme Court with extra-record allegations based on steps Texas took in January to prevent a municipal park (located over a mile north of where Defendants were destroying the state property at issue) from once again becoming an unlawful gateway into Texas. First, Defendants claimed that Texas's operation to secure Shelby Park prevented them from having any view of the border and any practical access to the river. Next, they accused Texas of preventing U.S. Border Patrol agents from entering the park to rescue three people who tragically drowned in the Rio Grande. Defendants afterwards refused to correct

the misconceptions they helped generate and even urged the Supreme Court not to resolve any factual disputes.

This Court ordered a limited remand to figure out what really happened in Shelby Park. On remand, Defendants again reversed course and claimed the very factual issues they put front and center in their Supreme Court pleadings were irrelevant (Texas's position, all along) because they were outside of the district court's preliminary-injunction record. That, of course, is true—and tantamount to a confession that it was inappropriate for them to make such inflammatory, unsubstantiated, and immaterial allegations. The record *was* closed. Defendants' allegations *were* irrelevant. And, as it turns out, they were *false*.

Under cross-examination, key assertions Defendants made before the Supreme Court fell apart: Defendants had continuous river access outside Shelby Park, which represented only a small portion of the map submitted to the Court; visibility of the area opposite Texas's shipping containers was unobstructed from federal ports of entry located directly above the park; the patrol road to the south gave Border Patrol unlimited access east of the fence at issue in this case; Texas has continuously transferred aliens who manage to enter Shelby Park (in smaller and smaller numbers) to Border Patrol custody; and the tragic drownings on January 12 occurred more than an hour before Border Patrol agents arrived at the Shelby Park gate—without a boat in tow. Perhaps Defendants' allegations were so wide of the mark because their sole declarant about events in Eagle Pass, was more than fifteen-hundred miles away in Detroit, Michigan, during the relevant period. But Defendants never bothered to tell

the Supreme Court that—or to clarify that they knew *before* their final pleading that their account of what happened on January 12 was inaccurate.

This Court should accept Defendants' concession that the factual allegations they offered the Supreme Court are irrelevant. It should therefore reaffirm the motions panel's conclusion that Texas is entitled to injunctive relief. In the process, it should also set the (extra) record straight.

## Background

### I. In Granting an Injunction Pending Appeal, This Court Largely Affirms the District Court's Conclusions and Expedites Its Review.

On October 30, 2023, the district court granted Texas a temporary restraining order after finding that all relevant factors favored injunctive relief. ROA.282-92. After holding several hearings and considering supplemental briefing, the district court reached largely the same conclusions at the preliminary-injunction stage. It noted that Defendants' "culpable and duplicitous conduct" betrays an "utter failure … to deter, prevent, and halt unlawful entry into the United States." ROA.932, ROA.954. It found that Defendants' repeated and ongoing property damage inflicts "irreparable harm" upon Texas and puts law enforcement and border crossers alike in danger by enticing people to "undertake the dangerous task of crossing the river" rather than crossing at a lawful port of entry. ROA.935, ROA.939, ROA.960. And it confirmed that Texas remained likely to prevail on the merits of its common-law trespass claim. ROA.946-55. Nonetheless, the district court concluded that it was powerless to convert Texas's TRO into a preliminary injunction because it thought

that the general waiver of sovereign immunity in 5 U.S.C. §702 could not apply to "common law claims for conversion or trespass to chattels." ROA.945.

A motions panel of this Court approved the district court's detailed findings of fact and careful conclusions of law in all but one crucial respect: "Section 702," the panel concluded, "plainly waives immunity for Texas's trespass to chattels claim" because it (1) "was brought as '[a]n action' in federal court, (2) "'seek[s] relief other than monetary damages,'" and (3) "'stat[es] a claim' that a federal agency's officials and employees 'acted or failed to act in an official capacity or under color of legal authority.'" ECF 49-2 at 8 (quoting 5 U.S.C. §702) (alteration in original). Accordingly, the APA provides that "Texas's claim 'shall not be dismissed nor relief therein be denied on the ground that it is against the United States.'" *Id.* at 8-9 (same). As that was the district court's only reason for declining to extend the TRO, this Court granted Texas an emergency injunction pending appeal, consistent with the terms of the district court's earlier TRO. *Id.* at 14.

After the motions panel granted an injunction pending appeal, Defendants moved for expedited review in this Court, asking that any briefing be concluded by February 12, 2024, with oral argument to follow "as soon as possible"— presumptively in March. ECF 53 at 1, 6. On December 28, 2023, this Court granted that motion and referred the "briefing schedule and argument date" to the merits panel. ECF 66-1 at 2. Unwilling to wait, Defendants asked the Supreme Court to immediately vacate the injunction. *See* Application to Vacate the Injunction Pending Appeal, *DHS v. Texas*, No. 23A607 (U.S. Jan. 2, 2024) [*Defs.' Application to Vacate*]. That same day, this Court's merits panel entered the promised schedule, which was

even more expeditious than the one Defendants had requested, ordering all briefing to be completed by January 30, 2024, and oral argument to be held on February 7. ECF 70 at 2; ECF 75 at 1.

## II. Defendants Levy Untrue Allegations in Public Statements and Pleadings Before the Supreme Court.

Perhaps sensing that the urgency had been sapped from their rush to the Supreme Court, Defendants began pointing to new factual developments that supposedly "changed the situation" and "highlight[ed] the need for vacatur" on an emergency basis. Supplemental Memorandum Regarding Emergency Application at 1, *DHS v. Texas*, No. 23A607 (U.S. Jan. 12, 2024) [*Defs.' First Suppl.*]; Second Supplemental Memorandum Regarding Emergency Application at 1, *DHS v. Texas*, No. 23A607 (U.S. Jan. 15, 2024) [*Defs.' Second Suppl.*]. These supplemental materials relate to events occurring in Shelby Park—a municipal recreational complex more than a mile away from the area where Chief Judge Moses had found that Defendants had willfully destroyed Texas's property "whenever and wherever they find convenient." ROA.952; *see* ROA.2466-67.

**A.** This Shelby Park complex comprises 46 acres, ROA.2510, roughly in the shape of a triangle that goes from the railroad bridge to the water's edge and encompasses: a golf course, ROA.2539, ROA.3160; baseball fields, ROA.2519, ROA.2572; and open space to picnic, ROA.2530. *See* ROA.2572, ROA.2936, ROA.3130 (providing a map of the facility). Due to the geography of the area and its proximity to a port of entry, since at least 2021, authorities have erected "various layers [of] obstacles" to deter illegal river crossings. ROA.2504. These include

5

"[s]ingle-strand concertina wire throughout the Shelby Park and the greater areas to the north and south of it," as well as a row of CONEX containers, "steel container boxes, commonly the ones seen on ships [and] trucks." ROA.2504. Such boxes serve as a "physical barrier … to deter more migrants from crossing because of access they have directly into the heart of the city." ROA.2505.[1] They also have the inevitable effect of reducing the line of sight from within the park, but because "Shelby Park is the low ground," surveillance points have long been set up north and south of the Park. ROA.2476.

Notwithstanding these lines of barriers, the citizens of Eagle Pass have actively used the facility for recreation. For example, a representative of the Texas Military Department described how their vehicles have "had a few windshields collect some [golf] balls," and so agreed that it is "a good thing they're bulletproof." ROA.2540.

Shelby Park was closed to the public for a brief period on the evening of January 10, 2024, to prevent a repeat of disturbing scenes from December 2023. During that month, thousands of people—no doubt including U.S. citizens who did not want the United States to know they had left the country—crossed illegally from Mexico into Texas via Shelby Park, ROA.2819, directly beneath two ports of entry where federal law requires individuals to cross the border, 8 U.S.C. §1325(a):

---

[1] To avoid injuries from people getting stuck on or jumping off the top of the CONEX boxes, Texas ultimately installed anti-climb barriers. ROA.2524-25, ROA.3157.



23-50869.3156

ROA.3156. The numbers were so great that Border Patrol set up an area that they "affectionally … called … 'the pit,'" with "galley lines set up, [and] bathrooms set up" where "they would segment migrants that came in into age groups, demographics, various different things." ROA.2525; *see* ROA.3156, ROA.3163.

By early January, however, that traffic began to subside, with "migrants" crossing only in "ones or twos, threes or fours." ROA.2526. On January 10 "a little after 1900 … there were no migrants under CBP control in the area of the pit." ROA.2526. Texas took advantage of that lull to secure the recreational park and return it to the public and eliminate the obvious magnet for illegal entry "at a

particularly dangerous stretch of the river." ROA.953-54; *see* ROA.933, ROA.2529-30.

**B.**    Even though the record on appeal was closed and addressed conduct more than a mile to the south, on January 12, Defendants rushed to the Supreme Court, asking it to vacate this Court's injunction based on developments in Shelby Park. In those pleadings, Defendants claimed Texas was preventing them from implementing federal immigration statutes that the district court already found "they are so obviously derelict in enforcing." ROA.954. Defendants claimed that a loss of access to the boat ramp in Shelby Park "blocked off ... the only safe and operationally practical boat ramp with access to the relevant portion of the river." Defs.' First Suppl. at 3-4, 5a. This was news to Texas, which explained that Border Patrol was observed *just the day before* "safe[ly] and operationally" accessing "the relevant portion of the river" from nearby boat ramps. *Compare id.*; *with* Response to Supplemental Memorandum Regarding Emergency Application at 4-5, *DHS v. Texas*, No. 23A607 (U.S. Jan. 13, 2024) [*Pl.'s First Suppl. Resp.*]. In any event, Texas immediately restored access. *See* ROA.2528-32. Similarly, Defendants claimed that Texas's actions left them "without any ability to view the border" just outside of Shelby Park, Defs.' First Suppl. at 2, 4-5, 6a, even though that area lies directly beneath two federal ports of entry and sits between high ground to the north and south capped by high-powered surveillance technology, *see* ROA.2528.

Later that day, three people tragically drowned in the Rio Grande near Eagle Pass. U.S. Congressman Henry Cuellar immediately claimed that "the State bears responsibility" for those deaths because Texas personnel refused to allow Border

Patrol access to a municipal park "even in the event of an emergency" and "did not grant access to Border Patrol agents to save the migrants." ROA.2249. Almost immediately, Defendants began leveling public accusations against Texas. Just hours after Cuellar blamed Texas for the deaths, a "U.S. Customs and Border Protection (CBP) official, who requested anonymity because they were not authorized to talk to the press, said Cuellar's description of the events was accurate." ROA.2249. Then, in an official statement reported by multiple news outlets, the Department of Homeland Security directly accused Texas of preventing federal officials from responding to a medical emergency: "'In responding to a distress call from the Mexican government, Border Patrol agents were physically barred by Texas officials from entering the area.'" ROA.2249-50.

Yet these allegations were not supported by the facts: The individuals who drowned that night had already died *before* Border Patrol even arrived at Shelby Park; although Texas had already granted Border Patrol access to the Shelby Park boat ramp for riverine operations, the agent who arrived (Michael Garcia) did not have a boat in tow; and instead of claiming an emergency, Garcia indicated to Texas personnel that Mexican authorities had the situation under control. Response to Second Supplemental Memorandum Regarding Emergency Application at 3-4, *DHS v. Texas*, No. 23A607 (U.S. Jan. 17, 2024) [*Pl.'s Second Suppl. Resp.*]. Defendants, nevertheless, returned to the Supreme Court on January 15 with a second supplemental memorandum "alert[ing] the Court to further factual developments" about these tragic drownings. Defs.' Second Suppl. at 1. Some news outlets eventually acknowledged what really happened, walking back initial reports when it

came to light that "the three migrant drownings had already occurred when Border Patrol requested access to Shelby Park." ROA.2250. But Defendants made no effort in their Supreme Court pleadings to correct the misconception they created. *See* Defs.' Second Suppl. at 3. DHS even repeated the charge in public letters to the Texas Attorney General. *Compare* ROA.3182-83, *with* ROA.3192-94.

On January 22, the Supreme Court entered an unsigned order vacating the Fifth Circuit's emergency injunction with no explanation. Order, *DHS v. Texas*, No. 23A607 (U.S. Jan. 22, 2024). This Court subsequently ordered a limited remand to sort out the relevance and accuracy of the allegations Defendants injected into this case after the district court's record was closed. ECF 117-1.

## III. On Remand Texas Thoroughly Discredits Defendants' Allegations, While Defendants Suddenly Claim They Are Irrelevant.

Rather than defend their extra-record assertions on remand, however, Defendants sought at every turn to avoid wading into those new issues and instead to revisit old ones. At the outset, Defendants claimed that while "[i]t was appropriate for [them] to inform the Supreme Court" of new and unsubstantiated allegations, those same allegations were now "no longer relevant to the issues before the Fifth Circuit or [the district court]." ROA.2275. Defendants also tried to constrain the scope of the remand to ignore their public accusations and the possibility that Texas's efforts in Shelby Park had helped reduce illegal crossings. ROA.2275-76. As Texas urged at the time: "If Defendants mean to suggest the allegations they levelled publicly are somehow exogenous to this dispute, it bears repeating what happened: *Defendants in this case* (CBP and DHS) made public

allegations about *the Plaintiff in this case* (the State of Texas) in statements to the press, *while this dispute was pending* before the Supreme Court, then *refused to correct them* in their filings." ROA.2273 (emphasis in original); *see also* ROA.2274. The district court appropriately agreed with Texas that the remand should consider "all the issues raised in the parties' joint brief." ROA.2280.

At the remand hearing, Defendants nevertheless argued that their public statements to the press on January 13 and 14 blaming Texas for the January 12 drownings were outside the scope of the remand hearing. *See* ROA.2672; ROA.2749-50.[2] In closing arguments, they continued to insist that "the last two days"—*i.e.*, the entire remand inquiry into "the [post-January 10] situation on the ground" that they introduced to this case, Defs.' First Suppl. at 5—"are virtually irrelevant to the appeal that is before the Fifth Circuit." ROA.2903; *see also* ROA.2912 ("none of this should impact the appeal"). And they repeatedly sought to reopen topics underlying the district court's earlier factual determinations about their deliberate destruction of state property in 2023. *See, e.g.*, ROA.2486-91 (reviewing video of wire cutting on unknown date), ROA.2492-95 (reviewing video of processing on unknown date); ROA.2809-10 (eliciting testimony about "how the world existed on November 29, 2023"), ROA.2811-13 (eliciting testimony about "the events of September 20th" south of Shelby Park).

---

[2] Defendants' efforts to divert attention away from their public statements is notable given that their own pleadings in the Supreme Court pointed to public statements by the Texas Military Department. *See* Defs.' Second Suppl. at 3.

Testimony at the remand hearing, however, established that Defendants were wrong about numerous assertions they made to the Supreme Court:

- Defendants claimed that Texas's move into Shelby Park on January 10 prevented them from apprehending aliens. Defs.' First Suppl. at 2, 5. But testimony established that Texas merely prohibited Defendants from conducting staging activities on Texas property, ROA.2510, ROA.2834, and has continued transferring aliens to Border Patrol custody for apprehension, ROA.2695 (when "the subjects make it past the wire, [Texas personnel] do escort those folks directly to" Border Patrol); ROA.2479, ROA.2545-46, ROA.2554-55, ROA.2583, ROA.2593-94, ROA.2611-12, ROA.2872. *See also* ROA.2330 (district court finding any individual not needing transport for medical care or criminal trespass arrest is "handed over to BP").

- Defendants presented maps to the Supreme Court representing that "the relevant stretch" Texas had secured was an area 2.5 miles long. Defs.' First Suppl. at 3, 2a, 9a; *cf.* ROA.3195-96 (DHS Letter making similar claim), ROA.3217. But testimony established that the area Texas secured was "much smaller"—just the 46 acres of Shelby Park, municipal land that lies more than one mile away from the area where Defendants were destroying the state property at issue. ROA.2510, ROA.2516-17, ROA.2524; *cf.* ROA.3198 (OAG Letter describing how another DHS map "fall[s] outside the perimeter area secured by Texas").[3]

---

[3] The maps of Eagle Pass reproduced below were entered as exhibits. The map on the left is what Defendants submitted to the Supreme Court, suggesting that Texas had assumed control of all the land between the yellow line and the Rio Grande. The map on the right reflects that Texas assumed control over only the area shaded in yellow.

 

- Defendants claimed they lost access to both sides of Texas's fence. Defs.' First Suppl. at 2; Defs.' Second Suppl. at 4-5. But testimony established that Defendants have had continuous access to the river, ROA.2465-66, ROA.2472-73, ROA.2478, ROA.2533-35, ROA.2571-72, ROA.2864-65, and to the parallel river road to patrol, ROA.2520-22, ROA.2544, ROA.2568-69, ROA.2582, ROA.2862-63, ROA.2879, ROA.2938, ROA.3154. *See also* ROA.2316-19 (district court finding "[n]o CBP officer raised the issue" of boat ramp access and Defendants could identify no river operation that was unsuccessful due to temporary loss of access).

- Defendants claimed that Texas's move into Shelby Park left them "without any ability to view the border." Defs.' First Suppl. at 5; *id.* at 6a (estimating loss of "90% of our prior [visual] surveillance"). But the only visual obstruction Defendants identified at the hearing was the line of CONEX shipping containers that Texas placed long before the January 2024 operation. ROA.2559, ROA.2684-85, ROA.2694, ROA.2852, ROA.2866, and testimony established the fact that the area directly opposite those containers is directly beneath two ports of entry, ROA.2477-78, ROA.2646, ROA.2866-67, ROA.3157. Although the trial court found that Defendants'

visibility was partially reduced between January 10 and 12, ROA.2316, it is also undisputed that Defendants have not sought to return their scope trucks to Shelby Park, that Texas would consider such a request, and that Texas has previously granted similar requests, ROA.2573-74, ROA.2650-53.

- Defendants claimed they possibly could have saved the people who tragically drowned on January 12 if Texas had not denied them entry. Defs.' Second Suppl. at 3; ROA.2249-50. But testimony established that the individuals had died hours before Border Patrol agents arrived at the gate around 9:45 PM, ROA.2607-11, ROA.2664-65. *See also* ROA.2325 (district court finding "the emergency involving possible drownings had concluded about one hour and a half before Border Patrol agents arrived at the gates of Shelby Park").

- Defendants claimed that Texas personnel said they would deny Border Patrol entry even to respond to emergencies. Defs.' Second Suppl. at 2-3, 5; ROA.2249-50. But Texas personnel testified that their orders were to admit Border Patrol to access the boat ramp and to address any emergency situation, and that they communicated this to their federal counterparts. ROA.2624 ("[DEFENDANTS' COUNSEL] Besides the boat, what did you mention? [MCKINNEY] Or emergency reasons. [DEFENDANTS' COUNSEL] Okay. So you do recall specifically saying, You would be admitted in the case of an emergency? [MCKINNEY] Yes, ma'am."); *see also* ROA.2590, ROA.2600, ROA.2618, ROA.2620.

- Defendants claimed they believed an emergency was ongoing when they arrived at the Shelby Park gate. Defs.' Second Suppl. at 2; ROA.2249-50. But testimony from both sides established that no one at the gate mentioned an emergency or acted consistent with an urgent threat to life. Sergeant Pujitha Gunawardana, who was posted at the gate, testified that Border Patrol Agent Garcia did not come with sirens or lights, did not appear worried or anxious, asked only to apprehend aliens inside the park, and never mentioned a possible drowning or other emergency. ROA.2595, ROA.2599-600, ROA.2602, ROA.2604. Staff Sergeant McKinney testified that Garcia told him that the individuals whose deaths had been the emotional focal point of Defendants' Supreme Court filings "had already drowned in the Rio Grande" and that "Mexican authorities were handling it." ROA.2609-11. And Agent Garcia admitted that after leaving the gate he made no effort to look down from the federal port of entry to locate the individuals he was supposedly trying to rescue. ROA.2792-93, ROA.2795-96. *See also*

ROA.2322-23 (district court finding "BP was not fully prepared to respond to an emergency" and "did not respond with the anticipated haste of an emergency involving possible drownings").

- Defendants claimed the emergency they sought to address concerned people in distress in the river. Defs.' Second Suppl. at 1-2. But testimony established that, despite already having access to the boat ramp, Border Patrol never asked to come in for river operations and arrived that night without a boat. ROA.2551, ROA.2617, ROA.2622-23, ROA.2668-69, ROA.2748. Moreover, even if they had such a boat, it would have done them no good because "CBP does not conduct boat operations" at night due to the shallowness of the water. ROA.2319.

- Across their pleadings, Defendants insisted they had an urgent need to destroy state property that justified Supreme Court intervention "as soon as possible." Defs.' Application to Vacate at 5, 37; Defs.' First Suppl. at 5; Defs.' Second at Suppl. 5-6. But on remand, all parties agreed that Defendants have not needed to cut Texas's fencing—"not once"—in more than five months since the district court first entered its temporary restraining order. ROA.2456, ROA.2566-67, ROA.2904, ROA.2912. *See also* ROA.2330 (district court finding that "[s]ince this Court's initial TRO, the Defendants have not cut or attempted to cut any wire barriers in the Eagle Pass area").

Testimony also established *why* the narrative reported to the Supreme Court diverged so sharply from the observations of the people present: Before the Supreme Court, Defendants relied on the sworn testimony, including the putative "personal knowledge," of Robert Danley, Lead Field Coordinator for CBP's Del Rio Sector. Defs.' First Suppl. at 1a-2a, 7a; Defs.' Second Suppl. at 1a-2a, 4a. Under examination, however, Danley admitted that when he signed sworn declarations to the Supreme Court describing "operational challenges" in Eagle Pass, Texas, he was "[j]ust outside of Detroit, Michigan." ROA.2628; *see* ROA.2662. Accordingly, Danley confessed that he "had no direct knowledge about Texas Military

Department's operations in Shelby Park on January 10th, 11th, and 12th." ROA.2626. Instead, his assertions "to the United States Supreme Court" about visibility issues, access to the patrol road and boat ramp, and the events of January 12, relied entirely on "information that somebody else gave to [him]." ROA.2635. He would not arrive in Eagle Pass until "about the 20th" of January—that is, "ten days after TMD moved into Shelby Park," ROA.2626, and five days after he signed his *second* declaration filed with the Supreme Court.

Notably, Danley "did not tell the Supreme Court when [he] signed a sworn declaration to them about what happened" in "Shelby Park that [he was] 2,000 miles away." ROA.2630; *see also* ROA.2663. Before submitting sworn statements, he also never asked: who took the photographs he submitted to the Supreme Court, ROA.2631-32; why state vehicles appeared to be parked at open gates, ROA.2633, ROA.2637-38; when access was granted at various other points south of the park, ROA.2635-36; or who released statements from CBP and DHS to the press, ROA.2671-72. In fact, Danley never spoke to Captain Garcia, the agent who approached the gate on January 12. ROA.2800.

Defendants also failed to apprise the Supreme Court of other key details or to correct earlier representations. For example, Defendants never told the Supreme Court: that the area Texas secured was smaller than they originally suggested, ROA.2649-52; that Texas initiated changes to transfer detained individuals from state to federal custody in a safer location, ROA.2658-60; or—most critically—that internal emails (that Danley admitted reading) established that by 7:00 PM on

Saturday, January 13, Defendants knew that the three drowning victims had died

hours before Border Patrol agents arrived at Shelby Park. ROA.3011-12. Even so—

> [PLAINTIFF'S COUNSEL] In Paragraph Number Seven of your January 15th declaration, some two days after CBP put all this information together, there are no times describing when the drownings occurred versus when CBP arrived at Shelby Park, are there?
>
> [DANLEY] No, sir.
>
> [PLAINTIFF'S COUNSEL] There is nothing in this declaration to indicate that by the time CBP arrived at Shelby Park, it could not have helped anyone who was distressed in the river based on the reports it had received from the Mexican side of the river?
>
> [DANLEY] I believe that's accurate. The only thing that I would say is at the time that we were responding, we weren't certain what had occurred. …
>
> [PLAINTIFF'S COUNSEL] My question is different, sir. Listen closely, please. You did not communicate to the Supreme Court the precise timeline of events that occurred on the night of January the 12th when you provided them with your second declaration.
>
> [DANLEY] I believe that's accurate.

ROA.2669-71.

# Argument

## I. This Court Should Reaffirm the Stay Panel's Conclusions as Defendants Now Concede their Extra-Record Allegations Are Irrelevant.

When Defendants first levied their allegations, Texas insisted that—in addition

to being false—those new factual allegations were also irrelevant to this litigation

about a campaign of property damage one mile away in the summer and fall of 2023.

*See* Pl.'s First Suppl. Resp. 1, 5; Pl.'s Second Suppl. Resp. 1-2. At the time, however, Defendants insisted it was appropriate and important to present (untested) "factual developments" to the Supreme Court because they supposedly altered assumptions underlying the district court's factual findings, *see* Defs.' Second Suppl. at 1, 4-6, notwithstanding that the Supreme Court ordinarily does not sit to develop or decide new factual disputes. *See, e.g.*, *United States v. Tillotson*, 25 U.S. (12 Wheat.) 180, 181 (1827) (Story, J.).[4]

As noted above (at 10-11), however, Defendants reversed course once this Court ordered a remand, arguing that all factual development about the events in Shelby Park after January 10 is "irrelevant" because the district court's order "must be reviewed under the record in which [that court] considered" the motion for a preliminary injunction. ROA.2903. In other words, Defendants' new "position is … that the record is closed for the—for the appeal of the denial [of] the PI." ROA.2452-53. Defendants also acknowledged that "the claims at issue here" "cover only" the destruction of Texas's fencing—not any disputes about new barriers erected to secure Shelby Park. ROA.2456-57.

Defendants "apprised the [Supreme] Court of actions that had taken place since the record had closed and since the Fifth Circuit had issued its injunction." ROA.2457. That was "appropriate," they claim, because the emergency application to vacate the Fifth Circuit's injunction was "a separate proceeding under the All

---

[4] Indeed, the last time the Supreme Court conducted trial proceedings itself was more than 100 years ago. *See United States v. Shipp*, 203 U.S. 563 (1906).

Writs Act." ROA.2905. Whatever factual issues they may have injected into these proceedings before the Supreme Court, Defendants now claim that "none of this should impact the appeal" before the Fifth Circuit. ROA.2912.

Texas, of course, agrees that Defendants allegations are irrelevant but not that it was ever appropriate to inject them. Both an All Writs Act petition under 28 U.S.C. §1651 and an appeal under 28 U.S.C. §1292(a)(1) may be separate proceedings from the preliminary injunction hearing in district court. But neither one is an invitation to rewrite the record on appeal. After all, both are exercises "in the nature of *appellate* jurisdiction." *Ex parte Crane*, 30 U.S. (5 Pet.) 190, 193 (1831) (Marshall, C.J.) (emphasis added); *see also, e.g.*, *Ex parte Republic of Peru*, 318 U.S. 578, 582 (1943). Both are therefore subject to the normal rules constraining the appellate record. *See* FED. R. APP. P. 10(a); 16A WRIGHT & MILLER, FED. PRAC. & PROC. §§3956.1, 3956.4 (5th ed.).

That means, however, the trial court's original findings about Defendants' "culpable and duplicitous conduct" and its "utter failure … to deter, prevent, and halt unlawful entry into the United States," ROA.932, ROA.954, must stand unless Defendants demonstrate those facts to be clear error without reference to their (now discredited) account of what happened in Shelby Park. "A factual finding is not clearly erroneous if it is plausible in light of the record as a whole." *United States v. Barfield*, 941 F.3d 757, 761 (5th Cir. 2019) (quoting *United States v. Zuniga*, 720 F.3d 587, 590 (5th Cir. 2013) (per curiam)). Defendants have not come close to meeting that standard for the reasons Texas explained in its opening brief (at 36-37, 40-41) and its reply brief (at 11-13, 21-24). Texas would have further explained at oral

argument on February 7 had the accelerated timeframe that Defendants sought not been derailed by their introduction of factual allegations they now admit are irrelevant.

Accordingly, this Court should reach the same conclusion the motions panel already reached—namely, that §702's categorical waiver of federal sovereign immunity in suits for non-monetary relief means what it says. Again, the *only* reason the district court declined to extend the TRO compelled by its findings of fact was due to a *legal* conclusion about the scope of §702's waiver of sovereign immunity. ROA.932. Apart from this Court's opinion holding that conclusion to be legal error and granting an injunction pending appeal, the only other legal development—the Supreme Court's recent (and unanimous) decision in *Department of Agriculture v. Kirtz*, 601 U.S. 42 (2024)—likewise favors Texas. As Texas has already explained via letter, that decision confirms this Court was right to read 5 U.S.C. §702's waiver of sovereign immunity according to its plain text. ECF 123. By contrast, the Supreme Court's unexplained, "bare-bones order" vacating this Court's injunction in an emergency posture, contains no legal analysis, is not precedential, and should not "create a lock-in effect" on the panel's consideration. *Labrador v. Poe*, 144 S. Ct. 921, 933-34 (2024) (Kavanaugh, J., concurring).

Even if this Court were to entertain Defendants' alternative arguments, *but see* ECF 120 at 15 (explaining how several of those arguments are waived or forfeited), such arguments rest on upsetting the district court's plainly correct (and certainly not clearly erroneous) factual findings that Defendants are *not* doing their job when they wantonly destroy state property. *See* ROA.954 ("The Defendants cannot claim

the statutory duties they are so obviously derelict in enforcing as excuses to puncture the Plaintiff's attempts to shore up the Defendants' failing system."). And the record underlying those findings, as Defendants admit, was closed months ago.[5]

## II. The Evidence on Remand, In Any Event, Confirms that the Equities Favor Texas.

As Texas stated in its reply (at 13), "[t]his Court prudently held this appeal in abeyance so that the district court can conduct further fact finding and bring clarity to the situation." Accordingly, this Court may do two additional things. *First*, the Court should set the record straight. By claiming—both in official court documents and in the court of public opinion—that it was "important" and "appropriate" to highlight the Shelby Park operation as a basis for vacating an injunction against wanton destruction of Texas's property, Defendants plainly confused two distinct issues in a way that prejudiced the State. *See, e.g.*, *P.I. & I. Motor Express, Inc. v. RLI Ins. Co.*, 40 F.4th 398, 417 (6th Cir. 2022) ("reject[ing]" evidence from outside the record). Indeed, at the same time Defendants introduced new factual assertions in this litigation—knowing those assertions were disputed—they also urged the Supreme Court "not … to adjudicate any factual disputes about recent events." Defs.' Second Suppl. at 5. The details recounted above provide a much-needed correction of what happened. *Supra* at 11-17.

---

[5] Because Defendants concede that their extra-record allegations are irrelevant, ordinary principles of judicial estoppel preclude them from arguing in this Court (or any other) against setting those allegations aside and reaffirming the stay panel's decision. *See New Hampshire v. Maine*, 532 U.S. 742, 755 (2001); 18B WRIGHT & MILLER, FED. PRAC. & PROC. §4477.1 (3d ed.).

*Second*, the Court should hold that to the extent events after the record was closed could be relevant to the underlying order, they inform—and confirm—the equity of providing Texas relief here once the district court's legal error is corrected. Whether the issue is the propriety of injunctive relief, of transfer to another venue, or of the exercise of bankruptcy jurisdiction, courts balancing the equities often look to a party's behavior, including during the underlying litigation. *See, e.g.*, *Netflix, Inc. v. Babin*, 88 F.4th 1080, 1100 (5th Cir. 2023); *Edokpayi v. Barr*, 762 F. App'x 211, 212 (5th Cir. 2019) (per curiam); *In re Krueger*, 812 F.3d 365, 371 (5th Cir. 2016).

The facts elicited here about Defendants' conduct after January 10 confirm, as the district court already found, that the equities favor Texas. For example, testimony at the remand hearing reaffirmed numerous conclusions in the district court's preliminary-injunction decision:

- Prior to Texas moving into Shelby Park, the park presented a public safety hazard and was a magnet for illegal immigration of such severity—up to 6,000 crossings per day—that the Border Patrol "shut down" the actual port of entry "for ten days" to staff the de facto one in Shelby Park. ROA.2819; *see* ROA.2462-64, ROA.2565, ROA.2629, ROA.2687, ROA.2811-12, ROA.2816, ROA.2825. This confirms the district court's earlier finding that "Defendants apparently seek to establish an unofficial and unlawful port of entry." ROA.953.

- Defendants' witnesses conceded that they were not apprehending the individuals who illegally crossed the border because they were "not in [federal] custody" but were "free to roam." ROA.2656-57, ROA.2661, ROA.2828-29, ROA.2868-69. This reinforces the district court's earlier finding that Defendants' "'inspection' and 'apprehension' practices, or lack thereof," were "illusory," that aliens were not "in custody," and that Border Patrol "can be seen making [no] effort to physically restrain them." ROA.936, ROA.954.

- Defendants further conceded that Texas's barriers are effective at deterring, redirecting, and slowing illegal entry. ROA.2665-66, ROA.2686-87, ROA.2818, ROA.2873-74, ROA.2883. Although the barrier in question was different—because Shelby Park is not in the area at issue in this suit, this is consistent with the district court's earlier finding that Texas's "wire serves as a deterrent—an effective one at that." ROA.934.

- Defendants acknowledged, consistent with the district court's prior discussion, that the statutory authority Defendants have principally relied on here to destroy state property (besides being limited to entering for the purpose of preventing illegal entry) is limited to private property. *Compare* ROA.2653, *with* ROA.948 (noting that 8 U.S.C. §1357(a)(3) provides authority "to 'access ... *private lands*' without a warrant within 25 miles of an external border 'for the purposes of patrolling the border to prevent the illegal entry'" of aliens (emphasis added)); *see* ROA.2312 (district court finding that Shelby Park is "a public municipal park"), ROA.3182 (DHS acknowledging the park "is municipal land"), ROA.3193 (OAG explaining State authority over municipal land under state law).

- The evidence revealed that just days after securing Shelby Park, Texas personnel intercepted an individual from Lebanon listed as a "Special Interest Migrant" requiring additional security screening by the FBI, ROA.2886-2887, thus confirming the district court's earlier finding that Defendants' policies create a danger to the public by "provid[ing] ample incentive for the individuals posing the greatest public danger to" enter illegally in hopes of evading detection. ROA.953.

In addition to reaffirming the district court's *prior* holdings, the unrebutted testimony of one of Texas's witnesses reflects that because of Texas's efforts, the public has been able to access Shelby Park for birthday parties, golfing, religious services, and other activities. ROA.2530; *see also* ROA.2330 (district court finding that now "[t]he public can use portions of the park for recreation, from golfing to birthday parties"). And illegal crossings in Texas fell dramatically around the time "Texas expanded its operations in the area," ROA.2327, with the January numbers

in Eagle Pass plummeting from "thousands of migrants" to "eight migrants a day," ROA.2464.

By contrast, Defendants' own conduct has demonstrated that awarding a preliminary injunction would cause no harm on their side of the ledger. The district court found that "[s]ince this Court's initial TRO, Defendants have not cut or attempted to cut any wire barriers in the Eagle Pass area." ROA.2330. And Defendants admitted the same fact repeatedly, calling it "the most relevant fact that we have discovered" in the two-day hearing. *See* ROA.2904 ("Border Patrol has not cut the wire since November 1st. Not once."), ROA.2912 ("No wire's been cut since November 1st."). Defendants may have once believed that they needed an unlimited license to destroy state property.[6] That belief is no longer tenable.

Apart from reconfirming the district court's original findings, moreover, the facts revealed on remand also demonstrate why the equities even more strongly favor Texas. By the time federal officials came to Shelby Park on January 12, not only had Defendants been informed by Mexico that the individuals had drowned hours earlier, but Texas had already provided Defendants access to the Shelby Park boat ramp, which Defendants did not need to access the river in all events. When Border Patrol Agent Garcia arrived, however, he had no boat—even though a water rescue

---

[6] From the outset, Defendants have refused to engage with Texas's arguments under the common law of trespass—as Texas has explained repeatedly. *See, e.g.*, ROA.647; ROA.846 n.2; ECF 47 at 10; ECF 84 at 27-28; ECF 120 at 8; Response to Application to Vacate the Injunction Pending Appeal at 15, 19-20, *DHS v. Texas*, No. 23A607 (U.S. Jan. 9, 2024). Defendants have thus forfeited any argument on that score.

operation would have been responsive to the emergency that was supposedly underway. Tellingly, Agent Garcia made no effort to locate the distressed individuals from the federal government's superior vantage point above Shelby Park.

Regardless, Defendants indisputably knew by 7:00 PM on January 13, 2024, that their preferred narrative about what happened on January 12 was *inaccurate*. Nevertheless, Defendants made no effort to correct the record—even before the Supreme Court. "[I]n weighing the equities," such inequitable conduct cuts decisively in Texas's favor. *Amorim v. Holder*, 575 F. App'x 529, 530 (5th Cir. 2014) (per curiam).

## Conclusion

The Court should reverse the district court's order denying a preliminary injunction and remand the case for entry of the requested relief.

Respectfully submitted.

Ken Paxton
Attorney General of Texas

Brent Webster
First Assistant Attorney General

Office of the Attorney General
P.O. Box 12548 (MC 059)
Austin, Texas 78711-2548
Tel.: (512) 936-1700
Fax: (512) 474-2697

/s/ Aaron L. Nielson
Aaron L. Nielson
Solicitor General
Aaron.Nielson@oag.texas.gov

Lanora C. Pettit
Principal Deputy Solicitor General

Counsel for Plaintiff-Appellant

## CERTIFICATE OF SERVICE

On April 29, 2024, this brief was served via CM/ECF on all registered counsel and transmitted to the Clerk of the Court. Counsel further certifies that: (1) any required privacy redactions have been made in compliance with Fifth Circuit Rule 25.2.13; (2) the electronic submission is an exact copy of the paper document in compliance with Fifth Circuit Rule 25.2.1; and (3) the document has been scanned with the most recent version of Symantec Endpoint Protection and is free of viruses.

/s/ Aaron L. Nielson
AARON L. NIELSON

## CERTIFICATE OF COMPLIANCE

This brief complies with: (1) the type-volume limitation of Federal Rule of Appellate Procedure 32(a)(7)(B) because it contains 6,620 words, excluding the parts of the brief exempted by Rule 32(f); and (2) the typeface requirements of Rule 32(a)(5) and the type style requirements of Rule 32(a)(6) because it has been prepared in a proportionally spaced typeface (14-point Equity) using Microsoft Word (the same program used to calculate the word count).

/s/ Aaron L. Nielson
AARON L. NIELSON