No. 23-50869

IN THE UNITED STATES COURT OF APPEALS
FOR THE FIFTH CIRCUIT

STATE OF TEXAS,

Plaintiff-Appellant,

v.

UNITED STATES DEPARTMENT OF HOMELAND SECURITY;
ALEJANDRO MAYORKAS, Secretary, U.S. Department of Homeland Security;
UNITED STATES CUSTOMS AND BORDER PROTECTION; UNITED
STATES BORDER PATROL; TROY MILLER, Senior Official Performing the
Duties of the Commissioner, U.S. Customs and Border Protection; JASON OWENS,
in his official capacity as Chief of the U.S. Border Patrol; ROBERT DANLEY, in his
official capacity as Chief Patrol Agent, Del Rio Sector, United States Border Patrol,

Defendants-Appellees.

On Appeal from the United States District Court
for the Western District of Texas

SUPPLEMENTAL BRIEF FOR APPELLEES

JAIME ESPARZA
  *United States Attorney*

MARY F. KRUGER
ROBERT GREEN
  *Assistant United States Attorneys*

BRIAN M. BOYNTON
  *Principal Deputy Assistant Attorney
  General*

SARAH E. HARRINGTON
  *Deputy Assistant Attorney General*

MARK R. FREEMAN
MELISSA N. PATTERSON
STEVEN A. MYERS
  *Attorneys, Appellate Staff
  Civil Division, Room 7232
  U.S. Department of Justice
  950 Pennsylvania Avenue NW
  Washington, DC 20530
  (202) 305-8648*

## CERTIFICATE OF INTERESTED PERSONS

A certificate of interested persons is not required, as defendants-appellees are all governmental parties.  5th Cir. R. 28.2.1.

/s/ Steven A. Myers
Steven A. Myers

# TABLE OF CONTENTS

Page

INTRODUCTION ....................................................................................1

BACKGROUND..................................................................................3

I.    The Federal Government Asks The Supreme Court To Vacate The
      Injunction Pending Appeal. ......................................................4

II.   Texas's "Unprecedented And Unannounced" Seizure Of Shelby Park
      While The Federal Government's Supreme Court Application Was
      Pending...................................................................................6

III.  The January 12 Drownings And Response .................................9

IV.   Additional Issues...................................................................12

ARGUMENT ..................................................................................13

I.    This Court's Review Is Limited To The Record Before The District
      Court At The Time Of Its Ruling............................................13

II.   To The Extent They Are Relevant, The District Court's Supplemental
      Findings Confirm That Texas Is Not Entitled To Injunctive Relief..............19

      A.    The District Court's Supplemental Findings Further Demonstrate
            Why Injunctive Relief Is Inappropriate...........................19

      B.    There Is No Basis For This Court To Make Factual Findings That
            The District Court Declined To Make. ............................21

CONCLUSION ..............................................................................33

# TABLE OF AUTHORITIES

**Cases:**                                                                                    **Page(s)**

*Dallas Cowboys Cheerleaders, Inc. v. Scoreboard Posters, Inc.,*
  600 F.2d 1184 (5th Cir. 1979) ......................................................... 13

*Democratic Nat'l Comm. v. Republican Nat'l Comm.,*
  543 U.S. 1304 (2004) ...................................................................... 17

*Hollingsworth v. Perry,*
  558 U.S. 183 (2010) ........................................................................ 15

*Humana, Inc. v. Jacobson,*
  804 F.2d 1390 (5th Cir. 1986) ......................................................... 21

*Lowry v. Barnhart,*
  329 F.3d 1019 (9th Cir. 2003) ......................................................... 17

*Merrill v. Milligan,*
  142 S. Ct. 879 (2022) ...................................................................... 18

*Nken v. Holder,*
  556 U.S. 418 (2009) ........................................................................ 15

*Pharmaceutical Research & Mfrs. of Am. v. Walsh,*
  538 U.S. 644 (2003) .................................................................... 13-14

*Shrimpers & Fishermen of the RGV v. U.S. Army Corps of Eng'rs,*
  849 F. App'x 459 (5th Cir. 2021) .................................................... 14

*Tong v. Lumpkin,*
  90 F.4th 857 (5th Cir. 2024) ........................................................... 14

*Trump v. International Refugee Assistance Project,*
  582 U.S. 571 (2017) ........................................................................ 15

*United States v. Joiner,*
  429 F.2d 489 (5th Cir. 1970) ........................................................... 22

*Whirlpool Corp. v. Shenzhen Sanlida Elec. Tech. Co.,*
  80 F.4th 536 (5th Cir. 2023) ........................................................... 13

**Statutes:**

8 U.S.C. § 1357(a)(3) ................................................................ 32

28 U.S.C. § 1292(a) ........................................................... 2, 15, 17

28 U.S.C. § 1292(a)(1) ............................................................. 13

28 U.S.C. § 1651 ............................................................... 1, 5

**Rule:**

Fed. R. App. P. 8(a)(2)(B) ........................................................ 16

**Legislative Material:**

H.R. Rep. No. 82-1377 (1952) .................................................... 32

**Other Authorities:**

Camilo Montoya-Galvez, *3 Migrants Drowned Near Area Where Texas
    Has Denied Entry to Federal Border Agents*, CBS NEWS
    (Jan. 15, 2024, 11:45 PM) ...................................................23

Order, *Austin v. U.S. Navy Seals 1-6*, No. 21A477 (U.S. Mar. 25, 2022) .........16

Order, *Kuang v. U.S. Dep't of Def.*, No. 18-17381, Dkt. 21 (9th Cir. Feb. 1, 2019) .........17

Order, *Kuang v. U.S. Dep't of Def*, No. 18-17381, Dkt. 38 (9th Cir. Apr. 17, 2019) ......17

Stephen M. Shapiro, et al., *Supreme Court Practice* (11th ed. 2019) ....................16

# INTRODUCTION

The only question presented in this interlocutory appeal is whether the district court abused its discretion on November 29, 2023, by declining to enter a preliminary injunction that would prohibit federal Border Patrol agents from disturbing concertina wire that the State of Texas has installed adjacent to the international border on the banks of the Rio Grande, even where agents do so to perform their functions under federal law.  As set out in the government's principal brief, the answer to that question is no: for a variety of interrelated reasons, Texas may not deploy state tort law, the Administrative Procedure Act, or nonstatutory ultra vires review to impede the lawful functioning of the federal government.  *See generally* Department of Homeland Security (DHS) Br. 15-52.  The district court properly refused to enter such an injunction, *see* ROA.927-65, but this Court entered an injunction pending appeal on December 19, 2023, invoking state tort law to enjoin Border Patrol activities along a 29-mile stretch of border in the vicinity of Eagle Pass, Texas, *see* Dkt. 49-2 (Dec. 19, 2023).

On January 2, 2024, the federal government filed an application asking the Supreme Court to exercise its authority under the All Writs Act, 28 U.S.C. § 1651, to vacate that injunction, explaining (among other things) that under the Supremacy Clause, Border Patrol's federally authorized activities cannot be required to give way to state law.  Texas opposed the application, noting that the injunction contained an exception permitting federal officials to move or cut the wire in the event of some

emergencies and representing that Border Patrol agents had access to both sides of its fence. Briefing was complete when the federal government filed its reply memorandum on January 10, 2024.

Texas then unilaterally and dramatically altered the on-the-ground situation. Approximately two hours after the government filed its reply, Texas began a "military operation" that the district court would later find effected an "unprecedented and unannounced" "[t]akeover" of Shelby Park, ROA.2314-16, which sits squarely within the stretch of border subject to the injunction pending appeal entered by this Court, ROA.2312; Dkt. 49-2 at 2 (Dec. 19, 2023). The federal government informed the Supreme Court of those developments, explaining that Texas's actions reinforced the need for vacatur as soon as possible. The parties each made two filings in the Supreme Court regarding these developments, each attaching declarations regarding post-briefing changes in circumstances at the relevant stretch of the border. The Supreme Court vacated the injunction on January 22, 2024.

Texas's extraordinary actions were directly relevant to the matter then pending before the Supreme Court: whether the Court should exercise its discretion under the All Writs Act to issue immediate relief from the injunction pending appeal. The parties' filing of materials regarding the changing factual background against which the Court could exercise that discretion was entirely consistent with established Supreme Court practice. In contrast—and as the parties agree—those developments are not pertinent to this interlocutory appeal under 28 U.S.C. § 1292(a), in which the

sole question over which this Court has jurisdiction is whether the district court abused its discretion at the time that it denied a preliminary injunction in November 2023.

Because neither Texas nor the United States contends that events in January 2024 bear on whether the district court abused its discretion in November 2023, this Court need not consider them. Should the Court nevertheless address those events, they underscore the extraordinary problems inherent in Texas's interference with Border Patrol's activities along the border: without warning, Border Patrol was shut out of an area where Congress charged it with patrolling the border and interdicting persons attempting to enter the United States. This Court should further reject Texas's numerous invitations to make factual findings that the district court declined to make, including Texas's wholly unsupported assertions that the government's Supreme Court filings were misleading or inaccurate. Finally, and most importantly, this Court should affirm the district court's order denying a preliminary injunction.

## BACKGROUND

The main legal, factual, and procedural background pertinent to this dispute is set out in the government's principal brief. *See* DHS Br. 3-11. The following discussion is drawn from the supplemental findings of fact that the district court entered on March 26, 2024, ROA.2306-31, as well as the testimony and exhibits from the two-day evidentiary hearing that the district court conducted on March 4 and 5,

ROA.2443-3223, in compliance with this Court's limited remand order of January 26,

Dkt. 117-1 (Jan. 26, 2024).

## I.    The Federal Government Asks The Supreme Court To Vacate The Injunction Pending Appeal.

After the district court denied a preliminary injunction in the order giving rise

to this appeal, this Court barred federal officials from disturbing Texas's border-

adjacent concertina wire, first on a temporary basis and then in an injunction pending

appeal.  *See* Dkt. 38-2 (Dec. 4, 2023); Dkt. 49-2 (Dec. 19, 2023).  The injunction

applied to "Texas's c-wire fence in the vicinity of Eagle Pass, Texas, as indicated in

Texas's complaint."  Dkt. 49-2 at 2 (Dec. 19, 2023) (noting that "Texas seeks an

injunction pending appeal to prevent the United States Border Patrol from cutting,

destroying, or otherwise interfering with concertina wire ('c-wire') Texas has

constructed along more than 29 miles of municipal and private land in the Eagle Pass

sector of our southern border").

As this Court explained, the parties correctly understood the injunction as

including the same medical-emergency exception "specified in the [temporary

restraining order]" entered earlier in the case.  Dkt. 49-2 at 2 (Dec. 19, 2023).  That

"narrow exception," ROA.291, applied to "any medical emergency that most[] likely

results in serious bodily injury or death to a person, absent any boats or other life-

saving apparatus available," ROA.285.  Thus, the injunction pending appeal included

an exception permitting federal officials to in some circumstances cut through the

wire from land to reach individuals in the river or trapped on U.S. soil between the wire and the river, as they had done on previous occasions.

The federal government filed an application in the Supreme Court to vacate this injunction pending appeal on January 2, 2024, invoking the Court's authority under the All Writs Act, 28 U.S.C. § 1651.  *See* DHS Appl. to Vacate Inj. Pending Appeal, *Department of Homeland Sec. v. Texas*, No. 23A607 (U.S. Jan. 2, 2024) (23A607 Appl.).  Before the Supreme Court, the parties disputed whether the injunction's exception was adequate to protect public safety and permit federal officials to discharge their duties under federal law—but the parties agreed that the activities that the exception permitted were relevant to the Supreme Court's consideration of the federal government's application.  *See* 23A607 Appl. 5, 36-37; Texas Resp. in Opp'n to U.S. Appl. to Vacate Inj. Pending Appeal 6, 8, 33, *Department of Homeland Sec. v. Texas*, No. 23A607 (U.S. Jan. 9, 2024) (23A607 Opp'n); DHS Reply in Supp. of Appl. to Vacate Inj. Pending Appeal 22, *Department of Homeland Sec. v. Texas*, No. 23A607 (U.S. Jan. 10, 2024) (23A607 Reply).  Similarly, among the reasons Texas urged the Court to deny relief was Texas's repeated contention that "Border Patrol agents already possess access to both sides of the fence."  23A607 Opp'n 7 & n.1, 26, 33, 34 (quotation marks omitted); *see id.* at 33 (explaining that this access was "by boat and to the further-inland side of the fence by road" (quotation marks omitted)).

## II.   Texas's "Unprecedented And Unannounced" Seizure Of Shelby Park While The Federal Government's Supreme Court Application Was Pending.

The government filed a reply memorandum in support of its application at approximately 4:00 p.m. central time on January 10, 2024, at which point the application was fully briefed. *See* 23A607 Reply.  Approximately two hours later, as set out in the district court's supplemental findings of fact, Texas initiated "what it called a 'military operation'" to "seize Shelby Park."  ROA.2314.  Texas "did not notify [U.S. Customs and Border Protection (CBP)] or any other federal officials in advance of its intent to seize and occupy Shelby Park."  ROA.2315.  Instead, the district court found, Texas's conduct was "unprecedented and unannounced."  ROA.2316.

The district court found that Texas's operation "unfolded in two stages."  ROA.2314.  "First, shortly after 6:00 p.m., [the Texas National Guard (TXNG)] sent nine platoons of approximately 41 soldiers each, or approximately 369 soldiers total, to establish an outer area of control (or 'outer cordon') that covered both the park and much of the surrounding land."  ROA.2314.  Then, "around 11:00 p.m.," ROA.2317, "TXNG proceeded to establish a smaller and more permanent inner area of control (or 'inner cordon') within the limits of Shelby Park by placing physical barriers along its boundaries," as well as "stationing soldiers at each park entrance" and "position[ing] obstacles in federal border wall gaps immediately south of Shelby Park," ROA.2315.

Texas did not alert Border Patrol of its actions until "some time after 7:00 p.m., approximately 60 to 90 minutes after TXNG soldiers entered the outer cordon," at which point Texas "finally" contacted the federal government.  ROA.2315.  Texas "requested that CBP immediately cease conducting migrant processing, staging, transportation, or other immigration functions within Shelby Park."  ROA.2315-16.  When a CBP agent "raised concern regarding CBP's scope truck operations," which the government uses to "maintain[] continuous visual and radar surveillance of the area," Texas suggested that CBP instead "place a scope truck 400 meters downriver." ROA.2316.  The district court determined that Texas's "failure to provide prior notification of the seizure left CBP partially blind, albeit temporarily."  ROA.2318. While Border Patrol was subsequently able to "regain partial visibility" of the river, the court found that its "visibility remains somewhat reduced since the Plaintiff's seizure of Shelby Park."  ROA.2318.  To date, Texas has "admitted only emergency vehicles—specifically, ambulances, fire trucks, and state and local law enforcement— into Shelby Park."  ROA.2317.  It has not permitted "federal agents to employ the park for immigration or border security operations."  ROA.2317.

The district court further described how Texas's operation interfered with Border Patrol's deployment of boats to patrol the river.  As it explained, "CBP regularly used the concrete, all-weather Shelby Park boat ramp for its river operations for at least two decades."  ROA.2318.  That boat ramp "is closest to the area that experienced a high traffic of migrant crossings," and it "allows CBP's marine unit to

deploy boats quickly and remains usable in adverse weather conditions." ROA.2318.
Yet "for approximately 42 hours after the Plaintiff seized Shelby Park, TXNG denied
CBP agents access to the Shelby Park boat ramp," which "prevented CBP from
launching boat operations they likely would have otherwise undertaken during
daylight hours on January 11 and from sunrise to noon on January 12." ROA.2318-
19. While Texas suggested that "CBP agents instead launch boats from" other ramps
farther away, the court noted testimony from Border Patrol Acting Division Chief
Micky Donaldson that doing so would involve "longer distances to travel by boat"
and that "fluctuating water levels could slow boats launched from boat ramps
elsewhere in reaching the Shelby Park area." ROA.2319 (apparently referencing
ROA.2838-41).[1]

The federal government filed a supplemental memorandum in the Supreme
Court in the early hours of the morning on January 12, 2024, to address the "new
activities by the Texas National Guard and Department of Public Safety since the
government filed its reply that are relevant to this case," given that they had "changed
the situation along the relevant stretch of the Rio Grande, rendering inaccurate the
account in prior filings, including Texas's opposition." Supp. Mem. Re: Emergency
Appl. to Vacate Inj. Pending Appeal 1, *Department of Homeland Sec. v. Texas*, No.

---

[1] When the district court issued its supplemental findings, a certified transcript
of the evidentiary hearing was not yet available, and the court's findings therefore do
not include citations to the transcript.

8

23A607 (U.S. Jan. 12, 2024) (23A607 Supp. Mem.).  Thereafter, Texas permitted CBP

to resume using the Shelby Park boat ramp at approximately "noon on January 12,"

ROA.2319, but it has continued to otherwise restrict Border Patrol's access to Shelby

Park, *see, e.g.*, ROA.2537 (Texas National Guard Colonel Fletcher testimony that

orders were to permit "[j]ust the boat to go conduct boat operations and then leave").

Texas filed a response on January 13, "acknowledg[ing] that it has seized

control of" Shelby Park and giving its own "on-the-ground understanding" of the

situation.  Tex. Resp. to U.S. Supp. Mem. Re: Emergency Appl. to Vacate Inj.

Pending Appeal 1, *Department of Homeland Sec. v. Texas*, No. 23A607 (U.S. Jan. 13,

2024) (23A607 Resp. to Supp. Mem.).  Both parties attached to their Supreme Court

filings supporting materials, such as declarations, regarding the changes in that

situation.

## III.  The January 12 Drownings And Response

"On the night of January 12, 2024, two days after Texas had assumed control

of Shelby Park, three Mexican nationals—a woman and two children ages 8 and 10—

drowned in the Rio Grande."  ROA.2319-20.  Virtually all the surrounding

circumstances "have been the subject of intense dispute."  ROA.2320.

The district court found that after receiving two telephone calls concerning

individuals requiring assistance in the river, Grupo Beta—"a service of the National

Institute of Migration of Mexico"—found three deceased migrants in the river

"between 8:05 p.m. and 8:15 p.m."  ROA.2320.  "Ten minutes later, at 8:25 p.m.,

9

Grupo Beta identified two male subjects on the U.S. riverbank who were attempting to make their way back to Mexico and appeared to be suffering from hypothermia and could be in distress." ROA.2320.

The district court found the evidence "confusing as to what was known and when it was known." ROA.2320. Under both timelines that the district court considered, however, Grupo Beta alerted Border Patrol to a situation on the river in the vicinity of 9:00 or 9:15 p.m. ROA.2320. The court further found that by 9:23 p.m., Border Patrol's Eagle Pass North Station "received an update that the situation was 'an emergency.'" ROA.2321 (citing ROA.3012).

At some point between 9:23 p.m. and 9:40 p.m., Acting Supervisory Border Patrol Agent Michael Garcia was instructed "to visit Shelby Park and request TXNG for access to the area." ROA.2321-22. The district court found that Garcia's supervisor, Supervisory Border Patrol Agent Lancaster, had advised him "to create an emergency rescue plan to locate those individuals and try and rescue them," though the court found (as is now undisputed) that by this point "Grupo Beta had already located the drowned victims and two other persons clinging to a bridge pillar on the Mexican side of the bridge." ROA.2322 (quotation marks omitted); *see also* ROA.2781 (Garcia describing his orders: "if granted access, to create an emergency rescue plan to locate those individuals and try to rescue them").

At 9:40 p.m., Garcia and another Border Patrol agent arrived at the main gate controlling access to Shelby Park. ROA.2322. By phone, Garcia was advised by

Texas Staff Sergeant Lindsey McKinney that McKinney "was denying access and would have someone investigate the situation." ROA.2322. Texas National Guard Colonel Fletcher "testified that after BP agents left the main gate, [Texas's] Command Desk informed Fletcher that the BP agents were there due to an 'emergency' that TXNG could not identify." ROA.2324 (apparently referencing ROA.2576); *see also* ROA.2324 (noting Garcia's testimony that he "clearly communicated … that there was an urgent situation" as he "needed access to Shelby Park to locate any migrants still in the water and to attempt to rescue them" (apparently referencing ROA.2785-86)).[2]

Ultimately, the Court declined to resolve "whether the parties were aware of an emergency, or not." ROA.2325. Irrespective of what the personnel on the ground understood at the time, the district court determined that the "emergency involving possible drownings had concluded about one hour and a half before Border Patrol agents arrived at the gates of Shelby Park." ROA.2325.

---

[2] While Texas has disputed the extent to which Garcia was prepared to respond to an emergency, the district court noted testimony that he had "various emergency equipment in the vehicle, including a flashlight, four standardized life vests, and a flotation ring." ROA.2322 (apparently referencing ROA.2794). While Garcia "did not have a boat," the court noted that he "believed he could assist migrants drowning in the river with the rescue devices in his vehicle" or "contact the local fire department and Grupo Beta." ROA.2322-23 (apparently referencing ROA.2782, 2797-98). Similarly, while Garcia did not use "emergency lights and drove at the posted speed limit," the court noted his testimony that "there was no need to speed" given the short distance he was traveling. ROA.2323 (apparently referencing ROA.2792-93, 2797).

On January 15, 2024, the federal government filed a second supplemental memorandum in the Supreme Court, informing the Court of the drownings and Texas's continued refusal to allow Border Patrol to access a stretch of the border and land adjacent to it. *See* Second Supp. Mem. Re: Emergency Appl. to Vacate Inj. Pending Appeal, *Department of Homeland Sec. v. Texas*, No. 23A607 (U.S. Jan. 15, 2024) (23A607 Second Supp. Mem.). Notwithstanding Border Patrol's contemporaneous understanding that there was an emergency in progress when its agents were denied access to Shelby Park, the federal government's Supreme Court filing clearly stated that the drowning had occurred "at approximately 8:00 p.m.," which was *before* Acting Supervisory Border Patrol Agent Garcia "went to the Shelby Park entrance gate and informed the guardsmen from the Texas National Guard stationed there of the drowned migrants and [other] migrants in distress," in an unsuccessful attempt to access the border through the park. *Id.* at 1-2. Texas responded with its own account of the events of January 12, noting the facts were "hotly disputed." *See* Texas Resp. to U.S. Second Supp. Mem. Re: Emergency Appl. to Vacate Inj. Pending Appeal 3, *Department of Homeland Sec. v. Texas*, No. 23A607 (U.S. Jan. 17, 2024) (23A607 Resp. to Second Supp. Mem.). Once again, both parties attached declarations to their filings.

## IV.    Additional Issues

The district court's remaining findings were largely inconclusive. The court declined to resolve whether Texas's seizure of Shelby Park impeded Border Patrol's operations, reasoning that "some agents may find it an 'impediment,' while others do

not." ROA.2327.  The court also declined to "speculate" as to whether and if so how Texas's actions had affected the number of migrants crossing into the United States, both in the area surrounding Shelby Park and elsewhere along the border. ROA.2327-28.  Finally, the court found that since it entered its temporary restraining order in October, "Defendants have not cut or attempted to cut any wire barriers in the Eagle Pass area."  ROA.2330.

## ARGUMENT

### I.    This Court's Review Is Limited To The Record Before The District Court At The Time Of Its Ruling.

On November 29, 2023, the district court denied Texas's motion for a preliminary injunction.  *See* ROA.927-65.  Texas appealed pursuant to 28 U.S.C. § 1292(a)(1), *see* ROA.966, and this Court has jurisdiction to determine whether that order represented an abuse of discretion, *see, e.g.*, *Whirlpool Corp. v. Shenzhen Sanlida Elec. Tech. Co.*, 80 F.4th 536, 543 (5th Cir. 2023).  Those basic jurisdictional facts control the issues that are properly before the Court in this posture.

1.    Because this Court has jurisdiction to review the district court's November 29 order denying a preliminary injunction, its review is limited to the "record as developed before the district court."  *Dallas Cowboys Cheerleaders, Inc. v. Scoreboard Posters, Inc.*, 600 F.2d 1184, 1187 (5th Cir. 1979).  In other words, this Court's task is to "review the discretion of the district judge in light of what was put before" that court.  *Id.* at 1188; *see also, e.g.*, *Pharmaceutical Research & Mfrs. of Am. v.*

13

*Walsh*, 538 U.S. 644, 687-88 (2003) (O'Connor, J., concurring in part and dissenting in part) (explaining that an "appellate court reviewing a preliminary injunction is confined to the record before the District Court"). As Texas agrees, events post-dating the district court's ruling do not bear on whether it abused its discretion at the time of its ruling. *See, e.g.*, Tex. Supp. Br. 19 ("Texas, of course, agrees that Defendants [sic] allegations are irrelevant ....").[3]

2.      Because the parties agree that events in January 2024 do not bear on whether the district court abused its discretion in November 2023, the Court need not consider those events. Nevertheless, Texas is wrong to suggest that there was impropriety in the government's bringing those events to the Supreme Court's attention in connection with its then-pending application to vacate this Court's

---

[3] The cases cited in this Court's remand order are not to the contrary. *See* Dkt. 117-1 at 2 (Jan. 26, 2024). *Tong v. Lumpkin*, 90 F.4th 857 (5th Cir. 2024), is a habeas case; it does not address the scope of the record when reviewing a decision granting or denying a preliminary injunction. Similarly, *Shrimpers & Fishermen of the RGV v. U.S. Army Corps of Engineers*, 849 F. App'x 459, 461-63 (5th Cir. 2021) (per curiam), held that a challenge to a natural gas pipeline was not ripe and held the petition challenging it in abeyance pending resolution of reconsideration proceedings. *See id.* at 463. Neither case suggests that a court of appeals properly reviews a district court's grant or denial of a preliminary injunction on the basis of evidence that was not before the district court at the time of its ruling. In contrast, had this Court remanded to the district court to entertain a renewed motion for preliminary injunction, whichever party was aggrieved by the district court's ruling could have filed a new notice of appeal, at which point the record on appeal would encompass all evidence before the district court. Yet in compliance with this Court's limited remand, the district court made only factual findings; its legal determinations were "frozen to November 29, 2023." ROA.2312 n.2; *accord, e.g.*, ROA.2448 ("I am not revisiting the November 29th order. I am just taking evidence and making findings of facts.").

injunction pending appeal.  As set out above, when an appellate court reviews a district court's preliminary injunction ruling, the question is whether the district court abused its discretion in entering the order triggering the court's interlocutory jurisdiction under 28 U.S.C. § 1292(a); by definition, a district court cannot abuse its discretion by failing to consider evidence that did not yet exist about events that had not yet occurred.  *Cf.* ROA.2450 ("Those new facts cannot be used to evaluate my order because those facts did not exist when that order was issued.").

In contrast, when an appellate court is presented with a motion to stay or vacate a lower court's injunction, it is asked to exercise "the grant of authority to federal courts to 'issue all writs necessary or appropriate in aid of their respective jurisdictions and agreeable to the usages and principles of law,' All Writs Act, 28 U.S.C. § 1651(a)."  *Nken v. Holder*, 556 U.S. 418, 426 (2009).  In exercising such § 1651 authority, a court must "bring to bear an equitable judgment of [its] own."  *Trump v. International Refugee Assistance Project*, 582 U.S. 571, 580 (2017) (per curiam) (citing *Nken*, 556 U.S. at 433); *see also, e.g.*, *Hollingsworth v. Perry*, 558 U.S. 183, 190 (2010) (per curiam) (explaining that "the Court will balance the equities and weigh the relative harms to the applicant and to the respondent").

Because a motion seeking "interim relief" under the All Writs Act, *Nken*, 556 U.S. at 427, requires a court to exercise its discretion in light of the circumstances before it, litigants may attach to such motions materials about events post-dating an order triggering appellate jurisdiction.  Such declarations routinely accompany district

15

court stay motions, even though (by definition) such declarations were not available to the district court at the time of the appealable order. *See, e.g.*, Decl. of Adm. William K. Lescher, *Navy-Seals 1-3 v. Austin*, No. 4:21-cv-01236-O, ECF No. 87, at App. 001-031 (N.D. Tex. Jan. 24, 2022), *cited in* Order, *Austin v. U.S. Navy Seals 1-6*, No. 21A477, at 2 (U.S. Mar. 25, 2022) (Kavanaugh, J., concurring), and *id.* at 1 n.1 (Alito, J., dissenting); Decl. of Thomas Homan, Texas's Opp'n to Mot. for Stay Ex. A, *Texas v. United States*, No. 6:21-cv-00016, ECF No. 85-1 (S.D. Tex. Aug. 22, 2021).

In some circumstances, it may be necessary for a litigant to file such a declaration in the court of appeals. *See* Fed. R. App. P. 8(a)(2)(B) (stay motion shall include both "originals or copies of affidavits or other sworn statements supporting facts subject to dispute" and "relevant parts of the record"); *see also, e.g.*, Appellants' Mot. for Stay Pending Appeal 3, *Cobell v. Norton*, No. 03-5314 (D.C. Cir. Nov. 10, 2003), https://perma.cc/8GWK-3QV8. And in unusual circumstances, when facts change after (or because of) proceedings in the court of appeals, it may be necessary for a party to file such a declaration directly in the Supreme Court. *See* Stephen M. Shapiro, et al., *Supreme Court Practice* 17-23 (11th ed. 2019) (explaining that affidavits "may be helpful if the application rests in whole or in part upon facts that may be disputed and that are not in the record or opinions below"); *id.* at 17-45 (stay application properly premised on "[a] change in circumstances or an anticipated change in circumstances"); *see also, e.g.*, Appl. to Stay Order Entered By U.S. Dist. Ct. for the N.D. Tex. at 110a-116a, *Food & Drug Admin. v. Alliance for Hippocratic Med.*, No.

22A902 (U.S. Apr. 14, 2023) (declaration of Janet Woodcock, M.D., in support of a successful application for a stay of a district court order pending appeal); *Democratic Nat'l Comm. v. Republican Nat'l Comm.*, 543 U.S. 1304, 1304-05 (2004) (Souter, J., in chambers) (denying stay application based on facts in "further pleading" filed after application).

In accordance with this accepted practice, both the federal government and Texas attached such materials to their Supreme Court filings regarding post-briefing developments concerning Texas's seizure of Shelby Park. *See supra* p. 8-12. Such declarations are properly considered in connection with a request for interim relief under the All Writs Act. But they are not typically part of the appellate record when a court exercises appellate jurisdiction under 28 U.S.C. § 1292(a) to review the preliminary injunction itself. *Compare* Order, *Kuang v. U.S. Dep't of Def.*, No. 18-17381 Dkt. 21, at 1 (9th Cir. Feb. 1, 2019) (denying motion to strike declaration filed in support of district court motion to stay "for the purposes of resolving the pending motion to stay"), *with* Order, *Kuang*, No. 18-17381, Dkt. 38, at 2-3 (Apr. 17, 2019), (striking declaration "as it pertains to the disposition of this appeal on the merits" because no exception to the rule that the court "consider[s] only the district court record on appeal" applied (quoting *Lowry v. Barnhart*, 329 F.3d 1019, 1024 (9th Cir. 2003))).

3.     Because all parties agree that the district court's supplemental findings are irrelevant to the merits of this appeal, this Court should decline Texas's invitation

17

to "set the record straight," Tex. Supp. Br. 21, about the events addressed in those findings. However much Texas might hope for an opinion setting forth its preferred narrative, it would be inappropriate for this Court to find facts that neither party contends is pertinent to this interlocutory appeal. Nor is there any merit to Texas's suggestions that the Supreme Court's vacatur of this Court's injunction is not a pertinent "legal development," *id.* at 20, or that the existence of factual disputes permits this Court to "reaffirm[] the stay panel's decision," *id.* at 21 n.5. The Supreme Court has vacated this Court's injunction, and its order was issued under a standard requiring the federal government to show "a reasonable probability that this Court would eventually grant review" and "a fair prospect that the Court would reverse." *Merrill v. Milligan*, 142 S. Ct. 879, 880 (2022) (Kavanaugh, J., concurring); *see* 23A607 Appl. 1. Thus, although not precedential, the Supreme Court's order should be afforded due consideration with respect to the legal issues pending before this Court—even though, as the Supreme Court well knew when it granted the government's application, the parties dispute certain facts that underlay that application. And in any event, as described more fully below, there is no basis for this Court to go beyond the factual findings reached by the district court after conducting a two-day evidentiary hearing, which strongly support the propriety of denying preliminary injunctive relief.

18

II.    **To The Extent They Are Relevant, The District Court's Supplemental Findings Confirm That Texas Is Not Entitled To Injunctive Relief.**

As described above, there is no need for this Court to consider the district court's supplemental findings to determine whether the district court's November order at issue in this appeal represented an abuse of discretion. Should the Court nevertheless consider those findings, they further demonstrate why Texas is not entitled to an injunction. And Texas's invitation to this Court to revisit the underlying testimony and exhibits to make numerous findings that the district court did not should be rejected out of hand.

A.    **The District Court's Supplemental Findings Further Demonstrate Why Injunctive Relief Is Inappropriate.**

Should the Court consider them, the district court's supplemental findings further demonstrate why injunctive relief is not appropriate. Most fundamentally, Texas's "unprecedented and unannounced conduct" in seizing Shelby Park, ROA.2316, underscores the extent to which Texas is seeking to wrest control over immigration policy from the federal government. This case started because Texas believed it could deploy its tort law to interfere with federal law enforcement officers' execution of federal law, but its recent conduct reflects its apparent belief that it may deploy its armed personnel to the same effect. Such activity presents serious risk of "a blue on blue situation"—"everything from impeding to a use-of-force situation." ROA.2738 (testimony of Border Patrol Deputy Chief David BeMiller); *see also*

19

ROA.2644 (testimony of Border Patrol Chief Patrol Agent Robert Danley, expressing concern about "an altercation between the Texas National Guard" and Department of Defense personnel who operated federal scope trucks in Shelby Park). Texas's assertive conduct underscores the need for judicial enforcement of the Supremacy Clause.

In addition, a key premise of Texas's position throughout this litigation has been that Border Patrol does not need to disturb Texas's wire to apprehend migrants because Border Patrol may access the river side of the wire by boat. *See* Tex. Br. 41; *see also* Dkt. 49-1 at 6 (Dec. 19, 2023). The district court has now confirmed, however, that Border Patrol "does not conduct boat operations between sundown and sunrise due to safety concerns with operating the air boats in the dark." ROA.2319 n.10. It is thus undisputed that if Border Patrol were subject to the injunction Texas seeks, it would be unable to access the international border after sundown other than in a narrow set of emergencies—and it is unclear whether even that circumscribed access would be available in Shelby Park, where Texas continues to use armed personnel to block federal officials from approaching the border by land. *See* ROA.2573 (testimony from Texas National Guard Colonel Fletcher agreeing that he "would deny [Border Patrol] access to apprehend someone within Shelby Park today").

Finally, the district court found that since it entered its temporary restraining order on October 30, 2023, "Defendants have not cut or attempted to cut any wire barriers in the Eagle Pass area." ROA.2330. While Texas has accused defendants of

being engaged in a scheme of "wanton destruction of Texas's property," Tex. Supp.

Br. 21, the absence of any wire cutting over the past several months confirms that

defendants only take such steps where appropriate to perform their functions under

federal law. It further confirms that Texas does not need a preliminary injunction to

prevent irreparable injury that is "impending" and "imminent." *Humana, Inc. v.

Jacobson*, 804 F.2d 1390, 1394 (5th Cir. 1986); *cf.* Tex. Br. 37 (tying claim of irreparable

harm to suggestion that federal government is "continuously destroy[ing]" Texas's

wire). Instead, should it become necessary for Border Patrol to disturb Texas's wire

in the future, Texas may pursue any compensation to which it is entitled at that time.

*See* DHS Br. 46-47.[4]

### B.    There Is No Basis For This Court To Make Factual Findings That The District Court Declined To Make.

This Court remanded to the district court "to make additional fact findings

concerning the matters contested by the parties" in their Supreme Court briefing.

Dkt. 117-1 at 3 (Jan. 26, 2024). Instead of relying on those findings—which, as set

out above, range from inconclusive to describing how Texas's "unprecedented and

unannounced conduct" affected Border Patrol's operations, ROA.2316-18—Texas

---

[4] Although the district court did not address it, unrebutted testimony confirmed that when a large group of migrants crosses the border, it may take several days for the migrants to be processed and appear in Border Patrol statistics. *See* ROA.2827 (Donaldson testimony). This testimony further undercuts Texas's speculation that nearly 2,000 migrants became "gotaways" on September 20, 2023. *Compare* Tex. Br. 38, *with* DHS Br. 23.

principally invites this Court to scrutinize the testimony itself and make findings that the district court did not. *See, e.g.*, Tex. Supp. Br. 21-22 (asking this Court to "set the record straight" based on "testimony at the remand hearing"). But there is a reason why the district court did not make the factual findings Texas now requests: as set out below, they are unsupported by the record and in some cases directly contrary to the testimony of Texas's own witnesses. In any case, a court of appeals is a "court of review and not a trial court or jury" and thus does "not find facts [or] resolve issues of credibility." *United States v. Joiner*, 429 F.2d 489, 494 (5th Cir. 1970). It is therefore not this Court's role to find facts that the district court did not.

1.      Texas's principal argument is that the federal government wrongly suggested to the Supreme Court that Texas's refusal to grant Border Patrol access to Shelby Park on the evening of January 12 prevented agents from rescuing the migrants before they drowned. *See* Tex. Supp. Br. 1, 2, 3, 8, 9, 10, 14, 15, 16, 17, 24, 25. That is a surprising contention, for the government's January 15 Supreme Court filing stated plainly that when Mexican officials contacted Border Patrol around 9:00 p.m. on January 12, the migrants had already drowned. *See* 23A607 Second Supp. Mem. 1, ¶ 1 ("On January 12, 2024, at approximately 9:00 p.m., Mexican officials advised Border Patrol … that three migrants – one woman and two children – had drowned at approximately 8:00 p.m. in the same area," i.e., "near the Shelby Park boat ramp."); *see also id.* at App. 2a, ¶ 5 (Danley Declaration) (similar). Indeed, Texas's responsive filing in the Supreme Court reflected none of the confusion it now claims.

22

*See* 23A607 Resp. to Second Supp. Mem. 3 ("According to Defendants … , an Acting Supervisory Border Patrol Agent went to the Shelby Park entrance gate to relay … that three other individuals had drowned in the same area one hour earlier."). Any suggestion that the government's Supreme Court filing was misleading is refuted by the plain text of that filing, which is presumably why the district court made no such finding.[5]

While the parties' Supreme Court filings reflect no dispute that the three migrants had drowned before Border Patrol agents responded to Shelby Park on January 12, Texas has questioned whether, while the events were unfolding, the responding agents understood there to be an emergency in progress. *See, e.g.*, Tex. Supp. Br. 9. The district court declined to resolve that question, finding that the

---

[5] Texas also points to a social media posting from Congressman Henry Cuellar that did not state that the migrants had drowned before agents requested access to Shelby Park. *See* Tex. Supp. Br. 8-9. The Executive Branch, of course, is not responsible for the social media postings of members of Congress. As for the news article in which an anonymous, purported CBP source is quoted as endorsing Rep. Cuellar's version, it is telling that Texas cites an archived version of that story, Tex. Supp. Br. 9 (citing ROA.2249 (in turn citing the Internet Archive's "Wayback Machine")), rather than the version that was updated to reflect the government's Supreme Court filing, *see* Camilo Montoya-Galvez, *3 Migrants Drowned Near Area Where Texas Has Denied Entry To Federal Border Agents*, CBS NEWS (Jan. 15, 2024, 11:45 P.M.), https://www.cbsnews.com/news/3-migrants-drown-near-shelby-park-eagle-pass-texas-soldiers-denied-entry-federal-border-agents ("Update: This story and headline were updated to reflect [the government's Supreme Court filing indicating] the three migrant drownings had already occurred when Border Patrol requested access to Shelby Park to help other migrants … ."). And DHS's official statement quoted in the article is accurate. *See id.* ("In responding to a distress call from the Mexican government, Border Patrol agents were physically barred by Texas officials from entering the area.").

"evidence is confusing as to what was known and when it was known." ROA.2320; *see also* ROA.2325 (declining to resolve "whether the parties were aware of an emergency, or not"). This Court need go no further, though it bears emphasis that the district court identified significant testimony, including from one of Texas's own witnesses, supporting the government's contention that, at the time, federal officials understood there to be an emergency in progress. *See* ROA.2321 (noting that at 9:23 p.m., Border Patrol's Eagle Pass North station was advised of an "emergency" (citing ROA.3012)); ROA.2322 (noting testimony that Garcia's assignment was to create an "emergency rescue plan" (apparently referencing ROA.2781)); ROA.2322-23 (noting Garcia's belief that he could assist with emergency equipment in his vehicle, or by coordinating with the local fire department and Grupo Beta (apparently referencing ROA.2797-98, 2844-45)); ROA.2324 (noting that Texas's witness "Fletcher testified that after BP agents left the main gate, the Command Desk informed Fletcher that the BP agents were there due to an 'emergency'" (apparently referencing ROA.2576)); ROA.2324 (noting Garcia's testimony that "he clearly communicated to [Texas Staff Sergeant] McKinney [at the Shelby Park gate] that there was an urgent situation and that he was requesting access into Shelby Park" (apparently referencing ROA.2786)).

2.     Texas complains that when the government first alerted the Supreme Court to Texas's seizure of Shelby Park, it did not explain that Texas intended to permanently bar Border Patrol from only the immediate Shelby Park area, rather than the broader area around which Texas initially restricted Border Patrol's access. *See*

Tex. Supp. Br. 12.  The government's Supreme Court filing, however, accurately reflected what Texas communicated to the federal government in its initial takeover. In particular, Texas National Guard Colonel Fletcher informed a Border Patrol watch commander that Texas was "going to basically take the park from the Shelby Park boat ramp to the 1430."[6]  ROA.2832 (Donaldson testimony); ROA.2876 (same); ROA.2879 (same); *see also* ROA.3018 (contemporaneous email from watch commander to Donaldson memorializing conversation with Fletcher).  Border Patrol Chief Patrol Agent Danley similarly testified that in a phone call with Texas Department of Public Safety Regional Director Victor Escalon, they determined that Border Patrol was excluded from "[a]bout two and a half miles."  ROA.2691; *see also* ROA.2695 (Danley testimony that he understood Border Patrol "had been operationally shut out" of the area marked on a map submitted to the Supreme Court).  Indeed, if the facts on the ground were as clear as Texas now presents them, it is difficult to understand why Texas's January 13 Supreme Court filing made no effort to describe the relationship between the "outer" and "inner" cordons it later identified or to confirm Border Patrol's access throughout the area.  *See generally* 23A607 Resp. to Supp. Mem.

---

[6] The "1430" represents the yellow line at the bottom of Exhibit A to the government's January 12 supplemental memorandum in the Supreme Court, which is reproduced in the record at ROA.2932.  *See* ROA.2807-08.  In other words, as Donaldson testified, he understood that Texas was excluding Border Patrol from "Shelby Park to the end of … my [Area of Responsibility]."  ROA.2833.

To the extent there was initial uncertainty about the precise scope of Texas's "unprecedented and unannounced" actions, ROA.2316, that is attributable to Texas's choice to conduct a "military operation" along the international border without providing advance notice to the federal government. *See generally* ROA.2314-16. Once Texas began permitting limited access to some of the area that it had initially restricted, the government informed the Supreme Court. *See* 23A607 Second Supp. Mem. 4-5, ¶ 3.[7] And the key point that the federal government conveyed to the Court regarding Texas's conduct was and is undisputed: after representing to the Supreme Court that Border Patrol had access to both sides of Texas's fence along the border near Eagle Pass, Texas began blocking that access by land throughout the Shelby Park area, territory to which the injunction the Court was considering applied. *See id.* (acknowledging Border Patrol's ability to drive through part of previously blocked area and explaining that "[r]egardless of the continually shifting circumstances on the ground," Texas continued to "imped[e] Border Patrol agents from accessing the land on the other side of the concertina wire for patrolling, deploying surveillance trucks,

---

[7] Contrary to Texas's suggestions, any uncertainty surrounding the precise boundaries of the area that Texas seized was attributable to Texas's decision to commence its operation without consulting the federal government, not the location from which Border Patrol Chief Patrol Agent Danley executed his Supreme Court declarations. *Cf.* Tex. Supp. Br. 2, 15. Like Texas's declarant, Danley accurately indicated that his declaration was based on both "personal knowledge and information made known to me in the course of my employment." *Compare* 23A607 Supp. Mem. App. 1a (Danley Declaration), *with* 23A607 Resp. to Second Supp. Mem. Fletcher Decl. ¶ 3.

and responding to emergencies"); ROA.2573 (Texas witness confirming in March 2024 the state's continued exclusion of Border Patrol from Shelby Park).[8]

3.      Texas also suggests that this Court should conclude that the federal government incorrectly claimed in the Supreme Court that Texas's seizure of Shelby Park "prevented [Border Patrol] from apprehending aliens."  Tex. Supp. Br. 12.  The district court made no such finding, instead recognizing that Texas has forbidden "federal agents to employ the park for immigration or border security operations."  ROA.2317.  And while Texas's supplemental brief suggests that it "transfer[s] aliens to Border Patrol custody for apprehension" outside of Shelby Park, Tex. Supp. Br. 12, it does not dispute that it precludes Border Patrol from exercising its authority to apprehend such individuals itself along that stretch of the border.  *See* ROA.2573 (Fletcher confirming that he "would deny [Border Patrol] access to apprehend someone within Shelby Park today").  Texas's decision to preclude Border Patrol from carrying out its functions with respect to any migrants within Shelby Park is particularly concerning given the evidence that Texas officials may not always apprehend, or even interact with, migrants along the border.  *See* ROA.2322 (district court finding that even when "TXNG soldiers observed subjects on the U.S. side of

---

[8] Texas's contention that "Shelby Park is not in the area at issue in this suit," Tex. Supp. Br. 23, is entirely without foundation.  The injunction that Texas sought, this Court entered, and the Supreme Court was considering vacating when the federal government made its supplemental filings plainly applied to Shelby Park.  *See* Dkt. 49-2 at 1 (Dec. 19, 2023).

the riverbank" after the January 12 drownings, the Texas "chain of command ordered [McKinney, a Texas National Guard Staff Sergeant on duty in Shelby Park] to not interact with the subjects").  Beyond that, when Texas encounters a migrant experiencing a medical emergency, the district court found that Texas contacts emergency medical services, not Border Patrol, ROA.2330; in such cases, Texas's witness testified that state personnel do not "go with them or transport with them," ROA.2578 (Fletcher testimony), which means that Border Patrol may never know the migrant has entered the United States.  In contrast, when Border Patrol encounters an injured migrant, an agent will "conduct hospital watch and watch them at the hospital during their care," ROA.2813 (Donaldson testimony), ensuring that such a migrant is properly processed under federal immigration law.  Ultimately, as Deputy Chief BeMiller testified, Border Patrol must "have access to the border in order to perform our duties."  ROA.2741.[9]

---

[9] Texas suggests that defendants' "witnesses conceded that they were not apprehending the individuals who illegally crossed the border because they were '"not in [federal] custody.'"  Tex. Supp. Br. 22 (quoting ROA.2656).  That is incorrect.  As set out in the government's principal brief, when Border Patrol agents encounter migrants, cut the wire, and direct them to a specific area for processing, those migrants have been apprehended even if they are not taken into physical custody immediately.  *See* DHS Br. 22.  The testimony to which Texas points concerns migrants who cross the wire on their own and voluntarily arrive at such an area *without* having been directed there by an agent.  *See* ROA.2657 (Donaldson testimony: "[W]e didn't put these people in this location.  I can't stress that enough.").  More importantly, the proper definition of "apprehension" is a question of law, not fact.

4.     Texas suggests the Court should find that the government had "continuous river access" from boat ramps outside Shelby Park.  Tex. Supp. Br. 2; *see also id.* at 8, 24.  But the relevant boat ramp is the Shelby Park boat ramp, to which it is undisputed that TXNG denied CBP agents access "for approximately 42 hours after the Plaintiff seized Shelby Park."  ROA.2318.  Consistent with Border Patrol's practice of using the Shelby Park boat ramp, testimony before the district court at the original preliminary injunction hearing focused on that boat ramp, and defendants' access to it therefore underlay the district court's view, prior to Texas's seizure of Shelby Park, that Border Patrol agents had access to the river and could in some instances effect rescues by boat without cutting the wire.  *See* ROA.1173 (testimony from preliminary injunction hearing that deploying boats from other ramps "dramatically increases not only response time, but deployment time as well").  This Court in turn relied upon the district court's view in entering its injunction pending appeal.  *See* Dkt. 49-2 at 6 (Dec. 19, 2023) (quoting ROA.950).  As the district court confirmed on remand, "CBP regularly used the concrete, all-weather Shelby Park boat ramp for its river operations for at least two decades."  ROA.2318.  That ramp "is closest to the area that experienced a high traffic of migrant crossings," and because it is made of concrete, it "allows CBP's marine unit to deploy boats quickly and remains usable in adverse weather conditions."  ROA.2318; *see also* ROA.2535 (Fletcher acknowledging that alternative boat ramps presented "a challenge" in "rain conditions"); 23A607 Resp. to Supp. Mem. 4 (acknowledging that the "road giving

29

access to [other] ramps [is] not paved" and stating that when "the weather is not …

inclement" the "ramps [are] accessible").

The government's indication to the Supreme Court that Texas had interfered

with its access to "the boat ramp from which Border Patrol routinely launches the

patrol boats it uses on this stretch of the Rio Grande," 23A607 Supp. Mem. 2, ¶ 2,

was thus entirely accurate.  Indeed, the district court specifically found that Texas did

not restore federal access to the ramp until "noon on January 12," ROA.2319, which

was hours after the federal government filed its supplemental memorandum regarding

the takeover in the Supreme Court.  And the federal government clearly informed the

Supreme Court once Texas ceased blocking its access to this ramp: "Texas responded

to the government's First Supplemental Memorandum in this Court by restoring

Border Patrol's access to the Shelby Park boat ramp for purpose of patrolling on the

river."  23A607 Second Supp. Mem. 4, ¶ 3.

5.     Texas further invites this Court to conclude that its seizure of Shelby

Park did not impair Border Patrol's visibility of the river.  *See* Tex. Supp. Br. 2, 13.

After receiving two days of testimony, however, the district court found that Texas's

operation "left CBP partially blind" at first, and that even now "CBP's visibility

remains somewhat reduced" to a degree that the court was "unable to determine."

ROA.2318; *see also* ROA.2317 (noting testimony that "permanently stationing scope

trucks [on the bridges] was unfeasible due to the flow of traffic").  There is no basis

for this Court to depart from the district court's well-supported factual findings.  *See*

ROA.2694 (Danley testimony describing "90 percent" loss of situational awareness); ROA.2851-52 (similar Donaldson testimony); *see also* ROA.2646-47 (Danley testimony describing infeasibility of moving scope trucks to international bridges).

6.    Texas suggests that defendants conceded "that Texas's barriers are effective at deterring, redirecting, and slowing illegal entry." Tex. Supp. Br. 23.  The testimony that Texas cites, however, states that "border barrier works very well to gain us time … to react when people are trying to evade apprehension." ROA.2686 (Danley testimony); *see also* ROA.2818 (Donaldson testimony).  Yet as Donaldson explained, the majority of people crossing into Eagle Pass are "turning themselves in" and "not trying to evade the arrest," ROA.2809; as Danley explained, they just "cross and they wait," ROA.2687; *see also* ROA.2817 (Donaldson testimony: "For the individuals turning themselves in, they were coming and they weren't stopping."). The testimony does not suggest that Texas's activities have reduced the number of such individuals crossing the border in Eagle Pass.

In this regard, it is notable that Texas's narrative—in which its activities around Shelby Park caused a sharp drop in migration—is unsupported by the evidence. Indeed, there was a mid-December surge of migrants of "about 2400 a day on average," despite Texas's many layers of wire (which, at the time, generally could not be disturbed by federal officials in light of this Court's orders).  ROA.2830 (Donaldson testimony); *see* Dkt. 38-2 (Dec. 4, 2023); Dkt. 49-2 (Dec. 19, 2023).  That figure dramatically dropped beginning in early January, prior to Texas's seizure of

31

Shelby Park.  *See* ROA.2688-89 (Danley testimony, attributing decrease to greater enforcement in Mexico); *accord* Tex. Supp. Br. 7 (acknowledging that "traffic began to subside" before Texas's seizure of Shelby Park).  The district court declined to "speculate on how the Plaintiff's occupation of Shelby Park may affect the rates of crossings elsewhere along the border" or to disentangle the "myriad factors [that] may converge to explain the drop in migrant crossings in Eagle Pass," ROA.2328, and there is no basis for this Court to make further findings that the district court did not.

7.      Finally, Texas suggests that defendants "conceded" that their authority to access the border under 8 U.S.C. § 1357(a)(3) does not apply to municipal land like Shelby Park.  *See* Tex. Supp. Br. 23 (citing ROA.2653 (Danley testimony)).  Defendants made no such concession; in the cited testimony, Danley simply referenced the statutory text, which speaks for itself.  In any case, the statutory reference to "private lands" plainly refers to lands other than those owned by the federal government, the only reading consistent with the statutory purpose to confirm the preexisting "sovereign right of the United States to protect its own boundaries." H.R. Rep. No. 82-1377, at 3 (1952).  Texas has not suggested otherwise at any point over months of litigation.

*      *      *

At bottom, Texas is asking this Court to make factual findings that the district court has already declined to make so that it may enter an injunction mirroring the

one the Supreme Court has already vacated. This Court should reject that invitation and affirm the order of the district court denying a preliminary injunction.

## CONCLUSION

For the foregoing reasons, as well as those in the government's principal brief, the district court's order denying Texas's motion for a preliminary injunction should be affirmed.

Respectfully submitted,

JAIME ESPARZA
  *United States Attorney*

MARY F. KRUGER
ROBERT GREEN
  *Assistant United States Attorneys*

BRIAN M. BOYNTON
  *Principal Deputy Assistant Attorney*
  *General*

SARAH E. HARRINGTON
  *Deputy Assistant Attorney General*

MARK R. FREEMAN
MELISSA N. PATTERSON
 */s/ Steven A. Myers*
STEVEN A. MYERS
  *Attorneys, Appellate Staff*
  *Civil Division, Room 7232*
  *U.S. Department of Justice*
  *950 Pennsylvania Avenue NW*
  *Washington, DC 20530*
  *(202) 305-8648*
  *Steven.A.Myers@usdoj.gov*

May 2024

## CERTIFICATE OF COMPLIANCE

This brief complies with the type-volume limit of Federal Rule of Appellate Procedure 32(a)(7)(B) because it contains 8,534 words. This brief also complies with the typeface and type-style requirements of Federal Rule of Appellate Procedure 32(a)(5)-(6) because it was prepared using Word for Microsoft 365 in Garamond 14-point font, a proportionally spaced typeface.

*/s/ Steven A. Myers*
Steven A. Myers