

# KEN PAXTON
### ATTORNEY GENERAL OF TEXAS

Aaron L. Nielson
Solicitor General

Aaron.Nielson@oag.texas.gov
(512) 463-2100

June 5, 2024

**VIA CM/ECF**

Mr. Lyle W. Cayce, Clerk
Court of Appeals for The Fifth Circuit

>    Re:    No. 23-50869, *Texas v. DHS*

Dear Mr. Cayce:

Pursuant to Rule 28(j), counsel provides notice that yesterday, Defendants announced "executive actions to bar migrants who cross our Southern border unlawfully from receiving asylum." Attachment A. Conceding that the current level of unlawful border crossing is "detrimental to the interest of the United States," the President "suspended" entry of individuals in the United States when border encounters reach a level that even he deems too high. Attachment B. The Department of Homeland Security and Department of Justice simultaneously issued an interim final rule "restrict[ing] asylum eligibility for those who irregularly enter across the southern border." Attachments C; Attachment D.

These actions flatly contradict Defendants' position—expressed to the district court, this Court, and the Supreme Court—that they cannot "immediately expel" any immigrant who "crosse[s] the international boundary" because he "has already entered the United States" and is entitled to statutory asylum protections. ROA.592, ROA.596, ROA.813, ROA.819; *see* Appellees Br. 20-21; Application to Vacate 22-23 & n.6, No. 23A607 (U.S.). They also confirm Texas's view, under Supreme Court precedent and CBP's own "turnback" practice, that an "alien who manages to get a toe across the international boundary line" has *not* entered the country for purposes of federal immigration law. ROA.703, ROA.848-850; *see also* ROA.701.

Unfortunately, these actions purport to allow Defendants to continue destroying Texas's property. Specifically, the Proclamation carves out "any noncitizen who is permitted to enter by … a CBP immigration officer" based on the

Letter to Mr. Cayce, Clerk
Page 2

"totality of the circumstances" or "operational considerations." Attachment B, Section 3(b)(vi)-(vii). Here, Officer Trevino testified he would destroy Texas property essentially anytime anyone reaches Texas's riverbank, and keep the fence open "until they're all in." ROA.847, ROA.857-58; *cf.* ROA.936 (rejecting Defendants' "cynical arguments").

As the district court explained, such destruction of Texas's property is not even plausibly authorized by the INA. ROA.939; *see also* Reply. Br. 7-13. And sovereign immunity does not preclude this Court from halting it. *See* Appellant Br. 16-27; Reply Br. 3-7. Nothing in Defendants' latest about-face changes the conclusions the motions panel already reached. They do, however, provide yet another reason why Texas is entitled to injunctive relief.

Respectfully submitted,

/s/ Aaron L. Nielson

Aaron L. Nielson
*Counsel for the State of Texas*

cc: All counsel of record (via CM/ECF)

# Attachment A:

White House, Fact Sheet: President Biden Announces New Actions to Secure the Border (June 4, 2024), https://tinyurl.com/bdz5trvd

JUNE 04, 2024

# FACT SHEET: President Biden Announces New Actions to Secure the Border

*New actions will bar migrants who cross our Southern border unlawfully from receiving asylum*

*Biden taking action as Congressional Republicans put partisan politics ahead of national security, twice voting against toughest reforms in decades*

Since his first day in office, President Biden has called on Congress to secure our border and address our broken immigration system. Over the past three years, while Congress has failed to act, the President has acted to secure our border. His Administration has deployed the most agents and officers ever to address the situation at the Southern border, seized record levels of illicit fentanyl at our ports of entry, and brought together world leaders on a framework to deal with changing migration patterns that are impacting the entire Western Hemisphere.

Earlier this year, the President and his team reached a historic bipartisan agreement with Senate Democrats and Republicans to deliver the most consequential reforms of America's immigration laws in decades. This agreement would have added critical border and immigration personnel, invested in technology to catch illegal fentanyl, delivered sweeping reforms to the asylum system, and provided emergency authority for the President to shut down the border when the system is overwhelmed. But Republicans in Congress chose to put partisan politics ahead of our national security, twice voting against the toughest and fairest set of reforms in decades.

**President Biden believes we must secure our border. That is why today, he announced executive actions to bar migrants who cross our Southern border unlawfully from receiving asylum. These actions will be in effect when high levels of encounters at the Southern Border exceed our ability**

**to deliver timely consequences, as is the case today. They will make it
easier for immigration officers to remove those without a lawful basis to
remain and reduce the burden on our Border Patrol agents.**

But we must be clear: this cannot achieve the same results as Congressional
action, and it does not provide the critical personnel and funding needed to
further secure our Southern border. Congress still must act.

**The Biden-Harris Administration's executive actions will:**

**Bar Migrants Who Cross the Southern Border Unlawfully From
Receiving Asylum**

- President Biden issued a proclamation under Immigration and
  Nationality Act sections 212(f) and 215(a) suspending entry of
  noncitizens who cross the Southern border into the United States
  unlawfully. This proclamation is accompanied by an interim final rule
  from the Departments of Justice and Homeland Security that restricts
  asylum for those noncitizens.

- These actions will be in effect when the Southern border is
  overwhelmed, and they will make it easier for immigration officers to
  quickly remove individuals who do not have a legal basis to remain in the
  United States.

- These actions are not permanent. They will be discontinued when the
  number of migrants who cross the border between ports of entry is low
  enough for America's system to safely and effectively manage border
  operations. These actions also include similar humanitarian exceptions
  to those included in the bipartisan border agreement announced in the
  Senate, including those for unaccompanied children and victims of
  trafficking.

**Recent Actions to secure our border and address our broken
immigration system:**

**Strengthening the Asylum Screening Process**

- The Department of Homeland Security published a proposed rule to ensure that migrants who pose a public safety or national security risk are removed as quickly in the process as possible rather than remaining in prolonged, costly detention prior to removal. This proposed rule will enhance security and deliver more timely consequences for those who do not have a legal basis to remain in the United States.

**Announced new actions to more quickly resolve immigration cases**

- The Department of Justice and Department of Homeland Security launched a Recent Arrivals docket to more quickly resolve a portion of immigration cases for migrants who attempt to cross between ports of entry at the Southern border in violation of our immigration laws.

- Through this process, the Department of Justice will be able to hear these cases more quickly and the Department of Homeland Security will be able to more quickly remove individuals who do not have a legal basis to remain in the United States and grant protection to those with valid claims.

- The bipartisan border agreement would have created and supported an even more efficient framework for issuing final decisions to all asylum seekers. This new process to reform our overwhelmed immigration system can only be created and funded by Congress.

**Revoked visas of CEOs and government officials who profit from migrants coming to the U.S. unlawfully**

- The Department of State imposed visa restrictions on executives of several Colombian transportation companies who profit from smuggling migrants by sea. This action cracks down on companies that help facilitate unlawful entry into the United States, and sends a clear message that no one should profit from the exploitation of vulnerable migrants.

- The State Department also imposed visa restrictions on over 250 members of the Nicaraguan government, non-governmental actors, and their immediate family members for their roles in supporting the Ortega-Murillo regime, which is selling transit visas to migrants from within and

beyond the Western Hemisphere who ultimately make their way to the Southern border.

- Previously, the State Department revoked visas of executives of charter airlines for similar actions.

## Expanded Efforts to Dismantle Human Smuggling and Support Immigration Prosecutions

- The Departments of State and Justice launched an "Anti-Smuggling Rewards" initiative designed to dismantle the leadership of human smuggling organizations that bring migrants through Central America and across the Southern U.S. border. The initiative will offer financial rewards for information leading to the identification, location, arrest, or conviction of those most responsible for significant human smuggling activities in the region.

- The Department of Justice will seek new and increased penalties against human smugglers to properly account for the severity of their criminal conduct and the human misery that it causes.

- The Department of Justice is also partnering with the Department of Homeland Security to direct additional prosecutors and support staff to increase immigration-related prosecutions in crucial border U.S. Attorney's Offices. Efforts include deploying additional DHS Special Assistant United States Attorneys to different U.S. Attorneys' offices, assigning support staff to critical U.S. Attorneys' offices, including DOJ Attorneys to serve details in U.S. Attorneys' Offices in several border districts, and partnering with federal agencies to identify additional resources to target these crimes.

## Enhancing Immigration Enforcement

- The Department of Homeland Security has surged agents to the Southern border and is referring a record number of people into expedited removal.

- The Department of Homeland Security is operating more repatriation flights per week than ever before. Over the past year, DHS has removed

or returned more than 750,000 people, more than in every fiscal year since 2010.

- Working closely with partners throughout the region, the Biden-Harris Administration is identifying and collaborating on enforcement efforts designed to stop irregular migration before migrants reach our Southern border, expand investment and integration opportunities in the region to support those who may otherwise seek to migrate, and increase lawful pathways for migrants as an alternative to irregular migration.

**Seizing Fentanyl at our Border**

- Border officials have seized more fentanyl at ports of entry in the last two years than the past five years combined, and the President has added 40 drug detection machines across points of entry to disrupt the fentanyl smuggling into the Homeland. The bipartisan border agreement would fund the installation of 100 additional cutting-edge inspection machines to help detect fentanyl at our Southern border ports of entry.

- In close partnership with the Government of Mexico, the Department of Justice has extradited Nestor Isidro Perez Salaz, known as "El Nini," from Mexico to the United States to face prosecution for his role in illicit fentanyl trafficking and human rights abuses. This is one of many examples of joint efforts with Mexico to tackle the fentanyl and synthetic drug epidemic that is killing so many people in our countries and globally, and to hold the drug trafficking organizations to account.

###

**Attachment B:**

White House, A Proclamation on Securing the Border
(June 4, 2024), https://tinyurl.com/skyans9y

JUNE 04, 2024

# A Proclamation on Securing the Border

There are more people around the world who are displaced from their homes today than at any point in time since World War II.  Many factors have contributed to this problem.  Failing regimes and dire economic conditions afflict many countries, including several in the Western Hemisphere.  Violence linked to transnational criminal organizations has displaced substantial numbers of people in Latin America.  The global COVID-19 pandemic upended societies around the globe.  Natural disasters have forced people from their homes.

As a result of these global conditions, we have been experiencing substantial levels of migration throughout the Western Hemisphere, including at our southwest land border.  In 2019, encounters nearly doubled from their 2018 level to almost 1 million.  In 2020, the global COVID-19 pandemic led countries throughout the world to shut their borders and suspend international travel; however, once the pandemic began to recede, international travel resumed, and we again experienced elevated levels of migration throughout the Western Hemisphere, including at our southwest land border.

On May 11, 2023, as part of my Administration's work to prepare for the end of the Centers for Disease Control and Prevention's public health order under title 42, United States Code, and to return to processing all noncitizens under immigration authorities under title 8, United States Code (title 8), the Department of Homeland Security (DHS) and the Department of Justice (DOJ) issued a final rule, entitled Circumvention of Lawful Pathways (Lawful Pathways rule), encouraging the use of lawful pathways and imposing a rebuttable presumption of asylum ineligibility on those who do not use them.

The Lawful Pathways rule was designed to address the high levels of migration throughout the Western Hemisphere and further discourage irregular migration by encouraging migrants to use lawful, safe, and orderly

processes for entering the United States or to seek protection in other partner nations; imposing a presumptive condition on asylum eligibility for those who fail to do so; and supporting the swift return of those who do not have valid protection claims.

As a complement to the Lawful Pathways rule and associated enforcement efforts, the Department of State and DHS have taken significant steps to expand safe and orderly pathways for migrants to enter the United States lawfully. Those steps include establishing Safe Mobility Offices in Colombia, Costa Rica, Ecuador, and Guatemala to facilitate access to lawful pathways; expanding country-specific and other available processes to seek parole on a case-by-case basis for urgent humanitarian reasons or significant public benefit; expanding access to visa programs for seasonal employment; establishing a mechanism for noncitizens to schedule a time and place to present at ports of entry in a safe, orderly, and lawful manner through the CBP One mobile application; and expanding refugee admissions from the Western Hemisphere from 5,000 in Fiscal Year 2021 to up to 50,000 in Fiscal Year 2024.

The Lawful Pathways rule and these complementary measures have made a substantial impact. On May 12, 2023, DHS returned to processing all noncitizens under title 8 immigration authorities and is processing noncitizens at record scale and efficiency. Since then, my Administration has maximized the use of expedited removal to the greatest extent possible given limited resources, placing more than 970 individuals encountered at and between ports of entry at the southwest land border into the process each day on average and conducting more than 152,000 credible fear interviews, both of which are record highs. As a result, from May 12, 2023, to May 1, 2024, my Administration removed or returned more than 720,000 noncitizens who did not have a lawful basis to remain in the United States, the vast majority of whom crossed the southwest land border. Total removals and returns in the 12 months following May 12, 2023, exceeded removals and returns in every full Fiscal Year since 2010. The majority of all individuals encountered at the southwest land border from Fiscal Year 2021 to Fiscal Year 2023 were removed, returned, or expelled.

Despite these efforts, and after months of reduced encounter levels following the changes put in place after May 12, 2023, encounter levels increased toward the end of 2023, and December 2023 saw the highest level

of encounters between ports of entry in history, as increasing numbers of people migrated through the Western Hemisphere. The challenges presented by this surge in migration, which would have been even worse had the Lawful Pathways rule and other measures not been in place, were compounded by the fact that the surge was focused increasingly on western areas of the border in California and Arizona that are geographically remote, challenging to address, and without sufficient pre-existing infrastructure or resources to respond to the surge. From January to March 2024, encounters decreased from and have remained below levels experienced in November and December 2023, including as a result of increased enforcement by the United States and partner countries. However, the factors that are driving the unprecedented movement of people in our hemisphere remain, and there is still a substantial and elevated level of migration that continues to pose significant operational challenges.

The current situation is also the direct result of the Congress's failure to update an immigration and asylum system that is simply broken — and not equipped to meet current needs. While my Administration has vigorously enforced the law within the constraints imposed by the existing system, the statutory framework put in place by the Congress is outdated. For the vast majority of people in immigration proceedings, the current laws make it impossible to quickly grant protection to those who require it and to quickly remove those who do not establish a legal basis to remain in the United States. This reality is compounded by the fact that the Congress has chronically underfunded our border security and immigration system and has failed to provide the resources or reforms it needs to be able to deliver timely consequences to most individuals who cross unlawfully and cannot establish a legal basis to remain in the United States.

Despite the strengthened consequences in place at our border through the Lawful Pathways rule and the related measures that have led to record returns and removals, encounter levels are exceeding our capacity to deliver those consequences in a timely manner due to the outdated laws and limited resources we have available.

My Administration has repeatedly asked the Congress to update the outdated and inadequate immigration statutes, to create a legal framework that is functional and addresses current realities, and to provide additional resources so that we can more effectively deliver consequences at the border.

In August 2023, I requested more than $4 billion in additional funding for border security and related migration issues, including more than $2 billion for urgent DHS border management requirements.  The Congress failed to act. In October 2023, I requested $13.6 billion for border enforcement and migration management.  This request included more than $5 billion for DHS to manage conditions on the southern border, as well as funding for critical capacity enhancements to keep the southern border secure.  The Congress once again failed to provide our border and immigration system with the resources it needs to deliver timely consequences to those who cross unlawfully.

In early February 2024, a bipartisan group of Senators introduced legislation (bipartisan legislative proposal) containing the toughest and fairest reforms of our asylum laws in decades that would have provided new authorities to significantly streamline and speed up immigration enforcement proceedings for individuals encountered at the border, including those who are seeking protection.  Critically, the bipartisan legislative proposal included nearly $20 billion in additional resources for DHS and other departments to implement those new authorities, such as:

(a)  over 1,500 new U.S. Customs and Border Protection (CBP) personnel, including Border Patrol agents and CBP officers;

(b)  over 4,300 new asylum officers and additional U.S. Citizenship and Immigration Services staff to facilitate timely and fair decisions;

(c)  100 new immigration judge teams to help reduce the asylum caseload backlog and adjudicate cases more quickly;

(d)  shelter and critical services for newcomers in our cities and States; and

(e)  1,200 new U.S. Immigration and Customs Enforcement personnel for functions including enforcement and deportations. While the bipartisan legislative proposal did not include everything we wanted, senior officials from my Administration worked closely with the bipartisan group of Senators to ensure that the reforms would adequately address the challenges that we have been facing at our southern border for more than a decade. However, the Congress failed to move forward with this bipartisan legislative proposal.

The Further Consolidated Appropriations Act, 2024 (Public Law 118-47) increased funding for DHS over Fiscal Year 2023, but it did not address the

needs identified in various related supplemental requests, nor did it equip the Federal Government with the new authorities from the bipartisan legislative proposal.  In May 2024, when the Senate again considered the bipartisan legislative proposal, the Senate failed to advance the measure.

Our broken immigration system is directly contributing to the historic migration we are seeing throughout the Western Hemisphere, exacerbated by poor economic conditions, natural disasters, and general insecurity, and this fact, combined with inadequate resources to keep pace, has once again severely strained our capacity at the border.  The result is a vicious cycle in which our United States Border Patrol facilities constantly risk overcrowding, our detention system has regularly been at capacity, and our asylum system remains backlogged and cannot deliver timely decisions, all of which spurs more people to make the dangerous journey north to the United States.

The Congress's failure to deliver meaningful policy reforms and adequate funding, despite repeated requests that they do so, is a core cause of this problem.  Under current law, whenever a noncitizen in expedited removal indicates an intention to apply for asylum or a fear of persecution, they are referred for an interview with an asylum officer and cannot be removed through expedited removal if there is a significant possibility that they could establish eligibility for asylum.  This screening standard is a requirement imposed by the Congress, but it has not functioned well in predicting ultimate success in asylum proceedings.  From 2014 to 2019, 83 percent of individuals referred for an interview with an asylum officer passed the screening stage, meaning that they were not removed pursuant to expedited removal, but less than 25 percent of cases ultimately resulted in a grant of asylum or other protection, often after waiting years to reach a final decision. By imposing a rebuttable presumption of asylum ineligibility on those who cross the border unlawfully, the Lawful Pathways rule has made a meaningful impact in reducing this disparity.  The screen-in rate from May 12, 2023, to March 31, 2024, dropped to 52 percent for individuals who are subject to the rebuttable presumption of asylum ineligibility.  However, the Lawful Pathways rule alone is inadequate during times of record encounter levels and cannot change the underlying statutory limitations.

Data confirm that the system has been badly strained for many years and is not functioning to provide timely relief for those who warrant it or timely

consequences for those without viable protection claims. Due to an outdated and inefficient system and insufficient resources that do not allow for prompt adjudication of claims, too many people have had to be processed by the Border Patrol and released with a notice to appear in removal proceedings before an immigration judge since May 2023. The U.S. Citizenship and Immigration Service affirmative asylum backlog is now over 1 million cases and growing, with over 300,000 applications filed prior to 2021 still pending. At the end of Fiscal Year 2023, there were over 2.4 million cases pending in the immigration courts. Pending cases more than doubled from the end of Fiscal Year 2016 to the end of Fiscal Year 2020 and doubled again between that time and the end of Fiscal Year 2023. Between Fiscal Year 2006 and the end of Fiscal Year 2023, in tandem with historic increases in filings to initiate immigration court proceedings, the immigration courts' pending caseload increased from approximately 170,000 to approximately 2.46 million. During Fiscal Year 2023, immigration judges completed more cases than they ever had before in a single year, but more than twice as many cases were received by the immigration courts than were completed.

The status quo system — the result of outdated laws and inadequate resources — has become a driver for unlawful migration throughout the region and an increasingly lucrative source of income for dangerous transnational criminal organizations and other criminal smuggling organizations that, without countermeasures, will continue to grow in strength and pose significant threats to the safety and security of United States communities and migrants, as well as countries throughout the region.

Considering these trends and the decades-long failure of the Congress to address the problem through systemic reform and adequate funding, and following the Congress's failure to pass the bipartisan legislative proposal, I must exercise my executive authorities to meet the moment. This proclamation answers the call by suspending entry of noncitizens across the southern border during this time of high border crossings. Appropriate exceptions are provided, such as for those who are particularly vulnerable or present pursuant to a process the Secretary of Homeland Security determines is appropriate to allow for safe and orderly processing into the United States. That process will continue to allow for individuals to seek entry to this country each day in a safe and orderly manner, and following

their arrival, to seek protection through the appropriate process. This proclamation, in conjunction with steps to be taken by DOJ and DHS, is needed to enhance our ability to address the historic levels of migration and more efficiently process migrants arriving at the southern border given current resource levels.

These actions do not change or fully compensate for the fact that our immigration system is under-resourced and broken, nor do they change the fact that there are significant limits to what can be achieved without the Congress fulfilling its responsibility to help solve the unprecedented challenge that we are facing. No executive action can deliver the significant policy reforms and additional resources that were in the bipartisan legislative proposal. But I will continue to take actions, within these constraints, to address the situation at our southern border.

NOW, THEREFORE, I, JOSEPH R. BIDEN JR., President of the United States, by the authority vested in me by the Constitution and the laws of the United States of America, including sections 212(f) and 215(a) of the Immigration and Nationality Act (8 U.S.C. 1182(f) and 1185(a)) and section 301 of title 3, United States Code, hereby find that, absent the measures set forth in this proclamation, the entry into the United States of persons described in section 1 of this proclamation under circumstances described in section 2 of this proclamation would be detrimental to the interests of the United States, and that their entry should be subject to certain restrictions, limitations, and exceptions. I therefore hereby proclaim the following:

Section 1. Suspension and Limitation on Entry. The entry of any noncitizen into the United States across the southern border is hereby suspended and limited, subject to section 3 of this proclamation. This suspension and limitation on entry shall be effective at 12:01 a.m. eastern daylight time on June 5, 2024. The suspension and limitation directed in this proclamation shall be discontinued pursuant to subsection 2(a) of this proclamation, subject to subsection 2(b) of this proclamation.

Sec. 2. Applicability of Suspension and Limitation on Entry. (a) The Secretary of Homeland Security shall monitor the number of daily encounters and, subject to subsection (b) of this section, the suspension and limitation on entry pursuant to section 1 of this proclamation shall be discontinued at 12:01 a.m. eastern time on the date that is 14 calendar days

after the Secretary makes a factual determination that there has been a 7-consecutive-calendar-day average of less than 1,500 encounters, not including encounters described in subsection 4(a)(iii) of this proclamation.

(b)  Notwithstanding a factual determination made under subsection (a) of this section, the suspension and limitation on entry pursuant to section 1 of this proclamation shall apply at 12:01 a.m. eastern time on the calendar day immediately after the Secretary has made a factual determination that there has been a 7-consecutive-calendar-day average of 2,500 encounters or more, not including encounters described in subsection 4(a)(iii) of this proclamation, until such suspension and limitation on entry is discontinued pursuant to subsection (a) of this section.

(c)  For purposes of subsection (a) and subsection (b) of this section, unaccompanied children (as defined in section 279(g)(2) of title 6, United States Code) from non-contiguous countries shall not be included in calculating the number of encounters.

Sec. 3.  Scope and Implementation of Suspension and Limitation on Entry.
 (a)  The suspension and limitation on entry pursuant to section 1 of this proclamation shall apply across the southern border to noncitizens, other than those described in subsection (b) of this section, during such times that the suspension and limitation on entry is in effect.

(b)  The suspension and limitation on entry pursuant to section 1 of this proclamation shall not apply to:

(i)   any noncitizen national of the United States;

(ii)  any lawful permanent resident of the United States;

(iii) any unaccompanied child as defined in section 279(g)(2) of title 6, United States Code;

(iv)  any noncitizen who is determined to be a victim of a severe form of trafficking in persons, as defined in section 7102(16) of title 22, United States Code;

(v)   any noncitizen who has a valid visa or other lawful permission to seek entry or admission into the United States, or presents at a port of entry pursuant to a pre-scheduled time and place, including:

(A)  members of the United States Armed Forces and associated personnel, United States Government employees or contractors on orders abroad, or their accompanying family members who are on their orders or are members of their household;

(B)  noncitizens who hold a valid visa or who have all necessary

documents required for admission consistent with the requirements of section 1182(a)(7) of title 8, United States Code, upon arrival at a port of entry;

>    (C)   noncitizens traveling pursuant to the visa waiver program as described in section 1187 of title 8, United States Code; and

>    (D)   noncitizens who arrive in the United States at a southwest land border port of entry pursuant to a process the Secretary of Homeland Security determines is appropriate to allow for the safe and orderly entry of noncitizens into the United States;

>    (vi)   any noncitizen who is permitted to enter by the Secretary of Homeland Security, acting through a CBP immigration officer, based on the totality of the circumstances, including consideration of significant law enforcement, officer and public safety, urgent humanitarian, and public health interests at the time of the entry or encounter that warranted permitting the noncitizen to enter; and

>    (vii)   any noncitizen who is permitted to enter by the Secretary of Homeland Security, acting through a CBP immigration officer, due to operational considerations at the time of the entry or encounter that warranted permitting the noncitizen to enter.

(c)   An exception under subsection (b) of this section from the suspension and limitation on entry pursuant to section 1 of this proclamation does not affect a noncitizen's inadmissibility under the Immigration and Nationality Act for a reason other than the applicability of this proclamation.

(d)   The Secretary of Homeland Security and the Attorney General are authorized to issue any instructions, orders, or regulations as may be necessary to implement this proclamation, including the determination of the exceptions in subsection (b) of this section, and shall promptly consider issuing any instructions, orders, or regulations as may be necessary to address the circumstances at the southern border, including any additional limitations and conditions on asylum eligibility that they determine are warranted, subject to any exceptions that they determine are warranted.

(e)   Nothing in this proclamation shall limit the statutory processes afforded to unaccompanied children upon entering the United States under section 279 of title 6, United States Code, and section 1232 of title 8, United States Code.

> Sec. 4.  Definitions.  (a)  The term "encounter" refers to a noncitizen who:

(i)   is physically apprehended by CBP immigration officers within 100

miles of the United States southwest land border during the 14-day period immediately after entry between ports of entry;

(ii)   is physically apprehended by DHS personnel at the southern coastal borders during the 14-day period immediately after entry between ports of entry; or

(iii)   is determined to be inadmissible at a southwest land border port of entry.

(b)   The term "southern coastal borders" means all maritime borders in Texas, Louisiana, Mississippi, Alabama, and Florida; all maritime borders proximate to the southwest land border, the Gulf of Mexico, and the southern Pacific coast in California; and all maritime borders of the United States Virgin Islands and Puerto Rico.

(c)   The term "southwest land border" means the entirety of the United States land border with Mexico.

(d)   The term "southern border" means the southwest land border and the southern coastal borders.

Sec. 5.  Severability.  It is the policy of the United States to enforce this proclamation to the maximum extent possible to advance the interests of the United States.  Accordingly, if any provision of this proclamation, or the application of any provision to any person or circumstance, is held to be invalid, the remainder of this proclamation and the application of its provisions to any other persons or circumstances shall not be affected thereby.

Sec. 6.  General Provisions. (a)  Nothing in this proclamation shall be construed to impair or otherwise affect:

(i)   the authority granted by law to an executive department or agency, or the head thereof; or

(ii)   the functions of the Director of the Office of Management and Budget relating to budgetary, administrative, or legislative proposals.

(b)   This proclamation shall be implemented consistent with applicable law and subject to the availability of appropriations.

(c)   This proclamation is not intended to, and does not, create any right or benefit, substantive or procedural, enforceable at law or in equity by any party against the United States, its departments, agencies, or entities, its officers, employees, or agents, or any other person.

IN WITNESS WHEREOF, I have hereunto set my hand this third day of June, in the year of our Lord two thousand twenty-four, and of the Independence of the United States of America the two hundred and forty-eighth.

JOSEPH R. BIDEN JR.

# Attachment C:

U.S. Department of Homeland Security, Fact Sheet: Presidential Proclamation to Suspend and Limit Entry and Joint DHS-DOJ Interim Final Rule to Restrict Asylum During High Encounters at the Southern Border (June 4, 2024), https://tinyurl.com/2y7s4n7w



U.S. Department of Homeland Security

# Fact Sheet: Presidential Proclamation to Suspend and Limit Entry and Joint DHS–DOJ Interim Final Rule to Restrict Asylum During High Encounters at the Southern Border

**Release Date:** June 4, 2024

### En español

Today, the Biden-Harris Administration took decisive new action to strengthen border security, announcing a series of measures that restrict asylum eligibility, and significantly increase the consequences for those who enter without authorization across the southern border. These extraordinary steps, which will be in effect during times when high levels of encounters exceed our ability to deliver timely consequences, will make noncitizens who enter across the southern border ineligible for asylum with certain exceptions, raise the standard that is used to screen for certain protection claims, and speed up our ability to quickly remove those who do not qualify for protection.

These actions follow a series of steps that the Administration has taken over the past three years as it prepared for the end of the Title 42 public health Order, and since it was lifted last year, including surging personnel, infrastructure, and technology to the border, issuing the Circumvention of Lawful Pathways Rule, and referring record numbers of noncitizens into expedited removal. Over the past year, we have removed or returned more than three quarters of a million people, more than in any fiscal year since 2010. Despite these efforts, our outdated and broken immigration and asylum system, coupled with a lack of sufficient funding, make it impossible to quickly impose consequences on all noncitizens who cross irregularly and without a legal basis to remain in the United States.

The Administration has repeatedly called on Congress to provide the resources and legal authorities needed to secure our border. The measures announced today will better enable the Department to quickly remove individuals without a legal basis to remain in the United States, strengthening enforcement and change the calculus for those considering crossing our border irregularly. However, they are no substitute for Congressional action. We continue to call on Congress to provide the new tools and resources we have asked for to support the men and women on the frontlines.

## Overview

President Biden issued a Presidential Proclamation to temporarily suspend the entry of noncitizens across the southern border. The Secretary of Homeland Security and the Attorney General also jointly issued an interim final rule that, consistent with the Proclamation, generally restricts asylum eligibility for those who irregularly enter across the southern border – including the Southwest land and the southern coastal borders. The rule also limits fear screenings to those who manifest a fear or express a desire to file for protection and heightens the screening standard for statutory withholding and claims under the Convention Against Torture. Taken together, these measures will significantly increase the speed and scope of consequences for those who cross our borders irregularly or who attempt to present themselves at Ports of Entry without authorization, allowing the Departments to more quickly remove individuals who do not establish a legal basis to remain in the United States. The restriction on asylum eligibility will be discontinued when encounters fall below certain levels but will come back into effect if encounters rise again.

## Process

The rule makes three key changes to current processing under Title 8 immigration authorities during periods of high border encounters:

- First, noncitizens who cross the southern border unlawfully or without authorization will generally be ineligible for asylum, absent exceptionally compelling circumstances and unless they are excepted by the Proclamation.
- Second, noncitizens who cross the southern border and are processed for expedited removal while the limitation is in effect will only be referred for a credible fear screening with an Asylum Officer if they manifest or express a fear of return to their country or country of removal, a fear of persecution or torture, or an intention to apply for asylum.
- Third, the U.S. will continue to adhere to its international obligations and commitments by screening individuals who manifest a fear as noted above and do not qualify for an exception to the Rule for withholding of removal and Convention Against Torture protections at a reasonable probability of persecution or torture standard – a new, substantially higher standard than is currently applied under the Circumvention of Lawful Pathways rule.

Like the Proclamation, the rule provides for an end to these enhanced measures following a sustained reduction in southern border encounters. Specifically, these measures are in effect until 14 calendar days after there has been a 7-consecutive-calendar-day average of less than 1,500 encounters between the ports of entry. The measures would again go into effect, or continue, as appropriate, when there has been a 7-consecutive-calendar-day average of 2,500 encounters or more.

## Exceptions

During periods of high encounters, the Proclamation will apply across the southern border. Lawful permanent residents, unaccompanied children, victims of a severe form of trafficking, and other noncitizens with a valid visa or other lawful permission to enter the United States are excepted from the Proclamation.

In addition, the suspension and limitation on entry and rule will not apply to noncitizens who use a Secretary-approved process—such as the CBP One mobile app—to enter the United States at a port of entry in a safe and orderly manner or pursue another lawful pathway.

Noncitizens who cross the southern border and who are not excepted from the Proclamation will be ineligible for asylum unless exceptionally compelling circumstances exist, including if the noncitizen demonstrates that they or a member of their family with whom they are traveling:

- faced an acute medical emergency;
- faced an imminent and extreme threat to life or safety, such as an imminent threat of rape, kidnapping, torture, or murder; or
- satisfied the definition of "victim of a severe form of trafficking in persons" currently provided in 8 CFR 214.11.

## Consequences

Noncitizens who are subject to the rule's limitation on asylum eligibility and who manifest or express a fear of return to their country or country of removal, express a fear of persecution or torture or an intention to apply for asylum, but do not establish a reasonable probability of persecution or torture in the country of removal will be promptly removed.

Those ordered removed will be subject to at least a five-year bar to reentry and potential criminal prosecution.

The Proclamation and rule will significantly enhance the security of our border by increasing the Departments' ability to impose swift consequences for individuals who cross the southern border irregularly and do not establish a legal basis to remain in the United States.  Together, the Proclamation and rule make critical changes to how the Departments operate during times when encounters are at historically high levels—levels that, in the absence of these changes, undermine the government's ability to process individuals through the expedited removal process. These changes will enable the Departments to quickly return those without a lawful basis to stay in the United States and thereby free up the asylum system for those with legitimate claims.

These extraordinary measures are a stop gap. Even with these measures in place, the Departments continue to lack the authorities and resources needed to adequately support the men and women on the frontlines. The Administration again calls on Congress to take up and pass the bipartisan reforms proposed in the Senate, which provide the new authorities, personnel, and resources that are needed to address the historic global migration that is impacting countries throughout the world, including our own. Until Congress does its part, we will continue to take any actions needed under current law and within existing resources to secure the border.

### Topics

BORDER SECURITY (/TOPICS/BORDER-SECURITY)

### Keywords

ASYLUM (/KEYWORDS/ASYLUM)     IMMIGRATION (/KEYWORDS/IMMIGRATION)     BIDEN-HARRIS ADMINISTRATION (/KEYWORDS/BIDEN-HARRIS-ADMINISTRATION)
BORDER SECURITY (/KEYWORDS/BORDER-SECURITY)     DEPARTMENT OF HOMELAND SECURITY (DHS) (/KEYWORDS/DEPARTMENT-HOMELAND-SECURITY-DHS)
DEPARTMENT OF JUSTICE (DOJ) (/KEYWORDS/DEPARTMENT-JUSTICE-DOJ)

Last Updated: 06/04/2024

# Attachment D:

Fed. Reg. Doc. 2024-12435 (June 4, 2024),
https://tinyurl.com/j8mbepku

This document is scheduled to be published in the
Federal Register on 06/07/2024 and available online at
**https://federalregister.gov/d/2024-12435**, and on **https://govinfo.gov**

Billing Code

**DEPARTMENT OF HOMELAND SECURITY**

**8 CFR Parts 208, 235**

**[USCIS Docket No. USCIS-2024-0006]**

**RIN 1615-AC92**

**DEPARTMENT OF JUSTICE**

**Executive Office for Immigration Review**

**8 CFR Part 1208**

**[A.G. Order No. 5943-2024]**

**RIN 1125-AB32**

**Securing the Border**

**AGENCY:** U.S. Citizenship and Immigration Services ("USCIS"), Department of Homeland

Security ("DHS"); Executive Office for Immigration Review ("EOIR"), Department of Justice

("DOJ").

**ACTION:** Interim final rule ("IFR") with request for comments.

**SUMMARY:** On June 3, 2024, the President signed a Proclamation under sections 212(f) and

215(a) of the Immigration and Nationality Act ("INA"), finding that the entry into the United

States of certain noncitizens during emergency border circumstances would be detrimental to the

interests of the United States, and suspending and limiting the entry of those noncitizens. The

Proclamation directed DHS and DOJ to promptly consider issuing regulations addressing the

circumstances at the southern border, including any warranted limitations and conditions on

asylum eligibility. The Departments are now issuing this IFR.

**DATES:** *Effective date:* This IFR is effective at 12:01 a.m. eastern daylight time on June 5,

2024.

*Submission of public comments:* Comments must be submitted on or before [INSERT DATE 30 DAYS AFTER DATE OF PUBLICATION IN THE *FEDERAL REGISTER*].

The electronic Federal Docket Management System will accept comments prior to midnight eastern time at the end of that day.

**ADDRESSES:** You may submit comments on this IFR, identified by USCIS Docket No. USCIS-2024-0006, through the Federal eRulemaking Portal: https://www.regulations.gov. Follow the website instructions for submitting comments.

Comments submitted in a manner other than the one listed above, including emails or letters sent to the Departments' officials, will not be considered comments on the IFR and may not receive a response from the Departments.  Please note that the Departments cannot accept any comments that are hand-delivered or couriered.  In addition, the Departments cannot accept comments contained on any form of digital media storage devices, such as CDs/DVDs and USB drives.  The Departments are not accepting mailed comments at this time.  If you cannot submit your comment by using https://www.regulations.gov, please contact the Regulatory Coordination Division, Office of Policy and Strategy, U.S. Citizenship and Immigration Services, Department of Homeland Security, by telephone at (240) 721–3000 for alternate instructions.

**FOR FURTHER INFORMATION CONTACT:**

For DHS: Daniel Delgado, Acting Deputy Assistant Secretary for Immigration Policy, Office of Strategy, Policy, and Plans, U.S. Department of Homeland Security; telephone (202) 447–3459 (not a toll-free call).

For the Executive Office for Immigration Review:  Lauren Alder Reid, Assistant Director, Office of Policy, EOIR, Department of Justice, 5107 Leesburg Pike, Falls Church, VA 22041; telephone (703) 305–0289 (not a toll-free call).

**SUPPLEMENTARY INFORMATION:**

**Table of Contents**

I.  Public Participation

II.  Executive Summary

    A.  Background and Purpose

    B.  Legal Authority

    C.  Summary of Provisions of the IFR

III.  Discussion of the IFR

    A.  Current Framework

        1.  Asylum, Statutory Withholding of Removal, and CAT Protection

        2.  Expedited Removal and Screenings in the Credible Fear Process

        3.  Lawful Pathways Condition on Asylum Eligibility

    B.  Justification

        1.  Global Migration at Record Levels

        2.  Need for These Measures

        3.  Description of the Rule and Explanation of Regulatory Changes

    C.  Section-by-Section Description of Amendments

        1.  8 CFR 208.13 and 1208.13

        2.  8 CFR 208.35

        3.  8 CFR 1208.35

        4.  8 CFR 235.15

IV.  Statutory and Regulatory Requirements

    A.  Administrative Procedure Act

        1. Foreign Affairs

        2. Good Cause

    B.  Executive Order 12866 (Regulatory Planning and Review), Executive Order 13563

    (Improving Regulation and Regulatory Review), and Executive Order 14094

    (Modernizing Regulatory Review)

    C.  Regulatory Flexibility Act

D.  Unfunded Mandates Reform Act of 1995

E.  Congressional Review Act

F.  Executive Order 13132 (Federalism)

G.  Executive Order 12988 (Civil Justice Reform)

H.  Family Assessment

I.  Executive Order 13175 (Consultation and Coordination with Indian Tribal

Governments)

J.  National Environmental Policy Act

K.  Paperwork Reduction Act

**List of Abbreviations**

AO    Asylum Officer

APA    Administrative Procedure Act

BIA    Board of Immigration Appeals (DOJ, EOIR)

CAT    Convention Against Torture and Other Cruel, Inhuman or Degrading Treatment or

Punishment

CBP    U.S. Customs and Border Protection

CBP One app    CBP One mobile application

CDC    Centers for Disease Control and Prevention

CHNV    Cuba, Haiti, Nicaragua, and Venezuela

DHS    Department of Homeland Security

DOD    Department of Defense

DOJ    Department of Justice

EOIR    Executive Office for Immigration Review

FARRA    Foreign Affairs Reform and Restructuring Act of 1998

FRP    Family Reunification Parole

FY    Fiscal Year

HSA    Homeland Security Act of 2002

ICE    U.S. Immigration and Customs Enforcement

IFR    Interim Final Rule

IIRIRA    Illegal Immigration Reform and Immigrant Responsibility Act of 1996

IJ    Immigration Judge

INA or the Act    Immigration and Nationality Act

INS    Immigration and Naturalization Service

MPP    Migrant Protection Protocols

NGO    Non-Governmental Organization

NEPA    National Environmental Policy Act

NTA    Notice to Appear

OHSS    Office of Homeland Security Statistics

OIS    Office of Immigration Statistics

OMB    Office of Management and Budget

POE    Port of Entry

RFA    Regulatory Flexibility Act

SWB    Southwest Land Border

TCO    Transnational Criminal Organization

UC    Unaccompanied Child, having the same meaning as Unaccompanied Alien Child as

defined at 6 U.S.C. 279(g)(2)

UIP    U.S. Customs and Border Protection Unified Immigration Portal

UMRA    Unfunded Mandates Reform Act of 1995

UNHCR    United Nations High Commissioner for Refugees

USBP    U.S. Border Patrol

USCIS    U.S. Citizenship and Immigration Services

**I.  Public Participation**

The Departments invite all interested parties to participate in this rulemaking by submitting written data, views, comments, and arguments on all aspects of this IFR by the deadline stated above. The Departments also invite comments that relate to the economic, environmental, or federalism effects that might result from this IFR. Comments that will provide the most assistance to the Departments in implementing these changes will reference a specific portion of the IFR, explain the reason for any recommended change, and include data, information, or authority that supports such recommended change. Comments must be submitted in English, or an English translation must be provided. Comments submitted in a manner other than pursuant to the instructions, including emails or letters sent to the Departments' officials, will not be considered comments on the IFR and may not receive a response from the Departments.

*Instructions:* If you submit a comment, you must include the USCIS Docket No. USCIS-2024-0006 for this rulemaking. All submissions may be posted, without change, to the Federal eRulemaking Portal at https://www.regulations.gov, and will include any personal information you provide. Therefore, submitting this information makes it public. You may wish to consider limiting the amount of personal information that you provide in any voluntary public comment submission you make to the Departments. The Departments may withhold information provided in comments from public viewing that they determine may impact the privacy of an individual or is offensive. For additional information, please read the Privacy and Security Notice available at https://www.regulations.gov.

*Docket:* For access to the docket and to read background documents or comments received, go to https://www.regulations.gov, referencing USCIS Docket No. USCIS-2024-0006. You may also sign up for email alerts on the online docket to be notified when comments are posted, or a final rule is published.

## II. Executive Summary

### A. Background and Purpose

On June 3, 2024, the President signed a Proclamation under sections 212(f) and 215(a) of the INA, 8 U.S.C. 1182(f) and 1185(a), finding that because the border security and immigration systems of the United States are unduly strained at this time, the entry into the United States of certain categories of noncitizens[1] is detrimental to the interests of the United States, and suspending and limiting the entry of such noncitizens. The Proclamation explicitly excepts from its terms certain persons who are not subject to the suspension and limitation. This rule is necessary to respond to the emergency border circumstances discussed in the Proclamation.

The Departments use the term "emergency border circumstances" in this preamble to generally refer to situations in which high levels of encounters at the southern border exceed DHS's capacity to deliver timely consequences to most individuals who cross irregularly into the United States and cannot establish a legal basis to remain in the United States. As the preamble elsewhere explains, the periods during which the Proclamation is intended to be in effect, when encounters exceed certain thresholds, identify such situations. Hence, the Departments in this preamble use the term "emergency border circumstances" to refer more specifically to the period of time after the date that the Proclamation's suspension and limitation on entry would commence (as described in section 1 of the Proclamation) until the discontinuation date referenced in section 2(a) of the Proclamation or the date the President revokes the Proclamation (whichever comes first), as well as any subsequent period during which the Proclamation's suspension and limitation on entry would apply as described in section 2(b) of the Proclamation.[2] As the Proclamation and this preamble explain, these circumstances exist despite the Departments' efforts to address substantial levels of migration, and such circumstances are a

---

[1] For purposes of this preamble, the Departments use the term "noncitizen" to be synonymous with the term "alien" as it is used in the INA. *See* INA 101(a)(3), 8 U.S.C. 1101(a)(3); *Barton v. Barr*, 590 U.S. 222, 226 n.2 (2020).

[2] The Departments have sought to avoid describing "emergency border circumstances" as the time period during which the Proclamation is in effect, because the Departments intend for certain provisions of this rule to remain in effect in the event a court enjoins or otherwise renders inoperable the Proclamation or this rule's limitation on asylum eligibility.

direct result of Congress's failure to update outdated immigration laws and provide needed funding and resources for the efficient operation of the border security and immigration systems.

The Proclamation explains that since 2021, as a result of political and economic conditions globally, there have been substantial levels of migration throughout the Western Hemisphere,[3] including record levels at the southwest land border ("SWB").[4]  In response to

---

[3] According to OHSS analysis of the United Nations High Commissioner for Refugees ("UNHCR") data from 1969 to 2022, there were more than 8.5 million displaced persons in the Western Hemisphere in 2022, including approximately 6.6 million Venezuelans, 300,000 Nicaraguans, 260,000 Hondurans, 250,000 Cubans, 250,000 Colombians, 210,000 Haitians, and 210,000 Salvadorans, among others.  By comparison, prior to 2018 there were never more than 1 million displaced persons in the hemisphere, and prior to 2007 there were never more than 300,000.  Nearly 1 in every 100 people in the Western Hemisphere was displaced in 2022, compared to less than 1 in 1,000 displaced in the region each year prior to 2018.  *See* UNHCR, *Refugee Data Finder*, unhcr.org/refugee-statistics/download/?url=PhV1Xc (last visited May 27, 2024); *see also* UNHCR, *Global Trends: Forced Displacement in 2022*, at 2, 8, 9, 12 (June 14, 2023), https://www.unhcr.org/global-trends-report-2022 (showing rapid global increases in forcibly displaced persons and other persons in need of international protection in 2021 and 2022, and projecting significant future increases); UNHCR, *Venezuela Situation*, https://www.unhcr.org/emergencies/venezuela-situation (last updated Aug. 2023).

[4] United States Government sources refer to the U.S. border with Mexico by various terms, including "SWB" and "the southern border."  In some instances, these differences can be substantive, referring only to portions of the border, while in others they simply reflect different word choices.  As defined in section 4(d) of the Proclamation, the term "southern border" includes both the southwest land border ("SWB") and the southern coastal borders.  As defined in section 4(c) of the Proclamation, the term "southwest land border" means the entirety of the United States land border with Mexico.  And as defined in section 4(b) of the Proclamation, the term "southern coastal borders" means all maritime borders in Texas, Louisiana, Mississippi, Alabama, and Florida; all maritime borders proximate to the SWB, the Gulf of Mexico, and the southern Pacific coast in California; and all maritime borders of the United States Virgin Islands and Puerto Rico.  The Departments believe that the factual circumstances described herein support applying this IFR to both the SWB and the southern coastal borders, although they recognize that occasionally different variations of this terminology may be used.  The Departments further note there are sound reasons for the Proclamation and rule to include maritime borders of the United States Virgin Islands and Puerto Rico; this aspect of the Proclamation and rule help avoid any incentive for maritime migration to such locations.  The dangers of such migration, and the operational challenges associated with responding to such maritime migration, are well documented.  *See Securing America's Maritime Border: Challenges and Solutions for U.S. National Security: Hearing Before the Subcomm. on Transp. & Mar. Sec. of the H. Comm. on Homeland Sec.*, 108th Cong. 10–11 (prepared statement of Rear Admiral Jo-Ann F. Burdian, Assistant Commandant for Response Policy, U.S. Coast Guard) (describing an increasingly challenging operational environment and noting that most "Cuban and Haitian migrants use transit routes into Florida, either directly or via the Bahamas.  Alternatively, Dominican and some Haitian migrants use shorter transit routes across the Mona Passage to Puerto Rico and the U.S. Virgin Islands.  Common conveyances used in this region range from fishing vessels, coastal freighters, sail freighters, go-fast type vessels, and 'rusticas.'"); PBS, *More Than 100 Migrants Stranded Near Puerto Rico Await Help During Human Smuggling Operation* (Oct. 18, 2022), https://www.pbs.org/newshour/world/more-than-100-migrants-stranded-near-puerto-rico-await-help-during-human-smuggling-operation ("Mona Island is located in the treacherous waters between Dominican Republic and Puerto Rico and has long been a dropping off point for human smugglers promising to ferry Haitian and Dominican migrants to the U.S. territory aboard rickety boats.  Dozens of them have died in recent months in an attempt to flee their countries amid a spike in poverty and violence."); United States Coast Guard, *Coast Guard Repatriates 38 Migrants to Dominican Republic Following 2 Interdictions Near Puerto Rico* (Apr. 25, 2024), https://www.news.uscg.mil/Press-Releases/Article/3755880/coast-guard-repatriates-38-migrants-to-dominican-republic-following-2-interdict/; United States Coast Guard, *Coast Guard Repatriates 101 Migrants to Dominican Republic Following 3 Interdictions Near Puerto Rico* (Apr. 9, 2024), https://www.news.uscg.mil/Press-Releases/Article/3734747/coast-guard-repatriates-101-migrants-to-dominican-republic-following-3-interdic/; United States Coast Guard, *Coast Guard, Federal, Local Interagency Responders Search for Possible Survivors of Capsized Migrant Vessel in Camuy, Puerto Rico* (Feb. 1, 2024), https://www.news.uscg.mil/Press-Releases/Article/3663106/coast-guard-federal-local-interagency-responders-

record levels of encounters at the SWB,[5] the United States Government has taken a series of significant steps to strengthen consequences for unlawful or unauthorized entry at the border, while at the same time overseeing the largest expansion of lawful, safe, and orderly pathways and processes for individuals to come to the United States for protection in decades.[6]  These steps include:

---

search-for-possible-survivors/; United States Coast Guard, *Coast Guard Repatriates 28 Migrants to Dominican Republic, Following Interdiction of Unlawful Migration Voyage in the Mona Passage* (Jan. 31, 2024), https://www.news.uscg.mil/Press-Releases/Article/3661517/coast-guard-repatriates-28-migrants-to-dominican-republic-following-interdictio/.  There were 35,100 encounters of Dominicans between POEs at the SWB in Fiscal Year ("FY") 2023 and 14,100 in the first six months of FY 2024 (on pace for 28,200), up from an average of 400 such encounters per year in FY 2014 through FY 2019—roughly a 90-fold increase.  Office of Homeland Security Statistics ("OHSS") analysis of March 2024 OHSS Persist Dataset.

[5] At the SWB, U.S. Customs and Border Protection ("CBP") completed approximately 1.7 million encounters at and between POEs in FY 2021, 2.4 million in FY 2022, and 2.5 million in FY 2023, with each year exceeding the previous record high of 1.68 million in FY 2000.  *Compare* OHSS, *2022 Yearbook of Immigration Statistics* 89 tbl. 33 (Nov. 2023), https://www.dhs.gov/sites/default/files/2023-11/2023_0818_plcy_yearbook_immigration_statistics_fy2022.pdf  (total apprehensions and Title 42 expulsions from 1925 to 2022), *and id.* at 94–96 tbl. 35 (apprehensions from FY 2013 to FY 2022), *with* OHSS, *2012 Yearbook of Immigration Statistics* 96 tbl. 35 (July 2013), https://www.dhs.gov/sites/default/files/publications/Yearbook_Immigration_Statistics_2012.pdf (apprehensions from FY 2003 to FY 2012), *and* OHSS, *2002 Yearbook of Immigration Statistics* 184 tbl. 40 (Oct. 2003), https://www.dhs.gov/sites/default/files/publications/Yearbook_Immigration_Statistics_2002.pdf (apprehensions from FY 1996 to FY 2002).  In December 2023, CBP also completed a single-month record of approximately 302,000 encounters at and between POEs, almost one and a half times as many as the highest monthly number recorded prior to 2021 (approximately 209,000 in March 2000) based on records available in the OHSS Persist Dataset from FY 2000 to the present.  Although some of the increase in encounters is explained by higher-than-normal numbers of repeat encounters of the same individuals during the period in which noncitizens were expelled pursuant to the Centers for Disease Control and Prevention's ("CDC's") Title 42 public health Order, OHSS analysis of the March 2024 OHSS Persist Dataset indicates that unique encounters were also at record high levels. *See* OHSS analysis of March 2024 OHSS Persist Dataset.

DHS data in this IFR are current through March 31, 2024, the most recent month for which DHS has data that have gone through its full validation process.  DHS primarily relies on two separate datasets for most of the data in this IFR.  Most DHS data are pulled from OHSS's official statistical system of record data, known as the OHSS Persist Dataset, which is typically released by OHSS on a 90-day delay.  Other data in this IFR are pulled from OHSS's Enforcement Lifecycle dataset, which combines 23 separate DHS and DOJ datasets to report on the end-to-end immigration enforcement process.  Due to this greater complexity, Lifecycle data generally become available for reporting 90 to 120 days after the end of each quarter.

CBP also publishes preliminary data pulled from its operational systems more quickly as part of its regular Monthly Operational Updates.  The data in these updates reflect operational realities but change over time as transactional records in the systems of record are cleaned and validated; they are best viewed as initial estimates rather than as final historical records.  CBP released an operational update on May 15, 2024, that includes the Component's official reporting for encounters through the end of April.  Based on these data, SWB encounters between POEs fell slightly by six percent between March and April.  OHSS analysis of data obtained from CBP, *Southwest Land Border Encounters*, https://www.cbp.gov/newsroom/stats/southwest-land-border-encounters (last accessed May 24, 2024).  The preliminary April data are best understood to reflect a continuation of the general pattern described elsewhere in this IFR.  Excluding March through April 2020, which was an unusual case because of the onset of the COVID-19 pandemic, the average month-over-month change between March and April for 2013 through 2024 is a 2.3 percent increase, with 4 out of those 11 years experiencing decreases in April and 7 years experiencing increases.

[6] *See* DHS, *Fact Sheet: Department of State and Department of Homeland Security Announce Additional Sweeping Measures to Humanely Manage Border through Deterrence, Enforcement, and Diplomacy* (May 10, 2023), https://www.dhs.gov/news/2023/05/10/fact-sheet-additional-sweeping-measures-humanely-manage-border.

- Promulgating and implementing the rule titled Circumvention of Lawful Pathways, 88 FR 31314 (May 16, 2023) ("Circumvention of Lawful Pathways rule");

- Deploying more than 500 additional DHS personnel at a time to the SWB to support U.S. Customs and Border Protection ("CBP") operations and refocusing a significant portion of DHS's SWB workforce to prioritize migration management above other border security missions;[7]

- Deploying over 1,000 additional Department of Defense ("DOD") personnel on top of the 2,500 steady state presence to the SWB in May 2023 to further enhance border security;[8]

- Processing record numbers of individuals through expedited removal;[9]

- Implementing a historic expansion of lawful pathways and processes to come to the United States, including: the Cuba, Haiti, Nicaragua, and Venezuela ("CHNV") parole processes, which allow individuals with U.S.-based supporters to seek parole on a case-by-case basis for urgent humanitarian reasons or significant public benefit; the Safe Mobility Offices in Colombia, Costa Rica, Ecuador, and Guatemala, which provide access to expedited refugee processing for eligible individuals; and the expansion of country-specific family reunification parole processes for individuals in the region who have U.S. citizen relatives in the United States;[10]

---

[7] DHS, *Fact Sheet: The Biden-Harris Administration Takes New Actions to Increase Border Enforcement and Accelerate Processing for Work Authorizations, While Continuing to Call on Congress to Act* (Sept. 20, 2023), https://www.dhs.gov/news/2023/09/20/fact-sheet-biden-harris-administration-takes-new-actions-increase-border.

[8] *Id.*; *see also* DOD, *Austin Approves Homeland Security Request for Troops at Border* (May 2, 2023), https://www.defense.gov/News/News-Stories/Article/Article/3382272/austin-approves-homeland-security-request-for-troops-at-border/.

[9] In the months between May 12, 2023, and March 31, 2024, CBP processed roughly 316,000 noncitizens encountered at and between SWB POEs for expedited removal, more than in any prior full fiscal year.  OHSS analysis of data pulled from CBP Unified Immigration Portal ("UIP") on April 2, 2024.

[10] DHS, *Fact Sheet: U.S. Government Announces Sweeping New Actions to Manage Regional Migration* (Apr. 27, 2023), https://www.dhs.gov/news/2023/04/27/fact-sheet-us-government-announces-sweeping-new-actions-manage-regional-migration.

- Expanding opportunities to enter the United States for seasonal employment;[11]

- Establishing a mechanism for over 1,400 migrants per day to schedule a time and place to arrive in a safe, orderly, and lawful manner at ports of entry ("POEs") through the CBP One mobile application ("CBP One app");[12]

- Increasing proposed refugee admissions from the Western Hemisphere from 5,000 in Fiscal Year ("FY") 2021 to up to 50,000 in FY 2024;[13]

- Completing approximately 89 percent more immigration court cases in FY 2023 as compared to FY 2019;[14] and

- Increasing the immigration judge ("IJ") corps by 66 percent from FY 2019 to FY 2023, including maximizing the congressionally authorized number in FY 2023 for a total corps of 734.[15]

The Proclamation further states that although these efforts and other complementary measures are having their intended effect—DHS is processing noncitizens for removal in record numbers and with record efficiency[16]—the border security and immigration systems have not been able to

---

[11] DHS, *DHS to Supplement H-2B Cap with Nearly 65,000 Additional Visas for FY 2024, Department of Homeland Security* (Nov. 3, 2023), https://www.dhs.gov/news/2023/11/03/dhs-supplement-h-2b-cap-nearly-65000-additional-visas-fiscal-year-2024.

[12] DHS, *Fact Sheet: U.S. Government Announces Sweeping New Actions to Manage Regional Migration* (Apr. 27, 2023), https://www.dhs.gov/news/2023/04/27/fact-sheet-us-government-announces-sweeping-new-actions-to-manage-regional-migration; CBP, *CBP One™ Appointments Increased to 1,450 Per Day* (June 30, 2023), https://www.cbp.gov/newsroom/national-media-release/cbp-one-appointments-increased-1450-day.

[13] U.S. State Dep't, *Report to Congress on Proposed Refugee Admissions for Fiscal Year 2024* (Nov. 3, 2023) https://www.state.gov/report-to-congress-on-proposed-refugee-admissions-for-fiscal-year-2024/.

[14] *See* EOIR, *Adjudication Statistics: New Cases and Total Completions - Historical* 1–2 (Oct. 12, 2023), https://www.justice.gov/d9/pages/attachments/2022/09/01/3_new_cases_and_total_completions_-_historical.pdf.

[15] *See* EOIR, *Adjudication Statistics: Immigration Judge (IJ) Hiring* 1 (Jan. 2024), https://www.justice.gov/eoir/media/1344911/dl?inline (showing 734 total IJs on board in FY 2023); Executive Office for Immigration Review ("EOIR") Strategic Plan 2024, Current Operating Environment, https://www.justice.gov/eoir/strategic-plan/strategic-context/current-operating-enviroment (last visited May 27, 2024) ("The agency's streamlining efforts also enabled EOIR, by the close of FY 2023, to fill all 734 appropriated IJ positions, thus creating the largest judge corps in the agency's history.").

[16] *See supra* note 9. Since May 12, 2023, the median time to refer noncitizens encountered by CBP at the SWB who claim a fear for credible fear interviews decreased by 77 percent from its historical average, from 13 days in the FY 2014 to FY 2019 pre-pandemic period to 3 days in the four weeks ending March 31, 2024; for those who receive negative credible fear determinations, the median time from encounter to removal, over the same time frames, decreased 85 percent from 73 days to 11 days. Pre-May 12, 2023, data from OHSS Lifecycle Dataset as of December 31, 2023; post-May 11, 2023, data from OHSS analysis of data downloaded from UIP on April 2, 2024.

keep pace with the number of individuals arriving at the southern border.[17]  Simply put, the

Departments do not have adequate resources and tools to deliver timely decisions and

consequences to individuals who cross unlawfully and cannot establish a legal basis to remain in

the United States, or to provide timely protection to those ultimately found eligible for protection

when individuals are arriving at such elevated, historic volumes.[18]

This became even more clear in the months following the lifting of the Title 42 public

health Order.[19]  As the Departments resumed widespread processing under title 8 authorities, the

---

DHS removed or returned over 662,000 noncitizens between May 12, 2023, and March 31, 2024, or an average of over 61,300 per month (excluding crew members detained on board their vessels and other administrative returns); this represents the highest average monthly count of removals and returns since FY 2010. Post-May 12, 2023, repatriations from OHSS analysis of data downloaded from UIP on April 2, 2024; *see also* OHSS, *Immigration Enforcement and Legal Processes Monthly Tables*, https://www.dhs.gov/ohss/topics/immigration/enforcement-and-legal-processes-monthly-tables (last updated May 10, 2024) (providing historic data on repatriations); OHSS, *2022 Yearbook of Immigration Statistics* 103–04 tbl. 39 (Nov. 2023), https://www.dhs.gov/sites/default/files/2023-11/2023_0818_plcy_yearbook_immigration_statistics_fy2022.pdf (noncitizen removals, returns, and expulsions for FY 1892 to FY 2022).

[17] *See* Letter for Kevin McCarthy, Speaker of the House of Representatives, from Shalanda D. Young, Director, Office of Management and Budget ("OMB") (Aug. 10, 2023), https://www.whitehouse.gov/wp-content/uploads/2023/08/Final-Supplemental-Funding-Request-Letter-and-Technical-Materials.pdf.

[18] *Id.*; *see also* Ariel G. Ruiz-Soto et al., Migration Pol'y Inst., *Shifting Realities at the U.S.-Mexico Border: Immigration Enforcement and Control in a Fast-Evolving Landscape* 20 (Jan. 2024), https://www.migrationpolicy.org/sites/default/files/publications/mpi-contemporary-border-policy-2024_final.pdf ("Across the border, interviewed agents expressed frustration with low staffing levels and resource allocations compared to the challenge of managing the border.").  DHS acknowledges that the enacted FY 2024 DHS budget does appropriate funding sufficient to pay for approximately 2,000 additional Border Patrol agents, bringing the total level indicated by Congress up to 22,000 agents, compared with 19,855 agents for FY 2023.  170 Cong Rec. H1809-10 (daily ed. Mar. 22, 2024) (Explanatory Statement Regarding H.R. 2882, Further Consolidated Appropriations Act, 2024) ("The agreement includes . . . [funding] to hire 22,000 Border Patrol Agents."); 168 Cong Rec. S8557 (daily ed. Dec. 20, 2022) (Explanatory Statement Regarding H.R. 2617, Consolidated Appropriations Act, 2023) ("The agreement provides funding for 19,855 Border Patrol agents.").  However, the FY 2024 appropriations do not fully fund CBP's existing operational and staffing requirements.  Additionally, CBP estimates that it will likely be unable to implement a hiring surge to meaningfully grow its overall staffing levels towards the staffing levels funded by the FY 2024 budget before the end of the current fiscal year.  The hiring process requires time and resources to bring additional agents on board.  For example, it generally takes more than six months for an applicant to complete the hiring process and report to the U.S. Border Patrol ("USBP") Academy to receive necessary training.  *See* DHS, *Statement from Secretary Mayorkas on the President's Fiscal Year 2025 Budget for the U.S. Department of Homeland Security* (Mar. 11, 2024), https://www.dhs.gov/news/2024/03/11/statement-secretary-mayorkas-presidents-fiscal-year-2025-budget-us-department ("However, DHS's border security and immigration enforcement efforts along the Southwest border desperately require the additional funds requested by the Administration and included in the Senate's bipartisan border security legislation, which would provide DHS with approximately $19 billion to fund additional personnel, facilities, repatriation capabilities, and other enforcement resources.").

[19] *See* Public Health Determination and Order Regarding Suspending the Right To Introduce Certain Persons From Countries Where a Quarantinable Communicable Disease Exists, 87 FR 19941, 19941–42 (Apr. 6, 2022) (describing the CDC's recent Title 42 public health Orders, which "suspend[ed] the right to introduce certain persons into the United States from countries or places where the quarantinable communicable disease exists in order to protect the public health from an increased risk of the introduction of COVID–19").  Although the CDC indicated its intention to lift the order on May 23, 2022, ongoing litigation prevented the order from being lifted until it ultimately expired on May 11, 2023.  *See* 88 FR at 31319.

insufficiency of both the available statutorily authorized tools and the resources provided to implement them came into stark focus.  Despite the expanded ability to impose consequences at the SWB through the Circumvention of Lawful Pathways rule and complementary measures, which led to the highest numbers of returns and removals in more than a decade,[20] encounter levels have remained elevated well above historical levels, with December 2023 logging the highest monthly total on record.[21]  While encounter levels in calendar year 2024 have decreased from these record numbers, there is still a substantial and elevated level of migration, and historically high percentages of migrants are claiming fear and are challenging to remove, as discussed in more detail in Section III.B.1 of this preamble.[22]  This substantial migration throughout the hemisphere, combined with inadequate resources and tools to keep pace, limits DHS's ability to impose timely consequences through expedited removal, the main consequence available at the border under title 8 authorities.

---

[20] In the ten and a half months between May 12, 2023, and March 31, 2024, DHS completed over 662,000 removals and enforcement returns, more than in any full fiscal year since FY 2011, and the highest monthly average of enforcement repatriations since FY 2010.  Post-May 12, 2023, repatriations from OHSS analysis of data downloaded from UIP on April 2, 2024; *see also* OHSS, *Immigration Enforcement and Legal Processes Monthly Tables*, https://www.dhs.gov/ohss/topics/immigration/enforcement-and-legal-processes-monthly-tables (last updated May 10, 2024) (providing historic data on repatriations); OHSS, *2022 Yearbook of Immigration Statistics* 103–04 tbl. 39 (Nov. 2023), https://www.dhs.gov/sites/default/files/2023-11/2023_0818_plcy_yearbook_immigration_statistics_fy2022.pdf (noncitizen removals, returns, and expulsions for FY 1892 to FY 2022).

[21] There were nearly 302,000 CBP encounters at and between POEs along the SWB in December 2023, higher than any previous month on record.  OHSS analysis of March 2024 OHSS Persist Dataset and historic CBP data for encounters prior to FY 2000; *see also* OHSS, *2022 Yearbook of Immigration Statistics* 89 tbl. 33 (Nov. 2023) (total apprehensions and Title 42 expulsions from 1925 to 2022), https://www.dhs.gov/sites/default/files/2023-11/2023_0818_plcy_yearbook_immigration_statistics_fy2022.pdf; *id.* at 94–96 tbl. 35 (apprehensions from FY 2013 to FY 2022); OHSS, *Immigration Enforcement and Legal Processes Monthly Tables*, https://www.dhs.gov/ohss/topics/immigration/enforcement-and-legal-processes-monthly-tables (last updated May 10, 2024) (SWB encounters from FY 2014 through December 2023).

[22] After peaking at nearly 302,000 in December 2023, encounters at and between POEs along the SWB fell to approximately 176,000 in January 2024, 190,000 in February 2024, and 189,000 in March 2024.  At an average of 185,000 for the first three months of 2024, monthly encounters levels were almost 4 times higher than the pre-pandemic (FY 2014 through 2019) average of 48,000 encounters at and between POEs per month and—with the exceptions of FY 2022 and FY 2023—represented the highest second quarter count of encounters in any year since FY 2001. March 2024 OHSS Persist Dataset; *see also* OHSS, *2022 Yearbook of Immigration Statistics* 89 tbl. 33 (Nov. 2023), https://www.dhs.gov/sites/default/files/2023-11/2023_0818_plcy_yearbook_immigration_statistics_fy2022.pdf (total apprehensions and title 42 expulsions from 1925 to 2022); *id.* at 94–96 tbl. 35 (apprehensions from FY 2013 to FY 2022); OHSS, *Immigration Enforcement and Legal Processes Monthly Tables*, https://www.dhs.gov/ohss/topics/immigration/enforcement-and-legal-processes-monthly-tables (last updated May 10, 2024) (SWB encounters from FY 2014 through December 2023).

The sustained, high encounter rates the Departments have experienced over the past year have outstripped the Departments' abilities—based on available resources—to process noncitizens through expedited removal in significant numbers.  Due to its funding shortfall, DHS simply lacks sufficient resources, such as sufficient USCIS asylum officers ("AOs") to conduct fear screenings and sufficient temporary processing facilities, often called "soft-sides," which limits DHS's ability to conduct credible fear interviews for individuals in CBP custody and to process and hold individuals in U.S. Immigration and Customs Enforcement ("ICE") custody during the expedited removal process.[23]  This mismatch in available resources and encounters creates stress on the border and immigration systems and forces DHS to rely on processing pathways outside of expedited removal—limiting the Departments' ability to deliver timely consequences to individuals who do not have a legal basis to remain in the United States.[24] Individuals who are subject to but cannot be processed under expedited removal due to resource constraints are instead released pending removal proceedings under section 240 of the INA, 8 U.S.C. 1229a ("section 240 removal proceedings"), before an IJ, a process that can take several years to conclude.[25]  These immigration court proceedings can be less resource intensive for

---

[23] "Because ICE has very limited detention capacity and appropriated bedspace has remained relatively static, the agency must carefully prioritize whom it detains.  Similar to FY 2022, during FY 2023, Enforcement and Removal Operations' limited detention capacity was primarily used to house two populations: noncitizens CBP arrested at the Southwest Border and noncitizens with criminal histories [Enforcement and Removal Operations] arrested in the interior."  Fiscal Year 2023 ICE Annual Report 18 (Dec. 29, 2023), https://www.ice.gov/doclib/eoy/iceAnnualReportFY2023.pdf.  In FY 2024, ICE was appropriated $5,082,218,000.00 "for enforcement, detention and removal operations."  Consolidated Appropriations Act, 2024, Pub. L. 118–47, 138 Stat. 460, 598 (2024).  The joint explanatory statement states that the bill provides "$5,082,218,000 for Enforcement and Removal Operations (ERO)" and "$355,700,000 for 41,500 beds for the full fiscal year and inflationary adjustments to support current detention facility operations."  170 Cong. Rec. H1807, 1812 (daily ed. Mar. 22, 2024).

[24] *See* CBP, *Custody and Transfer Statistics,* https://www.cbp.gov/newsroom/stats/custody-and-transfer-statistics (last updated Apr. 12, 2024) (table showing that, under current constraints, the number of individuals processed for expedited removal makes up only a fraction of total processing dispositions, including section 240 proceedings).

[25] EOIR decisions completed in December 2023 were, on average, initiated in December 2020, during the significant operational disruptions caused by the COVID-19 pandemic (with encounters several months earlier than that), but 50 percent of EOIR cases initiated during that time were still pending as of December 2023, so the final mean processing time (once all such cases are complete) will be longer.  OHSS analysis of EOIR data as of February 12, 2024; EOIR Strategic Plan 2024, Current Operating Environment, https://www.justice.gov/eoir/strategic-plan/strategic-context/current-operating-enviroment (last visited May 26, 2024) ("EOIR [] suffered operational setbacks during the COVID-19 pandemic years of FY 2020 through FY 2022, including declining case completions due to health closures and scheduling complications and delays in agency efforts to transition to electronic records and the efficiencies they represent.  While the challenges of the pandemic were overcome by adaptive measures

processing upon initial encounter, because individuals can be released from custody fairly quickly, but are also far less likely to result in swift decisions and swift consequences, and generally require more IJ and ICE attorney time to resolve. *Compare* INA 235(b)(1), 8 U.S.C. 1225(b)(1), *with* INA 240, 8 U.S.C. 1229a. Notably, in FY 2023, when the immigration courts had a historic high number of case completions, the number of new cases far outnumbered those completions and led to a larger backlog—likely extending the length of time it will take individuals encountered and referred into section 240 removal proceedings to finish their immigration court process.[26]

Said another way, at the current levels of encounters and with current resources, the Departments cannot predictably and swiftly deliver consequences to most noncitizens who cross the border without a lawful basis to remain. This inability to predictably deliver timely decisions and consequences further compounds incentives for migrants to make the dangerous journey to the SWB, regardless of any individual noncitizen's ultimate likelihood of success on an asylum or protection application.[27] Smugglers and transnational criminal organizations ("TCOs") have

---

taken during those years, the pandemic's impact on the pending caseload is still being felt."). While EOIR does not report statistics on pending median completion times for removal proceedings in general, it does report median completion times for certain types of cases, such as detained cases and cases involving UCs. *See, e.g.*, EOIR, *Median Unaccompanied Noncitizen Child (UAC) Case Completion and Case Pending Time* (Jan. 18, 2024), https://www.justice.gov/eoir/media/1344951/dl?inline (median completion time of 1,346 days); EOIR, *Median Completion Times for Detained Cases* (Jan. 18, 2024), https://www.justice.gov/eoir/media/1344866/dl?inline (median completion time of 47 days in the first quarter of 2024 for removal, deportation, exclusion, asylum-only, and withholding-only cases); EOIR, *Percentage of DHS-Detained Cases Completed within Six Months* (Jan. 18, 2024), https://www.justice.gov/eoir/media/1344886/dl?inline (reporting seven percent of detained cases not completed within six months).

[26] EOIR completed more than 520,000 cases in FY 2023 (a record number), but also had almost 1.2 million case receipts, resulting in a net increase of nearly 700,000 cases in its backlog. *See* EOIR, *Adjudication Statistics: Pending Cases, New Cases, and Total Completions* 1 (Oct. 12, 2023), https://www.justice.gov/d9/pages/attachments/2020/01/31/1_pending_new_receipts_and_total_completions.pdf; EOIR, *Adjudication Statistics: New Cases and Total Completions - Historical* (Oct. 12, 2023), https://www.justice.gov/d9/pages/attachments/2022/09/01/3_new_cases_and_total_completions_-_historical.pdf. OHSS estimates that 1.1 million of the nearly 1.2 million case receipts (95 percent) resulted from SWB encounters. OHSS analysis of March 2024 OHSS Persist Dataset.

[27] Miriam Jordan, *One Big Reason Migrants Are Coming in Droves: They Believe They Can Stay*, N.Y. Times (Jan. 31, 2024), https://www.nytimes.com/2024/01/31/us/us-immigration-asylum-border.html.

exploited this mismatch, further fueling migration by actively advertising to migrants that they are likely to be able to remain in the United States.[28]

The Departments' ability to refer and process noncitizens through expedited removal thus continues to be overwhelmed, creating a vicious cycle in which the border security and immigration systems cannot deliver timely decisions and consequences to all the people who are encountered at the SWB and lack a lawful basis to remain in the United States.  This, in turn, forces DHS to release individuals into the backlogged immigration court system; for the many cases in that system initiated just prior to or during the COVID-19 pandemic, the process can take several years to result in a final decision or consequence,[29] which then incentivizes more people to make the dangerous journey north to take their chances at the SWB.[30]  The status quo of the broken immigration and asylum system has become a driver for unlawful migration throughout the region and an increasingly lucrative source of income for dangerous TCOs.[31] Without countermeasures, those TCOs will continue to grow in strength, likely resulting in even more smuggling operations and undermining democratic governance in the countries where they operate.[32]  All of these factors, taken together, pose significant threats to the safety and security of migrants exploited into making the dangerous journey to the SWB and the U.S. communities through which many such migrants transit.

In the absence of congressional action to appropriately resource DHS and EOIR and to reform the outdated statutory framework, the Proclamation and the changes made by this rule are intended to substantially improve the Departments' ability to deliver timely decisions and consequences to noncitizens who lack a lawful basis to remain.  By suspending and limiting

---

[28] *See* Parker Asmann & Steven Dudley, *How US Policy Foments Organized Crime on US-Mexico Border*, Insight Crime (June 28, 2023), https://insightcrime.org/investigations/how-us-policy-foments-organized-crime-us-mexico-border/.

[29] *See supra* note 25.

[30] *See, e.g.*, Jordan, *supra* note 27.

[31] *See* Asmann & Dudley, *supra* note 28.

[32] *See* Jordan, *supra* note 27.

entries until 12:01 a.m. eastern time on the date that is 14 calendar days after the Secretary makes a factual determination that there has been a 7-consecutive-calendar-day average of less than 1,500 encounters, as defined by the Proclamation, but excluding noncitizens determined to be inadmissible at a SWB POE, and by imposing a limitation on asylum eligibility and making other policy changes, the Proclamation and IFR will realign incentives at the southern border.[33] The Proclamation and IFR will do this by improving DHS's ability to place into expedited removal the majority of noncitizens who are amenable to such processing; to avoid large-scale releases of such individuals pending section 240 removal proceedings; and to allow for swift resolution of their cases and, where appropriate, removal.

The Proclamation imposes a suspension and limitation on entry upon certain classes of noncitizens who are encountered while the suspension and limitation is in effect. The Proclamation provides that the suspension and limitation on entry applies beginning at 12:01 a.m. eastern daylight time on June 5, 2024. The suspension and limitation on entry will be discontinued 14 calendar days after the Secretary makes a factual determination that there has been a 7-consecutive-calendar-day average of less than 1,500 encounters, as defined by the Proclamation, but excluding noncitizens determined to be inadmissible at a SWB POE. Unaccompanied children ("UCs")[34] from non-contiguous countries are not included in calculating the number of encounters. If at any time after such a factual determination the Secretary makes a factual determination that there has been a 7-consecutive-calendar-day average of 2,500 encounters or more, the suspension and limitation on entry will apply at 12:01

---

[33] Under the Proclamation, the term "encounter" refers to a noncitizen who (i) is physically apprehended by CBP immigration officers within 100 miles of the United States SWB during the 14-day period immediately after entry between POEs; (ii) is physically apprehended by DHS personnel at the southern coastal borders during the 14-day period immediately after entry between POEs; or (iii) is determined to be inadmissible at a SWB POE. But the 1,500 and 2,500 encounter thresholds in the Proclamation and this rule exclude the third category of encounters—individuals determined to be inadmissible at a SWB POE. When describing historical data in this preamble, the Departments have generally sought to distinguish between encounters between POEs (also referred to as "USBP encounters") and encounters at and between the POEs (also referred to as "total CBP encounters" or "encounters," depending on the context).

[34] In this rulemaking, as in the Proclamation, the term "unaccompanied children" or "UCs" has the same meaning as the term "unaccompanied alien child[ren]" under 6 U.S.C. 279(g)(2).

a.m. eastern time on the next calendar day (or will continue to apply, if the 14-calendar-day period has yet to elapse) until 14 days after the Secretary makes another factual determination that there has been a 7-consecutive-calendar-day average of less than 1,500 encounters or the President revokes the Proclamation, at which time its application will be discontinued once again.

The Proclamation does not apply to the following persons:

(i) any noncitizen national of the United States;

(ii) any lawful permanent resident of the United States;

(iii) any unaccompanied child as defined in section 279(g)(2) of title 6, United States Code;

(iv) any noncitizen who is determined to be a victim of a severe form of trafficking in persons, as defined in section 7102(16) of title 22, United States Code;

(v) any noncitizen who has a valid visa or other lawful permission to seek entry or admission into the United States, or presents at a port of entry pursuant to a pre-scheduled time and place, including:

(A) members of the United States Armed Forces and associated personnel, United States Government employees or contractors on orders abroad, or their accompanying family members who are on their orders or are members of their household;

(B) noncitizens who hold a valid visa or who have all necessary documents required for admission consistent with the requirements of section 1182(a)(7) of title 8, United States Code, upon arrival at a port of entry;

(C) noncitizens traveling pursuant to the visa waiver program as described in section 217 of the INA, 8 U.S.C. 1187; and

(D) noncitizens who arrive in the United States at a southwest land border port of entry pursuant to a process the Secretary of Homeland Security determines is

appropriate to allow for the safe and orderly entry of noncitizens into the United States;

(vi) any noncitizen who is permitted to enter by the Secretary of Homeland Security, acting through a U.S. Customs and Border Protection immigration officer, based on the totality of the circumstances, including consideration of significant law enforcement, officer and public safety, urgent humanitarian, and public health interests at the time of the entry or encounter that warranted permitting the noncitizen to enter; and

(vii) any noncitizen who is permitted to enter by the Secretary of Homeland Security, acting through a U.S. Customs and Border Protection immigration officer, due to operational considerations at the time of the entry or encounter that warranted permitting the noncitizen to enter.

The President authorized the Secretary of Homeland Security and the Attorney General to issue any instructions, orders, or regulations as may be necessary to implement the Proclamation, including the determination of the exceptions in section 3(b), and directed them to promptly consider issuing any instructions, orders, or regulations as may be necessary to address the circumstances at the southern border, including any additional limitations and conditions on asylum eligibility that they determine are warranted, subject to any exceptions that they determine are warranted.

Consistent with the President's direction, the Departments have determined that this IFR is necessary to address the situation at the southern border. This IFR aligns the Departments' border operations and applicable authorities with the Proclamation's policy and objectives. Specifically, this IFR establishes a limitation on asylum eligibility that applies to certain individuals who enter during emergency border circumstances and revises certain procedures applicable to the expedited removal process to more swiftly apply consequences for irregular

migration[35] and remove noncitizens who do not have a legal basis to remain in the United States. Although the Departments are adopting these measures to respond to the emergency situation at the southern border, they are not a substitute for congressional action—which remains the only long-term solution to the challenges the Departments have confronted on the border for more than a decade.

## B.  Legal Authority

The Secretary and the Attorney General jointly issue this rule pursuant to their shared and respective authorities concerning consideration of claims for asylum, statutory withholding of removal, and protection under regulations implemented pursuant to U.S. obligations under Article 3 of the Convention Against Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment ("CAT").[36]  The Homeland Security Act of 2002 ("HSA"), Public Law 107–296, 116 Stat. 2135, as amended, created DHS and transferred to the Secretary of Homeland Security many functions related to the administration and enforcement of Federal immigration law while maintaining some functions and authorities with the Attorney General, including some shared concurrently with the Secretary.

The INA, as amended by the HSA, charges the Secretary "with the administration and enforcement of [the INA] and all other laws relating to the immigration and naturalization of aliens," except insofar as those laws assign functions to other agencies.  INA 103(a)(1), 8 U.S.C. 1103(a)(1).  The INA also grants the Secretary the authority to establish regulations and take other actions "necessary for carrying out" the Secretary's authority under the immigration laws, INA 103(a)(3), 8 U.S.C. 1103(a)(3); *see also* 6 U.S.C. 202.

---

[35] In this preamble, "irregular migration" refers to the movement of people into another country without authorization.

[36] Convention Against Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment art. 3, Dec. 10, 1984, S. Treaty Doc. No. 100-20 (1988), 1465 U.N.T.S. 85, 114; *see also* 8 U.S.C. 1231 note (United States Policy With Respect to Involuntary Return of Persons in Danger of Subjection to Torture); 8 CFR 208.16(c)–208.18, 1208.16(c)–1208.18.

The HSA provides the Attorney General with "such authorities and functions under [the INA] and all other laws relating to the immigration and naturalization of aliens as were [previously] exercised by [EOIR], or by the Attorney General with respect to [EOIR]."  INA 103(g)(1), 8 U.S.C. 1103(g)(1); *see also* 6 U.S.C. 521.  In addition, under the HSA, the Attorney General retains authority to "establish such regulations, . . . issue such instructions, review such administrative determinations in immigration proceedings, delegate such authority, and perform such other acts as the Attorney General determines to be necessary for carrying out" the Attorney General's authorities under the INA.  INA 103(g)(2), 8 U.S.C. 1103(g)(2).

Under the HSA, the Attorney General retains authority over the conduct of removal proceedings under section 240 of the INA, 8 U.S.C. 1229a ("section 240 removal proceedings"). These adjudications are conducted by IJs within DOJ's EOIR.  *See* 6 U.S.C. 521; INA 103(g)(1), 8 U.S.C. 1103(g)(1).  With limited exceptions, IJs adjudicate asylum, statutory withholding of removal, and CAT protection applications filed by noncitizens during the pendency of section 240 removal proceedings, including asylum applications referred by USCIS to the immigration court.  INA 101(b)(4), 8 U.S.C. 1101(b)(4); INA 240(a)(1), 8 U.S.C. 1229a(a)(1); INA 241(b)(3), 8 U.S.C. 1231(b)(3); 8 CFR 1208.2(b), 1240.1(a); *see also Dhakal v. Sessions*, 895 F.3d 532, 536–37 (7th Cir. 2018) (describing affirmative and defensive asylum processes).  The Board of Immigration Appeals ("BIA"), also within DOJ's EOIR, in turn hears appeals from IJ decisions.  *See* 8 CFR 1003.1(a)(1), (b)(3); *see also Garland v. Ming Dai*, 593 U.S. 357, 366–67 (2021) (describing appeals from IJs to the BIA).  And the INA provides that the "determination and ruling by the Attorney General with respect to all questions of law shall be controlling." INA 103(a)(1), 8 U.S.C. 1103(a)(1).

In addition to the separate authorities discussed above, the Attorney General and the Secretary share some authorities.[37]  Section 208 of the INA, 8 U.S.C. 1158, authorizes the

---

[37] The HSA further provides, "Nothing in this Act, any amendment made by this Act, or in section 103 of the [INA], as amended . . . , shall be construed to limit judicial deference to regulations, adjudications, interpretations, orders,

"Secretary of Homeland Security or the Attorney General" to "grant asylum" to a noncitizen "who has applied for asylum in accordance with the requirements and procedures established by" the Secretary or the Attorney General under section 208 if the Secretary or the Attorney General determines that the noncitizen is a "refugee" within the meaning of section 101(a)(42)(A) of the INA, 8 U.S.C. 1101(a)(42)(A).  INA 208(b)(1)(A), 8 U.S.C. 1158(b)(1)(A).  Section 208 thereby authorizes the Secretary and the Attorney General to "establish[]" "requirements and procedures" to govern asylum applications.  *Id.*  The statute further authorizes them to "establish," "by regulation," "additional limitations and conditions, consistent with" section 208, under which a noncitizen "shall be ineligible for asylum."  INA 208(b)(2)(C), 8 U.S.C. 1158(b)(2)(C); *see also* INA 208(d)(5)(B), 8 U.S.C. 1158(d)(5)(B) (authorizing the Secretary and the Attorney General to "provide by regulation for any other conditions or limitations on the consideration of an application for asylum not inconsistent with [the INA]").[38]  The INA also provides the Secretary and Attorney General authority to publish regulatory amendments governing their respective roles regarding apprehension, inspection and admission, detention and removal, withholding of removal, deferral of removal, and release of noncitizens encountered in the interior of the United States or at or between POEs.  *See* INA 235, 236, 241, 8 U.S.C. 1225, 1226, 1231.

The HSA granted DHS the authority to adjudicate asylum applications and to conduct credible fear interviews, make credible fear determinations in the context of expedited removal, and establish procedures for further consideration of asylum applications after an individual is found to have a credible fear.  INA 103(a)(3), 8 U.S.C. 1103(a)(3); INA 235(b)(1)(B), 8 U.S.C. 1225(b)(1)(B); *see also* 6 U.S.C. 271(b) (providing for the transfer of adjudication of asylum and refugee applications from the Commissioner of Immigration and Naturalization to the Director of

---

decisions, judgments, or any other actions of the Secretary of Homeland Security or the Attorney General."  Pub. L. 107–296, 116 Stat. 2135, 2274 (codified at 6 U.S.C. 522).

[38] Under the HSA, the references to the "Attorney General" in the INA also encompass the Secretary with respect to statutory authorities vested in the Secretary by the HSA or subsequent legislation, including in relation to immigration proceedings before DHS.  6 U.S.C. 251, 271(b)(3), (5), 557.

the Bureau of Citizenship and Immigration Services, now USCIS).  Within DHS, the Secretary

has delegated some of those authorities to the Director of USCIS, and AOs conduct credible fear

interviews, make credible fear determinations, and determine whether a noncitizen's asylum

application should be granted.  *See* DHS, No. 0150.1, Delegation to the Bureau of Citizenship

and Immigration Services (June 5, 2003); 8 CFR 208.2(a), 208.9, 208.30.

The United States is a party to the 1967 Protocol Relating to the Status of Refugees, Jan.

31, 1967, 19 U.S.T. 6223, 606 U.N.T.S. 267 ("Refugee Protocol"), which incorporates Articles 2

through 34 of the 1951 Convention Relating to the Status of Refugees, July 28, 1951, 19 U.S.T.

6259, 189 U.N.T.S. 150 ("Refugee Convention").  Article 33 of the Refugee Convention

generally prohibits parties to the Convention from expelling or returning ("refouler") "a refugee

in any manner whatsoever to the frontiers of territories where his life or freedom would be

threatened on account of his race, religion, nationality, membership of a particular social group

or political opinion."  Refugee Convention, *supra*, 19 U.S.T. at 6276, 189 U.N.T.S. at 176.

Congress implemented these obligations through the Refugee Act of 1980, Public Law

96–212, 94 Stat. 102 ("Refugee Act"), creating the precursor to what is now known as statutory

withholding of removal.  The Supreme Court has long recognized that the United States

implements its non-refoulement obligations under Article 33 of the Refugee Convention (via the

Refugee Protocol) through the statutory withholding of removal provision in section 241(b)(3) of

the INA, 8 U.S.C. 1231(b)(3) ("statutory withholding of removal"), which provides that a

noncitizen may not be removed to a country where their life or freedom would be threatened on

account of one of the protected grounds listed in Article 33 of the Refugee Convention.[39]  *See*

INA 241(b)(3), 8 U.S.C. 1231(b)(3); *see also* 8 CFR 208.16, 1208.16.  The INA also authorizes

---

[39] *See INS v. Aguirre-Aguirre*, 526 U.S. 415, 426–27 (1999); *see also INS v. Cardoza-Fonseca*, 480 U.S. 421, 440–41 (1987) (distinguishing between Article 33's non-refoulement prohibition, which aligns with what was then called withholding of deportation, and Article 34's call to "facilitate the assimilation and naturalization of refugees," which the Court found aligned with the discretionary provisions in section 208 of the INA, 8 U.S.C. 1158).  The Refugee Convention and Protocol are not self-executing.  *E.g.*, *Al-Fara v. Gonzales*, 404 F.3d 733, 743 (3d Cir. 2005) ("The 1967 Protocol is not self-executing, nor does it confer any rights beyond those granted by implementing domestic legislation.").

the Secretary and the Attorney General to implement statutory withholding of removal under

section 241(b)(3) of the INA, 8 U.S.C. 1231(b)(3). *See* INA 103(a)(1), (3), (g)(1)–(2), 8 U.S.C.

1103(a)(1), (3), (g)(1)–(2).

The Departments also have authority to implement Article 3 of the CAT. The Foreign

Affairs Reform and Restructuring Act of 1998 ("FARRA") provides the Departments with the

authority to "prescribe regulations to implement the obligations of the United States under

Article 3 of the [CAT], subject to any reservations, understandings, declarations, and provisos

contained in the United States Senate resolution of ratification of the Convention." Public L.

105–277, div. G, sec. 2242(b), 112 Stat. 2681, 2681–822 (codified at 8 U.S.C. 1231 note). DHS

and DOJ have implemented the obligations of the United States under Article 3 of the CAT in

the Code of Federal Regulations, consistent with FARRA. *See, e.g.*, 8 CFR 208.16(c)–208.18,

1208.16(c)–1208.18; Regulations Concerning the Convention Against Torture, 64 FR 8478 (Feb.

19, 1999), *amended by* 64 FR 13881 (Mar. 23, 1999).

This rule is necessary because, while the Proclamation recognizes that the asylum system

has contributed to the border emergency, the Proclamation itself does not and cannot affect

noncitizens' right to apply for asylum, eligibility for asylum, or asylum procedures. That has

been the Executive Branch's consistent position for four decades.[40] That longstanding

understanding follows from the text and structure of the governing statutes. Section 212(f)

provides that under certain circumstances, the President may "suspend the entry of all aliens or

---

[40] In 1984, then-Assistant Attorney General of the Office of Legal Counsel Theodore B. Olson advised that section 212(f) did not permit the President to eliminate the asylum rights of noncitizens who had hijacked a plane and, as a condition of the plane's release, been flown to the United States. And in 2018, the Departments reaffirmed that "[a]n alien whose entry is suspended or restricted under . . . a [section 212(f)] proclamation, but who nonetheless reaches U.S. soil contrary to the President's determination that the alien should not be in the United States, would remain subject to various procedures under immigration laws," including "expedited-removal proceedings" where they could "raise any claims for protection." *Aliens Subject to a Bar on Entry Under Certain Presidential Proclamations; Procedures for Protection Claims*, 83 FR 55934, 55940 (Nov. 9, 2018). Although Presidents have invoked section 212(f) at least 90 times since 1981, to the Departments' knowledge, none of those proclamations was understood to affect the right of noncitizens on U.S. soil to apply for, or noncitizens' statutory eligibility to receive, asylum. *See* Kelsey Y. Santamaria et al., Cong. Rsch. Serv., *Presidential Authority to Suspend Entry of Aliens Under 8 U.S.C. § 1182(f)* (Feb. 21, 2024). At the same time, nothing in the proclamations or the INA have precluded the Departments from considering as an adverse *discretionary* criterion that a noncitizen is described in a section 212(f) proclamation.

any class of aliens as immigrants or nonimmigrants, or impose on the entry of aliens any restrictions he may deem to be appropriate." INA 212(f), 8 U.S.C. 1182(f). Although this provision—first enacted in 1952—"grants the President broad discretion," it "operate[s]" only in its "sphere[]." *Trump v. Hawaii*, 585 U.S. 667, 683–84, 695 (2018). Section 212 of the INA, 8 U.S.C. 1182 (entitled "Inadmissible aliens"), generally "defines the universe of aliens who are admissible" and "sets the boundaries of admissibility into the United States." *Id.* at 695. Hence, when section 212(f) authorizes the President to suspend "entry," it "enabl[es] the President to supplement the other grounds of inadmissibility in the INA," *id.* at 684 (citing *Abourezk v. Reagan*, 785 F.2d 1043, 1049 n.2 (D.C. Cir. 1986)), and to bar individuals from entry into the United States.

This authority, though broad, does not authorize the President to override the asylum statute.[41] The asylum statute, first enacted in the Refugee Act of 1980, today provides that "[a]ny alien who is physically present in the United States or who arrives in the United States . . . irrespective of such alien's status, may apply for asylum." INA 208(a)(1), 8 U.S.C. 1158(a)(1). The right to apply for asylum thus turns on whether a noncitizen is "physically present" or has "arrive[d] in the United States," *id.*, as those terms are properly understood, and exists regardless of whether a noncitizen is inadmissible.[42] As a result, the power under section

---

[41] The Supreme Court, though it has never squarely addressed this issue, has also never indicated that section 212(f) confers power to affect asylum rights of those present in the United States. *Cf., e.g., Sale v. Haitian Ctrs. Council, Inc.*, 509 U.S. 155, 174–77 (1993) (upholding a Coast Guard program of intercepting migrant vessels and returning migrants to their home country, authorized in part by section 212(f), on the basis that statutory rights under the withholding of removal statute did not have "extraterritorial application" to migrants who were not physically present); *Hawaii*, 585 U.S. at 689, 695 (assuming, without deciding, that section 212(f) "does not allow the President to expressly override particular provisions of the INA," while emphasizing the particular "sphere[]" in which it operates).

[42] Section 212(f) contrasts with 42 U.S.C. 265, which authorizes the CDC to temporarily suspend "the right to introduce . . . persons and property" into the United States if such suspension "is required in the interest of the public health." During the COVID-19 pandemic and to prevent the "serious danger of the introduction of [the] disease into the United States," 42 U.S.C. 265, the CDC issued an order invoking section 265 to expel certain noncitizens without allowing asylum applications. As the final rule implementing section 265 explained, the provision is part of a "broad public health statute" that "operates separately and independently of the immigration power" and authorizes the CDC "to temporarily suspend the effect of any law . . . by which a person would otherwise have the right to be introduced . . . into the U.S.," *Control of Communicable Diseases; Foreign Quarantine: Suspension of the Right To Introduce and Prohibition of Introduction of Persons Into United States From Designated Foreign Countries or Places for Public Health Purposes*, 85 FR 56424, 56426, 56442 (Sept. 11, 2020), including the

212(f) to suspend "entry" does not authorize the President to override the asylum rights of noncitizens who have already physically entered the United States and who are entitled to an adjudication of eligibility under the applicable statutory and regulatory rules and standards.[43]

This rule, as discussed elsewhere, is authorized because Congress has conferred upon the Secretary and the Attorney General express rulemaking power to create new conditions and limitations on asylum eligibility and create certain procedures for adjudicating asylum claims. INA 103(a)(1), (a)(3), (g), 208(b)(1)(A), (b)(2)(C), (d)(5)(B), 8 U.S.C. 1103(a)(1), (a)(3), (g), 1158(b)(1)(A), (b)(2)(C), (d)(5)(B); INA 235(b)(1)(B)(iii)(III), (iv), 8 U.S.C. 1225(b)(1)(B)(iii)(III), (iv).

## C.  Summary of Provisions of the IFR

This IFR adds provisions at 8 CFR 208.13(g), 208.35, 235.15, 1208.13(g), and 1208.35 that effectuate three key changes to the process for those seeking asylum, statutory withholding of removal, or protection under the CAT during emergency border circumstances giving rise to the suspension and limitation on entry under the Presidential Proclamation of June 3, 2024, Securing the Border ("Presidential Proclamation of June 3"):

---

immigration laws, *id.* at 56426 (noting that legislative history indicates that section 265 was intended to suspend immigration if public health required it).  The drafting history of section 265 also confirms that Congress conferred authority to prohibit "the introduction of persons" in order to broaden this provision and that this provision subsumed but was not limited to the authority to "suspend immigration."  Br. for Appellants at 41–43, *Huisha-Huisha v. Mayorkas*, 27 F.4th 718 (D.C. Cir. 2022) (No. 21-5200); *see Huisha-Huisha*, 27 F.4th at 730–31 (determining plaintiffs not likely to succeed on their challenge to the CDC order on the ground that it improperly suspended migrants' right to apply for asylum).  Section 265 is a public-health authority under the Public Health Service Act.  Its grant of authority to allow the CDC to temporarily suspend immigration laws in case of a public health emergency has no relevance to the interpretation of section 212(f), which is in title 8.

[43] For similar reasons, section 215(a) of the INA, 8 U.S.C. 1185(a), which the Proclamation also invokes, does not authorize the President to impose the condition and limitation on asylum eligibility created by this rule.  *Cf. United States ex rel. Knauff v. Shaughnessy*, 338 U.S. 537, 540–47 (1950) (holding that under the precursor to section 215(a)(1) of the INA and the presidential proclamation and regulations issued pursuant to that provision, which during times of national emergency made it unlawful for "any alien to . . . enter or attempt to . . . enter the United States except under such reasonable rules, regulations, and orders, and subject to such limitations and exceptions as the President shall prescribe," the Attorney General could issue regulations governing entry during such an emergency to "deny [certain noncitizens] a hearing . . . in special cases" notwithstanding the ordinary exclusion hearing provisions governing entry).  This does not mean, however, that the President could not invoke section 215(a) as authority to impose reasonable rules, regulations, and orders on asylum applicants and asylees, such as travel document requirements for re-entry and departure controls.

- During emergency border circumstances, persons who enter across the southern border and who are not described in section 3(b) of the Proclamation will be ineligible for asylum unless they demonstrate by a preponderance of the evidence that exceptionally compelling circumstances exist, including if the noncitizen demonstrates that they or a member of their family as described in 8 CFR 208.30(c) with whom they are traveling: (1) faced an acute medical emergency; (2) faced an imminent and extreme threat to life or safety, such as an imminent threat of rape, kidnapping, torture, or murder; or (3) satisfied the definition of "victim of a severe form of trafficking in persons" provided in 8 CFR 214.11.

- During emergency border circumstances, rather than asking specific questions of every noncitizen encountered and processed for expedited removal to elicit whether the noncitizen may have a fear of persecution or an intent to apply for asylum, for those who enter across the southern border and are not described in section 3(b) of the Proclamation, DHS will provide general notice regarding the process for seeking asylum, statutory withholding of removal, or protection under the CAT and will refer a noncitizen for a credible fear interview only if the noncitizen manifests a fear of return, expresses an intention to apply for asylum or protection, or expresses a fear of persecution or torture or a fear of return to his or her country or the country of removal.

- The limitation on asylum eligibility will be applied during credible fear interviews and reviews, and those who enter across the southern border during emergency border circumstances and are not described in section 3(b) of the Proclamation will receive a negative credible fear determination with respect to their asylum claim unless  there is a significant possibility the noncitizen could demonstrate by a preponderance of the evidence that exceptionally compelling circumstances exist.  Such noncitizens will thereafter be screened for a reasonable probability of persecution because of a

protected ground or torture, a higher standard than that applied to noncitizens in a

similar posture under the Circumvention of Lawful Pathways rule.  The "reasonable

probability" standard is defined to mean substantially more than a "reasonable

possibility" but somewhat less than more likely than not.

As discussed throughout this IFR, these changes are designed to implement the policies and

objectives of the Proclamation by enhancing the Departments' ability to address historic levels of

migration and efficiently process migrants arriving at the southern border during emergency

border circumstances.

## III.  Discussion of the IFR

*A.  Current Framework*

1.  Asylum, Statutory Withholding of Removal, and CAT Protection

Asylum is a discretionary benefit that can be granted by the Secretary or the Attorney

General if a noncitizen establishes, among other things, that they have experienced past

persecution or have a well-founded fear of future persecution on account of race, religion,

nationality, membership in a particular social group, or political opinion.  INA 208(b)(1)–(2), 8

U.S.C. 1158(b)(1)–(2) (providing that, unless subject to a mandatory bar, the Secretary or

Attorney General "may" grant asylum to refugees); INA 101(a)(42)(A), 8 U.S.C. 1101(a)(42)(A)

(defining "refugee").  As long as they retain their asylee status, noncitizens who are granted

asylum (1) cannot be removed or returned to their country of nationality or, if they have no

nationality, their last habitual residence, (2) receive employment authorization incident to their

status, (3) may be permitted to travel outside of the United States and return with prior consent,

and (4) may seek derivative benefits for their spouses or children.  INA 208(c)(1), 8 U.S.C.

1158(c)(1); *see Johnson v. Guzman Chavez*, 594 U.S. 523, 536 (2021) ("[A] grant of asylum

permits an alien to remain in the United States and to apply for permanent residency after one

year[.]" (emphasis omitted) (internal quotation marks and citation omitted)); 8 CFR

274a.12(a)(5) (employment authorization incident to asylum status); 8 CFR 223.1(b) (allowing

for return to the United States after travel with a requisite travel document for a "person who holds . . . asylum status pursuant to section 208 of the Act"); *see also* 6 U.S.C. 271(b)(3) (transferring asylum functions to DHS); 6 U.S.C. 557 (providing that references to any other officer shall be deemed to refer to the "Secretary" with respect to any transferred function); INA 208(b)(3), 8 U.S.C. 1158(b)(3) (derivative asylum status).

Asylum applications are generally classified as "affirmative" or "defensive" applications, depending on the agency with which they are filed. If a noncitizen is physically present in the United States, not detained, and not in section 240 removal proceedings, the noncitizen may file an asylum application with USCIS. These applications are "affirmative" filings. Generally, if the noncitizen is in section 240 removal proceedings before an IJ, the noncitizen may apply for asylum before the IJ as a defense to removal.[44] These applications are "defensive" filings.

Noncitizens are eligible for asylum if they have been persecuted or have a well-founded fear of future persecution in their country of nationality or, if they have no nationality, their last habitual residence, on account of one of five protected grounds and are not subject to a bar to eligibility. *See generally* INA 208, 8 U.S.C. 1158; INA 101(a)(42), 8 U.S.C. 1101(a)(42). To be granted asylum, eligible noncitizens must also establish that they merit asylum in the exercise of discretion. *Id.* Noncitizens who are ineligible for a grant of asylum, or who are denied asylum based on the Attorney General's or the Secretary's discretion, may qualify for other forms of protection. An application for asylum submitted by a noncitizen in section 240 removal proceedings is also considered an application for statutory withholding of removal under section 241(b)(3) of the INA, 8 U.S.C. 1231(b)(3). *See* 8 CFR 1208.3(b), 1208.13(c)(1). An IJ also may consider a noncitizen's eligibility for statutory withholding of removal and CAT protection under regulations issued pursuant to the implementing legislation regarding the obligations of the

---

[44] The only exception is that USCIS has initial jurisdiction over asylum applications filed by a UC even where the applicant is in section 240 removal proceedings. INA 208(b)(3)(C), 8 U.S.C. 1158(b)(3)(C).

United States under Article 3 of the CAT.  FARRA sec. 2242(b) (codified at 8 U.S.C. 1231 note); 8 CFR 1208.3(b), 1208.13(c)(1); *see also* 8 CFR 1208.16(c), 1208.17.

Statutory withholding of removal and CAT protection preclude removing a noncitizen to any country where the noncitizen would "more likely than not" face persecution or torture, meaning that the noncitizen's life or freedom would be threatened because of a protected ground or that the noncitizen would be tortured.  8 CFR 1208.16(b)(2), (c)(2).  Thus, if a noncitizen establishes that it is more likely than not that their life or freedom would be threatened because of a protected ground, but is denied asylum for some other reason, the noncitizen nonetheless may be entitled to statutory withholding of removal if not otherwise barred from that form of protection.  INA 241(b)(3)(A), 8 U.S.C. 1231(b)(3)(A); 8 CFR 208.16, 1208.16.  Likewise, a noncitizen who establishes that they more likely than not will face torture in their country of removal will qualify for CAT protection.  *See* 8 CFR 208.16(c), 208.17(a), 1208.16(c), 1208.17(a).

In contrast to the more generous benefits available by attaining asylum, statutory withholding of removal and CAT protection do not: (1) prohibit the Government from removing the noncitizen to a third country where the noncitizen would not face the requisite likelihood of persecution or torture (even in the absence of an agreement with that third country); (2) create a path to lawful permanent resident status; or (3) afford the same ancillary benefits, such as derivative protection for family members.  *See, e.g.*, *Guzman Chavez*, 594 U.S. at 536 ("distinguish[ing] withholding-only relief from asylum" on the ground that withholding does not preclude the Government from removing the noncitizen to a third country and does not provide the noncitizen any permanent right to remain in the United States); *Matter of A-K-*, 24 I&N Dec. 275, 279 (BIA 2007) (stating that "the Act does not permit derivative withholding of removal under any circumstances"); INA 208(b)(3)(A), 8 U.S.C. 1158(b)(3)(A) (statutory provision allowing asylum status to be granted to accompanying or following-to-join spouse or children of

a noncitizen granted asylum; no equivalent statutory or regulatory provision for individuals granted withholding or deferral of removal).

2.  Expedited Removal and Screenings in the Credible Fear Process

In the Illegal Immigration Reform and Immigrant Responsibility Act of 1996 ("IIRIRA"), Pub. L. 104–208, div. C, 110 Stat. 3009, 3009–546, Congress established the expedited removal process.  The process is applicable to certain noncitizens present or arriving in the United States (and, in the discretion of the Secretary, certain other designated classes of noncitizens) who are found to be inadmissible under either section 212(a)(6)(C) of the INA, 8 U.S.C. 1182(a)(6)(C), which renders inadmissible noncitizens who make certain material misrepresentations, or section 212(a)(7) of the INA, 8 U.S.C. 1182(a)(7), which renders inadmissible noncitizens who lack documentation requirements for admission.  INA 235(b)(1)(A)(i), 8 U.S.C. 1225(b)(1)(A)(i).  Upon being subject to expedited removal, such noncitizens may be "removed from the United States without further hearing or review unless the [noncitizen] indicates either an intention to apply for asylum . . . or a fear of persecution."  *Id.*

Congress created a screening process, known as "credible fear" screening, to identify potentially valid claims for asylum by noncitizens in expedited removal proceedings.  The Departments have used the same screening process to identify potentially valid claims for statutory withholding of removal and CAT protection.  If a noncitizen indicates a fear of persecution or torture, a fear of return, or an intention to apply for asylum during the course of the expedited removal process, DHS refers the noncitizen to a USCIS AO to determine whether the noncitizen has a credible fear of persecution or torture in the country of citizenship or removal.  INA 235(b)(1)(A)(ii), (B), 8 U.S.C. 1225(b)(1)(A)(ii), (B); *see also* 8 CFR 235.3(b)(4).  A noncitizen has a "credible fear of persecution" if "there is a significant possibility, taking into account the credibility of the statements made by the alien in support of the alien's claim and such other facts as are known to the officer, that the alien could establish eligibility for asylum."  INA 235(b)(1)(B)(v), 8 U.S.C. 1225(b)(1)(B)(v).  If the AO determines that the noncitizen does

not have a credible fear of persecution or torture, the noncitizen may request that an IJ review

that determination. *See* INA 235(b)(1)(B)(iii)(III), 8 U.S.C. 1225(b)(1)(B)(iii)(III); 8 CFR

208.30(g), 208.33(b)(2)(v), 1208.30(g).

If the AO (or an IJ reviewing the AO's decision) determines that a noncitizen has a

credible fear of persecution or torture, USCIS can refer the noncitizen to an immigration court

for adjudication of the noncitizen's claims in section 240 removal proceedings, 8 CFR 208.30(f),

8 CFR 1208.30(g)(2)(iv)(B), and the noncitizen may subsequently file a defensive asylum

application with the court during those proceedings, *see* 8 CFR 1240.1(a)(1)(ii). Alternatively,

USCIS can retain jurisdiction over the application for asylum for further consideration in an

asylum merits interview. *See* 8 CFR 208.30(f). During an asylum merits interview, a positive

credible fear determination is treated as the asylum application, and strict timelines thereafter

govern the applicant's case before both USCIS and EOIR. *See* 8 CFR 208.2(a)(1)(ii),

208.3(a)(2), 208.4(b)(2), 208.9(a)(1), (e)(1)–(2), (g)(2), (i), 1240.17. The AO may grant asylum,

subject to review within USCIS, where the noncitizen is eligible and warrants a grant as a matter

of discretion. 8 CFR 208.14(b). If the noncitizen is not eligible or does not warrant a grant of

asylum as a matter of discretion, the AO refers the application to EOIR. 8 CFR 208.14(c)(1).

Where USCIS does not grant asylum, the AO's decision will also include a determination on

eligibility for statutory withholding of removal and CAT protection based on the record before

USCIS. 8 CFR 208.16(a), (c)(4).

For cases referred to EOIR following an asylum merits interview, the written record of

the positive credible fear determination serves as the asylum application, 8 CFR 1240.17(e), and

the record the AO developed during the asylum merits interview, as supplemented by the parties,

serves as the record before the IJ, 8 CFR 1240.17(c), (f)(2)(i)(A)(*1*), (f)(2)(ii)(B). The IJ reviews

applications for asylum de novo and also reviews applications for statutory withholding of

removal and CAT protection de novo where USCIS found the noncitizen ineligible for such

protection. 8 CFR 1240.17(i)(1). However, where USCIS found the noncitizen eligible for

statutory withholding of removal or CAT protection, IJs must give effect to USCIS's eligibility determination unless DHS demonstrates, through evidence or other testimony that specifically pertains to the noncitizen and was not in the record of proceedings for the asylum merits interview, that the noncitizen is not eligible for such protection.  8 CFR 1240.17(i)(2).  With a limited exception, DHS may not appeal the grant of any protection for which the AO determined the noncitizen eligible.  *Id.*

3.  Lawful Pathways Condition on Asylum Eligibility

On March 20, 2020, the Director of the Centers for Disease Control and Prevention ("CDC") issued an order under 42 U.S.C. 265 and 268 suspending the introduction of certain noncitizens from foreign countries or places where the existence of a communicable disease creates a serious danger of the introduction of such disease into the United States and the danger is so increased by the introduction of persons from the foreign country or place that a temporary suspension of such introduction is necessary to protect the public health.[45]  The CDC's Title 42 public health Order was extended multiple times.[46]  While the Title 42 public health Order was in effect, noncitizens who did not have proper travel documents were generally not processed into the United States; they were instead expelled to Mexico or to their home countries under the Order's authority without being processed under the authorities set forth in title 8 of the United States Code, which includes the INA.  Circumvention of Lawful Pathways, 88 FR 11704, 11705 (Feb. 23, 2023) ("Circumvention of Lawful Pathways NPRM").  In early 2023, the President announced that the Administration expected to end the public health emergency on May 11,

---

[45] CDC, Order Under Sections 362 & 365 of the Public Health Services Act (42 U.S.C.  265, 268): Order Suspending Introduction of Certain Persons from Countries Where a Communicable Disease Exists (Mar. 20, 2020), https://www.cdc.gov/quarantine/pdf/CDC-Order-Prohibiting-Introduction-of-Persons_Final_3-20-20_3-p.pdf.

[46] *See* Public Health Determination and Order Regarding Suspending the Right to Introduce Certain Persons From Countries Where a Quarantinable Communicable Disease Exists, 87 FR 19941, 19941–42 (Apr. 6, 2022) (describing the CDC's recent Title 42 public health Orders, which "suspend[ed] the right to introduce certain persons into the United States from countries or places where the quarantinable communicable disease exists in order to protect the public health from an increased risk of the introduction of COVID-19").

2023, which would cause the then-operative Title 42 public health Order to end. *See id.* at 11708.

As the Departments stated in the Circumvention of Lawful Pathways rule, absent further action, the end of the Title 42 public health Order was expected to cause encounters with noncitizens seeking to enter the United States at the SWB to rise to or remain at all-time highs—as high as 11,000 migrants daily. 88 FR at 31331, 31315. And many of these individuals would be entitled to remain in the United States pending resolution of their asylum and protection claims. *See* INA 235(b)(1)(B)(ii), 8 U.S.C. 1225(b)(1)(B)(ii) (not allowing for removal of those found to have a credible fear pending further consideration of the asylum claim); *see also* 88 FR at 31363 (noting that "most non-Mexicans processed for expedited removal under Title 8 would likely establish credible fear and remain in the United States for the foreseeable future"). The Departments thus faced a looming urgent situation: absent policy change, the end of the Title 42 public health Order was expected to result in many more migrants crossing the border and asserting claims of fear or seeking protection, which would in turn exceed the border security and immigration systems' capacity to process migrants in a safe, expeditious, and orderly way. *See* 88 FR at 31363. To address this expected increase in the number of migrants at the SWB and adjacent coastal borders seeking to enter the United States without authorization, the Departments promulgated the Circumvention of Lawful Pathways rule. *See* 88 FR 31314.

The Circumvention of Lawful Pathways rule, which became effective on its public inspection date, May 11, 2023, *id.*, and applies to those who enter during a two-year period, imposes a rebuttable presumption of asylum ineligibility on certain noncitizens who fail to pursue safe, orderly, and lawful processes for entry into the United States or seek protection in another qualifying country through which they traveled. 8 CFR 208.33(a), 1208.33(a). The rebuttable presumption applies to noncitizens who enter the United States from Mexico at the SWB or adjacent coastal borders without documents sufficient for lawful admission where the entry is: (1) between May 11, 2023, and May 11, 2025; (2) subsequent to the end of

implementation of the Title 42 public health Order issued on August 2, 2021, and related prior orders issued pursuant to the authorities in 42 U.S.C. 265 and 268 and the implementing regulation at 42 CFR 71.40; and (3) after the noncitizen traveled through a country other than their country of citizenship, nationality, or, if stateless, last habitual residence, that is a party to the Refugee Convention or Refugee Protocol.  8 CFR 208.33(a)(1), 1208.33(a)(1).

The presumption does not apply to UCs or to noncitizens who availed themselves of or were traveling with a family member who availed themselves of certain safe, orderly, and lawful pathways—specifically those who (1) received appropriate authorization to travel to the United States to seek parole, pursuant to a DHS-approved parole process; (2) presented at a POE pursuant to a pre-scheduled time and place or presented at a POE without a pre-scheduled time and place but who can demonstrate by a preponderance of the evidence that it was not possible to access or use the DHS scheduling system due to language barrier, illiteracy, significant technical failure, or other ongoing and serious obstacle; or (3) sought asylum or other protection in a country through which the noncitizen traveled and received a final decision denying that application.  8 CFR 208.33(a)(2), 1208.33(a)(2).  Noncitizens may also overcome the presumption by demonstrating by a preponderance of the evidence that "exceptionally compelling circumstances exist."  8 CFR 208.33(a)(3)(i), 1208.33(a)(3)(i).  Such circumstances necessarily exist where, at the time of entry, the noncitizen or a family member with whom the noncitizen is traveling: (1) faced an acute medical emergency; (2) faced an imminent and extreme threat to life or safety, such as an imminent threat of rape, kidnapping, torture, or murder; or (3) was a victim of a severe form of trafficking in persons under 8 CFR 214.11(a).  8 CFR 208.33(a)(3)(i)(A)–(C), (ii), 1208.33(a)(3)(i)(A)–(C), (ii).  A noncitizen presumed ineligible for asylum under the rule may still apply for statutory withholding of removal or CAT protection and thus may not be removed to a country where it is more likely than not that they will be persecuted because of a protected ground or tortured.

The condition on asylum eligibility in the Circumvention of Lawful Pathways rule ("Lawful Pathways condition") applies to asylum applications before USCIS and EOIR. 8 CFR 208.13(f), 1208.13(f). It also applies during credible fear screenings. 8 CFR 208.33(b), 1208.33(b). Noncitizens subject to expedited removal who indicate a fear of persecution or an intention to apply for asylum are currently first screened to assess whether the rebuttable presumption applies and, if so, whether the noncitizen is able to rebut the presumption. 8 CFR 208.33(b). If the AO determines that the rebuttable presumption does not apply or the noncitizen has rebutted the presumption, the general procedures governing the credible fear process then apply. *See* 8 CFR 208.33(b)(1)(ii). On the other hand, if the AO determines that the noncitizen is covered by the rebuttable presumption and no rebuttal ground applies, the AO will consider whether the noncitizen has established a reasonable possibility of persecution or torture with respect to the identified country or countries of removal. *See* 8 CFR 208.33(b)(1)(i), (b)(2). The Circumvention of Lawful Pathways rule currently provides that, if a noncitizen has established a reasonable possibility of persecution or torture, then DHS will issue a notice to appear ("NTA") to commence section 240 removal proceedings and may not refer the case to the asylum merits interview process. 8 CFR 208.33(b)(2)(ii).

Where a noncitizen requests review by an IJ, the IJ reviews the negative credible fear finding de novo. *See* 8 CFR 1208.33(b). If the IJ determines that the noncitizen has made a sufficient showing that the rebuttable presumption does not apply to them or that they can rebut the presumption, and that the noncitizen has established a significant possibility of eligibility for asylum, statutory withholding of removal, or CAT protection, the IJ issues a positive credible fear finding and the case proceeds under existing procedures. *See* 8 CFR 208.33(b)(2)(v)(A), 1208.33(b)(2)(i). If the IJ determines that the noncitizen is covered by the rebuttable presumption and it has not been rebutted, but the noncitizen has established a reasonable possibility of persecution or torture, the IJ issues a positive credible fear finding and DHS will issue an NTA to commence section 240 removal proceedings. 8 CFR 208.33(b)(2)(v)(B),

1208.33(b)(2)(ii). And finally, if the IJ issues a negative credible fear determination, the case is returned to DHS for removal of the noncitizen. *See* 8 CFR 208.33(b)(2)(v)(C), 1208.33(b)(2)(ii). In such a circumstance, the noncitizen may not appeal the IJ's decision or request that USCIS reconsider the AO's negative determination, although USCIS may, in its sole discretion, reconsider a negative determination. *See* 8 CFR 208.33(b)(2)(v)(C).

A noncitizen who has not established during expedited removal proceedings a significant possibility of eligibility for asylum because of the Lawful Pathways condition may, if placed in section 240 removal proceedings, apply for asylum, statutory withholding of removal, or CAT protection, or any other form of relief or protection for which the noncitizen is eligible. *See* 8 CFR 1208.33(b)(4). Where a principal asylum applicant in section 240 removal proceedings is eligible for statutory withholding of removal or withholding of removal under the CAT and would be granted asylum but for the rebuttable presumption, and where either an accompanying spouse or child does not independently qualify for asylum or other protection from removal or the principal asylum applicant has a spouse or child who would be eligible to follow to join that applicant, the presumption shall be deemed rebutted as an exceptionally compelling circumstance. 8 CFR 1208.33(c).

*B. Justification*

1. Global Migration at Record Levels

Border encounters in the 1980s, 1990s, and 2000s consisted overwhelmingly of single adults from Mexico, most of whom were migrating for economic reasons.[47] Beginning in the

---

[47] *See* 88 FR at 11708. According to OHSS Persist data and historic Office of Immigration Statistics ("OIS") Yearbooks of Immigration Statistics, Mexican nationals accounted for 87 to over 99 percent of apprehensions between POEs of persons entering without inspection between 1981 and 2010. *See* March 2024 OHSS Persist Dataset; *see, e.g.*, INS, *1981 Statistical Yearbook of the Immigration and Naturalization Service* 119 tbl. 53 (1981); INS, *1999 Statistical Yearbook of the Immigration and Naturalization Service* 208–11 tbl. 56 (Mar. 2002), https://www.dhs.gov/sites/default/files/publications/Yearbook_Immigration_Statistics_1999.pdf. For more information about Mexican migrants' demographics and economic motivations during some of that time period, see Jorge Durand et al., *The New Era of Mexican Migration to the United States*, 86 J. Am. Hist. 518, 525–27, 530–31, 535–36 (1999).

2010s, a growing share of migrants were from northern Central America[48] and, since the late 2010s, from countries throughout the Americas.[49]  Since 2010, the makeup of border crossers has significantly changed, expanding from Mexican single adults to single adults and families from the northern Central American countries, and now to single adults and families from throughout the hemisphere (and beyond).  Those encountered also have been more likely to seek asylum and other forms of relief or protection, straining the Departments' capacity to process individuals through expedited removal.[50]

In the early 2010s, U.S. Border Patrol ("USBP") encounters along the SWB reached modern lows, averaging fewer than 400,000 per year from 2011 to 2018.  *See* 88 FR at 11708.  This followed decades during which annual USBP encounters routinely numbered in the millions; however, the overall share of those who were processed for expedited removal and claimed a fear never exceeded 2 percent until 2011.  *Id.* at 11708, 11716.  Despite these historically low encounter numbers, the Departments faced significant challenges in 2014 due to an unprecedented surge in migration by UCs and in 2016 due to a surge in family units at the border—demographics that present unique challenges due to their vulnerability.[51]

---

[48] Northern Central America refers to El Salvador, Guatemala, and Honduras.  88 FR at 11708 n.35.

[49] According to OHSS Persist data, Mexican nationals continued to account for 89 percent of total CBP SWB encounters in FY 2010, with northern Central Americans accounting for 8 percent and all other nationalities accounting for 3 percent.  March 2024 OHSS Persist Dataset.  Northern Central Americans' share of total CBP SWB encounters increased to 21 percent by FY 2012 and averaged 48 percent from FY 2014 to FY 2019, the last full year before the start of the COVID-19 pandemic.  *Id.*  Nationals from all other countries except Mexico and the northern Central American countries accounted for an average of 5 percent of total CBP SWB encounters from FY 2010 to FY 2013, and for 10 percent of total encounters from FY 2014 to FY 2019.  *Id.*  This transition has accelerated since the start of FY 2021, as Mexican nationals accounted for approximately 32 percent of total CBP SWB encounters in FY 2021 through March 2024, including roughly 29 percent in the first six months of FY 2024; northern Central Americans accounted for roughly 25 percent from FY 2021 through March 2024 (20 percent in FY 2024 through March 2024); and all other countries accounted for roughly 42 percent from FY 2021 through March 2024, including roughly 51 percent of FY 2024 encounters through March 2024.  *Id.*

[50] For noncitizens encountered at the SWB from FY 2014 to FY 2019 who were placed in expedited removal proceedings, roughly 6 percent of Mexican nationals made fear claims that were referred to USCIS for determination compared to roughly 57 percent of people from northern Central America and 90 percent of all other nationalities.  OHSS analysis of Enforcement Lifecycle data as of December 31, 2023; *see also* 88 FR at 11709 n.37.

[51] Decl. of Blas Nuñez-Neto ¶ 6, *E. Bay Sanctuary Covenant v. Biden*, No. 18-cv-6810 (N.D. Cal. June 16, 2023) (Dkt. 176–2).

From FY 2017 to FY 2019, however, encounters between the POEs along the SWB more than doubled, to more than 850,000, and—following a significant drop during the beginning of the COVID-19 pandemic—continued to increase in FY 2021 and FY 2022.[52]  In FY 2021, USBP encounters between POEs along the SWB reached a level not seen since the early 2000s—over 1.6 million.[53]  In FY 2022, encounters at the SWB reached a new high-water mark, with total USBP encounters exceeding 2.2 million.[54]  FY 2023 saw a slight drop, but USBP encounters remained high—over 2.0 million.[55]  By early 2023, while the Title 42 public health Order was in place, total encounters at the SWB—referring to the number of times U.S. officials encountered noncitizens attempting to cross the SWB without authorization to do so either between or at POEs—had reached all-time highs.[56]  This dramatic increase in encounters has coincided with a substantial and—setting aside the period of time when the Title 42 public health Order was in effect—persistent increase in the number of noncitizens making fear claims in recent years.  *See* 88 FR at 11716.[57]  In 2019—prior to the implementation of the Title 42 public health Order—44

---

[52] OHSS analysis of March 2024 OHSS Persist Dataset; *see also* OHSS, *Immigration Enforcement and Legal Processes Monthly Tables*, https://www.dhs.gov/ohss/topics/immigration/enforcement-and-legal-processes-monthly-tables (last updated May 10, 2024) (providing historic data on SWB encounters).

[53] OHSS analysis of March 2024 OHSS Persist Dataset; *see also* OHSS, *Immigration Enforcement and Legal Processes Monthly Tables*, https://www.dhs.gov/ohss/topics/immigration/enforcement-and-legal-processes-monthly-tables (last updated May 10, 2024) (providing historic data on SWB encounters).

[54] OHSS analysis of March 2024 OHSS Persist Dataset; *see also* OHSS, *Immigration Enforcement and Legal Processes Monthly Tables*, https://www.dhs.gov/ohss/topics/immigration/enforcement-and-legal-processes-monthly-tables (last updated May 10, 2024) (providing historic data on SWB encounters).

[55] OHSS analysis of March 2024 OHSS Persist Dataset; *see also* OHSS, *Immigration Enforcement and Legal Processes Monthly Tables*, https://www.dhs.gov/ohss/topics/immigration/enforcement-and-legal-processes-monthly-tables (last updated May 10, 2024) (providing historic data on SWB encounters).

[56] OHSS analysis of March 2024 OHSS Persist Dataset; *see also* OHSS, *Immigration Enforcement and Legal Processes Monthly Tables*, https://www.dhs.gov/ohss/topics/immigration/enforcement-and-legal-processes-monthly-tables (last updated May 10, 2024) (providing historic data on SWB encounters).  During the initial seven months of FY 2023, while the Title 42 public health Order was still in effect, total CBP encounters surged to an all-time high of 1.4 million—an 11 percent increase over the same period in FY 2022 and nearly double the encounters recorded in FY 2021 for the same time period.

[57] The percentage of noncitizens encountered at and between SWB POEs processed for expedited removal who made fear claims steadily rose from 16 percent in FY 2013 to 44 percent in FY 2019, experienced a temporary dip in FY 2020 at the start of the Title 42 public health Order, and then resumed an upward trajectory, reaching a peak of 59 percent in FY 2023, marking the highest level of fear claims as a share of the SWB expedited removal population ever recorded.  *See* OHSS Enforcement Lifecycle as of December 31, 2023; March 2024 OHSS Persist Dataset.  Data on the exact number of noncitizens encountered at the SWB processed for expedited removal who made fear claims is not available for years prior to FY 2013, but OHSS estimates that about 84 percent of all fear claims made in prior years were made by noncitizens encountered at and between SWB POEs.  Even if 100 percent

percent of noncitizens encountered at the SWB placed in expedited removal proceedings claimed fear, resulting in 98,000 credible fear screenings. *Id.* The number of fear claims returned to these historically high levels after the Title 42 public health Order ended. From May 2023 through March 2024, approximately 54 percent of noncitizens encountered at and between SWB POEs who were subject to expedited removal claimed fear (approximately 169,000 fear claims out of 315,000 noncitizens processed for expedited removal, excluding cases processed for expedited removal but reprocessed into other dispositions by ICE).[58] These high numbers of both encounters and fear claims combine to further compound the significant stress on the immigration system.

Much of this growth in encounters was driven by nationalities that DHS had never before encountered in large numbers at the border—including nationals of countries such as Brazil, Colombia, Cuba, Ecuador, Haiti, Nicaragua, Peru, and Venezuela, as well as migrants from Eastern Hemisphere countries.[59] Because of this, DHS has had to undertake a focused diplomatic effort, working closely with the Department of State, to enter into commitments with countries to facilitate the return of their nationals. However, despite this concerted effort, it remains difficult for DHS to repatriate nationals of some of these countries who do not establish a legal basis to remain in the United States, including those from the Eastern Hemisphere—substantially limiting DHS's ability to impose consequences on those nationals.[60]

---

of fear claims made before FY 2013 were made by noncitizens encountered at the SWB, the level of fear claims as a share of SWB encounters at and between POEs processed for expedited removal in 2023 would be the highest ever.

[58] OHSS analysis of data downloaded from CBP UIP on April 2, 2024.

[59] Nationals from all countries other than Mexico and the northern Central American countries accounted for less than 5 percent of total CBP SWB encounters each year between FY 1981 and FY 2010, an average of 5 percent of SWB encounters from FY 2010 to FY 2013, and 10 percent of total SWB encounters from FY 2014 to FY 2019. The increase in encounters from these new countries of origin has accelerated since the start of FY 2021, as non-Mexican, non-northern Central American countries accounted for 42 percent of encounters from the start of FY 2021 through the second quarter of FY 2024, including 51 percent of FY 2024 encounters through March 2024. OHSS analysis of historic OIS *Yearbooks of Immigration Statistics* and March 2024 OHSS Persist Dataset; *see also* OHSS, *Immigration Enforcement and Legal Processes Monthly Tables*, https://www.dhs.gov/ohss/topics/immigration/enforcement-and-legal-processes-monthly-tables (last updated May 10, 2024) ("SW Border Encounters by Citizenship").

[60] *See* 88 FR at 11708–11.

Overall, countries other than Mexico and the northern Central American countries of El Salvador, Guatemala, and Honduras accounted for 43 percent of total SWB encounters from January 2021 to March 2024—including 51 percent of total SWB encounters in FY 2023 and in the first two quarters of FY 2024—up from 10 percent from FY 2014 to December 2020.[61] Encounters of Mexican nationals have fallen to 29 percent of total SWB encounters during this time frame—an enormous change from historical trends that has sweeping ramifications for the border and immigration system, which are detailed below.[62]

The increase in migration at the SWB is consistent with global and regional trends. Over the past three years, migration around the world has reached levels not seen since World War II.[63] The Western Hemisphere is no exception and has been facing historic levels of migration that have severely strained the immigration systems of countries throughout the region.[64] There is a growing consensus within the region that this shared challenge cannot be solved without collective action—a consensus reflected by the 22 countries that have supported the Los Angeles

---

[61] March 2024 OHSS Persist Dataset; *see also* OHSS, *Immigration Enforcement and Legal Processes Monthly Tables*, https://www.dhs.gov/ohss/topics/immigration/enforcement-and-legal-processes-monthly-tables (last updated May 10, 2024) ("CBP SW Border Encounters by Agency and Selected Citizenship").

The application of title 42 authorities at the SWB also altered migratory patterns, in part by incentivizing individuals who were expelled—without being issued a removal order, which, unlike a title 42 expulsion, carries immigration consequences—to try to re-enter, often multiple times. *See* 88 FR at 11709. The majority of repeat encounters were of Mexican and northern Central American nationals, who were much more likely than others to be expelled to the Mexican side of the U.S.-Mexico border—between FY 2020 and FY 2023, 72 percent of Mexican and 50 percent of northern Central American encounters at and between SWB POEs resulted in title 42 expulsion, contrasting sharply with 8 percent of non-Mexican and non-northern Central American encounters experiencing similar outcomes. March 2024 OHSS Persist Dataset; *see also* OHSS, *Immigration Enforcement and Legal Processes Monthly Tables*, https://www.dhs.gov/ohss/topics/immigration/enforcement-and-legal-processes-monthly-tables (last updated May 10, 2024) ("CBP SW Border Encounters Book-Outs by Selected Citizenship").

Even accounting for increased repeat encounters, unique encounters at and between SWB POEs also hit all-time highs in each year from FY 2021 to FY 2023. Nationals of countries other than Mexico and the northern Central America countries account for an even larger share of the growth in unique encounters, comprising 51 percent of unique encounters from January 2021 to March 2024, up from 9 percent in FY 2014 to December 2020. March 2024 OHSS Persist Dataset.

[62] March 2024 OHSS Persist Dataset.

[63] Decl. of Blas Nuñez-Neto ¶ 2, *M.A. v. Mayorkas*, No. 23-cv-1843 (D.D.C. Oct. 27, 2023) (Dkt. 53–1).

[64] *See* 88 FR at 11710–11.

Declaration on Migration and Protection, which proposes a comprehensive approach to managing migration throughout the region.[65]

As it prepared for the return to title 8 processing of all noncitizens, DHS led a comprehensive, all-of-government planning and preparation effort that lasted more than 18 months.[66]  This included record deployments of personnel, infrastructure, and resources to support DHS's frontline personnel at a substantial cost to other DHS operations.[67]  This effort also included the development and implementation of policy measures, including the joint DHS and DOJ Circumvention of Lawful Pathways rule and complementary measures, which were critically important components of DHS preparations to manage the anticipated significant influx of migrants associated with the end of the Title 42 public health Order's application at the border.[68]  And the United States Government's efforts were complemented by a range of measures taken by foreign partners in the region, such as Mexico's independent decision to continue to accept the return of certain non-Mexican migrants after May 11, 2023,[69] and campaigns by Colombia and Panama to attack smuggling networks operating in the Darién Gap.[70]

The Circumvention of Lawful Pathways rule has strengthened the consequences in place for those who cross the border irregularly and is a critical component of the Government's regional strategy.  DHS has also put in place complementary measures to streamline expedited removal processing to more quickly apply consequences to those who fail to use lawful

---

[65] *See* The White House, *Los Angeles Declaration on Migration and Protection* (June 10, 2022), https://www.whitehouse.gov/briefing-room/statements-releases/2022/06/10/los-angeles-declaration-on-migration-and-protection/.

[66] Decl. of Blas Nuñez-Neto ¶ 8, *E. Bay Sanctuary Covenant v. Biden*, No. 18-cv-6810 (N.D. Cal. June 16, 2023) (Dkt. 176–2).

[67] *Id.*

[68] *Id.*

[69] The White House, *Mexico and United States Strengthen Joint Humanitarian Plan on Migration* (May 2, 2023), https://www.whitehouse.gov/briefing-room/statements-releases/2023/05/02/mexico-and-united-states-strengthen-joint-humanitarian-plan-on-migration/.

[70] Decl. of Blas Nuñez-Neto ¶ 40, *M.A. v. Mayorkas*, No. 23-cv-1843 (D.D.C. Oct. 27, 2023) (Dkt. 53–1).

pathways.  These measures include holding noncitizens processed for expedited removal for the pendency of their credible fear interviews in CBP facilities to maximize the use of expedited removal and limit noncitizens absconding;[71] changing the consultation period such that credible fear interviews take place no earlier than 24 hours after the noncitizen's acknowledgement of receipt of information explaining the credible fear process;[72] returning certain third-country nationals to Mexico, consistent with established processes under the INA;[73] permitting certain non-Mexican citizens to withdraw their application for admission and voluntarily return to Mexico;[74] and increasing USCIS's capacity to train and prepare additional staff temporarily detailed as AOs to conduct credible fear interviews.[75]  These measures, combined with existing processes and resources and work with regional and international partners to disrupt irregular migration and smuggling networks, seek to form a comprehensive framework for managing migratory flows to the border—one that seeks to disincentivize noncitizens from putting their lives in the hands of callous smugglers by crossing the SWB between POEs and to incentivize noncitizens to use lawful, safe, and orderly pathways and processes instead.

Without the Circumvention of Lawful Pathways rule and complementary measures, DHS assesses that irregular migration at the border would be substantially higher today.  DHS saw evidence of very high levels of irregular migration in the days leading up to the end of the Title 42 public health Order on May 11, 2023.[76]  A historic surge in migration culminated with what were then the highest recorded encounter levels in U.S. history over the days immediately

---

[71] *Id.* ¶ 5.

[72] *Id.*

[73] *See, e.g.*, The White House, *Mexico and United States Strengthen Joint Humanitarian Plan on Migration* (May 2, 2023), https://www.whitehouse.gov/briefing-room/statements-releases/2023/05/02/mexico-and-united-states-strengthen-joint-humanitarian-plan-on-migration/ (noting the United States and Mexico's commitment to increase joint actions to counter human smugglers and traffickers, address root causes of migration, and continue to combine expanded lawful pathways with consequences for irregular migration, and noting that Mexico will continue to accept back migrants on humanitarian grounds).

[74] Decl. of Blas Nuñez-Neto ¶ 5, *M.A. v. Mayorkas*, No. 23-cv-1843 (D.D.C. Oct. 27, 2023) (Dkt. 53–1).

[75] *Id.*

[76] Decl. of Blas Nuñez-Neto ¶ 9, *E. Bay Sanctuary Covenant v. Biden*, No. 18-cv-6810 (N.D. Cal. June 16, 2023) (Dkt. 176–2); Decl. of Matthew J. Hudak ¶ 11, *Florida v. Mayorkas*, No. 22-cv-9962 (N.D. Fla. May 12, 2023) (Dkt. 13–1).

preceding May 11, which placed a significant strain on DHS's operational capacity at the border.[77] Encounters between POEs almost doubled from an average of approximately 4,900 per day the week ending April 11, 2023, to an average of approximately 9,500 per day the week ending May 11, 2023, including an average of approximately 10,000 encounters immediately preceding the termination of the Title 42 public health Order (from May 8 to May 11).[78] The sharp increase in encounters between POEs during the 30 days preceding May 11 represented the largest month-over-month increase in almost two decades—since January 2004.[79]

    As a consequence of the elevated flows USBP experienced in the days leading up to the end of the Title 42 public health Order, USBP saw a steady increase in the numbers of noncitizens in custody, leading to significant operational challenges.[80] From May 8 to 11, 2023, USBP's daily in-custody average was approximately 27,000 noncitizens, with a single-day peak of approximately 28,500 on May 10—well above its holding capacity at that time of approximately 18,500.[81] During this same time frame, eight out of nine SWB sectors were over their holding capacity—with four sectors (El Centro, El Paso, Rio Grande Valley, and Yuma) at more than 50 percent over their holding capacity and one sector (Tucson) at more than two-and-a-half times over its holding capacity.[82]

    This record number of encounters between POEs severely strained DHS operations and resources, as well as the resources of other Federal Government agencies, local communities, and non-governmental organizations ("NGOs").[83] CBP redirected limited resources from other mission needs—in particular, legitimate travel and trade operations, the volume of which by that

---

[77] Decl. of Blas Nuñez-Neto ¶ 9, *E. Bay Sanctuary Covenant v. Biden*, No. 18-cv-6810 (N.D. Cal. June 16, 2023) (Dkt. 176–2).

[78] *Id.*

[79] *Id.*

[80] *Id.* ¶ 10.

[81] *Id.*

[82] *Id.*

[83] *Id.* ¶ 11.

time had surpassed pre-pandemic levels—to focus on processing apprehended noncitizens.[84] Overcrowding in CBP facilities increased the potential for health and safety risks to noncitizens, Government personnel, and contract support staff.  Such risks were exacerbated by an increase in the average time in custody, which generally occurs when there are large numbers of noncitizens in custody who must be processed.[85]  To manage these conditions, USBP sectors redirected personnel from the field to perform tasks for noncitizens in custody, including processing, transporting, and escorting noncitizens.[86]  This, in turn, decreased USBP's ability to respond to noncitizens avoiding detection, other agency calls for assistance, and noncitizens in distress.[87]

The surge in encounters between POEs immediately preceding the end of the Title 42 public health Order also led to significant challenges for local border communities.[88]  For example, in the days leading up to May 11, 2023, local community resources in El Paso, Texas, were quickly overwhelmed as the number of noncitizens arriving in the United States surpassed the city's capacity.[89]  In anticipation of an influx of noncitizens arriving to the city—an influx that ultimately materialized—the city declared a state of emergency, as more than 1,000 noncitizens were sleeping on the sidewalks and left without shelter.[90]  Similarly, the cities of Brownsville and Laredo, Texas, declared states of emergency to allow them to seek additional resources to bolster their capacities.[91]  The surge in encounters also placed strain on interior cities.  In May 2023, for instance, New York's Governor declared a State Disaster Emergency.[92]

---

[84] *Id.*

[85] *Id.*

[86] *Id.*

[87] *Id.*

[88] *Id.* ¶ 12.

[89] *Id.*

[90] *Id.*

[91] *Id.*

[92] *See* N.Y. Exec. Order No. 28, Declaring a Disaster Emergency in the State of New York (May 9, 2023), https://www.governor.ny.gov/executive-order/no-28-declaring-disaster-emergency-state-new-york; *see also* Mayor of Chicago Emergency Exec. Order No. 2023–2 (May 9, 2023).

Since their implementation in May 2023, the Circumvention of Lawful Pathways rule and complementary measures have helped DHS to better manage migratory flows. Between May 12, 2023, and March 31, 2024, CBP placed into expedited removal more than 970 individuals encountered at and between POEs each day on average, and USCIS conducted a record number of credible fear interviews (more than 152,000) resulting from such cases. This is more interviews from SWB encounters at and between POEs during the span of ten and a half months than in any full fiscal year prior to 2023, and more than twice as many as the annual average from FY 2010 to FY 2019.[93] On average, since May 12, 2023, USCIS has completed approximately 3,300 cases each week, more than double its average weekly completed cases from FY 2014 to FY 2019.[94] In addition, in FY 2023, IJs conducted over 38,000 credible fear and reasonable fear reviews, the highest figure on record since at least 2000.[95] These efforts have significantly reduced the median time to process credible fear cases. Since May 12, 2023, the median time to refer noncitizens claiming a fear for credible fear interviews decreased by 77 percent from its historical average, from 13 days in the FY 2014 to FY 2019 pre-pandemic period to 3 days in the four weeks ending March 31, 2024; for those who receive negative fear determinations, the median time from encounter to removal, in the same time frames, decreased by 85 percent from 73 days to 11 days.[96]

The increase in referrals into expedited removal proceedings, combined with the streamlining of the process, has had tangible results. From May 12, 2023, to March 31, 2024,

---

[93] Pre-May 12, 2023, data from OHSS Lifecycle Dataset; post-May 11, 2023, data from OHSS analysis of data downloaded from UIP on April 2, 2024.

[94] Completed cases are those with credible fear interviews that have been adjudicated or that have been closed. Pre-May 12, 2023, data from OHSS Lifecycle Dataset; post-May 11, 2023, data from OHSS analysis of data downloaded from UIP on April 2, 2024.

[95] EOIR, *Adjudication Statistics: Credible Fear and Reasonable Fear Review Decisions* (Apr. 27, 2023), https://www.justice.gov/eoir/media/1344816/dl?inline.

[96] Historic processing times are based on OHSS Enforcement Lifecycle data as of December 31, 2023; post-May 12 estimates are based on OHSS analysis of operational CBP, ICE, USCIS, and DOJ/EOIR data downloaded from UIP on April 2, 2024. Encounter-to-removal cases include noncitizens removed after being placed in expedited removal proceedings, claiming fear, and receiving a negative fear determination or an administrative closure that is not referred to EOIR. Comparisons to the pandemic period are not relevant because many noncitizens who normally would have been referred for expedited removal processing were instead expelled under title 42 authority.

DHS removed more than 662,000 individuals—more removals than in any full fiscal year since 2013 and an indication that the increased efficiencies gained through these measures have enabled DHS to swiftly impose immigration consequences when individuals do not establish a legal basis to remain in the United States.[97]  Over the first six months immediately following May 12, 2023, DHS saw a significant decrease in border encounters between POEs.  After peaking at 9,700 per day in the seven days just before the end of the Title 42 public health Order, daily SWB encounters between POEs decreased by 45 percent to an average of 5,200 per day for the period from May 12, 2023, to November 30, 2023.[98]  While this months-long trend included variability over shorter periods, border encounters between POEs remained below the levels projected to occur in the absence of the Circumvention of Lawful Pathways rule and complementary measures.[99]

 While the Circumvention of Lawful Pathways rule and complementary measures have yielded demonstrable results, the resources provided to the Departments still have not kept pace with irregular migration.

 After months of relatively lower encounter levels between POEs following the changes put in place after May 11, 2023, encounter levels increased through the fall of 2023,[100] and December 2023 saw the highest levels of encounters between POEs in history, including a surge in which border encounters between POEs exceeded 10,000 for three consecutive days and

---

[97] OHSS analysis of data downloaded from UIP on April 2, 2024; *see* OHSS, *Immigration Enforcement and Legal Processes Monthly Tables*, https://www.dhs.gov/ohss/topics/immigration/enforcement-and-legal-processes-monthly-tables (last updated May 10, 2024); OHSS, *2022 Yearbook of Immigration Statistics* 103–04 tbl. 39 (Nov. 2023), https://www.dhs.gov/sites/default/files/2023-11/2023_0818_plcy_yearbook_immigration_statistics_fy2022.pdf (noncitizen removals, returns, and expulsions for FY 1892 to FY 2022).

[98] Pre-May 12, 2023, data from March 2024 OHSS Persist Dataset; post-May 11, 2023, data from OHSS analysis of data downloaded from UIP on December 12, 2023.

[99] Decl. of Blas Nuñez-Neto ¶ 4, *E. Bay Sanctuary Covenant v. Biden*, No. 18-cv-6810 (N.D. Cal. June 16, 2023) (Dkt. 176–2) (noting that in the absence of the rule, DHS planning models suggest that irregular migration could meet or exceed the levels that DHS recently experienced in the days leading up to the end of the Title 42 public health Order).

[100] *See* CBP, *Southwest Land Border Encounters*, https://www.cbp.gov/newsroom/stats/southwest-land-border-encounters (last visited May 27, 2024) (providing monthly figures for 2021 to 2024).

averaged more than 8,000 a day for the month.[101]  That surge in migration was focused increasingly on western areas of the border—California and Arizona—that had not been the focal point of migration over the prior two years, and in areas that are geographically remote and challenging to respond to.  For instance, the Tucson sector's average full-year encounter total for the pre-pandemic period (FY 2014 to FY 2019) was approximately 62,000; by contrast, in November and December of 2023, the sector recorded approximately 64,000 and 80,000 encounters, respectively.[102]  And while the number of encounters between POEs since December 2023 has decreased, consistent with seasonal migration flows and as a result of increased enforcement, they still remain at historically high levels—USBP encounters from January 2024 to March 2024 are just 5 percent below the levels reached during the same months in 2023,[103] while some USBP sectors, such as Tucson and San Diego, have seen increases of 83 percent and 62 percent, respectively, from the second quarter of FY 2023, and Tucson is on pace for an all-time high number of annual encounters.[104]

Since the lifting of the Title 42 public health Order, then, it has become increasingly clear that DHS's ability to process individuals encountered at the SWB under applicable title 8 authorities—including, critically, to deliver timely consequences to a meaningful proportion of those who do not establish a legal basis to remain in the United States—is significantly limited by the lack of resources and tools available to the Departments.  In response to the record high

[101] OHSS analysis of March 2024 OHSS Persist Dataset; *see also* OHSS, *Immigration Enforcement and Legal Processes Monthly Tables*, https://www.dhs.gov/ohss/topics/immigration/enforcement-and-legal-processes-monthly-tables (last updated May 10, 2024); OHSS, *2022 Yearbook of Immigration Statistics* 103–04 tbl. 39 (Nov. 2023), https://www.dhs.gov/sites/default/files/2024-02/2023_0818_plcy_yearbook_immigration_statistics_fy2022.pdf; - Priscilla Alvarez, *Authorities Encountering Record Number of Migrants at the Border Each Day Amid Unprecedented Surge*, CNN (Dec. 22, 2023), https://www.cnn.com/2023/12/22/politics/border-surge-record-amounts/index.html.

[102] *See* March 2024 OHSS Persist Dataset; *see also* OHSS, *Immigration Enforcement and Legal Processes Monthly Tables*, https://www.dhs.gov/ohss/topics/immigration/enforcement-and-legal-processes-monthly-tables (last updated May 10, 2024) ("SW Border Encounters by Sector").

[103] OHSS analysis of March 2024 OHSS Persist Dataset; *see also* OHSS, *Immigration Enforcement and Legal Processes Monthly Tables*, https://www.dhs.gov/ohss/topics/immigration/enforcement-and-legal-processes-monthly-tables (last updated May 10, 2024) ("SW Border Encounters by Sector").

[104] OHSS analysis of March 2024 OHSS Persist Dataset; *see also* OHSS, *Immigration Enforcement and Legal Processes Monthly Tables*, https://www.dhs.gov/ohss/topics/immigration/enforcement-and-legal-processes-monthly-tables (last updated May 10, 2024) ("SW Border Encounters by Sector").

levels of encounters between POEs in December 2023, DHS had to take extraordinary steps to shift personnel and resources to the affected sectors: CBP curtailed or suspended operations at a number of POEs, and, just before December 25, 2023, CBP reassigned 246 officers to support USBP operations.  As part of these extraordinary measures: vehicular traffic through the Eagle Pass, Texas, POE was suspended on November 27, 2023; the POE in Lukeville, Arizona, was closed on December 4, 2023; rail operations at POEs in El Paso and Eagle Pass, Texas, were suspended on December 18, 2023;[105] the Morley Gate POE in Nogales, Arizona, which was closed due to construction and slated to be reopened in November 2023, delayed its reopening;[106] and operations at Pedestrian West, part of the San Ysidro POE in San Diego, California, were suspended on December 9, 2023.[107]  On January 4, 2024, once the volume of migrants had diminished and CBP officers were able to return to normal duties, port operations in these locations resumed.[108]

The decision to close POEs was not one taken lightly.  The United States Government fully understands the impacts of such closures on local communities on both sides of the border, both socially and economically.[109]  Closing international POEs is a measure of last resort, and one that DHS was compelled to take in order to reassign its resources to support frontline agents in a challenging moment.

---

[105] *See* CBP, *Statement from CBP on Operations in Eagle Pass, Texas and Lukeville, Arizona* (Nov. 27, 2023), https://www.cbp.gov/newsroom/national-media-release/statement-cbp-operations-eagle-pass-texas-and-lukeville-arizona.

[106] *See* CBP, *Statement on Operational Changes and Resumption of Rail Operations in Eagle Pass and El Paso* (Dec. 22, 2023), https://www.cbp.gov/newsroom/national-media-release/statement-cbp-operational-changes-and-resumption-rail-operations.

[107] *See* CBP, *Statement from CBP on Operations in San Diego, California* (Dec. 7, 2023), https://www.cbp.gov/newsroom/national-media-release/statement-cbp-operations-san-diego-california.

[108] *See* CBP, *Statement from CBP on Resumption of Operations in Arizona, California, and Texas* (Jan. 2, 2024), https://www.cbp.gov/newsroom/national-media-release/statement-cbp-resumption-field-operations-arizona-california-and/.

[109] *See, e.g.*, Russel Contreras, *U.S.-Mexico Border Closures Could Cost Billions*, Axios (Dec. 22, 2023), https://www.axios.com/2023/12/22/us-mexico-border-closures-could-cost-billions (discussing evidence of the "devastating consequences" that follow from partial border closings); *cf.* Bryan Roberts et al., *The Impact on the U.S. Economy of Changes in Wait Times at Ports of Entry: Report to U.S. Customs and Border Protection* 5 (Apr. 2013), https://ebtc.info/wp-content/uploads/2014/07/USC-Create-CBP-Final-Report.pdf (discussing the benefits of adding staffing to land border POEs).

In addition to concerted efforts to strengthen and maximize consequences, including through new regulations, the United States Government has engaged intensively with the Government of Mexico to identify coordinated measures both countries could take, as partners, to address irregular migration. During the period before and after the December surge, the United States Government and the Government of Mexico held numerous talks at the highest levels of government to address migration. For example, President Biden and President of Mexico Andrés Manuel López Obrador spoke on December 21, 2023, and February 3, 2024.[110] During their conversation on December 21, the presidents agreed that additional enforcement actions were urgently needed so that the POEs that were temporarily closed could reopen.[111] In subsequent high-level meetings, both countries committed to expanding efforts to increase enforcement measures to deter irregular migration, expanding safe and lawful pathways, and strengthening cooperation.[112] The Government of Mexico expressed its concern about the economic impact of the POE closures and committed to increasing enforcement on key transit routes north.[113] On January 22, 2024, after a series of follow-on meetings between United States and Mexican Cabinet members in Washington, D.C., Mexico's Foreign Secretary enumerated a

---

[110] *See* The White House, *Readout of President Joe Biden's Call with President Andrés Manuel López Obrador of Mexico* (Dec. 21, 2023), https://www.whitehouse.gov/briefing-room/statements-releases/2023/12/21/readout-of-president-joe-bidens-call-with-president-andres-manuel-lopez-obrador-of-mexico-2/; The White House, *Readout of President Joe Biden's Call with President Andrés Manuel López Obrador of Mexico* (Feb. 3, 2024), https://www.whitehouse.gov/briefing-room/statements-releases/2024/02/03/readout-of-president-joe-bidens-call-with-president-andres-manuel-lopez-obrador-of-mexico-3/.

[111] The White House, *Readout of President Joe Biden's Call with President Andrés Manuel López Obrador of Mexico* (Dec. 21, 2023), https://www.whitehouse.gov/briefing-room/statements-releases/2023/12/21/readout-of-president-joe-bidens-call-with-president-andres-manuel-lopez-obrador-of-mexico-2/.

[112] The White House, *Readout of Homeland Security Advisor Dr. Liz Sherwood-Randall's Trip to Mexico* (Feb. 7, 2024), https://www.whitehouse.gov/briefing-room/statements-releases/2024/02/07/readout-of-homeland-security-advisor-dr-liz-sherwood-randalls-trip-to-mexico/.

[113] *Id.*; *see also, e.g.*, Amna Nawaz, *Mexico's Foreign Secretary Discusses What Her Country Is Doing to Ease Border Crisis*, PBS News Hour (Jan. 25, 2024), https://www.pbs.org/newshour/show/mexicos-foreign-secretary-discusses-what-her-country-is-doing-to-ease-border-crisis; *US, Mexico Agree to Strengthen Efforts to Curb Record Migration*, Reuters (Dec. 28, 2023), https://www.reuters.com/world/us-mexico-keep-border-crossings-open-lopez-obrador-says-2023-12-28/.

series of steps that the United States and Mexico committed to taking to continue to address migration, including combating human smuggling and trafficking organizations.[114]

DHS assesses that the surge in late 2023 was likely the result of a number of factors, including the growing understanding by smugglers and migrants that DHS's capacity to impose consequences at the border is limited by the lack of resources and tools that Congress has made available and the Government of Mexico's operational constraints at the end of its fiscal year, which limited its ability to enforce its own immigration laws.[115]  The Departments cannot address all of these factors in one rule, but assess that this rule will significantly increase the ability to deliver timely decisions and timely consequences at the border within current resources, combating perceptions and messaging to the contrary.

Encounters between POEs in January 2024 were substantially lower than December 2023 encounters, consistent with historic seasonal trends, and encounters in January 2022 and January 2023.[116]  In February and March 2024, encounter levels increased from the levels in January but remained significantly lower than in December 2023.[117]  Overall, from January 1 to March 31, 2024, encounters between POEs were 5 percent lower than during the same months in 2023 and 22 percent lower than those in 2022.[118]  However, despite the overall decrease in encounters since December 2023, specific areas of the border—in particular USBP's San Diego and Tucson

---

[114] *See, e.g.*, Valentine Hilaire & Cassandra Garrison, *Mexico, US Pitch Measures to Ease Pressure on Border, Plan Guatemala Talks*, Reuters (Jan. 22, 2024), https://www.reuters.com/world/americas/mexico-us-guatemala-officials-meet-migration-talks-2024-01-22/; Amna Nawaz, *Mexico's Foreign Secretary Discusses What Her Country Is Doing to Ease Border Crisis*, PBS News Hour (Jan. 25, 2024), https://www.pbs.org/newshour/show/mexicos-foreign-secretary-discusses-what-her-country-is-doing-to-ease-border-crisis (quoting Mexico's Foreign Affairs Secretary as saying that "we have done much more law enforcement to bring down the pressure in the border in the north").

[115] *See* María Verza, *Mexico Halts Deportations and Migrant Transfers Citing Lack of Funds*, AP News (Dec. 4, 2023), https://apnews.com/article/mexico-immigration-migrants-venezuela-17615ace23d0677bb443d8386e254fbc; *Smugglers Are Bringing Migrants To a Remote Arizona Crossing, Overwhelming Agents*, NPR (Dec. 10, 2023), https://www.npr.org/2023/12/10/1218428530/smugglers-are-bringing-migrants-to-a-remote-arizona-crossing-overwhelming-agents; Adam Isaacson, *Weekly U.S.-Mexico Border Update: Senate Negotiations, Migration Trends*, Washington Office of Latin America (Dec. 15, 2023), https://www.wola.org/2023/12/weekly-u-s-mexico-border-update-senate-negotiations-migration-trends/; Jordan, *supra* note 27.

[116] OHSS analysis of March 2024 OHSS Persist Dataset.

[117] OHSS analysis of March 2024 OHSS Persist Dataset.

[118] OHSS analysis of March 2024 OHSS Persist Dataset.

Sectors—have experienced localized increases in encounters that have, at times, strained DHS's holding capacity, adversely impacted local operations, and limited DHS's ability to swiftly impose consequences on individuals who do not establish a legal basis to remain in the United States. During the last week of April 2024, USBP's San Diego Sector encountered an average of more than 1,400 migrants each day, including many migrants from countries outside the Western Hemisphere who are more difficult to process.[119] The USBP Tucson Sector is experiencing similar, unprecedented migratory flows and consequent challenges. This high concentration of encounters, including comparatively large numbers of migrants who are hard to remove, in a focused geographic area places particular strain on the immigration enforcement system. This is particularly true in areas of the border—such as San Diego—where infrastructure-related capacity constraints limit DHS's ability to swiftly impose consequences at the border. These factors resulted in USBP's main processing facility in San Diego reaching over 200 percent capacity in April 2024, despite a recent expansion of this facility.

Since January 2024, the United States and Mexico have continued to hold regular, high-level conversations, as partners, to continue to deepen their collaboration, identify emerging trends, and coordinate additional steps by both countries to address changing flows. These meetings have informed operational deployments by both governments, including the coordinated response to the shift in migratory flows to the San Diego and Tucson sectors. This extensive ongoing collaboration was reflected by another bilateral engagement between President Biden and President López-Obrador on April 28, 2024, after which the presidents released a joint statement in which they "ordered their national security teams to work together to immediately implement concrete measures to significantly reduce irregular border crossings while protecting human rights."[120]

---

[119] *See* Elliot Spagat, *The Latest Hot Spot for Illegal Border Crossings is San Diego. But Routes Change Quickly*, AP News (May 17, 2024), https://apnews.com/article/san-diego-border-asylum-biden-mexico-da1e7b7c81e4e58912deff6d36dbdb9e.

[120] *See* The White House, *Joint Statement by the President of the United States Joe Biden and the President of*

Since then, the United States and the Government of Mexico have worked together, cooperatively, to increase enforcement.[121]  But these efforts—while significant—are likely to be less effective over time.  Smuggling networks are adaptable, responding to changes put in place.  Despite their immediate effectiveness, such changes are not enough—and will almost certainly have diminished effect over time.  The reality is that the scale of irregular migration over the past two years has strained the funding, personnel, and infrastructure of both countries' immigration enforcement systems in ways that have, at times, contributed to high encounters between POEs.

2.  Need for These Measures

DHS projects that, absent the policy changes being promulgated here, irregular migration will once again increase, and that any disruption in Mexican enforcement will only exacerbate that trend.  Without the Proclamation and this rule, the anticipated increase in migration will, in turn, worsen significant strains on resources already experienced by the Departments and communities across the United States.

Current trends and historical data indicate that migration and displacement in the Western Hemisphere will continue to increase as a result of violence, persecution, poverty, human rights abuses, the impacts of climate change, and other factors.  The case of migration through the Darién jungle between Colombia and Panama is illustrative.  For example, between January and April, 2024, the United Nations High Commissioner for Refugees ("UNHCR") tracked 139,000 irregular entries, up from 128,000 for the same months in 2023 and a seven-fold increase over

---

*Mexico Andrés Manuel López Obrador* (Apr. 29, 2024), https://www.whitehouse.gov/briefing-room/statements-releases/2024/04/29/joint-statement-by-the-president-of-the-united-states-joe-biden-and-the-president-of-mexico-andres-manuel-lopez-obrador.

[121] *See* Valerie Gonzalez & Elliot Spagat, *The US Sees a Drop in Illegal Border Crossings After Mexico Increases Enforcement*, AP News (Jan. 7, 2024), https://apnews.com/article/mexico-immigration-enforcement-crossings-drop-b67022cf0853dca95a8e0799bb99b68a; Luke Barr, *US Customs And Border Protection Reopening 4 Ports of Entry After Migrant Surge Subsides*, ABC News (Jan. 2, 2024), https://abcnews.go.com/US/us-customs-border-protection-reopening-4-ports-entry/story?id=106062555; Seung Min Kim, *US and Mexico Will Boost Deportation Flights and Enforcement to Crack Down on Illegal Immigration*, AP News (Apr. 30, 2024), https://apnews.com/article/joe-biden-andres-manuel-lopez-obrador-mexico-immigration-border-c7e694f7f104ee0b87b80ee859fa2b9b; Julia Ainsley & Chloe Atkins, *Mexico Is Stopping Nearly Three Times as Many Migrants Now, Helping Keep U.S. Border Crossings Down*, NBC News (May 15, 2024), https://www.nbcnews.com/politics/immigration/mexico-stopping-three-times-as-many-migrants-as-last-year-rcna146821.

migration levels during that period in 2022.[122]  The number of migrants crossing the Darién will only further increase the pressure on Mexico at its southern border and on the United States at the SWB.

Past unprecedented migration surges bolster the Departments' views and the need for this rulemaking.  As described in detail in Section III.B.1 of this preamble, migration trends have been steadily increasing in scope and complexity, featuring increasingly varied nationalities and demographic groups.  This has been true even as DHS has experienced sustained levels of historically high encounter levels.  Over the past two years, an increasing proportion of total CBP encounters at the SWB has been composed of families and UCs, and DHS has seen record flows of migrants from countries outside of northern Central America.[123]  These international migration trends are the result of exceedingly complex factors and are shaped by, among other things, family and community networks, labor markets, environmental and security-related push factors, and rapidly evolving criminal smuggling networks.[124]  The United States Government is working to address these root causes of migration and to abate adverse effects from unprecedented levels of irregular migration,[125] including through working closely with partner countries across the Western Hemisphere.[126]  But these efforts will take time to have significant

---

[122] The UNHCR tracked 20,000 irregular entries in the Darién gap in 2022.  OHSS analysis of downloaded from UNHCR Operational Data Portal, *Darien Panama: Mixed Movements Protection Monitoring - January - December 2023*, https://data.unhcr.org/en/documents/details/105569 (last visited May 31, 2024); *Darien Panama: Mixed Movements Protection Monitoring – April 2024,* https://data.unhcr.org/en/documents/details/108399 (last visited May 31, 2024).

[123] March 2024 OHSS Persist Dataset; *see also* OHSS, *Immigration Enforcement and Legal Processes Monthly Tables*, https://www.dhs.gov/ohss/topics/immigration/enforcement-and-legal-processes-monthly-tables (last updated May 10, 2024) ("SWB Encounters by Agency and Family Status" and "SWB Encounters by Citizenship and Family Status").

[124] *See* 88 FR at 31327–28 & n.59.

[125] *See, e.g.*, The White House, *Mexico and United States Strengthen Joint Humanitarian Plan on Migration* (May 2, 2023), https://www.whitehouse.gov/briefing-room/statements-releases/2023/05/02/mexico-and-united-states-strengthen-joint-humanitarian-plan-on-migration/ (committing to addressing root causes of migration).

[126] *See* The White House, *Fact Sheet: Third Ministerial Meeting on the Los Angeles Declaration On Migration and Protection in Guatemala* (May 7, 2024), https://www.whitehouse.gov/briefing-room/statements-releases/2024/05/07/fact-sheet-third-ministerial-meeting-on-the-los-angeles-declarationon-migration-and-protection-in-guatemala.

impacts and will not alleviate the stress that the border security and immigration systems are currently experiencing, as described in the Proclamation.

The Departments' views and the need for this rulemaking are further supported by projections developed from ongoing work by DHS's Office of Homeland Security Statistics ("OHSS"), which leads an interagency working group that produces encounter projections used for operational planning, policy development, and short-term budget planning. OHSS uses a mixed-method approach that combines a statistical predictive model with subject matter expertise intended to provide informed estimates of future migration flow and trends. The mixed-methods approach blends multiple types of models through an ensemble approach of model averaging.[127] The model includes encounter data disaggregated by country and demographic characteristics, data on apprehensions of third-country nationals by Mexican enforcement agencies, and economic data. DHS uses the encounter projection to generate a range of planning models, which can include "low" planning models that are based on the lower bound of the 95 percent forecast interval, "moderate" planning models that are based on the upper bound of the 68 percent forecast interval, and "high" planning models based on the upper bound of the 95 percent forecast interval. These planning models account for changes in effectiveness of current enforcement and lawful migration processes.[128]

Because of the significant time and operational cost it takes to redeploy resources, DHS is generally conservative in its enforcement planning. 88 FR at 31328. As a result, it focuses on

---

[127] Blending multiple models and basing predictions on prior data has been understood to improve modeling accuracy. *See, e.g.*, Spyros Makridakis et al., *Forecasting in Social Settings: The State of the Art*, 36 Int'l J. Forecasting 15, 16 (2020) (noting that it has "stood the test of time . . . that combining forecasts improves the [forecast] accuracy"); The Forecasting Collaborative, *Insights into the Accuracy of Social Scientists' Forecasts of Societal Change*, 7 Nat. Hum. Behaviour 484 (2023), https://doi.org/10.1038/s41562-022-01517-1 (comparing forecasting methods and suggesting that forecasting teams may materially improve accuracy by, for instance, basing predictions on prior data and including scientific experts and multidisciplinary team members). DHS notes that the complexity of international migration limits DHS's ability to precisely project border encounters under the best of circumstances. The current period is characterized by greater than usual uncertainty due to ongoing changes in the major migration source countries (i.e., the shift in demographics of those noncitizens encountered by DHS), the growing impact of climate change on migration, political instability in several source countries, the evolving recovery from the COVID-19 pandemic, and uncertainty generated by border-related litigation, among other factors. *See* 88 FR at 31316 n.14.

[128] OHSS Southwest Border Encounter Projection, April 2024.

its higher planning models as it projects future resource deployments to avoid using more optimistic scenarios that could leave enforcement efforts badly under-resourced. *Id.* The current internal projections, based on this robust modeling methodology, suggest that encounters may once again reach extremely elevated levels in the weeks to come, averaging in the three months from July to September, 2024, in the range of approximately 3,900 to approximately 6,700 encounters at and between POEs per day, not including an additional 1,450 noncitizens per day who are expected to be encountered at POEs after making appointments though the CBP One app.[129] The Departments believe the policies in this rule are justified in light of high levels of migration that have ultimately proved persistent even in the face of new policies that have resulted in processing migrants with record efficiency, as evidenced by the migration patterns witnessed in December 2023. Current sustained, high encounter rates exceed the border security and immigration systems' capacity to effectively and safely process, detain, and remove, as appropriate, all migrants who are encountered.[130] This is generally true when considering total encounters across the entire SWB, and even more the case when specific sectors along the border are targeted by smuggling organizations with focused localized surges in encounters—as has been happening since the late fall in Tucson, Arizona, which accounted for 35 percent of SWB encounters between POEs in the second quarter of FY 2024, up from 18 percent in FY 2023 and 13 percent in FY 2022.[131]

Despite the fact that the average of 4,400 daily encounters between POEs in the second quarter of FY 2024 is below the highs experienced in the days immediately preceding the end of

---

[129] OHSS Encounter Projections, April 2024. Note that the OHSS encounter projection excludes encounters of people who have registered with the CBP One app along with administrative encounters at POEs (i.e., encounters in which removal proceedings are not considered), but includes non-CBP One enforcement encounters at POEs, which have averaged about 190 per day since May 2023, based on OHSS analysis of March 2024 OHSS Persist Dataset. *See also* CBP, *CBP One™ Appointments Increased to 1,450 Per Day* (June 30, 2023), https://www.cbp.gov/newsroom/national-media-release/cbp-one-appointments-increased-1450-day.

[130] *See, e.g.*, Decl. of Blas Nuñez-Neto ¶ 8, *M.A. v. Mayorkas*, No. 23-cv-1843 (D.D.C. Oct. 27, 2023) (Dkt. 53–1).

[131] March 2024 OHSS Persist Dataset; *see also* OHSS, *Immigration Enforcement and Legal Processes Monthly Tables—October 2023*, https://www.dhs.gov/ohss/topics/immigration/enforcement-and-legal-processes-monthly-tables (last updated May 10, 2024) ("SW Border Encounters by Sector").

the Title 42 public health Order and in December 2023,[132] daily encounter numbers remain sufficiently high—especially in the locations where encounters have been extremely elevated, such as California and Arizona—that the numbers significantly impact the operational flexibility required to process individuals in a timely and consequential manner.[133]  When capacity is strained like this in specific locations along the border, it becomes even more difficult for the Departments to deliver timely decisions and timely consequences.  At increased levels of encounters and without a change in policy, most non-Mexicans processed for expedited removal under title 8 would likely establish a credible fear and remain in the United States for the foreseeable future despite the fact that most of them will not ultimately be granted asylum, assuming results are similar to historic rates,[134] a scenario that would likely continue to incentivize an increasing number of migrants to journey to the United States and further increase the likelihood of sustained high encounter rates.

---

[132] March 2024 OHSS Persist Dataset.  As noted *supra* note 5, preliminary April data show SWB encounters between POEs fell slightly, by 6 percent, between March and April.  OHSS analysis of data obtained from CBP, *Southwest Land Border Encounters*, https://www.cbp.gov/newsroom/stats/southwest-land-border-encounters (last accessed May 24, 2024).  The preliminary April data are best understood to reflect a continuation of the general pattern described elsewhere in this rule.

[133] The Tucson Sector accounted for 35 percent of USBP encounters in the second quarter of FY 2024, up from 18 percent in FY 2023 and 13 percent in FY 2022.  OHSS analysis of March 2024 OHSS Persist Dataset; *see also* CBP, *Southwest Land Border Encounters (By Component)*, https://www.cbp.gov/newsroom/stats/southwest-land-border-encounters-by-component (last modified May 15, 2024).  Border encounters typically fall around the New Year and often remain lower than other months in January.  *See* OHSS, *Immigration Enforcement and Legal Processes Monthly Tables*, https://www.dhs.gov/ohss/topics/immigration/enforcement-and-legal-processes-monthly-tables (last updated May 10, 2024) ("Nationwide CBP Encounters by Encounter Type and Region").  Thus, while CBP's apprehension of 402,000 noncitizens between POEs in the second quarter of FY 2024 is slightly lower than the 424,000 observed in FY 2023 and 518,000 in FY 2022, it is almost four times as high as the pre-pandemic second-quarter average for FY 2014 through FY 2019, and with the exceptions of FY 2022 and FY 2023 the highest second-quarter count recorded since FY 2001.  Even with the downturn between January and March, 2024, the high volume of encounters and challenging demographic mix still meant that most noncitizens processed by USBP were released from custody into the United States (including noncitizens enrolled in an ICE Alternatives to Detention program and those paroled by the Office of Field Operations).  OHSS analysis of March 2024 OHSS Persist Dataset; *see also* OHSS, *Immigration Enforcement and Legal Processes Monthly Tables*, https://www.dhs.gov/ohss/topics/immigration/enforcement-and-legal-processes-monthly-tables (last updated May 10, 2024) ("CBP SW Border Encounters Book-Outs by Agency").

[134] Since May 12, 2023, 60 percent of non-Mexican noncitizen SWB encounters (at and between POEs) processed for expedited removal who have made fear claims have been referred to EOIR for immigration proceedings.  OHSS analysis of data downloaded from UIP on April 2, 2024.  But based on historic (pre-pandemic) data, only 18 percent of non-Mexican noncitizens processed for expedited removal that are referred to EOIR result in an individual being granted relief or protection from removal once the case is completed.  OHSS Enforcement Lifecycle December 31, 2023.

Even in times with sustained lower encounter volumes, such as between 2011 and 2017, the Departments experienced challenging situations, including the first surge in UCs in 2014, that severely strained the United States Government's capacity.[135]  Surges in encounters at the southern border—both at and between POEs—are now occurring more frequently and at higher magnitudes, and featuring more diverse demographics and nationalities than ever before.[136]  These surges affect more CBP sectors along the border, disrupt operations more quickly, and affect readiness in other critical areas as DHS diverts resources, including front-line agents, from other urgent tasks and geographic areas.[137]  These actions, in turn, impact other critical mission sets, including processing lawful trade and travel at POEs.[138]

DHS continues to lack the necessary funding and resources to deliver timely consequences to the majority of noncitizens encountered given the increased level of encounters it is experiencing at the SWB.[139]  On August 10, 2023, the Administration submitted to Congress a request for $2.2 billion in supplemental funding for border operations, including $1.4 billion

---

[135] OHSS, *Immigration Enforcement and Legal Processes Monthly Tables*, https://www.dhs.gov/ohss/topics/immigration/enforcement-and-legal-processes-monthly-tables (last updated May 10, 2024) ("CBP SW Border Encounters by Agency and Family Status").

[136] OHSS, *Immigration Enforcement and Legal Processes Monthly Tables*, https://www.dhs.gov/ohss/topics/immigration/enforcement-and-legal-processes-monthly-tables (last updated May 10, 2024) ("CBP SW Border Encounters by Agency and Family Status" and "CBP SW Border Encounters by Agency and Selected Citizenship"); *The Unaccompanied Children Crisis: Does the Administration Have a Plan to Stop the Border Surge and Adequately Monitor the Children?: Hearing Before the S. Comm. On the Judiciary*, 114th Cong. (2016) (statement of Ronald Vitiello, Acting Chief of USBP), https://www.judiciary.senate.gov/imo/media/doc/02-23-16%20Vitiello%20Testimony.pdf; Memorandum on the Response to the Influx of Unaccompanied Alien Children Across the Southwest Border, 1 Pub. Papers of Pres. Barack Obama 635, 635 (June 2, 2014).

[137] *See, e.g.*, Decl. of Raul L. Ortiz ¶¶ 11–12, *Florida v. Mayorkas*, No. 23-11644 (11th Cir. May 19, 2023) (Dkt. 3–2).

[138] *See, e.g.*, Decl. of Raul L. Ortiz ¶¶ 11–12, *Florida v. Mayorkas*, No. 23-11644 (11th Cir. May 19, 2023) (Dkt. 3–2); Decl. of Blas Nuñez-Neto ¶ 32, *E. Bay Sanctuary Covenant v. Biden*, No. 18-cv-6810 (N.D. Cal. June 16, 2023) (Dkt. 176–2).

[139] Letter for Kevin McCarthy, Speaker of the House of Representatives, from Shalanda D. Young, Director, OMB, at 2–3 (Aug. 10, 2023), https://www.whitehouse.gov/wp-content/uploads/2023/08/Final-Supplemental-Funding-Request-Letter-and-Technical-Materials.pdf; The White House, *Fact Sheet: White House Calls on Congress to Advance Critical National Security Priorities* (Oct. 20, 2023), https://www.whitehouse.gov/briefing-room/statements-releases/2023/10/20/fact-sheet-white-house-calls-on-congress-to-advance-critical-national-security-priorities/.

for CBP and $714 million for ICE for border management and enforcement and an additional

$416 million for counter-fentanyl efforts.[140]

On October 20, 2023, the Administration submitted to Congress a second request for

supplemental funding for DHS, which would provide funding to enhance enforcement and

processing, procure and operationalize needed technologies, and hire additional personnel.[141]

This funding would further support critical border enforcement efforts, including:

- An additional 1,300 Border Patrol Agents to work alongside the 20,200 agents

  proposed in the President's FY 2024 budget request, as well as 300 Border Patrol

  Processing Coordinators and support staff;[142]

- An additional 1,600 AOs and associated support staff to process migrant claims,

  which would provide USCIS with the critical resources needed to expand its

  current credible fear interview capacity to support timely processing of those

  placed in expedited removal;[143] and

- An expansion of detention beds and ICE removal flight funding to sustain the

  current significantly increased use of expedited removal, provide necessary surge

  capacity, and allow DHS to process more expeditiously noncitizens who cross the

  SWB unlawfully and swiftly remove those without a legal basis to remain in the

  United States.[144]

---

[140] *See* Letter for Kevin McCarthy, Speaker of the House of Representatives, from Shalanda D. Young, Director, OMB, at 2–3, attach. at 45–50 (Aug. 10, 2023), https://www.whitehouse.gov/wp-content/uploads/2023/08/Final-Supplemental-Funding-Request-Letter-and-Technical-Materials.pdf.

[141] *See* The White House, *Fact Sheet: White House Calls on Congress to Advance Critical National Security Priorities* (Oct. 20, 2023), https://www.whitehouse.gov/briefing-room/statements-releases/2023/10/20/fact-sheet-white-house-calls-on-congress-to-advance-critical-national-security-priorities/.

[142] *See* DHS, *Fact Sheet: Biden-Harris Administration Supplemental Funding Request* (Oct. 20, 2023), https://www.dhs.gov/news/2023/10/20/fact-sheet-biden-harris-administration-supplemental-funding-request; The White House, *Fact Sheet: White House Calls on Congress to Advance Critical National Security Priorities* (Oct. 20, 2023), https://www.whitehouse.gov/briefing-room/statements-releases/2023/10/20/fact-sheet-white-house-calls-on-congress-to-advance-critical-national-security-priorities/.

[143] *See* The White House, *Fact Sheet: White House Calls on Congress to Advance Critical National Security Priorities* (Oct. 20, 2023), https://www.whitehouse.gov/briefing-room/statements-releases/2023/10/20/fact-sheet-white-house-calls-on-congress-to-advance-critical-national-security-priorities/.

[144] *See* The White House, *Fact Sheet: White House Calls on Congress to Advance Critical National Security*

On January 31, 2024, DHS published a new USCIS fee schedule, effective April 1, 2024, that adjusted the fees to fully recover costs and maintain adequate service. *See U.S. Citizenship and Immigration Services Fee Schedule and Changes to Certain Other Immigration Benefit Request Requirements*, 89 FR 6194, 6194 (Jan. 31, 2024); *U.S. Citizenship and Immigration Services Fee Schedule and Changes to Certain Other Immigration Benefit Request Requirements; Correction*, 89 FR 20101 (Mar. 21, 2024) (making corrections). Because there is no fee required to file an asylum application or for protection screenings, 8 CFR 106.2(a)(28), and because Congress has not provided other funds to pay for the operating expenses of the Asylum Division,[145] fees generated from other immigration applications and petitions must be used to pay for these expenses. *See* INA 286(m), 8 U.S.C. 1356(m). While the new fee rule does provide for increased funding for the Refugee, Asylum, and International Operations Directorate,[146] keeping pace with USCIS's protection screening and affirmative asylum workloads requires additional funding, as reflected in the President's FY 2025 Budget.[147] Raising fees on other applications and petitions to cover the $755 million that would be required to hire and support the additional 1,600 AOs called for in the President's 2025 FY Budget[148] would impose a burden on other filers.

In early February 2024, a bipartisan group of Senators proposed reforms of the country's asylum laws that would have provided new authorities to significantly streamline and speed up

---

*Priorities* (Oct. 20, 2023), https://www.whitehouse.gov/briefing-room/statements-releases/2023/10/20/fact-sheet-white-house-calls-on-congress-to-advance-critical-national-security-priorities/; DHS, *Fact Sheet: Biden-Harris Administration Supplemental Funding Request* (Oct. 20, 2023), https://www.dhs.gov/news/2023/10/20/fact-sheet-biden-harris-administration-supplemental-funding-request.

[145] *See* DHS, *U.S. Citizenship and Immigration Services, Budget Overview, Fiscal Year 2025 Congressional Justification* CIS—IEFA—22 (Mar. 8, 2024), https://www.dhs.gov/sites/default/files/2024-03/2024_0308_us_citizenship_and_immigration_services.pdf (showing AOs are funded by Immigration Examinations Fee Account); *id.* at CIS—O&S—30 (showing that appropriated funds from the Refugee, Asylum, and International Operations Directorate of USCIS support Refugee Officers).

[146] DHS, *Immigration Examinations Fee Account: Fee Review Supporting Documentation with Addendum* 53 (Nov. 2023), https://www.regulations.gov/document/USCIS-2021-0010-8176.

[147] *See* The White House, *Fact Sheet: The President's Budget Secures Our Border, Combats Fentanyl Trafficking, and Calls on Congress to Enact Critical Immigration Reform* (Mar. 11, 2024), https://www.whitehouse.gov/briefing-room/statements-releases/2024/03/11/fact-sheet-the-presidents-budget-secures-our-border-combats-fentanyl-trafficking-and-calls-on-congress-to-enact-critical-immigration-reform/.

[148] *Id.*

immigration enforcement proceedings and immigration adjudications for individuals encountered at the border, including those who are seeking protection, while preserving principles of fairness and humane treatment.[149]  Critically, the proposal included nearly $20 billion in additional resources for DHS, DOJ, and other departments to implement those new authorities,[150] including resources for:

- Over 1,500 new CBP personnel, including Border Patrol Agents and CBP Officers;

- Over 4,300 new AOs, as well as USCIS staff to facilitate timely and fair decisions;

- 100 additional IJ teams to help reduce the asylum caseload backlog and adjudicate cases more quickly;

- Shelter and critical services for newcomers in U.S. cities and States; and

- 1,200 new ICE personnel for functions including enforcement and removals.[151]

However, Congress failed to move forward with this bipartisan legislative proposal.[152]  It also failed to pass the emergency supplemental funding requests that the Administration submitted.  Although Congress did ultimately enact an FY 2024 appropriations bill for DHS, the funding falls significantly short of what DHS requires to deliver timely consequences and avoid large-scale releases pending section 240 removal proceedings.  For example, the bill does not provide the resources necessary for DHS to refer the majority of noncitizens encountered by USBP who are amenable to expedited removal into such processing, resulting in large-scale releases pending section 240 removal proceedings based on current encounter numbers.  Such

---

[149] The White House, *Fact Sheet: Biden-Harris Administration Calls on Congress to Immediately Pass the Bipartisan National Security Agreement* (Feb. 4, 2024), https://www.whitehouse.gov/briefing-room/statements-releases/2024/02/04/fact-sheet-biden-harris-administration-calls-on-congress-to-immediately-pass-the-bipartisan-national-security-agreement/.

[150] Deirdre Walsh & Claudia Grisales, *Negotiators release $118 billion border bill as GOP leaders call it dead in the House*, NPR (Feb. 4, 2024), https://www.npr.org/2024/02/04/1226427234/senate-border-deal-reached.

[151] The White House, *Fact Sheet: Biden-Harris Administration Calls on Congress to Immediately Pass the Bipartisan National Security Agreement* (Feb. 4, 2024), https://www.whitehouse.gov/briefing-room/statements-releases/2024/02/04/fact-sheet-biden-harris-administration-calls-on-congress-to-immediately-pass-the-bipartisan-national-security-agreement/.

[152] Associated Press, *Border Bill Fails Senate Test Vote as Democrats Seek to Underscore Republican Resistance* (May 23, 2024), https://apnews.com/article/border-immigration-senate-vote-924f48912eecf1dc544dc648d757c3fe.

releases, in turn, have significant impacts on communities and contribute to further migration by incentivizing potential migrants to travel to the United States with the belief that, even if initially detained, they will ultimately be released to live and work in the United States for long periods of time. Absent the Proclamation and this rule, these harmful results are especially likely given the circumstances described in the Proclamation.

The FY 2024 appropriations provided some additional funding for DHS above its request, including for additional Border Patrol Agents and a higher level of ICE detention beds than was previously appropriated.[153] Although this increase is helpful, there are a number of ways in which the FY 2024 budget falls well short of what DHS needs to respond to the current elevated levels of migration. For example, the FY 2024 appropriations failed to fund the salary increase set across the Federal Government by the Office of Management and Budget ("OMB"), effectively reducing salary funding for the entirety of the appropriations-funded DHS workforce.[154] This reduction will limit the availability of overtime to respond to surges in irregular migration and may require difficult operational decisions during the closing months of the fiscal year, which is historically a busier period for such migration. The appropriations also did not provide sufficient funding to maintain the temporary processing facilities needed to hold migrants in custody. Further, the funds for hiring additional personnel were restricted to the current fiscal year rather than being provided as multi-year funds as requested; given the length of the hiring process, DHS will not be able to realize the increases in personnel envisioned by the legislation before the funding expires.

All of these factors, taken together, mean that under the current appropriations law, DHS will, at best, be able only to sustain most of its current operations, resulting in an operating

---

[153] *See* House of Representatives, *Explanatory Statement: Division C, Department of Homeland Security Appropriations Act, 2024*, at 14, 25 (Mar. 18, 2024), https://docs.house.gov/billsthisweek/20240318/Division%20C%20Homeland.pdf.

[154] *See id.* at 14, 22 (explaining that for CBP, "[t]he agreement includes $346,498,000 below the request, including the following: $182,772,000 for the 2024 pay raise," and for ICE, "[t]he agreement provides $9,501,542,000 for Operations and Support, including a decrease below the request of $74,153,000 for the 2024 pay raise").

capacity that already experiences strain during times of high migration levels; this will, in turn, reduce DHS's ability to maximize the delivery of timely consequences for those without a lawful basis to remain.  Additionally, DHS will not be able to expand capacity along the border or increase its ability to deliver consequences through referrals into expedited removal.  Instead, DHS may actually need to reduce capacity in some key areas, including by closing critical temporary processing facilities and pulling USBP agents away from the frontline to undertake processing and tasks related to custody.  Thus, while DHS has made significant progress toward a migration strategy focused on enforcement, deterrence, encouragement of the use of lawful pathways, and diplomacy, a lack of needed resources and tools hampers DHS's current ability to manage the unprecedented flow of hemispheric migration, and the situation will only worsen with expected seasonal and other increases.

Immigration-related resource challenges are not unique to front-line border officials.  The immigration removal continuum—from apprehension, processing, and inspection to protection interviews and removal—is hampered by a lack of sufficient funding, resources, and tools at every stage.[155]  EOIR is underfunded, without sufficient resources to address the backlog of over 2.78 million cases that were pending in the immigration courts at the end of the first quarter of

[155] *See* DHS, *Statement from Secretary Mayorkas on the President's Fiscal Year 2025 Budget for the U.S. Department of Homeland Security* (Mar. 11, 2024), https://www.dhs.gov/news/2024/03/11/statement-secretary-mayorkas-presidents-fiscal-year-2025-budget-us-department ("DHS reiterates previously submitted funding requests that are critical to secure the border, build immigration enforcement capacity, combat fentanyl and address domestic needs like natural disaster response, which Congress has failed to act on.  Among them, the October funding request, which includes $8.7 billion for border, immigration, and counter fentanyl requirements and $9.2 billion for FEMA's Disaster Relief Fund and Nonprofit Security Grant Program.  Notably, the Administration's border supplemental request includes funding to build capacity in the areas of border security, immigration enforcement, and countering fentanyl.  DHS strongly supports the additional $19 billion in funding proposals included in the Senate's bipartisan border legislation that would, among other things, enable DHS to hire more CBP agents and officers, ICE enforcement and investigative personnel, and USCIS asylum officers and provide new tools to bolster the Department's efforts to secure and manage the border."); *see also* Letter for Kevin McCarthy, Speaker of the House of Representatives, from Shalanda D. Young, Director, OMB, at 2–3 (Aug. 10, 2023), https://www.whitehouse.gov/wp-content/uploads/2023/08/Final-Supplemental-Funding-Request-Letter-and-Technical-Materials.pdf; The White House, *Fact Sheet: White House Calls on Congress to Advance Critical National Security Priorities* (Oct. 20, 2023), https://www.whitehouse.gov/briefing-room/statements-releases/2023/10/20/fact-sheet-white-house-calls-on-congress-to-advance-critical-national-security-priorities/; DHS, *Fact Sheet: Biden-Harris Administration Supplemental Funding Request* (Oct. 20, 2023), https://www.dhs.gov/news/2023/10/20/fact-sheet-biden-harris-administration-supplemental-funding-request.

FY 2024.[156]  This under-resourcing has contributed to the growth of this backlog; in FY 2023, IJs completed more cases than they ever had before in a single year, but more than twice as many cases were received by the immigration courts as were completed.[157]  The FY 2024 budget creates even greater strains on EOIR.  EOIR received $844 million this fiscal year,[158] a cut of $16 million from FY 2023.[159]  EOIR's budget was also cut $94.3 million from its inflation-adjusted funding requirements (referred to as "Current Services").[160]  As a result of the significant budgetary gap, EOIR will necessarily be required to reduce the Federal and contract labor force that has been supporting its immigration courts nationwide and cut spending to technological initiatives.  Specifically, EOIR has identified a need to cut 200 of its authorized Federal positions and is identifying areas in which it can make cuts to contracts, including those supporting the Office of Information Technology, with the least amount of impact on operations.

Similarly, the USCIS backlog of affirmative asylum cases stands at over 1.16 million and is growing.[161]  USCIS does not have enough AOs to keep pace with the number of individuals who could be referred for credible fear interviews at the border, much less keep pace with new affirmative asylum receipts or even marginally reduce the affirmative asylum backlog.  In sum, the border security and immigration systems are badly strained and not functioning to provide

---

[156] *See* EOIR, *Adjudication Statistics: Pending Cases, New Cases, and Total Completions* (Jan. 18, 2024), https://www.justice.gov/eoir/workload-and-adjudication-statistics.

[157] *See* EOIR, *Adjudication Statistics: New Cases and Total Completions* (Oct. 12, 2023), https://www.justice.gov/d9/pages/attachments/2018/05/08/2_new_cases_and_total_completions.pdf; EOIR, *Adjudication Statistics: New Cases and Total Completions—Historical* 1 (Oct. 12, 2023), https://www.justice.gov/d9/pages/attachments/2022/09/01/3_new_cases_and_total_completions_-_historical.pdf.

[158] Consolidated Appropriations Act, 2024, Pub. L. 118–42, 138 Stat. 25, 133 ("[f]or expenses necessary for the administration of immigration-related activities of the Executive Office for Immigration Review, $844,000,000").

[159] Consolidated Appropriations Act, 2023, Pub. L. 117–328, 136 Stat. 4459, 4522 (2022) ("[f]or expenses necessary for the administration of immigration-related activities of the Executive Office for Immigration Review, $860,000,000"); EOIR, *FY 2024 Budget Request at a Glance*, https://www.justice.gov/d9/2023-03/eoir_fy_24_budsum_ii_omb_cleared_03.08.23.pdf (showing FY 2023 enacted budget providing EOIR $860 million).

[160] EOIR, *FY 2024 Budget Request at a Glance*, https://www.justice.gov/d9/2023-03/eoir_fy_24_budsum_ii_omb_cleared_03.08.23.pdf (providing the Current Services Adjustment as an increase of $78.3 million, bringing the inflation-adjusted amount to $938.3 million).

[161] OHSS analysis of USCIS Global Affirmative Data as of April 25, 2024 (noting that "[d]ata is limited to filings between FY2000 and March 31, 2024").

timely relief or protection for those who warrant it or timely consequences for those without a legal basis to remain, including those without viable asylum or protection claims.

The TCOs operating in the region, and the migrants they prey upon who intend to make the dangerous journey north, have taken notice of this situation. They understand that when the capacity of DHS to quickly process individuals at the border is strained, DHS is limited in its ability to deliver timely consequences. Because of these resource limitations, individuals are more likely than not to be released to pursue a years-long immigration court process during which, beginning 180 days after applying for asylum, they may be authorized to work.[162] These smuggling organizations have built a multi-billion-dollar industry, featuring online marketing campaigns to spread misinformation and sophisticated logistics networks designed to quickly funnel migrants to the parts of the border where DHS capacity is lower.[163]

While the emergency measures instituted by the Proclamation are in effect, the Departments will put in place extraordinary procedures to more quickly process individuals encountered at the southern border, reducing the time noncitizens spend in DHS facilities. The specific measures introduced by this rule are designed to further streamline DHS processes at the border so that DHS can more quickly deliver meaningful consequences to more individuals who cross unlawfully or without authorization within the resource and operational constraints that have limited DHS capacity to date.

Under this rule, while emergency border circumstances persist, the way noncitizens are processed, their eligibility for asylum, and the way in which their eligibility for protection is assessed, will change in three ways. First, during emergency border circumstances, those who

---

[162] *See* 8 CFR 208.7, 274a.12(c)(8). Sixty-seven percent of individuals encountered by CBP at and between POEs at the SWB between May 2023 and March 2024 were released, including 66 percent of such individuals in the second quarter of FY 2024. These individuals include noncitizens enrolled in an ICE Alternatives to Detention program. March 2024 OHSS Persist Dataset; *see also* OHSS, *Immigration Enforcement and Legal Processes Monthly Tables*, https://www.dhs.gov/ohss/topics/immigration/enforcement-and-legal-processes-monthly-tables (last updated May 10, 2024) ("CBP SW Border Encounters Book-Out Outcomes by Agency").

[163] *See, e.g.*, Priscilla Alvarez, *Human smugglers peddle misinformation to US-bound migrants on Facebook, watchdog says*, CNN (July 27, 2022), https://www.cnn.com/2022/07/27/politics/human-smuggling-misinformation/index.html; Bernd Debusmann Jr, *TikTok and Title 42 rumours fuel human smuggling at the US border*, BBC (July 8, 2023), https://www.bbc.com/news/world-us-canada-65848683.

enter the United States across the southern border and who are not described in section 3(b) of the Proclamation will be ineligible for asylum unless they demonstrate by a preponderance of the evidence that exceptionally compelling circumstances exist. As discussed in Section III.B.3.a of this preamble, the Departments expect that applying the limitation on asylum eligibility will encourage noncitizens to make an appointment to present at the SWB, take advantage of other lawful migration pathways, or not undertake the dangerous journey north to begin with.

Second, this rule will reduce the time it takes to process individuals placed in expedited removal at the border by changing the way CBP immigration officers identify and refer noncitizens for credible fear interviews. Under current title 8 procedures, noncitizens encountered at the border and processed for expedited removal are provided lengthy advisals regarding the credible fear and asylum process and are asked questions to ascertain whether they may potentially have a fear of persecution or torture.[164] During emergency border circumstances, DHS will move to a "manifestation of fear" process at the border, detailed below in Section III.B.3.b of this preamble, that will involve general (rather than individual) advisals and require individuals who have a fear of persecution or torture to manifest that fear, verbally, non-verbally, or physically, in order for DHS personnel to refer them for a credible fear interview.

Third, the limitation on asylum eligibility will be considered during credible fear interviews and reviews, and those who are subject to the limitation and are unable to establish a significant possibility of showing exceptionally compelling circumstances will be screened for eligibility for statutory withholding of removal and CAT protection under a heightened "reasonable probability of persecution or torture" standard—a higher standard than the "reasonable possibility" standard under the Circumvention of Lawful Pathways rule.

---

[164] 8 CFR 235.3(b)(2).

As the Departments described more fully in the Circumvention of Lawful Pathways rule, the current asylum system—in which a high number of migrants are initially determined to be eligible to pursue their claims, even though most ultimately are not granted asylum or protection at the merits stage—has contributed to the growing backlog of cases awaiting review by IJs.[165] The practical result is that those with meritorious claims may have to wait years for their claims to be granted, while individuals who are ultimately denied protection may spend years in the United States before being issued a final order of removal.[166] As the demographics of border encounters have shifted in recent years to include Mexicans claiming fear at a higher rate, and large numbers of non-Mexicans—who have historically been far more likely to assert fear claims—and as the time required to process and remove noncitizens ineligible for protection has grown (during which individuals may become eligible to apply for employment authorization), the deterrent effect of apprehending noncitizens at the SWB has become more limited.[167]

---

[165] 88 FR at 31315.

[166] *See supra* note 25.

[167] According to OHSS Persist data, Mexican nationals continued to account for 89 percent of total CBP SWB encounters in FY 2010, with northern Central Americans accounting for 8 percent and all other nationalities accounting for 3 percent. March 2024 OHSS Persist Dataset. Northern Central Americans' share of total CBP SWB encounters increased to 21 percent by FY 2012 and averaged 48 percent from FY 2014 to FY 2019, the last full year before the start of the COVID-19 pandemic. *Id.* Nationals from all other countries except Mexico and the northern Central American countries accounted for an average of 5 percent of total CBP SWB encounters from FY 2010 to FY 2013, and for 10 percent of total encounters from FY 2014 to FY 2019. *Id.* This transition has accelerated since the start of FY 2021, as Mexican nationals accounted for approximately 32 percent of total CBP SWB encounters in FY 2021 through March 2024, including roughly 29 percent in the first six months of FY 2024; northern Central Americans accounted for roughly 25 percent from FY 2021 through March 2024 (20 percent in FY 2024 through March 2024); and all other countries accounted for roughly 42 percent from FY 2021 through March 2024, including roughly 51 percent of FY 2024 encounters through March 2024. *Id.*

For noncitizens encountered at and between SWB POEs from FY 2014 through FY 2019 who were placed in expedited removal, nearly 6 percent of Mexican nationals made fear claims that were referred to USCIS for determination. OHSS analysis of Enforcement Lifecycle data as of December 31, 2023. In contrast, as discussed in Section III.B.3.a.iv of this preamble, from May 12, 2023 to March 31, 2024, 29 percent of all Mexican nationals processed for expedited removal at the SWB made fear claims, including 39 percent in February 2024. OHSS analysis of UIP ER Daily Report Data Dashboard as of April 2, 2024.

For noncitizens encountered at and between SWB POEs from FY 2014 through FY 2019, nearly 57 percent of people from northern Central America (i.e., El Salvador, Guatemala, and Honduras), and close to 90 percent of all other nationalities made fear claims that were referred to USCIS for determination. OHSS analysis of Enforcement Lifecycle data as of December 31, 2023. Of note, according to OHSS analysis of historic EOIR and CBP data, there is a clear correlation since FY 2000 between the increasing time it takes to complete immigration proceedings, which results in a lower share of noncitizens being removed, and the growth in non-Mexican encounters at and between SWB POEs. Both trends accelerated in the 2010s, as non-Mexicans became the majority of such encounters, and they have accelerated further since FY 2020, as people from countries other than Mexico and northern Central America now account for the largest numbers of such encounters. OHSS analysis of March 2024 OHSS Persist Dataset.

The provisions in this rule are intended to be emergency measures that impact the expedited removal process and eligibility for relief or protection only for those who enter the United States across the southern border during emergency border circumstances. Unfortunately, the significant efforts the Departments have made to address such circumstances to date have not been as effective as they could have been had Congress provided the personnel, infrastructure, technology, and broader reforms that the Departments have requested. Communities all over the United States are being adversely impacted as a result.  The goal of these measures is to quickly reduce unlawful and unauthorized entries at the border and to quickly impose decisions and consequences on those who cross our border unlawfully and lack a legal basis to remain.

3.  Description of the Rule and Explanation of Regulatory Changes

This rule amends the Departments' regulations to further the purpose of the Presidential Proclamation of June 3, 2024, which suspends and limits entry along the southern border to address the emergency border circumstances outlined in that Proclamation.  The rule does so by amending 8 CFR 208.13 and 1208.13 and adding regulatory provisions at 8 CFR 208.35, 235.15, and 1208.35 that (1) limit asylum eligibility for those who enter the United States across the southern border during emergency border circumstances described in the Proclamation and this rule, are not described in section 3(b) of the Proclamation, and do not establish the existence of exceptionally compelling circumstances; (2) alter the process for advising noncitizens of their rights to seek asylum and for identifying which noncitizens to refer to an AO for credible fear screening during emergency border circumstances; and (3) alter the standard for screening for statutory withholding of removal and CAT protection while such circumstances exist.[168]  Below

---

[168] The Departments understand that the President has directed the agencies to promptly consider issuing "any instructions, orders, or regulations as may be necessary to address the circumstances at the southern border."  Such actions may include other measures that are not addressed in this rule, and the Departments have considered and are continuing to consider such other actions.  The Departments believe that the changes made in this rule are the most appropriate means to begin addressing the concerns identified in the Proclamation, and the Departments will assess the effectiveness of this rule as they continue to consider other actions to respond to the President's direction.

is an explanation of the limitation and each change to the expedited removal and fear screening process.  The specific content of each provision and amendment is set forth in detail in Section III.C of this preamble.

a.  Limitation on asylum eligibility

As discussed above in Sections III.B.1 and 2 of this preamble, irregular migration is continuing to strain the Departments' ability to timely process, detain, and remove, as appropriate, and thus to swiftly deliver timely decisions and timely consequences to noncitizens at the southern border.  This challenge is exacerbated by the sheer number of migrants who invoke credible fear procedures at a POE or when they are encountered between POEs without following the lawful, safe, and orderly processes that DHS has made available.  The Departments have implemented the Circumvention of Lawful Pathways rule and complementary measures, but Congress has not provided the resources necessary to timely and effectively process and interview all those who invoke credible fear procedures through the expedited removal process at the southern border, particularly during times in which the country's border faces an emergency of the magnitude described in the Proclamation.  The record numbers of migrants invoking the credible fear procedures at the southern border exacerbate the risk of severe overcrowding in USBP facilities and POEs, and it creates a situation in which large numbers of migrants—only a small proportion of whom are likely to be granted asylum—are not able to be expeditiously removed but are instead referred to backlogged immigration courts.  This situation is self-reinforcing: the expectation of a lengthy stay in the United States and the lack of timely consequences for irregular migration encourage more migrants without potentially meritorious claims for asylum to make the dangerous journey to the southern border to invoke credible fear procedures at the southern border and take their chances on being allowed to remain in the country for a lengthy period.

For these reasons, pursuant to section 208(b)(1)(A), (b)(2)(C), (d)(5)(B) of the INA, 8 U.S.C. 1158(b)(1)(A), (b)(2)(C), (d)(5)(B), the Departments are adopting a limitation on asylum

eligibility for noncitizens who (1) enter the United States across the southern border during emergency border circumstances; (2) are not described in section 3(b) of the Proclamation; and (3) do not establish exceptionally compelling circumstances. *See* 8 CFR 208.13(g), 208.35(a), 1208.13(g), 1208.35(a). Section 3(b) of the Proclamation lists classes of individuals to whom the Proclamation's suspension and limitation on entry and this limitation on asylum eligibility does not apply; those classes are discussed in Section II.A of this preamble. The exceptionally compelling circumstances exception to this rule's limitation on asylum eligibility is discussed below in Sections III.B.3.a and III.C.2 of this preamble.

The limitation on asylum eligibility is needed to address the emergency border circumstances outlined in the Proclamation and this rule and responds to the President's direction to the Secretary of Homeland Security and the Attorney General to promptly consider issuing such instructions, orders, or regulations as may be necessary to address the circumstances at the southern border, including any additional limitations and conditions on asylum eligibility that they determine are warranted, subject to any exceptions that they determine are warranted. Under the circumstances described in the Proclamation, the Departments assess that the limitation on asylum is necessary to help streamline the Departments' processing of noncitizens, thereby conserving limited resources during the emergency border circumstances described in the Proclamation and this rule and allowing for enough resources to continue to process lawful cross-border trade and travel and noncitizens who present in a safe and orderly manner at a POE.[169]

---

[169] When it comes to determining the applicability of the Proclamation, CBP immigration officers, who first encounter noncitizens when they enter or attempt to enter, must determine whether a noncitizen is subject to the Proclamation under section 3(a), including whether the noncitizen is excluded from the suspension and limitation on entry under section 3(b). *See* 8 CFR 208.35(a), 1208.35(a). The Departments anticipate that, when determining whether the limitation on asylum eligibility applies, AOs and IJs will rarely have grounds to reach a different result from the CBP immigration officers. *See* 8 CFR 208.35(b), 1208.35(b). In part, the Proclamation's application turns on straightforward questions of status—e.g., whether someone was a noncitizen, Proclamation sec. 3(a)(i); was a noncitizen national, *id.* sec. 3(b)(i); was a lawful permanent resident, *id.* sec. 3(b)(ii); was a UC, *id.* sec. 3(b)(iii); or had a valid visa or other lawful permission to seek entry or admission into the United States or presented at a POE pursuant to a pre-scheduled time and place, *id.* sec. 3(b)(v). The Proclamation's application also turns on questions of historical fact, including whether the suspension and limitation on entry was in place at the relevant time, *id.* sec. 3(a), and whether someone was "permitted to enter by . . . a CBP immigration officer" based on two sets of specified

The Departments have further made the determination to apply the limitation on asylum eligibility to those who enter the United States across the southern border during emergency border circumstances irrespective of whether the noncitizen is encountered during such emergency border circumstances.  This will permit a consistent application of the rule to all those who enter across the southern border during such circumstances and are subject to this limitation on asylum eligibility, including those who evade detection at the southern border and are later placed in section 240 removal proceedings, as well as those who affirmatively apply for asylum. The Departments have considered applying the rule's asylum limitation only to those who enter and are encountered at the southern border during emergency border circumstances.  The Departments believe, however, that the rule's asylum limitation should avoid creating an incentive for noncitizens to take risky measures to evade detection, which would further strain resources dedicated to apprehension at the border.[170]

Additionally, the approach adopted in this rule is consistent with the Circumvention of Lawful Pathways rule, which, with narrow exceptions, applies to all those who enter during the two-year period currently specified in that rule, regardless of whether they are apprehended at or near the border during the 14-day period immediately after entry or within 100 miles of the border.  *See* 8 CFR 208.33(c), 1208.33(d).  Moreover, the Departments note that the provisions of §§ 208.35(b) and 235.15 would be applicable only to those who have entered the United States during the emergency border circumstances described in the Proclamation and this rule and are processed for expedited removal.  Thus, those provisions would not apply to those who have long since entered the United States.  Accordingly, the Departments have determined that it is reasonable to apply this rule's limitation on asylum eligibility consistent with the

considerations "at the time of the entry or encounter that warranted permitting the noncitizen to enter," *id.* Sec. 3(b)(vi)–(vii).  These two exceptions allow CBP immigration officers to permit the entry of noncitizens who present at the encounter with—for example—medical issues requiring immediate attention.  *See id.* sec. 3(b)(vi).

[170] The Departments note that adjudicators already make determinations regarding the noncitizen's date of arrival when determining whether the noncitizen is barred from filing an asylum application (unless meeting an exception) within one year of arrival.  *See* INA 208(a)(2)(B) and (D), 8 U.S.C. 1158(a)(2)(B) and (D).

Circumvention of Lawful Pathways rule, without regard to the date of encounter or commencement of proceedings.

Even if a noncitizen entered the United States across the southern border during emergency border circumstances and is not described in section 3(b) of the Proclamation, they may avoid application of the limitation on asylum eligibility if they establish by a preponderance of the evidence that exceptionally compelling circumstances exist.[171] Such circumstances necessarily exist where the noncitizen demonstrates that, at the time of entry, the noncitizen or a member of the noncitizen's family as described in 8 CFR 208.30(c) with whom the noncitizen was traveling faced an acute medical emergency; faced an imminent and extreme threat to their life or safety; or was a "victim of a severe form of trafficking in persons" as defined in 8 CFR 214.11.[172] 8 CFR 208.35(a)(2)(i), 1208.35(a)(2)(i). Acute medical emergencies would include, but would not be limited to, situations in which someone faces a life-threatening medical

---

[171] The Departments decline to adopt an exception mirroring the exception from the Circumvention of Lawful Pathways rule for those who present at a POE without a pre-scheduled time and place but show that it was not possible to access or use the DHS scheduling system due to language barrier, illiteracy, significant technical failure, or other ongoing and serious obstacle. *See* 8 CFR 208.33(a)(2)(ii)(B), 1208.33(a)(2)(ii)(B). This rule, unlike the Circumvention of Lawful Pathways rule, applies only in the emergency circumstances described in the Proclamation and the rule, where encounters strain the border security and immigration systems' capacity. And although the Circumvention of Lawful Pathways rule was also aimed at reducing irregular migration, it was focused on encouraging the use of lawful pathways, rather than the number of daily entrants. In these emergency border circumstances, this rule's exception for "exceptionally compelling circumstances" captures individuals with a time-sensitive imperative; such individuals may also be permitted to enter under one of the exceptions in section 3(b) of the Proclamation. And in these emergency border circumstances, the Departments have determined that individuals who do not qualify for this exception should wait for a CBP One appointment. Moreover, under the Circumvention of Lawful Pathways rule, this exception requires additional questioning of any noncitizen who entered at a POE and is subject to the rule—time that, in the aggregate, could diminish the Departments' ability to deploy resources to address the emergency circumstances that support application of this rule.

In addition, the Departments did not include an exception for a noncitizen who sought asylum or other protection in a country through which the noncitizen traveled and received a final decision denying that application. *See* 8 CFR 208.33(a)(2)(ii)(C), 1208.33(a)(2)(ii)(C). This rule serves a different purpose than 8 CFR 208.33(a)(2)(ii)(C) and 1208.33(a)(2)(ii)(C); specifically, this rule is aimed at deterring irregular migration and speeding up the border process during a period of high encounters, rather than encouraging noncitizens to seek protection in other countries. During the emergency border circumstances described in the Proclamation and this rule, narrowing the exceptions to those who are unable to wait for an appointment is key. Those who sought and were denied protection in another country will still be eligible for asylum if they enter pursuant to an appointment, meet another exception to the Proclamation, or establish exceptionally compelling circumstances, such as that at the time of entry they faced an acute medical emergency or an imminent and extreme threat to life or safety.

[172] The Departments note that noncitizens who are a "victim of a severe form of trafficking in persons" are already excepted from the Proclamation's suspension and limitation on entry as provided in section 3(b) of the Proclamation and are therefore also not subject to the rule's limitation on asylum eligibility. Nonetheless, the Departments have opted to retain "victims of severe form of trafficking in persons" as an exceptional circumstance to avoid any confusion and to ensure that the exceptions in this rule mirror the rebuttal circumstances the Departments adopted in the Circumvention of Lawful Pathways rule.

emergency or faces acute and grave medical needs that cannot be adequately addressed outside of the United States.  Examples of imminent and extreme threats would include imminent threats of rape, kidnapping, torture, or murder that the noncitizen faced at the time the noncitizen crossed the southern border, such that they cannot wait for an appointment at a pre-scheduled time and place or until this IFR's limitation on asylum eligibility is not in effect for an opportunity to present at a POE without putting their life or well-being at extreme risk; it would not include generalized threats of violence.

The "exceptionally compelling circumstances" exception mirrors the rebuttal circumstance the Departments adopted in the Circumvention of Lawful Pathways rule.  *See* 8 CFR 208.33(a)(3)(i), 1208.33(a)(3)(i).  That exception is adopted here for the reasons articulated for adopting it in the Circumvention of Lawful Pathways NPRM and rule and the exception is intended to apply to the same circumstances identified in that NPRM and rule.  *See, e.g.*, 88 FR at 11723; 88 FR at 31318, 31338, 31348, 31351, 31380, 31390, 31391–93.

Like the Circumvention of Lawful Pathways rule, this rule recognizes an additional exception that avoids the separation of families.  *See* 8 CFR 208.35(c), 1208.35(c).  Those noncitizens who are subject to the limitation on asylum eligibility and who do not establish exceptionally compelling circumstances under 8 CFR 208.35(a)(2)(i) or 1208.35(a)(2)(i) would be able to continue to apply for statutory withholding of removal and protection under the CAT, forms of protection to which the limitation does not apply if placed in section 240 removal proceedings.  Unlike asylum, spouses and minor children are not eligible for derivative grants of statutory withholding of removal or CAT protection.  *Compare* INA 208(b)(3)(A), 8 U.S.C. 1158(b)(3)(A) ("[a] spouse or child . . . of an alien who is granted asylum under this subsection may, if not otherwise eligible for asylum under this section, be granted the same status as the alien if accompanying, or following to join, such alien"), *with* INA 241(b)(3), 8 U.S.C. 1231(b)(3) (not providing for derivative statutory withholding of removal), *and* 8 CFR 1208.16(c) (not providing for derivative CAT protection); *see also Sumolang v. Holder*, 723 F.3d

1080, 1083 (9th Cir. 2013) (recognizing that the asylum statute allows for derivative beneficiaries of the principal applicant for asylum, but that the withholding of removal statute makes no such allowance).  Again, mirroring EOIR's family unity provision in the Circumvention of Lawful Pathways rule, *see* 8 CFR 1208.33(c), where a principal asylum applicant is eligible for statutory withholding of removal or CAT protection and would be granted asylum but for the limitation on eligibility established in this rule, and where an accompanying spouse or child as defined in section 208(b)(3)(A) of the INA, 8 U.S.C. 1158(b)(3)(A), does not independently qualify for asylum or other protection from removal or the principal asylum applicant has a spouse or child who would be eligible to follow to join that applicant as described in section 208(b)(3)(A) of the INA, 8 U.S.C. 1158(b)(3)(A), the noncitizen shall be excepted from the limitation on eligibility by the IJ if placed in section 240 removal proceedings.  8 CFR 1208.35(c).  The Departments have determined that the possibility of separating the family should be avoided.  *See* E.O. 14011, Establishment of Interagency Task Force on the Reunification of Families, 86 FR 8273, 8273 (Feb. 2, 2021) ("It is the policy of my Administration to respect and value the integrity of families seeking to enter the United States.").

In the Circumvention of Lawful Pathways rule, the Departments included a family unity provision in EOIR's regulations but not DHS's.  The Departments did so because they decided at that time that those who an AO concludes are subject to the Lawful Pathways presumption and who are not able to establish an exception or rebut the presumption during a credible fear screening may not be placed into the asylum merits interview process and may instead only be issued an NTA and placed into section 240 removal proceedings.  *See* 88 FR at 11725–26; 88 FR at 31336–37.  For purposes of this rule, the Departments have allowed for an asylum merits interview process at the discretion of USCIS that includes USCIS discretion to apply a parallel family unity provision.  *See* 8 CFR 208.35(c).  This provision is discretionary to allow USCIS flexibility as it implements the new process.  The Departments request comment on whether to

adopt a non-discretionary family unity provision for the asylum merits interview process in a final rule.

i. Authority to impose additional limitations on asylum eligibility

The Secretary and the Attorney General have authority to adopt this additional limitation on asylum eligibility.  Both have long exercised discretion, now expressly authorized by Congress, to create new rules governing the granting of asylum.  When section 208 of the INA was first enacted as part of the Refugee Act of 1980, it simply provided that the Attorney General "shall establish a procedure" for a noncitizen "to apply for asylum," and that the noncitizen "may be granted asylum in the discretion of the Attorney General if the Attorney General determines that such [noncitizen] is a refugee within the meaning of section 1101(a)(42)(A)."  8 U.S.C. 1158(a) (1982).  In 1980, the Attorney General, in the exercise of that broad statutory discretion, established several mandatory bars to the granting of asylum.  *See* 8 CFR 208.8(f)(1) (1980); Aliens and Nationality; Refugee and Asylum Procedures, 45 FR 37392, 37392 (June 2, 1980).  In 1990, the Attorney General substantially amended the asylum regulations, but exercised his discretion to retain the mandatory bars to asylum eligibility related to persecution of others on account of a protected ground, conviction of a particularly serious crime in the United States, firm resettlement in another country, and the existence of reasonable grounds to regard the noncitizen as a danger to the security of the United States.  *See* Aliens and Nationality; Asylum and Withholding of Deportation Procedures, 55 FR 30674, 30678, 30683 (July 27, 1990); *see also Yang v. INS*, 79 F.3d 932, 936–39 (9th Cir. 1996) (upholding firm-resettlement bar); *Komarenko v. INS*, 35 F.3d 432, 436 (9th Cir. 1994) (upholding particularly-serious-crime bar), *abrogated on other grounds by Abebe v. Mukasey*, 554 F.3d 1203 (9th Cir. 2009) (en banc).

In that 1990 rule, the Attorney General also codified another limitation that was first discussed in *Matter of Chen*, 20 I&N Dec. 16 (BIA 1989).  55 FR at 30678.  Specifically, although the statute defines a "refugee" and thus allows asylum for a noncitizen based on a

showing of past "persecution or a well-founded fear of persecution," INA 101(a)(42)(A), 8

U.S.C. 1101(a)(42)(A), by regulation, a showing of past persecution only gives rise to a

presumption of a well-founded fear of future persecution, which can be rebutted by showing that

circumstances have changed such that the noncitizen no longer has a well-founded fear of future

persecution or that the noncitizen can relocate to avoid persecution and under all the

circumstances it is reasonable to expect the noncitizen to do so.[173]  8 CFR 208.13(b)(1),

1208.13(b)(1).  Where the presumption is rebutted, the adjudicator, "in the exercise of his or her

discretion, shall deny the asylum application."[174]  8 CFR 208.13(b)(1)(i), 1208.13(b)(1)(i).  In

1990, Congress added a mandatory statutory bar for those with aggravated felony convictions.

Immigration Act of 1990, Pub. L. 101–649, sec. 515, 104 Stat. 4978, 5053.

    With the passage of IIRIRA, Congress added three categorical statutory bars to the ability

to apply for asylum for (1) noncitizens who can be removed, pursuant to a bilateral or

multilateral agreement, to a third country where they would not be persecuted on account of a

specified ground; (2) noncitizens who failed to apply for asylum within one year of arriving in

the United States; and (3) noncitizens who have previously applied for asylum and had the

application denied.  Pub. L. 104–208, div. C, sec. 604, 110 Stat. 3009, 3009–690 to –691.

Congress also adopted six mandatory bars to asylum eligibility that largely reflected the pre-

existing, discretionary bars that had been set forth in the Attorney General's asylum regulations.

These bars cover (1) noncitizens who "ordered, incited, assisted, or otherwise participated" in the

persecution of others; (2) noncitizens who, having been convicted of a "particularly serious

crime," constitute a danger to the United States; (3) noncitizens for whom there are serious

reasons to believe committed a "serious nonpolitical crime outside the United States" before

---

[173] As noted below, the internal relocation provision was added in 2000 by Asylum Procedures, 65 FR 76121, 76126 (Dec. 6, 2000).

[174] There is a narrow exception to this mandatory discretionary ground for denial, called "humanitarian asylum," where the noncitizen establishes "compelling reasons for being unwilling or unable to return to the [noncitizen's] country arising out of the severity of . . . past persecution" or "that there is a reasonable possibility that [the non-citizen] may suffer other serious harm upon removal to [the noncitizen's] country."  8 CFR 208.13(b)(1)(iii), 1208.13(b)(1)(iii).

arriving in the United States; (4) noncitizens for whom there are reasonable grounds to regard as a "danger to the security of the United States"; (5) noncitizens who are removable under a set of specified grounds relating to terrorist activity; and (6) noncitizens who were "firmly resettled" in another country prior to arriving in the United States. *Id.* at 3009–691 (codified at INA 208(b)(2)(A), 8 U.S.C. 1158(b)(2)(A)). Congress further added that aggravated felonies, defined in section 101(a)(43) of the INA, 8 U.S.C. 1101(a)(43), would be considered "particularly serious crime[s]." *Id.* at 3009–692 (codified at INA 208(b)(2)(B)(i), 8 U.S.C. 1158(b)(2)(B)(i)).

In IIRIRA, Congress also made clear that the Executive Branch may continue to exercise its broad discretion in determining whether to grant asylum by creating additional limitations and conditions on the granting of asylum. The INA provides that the Attorney General and Secretary "may by regulation establish additional limitations and conditions, consistent with [section 208], under which an alien shall be ineligible for asylum." INA 208(b)(2)(C), 8 U.S.C. 1158(b)(2)(C); *see* 6 U.S.C. 552(d); INA 103(a)(1), 8 U.S.C. 1103(a)(1). In addition, while section 208(d)(5) of the INA, 8 U.S.C. 1158(d)(5), establishes certain procedures for consideration of asylum applications, Congress specified that the Attorney General and Secretary "may provide by regulation for any other conditions or limitations on the consideration of an application for asylum" so long as those conditions or limitations are "not inconsistent with this chapter," INA 208(d)(5)(B), 8 U.S.C. 1158(d)(5)(B). In sum, the current statutory framework retains the broad discretion of the Attorney General (and, after the HSA, also the Secretary) to adopt additional limitations on the granting of asylum and procedures for implementing those limitations.

Previous Attorneys General and Secretaries have since invoked their authorities under section 208 of the INA, 8 U.S.C. 1158, to establish eligibility bars beyond those required by the statute itself. *See, e.g.*, Asylum Procedures, 65 FR 76121, 76126 (Dec. 6, 2000) (requiring consideration of the applicant's ability to relocate safely in his or her home country in assessing asylum eligibility); Aliens Subject to a Bar on Entry Under Certain Presidential Proclamations; Procedures for Protection Claims, 83 FR 55934 (Nov. 9, 2018) ("Proclamation Bar IFR") (limit

on eligibility for applicants subject to certain presidential proclamations);[175] *Asylum Eligibility and Procedural Modifications*, 85 FR 82260 (Dec. 17, 2020) ("TCT Bar final rule") (limit on eligibility for certain noncitizens who failed to apply for protection while in a third country through which they transited en route to the United States);[176] *Procedures for Asylum and Bars to Asylum Eligibility*, 85 FR 67202 (Oct. 21, 2020) (limits on eligibility for noncitizens convicted of certain criminal offenses);[177] *Inspection and Expedited Removal of Aliens; Detention and Removal of Aliens; Conduct of Removal Proceedings; Asylum Procedures*, 62 FR 10312, 10342 (Mar. 6, 1997) (IFR codifying mandatory bars and adding provision allowing for discretionary denials of asylum where "the alien can be removed to a third country which has offered resettlement and in which the alien would not face harm or persecution"); *see also Yang*, 79 F.3d at 936–39 (upholding firm-resettlement bar); *Komarenko*, 35 F.3d at 436 (upholding particularly-serious-crime bar).  Consistent with this historical practice, the Secretary and Attorney General exercised this authority when adopting the Lawful Pathways presumption of asylum ineligibility.  *See* Circumvention of Lawful Pathways rule, 88 FR 31314.[178]

## ii.  Litigation over the Proclamation Bar IFR

This rule places a limitation on asylum eligibility for those noncitizens who are described in the Proclamation subject to certain exceptions.  The Departments acknowledge prior judicial decisions addressing a different limit on asylum eligibility adopted pursuant to section 208(b)(2)(C) of the INA, 8 U.S.C. 1158(b)(2)(C), relating to suspensions and limitations on entry by presidential proclamation under section 212(f) of the INA, 8 U.S.C. 1182(f).  In *East Bay*

---

[175] *See O.A. v. Trump*, 404 F. Supp. 3d 109 (D.D.C. 2019) (vacating Proclamation Bar IFR).

[176] *See E. Bay Sanctuary Covenant v. Barr*, 519 F. Supp. 3d 663 (N.D. Cal. 2021) (preliminarily enjoining the TCT Bar final rule).

[177] *See Pangea Legal Servs. v. U.S. Dep't of Homeland Sec.*, 501 F. Supp. 3d 792, 827 (N.D. Cal. 2020) (granting temporary restraining order against operation of the rule and ordering defendants to show cause why the rule should not be preliminarily enjoined).

[178] The Circumvention of Lawful Pathways rule was vacated by *East Bay Sanctuary Covenant v. Biden*, 683 F. Supp. 3d 1025 (N.D. Cal. 2023).  But the Ninth Circuit has stayed that vacatur pending appeal, *see E. Bay Sanctuary Covenant v. Biden*, No. 23-16032 (9th Cir. Aug. 3, 2023), and thus the rule and its presumption remain in effect.  On February 21, 2024, the Ninth Circuit placed the case in abeyance pending settlement discussions.  *E. Bay Sanctuary Covenant v. Biden*, 93 F.4th 1130 (9th Cir. 2024).

*Sanctuary Covenant v. Biden*, 993 F.3d 640 (9th Cir. 2021) ("*East Bay III*"), the Ninth Circuit

affirmed a preliminary injunction against the Proclamation Bar IFR, which categorically

rendered certain noncitizens ineligible for asylum if they entered the United States in violation of

a presidential proclamation or other presidential order suspending or limiting the entry of

noncitizens along the southern border.  The relevant presidential proclamation in that case

suspended entry of all migrants along the southern border except those who entered at a POE.

*See id.* at 659.  The court held that the Proclamation Bar IFR was inconsistent with section

208(a) of the INA, 8 U.S.C. 1158(a), which provides that any migrant "who is physically present

in the United States or who arrives in the United States (whether or not at a designated port of

arrival and including an alien who is brought to the United States after having been interdicted in

international or United States waters), irrespective of such alien's status, may apply for asylum."

*Id.* at 670.[179]

     The Departments regard this rule as substantially different than the rule the Ninth Circuit

deemed invalid in *East Bay III*.  The Proclamation and limitation on asylum eligibility at issue

here differ significantly from the prior categorical bar on "manner of entry" because they do not

treat the manner of entry as dispositive in determining eligibility.  Rather, the limitation at issue

here turns on whether—during emergency border circumstances described in the Proclamation

and this rule—an individual has followed the lawful, safe, and orderly pathways that the United

States Government has established during these emergency situations when it is essential that

noncitizens use such pathways to ensure the United States Government's ability to manage the

border.  And even during these situations, AOs and IJs have the ability to except noncitizens

from the rule's asylum limitation where the noncitizens establish that an exceptionally

compelling circumstance exists.  *See* 8 CFR 208.35(a)(2)(i), 1208.35(a)(2)(i).  For example, a

noncitizen may be excepted from the limitation on asylum eligibility if they experienced an acute

---

[179] The court also held that the Proclamation Bar IFR likely did not properly fall under the good cause or foreign affairs exceptions to notice-and-comment rulemaking under 5 U.S.C. 553(a)(1) and (b)(B).  *See East Bay III*, 993 F.3d at 676–77.

medical emergency at the time of entry regardless of where that entry occurred. Other exceptionally compelling circumstances include, but are not limited to, if the noncitizen demonstrates that, at the time of entry, the noncitizen or a member of their family as described in 8 CFR 208.30(c) with whom the noncitizen was traveling faced an imminent and extreme threat to their life or safety or was a "victim of a severe form of trafficking in persons" as defined in 8 CFR 214.11. 8 CFR 208.35(a)(2)(i)(B)–(C), 1208.33(a)(2)(i)(B)–(C). Indeed, the rule's exceptionally compelling circumstances exception is identical to the grounds that would rebut the presumption of asylum ineligibility under the Circumvention of Lawful Pathways rule, which has been allowed to continue in effect despite litigation challenging its validity. *See E. Bay Sanctuary Covenant v. Biden*, No. 23-16032, 2023 WL 11662094, at \*1 (9th Cir. Aug. 3, 2023) (staying order vacating Circumvention of Lawful Pathways rule pending appeal). Furthermore, this rule does not implicate the same concerns as the prior categorical bar based on "manner of entry" because it applies only to individuals who enter during emergency border circumstances and would not treat solely the manner of entry as dispositive in determining eligibility even during such circumstances, given that the rule applies both at and between POEs and in light of the exceptions available under section 3(b) of the Proclamation and for exceptionally compelling circumstances under 8 CFR 208.35(a)(2) and 1208.35(a)(2).

Moreover, the Departments disagree with important aspects of the reasoning that the district court and Ninth Circuit relied upon in *East Bay III*. The Departments argued in *East Bay III* that section 208(a)(1) of the INA, 8 U.S.C. 1158(a)(1), by its plain terms requires only that a noncitizen be permitted to "apply" for asylum, regardless of their manner of entry. It does not require that a noncitizen be eligible to be granted asylum, regardless of their manner of entry. Indeed, the BIA has long taken account of a noncitizen's manner of entry in determining whether to grant asylum. *See Matter of Pula*, 19 I&N Dec. 467, 473 (BIA 1987) (holding that "manner of entry . . . is a proper and relevant discretionary factor to consider in adjudicating asylum applications"). The court in *East Bay III* rejected this argument, stating that "[e]xplicitly

authorizing a refugee to file an asylum application because he arrived between ports of entry and then summarily denying the application for the same reason borders on absurdity," 993 F.3d at 670 (emphasis omitted), but the statute draws a clear distinction between the two. Section 208(a) of the INA, 8 U.S.C. 1158(a), governs who may "apply for asylum" and includes several categorical bars, such as the bar for applications for noncitizens present in the country for more than one year. INA 208(a)(1), (2)(B), 8 U.S.C. 1158(a)(1), (2)(B); *see* INA 241(a)(5), 8 U.S.C. 1231(a)(5). Section 208(b) of the INA, 8 U.S.C. 1158(b), in turn, governs who is eligible to be granted asylum. Specifically, section 208(b)(1)(A) of the INA, 8 U.S.C. 1158(b)(1)(A), provides that the Attorney General or the Secretary "may grant asylum to an alien who has applied," INA 208(b)(2), 8 U.S.C. 1158(b)(2), then specifies six categories of noncitizens to whom "[p]aragraph (1)" (i.e., the discretionary authority to grant asylum to an applicant) "shall not apply." Any noncitizen falling within one of those categories may apply for asylum under section 208(a)(1) of the INA, 8 U.S.C. 1158(a)(1), but is categorically ineligible to receive it under section 208(b) of the INA, 8 U.S.C. 1158(b).

The broad preemptive sweep that the Ninth Circuit attributed to section 208(a)(1) of the INA, 8 U.S.C. 1158(a)(1), also fails to account for the discretionary nature of asylum. No noncitizen ever has a right to be granted asylum. The ultimate "decision whether asylum should be granted to an eligible alien is committed to the Attorney General's [and the Secretary's] discretion." *INS v. Aguirre-Aguirre*, 526 U.S. 415, 420 (1999). The *East Bay III* court did not dispute that manner of entry is a permissible consideration in determining whether to exercise that discretion to grant asylum in individual cases. 99 F.3d at 671; *see also Matter of Pula*, 19 I&N Dec. at 473; *Fook Hong Mak v. INS*, 435 F.2d 728, 730 (2d Cir. 1970) (Friendly, J.) (upholding the INS's authority to "determine[] certain conduct to be so inimical to the statutory scheme that all persons who have engaged in it shall be ineligible for favorable consideration").

The *East Bay III* court also suggested that a regulation categorically barring asylum based on manner of entry is inconsistent with the United States' commitments under the Refugee

Protocol, in which the United States adhered to specified provisions of the Refugee Convention. *See* 993 F.3d at 972–75. Even accepting *East Bay III*'s reasoning on this point, that reasoning is limited to a categorical eligibility bar premised on manner of entry; this IFR does not implicate the same concerns as the prior categorical bar on "manner of entry" for the reasons identified above. In any event, the *East Bay III* court's conclusion was incorrect. The United States' non-refoulement obligation under Article 33 of the Refugee Convention is implemented by statute through the provision in section 241(b)(3) of the INA, 8 U.S.C. 1231(b)(3)(A), for mandatory withholding of removal. This rule specifically preserves the availability of that protection from removal. The INA's provision in section 208 of the INA, 8 U.S.C. 1158, for the discretionary granting of asylum instead aligns with Article 34 of the Refugee Convention, which is precatory and does not require any signatory to actually grant asylum to all those who are eligible. *See, e.g.*, *INS v. Cardoza-Fonseca*, 480 U.S. 421, 440–41 (1987). The *East Bay III* court also misread Article 31(1) of the Refugee Convention, which pertains only to "penalties" imposed "on account of . . . illegal entry or presence" on refugees who, among other criteria, are "coming directly from a territory where" they face persecution. *See, e.g.*, *Singh v. Nelson*, 623 F. Supp. 545, 560–61 & n.14 (S.D.N.Y. 1985) (quoting the Refugee Convention). And a bar to the granting of the discretionary relief of asylum is not a penalty under Article 31(1), especially given that the noncitizen remains eligible to apply for statutory withholding of removal, which implements U.S. non-refoulement obligations under the Refugee Protocol. *See Mejia v. Sessions*, 866 F.3d 573, 588 (4th Cir. 2017); *Cazun v. U.S. Att'y Gen.*, 856 F.3d 249, 257 n.16 (3d Cir. 2017).

iii. Litigation over other limitations

The Departments also acknowledge other prior precedent concerning the scope of the Departments' statutory rulemaking authority under section 208(b)(2)(C) of the INA, 8 U.S.C. 1158(b)(2)(C). Specifically, when reviewing the TCT Bar final rule, the Ninth Circuit in *East Bay Sanctuary Covenant v. Garland*, 994 F.3d 962 (9th Cir. 2020) ("*East Bay I*"), held that a

new condition on asylum eligibility under section 208(b)(2)(C) of the INA, 8 U.S.C.

1158(b)(2)(C), must "further[] the purpose" of another provision in section 208 to be "consistent

with" it.  994 F.3d at 977, 977–80.  The Departments disagree.  A requirement that additional

asylum limitations can only "further[] the purpose" of the existing exceptions by either targeting

threats to the nation or promoting the purposes the Ninth Circuit identified in the safe-third-

country or firm-resettlement bars, *id.* at 977, is irreconcilable with the statute's meaning and

conflicts with its history.  Not only has Congress adopted asylum bars that do not further the

purpose the Ninth Circuit identified—e.g., the one-year filing deadline and the bar on successive

applications—it has granted to the Departments the broad discretion to add more such bars.  The

Ninth Circuit's approach is also inconsistent with *Trump v. Hawaii*, 585 U.S. 667, 690–91

(2018) (INA's express provisions governing entry "did not implicitly foreclose the Executive

from imposing tighter restrictions," even if restrictions addressed a subject that is "similar" to

one that Congress "already touch[ed] on").  The statutory asylum bars likewise do not foreclose

imposing further conditions, even if those conditions address subjects similar to those already in

the asylum statute.  *See, e.g.*, INA 241(a)(5), 8 U.S.C. 1231(a)(5) (barring from asylum those

whose orders of removal have been reinstated regardless whether they have asylum claims

stemming from events that occurred after the original order of removal); *see R-S-C v. Sessions*,

869 F.3d 1176, 1184 (10th Cir. 2017) (reconciling the reinstatement provision's bar on asylum

with section 208's allowing noncitizens to apply for asylum regardless of manner of entry).

Regardless, this rule is consistent with section 208 of the INA, 8 U.S.C. 1158, as a

limitation on asylum eligibility.[180]  The President has determined that, under certain emergency

---

[180] The Departments' interpretation of the phrase "consistent with" is supported by judicial interpretation of the term in other contexts.  The D.C. Circuit, for example, has cautioned against construing "consistent with" too narrowly in a Clean Air Act case.  *Envtl. Def. Fund, Inc. v. EPA*, 82 F.3d 451, 457 (D.C. Cir. 1996) (per curiam), *amended by* 92 F.3d 1209 (D.C. Cir. 1996).  The court emphasized that this "flexible statutory language" does not require "exact correspondence . . . but only congruity or compatibility" and underscored that the phrase's ambiguity warranted deference to the agency's policy.  *Id.*  Other courts have adopted the same understanding of "consistent with."  *See, e.g.*, *Jimenez-Rodriguez v. Garland*, 996 F.3d 190, 198 (4th Cir. 2021) ("The phrase 'consistent with' does not require 'exact correspondence . . . but only congruity or compatibility.'" (quoting *Nuclear Energy Inst., Inc. v. EPA*, 373 F.3d 1251, 1269 (D.C. Cir. 2004))); *Nat'l Wildlife Fed'n v. Sec'y of U.S. Dep't of Transp.*, 960 F.3d 872, 878

border circumstances, entries must be suspended and limited because in such circumstances the border security and immigration systems lack capacity to deliver timely decisions and timely consequences, which threatens to incentivize further migration.  And in light of such circumstances and their pernicious effects, the Departments have determined that special procedures must be used to quickly process the influx of noncitizens, including those seeking asylum.  Those determinations do not conflict with the text or structure of section 208 of the INA, 8 U.S.C. 1158, and are consistent with (and an appropriate exercise of the Departments' authority under) that provision.  Nothing more is required for the rule to constitute a valid exercise of authority under section 208(b)(2)(C) of the INA, 8 U.S.C. 1158(b)(2)(C).

Moreover, this rule's propriety is reinforced by the statutory bars on asylum Congress has enacted.  Just as Congress has chosen to promote systemic efficiency by prohibiting asylum applications filed more than one year after entry and by generally prohibiting noncitizens from pursuing successive asylum applications, INA 208(a)(2)(B)–(C), 8 U.S.C. 1158(a)(2)(B)–(C), this rule furthers systemic efficiency by limiting asylum in certain situations where the strains on the immigration system are at their peak.  Congress did not foreclose the Departments from likewise taking systemic considerations into account when exercising their discretion to add conditions or limitations on eligibility.  Indeed, the ultimate consideration when determining whether someone warrants a grant of relief as a matter of discretion is whether granting relief "appears in the best interests of th[e] country," *Matter of Marin*, 16 I&N Dec. 581, 584 (BIA 1978), a point Congress was aware of when it amended the INA in 1996, *see id.* (best interests standard preceded 1996 amendments by nearly two decades).  The Departments find that the rule's limitation on asylum eligibility furthers the efficiency aims of the asylum statute and is in the best interests of the United States because it allows the Departments to deliver timely

(6th Cir. 2020) ("[T]he phrase 'consistent with' cannot bear the weight that the Federation places on it.  Response plans are 'consistent' with the contingency plans if they 'show no noteworthy opposing, conflicting, inharmonious, or contradictory qualities'—in other words, if the documents put together are 'not self-contradictory.  Consistency does *not* mean exact, point-by-point correspondence." (cleaned up)).

decisions and timely consequences in order to address the emergency border circumstances discussed in the Proclamation and this rule.

Consistent with the best-interest standard, the BIA has long held a noncitizen's "circumvention of orderly refugee procedures" to be relevant to whether a favorable exercise of discretion is warranted. *Matter of Pula*, 19 I&N Dec. at 473. And the BIA has specifically considered as relevant factors the noncitizen's "manner of entry or attempted entry." *Id.* Although the rule places greater weight on these factors under certain emergency circumstances, this decades-old precedent establishes that the Departments can permissibly take into account manner of entry. And exactly how much weight to place on those factors, and whether to do so in weighing asylum eligibility, falls well within the broad discretion conferred on the Departments by section 208(b)(2)(C) of the INA, 8 U.S.C. 1158(b)(2)(C). *Cf. Lopez v. Davis*, 531 U.S. 230, 244 (2001); *Reno v. Flores*, 507 U.S. 292, 313 (1993); *Yang*, 79 F.3d at 936–37.

The Departments acknowledge that *Matter of Pula* did not consider a noncitizen's arrival at a POE to weigh against a discretionary grant of asylum. *See* 19 I&N Dec. at 473. But *Matter of Pula* also did not involve circumstances in which the country's border faced an emergency of a magnitude comparable to the emergency border circumstances described by the Proclamation and this rule, where even arrivals at POEs significantly contribute to the Departments' inability to process migrants and deliver timely decisions and timely consequences to those without a lawful basis to remain. Given the emergency border circumstances described by the Proclamation and the President's direction in section 3(d) of the Proclamation to promptly consider issuing any instructions, orders, or regulations as may be necessary to address the situation at the southern border; and given the strain on operations and resources that high volumes of new arrivals create, such that consequences cannot be appropriately delivered; the Departments believe that the rule's limitation on asylum eligibility should apply to noncitizens who enter the United States across the southern border, including at a POE during the emergency border circumstances described in the Proclamation and this rule, unless an exception applies.

In *Matter of Pula*, the BIA explained that a noncitizen's "circumvention of orderly refugee procedures," including their "manner of entry or attempted entry," is a relevant factor for asylum, 19 I&N Dec. at 473–74, and this rule merely takes such circumvention into account. Because the Proclamation contains an exception for arrivals at a pre-scheduled time and place under a process approved by the Secretary, this rule's limitation on asylum will also not apply to such arrivals. One of the mechanisms by which a noncitizen may arrive at a POE with a pre-scheduled time to appear is through the CBP One app. Use of the CBP One app creates efficiencies that enable CBP to safely and humanely expand its ability to process noncitizens at POEs, including those who may be seeking asylum. *See* 88 FR at 11719. Indeed, without CBP One, noncitizens could have longer wait times for processing at the POE depending on daily operational constraints and circumstances. *See* 88 FR at 31342. During emergency border circumstances, use of the CBP One app is especially critical because it allows DHS to maximize the use of its limited resources. *See, e.g.*, *id.* at 31317–18 (explaining the benefits of having noncitizens pre-schedule appointments using the CBP One app). The CBP One app and other lawful pathways that the United States Government has made available to those seeking to enter the United States, including to seek asylum or protection, are intended to allow for orderly processing. Therefore, those who "circumvent orderly refugee procedures," consistent with *Matter of Pula*, 19 I&N Dec. at 474, during emergency border circumstances without meeting one of the recognized exceptions will be ineligible for asylum.[181]

---

[181] As the BIA further explained with respect to the asylum statute as it existed at the time, "[a] careful reading of the language of [section 208(a)(1)] reveals that the phrase 'irrespective of such alien's status' modifies only the word 'alien.'" *Matter of Pula*, 19 I&N Dec. at 473. "The function of that phrase is to ensure that the procedure established by the Attorney General for asylum applications includes provisions for adjudicating applications from *any* alien present in the United States or at a land or port of entry, 'irrespective of such alien's status.'" *Id.* (collecting cases). Congress accordingly made clear that noncitizens like stowaways, who, at the time the Refugee Act was passed, could not avail themselves of our immigration laws, would be eligible at least to apply for asylum "irrespective of [their] status." *Id.* "Thus, while section 208(a) provides that an asylum application be accepted from an alien 'irrespective of such alien's status,' no language in that section precludes the consideration of the alien's status in granting or denying the application in the exercise of discretion." *Id.*

iv.  This limitation on asylum eligibility

For the reasons discussed above, the *East Bay* cases dealt with different limitations on asylum and involved different factual circumstances, and hence are distinguishable from this rule.[182]  Moreover, the Departments respectfully disagree with some of the substantive holdings of the Ninth Circuit and the district court as described above.  The Secretary and the Attorney General permissibly may determine that, during emergency border circumstances, it is in the "best interests of th[e] country," *Matter of Marin*, 16 I&N Dec. at 584, to limit asylum eligibility for those who enter in violation of the Proclamation, which, in turn, will allow the Departments to allocate their limited resources to prioritize processing noncitizens who do not enter in violation of it.  Nothing in section 208 of the INA, 8 U.S.C. 1158, forecloses that view, and securing the best interests of the country is a reasonable policy goal under section 208 and thus "consistent with" it.  INA 208(b)(2)(C), 8 U.S.C. 1158(b)(2)(C); *see Yang*, 79 F.3d at 939 (observing that "it is precisely to cope with the unexpected that Congress deferred to the experience and expertise of the Attorney General in fashioning section 208"); *see also id.* at 935 ("We must reject the argument that [the] regulation [establishing a categorical discretionary bar to asylum eligibility] exceeds the authority of the Attorney General if we find that the regulation has a 'reasonable foundation . . . that is, if it rationally pursues a purpose that it is lawful for the [immigration agencies] to seek.'" (quoting *Reno*, 507 U.S. at 309)).

Beyond the clear statutory text, settled principles of administrative law dictate that the Departments may adopt generally applicable eligibility requirements.  Those principles establish that it is permissible for agencies to establish general rules or guidelines in lieu of case-by-case assessments, so long as those rules or guidelines are not inconsistent with the statute, and that

---

[182] The Departments have considered the July 25, 2023 district court decision vacating the Circumvention of Lawful Pathways rule.  *See E. Bay Sanctuary Covenant v. Biden*, 683 F. Supp. 3d 1025 (N.D. Cal. 2023).  That decision applied the holdings of the other *East Bay* decisions generally, and the Departments do not see a need to address it separately except to note that as of publication the court's vacatur remains stayed pending appeal in the Ninth Circuit, and thus the rule is in effect.  *See E. Bay Sanctuary Covenant v. Biden*, No. 23-16032, 2023 WL 11662094, at *1 (9th Cir. Aug. 3, 2023).

principle is especially salient here as asylum is inherently discretionary in nature. *See Lopez*, 531 U.S. at 243–44 (rejecting the argument that the Bureau of Prisons was required to make "case-by-case assessments" of eligibility for sentence reductions and explaining that an agency "is not required continually to revisit 'issues that may be established fairly and efficiently in a single rulemaking'" (quoting *Heckler v. Campbell*, 461 U.S.458, 467 (1983))); *Reno*, 507 U.S. at 313–14 (holding that a statute requiring "individualized determination[s]" does not prevent immigration authorities from using "reasonable presumptions and generic rules" (quotation marks omitted)); *Fook Hong Mak*, 435 F.2d at 730 (upholding INS's authority to "determine[] certain conduct to be so inimical to the statutory scheme that all persons who have engaged in it shall be ineligible for favorable consideration" and observing that there is no legal principle forbidding an agency that is "vested with discretionary power" from determining that it will not use that power "in favor of a particular class on a case-by-case basis"); *see also Singh*, 623 F. Supp. at 556 ("attempting to discourage people from entering the United States without permission . . . provides a rational basis for distinguishing among categories of illegal aliens"); *Matter of Salim*, 18 I&N Dec. 311, 315–16 (BIA 1982) (before *Pula*, explaining that a certain form of entry can be considered an "extremely adverse factor which can only be overcome with the most unusual showing of countervailing equities"); *cf. Peulic v. Garland*, 22 F.4th 340, 346–48 (1st Cir. 2022) (rejecting challenge to *Matter of Jean*, 23 I&N Dec. 373 (A.G. 2002), which established strong presumption against a favorable exercise of discretion for certain categories of applicants for asylee and refugee adjustment of status under section 209(c) of the INA, 8 U.S.C. 1159(c) (citing cases)); *Cisneros v. Lynch*, 834 F.3d 857, 863–64 (7th Cir. 2016) (rejecting challenge to 8 CFR 1212.7(d), which established strong presumption against a favorable exercise of discretion for waivers under section 212(h) of the INA, 8 U.S.C. 1182(h), for certain classes of noncitizens, even if a few could meet the heightened discretionary standard (citing cases)).

The Departments recognize that in the Circumvention of Lawful Pathways rule they declined to adopt on a permanent basis the Proclamation Bar IFR because it conflicted with the

tailored approach in that rule and because barring all noncitizens who enter between POEs along the SWB was not the proper approach under the circumstances the Departments then faced. *See* 88 FR at 31432. The Departments continue to believe that the approach taken in the Proclamation Bar IFR conflicts with the tailored approach of the Circumvention of Lawful Pathways rule as well as the tailored approach in this rule, which borrows heavily from the Circumvention of Lawful Pathways rule. The Proclamation Bar IFR contained no exceptions and was open-ended, allowing for implementation of any future proclamations or orders regardless of their terms. *See* 83 FR at 55952. In contrast, like the Circumvention of Lawful Pathways rule, this rule is narrowly tailored to address the emergency border circumstances described in the Proclamation and the rule and includes exceptions to account for circumstances in which waiting for an end to the suspension and limitation on entry and the limitation on asylum eligibility is not possible. And by relating the rule to a specific proclamation and the circumstances described therein, the Departments have been able to tailor its provisions to the terms of the Proclamation and the circumstances under which it is applied.

Finally, the Departments acknowledge that, unlike the Circumvention of Lawful Pathways rule, neither the Proclamation nor this rule excepts Mexican nationals. *See* 8 CFR 208.33(a)(1)(iii), 1208.33(a)(1)(iii) (providing that the Lawful Pathways rebuttable presumption of asylum ineligibility applies only to those who enter the United States along the SWB after transiting through a third country). Traveling through a third country is a key part of the Circumvention of Lawful Pathways rule because one lawful pathway for obtaining protection is applying for protection in a third country. *See* 8 CFR 208.33(a)(2)(ii)(C), 1208.33(a)(2)(ii)(C). The Departments recognize that some Mexican nationals seek asylum and protection in the United States. Indeed, since 2021, DHS has seen a sharp increase in total SWB encounters of Mexican nationals, from a pre-pandemic (FY 2014 through FY 2019) average of approximately

239,000 to more than 717,000 in FY 2023.[183]  Of note, this increase in encounters has been accompanied by a sharp increase in referrals for credible fear interviews of Mexican nationals in expedited removal.  The percentage of Mexican nationals processed for expedited removal who claimed a fear of return averaged 6 percent in the pre-pandemic period (FY 2014 through FY 2019), and never exceeded 7 percent for any fiscal year.[184]  But 29 percent of all Mexican nationals processed for expedited removal at the SWB from May 12, 2023, to March 31, 2024, made fear claims, including 39 percent in February 2024.[185]  Because of this sharp increase from the historical average, the Departments believe that applying this rule to Mexican nationals will result in faster processing of a significant number of Mexican noncitizens and thereby significantly advance this rule's overarching goal of alleviating the strain on the border security and immigration systems while entry is suspended and limited under the Proclamation.  At the same time, the Departments continue to believe that, if encounters decrease to levels under which the systems do not experience the substantial strains they currently experience while the Circumvention of Lawful Pathways rule remains in effect, the application of that rule only to those noncitizens who travel through a third country en route to the United States appropriately accounts for the goals of encouraging migrants to seek protection in other countries or to use safe, orderly, and lawful pathways to enter the United States, ensuring the border security and immigration systems can efficiently process noncitizens, and affording asylum and other protection to those seeking it who establish their eligibility.

Under this rule, Mexican nationals will still be eligible for asylum in some circumstances—they may present at a POE pursuant to a pre-scheduled appointment, or, if they are unable to wait in Mexico while scheduling an appointment, they may be able to establish an

---

[183] March 2024 OHSS Persist Dataset; *see also* OHSS, *Immigration Enforcement and Legal Processes Monthly Tables*, https://www.dhs.gov/ohss/topics/immigration/enforcement-and-legal-processes-monthly-tables (last updated May 10, 2024) ("CBP SW Border Encounters by Agency and Selected Citizenship").

[184] OHSS Enforcement Lifecycle December 31, 2023.

[185] OHSS analysis of UIP ER Daily Report Data Dashboard as of April 2, 2024.

exception to the Proclamation or exceptionally compelling circumstances under the rule. Even if they are not able to do so, the rule does not preclude eligibility for statutory withholding of removal and CAT protection, and they will be able to seek such protection. In the absence of an exception, however, Mexican nationals should be ineligible for asylum under the rule because, during the emergency border circumstances described in the Proclamation and this rule, it is important to deter irregular entry by all noncitizens regardless of country of origin. And the above data make clear that additional incentives are necessary to encourage Mexican nationals to pursue the available lawful, safe, and orderly pathways, rather than entering the country unlawfully.

v. Application during credible fear screenings and reviews

The limitation on asylum eligibility adopted here applies during merits adjudications, *see* 8 CFR 208.13(g), 1208.13(g), but will most frequently be relevant for noncitizens who are subject to expedited removal under section 235(b)(1) of the INA, 8 U.S.C. 1225(b)(1). Noncitizens in expedited removal are subject to removal "without further hearing or review" unless they indicate an intention to apply for asylum or fear of persecution. INA 235(b)(1)(A)(i), 8 U.S.C. 1225(b)(1)(A)(i). Noncitizens in expedited removal who indicate an intention to apply for asylum or fear of persecution are referred to an AO for an interview to determine if they have a credible fear of persecution and should accordingly remain in proceedings for further consideration of the application. INA 235(b)(1)(A)(ii), (b)(1)(B)(i), (ii), 8 U.S.C. 1225(b)(1)(A)(ii), (b)(1)(B)(i), (ii). In addition, AOs consider whether a noncitizen in expedited removal may be eligible for statutory withholding of removal or for CAT protection. *See* 8 CFR 208.30(e)(2), (3).

This rule instructs AOs and IJs to apply the limitation it adopts during credible fear screenings and reviews. 8 CFR 208.35(b), 1208.35(b). Under the rule, when screening for asylum eligibility, the AO and IJ must determine whether there is a significant possibility that the noncitizen would be able to establish by a preponderance of the evidence that they were not

subject to the rule's limitation on asylum eligibility or that they will be able to establish by a preponderance of the evidence exceptionally compelling circumstances. For the reasons noted in the Circumvention of Lawful Pathways rule, the Departments expect that noncitizens rarely would be found excepted from the limitation on asylum for credible fear purposes and subsequently be found not to be excepted at the merits stage. *See* 88 FR at 31380–81.

The Departments recognize that in the recent past they changed course regarding whether to apply bars and conditions and limitations on asylum eligibility during credible fear screenings by rescinding provisions that would have applied the mandatory asylum bars during credible fear screenings. *See* 87 FR at 18135. In the Circumvention of Lawful Pathways NPRM, the Departments explained their reasoning for nevertheless applying that condition on asylum eligibility during credible fear screenings, stating that the rebuttable presumption would be less difficult to apply than other bars, limitations, or conditions because the facts regarding the presumption's applicability, exceptions, and rebuttal circumstances would generally be straightforward to apply. 88 FR at 11744–45. Indeed, the Departments have applied the presumption effectively in credible fear screenings for the time in which the Circumvention of Lawful Pathways rule has been in effect.[186]

The limitation adopted here is in many ways parallel to the Lawful Pathways rebuttable presumption—specifically, it borrows from the Circumvention of Lawful Pathways rule's rebuttal circumstances—although it is more straightforward because it does not include the Lawful Pathways rebuttable presumption's exceptions for those who applied and were denied

---

[186] In the post-May 12, 2023, period, the median time to refer noncitizens encountered by CBP at the SWB who claim a fear for credible fear interviews has decreased by 77 percent from its historical average, from 13 days in the FY 2014 to FY 2019 pre-pandemic period to 3 days in the four weeks ending March 31, 2024; for those who receive negative fear determinations or administrative closures that are not referred to EOIR, the median time from encounter to removal, in the same time frames, decreased 85 percent from 73 days to 11 days. Pre-pandemic medians based on OHSS analysis of OHSS Enforcement Lifecycle December 31, 2023; post-May 12 estimates based on OHSS analysis of operational CBP, ICE, USCIS, and DOJ/EOIR data downloaded from UIP on April 2, 2024. The Departments note that DHS recently published a notice of proposed rulemaking proposing that certain mandatory bars be considered at the screening stage under a reasonable possibility standard. Application of Certain Mandatory Bars in Fear Screenings, 89 FR 41347 (May 13, 2024). If DHS were to finalize that rule as drafted, this rule's "reasonable probability" standard would still apply when the noncitizen is subject to this rule's limitation on asylum eligibility.

asylum or other protection in a third country and those who were unable to schedule an

appointment through the CBP One app for certain reasons.  *See* 8 CFR 208.33(a)(2)(ii)(B)–(C),

1208.33(a)(2)(ii)(B)–(C).  Given the Departments' experience with implementing the

Circumvention of Lawful Pathways rule, the Departments are confident that the limitation and

exceptions established here will be just as straightforward to apply as the similar provisions are

for the Circumvention of Lawful Pathways rule.

b.  Manifestation of fear

      This rule also alters certain aspects of the expedited removal process for individuals who

enter across the southern border during emergency border circumstances and are not described in

section 3(b) of the Proclamation.  When an immigration officer inspects a noncitizen at a POE or

between POEs and determines that the noncitizen is inadmissible and will be subject to expedited

removal, current regulations require the immigration officer to take certain steps before ordering

the noncitizen removed from the United States.  *See* 8 CFR 235.3(b).  This process takes

approximately two hours per individual in USBP custody.  In particular, the immigration officer

conducts an inspection, including taking biometrics; running background checks; collecting

biographic information, citizenship, and place and manner of entry; and advising the noncitizen

of the charges against them.  8 CFR 235.3(b)(2)(i).  The noncitizen has an opportunity to provide

a response.  *Id.*  The officer must also read (or have read through an interpreter, if appropriate)

the information contained in the Form I-867A, Record of Sworn Statement in Proceedings under

Section 235(b)(1) of the Act, which advises the noncitizen of their ability to seek protection in

the United States.  *Id.*  The examining immigration officer must also read the noncitizen the

questions on the Form I-867B, Jurat for Record of Sworn Statement in Proceedings under

Section 235(b)(1) of the Act, which asks, among other things, whether the noncitizen has any

fear of return or would be harmed if returned.  *Id.*  After the noncitizen has provided answers to

the questions on Form I-867B, the immigration officer records the answers, and the noncitizen

then reads the statement (or has the statement read to them) and signs the statement.  *Id.*  On

average, USBP agents spend about 20 to 30 minutes of the inspection period completing both the Form I-867A and the Form I-867B.  Finally, a noncitizen who indicates a fear of return or an intention to seek asylum is served with and acknowledges receipt of a Form M-444, which includes more detailed information about the credible fear process.  8 CFR 235.3(b)(4)(i).

Instead of this current process, DHS is adding a new provision at 8 CFR 235.15(b)(4) to modify the process for determining whether a noncitizen who enters across the southern border and is not described in section 3(b) of the Proclamation during the emergency circumstances giving rise to the Proclamation's suspension and limitation on entry should be referred to an AO for a credible fear interview.  These procedures apply during emergency border circumstances. *See* 8 CFR 235.15(a).  Under the new rule, immigration officers will conduct an immigration inspection and, where the noncitizen will be subject to expedited removal, will advise the noncitizen of the removal charges against them and provide an opportunity to respond, consistent with existing practice and regulations outlined above.  8 CFR 235.3(b)(2)(i).  However, the immigration officer will not complete either the Form I-867A or Form I-867B or a sworn statement.  Moreover, the officer will not be required to provide individualized advisals on asylum or ask the noncitizen questions related to whether they have a fear.  *See* 8 CFR 235.15(b)(4).  Under the rule, the immigration officer will instead refer the noncitizen to an AO for a credible fear interview only if the noncitizen manifests a fear of return, expresses an intention to apply for asylum, expresses a fear of persecution or torture, or expresses a fear of return to the noncitizen's country or country of removal.  *See id*.  This manifestation can occur at any time in the process and can be expressed verbally, non-verbally, or physically.[187]  In such situations, the immigration officer will not proceed further with the removal and will comply

---

[187] By these terms, DHS intends to include a wide range of human communication and behavior, such that "non-verbally" could include things like noises or sounds without any words, while physical manifestations could include behaviors, with or without sound, such as shaking, crying, or signs of abuse.  *See* U.S. State Dep't, Bureau of Population, Refugees, and Migration, *Fact Sheet: U.S. Commemorations Pledges, Fact Sheet, Bureau of Population, Refugees, and Migration* (June 24, 2013), https://2009-2017.state.gov/j/prm/releases/factsheets/2013/211074.htm.  A noncitizen could thus manifest a fear of returning to a previous location without using actual words to state that they are specifically afraid of return to their home country or country of removal.

with the existing regulations, policies, and procedures, including as outlined in 8 CFR

235.3(b)(4), regarding processing and referring noncitizens for credible fear interviews.  At the

time that a noncitizen is referred for a credible fear interview, they will receive additional

information about the credible fear process that has the same substantive information as in the

current process, but without the requirement that such information be provided on a particular

form.

　　　DHS is making these changes to address the emergency circumstances at the southern

border discussed in the Proclamation and the rule in a manner consistent with its legal

obligations.  DHS has broad authority to change the procedures that immigration officers apply

to determine whether a noncitizen subject to expedited removal will be referred for a credible

fear interview by an AO so long as those procedures are consistent with the INA.  *See* INA

103(a)(1), (3), 8 U.S.C. 1103(a)(1), (3) (granting the Secretary the authority to establish

regulations and take other actions "necessary for carrying out" the Secretary's authority under

the immigration laws); *see also* 6 U.S.C. 202; *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State

Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 42 (1983) (emphasizing that agencies "must be given

ample latitude to adapt their rules and policies to the demands of changing circumstances"

(quotation marks omitted)).

　　　DHS believes that the above-described changes are fully consistent with the statutory

procedures governing expedited removal under section 235(b)(1)(A) of the INA, 8 U.S.C.

1225(b)(1)(A).  Section 235(b)(1)(A) of the INA, 8 U.S.C. 1225(b)(1)(A), does not specify the

relevant aspects of the procedures that immigration officers must follow to determine whether a

noncitizen who is subject to expedited removal can be ordered removed or whether the

noncitizen must be referred to an AO for a credible fear interview.  Instead, the statute provides

that the immigration officer may order removed any noncitizen who, subject to certain

exceptions, is arriving in the United States, or who is within a class of noncitizens subject to

expedited removal as designated by the Secretary, and who is inadmissible under sections

212(a)(6)(C) or 212(a)(7) of the INA, 8 U.S.C. 1182(a)(6)(C) or 1182(a)(7).  The statute further

provides that only those noncitizens who "indicate[] either an intention to apply for asylum . . .

or a fear of persecution," INA 235(b)(1)(A)(i), 8 U.S.C. 1225(b)(1)(A)(i), must be referred to an

AO for a credible fear interview, INA 235(b)(1)(A)(ii), 8 U.S.C. 1225(b)(1)(A)(ii).  But the

statute does not require immigration officers to affirmatively ask every noncitizen subject to

expedited removal if they have a fear of persecution or torture.  Moreover, Congress has not

provided a particular definition of the phrase "indicates . . . an intention."  The statute's text thus

gives DHS discretion to employ the procedures it reasonably concludes are appropriate to

implement section 235(b)(1)(A)(ii) of the INA, 8 U.S.C. 1225(b)(1)(A)(ii).[188]

Interpreting the statute in this manner is also consistent with the United States'

international law obligations.  As described in Section II.B of this preamble, the United States is

a party to the Refugee Protocol, which incorporates Articles 2 through 34 of the Refugee

Convention.  Article 33 of the Refugee Convention generally prohibits parties to the Convention

from expelling or returning "a refugee in any manner whatsoever to the frontiers of territories

where his life or freedom would be threatened on account of his race, religion, nationality,

membership of a particular social group or political opinion."  Refugee Convention, *supra*, 19

U.S.T. at 6276, 189 U.N.T.S. at 176.[189]  Neither the Refugee Convention nor the Protocol

prescribes minimum screening procedures that must be implemented.[190]  Rather, each state party

has the authority "to establish the procedure that it considers most appropriate, having regard to

---

[188] *See Vermont Yankee Nuclear Power Corp. v. Nat. Res. Def. Council, Inc.*, 435 U.S. 519, 543 (1978) ("Absent constitutional constraints or extremely compelling circumstances the administrative agencies should be free to fashion their own rules of procedure and to pursue methods of inquiry capable of permitting them to discharge their multitudinous duties." (quotation marks omitted)); *United States ex rel. Knauff* v. *Shaughnessy*, 338 U.S. 537, 543 (1950) ("[T]he decision to admit or to exclude an alien may be lawfully placed with the President, who may in turn delegate the carrying out of this function to a responsible executive officer of the sovereign, such as the Attorney General."); *Las Americas Immigrant Advoc. Ctr. v. Wolf*, 507 F. Supp. 3d 1, 18 (D.D.C. 2020).

[189] *See INS v. Stevic*, 467 U.S. 407, 428 & n.22 (1984); *Al-Fara v. Gonzales*, 404 F.3d 733, 743 (3d Cir. 2005) ("The 1967 Protocol is not self-executing, nor does it confer any rights beyond those granted by implementing domestic legislation.").

[190] UNHCR, *Handbook on Procedures and Criteria for Determining Refugee Status* ¶ 189 (Jan. 1992 ed., reissued Feb. 2019), https://www.unhcr.org/media/handbook-procedures-and-criteria-determining-refugee-status-under-1951-convention-and-1967.

its particular constitutional and administrative structure," as long as such procedures are consistent with the purposes of the Convention.[191]  The United States has also ratified the CAT, which includes a non-refoulement provision at Article 3 that prohibits the return of a person from the United States to a country where there are "substantial grounds for believing" the person would be tortured.  *See Pierre v. Gonzales*, 502 F.3d 109, 114 (2d Cir. 2007); *see id.* at 115 ("'[T]he United States understands the phrase, 'where there are substantial grounds for believing that he would be in danger of being subjected to torture,' as used in Article 3 of the Convention, to mean 'if it is more likely than not that he would be tortured.''" (quoting the Senate resolution of ratification)).  The CAT similarly does not prescribe screening requirements.  As such, the United States has broad discretion in what procedures are appropriate to implement, through domestic law, to satisfy its non-refoulement obligations.[192]

The United States implements its obligations under the Refugee Protocol and the CAT through the INA and related rulemaking, and it provides specified procedures—including in the expedited removal process, as described above—for seeking asylum or other protection in the United States.  The process outlined in this rule temporarily affords immigration officers the ability to refer noncitizens to an AO for a credible fear interview if the noncitizen manifests a fear of return, expresses an intention to apply for asylum, expresses a fear of persecution or torture, or expresses a fear of return to the noncitizen's country or country of removal.  The Departments have concluded that the manifestation standard is consistent with their obligations

---

[191] *Id.*

[192] Although neither the Refugee Convention nor the Refugee Protocol nor the CAT includes specific screening requirements, the United States is bound not to return noncitizens from the United States to countries where they would be tortured, or, with limited exceptions, to countries where they would be persecuted on account of a protected ground.  As discussed in detail above in Section III.A.1 of this preamble, the United States implements its non-refoulement obligations under Article 33 of the Refugee Convention (via the Refugee Protocol) through the statutory withholding of removal provision in section 241(b)(3) of the INA, 8 U.S.C. 1231(b)(3), not through the asylum provisions at section 208 of the INA, 8 U.S.C. 1158.  And the United States implements its obligations under the CAT through regulations.  *See* FARRA, Pub. L. 105–277, sec. 2242(b), 112 Stat. 2681, 2631–822 (8 U.S.C. 1231 note); 8 CFR 208.16(c), 208.17, 208.18, 1208.16(c), 1208.17, 1208.18.

(1) not to return noncitizens to countries where they would be persecuted; and (2) not to return noncitizens to countries where it is more likely than not that they would be tortured.[193]

In addition to changing to a "manifestation" standard, CBP is implementing operational changes to generally inform noncitizens subject to expedited removal that, if they have a fear of return, they should inform an immigration officer, and they will be referred to an AO for consideration of their fear claim.  DHS believes that these operational changes and notice provisions, as implemented, are consistent with the notice provision in section 235(b)(1)(B)(iv) of the INA, 8 U.S.C. 1225(b)(1)(B)(iv).[194]  Moreover, CBP will provide immigration officers with information on how to apply the manifestation standard, including that manifestation may occur verbally, non-verbally, or physically.

Upon implementation of this rule, signs will be posted in areas of CBP facilities where individuals are most likely to see those signs.  The signs will provide clear direction to individuals that, in addition to being able to inform the inspecting immigration officers of urgent medical or other concerns, they should inform the inspecting immigration officer if they have a fear of return, and that, if they do, they will be referred for a screening.  These signs will be in the languages spoken by the most common nationalities encountered by CBP and thus will likely

---

[193] 136 Cong. Rec. 36198 (1990) (recording the Senate's advice and consent to the ratification of the CAT, subject to certain reservations, understandings, and declarations, including that the phrase in Article 3 of the CAT, "'where there are substantial grounds for believing that he would be in danger of being subjected to torture,'" is understood to mean "'if it is more likely than not that he would be tortured'"); *see also Pierre*, 502 F.3d at 115.

[194] DHS acknowledges that an argument could be made that the requirement in section 235(b)(1)(B)(iv) of the INA, 8 U.S.C. 1225(b)(1)(B)(iv), which states that DHS "shall provide information concerning the asylum interview . . . to aliens who may be eligible," is not limited only to noncitizens who are eligible for a credible fear interview, but instead applies to noncitizens who are suspected of qualifying for expedited removal and "may" be eligible for an interview.  In all events, DHS is providing information to noncitizens who are being processed for expedited removal about their right to seek asylum and protection in the United States.  As explained below, DHS is posting signs on display for all noncitizens in CBP custody and including information in a video that will be on display for the vast majority of noncitizens in CBP custody, informing them that if they have a fear of return, they should inform an immigration officer and, if they do, an AO will conduct an interview and ask the noncitizens questions about any fear they may have.  Noncitizens who indicate a fear of return will be given a more detailed written explanation of the credible fear interview process prior to being referred for the interview.  That explanation will be translated into certain common languages or will be read to the noncitizen if required.

be understood by those described in the Proclamation and likely subject to the provisions of this rule.[195]

Moreover, in CBP's large capacity facilities—where the vast majority of individuals subject to expedited removal undergo processing—a short video explaining the importance of raising urgent medical concerns, a need for food or water, or fear of return will be shown on a loop in the processing areas and will also be available in those languages most commonly spoken by those noncitizens encountered by CBP who may be described in the Proclamation and likely subject to the provisions of this rule.[196]

The video will also explain to noncitizens that, if they inform an immigration officer that they have a fear, an AO will conduct an interview to ask questions about their fear. Consistent with CBP's Language Access Plan, CBP provides language assistance services for those who may not speak one of those languages.[197] CBP immigration officers have extensive experience and training in identifying whether an individual requires a translator or interpreter or is unable to understand a particular language. In addition, CBP facilities have "I Speak" signs, which are signs that assist literate individuals to identify a preferred language from one of over 60 possible languages.[198] Furthermore, individuals who are unable to read the signs or communicate

---

[195] Currently, these languages are English, Spanish, Mandarin, and Hindi.

[196] These large capacity facilities currently hold the vast majority of individuals in CBP custody. Although the videos will not be shown at smaller facilities, including small POEs and Border Patrol stations, these facilities house very few noncitizens who are subject to the asylum limitation. These small facilities will still post the relevant signs in the processing areas. And at these small facilities, resources are such that immigration officers will be able to devote a great deal of attention to observing individuals, including for any manifestations of fear or any indication that an individual requires assistance from a translator or reading assistance to understand the information provided at the facility, including the information provided on the signs. Immigration officers at these facilities are trained to provide such assistance as needed and will continue to do so under this rule.

[197] *See* CBP, *Language Access Plan* (Nov. 18, 2016), https://www.dhs.gov/sites/default/files/publications/final-cbp-language-access-plan.pdf; CBP, *Supplementary Language Access Plan* (Oct. 30, 2023), https://www.dhs.gov/sites/default/files/publications/cbp-updated-language-access-plan-2020.pdf.

[198] *See* CBP, *Language Access Plan* 7 (Nov. 18, 2016), https://www.dhs.gov/sites/default/files/publications/final-cbp-language-access-plan.pdf; *see also* DHS, *DHS Language Access Resources*, https://www.dhs.gov/publication/dhs-language-access-materials (last updated July 17, 2023); DHS, *I Speak… Language Identification Guide*, https://www.dhs.gov/sites/default/files/publications/crcl-i-speak-poster-2021.pdf (last updated Mar. 10, 2021).

effectively in one of the languages in which the sign and video will be presented will be read the contents of the sign and video in a language they understand.[199]

DHS's experience, based on the nature of CBP facilities and the utility of the existing signs, is that short, concise, and simple notifications are effective. This is because CBP holds individuals only for as long as it takes to complete inspection and processing, including conducting any basic medical screenings and making arrangements for transfer out of CBP custody. Particularly for those who are apprehended by USBP between POEs, noncitizens will go through a number of steps during their time in a CBP facility, including completion of processing paperwork, fingerprinting, and being interviewed by an inspecting immigration officer. In many USBP facilities, these steps occur at the same time as the facility provides showers and hygiene products, medical evaluations, and food and water. Given that noncitizens may move through other areas of the facility and do not remain in custody for a long period of time, DHS regularly places important signs in both the processing areas and the detention areas of its facilities, which are the locations where noncitizens spend time while being inspected or while in CBP custody; DHS is confident that noncitizens see these existing signs and that the new signs added as part of this rule are also likely to be seen. DHS has determined that more complicated videos and signs are less effective for conveying important information.

DHS acknowledges that these procedures represent a departure from the justification that the former Immigration and Naturalization Service ("INS") provided, in 1997, when it adopted the current procedures in 8 CFR 235.3(b)(2)(i). At the time, INS explained that adopting these procedures would "ensure that bona fide asylum claimants are given every opportunity to assert their claim[s]," and that it was including the requirement that immigration officers must provide

---

[199] These videos and signs will be presented in a manner that is consistent with how CBP provides other important notifications to individuals in its facilities. CBP utilizes posters for other critical information, such as ensuring that individuals are on the lookout for those who may commit suicide, advising all children in custody of the amenities available to them (e.g., food, water, medical care, blankets, and hygiene products), communicating its zero tolerance regarding sexual assault, and conveying critical information about oversight entities such as the Office of the Inspector General. CBP also has a video targeted towards UCs explaining the process that they will go through. These signs and videos are similarly posted in the areas of CBP facilities where DHS is confident they are likely to be seen by noncitizens being processed.

advisals about the credible fear process and ask questions about fear as "safeguards" to "protect potential asylum claimants." *See* 62 FR at 10318–19. INS further explained that these procedures would "not unnecessarily burden[] the inspections process or encourag[e] spurious asylum claims." *Id.* at 10318. While such procedures have remained in place since 1997, this fact alone is not an indication that they are required by the statute, and DHS maintains discretion to update the procedures in a manner consistent with the statute. *See FCC v. Fox Television Stations, Inc.*, 556 U.S. 502, 515 (2009) (holding that an agency changing an established rule need not justify the change with a more detailed justification than that supporting the original so long as it can show "good reasons" for the new policy). Given the extraordinary circumstances currently facing the Departments, DHS has determined it is reasonable to change the procedures here.

When the existing regulations were adopted in 1997, the situation at the border was different. In 1998 (the first full year that statistics concerning the expedited removal process were available), approximately 80,000 noncitizens were processed for expedited removal.[200] In that same year, AOs conducted fewer than 3,000 credible fear interviews[201] and IJ reviews numbered around 100.[202] Additionally, at that time, expedited removal was applied only to "arriving aliens," noncitizens processed at a POE, not noncitizens encountered between POEs.[203] Expedited removal was not extended to certain noncitizens encountered after entering between POEs until 2004. *See* Designating Aliens for Expedited Removal, 69 FR 48877 (Aug. 11, 2004) (extending expedited removal to noncitizens encountered within 100 air miles of the border and within 14 days of entry). At that time, USBP apprehended approximately 1.1 million noncitizens

---

[200] *See* INS, *1998 Statistical Yearbook of the Immigration and Naturalization Service* 203 (Nov. 1998), https://www.dhs.gov/sites/default/files/publications/Yearbook_Immigration_Statistics_1998.pdf.

[201] *See id.* at 91.

[202] EOIR, *Statistical Yearbook 2000*, at D1 (Jan. 2001), https://www.justice.gov/sites/default/files/eoir/legacy/2001/05/09/SYB2000Final.pdf (reporting that EOIR received 90 credible fear reviews in FY 1998).

[203] *See* 62 FR at 10318–19; *compare* INA 235(b)(1)(A)(i), 8 U.S.C. 1225(b)(1)(A)(i) (applying expedited removal to noncitizens arriving at ports of entry), *with* INA 235(b)(1)(A)(iii), 8 U.S.C. 1225(b)(1)(A)(iii) (permitting the application to designated noncitizens).

between POEs annually.[204]  The numbers have changed significantly since that time.  In FY

2023, USBP apprehended more than 2 million noncitizens between POEs along the SWB.[205]  In

February 2024, USBP processed more than 33,000 individuals for expedited removal,[206] and

USBP processed more than 28,000 in March 2024.[207]  Since May 2023, USCIS has completed

about 3,300 credible fear interviews per week of individuals encountered at and between SWB

POEs,[208] and in FY 2023, IJs reviewed over 34,000 credible fear decisions.[209]  These high levels

of encounters and credible fear referrals impose a significant burden on the expedited removal

process and have strained DHS and EOIR resources, substantially impairing the Departments'

ability to deliver timely decisions and timely consequences.  At a processing time of

approximately 2 hours per person, USBP agents spent approximately 56,000 hours—the

equivalent of approximately 2,333 calendar days—processing the approximately 28,000

expedited removal cases in March 2024 under the current process.  High numbers, such as those

giving rise to the Proclamation and this rule, increase the likelihood that USBP facilities will

become quickly overcrowded.[210]  This type of crowding in USBP facilities creates health and

safety concerns for noncitizens and Government personnel.[211]

    Additionally, compared to 1997, today's high levels of migration impose a severe strain

on the credible fear process.  AOs and IJs must devote substantial resources to credible fear

---

[204] CBP, *United States Border Patrol Nationwide Encounters Fiscal Year 1925-2020*, https://www.cbp.gov/sites/default/files/assets/documents/2021-Aug/U.S.%20Border%20Patrol%20Total%20Apprehensions%20%28FY%201925%20-%20FY%202020%29%20%28508%29.pdf (last accessed May 27, 2024).

[205] CBP, *Southwest Land Border Encounters*, https://www.cbp.gov/newsroom/stats/southwest-land-border-encounters (last modified May 15, 2024).

[206] OHSS analysis of data downloaded from UIP on April 2, 2024.

[207] OHSS analysis of data downloaded from UIP on April 2, 2024.

[208] OHSS analysis of data downloaded from UIP on April 2, 2024.

[209] *See* EOIR, *Adjudication Statistics: Credible Fear and Reasonable Fear Review Decisions* (Oct. 12, 2023), https://www.justice.gov/d9/pages/attachments/2018/10/26/7_credible_fear_review_and_reasonable_fear_review_decisions.pdf.

[210] *See* Decl. of Matthew J. Hudak ¶¶ 11, 17, *Florida v. Mayorkas*, Case No. 3:22-cv-9962 (N.D. Fla. May 12, 2023) (Dkt. 13–1).

[211] *Id.*

interviews and reviews.[212]  Despite the strengthened consequences in place at the SWB through the Circumvention of Lawful Pathways rule and the complementary measures that have led to record returns and removals, encounter levels and credible fear referrals are exceeding the capacity of the expedited removal process.[213]  Therefore, DHS has determined that a different approach is needed here.  The manifestation standard in the new rule is designed to reasonably help meet these challenges during emergency border circumstances.  It is intended to help immigration officers process noncitizens more expeditiously, while still affording opportunities for those seeking protection to do so.

DHS acknowledges that, by implementing a manifestation standard in the circumstances outlined in this rule, it is temporarily eliminating the requirement to provide individualized advisals and ask affirmative questions via Forms I-867A and B.  DHS has determined that, in light of the circumstances giving rise to the Proclamation and this rule, it is critical to have a system in place that more effectively and efficiently identifies those who may have a fear of return or indicate an intention to seek asylum.  DHS is making the decision to use the manifestation standard consistent with the statute, as described above, and for the reasons outlined below.  At bottom, based on DHS's long experience inspecting and interviewing individuals, DHS has determined that a manifestation approach is the most appropriate way to address emergency border circumstances while still sufficiently affording the ability to seek protection.  Specifically, DHS makes this determination based on its significant experience relating to the inspection of individuals seeking entry and admission into the United States.  DHS

---

[212] USCIS closed or adjudicated an estimated 135,000 credible fear interviews resulting from SWB encounters in FY 2023, up from an average of 52,000 from 2010 to 2019 and an average of 5,400 from 2005 to 2009.  OHSS analysis of March 2024 OHSS Persist Dataset and Enforcement Lifecycle December 31, 2023.  *See* OHSS, *Immigration Enforcement and Legal Processes Monthly Tables*, https://www.dhs.gov/ohss/topics/immigration/enforcement-and-legal-processes-monthly-tables (last updated May 10, 2024) (reflecting ever increasing numbers of credible fear interview screenings at the "SW Border Credible Fear Screenings Referred to USCIS by citizenship" tab); *see also* 88 FR at 31314, 31326, 31381.

[213] *See* Decl. of Blas Nuñez-Neto ¶¶ 9–10, *E. Bay Sanctuary Covenant v. Biden*, No. 18-cv-6810 (N.D. Cal. June 16, 2023) (Dkt. 176–2); Decl. of Matthew J. Hudak ¶¶ 10–12, *Florida v. Mayorkas*, No. 3:22-cv-9962 (N.D. Fla. May 12, 2023) (Dkt. 13–1); Decl. of Enrique M. Lucero ¶ 7, *Innovation Law Lab v. Wolf*, No. 19-15716 (9th Cir. Mar. 3, 2020) (Dkt. 95–3).

immigration officers have expertise observing and inspecting individuals, as they consistently encounter and inspect large numbers of people every day.  In FY 2019, prior to COVID-19, for example, the approximately 28,000 officers of CBP's Office of Field Operations[214] processed more than 1.1 million people at POEs every day.[215]  USBP's 20,000 agents[216] encountered more than 2 million people on the SWB in FY 2023.[217]

In addition, DHS, including through its predecessor agencies, has been implementing the expedited removal provisions since 1997.  It therefore has nearly 30 years of experience completing the Form I-867A advisals and asking the questions on Form I-867B.[218]  Based on this experience, it is DHS's determination that, when individuals are asked affirmative questions, such as those on Form I-867B, individuals are more likely to respond in the affirmative, even if they do not in fact have a fear of return or intention of seeking asylum.  Moreover, based on this experience, DHS concludes that providing noncitizens with specific advisals on fear claims— particularly given the emergency context of this rule and because few if any other advisals are provided—would be suggestive and prompt many individuals to respond in the affirmative even if they do not have any actual fear or intention to seek asylum.  For this reason, as well, DHS has made the determination, based on its experience and expertise inspecting noncitizens, to temporarily adjust its approach to individualized advisals and questions about fear.

As part of this approach, DHS is temporarily forgoing asking the fear questions on Form I-867B with respect to noncitizens who (1) are described in § 208.13(g), (2) are not described in section 3(b) of the Proclamation, and (3) are processed for expedited removal.  DHS anticipates

---

[214] *See* CBP, *About CBP: Leadership & Organization, Executive Assistant Commissioners' Offices*, https://www.cbp.gov/about/leadership-organization/executive-assistant-commissioners-offices (last updated Jan. 30, 2024).

[215] *See* CBP, *On a Typical Day in 2019, CBP…*, https://www.cbp.gov/newsroom/stats/typical-day-fy2019 (last modified May 11, 2022).

[216] *See* CBP, *About CBP: Leadership & Organization, Executive Assistant Commissioners' Offices*, https://www.cbp.gov/about/leadership-organization/executive-assistant-commissioners-offices (last updated Apr. 19, 2024).

[217] *See* CBP, *Southwest Land Border Encounters*, https://www.cbp.gov/newsroom/stats/southwest-land-border-encounters (last modified May 15, 2024).

[218] *See* 62 FR at 10312, 10318–19.

that this approach will likely lead to a higher proportion of those referred having colorable claims for protection. Based on the expertise of DHS in administering Form I-867B, it has determined that affirmative questions are suggestive and account for part of the high rates of referrals and screen-ins that do not ultimately result in a grant of asylum or protection.[219] DHS believes that those noncitizens who indicate a fear of return on their own, in the absence of suggestive questions, are more likely to be urgently seeking protection. Indeed, it is DHS's experience and assessment that asking questions is likely to lead individuals to answer yes, even if they do not actually have a fear of persecution or torture.[220] DHS acknowledges that there are mixed opinions on this point and that this may not be the case for all individuals, such that questioning may be helpful in order for some individuals to feel comfortable articulating a fear.[221] DHS recognizes that the manifestation standard, as with any other screening standard,

---

[219] From 2014 through 2019, of total SWB encounters with positive fear determinations, only 18 percent of EOIR case completions ultimately resulted in a grant of protection or relief. OHSS Enforcement Lifecycle December 31, 2023.

[220] This is also reflected in the behavioral science concept of "acquiescence," in which individuals tend to "consistently agree to questionnaire items, irrespective of item directionality." Shane Costello & John Roodenburg, *Acquiescence Response Bias – Yeasaying and Higher Education*, 32 Australian Ed. & Dev. Pysch. 105, 105 (2015). Studies have shown that this bias is higher amongst those with lower education levels and from countries that score higher on scales of corruption or collectivism. *See, e.g.*, Beatrice Rammstedt, Daniel Danner & Michael Bosnjak, *Acquiescence Response Styles: A Multilevel Model Explaining Individual-Level and Country-Level Differences*, 107 Personality & Individual Differences 190 (2017); Seth J. Hill & Margaret E. Roberts, *Acquiescence Bias Inflates Estimates of Conspiratorial Beliefs and Political Misperceptions*, 31 Pol. Analysis 575 (2023).

[221] DHS acknowledges that some studies of the expedited removal process concluded that the Form I-867A information and the Form I-867B questions are important protections, and that failure to read the advisals led to lower referrals for credible fear interviews. *See, e.g.*, Allen Keller et al., *Study on Asylum Seekers in Expedited Removal as Authorized by Section 605 of the International Religious Freedom Act of 1998: Evaluation of Credible Fear Referral in Expedited Removal at Ports of Entry in the United States* 16–18 (2005), https://www.uscirf.gov/sites/default/files/resources/stories/pdf/asylum_seekers/evalCredibleFear.pdf ("USCIRF Report") (finding that noncitizens who are read the information in Form I-867A are seven times more likely to be referred for a credible fear interview and "the likelihood of referral for a Credible Fear interview was roughly doubled for each fear question asked"); *see also* U.S. Gov't Accountability Off., *Opportunities Exist to Improve the Expedited Removal Process*, No. GAO/GGD-00-176 (Sept. 2000). DHS acknowledges that one study concluded that there was "little evidence" that the advisals and fear questions prompted noncitizens to make fear claims, but rather most of the noncitizens whose cases were studied "spontaneously expressed fear of returning to their home country." *See* USCIRF Report at 21. The same study noted that three quarters of those had been read the advisals on Form I-867A. *See id.* Given the small sample size (n=73) and the report's uncertain conclusion, this report does not alleviate CBP's long held "concerns that [noncitizens] may be 'prompted' to express fears to officers by the I-867B fear questions." *Id.* As in 2005, at the time of the report, DHS continues to have such concerns, and DHS further believes that the individualized advisals on Form I-867A raise similar "prompting" concerns. And, even to the extent that the study concluded otherwise, DHS notes that, under the manifestation standard outlined in the rule, noncitizens continue to have the ability to affirmatively manifest a fear. Thus, considering the current situation at the border that gives rise to the Proclamation and this rule and the need to allocate limited resources to those urgently seeking protection, DHS believes that, notwithstanding the study's finding, the approach taken in this rule

could result in some noncitizens with meritorious claims not being referred to a credible fear interview. However, in light of the emergency border circumstances facing the Departments and addressed by the Proclamation and this rule, DHS believes the standard is appropriate and necessary. During emergency border circumstances, it is critical for the Departments to devote their processing and screening resources to those urgently seeking protection while quickly removing those who are not. DHS believes that the manifestation standard, rather than affirmative questioning, better achieves this balance in emergency border circumstances.

Additionally, DHS is eliminating the requirement that officers and agents read the individualized advisals on Form I-867A. DHS plans to replace these advisals with a generalized notice—for all individuals in CBP facilities—of the ability to raise a claim of fear of persecution or torture. DHS is making this change based on its experience suggesting that, like with the Form I-867B questions, individualized Form I-867A advisals would be suggestive and would likely lead many individuals to claim a fear of return when they otherwise would not, particularly given the emergency context of this rule and because there are few if any other advisals provided. Based on its experience, DHS determines that receiving these advisals on their own is also suggestive.[222] Thus, in the context of inspecting individuals who (1) are described in § 208.13(g), (2) are not described in section 3(b) of the Proclamation, and (3) are processed for expedited removal, DHS has determined not to require the provision of such suggestive advisals. DHS acknowledges that, like with the Form I-867B questions, there are studies that show that

---

provides an appropriate standard for the emergency border circumstances at issue. As noted, CBP will be providing signs and videos advising, in a general matter, that individuals may express a fear of return. Accordingly, DHS has fully considered and weighed the contrary evidence and has concluded that the rule adopts the appropriate approach to help meet the challenge when emergency border circumstances are present.

[222] This determination is based, in part, on CBP's experience that the language in specific, individualized advisals often serves as a prompt for noncitizens to express a fear while in CBP custody. This is, in part, because CBP understands that TCOs coach noncitizens and advise them to listen for certain words in the language of particular advisals as a prompt to express a fear. While it is possible that TCOs will provide noncitizens information about how to manifest fear, even in the absence of affirmative advisals, CBP believes that, at least at the outset of the process, individuals without such a fear or intent to seek asylum are less likely to remember the information a TCO provided in the absence of individualized advisals. Additionally, CBP believes that individuals who do have a fear of return or intend to seek asylum will generally make such a claim even in the absence of such advisals.

such advisals make it more likely that a noncitizen will indicate a fear of return.[223]  However, based on DHS's experience, the nature of the emergency border circumstances facing the Departments, and the statutory requirements, DHS has determined that the approach taken here—eliminating the requirement to provide individualized advisals but providing signage and videos—is appropriate.[224]

Indeed, DHS notes that the manifestation standard has been used in other urgent and challenging situations to identify noncitizens with fear claims.  This standard has long been used by the United States Coast Guard, a DHS component, to determine whether an at-sea protection screening interview is required for migrants interdicted at sea.[225]  This standard was also adopted by the United States Government to screen family units during the pendency of the Title 42 public health Order, when the Government was similarly dealing with urgent, exigent circumstances—the global pandemic—while still allowing noncitizens an opportunity to seek protection.[226]

DHS believes that the manifestation standard is reasonably designed to identify meritorious claims even if a noncitizen does not expressly articulate a fear of return. Manifestations may be verbal, non-verbal, or physical.[227]  A manifestation of fear may present with non-verbal or physical cues, through behaviors such as shaking, crying, fleeing, or changes

---

[223] *See, e.g.*, USCIRF Report at 16–18.

[224] DHS considered whether to provide a short, individualized advisal to inform noncitizens of their ability to seek asylum, in addition to these signs and videos.  But DHS determined that such a short, individualized advisal would be unlikely to convey information more effectively than the signs and videos that CBP already intends to use as a general notification, and that even a short advisal would take undue time to administer.  Moreover, CBP assesses that the signs and videos providing general notification of the ability to seek asylum are less suggestive than short, individualized advisals would be.

[225] U.S. State Dep't, Bureau of Population, Refugees, and Migration, *Fact Sheet: U.S. Commemorations Pledges* (June 24, 2013), https://2009-2017.state.gov/j/prm/releases/factsheets/2013/211074.htm (notifying the public that U.S. Coast Guard personnel were provided updated training "on identifying manifestations of fear by interdicted migrants").

[226] *See Huisha-Huisha v. Mayorkas*, 27 F.4th 718, 732–33 (D.C. Cir. 2022); CBP, Office of Field Operations, *Processing of Noncitizens Manifesting Fear of Expulsion Under Title 42* (May 21, 2022); USBP, *Guidance Regarding Family Units Moving Forward Under Title 42* (May 21, 2022).

[227] *See* U.S. State Dep't, Bureau of Population, Refugees, and Migration, *Fact Sheet: U.S. Commemorations Pledges* (June 24, 2013), https://2009-2017.state.gov/j/prm/releases/factsheets/2013/211074.htm (noting implementation of training that "demonstrates different ways a migrant might express a verbal or non-verbal manifestation of fear").

in tone of voice, or through physical injuries consistent with abuse.[228]  An individual who may not be comfortable answering a question about whether they have a fear of return may nevertheless manifest that fear through an unconscious behavior, which can be observed by the inspecting immigration officer, and the individual may then be referred for a fear screening. DHS acknowledges that, in some cases, these behaviors may reflect circumstances other than a fear of return—for instance, a noncitizen who has just arrived at the border may be physically tired, cold, hungry, and disoriented, which may present similarly to manifestation of fear.  In such cases, DHS immigration officers will use their expertise and training to determine whether the noncitizen is manifesting a fear.  If there is any doubt, however, immigration officers will be instructed to err on the side of caution and refer the noncitizen to an AO for a credible fear interview.

Moreover, DHS will provide immigration officers with information on how to apply the standard, which will build on their existing training and experience.  Indeed, as noted above, CBP immigration officers (both USBP agents and CBP officers) have extensive experience interviewing and observing individuals.  As a result of their experience and training, they have skills and expertise in interacting with individuals and observing human behavior and in determining appropriate follow up steps with regards to any behaviors or indicators of concern. For instance, upon encountering a group of individuals who purport to be a family, USBP agents will observe the individuals to determine whether they evidence typical familial behavior or whether there are any concerns about the validity of the asserted familial relationship or the safety of any children in the group.  Agents and officers are also trained on identifying potential trafficking victims or victims of crimes and are trained on appropriate follow up action. Additionally, agents and officers frequently encounter individuals who may be vulnerable, including those in physical or medical distress or in need of humanitarian care, as well as those

---

[228] *Id.*

who may be seeking protection in the United States.  Agents and officers can similarly use such skills and experiences to identify any manifestations of fear.  Agents and officers will also receive information on how to apply the manifestation standard, including that manifestation may occur verbally, non-verbally, or physically.  DHS believes that this experience, coupled with guidance, will help agents and officers effectively identify noncitizens with potential fear or asylum claims under a manifestation approach.  Therefore, DHS believes that this rule remains consistent with the need to "safeguard[]" the rights of asylum seekers.  *See* 62 FR at 10319.  Because an immigration officer's observation of whether a noncitizen manifests a fear—rather than a noncitizen's answers to affirmative questions regarding asylum—will lead to a referral to an AO for a fear screening, this standard may result in a greater proportion of those referred to an AO being individuals with meritorious claims.

Additionally, the manifestation standard in the rule will enable DHS to streamline the process, allowing it to process noncitizens in a more expeditious manner during the emergency border circumstances identified in the Proclamation and this rule.  In particular, DHS anticipates that omitting the requirement to complete Form I-867A and I-867B will save about 20 to 30 minutes per noncitizen, providing DHS with—based on the number of cases in March 2024— approximately 14,000 extra personnel hours per month.[229]  This increased efficiency is critical for processing noncitizens in an expeditious way, and thus will better ensure that, given the immense challenges of irregular migration at the southern border, DHS's limited resources are used most effectively while still affording opportunities for noncitizens to seek asylum or protection.  Indeed, this is particularly critical in the emergency border circumstances described in the Proclamation and the rule.  As discussed above, given the number of noncitizens and the

---

[229] At a time savings of 30 minutes per noncitizen, multiplied by 28,466 noncitizens processed for expedited removal in March 2024, *see* OHSS analysis of data downloaded from UIP on April 2, 2024, DHS would save approximately 14,000 hours per month.

time it takes to process them during periods of heightened encounters, expediting the process is critical for avoiding overcrowding and ensuring safe conditions for those in custody.[230]

For all of these reasons, DHS believes that the "manifestation of fear" standard, as explained in the rule, will enable immigration officers to effectively identify noncitizens who require credible fear interviews while streamlining the process.  During the emergency circumstances described in the Proclamation and the rule, it is important for immigration officers to expeditiously process and swiftly apply consequences to noncitizens while still affording access to protection.  Here, the Departments are currently facing such emergency circumstances, as explained above in Sections III.B.1 and 2 of this preamble.  DHS believes that the approach taken in the rule is the most appropriate one in light of the situation at the southern border, as explained in this rule and as discussed in the Proclamation, balancing the need to protect those who may wish to seek protection in the United States against an urgent need to use DHS resources effectively.

c.  Raising the standard for protection screening

Under this rule, if the AO determines that, in light of the limitation on asylum eligibility under 8 CFR 208.35(a), there is not a significant possibility that the noncitizen could establish eligibility for asylum, *see* INA 235(b)(1)(B)(v), 8 U.S.C. 1225(b)(1)(B)(v), the AO will enter a negative credible fear determination with respect to the noncitizen's asylum claim.  *See* 8 CFR 208.35(b)(1)(i).  The AO will then assess whether the noncitizen has established a reasonable probability of persecution (meaning a reasonable probability of being persecuted because of their race, religion, nationality, membership in a particular social group, or political opinion) or torture, with respect to the designated country or countries of removal identified pursuant to section 241(b)(2) of the INA, 8 U.S.C. 1231(b)(2).[231]  *See* 8 CFR 208.35(b)(2)(i).  Likewise,

---

[230] *See* Decl. of Matthew J. Hudak ¶¶ 7, 17–22, *Florida v. Mayorkas*, No. 3:22-cv-9962 (N.D. Fla. May 12, 2023) (Dkt. 13–1).

[231] As noted above, DHS is also concurrently soliciting comment on the Application of Certain Mandatory Bars Notice of Proposed Rulemaking, which proposes that certain mandatory bars be considered at the screening stage under a reasonable possibility standard.

when reviewing a negative credible fear determination, where the IJ concludes that there is not a significant possibility that the noncitizen could establish eligibility for asylum in light of the limitation on asylum eligibility, the IJ will assess whether the noncitizen has established a reasonable probability of persecution because of a protected ground or torture.  *See* 8 CFR 1208.35(b)(2)(ii).

The Departments have some discretion to articulate the screening standard for claims for statutory withholding of removal and protection under the CAT.  As the Departments observed previously, "Congress clearly expressed its intent that the 'significant possibility' standard be used to screen for asylum eligibility but did not express any clear intent as to which standard should apply to other applications."  88 FR at 11742.  In addition, "the legislative history regarding the credible fear screening process references only asylum."  *Id.* at 11743.  By contrast, section 241(b)(3) of the INA, 8 U.S.C. 1231(b)(3), and FARRA section 2242 are silent as to what screening procedures are to be employed, while the INA elsewhere confers broad discretionary authority to establish rules and procedures for implementing those provisions, *see, e.g.*, INA 103(a)(3), (g)(2), 8 U.S.C. 1103(a)(3), (g)(2).

Moreover, in past rules applying a "reasonable possibility" screening standard to claims for statutory withholding of removal or CAT protection, the Departments have noted that such a screening standard is used "in other contexts where noncitizens would also be ineligible for asylum."  88 FR at 11743 (citing 8 CFR 208.31(c), (e)); *see also, e.g.*, Procedures for Asylum and Withholding of Removal; Credible Fear and Reasonable Fear Review, 85 FR 36264, 36270 (June 15, 2020) (referencing "the established framework for considering whether to grant statutory withholding of removal or CAT protection in the reasonable fear context").  Under the Circumvention of Lawful Pathways rule, "[i]f a noncitizen is subject to the lawful pathways condition on eligibility for asylum and not excepted and cannot rebut the presumption of the condition's applicability, there would not be a significant possibility that the noncitizen could establish eligibility for asylum."  88 FR at 11742.  For those noncitizens, the Departments

implemented a "reasonable possibility of persecution or torture" screening standard for statutory withholding of removal and protection under the CAT. *See* 8 CFR 208.33(b)(2)(ii), 1208.33(b)(2)(ii). The Departments similarly believe that those who enter across the southern border during the emergency border circumstances identified in the Proclamation and this rule and who are not described in section 3(b) of the Proclamation, do not establish an enumerated exception, and are unable to establish a significant possibility of eligibility for asylum should be screened for protection under a higher screening standard.

The Departments' experience with the Circumvention of Lawful Pathways rule has validated the Departments' choice to use an elevated screening standard to narrowly focus limited resources on those who are likely to be persecuted or tortured and to remove those who are unlikely to establish eligibility for statutory withholding of removal or CAT protection. Under that rule, which uses a "reasonable possibility of persecution or torture" screening standard for statutory withholding of removal and CAT protection claims, the Departments have processed record numbers of noncitizens through expedited removal and have seen a significant decrease in the rate at which noncitizens receive positive credible fear determinations, showing greater operational efficiencies.[232] Between May 12, 2023, and March 31, 2024, USCIS completed more than 152,000 credible fear interviews resulting from SWB expedited removal cases—this is more than twice as many interviews during the span of ten and a half months than the 75,000 interviews resulting from SWB encounters that USCIS averaged each year from FY 2014 to FY 2019.[233] Between May 12, 2023, and March 31, 2024, 52 percent (approximately 57,000) of those who were subject to the rule's presumption were able to establish a credible fear

---

[232] Decl. of Blas Nuñez-Neto ¶ 7, *M.A. v. Mayorkas*, No. 1:23-cv-01843 (D.D.C. Oct. 27, 2023) (Dkt. 53–1). The screen-in rate refers to the percentage of cases with a positive fear determination calculated by dividing the number of cases that receive a positive fear determination by the total number of determinations made (i.e., positive and negative fear determinations). *See id.* ¶ 7 n.2.

[233] Pre-May 12, 2023, data from OHSS Enforcement Lifecycle Dataset December 31, 2023; post-May 11, 2023, data from OHSS analysis of data downloaded from UIP on April 2, 2024.

of persecution or torture under the "reasonable possibility" standard,[234] compared to an 83

percent credible fear screen-in rate in the pre-pandemic period of 2014 to 2019.[235]  From 2014

through 2019, of SWB expedited removal cases with positive fear determinations, less than 25

percent of EOIR case completions ultimately resulted in a grant of protection or relief.[236]

Screening under the "reasonable possibility" standard has allowed the Departments to

screen out and swiftly remove additional noncitizens whose claims are unlikely to succeed at the

merits stage.  Although fewer noncitizens are screened in under the "reasonable possibility"

standard applied in the context of the Circumvention of Lawful Pathways rule, that screen-in rate

remains significantly higher than the grant rate for ultimate merits adjudication for SWB

expedited removal cases that existed prior to the rule.[237]  Under the emergency border

circumstances described in the Proclamation and this rule, the Departments' limited resources

must be focused on processing those who are most likely to be persecuted or tortured if removed,

and overall border security and immigration systems efficiencies outweigh any challenges

related to training on a new screening standard and a possible marginal increase in interview

length resulting from the application of a new standard in screening interviews.  Likewise, the

benefits of this rule, which is consistent with all statutory and regulatory requirements and the

United States' international law obligations, outweigh any potential marginal increase in the

likelihood that a meritorious case would fail under the raised screening standard.  Swiftly

removing noncitizens without meritorious claims is critical to deterring noncitizens from seeking

---

[234] OHSS analysis of data downloaded from UIP on April 2, 2024.  At this time, data on EOIR's grant rate under the Circumvention of Lawful Pathways rule is not available because only a small number of cases processed under that rule have been completed.  From May 12 through November 30, 2023 (the most recent data for which fully linked records are available), a total of 61,000 SWB expedited removal cases have been referred to EOIR for section 240 removal proceedings, including 1,400 with case completions (2.2 percent).  In addition, cases that are already completed are a biased sample of all future completions because in years since FY 2014, the median processing time for cases resulting in relief or other protection from removal has been, on average, about six times longer than the median processing time for cases resulting in removal orders, so reporting on the small data set of already completed cases would yield a relief rate that is artificially low.  OHSS analysis of OHSS Enforcement Lifecycle Dataset December 31, 2023 and OHSS analysis of EOIR data as of January 31, 2024.

[235] OHSS Enforcement Lifecycle Dataset as of December 31, 2023.

[236] OHSS Enforcement Lifecycle Dataset as of December 31, 2023.

[237] DHS OHSS Enforcement Lifecycle Dataset as of December 31, 2023.

entry under the belief that they will be released and able to remain in the United States for a significant period. *See, e.g.*, 88 FR at 31324 (discussing the success of the CHNV parole processes as being in part due to imposing consequences for failing to use a lawful pathway, namely swift removal); 88 FR at 11713 (noting that in the 60 days immediately following DHS's resumption of routine repatriation flights to Guatemala and Honduras, average daily encounters fell by 38 percent for Guatemala and 42 percent for Honduras).[238]

To allow for swift removals in the case of those noncitizens who the Departments are confident are unlikely to meet their ultimate burden to establish eligibility for statutory withholding of removal or protection under the CAT, the Departments have decided to raise the screening standard to "reasonable probability of persecution or torture" during the emergency border circumstances described in the Proclamation and this rule. The Departments define this "reasonable probability" standard as "substantially more than a reasonable possibility, but somewhat less than more likely than not." 8 CFR 208.35(b)(2)(i), 1208.35(b)(2)(ii). Under this standard, a noncitizen would be screened in if they provide credible testimony[239] and set forth a credible claim with sufficient specificity for an AO or IJ to be persuaded that there is a reasonable probability that the noncitizen would be persecuted or tortured so as to qualify for statutory withholding of removal or CAT protection in an ultimate merits adjudication.

---

[238] *See also, e.g.*, Muzaffar Chishti et al., *At the Breaking Point: Rethinking the U.S. Immigration Court System*, Migration Pol'y Inst., at 11 (2023), https://www.migrationpolicy.org/sites/default/files/publications/mpi-courts-report-2023_final.pdf ("In the case of noncitizens crossing or arriving at the U.S.-Mexico border without authorization to enter, years-long delays create incentives to file frivolous asylum claims that further perpetuate delays for those eligible for protection, undermining the integrity of the asylum system and border enforcement."); Doris Meissner, Faye Hipsman, & T. Alexander Aleinikoff, *The U.S. Asylum System in Crisis: Charting a Way Forward*, Migration Pol'y Inst., at 9 (2018), https://www.migrationpolicy.org/sites/default/files/publications/MPI-AsylumSystemInCrisis-Final.pdf ("Incentives to misuse the asylum system may also be reemerging. For example, over the past five years, the number of employment authorization documents (EADs) approved for individuals with pending asylum cases that have passed the 180-day mark increased from 55,000 in FY 2012 to 270,000 in FY 2016, and further to 278,000 in just the first six months of FY 2017. This high and growing level of EAD grants may suggest that, as processing times have grown, so too have incentives to file claims as a means of obtaining work authorization and protection from deportation, without a sound underlying claim to humanitarian protection.").

[239] Credible testimony alone is sufficient in a credible fear screening, and AOs are trained to ask questions to elicit testimony to assist the noncitizen in meeting their burden with testimony alone. Although testimony alone could certainly meet the burden, it is not required that the burden be met solely through testimony. And even though corroborating evidence is not required, AOs will consider any additional evidence the noncitizen presents. Additionally, AOs are trained to conduct interviews of individuals with persecution or non-persecution-related injuries, traumas, or conditions that may impact their ability to provide testimony for themselves.

The Departments view the difference between the "reasonable possibility" standard and the new "reasonable probability" standard as being that the new standard requires a greater specificity of the claim in the noncitizen's testimony before the AO or the IJ. In particular, although claims based on general fears of return may at times be found to meet the "reasonable possibility" standard where evidence in the record of country conditions indicates instances of persecution or torture within the country, such claims are less likely to be sufficient under the "reasonable probability" standard when the noncitizen cannot provide greater detail in their statements and information as to the basis for their individual claim.

The Departments frequently see such general claims of fear that lack specificity at both the screening and merits stage. However, generalized fear of persecution is ultimately not sufficient to establish a claim. *See Sharma v. Garland*, 9 F.4th 1052, 1060 (9th Cir. 2023) ("[A]dverse country conditions are not sufficient evidence of past persecution, for the obvious reason that '[t]o establish past persecution, an applicant must show that he as individually targeted on account of a protected ground rather than simply the victim of generalized violence.'" (quoting *Hussain v. Rosen*, 985 F.3d 634, 646 (9th Cir. 2012))); *Prasad v. INS*, 101 F.3d 614, 617 (9th Cir. 1996) (stating that to establish past persecution, "[i]t is not sufficient to show [the applicant] was merely subject to the general dangers attending a civil war or domestic unrest"); *Al Fara v. Gonzales*, 404 F.3d 733, 740 (3d Cir. 2005) ("[G]enerally harsh conditions shared by many other persons do not amount to persecution. . . . [H]arm resulting from country-wide civil strife is not persecution on account of an enumerated statutory factor." (quotation marks omitted)); *see also Debab v. INS*, 163 F.3d 21, 27 (1st Cir. 1998) (citing cases).

Moreover, to establish ultimate eligibility for CAT protection, the noncitizen must demonstrate an individualized risk of torture—not a general possibility of it. *See Escobar-Hernandez v. Barr*, 940 F.3d 1358, 1362 (10th Cir. 2019) ("[P]ervasive violence in an applicant's country generally is insufficient to demonstrate the applicant is more likely than not to be tortured upon returning there."); *Bernard v. Sessions*, 881 F.3d 1042, 1047 (7th Cir. 2018)

("Evidence of generalized violence is not enough; the IJ must conclude that there is a substantial risk that the petitioner will be targeted specifically."); *Lorzano-Zuniga v. Lynch*, 832 F.3d 822, 830–31 (7th Cir. 2016) ("[G]eneralized violence or danger within a country is not sufficient to make a claim that it is more likely than not that a petitioner would be tortured upon return to his home country."); *Alvizures-Gomes v. Lynch*, 830 F.3d 49, 55 (1st Cir. 2016) (country reports demonstrating overall corruption and ineffectiveness of Guatemalan authorities "do not relieve [the applicant] of the obligation to point to specific evidence indicating that he, personally, faces a risk of torture because of these alleged shortcomings"); *Delgado-Ortiz v. Holder*, 600 F.3d 1148, 1152 (9th Cir. 2010) ("Petitioners' generalized evidence of violence and crime in Mexico is not particular to Petitioners and is insufficient to meet th[e] standard [for eligibility for CAT protection].").

Under the "reasonable possibility" standard, a noncitizen presenting a claim based on general civil strife is sometimes found to pass the screening stage even where they provide only general testimony about their fear of harm. For example, a noncitizen may meet the "reasonable possibility" standard where he expresses a fear of being killed by the government upon his return to his native country, United States Government reports indicate the country may engage in human rights abuses, and the noncitizen has been involved in anti-government political activism for years, even absent specific information as to an individualized threat against the noncitizen or any other individuals who have been threatened or harmed. But to meet the "reasonable probability" standard, the noncitizen would either need to explain with some specificity why he thinks he, in particular, is likely to be harmed, or the record would have to reflect some specific information regarding the treatment of anti-government political activists similarly situated to the applicant. Such claims are assessed on a case-by-case basis. As an example, however, were the noncitizen to credibly state that he knew, and to provide details about, people who are similarly situated to him who have been killed, harmed, or credibly threatened, that testimony may be sufficient to meet the "reasonable probability" standard because it provides more specificity as to

why the noncitizen believes he would be harmed.  The Departments believe that the "reasonable probability" standard, by requiring additional specificity, will better identify claims that are likely to be meritorious in a full adjudication while screening out those whose claims are not likely to prevail.[240]

The Departments are confident that AOs and IJs can apply this heightened standard effectively to identify those who are likely to have viable claims on the merits while mitigating the possibility that those with a viable claim would be screened out.  The level of specificity and certainty that the "reasonable probability" standard requires remains lower than the ultimate merits standard, and AOs and IJs have the training and experience necessary to elicit the information required to determine whether a case is sufficiently specific to meet the "reasonable probability" standard.[241]  This is particularly the case because, in implementing such training, USCIS expects to adapt existing training, including on the ultimate merits standard, to prepare AOs on the "reasonable probability" screening standard, since the way evidence is evaluated remains the same, save for the degree of specificity required.  AOs especially have significant training in non-adversarial interview techniques and are required to elicit testimony from the noncitizen—in effect, to help the noncitizen meet their burden through testimony alone.[242]  If upon such questioning a noncitizen is unable to provide specific facts that lead the AO or IJ to believe that the noncitizen would be able to meet their burden with more opportunity to prepare, such claims are unlikely to prevail at the merits stage.

---

[240] Although the Departments believe the standard will better identify claims that are likely to be meritorious, for now the Departments do not seek to apply the "reasonable probability" standard outside the context of this rule—that is, to those who do not establish a significant possibility of eligibility for asylum because of the limitation on asylum eligibility or, if the limitation is rendered inoperative by court order, to those who are ineligible for asylum under the Circumvention of Lawful Pathways rule, *see* 8 CFR 208.35(b)(2)(i) and (3), 1208.35(b)(2)(iii) and (4)—because in this rule the Departments are addressing emergency border circumstances rather than regulating to change the status quo.  The Departments may consider such changes in future rulemaking.

[241] USCIS, *RAIO Directorate—Officer Training: Interviewing – Eliciting Testimony* (Dec. 20, 2019); EOIR, *Fact Sheet: Immigration Judge Training* (June 2022), https://www.justice.gov/eoir/page/file/1513996/dl?inline.

[242] USCIS, *RAIO Directorate—Officer Training: Interviewing – Introduction to the Non-Adversarial Interview* (Dec. 20, 2019).  As described in a previous rule, AOs have experience in "country conditions and legal issues, as well as nonadversarial interviewing techniques," and they have "ready access to country conditions experts."  Procedures for Credible Fear Screening and Consideration of Asylum, Withholding of Removal, and CAT Protection Claims by Asylum Officers, 86 FR 46906, 46918 (Aug. 20, 2021).

Moreover, this heightened screening standard targets information—specificity based on the noncitizen's own knowledge—that should generally be available at the screening stage. A noncitizen at the screening stage generally would have information regarding their fear of harm, such as whom they are afraid of and why, and an AO will elicit information regarding the claim that either is sufficiently specific to satisfy the heightened screening standard or is not. Credible testimony alone can satisfy the noncitizen's burden and is sometimes the only available evidence of persecution or torture. *See, e.g.*, *Matter of Mogharrabi*, 19 I&N Dec. 439, 443 (BIA 1987). In most cases, noncitizens would have such information at the screening stage, and the Departments expect—and logic suggests—that such information could be shared through testimony. Instances of past harm or those that inform a future fear of return that caused a noncitizen to seek protection generally occur before entry and would not be expected to develop after the fact of entry or after the screening stage. Hence, the Departments believe that this standard will screen out claims that are likely to fail at the merits stage and poses only a minimal risk of screening out claims that could ultimately succeed. For example, if a noncitizen does not know who harmed or would harm them or why, in the Departments' experience, AOs and IJs will often be able to determine—depending on the facts of the case—that it is unlikely that the noncitizen will be able to provide answers to those critical questions at the merits stage.

In addition, AOs and IJs also receive training in, and have substantial experience weighing, country conditions, which will further help them assess whether and under what circumstances the lack of specificity in a noncitizen's testimony indicates that they have little prospect of meeting their ultimate burden.[243] For example, it may be the case that where a

---

[243] USCIS, *RAIO Directorate—Officer Training: Decision Making* (Dec. 20, 2019); USCIS, *RAIO Directorate—Officer Training: Interviewing – Eliciting Testimony* (Dec. 20, 2019); USCIS, *RAIO Directorate—Officer Training: Interviewing – Introduction to the Non-Adversarial Interview* (Dec. 20, 2019); 86 FR at 46918. IJs "receive extensive training upon entry on duty, annual training, and periodic training on specialized topics as necessary." Procedures for Credible Fear Screening and Consideration of Asylum, Withholding of Removal, and CAT Protection Claims by Asylum Officers, 87 FR 18078, 18170 (Mar. 29, 2022); *see also* EOIR, *Fact Sheet: Immigration Judge Training* (June 2022), https://www.justice.gov/eoir/page/file/1513996/dl?inline. Moreover, IJs are required to maintain professional competence in the law, U.S. Dep't of Justice, Ethics and Professionalism Guide for Immigration Judges § IV (Jan. 26, 2011),

noncitizen expresses only generalized fear of harm based on their ethnicity, but country conditions confirm serious, ongoing harm in the form of widespread, systematic persecutory acts by government institutions targeting individuals who are similarly situated to the noncitizen, adjudicators will rely on that information to deem the "reasonable probability" standard satisfied.

AOs, supervisory AOs, and IJs receive training and have experience applying asylum, statutory withholding of removal, and CAT protection screening standards and in applying and reviewing decisions related to the ultimate asylum (for USCIS and EOIR) and statutory withholding of removal and CAT protection (for EOIR) merits standards, so they are well-suited to be able to identify in a screening whether the information the noncitizen has provided is sufficiently specific to lead them to believe that the noncitizen may be able to establish eligibility at the merits stage.[244]  Moreover, all credible fear determinations must be concurred upon by a supervisory AO before they become final to ensure quality and consistency and will be subject to de novo IJ review if requested by the noncitizen.  *See* 8 CFR 235.3(b)(7), 235.15(b)(2)(i)(B), 1208.35(b).

Although AOs, supervisory AOs, and IJs will have to be trained on applying the new "reasonable probability of persecution or torture" standard, the standard as explained above is

---

https://www.justice.gov/sites/default/files/eoir/legacy/2013/05/23/EthicsandProfessionalismGuideforIJs.pdf, which necessarily includes the elements required to establish eligibility for relief or entitlement to protection from removal, *id.*  Consistent with their role in adjudicating asylum and related protection applications, IJs have long been able to take administrative notice of commonly known facts, including country conditions evidence.  *See* 8 CFR 208.12 (1997) (stating that the adjudicator may rely on information from a variety of sources ranging from the Department of State to credible international organizations or academic institutions); 8 CFR 208.1a (1997) (stating this part shall apply to all applicants for asylum whether before an AO or an IJ).  Federal Government country conditions reports, such as the U.S. Department of State country conditions reports, are longstanding, credible sources of information to which IJs often look.  *See, e.g.*, *Sowe v. Mukasey*, 538 F.3d 1281, 1285 (9th Cir. 2008) ("U.S. Department of State country reports are the most appropriate and perhaps the best resource for information on political situations in foreign nations." (quotation marks omitted)); *Xiao Ji Chen v. U.S. Dep't of Justice*, 471 F.3d 315, 341 (2d Cir. 2006) (Department of State country reports are "usually the best available source of information on country conditions" (quotation marks omitted)).

[244] *See* USCIS, *RAIO Directorate—Officer Training: Note Taking* (Feb. 12, 2024); USCIS, *RAIO Directorate—Officer Training: Interviewing – Survivors of Torture and Other Severe Trauma* (Nov. 2, 2023); USCIS, *RAIO Directorate—Officer Training: Children's Claims* (Dec. 20, 2020); USCIS, *RAIO Directorate—Officer Training: Interviewing – Introduction to the Non-Adversarial Interview* (Dec. 20, 2019); USCIS, *RAIO Directorate—Officer Training: Interviewing – Eliciting Testimony* (Dec. 20, 2019); USCIS, *RAIO Directorate—Officer Training: Cross-Cultural Communication and Other Factors That May Impede Communication at an Interview* (Dec. 20, 2019); USCIS, *RAIO Directorate—Officer Training: Detecting Possible Victims of Trafficking* (Dec. 20, 2019); USCIS, *RAIO Directorate—Officer Training: Interviewing – Working With an Interpreter* (Dec. 20, 2019); EOIR, *Fact Sheet: Immigration Judge Training* (June 2022), https://www.justice.gov/eoir/page/file/1513996/dl?inline.

not a significant departure from the types of analyses AOs, supervisory AOs, and IJs conduct on a daily basis. Rather, it is a matter of degree—to meet the "reasonable probability of persecution or torture" standard, the noncitizen must present more specificity than is required to meet the "reasonable possibility of persecution or torture" standard, but not so much as to establish ultimate eligibility for protection. Indeed, to meet the ultimate standard, noncitizens may still be required to provide more evidence—whether testimonial or documentary.

The Departments do not believe that applying the "reasonable probability of persecution or torture" standard will increase the time required for credible fear interviews by any great margin. AOs generally ask similar questions to elicit information from noncitizens during screening interviews regardless of the standard they will apply to the information elicited. The difference will be whether the information provided as a result of those questions reaches the required level of specificity. That said, there may be cases where an AO believes that the noncitizen may be able to meet the "reasonable probability of persecution or torture" standard after answering a few additional questions. But even if there is a marginal increase in the length of some interviews, the Departments believe that the interest in swift removal of those unlikely to establish eligibility for protection during emergency border circumstances outweighs the risk of some interviews taking longer.[245] This is because a higher standard will be more likely to create a deterrent: Those less likely to establish eligibility for statutory withholding of removal or CAT protection will be swiftly removed rather than being released and waiting years for a hearing, or in some cases, absconding and remaining in the United States unlawfully. And this deterrent effect could lead to lower encounter levels as noncitizens and smugglers realize that the

---

[245] In Section III.B.3.b of this preamble, the Departments conclude that there is a need to streamline immigration officers' processing of noncitizens through expedited removal while the Proclamation's suspension and limitation on entry is in effect. That reasoning is not inconsistent with the reasoning here. Because AOs interview only a subset of noncitizens processed through expedited removal, the Departments believe at most a portion of those noncitizens' credible fear interviews may be longer, and, as noted, any marginal increase in the time it takes to conduct some interviews is outweighed by improving deterrence and avoiding erroneous screen-ins, which result in noncitizens being added to the backlog of immigration cases and being released into and remaining in the United States for a significant period of time.

process is functioning more effectively.[246]  Screening out those unlikely to establish eligibility

for protection has the added benefit of saving United States Government resources overall

because fewer noncitizens who are unlikely to establish eligibility for protection will be placed

into section 240 removal proceedings before EOIR, which as of the end of December 2023 had a

backlog of more than 2.7 million cases.[247]

In developing this rule, the Departments considered the possibility that the application of

different screening standards to "the same or a closely related set of facts" might result in

inefficiencies.  *See* 87 FR at 18091; *see also* 88 FR at 11746.  The Departments note, however,

that under this rule, that is unlikely to be the case.  The facts relevant to whether a noncitizen is

subject to the rule's limitation on asylum eligibility will only rarely be relevant to the inquiry

into whether the noncitizen has a fear of persecution or torture.  For example, whether the

noncitizen faced an acute medical emergency that excepts them from the rule under 8 CFR

208.35(a)(2)(i)(A) or 1208.35(a)(2)(i)(A) will not likely be relevant to whether the noncitizen

has a fear of persecution or torture in their designated country of removal and so only the

"reasonable probability" standard will be applied to the facts relevant to their persecution or

torture claim.  And where a noncitizen meets such an exception, they will continue to be eligible

to pursue asylum in addition to any claim of persecution or torture, and those claims will all be

considered only under the "significant possibility" standard.  Similarly, whether a noncitizen

---

[246] *See* Muzaffar Chishti et al., *At the Breaking Point: Rethinking the U.S. Immigration Court System*, Migration Pol'y Inst., at 11 (2023), https://www.migrationpolicy.org/sites/default/files/publications/mpi-courts-report-2023_final.pdf ("In the case of noncitizens crossing or arriving at the U.S.-Mexico border without authorization to enter, years-long delays create incentives to file frivolous asylum claims that further perpetuate delays for those eligible for protection, undermining the integrity of the asylum system and border enforcement."); Doris Meissner, Faye Hipsman, & T. Alexander Aleinikoff, *The U.S. Asylum System in Crisis: Charting a Way Forward*, Migration Pol'y Inst., at 9 (2018), https://www.migrationpolicy.org/sites/default/files/publications/MPI-AsylumSystemInCrisis-Final.pdf ("Incentives to misuse the asylum system may also be reemerging.  For example, over the past five years, the number of employment authorization documents (EADs) approved for individuals with pending asylum cases that have passed the 180-day mark increased from 55,000 in FY 2012 to 270,000 in FY 2016, and further to 278,000 in just the first six months of FY 2017.  This high and growing level of EAD grants may suggest that, as processing times have grown, so too have incentives to file claims as a means of obtaining work authorization and protection from deportation, without a sound underlying claim to humanitarian protection.").

[247] *See* EOIR, *Adjudication Statistics: Pending Cases, New Cases, and Total Completions* (Jan. 18, 2024), https://www.justice.gov/eoir/media/1344791/dl?inline.

faced an imminent and extreme threat to life and safety that excepts them from the rule under 8 CFR 208.35(a)(2)(i)(B) or 1208.35(a)(2)(i)(B) will involve an evaluation of the discrete set of circumstances at the time of the noncitizen's arrival at the border, and will not likely be relevant to whether the noncitizen has a fear of persecution or torture in their designated country of removal. The question of an imminent threat relates to the situation immediately prior to the noncitizen's entry into the United States, rather than necessarily any fear of persecution or torture. Thus, the Departments do not believe there will generally be a need to apply multiple standards to the same set of facts.

d. The scope of this rule

The Departments have decided to tie the application of this IFR, including the limitation on asylum eligibility, to emergency border circumstances. The suspension and limitation on entry applies beginning at 12:01 a.m. eastern time on June 5, 2024. The suspension and limitation on entry will be discontinued 14 calendar days after the Secretary makes a factual determination that there has been a 7-consecutive-calendar-day average of less than 1,500 encounters, as defined by the Proclamation, but excluding noncitizens determined to be inadmissible at a SWB POE. If encounters increase again (including during the 14-calendar-day period), the suspension and limitation will apply again (or continue to apply, as applicable) after the Secretary makes a factual determination that there has been a 7-consecutive-calendar-day average of more than 2,500 encounters, as defined by the Proclamation, but excluding noncitizens determined to be inadmissible at a SWB POE. These thresholds are consistent with those set forth in sections 2(a) and (b) of the Proclamation.[248] In order to maximize the

---

[248] The 14-day waiting period prior to a discontinuation provides time for the Departments to complete processing of noncitizens encountered during emergency border circumstances and to confirm that a downward trend in encounters is sustained. The absence of a similar waiting period prior to a reactivation reflects the operational exigencies in a circumstance in which there has been a 7-consecutive-calendar-day average of more than 2,500 encounters and is necessary to avoid a surge to the border in advance of a reactivation. As the Departments have explained, the preliminary data pulled from DHS's operational systems have not undergone a full validation process. *See supra* note 5. But a rapid policy and operational response to emergency border circumstances requires relying on this more recent data when making factual determinations consistent with sections 2(a) and 2(b) of the Proclamation. Hence, the data used to make these factual determinations may differ somewhat from the more definitive numbers that ultimately emerge from DHS's full validation process.

consequences for those who cross unlawfully or without authorization, DHS endeavors to deliver consequences swiftly to the highest proportion of individuals who fail to establish a legal basis to remain the United States. This includes, subject to available resources, referring the maximum number of eligible individuals possible into expedited removal to quickly adjudicate their claims. However, as described below, DHS has been limited in its ability to do so as a result of capacity and resource constraints. The number of people who can be processed for expedited removal is dependent on the Departments' resources and can be impacted by several factors, including limited detention beds and holding capacity;[249] the presence or absence of sufficient AOs to conduct credible fear interviews for all those who claim a fear or indicate an intent to apply for asylum; the availability of IJs to review negative fear findings; and the ability to repatriate individuals ordered removed in a timely manner—an option that is not always available because, among other things, it relies on independent decisions made by foreign governments.

Sustained high encounter rates threaten to overwhelm the Departments' ability to effectively process, detain, and remove the migrants encountered, as appropriate, in a timely manner. *See* 88 FR at 31316. The President has determined that the suspension and limitation on entry is necessary to manage encounter levels. The Departments have determined that emergency border circumstances described in the Proclamation and this rule necessitate this rule's limitation on asylum eligibility and changes to the referral process and screening standard because, in such circumstances, DHS lacks the capacity to deliver timely consequences, and absent this rule, must resort to large-scale releases of noncitizens pending section 240 removal proceedings, which leads to significant harms and threatens to incentivize further migration by individuals who recognize the limitations on the ability to deliver timely consequences.[250]

---

[249] *See, e.g.*, Consolidated Appropriations Act, 2024, Pub. L. 118–47, 138 Stat. 460, 598 (2024). The joint explanatory statement states that the bill provides "$5,082,218,000 for Enforcement and Removal Operations (ERO)" and "$355,700,000 for 41,500 beds for the full fiscal year and inflationary adjustments to support current detention facility operations." 170 Cong. Rec. H1807, H1812 (daily ed. Mar. 22, 2024).

[250] *See* Section III.B.2 of this preamble. The Departments acknowledge that, despite the protections preserved by the rule and the available exceptions, the provisions adopted by this rule will result in the denial of some asylum

DHS simply lacks sufficient resources to detain and conduct credible fear interviews for the number of noncitizens arriving each day who claim a fear of return when processed through expedited removal.  This mismatch in available resources and encounters creates stress on the border and immigration systems and forces DHS to rely on processing pathways outside of expedited removal—limiting DHS's ability to swiftly deliver consequences on individuals who do not have a legal basis to remain in the United States.[251]  The Departments have determined that the 1,500-encounter threshold is a reasonable proxy for when the border security and immigration system is no longer over capacity and the measures adopted in this rule are not necessary to deal with such circumstances.

At the outset, it is important to put the threshold in context.  From FY 2000 through FY 2008, USBP encounters between POEs averaged approximately 3,000 per day, routinely including monthly averages over 3,500 for a few months most springs.[252]  The vast majority (94 percent) of individuals encountered by USBP during this period were Mexican nationals, and very few of those who were processed for expedited removal claimed a fear of return or an intent to seek asylum during that process—fewer than one percent of all CBP SWB encounters.[253]  As a result, DHS and its predecessor agency were able to swiftly remove or voluntarily return the vast majority of those encountered at the SWB using comparatively few resources.  *See* 88 FR at 11708, 11716.

---

claims that otherwise may have been granted and, as with all screening mechanisms, there is some risk that a case that might otherwise warrant protection might not proceed to a merits adjudication.  However, in light of the emergency circumstances facing the Departments and addressed in the Proclamation and this rule, the Departments believe these measures are appropriate and necessary.  And given the Departments' experience with asylum and protection screenings and adjudications, the Departments believe the rule's provisions will produce accurate outcomes, although the Departments believe the rule continues to be justified even if that expectation turns out to be misplaced in close cases.

[251] *See* CBP, *Custody and Transfer Statistics* (May 15, 2024), https://www.cbp.gov/newsroom/stats/custody-and-transfer-statistics (detailing the number of individuals processed for expedited removal compared to another processing disposition, including section 240 proceedings).

[252] OHSS analysis of March 2024 OHSS Persist Dataset.  Total CBP encounters (at and between POEs) also averaged approximately 3,000 per day from FY 2004 to FY 2008; data on encounters at POEs are not available prior to FY 2004.

[253] OHSS analysis of March 2024 OHSS Persist Dataset.

From FY 2009 through FY 2020, USBP encounters between POEs declined substantially from these historical highs, averaging approximately 1,200 per day, and daily USBP encounters between the POEs averaged less than 3,500 per day in all but one month of that 12-year period—May 2019 when USBP encounters peaked at 4,300 during that year's surge.[254]  Within that 12-year stretch, there were only four months (from March through June 2019) with average encounters between the POEs even above 2,500 per day.[255]  In fact, for the 15 years prior to March 2021, DHS did not experience a single month with more than 5,000 total average daily encounters.[256]  However, during that time, the demographics of these encounters changed significantly, with nationals from the northern Central American countries steadily increasing as a proportion of encounters, becoming a majority of individuals encountered between POEs for the first time in history in 2017—a trend that continued until 2020.  Starting in 2014, families and UCs increased as a proportion of USBP encounters as well, reaching a high of 65 percent of encounters in 2019.[257]  Finally, and as described in greater detail in Section III.B.1 of this preamble, from 2021 to 2023, there was a historic surge in migration from other countries in the Western Hemisphere and from Eastern Hemisphere countries, which, for the first time ever,

---

[254] OHSS analysis of March 2024 OHSS Persist Dataset.  Total CBP encounters (at and between POEs) averaged approximately 1,500 per day during this period.  For most of this period (from FY 2009 through FY 2018), the share of encounters processed for expedited removal and the share of those processed through expedited removal making fear claims generally increased, so that during FY 2018, 41 percent of SWB encounters were processed for expedited removal and 45 percent of those processed for expedited removal made fear claims, yielding an all-time high of 18 percent of all encounters making fear claims.  OHSS analysis of March 2024 OHSS Persist Dataset.  Data on the exact number of SWB encounters processed for expedited removal who made fear claims is not available for years prior to FY 2013, but OHSS estimates that the vast majority (84 percent) of all fear claims made in prior years were made by SWB encounters.  Even if 100 percent of fear claims made before FY 2013 were made by SWB encounters, FY 2018 would represent the all-time highest percentage of all encounters making fear claims.

[255] OHSS analysis of March 2024 OHSS Persist Dataset.  Total CBP encounters (at and between POEs) also averaged approximately 2,700 per day and 2,600 per day in February and July 2019, respectively.

[256] OHSS analysis of March 2024 OHSS Persist Dataset.

[257] OHSS analysis of March 2024 OHSS Persist Dataset.  Northern Central Americans accounted for 54 percent of encounters between POEs in 2017.  Northern Central Americans' proportion of encounters between POEs continued to increase until it reached 71 percent of USBP encounters in 2019 but dropped at the onset of the pandemic, in 2020, to less than 26 percent.  *See also* OHSS, *Immigration Enforcement and Legal Processes Monthly Tables*, https://www.dhs.gov/ohss/topics/immigration/enforcement-and-legal-processes-monthly-tables (last updated May 10, 2024) ("CBP SW Border Encounters by Citizenship").

accounted for more than half of the encounters at the border in 2023—with Mexican nationals accounting for just 29 percent of encounters, an all-time low.[258]

The change in the nationalities and demographics being encountered at the border has coincided with a dramatic increase in the number of individuals who claim fear when they are processed at the border. Between 2005 and 2015, the proportion of noncitizens encountered by CBP and processed for expedited removal who claimed fear ranged from 5 percent at the low end to 26 percent at the high end.[259] Driven by the changing demographics at the border, both the percentage of those processed for expedited removal as well as the percentage of those processed for expedited removal who claimed a fear of return or an intent to seek asylum generally increased during this time frame.[260] This, in turn, has resulted in a steep increase in the number of credible fear interviews that USCIS is required to conduct.[261]

In 2023, a record 59 percent of encounters at and between POEs on the SWB that were processed for expedited removal resulted in fear claims. From 2016 to 2023, the percentage of SWB encounters processed for expedited removal who claimed a fear dipped below 41 percent just once, in FY 2020, the first year of the COVID-19 pandemic.[262] The global COVID-19 pandemic briefly interrupted this trend, which has continued after the lifting of the Title 42 public health Order in May 2023. Between May 12, 2023, and the end of March 2024, DHS processed a record number of individuals through expedited removal as it sought to maximize

---

[258] OHSS analysis of OIS Yearbook of Immigration Statistics 1980-1999 and OHSS analysis of March 2024 OHSS Persist Dataset. *See also* OHSS, *Immigration Enforcement and Legal Processes Monthly Tables*, https://www.dhs.gov/ohss/topics/immigration/enforcement-and-legal-processes-monthly-tables (last updated May 10, 2024) ("CBP SW Border Encounters by Citizenship"). Nationality breakouts of border encounters are not available prior to 1980, but Mexicans accounted for 97 percent of encounters for all of 1980 through 1999 and never accounted for less than 96 percent in any fiscal year during that period.

[259] OHSS analysis of March 2024 OHSS Persist Dataset.

[260] The percentage of those processed via expedited removal fell again in 2019 due to resource constraints. OHSS analysis of March 2024 OHSS Persist Dataset.

[261] The share of noncitizens encountered by CBP at and between POEs who were processed through expedited removal increased from 6 percent in FY 2005 to between 39 and 47 percent each year from FY 2012 to FY 2018, but then dropped in FY 2019 because DHS was unable to scale up expedited removal processing in proportion to the substantial increase in USBP encounters. OHSS analysis of March 2024 OHSS Persist Dataset.

[262] OHSS analysis of March 2024 OHSS Persist Dataset.

the consequences at the border, and 54 percent of noncitizens processed for expedited removal indicated a fear of persecution or intent to seek asylum.[263]  As part of DHS's comprehensive effort to impose strengthened consequences at the border after the lifting of the Title 42 public health Order, USCIS reassigned a significant number of AOs to conduct credible fear interviews, which resulted in USCIS completing a record number of such interviews.  In fact, USCIS conducted more interviews from SWB encounters during the span of ten and a half months after the lifting of the Title 42 public health Order than in any full fiscal year prior to 2023, and twice as many as the annual average from FY 2010 to FY 2019.[264]

As DHS transitioned from the enforcement of the Title 42 public health Order at the border to full use of its title 8 authorities after May 11, 2023, DHS's capacity constraints—and the impact of those constraints on DHS's ability to impose consequences on noncitizens who cross unlawfully or without authorization—have come increasingly into focus.  Given these real resource constraints, DHS has had to make hard choices about whom it can prioritize for detention or refer into expedited removal.[265]  As a result of a lack of sufficient holding spaces, detention beds, and AOs, DHS has only been able to refer certain noncitizens into expedited removal—which, as detailed above, is the most efficient tool available under title 8 authorities to impose swift consequences for irregular migration.  This means that DHS cannot impose consequences swiftly or predictably on most people encountered at the border, feeding the narrative pushed by smugglers that irregular migrants will be able to stay in the United States.[266]

The expedited removal process requires the outlay of significant Government resources. When a noncitizen in expedited removal indicates an intention to seek asylum or a fear of

---

[263] OHSS analysis of data downloaded from CBP UIP on April 2, 2024.

[264] OHSS analysis of data downloaded from CBP UIP on April 2, 2024.  Data on the exact number of SWB encounters processed for expedited removal who made fear claims is only available since FY 2013; for the years prior to FY 2013 there was no full fiscal year in which the total number of USCIS fear claims was equal to the number of fear claims completed for SWB encounters processed for expedited removal between May 12, 2023, and March 31, 2024.

[265] ICE, *Fiscal Year 2023 ICE Annual Report* 17–18 (Dec. 29, 2023), https://www.ice.gov/doclib/eoy/iceAnnualReportFY2023.pdf.

[266] March 2024 OHSS Persist Dataset.

persecution, rather than being swiftly removed, they are referred to an AO for a credible fear interview and may seek review of any negative screening by an IJ—all of which takes time and Government resources.  As described in further detail above, DHS has made significant process enhancements to reduce the overall time it takes for individuals to proceed through this process. However, the availability of sufficient numbers of AOs to conduct credible fear interviews is critical to DHS's ability to quickly adjudicate fear claims and deliver consequences to those who do not have a credible fear of persecution or torture.

As described above, Congress has failed to provide the additional resources requested for USCIS that would have increased the number of AOs that are available to conduct credible fear interviews for SWB cases.  This reality, combined with increases in encounters at the border, and increases in the proportion of noncitizens processed for expedited removal who claim fear of return, means that DHS cannot impose consequences swiftly or predictably on most people whom DHS encounters.  Due to its resource constraints, the majority of individuals USBP encountered since May 11, 2023, were ultimately placed in section 240 removal proceedings,[267] undercutting the effectiveness of the previous measures that have been implemented.  This reality contributes to the vicious cycle described above in which increasing numbers of releases lead to increased migration, fueled by the narrative, pushed by smugglers, that migrants who are encountered at the border will be allowed to remain and work in the United States for long periods of time.

As a result of the changes to the nationalities and demographics being encountered at the border, and the associated increase in the rate of claiming fear by individuals encountered, the amount of resources required to deliver consequences quickly through referrals into expedited removal for the vast majority of individuals who claimed a fear in 2000 (when DHS's predecessor agency averaged 3,000 to 7,000 daily encounters between POEs) or in 2010 (when

---

[267] OHSS analysis of March 2024 OHSS Persist Dataset.

DHS averaged 1,000 to 2,000 daily encounters between POEs) was far lower than the amount of resources required to manage the same number of encounters today.[268]

Of course, as noted above, DHS has been experiencing much higher encounter levels,[269] and simply does not have the resources it would need to place into expedited removal the majority of those encountered by USBP who are amenable to such processing. Similarly, DHS has never had the resources to detain every individual encountered at the border through the pendency of their immigration removal proceedings—even during FY 2009 through FY 2020, when average encounters between POEs on the SWB were 1,200 a day. Encounters between POEs on the SWB are now more than triple that level, resulting in overcrowded USBP facilities, an immigration detention system that has regularly been at capacity, and an asylum system that has been crippled by enormous backlogs and cannot deliver timely decisions.[270] When DHS

---

[268] March 2024 OHSS Persist Dataset. The most notable change has been the rising share of non-Mexican nationals as a share of encounters, with Mexican nationals accounting for 98 percent of USBP encounters in FY 2000 and 89 percent in 2010. OHSS Persist Database March 31, 2024; *see also* OHSS, *Immigration Enforcement and Legal Processes Monthly Tables*, https://www.dhs.gov/ohss/topics/immigration/enforcement-and-legal-processes-monthly-tables (last updated May 10, 2024) ("CBP SW Border Encounters by Citizenship" and "CBP SW Border Encounters by Family Status").

[269] Even as compared to the 2,000 to 7,000 daily encounters between POEs in 2000, the corresponding numbers in the recent past have been higher. In FY 2023, there were 3,300 to 7,300 such daily encounters, and from October 2023 through March 2024, the corresponding numbers are 4,000 to 8,300. March 2024 OHSS Persist Dataset.

[270] *See* OHSS analysis of data downloaded from UIP on April 2, 2024. CBP completed approximately 1.7 million total encounters at the SWB in FY 2021, 2.4 million in FY 2022, and 2.5 million in FY 2023, with each year exceeding the previous record high of 1.6 million in FY 2000. *See* OHSS analysis of March 2024 OHSS Persist Dataset. In December 2023, CBP also completed a single-month record of 302,000 encounters, almost one and a half times as many as the highest monthly number recorded prior to 2021 (209,000 in March 2000) based on records available in the OHSS Persist Dataset for FY 2000 to the present. Although some of the increase in encounters is explained by higher-than-normal numbers of repeat encounters of the same individual during the period in which noncitizens were expelled pursuant to the CDC's Title 42 public health Order, OHSS analysis of the March 2024 OHSS Persist Dataset indicates that unique encounters were also at record high levels. *See also* OHSS, *Immigration Enforcement and Legal Processes Monthly Tables*, https://www.dhs.gov/ohss/topics/immigration/enforcement-and-legal-processes-monthly-tables (last updated May 10, 2024) ("CBP SW Border Encounters by Citizenship" and "CBP SW Border Encounters by Family Status").

CBP held an average of 21,863 noncitizens in custody each day during December 2023, averaging 104 percent of CBP's daily custody capacity (21,042) roughly each day for the entire month. OHSS analysis of data downloaded from UIP on February 14, 2024.

EOIR had a backlog of over 2.7 million cases that were pending in the immigration courts at the end of the first quarter of FY 2024. *See* EOIR, *Adjudication Statistics: Pending Cases, New Cases, and Total Completions* (Jan. 18, 2024), https://www.justice.gov/eoir/media/1344791/dl?inline; *see also* Ariel G. Ruiz-Soto et al., *Shifting Realities at the U.S.-Mexico Border: Immigration Enforcement and Control in a Fast-Evolving Landscape*, Migration Pol'y Inst., at 1 (Jan. 2024), https://www.migrationpolicy.org/sites/default/files/publications/mpi-contemporary-border-policy-2024_final.pdf ("Insufficiently equipped to respond effectively to these and likely future changes, U.S. immigration agencies must perpetually react and shift operations according to their strained capacity and daily

does not have the capacity to process individuals through expedited removal or detain noncitizens to await their proceedings, releasing individuals into the interior of the United States is generally the only option that is left.[271]  The need to release individuals at the border has increased over time and peaked during surges.

By contrast, when encounters (excluding UCs from non-contiguous countries and noncitizens determined to be inadmissible at a SWB POE) are below 1,500 per day, DHS will be able to refer most individuals it encounters into expedited removal and deliver a swift consequence to the majority of individuals it encounters who do not establish a legal basis to remain in the United States—in the form of a return or removal.  Given limited congressional appropriations and agency funding levels, DHS has a finite capacity to deliver such consequences at the border, which is reflected in the number of individuals that can be processed through expedited removal on any given day.  As detailed above, DHS over the past year has significantly streamlined the expedited removal process and has set records in terms of individuals placed in expedited removal by CBP at the SWB and credible fear interviews conducted by AOs.  Given current resources, however, and in the absence of congressional action, there is a limit on how many people can be put through the process—and that limit directly informs the 1,500 threshold.

From May 12, 2023, through March 2024, USBP has referred a daily average of over 900 individuals encountered at the SWB into the expedited removal process.[272]  During the same period, about 17 percent of individuals encountered between POEs voluntarily returned to

---

changes in migrant arrivals."); UNHCR, *Global Trends: Forced Displacement in 2022*, at 2, 8–9, 12 (June 14, 2023), https://www.unhcr.org/global-trends-report-2022 (showing rapid global increases in forcibly displaced persons and other persons in need of international protection in 2021 and 2022, and projecting significant future increases).

[271] Consistent with the Departments' conclusion in the Circumvention of Lawful Pathways rule, the Departments believe the emergency border circumstances described in the Proclamation and this rule cannot be addressed by relying on the programmatic use of its contiguous territory return authority at section 235(b)(2)(C) of the INA, 8 U.S.C. 1225(b)(2)(C), due to resource constraints and foreign affairs considerations.  *See* 88 FR at 31370; 88 FR at 11731.

[272] OHSS analysis of data downloaded from UIP on April 2, 2024.

Mexico, had their removal orders reinstated at the border, or were subject to administrative removal pursuant to INA 238(b), 8 U.S.C. 1228(b).[273]  This means that, at the 1,500-encounter level and assuming a similar level of voluntary repatriations and reinstatements, DHS would be able to refer for expedited removal more than 70 percent of the individuals who are not quickly repatriated.[274]  As discussed previously, of those individuals encountered by USBP and placed into expedited removal from May 12, 2023 to March 31, 2024, 65 percent have been quickly removable—either because they do not claim a fear, or because they are found not to have a credible fear and are ordered removed.[275]  This means that, at 1,500 daily encounters between POEs, and assuming similar fear claim rates, DHS would be able to quickly remove the majority of the people it processes at the border on any given day who have no legal basis to remain in the United States.[276]

Simply put, at 1,500 daily encounters, DHS would be able to swiftly deliver a consequence to enough individuals to meaningfully impact migratory decisions and deter unlawful entries.  DHS would also be able to minimize releases of those who are amenable to expedited removal or transfer them to ICE custody pending immigration proceedings.  By contrast, above 2,500 encounters—the level at which the Proclamation and the rule would again apply—DHS's ability to impose such consequences is significantly lower and decreases rapidly

---

[273] Based on comprehensive CBP processing dispositions for single adults, family units, and UCs from contiguous countries encountered May 12, 2023 to March 31, 2024; data downloaded from UIP on April 2, 2024.

[274] At 1,500 single adult, family unit, and UC from contiguous countries encounters between POEs per day and with 17 percent of such encounters voluntarily returning to Mexico or subject to reinstatement of a removal order or administrative removal, 1,250 encounters would not be subject to rapid repatriation, including 1,240 who would potentially be amenable to expedited removal.  Further, assuming that CBP could process 900 people for expedited removal, the agency would have the ability to place 72 percent of people not subject to rapid repatriation and 73 percent of potentially amenable single adults and family units into expedited removal.  OHSS analysis of data downloaded from UIP on April 2, 2024.  Applying the rule even more broadly based on a lower threshold would also raise countervailing considerations, *see supra* note 250, and so the Departments have struck the balance reflected in the rule.

[275] OHSS analysis of data downloaded from UIP on April 2, 2024.

[276] At 1,500 encounters of single adults, family units, and UCs from contiguous countries per day and assuming similar shares of encounters accept voluntary return or are subject to reinstatement of removal or administrative removal, about 250 people would be repatriated with one of these dispositions.  Further, assuming 900 encounters would be processed for expedited removal, and that 65 percent of expedited removal encounters would be quickly removable, about 590 would be repatriated pursuant to an expedited removal order or withdrawal, yielding a total of about 830 repatriations (sums do not add due to rounding), or 56 percent of encounters.

as encounters increase beyond that level. At the 2,500-encounter level and assuming a similar level of voluntary repatriations and reinstatements described above, DHS would be able to place just 43 percent of the individuals who are not quickly repatriated into expedited removal— significantly less than the 70 percent under the 1,500-encounter threshold.[277] This would, in turn, lead to a significant degradation of DHS's ability to impose consequences at the border for individuals who do not establish a legal basis to remain in the United States, with DHS only able to quickly remove or return substantially less than half of the individuals it encounters.[278] Moreover, the percentage of people who can be referred to expedited removal and ultimately be quickly removed if they do not establish a legal basis to remain decreases rapidly as encounters increase beyond 2,500 given the baseline constraints outlined above.

This difficulty in imposing swift consequences on individuals without a legal basis to remain in the United States during periods of elevated encounters is borne out by both recent experience, which is detailed in Sections III.B.1 and 2 of this preamble, and by historical data. DHS historical data also clearly show the dichotomy between the outcomes for individuals processed at the border at the 1,500- and 2,500-encounter levels. DHS data show that releases from CBP custody as a share of encounters have generally been highest during periods of sustained high-encounter levels, and lowest when encounters have been at 1,500 or below. For example, from FY 2013 through FY 2019, months with average daily USBP encounters of fewer than 1,500 per day resulted in a minimal level of releases due to capacity constraints at the

---

[277] At 2,500 single adult, family unit, and UC from contiguous countries encounters between POEs per day and with 17 percent of such encounters voluntarily returning to Mexico or subject to reinstatement of a removal order or administrative removal, 2,080 encounters would not be subject to rapid repatriation. Further, assuming that CBP could process 900 people for expedited removal, the agency would have the ability to place 43 percent of people not subject to rapid repatriation into expedited removal. OHSS analysis of data downloaded from UIP on April 2, 2024.

[278] At 2,500 encounters of single adults, family units, and UCs from contiguous countries per day and assuming similar shares of encounters accept voluntary return or are subject to reinstatement of removal or administrative removal, about 420 people would be repatriated with one of these dispositions. Further, assuming 900 encounters would be processed for expedited removal, and that 65 percent of expedited removal encounters would be quickly removable, about 590 would be repatriated pursuant to an expedited removal order or withdrawal, yielding a total of about 1,010 repatriations (sums do not add due to rounding), or 40 percent of encounters.

border.[279]  During the 2013 to 2019 pre-pandemic period, USBP encounters only exceeded 1,500 per day for a sustained period from October 2018 to August 2019.  During that 7-year stretch, months in which daily encounters were between 1,500 and 2,500 resulted in an average of 210 individuals released each day, while months in which daily encounters exceeded 2,500 resulted in approximately 1,300 releases each day with CBP releasing as many as 46 percent of the individuals it processed pending section 240 removal proceedings.[280]

It is important to note, however, the demographics and nationalities encountered at the border significantly impact DHS's ability to impose timely consequences and the number of people who are ultimately released by CBP pending section 240 removal proceedings.  This is especially true for periods when CBP has encountered more UCs, family units, or individuals from countries to which it is difficult to effectuate removals.  During the 2013 to 2019 time frame—which forms the basis for the analysis in the preceding paragraph—the vast majority of encounters at the border were from Mexico, El Salvador, Guatemala, and Honduras—countries that are comparatively easy to return people to.[281]  Today, a much higher proportion of SWB encounters are from other countries that are comparatively much more difficult to return people to, including record numbers from the Eastern Hemisphere.[282]  At the same time, the proportion of encounters involving family units and UCs, although still high, is lower today than it was during periods of high numbers of encounters and releases in FY 2019.[283]  Although shifting demographics affect the Departments' capacity to deliver timely decisions and timely consequences at varying levels of encounters, it remains clear that with the challenging demographics being encountered today, DHS would have the ability to deliver a timely

---

[279] For FY 2013 to FY 2019, in months with fewer than 1,500 encounters between POEs, USBP released an average of 11 encounters per day.  OHSS analysis of March 2024 OHSS Persist Dataset.

[280] OHSS analysis of March 2024 OHSS Persist Dataset.

[281] OHSS analysis of March 2024 OHSS Persist Dataset.

[282] OHSS analysis of March 2024 OHSS Persist Dataset.

[283] UCs and family units accounted for 65 percent of USBP encounters in FY 2019, compared to 45 percent in FY 2024 through March.  OHSS analysis of March 2024 OHSS Persist Dataset.

consequence to the majority of people it processes at the border when encounters are below 1,500—supporting the decision to suspend the application of the rule when DHS reaches that level of encounters over a 7-day average. Likewise, as discussed above, the Departments have concluded that it is reasonable to apply the rule when encounter levels rise above a 7-day average of 2,500 due to the sharp decrease in their ability to swiftly impose meaningful consequences at the border once encounters exceed that level.

Lastly, it is important to note that using a single threshold—for example, 1,500 encounters—to activate or deactivate the measures in this rule would pose significant challenges and not be operationally viable. Having a single threshold would likely lead to scenarios where the rule would be regularly activated and deactivated as the 7-day average rose above and below 1,500, which would have significant operational impacts for CBP, ICE, and USCIS, and be confusing for government personnel, migrants, and other key stakeholders. For example, the Departments will need to notify and provide guidance to their personnel to apply the provisions of this rule in connection with each activation and deactivation. These actions represent a burden on staff time and resources that would have negative operational impacts if activation or deactivation happened regularly. CBP and ICE will also face scenarios in which they would have many people in their custody some of whom would be subject to and others of whom would not be subject to the provisions of this rule, and CBP and ICE will need to keep track of which individuals needed to be processed under which procedures—something that could become extraordinarily complex and unwieldy if the rule were to be activated and deactivated regularly. Legal service providers and migrants would similarly face a great deal of confusion about when the provisions of this rule were in effect based upon a single threshold of 1,500 encounters to activate or deactivate the measures in this rule. The burden of tracking, identifying, and applying different standards that change back and forth over a matter of days is significantly more complex for USCIS personnel as they consider protection claims.

For all of these reasons, it is important to ensure that there is a clear division between the levels at which the rule is deactivated and when it is activated. And to ensure that stakeholders are aware of when the rule is deactivated and activated, DHS will notify the public about Secretarial determinations of the encounter levels described in sections 2(a) and 2(b) of the Proclamation. As noted above, the 2,500-encounter level is a good proxy for when DHS's ability to quickly impose consequences at the border for individuals who do not establish a legal basis to remain is becoming so degraded that it is likely to further incentivize additional unlawful crossings. It also has the benefit of increasing the time that would elapse between deactivations and activations, allowing DHS to ensure that its personnel are not having to constantly switch back and forth between different procedures.[284]

The exclusion of those determined to be inadmissible at a SWB POE from the 1,500- and 2,500-encounter thresholds is also reasonable in light of recent policy decisions, processing experience, and operational needs. Since May 12, 2023, SWB daily POE encounters have averaged 1,650—largely because DHS has been incentivizing individuals to present at POEs in a safe, orderly manner.[285] This number has stayed relatively constant compared to the number of encounters between POEs, which have varied widely, from a low of 2,554 on May 21, 2023, to a high of 10,822 on December 18, 2023.[286] The predictability in the number of POE encounters, paired with the processing efficiencies gained by the widespread use of the CBP One app, improves CBP's ability to manage encounters at POEs. The vast majority of noncitizens who present at a SWB POE have done so after having registered with the CBP One app.[287] Because such individuals have registered with the CBP One app, CBP can process these individuals more

---

[284] The Departments recognize that, due to the rule's approach, at a given encounter level between 1,500 and 2,500 encounters per day—such as 2,000 encounters a day—whether the rule applies will be path dependent. If encounters have been above 2,500, the rule will apply. If encounters have been below 1,500, the rule will not apply. This is a necessary consequence of providing the clear division that the Departments have deemed necessary, and the Departments assess that adopting this approach best balances the relevant considerations.

[285] OHSS analysis of March 2024 OHSS Persist Dataset.

[286] OHSS analysis of March 2024 OHSS Persist Dataset.

[287] OHSS analysis of March 2024 OHSS Persist Dataset.

efficiently and in a more orderly way than individuals encountered between POEs.[288]  This is a critical element of our strategy to encourage the use of safe, orderly, and lawful pathways, as described above, to incentivize noncitizens to seek out lawful pathways instead of attempting to cross into the United States irregularly.  CBP officers will determine the most appropriate processing disposition on a case-by-case basis, although DHS expects to generally issue such individuals an NTA for removal proceedings under section 240 of the INA.

In short, DHS has assessed that the emergency border circumstances that are described by the Proclamation and this rule—and that the President has concluded warrant the step of suspending and limiting entry—reasonably capture the capacity of the border security and immigration systems to deliver consequences in a timely manner to individuals who cross unlawfully or without authorization.  Thus, the Departments have determined to tie the application of the rule's provisions to the date that the Proclamation takes effect, and to include a mechanism to temporarily halt the application of the rule's provisions when encounters between POEs reach 1,500 and to restart the application of its provisions if they once again rise above 2,500.  Because the Departments intend for certain provisions of this rule to remain in effect in the event a court enjoins or otherwise renders inoperable the Proclamation, the Departments intend for the Secretary of Homeland Security to continue to make the factual determinations regarding the 1,500 and 2,500 thresholds described in this rule and in sections 2(a) and 2(b) of the Proclamation, even if the Proclamation is enjoined, in order to provide continuity during emergency border circumstances.  Lastly, the Proclamation may be revoked by the President upon a determination that it is no longer needed.[289]

*C.  Section-by-Section Description of Amendments*

---

[288] *See, e.g.*, 88 FR at 11719.

[289] The Departments have not sought to apply the rule even after any revocation of the Proclamation by the President, because the Departments expect that any such revocation would only follow consultation with the Departments regarding the policy and operational implications of such an action.  Moreover, a decision by the President would reflect important changed circumstances, and the Departments would want to take into account those changed circumstances in assessing the appropriate policy as to the issues covered by this rule.

1.  8 CFR 208.13 and 1208.13

DHS and DOJ are adding a paragraph (g) to the end of 8 CFR 208.13 and 1208.13, respectively, *Establishing asylum eligibility*, to explain when a noncitizen is potentially subject to this IFR's limitation on asylum eligibility and credible fear screening procedures and how this limitation and its associated procedures interact with the Lawful Pathways condition referenced in paragraph (f) of 8 CFR 208.13 and 1208.13.  Paragraph (g) refers the reader to the new regulatory provisions at 8 CFR 208.35 and 1208.35 that establish the limitation on eligibility for asylum where a noncitizen entered the United States across the southern border during emergency border circumstances.

2.  8 CFR 208.35

DHS is adding to 8 CFR part 208, *Procedures for Asylum and Withholding of Removal*, a new subpart D, *Eligibility for Aliens Who Enter the United States During Emergency Border Circumstances*.  Within subpart D, DHS is adding a new § 208.35, *Limitation on asylum eligibility and credible fear procedures for those who enter the United States during emergency border circumstances*.  This section sets forth a new limitation on asylum eligibility and screening procedures related to the application of such limitation in expedited removal proceedings and the conduct of credible fear screenings during the emergency border circumstances.  This provision applies notwithstanding any contrary provision of part 208.

Section 208.35 consists of the following provisions:

Paragraph (a) sets forth the limitation on asylum eligibility.  Under the rule, a noncitizen is ineligible for asylum if the noncitizen is described in § 208.13(g) and not described in section 3(b) of the Proclamation.  This approach is consistent with the general policy of the Proclamation and rule and provides important exceptions that continue to incentivize the use of safe, orderly,

and lawful pathways, such as for those who arrive in the United States at a southwest land border POE pursuant to a process approved by the Secretary of Homeland Security.[290]

Paragraph (a)(2) contains provisions regarding an exception to the limitation on asylum eligibility that aligns with the means for rebutting the presumption of asylum ineligibility in the Circumvention of Lawful Pathways rule. *See* 8 CFR 208.33(a)(3)(i), 1208.33(a)(3)(i). The exception applies if the noncitizen, or the noncitizen's family member as described in § 208.30(c) with whom the noncitizen is traveling, demonstrates by a preponderance of the evidence exceptionally compelling circumstances, including that, at the time of entry, the noncitizen or a member of the noncitizen's family as described in § 208.30(c) with whom the noncitizen is traveling:

- Faced an acute medical emergency;

- Faced an imminent and extreme threat to life or safety, such as an imminent threat of rape, kidnapping, torture, or murder; or

- Satisfied the definition of "victim of a severe form of trafficking in persons" provided in 8 CFR 214.11.

Paragraph (a)(2)(ii) makes clear that where a noncitizen establishes one of the above, they shall necessarily have established exceptionally compelling circumstances. This exception for exceptionally compelling circumstances limits the potential adverse effects of the limitation on asylum eligibility on certain particularly vulnerable populations, and family members with whom they are traveling, without undermining the key policy imperative to disincentivize irregular migration during a time when encounters are above certain benchmarks.[291]  Paragraph (a)(2)(iii)

---

[290] *See* DHS, *Fact Sheet: Department of State and Department of Homeland Security Announce Additional Sweeping Measures To Humanely Manage Border through Deterrence, Enforcement, and Diplomacy* (May 10, 2023), https://www.dhs.gov/news/2023/05/10/fact-sheet-additional-sweeping-measures-humanely-manage-border.

[291] *See, e.g.*, 88 FR at 31325 ("These exceptions and opportunities for rebuttal are meant to ensure that migrants who are particularly vulnerable, who are in imminent danger, or who could not access the lawful pathways provided are not made ineligible for asylum by operation of the rebuttable presumption. Those who are not excepted from and are unable to rebut the presumption of ineligibility may still pursue statutory withholding of removal and protection under the CAT.").

deems those who have established exceptionally compelling circumstances for purposes of this asylum limitation or who are described in the provisions of the Proclamation as being excepted from its suspension and limitation on entry as having established exceptionally compelling circumstances for purposes of the Lawful Pathways condition.  This provision is intended to simplify administration of this asylum limitation while it and the Circumvention of Lawful Pathways rule are both operative.

Paragraph (b) prescribes procedures for considering the limitation on asylum eligibility during the credible fear screening process and for applying the "reasonable probability" standard in the event the Proclamation or the limitation on asylum eligibility are rendered inoperable by court order.  Under paragraph (b)(1), the AO will first determine whether there is a significant possibility that the noncitizen is eligible for asylum in light of the limitation on asylum eligibility in paragraph (a).  The paragraph sets forth three possible procedural scenarios depending on the AO's findings.  First, where the AO determines that the noncitizen is subject to the limitation on asylum eligibility under paragraph (a)—including that there is not a significant possibility, *see* INA 235(b)(1)(B)(iii), 8 U.S.C. 1225(b)(1)(B)(iii),[292] that the noncitizen could establish an exception under section 3(b) of the Proclamation—and that there is not a significant possibility that the noncitizen could establish an exception to the limitation under paragraph (a)(2), the AO will enter a negative credible fear determination with respect to the noncitizen's asylum claim and continue to consider the noncitizen for potential eligibility for statutory withholding of removal and CAT protection under the procedures in paragraph (b)(2), as described below.  *See* 8 CFR 208.35(b)(1)(i).  Second, where the AO determines that the noncitizen is not subject to this IFR's limitation on asylum eligibility because there is a significant possibility that the

---

[292] In the Circumvention of Lawful Pathways rule, the Departments described how AOs would apply the limitation on asylum eligibility at issue there consistent with the statutory "significant possibility" standard.  *See* 88 FR at 31380.  That discussion in the Circumvention of Lawful Pathways rule also applies to AOs' application of the limitation on asylum eligibility created by this IFR.  As explained above in Section III.B.3.a of this preamble, AOs will rarely have grounds to reach a different result from the CBP immigration officers as to the application of the Proclamation or its exceptions.

noncitizen could establish that they are not described in § 208.13(g), the AO will follow the procedures for credible fear interviews relating to the Lawful Pathways condition in § 208.33(b). *See id.* 208.35(b)(1)(ii). This provides that those noncitizens who are not subject to the Proclamation because they did not enter during emergency border circumstances are processed under the provisions governing the Lawful Pathways condition—and under § 208.33(b)(1)(ii), if the noncitizen is not subject to that condition, they will be screened for a significant possibility of eligibility for statutory withholding of removal or CAT protection consistent with § 208.30.[293] Third, where the AO determines that the noncitizen is not subject to this IFR's limitation on asylum eligibility because there is a significant possibility that the noncitizen could establish either that they are described in section 3(b) of the Proclamation or exceptionally compelling circumstances exist under paragraph (a)(2), the AO will conduct the screening consistent with 8 CFR 208.30. *See id.* 208.35(b)(1)(iii).

If the AO determines that the noncitizen is subject to paragraph (a) and cannot establish a significant possibility that they will be able to establish exceptionally compelling circumstances by a preponderance of the evidence per paragraph (a)(2), the AO will then assess whether the noncitizen has established a reasonable probability of persecution (meaning a reasonable probability of being persecuted because of their race, religion, nationality, membership in a particular social group, or political opinion) or torture, with respect to the designated country or countries of removal identified pursuant to section 241(b) of the INA, 8 U.S.C. 1231(b). *See* 8 CFR 208.35(b)(2)(i). As noted above, for purposes of this section, reasonable probability means substantially more than a reasonable possibility, but somewhat less than more likely than not, that the noncitizen would be persecuted because of his or her race, religion, nationality, membership in a particular social group, or political opinion, or tortured, with respect to the designated country or countries of removal. *See id.*

---

[293] In such cases, consistent with the Circumvention of Lawful Pathways rule, DHS would also have discretion to refer the noncitizen to EOIR for section 240 removal proceedings. *See Matter of E-R-M- & L-R-M-*, 25 I&N Dec. 520 (BIA 2011); *see also* 88 FR at 31348.

If the noncitizen establishes a reasonable probability of persecution or torture with respect to the designated country or countries of removal, DHS will issue a positive credible fear determination and follow the procedures in § 208.30(f).  *See id.* 208.35(b)(2)(ii).  Under § 208.30(f), USCIS may issue an NTA for removal proceedings under section 240 of the INA, or, in its discretion, retain the application for an asylum merits interview pursuant to § 208.2(a)(1)(ii).  Under the regulations governing the asylum merits interview process, where USCIS exercises its discretion to retain jurisdiction over an application for asylum of a noncitizen found to have a credible fear of persecution or torture pursuant to § 208.30(f), the written record of the positive credible fear determination is treated as the asylum application.  8 CFR 208.3(a)(2).  Under this IFR, however, noncitizens who are subject to the limitation on asylum eligibility under 8 CFR 208.35(a), and fail to show a significant possibility of being able to establish an exception by a preponderance of the evidence at the credible fear interview, will receive a negative credible fear determination with respect to their application for asylum, pursuant to § 208.35(b)(1)(i), but could go on to receive a positive credible fear determination with respect to a potential claim for statutory withholding of removal or protection under the CAT at the reasonable probability of persecution or torture standard.  *See id.* 208.35(b)(2).

In the event that USCIS were to exercise its discretion to place such a case into the asylum merits interview process, the credible fear record in that case would have found the applicant unable to establish eligibility for asylum under § 208.35(a) and the positive determination would be based only on a potential statutory withholding of removal or protection under the CAT claim.  USCIS may thus need supplementary information to constitute an application for asylum, as the asylum claim may not have been fully explored in the credible fear record given that the AO determined the applicant would have been ineligible for asylum based on the rule's limitation on asylum eligibility.  Therefore, § 208.35(b)(2)(ii) allows USCIS to require a noncitizen who received a negative credible fear determination with respect to their application for asylum pursuant to § 208.35(b)(1)(i), but whose application is nonetheless

retained by USCIS for asylum merits interview proceedings, to submit an asylum application to USCIS within 30 days of service of the positive credible fear determination, to ensure that there is a record of their potential asylum claim to serve as a substantive asylum application.  For purposes of the filing and receipt date, the date of service of the positive credible fear determination will continue to serve as the date of filing pursuant to § 208.3(a)(2); however, if USCIS requires the submission of an asylum application, the timelines laid out in § 208.9(a)(1) and § 208.9(e)(2) may be delayed up to 15 days, considering the need to allow extra time for the submission of an asylum application to USCIS following service of the positive credible fear determination.  *See id.* 208.35(b)(2)(ii).  Under this IFR, if the applicant does not submit the application within the time period required, USCIS will refer the noncitizen to section 240 removal proceedings before an IJ.  USCIS does not foresee that it would be a prudent use of resources to place such cases into the asylum merits interview process, considering that USCIS has a finite number of AOs, and it is more efficient at present to assign work in a manner that maximizes the number of credible fear interviews USCIS can conduct at the border.  Nevertheless, the IFR preserves the flexibility for USCIS to exercise its discretion to potentially place such cases into the asylum merits interview process (albeit with the potential addition of a supplementary application for asylum) should available resources and circumstances ever be such that it would be prudent to place such cases into the asylum merits interview process.

If the noncitizen fails to establish a reasonable probability of persecution or torture with respect to all designated countries of removal, the AO will provide the noncitizen with a written notice of decision and inquire whether the noncitizen wishes to have an IJ review the negative credible fear determination.  *See id.* 208.35(b)(2)(iii).  If the noncitizen indicates on the Record of Negative Fear that they request IJ review of the adverse finding, *see id.* 208.35(b)(2)(iv), the AO will serve the noncitizen with a Notice of Referral to Immigration Judge, *see id.* 208.35(b)(2)(v).  *See* 88 FR at 11747; 88 FR at 31423.  The record of determination, including copies of the Notice of Referral to Immigration Judge, the AO's notes, the summary of the

material facts, and other materials upon which the AO based their determination regarding the applicability of the condition on asylum eligibility (which, in cases where the limitation on asylum eligibility created by this IFR applies, includes materials showing the relevant known entry date), will be provided to the IJ with the negative determination. *See* 8 CFR 208.35(b)(2)(v). The IJ would then review the case consistent with § 1208.35, described below.

If, following IJ review, the IJ makes a positive credible fear determination under § 1208.35(b)(2)(iii) or § 1208.35(b)(4), the case will proceed under § 1208.30(g)(2)(iv)(B). *See id.* 208.35(b)(2)(v)(A). The IJ may vacate the Notice and Order of Expedited Removal and refer the case back to DHS for further proceedings consistent with 8 CFR 1208.2(a)(1)(ii). *See id.* 1208.30(g)(2)(iv)(B). Alternatively, DHS may commence section 240 removal proceedings, during which time the noncitizen may file an application for asylum, statutory withholding of removal, and CAT protection in accordance with § 1208.4(b)(3)(i). *See id.* 1208.30(g)(2)(iv)(B).

If the IJ makes a negative credible fear determination, however, the case will be returned to DHS for removal of the noncitizen. *See id.* 208.35(b)(2)(v)(B). Consistent with the purpose of the expedited removal process and this IFR, there would be no appeal from the IJ's decision and DHS would not accept requests for reconsideration. *See id.* USCIS may, however, in its sole discretion, reconsider a negative determination. *See id.*; 88 FR at 11747; 88 FR at 31418– 19.

Paragraph (b)(3) applies in the event that the limitation on asylum eligibility in paragraph (a) is rendered inoperative by court order. In such circumstance, those who enter during emergency border circumstances and who are found not to have a significant possibility of eligibility for asylum because of the Lawful Pathways condition will be screened for eligibility for statutory withholding of removal and CAT protection under the "reasonable probability" screening standard. This will ensure continued applicability of that standard during emergency border circumstances, even absent the rule's limitation on asylum eligibility. The Departments acknowledge that under this approach, not all who would have been subject to the higher

screening standard if the limitation remained in force would be subject to it in the event of an injunction—i.e., those who do not travel through a country other than their country of citizenship, nationality, or, if stateless, last habitual residence; those excepted from the Lawful Pathways condition under the exceptions at 8 CFR 208.33(a)(2)(ii)(A) and (C); those excepted from the Lawful Pathways condition because they present at a POE without a pre-scheduled time and place and demonstrate that it was not possible to access or use the DHS scheduling system due to language barrier, illiteracy, significant technical failure, or other ongoing and serious obstacle; and those who enter across the maritime borders covered by the Proclamation that are not covered by the Lawful Pathways condition. The Departments have adopted a somewhat narrower scope for the standard to avoid a circumstance where AOs and IJs would be required to analyze both the applicability of the Lawful Pathways condition and then also whether the noncitizen would otherwise be subject to the rule's limitation—which could complicate and increase the time required to conduct credible fear screenings. The Departments believe the approach adopted strikes the right balance between the interest in applying the screening standard to those to whom it would otherwise apply and administrability in the event the limitation on asylum eligibility is rendered inoperative by court order. The Departments request comment on whether to expressly expand this provision to also apply to those who are found not to have a significant possibility of eligibility for asylum because they are barred from asylum due to a mandatory bar to asylum eligibility if the rule Application of Certain Mandatory Bars in Fear Screenings, 89 FR 41347 (May 13, 2024), is finalized.

Paragraph (c) contains a family unity provision that parallels and serves the same purposes as the DOJ family unity provision in the Circumvention of Lawful Pathways rule. *See* 8 CFR 1208.33(c). The paragraph specifies that a noncitizen who would be eligible for asylum but for the limitation on eligibility set forth in the IFR, the condition set forth in the Circumvention of Lawful Pathways rule, or both, may meet the family unity exception where the other requirements are met. The expressly permissive, discretionary nature of this provision,

which owes in part to the considerations described earlier in this section with respect to asylum merits interviews, distinguishes it from the parallel DOJ provision in the Circumvention of Lawful Pathways rule and the parallel DOJ provision described in the next section of this preamble.

Paragraph (d) mirrors 8 CFR 208.33(c) and 1208.33(d) and specifies the ongoing applicability of the limitation on asylum eligibility by providing that it shall apply to "any asylum application" that is filed by a covered noncitizen "regardless of when the application is filed and adjudicated." *Id.* 208.35(d)(1). The Departments have excepted from this ongoing application of the limitation on asylum eligibility certain noncitizens who enter the United States during emergency border circumstances while under the age of 18 and who later seek asylum as principal applicants so long as the asylum application is filed after the period of time described in § 208.13(g) during which the noncitizen entered. *See id.* 208.35(d)(2). Commenters on the Circumvention of Lawful Pathways rule raised concerns about the impact of that rule on children who arrive as part of a family unit and who are thus subject to the decision-making of their parents. 88 FR at 31320. The Departments decided to adopt a provision excepting such children from that rule in certain circumstances after the two-year period ends. *See* 8 CFR 208.33(c)(2), 1208.33(d)(2). The Departments recognized that children who enter with their families are generally traveling due to their parents' decision-making. 88 FR at 31320. The Departments believe that these considerations are also relevant to this rule and have decided to adopt a similar approach as that adopted in the Circumvention of Lawful Pathways rule.

The Departments considered whether to except family units, or children who are part of family units, from the limitation on asylum eligibility entirely. The Departments decline to adopt such an approach. Excepting all family units that include minor children could incentivize families who otherwise would not make the dangerous journey and cross unlawfully to do so. And excepting only the child could inadvertently lead to the separation of a family in many cases because every child would have to be treated separately from their family during the credible

fear screening, as they would not be subject to the limitation but their parents could be. Although accompanied children remain subject to the limitation on asylum eligibility generally, the Departments have determined that the limitation should not apply to them in any application for asylum they file after the relevant period, but only if they apply as a principal (as opposed to a derivative) applicant.

The Departments also considered applying a specific calendar date to this provision, similar to the approach taken by the Departments in the Circumvention of Lawful Pathways rule.[294]  The Departments determined that such a provision would be challenging to implement because the Departments have not identified a date certain upon which emergency border circumstances are expected to discontinue.  The Departments believe that the key purpose of an asylum application waiting period—protecting against any perceived incentive for family units to migrate irregularly—is adequately served by a requirement that the applicable period of emergency border circumstances is no longer in place at the time of application.  For that same reason, the Departments do not believe it is necessary to make this exception unavailable during any period of emergency border circumstances; instead, this exception will be available after the end of the emergency border circumstance during which the applicant entered.  Because noncitizens will not know in advance when the emergency border circumstance will end, and when another emergency border circumstance might occur, the approach adopted in the rule addresses noncitizens' incentives without restricting this exception more than is necessary.

The Departments believe this approach balances the interest in ensuring the limitation has an impact on behavior, while at the same time recognizing the special circumstance of children who enter in a manner that triggers the limitation, likely without intending to do so or being able to form an understanding of the consequences.  Specifically, if the Departments were to extend this exception to children who filed as a derivative, the Departments would risk incentivizing

---

[294] Under that rule, the Lawful Pathways condition does not apply to certain asylum applications filed after May 11, 2025—two years after that rule's initial issuance.  8 CFR 208.33(c)(2), 1208.33(d)(2); 88 FR at 31449.

families to seek to prolong their proceedings to file their asylum applications after the end of the circumstances leading to the suspension and limitation on entry, undermining the Departments' interest in efficient adjudications. In addition, any family that did so would be able to avoid the applicability of the limitation entirely, by virtue of the rule's family unity provision. The Departments have decided not to include such a broad exception, in light of the urgent need to gain efficiencies in the expedited removal process and dissuade entry during the circumstances described in the Proclamation and this rule.

Finally, DHS is including a severability clause in this provision. *See* 8 CFR 208.35(e). If any provision of this section, § 235.15, or the Proclamation is held to be invalid or unenforceable by its terms, or as applied to any person or circumstance, DHS intends that the provision be construed so as to continue to give the maximum effect to the provision permitted by law, unless such holding is that the provision is wholly invalid and unenforceable, in which event the provision should be severed from the remainder of this section and the holding should not affect the remainder of this section or the application of the provision to persons not similarly situated or to dissimilar circumstances. Indeed, in this rule, the Departments have sought to avoid describing "emergency border circumstances" as the time period during which the Proclamation is in effect, because the Departments intend for certain provisions of this rule to remain in effect in the event a court enjoins or otherwise renders inoperable the Proclamation or this rule's limitation on asylum eligibility. This approach is consistent with the nature of the rule as an emergency measure and reflects DHS's determination that the limitation on asylum eligibility will improve the border security and immigration systems' capacity to safely process migrants during the circumstances described in the Proclamation and this rule. For example, even in the absence of the limitation on asylum eligibility, as expressly set forth in paragraph (b)(3), the Department intends that the "reasonable probability" standard be used for screening for eligibility for statutory withholding of removal and CAT protection for those who would have been subject to the limitation on asylum if they are otherwise unable to establish a credible fear

of persecution for asylum purposes, including but not limited to because they are subject to the Lawful Pathways rebuttable presumption.  Similarly, even in the absence of the new provision at 8 CFR 235.15 discussed below, the changes made in § 208.35 are expected to prove helpful in the emergency circumstances described by the Proclamation and the rule.  *See id.* 208.35(e).

3.  8 CFR 1208.35

Like DHS's addition to 8 CFR part 208, DOJ is adding to 8 CFR part 1208, *Procedures for Asylum and Withholding of Removal*, a new subpart D, *Eligibility for Aliens Who Enter the United States During Emergency Border Circumstances*.  Within subpart D, DOJ is adding a new § 1208.35, *Limitation on asylum eligibility and credible fear procedures for those who enter the United States during emergency border circumstances*.  This section sets forth a new limitation on asylum eligibility and procedures related to IJ review of credible fear determinations in expedited removal proceedings during emergency border circumstances.  This provision applies notwithstanding any contrary provision in EOIR's regulations.  Section 1208.35 consists of the following provisions:

Paragraph (a) mirrors new § 208.35(a), discussed above.

Paragraph (b) provides procedures for credible fear determinations.  Under these procedures, when a noncitizen has requested IJ review of an AO's negative credible fear determination, the IJ will evaluate the case de novo, taking into account the credibility of the statements made by the noncitizen in support of the noncitizen's claim and such other facts as are known to the IJ.  *See* 8 CFR 1208.35(b)(1).  The paragraph sets forth three possible procedural scenarios depending on the IJ's determinations.  First, where the IJ determines that the noncitizen is not subject to this IFR's limitation on asylum eligibility because there is a significant possibility that the noncitizen could establish that they are not described in § 1208.13(g), the IJ will follow the procedures for credible fear interviews relating to the Lawful Pathways condition

in § 1208.33(b).  *See id.* 1208.35(b)(2)(i).[295]  This provides that those noncitizens who did not enter during emergency border circumstances are processed under the provisions governing the Lawful Pathways condition—and under § 1208.33(b)(2)(i), if the noncitizen is not subject to that condition they will be screened for a significant possibility of eligibility for statutory withholding of removal or CAT protection consistent with § 208.30.  Second, where the IJ determines that the noncitizen is not subject to this IFR's limitation on asylum eligibility because there is a significant possibility that the noncitizen could establish either that they are described in section 3(b) of the Proclamation or exceptionally compelling circumstances exist under paragraph (a)(2), the IJ will follow the procedures in 8 CFR 1208.30.  *See id.* 1208.35(b)(2)(ii).  Third, where the IJ determines that the IFR's limitation on asylum eligibility applies—including that there is not a significant possibility that the noncitizen could establish an exception under section 3(b) of the Proclamation—and that there is not a significant possibility that the noncitizen could establish an exception under paragraph (a)(2) of the limitation, the IJ will apply the Circumvention of Lawful Pathways rule's procedures set forth in § 1208.33(b)(2)(ii), except that the IJ will apply a "reasonable probability" standard to parallel the standard adopted by DHS.  *See id.* 1208.35(b)(2)(iii).

Paragraph (b)(4), mirrors new § 208.35(b)(3), discussed above.

Paragraph (c) contains a family unity provision that parallels and serves the same purposes as the family unity provision in the Circumvention of Lawful Pathways rule.  *See id.* 1208.33(c), 1208.35(c).  The paragraph specifies that a noncitizen who would be eligible for asylum but for the limitation on eligibility set forth in the IFR, the condition set forth in the

---

[295] As explained above regarding AOs, the discussion in the Circumvention of Lawful Pathways rule regarding how AOs would apply the limitation on asylum eligibility at issue there consistent with the statutory "significant possibility" standard, *see* 88 FR at 31380, is equally applicable to IJs' application of the limitation on asylum eligibility created by this IFR.  As explained above in Section III.B.3.a of this preamble, IJs will rarely have grounds to reach a different result from the CBP immigration officers as to the application of the Proclamation or its exceptions.

Circumvention of Lawful Pathways rule, or both, may meet the family unity exception where the other requirements are met.

Paragraph (d) mirrors new § 208.35(d), discussed above.

Paragraph (e) contains a severability provision that serves a similar purpose to the provision in § 208.35(e) described above.  If any provision of this section or the Proclamation is held to be invalid or unenforceable by its terms, or as applied to any person or circumstance, DOJ intends that the provision be construed so as to continue to give the maximum effect to the provision permitted by law, unless such holding is that the provision is wholly invalid and unenforceable, in which event the provision should be severed from the remainder of this section and the holding should not affect the remainder of this section or the application of the provision to persons not similarly situated or to dissimilar circumstances.  This approach is consistent with the nature of the rule as an emergency measure and reflects DOJ's determination that the limitation on asylum eligibility will improve the border security and immigration systems' capacity to safely process migrants during the circumstances described in the Proclamation and this rule.  For example, as set forth explicitly in paragraph (b)(4), even in the absence of the limitation on asylum eligibility, the Department intends that the "reasonable probability" standard be used for screening for eligibility for statutory withholding of removal and CAT protection for those who would have been subject to the limitation on asylum if they are otherwise unable to establish a credible fear of persecution for asylum purposes, including but not limited to because they are subject to the Lawful Pathways rebuttable presumption.  *See id.* 1208.35(e).

4.  8 CFR 235.15

DHS is adding to 8 CFR part 235, *Inspection of Persons Applying for Admission*, a new § 235.15, *Inadmissible aliens and expedited removal during emergency border circumstances.* New 8 CFR 235.15 will further streamline aspects of the expedited removal process by effectively replacing paragraphs (b)(2)(i) and (b)(4)(i) of 8 CFR 235.3 for those individuals

described in § 235.3(b)(1)(i) or (ii) and who are described in § 208.13(g) but not described in

section 3(b) of the Proclamation.  *See* 8 CFR 235.15.  The changes would not affect

implementation of 8 CFR 235.3(b)(4)(ii) or any other portion of 8 CFR 235.3.  *See id.*  The

changes are as follows.

First, under 8 CFR 235.3(b)(2)(i), the record of proceeding includes a sworn statement

using Form I-867AB, *Record of Sworn Statement in Proceedings under Section 235(b)(1) of the*

*Act*.  Under the existing regulations, the examining immigration officer reads (or has read) to the

noncitizen all information contained on Form I-867A.  Following questioning and recording of

the noncitizen's statement regarding identity, alienage, and inadmissibility, the examining

immigration officer records the noncitizen's response to the questions contained on Form I-

867B, and has the noncitizen read (or has read to the noncitizen) the statement, and the

noncitizen signs and initials each page of the statement and each correction, if any.

DHS is adding a new 8 CFR 235.15(b)(2)(i) to apply to certain noncitizens instead of this

current process during emergency border circumstances.  Under this procedure, Forms I-867A

and I-867B will no longer be mandated in such circumstances.  Instead, the immigration officer

shall advise the individual of the charges against them on the Form I-860 and give him or her an

opportunity to respond to those charges.  *See* 8 CFR 235.15(b)(2)(i)(B).  This provision does not

require that the response be done through a sworn statement.  *See id*.  Consistent with current

regulations, however, the inspecting officer must obtain supervisory concurrence of an expedited

removal order in accordance with § 235.3(b)(7).  *Id*.  Moreover, consistent with current

regulations, the examining immigration official shall serve the noncitizen with Form I-860, and

the noncitizen shall be required to sign the form acknowledging receipt.  *Id*.  The new 8 CFR

235.15(b)(2)(i) no longer mandates that the signature occur on the reverse, but preserves the

requirement that the noncitizen be required to sign, allowing greater flexibility for location of

signature blocks on the document.  *See id.* 235.3(b)(2)(i).  The new provision maintains the

requirement that interpretative assistance shall be used if necessary to communicate with the

noncitizen.  *Id.* 235.3(b)(2)(i)(B).  The new 8 CFR 235.15(b)(2)(i) also allows for greater

flexibility regarding how DHS records the information that supports the finding that the

noncitizen is inadmissible and subject to expedited removal.  This operational flexibility is

consistent with the President's determination that emergency border circumstances are present

such that the suspension and limitation on entry is warranted.

Second, under 8 CFR 235.3(b)(4), if a noncitizen subject to the expedited removal

provisions indicates an intention to apply for asylum, or expresses a fear of persecution or

torture, or a fear of return to his or her country, the inspecting officer does not proceed further

with removal of the noncitizen until the noncitizen has been referred for an interview by an AO

in accordance with 8 CFR 208.30.

Instead of this current process, DHS is adding a new 8 CFR 235.15(b)(4), applicable to

those who (1) are described in § 208.13(g), (2) are not described in section 3(b) of the

Proclamation, and (3) are processed for expedited removal.  Under this provision the

immigration officer would refer the noncitizen to an AO if the noncitizen manifests a fear of

return or affirmatively expresses an intention to apply for asylum, or affirmatively expresses a

fear of persecution or torture, or a fear of return to his or her country or the country of removal.

Third, under 8 CFR 235.3(b)(4)(i), the referring officer provides the noncitizen with a

written disclosure on Form M-444, *Information About Credible Fear Interview*, describing

(1) the purpose of the referral and description of the credible fear interview process; (2) the right

to consult with other persons prior to the interview and any review thereof at no expense to the

United States Government; (3) the right to request a review by an IJ of the AO's credible fear

determination; and (4) the consequences of failure to establish a credible fear of persecution or

torture.  New 8 CFR 235.15(b)(4) will simply require that an immigration officer provide "a

written disclosure describing the purpose of the referral and the credible fear interview process;

the right to consult with other persons prior to the interview and any review thereof at no

expense to the United States Government; the right to request a review by an IJ of the AO's

credible fear determination; and the consequences of failure to establish a credible fear of

persecution or torture." 8 CFR 235.15(b)(4)(i)(B). Thus, while maintaining the substance of the

information that must be provided to the noncitizen, the regulation removes the requirement that

it be on a particular form, allowing for greater flexibility in how the information is distributed.

Finally, DHS is including a severability clause in this provision. *See id.* 235.15(g). DHS

believes that each of these changes can function sensibly without the others, given that each

change is independently seeking to provide greater flexibility during a time when the suspension

and limitation on entry is in effect, while still protecting the important ability of individuals to

seek protection from removal. DHS further believes that even if a court order enjoins or vacates

the Proclamation or provisions other than § 235.15 of this rule, the provisions in § 235.15 can

continue to apply to those described in § 208.13(g) and not described in section 3(b) of the

Proclamation, even if they cannot be subject to those provisions by operation of such court order.

## IV. Statutory and Regulatory Requirements

### A. Administrative Procedure Act

Under the Administrative Procedure Act ("APA"), agencies must generally provide

"notice of proposed rule making" in the *Federal Register* and, after such notice, "give interested

persons an opportunity to participate in the rule making through submission of written data,

views, or arguments." 5 U.S.C. 553(b) and (c). The APA further provides that the required

publication or service of a substantive rule shall be made not less than 30 days before its

effective date, except in certain circumstances. *Id*. 553(d). Consistent with the APA, the

Departments have not invoked these procedures because (1) this rule involves a foreign affairs

function of the United States and thus is excepted from such requirements, *id.* 553(a)(1), and (2)

the Departments have found good cause to proceed with an immediately effective interim final

rule, *id.* 553(b)(B), 553(d)(3), for the reasons explained below.  At the same time, the Departments seek and welcome post-promulgation comments on this IFR.

1.  Foreign Affairs

This rule is excepted from the APA's notice-and-comment and delayed-effective-date requirements because it involves a "foreign affairs function of the United States."  5 U.S.C. 553(a)(1).  Courts have held that this exception applies when the rule in question "is clearly and directly involved in a foreign affairs function."[296]  In addition, although the text of the APA does not require an agency invoking this exception to show that such procedures may result in "definitely undesirable international consequences," some courts have required such a showing. *Rajah v. Mukasey*, 544 F.3d 427, 437 (2d Cir. 2008) (quotation marks omitted).[297]  This rule satisfies both standards.

The United States' border management strategy is predicated on the belief that migration is a shared responsibility among all countries in the region—a fact reflected in the intensive and concerted diplomatic outreach on migration issues that DHS and the Department of State have made with partners throughout the Western Hemisphere.  This strategy includes the Los Angeles Declaration on Migration and Protection, which was joined by leaders during the Summit of the Americas on June 10, 2022, and has been endorsed by 22 countries.[298]  Under the umbrella of this framework, the United States has been working closely with its foreign partners to manage

---

[296] *E.B. v. U.S. Dep't of State*, 583 F. Supp. 3d 58, 63 (D.D.C. 2022) (cleaned up); *see Mast Indus., Inc. v. Regan*, 596 F. Supp. 1567, 1582 (Ct. Int'l. Trade 1984); *see also Am. Ass'n of Exps. & Imps. v. United States*, 751 F.2d 1239, 1249 (Fed. Cir. 1985) (holding that the exception applies where a rule is "linked intimately with the Government's overall political agenda concerning relations with another country").

[297] *See, e.g.*, *Rajah*, 544 F.3d at 437 ("There are at least three definitely undesirable international consequences that would follow from notice and comment rulemaking.  First, sensitive foreign intelligence might be revealed in the course of explaining why some of a particular nation's citizens are regarded as a threat.  Second, relations with other countries might be impaired if the government were to conduct and resolve a public debate over why some citizens of particular countries were a potential danger to our security.  Third, the process would be slow and cumbersome, diminishing our ability to collect intelligence regarding, and enhance defenses in anticipation of, a potential attack by foreign terrorists."); *see also Yassini v. Crosland*, 618 F.2d 1356, 1360 n.4 (9th Cir. 1980) ("For the [foreign affairs] exception to apply, the public rulemaking provisions should provoke definitely undesirable international consequences."). *But see E.B.*, 583 F. Supp. 3d at 64-66 (rejecting the "provoke definitely undesirable international consequences" standard).

[298] *See* Los Angeles Declaration on Migration and Protection, *Endorsing Countries*, https://losangelesdeclaration.com/endorsing-countries (last visited May 27, 2024).

the unprecedented levels of migration that countries throughout the region have recently been experiencing, including on efforts to: expand access to, and increase, lawful pathways, such as the Safe Mobility Office initiative;[299] conduct joint enforcement efforts, such as the Darién Campaign with Colombia and Panama and the mirrored patrols[300] with the Government of Mexico along our shared border;[301] and share information, technical assistance, and best practices.[302] The United States and endorsing countries continue to progress and expand upon our shared commitments made under this framework.[303]

This international coordination has yielded important results. A number of foreign partners, including Mexico, Panama, and Colombia, announced significantly enhanced efforts to enforce their borders in the days leading up to the end of the Title 42 public health Order.[304] These governments recognized that the United States was taking measures to strengthen border enforcement, specifically through application of the Circumvention of Lawful Pathways rule along with other complementary measures, and committed to taking their own actions to address

---

[299] *See* U.S. Dep't of State, *Safe Mobility Initiative*, https://www.state.gov/refugee-admissions/safe-mobility-initiative (last visited May 27, 2024).

[300] *See* CBP, *Readout: U.S.-- Mexico meeting on joint actions to further enhance border security* (Sept. 24, 2023), https://www.cbp.gov/newsroom/national-media-release/readout-us-mexico-meeting-joint-actions-further-enhance-border (noting that CBP encouraged mirrored patrols); U.S. Dep't of State, *Third Meeting of the U.S.-Mexico High-Level Security Dialogue—Fact Sheet* (Oct. 13, 2023), https://www.state.gov/third-meeting-of-the-u-s-mexico-high-level-security-dialogue/ (noting that "CBP and INM regularly coordinate enforcement efforts at the border through mirrored patrols," which suggests that those patrols were occurring).

[301] *See* DHS, *Trilateral Statement* (Apr. 11, 2023), https://www.dhs.gov/news/2023/04/11/trilateral-joint-statement.

[302] *See, e.g.*, *Creating a Comprehensive Regional Framework To Address the Causes of Migration, To Manage Migration Throughout North and Central America, and To Provide Safe and Orderly Processing of Asylum Seekers at the United States Border*, Exec. Order 14,010, 86 FR 8267, 8270 (Feb. 2, 2021); The White House, *Los Angeles Declaration on Migration and Protection* (June 10, 2022), https://www.whitehouse.gov/briefing-room/statements-releases/2022/06/10/los-angeles-declaration-on-migration-and-protection/; The White House, *Fact Sheet: U.S.-Mexico High-Level Security Dialogue* (Oct. 8, 2021), https://www.whitehouse.gov/briefing-room/statements-releases/2021/10/08/fact-sheet-u-s-mexico-high-level-security-dialogue/; U.S. Dep't of State, *Fact Sheet: Third Meeting of the U.S.-Mexico High-Level Security Dialogue* (Oct. 13, 2023), https://www.state.gov/third-meeting-of-the-u-s-mexico-high-level-security-dialogue/.

[303] *See* The White House, *Fact Sheet: Third Ministerial Meeting on the Los Angeles Declaration On Migration and Protection in Guatemala* (May 7, 2024),

[304] Kathia Martínez, *US, Panama and Colombia Aim to Stop Darien Gap Migration*, AP News (Apr. 11, 2023), https://apnews.com/article/darien-gap-panama-colombia-us-migrants-cf0cd1e9de2119208c9af186e53e09b7; Camilo Montoya-Galvez, *Mexico Will Increase Efforts To Stop U.S.-Bound Migrants as Title 42 Ends, U.S. Officials Say*, CBS News (May 10, 2023), https://www.cbsnews.com/news/title-42-end-border-mexico-efforts-us-bound-migrants/.

irregular migratory flows in the region.[305]  Additionally, immediately prior to the transition from DHS processing under the Title 42 public health Order to processing under title 8 authorities, the Government of Mexico announced that it had independently decided to accept the return into Mexico of nationals from CHNV countries under title 8 processes.[306]  However, in the intervening months, Mexico and other partners' resources have been significantly strained by sustained high encounter levels, and at different times enforcement by our partners has been disrupted, leading to surges at our own border.[307]

In public messaging, the Government of Mexico linked its decision to accept return into Mexico of CHNV nationals to the success of the CHNV parole processes framework under the Title 42 public health Order,[308] which combined expansion of lawful pathways and processes for nationals of these countries with a meaningful consequence framework, and which reduced

---

[305] 88 FR at 31444.

[306] *See* The White House, *Mexico and United States Strengthen Joint Humanitarian Plan on Migration* (May 2, 2023), https://www.whitehouse.gov/briefing-room/statements-releases/2023/05/02/mexico-and-united-states-strengthen-joint-humanitarian-plan-on-migration/; DHS, *Fact Sheet: Data From First Six Months of Parole Processes for Cubans, Haitians, Nicaraguans, and Venezuelans Shows that Lawful Pathways Work* (July 25, 2023), https://www.dhs.gov/news/2023/07/25/fact-sheet-data-first-six-months-parole-processes-cubans-haitians-nicaraguans-and.

[307] *See* Charles G. Ripley III, *Crisis Prompts Record Emigration from Nicaragua, Surpassing Cold War Era*, Migration Pol'y Inst. (Mar. 7, 2023), https://www.migrationpolicy.org/article/record-emigration-nicaragua-crisis; James Fredrick, *Mexico Feels Pressure of Relentless Migration from South America*, N.Y. Times (Sept. 21, 2023) ("Similar scenes are playing out across the country as Mexico's immigration system strains under a tide of people desperately trying to go north.  The relentless surge has led to a hodgepodge response in Mexico ranging from shutting down railways heading north to the busing of people to areas with fewer migrants."); Megan Janetsky & Javier Córdoba, *Central America scrambles as the international community fails to find solution to record migration*, AP News (Oct. 20, 2023), https://apnews.com/article/costa-rica-migration-darien-gap-biden-420e2d1219d403d7feec6463a6e9cdae (noting the resources pull migration flows place on certain Central American countries); María Verza, *Mexico halts deportations and migrant transfers citing lack of funds*, AP News (Dec. 4, 2023), https://apnews.com/article/mexico-immigration-migrants-venezuela-17615ace23d0677bb443d8386e254fbc (observing that the "head of Mexico's immigration agency . . . ordered the suspension of migrant deportations and transfers due to a lack of funds"); Valerie Gonzalez & Elliot Spagat, *The US sees a drop in illegal border crossings after Mexico increases enforcement*, AP News (Jan. 7, 2024), https://apnews.com/article/mexico-immigration-enforcement-crossings-drop-b67022cf0853dca95a8e0799bb99b68a (noting the disruption in enforcement that resulted from Mexico's lack of funding and quoting Andrew Selee, President of the Migration Policy Institute, as saying that "[t]he U.S. is able to lean on Mexico for a short-term enforcement effect at the border, but the long-term effects are not always clear").

[308] *See* Gobierno de México, *México y Estados Unidos fortalecen Plan Humanitario Conjunto sobre Migración* (May 2, 2023), https://www.gob.mx/presidencia/prensa/mexico-y-estados-unidos-fortalecen-plan-humanitario-conjunto-sobre-migracion?state=published (characterizing the effort of the Government of Mexico as a successful joint initiative and expressing the Government's commitment to continue to accept migrants back into Mexico on humanitarian grounds).

irregular border crossings.[309]  Sustaining and, as appropriate, ramping up efforts to improve border security and stem arrivals to the southern border is a critical element of the United States' ongoing diplomatic approach to migration management with partners in the region.  This has been a key component of our diplomacy, as regional partner countries have regularly encouraged DHS to take steps to address migratory flows, including by channeling intending migrants into expanded lawful pathways and processes.  For example, following the development of the parole process for Venezuelans announced in October 2022—an approach that was subsequently expanded to include processes for Cuban, Haitian, and Nicaraguan nationals in January 2023— regional partners urged the United States to continue building on this approach, which imposed consequences for irregular migration alongside the availability of a lawful, safe, and orderly process for migrants to travel directly to the United States.[310]  Following the announcement of the Venezuela parole process in October 2022 and the subsequent announcement of the Cuba, Haiti, and Nicaragua parole processes in January 2023, migration flows through the region and at the U.S.-Mexico border slowed.  *See* 88 FR at 31317 ("DHS estimates that the drop in CHNV encounters in January through March was almost four times as large as the number of people permitted entry under the parole processes.").

The United States has continued to build on this historic expansion of lawful pathways and processes, which include the humanitarian parole processes for CHNV nationals;[311] efforts to expand labor pathways and dedicate a set number of visas to nationals of countries in the hemisphere;[312] the implementation of new Family Reunification Parole ("FRP") processes for

---

[309] *See id.* (describing a significant reduction in irregular migration following the implementation of CHNV parole processes, which pair an expansion of lawful pathways with consequences for irregular migration).

[310] *See* 88 FR at 31444; The White House, *Mexico and United States Strengthen Joint Humanitarian Plan on Migration* (May 2, 2023), https://www.whitehouse.gov/briefing-room/statements-releases/2023/05/02/mexico-and-united-states-strengthen-joint-humanitarian-plan-on-migration/.

[311] *See* USCIS, *Processes for Cubans, Haitians, Nicaraguans, and Venezuelans* (Sept. 20, 2023), https://www.uscis.gov/CHNV.

[312] *See* DHS & U.S. Dep't of Labor, *Temporary Rule—Exercise of Time-Limited Authority To Increase the Numerical Limitation for FY 2024 for the H-2B Temporary Nonagricultural Worker Program and Portability Flexibility for H-2B Workers Seeking To Change Employers*, 88 FR 80394 (Nov. 17, 2023).

certain nationals of Colombia, Ecuador, El Salvador, Guatemala, and Honduras; and the modernization of FRP processes for certain nationals of Cuba and Haiti.[313]

Concurrently, the Governments of Colombia and Panama have made significant efforts to combat smuggling networks operating on both sides of the Darién Gap.[314]  The Government of Mexico has likewise increased enforcement along its southern border and the transit routes north.[315]  These enforcement campaigns have been implemented at substantial cost for those governments and, as with United States Government actions, reflect our shared regional responsibility to manage migration.[316]

Given the particular challenges facing the United States and its regional partners at this moment, the Departments assess that it is critical that the United States continue to lead the way in responding to ever-changing and increasing migratory flows, and that this regulatory effort and the Presidential Proclamation—and the strong consequences they will impose at the border—will send an important message to the region that the United States is prepared to put in place appropriate measures to prepare for and, if necessary, respond to ongoing migratory challenges.

In addition to this IFR's clear and direct involvement in foreign affairs, the Departments believe that conducting a notice-and-comment process and providing a delayed effective date on this rule likely would lead to a surge to the border before the Departments could finalize the rule,

---

[313] DHS, *DHS Modernizes Cuban and Haitian Family Reunification Parole Processes* (Aug. 10, 2023), https://www.dhs.gov/news/2023/08/10/dhs-modernizes-cuban-and-haitian-family-reunification-parole-processes.

[314] *See* Kathia Martínez, *US, Panama, and Colombia aim to stop Darien Gap migration*, AP News (Apr. 11, 2023), https://apnews.com/article/darien-gap-panama-colombia-us-migrants-cf0cd1e9de2119208c9af186e53e09b7; Juan Zamorano & Christopher Sherman, *Explainer: Panama launches operation against smugglers in Darien Gap*, AP News (June 3, 2023), https://apnews.com/article/panama-colombia-darien-gap-migrants-d0ec93c4d4ddc91f34e31c704b4cf8ae.

[315] *See, e.g.*, Associated Press, *U.S. Border Arrests Decline Amid Increased Enforcement in Mexico*, NPR (Apr. 13, 2024), https://www.npr.org/2024/04/13/1244590706/mexico-border-arrests-fall-march ("Mexico detained migrants 240,000 times in the first two months of the year, more than triple from the same period of 2023, sending many deeper south into the country to discourage them from coming to the United States.  While Mexico hasn't released figures for March, U.S. officials have said Mexican enforcement is largely responsible for recent declines.").

[316] *See, e.g.*, The White House, Press Release, *Mexico and United States Strengthen Joint Humanitarian Plan on Migration* (May 2, 2023), https://www.whitehouse.gov/briefing-room/statements-releases/2023/05/02/mexico-and-united-states-strengthen-joint-humanitarian-plan-on-migration/.

which would adversely impact the United States' foreign policy priorities. Prior to the end of the Title 42 public health Order, regional partners expressed great concern about the misperception that the end of the Order would mean an open U.S. border and result in a surge of irregular migration flowing through their countries as migrants sought to enter the United States. *See* 88 FR at 31444. One foreign partner, for example, expressed the strong concern that the formation of caravans during the spring of 2022 was spurred by rumors—and the subsequent official announcement—of the anticipated end of the Title 42 public health Order. *See id.* This view is consistent with the views of other regional partner countries that have repeatedly emphasized the ways in which U.S. policy announcements have a direct and immediate impact on migratory flows through their countries. *See id.* Such effects are precisely the kind of "definitely undesirable international consequences" that the Departments seek to avoid.

The surge about which many foreign leaders were concerned happened sooner than expected. In the weeks leading up to the lifting of the Title 42 public health Order, hemispheric migration spiked. Entries into the Darién jungle by migrants staged in Colombia began increasing in the months leading up to May 12, 2023, from a little more than 24,600 in January 2023, to more than 40,000 in April 2023 immediately before the Order lifted.[317] And as described more fully above, total CBP encounters at the SWB increased to then-record levels in the days immediately preceding May 12, 2023, a situation that was fueled by noncitizens seeking to enter the United States before new policies were put into effect, as well as by smuggling organizations that disseminated misinformation.[318] The scale of regional migration in those

---

[317] *See* Servicio Nacional de Migración Panamá, *Estadísicas, Tránsito Irregular por Darién 2023*, https://www.migracion.gob.pa/inicio/estadisticas.

[318] *See* Valerie Gonzalez, *Migrants rush across US border in final hours before Title 42 expires*, AP News (May 11, 2023), https://apnews.com/article/immigration-border-title-42-mexico-asylum-8c239766c2cb6e257c0220413b8e9cf9 (noting that "[m]any migrants were acutely aware of looming policy changes as they searched Thursday for an opportunity to turn themselves over to U.S. immigration authorities before the 11:59 EDT deadline . . . [and] [e]ven as migrants were racing to reach U.S. soil before the rules expire, Mexican President Andrés Manuel López Obrador said smugglers were sending a different message . . . [and] offering to take migrants to the United States and telling them the border was open starting Thursday").

weeks strained the immigration processes of all the affected countries, including those of the United States.

As noted above, the United States saw a similar scale of migration at the end of 2023. The surge in December 2023 led the United States Government and the Government of Mexico to hold a series of engagements at the highest levels—including between the countries' Presidents and Cabinet Members—to address the shared challenge of migration confronting both countries.[319]  These conversations included commitments by both governments to continue to expand efforts to coordinate enforcement actions on both sides of the border.[320]  January, February, and March are typically slower months, but since these engagements, and the joint operational actions that resulted, there has been a decrease in USBP encounters at the border, as discussed in Section III.B.1 of this preamble.

The record-breaking hemispheric migration throughout the region has deeply affected governments from South America all the way to the U.S.-Mexico border.  Panama has been encountering record numbers of migrants transiting one of the most dangerous smuggling corridors on the planet, the Darién Jungle.[321]  Colombia, Peru, and Ecuador have hosted around 3 million,[322] over 1.5 million,[323] and more than 475,000 Venezuelans,[324] respectively, while Costa

---

[319] *See supra* Section III.B.1 of this preamble.

[320] *See, e.g.*, White House, *Readout of Homeland Security Advisor Dr. Liz Sherwood-Randall's Trip to Mexico* (Feb. 7, 2024), https://www.whitehouse.gov/briefing-room/statements-releases/2024/02/07/readout-of-homeland-security-advisor-dr-liz-sherwood-randalls-trip-to-mexico/; Amna Nawaz, *Mexico's foreign secretary discusses what her country is doing to ease border crisis*, PBS News Hour (Jan. 25, 2024), https://www.pbs.org/newshour/show/mexicos-foreign-secretary-discusses-what-her-country-is-doing-to-ease-border-crisis (quoting Foreign Secretary Bárcena as describing "much more law enforcement to bring down the pressure in the border" by Mexico in the preceding weeks).

[321] *See* Nick Paton Walsh et al., *On one of the world's most dangerous migrant routes, a cartel makes millions off the American dream*, CNN (Apr. 17, 2023), https://www.cnn.com/2023/04/15/americas/darien-gap-migrants-colombia-panama-whole-story-cmd-intl/index.html; Diana Roy, *Crossing the Darién Gap: Migrants Risk Death on the Journey to the U.S.*, Council on Foreign Rels. (Feb. 1, 2024), https://www.cfr.org/article/crossing-darien-gap-migrants-risk-death-journey-us; Mallory Moench, *Volume of Migrants Crossing the Dangerous Darién Gap Hit Record High in 2023*, Time (Dec. 22, 2023), https://time.com/6547992/migrants-crossing-darien-gap-2023.

[322] *See* UNHCR, *Colombia Country Operations* (2024), https://reporting.unhcr.org/operational/operations/colombia.

[323] *See* UNHCR, *Peru Country Operations* (2024), https://reporting.unhcr.org/operational/operations/peru.

[324] *See* UNHCR, *Ecuador Country Operations* (2024), https://reporting.unhcr.org/operational/operations/ecuador.

Rica has recently hosted hundreds of thousands of Nicaraguans.[325]  Mexico has received record-breaking numbers of asylum applications in addition to the enforcement efforts it is undertaking.[326]

As described more fully above, DHS's internal projections suggest that SWB encounters may once again reach extremely elevated levels in the weeks to come, averaging in the range of approximately 3,900 to approximately 6,700 encounters at and between POEs per day from July to September, not including an additional 1,450 noncitizens per day who are expected to be encountered at POEs after making appointments though the CBP One app.[327]  Regional migration trends support these projections.  For example, between January and April 2024, UNHCR tracked 139,000 irregular entries, up from 128,000 for the same months in 2023 and a seven-fold increase over that period in 2022.[328]  Moreover, as noted above, the Government of Mexico has been receiving record-breaking numbers of asylum applications—reflecting the large number of migrants currently in Mexico.

The weeks leading up to May 12, 2023, demonstrated that when migrants anticipate major changes in border policy, there is the potential to ignite a rush to the border to arrive before the changes take effect.[329]  Any delay between announcement of this rule and its

---

[325] *See* UNHCR, *Costa Rica Country Operations* (2024), https://reporting.unhcr.org/operational/operations/costa-rica.

[326] *See* UNHCR, *Operational Update: Mexico* (Dec. 2023), https://reporting.unhcr.org/mexico-operational-update-6421; UNHCR, *Fact Sheet, Mexico* (Nov. 2023), https://data.unhcr.org/en/documents/download/105202 ("From January to October 2023, Mexico received over 127,796 asylum applications, the highest ever number of asylum claims received in this time frame."); Daina Beth Solomon & Lizbeth Diaz, *Mexico seeks to curb 'abuse' of asylum system by migrants who do not plan to stay*, Reuters (Feb. 13, 2023), https://www.reuters.com/world/americas/mexico-seeks-curb-abuse-asylum-system-by-migrants-who-do-not-plan-stay-2023-02-13/ ("Mexico has the world's third highest number of asylum applications after the United States and Germany, reflecting growing numbers of refugee seekers that have strained resources at the Mexican Commission for Refugee Assistance.").

[327] OHSS Southwest Border Encounter Projection, April 2024.  Note that the OHSS encounter projection excludes encounters of people who have registered with the CBP One app along with administrative encounters at POEs (i.e., encounters in which removal proceedings are not considered), but includes non-CBP One enforcement encounters at POEs, which have averaged about 190 per day since May 2023.  *See also* CBP, *CBP One™ Appointments Increased to 1,450 Per Day* (June 30, 2023), https://www.cbp.gov/newsroom/national-media-release/cbp-one-appointments-increased-1450-day.

[328] *See supra* note 122.

[329] Decl. of Blas Nuñez-Neto ¶¶ 9–10, *E. Bay Sanctuary Covenant v. Biden*, No. 4:18-cv-06810-JST (N.D. Cal. June

implementation through notice and comment would almost certainly trigger a surge in migration that would undermine the principal goal of this entire effort: to reduce migratory flows to our border, and throughout the region.

The Departments believe that the emergency measures being taken here are needed to help address this regional challenge, and that any decrease in migration that results will help relieve the strain not just on the U.S.-Mexico border but on countries throughout the hemisphere. The actions the United States is taking in this regulation demonstrate a commitment to addressing irregular migration in the region, even as foreign partners have been taking actions themselves that are aligned with a shared interest in reducing migration. The IFR changes key procedures to significantly streamline and strengthen the consequences delivered for unlawful or unauthorized entry at the southern border. The actions the Departments are taking are directly responsive to the shared challenge the United States and its regional partners are confronting and, equally important, it is critical to implement these actions without a lengthy period of advance notice before the actions go into effect.

2.  Good Cause

The Departments have also found good cause to forego the APA's notice-and-comment and delayed-effective-date procedures. *See* 5 U.S.C. 553(b)(B), (d)(3). Such procedures are impracticable because the delays associated with such procedures would unduly postpone implementation of a policy that is urgently needed to avert significant public harm. Such procedures are likewise contrary to the public interest because an advance announcement of this rule would seriously undermine a key goal of the policy: It would incentivize even more irregular migration by those seeking to enter the United States before the rule would take effect.

---

16, 2023) (Dkt. 176-2); Decl. of Matthew J. Hudak ¶ 11, *Florida v. Mayorkas*, No. 3:22-cv-9962 (N.D. Fla. May 12, 2023) (Dkt. 13-1).

First, the "impracticable" prong of the good cause exception "excuses notice and comment in emergency situations . . . or where delay could result in serious harm."[330]  Findings of impracticability are "inevitably fact- or context-dependent,"[331] and when reviewing such findings, courts generally consider, among other factors, the harms that might have resulted while the agency completed standard rulemaking procedures[332] and the agency's diligence in addressing the problem it seeks to address.[333]

The critical need to immediately implement more effective border management measures is described at length in the Presidential Proclamation of June 3, 2024, Securing the Border, and in Section III.B of this preamble.  Despite the strengthened consequences in place at the SWB, including the Circumvention of Lawful Pathways rule and other measures, the United States Government continues to contend with exceptionally high levels of irregular migration along the southern border, including record-high total USBP encounter levels on the SWB as recently as December 2023.[334]  DHS's ability to manage this increase in encounters has been significantly challenged by the substantial number of noncitizens processed for expedited removal and expressing a fear of return or an intent to seek asylum; rather than being swiftly removed, these

---

[330] *Jifry v. FAA*, 370 F.3d 1174, 1179 (D.C. Cir. 2004); *see, e.g.*, *id.* (upholding a claim of good cause to address "a possible imminent hazard to aircraft, persons, and property within the United States" (quotation marks omitted)); *Haw. Helicopter Operators Ass'n v. FAA*, 51 F.3d 212, 214 (9th Cir. 1995) (upholding a claim of good cause to address 20 air tour accidents over a four-year period, including recent incidents indicating that voluntary measures were insufficient to address the threat to public safety).

[331] *Mid-Tex Elec. Co-op, Inc. v. FERC*, 822 F.2d 1123, 1132 (D.C. Cir. 1987); *see Petry v. Block*, 737 F.2d 1193, 1203 (D.C. Cir. 1984) (when evaluating agency "good cause" arguments, "it is clear beyond cavil that we are duty bound to analyze the entire set of circumstances").  Courts have explained that notice-and-comment rulemaking may be impracticable, for instance, where air travel security agencies would be unable to address threats, *Jifry*, 370 F.3d at 1179, if "a safety investigation shows that a new safety rule must be put in place immediately," *Util. Solid Waste Activities Grp. v. EPA*, 236 F.3d 749, 754 (D.C. Cir. 2001) (ultimately finding that not to be the case and rejecting the agency's argument), or if a rule was of "life-saving importance" to mine workers in the event of a mine explosion, *Council of S. Mountains, Inc. v. Donovan*, 653 F.2d 573, 581 (D.C. Cir. 1981).

[332] *See Util. Solid Waste Activities Grp.*, 236 F.3d at 754–55 (explaining that "a situation is 'impracticable' when an agency finds that due and timely execution of its functions would be impeded by the notice otherwise required in § 553, as when a safety investigation shows that a new safety rule must be put in place immediately" (cleaned up)).

[333] *See, e.g.*, *Tri-Cty. Tel. Ass'n, Inc. v. FCC*, 999 F.3d 714, 720 (D.C. Cir. 2021) ("[T]his is not a case of unjustified agency delay.  The Commission *did* act earlier, . . . [and t]he agency needed to act again . . . .").

[334] According to March 2024 OHSS Persist Dataset and OHSS analysis of historic CBP data for encounters prior to FY 2000, USBP completed 250,000 encounters along the SWB in December 2023, higher than any previous month on record.  *See also* OHSS, *2022 Yearbook of Immigration Statistics*, tbls. 33 & 35, https://www.dhs.gov/ohss/topics/immigration/yearbook.

noncitizens are referred to an AO for a credible fear interview and can seek IJ review of an AO's negative credible fear determination, which requires additional time and resources.

Without adequate resources and tools to keep pace, the Departments cannot deliver timely decisions and timely consequences to all noncitizens encountered at the SWB who do not establish a lawful basis to remain.  Instead, DHS is forced to place many of these individuals into the backlogged immigration court system, a process that can take several years to result in a decision or consequence.[335]  Even then, it can take weeks, months, or years to execute a removal order depending upon the facts of the individual case.[336]

Quite simply, these historic levels of encounters and fear claims, combined with limited resources and tools to manage them, create a vicious cycle: The expectation of a lengthy stay in the United States and the inability to impose consequences for irregular migration close in time to entry inspires more people to make the dangerous journey north to take their chances at the border.[337]  The USCIS affirmative asylum backlog has reached almost 1.2 million cases and is growing.[338]  At the end of the first quarter of FY 2024, there were over 2.7 million cases pending in the immigration courts.[339]  During FY 2023, IJs completed more cases than they ever had before in a single year, but more than twice as many cases were received by the immigration courts as were completed.[340]

Absent changes promulgated in this rule, recent encounter trends both in the region and at our southern border indicate a risk of further exceeding the Departments' capacity to effectively

---

[335] *See supra* note 25.

[336] OHSS analysis of March 2024 OHSS Persist Dataset.

[337] *See, e.g.*, Jordan, *supra* note 27.

[338] OHSS analysis of USCIS Global Affirmative Data as of March 31, 2024.  Almost all of this backlog is the result of cases filed since FY 2015.  From FY 2015 through FY 2023, an average of 156,000 affirmative asylum cases were filed per year, versus an average of 49,000 cases completed.  In FY 2024 through March 31, 2024, 191,000 cases have been filed versus 78,000 cases completed.  OHSS analysis of USCIS Global Affirmative Data as of March 31, 2024.

[339] *See* EOIR, *Caseload: Pending Cases* (Jan. 18, 2024), https://www.justice.gov/eoir/media/1344791/dl?inline.

[340] *See id.*; EOIR, *New Cases and Total Completions-Historical*, https://www.justice.gov/eoir/media/1344801/dl?inline (Jan. 18, 2024).

process, detain, and remove, as appropriate, the noncitizens encountered, and exacerbating perceived incentives to migrate now. As noted above, DHS's current internal projections suggest that total encounters will average in the range of 3,900 to approximately 6,700 encounters at and between POEs per day from July to September, not including an additional 1,450 noncitizens per day who are expected to be encountered at POEs after making appointments though the CBP One app.[341] Even at the low end of such projections, such a volume of encounters would likely result in thousands of migrants per day being referred to section 240 removal proceedings; their cases would further exacerbate the immigration court backlog and perceived incentives to migrate irregularly, and would take many years to complete. Such harms would be mitigated by the additional measures put in place by this rule. If implementation of the rule is delayed, by contrast, the harms of such an increase would be immediate and substantial, even if such an increase would only last for the months needed to complete a very rapid notice-and-comment rulemaking. Thus, it is impracticable to delay the measures in this rule for even a few months to allow for notice and an opportunity to comment and a delayed effective date. In the interim, the heightened levels of migration and forced displacement that have resulted in the President's determination to apply the suspension and limitation on entry and the Departments adopting the provisions in this rule would further strain resources, risk overcrowding in USBP stations and border POEs in ways that pose significant health and safety concerns, and create a situation in which large numbers of migrants[342]—only a small proportion of whom are likely to be granted asylum or other protection—would be encouraged to put their lives in the hands of dangerous organizations to make the hazardous journey north based on a perceived lack of immediate consequences. The Departments must

---

[341] OHSS Encounter Projections, April 2024. Note that the OHSS encounter projection excludes encounters of people who have registered with the CBP One app along with administrative encounters at POEs (i.e., encounters in which removal proceedings are not considered), but includes non-CBP One enforcement encounters at POEs, which have averaged about 190 per day since May 2023. *See also* CBP, *CBP One™ Appointments Increased to 1,450 Per Day* (June 30, 2023), https://www.cbp.gov/newsroom/national-media-release/cbp-one-appointments-increased-1450-day (last modified July 14, 2023).

[342] Decl. of Matthew J. Hudak, *Florida v. Mayorkas*, No. 3:22-cv-9962 (N.D. Fla. May 12, 2023) (Dkt. 13-1).

immediately safeguard their ability to enforce our Nation's immigration laws in a timely way and at the scale necessary with respect to those who seek to enter without complying with our laws. This rule does just that.

Furthermore, current trends in migration, including through the Darién jungle between Colombia and Panama, indicate that a significant increase in encounters may be imminent. Between January and April 2024, UNHCR tracked 139,000 irregular entries, up from 128,000 for the same months in 2023 and a seven-fold increase over that period in 2022.[343]  And the Departments believe that most of those migrants are on their way to seek entry into the United States.[344]  Based on historical trends, the Departments expect that many of these migrants may already be proximate to the SWB, giving the Departments insufficient time to seek public comment and delay the effective date of this rule without immediate and substantial harm to U.S. interests.  Indeed, as of May 2024, CBP estimates that there are more than 40,000 non-Mexican migrants in northern Mexico, proximate to the SWB, in addition to more than 100,000 such migrants in central and southern Mexico.  These numbers show that a very large number of

---

[343] *See supra* note 122.

[344] *See* Sergio Martínez-Beltrán, *Despite a Fortified Border, Migrants Will Keep Coming, Analysts Agree. Here's Why.*, NPR, (Apr. 22, 2024), https://www.npr.org/2024/04/22/1244381584/immigrants-border-mexico-asylum-illegal-immigration ("[Analysts] keep a close eye on the Darién Gap in Panama and the borders between Central American countries, two key points to gauge the number of people venturing up north. 'In most countries (outward) migration has increased . . . particularly in Venezuela, and that's not really reflected yet in the U.S. numbers,' said [one analyst]. . . .  Despite Mexico's cracking down on migrants, [the analyst] said people are still making their way up north, even if they need to pause for months at different points during their journey. 'There must be a huge number of people from Venezuela bottled up in Mexico right now,' he said."); Diana Roy, *Crossing the Darién Gap: Migrants Risk Death on the Journey to the U.S.*, Council on Foreign Rels. (Feb. 1, 2024), https://www.cfr.org/article/crossing-darien-gap-migrants-risk-death-journey-us ("The surge across the Darién Gap is reflected in an influx at the southern U.S. border, where U.S. border authorities reported that they apprehended close to 2.5 million people during fiscal year 2023, a record high, while northern cities such as New York are also struggling to manage the arrivals."); Mallory Moench, *Volume of Migrants Crossing the Dangerous Darién Gap Hit Record High in 2023*, Time (Dec. 22, 2023), https://time.com/6547992/migrants-crossing-darien-gap-2023/ ("Laurent Duvillier, UNICEF's spokesperson for Latin America and the Caribbean based in Panama, tells TIME that many—driven to leave their homes by poverty, crime, or discrimination—aim to seek asylum in the U.S. or Canada, though they may never get there.  This analysis is supported by refugee protection organization HIAS, with a spokesperson telling TIME that, by the group's estimations, between 90 to 95% of those crossing the Darién Gap aim to reach the U.S."); Ariel G. Ruiz Soto, *Record-Breaking Migrant Encounters at the U.S.-Mexico Border Overlook the Bigger Story*, Migration Pol'y Inst. (Oct. 2022), https://www.migrationpolicy.org/news/2022-record-migrant-encounters-us-mexico-border ("Record flows of extracontinental migrants through the Darien Gap jungle that connects Colombia to Panama foreshadow increases in migration through Central America and Mexico.  The 28,000 Venezuelan migrants who trekked through the deadly jungle in August were mostly en route to the United States; with more than 34,000 Venezuelans recorded at the Darien Gap in September, it is very likely that many of them will be reaching the U.S.-Mexico border soon.").

migrants would likely have the ability and the incentive to travel to the U.S. border, and the

Departments assess that announcing this rule in advance would likely yield the type of surges

described in connection with prior changes in significant border policies affecting the availability

of asylum for large numbers of migrants. For these reasons, consistent with the President's

judgment, and given the emergency circumstances facing the Departments, the Departments

assess that it would be impracticable to delay the policies set forth in this rule to allow time to

complete notice-and-comment rulemaking or delay the rule's effective date.

Second, under the "contrary to the public interest" prong of the good cause exception, it

has long been recognized that agencies may use the good cause exception, and need not take

public comment in advance, where significant public harm would result from the notice-and-

comment process.[345] If, for example, advance notice of a coming price increase would

immediately produce market dislocations and lead to serious shortages, advance notice need not

be given.[346] A number of cases follow this logic in the context of economic regulation.[347]

The same logic applies here, where the Departments are responding to exceedingly

serious challenges at the border, and advance announcement of this response—which will

increase the Departments' ability to swiftly process and remove, as appropriate, more noncitizens

---

[345] *See, e.g.*, *Mack Trucks, Inc. v. EPA*, 682 F.3d 87, 95 (D.C. Cir. 2012) (noting that the "contrary to the public interest" prong of the "good cause" exception "is appropriately invoked when the timing and disclosure requirements of the usual procedures would defeat the purpose of the proposal—if, for example, announcement of a proposed rule would enable the sort of financial manipulation the rule sought to prevent . . . [or] in order to prevent the amended rule from being evaded" (cleaned up)); *DeRieux v. Five Smiths, Inc.*, 499 F.2d 1321, 1332 (Temp. Emer. Ct. App. 1974) ("[W]e are satisfied that there was in fact 'good cause' to find that advance notice of the freeze was 'impracticable, unnecessary, or contrary to the public interest' within the meaning of § 553(b)(B). . . . Had advance notice issued, it is apparent that there would have ensued a massive rush to raise prices and conduct 'actual transactions'—or avoid them—before the freeze deadline.").

[346] *See, e.g.*, *Nader v. Sawhill*, 514 F.2d 1064, 1068 (Temp. Emer. Ct. App. 1975) ("[W]e think good cause was present in this case based upon [the agency's] concern that the announcement of a price increase at a future date could have resulted in producers withholding crude oil from the market until such time as they could take advantage of the price increase." (quotation marks omitted)).

[347] *See, e.g.*, *Chamber of Com. of U.S. v. S.E.C.*, 443 F.3d 890, 908 (D.C. Cir. 2006) ("The ['good cause'] exception excuses notice and comment in emergency situations, where delay could result in serious harm, or when the very announcement of a proposed rule itself could be expected to precipitate activity by affected parties that would harm the public welfare." (citations omitted)); *Mobil Oil Corp. v. Dep't of Energy*, 728 F.2d 1477, 1492 (Temp. Emer. Ct. App. 1983) ("On a number of occasions…, this court has held that, in special circumstances, good cause can exist when the very announcement of a proposed rule itself can be expected to precipitate activity by affected parties that would harm the public welfare.").

who enter the United States irregularly—would significantly increase the incentive, on the part of migrants and others (such as smugglers), to engage in actions that would compound those very challenges.  For the same reasons, "the [need] for immediate implementation" outweighs the "principles" underlying the requirement for a 30-day delay in the effective date, justifying the Departments' finding of good cause to forego it.[348]  The Departments' experience has been that in some circumstances when official public announcements have been made regarding significant upcoming changes in immigration laws and procedures that would impact how individuals are processed at the border, such as changes that restrict access to immigration benefits to those attempting to enter the United States along the U.S.-Mexico land border, there have been dramatic increases in the numbers of noncitizens who enter or attempt to enter the United States—including, most recently, in the days preceding the lifting of the Title 42 public health Order in May 2023.[349]  This is not only because, generally, would-be migrants respond to real and perceived incentives created by border management and immigration policies, such that many choose to seek entry under a border processing regime they think is preferable, prior to the implementation of a new system, including increasing the speed of their transit north in an effort to arrive before the implementation of any such measure.  Additionally, smugglers routinely prey on migrants by spreading rumors, misrepresenting facts, or creating a sense of urgency to induce migrants to make the journey by overemphasizing the significance of recent or upcoming policy developments, among other tactics, and do so particularly when there is a change announced in U.S. policy, as highlighted by the many examples described below.[350]

---

[348] *Omnipoint Corp. v. FCC*, 78 F.3d 620, 630 (D.C. Cir. 1996) (cleaned up).

[349] *See supra* Sections III.B.1 and III.B.2 of this preamble.

[350] *See* Nick Miroff & Carolyn Van Houten, *The Border is Tougher to Cross Than Ever. But There's Still One Way into America*, Wash. Post (Oct. 24, 2018), https://www.washingtonpost.com/world/national-security/theres-still-one-way-into-america/2018/10/24/d9b68842-aafb-11e8-8f4b-aee063e14538_story.html; Valerie Gonzalez, *Migrants rush across US border in final hours before Title 42 expires*, AP News (May 11, 2023), https://apnews.com/article/immigration-border-title-42-mexico-asylum-8c239766c2cb6e257c0220413b8e9cf9 ("Even as migrants were racing to reach U.S. soil before the rules expire, Mexican President Andrés Manuel López Obrador said smugglers were sending a different message.  He noted an uptick in smugglers at his country's southern border offering to take migrants to the United States and telling them the border was open starting

The acuteness of such concerns is borne out by the facts.  An influx of migrants occurred in the days following the November 15, 2022, court decision that, had it not been stayed on December 19, 2022, would have resulted in the lifting of the Title 42 public health Order effective December 21, 2022.[351]  Leading up to the Order's expected termination date, migrants gathered in various parts of Mexico, including along the SWB, waiting to cross the border once the Title 42 public health Order was lifted.[352]  According to internal Government sources, smugglers were also expanding their messaging and recruitment efforts, using the expected lifting of the Title 42 public health Order to claim that the border was open, thereby seeking to persuade would-be migrants to participate in expensive and dangerous human smuggling schemes.  88 FR at 31315.  In that one-month period following the court decision, total CBP encounter rates jumped from an average of 7,800 per week (in mid-November) to over 9,100 per week (in mid-December), a change not predicted by normal seasonal effects.[353]

Similarly, on February 28, 2020, the Ninth Circuit lifted a stay of a nationwide injunction of the Migrant Protection Protocols ("MPP"), a program implementing the Secretary's contiguous return authority under section 235(b)(2)(C) of the INA, 8 U.S.C. 1225(b)(2)(C).[354]  Almost immediately, hundreds of migrants began massing at POEs across the southern border and attempting to immediately enter the United States, creating a severe safety hazard that forced

Thursday.").

The Departments recognize that there has been reporting on the possibility of the policies set forth in the Proclamation and this IFR since February with no apparent month-over-month increase in encounters.  *See, e.g.*, Myah Ward, *Biden considering major new executive actions for migrant crisis*, Politico (Feb. 21, 2024), https://www.politico.com/news/2024/02/21/biden-considering-major-new-executive-actions-for-southern-border-00142524.  But such reporting about vague, possible plans differs significantly from officially proposed policy changes with timelines provided for implementation, such as those mentioned below.

[351] *See Huisha-Huisha v. Mayorkas*, 642 F. Supp. 3d 1 (D.D.C. 2022), *stay granted*, *Arizona v. Mayorkas*, __ S. Ct. __, 2022 WL 17750015 (U.S. Dec. 19, 2022); DHS, *Statement by Secretary Mayorkas on Planning for End of Title 42* (Dec. 13, 2022), https://www.dhs.gov/news/2022/12/13/statement-secretary-mayorkas-planning-end-title-42.

[352] *See, e.g.*, Leila Miller, *Asylum Seekers Are Gathering at the U.S.-Mexico Border. This Is Why*, L.A. Times (Dec. 23, 2022), https://www.latimes.com/world-nation/story/2022-12-23/la-fg-mexico-title-42-confusion.

[353] OHSS analysis of March 2024 OHSS Persist Dataset. Month-over-month change from November to December for all of FY 2013 to FY 2022 averaged negative two percent.

[354] *See Innovation Law Lab v. Wolf*, 951 F.3d 1073, 1077, 1095 (9th Cir. 2020), *vacated as moot sub nom. Innovation Law Lab v. Mayorkas*, 5 F.4th 1099 (9th Cir. 2021).

CBP to temporarily close POEs in whole or in part.[355]  Many others requested immediate entry into the country through their counsel, while others attempted to illegally cross the southern border between the POEs.[356]  Absent immediate and resource-intensive action taken by CBP, the number of migrants gathered at the border, whether at or between the POEs, could have increased dramatically, especially considering there were approximately 25,000 noncitizens who were in removal proceedings pursuant to MPP without scheduled court appearances, as well as others in Mexico who could have become aware of CBP's operational limitations and sought to exploit them.[357]  And while CBP officers took action to resolve the sudden influx of migrants at multiple POEs and prevent further deterioration of the situation at the border, in doing so they were diverted away from other critical responsibilities of protecting national security, detecting and confiscating illicit materials, and guarding efficient trade and travel.[358]

This same phenomenon occurred in the days leading up to the end of the Title 42 public health Order on May 12, 2023, when DHS saw a historic surge in migration as smugglers falsely advertised that those arriving before the Order ended and the Circumvention of Lawful Pathways rule took effect would be allowed to remain in the United States.[359]  This surge culminated with what were then the highest recorded USBP encounter levels in U.S. history over the days immediately preceding May 12, which placed significant strain on DHS's operational capacity at the border.[360]  Encounters between POEs (which excludes arrival of inadmissible individuals scheduled through the CBP One app, who appear at POEs) almost doubled from an average of

---

[355] *See* Decl. of Robert E. Perez ¶¶ 4–15, *Innovation Law Lab*, No. 19-15716 (9th Cir. Mar. 3, 2020) (Dkt. 95-2).

[356] *Id.* ¶¶ 4, 8.

[357] *Id.* ¶ 14.

[358] *Id.* ¶ 15.

[359] Decl. of Blas Nuñez-Neto ¶ 9, *E. Bay Sanctuary Covenant v. Biden*, No. 4:18-cv-06810-JST (N.D. Cal. June 16, 2023) (Dkt. 176-2).  Conversely, as noted above, smugglers also messaged that the border would be open starting on May 12.  *See* Valerie Gonzalez, *Migrants rush across US border in final hours before Title 42 expires*, AP News (May 11, 2023), https://apnews.com/article/immigration-border-title-42-mexico-asylum-8c239766c2cb6e257c0220413b8e9cf9.  This conflicting messaging underscores smuggling organizations' tendency to deceptively message on changes in border policy to lure vulnerable migrants to pay for their services.

[360] Decl. of Blas Nuñez-Neto ¶ 9, *E. Bay Sanctuary Covenant v. Biden*, No. 4:18-cv-6810-JST (N.D. Cal. June 16, 2023) (Dkt. 176-2).

approximately 4,900 per day the week ending April 11, 2023, to an average of approximately

9,500 per day the week ending May 11, 2023, including an average of approximately 10,000

daily encounters immediately preceding the termination of the public health Order (from May 8

to May 11).[361]  The sharp increase in USBP encounters during the 30 days preceding May 12

represented the largest month-over-month increase in almost two decades—since January

2004.[362]

Meanwhile, the current backlogs and inefficiencies in our border security and

immigration systems render DHS unable to effect removals and apply consequences at a

sufficient scale to deter migration by those whose claims may not ultimately succeed.[363]  This,

too, serves as an incentive for migrants to take a chance.  And sudden influxes, which result in

part from smugglers' deliberate actions, overload scarce United States Government resources

dedicated to border security that, as reflected above, are already stretched extremely thin.[364]  This

rule is specifically designed to allow the United States Government to deliver consequences

more swiftly, and with a reduced resource burden, during such an influx.

In a more manageable steady-state environment, when encounters surge in specific

sectors, DHS manages its detention capacity using the other tools at its disposal, such as lateral

decompression flights and similar efforts.[365]  But the increase in SWB encounters preceding the

end of the Title 42 public health Order and the increase in border encounters that occurred in

December 2023 were far-reaching across multiple sectors of the SWB and significantly greater

than what DHS resources and operations are designed to handle.  They raised detention capacity

concerns anew.  At that point, DHS faced an urgent situation, including a significant risk of

---

[361] *Id.*

[362] *Id.*

[363] *See* EOIR, *Adjudication Statistics: Pending Cases* (Jan. 18, 2024),
https://www.justice.gov/eoir/media/1344791/dl?inline.

[364] Decl. of Enrique Lucero ¶¶ 6–8, *Innovation Law Lab v. Wolf*, No. 19-15716 (9th Cir. Mar. 3, 2020) (Dkt. 95-3);
Decl. of Robert E. Perez ¶ 15, *Innovation Law Lab*, No. 19-15716 (9th Cir. Mar. 3, 2020) (Dkt. 95-2).

[365] *See* 88 FR at 11715.

overcrowding in its facilities. Given the nature of its facilities, increased numbers and times in custody increase the likelihood that USBP facilities will become quickly overcrowded.[366] Crowding, particularly given the way that USBP facilities are necessarily designed, increases the potential risk of health and safety concerns for noncitizens and Government personnel.[367]

The Departments assess that there would be a significant risk of such an urgent situation occurring if they undertook notice-and-comment procedures for this rule or delayed its effective date. As demonstrated by the Departments' experience with the end of the Title 42 public health Order and MPP, significant shifts in U.S. border policies lead to an increase in migrants coming to the SWB that risks overwhelming the Departments' resources and operations. This rule is likewise a significant shift in U.S. border policy that affects the vast majority of noncitizens arriving at the southern border who do not have documents sufficient for lawful admission—a shift that may be viewed as similar to the end of the Title 42 public health Order and MPP. In addition, unlike the Lawful Pathways rebuttable presumption, the limitation on asylum eligibility in this rule would affect Mexican migrants, which may provide an additional perceived incentive for such migrants—who constitute a large and geographically proximate potential population[368]—to rush to the border during a notice-and-comment period. Finally, such a surge in migration would come at a time when our border security and immigration systems' resources are already stretched thin and severely backlogged.[369] Therefore, the Departments believe that a

---

[366] Decl. of Matthew J. Hudak ¶¶ 6, 14, 17, *Florida v. Mayorkas*, No. 3:22-cv-9962 (N.D. Fla. May 12, 2023) (Dkt. 13-1).

[367] *Id.* ¶ 17.

[368] U.S. Census Bureau, *Mexico*, https://www.census.gov/popclock/world/mx (last visited May 27, 2024).

[369] *See, e.g.*, Ariel G. Ruiz-Soto et al., *Shifting Realities at the U.S.-Mexico Border: Immigration Enforcement and Control in a Fast-Evolving Landscape*, Migration Pol'y Inst., at 1 (rev. Jan. 2024), https://www.migrationpolicy.org/sites/default/files/publications/mpi-contemporary-border-policy-2024_final.pdf ("Insufficiently equipped to respond effectively to these and likely future changes, U.S. immigration agencies must perpetually react and shift operations according to their strained capacity and daily changes in migrant arrivals."); The White House, *Fact Sheet: White House Calls on Congress To Advance Critical National Security Priorities* (Oct. 20, 2023), https://www.whitehouse.gov/briefing-room/statements-releases/2023/10/20/fact-sheet-white-house-calls-on-congress-to-advance-critical-national-security-priorities/; Letter for Kevin McCarthy, Speaker of the House of Representatives, from Shalanda D. Young, Director, Office and Management Budget (Aug. 10, 2023), https://www.whitehouse.gov/wp-content/uploads/2023/08/Final-Supplemental-Funding-Request-Letter-and-Technical-Materials.pdf.

gap between when this rule is made public and when it becomes effective would create the same incentive for migrants to come to the United States before the rule takes effect.

The Departments' determination here is consistent with past practice. For example, in the Circumvention of Lawful Pathways rule, the Departments undertook a notice-and-comment rulemaking while the Title 42 public health Order remained in effect,[370] but invoked the good cause exception (as well as the foreign affairs exception) to bypass a delayed effective date that would have resulted in a gap between the end of the Title 42 public health Order and the implementation of the rule. *See* 88 FR at 31445–47. The Departments noted that such a gap "would likely result in a significant further increase in irregular migration," and that such an increase, "exacerbated by an influx of migrants from countries such as Venezuela, Nicaragua, and Cuba, with limited removal options, and coupled with DHS's limited options for processing, detaining, or quickly removing such migrants, would unduly impede DHS's ability to fulfill its critical and varied missions." *Id.* at 31445.

Similarly, when implementing the parole process for Venezuelans, DHS implemented the process without prior public procedures,[371] and witnessed a drastic reduction in irregular migration by Venezuelans.[372] The process by which eligible Venezuelans could receive advance travel authorization to present at a POE was accompanied by a policy that those who entered the United States outside this process or who entered Mexico illegally after the date of announcement would be ineligible for parole under this process, and was conditioned on Mexico continuing to accept the expulsion or removal of Venezuelan nationals seeking to irregularly enter the United States between POEs. *See* 87 FR at 63508. Thus, had the parole process been announced prior to a lengthy notice-and-comment period, it likely would have resulted in

---

[370] The Departments noted, however, that the Circumvention of Lawful Pathways rule was exempt from notice-and-comment requirements pursuant to the good cause exception at 5 U.S.C. 553(b)(B) for the same reasons that the rule was exempt from delayed effective date requirements under 5 U.S.C. 553(d). *See* 88 FR at 31445 n.377.

[371] *See* DHS, Implementation of a Parole Process for Venezuelans, 87 FR 63507 (Oct. 19, 2022).

[372] *See* 88 FR at 31317 ("A week before the announcement of the Venezuela parole process on October 12, 2022, Venezuelan encounters between POEs at the SWB averaged over 1,100 a day from October 5–11. About two weeks after the announcement, Venezuelan encounters averaged under 200 per day between October 18 and 24.").

thousands of Venezuelan nationals attempting to cross the United States and Mexican borders before the ineligibility criteria went into effect, and before the United States was able to return Venezuelan nationals to Mexico in large numbers.

DHS also concluded in January 2017 that it was imperative to give immediate effect to a rule designating Cuban nationals arriving by air as eligible for expedited removal because "[p]re-promulgation notice and comment would . . . endanger[] human life and hav[e] a potential destabilizing effect in the region."[373]  DHS cited the prospect that "publication of the rule as a proposed rule, which would signal a significant change in policy while permitting continuation of the exception for Cuban nationals, could lead to a surge in migration of Cuban nationals seeking to travel to and enter the United States during the period between the publication of a proposed and a final rule."[374]  DHS found that "[s]uch a surge would threaten national security and public safety by diverting valuable Government resources from counterterrorism and homeland security responsibilities," "could also have a destabilizing effect on the region, thus weakening the security of the United States and threatening its international relations," and "could result in significant loss of human life."[375]

Given the urgent circumstances facing the Departments, the delays associated with requiring a notice-and-comment process for this rule would be contrary to the public interest because an advance announcement of the rule would incentivize even more irregular migration by those seeking to enter the United States before the IFR would take effect.

B.  *Executive Order 12866 (Regulatory Planning and Review), Executive Order 13563 (Improving Regulation and Regulatory Review), and Executive Order 14094 (Modernizing Regulatory Review)*

---

[373] DHS, Eliminating Exception to Expedited Removal Authority for Cuban Nationals Arriving by Air, 82 FR 4769, 4770 (Jan. 17, 2017).

[374] *Id.*

[375] *Id.*; *accord* U.S. Dep't of State, Visas: Documentation of Nonimmigrants Under the Immigration and Nationality Act, as Amended, 81 FR 5906, 5907 (Feb. 4, 2016) (finding the good cause exception applicable because of short-run incentive concerns).

Executive Order 12866 ("Regulatory Planning and Review"), as amended by Executive Order 14094 ("Modernizing Regulatory Review"), and Executive Order 13563 ("Improving Regulation and Regulatory Review"), directs agencies to assess the costs, benefits, and transfers of available alternatives, and, if regulation is necessary, to select regulatory approaches that maximize net benefits, including potential economic, environmental, public health and safety effects, distributive impacts, and equity. Executive Order 13563 emphasizes the importance of quantifying both costs and benefits, reducing costs, harmonizing rules, and promoting flexibility.

The Office of Information and Regulatory Affairs ("OIRA") of OMB reviewed this IFR as a significant regulatory action under Executive Order 12866, as amended by Executive Order 14094. The estimated effects of the rule are described and summarized qualitatively below. Consistent with OMB Circular A-4, the Departments assessed the impacts of this rule against a baseline. The baseline used for this analysis is the "no action" baseline, or what the world would be like absent the rule. For purposes of this analysis, the Departments assumed that the no-action baseline involved continued application of the Circumvention of Lawful Pathways rule.

The expected effect of this rule, as discussed above, is primarily to reduce incentives for irregular migration and illegal smuggling activity. As a result, the primary effects of this rule will be felt by noncitizens outside of the United States. In addition, for those who are present in the United States and described in the Proclamation, the rule will likely decrease the number of asylum grants and likely reduce the amount of time that noncitizens who are ineligible for asylum and who lack a reasonable probability of establishing eligibility for protection from persecution or torture would remain in the United States. Noncitizens, however, can avoid the limitation on asylum under this rule if they meet an exception to the rule's limitation or to the Proclamation, including by presenting at a POE pursuant to a pre-scheduled time and place or by showing exceptionally compelling circumstances. Moreover, noncitizens who in credible fear screenings establish a reasonable probability of persecution or torture would still be able to seek statutory withholding or CAT protection in proceedings before IJs.

The benefits of the rule are expected to include reductions in strains on limited Federal Government immigration processing and enforcement resources; preservation of the Departments' continued ability to safely, humanely, and effectively enforce and administer the immigration laws; and a reduction in the role of exploitative TCOs and smugglers. Some of these benefits accrue to noncitizens whose ability to receive timely decisions on their claims might otherwise be hampered by the severe strain that further surges in irregular migration would impose on the Departments.

The direct costs of the rule are borne by noncitizens and the Departments. To the extent that any noncitizens are made ineligible for asylum by virtue of the rule but would have received asylum in the absence of this rule, such an outcome would entail the denial of asylum and its attendant benefits, although such persons may continue to be eligible for statutory withholding of removal and withholding under the CAT. Unlike asylees, noncitizens granted these more limited forms of protection do not have a path to citizenship and cannot petition for certain family members to join them in the United States. Such noncitizens may also be required to apply for work authorization more frequently than an asylee would. As discussed in this preamble, the rule's manifestation of fear and reasonable probability standards may also engender a risk that some noncitizens with meritorious claims may not be referred for credible fear interviews or to removal proceedings to seek protection. In these cases, there may be costs to noncitizens that result from their removal.

The rule may also require additional time for AOs and IJs, during credible fear screenings and reviews, respectively, to inquire into the applicability of the rule and the noncitizen's fear claim. Similarly, the rule will require additional time for IJs during section 240 removal proceedings. However, as discussed throughout this preamble, the rule is expected to result in significantly reduced irregular migration. Accordingly, the Departments expect the additional time spent by AOs and IJs on implementation of the rule to be mitigated by a comparatively

smaller number of credible fear cases than AOs and IJs would otherwise have been required to handle in the absence of the rule.

Other entities may also incur some indirect, downstream costs as a result of the rule. The nature and scale of such effects will vary by entity and should be considered relative to the baseline condition that would exist in the absence of this rule, which as noted above is the continued application of the Circumvention of Lawful Pathways rule. As compared to the baseline condition, this rule is expected to reduce irregular migration. The Departments welcome comments on the effects described above to inform analysis in a final rule.

## C.  Regulatory Flexibility Act

The Regulatory Flexibility Act ("RFA"), as amended by the Small Business Regulatory Enforcement and Fairness Act of 1996, requires an agency to prepare and make available to the public a final regulatory flexibility analysis that describes the effect of a rule on small entities (i.e., small businesses, small organizations, and small governmental jurisdictions) when the agency was required "to publish a general notice of proposed rulemaking" prior to issuing the final rule. *See* 5 U.S.C. 604(a). Because this IFR is being issued without a prior proposal, on the grounds set forth above, a regulatory flexibility analysis is not required under the RFA.

## D.  Unfunded Mandates Reform Act of 1995

The Unfunded Mandates Reform Act of 1995 ("UMRA") is intended, among other things, to curb the practice of imposing unfunded Federal mandates on State, local, and Tribal governments. Title II of the UMRA requires each Federal agency to prepare a written statement assessing the effects of any Federal mandate in a proposed rule, or final rule for which the agency published a proposed rule, that includes any Federal mandate that may result in a $100 million or more expenditure (adjusted annually for inflation) in any one year by State, local, and Tribal governments, in the aggregate, or by the private sector. The term "Federal mandate" means a Federal intergovernmental mandate or a Federal private sector mandate. *See* 2 U.S.C. 658(6), 1502(1). A "Federal intergovernmental mandate," in turn, is a provision that would

impose an enforceable duty upon State, local, or Tribal governments (except as a condition of Federal assistance or a duty arising from participation in a voluntary Federal program). *See id.* 658(5). And the term "Federal private sector mandate" refers to a provision that would impose an enforceable duty upon the private sector (except as a condition of Federal assistance or a duty arising from participation in a voluntary Federal program). *See id.* 658(7).

This IFR is not subject to the UMRA because the Departments did not publish a proposed rule prior to this action. In addition, this rule does not contain a Federal mandate, because it does not impose any enforceable duty upon any other level of government or private sector entity. Any downstream effects on such entities would arise solely due to an entity's voluntary choices, and the voluntary choices of others, and would not be a consequence of an enforceable duty imposed by this rule. Similarly, any costs or transfer effects on State and local governments would not result from a Federal mandate as that term is defined under UMRA. The requirements of title II of the UMRA, therefore, do not apply, and the Departments have not prepared a statement under the UMRA.

*E. Congressional Review Act*

OMB has determined that this rule does not meet the criteria set forth in 5 U.S.C. 804(2). The rule will be submitted to Congress and the Government Accountability Office consistent with the Congressional Review Act's requirements no later than its effective date.

*F. Executive Order 13132 (Federalism)*

This rule would not have substantial direct effects on the States, on the relationship between the National Government and the States, or on the distribution of power and responsibilities among the various levels of government. Therefore, in accordance with section 6 of Executive Order 13132, it is determined that this rule does not have sufficient federalism implications to warrant the preparation of a federalism summary impact statement.

*G. Executive Order 12988 (Civil Justice Reform)*

This IFR meets the applicable standards set forth in sections 3(a) and 3(b)(2) of Executive Order 12988.

*H.  Family Assessment*

The Departments have reviewed this rule in line with the requirements of section 654 of the Treasury and General Government Appropriations Act, 1999, enacted as part of the Omnibus Consolidated and Emergency Supplemental Appropriations Act, 1999.  The Departments have reviewed the criteria specified in section 654(c)(1), by evaluating whether this regulatory action (1) impacts the stability or safety of the family, particularly in terms of marital commitment; (2) impacts the authority of parents in the education, nurture, and supervision of their children; (3) helps the family perform its functions; (4) affects disposable income or poverty of families and children; (5) only financially impacts families, if at all, to the extent such impacts are justified; (6) may be carried out by State or local governments or by the family; or (7) establishes a policy concerning the relationship between the behavior and personal responsibility of youth and the norms of society.  If the agency determines a regulation may negatively affect family well-being, then the agency must provide an adequate rationale for its implementation.

The Departments have determined that the implementation of this rule will not impose a negative impact on family well-being or the autonomy or integrity of the family as an institution.

*I.  Executive Order 13175 (Consultation and Coordination with Indian Tribal Governments)*

This rule would not have Tribal implications under Executive Order 13175, Consultation and Coordination with Indian Tribal Governments, because it would not have a substantial direct effect on one or more Indian Tribes, on the relationship between the Federal Government and Indian Tribes, or on the distribution of power and responsibilities between the Federal Government and Indian Tribes.

*J.  National Environmental Policy Act*

DHS and its components analyze actions to determine whether the National Environmental Policy Act of 1969 ("NEPA"), 42 U.S.C. 4321 *et seq.*, applies to these actions

and, if so, what level of NEPA review is required. 42 U.S.C. 4336. DHS's Directive 023-01, Revision 01[376] and Instruction Manual 023-01-001-01, Revision 01 ("Instruction Manual 023-01")[377] establish the procedures that DHS uses to comply with NEPA and the Council on Environmental Quality ("CEQ") regulations for implementing NEPA, 40 CFR parts 1500 through 1508.

Federal agencies may establish categorical exclusions for categories of actions they determine normally do not significantly affect the quality of the human environment and, therefore, do not require the preparation of an Environmental Assessment or Environmental Impact Statement. 42 U.S.C. 4336e(1); 40 CFR 1501.4, 1507.3(e)(2)(ii), 1508.1(d). DHS has established categorical exclusions, which are listed in Appendix A of its Instruction Manual 023-01. Under DHS's NEPA implementing procedures, for an action to be categorically excluded, it must satisfy each of the following three conditions: (1) the entire action clearly fits within one or more of the categorical exclusions; (2) the action is not a piece of a larger action; and (3) no extraordinary circumstances exist that create the potential for a significant environmental effect.[378]

The IFR effectuates the following three changes to the process for those seeking asylum, withholding of removal, or protection under the CAT during emergency border circumstances:

- For those who enter across the southern border during emergency border circumstances and are not described in section 3(b) of the Proclamation, rather than asking specific questions of every noncitizen encountered and processed for expedited removal to elicit whether the noncitizen may have a fear of persecution or

---

[376] DHS, *Implementation of the National Environmental Policy Act, Directive 023-01, Revision 01* (Oct. 31, 2014), https://www.dhs.gov/sites/default/files/publications/DHS_Directive%20023-01%20Rev%2001_508compliantversion.pdf.

[377] DHS, *Implementation of the National Environmental Policy Act (NEPA), Instruction Manual 023-01-001-01, Revision 01* (Nov. 6, 2014), https://www.dhs.gov/sites/default/files/publications/DHS_Instruction%20Manual%20023-01-001-01%20Rev%2001_508%20Admin%20Rev.pdf.

[378] Instruction Manual 023-01 at V.B(2)(a) through (c).

an intent to apply for asylum, DHS will provide general notice regarding the processes for seeking asylum, withholding of removal, and protection under the CAT, and will only refer a noncitizen for credible fear screenings if the noncitizen manifests a fear of return, or expresses an intention to apply for asylum or protection, expresses a fear of persecution or torture, or expresses a fear of return to his or her country or the country of removal.

- During emergency border circumstances, persons who enter the United States across the southern border and who are not described in paragraph 3(b) of the Proclamation will be ineligible for asylum unless they demonstrate by a preponderance of the evidence that exceptionally compelling circumstances exist, including if the noncitizen demonstrates that they or a member of their family as described in 8 CFR 208.30(c) with whom they are traveling: (1) faced an acute medical emergency; (2) faced an imminent and extreme threat to life or safety, such as an imminent threat of rape, kidnapping, torture, or murder; or (3) satisfied the definition of "victim of a severe form of trafficking in persons" provided in 8 CFR 214.11.

- The limitation on asylum eligibility will be applied during credible fear interviews and reviews, and those who enter across the southern border during emergency border circumstances and who are not described in section 3(b) of the Proclamation and do not establish exceptionally compelling circumstances will receive a negative credible fear determination with respect to asylum and will thereafter be screened for a reasonable probability of persecution because of a protected ground or torture, a higher standard than that applied to noncitizens in a similar posture under the Circumvention of Lawful Pathways rule.

Given the nature of the IFR, it is categorically excluded from DHS's NEPA implementing procedures, as it satisfies all three relevant conditions. First, the Departments have determined that the IFR fits clearly within categorical exclusions A3(a) and (d) of DHS's

Instruction Manual 023-01, Appendix A, for the promulgation of rules of a "strictly administrative or procedural nature" and rules that "interpret or amend an existing regulation without changing its environmental effect," respectively.  The IFR changes certain administrative procedures relating to the processing of certain noncitizens during emergency border circumstances, and does not result in a change in environmental effect.  Second, this IFR is a standalone rule and is not part of any larger action.  Third, the Departments are not aware of any extraordinary circumstances that would cause a significant environmental impact.  Therefore, this IFR is categorically excluded, and no further NEPA analysis or documentation is required.  DOJ is adopting the DHS determination that this IFR is categorically excluded under A3(a) and A3(d) of DHS's Instruction Manual 023-01, Appendix A, because the IFR's asylum limitation and the reasonable probability standard will be applied by EOIR in substantially the same manner as it will be applied by DHS.  *See* 40 CFR 1506.3(d) (setting forth the ability of an agency to adopt another agency's categorical exclusion determination).

*K.  Paperwork Reduction Act*

This IFR does not adopt new, or revisions to existing, "collection[s] of information" as that term is defined under the Paperwork Reduction Act of 1995, Public Law 104–13, 109 Stat. 163, 44 U.S.C. chapter 35, and its implementing regulations, 5 CFR part 1320.

**List of Subjects**

8 CFR Part 208

Administrative practice and procedure, Aliens, Immigration, Reporting and recordkeeping requirements.

8 CFR Part 235

Administrative practice and procedure, Aliens, Immigration, Reporting and recordkeeping requirements.

8 CFR Part 1208

Administrative practice and procedure, Aliens, Immigration, Reporting and recordkeeping requirements.

**DEPARTMENT OF HOMELAND SECURITY**

Accordingly, for the reasons set forth in the preamble, the Secretary of Homeland Security amends 8 CFR parts 208 and 235 as follows:

**PART 208—PROCEDURES FOR ASYLUM AND WITHHOLDING OF REMOVAL**

1. The authority citation for part 208 continues to read as follows:

**Authority:** 8 U.S.C. 1101, 1103, 1158, 1226, 1252, 1282; Title VII of Pub. L. 110–229; 8 CFR part 2; Pub. L. 115–218.

2. In § 208.13, add paragraph (g) to read as follows:

**§ 208.13 Establishing asylum eligibility.**

* * * * *

(g) *Entry during emergency border circumstances.*   For an alien who entered the United States across the southern border (as that term is described in section 4(d) of the Presidential Proclamation of June 3, 2024, Securing the Border) between the dates described in section 1 of such Proclamation and section 2(a) of such Proclamation (or the revocation of such Proclamation, whichever is earlier), or between the dates described in section 2(b) of such Proclamation and section 2(a) of such Proclamation (or the revocation of such Proclamation, whichever is earlier), refer to the provisions on asylum eligibility described in § 208.35.

3. Add subpart D, consisting of § 208.35, to read as follows:

**Subpart D–Eligibility for Aliens Who Enter the United States During Emergency Border Circumstances**

**§ 208.35 Limitation on asylum eligibility and credible fear procedures for those who enter the United States during emergency border circumstances.**

Notwithstanding any contrary section of this part, including §§ 208.2, 208.13, 208.30, and 208.33—

(a) *Limitation on eligibility.* (1) *Applicability.* An alien who is described in § 208.13(g) and who is not described in section 3(b) of the Presidential Proclamation of June 3, 2024, Securing the Border, is ineligible for asylum.

(2) *Exceptions.* (i) This limitation on eligibility does not apply if the alien demonstrates by a preponderance of the evidence that exceptionally compelling circumstances exist, including if the alien, or the alien's family member as described in § 208.30(c) with whom the alien is traveling, demonstrates by a preponderance of the evidence that, at the time of entry, the alien or a member of the alien's family as described in § 208.30(c) with whom the alien is traveling:

(A) Faced an acute medical emergency;

(B) Faced an imminent and extreme threat to life or safety, such as an imminent threat of rape, kidnapping, torture, or murder; or

(C) Satisfied the definition of "victim of a severe form of trafficking in persons" provided in § 214.11 of this chapter.

(ii) An alien who demonstrates by a preponderance of the evidence any of the circumstances in paragraph (a)(2)(i) of this section shall necessarily establish exceptionally compelling circumstances.

(iii) An alien described in section 3(b) of the Presidential Proclamation of June 3, 2024, Securing the Border, or who establishes exceptionally compelling circumstances under paragraph (a)(2)(i) of this section has established exceptionally compelling circumstances under § 208.33(a)(3).

(b) *Application in credible fear determinations.* (1) *Initial determination.* The asylum officer shall first determine whether the alien is subject to the limitation on asylum eligibility under paragraph (a) of this section.

(i) Where the asylum officer determines that the alien is subject to the limitation on asylum eligibility under paragraph (a) of this section, then the asylum officer shall enter a

negative credible fear determination with respect to the alien's asylum claim and continue to consider the alien's claim under paragraph (b)(2) of this section.

(ii) Where the asylum officer determines that the alien is not subject to the limitation on asylum eligibility under paragraph (a) of this section because the alien is not described in § 208.13(g), the asylum officer shall follow the procedures in § 208.33(b).

(iii) Where the asylum officer determines that the alien is not subject to the limitation on asylum eligibility under paragraph (a) of this section because the alien is described in section 3(b) of the Proclamation or is excepted from the limitation on asylum eligibility under paragraph (a)(2) of this section, the asylum officer shall follow the procedures in § 208.30.

(2) *Protection eligibility screening.* (i) In cases in which the asylum officer enters a negative credible fear determination under paragraph (b)(1)(i) or (b)(3) of this section, the asylum officer will assess the alien under the procedures set forth in § 208.33(b)(2)(i) except that the asylum officer will apply a reasonable probability standard. For purposes of this section, *reasonable probability* means substantially more than a reasonable possibility, but somewhat less than more likely than not, that the alien would be persecuted because of his or her race, religion, nationality, membership in a particular social group or political opinion, or tortured, with respect to the designated country or countries of removal.

(ii) In cases described in paragraph (b)(2)(i) or (b)(3) of this section, if the alien establishes a reasonable probability of persecution or torture with respect to the designated country or countries of removal, the Department will issue a positive credible fear determination and follow the procedures in § 208.30(f). For any case in which USCIS retains jurisdiction over the application for asylum pursuant to § 208.2(a)(1)(ii) for further consideration in an interview pursuant to § 208.9, USCIS may require aliens who received a negative credible fear determination with respect to their asylum claim under paragraph (b)(1)(i) of this section to submit a Form I-589, Application for Asylum and for Withholding of Removal, together with any additional supporting evidence in accordance with the instructions on the form, to USCIS

within 30 days from the date of service of the positive credible fear determination.  The date of service of the positive credible fear determination remains the date of filing and receipt of the asylum application under § 208.3(a)(2); however, for any case in which USCIS requires the alien to submit a Form I-589, it may extend the timelines in § 208.9(a)(1) and (e)(2) by up to 15 days. If USCIS requires the alien to submit a Form I-589 and the alien fails to do so within the applicable timeline, USCIS shall issue a Form I-862, Notice to Appear.

(iii) In cases described in paragraph (b)(2)(i) or (b)(3) of this section, if the alien fails to establish a reasonable probability of persecution or torture with respect to all designated countries of removal, the asylum officer will provide the alien with a written notice of decision and inquire whether the alien wishes to have an immigration judge review the negative credible fear determinations.

(iv) The alien must indicate whether he or she desires such review on a Record of Negative Fear Finding and Request for Review by Immigration Judge.

(v) Only if the alien requests such review by so indicating on the Record of Negative Fear shall the asylum officer serve the alien with a Notice of Referral to Immigration Judge.  The record of determination, including copies of the Notice of Referral to Immigration Judge, the asylum officer's notes, the summary of the material facts, and other materials upon which the determination was based shall be provided to the immigration judge with the negative determination.  Immigration judges will evaluate the case as provided in 8 CFR 1208.35(b).  The case shall then proceed as set forth in paragraphs (b)(2)(v)(A) and (B) of this section.

(A) Where the immigration judge issues a positive credible fear determination under 8 CFR 1208.35(b)(2)(iii) or (b)(4), the case shall proceed under 8 CFR 1208.30(g)(2)(iv)(B).

(B) Where the immigration judge issues a negative credible fear determination, the case shall be returned to the Department for removal of the alien.  No appeal shall lie from the immigration judge's decision and no request for reconsideration may be submitted to USCIS. Nevertheless, USCIS may, in its sole discretion, reconsider a negative determination.

(3) *Procedures in the absence of the limitation on asylum eligibility.*  If the limitation on asylum eligibility in paragraph (a) of this section is held to be invalid or unenforceable by its terms, or as applied to any person or circumstance, then during the period(s) described in § 208.13(g), the asylum officer shall, as applicable, apply a reasonable probability screening standard for any protection screening under § 208.33(b)(2).

(c) *Family unity in the asylum merits process.*  In cases where the Department retains jurisdiction over the application for asylum pursuant to § 208.2(a)(1)(ii), where a principal asylum applicant is found eligible for withholding of removal under section 241(b)(3) of the Act or withholding of removal under § 208.16(c)(2) and would be granted asylum but for the limitation on asylum in paragraph (a)(1) of this section or § 208.33(a), or both, and where an accompanying spouse or child as defined in section 208(b)(3)(A) of the Act does not independently qualify for asylum or other protection from removal or the principal asylum applicant has a spouse or child who would be eligible to follow to join that applicant as described in section 208(b)(3)(A) of the Act, the asylum officer may deem the principal applicant to have established exceptionally compelling circumstances under paragraph (a)(2)(i) of this section and § 208.33(a)(3)(i).

(d) *Continuing applicability of limitation on eligibility*. (1) Subject to paragraph (d)(2) of this section, the limitation on asylum eligibility in paragraph (a) of this section shall apply to any asylum application filed by an alien who entered the United States during the time and in the manner described in § 208.13(g) and who is not covered by an exception in paragraph (d)(2) of this section, regardless of when the application is filed and adjudicated.

(2) The limitation on asylum eligibility in paragraph (a) of this section shall not apply to an alien who was under the age of 18 at the time of the alien's entry, if –

(i) The alien is applying for asylum as a principal applicant; and

(ii) The asylum application is filed after the period of time in 208.13(g) during which the alien entered.

(e) *Severability*.  The Department intends that in the event that any provision of this section, § 235.15, or the Presidential Proclamation of June 3, 2024, Securing the Border, is held to be invalid or unenforceable by its terms, or as applied to any person or circumstance, the provisions of this section and § 235.15 should be construed so as to continue to give the maximum effect to those provisions permitted by law, unless such holding is that a provision is wholly invalid and unenforceable, in which event the provision should be severed from the remainder of this section and the holding should not affect the remainder of this section or the application of the provision to persons not similarly situated or to dissimilar circumstances.

## PART 235—INSPECTION OF PERSONS APPLYING FOR ADMISSION

4. The authority citation for part 235 continues to read as follows:

**Authority:** 8 U.S.C. 1101 and note, 1103, 1183, 1185 (pursuant to E.O. 13323, 69 FR 241, 3 CFR, 2003 Comp., p. 278), 1201, 1224, 1225, 1226, 1228, 1365a note, 1365b, 1379, 1731–32; 48 U.S.C. 1806 and notes, 1807, and 1808 (Title VII, Pub. L. 110–229, 122 Stat. 754); 8 U.S.C. 1185 note (sec. 7209, Pub. L. 108–458, 118 Stat. 3638, and Pub. L. 112–54, 125 Stat. 550).

5. Add § 235.15 to read as follows:

## § 235.15 Inadmissible aliens and expedited removal during emergency border circumstances.

(a) *Applicability*.  Notwithstanding §§ 235.3(b)(2)(i) and 235.3(b)(4)(i) (but not § 235.3(b)(4)(ii)), the provisions of this section apply to any alien described in § 235.3(b)(1)(i) through (ii) if the alien is described in § 208.13(g) and is not described in section 3(b) of the Presidential Proclamation of June 3, 2024, Securing the Border.

(b) *Expedited removal*. (1) [Reserved]

(2) *Determination of inadmissibility*—(i) *Record of proceeding.* (A) A noncitizen who is arriving in the United States, or other alien as designated pursuant to § 235.3(b)(1)(ii), who is determined to be inadmissible under section 212(a)(6)(C) or 212(a)(7) of the Act (except an alien

for whom documentary requirements are waived under § 211.1(b)(3) or § 212.1 of this chapter) shall be ordered removed from the United States in accordance with section 235(b)(1) of the Act. In every case in which the expedited removal provisions will be applied and before removing an alien from the United States pursuant to this section, the examining immigration officer shall create a record of the facts of the case and statements made by the alien.

(B) The examining immigration officer shall advise the alien of the charges against him or her on Form I-860, Notice and Order of Expedited Removal, and the alien shall be given an opportunity to respond to those charges. After obtaining supervisory concurrence in accordance with § 235.3(b)(7), the examining immigration official shall serve the alien with Form I-860 and the alien shall sign the form acknowledging receipt. Interpretative assistance shall be used if necessary to communicate with the alien.

(ii) [Reserved]

(iii) [Reserved]

(3) [Reserved]

(4) *Claim of asylum or fear of persecution or torture.* (i) If an alien subject to the expedited removal provisions manifests a fear of return, or expresses an intention to apply for asylum or protection, expresses a fear of persecution or torture, or expresses a fear of return to his or her country or the country of removal, the inspecting officer shall not proceed further with removal of the alien until the alien has been referred for an interview by an asylum officer in accordance with part 208 of this chapter.

(A) The inspecting immigration officer shall document whether the alien has manifested or affirmatively expressed such intention, fear, or concern.

(B) The referring officer shall provide the alien with a written disclosure describing the purpose of the referral and the credible fear interview process; the right to consult with other persons prior to the interview and any review thereof at no expense to the United States Government; the right to request a review by an immigration judge of the asylum officer's

credible fear determination; and the consequences of failure to establish a credible fear of persecution or torture.

(ii) [Reserved]

(c) – (f) [Reserved]

(g) *Severability*.  The Department intends that in the event that any provision of paragraphs (a), (b)(2)(i), and (b)(4) of this section, § 208.35, or the Presidential Proclamation of June 3, 2024, Securing the Border, is held to be invalid or unenforceable by its terms, or as applied to any person or circumstance, the provisions of this section and § 208.35 should be construed so as to continue to give the maximum effect to those provisions permitted by law, unless such holding is that a provision is wholly invalid and unenforceable, in which event the provision should be severed from the remainder of this section and the holding should not affect the remainder of this section or the application of the provision to persons not similarly situated or to dissimilar circumstances.

**DEPARTMENT OF JUSTICE**

Accordingly, for the reasons set forth in the preamble, the Attorney General amends 8 CFR part 1208 as follows:

**PART 1208—PROCEDURES FOR ASYLUM AND WITHHOLDING OF REMOVAL**

6. The authority citation for part 1208 continues to read as follows:

**Authority:** 8 U.S.C. 1101, 1103, 1158, 1226, 1252, 1282; Title VII of Pub. L. 110–229; Pub. L. 115–218.

7. In § 1208.13, add paragraph (g) to read as follows:

**§ 1208.13 Establishing asylum eligibility.**

* * * * *

(g) *Entry during emergency border circumstances*.  For an alien who entered the United States across the southern border (as that term is described in section 4(d) of the Presidential Proclamation of June 3, 2024, Securing the Border) between the dates described in section 1 of

such Proclamation and section 2(a) of such Proclamation (or the revocation of such Proclamation, whichever is earlier), or between the dates described in section 2(b) of such Proclamation and section 2(a) of such Proclamation (or the revocation of such Proclamation, whichever is earlier) refer to the provisions on asylum eligibility described in § 1208.35.

8. Add subpart D, consisting of § 1208.35, to read as follows:

**Subpart D – Eligibility for Aliens Who Enter the United States During Emergency Border Circumstances**

**§ 1208.35 Limitation on asylum eligibility and credible fear procedures for those who enter the United States during emergency border circumstances.**

Notwithstanding any contrary section of this chapter, including §§ 1003.42, 1208.2, 1208.13, 1208.30, and 1208.33—

(a)  *Limitation on eligibility*.  (1) *Applicability.*  An alien who is described in § 1208.13(g) and who is not described in section 3(b) of the Presidential Proclamation of June 3, 2024, Securing the Border, is ineligible for asylum.

(2) *Exceptions.* (i) This limitation on eligibility does not apply if the alien demonstrates by a preponderance of the evidence that exceptionally compelling circumstances exist, including if the alien, or the alien's family member as described in 8 CFR 208.30(c) with whom the alien is traveling, demonstrates by a preponderance of the evidence that, at the time of entry, the alien or a member of the alien's family as described in § 208.30(c) with whom the alien is traveling:

(A) Faced an acute medical emergency;

(B) Faced an imminent and extreme threat to life or safety, such as an imminent threat of rape, kidnapping, torture, or murder; or

(C) Satisfied the definition of "victim of a severe form of trafficking in persons" provided in § 214.11 of this title.

(ii) An alien who demonstrates by a preponderance of the evidence any of the circumstances in paragraph (a)(2)(i) of this section shall necessarily establish exceptionally compelling circumstances.

(iii) An alien described in section 3(b) of the Presidential Proclamation of June 3, 2024, Securing the Border, or who establishes exceptionally compelling circumstances under paragraph (a)(2)(i) of this section has established exceptionally compelling circumstances under § 1208.33(a)(3).

(b) *Application in credible fear determinations.* (1) Where an asylum officer has issued a negative credible fear determination pursuant to 8 CFR 208.35(b), and the alien has requested immigration judge review of that credible fear determination, the immigration judge shall evaluate the case de novo, as specified in paragraph (b)(2) of this section. In doing so, the immigration judge shall take into account the credibility of the statements made by the alien in support of the alien's claim and such other facts as are known to the immigration judge.

(2) The immigration judge shall first determine whether the alien is subject to the limitation on asylum eligibility under paragraph (a) of this section.

(i) Where the immigration judge determines that the alien is not subject to the limitation on asylum eligibility under paragraph (a) of this section because the alien is not described in § 1208.13(g), the immigration judge shall follow the procedures in § 1208.33(b).

(ii) Where the immigration judge determines that the alien is not subject to the limitation on asylum eligibility under paragraph (a) of this section because the alien is described in section 3(b) of the Proclamation or is excepted from the limitation on asylum eligibility under paragraph (a)(2) of this section, the immigration judge shall follow the procedures in § 1208.30.

(iii) Where the immigration judge determines that the alien is subject to the limitation on asylum eligibility under paragraph (a) of this section, the immigration judge shall assess the alien under the procedures set forth in § 1208.33(b)(2)(ii) except that the immigration judge shall apply a reasonable probability standard. For purposes of this section, *reasonable probability*

means substantially more than a reasonable possibility, but somewhat less than more likely than not, that the alien would be persecuted because of his or her race, religion, nationality, membership in a particular social group or political opinion, or tortured, with respect to the designated country or countries of removal.

(3) Following the immigration judge's determination, the case will proceed as indicated in 8 CFR 208.35(b)(2)(v)(A) and (B).

(4) If the limitation on asylum eligibility in paragraph (a) of this section is held to be invalid or unenforceable by its terms, or as applied to any person or circumstance, then during the period(s) described in § 1208.13(g), the immigration judge shall, as applicable, apply a reasonable probability screening standard for any protection screening under § 1208.33(b)(2)(ii).

(c) *Family unity and removal proceedings*.  In removal proceedings under section 240 of the Act, where a principal asylum applicant is found eligible for withholding of removal under section 241(b)(3) of the Act or withholding of removal under § 1208.16(c)(2) and would be granted asylum but for the limitation on asylum eligibility in paragraph (a)(1) of this section or § 1208.33(a), or both, and where an accompanying spouse or child as defined in section 208(b)(3)(A) of the Act does not independently qualify for asylum or other protection from removal or the principal asylum applicant has a spouse or child who would be eligible to follow to join that applicant as described in section 208(b)(3)(A) of the Act, the alien shall be deemed to have established exceptionally compelling circumstances under paragraph (a)(2)(i) of this section and § 1208.33(a)(3)(i).

(d) *Continuing applicability of limitation on eligibility*. (1) Subject to paragraph (d)(2) of this section, the limitation on asylum eligibility in paragraph (a) of this section shall apply to any asylum application filed by an alien who entered the United States during the time and in the

manner described in § 1208.13(g) and who is not covered by an exception in paragraph (d)(2) of this section, regardless of when the application is filed and adjudicated.

(2) The limitation on asylum eligibility in paragraph (a) of this section shall not apply to an alien who was under the age of 18 at the time of the alien's entry, if –

(i) The alien is applying for asylum as a principal applicant; and

(ii) The asylum application is filed after the period of time in 1208.13(g) during which the alien entered.

(e) *Severability*.  The Department intends that in the event that any provision of this section or the Presidential Proclamation of June 3, 2024, Securing the Border, is held to be invalid or unenforceable by its terms, or as applied to any person or circumstance, the provisions of this section should be construed so as to continue to give the maximum effect to those provisions permitted by law, unless such holding is that a provision is wholly invalid and unenforceable, in which event the provision should be severed from the remainder of this section and the holding should not affect the remainder of this section or the application of the provision to persons not similarly situated or to dissimilar circumstances.

Alejandro N. Mayorkas,
Secretary,
U.S. Department of Homeland Security.

Merrick B. Garland,
Attorney General,
U.S. Department of Justice.

[FR Doc. 2024-12435 Filed: 6/4/2024 4:15 pm; Publication Date:  6/7/2024]