# United States Court of Appeals
# for the Fifth Circuit

---

No. 23-50869

---

United States Court of Appeals
Fifth Circuit

**FILED**

November 27, 2024

Lyle W. Cayce
Clerk

STATE OF TEXAS,

*Plaintiff—Appellant,*

*versus*

UNITED STATES DEPARTMENT OF HOMELAND SECURITY;
ALEJANDRO MAYORKAS, *Secretary, U.S. Department of Homeland
Security*; UNITED STATES CUSTOMS AND BORDER PROTECTION;
UNITED STATES BORDER PATROL; TROY MILLER, *Senior Official
Performing the Duties of the Commissioner, U.S. Customs and Border
Protection*; JASON OWENS, *in his official capacity as Chief of the U.S. Border
Patrol*; ROBERT DANLEY, *in his official capacity as Chief Patrol Agent, Del
Rio Sector, United States Border Patrol*,

*Defendants—Appellees.*

---

Appeal from the United States District Court
for the Western District of Texas
USDC No. 2:23-CV-55

---

Before WILLETT, DUNCAN, and RAMIREZ, *Circuit Judges*.

STUART KYLE DUNCAN, *Circuit Judge*:

We address whether United States Border Patrol agents can legally cut a concertina wire ("c-wire" or "wire") fence the State of Texas has placed along part of the border with Mexico. Border Patrol claims removing

the c-wire is sometimes necessary to fulfill its duty of "patrolling the border to prevent the illegal entry of aliens into the United States." 8 U.S.C. § 1357(a)(3). The fence is located in the Eagle Pass area, which in recent years has been an epicenter of millions of unlawful entries into Texas.

Texas sued for an injunction, arguing Border Patrol was needlessly cutting its wire. After days of testimony, the district court agreed with Texas on the facts: not only was Border Patrol unhampered by the wire, but its agents had breached the wire numerous times "for no apparent purpose other than to allow migrants easier entrance further inland." Still, the court denied an injunction based on a legal point: it believed the United States retains sovereign immunity against Texas's claims.

A motions panel of our court disagreed and granted a temporary injunction pending appeal. The United States immediately sought relief in the Supreme Court, based in part on events occurring *after* the injunction issued. Specifically, it claimed that Texas's occupying Shelby Park, an area along the border, obstructed access and led to two aliens' drowning in the Rio Grande. The Supreme Court vacated the injunction without giving reasons.

Our panel, now assigned to the appeal, remanded to find out what happened in Shelby Park. With admirable speed, the district court heard testimony and made new findings. Texas's move into the park, it turned out, had only a marginal effect on Border Patrol's access and had nothing to do with the drownings. The case then returned to us, and we heard oral argument on the denial of the preliminary injunction.

We now rule that Texas is entitled to a preliminary injunction. Specifically, the United States clearly waived sovereign immunity as to Texas's state law claims under § 702 of the Administrative Procedure Act ("APA"). That conclusion is supported by a flood of uncontradicted circuit precedent to which the United States has no answer. We also reject the

No. 23-50869

United States' alternate arguments. The injunction is not barred by intergovernmental immunity because Texas is seeking, not to "regulate" Border Patrol, but only to safeguard its own property. Nor, for similar reasons, is the injunction barred by the Immigration and Nationality Act ("INA"). Finally, Texas has satisfied the injunction factors from *Winter v. Natural Resources Defense Council, Inc.*, 555 U.S. 7 (2008). Most importantly, the United States does not even contest that Texas has shown it will likely succeed on its state law trespass claims.

Accordingly, we REVERSE the district court's judgment and GRANT Texas's request for a preliminary injunction. Based on the district court's supplemental fact findings concerning intervening events in Shelby Park, however, we modify the preliminary injunction as follows.[1]

Defendants are ENJOINED from damaging, destroying, or otherwise interfering with Texas's c-wire fence in the vicinity of Eagle Pass, Texas, as indicated in Texas's complaint, in instances where Defendants have the necessary access to both sides of Texas's c-wire for immigration law enforcement and emergency purposes. That access must include the land side of the c-wire fence along the international border within Shelby Park.

---

[1] *See Sys. Fed'n No. 91, Ry. Emp. Dept., AFL-CIO v. Wright*, 364 U.S. 642, 647 (1961) ("There is also no dispute but that a sound judicial discretion may call for the modification of the terms of an injunctive decree if the circumstances, whether of law or fact, obtaining at the time of its issuance have changed, or new ones have arisen.").

No. 23-50869

## I. Facts and Proceedings

### A. Facts[2]

Along the 1,200 miles of the Rio Grande forming the border between Texas and Mexico, there are 29 official points of entry into the United States. In recent years, "[t]he number of Border Patrol encounters with migrants illegally entering the country has swelled from a comparatively paltry 458,000 in 2020 to 1.7 million in 2021 and 2.4 million in 2022." Exploiting this situation, drug cartels have made "an incredibly lucrative enterprise" out of trafficking humans and illegal drugs like fentanyl, which "is frequently encountered in vast quantities at the border."

In 2021, Texas launched Operation Lone Star to aid the Border Patrol. "By all accounts, Border Patrol is grateful for the assistance of Texas law enforcement, and the evidence shows the parties work cooperatively across the state, including in El Paso and the Rio Grande Valley." There has been conflict in the Eagle Pass area, however.

Maverick County and Eagle Pass are "the epicenter of the present migrant influx: nearly a quarter of migrant entries into the United States happen there." Border Patrol set up a temporary processing center in Maverick County on private land close to the Rio Grande. By September 2023, Texas had installed over 29 miles of c-wire in this area, much of which Texas laid "along several sections of [the] riverfront." The c-wire serves as

---

[2] The facts are taken from the findings made after the district court's initial preliminary injunction hearing and the subsequent hearing on limited remand.

a "deterrent—an effective one at that," causing illegal crossings to drop precipitously.

Both the Border Patrol and Texas agree that the c-wire must be cut in the event of a medical emergency or to enforce federal immigration law. "The problem arises when Border Patrol agents cut the wire without prior notification to [Texas] for [other] reasons." Beginning around September 2023, Texas and Border Patrol began to clash in the Eagle Pass area. Agents began cutting Texas's wire to permit aliens to enter the United States. The district court found "at least fourteen incidents of wire cutting."

A September 20th incident captured on video was, in the district court's view, the "most illustrative." The video shows that Border Patrol agents have cut a hole in the c-wire to allow aliens to enter. They then cut two additional holes about 15 feet away and install "a climbing rope for migrants." Meanwhile, a Border Patrol boat "passively observ[es] a stream of migrants" stretching across the river and onto the Mexican shore who were never "interviewed, questioned as to citizenship, or in any way hindered in their progress into the United States." Instead, after letting the aliens through, the Border Patrol sent them to "walk as much as a mile or more" with no supervision in hopes they would proceed to the nearest processing center.

## B. District court proceedings

Due to repeated instances like the one described above, Texas sued Defendants[3] in federal court alleging common law conversion, common law

---

[3] Defendants are the U.S. Department of Homeland Security and its Secretary, Alejandro Mayorkas; U.S. Customs and Border Protection; U.S. Border Patrol; Troy Miller, Acting Commissioner of U.S. Customs and Border Protection; Jason Owens, Chief of the U.S. Border Patrol; and Juan Bernal, Acting Chief Patrol Agent, Del Rio Sector U.S. Border Patrol.

trespass to chattels, and violations of the APA. Among other relief, Texas sought a preliminary injunction based on its trespass to chattels claim. Three days later, Texas sought a TRO. The next day, Texas notified the court that "Defendants, knowing a motion for a TRO had already been filed, used a forklift to seize concertina wire and smash it to the ground."

The court granted an emergency TRO barring Defendants "from interfering with [Texas's] concertina wire except for medical emergencies." Over the ensuing month, the court held two hearings on Texas's motion, featuring testimony from multiple witnesses and thousands of pages of evidence (including five videos) as a result of expedited discovery. The court twice extended the TRO.

Ultimately, the district court denied a preliminary injunction for the sole reason that, in its view, Congress did not waive the United States' sovereign immunity under 5 U.S.C. § 702. Despite this holding, the court fully analyzed the injunction factors from *Winter*. Analyzing Texas's likelihood of success on its common law claims, the court rejected Defendants' arguments that they were justified in cutting the c-wire either to detain aliens or prevent emergencies. Instead, the court found that Defendants cut the wire "for no apparent purpose other than to allow aliens easier entrance further inland."

The court rejected as a factual matter Defendants' assertion that they cut the wire to "inspect, apprehend, and process" incoming aliens.[4] It found

---

[4] *See* 6 U.S.C. § 211(c)(8)(B) (setting out Commissioner's responsibility for "the detection, interdiction, removal, departure from the United States, short-term detention, and transfer of persons unlawfully entering, or who have recently unlawfully entered, the United States"); 8 U.S.C. § 1357(a)(3) (authorizing agents, "within a distance of twenty-five miles from any . . . external boundary [of the United States] to have access to private lands, but not dwellings, for the purpose of patrolling the border to prevent the illegal entry of aliens into the United States").

No. 23-50869

that no aliens were "inspected" at all. Regardless, though, Border Patrol could have inspected aliens without disturbing the wire because "agents already possess access to both sides of the fence . . . to the river and bank by boat and to the further-inland side of the fence by road." Based on this finding, the court concluded that Defendants "cannot justify cutting or moving [Texas's] fence whenever and wherever they find convenient based on a supposed need to access the river by both boat and foot so they may passively observe migrants crossing."

Nor was wire-cutting necessary to "apprehend" or "process" aliens. Indeed, no one was "apprehended"—aliens coming through the holes were waived along in the "hope that [they] will flow in an orderly manner . . . to the nearest processing center." Defendants let "some 4,555 migrants [in] during [the September 20] incident, but only 2,680 presented themselves for processing." The court thus rejected Defendants' claim that they needed to cut or move Texas's fence "to allow migrants to proceed toward a further-inland processing center." "Any justifications resting on the Defendants' illusory and life-threatening 'inspection' and 'apprehension' practices, or lack thereof, fail."[5]

The court also rejected the contention that wire-cutting was needed to prevent "medical emergencies." To be sure, everyone recognized that "[i]njury, drowning, dehydration, and fatigue are real and common perils in this area of the border," and so "medical emergencies justify cutting or

---

[5] The court also rejected Defendants' argument that it must inspect, apprehend, and afford statutory rights to aliens the instant they step over the international border. The court held that aliens who were "detained shortly after unlawful entry cannot be said to have 'effected an entry.'" The court relied on the Supreme Court's decision in *DHS v. Thuraissigiam*, 591 U.S. 103, 139–40 (2020), which held that an alien lacks any due process rights and discussed how an alien's entry into the country "25 yards" changed nothing about his legal status.

No. 23-50869

moving [Texas's] fence." But such events would not justify any and all destruction of the wire. "While an ongoing medical emergency can justify opening the fence, the end of that exigency ends the justification." So, for example, "cutting the wire to address a single individual's display of distress does not justify leaving the fence open for a crowd of dozens or hundreds to pass through."[6]

Ultimately, the court concluded that "an emergency that can be just as adequately addressed by less destructive means, such as by reaching one or more individuals by boat rather than on foot, does not justify opening the fence at all." It also held that Defendants cut the c-wire "for no apparent purpose other than to allow migrants easier entrance further inland," and they "cannot claim the statutory duties they are so obviously derelict in enforcing as excuses to puncture" the wire.

As to *Winter*'s third and fourth prongs, the court held that the "possible harm suffered by [Texas] in the form of loss of control and use of its private property continues to satisfy the irreparable harm prong." It also stood by the "public interest calculation" from its TRO—namely, that deterring illegal immigration and unlawful agency action were in the public interest.

Turning to Texas's other claims, the court concluded there was "insufficient evidence" at this early stage to support finding a "final agency

---

[6] The court also rejected Defendants' argument that cutting the c-wire could be justified because it would assist in the "prevention of possible future exigencies." Such an exception would "swallow [the] rule."

action" or "*ultra vires*" acts. The court noted, however, that further "[d]iscovery may produce information that sheds new light" on these claims.

The court thus found the *Winter* factors favored Texas but, due to sovereign immunity, it denied a preliminary injunction. Texas appealed and sought an emergency injunction pending appeal.

### C. Motions panel grants injunction pending appeal

The motions panel granted an administrative stay and requested a response to Texas's motion. On December 19, 2023, the panel granted an injunction pending appeal, enjoining the Border Patrol from "damaging, destroying, or otherwise interfering with Texas's c-wire fence in the vicinity of Eagle Pass, Texas" except "if necessary to address any medical emergency as specified in the TRO." The injunction was based on the following reasoning.

First, the panel ruled that the district court legally erred because 5 U.S.C. § 702 does waive sovereign immunity for state law claims seeking non-monetary relief. Second, the panel rejected Defendants' argument that the Federal Tort Claims Act ("FTCA") "impliedly forbids" tort-based injunctive relief under § 702. Third, the panel ruled Texas's suit was not barred by intergovernmental immunity because it does not "directly regulat[e]" Border Patrol. Fourth, for similar reasons, the panel ruled Texas's suit was not barred by § 1252(f)(1) of the INA. *See* 8 U.S.C. § 1252(f)(1). Finally, the panel assessed the additional stay factors based on the district court's fact findings, ruling that Texas was irreparably

No. 23-50869

harmed by Defendants' unjustified destruction of the c-wire. *See Nken v. Holder*, 556 U.S. 418, 434 (2009).[7]

Two days later, Defendants moved to expedite the appeal, which the motions panel granted on December 28, 2023. An expedited schedule was set to finish briefing by January 30, 2024.

### D. Supreme Court vacates the injunction pending appeal

Despite receiving expedited relief, Defendants filed an emergency application in the Supreme Court to vacate the injunction pending appeal. *See* Application to Vacate the Injunction Pending Appeal, *DHS v. Texas*, No. 23A607 (U.S. Jan. 2, 2024) ("Vacatur Application"). The parties' briefing advanced the same arguments made to the motions panel and was completed by January 10, 2024.

Two days later, however, Defendants filed a supplemental brief in the Supreme Court, arguing events *after* the injunction's entry justified vacatur. They pointed to Texas officials' occupying Shelby Park, a border area within the zone affected by the injunction. According to Defendants, this move prevented Border Patrol from surveilling a 2.5 mile stretch of the border, from accessing a boat ramp, and from using the park for processing aliens. *See* Supplemental Memorandum at 2–5, *DHS v. Texas*, No. 23A607 (U.S. Jan. 12, 2024) ("Supplemental Memo").

Texas disputed these assertions. *See* Texas's Response to the United States's Supplemental Memorandum at 2–3, *DHS v. Texas*, No. 23A607 (U.S. Jan. 13, 2024) ("Supplemental Response"). Texas argued that it moved into the park only to ensure public safety, that Border Patrol had already ceased operations there, and that Texas's move did not obstruct

---

[7] Given its disposition, the panel did not need to reach Texas's APA claims.

surveillance. Texas also contended it had never been informed that Border Patrol lacked boat ramp access, only learning this from Defendants' briefing. *Id.* at 4–5. Texas immediately restored Border Patrol's access to the ramp. *Id*. at 5.

On January 15, 2024, Defendants filed a second supplemental brief, claiming Texas prevented Border Patrol from accessing the river to save two aliens who drowned on January 12. *See* Second Supplemental Memorandum Regarding Emergency Application to Vacate the Injunction Pending Appeal, *DHS v. Texas*, No. 23A607 (U.S. Jan. 15, 2024) ("Second Supplemental Memo"). Texas hotly disputed this, arguing Border Patrol never sought access to the park for that purpose and, instead, informed Texas officers only that Mexican officials had recovered two bodies and rescued two other aliens. *See* Texas's Response to the United States' Second Supplemental Memorandum at 3–4, *DHS v. Texas*, No. 23A607 (U.S. Jan. 17, 2024) ("Second Supplemental Response"). Hours after the drownings, the Department of Homeland Security released a public statement asserting: "In responding to a distress call from the Mexican government, Border Patrol agents were physically barred by Texas officials from entering the area."

A week later, the Supreme Court vacated the injunction pending appeal by 5-4 vote without accompanying reasons. *DHS v. Texas*, 144 S. Ct. 715 (2024) (Mem) (No. 23A607) (Jan. 22, 2024).

### E. Limited remand

On January 26, 2024, our panel held Texas's appeal in abeyance and ordered a limited remand to the district court. The order noted that, in the Supreme Court, the parties "strenuously disputed various factual issues, many of which concerned matters arising after the motion panel's injunction." We asked the district court "to make additional fact findings concerning th[ose] matters . . . and any other matters the district court

deem[ed] relevant." With admirable dispatch and thoroughness, the district court held two days of hearings and issued supplemental findings. We briefly summarize those findings here.

First, the findings clarify Texas's move into Shelby Park. On January 10, 2024, Texas established a 2.5-mile perimeter while constructing an "inner cordon" within the park. This is illustrated by two maps from Texas's supplemental brief—the left-hand map depicts the 2.5-mile perimeter and the right-hand map shows the park:



Texas withdrew from the 2.5-mile line a "few hours" into the operation. At the hearing, Defendants agreed they lost border access along the 2.5-mile stretch only for about four hours.

Second, the findings clarify whether Texas's actions compromised boat ramp access or border visibility. Regarding Border Patrol's January 10–12 loss of ramp access, the court found no "emergency river operations"

were impeded during that interval. As to visibility, the court found Border Patrol experienced some reduction from January 10–12 but regained substantial visibility "within hours or days" of Texas's occupying the park.

Third, the findings shed light on the January 12 drownings. The court found that "the emergency involving possible drownings had concluded about one hour and a half before Border Patrol agents arrived at the gates of Shelby Park." By that time, Mexican officials had also rescued two other distressed aliens and had them on the Mexican side of the river. Finally, when Border Patrol approached Texas officials in the park, the federal officers did not act as if any emergency were underway but "were instead professional and calm."

Finally, the findings address Defendants' broader contention that Texas's actions were "an impediment" to enforcing federal law. The court found these claims "too vague to make a concrete determination." The court did find, however, that Border Patrol agents were put "at risk" and "slow[ed] down" by having to pass through the gate in Texas's fencing around the park. But the court ultimately concluded it was "an open question . . . whether [Texas's activity] constitutes an impediment, an inconvenience, or none of the above."

The parties disagree over whether we can consider these supplemental findings in reviewing the propriety of the district court's denial of a preliminary injunction. We need not resolve that issue. Reliance on the

No. 23-50869

supplemental findings is not necessary to resolve the legal issues before us, which are the same as those before the motions panel.[8]

## II. Standard of Review

A party seeking a preliminary injunction must establish: (1) a substantial likelihood it will prevail on the merits, (2) a substantial threat it will suffer irreparable injury if the injunction is not granted, (3) that the threatened injury to the movant outweighs the threatened harm the injunction may do to the nonmovant, and (4) that granting the preliminary injunction will not disserve the public interest. *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008). We review the decision to grant or deny a preliminary injunction for abuse of discretion. *Anibowei v. Morgan*, 70 F.4th 898, 902 (5th Cir. 2023). A district court abuses its discretion by "rest[ing] its legal analysis on an erroneous understanding of governing law." *McKinney ex rel. N.L.R.B. v. Creative Vision Res., L.L.C.*, 783 F.3d 293, 298 (5th Cir. 2015) (quoting *Langbecker v. Elec. Data Sys. Corp.*, 476 F.3d 299, 306 (5th Cir. 2007)).

## III. Discussion

Texas contends that, contrary to the district court's ruling, 5 U.S.C. § 702 waives sovereign immunity on its state law claims for injunctive relief. Because the district court found the *Winter* factors otherwise favored Texas, Texas argues it is entitled to a preliminary injunction. For their part, Defendants dispute that § 702 waives immunity and, additionally, raise alternate grounds for affirmance under

---

[8] As explained in Part IV *infra*, however, we do rely on the supplemental findings to modify the preliminary injunction in one respect—specifically, to require that Border Patrol have access to both sides of the c-wire in Shelby Park.

No. 23-50869

intergovernmental immunity, the INA, and the remaining *Winter* factors. We address each argument in turn.

## A. Section 702 Waiver

We begin with Texas's argument that, contrary to the district court's ruling, § 702 of the APA waives sovereign immunity for its common law claims.

The United States and its agencies are immune from suit, even by states, unless Congress waives sovereign immunity. *See FDIC v. Meyer*, 510 U.S. 471, 475 (1994); *California v. Arizona*, 440 U.S. 59, 61–62 (1979). A waiver of sovereign immunity requires a "clear statement." *Dep't of Agric. v. Kirtz*, 601 U.S. 42, 48–49 (2024).

We first examine § 702's text, then turn to the precedents interpreting it, and finally address Defendants' argument under the FTCA.

### 1. <u>Section 702's text</u>

Section 702 provides in relevant part:

A person suffering legal wrong because of agency action, or adversely affected or aggrieved by agency action within the meaning of a relevant statute, is entitled to judicial review thereof. An action in a court of the United States seeking relief other than money damages and stating a claim that an agency or an officer or employee thereof acted or failed to act in an official capacity or under color of legal authority shall not be dismissed nor relief therein be denied on the ground that it is against the United States or that the United States is an indispensable party. The United States may be named as a defendant in any such action, and a judgment or decree may be entered against the United States[.]

No. 23-50869

5 U.S.C. § 702. Texas's lawsuit checks all of § 702's boxes. Texas claims it has been "adversely affected" by "agency action," whose definition includes an agency's "destruction . . . of property." *See id.* § 551(13), (10)(D). Its suit was brought as "an action" in federal court; it "seek[s] relief other than monetary damages"; and it "stat[es] a claim" that a federal agency's officials and employees "acted or failed to act in an official capacity or under color of legal authority." *Id.* § 702. Accordingly, § 702 directs that Texas's suit "shall not be dismissed nor relief therein be denied on the ground that it is against the United States." That should end the matter.[9]

---

[9] The dissent argues that § 702 does not waive sovereign immunity because Texas fails to identify any "final agency action." Dissent at 21. We disagree. As the dissent acknowledges, when a plaintiff seeks review of agency action pursuant to a "non-statutory cause of action that arises completely apart from the general provisions of the APA," "[t]here is no requirement of 'finality.'" *Alabama-Coushatta Tribe of Tex. v. U.S.*, 757 F.3d 484, 489 (5th Cir. 2014) (citations omitted). That principle governs here. In addition to its substantive APA and *ultra vires* claims, Texas seeks to enjoin agency action under a state law trespass-to-chattels claim. That claim does not arise under the APA, and so the final agency action requirement is inapplicable. *See, e.g.*, *Apter v. Dep't of Health and Human Servs.*, 80 F.4th 579, 589 (5th Cir. 2023) ("When a plaintiff uses the APA to assert a 'non-statutory cause of action,'" he "must identify some 'agency action' affecting him in a specific way," but "[t]he action *need not be final.*" (quoting *Alabama-Coushatta*, 757 F.4th at 489) (emphasis added)). And, as noted, Texas easily meets the general "agency action" requirement by alleging that border agents have repeatedly cut or removed its c-wire. *See* 5 U.S.C. §§ 551(13), (10)(D) (agency action includes "destruction . . . of property").

The dissent also argues that Texas's trespass-to-chattels claim cannot qualify as a non-statutory claim under § 702 because it is a "state-law claim" that does not arise under 28 U.S.C. § 1331. Dissent at 21. We disagree. The dissent cites no authority for that proposition. The three cases the dissent cites—our *Alabama-Coushatta* decision and decisions from the Third and D.C. Circuits—do not address the issue. They recognize only that an equitable claim under § 1331 qualifies as a non-statutory claim under § 702, something no one disputes. What the dissent overlooks, however, is that at least four circuits (including later decisions from the Third and D.C. Circuits) expressly recognize that § 702 also waives immunity for state-law equitable claims such as Texas's trespass claim. *See infra* III.A.2 (discussing *Perry Cap. v. Mnuchin*, 864 F.3d 591, 620 (D.C. Cir. 2017); *Treasurer of New Jersey v. U.S. Dep't of Treasury*, 684 F.3d 382, 389–90, 400 n.19 (3d Cir. 2012); *S. Delta Water Agency v. U.S. Dep't of Interior, Bureau of Reclamation*, 767

No. 23-50869

The district court thought § 702 was not plain enough, however. What was lacking, it reasoned, was precedent confirming that "an action" includes state or common law trespass-to-chattels claims. That asks too much. It is true, of course, that courts construe ambiguities strictly in favor of sovereign immunity. *See Sebelius v. Cloer*, 569 U.S. 369, 380–81 (2013). But there is no ambiguity here. By its terms, § 702 waives immunity for any "action" seeking nonmonetary relief in federal court. *See* Richard Fallon et al., Hart & Wechsler's The Federal Courts and the Federal System 902 (7th ed. 2015) (§ 702 waiver applies to "any suit"). And the Supreme Court recently reaffirmed that Congress needs no "magic words" to waive sovereign immunity. *Kirtz*, 601 U.S. at 48–49 (quoting *FAA v. Cooper*, 566 U.S. 284, 291 (2012)). To the contrary, a statute must be "unmistakably clear" that "in so many words . . . it is stripping immunity from a sovereign entity." *Id.* (quoting *Financial Oversight and Management Bd. for P.R. v. Centro De Periodismo Investigativo, Inc.*, 598 U.S. 339, 347 (2023)). Section 702 meets that bar, and its text does not suggest it excludes state or common law claims.

Defendants' counterarguments fail. They argue § 702 applies only to *federal* causes of action, whether common, statutory, or constitutional. As explained, though, the text does not support that reading. We cannot rewrite § 702 to say "a federal action" when Congress only wrote "an action." *See Elec. Storage Battery Co. v. Shimadzu*, 307 U.S. 5, 14 (1939) ("We cannot thus rewrite the statute" by "read[ing] into the law words which plainly are missing."); *United States v. Shear*, 962 F.2d 488, 495 (5th Cir. 1992) (refusing to "effectively rewrite the statute" by reading words into it).

---

F.2d 531, 536 (9th Cir. 1985); and *Gilmore v. Weatherford*, 694 F.3d 1160, 1166 n.1 (10th Cir. 2012)).

No. 23-50869

When Congress wants to add the qualifier "federal," it knows how. Elsewhere in § 702 itself, Congress did just that. *See* § 702 ("*Provided*, That any mandatory or injunctive decree shall specify the Federal officer or officers . . . personally responsible for compliance."). That word choice powerfully suggests that, earlier in the same provision, Congress chose not to qualify "action" with "federal." *See Romag Fasteners, Inc v. Fossil, Inc.*, 590 U.S. 212, 215 (2020) ("Nor does this Court usually read into statutes words that aren't there. It's a temptation we are doubly careful to avoid when Congress has (as here) *included the term in question elsewhere in the very same statutory provision.*" (emphasis added)); *see* Antonin Scalia & Bryan Garner, Reading Law 107 (2012) ("The expression of one thing implies the exclusion of others.").[10]

Finally, Defendants point to Congress's simultaneous elimination of the amount-in-controversy requirement for federal question jurisdiction, arguing this shows § 702 meant to waive immunity for federal actions only. *See* Pub. L. No. 94-574, 90 Stat. 2721 (1976). We disagree. Statutory history (unlike *legislative* history) can sometimes illuminate a statute's meaning. *See Thomas v. Reeves*, 961 F.3d 800, 807 n.8 (5th Cir. 2020); *In re Crocker*, 941 F.3d 206, 213 (5th Cir. 2019). But the history Defendants cite does not do that here. The bare fact of Congress's eliminating the amount-in-controversy

---

[10] Moreover, when Congress amended the APA in 1976 to waive sovereign immunity for an "action" seeking nonmonetary relief in federal court, *see* Pub. L. No. 94-574, 90 Stat. 2721 (1976) (codified as amended at 5 U.S.C. § 702), federal courts had long exercised jurisdiction over state claims via pendent (now supplemental) jurisdiction. *See United Mine Workers of Am. v. Gibbs*, 383 U.S. 715, 725 (1966); *Levering & Garrigues Co. v. Morrin*, 289 U.S. 103, 106–08 (1933). Congress is presumed to be aware of that legal background when amending a statute. *See Cannon v. Univ. of Chi.*, 441 U.S. 677, 696–97 (1979) (elected officials are presumed to know the law when legislating); *Ryan v. Gonzales*, 568 U.S. 57, 66 (2013) ("We normally assume that, when Congress enacts statutes, it is aware of relevant judicial precedent." (quoting *Merck & Co. v. Reynolds*, 559 U.S. 633, 648 (2010))).

No. 23-50869

threshold for federal jurisdiction tells us nothing that would override the plain import of § 702's text.

## 2. Precedent interpreting § 702

Texas's waiver argument is also strongly supported by the cases interpreting § 702.

Start with our own decisions. We have never suggested that § 702 excludes state or common law claims. To the contrary, we have said that § 702 "generally waives" sovereign immunity, *Apter v. HHS*, 80 F.4th 579, 589 (5th Cir. 2023) (quoting *Match-E-Be-Nash-She-Wish Band of Pottawatomi Indians v. Patchak*, 567 U.S. 209, 215 (2012)), including for "suits seeking nonmonetary relief through nonstatutory judicial review of agency action." *Geyen v. Marsh*, 775 F.2d 1303, 1307 (5th Cir. 1985).[11]

Every one of our sister circuits has construed § 702's plain language as a waiver of sovereign immunity for all equitable actions, regardless of whether they arise under the APA or other federal law. *See, e.g.*, *Puerto Rico*

---

[11] *See also Gulf Restoration Network v. McCarthy*, 783 F.3d 227, 232 n.22 (5th Cir. 2015) (§ 702 "waives sovereign immunity for all claims 'other than money damages'" (quoting 5 U.S.C. § 702)); *Doe v. United States*, 853 F.3d 792, 798–99 (5th Cir. 2017) (explaining § 702 "broaden[s] the avenues for judicial review of agency action by eliminating the defense of sovereign immunity" in nonmonetary suits (quoting *Bowen v. Massachusetts*, 487 U.S. 879, 891–92 (1988)); *Hous. Cmty. Hosp. v. Blue Cross Shield of Tex., Inc.*, 481 F.3d 265, 278 (5th Cir. 2007) ("Now that 5 U.S.C. § 702 exposes the United States to equitable relief . . . *[t]he only portion* of the United States' original immunity from suit that Congress continues to assert *is a right not to pay damages*[.]" (emphases added) (quoting *Pullman Const. Indus., Inc. v. United States*, 23 F.3d 1166, 1168 (7th Cir. 1994), as amended on denial of reh'g (May 19, 1994)); *Fort Bend County v. U.S. Army Corp of Eng'rs*, 59 F.4th 180, 192 (5th Cir. 2023) (holding that § 702 "has been satisfied in that the complaint alleges plaintiffs have been aggrieved by agency action, that the suit is not one for money damages, and that the injury arises from an officer or employee" of the federal government).

*v. United States*, 490 F.3d 50, 57–58 (1st Cir. 2007) (holding § 702 waives sovereign immunity for "*all* equitable actions" and thus "applies to any suit whether under the APA or not" (quoting *Trudeau v. FTC*, 456 F.3d 178, 186 (D.C. Cir. 2006) (noting D.C. Circuit has "repeatedly . . . rejected" the argument § 702 waiver applies only to APA actions))).[12] And at least four of

---

[12] *See also B.K. Instrument, Inc. v. United States*, 715 F.2d 713, 724–25 (2d Cir. 1983) (noting Congress stated that "the time [has] now come to eliminate the sovereign immunity defense in all equitable actions for specific relief against a Federal agency or officer acting in an official capacity" (alteration in original) (quoting H.R. Rep. No. 1656, 94th Cong., 2d Sess. 9, *reprinted in* 1976 U.S. Code Cong. & Admin. News 6121, 6129)); *Stehney v. Perry*, 101 F.3d 925, 932–33 (3d Cir. 1996) (holding § 702 waives sovereign immunity when a party seeks nonmonetary relief and a separate statute does not preclude relief); *Randall v. United States*, 95 F.3d 339, 346 (4th Cir. 1996) (explaining that "[t]he waiver of sovereign immunity in the APA is limited to suits seeking relief 'other than money damages'" (quoting 5 U.S.C. § 702)); *Hostetter v. United States*, 739 F.2d 983, 985 (4th Cir. 1984) ("In Section 702 Congress has waived the defense of sovereign immunity in such nonstatutory review cases in which nonmonetary relief is sought . . . ."); *Muniz-Muniz v. U.S. Border Patrol*, 741 F.3d 668, 672 (6th Cir. 2013) (joining "all of our sister circuits" in holding that "§ 702's waiver of sovereign immunity extends to *all* non-monetary claims against federal agencies" (emphasis added)); *Michigan v. U.S. Army Corps of Eng'rs*, 667 F.3d 765, 775–76 (7th Cir. 2011) ("When Congress amended the APA in 1976 it gave every indication that it intended to provide specific relief for *all* nonstatutory claims against the government.") (emphasis added); *Blagojevich v. Gates*, 519 F.3d 370, 371 (7th Cir. 2008) (holding that "Congress has waived sovereign immunity for most forms of prospective relief"); *Red Lake Band of Chippewa Indians v. Barlow*, 846 F.2d 474, 476 (8th Cir. 1988) (holding that "the waiver of sovereign immunity contained in section 702 . . . is dependent on the suit against the government being one for non-monetary relief"); *Presbyterian Church (U.S.A.) v. United States*, 870 F.2d 518, 525 (9th Cir. 1989) ("Congress stated that 'the time [has] now come to eliminate the sovereign immunity defense in *all* equitable actions for specific relief against a Federal agency or officer acting in an official capacity'" (alteration in original) (quoting H.R. Rep. No. 1656, 94th Cong., 2d Sess. 9, *reprinted in* 1976 U.S.Code Cong. & Admin.News 6121, 6129)); *Kansas v. United States*, 249 F.3d 1213, 1222 (10th Cir. 2001) ("Section 702 generally waives the sovereign immunity of the United States in agency review actions 'seeking relief other than money damages.'" (quoting 5 U.S.C. § 702)); *Tinnerman v, United States*, No. 21-14023, 2022 WL 3654844, at *4 (11th Cir. Aug. 25, 2022) (holding that § 702 "operates as a general waiver of sovereign immunity for suits against the United States seeking nonmonetary relief, even if the claim does not arise under the APA." (citing *Panola Land Buyers Ass'n v. Shuman*, 762 F.2d 1550, 1555 (11th Cir. 1985)); *Delano Farms Co. v. Ca. Table Grape Comm'n*, 655 F.3d

No. 23-50869

those circuits have logically taken that principle to mean that the § 702 waiver applies to *state* law claims for nonmonetary relief. *See, e.g.*, *Perry Cap. v. Mnuchin*, 864 F.3d 591, 620 (D.C. Cir. 2017) ("Treasury's argument that § 702 does not waive its immunity from suit for state law claims is foreclosed by our precedent.").

For instance, the Third Circuit held that § 702 allowed New Jersey's claim against the Treasury under that state's unclaimed property acts, rejecting "the distinction that the Government makes between federal and state law in either the text or the history of section 702." *Treasurer of New Jersey v. U.S. Dep't of Treasury*, 684 F.3d 382, 389–90, 400 n.19 (3d Cir. 2012). The Ninth Circuit has similarly permitted application of state water laws against the Department of the Interior under § 702. *See S. Delta Water Agency v. U.S. Dep't of Interior, Bureau of Reclamation*, 767 F.2d 531, 536 (9th Cir. 1985) (holding § 702 waived immunity because "[c]ontrary to federal defendants' contentions, the federal government must acquire water rights in accordance with state law"). And the Tenth Circuit has twice explained that it is immaterial to § 702 whether a claim arises under the APA or common law. *See Gilmore v. Weatherford*, 694 F.3d 1160, 1166 n.1 (10th Cir. 2012) (Gorsuch, J., on panel) (explaining "[w]hether plaintiffs' claims arise under the APA or common law is [] immaterial with respect to the sovereign

---

1337, 1344 (Fed. Cir. 2011) (holding that § 702 "waives sovereign immunity for nonmonetary claims against federal agencies, subject [only] to the limitations" that § 702 does not "affect[] other limitations on judicial review" or permit the court to "grant relief if any other statute . . . expressly or impliedly forbids the relief which is sought" (cleaned up)); *Aetna Cas. & Sur. Co. v. United States*, 71 F.3d 475 (2d Cir. 1995) (allowing plaintiff asserting tortious conversion against IRS to amend complaint to state a claim under § 702).

No. 23-50869

immunity analysis[,]" because "[u]nder 5 U.S.C. § 702, the United States waives sovereign immunity as to [such] actions").[13]

For their part, Defendants fail to cite a single circuit precedent supporting their view that the § 702 waiver applies only to federal claims.[14]

### 3. The FTCA does not implicitly override § 702's waiver

One of Defendants' counterarguments merits separate mention. They contend the FTCA is the exclusive remedy for all state tort actions, regardless of the remedy sought. So, § 702 does not apply here because the FTCA "impliedly forbids" waiving immunity for state tort claims seeking injunctive relief. This argument fails.

Defendants' argument finds no foothold in the FTCA's text. They claim the FTCA imposes "important limitations" on tort claims against the United States because "it permits money damages, not prospective relief."

---

[13] *See also Fletcher v. United States*, 160 F. App'x 792, 796–97 (10th Cir. 2005) ("[P]laintiffs' reliance upon common law trust principles in pursuit of their [§ 702] claim is immaterial [for sovereign immunity purposes], as here they seek specific relief other than money damages; and federal courts have jurisdiction to hear such claims under the APA." (cleaned up)). The Sixth Circuit has held that § 702's waiver applies to a suit to enjoin a U.S. Forest Service policy based on both federal and state law. *See Herr v. U.S. Forest Servs.*, 803 F.3d 809, 812, 818–19 (6th Cir. 2015). The court seemed to assume that the waiver applied equally to the state claim but without discussing the issue specifically.

[14] And, as discussed, neither does the dissent. *See supra* note 9. The dissent argues the circuits applying § 702's waiver to state and common-law claims are irrelevant because, unlike ours, they maintain a § 702 waiver "does not require final agency action." Dissent at 23. We disagree. As our court has recognized, the final agency action requirement does not apply here because Texas seeks an injunction pursuant to a non-statutory claim. *See, e.g.*, *Apter*, 80 F.4th at 589 ("When a plaintiff uses the APA to assert a 'non-statutory cause of action,'" he "must identify some 'agency action' affecting him in a specific way," but "[t]he action *need not be final.*" (quoting *Alabama-Coushatta*, 757 F.4th at 489) (emphasis added)). And, as discussed, Texas has easily shown that Defendants' destruction of its c-wire constitutes "agency action" specifically affecting Texas. *See* 5 U.S.C. §§ 551(13), (10)(D) (agency action includes "destruction . . . of property").

No. 23-50869

Only the first half of that statement is true. Yes, the FTCA permits "claim[s] *for money damages* against the United States" in certain situations. *See* 28 U.S.C. § 2672 (emphasis added). But it neither says nor implies anything about prospective or nonmonetary relief. Every substantive section of the statute deals only with money damages.[15] The FTCA gives no indication, implicit or otherwise, that it meant to preclude prospective relief in general, much less the nonmonetary relief expressly authorized by § 702.

Three of our sister circuits have rejected the argument Defendants urge here. The D.C. Circuit, for instance, drew precisely the *opposite* inference from the FTCA's silence about nonmonetary relief. It reasoned that, in certain circumstances, the "FTCA specifically bars money damages . . . which by parity of reasoning implies that injunctive relief is

---

[15] *See* § 2672 (requiring written approval from the Attorney General for any "award, compromise, or settlement in excess of $25,000" and dictating which budgets payouts must come from); § 2673 (requiring the head of federal agencies to report annually to Congress "all claims paid by it" including, among other things "the amount claimed" and "the amount awarded"); § 2674 (making the United States liable for "tort claims, in the same manner and to the same extent as a private individual under like circumstances" but not for "interest prior to judgment or for punitive damages" unless the case involved a victim's death and the local law construes such damages as "only punitive in nature" in which case "the United States shall be liable for actual or compensatory damages, measured by the pecuniary injuries resulting from such death"); § 2675(a) (requiring that plaintiffs first present their "claim against the United States for money damages" to the agency and only permitting a suit if the agency denies the claim); § 2675(b) (restricting any action in federal court to the "amount of the claim presented to the federal agency" unless newly discovered evidence not reasonably discoverable supports a different amount); § 2675(c) ("Disposition of any claim by the Attorney General or other head of a federal agency shall not be competent evidence of liability or amount of damages."); § 2676 (explaining that a judgment in an action for money damages "shall constitute a complete bar to any action by the claimant, by reason of the same subject matter" against the government employee); § 2678 (restricting attorney fees to "25 per centum of any judgment" or "20 per centum of any award, compromise, or settlement"); § 2679(b)(1) (providing that "[t]he remedy against the United States provided by [the FTCA] . . . is exclusive of any other civil action or proceeding *for money damages*" (emphasis added)).

No. 23-50869

available." *U.S. Info. Agency v. Krc*, 989 F.2d 1211, 1216 (D.C. Cir. 1993). So, it rejected the argument that the FTCA "impliedly forbids specific relief for tortious interference with prospective employment opportunities" (which was, not incidentally, a state tort law claim for nonmonetary relief). *Ibid.* For its part, the Seventh Circuit cautioned that efforts to "transform [the FTCA's] silence into implicit prohibition would seriously undermine Congress's effort in the APA to authorize specific relief against the United States," because by enacting § 702 Congress "intended to provide specific relief for all nonstatutory claims against the government." *Michigan*, 667 F.3d at 775–76. Accordingly, the court rejected the argument that "the FTCA implicitly prohibits injunctive relief in tort suits against the United States" as "read[ing] too much into congressional silence." *Id.* at 775. Finally, the Tenth Circuit aptly explained that § 702 and the FTCA should be read in harmony. "Congress has limited the relief available under the APA by waiving sovereign immunity only as to suits 'seeking relief other than money damages,'" whereas "[t]he *raison d'etre* of the FTCA . . . is to waive sovereign immunity to suits seeking relief via money damages." *Franklin Sav. Corp. v. United States*, 180 F.3d 1124, 1140 (10th Cir. 1999) (quoting 5 U.S.C. § 702).

Defendants give us no reason to split from these circuits.

\*\*\*

To sum up: § 702 clearly waives the United States' sovereign immunity for Texas's common law claims. The district court legally erred in ruling otherwise.[16]

---

[16] The dissent suggests that even after establishing a § 702 waiver, Texas must show Defendants are substantively liable. Dissent at 18–19, 22–23. Not so. It is true, of course, that a waiver of sovereign immunity does not itself provide a cause of action. *See In re Supreme Beef Processors, Inc.*, 468 F.3d 248, 254 (5th Cir. 2006). But the cases cited by

No. 23-50869

## B. Intergovernmental Immunity

We next address the argument that Texas's claims are barred by intergovernmental immunity. A state law violates intergovernmental immunity when it (1) "regulates the United States directly" or (2) "'discriminates against the Federal Government or those with whom it deals' (*e.g.*, contractors)." *United States v. Washington*, 596 U.S. 832, 838 (2022) (cleaned up) (quoting *North Dakota v. United States*, 495 U.S. 423, 435 (1990) (plurality opinion)). Defendants argue under the first prong only, contending Texas's lawsuit seeks to "directly regulate the federal government's operations."

---

the dissent address whether the plaintiffs had any valid cause of action for their asserted claims. For example, in *FDIC v. Meyer*, the question was whether the plaintiff could sue the federal defendants under *Bivens*. 510 U.S. 471, 483–84 (1994). Similarly, in *U.S. Postal Service v. Flamingo Industries (USA) Ltd.*, the Supreme Court ruled that Congress waived the Postal Service's immunity from suit but nevertheless held that the Postal Service was not subject to substantive liability under the Sherman Act. 540 U.S. 736, 743–44 (2004). Unlike in those cases, there is no issue as to whether the underlying substantive law here—state common law—furnishes Texas with a cause of action. The only question is whether sovereign immunity has been waived against those state law claims.

Finally, then-Judge Kavanaugh's concurrence in *El-Shifa Pharm. Indus. Co. v. United States*, is not to the contrary. 607 F.3d 836, 854 (D.C. Cir. 2010) (en banc) (Kavanaugh, J., concurring in the judgment). There, Judge Kavanaugh noted that "the APA does not borrow state law or permit state law to be used as a basis for seeking injunctive or declaratory relief against the United States." *Id.* But that case dealt with an APA cause of action and monetary damages, not a sovereign immunity waiver under § 702. Moreover, the D.C. Circuit has subsequently held that § 702's waiver *does* extend to state law claims. *Perry Cap.*, 864 F.3d at 620.

No. 23-50869

For several reasons, we disagree.[17] Assuming intergovernmental immunity has not been waived,[18] Texas's lawsuit does not violate it. That is because (1) Texas is acting as a proprietor and not a regulator; and (2) regardless, Texas's lawsuit does not seek to control federal employees but, at most, only incidentally affects their duties.

First of all, Texas is acting as a proprietor, not a regulator.[19] Through its lawsuit, Texas asserts its rights as "an ordinary proprietor" under state tort law, *Fort Leavenworth Ry. v. Lowe*, 114 U.S. 525, 531 (1885), and so is not "acting in a regulatory rather than proprietary mode," *Am. Trucking Ass'ns v. City of L.A.*, 569 U.S. 641, 649–50 (2013).[20] That accords with the district

---

[17] At the outset, we note that Defendants rely heavily on outdated precedent. They cite older cases invalidating state laws because they increased the Federal Government's operating costs. *See, e.g.*, *United States v. County of Fresno*, 429 U.S. 452, 460 (1977). Those cases are no longer the law. *See Washington*, 596 U.S. at 839 (explaining "a state law is . . . no longer unconstitutional just because it indirectly increases costs for the Federal Government, so long as the law imposes those costs in a neutral, nondiscriminatory way").

[18] The doctrine does not apply if "Congress has consented to such regulation through waiver." *Washington*, 596 U.S. at 838–39. As explained, § 702 plainly waives sovereign immunity for the nonmonetary relief Texas seeks here. Moreover, § 702 expressly authorizes an "injunctive decree" against "Federal officers." *Ibid.* In any event, we need not rely on waiver because, as we explain *infra*, Texas's lawsuit does not seek to "regulate" federal officers within the meaning of the doctrine.

[19] This distinguishes our case from *Leslie Miller, Inc. v. Arkansas*, 352 U.S. 187 (1956), on which the dissent relies heavily. *See* Dissent at 27. *Leslie Miller* dealt with a "conflict between [a] license requirement which Arkansas places on a federal contractor and the action which Congress and the Department of Defense have taken to [e]nsure the reliability of persons and companies contracting with the Federal Government." *Id.* at 190. Through its licensing requirement, Arkansas was acting as a regulator, rather than as an "ordinary proprietor." *Fort Leavenworth Ry. v. Lowe*, 114 U.S. 525, 531 (1885).

[20] *See also Shannon v. United States*, 160 F. 870, 875–76 (9th Cir. 1908) (treating federal government's forbidding trespass as proprietary); *Denver v. Mercantile Trust Co. of N.Y.*, 201 F. 790, 802–03 (8th Cir. 1912) (city's trespass action against a company was "proprietary, as distinguished from legislative or governmental, authority"). The dissent tries to distinguish cases like *American Trucking* on the ground that they involved "a state's

No. 23-50869

court's finding at the preliminary injunction hearing that "nobody is trying to regulate federal law enforcement" and "nobody is prohibiting the federal government from enforcing immigration law." In short, Texas is not seeking to "regulate" Defendants merely by suing to prevent trespass and property damage.

That makes this case quite different from typical intergovernmental immunity cases. Those cases deal with states (1) targeting the Federal Government through state laws or regulations,[21] or (2) applying neutral state laws to federal property.[22] This case fits neither category. The first does not apply because Texas is not discriminating against the Federal Government (and Defendants do not claim it is). Rather, Texas seeks to enforce generally applicable state tort laws against trespass and conversion. The second

---

participation in the marketplace" and not "what a state can do as a property owner." Dissent at 29. We disagree. *American Trucking* discussed a state acting as a "market actor" and a "proprietor" in the same breath. *See Am. Trucking*, 569 U.S. at 650 (discussing "the State acting as a State, not as any market actor—or otherwise said, the State acting *in a regulatory rather than proprietary mode*" (emphasis added)).

[21] *See e.g.*, *Washington*, 596 U.S. at 835 (statute that applied only to employees at federal facilities); *Davis v. Michigan Dep't of Treasury*, 489 U.S. 803, 815–17 (1989) (state tax law favoring state employee retirees over federal); *Dawson v. Steager*, 586 U.S. 171, 179–80 (2019) (same); *Boeing v. Movassaghi*, 768 F.3d 832, 839–43 (9th Cir. 2014) (state law directly regulating federal nuclear cleanup efforts); *Geo Grp., Inc. v. Newsom*, 50 F.4th 745, 758–61 (9th Cir. 2022) (en banc) (state law prohibiting operation of private detention facilities); *United States v. City of Arcata*, 629 F.3d 986, 991 (9th Cir. 2010) (ordinance expressly regulating military recruiters); *United States v. Delaware*, 958 F.2d 555, 563 (3d Cir. 1992) (utility rate regulation of Air Force electricity rates).

[22] *See, e.g.*, *South Carolina v. Baker*, 485 U.S. 505, 523 (1988) (state cannot directly tax federal government but can tax its contractors); *Blackburn v. United States*, 100 F.3d 1426, 1435 (9th Cir. 1996) (neutral ordinance not applicable to federal lands in Yosemite National Park); *State of Ariz. v. Bowsher*, 935 F.2d 332, 334 (D.C. Cir. 1991) (state unclaimed property laws impermissibly sought to directly regulate federal property).

category does not apply because Texas has sued to preserve its own property, not to affect federal property.

But let's assume *arguendo* that Texas's suit counts as "regulating" the Federal Government. The intergovernmental immunity argument would still fail. It is well settled that generally applicable state laws can apply to federal agents.[23] As the Supreme Court has explained, "[o]f course an employee of the United States does not secure a general immunity from state law while acting in the course of his employment." *Johnson*, 254 U.S. at 56.

As numerous cases have recognized, the key question is whether state law seeks to improperly "control" the employee's federal duties, or whether the law only "might affect incidentally the mode of carrying out the employment—as, for instance, a statute or ordinance regulating the mode of turning at the corners of streets." *Id.* at 56–57.[24] Texas's suit does not seek

---

[23] *See United States ex rel. Drury v. Lewis*, 200 U.S. 1, 3, 7–8 (1906) (applying state criminal law to United States Army officers); *Johnson v. Maryland*, 254 U.S. 51, 56 (1920) (discussing state tort law's application to a United States postal worker); *Wilkie v. Robbins*, 551 U.S. 537, 560 (2007) (discussing state tort and property law's application to federal Bureau of Land Management officials); *Hall v. Virginia*, 105 S.E. 551, 552 (Va. 1921) (applying state traffic laws to a United States postal worker); *North Carolina v. Ivory*, 906 F.2d 999, 1001–02 (4th Cir. 1990) (same).

[24] *See also North Dakota*, 495 U.S. at 434 (noting the Supreme Court "[o]ver 50 years ago . . . decisively rejected the argument that any state regulation which indirectly regulates the Federal Government's activity is unconstitutional" and "that view has now been 'thoroughly repudiated'" (and collecting cases)); *Jefferson County v. Acker*, 527 U.S. 423, 428 (1999) (rejecting intergovernmental immunity arguments and applying a county tax on professional licenses to federal judges because "[i]n practice, [it] serve[d] a revenue-raising, not a regulatory, purpose" and did not "in any way regulate[] them in the performance of their duties"); *Evansville-Vanderburgh Airport Auth. v. Delta Airlines*, 405 U.S. 707, 720–21 (1972) (holding the "use and service charge" of $1 for each passenger deplaning from a commercial aircraft for maintenance and improvement of airport was not blocked by intergovernmental immunity because it was an incidental burden); *Wilson v. Cook*, 327 U.S. 474, 486–88 (1946) (holding a state tax on lumber-severance from federal land was not barred by intergovernmental immunity because it was an incidental burden);

No. 23-50869

to control how Border Patrol agents carry out their duties. At most, Texas's seeking to preserve its *own* property might incidentally affect how agents do their jobs.

The only federal duty implicated here is found in 8 U.S.C. § 1357(a)(3). That provision allows Border Patrol agents, within 25 miles of the border, to "have access to private lands, but not dwellings, for the purpose of patrolling the border to prevent the illegal entry of aliens into the United States." Texas concedes Border Patrol's right of access under § 1357(a)(3). What it contests, though, is whether Border Patrol is destroying its c-wire for the "purposes" set out in that provision. The district court concluded—after a multi-day hearing featuring live witnesses—that the federal agents were not. Instead, agents were "cutting multiple holes in the concertina wire for no apparent purpose other than to allow migrants easier entrance further inland." Moreover, they were doing so when they already had "access" to both sides of the fence, which is what § 1357(a)(3) requires.

At most, Texas's suit incidentally impacts how Defendants carry out their duties under § 1357(a)(3). Yes, as all concede, Border Patrol agents may access private property in order to prevent illegal entries. Texas's suit would

---

*McHenry County v. Kwame Raoul*, 44 F.4th 581, 592 (7th Cir. 2022) (holding that a state law prohibiting state and local government officials from entering or maintaining cooperative agreements to house aliens only incidentally burdened the Federal Government and did not directly regulate it); *K&D LLC v. Trump Old Post Office LLC*, 951 F.3d 503, 507 (D.C. Cir. 2020) (intergovernmental immunity "is not boundless" and citing *Johnson* and *Acker* to distinguish between "regulatory" laws that impermissibly control the lawful exercise of federal power and permissible "revenue-raising" provisions that do not); *Don't Tear It Down, Inc. v. Pa. Ave. Dev. Corp.*, 642 F.2d 527, 534–36 (D.C. Cir. 1980) ("Insofar as [local] laws substantially impede federal activities or directly place 'a prohibition on the federal government,' the Court has treated them as presumptively invalid under the Supremacy Clause . . . . This is not to say that federal programs or properties are necessarily insulated from incidental or nonburdensome local requirements." (quoting *Hancock v. Train*, 426 U.S. 167, 179 (1976)).

No. 23-50869

only ensure that agents' destruction of fencing is actually in furtherance of § 1357(a)(3). True, that imposes a burden on agents, but it is an incidental one that comes nowhere near the burdens courts have, in the past, found sufficient to trigger intergovernmental immunity.[25] *Cf. Washington*, 596 U.S. at 839 (explaining "a state law is . . . no longer unconstitutional just because it indirectly increases costs for the Federal Government, so long as the law imposes those costs in a neutral, nondiscriminatory way").

Consider a hypothetical. In addition to allowing conditional access to private lands, § 1357(a)(3) flatly forbids agents from accessing "dwellings" to prevent illegal entries. Suppose agents were nonetheless barging into dwellings in violation of the statute. Would intergovernmental immunity prevent a homeowner's trespass suit? Of course not. And that would be true even if the agents argued the suit sought to "control" how they were carrying out their duties. The same is true here. Based on the district court's findings, the destruction of Texas's c-wire fence was not in furtherance of § 1357(a)(3) and so every bit as impermissible as accessing dwellings.[26] Both illegal actions

---

[25] *See, e.g.*, *Hancock*, 426 U.S. at 180 (a state permit "tantamount to prohibiting operation of [] federal installations" impermissibly sought to control the Federal Government); *Augustine v. Dep't of Veteran Affs.*, 429 F.3d 1334, 1339–40 (Fed. Cir. 2005) (gathering cases discussing how state licensing requirements for federal employees and contractors that control who can effectuate federal law impermissibly seek to regulate the Federal Government); *Arcata*, 629 F.3d at 991 (local ordinances that "by their express terms—prohibit military recruiters from recruiting or attempting to recruit individuals under the age of eighteen"); *Movassaghi*, 768 F.3d at 839 (state law empowering local authorities to compel federal agencies to clean up a nuclear waste site); *Blackburn*, 100 F.3d at 1435 (state law seeking to compel the National Park Service to install certain signs and safety ropes as well as operate a national park in a specific way); *cf. Drury*, 200 U.S. at 7–8 (permitting a state criminal law prosecution against federal officers to proceed because they killed a man while potentially acting beyond their authority to enforce federal law); *Ivory*, 906 F.3d 1001–02 (enforcing traffic laws against a federal military driver because he did not demonstrate how anything in his federal duties justified violation of these laws).

[26] For that reason, we disagree with the dissent's suggestion that a private party "could not assert a [trespass] claim against" the federal agents here "because doing so

No. 23-50869

can be enjoined by a state law trespass suit without "controlling" federal agents' patrol of the border.

Defendants also suggest that accepting Texas's argument would create a conflict with the Ninth Circuit's decision in *Geo Grp., Inc. v. Newsom*, 50 F.4th 745 (9th Cir. 2022) (en banc). We again disagree. In *Geo Group*, the Government, alongside a private detention facility, challenged a California law forbidding operation of "a private detention facility within the state." *Id.* at 750 (quoting CAL. PENAL CODE § 9501). But Immigration and Customs Enforcement ("ICE") relies "almost exclusively on privately operated detention facilities" in California to house aliens. *Ibid.* The en banc Ninth Circuit held that California's law violated intergovernmental immunity by requiring ICE "to cease its ongoing immigration detention operations in California and adopt an entirely new approach in the state." *Id.* at 758.

This case presents no such concern. Texas does not seek to prohibit Defendants from cutting a lock or a fence when necessary under § 1357(a)(3). It only claims that, on these facts, Defendants continuously destroyed its property when *not* necessary under federal law. That is a far cry from banning federal officials from performing necessary immigration operations within an entire state. *Geo Group* involved that sort of attempted "control" of federal employees, but this case does not.

Finally, Defendants try to smuggle in preemption. They insinuate that intergovernmental immunity "follows from principles of federal

---

would offend the Supremacy Clause." Dissent at 29 n.15. That begs the question whether the agents were acting in contravention of federal law, which is the question at issue. The Supremacy Clause does not immunize federal agents from state law merely because they work for the United States. *See, e.g.*, *Johnson*, 254 U.S. at 56 ("Of course an employee of the United States does not secure a general immunity from state law while acting in the course of his employment.").

No. 23-50869

preemption." That will not do. Defendants expressly disavowed a preemption argument below—they explicitly told the district court that, in contrast to preemption, "the better doctrine to follow is intergovernmental immunity." And they never raised preemption anywhere else. So, the issue is forfeited. *Yohey v. Collins*, 985 F.2d 222, 225 (5th Cir. 1993).

Regardless, preemption would not help Defendants. Their brief suggests an intractable conflict between federal law and Texas's assertion of property rights. We fail to see any conflict. As noted, the only federal statute in play is § 1357(a)(3), which grants agents "access to private lands" within 25 miles of the border to prevent illegal entries. Defendants cannot possibly maintain this statute inevitably *requires* the destruction of Texas's c-wire. As Texas correctly argues, "nothing in the statute allows federal officials to destroy private property when they have no need to do so."

In sum, intergovernmental immunity does not bar Texas's lawsuit.

## C. INA Jurisdictional Bar

Finally, Defendants contend that § 1252(f)(1) of the INA jurisdictionally bars us from enjoining Border Patrol from engaging in unauthorized destruction of Texas's c-wire. We disagree.[27]

The INA bars inferior courts from enjoining "the operation of" certain immigration statutes, specifically 8 U.S.C. §§ 1221–1232. *See*

---

[27] For its part, Texas argues Defendants "waived reliance on § 1252(f)(1)" by voluntarily submitting to an extension of the district court's original TRO. We disagree. Defendants merely agreed to extend the TRO for 48 hours to allow the court to conduct a second preliminary injunction hearing. But Defendants consistently maintained that § 1252(f)(1) prohibited injunctive relief during those proceedings. *See, e.g., CSX Transp., Inc. v. N.Y. State Office of Real Prop. Servs.*, 306 F.3d 87, 92, 94–98 (2d Cir. 2002) (considering a party's state sovereign immunity argument despite both parties consenting to an extended TRO).

§ 1252(f)(1).[28] Plainly, though, the provision does not encompass an injunction against statutes it does not cross-reference. *See Gonzalez v. ICE*, 975 F.3d 788, 814 (9th Cir. 2020) (holding "§ 1357(d) is not located in Part IV, and thus § 1252(f)(1)'s limitations do not apply"); *O.A. v. Trump*, 404 F. Supp. 3d 109, 158 (D.D.C. 2019) (holding § 1252(f)(1) does not bar an injunction issued against § 1158(b)(1) since it is not a covered provision). And as the Supreme Court suggested in dicta, "a court may enjoin the unlawful operation of a provision *that is not specified in § 1252(f)(1)* even if that injunction has some collateral effect on the operation of a covered provision." *Garland v. Aleman Gonzalez*, 596 U.S. 543, 553 n.4 (2022).

Texas does not seek to enjoin the operation of any of the provisions listed in § 1252(f)(1). It seeks an injunction only against conduct—namely, cutting or other destruction of its c-wire—unauthorized by § 1357(a)(3). Accordingly, because § 1357(a)(3) is not one of the statutes referenced in § 1252(f)(1), the injunction Texas seeks is not barred. Such an injunction would, at most, have only a "collateral effect on the operation" of the covered statutes (specifically, §§ 1225 and 1226). *Aleman Gonzalez*, 596 U.S. at 553 n.4. That is especially the case here, where the district court found

---

[28] Section 1252(f)(1) provides in full:

Regardless of the nature of the action or claim or of the identity of the party or parties bringing the action, no court (other than the Supreme Court) shall have jurisdiction or authority to enjoin or restrain the operation of the provisions of part IV of this subchapter, as amended by the Illegal Immigration Reform and Immigrant Responsibility Act of 1996, other than with respect to the application of such provisions to an individual alien against whom proceedings under such part have been initiated.

The referenced provisions in part IV are 8 U.S.C. §§ 1221–1232, which generally address the admission, legal status, and removal of aliens in the United States.

No. 23-50869

Defendants were cutting c-wire neither to detain aliens nor to respond to emergencies.

Defendants respond that, in essence, *they* are the ultimate judges of whether § 1252(f)(1)'s bar applies. They argue *Aleman Gonzalez* prohibits injunctions of *uncovered* statutes that "in the Government's view" impact its ability to enforce the *covered* sections listed in § 1252(f)(1). That is badly mistaken. Congress legislated which sections are covered by § 1252(f)(1). The Executive Branch does not get to propose additions. *See* U.S. Const. art. I, § 1 (vesting "All legislative Powers" in Congress).

In any event, *Aleman Gonzalez* does not mandate the bizarre result Defendants propose. There, two district courts ordered the Government to provide certified classes of aliens with bond hearings under § 1231(a)(6), a provision squarely within § 1252(f)(1). *Aleman Gonzalez*, 596 U.S. at 546. The Supreme Court reversed, holding § 1252(f)(1) prohibits courts from granting class wide injunctive relief as to § 1231(a)(6). *See id.* at 550 ("[Section] 1252(f)(1) generally prohibits lower courts from entering injunctions that order federal officials to take or to refrain from taking actions to enforce, implement, or otherwise carry out *the specified statutory provisions*." (emphasis added)).

*Aleman Gonzalez*'s references to "the Government's view" were, contrary to Defendants' argument here, not invitations for the Government to add new statutes to the list in § 1252(f)(1). *See id.* at 551. The Court was merely alluding to the fact that the injunctions at issue (requiring bond hearings) were, according to the Government, contrary to the affirmative grant of authority in § 1231(a)(6). *See* 8 U.S.C. § 1231(a)(6) (providing certain aliens ordered removed "may be detained beyond the removal period"). The Supreme Court did not, however, make "the Government" the arbiter of which immigration statutes fall within § 1252(f)(1)'s bar. In

No. 23-50869

*Aleman Gonzalez*, there was no question that the enjoined statute, § 1231(a)(6), fell within the bar. Here, there is no question that the enjoined statute, § 1357(a)(3), does not. *See Gonzalez v. DHS*, 508 F.3d 1227, 1233 (9th Cir. 2007) (holding injunction against unlawful application of § 1255(i) was not barred even though it incidentally impacted reinstatement proceedings under § 1231(a)(5)).

Finally, Defendants argue that an injunction prohibiting Border Patrol from cutting Texas's c-wire would directly interfere with the operation of two of the statutes covered by § 1251(f)(1)—specifically, 8 U.S.C. §§ 1225 and 1226. Those statutes empower agents to inspect and apprehend aliens entering the United States. Defendants argue an injunction against wire-cutting would "directly impede[] agents' ability to inspect migrants under Section 1225, as well as to apprehend and detain them under Section 1226." We disagree.

The district court found as a factual matter that Defendants' duties under §§ 1225 and 1226 would not be thwarted by the injunction. As it found, "Border Patrol agents already possess access to both sides of the fence . . . to the river and bank by boat and to the further-inland side of the fence by road." According to those findings, Defendants did not need to cut the wire in order to carry out their duties to inspect and apprehend aliens. The fact that they cut the wire anyway did not convince the district court that doing so was necessary to enforce those covered sections of the INA. We see no error in that finding.

\*\*\*

No. 23-50869

In sum, § 1251(f)(1) of the INA does not bar the injunction Texas seeks against unauthorized cutting of its c-wire.[29]

## D. *Winter* Factors

Having decided that Texas's state law claims are not barred by sovereign immunity, intergovernmental immunity, or the INA, we proceed to consider whether Texas is entitled to a preliminary injunction on those claims. *See Winter*, 555 U.S. at 20.

### 1. Likelihood of Success on the Merits

In its TRO, the district court concluded Texas had a strong likelihood of success because "[1] the concertina wire is state property; [2] Defendants have exercised dominion over that property absent any kind of exigency; and [3] they have continued to do so even after being put on notice of [Texas's] interest in the property." On appeal, Texas reasserts its likelihood of success for those same reasons. Defendants do not contest the merits of these state law claims, choosing instead to focus solely on immunity. They have thus forfeited any argument that their actions do not amount to violations of state law. *Am. Precision Ammunition, L.L.C. v. City of Min. Wells*, 90 F.4th 820, 827 n.6 (5th Cir. 2024) ("Arguments not raised in district court will not be considered absent extraordinary circumstances." (quoting *Chevron USA, Inc. v. Aker Mar. Inc.*, 689 F.3d 497, 503 (5th Cir. 2012)). We therefore agree with the district court that Texas has demonstrated a likelihood of success on the merits of its state law claims.

---

[29] Because we conclude Texas is entitled to a preliminary injunction on its state law claims, we need not consider whether Texas is also likely to succeed on its APA claims that Defendants' actions were arbitrary and capricious and *ultra vires*. As such, we need not address whether the Policy is subject to judicial review under 5 U.S.C. § 704 or whether there has been "final agency action." *See* Dissent at 2–17. Review under § 704 is only relevant to Texas's federal APA and *ultra vires* claims, not its state law claims.

No. 23-50869

### 2. <u>Irreparable Harm</u>

We next consider whether Texas has shown it would be irreparably injured absent an injunction. Texas contends it will suffer irreparable harm from (1) Defendants' continuous unjustified trespass; (2) an increased risk of harm from the dangers the fence was meant to prevent; and (3) a decrease in public safety from higher levels of criminals and drugs entering Texas. We agree in part.

We review findings on likelihood of irreparable harm for clear error. *See Jiao v. Xu*, 28 F.4th 591, 598 (5th Cir. 2022); *Tribal Sols. Grp., L.L.C. v. Valandra*, 2023 WL 7314308, at *3 (5th Cir. Nov. 6, 2023). Moreover, in reviewing a court's preliminary injunction ruling, we must give "due regard to the trial court's opportunity to judge the witnesses' credibility." *CAE Integrated, L.L.C. v. Moov Techs., Inc.*, 44 F.4th 257, 261 (5th Cir. 2022) (quoting *Harm v. Lake-Harm*, 16 F.4th 450, 455 (5th Cir. 2021).

The court found Texas would suffer irreparable harm "in the form of loss of control and use of its private property" and held that the harm and public interest "calculation" in its TRO "stands." In the TRO, the court explained that Defendants' employees have repeatedly "damag[ed], destroy[ed], and exercis[ed] dominion over state property" and "show[ed] that they intend to prevent [Texas] from 'maintaining operational control over its own property.'" The court noted "at least fourteen incidents of wire cutting" of which "the Court is aware." Moreover, the court discredited the Defendants' justifications for cutting Texas's wire, describing their conduct as "culpable and duplicitous," labeling their arguments as "cynical," and not crediting their "evasive answers and demeanor." Accordingly, the court concluded that "compensation for past injury cannot adequately redress the prospect of [Texas's] continuing or future harm for which the only appropriate remedy would be injunctive relief."

No. 23-50869

We see no clear error here. When a trespass is continuous such that stopping it would require a multiplicity of suits, an injunction is justified because monetary relief is inadequate.[30] *Donovan v. Pa. Co.*, 199 U.S. 279, 304–05 (1905) (During "a continuing trespass," equitable relief is necessary to "avoid[] a multiplicity of suits" and "the inadequacy of a legal remedy . . . is quite apparent."); *Rojas-Adam Corp. of Del. v. Young*, 13 F.2d 988, 989–90 (5th Cir. 1926) (granting an injunction against continuous trespass); *Beathard Joint Venture v. W. Hous. Airport Corp.*, 72 S.W.3d 426, 432 (Tex. App.—Texarkana 2002, no pet.) (applying Texas law). In other words, where a tort claim seeks to stop a "continuing trespass to land," as Texas's does, irreparable injury exists, and injunctive relief is appropriate. *See* Restatement (Second) of Torts § 938 cmt. c (1979).[31]

The record therefore supports the court's factual finding that Texas has demonstrated a likelihood of irreparable harm.

### 3. <u>Balance of Equities and Public Interest</u>

Last, we turn to the balance of equities and public interest. "Where the State is appealing an injunction, its interest and harm merge with the public interest." *Book People, Inc. v. Wong*, 91 F.4th 318, 341 (5th Cir. 2024). Texas contends on appeal that Defendants' improper conduct, the

---

[30] Defendants argue that Texas has not suffered irreparable harm because its claims are for property damage and can be adequately remedied by an FTCA claim or settled by the Government under 19 U.S.C. § 1630. While it is true that harm is generally not irreparable if there is an adequate remedy at law such as money damages, *see Janvey v. Alguire*, 647 F.3d 585, 600 (5th Cir. 2011), this argument ignores the nature of Texas's *continuous* trespass claim.

[31] *See also* 42 Am. Jur. 2d *Injunctions* § 109 (2023) (explaining that "prevention of a multiplicity of suits is universally recognized as a ground for equitable intervention by injunction, and especially is this so in the case of trespasses. . . . even when each act of trespass is trivial or the damage is trifling and despite the fact that no single trespass causes irreparable injury" (footnote omitted)).

prevention of illegal immigration and accompanying crime, and the prevention of unlawful agency action all support granting it an injunction. We again agree in part.

"In reviewing a district court's decision on injunctive relief, we may reverse the district court's factual findings regarding irreparable injury, balancing of the equities, and the public interest only if they are clearly erroneous." *Clark v. Prichard*, 812 F.2d 991, 996 n.9 (5th Cir. 1987); *Google, Inc. v. Hood*, 822 F.3d 212, 220 (5th Cir. 2016) ("We review the district court's determination on each of these [preliminary injunction] elements for clear error . . . ."). A court's findings concerning the balance of equities and public interest are factual and thus "implicate the discretion of that court to craft a remedy and weigh the evidence." *Janvey*, 647 F.3d at 601.

Incorporating its TRO by reference, the court focused its public interest analysis on two grounds: preventing unlawful agency action and deterring illegal immigration. It found both factors weighed in Texas's favor "but just barely." The motions panel declined to rely on the illegal immigration justification and instead relied on a public interest in protecting property rights. We agree that the district court's findings are not clearly erroneous for two reasons.

First, "[t]here is generally no public interest in the perpetuation of unlawful agency action." *Louisiana v. Biden*, 55 F.4th 1017, 1035 (5th Cir. 2022) (quoting *State v. Biden*, 10 F.4th 538, 560 (5th Cir. 2021)). The opposite is true: there is "substantial public interest 'in having governmental agencies abide by the federal laws that govern their existence and operations.'" *Texas v. United States*, 40 F.4th 205, 229 (5th Cir. 2022) (quoting *League of Women Voters of United States v. Newby*, 838 F.3d 1, 12 (D.C. Cir. 2016)). The court found that Defendants exceeded their authority by cutting Texas's c-wire for purposes other than a medical emergency,

inspection, or detention. Because Defendants exceeded their statutory authority under these facts, the court's findings withstand clear error review.

Second, consider the vast swath of private and state land where Defendants can enter without a warrant to enforce immigration law. As Texas has explained, § 1357(a)(3)'s grant of authority covers "tens of thousands of square miles." But the public interest supports clear protections for property rights from government intrusion and control.[32] That interest is protected by ensuring that the actions taken by federal agents to enforce immigration law do not unnecessarily intrude into the rights of countless property owners.

Defendants argue that the equities weigh against an injunction because it would "flout the Supremacy Clause" by preventing them from enforcing immigration law and "diminish[] the Federal Government's control over enforcement," risk human life, and undermine international relations with Mexico. We disagree that a well-crafted injunction under these facts would have such effects.

As already explained, *supra* III.A and III.B, Congress waived sovereign immunity for Texas's state law claims and explicitly gave federal courts authority to enjoin federal officers. There is no risk, then, that an injunction would undermine the Supremacy Clause because federal law itself

---

[32] *See Chi., B. & Q.R. Co. v. City of Chicago*, 166 U.S. 226, 235–36 (1897) ("Due protection of the rights of property has been regarded as a vital principle of republican institutions."); *Pa. Coal Co. v. Mahon*, 260 U.S. 393, 413 (1922) ("This is the case of a single private house. No doubt there is a public interest even in this . . . ."); *Minard Run Oil Co. v. U.S. Forest Serv.*, 670 F.3d 236, 257 (3d Cir. 2011) ("Granting the injunction would vindicate the public's interest in aiding the local economy [and] protecting the property rights of mineral rights owners . . . ." (citation omitted)); *Apple Inc. v. Samsung Elec. Co., Ltd.*, 809 F.3d 633, 647 (Fed. Cir. 2015) ("[T]he public interest nearly always weighs in favor of protecting property rights . . . .").

authorizes the injunction. Moreover, an injunction prohibiting Defendants from cutting Texas's wire in instances where it has access to both sides of the fence and yet unnecessarily cuts the wire would in no way undermine Defendants' ability to enforce immigration law. Rather, as the district court found, an injunction would encourage adherence to "Border Patrol guidance [that] require[s] that agents take steps to work with the owner to gain access" to private land.

As for risks to human life, this factor is neutral. Texas's c-wire conceivably poses a risk to human safety. But so does Defendants' behavior. The court found Defendants facilitated and encouraged aliens to "undertake the dangerous task of crossing the river." It found that "the very emergencies the Defendants assert make it necessary to cut the wire are of their own creation." The unauthorized port of entry "at a particularly dangerous stretch of the river creates a perverse incentive for aliens to attempt to cross at that location, begetting life-threatening crises for aliens and agents both." Moreover, the court found that Texas's "c-wire serves as a deterrent—an effective one at that." So, this prong favors neither party.

Finally, we reject Defendants' contention that Texas's fencing undermines international relations. Mexico's complaints focus principally on Texas's installation of buoys in the Rio Grande and barriers on islands within the floodplain that could divert water into Mexico.[33] The buoy issue was never raised in this litigation, however. Moreover, our en banc court recently vacated a preliminary injunction against the buoys, noting the Government had not shown how the relief it sought—moving the buoys to the American bank—would ease international tensions. *See United States v. Abbott*, 110

---

[33] *See* Gov't of Mex., Information Note No. 04 (July 14, 2023), https://perma.cc/V72L-GTXE; Gov't of Mex., Information Note No. 05 (July 26, 2023), https://perma.cc/F932-U9T9.

F.4th 700, 720–21 (5th Cir. 2024) (en banc). Similarly, Defendants here have not shown how removing Texas's wire would ease international relations when they themselves continue to use c-wire. True, both of Mexico's complaints reference c-wire, but they suggest the main problem is c-wire inside the floodplain. That is not at issue. The c-wire here is on top of the riverbank, not in the floodplain.

More importantly, though, concerns about international relations do not erase property owners' rights over thousands of square miles along the border. "Our precedents, old and new, make clear that concerns of national security and foreign relations do no warrant abdication of the judicial role." *Holder v. Humanitarian L. Project*, 561 U.S. 1, 34 (2010). And foreign policy below the binding level of a treaty or legislation cannot displace state law. *See Medellín v. Texas*, 552 U.S. 491, 529–32 (2008).

In sum, we find no clear error or abuse of discretion in the district court's weighing of the balance of equities and public interest prongs.

## IV. Conclusion

Texas's state law claims for injunctive relief are not barred by sovereign immunity, intergovernmental immunity, or the INA's jurisdictional bar. Accordingly, we REVERSE the district court's judgment and GRANT Texas's request for a preliminary injunction. Based on the district court's supplemental fact findings concerning intervening events in Shelby Park, however, we modify the preliminary injunction as follows.

Defendants are ENJOINED from damaging, destroying, or otherwise interfering with Texas's c-wire fence in the vicinity of Eagle Pass, Texas, as indicated in Texas's complaint, in instances where Defendants have the necessary access to both sides of Texas's c-wire for immigration law enforcement purposes. That necessary access must include the land side of the c-wire fence along the international border within Shelby Park.

Irma Carrillo Ramirez, *Circuit Judge*, dissenting:

Because Texas has not met its burden to show a waiver of sovereign immunity or a likelihood of success on the merits, I respectfully dissent.

I

Texas pleads four claims arising under federal law—three via the Administrative Procedure Act (APA) and one challenging "*ultra vires* non-final agency action." It contends that Defendants have a "policy, pattern, or practice of intermeddling with [Texas]'s concertina wire" along the border, and that this "wire-cutting policy" (the Policy) runs afoul of the APA both substantively and procedurally. Substantively, Texas claims that the Policy is arbitrary and capricious, and it exceeds Defendants' statutory authorization to "control and guard the boundaries and borders of the United States against the illegal entry of aliens." Procedurally, Texas claims that Defendants did not submit the Policy for notice-and-comment as required under the APA.[34]

Texas also pleads two claims arising under state law: common-law trespass-to-chattels and common-law conversion. According to Texas, the concertina wire is its personal property, and Defendants "intentionally and repeatedly intermeddled with, destroyed, or otherwise exercised dominion over [the wire] by seizing and cutting it." Texas claims that these repeated and ongoing acts of trespass and conversion may only be remedied through injunctive relief.

---

[34] Because it did not address its notice-and-comment rulemaking claim, Texas forfeited this argument. *Sec. & Exch. Comm'n v. Hallam*, 42 F.4th 316, 327 (5th Cir. 2022) ("[A]ny issue not raised in an appellant's opening brief is forfeited." (citing *United States v. Bowen*, 818 F.3d 179, 192 n. 8 (5th Cir. 2016))).

No. 23-50869

The district court initially found that sovereign immunity barred Texas's claim for injunctive relief.[35] *Texas v. DHS*, No. 23-CV-55, 2023 WL 8285223, at *6 n.8, *7–11 (W.D. Tex. Nov. 29, 2023). It then assessed the likelihood of success on the merits of Texas's federal claims. *Id.* at *14–17. It found that Texas had not established a "policy, practice, or pattern" of cutting the concertina wire, and that there was insufficient evidence that the alleged "wire-cutting policy" is final agency action as required for Texas to succeed on its three APA claims. *Id.* The district court also found Texas's *ultra vires* claim lacking and denied the motion for preliminary injunction. *Id.* at *17.

## II

The APA dictates how federal courts review agency action. Christopher J. Walker, *The Lost World of the Administrative Procedure Act: A Literature Review*, 28 GEO. MASON L. REV. 733, 734 (2021). Enacted in 1946, it emerged "against a background of rapid expansion of the administrative process as a check upon administrators whose zeal might otherwise have carried them to excesses not contemplated in legislation creating their offices." *United States v. Morton Salt Co.*, 338 U.S. 632, 644 (1950).

The APA requires federal agencies to meet certain procedural requirements in developing and issuing regulations. For example, agencies are required to publish "[g]eneral notice of proposed rule making[s] . . . in the Federal Register." 5 U.S.C. § 553(b). After notice has been given, the agencies must then allow "interested persons an opportunity to participate

---

[35] The district court granted Texas's motion for a temporary restraining order based on its trespass-to-chattels claim, and Texas appears to pursue only this state-law claim on appeal.

in the rule making through submission of written data, views, or arguments with or without opportunity for oral presentation." 5 U.S.C. § 553(c).

Under the APA, there are two types of rules: (a) substantive rules and (b) interpretative rules. A substantive rule is "[a]n agency action that purports to impose legally binding obligations or prohibitions on regulated parties—and that would be the basis for an enforcement action for violations of those obligations or requirements." *Nat'l Mining Ass'n v. McCarthy*, 758 F.3d 243, 251 (D.C. Cir. 2014) (Kavanaugh, J.). Substantive rules have "the 'force and effect of law.'" *Mock v. Garland*, 75 F.4th 563, 578 (5th Cir. 2023) (quoting *Perez v. Mortgage Bankers Ass'n*, 575 U.S. 92, 96 (2015)). An interpretive rule, on the other hand, "merely interprets a prior statute or regulation, and does not itself purport to impose new obligations or prohibitions or requirements on regulated parties." *Nat'l Mining Ass'n*, 758 F.3d at 252.

In contrast to rules, a "statement of policy" "merely explains how the agency will enforce a statute or regulation—in other words, how it will exercise its broad enforcement discretion . . . under some extant statute or rule." *Id.* It "leaves the agency and its decision-makers free to exercise discretion" and does not impose any rights or obligations. *Texas v. United States*, 809 F.3d 134, 171 (5th Cir. 2015).

The APA permits judicial review of agency actions, including substantive rules, in certain instances, 5 U.S.C. §§ 701–06. For example, § 701 permits judicial review except to the extent that a statute precludes judicial review, 5 U.S.C. § 701(a)(1), or when "agency action is committed to agency discretion by law," 5 U.S.C. § 701(a)(2). Section 702 further "authorizes suit by '[a] person suffering legal wrong because of agency action, or adversely affected or aggrieved by agency action within the meaning of a relevant statute.'" *Norton v. S. Utah Wilderness All.*, 542 U.S.

No. 23-50869

55, 61 (2004) (quoting 5 U.S.C. § 702). But under § 704, only "[a]gency action made reviewable by statute and final agency action for which there is no other adequate remedy in a court are subject to judicial review." 5 U.S.C. § 704. A "preliminary, procedural, or intermediate agency action or ruling not directly reviewable is subject to review on the review of the final agency action." *Id.*

## A

Texas contends the Policy is "subject to judicial review" under § 704.[36]

Section 704 determines which agency actions are subject to judicial review. Whether agency action is subject to judicial review is a jurisdictional question. *Fort Bend County v. U.S. Army Corps of Eng'rs*, 59 F.4th 180, 192 (5th Cir. 2023). Under § 704, federal courts may review two "categories" of agency action: (1) agency action "made reviewable by a specific review-

---

[36] Only a "person" may seek judicial review of agency action. 5 U.S.C. § 702. The APA defines a person as "an individual, partnership, corporation, association, or public or private organization other than an agency." *See id.* §§ 551(2), 701(b)(2). A member of the Supreme Court has noted that, it "never explicitly mentions a state or state agency, much less expressly authorizes a state or state entity to sue the federal government in their role as *parens patriae*." *Maryland v. U.S. Dep't of Educ.*, 474 F. Supp. 3d 13, 44 (D.D.C. 2020) (Jackson, K.B., J.), *vacated as moot*, No. 20-5268, 2020 WL 7868112 (D.C. Cir. Dec. 22, 2020); *see Alfred L. Snapp & Son, Inc. v. Puerto Rico ex rel. Barez*, 458 U.S. 592, 610 n.16 (1982) ("A State does not have standing as *parens patriae* to bring an action against the Federal Government."). Several statements plausibly demonstrate that Texas has brought this action in its *parens patriae* capacity. Nevertheless, its claims are analyzed as if asserted as "any other property owner" because the district court found that Defendants had not challenged Texas's authority to sue in this capacity. *DHS*, 2023 WL 8285223, at *5–6.

No. 23-50869

authorizing statute," and (2) final agency action for which no adequate remedy at law exists. 5 U.S.C. § 704.

Because Texas does not identify a statute expressly authorizing review of the Policy, judicial review may be available only under the second option. *See Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 882 (1990). The adequate-remedy prong is not at issue, so Texas must demonstrate that the Policy constitutes final agency action. *See Qureshi v. Holder*, 663 F.3d 778, 781 & n.4 (5th Cir. 2011).

"[A]n action is 'final' if it both (1) 'marks the "consummation" of the agency's decisionmaking process' and (2) is 'one by which "rights or obligations have been determined," or from which "legal consequences will flow." '" *Smith v. Berryhill*, 587 U.S. 471, 481 (2019) (quoting *Bennett v. Spear*, 520 U.S. 154, 177–78 (1997)); *see Driftless Area Land Conservancy v. Rural Utils. Serv.*, 74 F.4th 489, 493 (7th Cir. 2023) ("In other words, § 704 asks whether a 'terminal event' has occurred." (quoting *Salinas v. U.S. R.R. Bd.*, 592 U.S. 188, 195 (2021))). These are the "*Bennett* prongs." *See, e.g.*, *U.S. Army Corps of Eng'rs v. Hawkes Co., Inc.*, 578 U.S. 590, 599 (2016); *Nat'l Pork Producers Council v. EPA*, 635 F.3d 738, 755–56 (5th Cir. 2011).

Both requirements "must be satisfied independently." *Soundboard Ass'n v. FTC*, 888 F.3d 1261, 1271 (D.C. Cir. 2018). They are not unbending, however—courts "take[] a 'pragmatic approach,' viewing the APA finality requirement as 'flexible.' " *Texas v. Becerra*, 89 F.4th 529, 538 (5th Cir. 2024) (quoting *Texas v. EEOC*, 933 F.3d 433, 441 (5th Cir. 2019)). "Absent a showing of finality," this court "lacks jurisdiction to review" agency action. *La. Real Est. Appraisers Bd. v. FTC*, 976 F.3d 597, 601 (5th Cir. 2020).

1

The first *Bennett* prong requires courts "to determine 'whether an action is properly attributable to the agency itself and represents the

culmination of that agency's consideration of an issue,' or is, instead, 'only the ruling of a subordinate official, or tentative.'" *NRDC v. Wheeler*, 955 F.3d 68, 78 (D.C. Cir. 2020) (citation omitted). Agency action that is "tentative or interlocutory" is non-final. *Nat'l Pork*, 635 F.3d at 755. Agency action becomes final once it is no longer "'subject to further agency review,' which occurs when the agency has 'asserted its final position on the factual circumstances underpinning' the agency action." *Louisiana v. U.S. Army Corps of Eng'rs*, 834 F.3d 574, 581 (5th Cir. 2016) (citation omitted) (first quoting *Sackett v. EPA*, 566 U.S. 120, 127 (2012); and then quoting *Alaska Dep't of Env't Conservation v. EPA*, 540 U.S. 461, 483 (2004)).

Texas's challenge appears to be directed at internal "communications between lower- and higher-ranking [Department of Homeland Security] officers regarding wire-cutting in the Del Rio Sector." These emails, according to Texas, constitute the Policy.[37] Texas alleges that the emails at issue are "changeable agency action authorizing line-level officers to tamper with Texas's property," memorializing Defendants' alleged "policy, pattern, or practice of intermeddling with [Texas]'s concertina wire" along the border.

But in fact, these emails discuss federal agents' responsibilities in apprehending, processing, and inspecting noncitizens,[38] as well as the agents' corresponding authority when doing so. They set forth informal field guidance for agents for when they encounter physical objects impeding their ability to apprehend, process, and inspect noncitizens. This guidance appears

---

[37] Texas offers the internal communications as evidence that the Policy exists but acknowledges that it "could better establish the details of the policy if it had access to the relevant documents."

[38] "This opinion uses the term 'noncitizen' as equivalent to the statutory term 'alien.'" *Nasrallah v. Barr*, 590 U.S. 573, 578 n.2 (2020) (citing 8 U.S.C. § 1101(a)(3)).

deliberately open ended, as it provides different advice depending on the circumstances. And even when the guidance runs out, *i.e.*, when a "supervisor is not available" and "anyone is in distress," the communications advise agents to "use their judgment regarding how best to proceed." They never *require* cutting through or lifting fencing or other obstacles.

The emails, i.e., the Policy, are "more like a tentative recommendation than a final and binding determination." *Franklin v. Massachusetts*, 505 U.S. 788, 798 (1992). The Policy does not evidence any "settled agency position." *Barrick Goldstrike Mines Inc. v. Browner*, 215 F.3d 45, 48 (D.C. Cir. 2000). They clearly contemplate further decision-making in light of future circumstances. *See, e.g.*, *Louisiana*, 834 F.3d at 582 (finding agency action "interlocutory" because it "anticipate[d] the necessity of further agency action"). Because the Policy's fact-dependent guidance does not provide "final position[s]" regarding specific "factual circumstances," the Policy does not mark the consummation of Defendants' decision-making process. *See id.* at 581 (quoting *Alaska Dep't of Env't Conservation*, 540 U.S. at 483).

Texas initially attempts to satisfy its burden on the first *Bennett* prong by stating that Defendants "all but conceded" that the Policy marks the consummation of the decision-making process. It provides no citation to the briefs or the record for this alleged concession, however, and Defendants appear to contest this point.

Texas also references its "mangled fencing." The challenge it brings specifically concerns the Policy, not various instances of Defendants cutting the concertina wire. Notably, "identifying specific allegedly improper" agency conduct does not permit Texas to challenge an "entire" pattern or practice, *see Sierra Club v. Peterson*, 228 F.3d 559, 567 (5th Cir. 2000) (en

No. 23-50869

banc), because that conduct is insufficiently "discrete" to be agency action. *See City of New York v. U.S. Dep't of Def.*, 913 F.3d 423, 431 (4th Cir. 2019) (distinguishing "discrete acts" from "programmatic challenges"). Supporting this challenge with instances in which Defendants cut Texas's fencing constitutes "the kind of broad programmatic attack" the Supreme Court has previously rejected. *See Norton v. S. Utah Wilderness All.*, 542 U.S. 55, 64 (2004); *see also Indep. Equip. Dealers Ass'n v. EPA*, 372 F.3d 420, 427 (D.C. Cir. 2004) (Roberts, J.) ("'[A]gency action' undoubtedly has a broad sweep. But . . . the term is not so all-encompassing as to authorize us to exercise 'judicial review over' everything done by an administrative agency." (brackets and citation omitted)); Jerry L. Mashaw et al., Administrative Law: The American Public Law System 1218 (7th ed. 2014) ("Agencies engage in a host of other types of regulatory activities that do not involve their formal law making or enforcement authority."). To the extent Texas believes that a particular instance in which Defendants cut through its fencing constituted unlawful agency action, Texas may file an action seeking review of that specific act—but because the challenge Texas has brought concerns the Policy, instances of wire cutting do not bear on the immediate challenge. *See Lujan*, 497 U.S. at 894 ("Th[is] case-by-case approach . . . is understandably frustrating . . . . But this is the traditional, and remains the normal, mode of operation of the courts.").

2

The second *Bennett* prong requires courts to ascertain if agency action "either determine[s] 'rights or obligations' or produce[s] 'legal consequences.'" *Texas v. Biden*, 10 F.4th 538, 550 (5th Cir. 2021) (per curiam) (quoting *EEOC*, 933 F.3d at 441). Agency action satisfies this prong if, instead of "adversely affect[ing]" the complainant, it "only affects" the complainant's "rights adversely on the contingency of future administrative action." *Rochester Tel. Corp. v. United States*, 307 U.S. 125, 130 (1939); *see*

*Nat'l Pork*, 635 F.3d at 756 ("If the practical effect of the agency action is not a *certain* change in the legal obligations of a party, the action is non-final for the purpose of judicial review." (emphasis added) (brackets omitted) (quoting *Nat'l Ass'n of Home Builders v. Norton*, 415 F.3d 8, 15 (D.C. Cir. 2005))). A determination regarding any such "rights, obligations, or legal consequences must be new," *Texas v. Rettig*, 987 F.3d 518, 529 (5th Cir. 2021)—if agency action "'merely restates' a statutory requirement or 'merely reiterates what has already been established,'" it is nonfinal, *Becerra*, 89 F.4th at 540 (brackets omitted) (quoting *Nat'l Pork*, 635 F.3d at 756).

The Policy provides guidance to federal agents when they encounter physical impediments while apprehending, processing, and inspecting noncitizens. It does not reflect "new" determinations of "rights, obligations, or legal consequences." *See Rettig*, 987 F.3d at 529; *see also Indep. Equip.*, 372 F.3d at 427 (holding that courts lack authority "to review claims where 'an agency merely expresses its view of what the law requires of a party, even if that view is adverse to the party'" (citation omitted)). As well, there is no guarantee that the Policy will adversely affect Texas. *See Nat'l Ass'n of Home Builders v. U.S. Army Corps of Eng'rs*, 417 F.3d 1272, 1278 (D.C. Cir. 2005) (stating that agency action is nonfinal if it does not "ha[ve] a 'direct and immediate effect on the day-to-day business' of the party challenging it" (original alterations omitted) (quoting *FTC v. Standard Oil Co.*, 449 U.S. 232, 239 (1980))). This means the Policy does not compel Texas "either to alter its conduct[] or expose itself to potential liability." *See EEOC*, 933 F.3d at 446. Cumulatively, these considerations demonstrate that the Policy does not "determine 'rights or obligations' or produce 'legal consequences.'" *See Biden*, 10 F.4th at 550 (quoting *EEOC*, 933 F.3d at 441).

Texas advances two reasons for its claim that the Policy determines rights or obligations or produces legal consequences. It first contends the Policy binds Defendants' staff to a legal position that produces legal

consequences. Texas appears to contend that the problem stems from the fact that Defendants' "interpretation of statutory language is binding on their staff." But it provides no evidence to contradict what the Policy seemingly contains: information regarding federal agents' preexisting responsibilities and authority when they encounter physical impediments in the course of apprehending, processing, and inspecting noncitizens. *See Nat'l Pork*, 635 F.3d at 756 (stating that agency action is nonfinal if it restates an existing legal rule). The Policy cannot produce new legal consequences if it recites what is already established. *See Becerra*, 89 F.4th at 540. Moreover, Texas does not specify how the Policy binds Defendants' staff. There is no record evidence demonstrating that the Policy requires cutting any fencing, and Texas does not explain how the Policy requires or prohibits specific acts by Defendants or their staff, *see, e.g., Luminant Generation Co., L.L.C. v. EPA*, 757 F.3d 439, 442 (5th Cir. 2014) (determining that agency action did not meet the second *Bennett* prong because it did "not commit the [agency] to any particular course of action"). It is therefore unclear how the Policy is binding.

Second, Texas contends the Policy satisfies the second *Bennett* prong because "every policy must be implemented." As previously noted, the agency action Texas challenges is the Policy, not various instances of Defendants cutting Texas's fencing. If Texas wishes to challenge specific applications of the Policy, it may do so on a case-by-case basis. *See Lujan*, 497 U.S. at 894. But challenging how Defendants implement the Policy is different from Texas's current challenge to the Policy itself. *Cf. Turtle Island Foods, S.P.C. v. Strain*, 65 F.4th 211, 218–19 (5th Cir. 2023) (distinguishing facial and as-applied constitutional challenges). Additionally, Texas's contention incorrectly assumes that the Policy *will* require Defendants to cut through or lift Texas's fencing. *See Am. Airlines, Inc. v. Herman*, 176 F.3d 283, 288 (5th Cir. 1999) ("[T]he Supreme Court has defined a nonfinal

No. 23-50869

agency order as one that 'does not itself adversely affect complainant but only affects his rights adversely on the contingency of future administrative action.'" (quoting *Rochester Tel.*, 307 U.S. at 130)). This not apparent from the face of the Policy—in fact, the record evidence shows that it may *never* be necessary to cut through fencing. *See, e.g.*, *Lujan*, 497 U.S. at 892–93. And this contention also assumes that Texas will keep its newly installed fencing in place. Taken to its logical conclusion, Texas's assertion would do away with the concept of "final" agency action altogether: if implementation of a policy makes it final and all policies must be implemented, then any policy an agency promulgates will necessarily constitute final agency action.[39] *See, e.g.*, *Cement Kiln Recycling Coal. v. EPA*, 493 F.3d 207, 228 (D.C. Cir. 2007) (determining an agency policy to be nonfinal agency action); *Ctr. for Auto Safety v. NHTSA*, 452 F.3d 798, 807–08 (D.C. Cir. 2006) (same).

\* \* \*

Because Texas has not satisfied its burden to show that the Policy meets either *Bennett* prong, it has not demonstrated that the Policy constitutes final agency action. Absent final agency action, jurisdiction to consider the Policy is lacking and Texas cannot establish a substantial likelihood of success on the merits of its claim.

---

[39] Texas cites *Biden v. Texas* for the proposition that agency action requiring execution by agency personnel satisfies the second *Bennett* prong prior to execution. *See* 597 U.S. 785, 808 (2022). Unlike here, however, the agency actions at issue in *Biden* legally obligated agency personnel to refrain from taking certain actions. *See id.* at 808–09.

B

Texas also contends that judicial review is not precluded under § 701(a)(2) of the APA because the Policy is not "committed to agency discretion by law."

Section 701(a) specifies when judicial review of agency action is precluded. Relevant here, § 701(a)(2) instructs that federal courts may not review agency action "committed to agency discretion by law." Whether agency action is committed to agency discretion is a jurisdictional question. *Mejia-Alvarenga v. Garland*, 95 F.4th 319, 327 (5th Cir. 2024).

To determine whether § 701(a)(2) precludes judicial review, courts look to "the statute on which the claim of agency illegality is based" and "careful[ly] examin[e]" it. *Webster v. Doe*, 486 U.S. 592, 600 (1988). "[I]f the statute is drawn so that a court would have no meaningful standard against which to judge the agency's exercise of discretion," judicial review is unavailable. *Heckler v. Chaney*, 470 U.S. 821, 830 (1985); *Perales v. Casillas*, 903 F.2d 1043, 1047 (5th Cir. 1990) ("Agency action is committed to agency discretion by law . . . if there are no statutory or regulatory provisions creating standards against which the agency action can be measured."). The Supreme Court has generally limited § 701(a)(2)'s reach "to 'certain categories of administrative decisions that courts traditionally have regarded as "committed to agency discretion."' " *Dep't of Com. v. New York*, 588 U.S. 752, 772 (2019) (quoting *Lincoln v. Vigil*, 508 U.S. 182, 191 (1993)). "Section 701(a)(2) is " 'very narrow' and applies only 'in . . . rare instances,'" *Ellison v. Connor*, 153 F.3d 247, 251 (5th Cir. 1998) (quoting *Citizens to Preserve Overton Park, Inc. v. Volpe*, 401 U.S. 402, 410 (1971)), but "rare does not mean never," *Make the Rd. N.Y. v. Wolf*, 962 F.3d 612, 631 (D.C. Cir. 2020). *See Webster*, 486 U.S. at 608 (Scalia, J., dissenting) ("[T]here are

No. 23-50869

many governmental decisions that are not at all subject to judicial review."); *see also, e.g.*, *FDIC v. Bank of Coushatta*, 930 F.2d 1122, 1129 (5th Cir. 1991).

The Supreme Court has made clear that in the immigration context, "courts generally lack meaningful standards for assessing the propriety of enforcement choices." *United States v. Texas*, 599 U.S. 670, 679 (2023); *see, e.g.*, *Arizona v. Biden*, 40 F.4th 375, 394 (6th Cir. 2022) (Sutton, C.J., concurring) ("The Guidance represents the Department's effort at implementing §§ 1226(c)(1) and 1231(a)(1)(A) by prioritizing the use of scarce resources."). That is so primarily because "the immigration statutes afford substantial discretion to the Executive." *Biden*, 597 U.S. at 815 (Kavanaugh, J., concurring). When different administrations "exercise that discretion differently," Article III tribunals have no role to play—"Administrative Law 101" is at work.[40] *Id.*; *see Texas v. United States*, 106 F.3d 661, 667 (5th Cir. 1997) ("Real or perceived inadequate enforcement of immigration laws does not constitute a reviewable abdication of duty."). So long as a meaningful standard does not exist to gauge an agency's exercise of discretion, § 701(a)(2) precludes judicial review.[41]

Texas proffers state tort law as the standard. But precedent is clear that the statute or regulation "on which the claim of agency illegality is based" supplies the applicable standard. *See Webster*, 486 U.S. at 600 (majority

---

[40] The political branches can provide federal courts a role to play by putting forth "statutory or regulatory provisions" that "creat[e] standards against which . . . agency action can be measured." *See Perales*, 903 F.2d at 1047.

[41] The discretion afforded to the executive branch flows directly from legislative enactments. It is within Congress's purview to grant such discretion and define it. *See Lincoln*, 508 U.S. at 193. When Congress commits an action to agency discretion, "the Judiciary has no role to play." *Dep't of Com.*, 588 U.S. at 837 (Alito, J., concurring in part and dissenting in part); *see Dep't of State v. Muñoz*, 144 S. Ct. 1812, 1820 (2024) ("The Judicial Branch has no role to play 'unless expressly authorized by law.'" (citation omitted)).

opinion); *see* 4 Charles H. Koch, Jr. & Richard Murphy, Administrative Law and Practice § 12:12 (3d ed.) ("Where a standard cannot be gleaned from either the statutory scheme or its legislative history, . . . review should be precluded.").

This court may grant Texas the injunctive relief it seeks only if § 701(a)(2) permits judicial review of the complained-of agency action. Because Texas has not identified a viable legal standard by which Defendants' discretion may be evaluated, jurisdiction to review § 701(a)(2)'s judicial-review bar is lacking, and Texas has not demonstrated a substantial likelihood of success.

## C

Texas claims that, if not a final agency action, the Policy is *ultra vires* action. According to Texas, "the agency action irreparably harms [Texas], and [Texas's] injuries are in the zone of interests sought to be protected by the APA."

Texas's complaint, request for injunctive relief, and briefing allege an APA *ultra vires* claim for which final agency action is required. *See Ala.-Coushatta Tribe of Tex. v. United States*, 757 F.3d 484, 489 (5th Cir. 2014). Because Texas has not demonstrated that the Policy constitutes final agency action, any *ultra vires* claim it asserts under the APA fails for the same reasons as its claim under § 704. Some jurisdictions recognize two types of *ultra vires* claims, however: (i) those under the APA, and (ii) those under the common law. *See Fed. Express Corp. v. U.S. Dep't of Com.*, 39 F.4th 756, 763 (D.C. Cir. 2022) (distinguishing "statutory review of an agency action" from common-law *ultra vires* challenges). Based on its contention that *ultra vires*

No. 23-50869

challenges to agency action do not require final agency action, Texas appears to assert a common-law *ultra vires* claim.[42]

"At common law, 'the ultra vires exception to sovereign immunity provides that "where the officer's powers are limited by statute, his actions beyond those limitations are considered individual and not sovereign actions."'" *Apter v. Dep't of Health & Hum. Servs.*, 80 F.4th 579, 587 (5th Cir. 2023) (brackets and ellipsis omitted) (quoting *Danos*, 652 F.3d at 583). It was "the 'main weapon in the arsenal for attacking federal administrative action'" "[l]ong before the APA." *Fed. Express Corp.*, 39 F.4th at 763 (citation omitted).

To succeed on a common-law *ultra vires* claim, "a plaintiff must 'do more than simply allege that the actions of the officer are illegal or unauthorized.'" *Danos*, 652 F.3d at 583 (quoting *Ala. Rural Fire Ins. Co. v. Naylor*, 530 F.2d 1221, 1226 (5th Cir. 1976)). "The complaint must allege facts sufficient to establish that the officer was acting 'without any authority whatever,' or without any 'colorable basis for the exercise of authority.'" *Id.* (quoting *Pennhurst State Sch. & Hosp. v. Halderman*, 465 U.S. 89, 101 n.11 (1984)). If the plaintiff cannot not satisfy this pleading standard, then sovereign immunity bars the suit. In other words, "even at the pleading stage," the plaintiff must present "a strong merits argument." *Apter*, 80 F.4th at 588; *see Griffith v. Fed. Labor Relations Auth.*, 842 F.2d 487, 493

---

[42] The 1976 amendment to the APA sought "to do away with th[is] *ultra vires* doctrine." *Geyen v. Marsh*, 775 F.2d 1303, 1307 (5th Cir. 1985); *but see Fed. Express Corp.*, 39 F.4th at 763 (finding that the doctrine "survived the enactment of the APA"). To the extent Texas reads post-*Geyen* caselaw to permit the application of the common-law *ultra vires* exception, *Geyen* likely precludes such a result. *See Arnold v. U.S. Dep't of Interior*, 213 F.3d 193, 196 n.4 (5th Cir. 2000) ("[U]nder the rule of orderliness, to the extent that a more recent case contradicts an older case, the newer language has no effect."). Nevertheless, previous panels, *see, e.g.*, *Danos v. Jones*, 652 F.3d 577, 582 (5th Cir. 2011), have assumed *arguendo* that the common-law *ultra vires* doctrine is available.

(D.C. Cir. 1988) ("The Supreme Court and others have sought to confine [the *ultra vires* exception] to agency error so extreme that one may view it as jurisdictional or nearly so.").

Common-law *ultra vires* claims address "situations in which an agency has exceeded its delegated powers or 'on its face' violated a statute." *Kirby Corp. v. Peña*, 109 F.3d 258, 269 (5th Cir. 1997). It is not enough that an agency "may have made an error of fact or law," *Physicians Nat'l House Staff Ass'n v. Fanning*, 642 F.2d 492, 496 (D.C. Cir. 1980) (en banc)—*ultra vires* claims are cabined to "'extreme' agency error where the agency has 'stepped so plainly beyond the bounds of its statutory authority, or acted so clearly in defiance of it, as to warrant the immediate intervention of an equity court,'" *Fed. Express Corp.*, 39 F.4th at 764 (brackets omitted) (quoting *Griffith*, 842 F.2d at 493). *See Herman*, 176 F.3d at 293 ("[A]ccess to the courts is accorded only if the agency's interpretation 'is infused with error which is of a *summa* or *magna* quality as contraposed to decisions which are simply *cum* error. Only the egregious error melds the agency's decision into justiciability. Lesser malignancies thwart the jurisdiction of the courts." (original alterations omitted) (quoting *United States v. Feaster*, 410 F.2d 1354, 1368 (5th Cir. 1969))). That is why, "[t]ime and again, courts have stressed that ultra vires review has 'extremely limited scope.'" *Changji Esquel Textile Co. Ltd. v. Raimondo*, 40 F.4th 716, 721–22 (D.C. Cir. 2022) (citation omitted); *see, e.g.*, *Monroe Auto Equip. Co. v. NLRB*, 511 F.2d 611, 614 (5th Cir. 1975) (finding that the *ultra vires* exception "opens the door seldom and then only slightly"); *Nyunt v. Chairman, Broad. Bd. of Governors*, 589 F.3d 445, 449 (D.C. Cir. 2009) (Kavanaugh, J.) ("A [common-law *ultra vires*] claim is essentially a Hail Mary pass— . . . the attempt rarely succeeds.").

Texas contends that "Defendants' destruction of [its] property [cannot] be justified by any authority that federal law grants Defendants," further claiming that "th[is] is enough to show *ultra vires* conduct." But

No. 23-50869

Defendants cite several federal authorities that, at a minimum, arguably authorize their actions. While Texas disagrees with Defendants' interpretation of these authorities, this disagreement demonstrates the difficulty with common-law *ultra vires* claims—a "dispute over statutory interpretation or challenged findings of fact" does not give rise to such claims. *Kirby Corp.*, 109 F.3d at 269 (citation omitted). At most, the authorities Defendants cite are "vague," and therefore "not sufficiently clear and mandatory to warrant non-APA review." *Nat'l Ass'n of Postal Supervisors v. USPS*, 26 F.4th 960, 971–72 (D.C. Cir. 2022); *see, e.g.*, *Paladin Cmty. Mental Health Ctr. v. Sebelius*, 684 F.3d 527, 532–33 (5th Cir. 2012). In short, Texas has not demonstrated that it is substantially likely to succeed on the merits of its common-law *ultra vires* claim because it has not shown that Defendants "transgress[ed] 'clear and mandatory' limits that Congress . . . imposed on [their] authority." *Changji Esquel*, 40 F.4th at 725 (citation omitted).

\*     \*     \*

Texas has not shown that the purported agency action is subject to judicial review under § 704 or based on an APA *ultra vires* claim, or that § 701(a)(2) permits judicial review. Texas has also failed to establish a common-law *ultra vires* claim that can overcome sovereign immunity. Accordingly, because this court has no jurisdiction to consider the purported agency action it challenges, Texas has not demonstrated a substantial likelihood of success on the merits of its claims.

## III

Texas also seeks injunctive relief for its trespass-to-chattels claim, which arises under Texas law. Texas contends § 702's plain text waives Defendants' sovereign immunity for this claim. Defendants respond that

§ 702's waiver extends to those suits seeking nonmonetary relief arising under federal law.

It is a "familiar doctrine" that "the sovereign cannot be sued in [its] own courts without [its] consent." *The Siren*, 74 U.S. (7 Wall.) 152, 153–54 (1868); *see* THE FEDERALIST NO. 81, at 487 (Alexander Hamilton) (Clinton Rossiter ed., 1961) ("It is inherent in the nature of sovereignty not to be amenable to the suit of an individual without its consent." (emphasis omitted)). This doctrine—sovereign immunity—shields the United States, as well as its agencies and the officers of those agencies acting in their official capacities, from suit. *Simons v. Vinson*, 394 F.2d 732, 736 (5th Cir. 1968). "The federal government enjoys complete sovereign immunity except as it has consented to be sued and consented to submit to liability." *Zayler v. Dep't of Agric. (In re Supreme Beef Processors, Inc.)*, 468 F.3d 248, 255 (5th Cir. 2006) (en banc).

Congress may "waive the federal government's immunity" by statute. *Dep't of Agric. Rural Dev. Rural Hous. Serv. v. Kirtz*, 601 U.S. 42, 48 (2024). "[N]o suit may be maintained against the United States unless the suit is brought in exact compliance with the terms of [the] statute under which the sovereign has consented to be sued." *Koehler v. United States*, 153 F.3d 263, 265 (5th Cir. 1998); *see United States v. Mitchell*, 463 U.S. 206, 212 (1983) ("[T]he existence of consent is a prerequisite for jurisdiction."). "[A]cts of Congress waiving sovereign immunity must be strictly construed; exceptions to sovereign immunity are not to be implied." *Stanton v. United States*, 434 F.2d 1273, 1275 (5th Cir. 1970). "Section 702 of the APA waives the United States' sovereign immunity for actions seeking non-monetary relief against federal government agencies." *Cambranis v. Blinken*, 994 F.3d 457, 462 (5th Cir. 2021). Whether § 702 waives sovereign immunity here turns on whether § 702 waives Defendants' immunity from suit, and whether

No. 23-50869

Defendants are subject to Texas law.[43] *See FDIC v. Meyer*, 510 U.S. 471, 484 (1994).

## A

The second sentence of § 702, in relevant part, reads: "An action in a court of the United States seeking relief other than money damages and stating a claim that an agency or an officer or employee thereof acted or failed to act in an official capacity or under color of legal authority . . . shall not be dismissed nor relief therein be denied on the ground that it is against the United States . . . ." Read in isolation, this sentence seemingly indicates that Congress waived the United States' sovereign immunity "in all suits seeking equitable, nonmonetary relief against an agency." *Walmart Inc. v. DOJ*, 21 F.4th 300, 307 (5th Cir. 2021).

This court has held, however, that § 702 waives sovereign immunity only if the challenged government actions are "otherwise subject to judicial review." *Fort Bend County*, 59 F.4th at 189 (quoting *Ala.-Coushatta*, 757 F.3d at 488). In other words, § 702's sovereign-immunity waiver applies only in "cases in which a plaintiff can 'identify some "agency action" affecting him in a specific way' and 'show that he has "suffered legal wrong because of the challenged agency action, or is adversely affected or aggrieved by that action within the meaning of a relevant statute."'" *Harrison County v. U.S. Army*

---

[43] The parties also debate the availability of judicial review given § 702(2), which makes the APA's waiver of sovereign immunity inapplicable if another statute (here, the FTCA) "grants consent to suit expressly or impliedly forbids the relief" sought by Texas. *See Match-E-Be-Nash-She-Wish Band of Pottawatomi Indians v. Patchak*, 567 U.S. 209, 215 (2012). This court has not previously addressed this question, and it is unnecessary to so at this stage. *See Privitera v. Curran (In re Curran)*, 855 F.3d 19, 22 (1st Cir. 2017) ("[C]ourts should not rush to decide unsettled issues when the exigencies of a particular case do not require such definitive measures.").

No. 23-50869

*Corps of Eng'rs*, 63 F.4th 458, 462 (5th Cir. 2023) (quoting *Ala.-Coushatta*, 757 F.3d at 489).[44]

The initial step is therefore to determine whether judicial review is sought under (i) only "the general provisions of the APA," or (ii) "a statutory or non-statutory cause of action that arises completely apart from the general provisions of the APA." *Ala.-Coushatta*, 757 F.3d at 489. If review is sought only under the APA, then final agency action is required to waive sovereign immunity. *Id.* Texas appears to argue that it has been "adversely affected" by "agency action" under 5 U.S.C. § 551(13). It contends its "mangled fence" falls squarely within the definition of "agency action" under the APA because this definition includes "destruction of … property." [45]

---

[44] A circuit split exists as to whether § 702's second sentence is "cabined" by its first sentence. *See Walmart*, 21 F.4th at 307–08. This court answered the question affirmatively. *See id.* at 308 & n.4 (recognizing as much and identifying other concurring circuits); *Doe v. United States*, 853 F.3d 792, 799 & n.20 (5th Cir. 2017) (acknowledging this court's interpretation of § 702's sovereign-immunity waiver differs from *Trudeau v. Federal Trade Commission*, 456 F.3d 178 (D.C. Cir. 2006)); *see also* William Baude, Jack L. Goldsmith, John F. Manning, James E. Pfander & Amanda L. Tyler, Hart and Wechsler's The Federal Courts and the Federal System 114 (7th ed. Supp. 2022) ("[T]he circuits are split over whether the waiver of sovereign immunity is limited to suits under the APA and is constrained by its 'final agency action' requirement. The majority position is no: though codified in the APA, the waiver applies to any suit, whether or not brought under the APA.").

[45] Under the APA, "'agency action' includes the whole or a part of an agency rule, order, license, *sanction*, relief, or the equivalent or denial thereof, or failure to act." 5 U.S.C. § 551(13) (emphasis added). "Sanction" is further defined to include: (a) "prohibition, requirement, limitation, or other condition affecting the freedom of a person"; (b) "withholding of relief"; (c) "imposition of a penalty or fine"; (d) "*destruction, taking, seizure, or withholding of property*"; (e) "assessment of damages, reimbursement, restitution, compensation, costs, charges, or fees"; (f) "requirement, revocation, or suspension of a license"; and (g) "taking other compulsive or restrictive action." *Id.* § 551(10)(D) (emphasis added).

No. 23-50869

Texas clearly seeks judicial review under the APA. But as discussed, it has not identified any final agency action, meaning that sovereign immunity is not waived for the requested APA review. *See Walmart*, 21 F.4th at 308.

If Texas seeks review on non-APA grounds, then the agency need not be final. *Ala.-Coushatta*, 757 F.3d at 489. To the extent Texas seeks judicial review via a common-law *ultra vires* claim, it has not established a claim that can overcome sovereign immunity, so sovereign immunity is not waived under this theory either.

Texas appears to contend that its trespass-to-chattels claim is a non-statutory cause of action. While this court has described non-statutory causes of action as those that "arise[] completely apart from the general provisions of the APA," *Ala.-Coushatta*, 757 F.3d at 480, it has limited this definition to those "causes of action against federal agencies arising under 28 U.S.C. § 1331," *Ala.-Coushatta*, 757 F.3d at 488. This is a position shared by at least three of our sister courts. *See Commonwealth of Puerto Rico v. United States*, 490 F.3d 50, 59 (1st Cir. 2007) ("Non-statutory review is available pursuant to the general 'federal question' jurisdiction of the federal courts under 28 U.S.C. § 1331 . . ."); *Jaffee v. United States*, 592 F.2d 712, 718 (3d Cir. 1979) ("We . . . hold that section 702, when it applies, waives sovereign immunity in 'nonstatutory' review of agency action under section 1331."); *Five Flags Pipe Line Co. v. Dep't of Transp.*, 854 F.2d 1438, 1439 (D.C. Cir. 1988) ("If Congress makes no specific choice [of which court will conduct judicial review] in the statute pursuant to which the agency action is taken, or in another statute applicable to it, . . . then an aggrieved person may get 'nonstatutory review'—a confusing misnomer—in federal district court pursuant to the general 'federal question' jurisdiction of that court."). Because Texas's trespass-to-chattels claim is a state-law claim, it does not implicate § 1331 and is therefore not a non-statutory cause of action.

No. 23-50869

Texas does not identify any other "statutory or non-statutory" causes of action under § 1331, so it has not demonstrated a substantial likelihood of success on its contention that Congress clearly waived Defendants' sovereign immunity. Jurisdiction over the claim is therefore lacking.

## B

Even if Texas satisfied this first requirement, it is necessary to determine whether Defendants are subject to Texas law, as "[a]n absence of immunity does not result in liability if the substantive law in question is not intended to reach the federal entity." *See USPS v. Flamingo Indus. (USA) Ltd.*, 540 U.S. 736, 744 (2004). This question is analytically distinct from whether sovereign immunity has been waived. *See id.* at 743–44 ("[H]aving found that the [agency]'s immunity from suit is waived . . . , the Court of Appeals relied on the same waiver to conclude that the Sherman Act applies to the [agency]. This conflated the two steps and resulted in an erroneous conclusion."). It is also analytically distinct from whether Defendants are liable in this case. Determining whether Defendants are subject to Texas law is made by "look[ing] to the statute" at issue. *Id.* at 744; *see also Green Valley Special Util. Dist. v. City of Schertz*, 969 F.3d 460, 500 n.6 (5th Cir. 2020) (en banc) (Oldham, J., concurring) ("[S]tate law generally cannot direct 'the exercise of the powers of the federal government'—a federal official's 'conduct can only be controlled by the power that created him.'" (original alterations omitted) (quoting *McClung v. Silliman*, 19 U.S. (6 Wheat.) 598, 605 (1821))).

Texas does not identify anything in § 702, or the APA more broadly, that explicitly subjects Defendants to Texas law. *But cf. El-Shifa Pharm. Indus. Co. v. United States*, 607 F.3d 836, 854 (D.C. Cir. 2010) (en banc) (Kavanaugh, J., concurring in the judgment) ("The FTCA and Westfall Act do expressly borrow (or permit) state tort causes of action against the United

States in certain carefully defined circumstances."). Absent authorization, Texas's "state-law cause of action may not be brought against" Defendants because "the APA does not borrow state law or permit state law to be used as a basis for seeking injunctive or declaratory relief against the United States." *Id.*; *see Supreme Beef*, 468 F.3d at 255.

Texas's main argument to the contrary appears to be that "at least two circuits have held that Section 702's broad waiver applies to state-law claims." This contention treats waiver of immunity synonymously with consent to substantive liability, even though the Supreme Court makes clear that those are separate considerations. *See Flamingo Indus.*, 540 U.S. at 743–44. Even still, the cases Texas relies on are distinguishable—both were decided in circuits in which § 702's waiver of sovereign immunity does not require final agency action. *See Perry Cap. LLC v. Mnuchin*, 864 F.3d 591, 620–22 (D.C. Cir. 2017) (holding "that the requirement of final agency action in § 704 is not a condition of the waiver of immunity in § 702, but instead limits the cause of action created by the APA"); *Treasurer of N.J. v. U.S. Dep't of Treasury*, 684 F.3d 382, 400 (3d Cir. 2012) ("Accordingly, section 704 in limiting review to 'final agency action' concerns whether a plaintiff has a cause of action under the APA that can survive a motion to dismiss under Rule 12(b)(6) but does not provide a basis for dismissal on grounds of sovereign immunity."). As discussed, this court requires final agency action before § 702's waiver of sovereign immunity takes effect when there is no specific review-authorizing statute. *See* 5 U.S.C. § 704 ("Agency action made reviewable by statute and final agency action for which there is no other adequate remedy in court are subject to judicial review."). Absent such action, *Perry Capital* and *Treasurer of New Jersey* are inapposite.

Texas also contends that this court should hold that § 702 waives sovereign immunity because Defendants cite no circuit precedent stating that the § 702 waiver applies only to federal claims. This again treats the waiver

of immunity synonymously with consent to substantive liability, but it also improperly shifts the burden of showing an unequivocal waiver of sovereign immunity. Texas carries this burden, not Defendants; Defendants are not required to prove—as Texas appears to suggest—that there has been no waiver of sovereign immunity. *St. Tammany Par., ex rel. Davis v. Fed. Emergency Mgmt. Agency*, 556 F.3d 307, 315 (5th Cir. 2009) ("Plaintiff bears the burden of showing Congress's unequivocal waiver of sovereign immunity."). Instead, as the party suing the federal government and asserting subject-matter jurisdiction, Texas has the burden of pointing to a congressional act that gives it consent to do so. *See Peoples Nat'l Bank v. Office of the Comptroller of the Currency of the U.S.*, 362 F.3d 333, 336 (5th Cir.2004) ("The party claiming federal subject matter jurisdiction has the burden of proving it exists."); *Paterson v. Weinberger*, 644 F.2d 521, 523 (5th Cir.1981) (holding that, when faced with factual attack on federal court's subject matter jurisdiction, plaintiff bears the burden "of proving by a preponderance of the evidence that the trial court does have subject matter jurisdiction"). Texas has not done so here.

Texas's general argument that other circuit courts have held that § 702 applies to state law is likewise unfounded. Several of our sister courts have instead considered claims arising from a federal statute or federal common law or issues totally removed from sovereign immunity. *S. Delta Water Agency v. U.S., Dep't of Interior, Bureau of Reclamation*, 767 F.2d 531, 536 (9th Cir. 1985) (permitting application of state water laws against the Department of the Interior because "the Supreme Court interpreted the [Reclamation Act of 1902], including section 7, as requiring federal defendants to comply with state law in appropriating, purchasing, or condemning water rights." (citing *California v. U. S.*, 438 U.S. 645, 665 (1978))); *Gilmore v. Weatherford*, 694 F.3d 1160, 1164 (10th Cir. 2012) (plaintiff "pled an accounting claim that they contend arises under federal

No. 23-50869

common law"); *Fletcher v. United States*, 160 Fed. Appx. 792, 796–97 (10th Cir. 2005) ("…the plaintiffs sought an order directing the defendants to comply with the requirements of the [Osage Allotment Act of 1906] from the date of the filing of the complaint in this case."); *Herr v. U.S. Forest Serv.*, 803 F.3d 809, 813 (6th Cir. 2015) ("The Herrs' appeal raises two questions: (1) Does the statute of limitations … impose a jurisdictional barrier on the power of the federal courts to hear this case? And (2) did the six-year limitations period run before they filed this lawsuit?"). *See also Hanson v. Wyatt*, 552 F.3d 1148, 1173 n.11 (10th Cir. 2008) (Gorsuch, J., concurring) (explaining that, in the 10th Circuit, § 702's waiver of sovereign immunity does not require final agency action because "we have not treated Section 704 as a limit on that waiver." (internal citations omitted)).

Because Texas has not shown that its law runs against Defendants, Texas has not demonstrated Congress consented to subjecting Defendants to substantive liability here.

\*    \*    \*

Texas has not satisfied its burden to show that (1) § 702 waives Defendants' sovereign immunity on Texas's trespass-to-chattels claim, and (2) the APA does not subject Defendants to Texas law.

IV

In the alternative, Defendants argue that intergovernmental immunity also precludes Texas's state-law claim.

The doctrine of intergovernmental immunity "prohibit[s] state laws that either 'regulate the United States directly or discriminate against the Federal Government or those with whom it deals.'" *United States v. Washington*, 596 U.S. 832, 838 (2022) (original alterations omitted) (quoting

*North Dakota v. United States*, 495 U.S. 423, 435 (1990) (plurality opinion)). It is derived from the Supremacy Clause, *see id.*, and is generally considered a "component of Supremacy Clause jurisprudence," *Arizona v. Bowsher*, 935 F.2d 332, 334 (D.C. Cir. 1991). *See McCulloch v. Maryland*, 17 U.S. (4 Wheat.) 316, 436 (1819) (Marshall, C.J.) ("[T]he states have no power . . . to retard, impede, burden, or in any manner control, the operations of the constitutional laws enacted by congress to carry into execution the powers vested in the general government."). And given that the federal government "can act only through its officers and agents," *Tennessee v. Davis*, 100 U.S. (10 Otto) 257, 263 (1879), federal officers performing "governmental functions" are also immune from "state regulation,"[46] *Penn Dairies v. Milk Control Comm'n of Pa.*, 318 U.S. 261, 269 (1943). *See Trump v. Vance*, 591 U.S. 786, 830–31 (2020) (Alito, J., dissenting) ("[T]wo centuries of case law prohibit the States from taxing, regulating, or otherwise interfering with the lawful work of federal agencies, instrumentalities, and officers." (footnote omitted)).

The first step in the intergovernmental-immunity analysis is determining whether the state law at issue (1) directly regulates the federal government by "controlling" its "operations," *Washington*, 596 U.S. at 838, or (2) discriminates against the federal government by "'singl[ing it] out' for less favorable 'treatment,'" or "regulat[ing it] unfavorably on some basis related to [its] governmental 'status,'" *id.* at 839 (original alterations omitted) (first quoting *Washington v. United States*, 460 U.S. 536, 546 (1983); and then quoting *North Dakota*, 495 U.S. at 438). On its face, Texas tort law

---

[46] When immunizing federal officers, this doctrine is sometimes known as "Supremacy Clause immunity." *See Texas v. Kleinert*, 855 F.3d 305, 313 (5th Cir. 2017). The parties cite cases concerning intergovernmental immunity and Supremacy Clause immunity to support their intergovernmental-immunity arguments—for immediate purposes, these strands of immunity are functionally synonymous.

No. 23-50869

does not discriminate against Defendants—it does not single them out or regulate them based on their governmental status. If intergovernmental immunity applies, it must be because applying Texas tort law directly regulates Defendants by controlling its operations.

In *Leslie Miller, Inc. v. Arkansas*, 352 U.S. 187 (1956) (per curiam), the Supreme Court faced the question of whether a state law directly regulated the federal government. Leslie Miller submitted a bid to construct an air force base in Arkansas, which the United States accepted. *See id.* at 187–88. Arkansas subsequently sought to enforce a state law against Leslie Miller that proscribes contractors from "submitting a bid, executing a contract, and commencing work as a contractor" in Arkansas without first "obtain[ing] a license under Arkansas law." *Id.* at 188. Leslie Miller contested Arkansas's application of state law, which the Supreme Court ultimately decided in Leslie Miller's favor. *See id.* at 189–90. It determined that "[s]ubjecting a federal contractor to the Arkansas contractor license requirements would give [Arkansas]'s licensing board a virtual power of review over the federal determination . . . and would thus frustrate . . . federal policy." *Id.* at 190. The Supreme Court concluded,

> [T]he immunity of the instruments of the United States from state control in the performance of their duties extends to a requirement that they desist from performance until they satisfy a state officer upon examination that they are competent for a necessary part of them and pay a fee for permission to go on. Such a requirement does not merely touch the Government servants remotely by a general rule of conduct; it lays hold of them in their specific attempt to obey orders and requires qualifications in addition to those that the Government has pronounced sufficient.

*Id.* (quoting *Johnson v. Maryland*, 254 U.S. 51, 57 (1920) (Holmes, J.)).

No. 23-50869

Similarly, enforcing Texas tort law against Defendants constitutes an effort to control federal operations. The tort law Texas seeks to apply bears directly on how Defendants execute the laws they are charged with implementing. The relief Texas requests—enjoining Defendants from cutting Texas's fencing—has the direct effect of "restrain[ing] or control[ling]" Defendants' immigration-enforcements efforts. *See Pub. Utils. Comm'n of Cal. v. United States*, 355 U.S. 534, 543 (1958); *see also Nw., Inc. v. Ginsberg*, 572 U.S. 273, 283 (2014) ("What is important . . . is the effect of a state law, regulation, or provision . . . ."). Texas's use of its tort law against Defendants provides Texas with "a virtual power of review" of Defendants' immigration-enforcement operations, which would "frustrate" Defendants' ability to ensure faithful execution of federal law. *See Leslie Miller*, 352 U.S. at 190. Because Texas's application of its tort law "places a prohibition on" Defendants, *see Hancock v. Train*, 426 U.S. 167, 180 (1976), Defendants are shielded by intergovernmental immunity.[47] *See Mayo*, 319 U.S. at 445 ("[T]he activities of the Federal Government are free from regulation by any state. No other adjustment of competing enactments or legal principles is possible." (footnote omitted)).

Texas argues that its lawsuit does not violate intergovernmental immunity because it is acting as a proprietor rather than a regulator. It is true that Texas "possess[es] the rights of a proprietor, and had political dominion and sovereignty over [its territories]." *Fort Leavenworth Ry. v. Lowe*, 114 U.S.

---

[47] Congress may waive intergovernmental immunity for state regulation. *See Hancock*, 426 U.S. at 179 ("[W]here 'Congress does not affirmatively declare its instrumentalities or property subject to regulation,' 'the federal function must be left free' of regulation." (quoting *Mayo v. United States*, 319 U.S. 441, 447 (1943))). Texas does not identify congressional authorization permitting Texas tort law to apply to Defendants. *See El-Shifa*, 607 F.3d at 854 (Kavanaugh, J., concurring in the judgment) ("State tort law doesn't run against the United States . . . .").

525, 527 (1885). But these rights, as discussed above, do not entitle Texas to "a virtual power of review" of Defendants' immigration-enforcement operations. *See Leslie Miller*, 352 U.S. at 190. And the cases cited to distinguish a state acting as a proprietor rather than a regulator discuss a state's participation in the marketplace; they do not consider what a state can do as a property owner. *See Am. Trucking Associations, Inc. v. City of Los Angeles, Cal.*, 569 U.S. 641, 651 (2013) ("The Port here has not acted as a private party, contracting in a way that the owner of an ordinary commercial enterprise could mimic. Rather, it has forced terminal operators—and through them, trucking companies—to alter their conduct by implementing a criminal prohibition punishable by time in prison."); *Dep't of Revenue of Ky. v. Davis*, 553 U.S. 328, 345 (2008) ("The failure to appreciate that regulation by taxation here goes hand in hand with market participation by selling bonds allows the Davises to advocate the error of focusing exclusively on the Commonwealth as regulator and ignoring the Commonwealth as bondseller, . . . just as the state court did in saying that '"when a state chooses to tax its citizens, it is acting as a market regulator[,]' not as a market participant."'" (internal citations omitted)). Here, these cases are not implicated because the nature of Texas's participation in the market is not at issue.[48] Texas has not shown that intergovernmental immunity is inapplicable.

_____

[48] Texas also appears to further argue that it is acting as a proprietor because its trespass claim could be asserted by a private party. But Texas has not acted "in a way that [a private citizen] could mimic." *Am. Trucking Associations, Inc.*, 569 U.S. at 651. Indeed, a private party could not assert a similar claim against the specific defendants in this case without an explicit waiver of sovereign immunity because doing so would offend the Supremacy Clause. *See, e.g., Joiner v. United States*, 955 F.3d 399, 407 (5th Cir. 2020) ("But a waiver of sovereign immunity 'cannot be implied but must be unequivocally expressed.'" (quoting *United States v. King*, 395 U.S. 1, 4 (1969))).

No. 23-50869

V

The parties also dispute whether 8 U.S.C. § 1252(f)(1) limits the authority of the lower courts to issue the injunction Texas seeks.[49]

In relevant part, the statute reads: "Regardless of the nature of the action or claim or of the identity of the party or parties bringing the action, no court (other than the Supreme Court) shall have jurisdiction or authority to enjoin or restrain the operation of [the provisions in the Immigration and Nationality Act governing the inspection, apprehension, examination, and removal of noncitizens] . . . ." *Id.* § 1252(f)(1). "Section 1252(f)(1) deprives courts of the power to issue a specific category of remedies: those that 'enjoin or restrain the operation of' the relevant sections of the statute." *Biden*, 597 U.S. at 798; *see Reno v. Am.-Arab Anti-Discrimination Comm.*, 525 U.S. 471, 481 (1999) ("By its plain terms, and even by its title, [§ 1252(f)(1)] is nothing more or less than a limit on injunctive relief."). Texas advances three arguments for why § 1252(f)(1) is inapplicable: (1) the injunctive relief sought would not enjoin a statutory provision to which § 1252(f)(1) applies; (2) the effect an injunction might have on any such provision is "collateral"; and (3)

---

[49] Texas contends Defendants waived this argument. The Supreme Court has yet to address whether § 1252(f)(1)'s limitation is subject to forfeiture," *Biden*, 597 U.S. at 801 n.4, but Texas instead urges waiver, not forfeiture. Nevertheless, Defendants did not waive their § 1252(f)(1) argument because it was raised before the district court in a manner "sufficient to permit the district court to rule on it." *Lifemark Hosps., Inc. v. Liljeberg Enters., Inc. (In re Liljeberg Enters., Inc.)*, 304 F.3d 410, 427 n.29 (5th Cir. 2002). Even if Defendants had raised this argument for the first time on appeal, this court has previously assumed without deciding that the argument was not waived and examined the issue. *See Texas v. United States*, 50 F.4th 498, 528–29 (5th Cir. 2022).

No. 23-50869

Defendants cannot evade an injunction while inappropriately enforcing immigration laws.

Contrary to Texas's contention, the injunctive relief it seeks would operate against at least two provisions covered by § 1252(f)(1)—§§ 1225 and 1226—which pertain to inspecting and apprehending noncitizens. Because the injunction sought would "enjoin Defendants from seizing and destroying [Texas]'s concertina wire fencing and maintaining breaches in said fencing," the "operation" of §§ 1225 and 1226 would be "enjoin[ed] or restrain[ed]," which violates § 1252(f)(1). Texas points to two statutes it claims Defendants actually relied on, *see id.* §§ 1103(a)(3), 1357(a)(3), but those provisions provide further authority and guidance in carrying out provisions like §§ 1225 and 1226.

Texas also contends that the effect an injunction may have on the operation of §§ 1225 and 1226 would be collateral, making the injunction permissible under § 1252(f)(1). *See Garland v. Aleman Gonzalez*, 596 U.S. 543, 553 n.4 (2022) (referencing the "proposition that a court may enjoin the unlawful operation of a provision that is not specified in § 1252(f)(1) even if that injunction has some collateral effect on the operation of a covered provision" (emphasis omitted)). This principle is inapplicable here—the injunctive relief Texas seeks would prevent Defendants from cutting Texas's wire fencing. When they do so, Defendants are, in their view, "discharging their responsibilities" under §§ 1225 and 1226. And unlike an instance in which an injunction is permitted even though it affects a statutory provision § 1252(f)(1) covers, the effect of the requested injunction on the inspection and apprehension of noncitizens would not be a "step removed" from the relief Texas seeks. *See Gonzales v. DHS*, 508 F.3d 1227, 1233 (9th Cir. 2007); *see also id.* ("Section 1252(f)(1) does not prohibit the current injunction because . . . it directly implicates the adjustment of status provision which falls under part V of subchapter II, notwithstanding that a reinstatement

31

proceeding may be a collateral consequence of an unsuccessful adjustment application."); *Texas*, 50 F.4th at 529 (finding § 1252(f)(1) inapplicable because the injunction, though "vacat[ing] the DACA Memorandum," did not require "the removal of any DACA applicant").

Additionally, Texas argues that Defendants are enforcing the Immigration and Nationality Act (INA) in violation of the statutory scheme. The INA governs all aspects of immigration into the United States, including the process of inspecting, apprehending, examining, and removing noncitizens. *See* 8 U.S.C. §§ 1221–1231.

The Supreme Court has found that Texas's "interpretation, which makes the reach of § 1252(f)(1) depend on the nature of the claim in question, clashes with § 1252(f)(1)'s prefatory clause, which states that [§ 1252(f)(1)] applies 'regardless of the nature of the action or claim.'" *Aleman Gonzales*, 596 U.S. at 553 (quoting *Nielsen v. Preap*, 586 U.S. 392, 425 (2019) (Thomas, J., concurring in part and concurring in the judgment)). Section 1252(f)(1) prohibits lower courts from issuing injunctive relief even if the statute at issue is "unlawfully or improperly operated." *Id.* at 552–53; *see Arizona*, 40 F.4th at 394 (Sutton, C.J., concurring) ("[Section] 1252(f)(1) has the same force even when the National Government allegedly enforces the relevant statutes unlawfully. Else, it would not be much of a prohibition."); *see also, e.g.*, *Make the Rd. N.Y.*, 962 F.3d at 644–45 (Rao, J., dissenting) ("Even if the court found the Expansion Designation to be unlawful, it is precluded from providing any injunctive relief."). What matters is *Defendants'* interpretation. *See, e.g.*, *Aleman Gonzales*, 596 U.S. at 551 ("Those orders 'enjoin or restrain the operation' of § 1231(a)(6) because they require officials . . . to refrain from actions that . . . *in the Government's view*[] are allowed by § 1231(a)(6). Those injunctions thus interfere with the Government's efforts to operate § 1231(a)(6) . . . ." (emphasis added)). Even if Texas's interpretation of the INA

No. 23-50869

is correct, § 1252(f)(1) prevents this court and the district court from issuing the requested injunctive relief.

Because Texas has not met its burden to demonstrate § 1252(f)(1)'s inapplicability, the injunctive relief Texas seeks is "a forbidden one in this case." *United States*, 599 U.S. at 690 (Gorsuch, J., concurring in the judgment).[50]

## VI

For these reasons, I respectfully dissent from reversing the district court's denial of a preliminary injunction.

---

[50] Because a substantial likelihood of success on the merits has not been shown, it is unnecessary to address the other injunctive-relief elements. *See Barr v. SEC*, 114 F.4th 441, 452 n.6 (5th Cir. Aug. 30, 2024) ("If it is not necessary to decide more, it is necessary not to decide more." (brackets and ellipsis omitted) (quoting *PDK Labs. Inc. v. DEA*, 362 F.3d 786, 799 (D.C. Cir. 2004) (Roberts, J., concurring in part and concurring in the judgment))).